# EXHIBIT G
# FILED
# UNDER
# SEAL

**Exhibit G, Page 61**

Dockets.Justia.com



Join Email List          Take a Tour          Features          FAQs

# RealDVD. The best way to experience DVDs.

Watch your collection anywhere without discs.

**Join Our RealDVD Email List**

## Save your favorite DVDs to your PC
Go anywhere with RealDVD.

- Take your DVDs with you and leave your discs behind
- Save and play movies at the same time - with a single click
- Browse by title, genres, and actor
- Find and play movies and TV shows instantly
- Protect your discs from scratches and damage
- Save your movies legally, and with confidence

See what you can do with RealDVD

Learn More | System Requirements

Take a Tour

Real.com

My Account | Customer Support | Site Map | Privacy Policy | Terms of Use

RealDVD is only available in the U.S.
© 2008 RealNetworks Home Entertainment, Inc. Patents pending. All rights reserved.
RealDVD and the RealDVD logo are trademarks or registered trademarks of RealNetworks, Inc.

**Exhibit H, Page 62**



Join Email List          Take a Tour          FAQs

# RealDVD Features

Your favorite movies, TV shows, scenes and actors are all just a click away. No more searching through boxes, scratching, damaging and losing your discs. Your entire collection is safe, manageable and viewable anywhere and anytime you want. And it's completely legal.

## Watch your DVDs anywhere — without the discs


**Go anywhere**
Play any of your DVDs straight from your authorized laptop or portable hard drive.


**Watch everything**
Save your entire DVD collection to your PC or portable hard drive, then play them back without the discs.


**Easy to use**
Watch and save your DVDs simultaneously. Plus you can stop at any time and resume saving where you left off.


**Find your movies — fast**
Browse by cover art, genre, title, rating, and actor. Then simply click and play.


**Never lose your place**
RealDVD remembers where you are, so you can stop, shut down and come back later without losing your spot in the movie.


**Skip ahead, jump back and slide**
Your favorite scene. The best lines. Great action sequences. Skip, jump or "slide" to any part of the movie you want, even between chapters.


**Start watching immediately**
RealDVD's intuitive design and quick menus let you save and play movies, skip previews, show subtitles, and access most other features in a click or two.


**Let your kids play**
Parental Controls allow you to control the types of movies children can access.


**Become a film buff**
Dig deeper into your movies with detailed plot synopses and cast lists. Plus get more info and photos via links to Film.com.


**Protect your discs**
Using RealDVD keeps your discs safe — no more scratches, skips, blips, or lost titles.


**Save Battery Power**
RealDVD saves up to 12% of your battery power versus watching a movie that's spinning in your laptop.


**Totally legit**
RealDVD is 100% legal, so you can save movies with confidence.

System Requirements

Real.com

My Account  |  Customer Support  |  Site Map  |  Privacy Policy  |  Terms of Use

RealDVD is only available in the U.S.
© 2008 RealNetworks Home Entertainment, Inc. Patents pending. All rights reserved.
RealDVD and the RealDVD logo are trademarks or registered trademarks of RealNetworks, Inc.

**Exhibit I, Page 63**

Case3:08-cv-04548-MHP   Document8-3   Filed10/03/08   Page4 of 88



# The Seattle Times

Monday, September 8, 2008 - Page updated at 02:01 PM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

## RealNetworks releasing DVD copying software

**By RACHEL METZ**
*AP Technology Writer*

RealNetworks Inc. plans to begin selling software that lets people copy DVDs to their PCs, which might be convenient for on-the-go movie buffs but could incite some wrath in Hollywood.

Unlike various software programs that can be used for illicit disc copying, the new RealDVD software will copy DVDs to computers or portable hard drives without taking off or altering the "content scrambling system," or CSS, encryption that is included on commercial DVDs.

The software will create a full copy of a DVD in about 10 to 40 minutes, RealNetworks said, and copies saved on portable hard drives will be playable on up to five computers per user. RealNetworks Chief Executive Rob Glaser thinks the product will have wide appeal, from business travelers to families wanting backup discs in case of scratches.

Initially, the software was to be rolled out Monday, but Glaser said the company decided to work on it longer. Instead, RealDVD will be available by the end of the month for $30, he said. Consumers who want to use the product on other computers can buy up to four additional software licenses for $20 each.

Glaser said RealNetworks licensed the encryption software for the product from the DVD Copy Control Association, which also licenses to the manufacturers of DVD players. Greg Larsen, a spokesman for the association, had no comment.

But despite the inclusion of encryption, the product may be viewed negatively by movie studios, which have traditionally been strict on content protection issues like their counterparts in the music industry.

Charles Van Horn, president of the Content Delivery and Storage Association, a trade group that represents some entertainment companies, expects some kind of industry response. He noted that consumers could still use the software to copy things that they don't really own.

"I don't see how they're going to stop the consumer from making a copy of something they borrowed for free from a friend or a library, or rented from Netflix or Blockbuster or anywhere else," he said.

Glaser concedes that is possible, but said that RealDVD does remind users when they save content that they should save only DVDs that belong to them.

"If you want to steal, we remind you what the rules are and we discourage you from doing it, but we're not your nanny," he said.

Analysts said maintaining the CSS encryption may be enough to keep studios happy. But Piper Jaffray analyst Michael J. Olson said RealNetworks still "crossed a line" that nobody has successfully crossed in legally copying DVDs.

"It wouldn't surprise me if some of the studios have something more to say about this, or something to discuss with Real about this," Olson said.

Glaser said RealNetworks is confident that its product is on the right side of the law because of a 2007 victory by media streaming company Kaleidescape Inc. in a lawsuit against the DVD association. The association has appealed. Glaser also said RealNetworks has had "constructive" talks with entertainment studios about its product.

**Exhibit J, Page 64**

Case3:08-cv-04548-MHP    Document8-3    Filed10/03/08    Page5 of 88

Shares of RealNetworks gained 12 cents, or 1.9 percent, to $6.31 Monday.

Copyright © 2008 The Seattle Times Company

Case3:08-cv-04548-MHP   Document8-3   Filed10/03/08   Page6 of 88

## The Real Story

http://realnetworksblog.com

Exhibit K, Page 66

## Back to Main Page

### Quicksearch

Search only in titles:

Advanced Search

**Search**

### September 2008

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |    |    |    |    |

### Syndicate

Entries Atom 1.0
Comments Atom 1.0
Entries RSS 2.0
Comments RSS 2.0
Podcasts RSS 2.0

### Monthly Archives

September 2008 (9)
August 2008 (7)
July 2008 (9)
June 2008 (2)

### Category Archives

Baltimore (1)
Blogging (1)
Casual Connect (1)
Casual Games (4)
Community (1)
Company Picnic (1)
Customer Relations (1)
Deals (2)
DJs (1)
DRM-free (1)
Exclusive content (1)
Games (2)
Getting started (1)
Green (1)
Launch (1)
Listening (1)
Live Shows (1)
Mp3 (3)
MP3s (1)
Music (13)
Online Video (1)
Partnerships (1)
party (1)
Real Games (1)
RealArcade (1)
RealGames (1)
RealNetworks (2)
RealPlayer (2)
rhapsody (10)
Rhapsody Exclusives (1)
social networking (1)
Video (3)
Wii (1)

### Recent Entries

Beating The Economic Blues
Monday, September 29, 2008

My Cabbie Made My Day
Monday, September 22, 2008

The Web Officially Rocks
Wednesday, September 17, 2008

## Announcing RealDVD

Posted by Lacy Kemp at 9/7/2008 7:50 PM and is filed under Video





Today is a big day for RealNetworks. Today is a big day for any PC-using, laptop-toting, DVD mess-owning, movie-loving person. Why? Because today Real announced a sweet new product that just may make your next plane ride less crappy.

Today we announced RealDVD. It's simple: now you will have the ability download almost ANY DVD to your PC. Movies, TV Shows, snowboard videos, things I don't even want to know about- it can all be saved to your PC, for as long as you want. RealDVD is game changing because it takes the video files, extras and artwork from the DVD and saves it to your hard drive so you can play them back later without the disc. No extras, no weird message centers. You download the software, and your movie collection begins on your PC (a Mac version is in the pipeline).

What about movies from say, Netflix or Blockbuster? Call us crazy, but we are putting YOU on the honor system. If you do not own the movie, we do not want you to copy it. We're trusting our users to respect the movie studios and not abuse this technology.

Of course people are going to ask how is this legal? Simply, we don't break any encryption on the DVD and are a licensed member of the DVD-CCA. It's that simple, and that means it gives you the unhindered ability to do what has been done illegally for awhile.

There are so many reasons why this is so rad. First, and most obvious (to me) is that it's legal. Sure, there are tons of utilities and shareware available to do this, but you're likely to need a computer engineering degree to make it work, and they most certainly break the CSS encryption (that's a BIG no-no).  When you're traveling, you won't be wasting your laptop's paltry battery life spinning a DVD. That means that you can keep yourself or your kids entertained way longer than before. The PC can become for movies what the iPod became for music-your collection.

We are stoked about the product and its future. We hope you are too. RealDVD will be available for consumers by the end of September for an initial price of $30.00.

If you have questions about the product, feel free to ask in the comment section.

my del.icio.us    My Stumbles    Technorati This!    Digg This

### Trackbacks

Trackback specific URL for this entry

No trackbacks exist for this entry.

### Comments

No comments exist for this entry.

### Leave a comment

Submitted comments will be subject to moderation before being displayed.

**Exhibit K, Page 67**

Case3:08-cv-04548-MHP    Document8-3    Filed10/03/08    Page8 of 88

90274

Enter the above security code (required)

Name (required)

Email (will not be published) (required)

Website

Your comment is 0 characters limited to 3000 characters.

☐ Subscribe to this entry
☐ Subscribe to this blog
☐ Remember me

[Submit Comment]  [Cancel]  [Check Spelling]

Copyright The Real Story 2008, all rights reserved.

**Exhibit K, Page 68**

813

1          TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                    SIXTH APPELLATE DISTRICT

3                         ---oOo---

4

5      DVD COPY CONTROL ASSOCIATION, INC.,)
       A DELEWARE CORPORATION,            )
6                              PLAINTIFF,)
                                          ) SUPERIOR COURT
7      -VS-                               ) NO. 1-04 CV031829
       KALEIDESCAPE, INC., A DELEWARE     )
8      CORPORATION,                       )
                               DEFENDANT.)
9      _____)

10

11

12               REPORTER'S TRANSCRIPT ON APPEAL

13          FROM THE JUDGMENT OF THE SUPERIOR COURT

14                 OF THE STATE OF CALIFORNIA

15            IN AND FOR THE COUNTY OF SANTA CLARA

16         BEFORE THE HONORABLE LESLIE C. NICHOLS, JUDGE

17                      MARCH 29, 2007

18                        VOLUME 8

19                    PAGES 813 - 892

20

21     APPEARANCES:

22     FOR PLAINTIFF-APPELLANT: AKIN, GUMP, STRAUSS, HAUER &
                                FELD, LLP
23                              2029 CENTURY PARK EAST
                                SUITE 2400
24                              LOS ANGELES, CALIFORNIA 90067

25

       FOR DEFENDANT-RESPONDENT: THE MOORE LAW GROUP
26                               THOMAS E. MOORE, III
                                 228 HAMILTON AVENUE,
27                               THIRD FLOOR
                                 PALO ALTO, CALIFORNIA 94301
28

**Exhibit L, Page 69**

| | |
|---|---|
| 1 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | IN AND FOR THE COUNTY OF SANTA CLARA |
| 3 | BEFORE THE HONORABLE LESLIE C. NICHOLS, JUDGE |
| 4 | DEPARTMENT NO. 21 |
| 5 | ---oOo--- |
| 6 | |

```
 7   DVD COPY CONTROL ASSOCIATION, INC.,)
     A DELAWARE CORPORATION,            )
 8                        PLAINTIFF,)
                                        )
 9   VS                                 )NO.1-04-CV031829
     KALEIDESCAPE, INC., A DELAWARE     )
10   CORPORATION,                       )
                             DEFENDANT.)
11   _____     )
     AND RELATED CROSS-ACTION           )
12
```

```
15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                HELD ON MARCH 29, 2007

17              VOLUME 8, PAGES 813-892


19   APPEARANCES:


21   FOR THE PLAINTIFF:
             BY: WILLIAM COATS, ATTORNEY AT LAW
             BY: HEIDI L. KEEFE,ATTORNEY AT LAW
22           BY: MARK WEINSTEIN, ATTORNEY AT LAW
             BY: MARK LAMBERT, ATTORNEY AT LAW
23           BY: SAM O'ROURKE, ATTORNEY AT LAW

24   FOR THE DEFENDANT:
             BY: THOMAS E. MOORE, III, ATTORNEY AT LAW
25           BY: RICHARD R. WIEBE, ATTORNEY AT LAW
             BY: NICOLE V. ECONOMOU, ATTORNEY AT LAW

26   COURT REPORTER:  MICHELLE V. LARIOS
27             C.S.R. NO. 9244, C.R.P. NO. 043

28
```

1    SAN JOSE, CALIFORNIA      MARCH 29, 2007

2

3                  PROCEEDINGS:

4         (WHEREUPON, COURT CONVENED AND THE

5    FOLLOWING PROCEEDING WERE HAD:)

6         THE COURT:  GOOD MORNING.  WE'RE ALL

7    TOGETHER ON THE MATTER OF DVD COPY CONTROL

8    ASSOCIATION VERSUS KALEIDESCAPE, INC.  I THINK I

9    MENTIONED INFORMALLY JUST A SHORT TIME AGO THAT I

10   WOULD LIKE TO GET YOUR AGREEMENT ON THIS.  WHAT I

11   THOUGHT I WOULD DO IS DEAL WITH THE NONSUIT MOTION

12   FIRST AND THEN TAKE A LITTLE RECESS AND GET SET UP

13   WITH MY MATERIALS FOR ANNOUNCING THE DECISION ON THE

14   PLAINTIFF'S CASE.

15        IS THAT AGREEABLE?

16        MR. COATES:  YES, YOUR HONOR.

17        MR. MOORE:  THAT'S FINE, YOUR HONOR.

18        THE COURT:  FIRST I WANT TO COME DOWN FROM

19   THE BENCH AND THANK YOU ALL FOR A JOB VERY WELL

20   DONE.

21        IT'S A NECESSITY TO WORK WITH PEOPLE WHO

22   ARE NOT AN A TEAM.  WE ALL DO THAT.  BUT EVERY PARTY

23   HAS OBVIOUSLY BROUGHT THE A TEAM TO THE CONTEST, AND

24   I APPRECIATE THAT BECAUSE IT MAKES -- HELPS DIRECT

25   THE COURT AWAY FROM ERROR AND IN THE DIRECTION OF A

26   SUSTAINABLE DECISION, WHICH IS NOT, OF COURSE, BY

27   DEFINITION SATISFACTORY TO EACH PARTY.

28        BUT I THINK IT'S UNDERAPPRECIATED IN THE

1   COMMUNITY, THE VERY IMPORTANT ROLE OF ADVOCATES IN A

2   FREE SOCIETY.  EVERYBODY COMPLAINS ABOUT IT UNTIL

3   THEY NEED THEM, AND THEN THEY CAN'T LIVE WITHOUT

4   THEM.  AND I LIVED IN THAT ENVIRONMENT FOR MANY

5   YEARS, PEOPLE ASKING ME, HOW COULD YOU REPRESENT

6   SOMEONE WHEN YOU KNOW THEY'RE GUILTY?  YOU KNOW,

7   THOSE KINDS OF QUESTIONS.  AND THEN, OF COURSE, SOME

8   GREAT CELEBRITY OR MEMBER OF CONGRESS IS ARRESTED,

9   AND, OF COURSE, THEY'RE CLOAKED WITH ALL THE

10  ASSUMPTIONS OF A FREE SOCIETY THAT THEY

11  APPROPRIATELY SHOULD BE CLOAKED WITH.

12          I'M GOING TO FIRST TALK BRIEFLY ABOUT THE

13  NONSUIT, AND I CAN TAKE A SHORT TIME ON THAT, I

14  THINK.  BUT I WANT TO BE REAL CLEAR BECAUSE THE

15  RULES CONCERNING A NONSUIT MOTION ARE PRETTY CLEAR.

16  I'M GOING TO STATE THOSE RULES IN A MOMENT.  BUT

17  IT'S IMPORTANT THAT THE GROUNDS BE STATED.

18          AND WITHOUT GETTING IN TO REWORK THIS, I

19  UNDERSTAND THAT THE GROUNDS THAT WERE ASSERTED WERE

20  THREE IN NUMBER.  BUT CONNECTED WITH THAT OF

21  NECESSITY WAS THE -- THE ASSERTED GROUND THAT -- AND

22  BY VIRTUE OF THOSE MATTERS, THERE ARE NOT FACTS OF

23  SUFFICIENT SUBSTANTIALITY TO SUBMIT TO A JURY.

24  ISN'T THAT THE GIST OF IT?

25          MR. COATES:  THAT'S CORRECT, YOUR HONOR.

26          THE COURT:  I THINK YOU UNDERSTOOD THAT,

27  DIDN'T YOU?

28          MR. MOORE:  YES, YOUR HONOR.

817

```
 1          THE COURT:  THE NONSUIT MOTION REPRESENTS
 2    A BALANCING OF INTERESTS THAT IS REFLECTED IN THE
 3    LAW.  THERE IS A STRONG POLICY FOR TRIAL ON THE
 4    MERITS.  YET NOT AT ALL SURPRISINGLY THERE ARE WAYS
 5    IN WHICH PARTIES CAN INTERVENE FROM THE BEGINNING OF
 6    A LAWSUIT UNTIL A JURY VERDICT OR DECISION BY THE
 7    UNITED STATE SUPREME COURT TO TERMINATE THE
 8    LITIGATION.  AND SOME OF THE VEHICLES, FOR EXAMPLE,
 9    ARE THE DEMURRER; THE CHALLENGE TO THE LEGAL
10    SUFFICIENCY OF THE COMPLAINT.
11          IF ALFRED FILES A COMPLAINT AND SAYS THAT
12    WILLIAM HIT HIM AND HE BRINGS -- AND HE SERVES THE
13    PAPERS UPON JANE.  JANE MAY COME BEFORE THE COURT
14    AND SAY, THIS HAS NOTHING TO DO WITH ME.  WHY AM I
15    HERE?  PLEASE LET ME GO HOME.  THE COURT WILL SAY,
16    PERHAPS THERE'S SOME INADVERTENCE IN THE PREPARATION
17    OF YOUR CLAIM.  I'LL UPHOLD THE CLAIM AND ALLOW YOU
18    TO AMEND.  AND IF YOU FAIL TO DO SO, JANE IS OUT OF
19    THE LAWSUIT.
20          THERE ARE OTHER WAYS IN WHICH LITIGATION
21    IS TERMINATED ALONG THE ROAD OF LITIGATION.  IT
22    MIGHT BE THAT ONE PARTY CONSISTENTLY REFUSES TO TURN
23    OVER EVIDENCE, IT'S DISCOVERABLE, MAKING IT
24    DIFFICULT OR IMPOSSIBLE FOR ANOTHER PARTY TO DEFEND
25    OR PROSECUTE THEIR CLAIM.  AND WHEN THAT HAPPENS, AS
26    YOU CAN WELL IMAGINE, THE LAW IS NOT A BLUNT
27    INSTRUMENT.  IT WORKS AT IT LEVEL BY LEVEL,
28    ORDINARILY DETERMINING WHETHER THE ANSWER OUGHT TO
```

1   BE PROVIDED, PERHAPS PROVIDE MONETARY SANCTIONS TO

2   LEVEL THAT PLAYING FIELD SO SOMEONE CAN'T CRUSH THE

3   OTHER LITIGANT BY VIRTUE OF SUPERIOR RESOURCES.

4   MOVING IT ALONG, ULTIMATELY, PERHAPS, PRECLUDING THE

5   EVIDENCE ON AN ISSUE AND SOMETIMES TERMINATING THE

6   LAWSUIT AS A LAST RESORT.

7         THERE WAS A DECISION IN THE APPELLATE

8   COURT JUST THE OTHER DAY THAT SHOWED THAT THE COURTS

9   DO TAKE THOSE OBLIGATIONS SERIOUSLY.  AND WE'LL

10  EXERCISE THE MOST DRAMATIC REMEDY AVAILABLE WHEN

11  PRESSED.

12        YOU'VE ALSO HAD EXPERIENCE WITH THE MOTION

13  FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION.  THE

14  PARTIES FILE PAPERS.  THEY ENUMERATE WHAT THEY CLAIM

15  ARE UNDISPUTED ISSUES OF FACT GOING TO THE MERITS.

16  EACH PARTY MAY SEEK TO KNOCK OUT THE OTHER PERSON'S

17  CLAIM OR A CLAIM -- A WHOLE CLAIM.  AND THE TRIAL

18  COURT MAY GRANT OR DENY THAT.

19        THE DENIAL OF THE MOTION SIMPLY MOVES IT

20  INTO THE TRIAL DEPARTMENT.  THE GRANT MAY LEAD TO A

21  REVIEW BY THE APPELLATE COURT.  AND ALL JUDGES WHO

22  SERVE FOR ANY DURATION HAVE BEEN REVERSED ON THOSE

23  CLOSE ISSUES BECAUSE IT REPRESENTS THE REAL TENSION

24  BETWEEN GET RID OF THOSE FRIVOLOUS LAWSUITS, YOU

25  HEAR ABOUT THEM IN THE NEWSPAPER, AND, OF COURSE,

26  THE STRONG POLICY ON THE ADJUDICATION ON THE MERITS.

27  BECAUSE AS AMERICANS WE HAVE A RIGHT TO PETITION TO

28  ADDRESS GRIEVANCES.  IT'S RIGHT THERE IN THE

1    CONSTITUTION.

2         AND IT MOVES INTO THE TRIAL DEPARTMENT,

3    AND UNDERSTANDABLY THERE IS A LITTLE BIT MORE FLEX

4    THERE.  MUSCLE IF NOT USED ATROPHIES.  AND THEN ON

5    THE OTHER HAND, THE TRIAL COURT WILL TRY TO MAKE

6    DECISIONS TO ALLOW THE CASE TO FULLY COME TO

7    MATURITY IF THAT CAN BE DONE.

8         AND SO THE MECHANISMS PROVIDED, SOME

9    STATUTORY, SOME COMMON LAW, SOME THE LEGISLATURE

10   ADOPTED THE PRACTICES OF THE COURT IN EXPRESS

11   LEGISLATION, START WITH THE MOTIONS IN LIMINE, WHICH

12   I HEARD.  ACTUALLY, I -- TO BE CLEAR ON WHAT

13   HAPPENED THERE, OF COURSE, I ANNOUNCED -- I

14   SUGGESTED THAT COUNSEL MAY WANT TO KNOW MY

15   PRELIMINARY THINKING ON THOSE MATTERS.  COUNSEL

16   AGREED.  I DID THAT.  AND NO ONE PRESSED FOR A

17   RULING ON ANY IN LIMINE AT THAT TIME.  TWO OF THE

18   MOTIONS COME UP NOW IN A NONSUIT.  OTHER THAN THAT,

19   NO RULING WAS EVER SOUGHT ON THOSE MATTERS, AND

20   EVIDENCE IN THE CASE CAME IN LEAVING THE MOTION IN

21   AN OPEN WAY A VERY FREE ADMISSIBILITY OF EVIDENCE

22   WITHOUT OBJECTION IN ALMOST EVERY PARTICULAR.  I

23   THINK IN EVERY WAY THAT COUNTS.

24         THAT'S ONE WAY THAT A CASE COULD BE

25   TERMINATED.  THAT'S VERY UNUSUAL THAT THAT OCCURS.

26   ANOTHER IS AT THE END OF THE OPENING STATEMENT.

27   ANOTHER WAY IS AT THE MOTION FOR JUDGMENT OR

28   DIRECTED VERDICT, AT THE END OF THE PRESENTATION BY

1   THE PLAINTIFF, OR AT THE END OF THE PRESENTATION OF

2   ALL EVIDENCE.  OF COURSE, THEN THE COURT HAS A ROLE

3   IN FASHIONING INSTRUCTIONS THAT MAY TAKE AWAY OR

4   LIMIT CERTAIN CLAIMS, ALL OF WHICH IS RECORDED.

5           FINALLY, THERE WAS A VERDICT, AND THEN, OF

6   COURSE, THERE ARE MOTIONS FOR JUDGMENT

7   NOTWITHSTANDING THE VERDICT OR A MOTION FOR NEW

8   TRIAL.  ON THE LATTER, A LOT OF DISCRETION IS GIVEN

9   TO THE VERY LIBERAL RULE OF INTERPRETATION ON THE

10  APPELLATE COURT.  THAT VERY LAST MOTION THE JUDGE

11  ACTS AS, SOME HAVE SAID, KIND OF LIKE A 13TH JUROR,

12  BUT IN ANY EVENT HAVE SUBSTANTIAL INPUT IN EACH

13  CASE.  WHEN THEY'RE JURY FACT-FINDINGS, OBVIOUSLY,

14  THE COURTS EXAMINE THAT VERY CLOSELY.  THERE ARE

15  THOSE THAT WE GO ABOUT IT.

16          THIS IS A MOTION FOR NONSUIT.  THERE IS A

17  LEADING CASE OFTEN CITED.  THE CASE IS ESTATE OF

18  LANCES, L-A-N-C-E-S.  IT'S A 1932 CASE, AT VOLUME

19  216, OF THE CALIFORNIA SUPREME COURT REPORTS, PAGE

20  397.   IT'S CITED IN WITKIN ON THIS SUBJECT, AND

21  IT'S A CLASSIC CASE AS THE LEADING CASE.

22          AND IT READS AS FOLLOWS ON THIS ISSUE: "IT

23  HAS BECOME THE ESTABLISHED LAW OF THIS STATE THAT

24  THE POWER OF THE COURT TO DIRECT A VERDICT IS

25  ABSOLUTELY THE SAME AS THE POWER OF THE COURT TO

26  GRANT A NONSUIT.  A NONSUIT OR A DIRECTED VERDICT

27  MAY BE GRANTED ONLY WHEN DISREGARDING CONFLICTING

28  EVIDENCE AND GIVING THE PLAINTIFF'S EVIDENCE ALL THE

1    VALUE TO WHICH IT IS LEGALLY ENTITLED, HEREIN

2    INDULGING IN EVERY LEGITIMATE INFERENCE WHICH MAY BE

3    DRAWN FROM THAT EVIDENCE.  THE RESULT IS THAT THERE

4    IS A DETERMINATION THAT THERE IS NO EVIDENCE OF

5    SUFFICIENT SUBSTANTIALITY TO SUPPORT A VERDICT IN

6    FAVOR OF THE PLAINTIFF IF SUCH A VERDICT WERE

7    GIVEN," CLOSE QUOTE.

8          "UNLESS IT CAN BE SAID AS A MATTER OF LAW

9    WHEN SO CONSIDERED, NO OTHER REASONABLE CONCLUSION

10   IS REASONABLY DEDUCIBLE FROM THE EVIDENCE AND THAT

11   ANY OTHER HOLDING WOULD BE SO LACKING IN EVIDENTIARY

12   SUPPORT THAT A REVIEWING COURT WOULD BE IMPELLED TO

13   REVERSE IT UPON APPEAL OR THE TRIAL COURT TO SET IT

14   ASIDE.  AS A MATTER OF LAW, THE TRIAL COURT IS NOT

15   JUSTIFIED IN TAKING THE CASE FROM THE JURY.

16         "IN OTHER WORDS, THE FUNCTION OF THE TRIAL

17   COURT ON A MOTION FOR DIRECTED VERDICT IS ANALOGOUS

18   TO AND PRACTICALLY THE SAME AS THAT OF A REVIEWING

19   COURT IN DETERMINING ON APPEAL WHETHER THERE IS

20   EVIDENCE IN THE RECORD OF SUFFICIENT SUBSTANCE TO

21   SUPPORT A VERDICT."

22         I THINK THAT YOU DID INDICATE VERY

23   CANDIDLY THAT IN ORDER TO ADVANCE THE CLAIMS ON THE

24   CROSS-COMPLAINT, THE BREACH OF CONTRACT OR THE

25   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR

26   DEALING AND TO REACH A JURY, YOU ARE -- YOU WOULD

27   NEED THE TESTIMONY OF THE MEDIATOR OMBUDSMAN.  THAT

28   IS MY UNDERSTANDING.

1          MR. MOORE:  YES, YOUR HONOR.

2          THE COURT:  OKAY.  FINE.  SO THAT REALLY

3     FOCUSES THE ISSUE.

4          THERE WERE THREE GROUNDS NOTED.  I FIND IT

5     NECESSARY ONLY TO GO TO THAT SECOND GROUND, AS I

6     RECALL, WHICH WAS BASICALLY THAT THE MEDIATOR CAN'T

7     BE CALLED.  THERE IS NO EVIDENCE IT CAN BE PRESENTED

8     CONCERNING THE MEDIATION PROCESS MORE GENERALLY.

9     AND FOR THAT REASON AND REALLY DISTINCT FROM ANY

10    CLAIMED MERITS THAT THERE CANNOT BE EVIDENCE OF ANY

11    SUBSTANTIALITY TO REACH A JURY.  AND I AGREE WITH

12    THAT PROPOSITION AS A MATTER OF LAW.

13         AND I'LL BRIEFLY REFER TO -- TO MAKE A

14    RECORD OF THE THINGS THAT I CONSIDERED.  I DID

15    CONSIDER THE SUMMARY ADJUDICATION ORDER FROM JUDGE

16    ELFVING.  BUT, OF COURSE, IT'S NOT BINDING IN ANY

17    WAY.  THE JUDGE FOLLOWED THE COURT OF APPEAL 6TH

18    DISTRICT DECISION, IT DID NOT RULE ON EVIDENCE

19    OBJECTIONS.  OTHER DISTRICTS SUGGEST IT'S REQUIRED.

20    WE'LL GET RESOLUTION ON THAT SOME DAY.

21         BUT IT REALLY LEFT OPEN THE QUESTION

22    BECAUSE, OF COURSE, THE MOTION'S JUDGE HAD TO

23    BALANCE A LOT OF DIFFERENT THINGS, AND WE SPEAK IN

24    ONE VOICE.  I'M JUST SAYING, WELL, I REALLY DON'T

25    BELIEVE IT'S NOT MY PROVINCE AT THIS TIME TO DISPOSE

26    OF THE CROSS-COMPLAINT IN THIS WAY.

27         THE LAW IS ABSOLUTELY CLEAR THAT THE

28    DENIAL OF A MOTION FOR SUMMARY JUDGMENT IN NO WAY

1    EQUATES WITH ANY LIMITATION ON THE AUTHORITY OF THE

2    TRIAL JUDGE TO GRANT A MOTION FOR NONSUIT.

3           THE COURT READ ALL THE MOTIONS IN LIMINE,

4    AND I TAKE JUDICIAL NOTICE OF THOSE.  THERE WERE

5    ATTACHMENTS, AND, AS RELEVANT, I'VE CONSIDERED ALL

6    THAT.  THERE WERE TWO MOTIONS IN LIMINE, NUMBER 4

7    AND NUMBER 10, THAT WERE SPECIFICALLY PRESENTED.

8    AND AN OPPOSITION WAS FILED WITH REFERENCE TO NUMBER

9    4, BUT NOT TO 10.  BUT I'VE TAKEN INTO ACCOUNT THE

10   BRIEFINGS AND THE DISCOVERY ORDER, SO I HAVE A GOOD

11   SENSE OF THE ARGUMENTS THAT WERE ADVANCED THERE.

12          I TAKE JUDICIAL NOTICE OF THE FILINGS AND

13   ORDERS IN THE CASE, INCLUDING ORDERS WHICH QUASHED A

14   MOTION FOR PRODUCTION OF DOCUMENTS AND QUASHED -- I

15   THINK IT WAS THE DEPOSITION NOTICE, WASN'T IT?

16          MR. COATES:  YES, YOUR HONOR.

17          THE COURT:  THOSE WERE ORDERS FROM

18   DISCOVERY AND THE DETERMINATIONS OF JUDGE MANOUKIAN

19   IN THAT REGARD, WHO WAS HEARING DISCOVERY MATTERS.

20          I THINK WITHOUT GOING THROUGH ALL THE

21   CASES, I CAN SAY THAT I WAS RECENTLY ATTENDING A

22   CALIFORNIA JUDGES CONFERENCE AND JUSTICE GILBERT

23   FROM THE COURT OF APPEAL IN ITS ANNUAL REVIEW, AND

24   HE PICKED OUT THESE MEDIATION ON ARBITRATION CASES

25   FOR SOME DISCUSSION.  AND THERE ARE A NUMBER OF

26   CASES, REALLY, COLLATERAL TO WHAT WE HAVE HERE.

27   WHAT HAPPENS IF THE MEDIATOR AND THE PARTIES SAY, WE

28   HAVE A DEAL, AND THEY -- AND THEY HAVE A DOCUMENT

1    CALLED, DEAL POINTS OR TERMS OF AGREEMENT, BUT IT

2    DOESN'T EXPRESSLY PROVIDE, FOR EXAMPLE, THAT IT

3    SHALL BE ENFORCED IN COURT.

4         YOU KNOW, IT MAY BE THAT IT'S PROTECTED BY

5    THE MEDIATION PRIVILEGE FRUSTRATING THE REASONABLE

6    EXPECTATION OF THE PARTY.  BUT BECAUSE OF THE STRONG

7    LEGISLATIVE POLICY, SO MEDIATORS ARE LEARNING TO CAP

8    THE DEAL, SAY HERE'S THE PEN.  YOU WANT TO SUBSCRIBE

9    YOUR NAME, THEN DO IT.  THAT TYPE OF THING.

10        I THINK IT'S NOT NECESSARY TO PROLONG IT

11   BECAUSE I CITED THE VARIOUS COURT ORDERS.  LET ME

12   JUST REFER TO ONE CASE BECAUSE I THINK IT'S

13   ILLUSTRATIVE.  AND I TRY AS BEST I CAN TO BE

14   INFORMATIVE TO JUSTIFY MY DECISION SO THAT PEOPLE

15   CAN UNDERSTAND IT.

16        THIS IS THE CASE, AND IT WAS ATTACHED BY

17   MR. O'ROURKE TO THE REPLY TO THE PLAINTIFF'S -- RE:

18   PLAINTIFF'S MOTION IN LIMINE NUMBER 4.  IT WAS A

19   PHOTOCOPY OF A CALIFORNIA SUPREME COURT CASE,

20   FOXGATE HOMEOWNERS ASSOCIATION VERSUS BRAMALEA,

21   B-R-A-M-A-L-E-A.  I'M NOT SAYING IT'S RIGHT ON

22   POINT.  THERE ARE SO MANY CASES THAT ARE NOW

23   DEVELOPING IN THIS AREA.  I'LL JUST REFER TO IT.

24   I'M GOING TO REFER TO THE SUMMARY.  IT'S NOT A

25   SUBSTITUTE TO READING THE WHOLE CASE.  I DON'T WANT

26   TO BLUDGEON YOU INTO SOMNOLENCE BY READING THIS

27   WHOLE THING.

28        THIS WAS A SUPREME COURT DECISION ON JULY

1    9TH, 2001, A UNANIMOUS DECISION, IN A CONSTRUCTION

2    DEFECTS ACTION.  THE PLAINTIFF HOMEOWNER'S

3    ASSOCIATION FILED A MOTION, JUST A WORD FOR A

4    REQUEST FOR AN ORDER, AGAINST THE DEFENDANT

5    DEVELOPER AND ITS ATTORNEY, UNDER CODE OF CIVIL

6    PROCEDURE 128.5, A SANCTIONS PROVISION, FOR FAILING

7    TO PARTICIPATE IN GOOD FAITH IN COURT-ORDERED

8    MEDIATION AND TO COMPLY WITH AN ORDER OF THE

9    MEDIATOR.

10          NOW, IF ANYTHING, THAT INTRODUCTORY

11   LANGUAGE SUGGESTS IT'S MORE SUPPORTIVE OF THE

12   PLAINTIFF'S ARGUMENT THAN LESS SUPPORTIVE BECAUSE IT

13   WAS COURT-ORDERED MEDIATION, NOT CONTRACTUAL

14   MEDIATION.  SO IT WOULD INVOKE THE AUTHORITY OF THE

15   COURT TO CONTROL JUDICIAL PROCESSES.

16          READING ON, ATTACHED TO THE SANCTIONS

17   MOTION WERE THE REPORT OF THE MEDIATOR AND A

18   DECLARATION BY PLAINTIFF'S COUNSEL RECITING

19   STATEMENTS MADE DURING THE MEDIATION SESSION.

20          THE TRIAL COURT GRANTED THE MOTION FOR

21   SANCTIONS.  THE COURT OF APPEAL REVERSED.  IT

22   CONCLUDED THAT A MEDIATOR MAY REVEAL MATERIAL

23   NECESSARY TO PLACE SANCTIONABLE CONDUCT IN CONTEXT,

24   BUT THAT IN THIS CASE THE MEDIATOR'S REPORT INCLUDED

25   MORE INFORMATION THAN WAS NECESSARY.

26          NOW, THERE IS NO AUTOMATIC RIGHT TO APPEAL

27   TO THE CALIFORNIA SUPREME COURT.  THERE ARE SOME

28   DIRECT APPEALS LIKE DEATH PENALTY CASES.  BUT

1    ORDINARILY REVIEW IS DISCRETIONARY ON AN APPLICATION

2    CALLED PETITION FOR HEARING.  THE SUPREME COURT

3    GRANTED A HEARING AND AFFIRMED THE JUDGMENT OF THE

4    COURT OF APPEAL BUT ONLY BECAUSE THE COURT OF APPEAL

5    HAD REVERSED THE SANCTIONS ORDER.

6         THE SUPREME COURT HELD THAT THE COURT OF

7    APPEAL ERRED IN JUDICIALLY CREATING AN EXCEPTION TO

8    EVIDENCE CODE SECTION 1119, CONFIDENTIALITY OF

9    MEDIATION COMMUNICATIONS, AND EVIDENCE CODE SECTION

10   1121, CONFIDENTIALITY OF MEDIATOR'S REPORTS AND

11   FINDINGS.  THESE STATUTES UNAMBIGUOUSLY CONFERRED

12   CONFIDENTIALITY ON THE MATERIAL AT ISSUE, AND THERE

13   WAS NO NEED TO CREATE A JUDICIAL EXCEPTION TO CARRY

14   OUT THE PURPOSE FOR WHICH THE STATUTES WERE ENACTED

15   OR TO AVOID AN ABSURD RESULT.

16        I'M SURE THE MOVING LAWYER SAID THAT'S

17   ABSURD, THE PERSON STONEWALLED MEDIATION, AND THE

18   COURT ORDERED IT.  NO NEED TO CREATE A JUDICIALLY

19   CREATED EXCEPTION TO THE STATUTE.

20        THE COURT HELD THAT IF ON REMAND THE

21   PLAINTIFF -- I'M SENDING IT BACK TO THE LOWER

22   COURT -- THE PLAINTIFF ELECTED TO PURSUE THE

23   SANCTIONS MOTIONS, NO EVIDENCE OF COMMUNICATIONS

24   MADE DURING THE MEDIATION COULD BE ADMITTED OR

25   CONSIDERED.  JUSTICE BAXTER -- I'VE BEEN INSTRUCTED

26   FROM HIM EVER SINCE WE WERE IN THE FIRST YEAR OF LAW

27   SCHOOL TOGETHER -- EXPRESSING THE UNANIMOUS VIEW OF

28   THE COURT.

1      NOW, OF COURSE, IN THIS CASE WE HAVE AN

2   EVIDENCE CODE PROVISION THAT THE MEDIATOR IS NOT

3   COMPETENT TO TESTIFY AS A WITNESS.  AND I THINK THIS

4   IS QUITE INSTRUCTIVE TO THE TRIAL COURT IN THE

5   UNANIMOUS DECISION.  AND SO ON THAT GROUND WITHOUT

6   THE NEED TO GOING INTO THE PURPORTED CONTRACTUAL

7   WAIVER AND WHETHER THAT WOULD BE ILLUSTRATIVE OR

8   UNDULY HARSH OR THINGS THAT MIGHT NOT PROPERLY BE

9   ATTENDED TO ON NONSUIT, I DON'T HAVE AN OPINION TO

10  EXPRESS ON THAT.  I THINK THE COURT WILL TAKE UP AT

11  THIS TIME -- I ASSUME THERE IS NO OBJECTION FOR THE

12  RECORD; THAT IS, THERE WAS A MOTION TO QUASH THE

13  SUBPOENA OF GEOFFREY TULLY.  I WILL QUASH THE MOTION

14  FOR THE SUBPOENA OF GEOFFREY TULLY BASED ON THE

15  GROUNDS STATED.

16      BUT IT'S REALLY THE FLIP SIDE OF THE SAME

17  COIN, ISN'T IT?  THAT IS, THAT I'M DETERMINING THAT

18  HE WOULD NOT BE COMPETENT AS A WITNESS.  AND I THINK

19  IT'S MERELY PART AND PARCEL OF WHAT'S BEEN

20  PRESENTED.

21      DO YOU AGREE, OR DO YOU WANT TO ADD

22  SOMETHING?

23      MR. MOORE:  NO, I THINK YOU MAY HAVE

24  MISSPOKE.  I THINK YOU SAID YOU WANTED TO QUASH THE

25  MOTION.  I THINK YOU MEAN YOU'RE GRANTING THE

26  MOTION.

27      THE COURT:  EXCUSE ME.  I THINK I USED A

28  DOUBLE TWIST THERE.  I MEAN THERE IS MOTION TO QUASH

1   THE SUBPOENA, AND THAT MOTION IS GRANTED.

2           MR. MOORE:  OKAY.

3           THE COURT:  THANK YOU.  AND SO NOW I WILL

4   JUST SAY THIS IS THE KIND OF RULING THAT ALONG WITH

5   ANY RULING CAN BE TESTED ON APPEAL.  I WILL SAY NOW

6   WHAT I WILL SAY LATER.  I WOULD URGE THE PARTIES

7   WITHIN THE TIME PERMITTED BY LAW, AND FOR REASONS

8   I'LL SUGGEST LATER, THE SECOND PHASE, TO

9   RECONNOITER, CONSULT WITH COUNSEL, CONSIDER THE

10  OPTIONS.  ANY GRIEVOUS ERROR SHOULD CERTAINLY BE

11  CORRECTED.

12          I DON'T VIEW MY DECISIONS TO BE ANYTHING

13  OTHER THAN THE BROAD STREAM OF THE DEVELOPING COMMON

14  LAW AND PURSUANT TO LAW AND STATUTE, GOOD REASONING.

15  BUT WHEN I DID HEAR THE OPENING STATEMENT THAT BY

16  VIRTUE OF A CONSTELLATION OF FACTS LARGELY DESCRIBED

17  AS FOLLOWS:  THAT THE PARTIES ENTERED INTO A

18  CONTRACT; THAT THERE WAS A CONTRACT THAT PROVIDED

19  FOR A MEDIATION OMBUDSMAN POLICY; THAT THE PLAINTIFF

20  REFERRED THE MATTER TO MEDIATION; THAT THE --

21  DR. MALCOLM AND OTHERS SPENT A GOOD DEAL OF TIME

22  TALKING TO MR. TULLY; THAT SOME MONTHS WENT BY; THAT

23  THEY HEARD FROM MR. TULLY, WHO REPORTEDLY SAID ON

24  THE OFFER OF PROOF, I HAVEN'T HEARD FROM DVD.  I

25  THOUGHT THAT I WOULD HAVE HEARD.  I WOULD EXPECT,

26  ALTHOUGH I'VE NEVER DONE A MEDIATION FOR DVD IN THE

27  PAST, I WOULD EXPECT THAT I WOULD BE CALLED UPON TO

28  REPORT TO THEM.  AND THEN LATER A LAWSUIT WAS FILED,

**Exhibit L, Page 84**

 1   THAT WE ALL READ NEWSPAPER ACCOUNTS AND SO FORTH.

 2          I DON'T TAKE ANY ACCOUNT OF THAT, THE IDEA

 3   THAT THE CORPORATION WOULD BE WITH THE INCREASING

 4   INCOME THAT HAS BEEN DESCRIBED WOULD CLAIM THAT BY

 5   VIRTUE OF THAT CONSTELLATION OF FACTS THEY'RE

 6   SEEKING $12 MILLION.  I JUST LAY IT OUT TO YOU TO

 7   CONSIDER.  CERTAINLY BEFORE A, QUOTE, ECONOMETRIC

 8   EXPERT WOULD JUMP UP ON THE WITNESS STAND AND TALK

 9   TO A JURY, SOME OTHER JUDGE OR EVEN ME, IF I WERE

10   ENTRUSTED WITH IT -- SOMETIMES PEOPLE SAY THE JUDGE

11   IS PREJUDICED AFTER HE'S JUDGED.  BUT THE POINT IS

12   THAT SOME OTHER JUDGE WOULD BE CALLED UPON TO

13   DETERMINE WHETHER THERE IS ANYTHING THAT AN EXPERT

14   COULD OFFER ON THAT ISSUE, POSSIBLY HEARING OUT OF

15   THE PRESENCE OF THE JURY, IT'S COMMONLY DONE.

16          SO THAT UNDER THE CODE THERE IS A DEFAULT

17   POSITION, BUT I SHOULD MAKE IT CLEAR.  THIS

18   CONSTITUTES AN ADJUDICATION ON THE MERITS.  A

19   JUDGMENT ENTERED WOULD BE INCORPORATED IN ANY OTHER

20   JUDGMENT.

21          I WOULD SAY JUST SO THERE IS NO SUSPENSE

22   THAT ALTHOUGH BECAUSE EITHER PARTY ON EITHER CLAIM

23   COULD LATER PROVIDE -- FILE A COST BILL AND A --

24   INCLUDING A REQUEST FOR ATTORNEY'S FEES, I WILL SAY

25   THAT ALTHOUGH COUNSEL SAID THAT AS A COURTESY I

26   COULD HAVE REFERENCE TO THE EARLIER TESTIMONY IN THE

27   CASE, I REALLY VIEWED THIS IN TERMS OF ANYTHING THAT

28   I HAD TO DO AS REALLY STAND-ALONE ON THESE PAPERS.

1    IT'S TO ME IN NO WAY -- I DID GRANT THE

2    MOTION UNDER 597 OF THE OTHER PHASE IN TRIAL.   I

3    DON'T VIEW ALL OF THAT TIME AS ANYTHING TO DO WITH

4    THIS DETERMINATION OF LAW.   THAT IS THE

5    DETERMINATION.   I THINK THAT COVERS THE GROUND.

6         I WANT TO LOOK AT MY NOTES FOR ONE SECOND.

7         YES, I THINK I SAID EVERYTHING THAT NEEDS

8    TO BE SAID AND NO MORE ON THAT MOTION.   ARE THERE

9    ANY QUESTIONS?

10        MR. MOORE:   NO.

11        MR. COATES:   NO, YOUR HONOR.

12        THE COURT:   WE'LL TAKE A RECESS BECAUSE

13   I'LL BE GOING AT IT A LONGER TIME ON THE ACTUAL

14   ADJUDICATION ON THESE FACT ISSUES.

15        MR. COATES:   VERY GOOD.   THANK YOU, YOUR

16   HONOR.

17        (WHEREUPON, A SHORT RECESS WAS TAKEN,

18   AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

19        THE COURT:   WE'RE HERE TOGETHER FOR THE

20   COURT TO CONTINUE IN ANNOUNCING DECISIONS IN

21   CONNECTION WITH THE SUBMITTED MATTER DVD COPY

22   CONTROL ASSOCIATION, INC., A DELAWARE CORPORATION,

23   VERSUS KALEIDESCAPE, INC., A DELAWARE CORPORATION.

24   ALL PARTIES, COUNSEL ARE PRESENT.

25        I WANT TO CONFIRM WHAT I BELIEVE WE PLACED

26   ON RECORD YESTERDAY.   THAT IS, WHAT I SAY, AND YOUR

27   ABILITY TO GET A TRANSCRIPT OF WHAT I SAY, WILL

28   CONSTITUTE, OBVIOUSLY, MY NOTICE OF INTENDED

1   DECISION, BUT ALSO THE STATEMENT OF DECISION UNLESS

2   WITHIN THE TIME PERIODS PRESCRIBED IN THE CODE OF

3   CIVIL PROCEDURE SECTION 632 AND THE CORRESPONDING

4   RULES OF COURT YOU PROCEED TO FILE OBJECTIONS OR

5   OTHER PROPOSED STATEMENTS OR TAKE FURTHER ACTION.

6   IS THAT AGREED?

7           MR. MOORE:  YES, IT IS, YOUR HONOR.

8           MR. COATES:  YES, YOUR HONOR.

9           THE COURT:  AFTER I'M DONE I WILL, AS I

10  INDICATED BEFORE, HAVE A RECESS SO THAT WHILE THESE

11  MATTERS ARE FRESH IN YOUR MIND IF YOU WISH TO SEEK

12  FURTHER CLARIFICATION, I'LL GIVE YOU THAT

13  OPPORTUNITY TO DO SO.  THIS PROCESS OF GOING BACK

14  AND FORTH ON PAPERS IS EXPENSIVE ENOUGH WITHOUT ME

15  ADDING TO YOUR BURDENS.  IF I CAN BE RESPONSIVE, I

16  LIKE TO DO THAT.

17          I WANT TO SAY AT THIS SEPARATE STAGE OF

18  THIS PROCEEDING, AGAIN, I WANT TO THANK COUNSEL AND

19  THE PARTIES FOR THEIR COURTESIES THROUGHOUT.  IT'S

20  MY KNOWLEDGE THAT IN THE KIND OF WORK THAT I DO

21  DAILY, SOMEBODY PERCEIVES THAT I'VE DONE VIOLENCE TO

22  THEM.  UNDER RULE OF LAW, WE MAKE EVERY EFFORT TO

23  SEE IF PARTIES CAN COME TO VOLUNTARY AGREEMENT, BUT,

24  OF COURSE, WE HAVE RULES THAT NEED TO BE ENFORCED.

25          AND EVERYONE WOULD LOVE TO HAVE THEIR

26  FAVORITE JUDGE, BUT WHAT YOU'RE ENTITLED TO IS A

27  NEUTRAL PERSON.  I'M ABSOLUTELY CLEAR ON THAT.  AND

28  HOPEFULLY SOMEONE THAT BRINGS SOME BACKGROUND AND

1    TRAINING AND EXPERIENCE TO THE TASK.

2           THERE ARE LOTS OF WAYS THAT THAT'S

3    EVALUATED.  EVERY TWO YEARS OUR BAR ASSOCIATION

4    SENDS OUT QUESTIONS, ASKS LAWYERS TO RATE THE

5    JUDGES.  WE ARE SUBJECT TO THE COMPLAINTS OF THE

6    JUDICIAL PERFORMANCE COMMISSION.  WE WENT THROUGH

7    OUR OWN SUBSTANTIAL REVIEW, A CONSTITUTIONAL BODY,

8    BEFORE I BECAME A JUDGE 23 YEARS AGO, AND SUBJECT TO

9    THE CHALLENGE AT THE POLLS EVERY SIX YEARS.  AND

10   HAVING BEEN A MAYOR, I'VE DONE THAT TWICE IN A

11   NONPARTISAN CAPACITY.  I'M GRATEFUL THAT THAT'S

12   NEVER OCCURRED WHEN I'VE SERVED AS A JUDGE.

13          SO I HAVE A RIGHT TO EXPECT -- IT'S

14   DISAPPOINTING FROM TIME TO TIME THAT COUNSEL WILL

15   ADDRESS THE COURT WITH COMPLETE CANDOR, BUT THAT

16   EXPECTATION HAS BEEN FULLY SATISFIED HERE.  I

17   APPRECIATE DIRECTNESS AND THE CORDIALITY SHOWN BY

18   COUNSEL.  NO ONE HAS CONFUSED THEY'RE ZEALOUSLY

19   ADVOCATING FOR THE CLIENTS, NOT THE COURT, BUT THE

20   CLIENTS, BUT THEY ARE OFFICERS OF THE COURT AND

21   ENJOY THAT HIGH STANDING, AND IT'S AN HONORED

22   PROFESSION.

23          THE CODE OF CIVIL PROCEDURE -- I'LL TAKE

24   AWHILE.  IF ANYONE -- IF YOU THINK WE SHOULD TAKE A

25   BREAK, I'LL TAKE A BREAK.  IF ANYONE CAN'T STAND

26   WHAT THEY'RE HEARING, THEY COULD QUIETLY LEAVE.  OF

27   COURSE, I EXPECT THE SAME COURTESY THAT I'VE GIVEN

28   TO OTHERS.

1          THE CODE OF CIVIL PROCEDURE IN SECTION

2     632 -- AND I REFER TO THESE DETAILS BECAUSE THESE

3     ARE LEGISLATIVE ENACTMENTS THAT JUDGES CONSTRUE AND

4     APPLY IN HIGHER COURT DECISIONS WHICH GUIDE THE

5     TRIAL COURTS -- QUOTE, "IN SUPERIOR COURTS UPON THE

6     TRIAL OF A QUESTION OF FACT BY THE COURT, WRITTEN

7     FINDINGS OF FACT AND CONCLUSION OF LAW SHALL NOT BE

8     REQUIRED.  THE COURT SHALL STATE A WRITTEN DECISION

9     INCLUDING THE FACTS AND WRITTEN STATEMENTS FOR THE

10    DECISION ON EACH OF THE PRINCIPAL CONTROVERTED

11    ISSUES AT TRIAL UPON THE REQUEST OF ANYONE APPEARING

12    AT TRIAL."

13         THAT'S THE BASIC GUIDELINE.  TIME PERIODS

14    ARE SET FORTH AND SO FORTH.  OF COURSE, THE

15    APPELLATE COURTS HAVE DEALT WITH THE GENERAL

16    SUBJECT, AND I WON'T TARRY ON THIS TOO LONG, WHAT DO

17    THOSE OBLIGATIONS ENTAIL?

18         WELL, FIRST I'LL DO MY BEST TO ATTEND TO

19    WHAT I HAVE UNDERSTOOD WERE THE PRINCIPAL

20    CONTROVERTED ISSUES AT TRIAL.  WHEN I'M DONE, AFTER

21    RECESS IF SOMEONE IDENTIFIES SOMETHING ELSE THAT

22    THEY THOUGHT WAS A PRINCIPAL CONTROVERTED ISSUE,

23    THEY CAN TELL ME, AND I'LL ATTEND TO IT.  BUT I

24    BELIEVE THE PARTIES HAVE ADEQUATELY IDENTIFIED THOSE

25    ISSUES SO I CAN GO FORTH AT LEAST PRELIMINARILY NOW.

26         NUMEROUS CASES ARE CITED IN THE TREATISES

27    TO ILLUSTRATE THAT IT IS SUFFICIENT TO STATE THE

28    ULTIMATE FACTS THAT SUPPORT A DECISION.  IT'S NOT

Exhibit L, Page 89

1    NECESSARY TO STATE EVIDENTIARY FACTS.

2         IN OTHER WORDS, JUST IN ONE CASE A JUDGE'S

3    FINDING OF MISREPRESENTATION DIDN'T HAVE TO SPECIFY

4    WHICH ACTS OR WHICH LANGUAGE CONSTITUTED

5    MISREPRESENTATION.  A TEST IS WHETHER THE DETAILS

6    GIVEN FAIRLY DISCLOSE THE COURT'S DETERMINATION ON

7    ALL ISSUES OF FACT.

8         AND I SAY THAT BECAUSE SOMETIMES ZEALOUS

9    ADVOCATES HAVE SENT ME LISTS OF, IN EFFECT,

10   INTERROGATORIES AND I DON'T DO THOSE THINGS.  I JUST

11   STRIKE THEM FROM THE RECORD IF THEY'RE NOT IN

12   ACCORDANCE WITH LAW.  BUT THERE IS A PROCEDURE, AS I

13   INDICATED, TO GET A FAIR STATEMENT.

14        I'M GOING TO COMMENT ABOUT THE WITNESSES

15   THAT TESTIFIED IN THE CASE IN THE BROADEST OVERVIEW.

16   AND I'M GOING TO EXPLAIN WHAT I UNDERSTAND THE

17   STANDARD REVIEW BY HIGHER COURTS ARE.  NOT THAT THAT

18   ADDS ANYTHING TO WHAT I SAY, BUT TO ACKNOWLEDGE TO

19   COUNSEL AND THE PARTIES THE IMPORTANCE OF WHAT I DO

20   FROM MY OWN PERSPECTIVE AND TO SHOW THAT IF I'M

21   GOING ON A LITTLE BIT AT LENGTH, IT'S BECAUSE I TAKE

22   THESE OBLIGATIONS FREELY AND AS I SAID IN THE OATH,

23   WITHOUT ANY MENTAL RESERVATIONS OR PURPOSE OF

24   EVASION.

25        AND I THINK YOU'LL SEE THAT ON THESE

26   ISSUES WHERE THERE MIGHT HAVE BEEN CLAIMS FOR A JURY

27   TRIAL HAD MONEY BEEN CLAIMED, THE COURT HAS THE VERY

28   SAME OBLIGATIONS PLUS OTHERS, BUT IT ALL REALLY

RELATES TO THE FACTS.  AND AS TO THE FACTS, REALLY

THE BROADEST SCOPE OF EVIDENCE HAS BEEN PRESENTED

ONCE THE PARTIES WERE SATISFIED THAT THE CASE WOULD

BE TRIED NOT TO A JURY, BUT BEFORE A JUDGE, WHO IS

USED TO SEPARATING THE WHEAT FROM THE CHAFF.  SO IT

ALL CAME, AND THAT'S BECAUSE ALTHOUGH THE DEFENDANT

TOOK THE POSITION THAT THE WORDS OF THE CONTRACT

WERE CLEAR, AND THE PLAINTIFF TOOK THE POSITION THAT

THE WORDS OF THE CONTRACT WERE CLEAR, I THINK MAYBE

DECISIONS WERE MADE IN THE NATURE OF HEDGING BETS TO

PUT IT ALL IN SO THAT THE PARTIES WOULD REALLY FEEL

THAT THEIR STORY HAD BEEN TOLD, HEARD, AND ACTED

UPON.  AND I CERTAINLY HONOR THAT DECISION.  IT JUST

PLACES OBLIGATIONS ON ME.

          AND THEN I'LL GO THROUGH WHAT I UNDERSTAND

TO BE SOME OF THE RULES OF CONTRACT INTERPRETATION.

IT'S ALL IN THE PAPERS, BUT I'VE ACTUALLY HAD CASES

OVER THE YEARS WITH VERY DISTINGUISHED ATTORNEYS

I'VE GIVEN A SHORTHAND RENDITION, AND PEOPLE LOOKED

AT ME THAT THEY DIDN'T HAVE A CLUE TO WHAT'S GOING

ON.  THAT'S NOT TRUE WITH YOU FOLKS BECAUSE YOU'VE

HAD EVERY OPPORTUNITY TO REVIEW EACH OF THESE LEGAL

BRIEFS HAD YOU ELECTED TO DEVOTE YOUR VALUABLE TIME

TO THAT ENTERPRISE. BUT YOU'RE STUCK WITH ME REALLY

SUMMARIZING IN THE WAY THAT MAKES SENSE TO ME.  AND

THAT'S BECAUSE UPON REQUEST, I'M REQUIRED TO DO THIS

NOT IN SECRET, BUT HERE IN PUBLIC.  NOT JUST TO HEAR

MYSELF TALK, ALTHOUGH YOU MAY THINK THAT BY THE TIME

1    I'M DONE.

2            HERE WERE THE WITNESSES IN ORDER.  IF I'VE

3    OMITTED, IT REALLY DOESN'T MAKE ANY DIFFERENCE.  I

4    CONSIDERED EVERYTHING.  I'M TRYING TO RESPECT YOU BY

5    GOING THROUGH THE MAIN POINTS THAT I UNDERSTOOD.

6    PLEASE DON'T FROWN IF THERE IS SOME POINT THAT YOU

7    THOUGHT WAS IMPORTANT, BECAUSE IT'S NOT MY PURPOSE

8    TO READ THE TRANSCRIPT.

9            JANE SUNDERLAND TESTIFIED.  SHE WORKED FOR

10   FOX LEGAL AS VICE PRESIDENT OF CONTENT PROTECTION.

11   SHE IS AND WAS A BOARD MEMBER AT THE RELEVANT TIME.

12   I MAKE LITTLE SIDE POINTS BECAUSE THEY'RE NOT

13   DISPOSITIVE HERE.  I MAKE LITTLE SUMMARY NOTES.

14   PLEASE DON'T THINK I OMITTED THAT.  IT'S JUST THAT

15   I'M TRYING TO GIVE A LITTLE OVERVIEW.

16           AND SHE, ALONG WITH OTHER WITNESSES,

17   TALKED ABOUT THE BASIC UNDERSTANDING THAT BOARD

18   MEMBERS HAVE CONCERNING THE PURPOSE AND INTENT AND

19   FACT, REALLY, OF THE CONTRACT DOCUMENTS.  I SAY

20   CONTRACT DOCUMENTS BECAUSE THE CONTRACT ITSELF DID

21   INCORPORATE SOMETHING SPECIFICALLY.  SOMETHING

22   SPECIFICALLY.  AND ARGUMENTS AROSE ABOUT OTHER

23   THINGS.

24           SHE SAID WHAT SHE SAID ON THE SUBJECT OF A

25   LACK OF TRUST NOT BEING MANIFESTED YET.  I DID GO

26   THROUGH THE TRANSCRIPT.  IT IS ALL SUBJECT TO MY

27   INTERPRETATION.  THE POINT IS THAT THE WORDS OF THE

28   WITNESS DON'T CONTROL.  IT'S WHAT THE TRIAL JUDGE

1    WHO EVALUATES THE BELIEVABILITY OF THE WITNESSES

2    DRAWS INFERENCES FROM WHAT THEY SAY, PUTS IT ALL

3    TOGETHER, FINDS TO BE THE CASE.

4            MANY AN APPEAL HAS BEEN TAKEN BY SOMEONE

5    WHO FELT THAT THEY LOST, SAID THAT THESE ARE THE

6    WORDS THAT I SAID.  AND BEING VERY GENTLE ABOUT IT,

7    I WILL SAY THAT IN RESOLVING ALL THESE ISSUES, I

8    RESOLVE ALL ISSUES OF CREDIBILITY IN FAVOR OF THE

9    FINDINGS WHICH ARE NECESSARY, EXPLICIT, IMPLICIT OR

10   APPROPRIATE.

11           SO I'VE HAD CASES IN WHICH PEOPLE ASK FOR

12   FURTHER STATEMENTS, AND I LOOK AT THEM, YOU KNOW, DO

13   YOU REALLY WANT THAT?  BECAUSE MY PURPOSE IS TO BE

14   VERY RESPECTFUL TO EVERYBODY AND NOT TO DISPARAGE

15   ANYONE.  SO I THINK THE BROAD FORM OF STATEMENT ON

16   CREDIBILITY HAS CERTAINLY BEEN APPROPRIATE TO MY USE

17   AND ACTUALLY APPELLATE COURTS IN MY EXPERIENCE.

18           IN OTHER WORDS, I KNEW THAT SHE TALKED

19   ABOUT THE ISSUE OF PIRATES, OTHER ROGUES, I THINK

20   THE REFERENCE WAS, WHO REALLY WERE PEOPLE OUTSIDE

21   THE MAIN STREAM OF THE -- UPON WHOM THE CORPORATION

22   RELIED AND OTHERS RELIED IN DOING BUSINESS.  AND

23   THEY HAD NOT HAD ANY REAL SIGNIFICANT EFFECT ON THE

24   OPERATIONS OF THE DVD CCA BECAUSE DVD CCA IS REALLY

25   DEALING TO THE MARKETPLACE OF PEOPLE WHO ARE REALLY

26   TRYING TO PLAY BY THE RULES.

27           HOWEVER, IN EXPRESSING OPINIONS AS TO THE

28   FACT THAT THERE HAD BEEN NO UNTOWARD -- LET ME

1   RESTATE THAT.  IN EXPRESSING THE OPINION THAT LACK
2   OF TRUST HAD NOT YET BEEN MANIFESTED AS OF THIS
3   TIME, OF COURSE, THAT WAS HER OPINION.  IT WASN'T
4   PUT FORTH AS AN EXPERT OPINION.  IT WAS AN OPINION.
5   AND I CAN DRAW INFERENCES AND CONCLUSIONS BASED ON
6   ALL THE FACTS WHEN WE LATER GET TO THE ISSUE OF
7   IRREPARABLE HARM.
8        SHE ALONG WITH OTHERS VOTED ON THE ISSUE
9   OF BRINGING A LAWSUIT.  SHE RELIED ON COUNSEL.
10  PRETTY MUCH WHAT CAME FORWARD WAS THAT CERTAIN
11  WITNESSES SAID CERTAIN THINGS, BUT ONCE IT GOT INTO
12  THE IMPORTANT MEETING WHERE THEY ALL ACTED, THEY ALL
13  SAID, I RELIED ON COUNSEL, AND THAT'S ABOUT IT, AND
14  I PREFER NOT TO TALK ABOUT WHAT COUNSEL SAID.  AND I
15  SAID, YES, INDEED, DON'T TALK ABOUT WHAT COUNSEL
16  SAID.  BECAUSE THERE WAS AN OBJECTION, AND IT IS AN
17  IMPORTANT PRIVILEGE.  I DIDN'T THINK TOO MUCH ABOUT
18  WHAT THE BOARD WAS THINKING, WHAT IT DID WHEN IT
19  DID.
20        AND I THINK A MAIN PURPOSE OF
21  MS. SUNDERLAND ALONG WITH OTHER WITNESSES WAS TO
22  GIVE CONTEXT AND MEANING AND NUANCE TO THE WHOLE
23  DEVELOPMENT OF THIS PROCESS FROM HER OWN KNOWLEDGE
24  AND ALSO TO INFORM THE COURT'S OPINION AS IT RELATES
25  TO THE EFFECTS OF ANY BREACH UPON THE -- UPON THE
26  PLAINTIFF.
27        ALFRED PERRY TESTIFIED NEXT, VICE
28  PRESIDENT OF LEGAL AFFAIRS FOR PARAMOUNT.  AS ALL OF

1    THE WITNESSES ARE PERSONS OF DISTINGUISHED

2    BACKGROUND, PERSONS OF REAL ACHIEVING, AND HE ALONG

3    WITH OTHER WITNESSES DID NOT READ THE PARTICULAR

4    DOCUMENT CLAIMED TO BE THE CONTRACT WHICH EXISTED

5    BETWEEN THE PLAINTIFF AND THE DEFENDANT.  AND WHEN I

6    SAY HE AND OTHERS, I'M TALKING ABOUT THESE FIRST

7    SEVERAL WITNESSES CALLED BY THE PLAINTIFF.  HE, AS

8    WELL, RELIED UPON THE ADVICE OF COUNSEL.  HE HAD

9    SIMILAR OPINIONS, HIS OWN PERSPECTIVE CONCERNING HIS

10   OWN OPINIONS AS TO ANY BREACH.

11           BRIAN BERG TESTIFIED AT LENGTH.  HE WAS A

12   DESIGNATED EXPERT WITNESS, AND HE TESTIFIED

13   CONCERNING VIOLATIONS.  HE DID A DEMONSTRATION.  THE

14   COURT HAS THE BENEFIT OF HIS POWER POINT

15   SUBMISSIONS.  I DON'T KNOW IF THEY WERE MARKED IN

16   EVIDENCE.  EVERYBODY SAID I COULD LOOK AT THOSE.

17   THEY WERE SHOWN ON THE SCREEN.  AND CERTAINLY WHAT

18   HE PRESENTED IS GOING TO BE MADE PART OF THE RECORD.

19   THERE IS NO DISPUTE ABOUT THAT BECAUSE I HEARD HIS

20   TESTIMONY AND SAW THE PRESENTATION.

21           HE TALKED ABOUT THE VARIOUS PARAGRAPHS AND

22   THE DOCUMENTS AND HIS CONCLUSIONS THAT THE

23   DEFENDANT'S ACTIONS WERE NONCOMPLIANT WITH THE TERMS

24   OF WHAT HE UNDERSTOOD TO BE THE CONTRACT.  EVERYBODY

25   MADE CLEAR, THE COURT ACKNOWLEDGED ON MANY OCCASIONS

26   THAT, AS I'VE SAID, THESE CAN BE THE BRIGHTEST

27   PEOPLE IN THE WORLD, BUT I'M THE ONE THAT GETS

28   REVERSED.  SO NO ONE EXPRESSED OPINIONS ON LEGAL

1   CONCLUSIONS, ALTHOUGH THEY WERE EXPRESSING OPINIONS

2   ON ULTIMATE ISSUES.  AND ONE OF THE ULTIMATE ISSUES

3   IS THE ISSUE OF WHETHER OR NOT THERE HAS BEEN A

4   BREACH.

5          ALSO I HAVE TO -- THE COURT ALONE CAN,

6   DOES INTERPRET THE CONTRACT.  THE COURT ALONE

7   INTERPRETS THE CONTRACT.  BUT THE COURT ALSO ACTS AS

8   A FACT-FINDER TO DETERMINE WHAT WAS THE CONTRACT.

9          WADE LOWELL HANNIBAL IS A TECHNOLOGIST,

10  UNIVERSAL PICTURES, HAS A LONG CAREER.  HE WAS ON

11  THE DVD CCA BOARD FROM 2002 TO 2006.  HE CHAIRED THE

12  LICENSE ENFORCEMENT ACTIVITIES COMMITTEE, *LEAC*.  HE

13  AND BRUCE TURNBULL, AN ATTORNEY, I LATER LEARNED WAS

14  ACTUALLY ACTIVE IN DRAFTING THE SUBJECT OF THE

15  CONTRACT, 156.  WITH SOME EXCEPTION, I'M THINKING

16  NOW THE TECHNICAL COMMITTEE WAS -- AT LEAST I DRAW

17  AN INFERENCE THAT HE WAS INTIMATELY INVOLVED IN ALL

18  ASPECTS OF PRODUCING THE LEGAL PRODUCT; THAT IS,

19  WHAT WAS CLAIMED TO BE THE CONTRACT.

20         AND THOSE TWO INDIVIDUALS MET WITH THE

21  FOUNDERS, REPRESENTATIVES OF KALEIDESCAPE AT LAS

22  VEGAS AT THE CONSUMER ELECTRONICS SHOW IN JANUARY OF

23  2004.  I LEARNED FROM MR. HANNIBAL THAT DVD COPY

24  CONTROL ASSOCIATION'S CONCERNS WERE NOT ASSUAGED.

25  REALLY, THEY WERE JUST PERSONAL OBSERVATIONS AT THAT

26  TIME, ALTHOUGH THERE WAS NO DOUBT HE WAS A BOARD

27  MEMBER, A KEY PERSON TO DO PRELIMINARY WORK ON

28  BEHALF OF DVD, AND THAT WAS A PREDICATE FOR FUTURE

1    ACTION.

2            AT A BOARD MEETING BRUCE TURNBULL WAS

3    CHAIR OF THE LITIGATION COMMITTEE.  I THINK

4    MR. HANNIBAL MADE IT CLEAR TO ME THAT HE WOULDN'T

5    HAVE DONE THESE THINGS THAT HE DESCRIBED UNLESS HE

6    FELT, WHETHER BY FORMAL VOTE OR NOT, HE WAS ACTING

7    ON BEHALF OF THE CORPORATION.  AND THAT HAS NOT BEEN

8    CHALLENGED, I BELIEVE.

9            HE IS THE ONE THAT TESTIFIED MR. TURNBULL

10   HAD BEEN INVOLVED IN THE DRAFTING OF EXHIBIT 156,

11   THE CSS LICENSING AGREEMENT.  MR. HANNIBAL HIMSELF

12   DID NOT REVIEW THAT LICENSE, THE LICENSE SIGNED BY

13   THE DEFENDANT.  HE WAS AWARE OF SOME OF THE

14   TECHNICAL SPECIFICATIONS, BUT HE WAS NOT AWARE OF

15   THE TECHNICAL SPECIFICATIONS AT THE TIME NOTED; THAT

16   IS, THE TIME OF EXECUTING THE CONTRACT -- EXCUSE ME,

17   AT THE TIME THE DECISION WAS MADE TO SUE, HE ALONG

18   WITH OTHERS RELIED UPON COUNSEL.  THAT WAS LEFT A

19   LITTLE HANGING.  I WASN'T ENTIRELY CLEAR WHAT WAS

20   COMMUNICATED, BUT ALTHOUGH I WAS FREQUENTLY INVOLVED

21   IN QUESTIONING.  IT REALLY WASN'T WORTH THE TIME,

22   AND IT WASN'T EXACTLY CLEAR WHEN HE REVIEWED IT.  AT

23   THE TIME HE VOTED, HE SAID HE WAS I WAS NOT CLEAR

24   WITH THE SPECIFICATIONS.

25           DR. ALAN BELL.  ALL ACKNOWLEDGED THAT HE

26   WAS A MAN OF IMPRESSIVE CREDENTIALS AND GREAT

27   ACHIEVEMENTS.  WE ALL LIKE TO WRITE THESE

28   ACHIEVEMENTS IN OUR BOOK OF LIFE.  I SAY THAT VERY

842

```
 1   SINCERELY, VERY HUMBLING.  I HEAR ALL MANNER OF
 2   PEOPLE.  IT'S A LIBERAL EDUCATION.  I GET PAID FOR
 3   IT.  I'M STILL PINCHING MYSELF.
 4          TREMENDOUS BACKGROUND.  TOTALLY UNKNOWN TO
 5   KALEIDESCAPE.  HE COULD NOT HELP IN DETERMINING THE
 6   ACTUAL INTENTIONS BETWEEN THE PARTIES.  HE WAS
 7   REALLY CALLED UPON TO GIVE GREAT AND DEEP HISTORICAL
 8   KNOWLEDGE CONCERNING THE WHOLE EVOLUTION OF THE
 9   PROCESS, A VERY INTRICATE PROCESS REQUIRING THE
10   CLOSE INTERACTIONS BETWEEN A NUMBER OF CONSTITUENT
11   GROUPS, AND THE MEETINGS THAT WERE IN MANY WAYS OPEN
12   TO INDIVIDUALS WHO WOULD CALL THEMSELVES CONSUMERS.
13   AND I'M JUST BROADLY SPEAKING.  WHATEVER THE ACTUAL
14   CONSTITUTION OF THE GOVERNING BOARD MIGHT BE
15   DESCRIBED, SOMETHING THAT WAS A PROCESS THAT WAS
16   INTENDED TO BE BENEFICIAL AND SPEAKING TO THE PUBLIC
17   INTEREST, BE BENEFICIAL TO THE PUBLIC AND ALLOW THE,
18   I THINK, TECHNOLOGY TO THRIVE AND HE DIDN'T COMMENT
19   ON THE DETAILS, CERTAINLY, OF ANYTHING THAT HAPPENED
20   BETWEEN THESE PARTIES BECAUSE HE DIDN'T KNOW ABOUT
21   IT.
22          HE DID TESTIFY THAT ANY BREACH OF THE
23   CONTRACT -- AND I REALLY TEND TO THINK FROM WHAT I
24   HEARD THAT IT WOULD BE HIS UNDERSTANDING OF THE CORE
25   ELEMENTS OF THE CONTRACT.  HE WAS NOT CALLED AS A
26   LAWYER, DRAFTSPERSON, ANYTHING LIKE THAT.  WHO IN
27   THE WORLD WOULD COME IN TO TESTIFY ABOUT THESE
28   MATTERS AND OFFER OPINION ON THE DETAILS OF THESE
```

1   CONTRACTS UNLESS THEY PURPORTED TO KNOW AS A

2   SCIENTIFIC KNOWLEDGEABLE PERSON?  HE'S NOT GOING TO

3   GO BEYOND HIS KNOWLEDGE, I THINK.

4           HE DID EXPRESS OPINIONS.  AND AS IT

5   RELATES TO OPINIONS, AS IT RELATES TO OPINIONS NOT

6   BASED ON PERSONAL KNOWLEDGE OF FACTS, THE COURT HAS

7   AN OBLIGATION TO CONSIDER ONE EXPERT AS TO THAT OF

8   ANOTHER AND GIVE IT WHAT WEIGHT, IF ANY, I THINK

9   IT'S ENTITLED TO.

10          I THINK I EXPLAINED IN OUR COLLOQUY

11  EARLIER THAT THERE WAS NO OBLIGATION OF EITHER PARTY

12  TO CALL AN EXPERT OF LAW.  IT'S NOT A MEDICAL

13  MALPRACTICE CASE IN WHICH ONE CANNOT BRING A CLAIM

14  AGAINST A LICENSED PROFESSIONAL IN MANY INSTANCES

15  UNLESS THERE IS SOMEONE WHO WILL STAND UP AND BE

16  ACCOUNTABLE FOR THEIR OPINIONS AS THE PERSON

17  VIOLATING A STANDARD OF CARE.  THE STANDARD OF CARE

18  IS REALLY PASSED ON TO ANCIENT LEARNING AND

19  LICENSURE PROCEDURES AND THE LIKE.

20          SO WHEN HE SAID ANY BREACH, I DON'T THINK

21  HE WAS OPINING ON THE SPECIFICS OF ANY INTERACTION

22  BETWEEN THE PARTIES HERE.  BUT HE CERTAINLY WAS

23  GIVEN QUESTIONS IN THE NATURE OF HYPOTHETICALS.  HOW

24  WOULD THIS IMPACT UPON THE CORPORATION?  AND HE

25  INDICATED, I THINK RATHER ROBUSTLY, IT WOULD

26  CONSTITUTE IRREPARABLE HARM, VERY SIGNIFICANT

27  DAMAGE, AN EROSION OF TRUST.  HE ALSO, IN RESPONSE

28  TO QUESTIONS, HAD AN OPINION THAT IT WAS NOT

1   FEASIBLE TO PUT MARKERS ON RENTAL DVD'S AMONG OTHER

2   THINGS.

3          ANDY PARSONS SPOKE.  HE IS AT PIONEER

4   ELECTRONICS; A DVD CCA BOARD MEMBER.  HE VOTED TO

5   BRING THE ACTION.  HE TALKED ABOUT THE PRODUCTION

6   AND THE LOW COST.  IF WHAT KALEIDESCAPE DOES IS

7   REPLICATED, COST WILL BE DRIVEN DOWN.  THIS WILL

8   THREATEN THE BUSINESS AND CONSUMER ELECTRONICS

9   INDUSTRY.

10          AND I APPRECIATE MR. COATES DRAWING HIS

11  TESTIMONY TO MY RECOLLECTION IN OUR COLLOQUY IN

12  ARGUMENT.  BECAUSE I DID GO BACK THROUGH MY NOTES ON

13  THAT ISSUE.  HE FELT THAT PRODUCERS WOULDN'T SELL.

14  I THINK HE -- SOMEONE SAID PERHAPS PARAMOUNT WAS THE

15  LAST TO COME IN.  AT LEAST THAT'S MY RECOLLECTION.

16  IN OTHER WORDS, FROM MY -- PARAMOUNT SAID, WE WERE

17  THE LAST TO JOIN BECAUSE WE WERE CONCERNED ABOUT

18  SECURITY.  OF COURSE, MR. PARSONS DID NOT READ THE

19  CSS LICENSE AGREEMENT.  HE, TOO, RELIED UPON

20  COUNSEL.

21          MR. CHEENA SRINIVASAN.  I'LL PROBABLY GO

22  THROUGH THESE WITNESSES AND THEN TAKE A LITTLE BREAK

23  AND THEN CONTINUE.  HE WAS A FOUNDER, REALLY AN IDEA

24  MAN.  HE HAS TWO DEGREES, I THINK, FROM MIT, A

25  MASTER'S DEGREE AND AN MBA FROM THE SLOAN SCHOOL OF

26  BUSINESS.  HE EXPRESSED THE VIEW ON BEHALF OF THE

27  DEFENDANT.  I THINK CHIEF OPERATING OFFICER.  IF I

28  HAVE THE TITLES WRONG, IT'S INCIDENTAL AND NOT

1    NECESSARY TO ANYTHING I'M DOING HERE.  VERY

2    RESPONSIBLE PERSON.  ONE OF THE FOUNDERS.  FULLY

3    AUTHORIZED TO SPEAK AS A KNOWLEDGEABLE PERSON ON

4    BEHALF OF THE DEFENDANT.  THAT HE HELD A STRONG

5    BELIEF THAT IT WAS IMPORTANT FOR CUSTOMERS TO KNOW

6    THAT THE DEFENDANT WAS FULLY COMPLIANT AND KNOW THAT

7    IT HAD AND MAINTAINED ALL NECESSARY LICENSES.

8            HE DID -- THERE WAS SOME DEPOSITION

9    TESTIMONY ON HIS READING OF THE GENERAL

10   SPECIFICATIONS, WHETHER HE THOUGHT THEY WERE PART OF

11   THE TECHNICAL SPECIFICATIONS.  HE WAS ASKED IN A

12   DEPOSITION, DO YOU HAVE ANY REASON TO DOUBT THAT

13   THE -- IN EFFECT, THE GENERAL SPECIFICATIONS ARE THE

14   TECHNICAL SPECIFICATIONS?  HIS ANSWER TO THAT

15   QUESTION, DO YOU HAVE ANY REASON TO DOUBT? WAS,

16   QUOTE, NO, CLOSE QUOTE.

17           HE INDICATED -- I'LL COMMENT ON THIS LATER

18   ABOUT THE -- MR. COLLENS' WORK AS A FOUNDER AND HIS

19   GENERAL DEVELOPMENT, TO THE RESPONSIBILITIES AND

20   ACTS OF MR. COLLENS, AS THE SOCIAL WORKERS SAY IN A

21   PASSIVE VOICE, CONCERNING TO ALL OF THE CORPORATION

22   AT THE TIME THE CERTAIN ACTION WAS TAKEN.

23           ULTIMATELY, MR. COLLENS VOLUNTARILY LEFT

24   TO MOVE ON, AS HE SAID LATER, MAYBE GET INVOLVED IN

25   ANOTHER SMALL VENTURE.  THIS ONE WAS GROWING.

26           I WROTE THE NAME ROD, LAST NAME

27   D-J-U-K-I-C-H.

28           MR. COATES:  DJUKICH, YOUR HONOR.

1          THE COURT:  I BELIEVE THAT MR. SRINIVASAN

2     SAID THAT THAT PERSON, ROD WAS THE ONLY PERSON THAT

3     HE DEALT WITH DIRECTLY AT DVD CCA.  HE EXPRESSED THE

4     OPINION THAT THE CORPORATION WAS IN COMPLIANCE WITH

5     ITS CONTRACTUAL OBLIGATIONS.  AND HE TESTIFIED

6     CONCERNING THE HEAVY EMPHASIS THAT HE SAID

7     KALEIDESCAPE PLACED AND CLEARLY COMMUNICATED TO ALL

8     DEALERS THAT THEY MUST BE FULLY COMPLIANT.

9          HE INDICATED WHEN THE PRODUCT WAS SHIPPED,

10    THE VARIOUS PRESTIGIOUS AND TECHNICAL AWARDS AND

11    ASSOCIATION AWARDS, ABOUT 25 IN NUMBER, THAT HAD

12    BEEN AWARDED TO KALEIDESCAPE.

13         MR. JOHN JULIAN HOY TESTIFIED ON A COUPLE

14    OF OCCASIONS, MOST RECENTLY IN A BRIEF REBUTTAL.  HE

15    TESTIFIED ON MONDAY, MARCH 26TH.  HE WAS THE

16    PRESIDENT AND SECRETARY OF DVD CCA.  DVD CCA WAS

17    DESCRIBED AS A CORPORATION THAT HAS OFFICERS AND NO

18    EMPLOYEES.  AND I WON'T BELABOR THE RECORD BECAUSE

19    THE CONSTITUENT MEMBERSHIP WAS WELL DESCRIBED AND IS

20    REALLY NOT CONTESTED.  I UNDERSTOOD HOW THAT

21    ORGANIZATION MAINTAINS ITS MEMBERSHIP AND ITS

22    GOVERNING BOARD, ITS TERMS OF YEARS, AND ITS PROCESS

23    FOR THE RENEWAL OR PUTTING UP NEW NOMINEES AND THE

24    LIKE.

25         HE INDICATED THAT DOCUMENTS EXHIBITS 4,

26    17, AND 156 ARE ALL PUBLICLY AVAILABLE FOR ANYONE TO

27    LOOK AT ON THE PLAINTIFF'S WEBSITE.  HE DESCRIBED

28    PROCEDURES TO -- IN ORDER TO SECURE A LICENSING

1    AGREEMENT AND HOW ONE THEN OBTAINS THE TECHNICAL

2    SPECIFICATIONS AFTER, AND IN NO PARTICULAR ORDER,

3    THE EXECUTION OF THE AGREEMENT, THE FILLING OUT OF

4    FORMS, THE PAYMENT OF THE APPROPRIATE MONEY

5    CONSIDERATION.

6         HE ACKNOWLEDGED THAT EXHIBIT NUMBER 156 AT

7    PAGE KAL -- I THINK IT WAS 605, 621 -- DID NOT LIST

8    THE GENERAL SPECIFICATIONS ON THE LIST.  THE POINT

9    AND COUNTERPOINT WAS DEVELOPED, PERHAPS IN REBUTTAL

10   AS WELL, AS TO WHAT TO MAKE OF THAT, IF ANYTHING.

11        HE TALKED ABOUT THE CP TWIG, THE CONTENT

12   PROTECTION TECHNICAL WORKING GROUP, AND CPAC, THE

13   CONTENT PROTECTION ADVISORY COUNSEL.  HE

14   EMPHASIZED -- HE TALKED ABOUT THE DRAFTING

15   COMMITTEE.  THE DRAFTING COMMITTEE -- AND DR. BELL

16   CONFIRMED THIS.  DR. BELL TESTIFIED THAT HE ATTENDED

17   ABOUT TWO MEETINGS, PERHAPS ONE OR TWO MEETINGS OF

18   THE DRAFTING COMMITTEE.  REALLY HE WAS PASSING THE

19   BATON AT THAT TIME TO THE COMMITTEE THAT MET OVER A

20   HUNDRED TIMES TO DRAFT THE DOCUMENT THAT IS SAID TO

21   BE THE CONTRACT.  LEGAL COUNSEL OF TOSHIBA WANTED TO

22   TALK, MATSUSHITA, HITACHI, IT COUNSEL, AND A NOW

23   DEFUNCT COMPANY.  AND HE NOTED THAT EXHIBIT 4 AT

24   PAGE KAL 018753 DID NOT INCLUDE THE GENERAL SPECS,

25   SPECIFICATIONS, IN WORDS.

26        MICHAEL -- DR. MICHAEL ALEXANDER MALCOLM

27   TESTIFIED.  HE TALKED ABOUT HIS BACKGROUND AS AN

28   ENTREPRENEUR.  AND ALONG WITH OTHER FOUNDERS AT

1   KALEIDESCAPE AND KEY PEOPLE AT KALEIDESCAPE DID NOT

2   HAVE A BACKGROUND IN VIDEO OR CONSUMER ELECTRONICS

3   ENTERTAINMENT, MOSTLY WAS IN EDUCATION AND TEACHING.

4   HE GOT TOGETHER WITH MR. SRINIVASAN; AND MR. COLLENS

5   LATER TESTIFIED, THEY WERE BRAINSTORMING WHAT THEY

6   WANTED TO DO.  THEY WANTED SOMETHING SIMPLE, SAFE,

7   RELIABLE, LIKE AN APPLIANCE THAT MY MOTHER-IN-LAW

8   COULD OPERATE.

9        I'M NOT DISPARAGING MOTHER-IN-LAWS.  MY

10  WIFE IS A MOTHER-IN-LAW.  SHE HANDLES THIS STUFF.  I

11  CAN'T GET THIS, PUSH THE BUTTONS, SHE DOES THAT VERY

12  ABLY.  IF I DON'T, I SAY, I'M GOING TO GO TO MY ROOM

13  AND READ.  NO, NO, I WANT YOU TO SEE THIS MOVIE.

14        THEY VISITED HOLLYWOOD.  AS AN

15  ENTREPRENEUR, HE UNDERSTOOD HE WAS VOLUNTARILY

16  UNDERTAKING BIG RISKS.  THERE WERE HIGH HURDLES.

17  DID RESEARCH.  THE PRODUCT CONCEPT EVOLVED A LOT

18  OVER TIME WERE HIS WORDS.  HE SAID, WE WERE SILICON

19  VALLEY COMPUTER PEOPLE WITH NO EXPERIENCE IN VIDEO

20  OR ELECTRONICS.  WE, QUOTE, CAME FROM ENTERPRISE,

21  STAR TREK, DIDN'T WANT TO MAKE DOLLARS OFF SOMEBODY

22  ELSE'S MISFORTUNE.

23        NOW, I UNDERSTAND ALL OF THIS IS SUBJECT

24  TO CHARACTERIZATION, SELF-SERVING AS OPPOSED TO

25  FULLY ACCURATE.  WE'RE ALL PEOPLE.  LOTS OF STUDY ON

26  MEMORY HAS SHOWED THAT OUR MEMORY EVOLVES OVER TIME,

27  OUR STORY GETS TOLD.  MOST PEOPLE DON'T COME INTO

28  COURT TO STRAP ON AN ARM OR TO TELL A LIE.  THERE IS

```
 1    SO MANY CLASSIC STUDIES IN PSYCHOLOGY ABOUT PEOPLE
 2    WHO SAW THE HARVARD BOSTON GAME, SOMETHING HAPPENED
 3    ON THE FIELD, THEY REPEAT IT.  I'M MORALLY CERTAIN
 4    THAT STANFORD WON THE BIG GAME AND THAT THE BAND RAN
 5    ONTO THE FIELD.  OTHER PEOPLE WHO COUNT SAY NO.
 6    I'VE LONG LIVED TO ACCOMMODATE MYSELF TO THAT FACT
 7    OF LIFE.
 8              HE INDICATED THERE WERE LOTS OF
 9    DISCUSSIONS AND RESEARCH ON HOW TO PREVENT MISUSE.
10    HE GOT INTO THE SPECIFICS.  HE TALKED ABOUT THE
11    BENEFITS AND BURDENS OF DIFFERENT CHOICES.  AND HE
12    TALKED GENERALLY ABOUT THE IDEA OF LARGE CHANGERS.
13    HE SAID THEY WERE UNRELIABLE, VERY EXPENSIVE, TOOK A
14    LOT OF ELECTRICITY, HAD NEED FOR REPAIRS.  THIS
15    WASN'T GOING TO WORK WE THOUGHT WITH CONSUMERS WHO
16    ARE HIGH END WHO DON'T WANT TO HAVE A REPAIR PERSON
17    COME TO THEIR HOME EVERY DAY.  CONSIDERED THE VAULT
18    BOX.  HAD A LITTLE FUN AT THE FORMER VICE PRESIDENT.
19    HE TALKED ABOUT DVD DESTRUCTION, ESCROWING DVDS.
20              HE DID INVESTIGATION OF COPYRIGHT,
21    CONTACTED COUNSEL.  I DIDN'T HEAR ANY TESTIMONY.  IN
22    FACT, I THINK IT WAS THE CONTRARY, NOBODY SECURED A
23    WRITTEN LEGAL OPINION ON WHICH THEY PURPORT TO RELY
24    HERE IN COURT, I UNDERSTAND.  BUT THE EACH OF THE
25    WITNESSES -- AND I'LL GO THROUGH THEM.  IN A SHORT
26    TIME, WE'LL TAKE A RECESS.  I'M PRETTY SURE WE CAN
27    GET THIS DONE BY NOON.  IF NOT, WE'LL CONTINUE.
28              THAT EVERYONE, THAT IS, MR. COLLENS,
```

1    MR. SRINIVASAN, AND DR. MALCOLM, WERE CONCERNED.

2    THEY WERE ANXIOUS, IT APPEARS, ABOUT WHAT WOULD BE

3    IN THAT CONTRACT, WOULD IT PROHIBIT THEIR EVOLVEMENT

4    AND CONCEPT OF THE BUSINESS MODEL.

5         HE WAS RELIEVED -- HE WAS RELIEVED WHEN

6    THERE WAS NO PROHIBITION FOR PERSISTENT DIGITAL

7    COPYING.  THE CONTRACT FROM HIS PERSPECTIVE SEEMED

8    TO BE WRITTEN IN ANTICIPATION OF PEOPLE MAKING

9    COPIES, DR. MALCOLM SAID.

10        HE HAD THEN COLLENS REVIEW COMPLIANCE.

11   THERE WAS, QUOTE, NEVER AN INTENTION TO MAKE A

12   NONCOMPLIANT SYSTEM.  LATER DR. STEPHEN WATSON GOT

13   INVOLVED IN A SECOND COMPLIANCE INVESTIGATION.

14   QUOTE, A DOUBLE-SURE AUDIT IS HOW HE CHARACTERIZED

15   IT.

16        HE PUT A LOT OF MONEY INTO THE BUSINESS

17   VENTURE, UP TO $6 MILLION OF HIS OWN MONEY.  HE

18   ALPHA TESTED IT WITH HIS KIDS.  HE BETA TESTED IT,

19   TOO.  SOMEBODY CORRECTED ME.  WHATEVER THAT MIGHT

20   MEAN.

21        HE TALKED IN DETAIL ABOUT THE FEATURES OF

22   THE PRODUCT WHICH ARE NOT DEPENDENT UPON RESOLUTION

23   OF THIS DISPUTED ISSUE.  THE ACCESS DATA, TITLE, THE

24   COVER ART, THE RUN TIME, THE ASPECT RATIO, WHICH IS

25   A HEIGHT TO WIDTH RATIO, MOVIE GUIDE SERVICE.  THE

26   COMPANY HAS 43,000 MOVIES IN ITS DATABASE.  THAT'S A

27   VERY IMPORTANT PART OF THEIR SERVICE, HE SAYS.

28        THE TECHNICAL -- THEY PROVIDE TECHNICAL

1   SUPPORT TO DEALERS, 668 IN THE U.S. AND CANADA AS OF

2   A FEW WEEKS AGO, 190 ELSEWHERE AROUND THE WORLD.

3   870, 42 COUNTRIES.

4          HE EMPHASIZED THE EFFORTS OF KALEIDESCAPE

5   TO MAKE AN EXCEEDINGLY SECURE SYSTEM.  AND HE TALKED

6   ABOUT THE MARKING OF DVD'S AND WHAT, BASED ON HIS

7   RESEARCH, HE THOUGHT INDUSTRY PEOPLE COULD DO SO

8   THAT THIS COULD END UP BEING A WIN-WIN SITUATION FOR

9   EVERYBODY.  THAT IS, THE MOVIE PRODUCERS, ALL THE

10  CONSTITUENT ELEMENTS.

11         AND I TOOK THAT AS TESTIMONY ON THE ISSUE

12  OF RELATIVE HARDSHIPS, INDICATING THAT HIS OPINIONS,

13  JUST LIKE OTHER OPINIONS, WERE OFFERED AND NOT

14  OBJECTED TO.  ALTHOUGH THERE IS NO SUGGESTION FROM

15  HIS TESTIMONY THAT DVD COPY CONTROL ASSOCIATION,

16  INCORPORATED, COULD FORCE CHANGE, THAT INDUSTRY

17  PLAYERS COULD THROUGH ITS PROCESSES SEE THE LIGHT,

18  FROM HIS PERSPECTIVE, AND EVERYONE COULD DO WELL, HE

19  THOUGHT.

20         HE TESTIFIED ABOUT THE MEETING IN LAS

21  VEGAS, THE THOUGHTS HE HAD BEFORE EXECUTING THE

22  CONTRACT THAT THERE WOULD BE SOME SORT OF MEETING OR

23  JUSTIFICATION REQUIRED.  HE WAS SURPRISED THAT THAT

24  WAS NOT GOING TO HAPPEN.

25         EACH OF THE WITNESSES TESTIFIED, THOSE WHO

26  HAD PERSONAL KNOWLEDGE ON KALEIDESCAPE'S SIDE, AND

27  PERSONALLY RATIFIED BY MR. HOY, THAT ON -- WELL,

28  MR. HOY RATIFIED THE PROCESS, NOT ACKNOWLEDGE ABOUT

1    THE DEFENDANT'S CONDUCT.  BUT THE DEFENDANTS SAID

2    THEY WERE EXPECTING TO MEET AND CONFER.  THEY CALLED

3    A NUMBER, WERE TOLD THERE WERE NO EMPLOYEES, SIGN

4    THE DEAL OR NOT.  NO NEGOTIATION.  NO CLARIFICATION

5    POSSIBLE.

6         AND THEY THOUGHT IT WAS ESSENTIAL TO GET

7    THE LICENSE, AS IT HAS BEEN ESSENTIAL TO GET ANY

8    OTHER LICENSES, WHICH DEFENDANT SAYS THERE HAVE BEEN

9    RIGOROUS JUSTIFICATION, BUT NOT PROBLEMATIC TO

10   ATTAIN.  I MAY HAVE GONE TOO FAR IN SUGGESTING IT

11   WAS NOT PROBLEMATIC TO OBTAIN.  THIS WAS THE MOST

12   BURDENSOME PROCESS.  AND WE HELD THE OTHER LICENSES

13   WITHOUT OBJECTION.

14        DR. MALCOLM TESTIFIED THAT REALLY THE

15   COMPANY IS AT STAKE.  HE WAS CROSS-EXAMINED BY

16   REFERENCE TO WEBSITES, PUBLICATIONS, AND THE LIKE,

17   THAT THE COMPANY WOULD CONTINUE TO SERVE ITS

18   CUSTOMERS AND WOULD CONTINUE TO PROVIDE OTHER

19   SERVICES.  IN THE NATURE OF IMPEACHMENT, QUESTIONS

20   BASED ON PRIOR STATEMENTS, DR. MALCOLM INDICATED

21   THAT -- I TOOK FROM HIS TESTIMONY THAT IT WOULD BE

22   PROBABLY A SLOW RIDE, MAYBE A QUICK RIDE DOWNWARD.

23   THEY WOULD OBVIOUSLY HONOR, FROM HIS PERSPECTIVE,

24   THEIR CONTRACTUAL BUSINESS OBLIGATIONS AS LONG AS

25   THEY COULD.  BUT THEIR BUSINESS MODEL IS BASED ON

26   THEIR ABILITY TO DO WHAT PLAINTIFF CHALLENGES.  AND

27   HE TALKED ABOUT THE GENERAL SALES AND HOW THAT WOULD

28   BE IMPACTED IN A GENERAL WAY.

**Exhibit L, Page 108**

1          DANIEL COLLENS TESTIFIED.  HE TALKED ABOUT

2     THE SUPER SECURE SYSTEM WITH THE AES 256.

3          IS THAT THE RIGHT NUMBER, 256?

4          MR. MOORE:  YES, YOUR HONOR.

5          THE COURT:  MORE SECURE THAN A STANDARD

6     OPERATING SERVER -- SYSTEM, EXCUSE ME.  HE DIDN'T

7     KNOW EITHER ABOUT THE DVD CCA PROCESSES.  I'LL

8     SHORTHAND IT BY SAYING MORE OF THE SAME, BUT FROM

9     HIS PERSPECTIVE -- AS TO SAYING HOW THEY WOULD HAVE

10    ATTAINED THE LICENSE AND A SURPRISE THAT THERE WAS

11    NO PROCEDURE FOR A SIT-DOWN, THAT TYPE OF THING.

12    BUT WHEN THE LICENSE DOCUMENTS CAME AND HE RECEIVED

13    THEM IN WATERLOO, HE READ THEM ONCE VERY CAREFULLY,

14    PROBABLY TWICE, AND, QUOTE, DOZENS OF TIME SINCE,

15    TRYING TO FOLLOW AN ANALYTICAL PATH ON SPECIFIC

16    ISSUES.

17          BUT AT THE TIME -- I HAD IN MY NOTES,

18    FIGURATIVELY SPEAKING -- BUT LIKE DR. MALCOLM AND

19    MR. SRINIVASAN, THAT HIS HEART LEAPED WITH JOY THAT

20    THE BUSINESS MODEL WAS NOT PROHIBITED.  HE WENT

21    FORWARD, HE SAID.

22          AND HE INDICATED IN SOME DETAIL FROM HIS

23    MATHEMATICAL AND LOGICAL BACKGROUND HOW HE

24    ATTEMPTED -- I'M QUITE SURE IT WAS MR. COLLENS,

25    ALTHOUGH DR. WATSON TESTIFIED TO THE SAME EFFECT --

26    HOW THEY WENT ABOUT ATTEMPTING TO INSURE COMPLIANCE,

27    AND TO THEMSELVES THEY WERE COMPLIANT.

28          HE CONFESSED TO HIS OWN TRANSGRESSIONS AND

1    INDICATED WHAT HAPPENED.  HIS MOTHER CAME OVER, AND

2    HE PUT MOM'S RENTAL IN THE DVD MACHINE.  AND HE

3    TESTIFIED ABOUT THAT.  AND HE WAS CHASTISED FOR

4    THAT, IN EFFECT.  HE DELETED IT, HE SAID, RIGHT

5    AWAY.

6              DR. STEPHEN WATSON TESTIFIED.  AND HE

7    TESTIFIED ABOUT THE HISTORY OF COMPLIANCE EFFORTS,

8    THE WORK OF MR. BRYANT, THE EARLY FEELING THAT THAT

9    WORK WAS NOT SUFFICIENTLY WELL-GROUNDED, THAT THE

10   COMPANY COULD RELY UPON IT, AND THE PASSING OF THAT

11   BATON TO MR. COLLENS, MR. COLLENS' EFFORT AND --

12   JUST ONE SECOND.  MAYBE COUNSEL CAN HELP ME.  I'M

13   THINKING OF 343 AND 344.  ONE WAS ABOUT A YEAR

14   BEFORE DR. WATSON'S EFFORT

15             MR. COATES:  THAT'S RIGHT, YOUR HONOR.

16   DR. WATSON WAS 2003.

17             THE COURT:  AND SO DR. WATSON'S, WAS HIS

18   COMPLIANCE REPORT 344 OR 343?

19             MR. MOORE:  ONE OF THOSE TWO, YOUR HONOR.

20             THE COURT:  DON'T WORRY ABOUT IT.  I

21   ACKNOWLEDGE THAT THERE WAS A SEQUENCE FROM THE

22   E-MAIL WITH MR. BRYANT AND THEN LATER WITH

23   MR. COLLENS' EFFORT AND THEN A FURTHER DETAILED

24   PRESENTATION.

25             MR. MOORE:  I NOW HAVE THE ANSWER, YOUR

26   HONOR.  DR. WATSON'S EFFORT WAS EXHIBIT 344.

27             THE COURT:  THAT'S WHAT I HAD NOTED.

28             MR. MOORE:  YES.

```
1              THE COURT:  OKAY.  AND I THINK -- SO THAT
2     343 WAS --
3              MR. MOORE:  WAS MR. COLLENS' PRECONTRACT.
4              THE COURT:  RIGHT.  DANIEL HARKINS
5     TESTIFIED.  AND HE TESTIFIED TO HIS REVIEW -- HE WAS
6     A DESIGNATED EXPERT WITNESS AS WELL.  AND HE
7     TESTIFIED THAT THE GENERAL SPECIFICATIONS ARE
8     INFORMATIVE, NOT NORMATIVE.  AND HE TALKED ABOUT
9     WHAT PEOPLE IN HIS LINE OF WORK DO TO TAKE THESE
10    DOCUMENTS AND APPLY THEM, AS THESE PEOPLE WITH
11    SPECIALIZED KNOWLEDGE DO, TO APPLY THEM TO THEIR
12    TASKS TO CARRY OUT THEIR ASSIGNMENTS.
13             AND HE SAID THAT THE GENERAL
14    SPECIFICATIONS WERE NOT THE NORMATIVE DOCUMENTS THAT
15    PEOPLE IN HIS LINE OF WORK USE TO DETERMINE WHAT
16    SHALL AND SHALL NOT BE DONE, WHAT MAY OR MAY NOT BE
17    DONE, WHAT MUST OR MUST NOT BE DONE.  INSTEAD THEY
18    WERE INSPIRATIONAL, ASPIRATIONAL GOALS.  AND THAT'S
19    BEEN THE SUBJECT OF BRIEFING AND ARGUMENT, AS WELL.
20             DENISE MALCOLM TESTIFIED.  SHE TESTIFIED
21    THAT SHE'S GENERAL COUNSEL.  I THINK THEY NEED TO
22    GET THAT STRAIGHTENED OUT.  I THOUGHT HER HUSBAND
23    SAID SHE WAS ACTING GENERAL COUNSEL.  I DON'T
24    INVOLVE MYSELF IN THAT WAY.  IT'S AN IMPORTANT
25    POSITION WITHIN THE CORPORATION AND IN LAW.  SHE
26    HAS, LIKE EVERYBODY ELSE, A DISTINGUISHED BACKGROUND
27    AND TESTIFIED THAT SHE REALLY DOES SOUP TO NUTS,
28    WHATEVER SHE CAN DO TO HELP OUT THE BUSINESS
```

1   ENTERPRISE.  BUT SHE CARRIES OUT THE GENERAL COUNSEL

2   TASKS.

3           AND THAT SHE ALONG WITH OTHER WITNESSES

4   TESTIFIED THAT THEY WERE VERY SURPRISED WHEN AFTER

5   RECEIVING MR. ROODMAN'S LETTER AND PREPARING -- WITH

6   TESTIMONY FROM DR. MALCOLM AND OTHERS, DR. STEPHEN

7   WATSON -- PERHAPS A GOOD PART OF FOUR TO FIVE WEEKS

8   TO PREPARE THIS SUBMISSION, THAT IT WAS, I THINK,

9   PRETTY RUDELY REJECTED.

10          BUT THAT'S NOT -- IT'S ONLY CONTEXTUAL.

11  BECAUSE I KNOW THERE'S AN OFFER THAT THE PARTIES

12  NEVER GOT TO A MEANINGFUL EXCHANGE.  IT SUGGESTS

13  THAT THE PARTIES WANTED THAT MEANINGFUL EXCHANGE.  I

14  UPHELD ALL OBJECTIONS COMING TO THAT.

15          PEOPLE SOMETIMES COME TO COURT AND SAY,

16  HOW DID THAT HAPPEN?  AND MONDAY -- I HAVE A DAY SET

17  ASIDE FOR MEDIATION.  PEOPLE SAY THEY CAME.  I TOLD

18  THE LAWYERS, DON'T WASTE MY VALUABLE TIME UNLESS

19  THESE PARTIES ARE IN A MOOD TO MEDIATE.  OTHERWISE

20  I'LL SAY GOODBYE IN A HALF HOUR.

21          JEFFREY FRANKLIN WAS THE LAST WITNESS FOR

22  KALEIDESCAPE.  HE'S AN INSTALLER, WORKS IN CORTE

23  MADERA, AND TALKS ABOUT WHAT HE DOES AND THE

24  KALEIDESCAPE PRODUCT IS REALLY VERY ADVANCED.

25  PLAINTIFF HAS CERTAINLY NEVER DISPARAGED THE PRODUCT

26  AND HOLDS -- IT'S AN IMPORTANT PART OF HIS WORK.

27  AND HE TALKED ABOUT OTHER DETAILS THAT I WON'T GO

28  INTO.

1          AND THEN, FINALLY, MR. HOY TESTIFIED.  I

2     BELIEVE I'VE TOUCHED UPON ALL THE WITNESSES HERE.

3          MR. MOORE:  YES, YOUR HONOR.

4          MR. COATES:  YES, YOUR HONOR.

5          THE COURT:  WELL, I THINK IT'S AN

6     APPROPRIATE TIME TO TAKE A RECESS.  THIS ISN'T

7     NECESSARY TO A STATEMENT OF DECISION TECHNICALLY,

8     BUT MY OWN BELIEF THAT PARTIES ARE IN A BETTER

9     POSITION TO DECIDE HOW TO EXERCISE THEIR CLAIMED

10    RIGHTS, AND THERE ARE MANY, OR ON THE OTHER HAND TO

11    CONFORM THEIR CONDUCT TO LAW IF THEY BELIEVE THAT

12    THE JUDGE IN A DEMONSTRATED WAY PAID CAREFUL

13    ATTENTION TO ALL THAT THEY SAID AND DID.  I BELIEVE

14    THAT'S AN IMPORTANT PART OF MY OBLIGATION AS A

15    PUBLIC OFFICIAL.  THAT'S MY DUTY.

16         WE'LL BE IN A RECESS, AND THEN WE'LL

17    CONTINUE.

18         (WHEREUPON, A SHORT RECESS WAS TAKEN,

19    AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

20         THE COURT:  WE NOW MOVE, IN MY WAY OF

21    THINKING, TO THE QUESTION OF INVOKING WHAT IS CALLED

22    EQUITY JURISDICTION.  AND THERE IS A MAXIM, OF

23    COURSE, ALONG WITH MANY OTHER MAXIMS OF JURIS

24    PRUDENCE, THAT EQUITY FOLLOWS THE LAW.  SO SOON

25    YOU'RE GOING TO BE MOVING INTO THIS ISSUE OF, UNDER

26    THE LAW, WHAT IS THIS CONTRACT?  AND THEN I'LL BE

27    CALLED UPON TO COMMENT UPON SOME OF THE ISSUES

28    CONCERNING THE REQUEST TO INVOKE THE EQUITY

1    JURISDICTION OF THE COURT.

2         AND FIRST, BEFORE DOING THAT, I WANT TO

3    TALK TO YOU A LITTLE BIT ABOUT EQUITY.  THIS ALL

4    GOES BACK TO AS EARLY AS THE 14TH CENTURY.  YOU SAY,

5    OH, NO, WE'LL BE HERE ALL WEEKEND.  NO, I'LL GET OUT

6    OF HERE BY NOON OR A LITTLE BIT LATER.  THE PARTIES

7    HAVE ENTRUSTED THIS TO THE COURT.  I WANT THEM TO

8    KNOW A LITTLE BIT ABOUT THIS.

9         IT HAPPENED IN EARLY LAW THERE WERE VERY

10   STRICT RULES.  WE HEARD, FOR EXAMPLE, THERE WAS A

11   MUSICAL, LE MISERABLE, CHASING THE PERSON AROUND

12   FOREVER WHO STOLE THE LOAF OF BREAD TO FEED HIS

13   CHILDREN, WHEN STEALING A LOAF OF BREAD WAS A

14   CAPITAL OFFENSE.

15        WELL, JURIES DISPENSED WITH THAT RULE

16   BECAUSE THEY WOULD ROUTINELY FIND PEOPLE LIKE THAT

17   NOT GUILTY, AND IT'S A FORM OF JURY NULLIFICATION.

18   AND THAT'S PART OF THE LAW.

19        THE GREAT ROSCOE POUND SAID THAT, AND I

20   DON'T ADOPT THIS, AND I'M JUST SAYING A PART OF

21   HISTORY, THAT IN ITS ACTUAL ADMINISTRATION, JURY

22   LAWLESSNESS IS A GREAT CORRECTIVENESS OF THE COMMON

23   LAW.  I'M NOT SPEAKING HERESY.  I'M TALKING ABOUT

24   THE DEAN OF THE HARVARD LAW SCHOOL.

25        BASICALLY THE KING OF ENGLAND, THROUGH HIS

26   CHANCELLORS, GAVE AUTHORITY FOR THERE TO BE A LITTLE

27   LUBRICATION IN THE JOINTS TO AVOID THE HARSH, MORE

28   DRACONIAN ASPECTS OF THE APPLICATIONS IN THE STRICT

```
 1    LETTER OF THE LAW.  AND THAT HAS EVOLVED OVER
 2    CENTURIES, A VERY VITAL PART OF OUR JURIS PRUDENCE
 3    TODAY, I MIGHT SAY, AS WELL IN CANADA, OF COURSE.
 4            I WAS JUST LOOKING AT THE CASE NOTES THAT
 5    I STUDIED IN 1964.  AND THIS ISN'T ANCIENT BECAUSE
 6    I'VE ALREADY GIVEN HISTORICAL REFERENCE BACK MANY
 7    HUNDREDS OF YEARS, BUT THE GREAT WALTER WHEELER
 8    COOK, THE GREAT PROFESSOR OF LAW AT NORTHWESTERN
 9    UNIVERSITY LAW SCHOOL, WROTE IN HIS TREATISE, UNTIL
10    THE RISE OF THE MODERN LEGISLATIVE BODY, EQUITY WAS
11    THE MOST -- EXCUSE ME -- EQUITY IS THE GREAT FORCE
12    OF LEGAL REFORM IN ANGLO AMERICAN LAW.  AND BY
13    DEVELOPMENT OF USES AND TRUSTS, IT PROFOUNDLY
14    MODIFIED THE LAND LAW OF ENGLAND AND AMERICA.  IT
15    DEVELOPED BY MEANS OF THE LAW OF TRUST THE FIRST
16    MARRIED WOMAN'S PROPERTY LAW.  IT ENABLED MARRIED
17    WOMEN TO CONTRACT WITH REFERENCE TO THEIR SEPARATE
18    PROPERTY IN EQUITY.  IT WAS THE FIRST TO ENFORCE
19    SIMPLE CONTRACTS AS EARLY AS THE 15TH CENTURY IN
20    DEVELOPING THE LAW OF, YOU GUESSED IT, SPECIFIC
21    PERFORMANCE OF CONTRACTS.
22            WELL, THE CONVEYANCE OF LAND, IT EFFECTED
23    OTHER IMPORTANT CHANGES IN THE LAW OF REAL PROPERTY.
24    IT MADE THINGS CALLED CHOSES OF AN ACTION ASSIGNABLE
25    BEFORE THE COMMON LAW ADOPTED FULLY THE ROMAN LAW
26    DEVICE OF THE POWER OF THE ATTORNEY.  IT DEVELOPED
27    MUCH OF OUR TORT LAW IN CONNECTION WITH THE ISSUANCE
28    OF INJUNCTIONS, IN LABOR DISPUTES, UNFAIR
```

1    COMPETITION.  IT CREATED SUBSTANTIALLY THE WHOLE OF

2    THE LAW OF MORTGAGES WITH ITS EQUITY OF REDEMPTION

3    AND BILLS TO FORECLOSE THAT EQUITY.

4            IT PREVENTED THE ENFORCEMENT OF JUDGMENTS

5    OF LAW, WHICH IT DEEMED INEQUITABLE TO PERMIT --

6    WHEN IT DEEMED IT INEQUITABLE TO PERMIT THEIR

7    ENFORCEMENT.  IT ORDERED THE RECONVEYANCE OF LAND

8    WHERE THE CONVEYANCE HAD BEEN OBTAINED BY FRAUD OR

9    IT WAS MADE BY MISTAKE.  IN FACT, IT WROTE NEW

10   CHAPTERS IN PRACTICALLY EVERY FIELD OF LAW.

11           IN THEODORE PLUCKETT'S TEST,

12   P-L-U-C-K-E-T-T, A CONCISE HISTORY OF COMMON LAW,

13   IT'S WRITTEN THAT THE DECISIVE TEST FOR THE

14   EXISTENCE OR NOT OF AN EQUITABLE RULE OR REMEDY IS

15   TO BE FOUND IN THE SEARCH OF THE RECORDS AND

16   DECISIONS OF THE COURTS OF CHANCERY, THAT'S THIS

17   COURT, AND IT'S MODERN SUCCESSORS.  THERE ARE,

18   INDEED, A NUMBER OF MAXIMS WHICH HAVE ALMOST

19   ATTAINED THE DIGNITY OF PRINCIPLES, BUT DEDUCTION

20   ALONE WILL NOT REVEAL THE CONTENT OF OUR SYSTEM OF

21   EQUITY.  THE ONLY AUTHORITATIVE SOURCE IS THE CUSTOM

22   OF THE COURT, AND THAT MUST BE GATHERED FROM AN

23   EXAMINATION OF THE CASES.

24           THIS IS SUCH A CASE.  WHAT I'M GOING TO BE

25   ENGAGED IN IS INTERPRETING THE CONTRACT IN

26   ACCORDANCE WITH MY UNDERSTANDING OF THE LAW AND

27   MAKING DECISIONS AND RESOLVING CONFLICTS IN

28   EVIDENCE.  AND THEN, ALTHOUGH YOU SHOULD RELY ON

1   YOUR ATTORNEYS AND NOT THE COURT ON THIS ISSUE, IF

2   THERE IS A CLAIM THAT ANYTHING I DID WAS FATALLY

3   DEFECTIVE, YOU WOULD BE IN A HIGHER COURT WHERE THE

4   JUDGES WOULD NOT HAVE SEEN THE DRAMA, BUT WHERE THEY

5   WOULD HAVE READ THE PAPERS, THE TEXT, THE PRINTED

6   PAGE.

7           AND THERE IS A VENERABLE PRINCIPLE RELATED

8   TO WHAT THE APPELLATE COURTS DO WHEN EXAMINING

9   CLAIMS OF ERROR IN RESOLVING CONFLICTS IN EVIDENCE,

10  AND IT'S CALLED THE RULE OF CONFLICTING EVIDENCE.

11  AND I'M CITING FROM WITKIN, A GREAT SCHOLAR,

12  CALIFORNIA 4TH EDITION, ON APPEAL.  I'M DOING THIS

13  BECAUSE I'M COMMUNICATING THIS DIRECTLY.  BECAUSE

14  I'VE READ HUNDREDS OF BRIEFS AND HUNDREDS OF

15  OPINIONS WHICH REPEAT THIS RULE AT SECTION 359, PAGE

16  408, VOLUME 9.

17          "WHERE THE EVIDENCE IS IN CONFLICT, THE

18  APPELLATE COURT WILL NOT DISTURB THE VERDICT OF THE

19  JURY OR THE FINDING OF THE TRIAL COURT.  THE

20  PRESUMPTION BEING IN FAVOR OF THE JUDGMENT, THE

21  COURT MUST CONSIDER THE EVIDENCE IN LIGHT MOST

22  FAVORABLE TO THE PREVAILING PARTY, GIVING THE

23  PREVAILING PARTY THE BENEFIT OF EVERY REASONABLE

24  INFERENCE AND RESOLVING CONFLICTS IN SUPPORT OF THE

25  JUDGMENT."

26          I'VE SEEN THIS WRITTEN IN SCORES OF

27  DECISIONS REVIEWING MY WORKS.  I'LL JUST QUOTE IT.

28  "THE EXPOSITION IN CRAWFORD VERSUS SOUTHERN PACIFIC

1   COMPANY, 1935, 3 CAL.2D, 427, IS TYPICAL.  THIS IS

2   THE LANGUAGE OF THE CALIFORNIA SUPREME COURT.  "IN

3   REVIEWING THE EVIDENCE ON SUCH AN APPEAL, ALL

4   CONFLICTS MUST BE RESOLVED IN FAVOR OF THE

5   RESPONDENT,"  THAT'S THE WINNING PARTY, "AND ALL

6   LEGITIMATE AND REASONABLE INFERENCES INDULGED AND TO

7   UPHOLD THE VERDICT IS POSSIBLE."  AND THAT, TAKE MY

8   WORD FOR IT, APPLIES TO THE DECISION WHEN PARTIES

9   PROCEED WITHOUT A JURY.

10          THIS IS QUOTING FROM THE SUPREME COURT.

11  "IT IS AN ELEMENTARY, BUT OFTEN OVERLOOKED PRINCIPLE

12  OF LAW THAT WHEN A VERDICT IS ATTACKED AS BEING

13  UNSUPPORTED, THE POWER OF THE APPELLATE COURT BEGINS

14  AND ENDS WITH A DETERMINATION AS TO WHETHER THERE IS

15  ANY SUBSTANTIAL EVIDENCE, CONTRADICTED OR

16  UNCONTRADICTED, WHICH WILL SUPPORT THE CONCLUSION

17  REACHED BY THE JURY."  AND THAT RULE HAS BEEN

18  APPLIED TO JUDGE TRIALS.  THAT IS, THE DECIDER OF

19  FACT.  "WHEN TWO OR MORE INFERENCES CAN BE

20  REASONABLY DEDUCED FROM THE FACTS, THE REVIEWING

21  COURT IS WITHOUT POWER TO SUBSTITUTE ITS DEDUCTIONS

22  FOR THOSE OF THE TRIAL COURT."

23          ANOTHER DECISION GOES ON TO SAY, "AND THE

24  RULE IS IDENTICAL WHERE THE TRIAL IS BY THE COURT."

25          ANOTHER CASE, BANCROFT WHITNEY COMPANY

26  VERSUS MCHUGH, M-C-H-U-G-H, A 1913 DECISION, VOLUME

27  166 CAL. PAGE 140.  "IN EXAMINING THE SUFFICIENCY OF

28  THE EVIDENCE TO SUPPORT A QUESTIONED FINDING, AN

1    APPELLATE COURT MUST ACCEPT AS TRUE ALL EVIDENCE

2    TENDING TO ESTABLISH THE CORRECTNESS OF THE FINDING

3    AS MADE, TAKING INTO ACCOUNT, AS WELL, ALL

4    INFERENCES WHICH MIGHT REASONABLY BE THOUGHT BY THE

5    TRIAL COURT TO LEAD TO THE SAME CONCLUSION.  EVERY

6    SUBSTANTIAL CONFLICT IN THE TESTIMONY IS UNDER THE

7    RULE WHICH HAS ALWAYS PREVAILED IN THIS COURT TO BE

8    RESOLVED IN FAVOR OF THE FINDING."

9         WITKIN GOES ON, "THIS FUNDAMENTAL DOCTRINE

10    IS STATED AND APPLIED IN HUNDREDS OF CASES."

11         NOW, I DIGRESSED ON THAT JUST FOR A

12    MOMENT, NOT TO IN ANY WAY -- BECAUSE I COULDN'T AND

13    WOULDN'T.  I WOULDN'T WANT TO USURP THE FUNCTION OF

14    YOU MEETING WITH YOUR LEARNED COUNSEL.  BUT TO SPEAK

15    DIRECTLY BECAUSE, OF COURSE, I'M ALWAYS HOPEFUL THAT

16    PEOPLE CAN RESOLVE THEIR MATTERS TO THEIR MUTUAL

17    SATISFACTION.  AND HAVING AT LEAST BEEN REPRESENTED,

18    THE PARTIES NEVER REALLY MEANINGFULLY TALKED ABOUT

19    THIS CONFLICT BEFORE COMING HERE.  I'M TALKING TO

20    THEM DIRECTLY FOR WHAT IT'S WORTH.  BUT IF YOU THINK

21    THE COURT MADE AN EGREGIOUS ERROR, GO FOR IT.  THE

22    CALIFORNIA CONSTITUTION SAYS, NO ERROR MATTERS

23    UNLESS PREJUDICE IS SHOWN; IT IS NEVER PRESUMED.

24    BUT I'VE CERTAINLY BEEN REVERSED.  THAT'S FOR SURE.

25         I'LL NOW REALLY FOCUS ON THE FIRST

26    SUBSTANTIAL CONTROVERTED ISSUE, WHICH IS -- I THINK

27    SIMPLY STATED IS THE DOCUMENT CALLED, GENERAL

28    SPECIFICATIONS, WHICH IS EXHIBIT 3, PART OF THE

1    CONTRACT EXHIBIT 156.  IF SO, DOES EXHIBIT 3, IF

2    FOUND TO BE PART OF THE CONTRACT EXHIBIT 156, THE

3    ONLY DOCUMENT SIGNED BY THE LAWFUL REPRESENTATIVES

4    OF THE PLAINTIFF AND DEFENDANT, IMPOSE OBLIGATIONS

5    ON KALEIDESCAPE, WHICH SHOULD BE SPECIFICALLY

6    ENFORCED OR THE SUBJECT OF AN INJUNCTION?

7         WHAT DOES 156 SAY?  WELL, IT'S SET FORTH

8    IN WRITING.  I'M NOT GOING TO REALLY GO THROUGH ALL

9    THE DETAILS HERE, BUT I'M GOING TO TALK ABOUT SOME

10   RULES OF INTERPRETATION THAT HAVE BEEN SUMMARIZED OR

11   TOUCHED UPON.  AND BY DOING THAT, IT'S REALLY

12   COMMUNICATIVE, IT'S NOT DESIGNED TO PURPORT AND CITE

13   EVERY RULE, OF COURSE.  IF IT'S NOT EXPRESSLY MADE

14   PART OF THE CONTRACT, IS EXHIBIT 3 BY NECESSARY

15   IMPLICATION OR PROPER RULE OF JUDICIAL CONSTRUCTION,

16   MOST OF THOSE RULES HAVING BEEN EMBODIED IN

17   LEGISLATIVE ENACTMENTS WHICH REALLY CONFIRM RATHER

18   ANCIENT PRACTICES, IS IT SUFFICIENTLY IDENTIFIED SO

19   AS TO BE PART OF THE CONTRACT?

20        WELL, I CONCLUDE THAT NO PART OF EXHIBIT

21   156 SPECIFICALLY CALLS OUT IN CLEAR WORDS THE

22   GENERAL SPECIFICATIONS.  SO IT -- FROM THE TEXT OF

23   156 ALONE IS NOT PART OF THE CONTRACT.  BUT, OF

24   COURSE, THAT BEGINS THE DISCUSSION.  IT DOESN'T END

25   IT.  IT MIGHT END IT IF I TOOK A VIEW THAT PAROL

26   EVIDENCE WAS INADMISSIBLE, EXCEPT THAT THE ARGUMENT,

27   FULLY ACCEPTED FOR PURPOSE OF PRESENTING EVIDENCE,

28   IS THAT EXHIBIT 4 DOES NOT VARY OR DOES NOT

1  CONTRADICT THE TERMS OF THE CONTRACT AS IS THE

2  PLAINTIFF'S ARGUMENT.  IT IS AN ESSENTIAL PART OF

3  IT.  WE'VE HEARD A LOT OF TESTIMONY.

4        INTERPRETATION OF CONTRACTS EXIST IN

5  ASCERTAINING THE MEANING TO BE GIVEN TO THE

6  EXPECTATION OF THE PARTIES.  I'M NOT GOING TO CITE

7  THE CODE SECTION.  I'M PRETTY MUCH MARCHING THROUGH

8  THEM.  THEY'RE ALL SHORT SENTENCES.  WHERE THE

9  LANGUAGE OF A CONTRACT IS CLEAR AND NOT ABSURD, IT

10  WILL BE FOLLOWED.  WELL, IF A CONTRACT IS REDUCED TO

11  WRITING THE PARTIES' INTENTION IS ASCERTAINED FROM

12  THE WRITING ALONE, IF POSSIBLE, SUBJECT TO OTHER

13  PROVISIONS GOVERNING THE INTERPRETATION OF

14  CONTRACTS.

15        AS I'VE SAID, BASED UPON THE WRITING

16  ALONE, THAT IS 156, IT APPEARS THAT EXHIBIT IS NOT

17  PART OF THE CONTRACT.  HOWEVER, IT APPEARS THAT MUCH

18  EXTRINSIC EVIDENCE WAS INTRODUCED NOT TO VARY THE

19  TERMS OF THE WRITING, BUT TO ASSIST THE COURT IN ITS

20  FACT-FINDING AND INTERPRETATION OF CONTRACT DUTIES.

21        SO THE RULE OF LAW IS THAT WHERE EXTRINSIC

22  EVIDENCE HAS BEEN PROPERLY ADMITTED AND THE EVIDENCE

23  IS IN CONFLICT, ANY REASONABLE CONSTRUCTION BY THE

24  TRIAL JUDGE WILL BE UPHELD UNDER THE GENERAL RULE OF

25  CONFLICTING EVIDENCE WHICH I JUST READ TO YOU,

26  CITING TWO ALWAYS UPHELD CALIFORNIA SUPREME COURT

27  DECISIONS.  THIS BEING A MATTER OF STATE LAW.

28        AN OVERLAY ON THESE RULES IS A RESTATEMENT

```
 1    SECTION OF CONTRACT SECTION 207.  THE AMERICAN LAW
 2    INSTITUTE DREW TOGETHER LEGAL SCHOLARS AND
 3    PRACTITIONERS OVER TIME, AND ALTHOUGH THE INFLUENCE
 4    OF THE RESTATEMENT IS SAID TO HAVE WAXED AND WANED
 5    OVER THE YEARS, IT IS AN EFFORT TO DRAW TOGETHER IN
 6    SO MANY AREAS OF LAW WHICH THERE IS NOT LEGISLATIVE
 7    COMPULSION.  AND I DON'T MEAN THAT IN A RECALCITRANT
 8    WAY, OF COURSE.  I MEAN THE LEGISLATURE HAS OFTEN
 9    LEFT WHOLE FIELDS OF LAW TO CASE LAW DEVELOPMENT.
10          SO WHEN YOU HEAR THE SIMPLISTIC QUESTION
11    ON TV, IT IS AN ACTIVIST JUDGE THAT MAKES THE LAW?
12    OF COURSE WE DO.  WE'RE REQUIRED TO DO SO BECAUSE
13    ANYBODY WHO HAS AN ACTUAL CASE OR CONTROVERSY HAS
14    ACCESS TO THE COURT.  AND MANY OF THE PROBLEM ISSUES
15    THAT ARE CONFRONTED ARE MATTERS WHERE ELECTED
16    REPRESENTATIVES HAVE SAID -- WELL, I WON'T
17    CHARACTERIZE WHY.  I CAN'T READ THEIR MIND.  I
18    WOULDN'T DO THAT -- BUT WE'RE NOT GOING TO GET
19    INVOLVED.  WE'LL WAIT SO THAT WE CAN GET A GOOD
20    UNDERSTANDING OF HOW THE LAW IS DEVELOPING, AND THEN
21    EXERCISING OUR SUPERIOR AUTHORITY ON BEHALF OF THE
22    PEOPLE, IF WE THINK IT IS A PROPER CASE FOR
23    LEGISLATIVE INTERVENTION, WE'LL DO THAT.  THAT'S
24    PART AND PARCEL OF HOW THE LAW DEVELOPS.  OF COURSE,
25    THE THEORY IS WE'RE NOT MAKING ALL THE FINDINGS.  WE
26    UNDERSTAND HOW SCHOLARS HAVE DEALT WITH THAT ISSUE.
27          SO THE RESTATEMENT OF CONTRACT SECTION
28    2307 READS, QUOTE, "IN CHOOSING AMONG THE REASONABLE
```

**Exhibit L, Page 122**

1   MEANINGS OF A PROMISE OR AGREEMENT OR A TERM

2   THEREOF, A MEANING THAT SERVES THE PUBLIC INTEREST

3   IS GENERALLY PREFERRED."  AND THIS IS CITED AT

4   WITKIN ON CONTRACTS SECTION 743.

5            "IN DETERMINING THE INTENTION OF THE

6   PARTIES AN OBJECTIVE TEST IS APPLIED.  A CONTRACT

7   MUST BE INTERPRETED AS TO GIVE EFFECT TO THE MUTUAL

8   INTENTION OF THE PARTIES AS IT EXISTED AT THE TIME

9   OF CONTRACTING SO FAR AS THE SAME IS ASCERTAINABLE

10  AND LAWFUL.  THE MODERN APPROACH IS TO AVOID THE

11  TERMINOLOGY OF INTENTION, IN QUOTES, AND TO LOOK FOR

12  THE EXPRESSED INTENT.

13           "UNDER AN OBJECTIVE STANDARD, SIMILARLY IT

14  IS SAID THAT THE RULES OF INTERPRETATION OF A

15  WRITING" -- EXCUSE ME -- "OF WRITTEN CONTRACT IS FOR

16  THE PURPOSE OF ASCERTAINING THE MEANING OF THE WORDS

17  USED THEREIN.  EVIDENCE CANNOT BE ADMITTED TO SHOW

18  INTENTION INDEPENDENT OF THE INSTRUMENT."

19           THAT RULE OF LAW CERTAINLY COMPORTS WITH

20  WHAT THE PARTIES HAVE TO SAY.  THEY WROTE IN THEIR

21  CONTRACT, PARAGRAPH 10.1, ENTIRE AGREEMENT.  "THIS

22  AGREEMENT AND THE EXHIBITS HERETO CONSTITUTE THE

23  ENTIRE AGREEMENT BETWEEN THE PARTIES RELATED TO THE

24  SUBJECT MATTER OF THIS AGREEMENT HERETO AND

25  SUPERCEDE ALL ORAL OR WRITTEN AGREEMENTS ON THIS

26  SUBJECT MATTER ENTERED PRIOR TO THIS AGREEMENT.

27  SUBJECT TO SECTION 10.7 THIS AGREEMENT MAY NOT BE

28  MODIFIED EXCEPT BY A WRITTEN AGREEMENT DATED

1    SUBSEQUENT TO THE DATE OF THIS AGREEMENT AND SIGNED

2    BY BOTH PARTIES."

3          AND SECTION 10.7 IS A LONG PARAGRAPH THAT

4    SAYS AMENDMENT, BUT NO ONE HAS CLAIMED THIS CONTRACT

5    HAS BEEN AMENDED, AND NO ONE CLAIMED THAT THERE WERE

6    DISCUSSIONS BEFORE THE CONTRACT WAS SIGNED BETWEEN

7    THE PARTIES.

8          SO THE PROPOSITION I'VE JUST ANNOUNCED IS

9    ENTIRELY UNPROBLEMATIC AND ENTIRELY CONSISTENT WITH

10   THE WORDS THE PARTIES CHOSE TO EXPRESS THEMSELVES.

11         A SPECIAL DIRECTIVE.  "IF THE TERM OF A

12   PROMISE IS AMBIGUOUS IS -- OR UNCERTAIN APPLIES, THE

13   CONTRACT MUST BE INTERPRETED IN THE SENSE IN WHICH

14   THE PROMISOR, IN THIS CASE KALEIDESCAPE, BELIEVED AT

15   THE TIME OF MAKING IT, THAT THE PROMISEE

16   UNDERSTOOD."

17         WELL, I DON'T THINK THIS REALLY HELPS THE

18   PLAINTIFF, AND THERE IS NO BASIS TO KNOW WHAT DVD

19   CCA MEANT.  BECAUSE MR. HOY CONFIRMED THAT REALLY

20   THERE WERE NO DISCUSSIONS, NO BASIS TO KNOW.  AND

21   ALL THE DEFENSE WITNESSES SAID, ANY TIME WE SOUGHT

22   TO FIND A BASIS WHAT THEY MIGHT THINK ABOUT THIS, WE

23   WERE POLITELY TOLD, SIGN IT OR NOT, YOUR CHOICE.  SO

24   IN SHORT, THE DEFENDANT RECEIVED NO INFORMATION AND

25   WOULD HAVE NO BASIS TO KNOW WHAT THE PLAINTIFF

26   BELIEVED.

27         "THE WHOLE OF A CONTRACT IS TO BE TAKEN

28   TOGETHER SO AS TO GIVE EFFECT OF EVERY PART IF

```
 1    REASONABLY PRACTICABLE, EACH CLAUSE HELPING TO

 2    INTERPRET THE OTHER.  WHERE THERE ARE SEVERAL

 3    PROVISIONS OR PARTICULARS, SUCH CONSTRUCTION, IF

 4    POSSIBLE, IS TO BE ADOPTED AS TO GIVE EFFECT TO

 5    ALL".

 6           THIS LAST SENTENCE, OF COURSE, BEGS THE

 7    QUESTION.  THE QUESTION IS, IS THE DOCUMENT, GENERAL

 8    SPECIFICATIONS, EXHIBIT 3, ONE OF THOSE DOCUMENTS

 9    WHICH SHOULD BE GIVEN EFFECT?  YOU KNOW, THE GENERAL

10    PRINCIPLE THAT I TALKED ABOUT RELATES TO WRITINGS

11    AND ESCROW AGREEMENTS, AND YOU HAVE TO SORT IT OUT,

12    BUT ORDINARILY DO NOT DEAL WITH THE INTEGRATED

13    CONTRACT IN WHICH THERE IS A STATEMENT THAT THESE

14    PAGES CONSTITUTE THE ENTIRE AGREEMENT.

15           ANOTHER RULE IS THAT SEVERAL CONTRACTS

16    RELATED TO THE SAME MATTERS BETWEEN THE SAME PARTIES

17    AND MADE AS PART OF SUBSTANTIALLY ONE TRANSACTION

18    ARE TO BE TAKEN TOGETHER.  BUT THIS IS NOT

19    APPLICABLE HERE BECAUSE OF THE ENTIRE AGREEMENT

20    LANGUAGE OF THE CONTRACT SIGNED BY MR. SRINIVASAN

21    AND MR. HOY, EXHIBIT 156, EXPRESSLY MAKES THAT RULE

22    OF INTERPRETATION INAPPLICABLE.

23           THE PLAINTIFF HAS EMPHASIZED THE RULE OF

24    INTERPRETATIONS FOUND IN CIVIL CODE SECTION 1647 AS

25    FOLLOWS, QUOTE, "A CONTRACT MAY BE EXPLAINED BY

26    REFERENCE TO THE CIRCUMSTANCES UNDER WHICH IT WAS

27    MADE AND THE MATTER TO WHICH IT RELATES," CLOSE

28    QUOTE.
```

1          AND A CODE SECTION, I THINK PERHAPS NOT

2     CITED, BUT NOT AN OMISSION, IT'S JUST A VENERABLE

3     PRINCIPLE OF LAW, IS FOUND IN CODE OF CIVIL

4     PROCEDURE 1860.  QUOTE, "FOR THE -- FOR THE PROPER

5     CONSTRUCTION OF AN INSTRUMENT, THE CIRCUMSTANCES

6     UNDER WHICH IT WAS MADE, INCLUDING THE SITUATION OF

7     THE SUBJECT OF THE INSTRUMENT AND OF THE PARTIES TO

8     IT, MAY ALSO BE SHOWN, SO THAT THE JUDGE BE PLACED

9     IN THE POSITION OF THOSE WHOSE LANGUAGE HE IS TO

10    INTERPRET," CLOSE QUOTE.

11         THERE IS ANOTHER ONE THAT SAYS HE.  IT

12    MIGHT INCLUDE THE PRONOUN SHE.  BUT WE MODERNLY READ

13    THEM SHE.  THEY DON'T SAY S, SLASH, HE.  I'M JUST

14    READING.

15         EVIDENCE OF CIRCUMSTANCES IS ADMISSIBLE,

16    IF RELEVANT, TO PROVE A MEANING OF WHICH THE

17    CONTRACT IS REASONABLY SUSCEPTIBLE.  A FEW OTHER

18    RULES ARE THAT SUBSEQUENT CONDUCT OF THE PARTIES

19    AFTER THE EXECUTION OF THE CONTRACT AND BEFORE ANY

20    CONTROVERSY HAS ARISEN MAY BE CONSIDERED IN

21    DETERMINING THE MEANING OF THE CONTRACT.  AND

22    PLAINTIFF CITED THIS SECTION.

23         HERE, OF COURSE, THERE WAS NO REAL ONGOING

24    RELATIONSHIP BETWEEN THE PARTIES IN THEIR CONDUCT

25    THAT WOULD GIVE REAL HELP TO THE COURT RELATED TO

26    HOW THEY MUTUALLY INTENDED TO BE CARRIED OUT.  BUT

27    THAT DOESN'T END THE DISCUSSION BECAUSE -- AND SO

28    THAT PROVISION AND THE ONE FOUND ALSO IN RESTATEMENT

1    OF CONTRACT SECTION 2 OF SUBPART 4 IS NOT EXPRESSLY

2    APPLICABLE.  BUT HERE THE PLAINTIFF HAS POINTED TO

3    SOME E-MAILS AND OTHER MATTERS FOUND IN DISCOVERY,

4    AND THE QUESTION THEN WOULD BE, WELL, CAN THE COURT

5    CONSIDER THE CONDUCT OF ONLY ONE PARTY.  THE ANSWER

6    IS YES.  AND I'LL REFER TO THAT CASE NOW.

7         I SHOULDN'T APOLOGIZE FOR TAKING THIS

8    TIME.  I KNOW ITS BURDENSOME.  BUT SINCE EVERYBODY

9    CHEWS OVER THE JUDGE'S DECISION LATER, I THOUGHT I

10   WOULD BE THOROUGH.

11        I'VE JUST PRESENTED A QUESTION AND AN

12   ANSWER.  IS IT POSSIBLE FOR THE COURT TO CONSIDER

13   EVIDENCE OF ONLY ONE PARTY AFTER THE CONTRACT WAS

14   EXECUTED IF IT MIGHT HAVE SOME BENEFIT IN FIGURING

15   OUT WHAT THE CONTRACT MEANS?  THE ANSWER IS YES.

16        AND I'LL READ FROM A CASE.  THE FACTS ARE

17   NOT REALLY IMPORTANT, BUT IT'S THE LANGUAGE THAT IS

18   EXPLANATORY FROM A HIGHER COURT.  I'LL REFER TO IT

19   NOW.  IT'S SOUTHERN CALIFORNIA EDISON COMPANY VERSUS

20   SUPERIOR COURT, FOUND AT 37 CAL.APP. 4TH, PAGE 839

21   AT PAGE 851.  THIS WAS ACTUALLY A REVIEW OF A

22   SUMMARY ADJUDICATION, WHERE IT'S COMPLETELY

23   DIFFERENT STANDARDS AND SO FORTH, BUT THEN WHEN A

24   TRIAL JUDGE HAS ACTUALLY LAID HIS OR HER EYEBALLS ON

25   A WITNESS, LISTENED AND DONE WHAT ONLY A TRIAL JUDGE

26   CAN DO, AND THAT IS MAKE APPRAISALS.  BUT AT PAGE

27   851 THE COURT IN THE CITED CASE STATES THE

28   FOLLOWING, QUOTE:  "THE RULE IS WELL SETTLED THAT IN

```
1    CONSTRUING THE TERMS OF A CONTRACT, THE CONSTRUCTION
2    GIVEN IT BY THE ACTS AND CONDUCTS OF THE PARTIES,
3    PLURAL, WITH KNOWLEDGE OF ITS TERMS AND BEFORE ANY
4    CONTROVERSY HAS ARISEN AS TO ITS MEANING IS
5    ADMISSIBLE ON THE PARTIES' INTENT."
6             I WILL NOT CITE THE INTERNAL CITATION.
7    IT'S THERE FOR YOU TO FIND IT.  BUT THERE WAS A
8    CASE, CONTINUING, "CONTRARY TO ENERGY DEVELOPMENT'S
9    CLAIM, THIS RULE IS NOT LIMITED TO THE JOINT CONDUCT
10   OF THE PARTIES IN THE COURSE OF THE PERFORMANCE OF
11   THE CONTRACT."
12            "AS STATED IN CORBIN ON CONTRACTS," THAT'S
13   C-O-R-B-I-N, "THE PRACTICAL INTERPRETATION OF THE
14   CONTRACT BY ONE PARTY EVIDENCED BY HIS WORDS OR ACTS
15   CAN BE USED AGAINST HIM ON BEHALF OF THE OTHER PARTY
16   EVEN THOUGH THAT OTHER PARTY HAD NO KNOWLEDGE OF
17   THOSE WORDS OR ACTS WHEN THEY OCCURRED AND DID NOT
18   CONCUR IN THEM."
19            "IN THE LITIGATION THAT HAS ENSUED, ONE
20   WHO IS MAINTAINING THE SAME INTERPRETATION THAT IS
21   EVIDENCED BY THE OTHER PARTY'S EARLIER WORDS AND
22   ACTS CAN INTRODUCE THEM TO SUPPORT HIS CONTENTION,"
23   CLOSE QUOTE.  CITING CORBIN ON CONTRACTS AND ANOTHER
24   CALIFORNIA APPELLATE CASE.
25            THE COURT OF APPEAL COMPLETES THIS
26   STATEMENT WITH THE FOLLOWING WORDS:  "WE EMPHASIZE,
27   THE CONDUCT OF ONE PARTY TO A CONTRACT IS BY NO
28   MEANS CONCLUSIVE EVIDENCE AS TO THE MEANING OF THE
```

1   CONTRACT.  IT IS RELEVANT, HOWEVER, TO SHOW THE

2   CONTRACT IS REASONABLY SUSCEPTIBLE TO THE MEANING

3   EVIDENCED BY THAT PARTY'S CONDUCT," CLOSE QUOTE.  IN

4   OTHER WORDS, IT GETS LEFT WITH THE TRIAL COURT,

5   THAT'S MY OWN GLOSS, IF THERE IS A CONFLICT.

6          NOW, IN CASES -- I'M GETTING CLOSE TO

7   THESE RULES AND TO THE END OF THESE GENERAL RULES OF

8   INTERPRETATION, SPECIFIC ONES.  "IN CASES OF

9   UNCERTAINTY NOT REMOVED BY THESE PRECEDING RULES" --

10  AND I SHOULD REFERENCE THE RULE, AS WELL, AND NOT

11  OMIT IT -- "THAT A CONTRACT MUST RECEIVE AN

12  INTERPRETATION AS WILL MAKE IT LAWFUL, OPERATIVE,

13  DEFINITE, REASONABLE AND CAPABLE OF BEING CARRIED

14  INTO EFFECT, IF IT CAN BE DONE WITHOUT VIOLATING THE

15  INTENTION OF THE PARTIES," CLOSE QUOTE.

16         THAT WAS CITED BY PLAINTIFF AS WELL AS

17  DEFENDANT.  ONE OF THE MANY RULES.  I WENT THROUGH

18  THE EXHAUSTIVE TREATISES.  THERE ARE OTHER RULES.

19  MY OMISSION DOESN'T MEAN THEY -- THERE AREN'T RULES,

20  BUT I DON'T THINK THEY'RE AS DIRECTLY APPLICABLE AND

21  WERE NOT SEPARATELY ARGUED BY THE PARTIES.

22         "IN CASES OF UNCERTAINTY NOT REMOVED BY

23  ALL THE PRECEDING RULES, THE LANGUAGE OF A CONTRACT

24  SHOULD BE INTERPRETED MOST STRONGLY AGAINST THE

25  PARTY WHO CAUSED THE UNCERTAINTY TO EXIST."  THAT'S

26  BEEN CITED, AND IT'S EMPHASIZED THAT IT'S THE LAST

27  RULE IF THE COURT IS IN DOUBT, NOT THE FIRST.

28         AND THE RULE THAT ANY AMBIGUITY CAUSED BY

1   THE DRAFTSMAN OF A CONTRACT MUST BE RESOLVED AGAINST

2   THAT PARTY APPLIES WITH SPECIFIC FORCE IN THE CASE

3   OF A CONTRACT OF ADHESION.  AND QUOTING FROM A CASE

4   HERE, "IN A CONTRACT OF ADHESION, THE PARTY'S

5   SUPERIOR BARGAINING POWER NOT ONLY PRESCRIBES THE

6   WORDS OF THE INSTRUMENT, BUT THE PARTY WHO

7   SUBSCRIBES TO IT LACKS THE ECONOMIC STRENGTH TO

8   CHANGE SUCH LANGUAGE.  HENCE, ANY AMBIGUITY IN THE

9   CONTRACT SHOULD BE CONSTRUED IN FAVOR OF THE

10  SUBSCRIBING PARTY."

11        IT'S NOT NECESSARY FOR THE COURT TO MAKE A

12  LEGAL FINDING IN THIS CASE THAT THIS IS A CONTRACT

13  OF ADHESION.  I CITE THAT RULE BECAUSE BOTH THE RULE

14  IN 1654 IN THE CIVIL CODE THAT IS, AMBIGUITIES

15  RESOLVED AGAINST THE DRAFTSPERSON IF THAT'S

16  NECESSARY AFTER CONSIDERING ALL OTHER RULES, AND THE

17  ADHESION RULE OPERATE IN THE SAME WAY.  THIS

18  CONTRACT CERTAINLY HAS ELEMENTS OF AN ADHESION

19  CONTRACT.  SUCH A FORMAL DETERMINATION I BELIEVE IT

20  IS UNNECESSARY TO A DETERMINATION BECAUSE IT'S CLEAR

21  THAT IF THE OTHER RULES DO NOT RESOLVE THE

22  INTERPRETATION ISSUE, SECTION 1654, WHICH I JUST

23  CITED ON AMBIGUITIES, WORKS IN THE VERY SAME WAY AS

24  THE ADHESION CONTRACT RULE.

25        THE RESULT OF ESTABLISHING AN ADHESION

26  CLASSIFICATION IS ONLY TO PERMIT A FAVORABLE

27  CONSTRUCTION OF UNCERTAINTY.  THAT IS, WHETHER THE

28  GENERAL SPECIFICATIONS, NUMBER 3, IS PART OF THE

875

1   CONTRACT, OR ANY OTHER AMBIGUOUS TERM, IN THE

2   ABSENCE OF UNCERTAINTY OR AMBIGUITY, THE CONTRACT IS

3   ENFORCEABLE IN ACCORDANCE WITH ITS TERMS.  AND

4   ALTHOUGH THERE IS A SEPARATE BODY OF LAW CONCERNING

5   UNCONSCIONABILITY, THAT HASN'T BEEN ARGUED.  IT'S A

6   RELATED THEME IN THE LAW, BUT IS NOT APPLICABLE

7   HERE.

8           THE COURT DETERMINES -- THOSE ARE THE

9   RULES.  I'VE CITED THE TESTIMONY.  I'LL GIVE MY

10  CONCLUSION ON THAT NOW AND THEN MOVE TO OTHER

11  ISSUES.

12          THE COURT DOES DETERMINE THAT THE GENERAL

13  SPECIFICATIONS -- AND IN DOING THIS I'VE CONSIDERED

14  ALL THE EVIDENCE AND WEIGHED THE TESTIMONY OF ALL

15  WITNESSES AND READ ALL THE DOCUMENTS, ALL THE BRIEFS

16  EXHAUSTIVELY.

17          THE COURT DETERMINES THAT THE GENERAL

18  SPECIFICATIONS FOUND IN EXHIBIT 3 ARE NOT PART OF

19  THE CONTRACT SIGNED BY THE PARTIES.  THAT CONTRACT

20  BEING EXHIBIT NUMBER 156.  THE PLAINTIFF HAS

21  RATIFIED ON SEVERAL OCCASIONS THAT THE ONLY TERMS OF

22  THE PURPORTED CONTRACT UPON WHICH IT BRINGS CLAIM

23  ARE FOUND IN EXHIBIT 3, AND, THEREFORE, BY

24  DEFINITION THE CLAIM FAILS.

25          THE COURT ADOPTS THE ANALYSIS OF

26  KALEIDESCAPE'S TRIAL BRIEF, FILED ON MARCH 20TH OF

27  2007, AND THE BRIEF ON, QUOTE, DETERMINING THE

28  WRITINGS OF THE CONTRACT, CLOSE QUOTE, FILED ON

**Exhibit L, Page 131**

1    MARCH 27, 2007.  WITHOUT READING THEM OUT LOUD,

2    THE -- THOSE BRIEFS ADEQUATELY STATE IN DETAIL

3    WITHOUT BEATING YOU OVER THE HEAD WITH IT THE

4    COURT'S ANALYSIS ON THE PROPER CONSTRUCTION, IN

5    ADDITION TO WHAT I'VE DONE MYSELF HERE IN COURT.

6            IN MAKING THIS DETERMINATION FINDING, THE

7    COURT HAS RESOLVED IN ITS MIND THE FACTUAL

8    RESOLUTION ON EACH OF THESE RULES OF INTERPRETATION

9    AND CONSIDERED THE CASE FILE, ALL THE DOCUMENTS THAT

10   WERE THE SUBJECT OF JUDICIAL NOTICE, THE EXHIBITS

11   SUBMITTED WITHOUT NOTATION, THE BROAD SCOPE OF

12   EVIDENCE SUBMITTED FOR THE COURT'S CONSIDERATION

13   WITHOUT OBJECTION, AND RESOLVES ALL CREDIBILITY IN

14   FAVOR OF EVERY FINDING, EXPRESS, IMPLIED, NECESSARY

15   OR APPROPRIATE TO THIS COURT'S DETERMINATION.

16           I WILL JUST GO BACK FOR A MOMENT ON A

17   COUPLE OF THESE POINTS.  I THINK I'VE ALLUDED TO

18   THEM, CERTAINLY THE TESTIMONY OF DEFENSE WITNESSES,

19   TO THE EFFECT THE PLAINTIFF ASSERTS, THE COURT DOES

20   NOT ADOPT THAT INTERPRETATION.  I SAW THIS AS A CASE

21   IN WHICH EVERYONE TRIED TO DO DISCOVERY IN A WAY TO

22   KIND OF MAKE UP FOR THE FACT THAT NOBODY SAT DOWN

23   AND MET AND TALKED.

24           AND I DO ADOPT AND FIND CREDIBLE NOT THE

25   CLAIM THAT THE DEFENDANT CORPORATION AB INITIO, OR

26   AS THEY SAY, FROM THE BEGINNING, CONSPIRED AND

27   PLANNED -- I'M SOMEWHAT OVERSTATING, BUT NOT MUCH --

28   THE PLAINTIFF'S THESIS TO DODGE AND WEAVE AND

1   VIOLATE THE TERMS OF THE CONTRACT.  BUT RATHER THAT

2   HARD MONEY WAS PUT DOWN IN AN ENTREPRENEURIAL

3   ENVIRONMENT TAKING A RISK, THAT THAT RISK WAS

4   ENHANCED BY THE FACT THAT THEY REALLY COULDN'T GET

5   ANSWERS IN THE CONTRACT FORMATION PROCESS.  THAT THE

6   DOCUMENTS WERE DELIVERED AND ANALYZED.  AND I'VE

7   HEARD THE TESTIMONY OF EVERYONE AT THE DEFENDANT WHO

8   SAID THEY TRIED TO ANALYZE IT.  THE COURT FINDS IT

9   CREDIBLE.

10          I GIVE CREDIT TO THE -- AND RESOLVE THE

11  CONFLICT IN EXPERTS NOT IN FAVOR OF BRIAN BERG, BUT

12  IN FAVOR OF DANIEL HARKIN'S INTERPRETATION.  IT

13  MAKES SENSE THAT THIS IS A CONTRACT THAT IS NOT

14  TOUCHY FEELY, BUT IS STRONG AND NORMATIVE AND TELLS

15  PEOPLE WHAT THEIR OBLIGATIONS ARE.

16          ESPECIALLY -- AND I DO FIND THAT THE --

17  THAT THERE IS REALLY NO CONFLICT.  HAVING RESOLVED

18  IT, THE COURT'S QUITE READILY ABLE TO DETERMINE THIS

19  WITHOUT RESORT TO 1654, BUT THE COURT DOES RESORT TO

20  THAT AS WELL BECAUSE THE LAWYERS SAY THERE'S AN

21  AMBIGUITY.  AND THAT IS THAT THIS WAS A PRODUCT

22  CREATED BY A COMMITTEE OF LAWYERS.  AND IF A

23  COMMITTEE OF LAWYERS MEETING ON -- AND THIS IS

24  NO CRITICISM OF THE PARTIES.  IT IS JUST ONE OF

25  THOSE THINGS GETS DELEGATED.

26          ON OCCASION AS A SOLO PRACTITIONER IT

27  WOULD BRING JOY TO MY HEART WHEN THERE WERE 27 ON

28  THE OTHER SIDE.  I MIGHT HAVE A CHANCE WINDING MY

1    LITTLE DINGHY THROUGH THE PROCESS BECAUSE AT LEAST I

2    KNEW WHAT WAS IN MY MIND.  I'M NOT BEING -- TRYING

3    TO MAKE LIGHT OF IT.

4            BUT THE PLAINTIFF HAD EVERY ADVANTAGE, THE

5    RESOURCES OF THE WHOLE INDUSTRY AND THREE OF THEM TO

6    COME TOGETHER.  AND IN A WAY, IT'S AS IF EVERYBODY

7    IS RESPONSIBLE, BUT NOBODY IS RESPONSIBLE.  THE BEST

8    LAWYERS WHO WERE ATTAINABLE FROM EVERYBODY ON ALL

9    SIDES OF THIS CASE HAD ACCESS TO WHAT THEY BELIEVE

10   ARE THE BEST LAWYERS.  I'M NOT CRITICIZING ANYBODY.

11   THEY CAME TOGETHER ON OVER A HUNDRED OCCASIONS.

12           NOW, IN EVALUATING THE BELIEVABILITY OF

13   THIS, IT ALMOST SEEMS SELF-EVIDENT THAT THERE IS

14   POTENTIAL FOR CONFUSION.  IT SEEMED TO ME IN READING

15   THESE DOCUMENTS KIND OF LIKE HEDGING THE BETS, THAT

16   CLEAR, UNEQUIVOCAL, DECISIVE DECISION WAS NOT MADE.

17   AND THE LANGUAGE OF 156 WHEN IT CALLS OUT WORDS, THE

18   ATTACHMENT -- AND AFTER ALL, THE QUESTION BEFORE THE

19   COURT IS -- IS RESOLVED IN MANY WAYS ON WHAT'S

20   CALLED THE BURDEN OF PROOF.

21           I HEARD SOMETHING ON C-SPAN.  SOMEBODY WAS

22   TELLING ME ABOUT ONE OF THESE CONTINUING EDUCATION

23   COURSES.  ONE JUDGE, A NEW JUDGE, WAS VEXED BY THE

24   PROBLEMS OF UNDERSTANDING.  AND AN OLD LINE, 5TH

25   CIRCUIT FEDERAL JUDGE SAID, WE'VE HAD THIS PROBLEM

26   FOR A HUNDRED YEARS.  IT'S RESOLVED BY WHAT IS

27   CALLED THE BURDEN OF PROOF.  IT IS THE OBLIGATION OF

28   LAWYERS AND PARTIES TO MAKE THEMSELVES UNDERSTOOD IN

1  ACCORDANCE WITH THE BURDENS OF PROOF.

2        IF THIS WERE A JURY TRIAL, I WOULD HAVE

3  INSTRUCTED YOU IN ACCORDANCE WITH THE JURY AND IN

4  ACCORDANCE WITH A STANDARD INSTRUCTION, THAT A PARTY

5  MUST PERSUADE YOU BY THE EVIDENCE PRESENTED IN COURT

6  THAT WHAT HE OR SHE IS REQUIRED TO PROVE IS MORE

7  LIKELY TO BE TRUE THAN NOT TRUE.  THIS IS REFERRED

8  TO AS THE BURDEN OF PROOF.  AFTER WEIGHING ALL THE

9  EVIDENCE, IF YOU CANNOT DECIDE THAT SOMETHING IS

10  MORE LIKELY TO BE TRUE THAN NOT TRUE, YOU MUST

11  CONCLUDE THAT THE PARTY DID NOT PROVE IT.  YOU

12  SHOULD CONSIDER ALL OF THE EVIDENCE, NO MATTER WHICH

13  PARTY PRODUCED THE EVIDENCE.

14        AND, OF COURSE, JUDGES DON'T LOSE SIGHT OF

15  THAT OBLIGATION.  THE COMMITTEE OF LAWYERS WORKED ON

16  THIS.  IT ULTIMATELY WAS PRESENTED FOR PEOPLE TO

17  TAKE IT OR NOT.  I ASSIGN NO WEIGHT TO THE FACT THAT

18  MEMOS WERE BEING PREPARED IN KALEIDESCAPE, OR

19  PH.D.'S AND MATH, LOGIC AND EVERYTHING ELSE, MBA'S

20  TALKING ABOUT WHAT THEY COULD DO AND NOT DO.  NONE

21  OF THAT REALLY ADDS TO WHAT WAS IN THE CONTRACT.

22        I DO UNDERSTAND -- I'LL NOW MOVE BRIEFLY

23  TO SOME OTHER ISSUES.  BECAUSE THAT SINGLE GROUND IS

24  SUSTAINABLE, IT DISPENSES OF ALL CLAIMS.  THE

25  PLAINTIFF UNCONDITIONALLY AND FOREVER GAVE UP ITS

26  CLAIM WHICH COULD HAVE BEEN LITIGATED HERE CLAIMING

27  MONEY RELIEF.

28        THE QUESTION ARISES WHETHER THERE IS

```
 1    IRREPARABLE HARDSHIP.  I'M SIMPLY MAKING CUMULATIVE
 2    FINDINGS NOW BECAUSE I THINK THE CLASSIC ISSUE IS,
 3    WAS THERE A CONTRACT?  I WILL SAY AS AN ALTERNATIVE
 4    FINDING, THAT IF BY LEGAL COMPULSION THIS SUPPOSEDLY
 5    FACT-INTENSIVE DETERMINATION WERE FOUND NOT TO BE
 6    SUSTAINABLE, THEN ANOTHER RULE IS INVOKED, AND THAT
 7    IS THAT SPECIFIC PERFORMANCE CANNOT BE GRANTED
 8    UNLESS THE TERMS OF THE CONTRACT ARE SUFFICIENTLY
 9    DEFINITE FOR THE COURT TO KNOW WHAT TO ENFORCE.
10    THAT'S FOUND IN CIVIL CODE 3390, PARENTHESIS 5,
11    CLOSE PAREN.
12            IT'S NOT DEFINITE TO ME.  THESE WORDS SEEM
13    TO BE STATEMENTS OF WHAT THE COMPUTER SCRAMBLING
14    DEVICE IS SUPPOSED TO DO.  DOCUMENT 3, ITSELF,
15    REFERS -- NOT TO THIS CONTRACT, BUT THERE IS ANOTHER
16    CONTRACT WHICH VERY MUCH APPLIES.  IT IS OUTSIDE OF
17    THAT DOCUMENT.  IT'S JUST A BIG OMISSION TF THE
18    LAWYER COMMITTEE IN A HUNDRED MEETINGS DIDN'T DO IT.
19    THAT'S -- THEY PRESENTED TO THE PLAINTIFF'S
20    CORPORATION -- IT'S NO CRITICISM OF MR. HOY, OF
21    COURSE.  THIS IS A DOCUMENT OF THE COMMITTEE,
22    EVERYBODY OR NOBODY PREPARED.  AND THIS IS WHAT YOU
23    GIVE TO PEOPLE.  THEY CAN SIGN IT OR NOT.
24            OF COURSE, I'VE DETERMINED ON THE MERITS
25    THAT THE PLAINTIFF CANNOT ASSERT A CLAIM, BUT
26    SOMETIMES PEOPLE DO MEDIATE OR DISCUSS THINGS IN THE
27    SHADOW OF UNCERTAINTY.  BUT ACCORDING TO THE
28    DEFENDANTS, THERE WAS NEVER REALLY A CHANCE TO DO
```

1     THAT.

2              IN LOOKING TO THE OTHER MATTERS OF

3     IRREPARABLE HARDSHIP, I BELIEVE THAT THE -- FROM ALL

4     THE PAPERS THAT I HAVE READ, THAT THE COURT SHOULD

5     GIVE DEFERENCE TO A CONTRACTUAL PROVISION AND EACH

6     PROVISION.

7              I DO BELIEVE FROM THE CASES CITED, AND

8     THERE WAS ONE OF THE CASES CITED BY THE PLAINTIFF

9     FROM THE CHANCERY COURT.  I DIDN'T KNOW IF IT WAS

10    SHEPHERDIZED BECAUSE A LATER CASE WAS CITED.  I HOPE

11    AND TRUST THAT PLAINTIFF'S COUNSEL HAD NO KNOWLEDGE

12    OF THAT.  I SHOULD BE GUIDED IN THE DIRECTION OF THE

13    TRUTH.  I MAKE NO BAD ASSUMPTION ABOUT THAT.

14             IT SEEMS TO ME THAT THE QUESTION I ASKED

15    ON THE FIRST DAY OF TRIAL, THAT ON THE ISSUE OF

16    IRREPARABLE HARDSHIP, IS THERE ANY LAW THAT WOULD

17    GUIDE ME IN THE DIRECTION OF WHETHER THE CONTRACTUAL

18    PROVISION IS DISPOSITIVE OR ONE FACTOR TO BE

19    CONSIDERED?

20             IT SEEMS TO ME FROM READING THE CASES, NO

21    CALIFORNIA CASE BEING PRECISELY ON POINT, AND GIVEN

22    THE IMPORTANT OBLIGATIONS OF THE COURT TO TAKE GREAT

23    CARE IN ROBUSTLY EXERCISING AUTHORITY THAT IS

24    LAWFULLY AND APPROPRIATELY GIVEN OR REFRAINING FROM

25    DOING SO, THAT THE -- THAT THE GREAT MODERN TREND

26    AND THE MAJORITY RULE SEEMS TO BE, THAT THE PARTIES

27    CANNOT CONTROL THE SOUND EXERCISE OF JURISDICTION BY

28    THE TRIAL COURT ACTING IN EQUITY.

1    AND THAT MEANS THAT I WOULD CONSIDER THAT

2  PROVISION IN LIGHT OF ALL THE FACTS AND

3  CIRCUMSTANCES.  IT'S ACADEMIC -- BUT I SHOULD

4  ANNOUNCE ON EACH OF THE CONTESTED ISSUES.  IT'S

5  ACADEMIC BECAUSE I BELIEVE MY CONTRACT DETERMINATION

6  IS FULLY DISPOSITIVE.  BUT IT WAS ONE OF THE

7  SUBSTANTIAL CONTROVERTED ISSUES PRESENTED.  AND IT

8  SEEMS TO ME I SHOULD GIVE APPROPRIATE CONSIDERATION

9  TO THE CONTRACT AND ALL THE FACTS AND CIRCUMSTANCES

10  SURROUNDING IT, WHICH I DESCRIBED IN DETAIL OR

11  TOUCHED UPON IN DETAIL.

12    AND IN THAT REGARD, I DID NOT FIND

13  PERSUASIVE THE CLAIM OF IRREPARABLE HARM.  I DID

14  INDICATE AND WAS CORRECTED.  IT'S NO OFFENSE.  I

15  ASKED THE QUESTION OF COUNSEL CONCERNING

16  MS. SUNDERLAND'S TESTIMONY.  AND HER STATEMENT CAN

17  BE FAIRLY READ, OFFER AN OPINION THAT IT'S POSSIBLY

18  TRUE THAT THESE ROGUES OUT THERE WHO DO ALL SORTS OF

19  PIRATING, HAVE NOT ADVERSELY IMPACTED THIS

20  CONTRACTUAL ARRANGEMENT AND HAVE NOT HURT THE

21  PLAINTIFF FOR THE REASONS THAT SHE SAID.

22    TO THE -- I DON'T RECALL EXACTLY, BUT

23  ASSUMING THAT SHE OFFERED AN OPINION THAT ANY BREACH

24  WOULD IRREPARABLY HARM THE PLAINTIFF, AS OTHERS DID

25  TESTIFY TO, SO IT'S NOT THAT THERE IS AN OMISSION IN

26  THE RECORD ON THAT.  I CREDIT THAT AS BEING THE

27  SINCERE BELIEF OF THOSE PARTIES NOT CONTROLLING ON

28  THE COURT.

1    AND BALANCING -- IT SEEMS TO ME THAT

2    ESSENTIALLY EVERY WITNESS SAID, THESE ARE THE BAD

3    THINGS THAT WILL CERTAINLY HAPPEN.  AND I BELIEVE

4    THAT I'M ENTITLED TO TAKE INTO ACCOUNT THOSE BAD

5    THINGS THAT HAVE NOT BEEN -- HAVE NOT BEEN

6    DEMONSTRATED TO HAVE OCCURRED IN THE SEVERAL YEARS

7    SINCE THIS DISPUTE AROSE.  IN ASSESSING AND

8    INTERPRETING THIS ALL IN THE CONTEXT OF WHEN IT CAN

9    BE DONE, IN A WAY SO AS TO PROMOTE THE PUBLIC

10   INTEREST, THE COURT SHOULD DO THAT IF IT CAN WITHOUT

11   VIOLENCE TO THE CONTRACT AND ALL OF THE FACTS.

12    AND I HAVE NOT BEEN SATISFIED THAT THERE

13   IS IRREPARABLE HARM OR AT THIS POINT ANY

14   DEMONSTRATED HARM.  ALTHOUGH I RECOGNIZE THE

15   FORECASTS; I ALSO RECOGNIZE FULLY TO THE EXTENT THAT

16   THE LAW PERMITS AND IT IS SAID TO PERMIT IT ON

17   SPECIFIC PERFORMANCE.  AND IF SPECIFIC PERFORMANCE

18   IS NOT ISSUED, MY ANALYSIS ON INJUNCTIONS AND

19   WHETHER THERE IS A CONTRACT TO ENFORCE FULLY ARE

20   EQUITABLE HERE.  THAT TO THE EXTENT THE COURT IS

21   PERMITTED TO BALANCE HARDSHIP, IT DOES APPEAR THAT

22   THERE WOULD BE A GREAT HARDSHIP OVERCOMING ANY CLAIM

23   OF HARM THAT WOULD BEFALL THE DEFENDANT CORPORATION

24   AND ITS EMPLOYEES.

25    I CREDIT DR. MALCOLM'S OPINION THAT THE

26   CORPORATE -- CORPORATION WOULD BE DRAMATICALLY

27   SCALED BACK.  I RECOGNIZE THAT AS A RISK OF DOING

28   BUSINESS.  THAT IF I FOUND A STRONG CLAIM OF THE

1    EXISTENCE OF A CONTRACT, AND IF I HAD MADE OTHER

2    ANALYSES, IT WOULD NOT HAVE FORECLOSED ME IN MY VIEW

3    FOR GRANTING INJUNCTIVE RELIEF OR SPECIFIC

4    PERFORMANCE RELIEF.

5          IT ALL FITS IN IN EVALUATING THIS VERY

6    BROADLY, MY DETERMINATION THAT THERE HAS BEEN NO

7    SHOWING OF BAD FAITH BY THE DEFENDANT OR ANY OF ITS

8    REPRESENTATIVES.  AND OBVIOUSLY, IF THAT WERE A

9    DIFFERENT FINDING, IT COULD HAVE LED TO A DIFFERENT

10   RESULT.

11         I DON'T MEAN TO BE AMBIGUOUS, MYSELF,

12   ABOUT THAT.  I'VE MADE MY STRONG DETERMINATIONS ON

13   THE CONTRACT ISSUE.  BUT I THINK I LOOK TO THE WHOLE

14   ISSUE OF GOOD FAITH IN GOING FORWARD.  AND CERTAINLY

15   I DO NOT CAST ASPERSION UPON MR. HOY, OBVIOUSLY.

16   YOU KNOW, I THINK THAT THIS ALL IN MANY WAYS

17   HAPPENED BEFORE HIS TIME IN THE SENSE THAT THE

18   PRODUCT WAS DELIVERED.  THE PRODUCT WAS THE

19   CONTRACT.  AND I BELIEVE THAT THE DEFENDANT WAS ABLE

20   AND PERMITTED, NEVER HAVING GOTTEN A VOICE WITH

21   ANYBODY, TO READ THE CONTRACT, RELY UPON IT, AND

22   WHAT IT SAID.

23         EQUITIES ARE STRONGLY IN FAVOR -- IN

24   CONTRACT INTERPRETATION ISSUES ARE STRONGLY IN FAVOR

25   OF THE DEFENSE AND AGAINST THE PLAINTIFF ON THAT

26   ISSUE.

27         THERE WASN'T A LOT OF TESTIMONY ON THIS,

28   BUT IT DOES -- FROM WHAT I HAVE HEARD AND EVERYTHING

THAT I'VE HEARD IN THIS CASE, THERE IS NOTHING THAT
I HEARD THAT SUGGESTS THAT THE PUBLIC INTEREST IS
ADVERSELY AFFECTED BY HONORING THIS CONTRACT AS
INTERPRETED.  AND I'VE REALLY HEARD NOTHING HERE
THAT WOULD EQUATE IN THIS TRIAL THE CONDUCT OF
KALEIDESCAPE AND ITS AGENTS AND EMPLOYEES WITH
ROGUES OR PIRATES.

        AND OBVIOUSLY, AS I SAID, WHETHER THE
EVIDENCE CAPTURES A KIND OF A VISUAL DEPICTION IN
ONE'S MIND DOES MATTER.  AND THERE IS NO SENSE OF
THAT.  THAT I HAVE RIGHTFULLY CREDITED THE STATEMENT
THAT THEY INTEND TO CREATE A ROBUST, VIABLE BUSINESS
ENTERPRISE, TAKE RISKS AND LIVE WITH RISKS.  BUT THE
ISSUE WAS SHARPLY JOINED BY THE PLAINTIFF'S ACTION,
AND THEY HAVE DEFENDED SUCCESSFULLY.  ALBEIT, I FIND
THAT THE CROSS-COMPLAINT IS WITHOUT MERIT BASED UPON
MY LEGAL RULING.

        AS TO THE FAIR USE ISSUE, THAT GETS EVEN
FURTHER ATTENUATED IN TERMS OF THE NECESSITY FOR THE
COURT TO RULE.  I THINK IN LIGHT OF MY FINDINGS THAT
THERE IS NO NECESSITY FOR RULING.  IT'S JUST THAT MY
UNDERSTANDING OF THE POSTURE OF THE CASE IS THAT THE
PLAINTIFF DID NOT SEEK TO INVOKE THE COPYRIGHT
STATUTE AS A SWORD IN THE CASE.

        I UNDERSTAND THE DEFENDANT'S BRIEF DID
RAISE THE COPYRIGHT MATTER AS A DEFENSIVE MATTER.
THE MOST RECENT BRIEF FILED BY THE DEFENDANT
INDICATES THAT FAIR USE IMPLICATES THE FULL RANGE OF

1    EQUITABLE PRINCIPLES.  AND ALL I NEED SAY AT THIS

2    TIME IS THAT I HAVEN'T SEEN ANYTHING THAT DEFENDANT

3    HAS DONE IS UNFAIR WITHOUT TIPTOEING INTO THE AREA

4    OF -- OBTUSE AREAS OF FEDERAL COPYRIGHT LAW, NIMMER

5    ON COPYRIGHT OR ANYTHING ELSE. I'M NOT GOING TO NEED

6    THAT.  IT'S UNNECESSARY TO THE COURT'S

7    DETERMINATION.  AND FRANKLY, I THINK IT BOLSTERS THE

8    DEFENSE BECAUSE I'M ACCEPTING THE PLAINTIFF'S

9    ARGUMENT FOR THIS PURPOSE THAT IT IS NOT NECESSARY

10   IN INTERPRETING THIS OR RULING ON THE CLASSIC STATE

11   LAW ISSUES TO DO THAT.  SO THERE IS NO ERROR IN

12   FAILING TO DO SO, AT LEAST IN TERMS OF FRAMING THE

13   COURT'S JUDGMENT.

14        IN CONSIDERING THE NO HARM AND GOOD FAITH,

15   I DID CONSIDER, AMONG OTHERS, OF COURSE, MR. JEFFREY

16   FRANKLIN.  HE'S REPRESENTATIVE OF MANY OF THE PEOPLE

17   OUT THERE DOING THEIR WORK.  AND IT REALLY SEEMS TO

18   ME THAT MUCH OF THIS DISPUTE, AT LEAST BASED ON THE

19   EVIDENCE PRESENTED HERE, IS AT PRESENT MORE IN THE

20   NATURE OF AN ACADEMIC INQUIRY THAN ANY DEMONSTRATION

21   OF ACTUAL HARM.

22        IT DOES APPEAR THAT THESE CUSTOMERS ARE

23   HIGH-END CUSTOMERS.  AND I HAVEN'T HEARD ANYTHING

24   THAT PERSUADES ME -- ALTHOUGH THERE IS A POSSIBILITY

25   THAT THE PRICE WILL RAPIDLY FALL, IT'S FAR BEYOND MY

26   COMPETENCE TO -- THAT'S NOT A SUBSTANTIAL

27   CONTROVERTED ISSUE.  MIGHT HAPPEN; MIGHT NOT.  THE

28   BUSINESS MIGHT BE HERE TODAY, GONE TOMORROW.  AND IF

**Exhibit L, Page 142**

1    SO, THOSE ARE THE HAZARDS OF DOING BUSINESS IN THE

2    VALLEY.  SOME PEOPLE GET OBSCENELY RICH.  THERE IS

3    NOTHING WRONG WITH PEOPLE GOING BROKE IN THE

4    ENTERPRISE, AND WE NEED ALL OF US.

5         SO I BELIEVE THAT IN DOING THIS I HAVE NOW

6    ATTENDED TO ALL OF THE ISSUES DESCRIBED AS

7    SUBSTANTIAL CONTROVERTED ISSUES.  WHAT I WANT TO DO

8    IS GO OFF THE BENCH FOR FIVE MINUTES AND GIVE YOU A

9    CHANCE TO RECONNOITER AND ASK ME IF THERE ARE OTHER

10   ISSUES THAT YOU WANT ME TO ADDRESS.  IF NOT, ON THE

11   FACE OF IT, I'LL ACCEPT THE CONCEPT.  YOU CAN FILE

12   PAPERS.  I'VE GIVEN THE WHOLE LEGAL TEAMS ON EACH

13   SIDE THE OPPORTUNITY TO POINT OUT ANY SUBSTANTIAL

14   OMISSIONS OR AMBUGITY, FAILINGS.  THIS IS A

15   SUBSTANTIAL STATEMENT OF DECISION, AND I'LL SAY NO

16   MORE.  I'LL BE IN A SHORT RECESS.

17        (WHEREUPON, A SHORT RECESS WAS TAKEN,

18   AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

19        THE COURT:  IS THERE ANYTHING ELSE THAT

20   YOU REQUIRE?

21        MR. COATES:  NOT AT THE MOMENT, YOUR

22   HONOR.

23        THE COURT:  YOU'LL ASSESS THIS?

24        MR. COATES:  EXACTLY.

25        THE COURT:  THAT'S FINE.

26        MR. MOORE:  NOT FROM THE DEFENSE, YOUR

27   HONOR.

28        THE COURT:  I WANTED TO JUST ADD ONE

```
 1   STATEMENT.  ON THIS WHOLE ISSUE OF GOOD FAITH AND
 2   IRREPARABLE HARDSHIP, I'VE BEEN QUITE COMPREHENSIVE
 3   IN AN ATTEMPT TO COVER EVERY DETAIL.  BUT,
 4   SPECIFICALLY, I FIND AND BELIEVE THAT THE TESTIMONY
 5   CONCERNING THE FOUR INTERACTIONS OVER THE SEVERAL
 6   YEARS WITH DEALERS AND THE ONE INTERACTION WITH
 7   MR. COLLENS SHOWS TO ME THAT THE COMPANY, FAR FROM
 8   ATTEMPTING TO DO ANYTHING BAD, SEEMS TO HAVE
 9   INTERNAL PROCEDURES TO CARRY OUT WHAT THEY SAY
10   THEY'RE TRYING TO DO, WHICH IS TO PROCEED IN AN
11   ENTIRELY COMPLIANT, LAWFUL, AND ETHICAL WAY.  AND IT
12   SUGGESTS TO ME THAT THERE BEING ONLY FOUR OF THOSE
13   DOCUMENTED SITUATIONS, THAT THINGS ARE NOT AS DIRE
14   AS THE PLAINTIFF OPINES.
15           THANK YOU.
16           I WILL ASK IF THERE IS ANYTHING FURTHER.
17   I WILL PROBABLY DELEGATE -- I'LL INDICATE NOW I'LL
18   ASK COUNSEL TO WORK TOGETHER IN PREPARING AN
19   APPROPRIATE FORM OF JUDGMENT.  IT SHOULD ACKNOWLEDGE
20   THE COURT'S RESOLUTION ON THE NONSUIT.  IT SHOULD
21   ACKNOWLEDGE THE COURT'S RESOLUTION ON THIS MATTER.
22           IF THERE ARE NO FURTHER REQUESTS, THE
23   COURT HAVING GIVEN AN OPPORTUNITY TO CLARIFY IT FACE
24   TO FACE WITH EVERYBODY RIGHT NOW, THEN YOU'LL MAKE
25   THEM.  I'D PREFER TO DO AS MUCH AS I CAN HERE WHILE
26   THE PARTIES ARE HERE AND HAVE A CHANCE TO APPRAISE
27   MY CONDUCT AND WHILE I HAVE THE DOCUMENTS PRESENT.
28   AND I REALIZE PEOPLE SHOULD BE ABLE TO CONFER WITH
```

1    THEIR CLIENTS.

2          I WOULD ENCOURAGE VOLUNTARY RESOLUTION

3    BETWEEN THE PARTIES, OF COURSE.  IF MY WORDS HAVE

4    BEEN PERSUASIVE, FINE.  I MEAN THAT IN A TRUE SENSE.

5    IF NOT, PEOPLE WILL PROCEED AS THEY DEEM

6    APPROPRIATE.  BUT ONE THING THAT IS REQUIRED IS

7    THAT, OF COURSE, IF THERE IS NO FURTHER REQUEST,

8    THEN THE STATEMENT OF DECISION I'M ANNOUNCING ON

9    THIS DAY SHALL BE THE STATEMENT OF DECISION UNLESS

10   YOU PROCEED WITHIN THE TIMELINES SUGGESTED.  I DEFER

11   TO THE RULES, BUT I ORDINARILY WOULD SEE THOSE AS

12   POINTING AT ANY SUBSTANTIAL OMISSION OR AMBIGUITY.

13          AND FROM YOUR PERSPECTIVE, HAVE I TOUCHED

14   ON WHAT WERE THE SUBSTANTIAL CONTROVERTED ISSUES?

15          MR. MOORE:  YES, YOU HAVE, YOUR HONOR.

16          THE COURT:  ALL RIGHT.  IF THERE ARE OTHER

17   PROPOSALS, FINE.  I'VE DONE THIS IN ORAL FORM.  IT'S

18   NOT NECESSARY THAT THE TRANSCRIPT BE PLACED IN THE

19   OFFICIAL CASE FILE AS FAR AS I'M CONCERNED FOR THE

20   BENEFIT OF THE PARTIES.  BUT IF ANYONE CHALLENGES

21   THIS, WITH ALL RESPECT OF COURSE, I WOULD PROBABLY

22   DELEGATE TO PLAINTIFF TO JUST BILL IT OUT, TURN THE

23   CRANK, DO WHAT YOU DO.

24          I'VE TRIED TO SAVE EVERYTHING DISCUSSED

25   FOR THE PARTIES USING THIS AS A TEMPLATE.  YOU DON'T

26   HAVE TO GO THROUGH ALL THE MATTERS.  A STATEMENT OF

27   DECISION CAN BE A WHOLE LOT SHORTER THAN WHAT I'VE

28   DONE.  I'VE TRIED TO BE REALLY COMPREHENSIVE.

1          IF EITHER PARTY UPON THE EXECUTION OF A

2    JUDGMENT, WHICH SHOULD BE SUBMITTED IN THE TIME

3    FRAME REQUIRED, AND I'LL DELEGATE THAT TO -- THE

4    LABORING ORE, TO DEFENSE COUNSEL TO INITIATE THIS,

5    WHICH SHOULD ALSO ENCOMPASS THE COURT'S RESOLUTION

6    AGAINST THE CROSS-COMPLAINT, ONE FINAL JUDGMENT.

7          THEN IF THERE ARE ATTORNEY'S FEE REQUESTS,

8    THAT YOU HOPEFULLY CAN NEGOTIATE.  YOU HAVE A LITTLE

9    TIME TO DO THAT.  BUT IF THAT IS NOT RESOLVED TO

10   YOUR SATISFACTION, YOU CAN TEE THAT UP.  AS FAR AS

11   I'M CONCERNED, YOU CAN DO IT ON A COST BILL LISTING

12   THE COSTS THAT YOU BELIEVE WERE SUBJECT TO BEING

13   CLAIMED.

14          FRANKLY, ON EACH PARTY PREVAILING ON SOME

15   ISSUE, I WOULD THINK MOST OF THE TIME PEOPLE CAN

16   RECOGNIZE THAT THE PROCESS OF BILLING ATTORNEY'S

17   FEES OVER COSTS FAR OUTWEIGHS USUALLY THE DISPUTED

18   ITEMS.  BUT I SEE MANY A DISPUTE OVER SMALL ITEMS,

19   PEOPLE REFER TO LITIGATION.  BUT ON THE ATTORNEY

20   FEES ISSUES, HOPEFULLY YOU CAN RECOGNIZE THAT I'VE

21   MADE A DETERMINATION ON THE MERITS AGAINST THE

22   CROSS-COMPLAINT.  I SEE THAT AS A SMALL PART OF THE

23   CASE, BUT, HOPEFULLY, YOU CAN MERGE THESE ISSUES.

24          IF YOU COME TO AGREEMENT ON COSTS AND

25   ATTORNEY'S FEES -- OF COURSE, IT'S NOT ACQUIESCENCE

26   IN THE JUDGMENT.  PEOPLE WOULD THEN HAVE THEIR FULL

27   RIGHTS OF REVIEW, IF YOU BELIEVED ON EVERYTHING I'VE

28   SAID THERE WAS A GOOD BASIS; OR IF NOT, YOU CAN

1    STILL DO IT.

2         THE -- JUST ONE SECOND.  WHEN THE JUDGMENT

3    IS PREPARED AND ENTERED, I WOULD DIRECT THE OFFICIAL

4    PREPARATION OF A NOTICE OF ENTRY OF JUDGMENT.

5    BECAUSE IT'S VERY IMPORTANT THAT THE PARTIES KNOW

6    THAT FROM THIS COURT'S PERSPECTIVE I LIKE THE CASE

7    TO MOVE ALONG.  MANY TIMES LAWYERS JUST LEAVE IT OUT

8    THERE, SIX-MONTH APPEAL PERIODS.  NO, IT SHOULD BE A

9    60-DAY PERIOD FROM NOTICE OF ENTRY OF JUDGMENT SO

10   PARTIES CAN FISH OR CUT BAIT AND GET ON WITH THEIR

11   LIVES.

12         THANK YOU.  THANK YOU SO MUCH.

13         MR. MOORE:  THANK YOU, YOUR HONOR.

14         MR. COATES:  THANK YOU, YOUR HONOR.

15         THE COURT:  LOOKING FORWARD TO HAVING THE

16   PRIVILEGE OF WORKING WITH YOU AGAIN ON ANY ISSUE

17   THAT WOULD COME UP.  THANK YOU.

18         MR. MOORE:  THANK YOU, YOUR HONOR.

19         MR. COATES:  THANK YOU, YOUR HONOR.

20         (WHEREUPON, PROCEEDINGS WERE CONCLUDED.)

21

22

23

24

25

26

27

28

892

1

STATE OF CALIFORNIA   )

2                                                      )   SS.

COUNTY OF SANTA CLARA)

3

4          I, MICHELLE V. LARIOS, DO HEREBY CERTIFY

5    THAT THE FOREGOING IS A FULL, TRUE AND CORRECT

6    TRANSCRIPT OF THE PROCEEDINGS HAD IN THE

7    WITHIN-ENTITLED ACTION HELD ON THE 28TH AND 29TH DAY

8    OF MARCH, 2007;

9          THAT I REPORTED THE SAME IN STENOTYPE

10   BEING THE QUALIFIED AND ACTING OFFICIAL COURT

11   REPORTER OF THE SUPERIOR COURT, IN AND FOR THE CITY

12   AND COUNTY OF SANTA CLARA, APPOINTED TO SAID COURT,

13   AND THEREAFTER TRANSCRIBED INTO TYPEWRITING AS

14   HEREIN APPEARS.

15          I FURTHER CERTIFY THAT I HAVE COMPLIED

16   WITH CCP 237(A)(2) IN THAT ALL PERSONAL JUROR

17   IDENTIFYING INFORMATION HAS BEEN REDACTED IF

18   APPLICABLE.

19

20          DATED:  AUGUST 16, 2007.

21

22                            _____

23                            MICHELLE V. LARIOS,C.S.R.

24                            LICENSE NO. 9244, C.R.P.

25                            NO. 043

26

27

28