

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

DVD COPY CONTROL ASSOCIATION, INC., PLAINTIFF

v.

KALEIDESCAPE, INC.

CASE NO. 1-04-CV 031829

ADDENDUM TO STATEMENT OF DECISION

This matter was tried to the court over a period spanning seven days. For reasons stated in detail on the record, the court granted DVD CCA's motion for nonsuit on Kaleidescape's cross-complaint for breach of contract and breach of the implied covenant of good faith and fair dealing.

Upon stipulation of counsel, the court issued its proposed statement of decision on plaintiff's claim for breach of contract. As agreed, except as may be dealt with in writing by the parties [pursuant to the statutes and rules governing statements of decision], the proposed statement of decision will constitute the statement of decision. Thus, except as here modified, the court adopts the March 29, 2007 oral statement of decision as the statement of decision. A copy of the transcript, previously provided to counsel, is attached to this addendum.

**Exhibit M, Page 149**

Dockets.Justia.com

This addendum addresses plaintiff's request for statement of decision filed on April 6, 2007. For reasons explained herein, the court is of the opinion that the oral statement of decision is complete and unambiguous on issues raised by plaintiff. Nonetheless, the court further addresses the issues raised to make it abundantly clear that there are no ambiguities or omissions.

1.  Whether the CSS General Specifications are CSS Technical Specifications under the License Agreement.

The court stated in its oral statement of decision" "Well, I conclude that no part of exhibit 156 specifically calls out in clear words the general specifications. So it ... from the text of Exhibit 156 alone is not part of the contract. But, of course, that begins the discussion. It does not end it." The court went on to explain, based on all the evidence presented, and applying the rules of contract interpretation and construction, the general specifications were not part of the contract. It also explained why, even if the general specifications were part of the contract [an assumption directly contrary to the court's finding], it did not impose obligations upon defendant which were sufficiently clear and definite to support plaintiff's only claims – for specific performance and injunctive relief.

2.  Whether or not the contract was "reasonably susceptible" to the interpretation urged by DVD CCA (i.e. that the CSS General specifications were CSS Technical Specifications and therefore part of the Agreement).

This never was a contested issue. It is true that Kaleidescape filed a trial brief on March 20, 2007 [Supplemental Trial Brief Re Lack of Incorporation of CSS General Specifications Into The CSS License Agreement], the day before opening statements and the administration of the oath to the first witness, which concluded, at page 4: lines 12-13, "Any evidence or argument regarding the CSS General Specifications should be excluded at trial because they are not part of the parties' contract." It is equally true that neither party ever moved to exclude or strike testimony of witnesses, and the court heard and considered all the proffered evidence on plaintiff's claims.

The court was never asked to and never did apply the old, and largely discredited, "face of the document" or "plain meaning" test in order to exclude any proffered evidence. The whole trial was conducted in recognition of and in accordance with the well recognized rule stated in PG& E v. G.W. Thomas Drayage & Rigging Co. (1968) 69 C2d 33, 41: Extrinsic evidence offered to interpret or explain the meaning of a written instrument is not made inadmissible by the parol evidence rule if the wording of the written instrument, in light of all the circumstances shown by the evidence introduced by the parties, is reasonable susceptible of the meaning of interpretation contended for by the party-proponent of the extrinsic evidence.

Although the court does not think it is necessary to do so, the court does modify the oral statement of decision to make clear that, after a full consideration of the evidence and argument in the case, and after considering all the briefs filed in the matter, the court

**Exhibit M, Page 150**

found the legal analysis set forth in defendant's Supplemental Trial Brief Re Lack of Incorporation of CSS General Specifications Into The CSS License Agreement, filed March 20, 2007, and defendant's Brief on Determining the Writing of the Contract, filed March 27, 2007, persuasive. The court does not "adopt" the briefs. Obviously, the court did not exclude any evidence.

3. Whether the CSS General Specifications are CSS Technical Specifications and therefore a part of the Agreement as a matter of law based on Kaleidescape's judicial admission.

The request comes with a history, as the court will explain in detail. The court is of the opinion that the request, the arguments set forth therein, and the brief filed April 2, 2007 [ordered stricken by the court that same day], are very misleading as that word is commonly understood – "to lead into the wrong direction, to lead astray, to lead into error (of judgment); deceive or delude" Business and Professions Code 6068(d) and Rule of Professional Conduct 5 (B) counsel against misleading.

The court is very disappointed. If lead counsel for plaintiff, upon reading the submission referenced above, and upon considering this addendum to statement of decision, is of the same opinion, the court would greatly appreciate receiving a letter from counsel, copy to defendant's counsel, acknowledging that fact. The court makes this suggestion and request because of the great respect it had for all counsel in this matter. The court accords great weight, based upon experience with counsel at trial, to the presumption that counsel would never intentionally mislead the court away from a proper analysis and judgment in this or any other matter. Such a letter would be in accord with that presumption.

The court has reviewed trial notes and transcripts, all exhibits, and all trial briefs. The court finds that the first reference to plaintiff's request for admission 26 and the response thereto, was put forth in the brief filed April 2, 2007 [hereafter "stricken brief"], which was presented for filing four days after counsel submitted the matter for decision and the court rendered its oral proposed statement of decision. After the court announced its proposed statement of decision, the court took a recess so that the team of trial counsel could confer and confer with counsel. The court announced that it would resume the bench in order to respond to any request to cure any ambiguity or omission. After the recess, the court inquired, "Is there anything else you require?" Lead counsel for plaintiff responded, "Not at this moment, your honor." The court gave a further opportunity to respond to any request. There being none, court adjourned.

Plaintiff's April 2, 2007 filing was stricken for obvious reasons, some of which were stated in the order. It was, in essence, an ex parte communication. The fact that it was served on the opposing counsel, does not alter that fact. No advance notice was given to counsel. It invited the court to consider reopening the case with no opportunity for

3

**Exhibit M, Page 151**

opposing counsel to be heard. It did not relate to any pending motion or hearing date. It was stricken, because it was not filed in accordance with law.

The stricken brief does not expressly admit the obvious – that there had been no reference at any time before or during the trial, or at any time until after the matter was submitted and decided, to a purported request for admission and response. The documents, to this day, have not been submitted to the court in the manner provided for in law.

The stricken brief, at page 5:1-5, states: "It should be noted that DVD CCA does not seek to reopen the case to consider additional evidence. As noted above, California law is clear that the admission made by Kaleidescape 'need not (and should not) be offered as evidence,' Valerio, 103 Cal. App. 4[th] at 1271, because it is a judicial admission and not evidence.'"

Not one word on the cited page refers to requests for admissions and the responses thereto. Quoting from the page, as plaintiff did at page 4 of the stricken brief, "the admission of fact in a *pleading* is a 'judicial admission.' And again, from the cited page, "The law on this topic is well settled by venerable authority. Because an admission in the *pleading* forbids the consideration of contrary evidence, any discussion of such evidence is irrelevant and immaterial. [Citation omitted]. When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as "found." … [Emphasis in italics added].

The stricken brief, at the place cited, contains circular reasoning, or reasoning that begs the question. It sets forth a black letter rule not connected to any fact in the case. That is because answers to requests for admissions are not pleadings. CCP 420 provides, "The pleadings are the formal allegations by the parties of their respective claims and defenses for the judgment of the case." CCP 422.10 provides, "The pleadings allowed in civil actions are complaints, demurrers, answers, and cross complaints." No other pleading are permitted. Chamberlain v. Loewenthal (1902) 138 C. 47, 49. Kaleidescape's answer to plaintiff's complaint, filed on June 1, 2005, in addition to setting forth affirmative defenses, states, at page 1, lines 103, "General Denial. Defendant  Kaleidescape, Inc. ('Kaleidescape') denies each and every allegation of plaintiff' DVD Copy Control Association's ('DVD CCA') Complaint."

This misdirection, plus more, as described, evokes the haunting words of Marvin Gaye's 1971 Motown hit, "What's Going On/What's Happening Brother."

The court will now turn to a consideration of the papers as they relate to the use of requests for admissions. Plaintiff simply refers to a purported request for admission and a purported response thereto. Purported copies of those documents, dates in November and December, 2006, are attached to the stricken brief. In combination, the stricken brief and plaintiff's request for statement of decision, advance the bold proposition that, "The law is clear that a trial judge has no discretion to disregard a party's admission." Why is this proposition advanced in this way? Why does plaintiff omit and fail to deal with facts and

**Exhibit M, Page 152**

law relevant to its argument? Since a statement of decision sets the stage for appellate review, one can infer the answer.  This way of proceeding is a shortcut which does not advance the interests of justice, or, in the court's opinion, advance the interests of the plaintiff.

Plaintiff makes no mention of the fact and the law that, "Discovered matter is subject to all the usual rules of evidence." California Judges Benchbook, Civil Proceedings, Trial (1997) section 5.56 – Introduction of Discovered Matter. As substantive evidence at trial, an adverse party's responses to requests for admission may be read into the record against that party. If an admission conclusively establishes a fact, any contrary evidence is inadmissible. This objection can be anticipated and resolved in advance. These issues can often be addressed through utilization of motions in limine. Civil Proceedings, sections 6.48, 6.49.

It is true that a party may move to reopen a case to introduce additional evidence, and this can be done anytime before judgment. As noted above, however, plaintiff has made it clear that plaintiff "does not seek to reopen the case to consider additional evidence." Stricken brief, page 4: 1-2. There may be good reasons for this decision, which, in order to maintain a true record for any appellate review, the court will recite.

Sometime during the trial day of March 27, 2007, plaintiff filed a document entitled, "Plaintiff DVD Copy Control Association, Inc.'s Trial Brief Re Liability and Equitable Remedies." Upon reviewing the document, counsel for Kaleidescape, on the morning of Wednesday, March 28, 2007, asked for a chambers conference. All four members of plaintiff's trial team, and, as the court recalls, the three counsel for defendant were invited in to chambers, and all attended the conference. The court and counsel were in close proximity, each was in a position to hear the other. When the court addressed a comment to counsel, each responded appropriately, as if they had heard what the court stated.

Defense counsel objected that plaintiff's brief asserted a third breach of contract, at page 9:20 through page 10: line 16, which ran contrary to lead counsel's express representations in opening statement. The court entered into an exchange with counsel. Points were made which would have been placed on the record had any counsel so requested. Instead, lead counsel for plaintiff elected to withdraw the assertion. Accordingly, minutes later, upon confirmation of the withdrawal on the record in open court,  the court endorsed in the margin on page 9, "The claim and contention set forth at paragraph 3, page 9 line 20 through page 10 line 16 was formally withdrawn by William Sloan Coats, counsel for plaintiff, in open court, in the presence of the parties and counsel, on the morning of Wednesday, March 28, 2007, all as shown in the record and as taken down by the court reporter."

During the chambers conference, and in forecasting arguments that plaintiff's counsel might have made had he elected to proceed on record, lead counsel initially stated he wanted to assert this third breach of contract, because he had first learned at trial that defense counsel took the position that the general specifications were not part of the

5

contract. The court responded that surprises can happen, and that trial counsel usually use discovery tools, such as, but not limited to, fact and contention interrogatories, to avoid surprise. The court made clear that plaintiff was free to ask leave to amend his complaint or claim if he chose to do so. As stated above, counsel elected, instead, to withdraw the claim.

A similar decision had been made by defense counsel, after conference on the first day of trial. Counsel elected not to proceed with a motion to augment his expert witness designation. Instead, defense counsel elected to proceed without the desired expert witnesses.

The plaintiff's trial counsel who subscribed the purported request for admission 26 was present in chambers when the conference occurred on the morning of March 28, 2007. These background facts are relevant for a number of reasons. Plaintiff had an opportunity to move to reopen the case to present further evidence. Instead, as noted above, plaintiff elected to forego that opportunity. Although the court would have had discretion to reopen the case to receive further evidence, had plaintiff decided to advance such a motion, such a motion must be supported by a showing of good cause and due diligence.

The court has no idea what plaintiff would have put forth had it made such a motion. Would counsel have stated that the request for admission answers were newly discovered? It appears unlikely since the purported answers were allegedly executed on December 29, 2007, and there is no suggestion that they were not served on plaintiff's counsel at about that time. Would plaintiff's counsel have asserted that the failure to make any reference to the purportedly relevant request for admission and the response thereto during trial was a result of mistake, inadvertence, surprise, or excusable neglect? Perhaps that is unlikely in light of the colloquy at the March 28, 2007 chambers conference. The court might have required declarations under penalty of perjury from each member of plaintiff' trial team on any issue presented on a motion to reopen.

Without more, it appears possible that the failure to use the request for admission and response thereto is the result of a strategic decision or because there was nothing in the request and answer that was helpful to plaintiff. Absent more, and plaintiff elected not to submit more, it would appear that plaintiff has waived any right or claim to present evidence in the form of a request for admission and response thereto, and that, under the circumstances, it should be estopped to argue any request related to a purported request for admission and response for any purpose.

If plaintiff had moved to reopen, and if the court had indulged every inference in favor of granting relief based, for example, on a claim of excusable neglect, then the court would have been presented with the issue – what to do with the purported request and admission. Code of Civil Procedure section 2033.410 (a) provides: "Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action, unless the court has permitted withdrawal or amendment of that admission under Section 2033.300." Section 2033.300 provides: (a) A party may withdraw or amend an admission made in response to a request for admission

**Exhibit M, Page 154**

only on leave of court granted after notice to all parties." (b) The court may permit withdrawal or amendment of an admission only if it determines that the admission was the result of mistake, inadvertence, or excusable neglect, and that the party who obtained the admission will not be substantially prejudiced in maintaining that party's action or defense on the merits."

If the court had been called upon, which he has not, to grant relief to plaintiff, would it not be called upon equally to grant relief to defendant, especially since it appears that the whole case was presented by both sides as one which called for the presentation of evidence so that the court could properly interpret and construe the contract? In light of the whole record before the court, it appears likely that any reference, post trial and post determination, to pretrial discovery, is merely an afterthought.

Assuming, arguendo, that a request had been made to reopen, that the request had been granted, that the court had denied defense counsel's request to withdraw or amend a purported admission, and the court considered such admission, the court would have had to perform another task. The court would have heard argument as to whether the purported admission was subject to interpretation, and, if so, how the court should interpret the purported admission – based on a consideration of all that had been presented at trial. These arguments and hypotheses become highly attenuated, of course, because plaintiff never undertook to reopen – indeed, plaintiff made it clear that it was not doing so.

 If the court had been called upon to exercise its discretion to consider the purported request for admission and response, its ruling would have been subject to review for abuse of discretion. One of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. The court would have considered all arguments, had then been made, but it is difficult to contemplate an injustice in considering all the evidence as distinguished counsel chose to present it, urging voluntary resolution by the parties, and, upon being informed that a decision was required, deciding the case.

Many parts of the statement were accepted without objection. Those include the court's determination that, even if the general specifications were part of the contract, the provisions of the general specifications were not definite or clear enough to be place obligations on defendant or to be enforced; that the claimed damage was hypothetical, contingent, academic, and not clearly established – certainly not to the degree to support equitable relief requested by plaintiff; that is was not necessary to rule on defendant's copyright defenses or to determine whether copyright law was applicable – that it was sufficient to decide, as a matter of state law, that nothing defendant did, as shown by the evidence, was unfair. In sum, the court accepted this case as a breach of contract case as urged by plaintiff' counsel, received all the evidence put forth, considered it carefully, and determined that plaintiff did not carry its burden of proof on the substantial controverted issues at trial. Likewise, the court heard full argument on cross-complainant's offer of proof and granted  DVD CCA's motion for nonsuit on Kaleidescape's cross-complaint.

**Exhibit M, Page 155**

This has been an extended presentation, because the court is of the opinion, as expressed, that the post determination submission by defendant, would have had the effect, unless corrected, of giving a false and misleading impression of what happened at trial. By suggesting a desired remedy [reopening] while at the same time eschewing that same relief, defendant appeared to try to have its cake and eat it, too. The court is used to having its determinations reviewed, here heavily fact and evidence based considerations usually deferred to by appellate courts, but it expects any review to be based on the true record. The court is encouraged that, subject to the right of the trial court, to grant relief for default, relief never sought here, the doctrines of waiver, estoppel, and invited error are said to alive and well in reviewing courts.

The court understands that the post trial submissions are executed by trial associates. The court respects each attorney for the parties. The court renews the invitation to lead counsel to review the papers, and, if it agrees with the court concerning its criticisms of these presentations, an acknowledgment would be graciously and respectfully received. If lead counsel does not agree with this criticism, no response is requested or desired. In any event, if the parties will not come to agreement, they may of course press ahead with litigation in this or any reviewing court.

April 13, 2007

**Leslie C. Nichols**

_____

LESLIE C. NICHOLS
JUDGE OF THE SUPERIOR COURT

8

**Exhibit M, Page 156**

1  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2  IN AND FOR THE COUNTY OF SANTA CLARA

3  BEFORE THE HONORABLE LESLIE C. NICHOLS, JUDGE

4  DEPARTMENT NO. 21

5  ---oOo---

6

7  DVD COPY CONTROL ASSOCIATION, INC.,)
   A DELAWARE CORPORATION,            )
8                         PLAINTIFF, )
                                      )
9  VS                                 )NO.1-04-CV031829
   KALEIDESCAPE, INC., A DELAWARE     )
10 CORPORATION,                       )
                           DEFENDANT.)
11 AND RELATED CROSS-ACTION           )

12

13

14

15  REPORTER'S TRANSCRIPT OF PROCEEDINGS

16  HELD ON MARCH 29, 2007

17

18

19

20 APPEARANCES:

21

22 FOR THE PLAINTIFF:
      BY: WILLIAM COATS, ATTORNEY AT LAW
23    BY: HEIDI L. KEEFE, ATTORNEY AT LAW
      BY: MARK WEINSTEIN, ATTORNEY AT LAW
24    BY: MARK LAMBERT, ATTORNEY AT LAW
      BY: SAM O'ROURKE, ATTORNEY AT LAW

25 FOR THE DEFENDANT:
      BY: THOMAS E. MOORE, III, ATTORNEY AT LAW
26    BY: RICHARD R. WIEBE, ATTORNEY AT LAW
      BY: NICOLE V. ECONOMOU, ATTORNEY AT LAW

27 COURT REPORTER:  MICHELLE V. LARIOS
28               C.S.R. NO. 9244, C.R.P. NO. 043

1

---

1         SAN JOSE, CALIFORNIA     MARCH 29, 2007

2

3              PROCEEDINGS:

4         (WHEREUPON, COURT CONVENED AND THE

5  FOLLOWING PROCEEDING WERE HAD:)

6         THE COURT:  GOOD MORNING.  WE'RE ALL

7  TOGETHER ON THE MATTER OF DVD COPY CONTROL

8  ASSOCIATION VERSUS KALEIDESCAPE, INC.  I THINK I

9  MENTIONED INFORMALLY JUST A SHORT TIME AGO THAT I

10 WOULD LIKE TO GET YOUR AGREEMENT ON THIS.  WHAT I

11 THOUGHT I WOULD DO IS DEAL WITH THE NONSUIT MOTION

12 FIRST AND THEN TAKE A LITTLE RECESS AND GET SET UP

13 WITH MY MATERIALS FOR ANNOUNCING THE DECISION ON THE

14 PLAINTIFF'S CASE.

15         IS THAT AGREEABLE?

16         MR. COATES:  YES, YOUR HONOR.

17         MR. MOORE:  THAT'S FINE, YOUR HONOR.

18         THE COURT:  FIRST I WANT TO COME DOWN FROM

19 THE BENCH AND THANK YOU ALL FOR A JOB VERY WELL

20 DONE.

21         IT'S A NECESSITY TO WORK WITH PEOPLE WHO

22 ARE NOT AN A TEAM.  WE ALL DO THAT.  BUT EVERY PARTY

23 HAS OBVIOUSLY BROUGHT THE A TEAM TO THE CONTEST, AND

24 I APPRECIATE THAT BECAUSE IT MAKES -- HELPS DIRECT

25 THE COURT AWAY FROM ERROR AND IN THE DIRECTION OF A

26 SUSTAINABLE DECISION, WHICH IS NOT, OF COURSE, BY

27 DEFINITION SATISFACTORY TO EACH PARTY.

28         BUT I THINK IT'S UNDERAPPRECIATED IN THE

2

---

1  COMMUNITY, THE VERY IMPORTANT ROLE OF ADVOCATES IN A

2  FREE SOCIETY.  EVERYBODY COMPLAINS ABOUT IT UNTIL

3  THEY NEED THEM, AND THEN THEY CAN'T LIVE WITHOUT

4  THEM.  AND I LIVED IN THAT ENVIRONMENT FOR MANY

5  YEARS, PEOPLE ASKING ME, HOW COULD YOU REPRESENT

6  SOMEONE WHEN YOU KNOW THEY'RE GUILTY?  YOU KNOW,

7  THOSE KINDS OF QUESTIONS.  AND THEN, OF COURSE, SOME

8  GREAT CELEBRITY OR MEMBER OF CONGRESS IS ARRESTED,

9  AND, OF COURSE, THEY'RE CLOAKED WITH ALL THE

10 ASSUMPTIONS OF A FREE SOCIETY THAT THEY

11 APPROPRIATELY SHOULD BE CLOAKED WITH.

12         I'M GOING TO FIRST TALK BRIEFLY ABOUT THE

13 NONSUIT, AND I CAN TAKE A SHORT TIME ON THAT, I

14 THINK.  BUT I WANT TO BE REAL CLEAR BECAUSE THE

15 RULES CONCERNING A NONSUIT MOTION ARE PRETTY CLEAR.

16 I'M GOING TO STATE THOSE RULES IN A MOMENT.  BUT

17 IT'S IMPORTANT THAT THE GROUNDS BE STATED.

18         AND WITHOUT GETTING IN TO REWORK THIS, I

19 UNDERSTAND THAT THE GROUNDS THAT WERE ASSERTED WERE

20 THREE IN NUMBER.  BUT CONNECTED WITH THAT OF

21 NECESSITY WAS THE -- THE ASSERTED GROUND THAT -- AND

22 BY VIRTUE OF THOSE MATTERS, THERE ARE NOT FACTS OF

23 SUFFICIENT SUBSTANTIALITY TO SUBMIT TO A JURY.

24 ISN'T THAT THE GIST OF IT?

25         MR. COATES:  THAT'S CORRECT, YOUR HONOR.

26         THE COURT:  I THINK YOU UNDERSTOOD THAT,

27 DIDN'T YOU?

28         MR. MOORE:  YES, YOUR HONOR.

3

---

1         THE COURT:  THE NONSUIT MOTION REPRESENTS

2  A BALANCING OF INTERESTS THAT IS REFLECTED IN THE

3  LAW.  THERE IS A STRONG POLICY FOR TRIAL ON THE

4  MERITS.  YET NOT AT ALL SURPRISINGLY THERE ARE WAYS

5  IN WHICH PARTIES CAN INTERVENE FROM THE BEGINNING OF

6  A LAWSUIT UNTIL A JURY VERDICT OR DECISION BY THE

7  UNITED STATE SUPREME COURT TO TERMINATE THE

8  LITIGATION.  AND SOME OF THE VEHICLES, FOR EXAMPLE,

9  ARE THE DEMURRER; THE CHALLENGE TO THE LEGAL

10 SUFFICIENCY OF THE COMPLAINT.

11         IF ALFRED FILES A COMPLAINT AND SAYS THAT

12 WILLIAM HIT HIM AND HE BRINGS -- AND HE SERVES THE

13 PAPERS UPON JANE.  JANE MAY COME BEFORE THE COURT

14 AND SAY, THIS HAS NOTHING TO DO WITH ME.  WHY AM I

15 HERE?  PLEASE LET ME GO HOME.  THE COURT WILL SAY,

16 PERHAPS THERE'S SOME INADVERTENCE IN THE PREPARATION

17 OF YOUR CLAIM.  I'LL UPHOLD THE CLAIM AND ALLOW YOU

18 TO AMEND.  AND IF YOU FAIL TO DO SO, JANE IS OUT OF

19 THE LAWSUIT.

20         THERE ARE OTHER WAYS IN WHICH LITIGATION

21 IS TERMINATED ALONG THE ROAD OF LITIGATION.  IT

22 MIGHT BE THAT ONE PARTY CONSISTENTLY REFUSES TO TURN

23 OVER EVIDENCE, IT'S DISCOVERABLE, MAKING IT

24 DIFFICULT OR IMPOSSIBLE FOR ANOTHER PARTY TO DEFEND

25 OR PROSECUTE THEIR CLAIM.  AND WHEN THAT HAPPENS, AS

26 YOU CAN WELL IMAGINE, THE LAW IS NOT A BLUNT

27 INSTRUMENT.  IT WORKS AT IT LEVEL BY LEVEL,

28 ORDINARILY DETERMINING WHETHER THE ANSWER OUGHT TO

**Exhibit M, Page 157**

**Page 5**

1 BE PROVIDED, PERHAPS PROVIDE MONETARY SANCTIONS TO
2 LEVEL THAT PLAYING FIELD SO SOMEONE CAN'T CRUSH THE
3 OTHER LITIGANT BY VIRTUE OF SUPERIOR RESOURCES.
4 MOVING IT ALONG, ULTIMATELY, PERHAPS, PRECLUDING THE
5 EVIDENCE ON AN ISSUE AND SOMETIMES TERMINATING THE
6 LAWSUIT AS A LAST RESORT.
7          THERE WAS A DECISION IN THE APPELLATE
8 COURT JUST THE OTHER DAY THAT SHOWED THAT THE COURTS
9 DO TAKE THOSE OBLIGATIONS SERIOUSLY.  AND WE'LL
10 EXERCISE THE MOST DRAMATIC REMEDY AVAILABLE WHEN
11 PRESSED.
12          YOU'VE ALSO HAD EXPERIENCE WITH THE MOTION
13 FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION.  THE
14 PARTIES FILE PAPERS.  THEY ENUMERATE WHAT THEY CLAIM
15 ARE UNDISPUTED ISSUES OF FACT GOING TO THE MERITS.
16 EACH PARTY MAY SEEK TO KNOCK OUT THE OTHER PERSON'S
17 CLAIM OR A CLAIM -- A WHOLE CLAIM.  AND THE TRIAL
18 COURT MAY GRANT OR DENY THAT.
19          THE DENIAL OF THE MOTION SIMPLY MOVES IT
20 INTO THE TRIAL DEPARTMENT.  THE GRANT MAY LEAD TO A
21 REVIEW BY THE APPELLATE COURT.  AND ALL JUDGES WHO
22 SERVE FOR ANY DURATION HAVE BEEN REVERSED ON THOSE
23 CLOSE ISSUES BECAUSE IT REPRESENTS THE REAL TENSION
24 BETWEEN GET RID OF THOSE FRIVOLOUS LAWSUITS, YOU
25 HEAR ABOUT THEM IN THE NEWSPAPER, AND, OF COURSE,
26 THE STRONG POLICY ON THE ADJUDICATION ON THE MERITS.
27 BECAUSE AS AMERICANS WE HAVE A RIGHT TO PETITION TO
28 ADDRESS GRIEVANCES.  IT'S RIGHT THERE IN THE

**Page 6**

1 CONSTITUTION.
2          AND IT MOVES INTO THE TRIAL DEPARTMENT,
3 AND UNDERSTANDABLY THERE IS A LITTLE BIT MORE FLEX
4 THERE.  MUSCLE IF NOT USED ATROPHIES.  AND THEN ON
5 THE OTHER HAND, THE TRIAL COURT WILL TRY TO MAKE
6 DECISIONS TO ALLOW THE CASE TO FULLY COME TO
7 MATURITY IF THAT CAN BE DONE.
8          AND SO THE MECHANISMS PROVIDED, SOME
9 STATUTORY, SOME COMMON LAW, SOME THE LEGISLATURE
10 ADOPTED THE PRACTICES OF THE COURT IN EXPRESS
11 LEGISLATION, START WITH THE MOTIONS IN LIMINE, WHICH
12 I HEARD.  ACTUALLY, I -- TO BE CLEAR ON WHAT
13 HAPPENED THERE, OF COURSE, I ANNOUNCED -- I
14 SUGGESTED THAT COUNSEL MAY WANT TO KNOW MY
15 PRELIMINARY THINKING ON THOSE MATTERS.  COUNSEL
16 AGREED.  I DID THAT.  AND NO ONE PRESSED FOR A
17 RULING ON ANY IN LIMINE AT THAT TIME.  TWO OF THE
18 MOTIONS COME UP NOW IN A NONSUIT.  OTHER THAN THAT,
19 NO RULING WAS EVER SOUGHT ON THOSE MATTERS, AND
20 EVIDENCE IN THE CASE CAME IN LEAVING THE MOTION IN
21 AN OPEN WAY A VERY FREE ADMISSIBILITY OF EVIDENCE
22 WITHOUT OBJECTION IN ALMOST EVERY PARTICULAR.  I
23 THINK IN EVERY WAY THAT COUNTS.
24          THAT'S ONE WAY THAT A CASE COULD BE
25 TERMINATED.  THAT'S VERY UNUSUAL THAT THAT OCCURS.
26 ANOTHER IS AT THE END OF THE OPENING STATEMENT.
27 ANOTHER WAY IS AT THE MOTION FOR JUDGMENT OR
28 DIRECTED VERDICT, AT THE END OF THE PRESENTATION BY

**Page 7**

1 THE PLAINTIFF, OR AT THE END OF THE PRESENTATION OF
2 ALL EVIDENCE.  OF COURSE, THEN THE COURT HAS A ROLE
3 IN FASHIONING INSTRUCTIONS THAT MAY TAKE AWAY OR
4 LIMIT CERTAIN CLAIMS, ALL OF WHICH IS RECORDED.
5          FINALLY, THERE WAS A VERDICT, AND THEN, OF
6 COURSE, THERE ARE MOTIONS FOR JUDGMENT
7 NOTWITHSTANDING THE VERDICT OR A MOTION FOR NEW
8 TRIAL.  ON THE LATTER, A LOT OF DISCRETION IS GIVEN
9 TO THE VERY LIBERAL RULE OF INTERPRETATION ON THE
10 APPELLATE COURT.  THAT VERY LAST MOTION THE JUDGE
11 ACTS AS, SOME HAVE SAID, KIND OF LIKE A 13TH JUROR,
12 BUT IN ANY EVENT HAVE SUBSTANTIAL INPUT IN EACH
13 CASE.  WHEN THEY'RE JURY FACT-FINDINGS, OBVIOUSLY,
14 THE COURTS EXAMINE THAT VERY CLOSELY.  THERE ARE
15 THOSE THAT WE GO ABOUT IT.
16          THIS IS A MOTION FOR NONSUIT.  THERE IS A
17 LEADING CASE OFTEN CITED.  THE CASE IS ESTATE OF
18 LANCES, L-A-N-C-E-S.  IT'S A 1932 CASE, AT VOLUME
19 216, OF THE CALIFORNIA SUPREME COURT REPORTS, PAGE
20 397.  IT'S CITED IN WITKIN ON THIS SUBJECT, AND
21 IT'S A CLASSIC CASE AS THE LEADING CASE.
22          AND IT READS AS FOLLOWS ON THIS ISSUE: "IT
23 HAS BECOME THE ESTABLISHED LAW OF THIS STATE THAT
24 THE POWER OF THE COURT TO DIRECT A VERDICT IS
25 ABSOLUTELY THE SAME AS THE POWER OF THE COURT TO
26 GRANT A NONSUIT.  A NONSUIT OR A DIRECTED VERDICT
27 MAY BE GRANTED ONLY WHEN DISREGARDING CONFLICTING
28 EVIDENCE AND GIVING THE PLAINTIFF'S EVIDENCE ALL THE

1 VALUE TO WHICH IT IS LEGALLY ENTITLED, HEREIN
2 INDULGING IN EVERY LEGITIMATE INFERENCE WHICH MAY BE
3 DRAWN FROM THAT EVIDENCE.  THE RESULT IS THAT THERE
4 IS A DETERMINATION THAT THERE IS NO EVIDENCE OF
5 SUFFICIENT SUBSTANTIALITY TO SUPPORT A VERDICT IN
6 FAVOR OF THE PLAINTIFF IF SUCH A VERDICT WERE
7 GIVEN," CLOSE QUOTE.
8          "UNLESS IT CAN BE SAID AS A MATTER OF LAW
9 WHEN SO CONSIDERED, NO OTHER REASONABLE CONCLUSION
10 IS REASONABLY DEDUCIBLE FROM THE EVIDENCE AND THAT
11 ANY OTHER HOLDING WOULD BE SO LACKING IN EVIDENTIARY
12 SUPPORT THAT A REVIEWING COURT WOULD BE IMPELLED TO
13 REVERSE IT UPON APPEAL OR THE TRIAL COURT TO SET IT
14 ASIDE.  AS A MATTER OF LAW, THE TRIAL COURT IS NOT
15 JUSTIFIED IN TAKING THE CASE FROM THE JURY.
16          "IN OTHER WORDS, THE FUNCTION OF THE TRIAL
17 COURT ON A MOTION FOR DIRECTED VERDICT IS ANALOGOUS
18 TO AND PRACTICALLY THE SAME AS THAT OF A REVIEWING
19 COURT IN DETERMINING ON APPEAL WHETHER THERE IS
20 EVIDENCE IN THE RECORD OF SUFFICIENT SUBSTANCE TO
21 SUPPORT A VERDICT."
22          I THINK THAT YOU DID INDICATE VERY
23 CANDIDLY THAT IN ORDER TO ADVANCE THE CLAIMS ON THE
24 CROSS-COMPLAINT, THE BREACH OF CONTRACT OR THE
25 BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR
26 DEALING AND TO REACH A JURY, YOU ARE -- YOU WOULD
27 NEED THE TESTIMONY OF THE MEDIATOR OMBUDSMAN.  THAT
28 IS MY UNDERSTANDING.

1 MR. MOORE:  YES, YOUR HONOR.
2 THE COURT:  OKAY.  FINE.  SO THAT REALLY
3 FOCUSES THE ISSUE.
4 THERE WERE THREE GROUNDS NOTED.  I FIND IT
5 NECESSARY ONLY TO GO TO THAT SECOND GROUND, AS I
6 RECALL, WHICH WAS BASICALLY THAT THE MEDIATOR CAN'T
7 BE CALLED.  THERE IS NO EVIDENCE IT CAN BE PRESENTED
8 CONCERNING THE MEDIATION PROCESS MORE GENERALLY.
9 AND FOR THAT REASON AND REALLY DISTINCT FROM ANY
10 CLAIMED MERITS THAT THERE CANNOT BE EVIDENCE OF ANY
11 SUBSTANTIALITY TO REACH A JURY.  AND I AGREE WITH
12 THAT PROPOSITION AS A MATTER OF LAW.
13 AND I'LL BRIEFLY REFER TO -- TO MAKE A
14 RECORD OF THE THINGS THAT I CONSIDERED.  I DID
15 CONSIDER THE SUMMARY ADJUDICATION ORDER FROM JUDGE
16 ELFVING.  BUT, OF COURSE, IT'S NOT BINDING IN ANY
17 WAY.  THE JUDGE FOLLOWED THE COURT OF APPEAL 6TH
18 DISTRICT DECISION, IT DID NOT RULE ON EVIDENCE
19 OBJECTIONS.  OTHER DISTRICTS SUGGEST IT'S REQUIRED.
20 WE'LL GET RESOLUTION ON THAT SOME DAY.
21 BUT IT REALLY LEFT OPEN THE QUESTION
22 BECAUSE, OF COURSE, THE MOTION'S JUDGE HAD TO
23 BALANCE A LOT OF DIFFERENT THINGS, AND WE SPEAK IN
24 ONE VOICE.  I'M JUST SAYING, WELL, I REALLY DON'T
25 BELIEVE IT'S NOT MY PROVINCE AT THIS TIME TO DISPOSE
26 OF THE CROSS-COMPLAINT IN THIS WAY.
27 THE LAW IS ABSOLUTELY CLEAR THAT THE
28 DENIAL OF A MOTION FOR SUMMARY JUDGMENT IN NO WAY

9

1 EQUATES WITH ANY LIMITATION ON THE AUTHORITY OF THE
2 TRIAL JUDGE TO GRANT A MOTION FOR NONSUIT.
3 THE COURT READ ALL THE MOTIONS IN LIMINE,
4 AND I TAKE JUDICIAL NOTICE OF THOSE.  THERE WERE
5 ATTACHMENTS, AND, AS RELEVANT, I'VE CONSIDERED ALL
6 THAT.  THERE WERE TWO MOTIONS IN LIMINE, NUMBER 4
7 AND NUMBER 10, THAT WERE SPECIFICALLY PRESENTED.
8 AND AN OPPOSITION WAS FILED WITH REFERENCE TO NUMBER
9 4, BUT NOT TO 10.  BUT I'VE TAKEN INTO ACCOUNT THE
10 BRIEFINGS AND THE DISCOVERY ORDER, SO I HAVE A GOOD
11 SENSE OF THE ARGUMENTS THAT WERE ADVANCED THERE.
12 I TAKE JUDICIAL NOTICE OF THE FILINGS AND
13 ORDERS IN THE CASE, INCLUDING ORDERS WHICH QUASHED A
14 MOTION FOR PRODUCTION OF DOCUMENTS AND QUASHED -- I
15 THINK IT WAS THE DEPOSITION NOTICE, WASN'T IT?
16 MR. COATES:  YES, YOUR HONOR.
17 THE COURT:  THOSE WERE ORDERS FROM
18 DISCOVERY AND THE DETERMINATIONS OF JUDGE MANOUKIAN
19 IN THAT REGARD, WHO WAS HEARING DISCOVERY MATTERS.
20 I THINK WITHOUT GOING THROUGH ALL THE
21 CASES, I CAN SAY THAT I WAS RECENTLY ATTENDING A
22 CALIFORNIA JUDGES CONFERENCE AND JUSTICE GILBERT
23 FROM THE COURT OF APPEAL IN ITS ANNUAL REVIEW, AND
24 HE PICKED OUT THESE MEDIATION ON ARBITRATION CASES
25 FOR SOME DISCUSSION.  AND THERE ARE A NUMBER OF
26 CASES, REALLY, COLLATERAL TO WHAT WE HAVE HERE.
27 WHAT HAPPENS IF THE MEDIATOR AND THE PARTIES SAY, WE
28 HAVE A DEAL, AND THEY -- AND THEY HAVE A DOCUMENT

10

1 CALLED, DEAL POINTS OR TERMS OF AGREEMENT, BUT IT
2 DOESN'T EXPRESSLY PROVIDE, FOR EXAMPLE, THAT IT
3 SHALL BE ENFORCED IN COURT.
4 YOU KNOW, IT MAY BE THAT IT'S PROTECTED BY
5 THE MEDIATION PRIVILEGE FRUSTRATING THE REASONABLE
6 EXPECTATION OF THE PARTY.  BUT BECAUSE OF THE STRONG
7 LEGISLATIVE POLICY, SO MEDIATORS ARE LEARNING TO CAP
8 THE DEAL, SAY HERE'S THE PEN.  YOU WANT TO SUBSCRIBE
9 YOUR NAME, THEN DO IT.  THAT TYPE OF THING.
10 I THINK IT'S NOT NECESSARY TO PROLONG IT
11 BECAUSE I CITED THE VARIOUS COURT ORDERS.  LET ME
12 JUST REFER TO ONE CASE BECAUSE I THINK IT'S
13 ILLUSTRATIVE.  AND I TRY AS BEST I CAN TO BE
14 INFORMATIVE TO JUSTIFY MY DECISION SO THAT PEOPLE
15 CAN UNDERSTAND IT.
16 THIS IS THE CASE, AND IT WAS ATTACHED BY
17 MR. O'ROURKE TO THE REPLY TO THE PLAINTIFF'S -- RE:
18 PLAINTIFF'S MOTION IN LIMINE NUMBER 4.  IT WAS A
19 PHOTOCOPY OF A CALIFORNIA SUPREME COURT CASE,
20 FOXGATE HOMEOWNERS ASSOCIATION VERSUS BRAMELEA,
21 B-R-A-M-E-L-E-A.  I'M NOT SAYING IT'S RIGHT ON
22 POINT.  THERE ARE SO MANY CASES THAT ARE NOW
23 DEVELOPING IN THIS AREA.  I'LL JUST REFER TO IT.
24 I'M GOING TO REFER TO THE SUMMARY.  IT'S NOT A
25 SUBSTITUTE TO READING THE WHOLE CASE.  I DON'T WANT
26 TO BLUDGEON YOU INTO SOMNOLENCE BY READING THIS
27 WHOLE THING.
28 THIS WAS A SUPREME COURT DECISION ON JULY

11

1 9TH, 2001, A UNANIMOUS DECISION, IN A CONSTRUCTION
2 DEFECTS ACTION.  THE PLAINTIFF HOMEOWNER'S
3 ASSOCIATION FILED A MOTION, JUST A WORD FOR A
4 REQUEST FOR AN ORDER, AGAINST THE DEFENDANT
5 DEVELOPER AND ITS ATTORNEY, UNDER CODE OF CIVIL
6 PROCEDURE 128.5, A SANCTIONS PROVISION, FOR FAILING
7 TO PARTICIPATE IN GOOD FAITH IN COURT-ORDERED
8 MEDIATION AND TO COMPLY WITH AN ORDER OF THE
9 MEDIATOR.
10 NOW, IF ANYTHING, THAT INTRODUCTORY
11 LANGUAGE SUGGESTS IT'S MORE SUPPORTIVE OF THE
12 PLAINTIFF'S ARGUMENT THAN LESS SUPPORTIVE BECAUSE IT
13 WAS COURT-ORDERED MEDIATION, NOT CONTRACTUAL
14 MEDIATION.  SO IT WOULD INVOKE THE AUTHORITY OF THE
15 COURT TO CONTROL JUDICIAL PROCESSES.
16 READING ON, ATTACHED TO THE SANCTIONS
17 MOTION WERE THE REPORT OF THE MEDIATOR AND A
18 DECLARATION BY PLAINTIFF'S COUNSEL RECITING
19 STATEMENTS MADE DURING THE MEDIATION SESSION.
20 THE TRIAL COURT GRANTED THE MOTION FOR
21 SANCTIONS.  THE COURT OF APPEAL REVERSED.  IT
22 CONCLUDED THAT A MEDIATOR MAY REVEAL MATERIAL
23 NECESSARY TO PLACE SANCTIONABLE CONDUCT IN CONTEXT,
24 BUT THAT IN THIS CASE THE MEDIATOR'S REPORT INCLUDED
25 MORE INFORMATION THAN WAS NECESSARY.
26 NOW, THERE IS NO AUTOMATIC RIGHT TO APPEAL
27 TO THE CALIFORNIA SUPREME COURT.  THERE ARE SOME
28 DIRECT APPEALS LIKE DEATH PENALTY CASES.  BUT

**Page 13**

1  ORDINARILY REVIEW IS DISCRETIONARY ON AN APPLICATION
2  CALLED PETITION FOR HEARING.  THE SUPREME COURT
3  GRANTED A HEARING AND AFFIRMED THE JUDGMENT OF THE
4  COURT OF APPEAL BUT ONLY BECAUSE THE COURT OF APPEAL
5  HAD REVERSED THE SANCTIONS ORDER.
6          THE SUPREME COURT HELD THAT THE COURT OF
7  APPEAL ERRED IN JUDICIALLY CREATING AN EXCEPTION TO
8  EVIDENCE CODE SECTION 1119, CONFIDENTIALITY OF
9  MEDIATION COMMUNICATIONS, AND EVIDENCE CODE SECTION
10 1121, CONFIDENTIALITY OF MEDIATOR'S REPORTS AND
11 FINDINGS.  THESE STATUTES UNAMBIGUOUSLY CONFERRED
12 CONFIDENTIALITY ON THE MATERIAL AT ISSUE, AND THERE
13 WAS NO NEED TO CREATE A JUDICIAL EXCEPTION TO CARRY
14 OUT THE PURPOSE FOR WHICH THE STATUTES WERE ENACTED
15 OR TO AVOID AN ABSURD RESULT.
16         I'M SURE THE MOVING LAWYER SAID THAT'S
17 ABSURD, THE PERSON STONEWALLED MEDIATION, AND THE
18 COURT ORDERED IT.  NO NEED TO CREATE A JUDICIALLY
19 CREATED EXCEPTION TO THE STATUTE.
20         THE COURT HELD THAT IF ON REMAND THE
21 PLAINTIFF -- I'M SENDING IT BACK TO THE LOWER
22 COURT -- THE PLAINTIFF ELECTED TO PURSUE THE
23 SANCTIONS MOTIONS, NO EVIDENCE OF COMMUNICATIONS
24 MADE DURING THE MEDIATION COULD BE ADMITTED OR
25 CONSIDERED.  JUSTICE BAXTER -- I'VE BEEN INSTRUCTED
26 FROM HIM EVER SINCE WE WERE IN THE FIRST YEAR OF LAW
27 SCHOOL TOGETHER -- EXPRESSING THE UNANIMOUS VIEW OF
28 THE COURT.

13

**Page 14**

1          NOW, OF COURSE, IN THIS CASE WE HAVE AN
2  EVIDENCE CODE PROVISION THAT THE MEDIATOR IS NOT
3  COMPETENT TO TESTIFY AS A WITNESS.  AND I THINK THIS
4  IS QUITE INSTRUCTIVE TO THE TRIAL COURT IN THE
5  UNANIMOUS DECISION.  AND SO ON THAT GROUND WITHOUT
6  THE NEED TO GOING INTO THE PURPORTED CONTRACTUAL
7  WAIVER AND WHETHER THAT WOULD BE ILLUSTRATIVE OR
8  UNDULY HARSH OR THINGS THAT MIGHT NOT PROPERLY BE
9  ATTENDED TO ON NONSUIT, I DON'T HAVE AN OPINION TO
10 EXPRESS ON THAT.  I THINK THE COURT WILL TAKE UP AT
11 THIS TIME -- I ASSUME THERE IS NO OBJECTION TO THE
12 RECORD; THAT IS, THERE WAS A MOTION TO QUASH THE
13 SUBPOENA OF GEOFFREY TULLY.  I WILL QUASH THE MOTION
14 FOR THE SUBPOENA OF GEOFFREY TULLY BASED ON THE
15 GROUNDS STATED.
16         BUT IT'S REALLY THE FLIP SIDE OF THE SAME
17 COIN, ISN'T IT?  THAT IS, THAT I'M DETERMINING THAT
18 HE WOULD NOT BE COMPETENT AS A WITNESS.  AND I THINK
19 IT'S MERELY PART AND PARCEL OF WHAT'S BEEN
20 PRESENTED.
21         DO YOU AGREE, OR DO YOU WANT TO ADD
22 SOMETHING?
23         MR. MOORE:  NO, I THINK YOU MAY HAVE
24 MISSPOKE.  I THINK YOU SAID YOU WANTED TO QUASH THE
25 MOTION.  I THINK YOU MEAN YOU'RE GRANTING THE
26 MOTION.
27         THE COURT:  EXCUSE ME.  I THINK I USED A
28 DOUBLE TWIST THERE.  I MEAN THERE IS MOTION TO QUASH

14

**Page 15**

1  THE SUBPOENA, AND THAT MOTION IS GRANTED.
2          MR. MOORE:  OKAY.
3          THE COURT:  THANK YOU.  AND SO NOW I WILL
4  JUST SAY THIS IS THE KIND OF RULING THAT ALONG WITH
5  ANY RULING CAN BE TESTED ON APPEAL.  I WILL SAY NOW
6  WHAT I WILL SAY LATER.  I WOULD URGE THE PARTIES
7  WITHIN THE TIME PERMITTED BY LAW, AND FOR REASONS
8  I'LL SUGGEST LATER, THE SECOND PHASE, TO
9  RECONNOITER, CONSULT WITH COUNSEL, CONSIDER THE
10 OPTIONS.  ANY GRIEVOUS ERROR SHOULD CERTAINLY BE
11 CORRECTED.
12         I DON'T VIEW MY DECISIONS TO BE ANYTHING
13 OTHER THAN THE BROAD STREAM OF THE DEVELOPING COMMON
14 LAW AND PURSUANT TO LAW AND STATUTE, GOOD REASONING.
15 BUT WHEN I DID HEAR THE OPENING STATEMENT THAT BY
16 VIRTUE OF A CONSTELLATION OF FACTS LARGELY DESCRIBED
17 AS FOLLOWS:  THAT THE PARTIES ENTERED INTO A
18 CONTRACT; THAT THERE WAS A CONTRACT THAT PROVIDED
19 FOR A MEDIATION OMBUDSMAN POLICY; THAT THE PLAINTIFF
20 REFERRED THE MATTER TO MEDIATION; THAT THE --
21 DR. MALCOLM AND OTHERS SPENT A GOOD DEAL OF TIME
22 TALKING TO MR. TULLY; THAT SOME MONTHS WENT BY; THAT
23 THEY HEARD FROM MR. TULLY, WHO REPORTEDLY SAID ON
24 THE OFFER OF PROOF, I HAVEN'T HEARD FROM DVD.  I
25 THOUGHT THAT I WOULD HAVE HEARD.  I WOULD EXPECT,
26 ALTHOUGH I'VE NEVER DONE A MEDIATION FOR DVD IN THE
27 PAST, I WOULD EXPECT THAT I WOULD BE CALLED UPON TO
28 REPORT TO THEM.  AND THEN LATER A LAWSUIT WAS FILED,

15

**Page 16**

1  THAT WE ALL READ NEWSPAPER ACCOUNTS AND SO FORTH.
2          I DON'T TAKE ANY ACCOUNT OF THAT, THE IDEA
3  THAT THE CORPORATION WOULD BE WITH THE INCREASING
4  INCOME THAT HAS BEEN DESCRIBED WOULD CLAIM THAT BY
5  VIRTUE OF THAT CONSTELLATION OF FACTS THEY'RE
6  SEEKING $12 MILLION.  I JUST LAY IT OUT TO YOU TO
7  CONSIDER.  CERTAINLY BEFORE A, QUOTE, ECONOMETRIC
8  EXPERT WOULD JUMP UP ON THE WITNESS STAND AND TALK
9  TO A JURY, SOME OTHER JUDGE OR EVEN ME, IF I WERE
10 ENTRUSTED WITH IT -- SOMETIMES PEOPLE SAY THE JUDGE
11 IS PREJUDICED AFTER HE'S JUDGED.  BUT THE POINT IS
12 THAT SOME OTHER JUDGE WOULD BE CALLED UPON TO
13 DETERMINE WHETHER THERE IS ANYTHING THAT AN EXPERT
14 COULD OFFER ON THAT ISSUE, POSSIBLY HEARING OUT OF
15 THE PRESENCE OF THE JURY, IT'S COMMONLY DONE.
16         SO THAT UNDER THE CODE THERE IS A DEFAULT
17 POSITION, BUT I SHOULD MAKE IT CLEAR.  THIS
18 CONSTITUTES AN ADJUDICATION ON THE MERITS.  A
19 JUDGMENT ENTERED WOULD BE INCORPORATED IN ANY OTHER
20 JUDGMENT.
21         I WOULD SAY JUST SO THERE IS NO SUSPENSE
22 THAT ALTHOUGH BECAUSE EITHER PARTY ON EITHER CLAIM
23 COULD LATER PROVIDE -- FILE A COST BILL AND A --
24 INCLUDING A REQUEST FOR ATTORNEY'S FEES, I WILL SAY
25 THAT ALTHOUGH COUNSEL SAID THAT AS A COURTESY I
26 COULD HAVE REFERENCE TO THE EARLIER TESTIMONY IN THE
27 CASE, I REALLY VIEWED THIS IN TERMS OF ANYTHING THAT
28 I HAD TO DO AS REALLY STAND-ALONE ON THESE PAPERS.

**Page 17**

```
 1          IT'S TO ME IN NO WAY -- I DID GRANT THE
 2   MOTION UNDER 597 OF THE OTHER PHASE IN TRIAL.  I
 3   DON'T VIEW ALL OF THAT TIME AS ANYTHING TO DO WITH
 4   THIS DETERMINATION OF LAW.  THAT IS THE
 5   DETERMINATION.  I THINK THAT COVERS THE GROUND.
 6          I WANT TO LOOK AT MY NOTES FOR ONE SECOND.
 7          YES, I THINK I SAID EVERYTHING THAT NEEDS
 8   TO BE SAID AND NO MORE ON THAT MOTION.  ARE THERE
 9   ANY QUESTIONS?
10          MR. MOORE:  NO.
11          MR. COATES:  NO, YOUR HONOR.
12          THE COURT:  WE'LL TAKE A RECESS BECAUSE
13   I'LL BE GOING AT IT A LONGER TIME ON THE ACTUAL
14   ADJUDICATION ON THESE FACT ISSUES.
15          MR. COATES:  VERY GOOD.  THANK YOU, YOUR
16   HONOR.
17          (WHEREUPON, A SHORT RECESS WAS TAKEN,
18   AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)
19          THE COURT:  WE'RE HERE TOGETHER FOR THE
20   COURT TO CONTINUE IN ANNOUNCING DECISIONS IN
21   CONNECTION WITH THE SUBMITTED MATTER DVD COPY
22   CONTROL ASSOCIATION, INC., A DELAWARE CORPORATION,
23   VERSUS KALEIDESCAPE, INC., A DELAWARE CORPORATION.
24   ALL PARTIES, COUNSEL ARE PRESENT.
25          I WANT TO CONFIRM WHAT I BELIEVE WE PLACED
26   ON RECORD YESTERDAY.  THAT IS, WHAT I SAY, AND YOUR
27   ABILITY TO GET A TRANSCRIPT OF WHAT I SAY, WILL
28   CONSTITUTE, OBVIOUSLY, MY NOTICE OF INTENDED
                                                    17
```

**Page 18**

```
 1   DECISION, BUT ALSO THE STATEMENT OF DECISION UNLESS
 2   WITHIN THE TIME PERIODS PRESCRIBED IN THE CODE OF
 3   CIVIL PROCEDURE SECTION 632 AND THE CORRESPONDING
 4   RULES OF COURT YOU PROCEED TO FILE OBJECTIONS OR
 5   OTHER PROPOSED STATEMENTS OR TAKE FURTHER ACTION.
 6   IS THAT AGREED?
 7          MR. MOORE:  YES, IT IS, YOUR HONOR.
 8          MR. COATES:  YES, YOUR HONOR.
 9          THE COURT:  AFTER I'M DONE I WILL, AS I
10   INDICATED BEFORE, HAVE A RECESS SO THAT WHILE THESE
11   MATTERS ARE FRESH IN YOUR MIND IF YOU WISH TO SEEK
12   FURTHER CLARIFICATION, I'LL GIVE YOU THAT
13   OPPORTUNITY TO DO SO.  THIS PROCESS OF GOING BACK
14   AND FORTH ON PAPERS IS EXPENSIVE ENOUGH WITHOUT ME
15   ADDING TO YOUR BURDENS.  IF I CAN BE RESPONSIVE, I
16   LIKE TO DO THAT.
17          I WANT TO SAY AT THIS SEPARATE STAGE OF
18   THIS PROCEEDING, AGAIN, I WANT TO THANK COUNSEL AND
19   THE PARTIES FOR THEIR COURTESIES THROUGHOUT.  IT'S
20   MY KNOWLEDGE THAT IN THE KIND OF WORK THAT I DO
21   DAILY, SOMEBODY PERCEIVES THAT I'VE DONE VIOLENCE TO
22   THEM.  UNDER RULE OF LAW, WE MAKE EVERY EFFORT TO
23   SEE IF PARTIES CAN COME TO VOLUNTARY AGREEMENT, BUT,
24   OF COURSE, WE HAVE RULES THAT NEED TO BE ENFORCED.
25          AND EVERYONE WOULD LOVE TO HAVE THEIR
26   FAVORITE JUDGE, BUT WHAT YOU'RE ENTITLED TO IS A
27   NEUTRAL PERSON.  I'M ABSOLUTELY CLEAR ON THAT.  AND
28   HOPEFULLY SOMEONE THAT BRINGS SOME BACKGROUND AND
                                                    18
```

**Page 19**

```
 1   TRAINING AND EXPERIENCE TO THE TASK.
 2          THERE ARE LOTS OF WAYS THAT THAT'S
 3   EVALUATED.  EVERY TWO YEARS OUR BAR ASSOCIATION
 4   SENDS OUT QUESTIONS, ASKS LAWYERS TO RATE THE
 5   JUDGES.  WE ARE SUBJECT TO THE COMPLAINTS OF THE
 6   JUDICIAL PERFORMANCE COMMISSION.  WE WENT THROUGH
 7   OUR OWN SUBSTANTIAL REVIEW, A CONSTITUTIONAL BODY,
 8   BEFORE I BECAME A JUDGE 23 YEARS AGO, AND SUBJECT TO
 9   THE CHALLENGE AT THE POLLS EVERY SIX YEARS.  AND
10   HAVING BEEN A MAYOR, I'VE DONE THAT TWICE IN A
11   NONPARTISAN CAPACITY.  I'M GRATEFUL THAT THAT'S
12   NEVER OCCURRED WHEN I'VE SERVED AS A JUDGE.
13          SO I HAVE A RIGHT TO EXPECT -- IT'S
14   DISAPPOINTING FROM TIME TO TIME THAT COUNSEL WILL
15   ADDRESS THE COURT WITH COMPLETE CANDOR, BUT THAT
16   EXPECTATION HAS BEEN FULLY SATISFIED HERE.  I
17   APPRECIATE DIRECTNESS AND THE CORDIALITY SHOWN BY
18   COUNSEL.  NO ONE HAS CONFUSED THEY'RE ZEALOUSLY
19   ADVOCATING FOR THE CLIENTS, NOT THE COURT, BUT THE
20   CLIENTS, BUT THEY ARE OFFICERS OF THE COURT AND
21   ENJOY THAT HIGH STANDING, AND IT'S AN HONORED
22   PROFESSION.
23          THE CODE OF CIVIL PROCEDURE -- I'LL TAKE
24   AWHILE.  IF ANYONE -- IF YOU THINK WE SHOULD TAKE A
25   BREAK, I'LL TAKE A BREAK.  IF ANYONE CAN'T STAND
26   WHAT THEY'RE HEARING, THEY COULD QUIETLY LEAVE.  OF
27   COURSE, I EXPECT THE SAME COURTESY THAT I'VE GIVEN
28   TO OTHERS.
                                                    19
```

**Page 20**

```
 1          THE CODE OF CIVIL PROCEDURE IN SECTION
 2   632 -- AND I REFER TO THESE DETAILS BECAUSE THESE
 3   ARE LEGISLATIVE ENACTMENTS THAT JUDGES CONSTRUE AND
 4   APPLY IN HIGHER COURT DECISIONS WHICH GUIDE THE
 5   TRIAL COURTS -- QUOTE, "IN SUPERIOR COURTS UPON THE
 6   TRIAL OF A QUESTION OF FACT BY THE COURT, WRITTEN
 7   FINDINGS OF FACT AND CONCLUSION OF LAW SHALL NOT BE
 8   REQUIRED.  THE COURT SHALL STATE A WRITTEN DECISION
 9   INCLUDING THE FACTS AND WRITTEN STATEMENTS FOR THE
10   DECISION ON EACH OF THE PRINCIPAL CONTROVERTED
11   ISSUES AT TRIAL UPON THE REQUEST OF ANYONE APPEARING
12   AT TRIAL."
13          THAT'S THE BASIC GUIDELINE.  TIME PERIODS
14   ARE SET FORTH AND SO FORTH.  OF COURSE, THE
15   APPELLATE COURTS HAVE DEALT WITH THE GENERAL
16   SUBJECT, AND I WON'T TARRY ON THIS TOO LONG, WHAT DO
17   THOSE OBLIGATIONS ENTAIL?
18          WELL, FIRST I'LL DO MY BEST TO ATTEND TO
19   WHAT I HAVE UNDERSTOOD WERE THE PRINCIPAL
20   CONTROVERTED ISSUES AT TRIAL.  WHEN I'M DONE, AFTER
21   RECESS IF SOMEONE IDENTIFIES SOMETHING ELSE THAT
22   THEY THOUGHT WAS A PRINCIPAL CONTROVERTED ISSUE,
23   THEY CAN TELL ME, AND I'LL ATTEND TO IT.  BUT I
24   BELIEVE THE PARTIES HAVE ADEQUATELY IDENTIFIED THOSE
25   ISSUES SO I CAN GO FORTH AT LEAST PRELIMINARILY NOW.
26          NUMEROUS CASES ARE CITED IN THE TREATISES
27   TO ILLUSTRATE THAT IT IS SUFFICIENT TO STATE THE
28   ULTIMATE FACTS THAT SUPPORT A DECISION.  IT'S NOT
```

**Exhibit M, Page 161**

1  NECESSARY TO STATE EVIDENTIARY FACTS.
2          IN OTHER WORDS, JUST IN ONE CASE A JUDGE'S
3  FINDING OF MISREPRESENTATION DIDN'T HAVE TO SPECIFY
4  WHICH ACTS OR WHICH LANGUAGE CONSTITUTED
5  MISREPRESENTATION.  A TEST IS WHETHER THE DETAILS
6  GIVEN FAIRLY DISCLOSE THE COURT'S DETERMINATION ON
7  ALL ISSUES OF FACT.
8          AND I SAY THAT BECAUSE SOMETIMES ZEALOUS
9  ADVOCATES HAVE SENT ME LISTS OF, IN EFFECT,
10 INTERROGATORIES AND I DON'T DO THOSE THINGS.  I JUST
11 STRIKE THEM FROM THE RECORD IF THEY'RE NOT IN
12 ACCORDANCE WITH LAW.  BUT THERE IS A PROCEDURE, AS I
13 INDICATED, TO GET A FAIR STATEMENT.
14         I'M GOING TO COMMENT ABOUT THE WITNESSES
15 THAT TESTIFIED IN THE CASE IN THE BROADEST OVERVIEW.
16 AND I'M GOING TO EXPLAIN WHAT I UNDERSTAND THE
17 STANDARD REVIEW BY HIGHER COURTS ARE.  NOT THAT THAT
18 ADDS ANYTHING TO WHAT I SAY, BUT TO ACKNOWLEDGE TO
19 COUNSEL AND THE PARTIES THE IMPORTANCE OF WHAT I DO
20 FROM MY OWN PERSPECTIVE AND TO SHOW THAT IF I'M
21 GOING ON A LITTLE BIT AT LENGTH, IT'S BECAUSE I TAKE
22 THESE OBLIGATIONS FREELY AND AS I SAID IN THE OATH,
23 WITHOUT ANY MENTAL RESERVATIONS OR PURPOSE OF
24 EVASION.
25         AND I THINK YOU'LL SEE THAT ON THESE
26 ISSUES WHERE THERE MIGHT HAVE BEEN CLAIMS FOR A JURY
27 TRIAL HAD MONEY BEEN CLAIMED, THE COURT HAS THE VERY
28 SAME OBLIGATIONS PLUS OTHERS, BUT IT ALL REALLY
                                                21

1  RELATES TO THE FACTS.  AND AS TO THE FACTS, REALLY
2  THE BROADEST SCOPE OF EVIDENCE HAS BEEN PRESENTED
3  ONCE THE PARTIES WERE SATISFIED THAT THE CASE WOULD
4  BE TRIED NOT TO A JURY, BUT BEFORE A JUDGE, WHO IS
5  USED TO SEPARATING THE WHEAT FROM THE CHAFF.  SO IT
6  ALL CAME, AND THAT'S BECAUSE ALTHOUGH THE DEFENDANT
7  TOOK THE POSITION THAT THE WORDS OF THE CONTRACT
8  WERE CLEAR, AND THE PLAINTIFF TOOK THE POSITION THAT
9  THE WORDS OF THE CONTRACT WERE CLEAR, I THINK MAYBE
10 DECISIONS WERE MADE IN THE NATURE OF HEDGING BETS TO
11 PUT IT ALL IN SO THAT THE PARTIES WOULD REALLY FEEL
12 THAT THEIR STORY HAD BEEN TOLD, HEARD, AND ACTED
13 UPON.  AND I CERTAINLY HONOR THAT DECISION.  IT JUST
14 PLACES OBLIGATIONS ON ME.
15         AND THEN I'LL GO THROUGH WHAT I UNDERSTAND
16 TO BE SOME OF THE RULES OF CONTRACT INTERPRETATION.
17 IT'S ALL IN THE PAPERS, IF I'VE ACTUALLY HAD CASES
18 OVER THE YEARS WITH VERY DISTINGUISHED ATTORNEYS
19 I'VE GIVEN A SHORTHAND RENDITION, AND PEOPLE LOOKED
20 AT ME THAT THEY DIDN'T HAVE A CLUE TO WHAT'S GOING
21 ON.  THAT'S NOT TRUE WITH YOU FOLKS BECAUSE YOU'VE
22 HAD EVERY OPPORTUNITY TO REVIEW EACH OF THESE LEGAL
23 BRIEFS HAD YOU ELECTED TO DEVOTE YOUR VALUABLE TIME
24 TO THAT ENTERPRISE. BUT YOU'RE STUCK WITH ME REALLY
25 SUMMARIZING IN THE WAY THAT MAKES SENSE TO ME.  AND
26 THAT'S BECAUSE UPON REQUEST, I'M REQUIRED TO DO THIS
27 NOT IN SECRET, BUT HERE IN PUBLIC.  NOT JUST TO HEAR
28 MYSELF TALK, ALTHOUGH YOU MAY THINK THAT BY THE TIME
                                                22

1  I'M DONE.
2          HERE WERE THE WITNESSES IN ORDER.  IF I'VE
3  OMITTED, IT REALLY DOESN'T MAKE ANY DIFFERENCE.  I
4  CONSIDERED EVERYTHING.  I'M TRYING TO RESPECT YOU BY
5  GOING THROUGH THE MAIN POINTS THAT I UNDERSTOOD.
6  PLEASE DON'T FROWN IF THERE IS SOME POINT THAT YOU
7  THOUGHT WAS IMPORTANT, BECAUSE IT'S NOT MY PURPOSE
8  TO READ THE TRANSCRIPT.
9          JANE SUNDERLAND TESTIFIED.  SHE WORKED FOR
10 FOX LEGAL AS VICE PRESIDENT OF CONTENT PROTECTION.
11 SHE IS AND WAS A BOARD MEMBER AT THE RELEVANT TIME.
12 I MAKE LITTLE SIDE POINTS BECAUSE THEY'RE NOT
13 DISPOSITIVE HERE.  I MAKE LITTLE SUMMARY NOTES.
14 PLEASE DON'T THINK I OMITTED THAT.  IT'S JUST THAT
15 I'M TRYING TO GIVE A LITTLE OVERVIEW.
16         AND SHE, ALONG WITH OTHER WITNESSES,
17 TALKED ABOUT THE BASIC UNDERSTANDING THAT BOARD
18 MEMBERS HAVE CONCERNING THE PURPOSE AND INTENT AND
19 FACT, REALLY, OF THE CONTRACT DOCUMENTS.  I SAY
20 CONTRACT DOCUMENTS BECAUSE THE CONTRACT ITSELF DID
21 INCORPORATE SOMETHING SPECIFICALLY.  SOMETHING
22 SPECIFICALLY.  AND ARGUMENTS AROSE ABOUT OTHER
23 THINGS.
24         SHE SAID WHAT SHE SAID ON THE SUBJECT OF A
25 LACK OF TRUST NOT BEING MANIFESTED YET.  I DID GO
26 THROUGH THE TRANSCRIPT.  IT IS ALL SUBJECT TO MY
27 INTERPRETATION.  THE POINT IS THAT THE WORDS OF THE
28 WITNESS DON'T CONTROL.  IT'S WHAT THE TRIAL JUDGE
                                                23

1  WHO EVALUATES THE BELIEVABILITY OF THE WITNESSES
2  DRAWS INFERENCES FROM WHAT THEY SAY, PUTS IT ALL
3  TOGETHER, FINDS TO BE THE CASE.
4          MANY AN APPEAL HAS BEEN TAKEN BY SOMEONE
5  WHO FELT THAT THEY LOST, SAID THAT THESE ARE THE
6  WORDS THAT I SAID.  AND BEING VERY GENTLE ABOUT IT,
7  I WILL SAY THAT IN RESOLVING ALL THESE ISSUES, I
8  RESOLVE ALL ISSUES OF CREDIBILITY IN FAVOR OF THE
9  FINDINGS WHICH ARE NECESSARY, EXPLICIT, IMPLICIT OR
10 APPROPRIATE.
11         SO I'VE HAD CASES IN WHICH PEOPLE ASK FOR
12 FURTHER STATEMENTS, AND I LOOK AT THEM, YOU KNOW, DO
13 YOU REALLY WANT THAT?  BECAUSE MY PURPOSE IS TO BE
14 VERY RESPECTFUL TO EVERYBODY AND NOT TO DISPARAGE
15 ANYONE.  SO I THINK THE BROAD FORM OF STATEMENT ON
16 CREDIBILITY HAS CERTAINLY BEEN APPROPRIATE TO MY USE
17 AND ACTUALLY APPELLATE COURTS IN MY EXPERIENCE.
18         IN OTHER WORDS, I KNEW THAT SHE TALKED
19 ABOUT THE ISSUE OF PIRATES, OTHER ROGUES, I THINK
20 THE REFERENCE WAS, WHO REALLY WERE PEOPLE OUTSIDE
21 THE MAIN STREAM OF THE -- UPON WHOM THE CORPORATION
22 RELIED AND OTHERS RELIED IN DOING BUSINESS.  AND
23 THEY HAD NOT HAD ANY REAL SIGNIFICANT IMPACT ON THE
24 OPERATIONS OF THE DVD CCA BECAUSE DVD CCA IS REALLY
25 DEALING TO THE MARKETPLACE OF PEOPLE WHO ARE REALLY
26 TRYING TO PLAY BY THE RULES.
27         HOWEVER, IN EXPRESSING OPINIONS AS TO THE
28 FACT THAT THERE HAD BEEN NO UNTOWARD -- LET ME
                                                24

**Page 25**

1  RESTATE THAT.  IN EXPRESSING THE OPINION THAT LACK
2  OF TRUST HAD NOT YET BEEN MANIFESTED AS OF THIS
3  TIME, OF COURSE, THAT WAS HER OPINION.  IT WASN'T
4  PUT FORTH AS AN EXPERT OPINION.  IT WAS AN OPINION.
5  AND I CAN DRAW INFERENCES AND CONCLUSIONS BASED ON
6  ALL THE FACTS WHEN WE LATER GET TO THE ISSUE OF
7  IRREPARABLE HARM.
8      SHE ALONG WITH OTHERS VOTED ON THE ISSUE
9  OF BRINGING A LAWSUIT.  SHE RELIED ON COUNSEL.
10  PRETTY MUCH WHAT CAME FORWARD WAS THAT CERTAIN
11  WITNESSES SAID CERTAIN THINGS, BUT ONCE IT GOT INTO
12  THE IMPORTANT MEETING WHERE THEY ALL ACTED, THEY ALL
13  SAID, I RELIED ON COUNSEL, AND THAT'S ABOUT IT, AND
14  I PREFER NOT TO TALK ABOUT WHAT COUNSEL SAID.  AND I
15  SAID, YES, INDEED, DON'T TALK ABOUT WHAT COUNSEL
16  SAID.  BECAUSE THERE WAS AN OBJECTION, AND IT IS AN
17  IMPORTANT PRIVILEGE.  I DIDN'T THINK TOO MUCH ABOUT
18  WHAT THE BOARD WAS THINKING, WHAT IT DID WHEN IT
19  DID.
20      AND I THINK A MAIN PURPOSE OF
21  MS. SUNDERLAND ALONG WITH OTHER WITNESSES WAS TO
22  GIVE CONTEXT AND MEANING AND NUANCE TO THE WHOLE
23  DEVELOPMENT OF THIS PROCESS FROM HER OWN KNOWLEDGE
24  AND ALSO TO INFORM THE COURT'S OPINION AS IT RELATES
25  TO THE EFFECTS OF ANY BREACH UPON THE -- UPON THE
26  PLAINTIFF.
27      ALFRED PERRY TESTIFIED NEXT, VICE
28  PRESIDENT OF LEGAL AFFAIRS FOR PARAMOUNT.  AS ALL OF

**Page 26**

1  THE WITNESSES ARE PERSONS OF DISTINGUISHED
2  BACKGROUND, PERSONS OF REAL ACHIEVING, AND HE ALONG
3  WITH OTHER WITNESSES DID NOT READ THE PARTICULAR
4  DOCUMENT CLAIMED TO BE THE CONTRACT WHICH EXISTED
5  BETWEEN THE PLAINTIFF AND THE DEFENDANT.  AND WHEN I
6  SAY HE AND OTHERS, I'M TALKING ABOUT THESE FIRST
7  SEVERAL WITNESSES CALLED BY THE PLAINTIFF.  HE, AS
8  WELL, RELIED UPON THE ADVICE OF COUNSEL.  HE HAD
9  SIMILAR OPINIONS, HIS OWN PERSPECTIVE CONCERNING HIS
10  OWN OPINIONS AS TO ANY BREACH.
11      BRIAN BERG TESTIFIED AT LENGTH.  HE WAS A
12  DESIGNATED EXPERT WITNESS, AND HE TESTIFIED
13  CONCERNING VIOLATIONS.  HE DID A DEMONSTRATION.  THE
14  COURT HAS THE BENEFIT OF HIS POWER POINT
15  SUBMISSIONS.  I DON'T KNOW IF THEY WERE MARKED IN
16  EVIDENCE.  EVERYBODY SAID I COULD LOOK AT THOSE.
17  THEY WERE SHOWN ON THE SCREEN.  AND CERTAINLY WHAT
18  HE PRESENTED IS GOING TO BE MADE PART OF THE RECORD.
19  THERE IS NO DISPUTE ABOUT THAT BECAUSE I HEARD HIS
20  TESTIMONY AND SAW THE PRESENTATION.
21      HE TALKED ABOUT THE VARIOUS PARAGRAPHS AND
22  THE DOCUMENTS AND HIS CONCLUSIONS THAT THE
23  DEFENDANT'S ACTIONS WERE NONCOMPLIANT WITH THE TERMS
24  OF WHAT HE UNDERSTOOD TO BE THE CONTRACT.  EVERYBODY
25  MADE CLEAR, THE COURT ACKNOWLEDGED ON MANY OCCASIONS
26  THAT, AS I'VE SAID, THESE CAN BE THE BRIGHTEST
27  PEOPLE IN THE WORLD, BUT I'M THE ONE THAT GETS
28  REVERSED.  SO NO ONE EXPRESSED OPINIONS ON LEGAL

**Page 27**

1  CONCLUSIONS, ALTHOUGH THEY WERE EXPRESSING OPINIONS
2  ON ULTIMATE ISSUES.  AND ONE OF THE ULTIMATE ISSUES
3  IS THE ISSUE OF WHETHER OR NOT THERE HAS BEEN A
4  BREACH.
5      ALSO I HAVE TO -- THE COURT ALONE CAN,
6  DOES INTERPRET THE CONTRACT.  THE COURT ALONE
7  INTERPRETS THE CONTRACT.  BUT THE COURT ALSO ACTS AS
8  A FACT-FINDER TO DETERMINE WHAT WAS THE CONTRACT.
9      WADE LOWELL HANNIBAL IS A TECHNOLOGIST,
10  UNIVERSAL PICTURES, HAS A LONG CAREER.  HE WAS ON
11  THE DVD CCA BOARD FROM 2002 TO 2006.  HE CHAIRED THE
12  LICENSE ENFORCEMENT ACTIVITIES COMMITTEE, LEAC.  HE
13  AND BRUCE TURNBULL, AN ATTORNEY, I LATER LEARNED WAS
14  ACTUALLY ACTIVE IN DRAFTING THE SUBJECT OF THE
15  CONTRACT, 156.  WITH SOME EXCEPTION, I'M THINKING
16  NOW THE TECHNICAL COMMITTEE WAS -- AT LEAST I DRAW
17  AN INFERENCE THAT HE WAS INTIMATELY INVOLVED IN ALL
18  ASPECTS OF PRODUCING THE LEGAL PRODUCT; THAT IS,
19  WHAT WAS CLAIMED TO BE THE CONTRACT.
20      AND THOSE TWO INDIVIDUALS MET WITH THE
21  FOUNDERS, REPRESENTATIVES OF KALEIDESCAPE AT LAS
22  VEGAS AT THE CONSUMER ELECTRONICS SHOW IN JANUARY OF
23  2004.  I LEARNED FROM MR. HANNIBAL THAT DVD COPY
24  CONTROL ASSOCIATION'S CONCERNS WERE NOT ASSUAGED.
25  REALLY, THEY WERE JUST PERSONAL OBSERVATIONS AT THAT
26  TIME, ALTHOUGH THERE WAS NO DOUBT HE WAS A BOARD
27  MEMBER, A KEY PERSON TO DO PRELIMINARY WORK ON
28  BEHALF OF DVD, AND THAT WAS A PREDICATE FOR FUTURE

**Page 28**

1  ACTION.
2      AT A BOARD MEETING BRUCE TURNBULL WAS
3  CHAIR OF THE LITIGATION COMMITTEE.  I THINK
4  MR. HANNIBAL MADE IT CLEAR TO ME THAT HE WOULDN'T
5  HAVE DONE THESE THINGS THAT HE DESCRIBED UNLESS HE
6  FELT, WHETHER BY FORMAL VOTE OR NOT, HE WAS ACTING
7  ON BEHALF OF THE CORPORATION.  AND THAT HAS NOT BEEN
8  CHALLENGED, I BELIEVE.
9      HE IS THE ONE THAT TESTIFIED MR. TURNBULL
10  HAD BEEN INVOLVED IN THE DRAFTING OF EXHIBIT 156,
11  THE CSS LICENSING AGREEMENT.  MR. HANNIBAL HIMSELF
12  DID NOT REVIEW THAT LICENSE, THE LICENSE SIGNED BY
13  THE DEFENDANT.  HE WAS AWARE OF SOME OF THE
14  TECHNICAL SPECIFICATIONS, BUT HE WAS NOT AWARE OF
15  THE TECHNICAL SPECIFICATIONS AT THE TIME NOTED; THAT
16  IS, THE TIME OF EXECUTING THE CONTRACT -- EXCUSE ME,
17  AT THE TIME THE DECISION WAS MADE TO SUE, HE ALONG
18  WITH OTHERS RELIED UPON COUNSEL.  THAT WAS LEFT A
19  LITTLE HANGING.  I WASN'T ENTIRELY CLEAR WHAT WAS
20  COMMUNICATED, BUT ALTHOUGH I WAS FREQUENTLY INVOLVED
21  IN QUESTIONING.  IT REALLY WASN'T WORTH THE TIME,
22  AND IT WASN'T EXACTLY CLEAR WHEN HE REVIEWED IT.  AT
23  THE TIME HE VOTED, HE SAID HE WAS I WAS NOT CLEAR
24  WITH THE SPECIFICATIONS.
25      DR. ALAN BELL.  ALL ACKNOWLEDGED THAT HE
26  WAS A MAN OF IMPRESSIVE CREDENTIALS AND GREAT
27  ACHIEVEMENTS.  WE ALL LIKE TO WRITE THESE
28  ACHIEVEMENTS IN OUR BOOK OF LIFE.  I SAY THAT VERY

1 SINCERELY, VERY HUMBLING.  I HEAR ALL MANNER OF
2 PEOPLE.  IT'S A LIBERAL EDUCATION.  I GET PAID FOR
3 IT.  I'M STILL PINCHING MYSELF.
4         TREMENDOUS BACKGROUND.  TOTALLY UNKNOWN TO
5 KALEIDESCAPE.  HE COULD NOT HELP IN DETERMINING THE
6 ACTUAL INTENTIONS BETWEEN THE PARTIES.  HE WAS
7 REALLY CALLED UPON TO GIVE GREAT AND DEEP HISTORICAL
8 KNOWLEDGE CONCERNING THE WHOLE EVOLUTION OF THE
9 PROCESS, A VERY INTRICATE PROCESS REQUIRING THE
10 CLOSE INTERACTIONS BETWEEN A NUMBER OF CONSTITUENT
11 GROUPS, AND THE MEETINGS THAT WERE IN MANY WAYS OPEN
12 TO INDIVIDUALS WHO WOULD CALL THEMSELVES CONSUMERS.
13 AND I'M JUST BROADLY SPEAKING.  WHATEVER THE ACTUAL
14 CONSTITUTION OF THE GOVERNING BOARD MIGHT BE
15 DESCRIBED, SOMETHING THAT WAS A PROCESS THAT WAS
16 INTENDED TO BE BENEFICIAL AND SPEAKING TO THE PUBLIC
17 INTEREST, BE BENEFICIAL TO THE PUBLIC AND ALLOW THE,
18 I THINK, TECHNOLOGY TO THRIVE AND HE DIDN'T COMMENT
19 ON THE DETAILS, CERTAINLY, OF ANYTHING THAT HAPPENED
20 BETWEEN THESE PARTIES BECAUSE HE DIDN'T KNOW ABOUT
21 IT.
22         HE DID TESTIFY THAT ANY BREACH OF THE
23 CONTRACT -- AND I REALLY TEND TO THINK FROM WHAT I
24 HEARD THAT IT WOULD BE HIS UNDERSTANDING OF THE CORE
25 ELEMENTS OF THE CONTRACT.  HE WAS NOT CALLED AS A
26 LAWYER, DRAFTSPERSON, ANYTHING LIKE THAT.  WHO IN
27 THE WORLD WOULD COME IN TO TESTIFY ABOUT THESE
28 MATTERS AND OFFER OPINION ON THE DETAILS OF THESE

29

1 CONTRACTS UNLESS THEY PURPORTED TO KNOW AS A
2 SCIENTIFIC KNOWLEDGEABLE PERSON?  HE'S NOT GOING TO
3 GO BEYOND HIS KNOWLEDGE, I THINK.
4         HE DID EXPRESS OPINIONS.  AND AS IT
5 RELATES TO OPINIONS, AS IT RELATES TO OPINIONS NOT
6 BASED ON PERSONAL KNOWLEDGE OF FACTS, THE COURT HAS
7 AN OBLIGATION TO CONSIDER ONE EXPERT AS TO THAT OF
8 ANOTHER AND GIVE IT WHAT WEIGHT, IF ANY, I THINK
9 IT'S ENTITLED TO.
10         I THINK I EXPLAINED IN OUR COLLOQUY
11 EARLIER THAT THERE WAS NO OBLIGATION OF EITHER PARTY
12 TO CALL AN EXPERT OF LAW.  IT'S NOT A MEDICAL
13 MALPRACTICE CASE IN WHICH ONE CANNOT BRING A CLAIM
14 AGAINST A LICENSED PROFESSIONAL IN MANY INSTANCES
15 UNLESS THERE IS SOMEONE WHO WILL STAND UP AND BE
16 ACCOUNTABLE FOR THEIR OPINIONS AS THE PERSON
17 VIOLATING A STANDARD OF CARE.  THE STANDARD OF CARE
18 IS REALLY PASSED ON TO ANCIENT LEARNING AND
19 LICENSURE PROCEDURES AND THE LIKE.
20         SO WHEN HE SAID ANY BREACH, I DON'T THINK
21 HE WAS OPINING ON THE SPECIFICS OF ANY INTERACTION
22 BETWEEN THE PARTIES HERE.  BUT HE CERTAINLY WAS
23 GIVEN QUESTIONS IN THE NATURE OF HYPOTHETICALS.  HOW
24 WOULD THIS IMPACT UPON THE CORPORATION?  AND HE
25 INDICATED, I THINK RATHER ROBUSTLY, IT WOULD
26 CONSTITUTE IRREPARABLE HARM, VERY SIGNIFICANT
27 DAMAGE, AN EROSION OF TRUST.  HE ALSO, IN RESPONSE
28 TO QUESTIONS, HAD AN OPINION THAT IT WAS NOT

30

1 FEASIBLE TO PUT MARKERS ON RENTAL DVD'S AMONG OTHER
2 THINGS.
3         ANDY PARSONS SPOKE.  HE IS AT PIONEER
4 ELECTRONICS; A DVD CCA BOARD MEMBER.  HE VOTED TO
5 BRING THE ACTION.  HE TALKED ABOUT THE PRODUCTION
6 AND THE LOW COST.  IF WHAT KALEIDESCAPE DOES IS
7 REPLICATED, COST WILL BE DRIVEN DOWN.  THIS WILL
8 THREATEN THE BUSINESS AND CONSUMER ELECTRONICS
9 INDUSTRY.
10         AND I APPRECIATE MR. COATES DRAWING HIS
11 TESTIMONY TO MY RECOLLECTION IN OUR COLLOQUY IN
12 ARGUMENT.  BECAUSE I DID GO BACK THROUGH MY NOTES ON
13 THAT ISSUE.  HE FELT THAT PRODUCERS WOULDN'T SELL.
14 I THINK HE -- SOMEONE SAID PERHAPS PARAMOUNT WAS THE
15 LAST TO COME IN.  AT LEAST THAT'S MY RECOLLECTION.
16 IN OTHER WORDS, FROM MY -- PARAMOUNT SAID, WE WERE
17 THE LAST TO JOIN BECAUSE WE WERE CONCERNED ABOUT
18 SECURITY.  OF COURSE, MR. PARSONS DID NOT READ THE
19 CSS LICENSE AGREEMENT.  HE, TOO, RELIED UPON
20 COUNSEL.
21         MR. CHEENA SRINIVASAN.  I'LL PROBABLY GO
22 THROUGH THESE WITNESSES AND THEN TAKE A LITTLE BREAK
23 AND THEN CONTINUE.  HE WAS A FOUNDER, REALLY AN IDEA
24 MAN.  HE HAS TWO DEGREES, I THINK, FROM MIT, A
25 MASTER'S DEGREE AND AN MBA FROM THE SLOAN SCHOOL OF
26 BUSINESS.  HE EXPRESSED THE VIEW ON BEHALF OF THE
27 DEFENDANT.  I THINK CHIEF OPERATING OFFICER.  IF I
28 HAVE THE TITLES WRONG, IT'S INCIDENTAL AND NOT

31

1 NECESSARY TO ANYTHING I'M DOING HERE.  VERY
2 RESPONSIBLE PERSON.  ONE OF THE FOUNDERS.  FULLY
3 AUTHORIZED TO SPEAK AS A KNOWLEDGEABLE PERSON ON
4 BEHALF OF THE DEFENDANT.  THAT HE HELD A STRONG
5 BELIEF THAT IT WAS IMPORTANT FOR CUSTOMERS TO KNOW
6 THAT THE DEFENDANT WAS FULLY COMPLIANT AND KNOW THAT
7 IT HAD AND MAINTAINED ALL NECESSARY LICENSES.
8         HE DID -- THERE WAS SOME DEPOSITION
9 TESTIMONY ON HIS READING OF THE GENERAL
10 SPECIFICATIONS, WHETHER HE THOUGHT THEY WERE PART OF
11 THE TECHNICAL SPECIFICATIONS.  HE WAS ASKED IN A
12 DEPOSITION, DO YOU HAVE ANY REASON TO DOUBT THAT
13 THE -- IN EFFECT, THE GENERAL SPECIFICATIONS ARE THE
14 TECHNICAL SPECIFICATIONS?  HIS ANSWER TO THAT
15 QUESTION, DO YOU HAVE ANY REASON TO DOUBT? WAS,
16 QUOTE, NO, CLOSE QUOTE.
17         HE INDICATED -- I'LL COMMENT ON THIS LATER
18 ABOUT THE -- MR. COLLENS' WORK AS A FOUNDER AND HIS
19 GENERAL DEVELOPMENT, TO THE RESPONSIBILITIES AND
20 ACTS OF MR. COLLENS, AS THE SOCIAL WORKERS SAY IN A
21 PASSIVE VOICE, CONCERNING TO ALL OF THE CORPORATION
22 AT THE TIME THE CERTAIN ACTION WAS TAKEN.
23         ULTIMATELY, MR. COLLENS VOLUNTARILY LEFT
24 TO MOVE ON, AS HE SAID LATER, MAYBE GET INVOLVED IN
25 ANOTHER SMALL VENTURE.  THIS ONE WAS GROWING.
26         I WROTE THE NAME ROD, LAST NAME
27 D-J-U-K-I-C-H.
28         MR. COATES:  DJUKICH, YOUR HONOR.

**[Page 33]**

1  THE COURT: I BELIEVE THAT MR. SRINIVASAN
2  SAID THAT THAT PERSON, ROD WAS THE ONLY PERSON THAT
3  HE DEALT WITH DIRECTLY AT DVD CCA. HE EXPRESSED THE
4  OPINION THAT THE CORPORATION WAS IN COMPLIANCE WITH
5  ITS CONTRACTUAL OBLIGATIONS. AND HE TESTIFIED
6  CONCERNING THE HEAVY EMPHASIS THAT HE SAID
7  KALEIDESCAPE PLACED AND CLEARLY COMMUNICATED TO ALL
8  DEALERS THAT THEY MUST BE FULLY COMPLIANT.
9  HE INDICATED WHEN THE PRODUCT WAS SHIPPED,
10 THE VARIOUS PRESTIGIOUS AND TECHNICAL AWARDS AND
11 ASSOCIATION AWARDS, ABOUT 25 IN NUMBER, THAT HAD
12 BEEN AWARDED TO KALEIDESCAPE.
13 MR. JOHN JULIAN HOY TESTIFIED ON A COUPLE
14 OF OCCASIONS, MOST RECENTLY IN A BRIEF REBUTTAL. HE
15 TESTIFIED ON MONDAY, MARCH 26TH. HE WAS THE
16 PRESIDENT AND SECRETARY OF DVD CCA. DVD CCA WAS
17 DESCRIBED AS A CORPORATION THAT HAS OFFICERS AND NO
18 EMPLOYEES. AND I WON'T BELABOR THE RECORD BECAUSE
19 THE CONSTITUENT MEMBERSHIP WAS WELL DESCRIBED AND IS
20 REALLY NOT CONTESTED. I UNDERSTOOD HOW THAT
21 ORGANIZATION MAINTAINS ITS MEMBERSHIP AND ITS
22 GOVERNING BOARD, ITS TERMS OF YEARS, AND ITS PROCESS
23 FOR THE RENEWAL OR PUTTING UP NEW NOMINEES AND THE
24 LIKE.
25 HE INDICATED THAT DOCUMENTS EXHIBITS 4,
26 17, AND 156 ARE ALL PUBLICLY AVAILABLE FOR ANYONE TO
27 LOOK AT ON THE PLAINTIFF'S WEBSITE. HE DESCRIBED
28 PROCEDURES TO -- IN ORDER TO SECURE A LICENSING

33

**[Page 34]**

1  AGREEMENT AND HOW ONE THEN OBTAINS THE TECHNICAL
2  SPECIFICATIONS AFTER, AND IN NO PARTICULAR ORDER,
3  THE EXECUTION OF THE AGREEMENT, THE FILLING OUT OF
4  FORMS, THE PAYMENT OF THE APPROPRIATE MONEY
5  CONSIDERATION.
6  HE ACKNOWLEDGED THAT EXHIBIT NUMBER 156 AT
7  PAGE KAL -- I THINK IT WAS 605, 621 -- DID NOT LIST
8  THE GENERAL SPECIFICATIONS ON THE LIST. THE POINT
9  AND COUNTERPOINT WAS DEVELOPED, PERHAPS IN REBUTTAL
10 AS WELL, AS TO WHAT TO MAKE OF THAT, IF ANYTHING.
11 HE TALKED ABOUT THE CP TWIG, THE CONTENT
12 PROTECTION TECHNICAL WORKING GROUP, AND CPAC, THE
13 CONTENT PROTECTION ADVISORY COUNSEL. HE
14 EMPHASIZED -- HE TALKED ABOUT THE DRAFTING
15 COMMITTEE. THE DRAFTING COMMITTEE -- AND DR. BELL
16 CONFIRMED THIS. DR. BELL TESTIFIED THAT HE ATTENDED
17 ABOUT TWO MEETINGS, PERHAPS ONE OR TWO MEETINGS OF
18 THE DRAFTING COMMITTEE. REALLY HE WAS PASSING THE
19 BATON AT THAT TIME TO THE COMMITTEE THAT MET OVER A
20 HUNDRED TIMES TO DRAFT THE DOCUMENT THAT IS SAID TO
21 BE THE CONTRACT. LEGAL COUNSEL OF TOSHIBA WANTED TO
22 TALK, MATSUSHITA, HITACHI, IT COUNSEL, AND A NOW
23 DEFUNCT COMPANY. AND HE NOTED THAT EXHIBIT 4 AT
24 PAGE KAL 018753 DID NOT INCLUDE THE GENERAL SPECS,
25 SPECIFICATIONS, IN WORDS.
26 MICHAEL -- DR. MICHAEL ALEXANDER MALCOIM
27 TESTIFIED. HE TALKED ABOUT HIS BACKGROUND AS AN
28 ENTREPRENEUR. AND ALONG WITH OTHER FOUNDERS AT

34

**[Page 35]**

1  KALEIDESCAPE AND KEY PEOPLE AT KALEIDESCAPE DID NOT
2  HAVE A BACKGROUND IN VIDEO OR CONSUMER ELECTRONICS
3  ENTERTAINMENT, MOSTLY WAS IN EDUCATION AND TEACHING.
4  HE GOT TOGETHER WITH MR. SRINIVASAN; AND MR. COLLENS
5  LATER TESTIFIED, THEY WERE BRAINSTORMING WHAT THEY
6  WANTED TO DO. THEY WANTED SOMETHING SIMPLE, SAFE,
7  RELIABLE, LIKE AN APPLIANCE THAT MY MOTHER-IN-LAW
8  COULD OPERATE.
9  I'M NOT DISPARAGING MOTHER-IN-LAWS. MY
10 WIFE IS A MOTHER-IN-LAW. SHE HANDLES THIS STUFF. I
11 CAN'T GET THIS, PUSH THE BUTTONS, SHE DOES THAT VERY
12 ABLY. IF I DON'T, I SAY, I'M GOING TO GO TO MY ROOM
13 AND READ. NO, NO, I WANT YOU TO SEE THIS MOVIE.
14 THEY VISITED HOLLYWOOD. AS AN
15 ENTREPRENEUR, HE UNDERSTOOD HE WAS VOLUNTARILY
16 UNDERTAKING BIG RISKS. THERE WERE HIGH HURDLES.
17 DID RESEARCH. THE PRODUCT CONCEPT EVOLVED A LOT
18 OVER TIME WERE HIS WORDS. HE SAID, WE WERE SILICON
19 VALLEY COMPUTER PEOPLE WITH NO EXPERIENCE IN VIDEO
20 OR ELECTRONICS. WE, QUOTE, CAME FROM ENTERPRISE,
21 STAR TREK, DIDN'T WANT TO MAKE DOLLARS OFF SOMEBODY
22 ELSE'S MISFORTUNE.
23 NOW, I UNDERSTAND ALL OF THIS IS SUBJECT
24 TO CHARACTERIZATION, SELF-SERVING AS OPPOSED TO
25 FULLY ACCURATE. WE'RE ALL PEOPLE. LOTS OF STUDY ON
26 MEMORY HAS SHOWED THAT OUR MEMORY EVOLVES OVER TIME,
27 OUR STORY GETS TOLD. MOST PEOPLE DON'T COME INTO
28 COURT TO STRAP ON AN ARM OR TO TELL A LIE. THERE IS

35

**[Page 36]**

1  SO MANY CLASSIC STUDIES IN PSYCHOLOGY ABOUT PEOPLE
2  WHO SAW THE HARVARD BOSTON GAME, SOMETHING HAPPENED
3  ON THE FIELD, THEY REPEAT IT. I'M MORALLY CERTAIN
4  THAT STANFORD WON THE BIG GAME AND THAT THE BAND RAN
5  ONTO THE FIELD. OTHER PEOPLE WHO COUNT SAY NO.
6  I'VE LONG LIVED TO ACCOMMODATE MYSELF TO THAT FACT
7  OF LIFE.
8  HE INDICATED THERE WERE LOTS OF
9  DISCUSSIONS AND RESEARCH ON HOW TO PREVENT MISUSE.
10 HE GOT INTO THE SPECIFICS. HE TALKED ABOUT THE
11 BENEFITS AND BURDENS OF DIFFERENT CHOICES. AND HE
12 TALKED GENERALLY ABOUT THE IDEA OF LARGE CHANGERS.
13 HE SAID THEY WERE UNRELIABLE, VERY EXPENSIVE, TOOK A
14 LOT OF ELECTRICITY, HAD NEED FOR REPAIRS. THIS
15 WASN'T GOING TO WORK WE THOUGHT WITH CONSUMERS WHO
16 ARE HIGH END WHO DON'T WANT TO HAVE A REPAIR PERSON
17 COME TO THEIR HOME EVERY DAY. CONSIDERED THE VAULT
18 BOX. HAD A LITTLE FUN AT THE FORMER VICE PRESIDENT.
19 HE TALKED ABOUT DVD DESTRUCTION, ESCROWING DVDS.
20 HE DID INVESTIGATION OF COPYRIGHT,
21 CONTACTED COUNSEL. I DIDN'T HEAR ANY TESTIMONY. IN
22 FACT, I THINK IT WAS THE CONTRARY, NOBODY SECURED A
23 WRITTEN LEGAL OPINION ON WHICH THEY PURPORT TO RELY
24 HERE IN COURT, I UNDERSTAND. BUT THE EACH OF THE
25 WITNESSES -- AND I'LL GO THROUGH THEM. IN A SHORT
26 TIME, WE'LL TAKE A RECESS. I'M PRETTY SURE WE CAN
27 GET THIS DONE BY NOON. IF NOT, WE'LL CONTINUE.
28 THAT EVERYONE, THAT IS, MR. COLLENS,

1 MR. SRINIVASAN, AND DR. MALCOLM, WERE CONCERNED.
2 THEY WERE ANXIOUS, IT APPEARS, ABOUT WHAT WOULD BE
3 IN THAT CONTRACT, WOULD IT PROHIBIT THEIR EVOLVEMENT
4 AND CONCEPT OF THE BUSINESS MODEL.
5         HE WAS RELIEVED -- HE WAS RELIEVED WHEN
6 THERE WAS NO PROHIBITION FOR PERSISTENT DIGITAL
7 COPYING.  THE CONTRACT FROM HIS PERSPECTIVE SEEMED
8 TO BE WRITTEN IN ANTICIPATION OF PEOPLE MAKING
9 COPIES, DR. MALCOLM SAID.
10         HE HAD THEN COLLENS REVIEW COMPLIANCE.
11 THERE WAS, QUOTE, NEVER AN INTENTION TO MAKE A
12 NONCOMPLIANT SYSTEM.  LATER DR. STEPHEN WATSON GOT
13 INVOLVED IN A SECOND COMPLIANCE INVESTIGATION.
14 QUOTE, A DOUBLE-SURE AUDIT IS HOW HE CHARACTERIZED
15 IT.
16         HE PUT A LOT OF MONEY INTO THE BUSINESS
17 VENTURE, UP TO $6 MILLION OF HIS OWN MONEY.  HE
18 ALPHA TESTED IT WITH HIS KIDS.  HE BETA TESTED IT,
19 TOO.  SOMEBODY CORRECTED ME.  WHATEVER THAT MIGHT
20 MEAN.
21         HE TALKED IN DETAIL ABOUT THE FEATURES OF
22 THE PRODUCT WHICH ARE NOT DEPENDENT UPON RESOLUTION
23 OF THIS DISPUTED ISSUE.  THE ACCESS DATA, TITLE, THE
24 COVER ART, THE RUN TIME, THE ASPECT RATIO, WHICH IS
25 A HEIGHT TO WIDTH RATIO, MOVIE GUIDE SERVICE.  THE
26 COMPANY HAS 43,000 MOVIES IN ITS DATABASE.  THAT'S A
27 VERY IMPORTANT PART OF THEIR SERVICE, HE SAYS.
28         THE TECHNICAL -- THEY PROVIDE TECHNICAL

37

1 SUPPORT TO DEALERS, 668 IN THE U.S. AND CANADA AS OF
2 A FEW WEEKS AGO, 190 ELSEWHERE AROUND THE WORLD.
3 870, 42 COUNTRIES.
4         HE EMPHASIZED THE EFFORTS OF KALEIDESCAPE
5 TO MAKE AN EXCEEDINGLY SECURE SYSTEM.  AND HE TALKED
6 ABOUT THE MARKING OF DVD'S AND WHAT, BASED ON HIS
7 RESEARCH, HE THOUGHT INDUSTRY PEOPLE COULD DO SO
8 THAT THIS COULD END UP BEING A WIN-WIN SITUATION FOR
9 EVERYBODY.  THAT IS, THE MOVIE PRODUCERS, ALL THE
10 CONSTITUENT ELEMENTS.
11         AND I TOOK THAT AS TESTIMONY ON THE ISSUE
12 OF RELATIVE HARDSHIPS, INDICATING THAT HIS OPINIONS,
13 JUST LIKE OTHER OPINIONS, WERE OFFERED AND NOT
14 OBJECTED TO.  ALTHOUGH THERE IS NO SUGGESTION FROM
15 HIS TESTIMONY THAT DVD COPY CONTROL ASSOCIATION,
16 INCORPORATED, COULD FORCE CHANGE, THAT INDUSTRY
17 PLAYERS COULD THROUGH ITS PROCESSES SEE THE LIGHT,
18 FROM HIS PERSPECTIVE, AND EVERYONE COULD DO WELL, HE
19 THOUGHT.
20         HE TESTIFIED ABOUT THE MEETING IN LAS
21 VEGAS, THE THOUGHTS HE HAD BEFORE EXECUTING THE
22 CONTRACT THAT THERE WOULD BE SOME SORT OF MEETING OR
23 JUSTIFICATION REQUIRED.  HE WAS SURPRISED THAT THAT
24 WAS NOT GOING TO HAPPEN.
25         EACH OF THE WITNESSES TESTIFIED, THOSE WHO
26 HAD PERSONAL KNOWLEDGE ON KALEIDESCAPE'S SIDE, AND
27 PERSONALLY RATIFIED BY MR. HOY, THAT ON -- WELL,
28 MR. HOY RATIFIED THE PROCESS, NOT ACKNOWLEDGE ABOUT

38

1 THE DEFENDANT'S CONDUCT.  BUT THE DEFENDANTS SAID
2 THEY WERE EXPECTING TO MEET AND CONFER.  THEY CALLED
3 A NUMBER, WERE TOLD THERE WERE NO EMPLOYEES, SIGN
4 THE DEAL OR NOT.  NO NEGOTIATION.  NO CLARIFICATION
5 POSSIBLE.
6         AND THEY THOUGHT IT WAS ESSENTIAL TO GET
7 THE LICENSE, AS IT HAS BEEN ESSENTIAL TO GET ANY
8 OTHER LICENSES, WHICH DEFENDANT SAYS THERE HAVE BEEN
9 RIGOROUS JUSTIFICATION, BUT NOT PROBLEMATIC TO
10 ATTAIN.  I MAY HAVE GONE TOO FAR IN SUGGESTING IT
11 WAS NOT PROBLEMATIC TO OBTAIN.  THIS WAS THE MOST
12 BURDENSOME PROCESS.  AND WE HELD THE OTHER LICENSES
13 WITHOUT OBJECTION.
14         DR. MALCOLM TESTIFIED THAT REALLY THE
15 COMPANY IS AT STAKE.  HE WAS CROSS-EXAMINED BY
16 REFERENCE TO WEBSITES, PUBLICATIONS, AND THE LIKE,
17 THAT THE COMPANY WOULD CONTINUE TO SERVE ITS
18 CUSTOMERS AND WOULD CONTINUE TO PROVIDE OTHER
19 SERVICES.  IN THE NATURE OF IMPEACHMENT, QUESTIONS
20 BASED ON PRIOR STATEMENTS, DR. MALCOLM INDICATED
21 THAT -- I TOOK FROM HIS TESTIMONY THAT IT WOULD BE
22 PROBABLY A SLOW RIDE, MAYBE A QUICK RIDE DOWNWARD.
23 THEY WOULD OBVIOUSLY HONOR, FROM HIS PERSPECTIVE,
24 THEIR CONTRACTUAL BUSINESS OBLIGATIONS AS LONG AS
25 THEY COULD.  BUT THEIR BUSINESS MODEL IS BASED ON
26 THEIR ABILITY TO DO WHAT PLAINTIFF CHALLENGES.  AND
27 HE TALKED ABOUT THE GENERAL SALES AND HOW THAT WOULD
28 BE IMPACTED IN A GENERAL WAY.

39

1         DANIEL COLLENS TESTIFIED.  HE TALKED ABOUT
2 THE SUPER SECURE SYSTEM WITH THE AES 256.
3         IS THAT THE RIGHT NUMBER, 256?
4         MR. MOORE:  YES, YOUR HONOR.
5         THE COURT:  MORE SECURE THAN A STANDARD
6 OPERATING SERVER -- SYSTEM, EXCUSE ME.  HE DIDN'T
7 KNOW EITHER ABOUT THE DVD CCA PROCESSES.  I'LL
8 SHORTHAND IT BY SAYING MORE OF THE SAME, BUT FROM
9 HIS PERSPECTIVE -- AS TO SAYING HOW THEY WOULD HAVE
10 ATTAINED THE LICENSE AND A SURPRISE THAT THERE WAS
11 NO PROCEDURE FOR A SIT-DOWN, THAT TYPE OF THING.
12 BUT WHEN THE LICENSE DOCUMENTS CAME AND HE RECEIVED
13 THEM IN WATERLOO, HE READ THEM ONCE VERY CAREFULLY,
14 PROBABLY TWICE, AND, QUOTE, DOZENS OF TIME SINCE,
15 TRYING TO FOLLOW AN ANALYTICAL PATH ON SPECIFIC
16 ISSUES.
17         BUT AT THE TIME -- I HAD IN MY NOTES,
18 FIGURATIVELY SPEAKING -- BUT LIKE DR. MALCOLM AND
19 MR. SRINIVASAN, THAT HIS HEART LEAPED WITH JOY THAT
20 THE BUSINESS MODEL WAS NOT PROHIBITED.  HE WENT
21 FORWARD, HE SAID.
22         AND HE INDICATED IN SOME DETAIL FROM HIS
23 MATHEMATICAL AND LOGICAL BACKGROUND HOW HE
24 ATTEMPTED -- I'M QUITE SURE IT WAS MR. COLLENS,
25 ALTHOUGH DR. WATSON TESTIFIED TO THE SAME EFFECT --
26 HOW THEY WENT ABOUT ATTEMPTING TO INSURE COMPLIANCE,
27 AND TO THEMSELVES THEY WERE COMPLIANT.
28         HE CONFESSED TO HIS OWN TRANSGRESSIONS AND

1 INDICATED WHAT HAPPENED.  HIS MOTHER CAME OVER, AND
2 HE PUT MOM'S RENTAL IN THE DVD MACHINE.  AND HE
3 TESTIFIED ABOUT THAT.  AND HE WAS CHASTISED FOR
4 THAT, IN EFFECT.  HE DELETED IT, HE SAID, RIGHT
5 AWAY.
6          DR. STEPHEN WATSON TESTIFIED.  AND HE
7 TESTIFIED ABOUT THE HISTORY OF COMPLIANCE EFFORTS,
8 THE WORK OF MR. BRYANT, THE EARLY FEELING THAT THAT
9 WORK WAS NOT SUFFICIENTLY WELL-GROUNDED, THAT THE
10 COMPANY COULD RELY UPON IT, AND THE PASSING OF THAT
11 BATON TO MR. COLLENS, MR. COLLENS' EFFORT AND --
12 JUST ONE SECOND.  MAYBE COUNSEL CAN HELP ME.  I'M
13 THINKING OF 343 AND 344.  ONE WAS ABOUT A YEAR
14 BEFORE DR. WATSON'S EFFORT
15          MR. COATES:  THAT'S RIGHT, YOUR HONOR.
16 DR. WATSON WAS 2003.
17          THE COURT:  AND SO DR. WATSON'S, WAS HIS
18 COMPLIANCE REPORT 344 OR 343?
19          MR. MOORE:  ONE OF THOSE TWO, YOUR HONOR.
20          THE COURT:  DON'T WORRY ABOUT IT.  I
21 ACKNOWLEDGE THAT THERE WAS A SEQUENCE FROM THE
22 E-MAIL WITH MR. BRYANT AND THEN LATER WITH
23 MR. COLLENS' EFFORT AND THEN A FURTHER DETAILED
24 PRESENTATION.
25          MR. MOORE:  I NOW HAVE THE ANSWER, YOUR
26 HONOR.  DR. WATSON'S EFFORT WAS EXHIBIT 344.
27          THE COURT:  THAT'S WHAT I HAD NOTED.
28          MR. MOORE:  YES.

41

1          THE COURT:  OKAY.  AND I THINK -- SO THAT
2 343 WAS --
3          MR. MOORE:  WAS MR. COLLENS' PRECONTRACT.
4          THE COURT:  RIGHT.  DANIEL HARKINS
5 TESTIFIED.  AND HE TESTIFIED TO HIS REVIEW -- HE WAS
6 A DESIGNATED EXPERT WITNESS AS WELL.  AND HE
7 TESTIFIED THAT THE GENERAL SPECIFICATIONS ARE
8 INFORMATIVE, NOT NORMATIVE.  AND HE TALKED ABOUT
9 WHAT PEOPLE IN HIS LINE OF WORK DO TO TAKE THESE
10 DOCUMENTS AND APPLY THEM, AS THESE PEOPLE WITH
11 SPECIALIZED KNOWLEDGE DO, TO APPLY THEM TO THEIR
12 TASKS TO CARRY OUT THEIR ASSIGNMENTS.
13          AND HE SAID THAT THE GENERAL
14 SPECIFICATIONS WERE NOT THE NORMATIVE DOCUMENTS THAT
15 PEOPLE IN HIS LINE OF WORK USE TO DETERMINE WHAT
16 SHALL AND SHALL NOT BE DONE, WHAT MAY OR MAY NOT BE
17 DONE, WHAT MUST OR MUST NOT BE DONE.  INSTEAD THEY
18 WERE INSPIRATIONAL, ASPIRATIONAL GOALS.  AND THAT'S
19 BEEN THE SUBJECT OF BRIEFING AND ARGUMENT, AS WELL.
20          DENISE MALCOLM TESTIFIED.  SHE TESTIFIED
21 THAT SHE'S GENERAL COUNSEL.  I THINK THEY NEED TO
22 GET THAT STRAIGHTENED OUT.  I THOUGHT HER HUSBAND
23 SAID SHE WAS ACTING GENERAL COUNSEL.  I DON'T
24 INVOLVE MYSELF IN THAT WAY.  IT'S AN IMPORTANT
25 POSITION WITHIN THE CORPORATION AND IN LAW.  SHE
26 HAS, LIKE EVERYBODY ELSE, A DISTINGUISHED BACKGROUND
27 AND TESTIFIED THAT SHE REALLY DOES SOUP TO NUTS,
28 WHATEVER SHE CAN DO TO HELP OUT THE BUSINESS

42

1 ENTERPRISE.  BUT SHE CARRIES OUT THE GENERAL COUNSEL
2 TASKS.
3          AND THAT SHE ALONG WITH OTHER WITNESSES
4 TESTIFIED THAT THEY WERE VERY SURPRISED WHEN AFTER
5 RECEIVING MR. ROODMAN'S LETTER AND PREPARING -- WITH
6 TESTIMONY FROM DR. MALCOLM AND OTHERS, DR. STEPHEN
7 WATSON -- PERHAPS A GOOD PART OF FOUR TO FIVE WEEKS
8 TO PREPARE THIS SUBMISSION, THAT IT WAS, I THINK,
9 PRETTY RUDELY REJECTED.
10          BUT THAT'S NOT -- IT'S ONLY CONTEXTUAL.
11 BECAUSE I KNOW THERE'S AN OFFER THAT THE PARTIES
12 NEVER GOT TO A MEANINGFUL EXCHANGE.  IT SUGGESTS
13 THAT THE PARTIES WANTED THAT MEANINGFUL EXCHANGE.  I
14 UPHELD ALL OBJECTIONS COMING TO THAT.
15          PEOPLE SOMETIMES COME TO COURT AND SAY,
16 HOW DID THAT HAPPEN?  AND MONDAY -- I HAVE A DAY SET
17 ASIDE FOR MEDIATION.  PEOPLE SAY THEY CAME.  I TOLD
18 THE LAWYERS, DON'T WASTE MY VALUABLE TIME UNLESS
19 THESE PARTIES ARE IN A MOOD TO MEDIATE.  OTHERWISE
20 I'LL SAY GOODBYE IN A HALF HOUR.
21          JEFFREY FRANKLIN WAS THE LAST WITNESS FOR
22 KALEIDESCAPE.  HE'S AN INSTALLER, WORKS IN CORTE
23 MADERA, AND TALKS ABOUT WHAT HE DOES AND THE
24 KALEIDESCAPE PRODUCT IS REALLY VERY ADVANCED.
25 PLAINTIFF HAS CERTAINLY NEVER DISPARAGED THE PRODUCT
26 AND HOLDS -- IT'S AN IMPORTANT PART OF HIS WORK.
27 AND HE TALKED ABOUT OTHER DETAILS THAT I WON'T GO
28 INTO.

43

1          AND THEN, FINALLY, MR. HOY TESTIFIED.  I
2 BELIEVE I'VE TOUCHED UPON ALL THE WITNESSES HERE.
3          MR. MOORE:  YES, YOUR HONOR.
4          MR. COATES:  YES, YOUR HONOR.
5          THE COURT:  WELL, I THINK IT'S AN
6 APPROPRIATE TIME TO TAKE A RECESS.  THIS ISN'T
7 NECESSARY TO A STATEMENT OF DECISION TECHNICALLY,
8 BUT MY OWN BELIEF THAT PARTIES ARE IN A BETTER
9 POSITION TO DECIDE HOW TO EXERCISE THEIR CLAIMED
10 RIGHTS, AND THERE ARE MANY, OR ON THE OTHER HAND TO
11 CONFORM THEIR CONDUCT TO LAW IF THEY BELIEVE THAT
12 THE JUDGE IN A DEMONSTRATED WAY PAID CAREFUL
13 ATTENTION TO ALL THAT THEY SAID AND DID.  I BELIEVE
14 THAT'S AN IMPORTANT PART OF MY OBLIGATION AS A
15 PUBLIC OFFICIAL.  THAT'S MY DUTY.
16          WE'LL BE IN A RECESS, AND THEN WE'LL
17 CONTINUE.
18          (WHEREUPON, A SHORT RECESS WAS TAKEN,
19 AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)
20          THE COURT:  WE NOW MOVE, IN MY WAY OF
21 THINKING, TO THE QUESTION OF INVOKING WHAT IS CALLED
22 EQUITY JURISDICTION.  AND THERE IS A MAXIM, OF
23 COURSE, ALONG WITH MANY OTHER MAXIMS OF JURIS
24 PRUDENCE, THAT EQUITY FOLLOWS THE LAW.  SO SOON
25 YOU'RE GOING TO BE MOVING INTO THIS ISSUE OF, UNDER
26 THE LAW, WHAT IS THIS CONTRACT?  AND THEN I'LL BE
27 CALLED UPON TO COMMENT UPON SOME OF THE ISSUES
28 CONCERNING THE REQUEST TO INVOKE THE EQUITY

1 JURISDICTION OF THE COURT.
2        AND FIRST, BEFORE DOING THAT, I WANT TO
3 TALK TO YOU A LITTLE BIT ABOUT EQUITY.  THIS ALL
4 GOES BACK TO AS EARLY AS THE 14TH CENTURY.  YOU SAY,
5 OH, NO, WE'LL BE HERE ALL WEEKEND.  NO, I'LL GET OUT
6 OF HERE BY NOON OR A LITTLE BIT LATER.  THE PARTIES
7 HAVE ENTRUSTED THIS TO THE COURT.  I WANT THEM TO
8 KNOW A LITTLE BIT ABOUT THIS.
9        IT HAPPENED IN EARLY LAW THERE WERE VERY
10 STRICT RULES.  WE HEARD, FOR EXAMPLE, THERE WAS A
11 MUSICAL, LE MISERABLE, CHASING THE PERSON AROUND
12 FOREVER WHO STOLE THE LOAF OF BREAD TO FEED HIS
13 CHILDREN, WHEN STEALING A LOAF OF BREAD WAS A
14 CAPITAL OFFENSE.
15        WELL, JURIES DISPENSED WITH THAT RULE
16 BECAUSE THEY WOULD ROUTINELY FIND PEOPLE LIKE THAT
17 NOT GUILTY, AND IT'S A FORM OF JURY NULLIFICATION.
18 AND THAT'S PART OF THE LAW.
19        THE GREAT ROSCOE POUND SAID THAT, AND I
20 DON'T ADOPT THIS, AND I'M JUST SAYING A PART OF
21 HISTORY, THAT IN ITS ACTUAL ADMINISTRATION, JURY
22 LAWLESSNESS IS A GREAT CORRECTIVENESS OF THE COMMON
23 LAW.  I'M NOT SPEAKING HERESY.  I'M TALKING ABOUT
24 THE DEAN OF THE HARVARD LAW SCHOOL.
25        BASICALLY THE KING OF ENGLAND, THROUGH HIS
26 CHANCELLORS, GAVE AUTHORITY FOR THERE TO BE A LITTLE
27 LUBRICATION IN THE JOINTS TO AVOID THE HARSH, MORE
28 DRACONIAN ASPECTS OF THE APPLICATIONS IN THE STRICT
                                                      45

1 COMPETITION.  IT CREATED SUBSTANTIALLY THE WHOLE OF
2 THE LAW OF MORTGAGES WITH ITS EQUITY OF REDEMPTION
3 AND BILLS TO FORECLOSE THAT EQUITY.
4        IT PREVENTED THE ENFORCEMENT OF JUDGMENTS
5 OF LAW, WHICH IT DEEMED INEQUITABLE TO PERMIT --
6 WHEN IT DEEMED IT INEQUITABLE TO PERMIT THEIR
7 ENFORCEMENT.  IT ORDERED THE RECONVEYANCE OF LAND
8 WHERE THE CONVEYANCE HAD BEEN OBTAINED BY FRAUD OR
9 IT WAS MADE BY MISTAKE.  IN FACT, IT WROTE NEW
10 CHAPTERS IN PRACTICALLY EVERY FIELD OF LAW.
11        IN THEODORE PLUCKETT'S TEST,
12 P-L-U-C-K-E-T-T, A CONCISE HISTORY OF COMMON LAW,
13 IT'S WRITTEN THAT THE DECISIVE TEST FOR THE
14 EXISTENCE OR NOT OF AN EQUITABLE RULE OR REMEDY IS
15 TO BE FOUND IN THE SEARCH OF THE RECORDS AND
16 DECISIONS OF THE COURTS OF CHANCERY, THAT'S THIS
17 COURT, AND IT'S MODERN SUCCESSORS.  THERE ARE,
18 INDEED, A NUMBER OF MAXIMS WHICH HAVE ALMOST
19 ATTAINED THE DIGNITY OF PRINCIPLES, BUT DEDUCTION
20 ALONE WILL NOT REVEAL THE CONTENT OF OUR SYSTEM OF
21 EQUITY.  THE ONLY AUTHORITATIVE SOURCE IS THE CUSTOM
22 OF THE COURT, AND THAT MUST BE GATHERED FROM AN
23 EXAMINATION OF THE CASES.
24        THIS IS SUCH A CASE.  WHAT I'M GOING TO BE
25 ENGAGED IN IS INTERPRETING THE CONTRACT IN
26 ACCORDANCE WITH MY UNDERSTANDING OF THE LAW AND
27 MAKING DECISIONS AND RESOLVING CONFLICTS IN
28 EVIDENCE.  AND THEN, ALTHOUGH YOU SHOULD RELY ON
                                                      47

1 LETTER OF THE LAW.  AND THAT HAS EVOLVED OVER
2 CENTURIES, A VERY VITAL PART OF OUR JURIS PRUDENCE
3 TODAY, I MIGHT SAY, AS WELL IN CANADA, OF COURSE.
4        I WAS JUST LOOKING AT THE CASE NOTES THAT
5 I STUDIED IN 1964.  AND THIS ISN'T ANCIENT BECAUSE
6 I'VE ALREADY GIVEN HISTORICAL REFERENCE BACK MANY
7 HUNDREDS OF YEARS, BUT THE GREAT WALTER WHEELER
8 COOK, THE GREAT PROFESSOR OF LAW AT NORTHWESTERN
9 UNIVERSITY LAW SCHOOL, WROTE IN HIS TREATISE, UNTIL
10 THE RISE OF THE MODERN LEGISLATIVE BODY, EQUITY WAS
11 THE MOST -- EXCUSE ME -- EQUITY IS THE GREAT FORCE
12 OF LEGAL REFORM IN ANGLO AMERICAN LAW.  AND BY
13 DEVELOPMENT OF USES AND TRUSTS, IT PROFOUNDLY
14 MODIFIED THE LAND LAW OF ENGLAND AND AMERICA.  IT
15 DEVELOPED BY MEANS OF THE LAW OF TRUST THE FIRST
16 MARRIED WOMAN'S PROPERTY LAW.  IT ENABLED MARRIED
17 WOMEN TO CONTRACT WITH REFERENCE TO THEIR SEPARATE
18 PROPERTY IN EQUITY.  IT WAS THE FIRST TO ENFORCE
19 SIMPLE CONTRACTS AS EARLY AS THE 15TH CENTURY IN
20 DEVELOPING THE LAW OF, YOU GUESSED IT, SPECIFIC
21 PERFORMANCE OF CONTRACTS.
22        WELL, THE CONVEYANCE OF LAND, IT EFFECTED
23 OTHER IMPORTANT CHANGES IN THE LAW OF REAL PROPERTY.
24 IT MADE THINGS CALLED CHOSES OF AN ACTION ASSIGNABLE
25 BEFORE THE COMMON LAW ADOPTED FULLY THE ROMAN LAW
26 DEVICE OF THE POWER OF THE ATTORNEY.  IT DEVELOPED
27 MUCH OF OUR TORT LAW IN CONNECTION WITH THE ISSUANCE
28 OF INJUNCTIONS, IN LABOR DISPUTES, UNFAIR
                                                      46

1 YOUR ATTORNEYS AND NOT THE COURT ON THIS ISSUE, IF
2 THERE IS A CLAIM THAT ANYTHING I DID WAS FATALLY
3 DEFECTIVE, YOU WOULD BE IN A HIGHER COURT WHERE THE
4 JUDGES WOULD NOT HAVE SEEN THE DRAMA, BUT WHERE THEY
5 WOULD HAVE READ THE PAPERS, THE TEXT, THE PRINTED
6 PAGE.
7        AND THERE IS A VENERABLE PRINCIPLE RELATED
8 TO WHAT THE APPELLATE COURTS DO WHEN EXAMINING
9 CLAIMS OF ERROR IN RESOLVING CONFLICTS IN EVIDENCE,
10 AND IT'S CALLED THE RULE OF CONFLICTING EVIDENCE.
11 AND I'M CITING FROM WITKIN, A GREAT SCHOLAR,
12 CALIFORNIA 4TH EDITION, ON APPEAL.  I'M DOING THIS
13 BECAUSE I'M COMMUNICATING THIS DIRECTLY.  BECAUSE
14 I'VE READ HUNDREDS OF BRIEFS AND HUNDREDS OF
15 OPINIONS WHICH REPEAT THIS RULE AT SECTION 359, PAGE
16 408, VOLUME 9.
17        "WHERE THE EVIDENCE IS IN CONFLICT, THE
18 APPELLATE COURT WILL NOT DISTURB THE VERDICT OF THE
19 JURY OR THE FINDING OF THE TRIAL COURT.  THE
20 PRESUMPTION BEING IN FAVOR OF THE JUDGMENT, THE
21 COURT MUST CONSIDER THE EVIDENCE IN LIGHT MOST
22 FAVORABLE TO THE PREVAILING PARTY, GIVING THE
23 PREVAILING PARTY THE BENEFIT OF EVERY REASONABLE
24 INFERENCE AND RESOLVING CONFLICTS IN SUPPORT OF THE
25 JUDGMENT."
26        I'VE SEEN THIS WRITTEN IN SCORES OF
27 DECISIONS REVIEWING MY WORKS.  I'LL JUST QUOTE IT.
28 "THE EXPOSITION IN CRAWFORD VERSUS SOUTHERN PACIFIC

COMPANY, 1935, 3 CAL.2D, 427, IS TYPICAL.  THIS IS
THE LANGUAGE OF THE CALIFORNIA SUPREME COURT.  "IN
REVIEWING THE EVIDENCE ON SUCH AN APPEAL, ALL
CONFLICTS MUST BE RESOLVED IN FAVOR OF THE
RESPONDENT," THAT'S THE WINNING PARTY, "AND ALL
LEGITIMATE AND REASONABLE INFERENCES INDULGED AND TO
UPHOLD THE VERDICT IS POSSIBLE."  AND THAT, TAKE MY
WORD FOR IT, APPLIES TO THE DECISION WHEN PARTIES
PROCEED WITHOUT A JURY.
          THIS IS QUOTING FROM THE SUPREME COURT.
"IT IS AN ELEMENTARY, BUT OFTEN OVERLOOKED PRINCIPLE
OF LAW THAT WHEN A VERDICT IS ATTACKED AS BEING
UNSUPPORTED, THE POWER OF THE APPELLATE COURT BEGINS
AND ENDS WITH A DETERMINATION AS TO WHETHER THERE IS
ANY SUBSTANTIAL EVIDENCE, CONTRADICTED OR
UNCONTRADICTED, WHICH WILL SUPPORT THE CONCLUSION
REACHED BY THE JURY."  AND THAT RULE HAS BEEN
APPLIED TO JUDGE TRIALS.  THAT IS, THE DECIDER OF
FACT.  "WHEN TWO OR MORE INFERENCES CAN BE
REASONABLY DEDUCED FROM THE FACTS, THE REVIEWING
COURT IS WITHOUT POWER TO SUBSTITUTE ITS DEDUCTIONS
FOR THOSE OF THE TRIAL COURT."
          ANOTHER DECISION GOES ON TO SAY, "AND THE
RULE IS IDENTICAL WHERE THE TRIAL IS BY THE COURT."
          ANOTHER CASE, BANCROFT WHITNEY COMPANY
VERSUS MCHUGH, M-C-H-U-G-H, A 1913 DECISION, VOLUME
166 CAL. PAGE 140.  "IN EXAMINING THE SUFFICIENCY OF
THE EVIDENCE TO SUPPORT A QUESTIONED FINDING, AN

49

APPELLATE COURT MUST ACCEPT AS TRUE ALL EVIDENCE
TENDING TO ESTABLISH THE CORRECTNESS OF THE FINDING
AS MADE, TAKING INTO ACCOUNT, AS WELL, ALL
INFERENCES WHICH MIGHT REASONABLY BE THOUGHT BY THE
TRIAL COURT TO LEAD TO THE SAME CONCLUSION.  EVERY
SUBSTANTIAL CONFLICT IN THE TESTIMONY IS UNDER THE
RULE WHICH HAS ALWAYS PREVAILED IN THIS COURT TO BE
RESOLVED IN FAVOR OF THE FINDING."
          WITKIN GOES ON, "THIS FUNDAMENTAL DOCTRINE
IS STATED AND APPLIED IN HUNDREDS OF CASES."
          NOW, I DIGRESSED ON THAT JUST FOR A
MOMENT, NOT TO IN ANY WAY -- BECAUSE I COULDN'T AND
WOULDN'T.  I WOULDN'T WANT TO USURP THE FUNCTION OF
YOU MEETING WITH YOUR LEARNED COUNSEL.  BUT TO SPEAK
DIRECTLY BECAUSE, OF COURSE, I'M ALWAYS HOPEFUL THAT
PEOPLE CAN RESOLVE THEIR MATTERS TO THEIR MUTUAL
SATISFACTION.  AND HAVING AT LEAST BEEN REPRESENTED,
THE PARTIES NEVER REALLY MEANINGFULLY TALKED ABOUT
THIS CONFLICT BEFORE COMING HERE.  I'M TALKING TO
THEM DIRECTLY FOR WHAT IT'S WORTH.  BUT IF YOU THINK
THE COURT MADE AN EGREGIOUS ERROR, GO FOR IT.  THE
CALIFORNIA CONSTITUTION SAYS, NO ERROR MATTERS
UNLESS PREJUDICE IS SHOWN; IT IS NEVER PRESUMED.
BUT I'VE CERTAINLY BEEN REVERSED.  THAT'S FOR SURE.
          I'LL NOW REALLY FOCUS ON THE FIRST
SUBSTANTIAL CONTROVERTED ISSUE, WHICH IS -- I THINK
SIMPLY STATED IS THE DOCUMENT CALLED, GENERAL
SPECIFICATIONS, WHICH IS EXHIBIT 3, PART OF THE

50

CONTRACT EXHIBIT 156.  IF SO, DOES EXHIBIT 3, IF
FOUND TO BE PART OF THE CONTRACT EXHIBIT 156, THE
ONLY DOCUMENT SIGNED BY THE LAWFUL REPRESENTATIVES
OF THE PLAINTIFF AND DEFENDANT, IMPOSE OBLIGATIONS
ON KALEIDESCAPE, WHICH SHOULD BE SPECIFICALLY
ENFORCED OR THE SUBJECT OF AN INJUNCTION?
          WHAT DOES 156 SAY?  WELL, IT'S SET FORTH
IN WRITING.  I'M NOT GOING TO REALLY GO THROUGH ALL
THE DETAILS HERE, BUT I'M GOING TO TALK ABOUT SOME
RULES OF INTERPRETATION THAT HAVE BEEN SUMMARIZED OR
TOUCHED UPON.  AND BY DOING THAT, IT'S REALLY
COMMUNICATIVE, IT'S NOT DESIGNED TO SUPPORT AND CITE
EVERY RULE, OF COURSE.  IF IT'S NOT EXPRESSLY MADE
PART OF THE CONTRACT, IS EXHIBIT 3 BY NECESSARY
IMPLICATION OR PROPER RULE OF JUDICIAL CONSTRUCTION,
MOST OF THOSE RULES HAVING BEEN EMBODIED IN
LEGISLATIVE ENACTMENTS WHICH REALLY CONFIRM RATHER
ANCIENT PRACTICES, IS IT SUFFICIENTLY IDENTIFIED SO
AS TO BE PART OF THE CONTRACT?
          WELL, I CONCLUDE THAT NO PART OF EXHIBIT
156 SPECIFICALLY CALLS OUT IN CLEAR WORDS THE
GENERAL SPECIFICATIONS.  SO IT -- FROM THE TEXT OF
156 ALONE IS NOT PART OF THE CONTRACT.  BUT, OF
COURSE, THAT BEGINS THE DISCUSSION.  IT DOESN'T END
IT.  IT MIGHT END IT IF I TOOK A VIEW THAT PAROL
EVIDENCE WAS INADMISSIBLE, EXCEPT THAT THE ARGUMENT,
FULLY ACCEPTED FOR PURPOSE OF PRESENTING EVIDENCE,
IS THAT EXHIBIT 4 DOES NOT VARY OR DOES NOT

51

CONTRADICT THE TERMS OF THE CONTRACT AS IS THE
PLAINTIFF'S ARGUMENT.  IT IS AN ESSENTIAL PART OF
IT.  WE'VE HEARD A LOT OF TESTIMONY.
          INTERPRETATION OF CONTRACTS EXIST IN
ASCERTAINING THE MEANING TO BE GIVEN TO THE
EXPECTATION OF THE PARTIES.  I'M NOT GOING TO CITE
THE CODE SECTION.  I'M PRETTY MUCH MARCHING THROUGH
THEM.  THEY'RE ALL SHORT SENTENCES.  WHERE THE
LANGUAGE OF A CONTRACT IS CLEAR AND NOT ABSURD, IT
WILL BE FOLLOWED.  WELL, IF A CONTRACT IS REDUCED TO
WRITING THE PARTIES' INTENTION IS ASCERTAINED FROM
THE WRITING ALONE, IF POSSIBLE, SUBJECT TO OTHER
PROVISIONS GOVERNING THE INTERPRETATION OF
CONTRACTS.
          AS I'VE SAID, BASED UPON THE WRITING
ALONE, THAT IS 156, IT APPEARS THAT EXHIBIT IS NOT
PART OF THE CONTRACT.  HOWEVER, IT APPEARS THAT MUCH
EXTRINSIC EVIDENCE WAS INTRODUCED NOT TO VARY THE
TERMS OF THE WRITING, BUT TO ASSIST THE COURT IN ITS
FACT-FINDING AND INTERPRETATION OF CONTRACT DUTIES.
          SO THE RULE OF LAW IS THAT WHERE EXTRINSIC
EVIDENCE HAS BEEN PROPERLY ADMITTED AND THE EVIDENCE
IS IN CONFLICT, ANY REASONABLE CONSTRUCTION BY THE
TRIAL JUDGE WILL BE UPHELD UNDER THE GENERAL RULE OF
CONFLICTING EVIDENCE WHICH I JUST READ TO YOU,
CITING TWO ALWAYS UPHELD CALIFORNIA SUPREME COURT
DECISIONS.  THIS BEING A MATTER OF STATE LAW.
          AN OVERLAY ON THESE RULES IS A RESTATEMENT

SECTION OF CONTRACT SECTION 207.  THE AMERICAN LAW
INSTITUTE DREW TOGETHER LEGAL SCHOLARS AND
PRACTITIONERS OVER TIME, AND ALTHOUGH THE INFLUENCE
OF THE RESTATEMENT IS SAID TO HAVE WAXED AND WANED
OVER THE YEARS, IT IS AN EFFORT TO DRAW TOGETHER IN
SO MANY AREAS OF LAW WHICH THERE IS NOT LEGISLATIVE
COMPULSION.  AND I DON'T MEAN THAT IN A RECALCITRANT
WAY, OF COURSE.  I MEAN THE LEGISLATURE HAS OFTEN
LEFT WHOLE FIELDS OF LAW TO CASE LAW DEVELOPMENT.
        SO WHEN YOU HEAR THE SIMPLISTIC QUESTION
ON TV, IT IS AN ACTIVIST JUDGE THAT MAKES THE LAW?
OF COURSE WE DO.  WE'RE REQUIRED TO DO SO BECAUSE
ANYBODY WHO HAS AN ACTUAL CASE OR CONTROVERSY HAS
ACCESS TO THE COURT.  AND MANY OF THE PROBLEM ISSUES
THAT ARE CONFRONTED ARE MATTERS WHERE ELECTED
REPRESENTATIVES HAVE SAID -- WELL, I WON'T
CHARACTERIZE WHY.  I CAN'T READ THEIR MIND.  I
WOULDN'T DO THAT -- BUT WE'RE NOT GOING TO GET
INVOLVED.  WE'LL WAIT SO THAT WE CAN GET A GOOD
UNDERSTANDING OF HOW THE LAW IS DEVELOPING, AND THEN
EXERCISING OUR SUPERIOR AUTHORITY ON BEHALF OF THE
PEOPLE, IF WE THINK IT IS A PROPER CASE FOR
LEGISLATIVE INTERVENTION, WE'LL DO THAT.  THAT'S
PART AND PARCEL OF HOW THE LAW DEVELOPS.  OF COURSE,
THE THEORY IS WE'RE NOT MAKING ALL THE FINDINGS.  WE
UNDERSTAND HOW SCHOLARS HAVE DEALT WITH THAT ISSUE.
        SO THE RESTATEMENT OF CONTRACT SECTION
2307 READS, QUOTE, "IN CHOOSING AMONG THE REASONABLE

53

MEANINGS OF A PROMISE OR AGREEMENT OR A TERM
THEREOF, A MEANING THAT SERVES THE PUBLIC INTEREST
IS GENERALLY PREFERRED."  AND THIS IS CITED AT
WITKIN ON CONTRACTS SECTION 743.
        "IN DETERMINING THE INTENTION OF THE
PARTIES AN OBJECTIVE TEST IS APPLIED.  A CONTRACT
MUST BE INTERPRETED AS TO GIVE EFFECT TO THE MUTUAL
INTENTION OF THE PARTIES AS IT EXISTED AT THE TIME
OF CONTRACTING SO FAR AS THE SAME IS ASCERTAINABLE
AND LAWFUL.  THE MODERN APPROACH IS TO AVOID THE
TERMINOLOGY OF INTENTION, IN QUOTES, AND TO LOOK FOR
THE EXPRESSED INTENT.
        "UNDER AN OBJECTIVE STANDARD, SIMILARLY IT
IS SAID THAT THE RULES OF INTERPRETATION OF A
WRITING" -- EXCUSE ME -- "OF WRITTEN CONTRACT IS FOR
THE PURPOSE OF ASCERTAINING THE MEANING OF THE WORDS
USED THEREIN.  EVIDENCE CANNOT BE ADMITTED TO SHOW
INTENTION INDEPENDENT OF THE INSTRUMENT."
        THAT RULE OF LAW CERTAINLY COMPORTS WITH
WHAT THE PARTIES HAVE TO SAY.  THEY WROTE IN THEIR
CONTRACT, PARAGRAPH 10.1, ENTIRE AGREEMENT.  "THIS
AGREEMENT AND THE EXHIBITS HERETO CONSTITUTE THE
ENTIRE AGREEMENT BETWEEN THE PARTIES RELATED TO THE
SUBJECT MATTER OF THIS AGREEMENT HERETO AND
SUPERCEDE ALL ORAL OR WRITTEN AGREEMENTS ON THIS
SUBJECT MATTER ENTERED PRIOR TO THIS AGREEMENT.
SUBJECT TO SECTION 10.7 THIS AGREEMENT MAY NOT BE
MODIFIED EXCEPT BY A WRITTEN AGREEMENT DATED

54

SUBSEQUENT TO THE DATE OF THIS AGREEMENT AND SIGNED
BY BOTH PARTIES."
        AND SECTION 10.7 IS A LONG PARAGRAPH THAT
SAYS AMENDMENT, BUT NO ONE HAS CLAIMED THIS CONTRACT
HAS BEEN AMENDED, AND NO ONE CLAIMED THAT THERE WERE
DISCUSSIONS BEFORE THE CONTRACT WAS SIGNED BETWEEN
THE PARTIES.
        SO THE PROPOSITION I'VE JUST ANNOUNCED IS
ENTIRELY UNPROBLEMATIC AND ENTIRELY CONSISTENT WITH
THE WORDS THE PARTIES CHOSE TO EXPRESS THEMSELVES.
        A SPECIAL DIRECTIVE.  "IF THE TERM OF A
PROMISE IS AMBIGUOUS IS -- OR UNCERTAIN APPLIES, THE
CONTRACT MUST BE INTERPRETED IN THE SENSE IN WHICH
THE PROMISOR, IN THIS CASE KALEIDESCAPE, BELIEVED AT
THE TIME OF MAKING IT, THAT THE PROMISEE
UNDERSTOOD."
        WELL, I DON'T THINK THIS REALLY HELPS THE
PLAINTIFF, AND THERE IS NO BASIS TO KNOW WHAT DVD
CCA MEANT.  BECAUSE MR. HOY CONFIRMED THAT REALLY
THERE WERE NO DISCUSSIONS, NO BASIS TO KNOW.  AND
ALL THE DEFENSE WITNESSES SAID, ANY TIME WE SOUGHT
TO FIND A BASIS WHAT THEY MIGHT THINK ABOUT THIS, WE
WERE POLITELY TOLD, SIGN IT OR NOT, YOUR CHOICE.  SO
IN SHORT, THE DEFENDANT RECEIVED NO INFORMATION AND
WOULD HAVE NO BASIS TO KNOW WHAT THE PLAINTIFF
BELIEVED.
        "THE WHOLE OF A CONTRACT IS TO BE TAKEN
TOGETHER SO AS TO GIVE EFFECT OF EVERY PART IF

55

REASONABLY PRACTICABLE, EACH CLAUSE HELPING TO
INTERPRET THE OTHER.  WHERE THERE ARE SEVERAL
PROVISIONS OR PARTICULARS, SUCH CONSTRUCTION, IF
POSSIBLE, IS TO BE ADOPTED AS TO GIVE EFFECT TO
ALL".
        THIS LAST SENTENCE, OF COURSE, BEGS THE
QUESTION.  THE QUESTION IS, IS THE DOCUMENT, GENERAL
SPECIFICATIONS, EXHIBIT 3, ONE OF THOSE DOCUMENTS
WHICH SHOULD BE GIVEN EFFECT?  YOU KNOW, THE GENERAL
PRINCIPLE THAT I TALKED ABOUT RELATES TO WRITINGS
AND ESCROW AGREEMENTS, AND YOU HAVE TO SORT IT OUT,
BUT ORDINARILY DO NOT DEAL WITH THE INTEGRATED
CONTRACT IN WHICH THERE IS A STATEMENT THAT THESE
PAGES CONSTITUTE THE ENTIRE AGREEMENT.
        ANOTHER RULE IS THAT SEVERAL CONTRACTS
RELATED TO THE SAME MATTERS BETWEEN THE SAME PARTIES
AND MADE AS PART OF SUBSTANTIALLY ONE TRANSACTION
ARE TO BE TAKEN TOGETHER.  BUT THIS IS NOT
APPLICABLE HERE BECAUSE OF THE ENTIRE AGREEMENT
LANGUAGE OF THE CONTRACT SIGNED BY MR. SRINIVASAN
AND MR. HOY, EXHIBIT 156, EXPRESSLY MAKES THAT RULE
OF INTERPRETATION INAPPLICABLE.
        THE PLAINTIFF HAS EMPHASIZED THE RULE OF
INTERPRETATIONS FOUND IN CIVIL CODE SECTION 1647 AS
FOLLOWS, QUOTE, "A CONTRACT MAY BE EXPLAINED BY
REFERENCE TO THE CIRCUMSTANCES UNDER WHICH IT WAS
MADE AND THE MATTER TO WHICH IT RELATES," CLOSE
QUOTE.

56

**Exhibit M, Page 170**

1 AND A CODE SECTION, I THINK PERHAPS NOT
2 CITED, BUT NOT AN OMISSION, IT'S JUST A VENERABLE
3 PRINCIPLE OF LAW, IS FOUND IN CODE OF CIVIL
4 PROCEDURE 1860. QUOTE, "FOR THE -- FOR THE PROPER
5 CONSTRUCTION OF AN INSTRUMENT, THE CIRCUMSTANCES
6 UNDER WHICH IT WAS MADE, INCLUDING THE SITUATION OF
7 THE SUBJECT OF THE INSTRUMENT AND OF THE PARTIES TO
8 IT, MAY ALSO BE SHOWN, SO THAT THE JUDGE BE PLACED
9 IN THE POSITION OF THOSE WHOSE LANGUAGE HE IS TO
10 INTERPRET," CLOSE QUOTE.
11 THERE IS ANOTHER ONE THAT SAYS HE. IT
12 MIGHT INCLUDE THE PRONOUN SHE. BUT WE MODERNLY READ
13 THEM SHE. THEY DON'T SAY S, SLASH, HE. I'M JUST
14 READING.
15 EVIDENCE OF CIRCUMSTANCES IS ADMISSIBLE,
16 IF RELEVANT, TO PROVE A MEANING OF WHICH THE
17 CONTRACT IS REASONABLY SUSCEPTIBLE. A FEW OTHER
18 RULES ARE THAT SUBSEQUENT CONDUCT OF THE PARTIES
19 AFTER THE EXECUTION OF THE CONTRACT AND BEFORE ANY
20 CONTROVERSY HAS ARISEN MAY BE CONSIDERED IN
21 DETERMINING THE MEANING OF THE CONTRACT. AND
22 PLAINTIFF CITED THIS SECTION.
23 HERE, OF COURSE, THERE WAS NO REAL ONGOING
24 RELATIONSHIP BETWEEN THE PARTIES IN THEIR CONDUCT
25 THAT WOULD GIVE REAL HELP TO THE COURT RELATED TO
26 HOW THEY MUTUALLY INTENDED TO BE CARRIED OUT. BUT
27 THAT DOESN'T END THE DISCUSSION BECAUSE -- AND SO
28 THAT PROVISION AND THE ONE FOUND ALSO IN RESTATEMENT
57

1 OF CONTRACT SECTION 2 OF SUBPART 4 IS NOT EXPRESSLY
2 APPLICABLE. BUT HERE THE PLAINTIFF HAS POINTED TO
3 SOME E-MAILS AND OTHER MATTERS FOUND IN DISCOVERY,
4 AND THE QUESTION THEN WOULD BE, WELL, CAN THE COURT
5 CONSIDER THE CONDUCT OF ONLY ONE PARTY. THE ANSWER
6 IS YES. AND I'LL REFER TO THAT CASE NOW.
7 I SHOULDN'T APOLOGIZE FOR TAKING THIS
8 TIME. I KNOW ITS BURDENSOME. BUT SINCE EVERYBODY
9 CHEWS OVER THE JUDGE'S DECISION LATER, I THOUGHT I
10 WOULD BE THOROUGH.
11 I'VE JUST PRESENTED A QUESTION AND AN
12 ANSWER. IS IT POSSIBLE FOR THE COURT TO CONSIDER
13 EVIDENCE OF ONLY ONE PARTY AFTER THE CONTRACT WAS
14 EXECUTED IF IT MIGHT HAVE SOME BENEFIT IN FIGURING
15 OUT WHAT THE CONTRACT MEANS? THE ANSWER IS YES.
16 AND I'LL READ FROM A CASE. THE FACTS ARE
17 NOT REALLY IMPORTANT, BUT IT'S THE LANGUAGE THAT IS
18 EXPLANATORY FROM A HIGHER COURT. I'LL REFER TO IT
19 NOW. IT'S SOUTHERN CALIFORNIA EDISON COMPANY VERSUS
20 SUPERIOR COURT, FOUND AT 37 CAL.APP. 4TH, PAGE 839
21 AT PAGE 851. THIS WAS ACTUALLY A REVIEW OF A
22 SUMMARY ADJUDICATION, WHERE IT'S COMPLETELY
23 DIFFERENT STANDARDS AND SO FORTH, BUT THEN WHEN A
24 TRIAL JUDGE HAS ACTUALLY LAID HIS OR HER EYEBALLS ON
25 A WITNESS, LISTENED AND DONE WHAT ONLY A TRIAL JUDGE
26 CAN DO, AND THAT IS MAKE APPRAISALS. BUT AT PAGE
27 851 THE COURT IN THE CITED CASE STATES THE
28 FOLLOWING, QUOTE: "THE RULE IS WELL SETTLED THAT IN
58

1 CONSTRUING THE TERMS OF A CONTRACT, THE CONSTRUCTION
2 GIVEN IT BY THE ACTS AND CONDUCTS OF THE PARTIES,
3 PLURAL, WITH KNOWLEDGE OF ITS TERMS AND BEFORE ANY
4 CONTROVERSY HAS ARISEN AS TO ITS MEANING IS
5 ADMISSIBLE ON THE PARTIES' INTENT."
6 I WILL NOT CITE THE INTERNAL CITATION.
7 IT'S THERE FOR YOU TO FIND IT. BUT THERE WAS A
8 CASE, CONTINUING, "CONTRARY TO ENERGY DEVELOPMENT'S
9 CLAIM, THIS RULE IS NOT LIMITED TO THE JOINT CONDUCT
10 OF THE PARTIES IN THE COURSE OF THE PERFORMANCE OF
11 THE CONTRACT."
12 "AS STATED IN CORBIN ON CONTRACTS," THAT'S
13 C-O-R-B-I-N, "THE PRACTICAL INTERPRETATION OF THE
14 CONTRACT BY ONE PARTY EVIDENCED BY HIS WORDS OR ACTS
15 CAN BE USED AGAINST HIM ON BEHALF OF THE OTHER PARTY
16 EVEN THOUGH THAT OTHER PARTY HAD NO KNOWLEDGE OF
17 THOSE WORDS OR ACTS WHEN THEY OCCURRED AND DID NOT
18 CONCUR IN THEM."
19 "IN THE LITIGATION THAT HAS ENSUED, ONE
20 WHO IS MAINTAINING THE SAME INTERPRETATION THAT IS
21 EVIDENCED BY THE OTHER PARTY'S EARLIER WORDS AND
22 ACTS CAN INTRODUCE THEM TO SUPPORT HIS CONTENTION,"
23 CLOSE QUOTE. CITING CORBIN ON CONTRACTS AND ANOTHER
24 CALIFORNIA APPELLATE CASE.
25 THE COURT OF APPEAL COMPLETES THIS
26 STATEMENT WITH THE FOLLOWING WORDS: "WE EMPHASIZE,
27 THE CONDUCT OF ONE PARTY TO A CONTRACT IS BY NO
28 MEANS CONCLUSIVE EVIDENCE AS TO THE MEANING OF THE
59

1 CONTRACT. IT IS RELEVANT, HOWEVER, TO SHOW THAT
2 CONTRACT IS REASONABLY SUSCEPTIBLE TO THE MEANING
3 EVIDENCED BY THAT PARTY'S CONDUCT," CLOSE QUOTE. IN
4 OTHER WORDS, IT GETS LEFT WITH THE TRIAL COURT,
5 THAT'S MY OWN GLOSS, IF THERE IS A CONFLICT.
6 NOW, IN CASES -- I'M GETTING CLOSE TO
7 THESE RULES AND TO THE END OF THESE GENERAL RULES OF
8 INTERPRETATION, SPECIFIC ONES. "IN CASES OF
9 UNCERTAINTY NOT REMOVED BY THESE PRECEDING RULES" --
10 AND I SHOULD REFERENCE THE RULE, AS WELL, AND NOT
11 OMIT IT -- "THAT A CONTRACT MUST RECEIVE AN
12 INTERPRETATION AS WILL MAKE IT LAWFUL, OPERATIVE,
13 DEFINITE, REASONABLE AND CAPABLE OF BEING CARRIED
14 INTO EFFECT, IF IT CAN BE DONE WITHOUT VIOLATING THE
15 INTENTION OF THE PARTIES," CLOSE QUOTE.
16 THAT WAS CITED BY PLAINTIFF AS WELL AS
17 DEFENDANT. ONE OF THE MANY RULES. I WENT THROUGH
18 THE EXHAUSTIVE TREATISES. THERE ARE OTHER RULES.
19 MY OMISSION DOESN'T MEAN THEY -- THERE AREN'T RULES,
20 BUT I DON'T THINK THEY'RE AS DIRECTLY APPLICABLE AND
21 WERE NOT SEPARATELY ARGUED BY THE PARTIES.
22 "IN CASES OF UNCERTAINTY NOT REMOVED BY
23 ALL THE PRECEDING RULES, THE LANGUAGE OF A CONTRACT
24 SHOULD BE INTERPRETED MOST STRONGLY AGAINST THE
25 PARTY WHO CAUSED THE UNCERTAINTY TO EXIST." THAT'S
26 BEEN CITED, AND IT'S EMPHASIZED THAT IT'S THE LAST
27 RULE IF THE COURT IS IN DOUBT, NOT THE FIRST.
28 AND THE RULE THAT ANY AMBIGUITY CAUSED BY

1 THE DRAFTSMAN OF A CONTRACT MUST BE RESOLVED AGAINST
2 THAT PARTY APPLIES WITH SPECIFIC FORCE IN THE CASE
3 OF A CONTRACT OF ADHESION.  AND QUOTING FROM A CASE
4 HERE, "IN A CONTRACT OF ADHESION, THE PARTY'S
5 SUPERIOR BARGAINING POWER NOT ONLY PRESCRIBES THE
6 WORDS OF THE INSTRUMENT, BUT THE PARTY WHO
7 SUBSCRIBES TO IT LACKS THE ECONOMIC STRENGTH TO
8 CHANGE SUCH LANGUAGE.  HENCE, ANY AMBIGUITY IN THE
9 CONTRACT SHOULD BE CONSTRUED IN FAVOR OF THE
10 SUBSCRIBING PARTY."
11        IT'S NOT NECESSARY FOR THE COURT TO MAKE A
12 LEGAL FINDING IN THIS CASE THAT THIS IS A CONTRACT
13 OF ADHESION.  I CITE THAT RULE BECAUSE BOTH THE RULE
14 IN 1654 IN THE CIVIL CODE THAT IS, AMBIGUITIES
15 RESOLVED AGAINST THE DRAFTSPERSON IF THAT'S
16 NECESSARY AFTER CONSIDERING ALL OTHER RULES, AND THE
17 ADHESION RULE OPERATE IN THE SAME WAY.  THIS
18 CONTRACT CERTAINLY HAS ELEMENTS OF AN ADHESION
19 CONTRACT.  SUCH A FORMAL DETERMINATION I BELIEVE IT
20 IS UNNECESSARY TO A DETERMINATION BECAUSE IT'S CLEAR
21 THAT IF THE OTHER RULES DO NOT RESOLVE THE
22 INTERPRETATION ISSUE, SECTION 1654, WHICH I JUST
23 CITED ON AMBIGUITIES, WORKS IN THE VERY SAME WAY AS
24 THE ADHESION CONTRACT RULE.
25        THE RESULT OF ESTABLISHING AN ADHESION
26 CLASSIFICATION IS ONLY TO PERMIT A FAVORABLE
27 CONSTRUCTION OF UNCERTAINTY.  THAT IS, WHETHER THE
28 GENERAL SPECIFICATIONS, NUMBER 3, IS PART OF THE
61

1 CONTRACT, OR ANY OTHER AMBIGUOUS TERM, IN THE
2 ABSENCE OF UNCERTAINTY OR AMBIGUITY, THE CONTRACT IS
3 ENFORCEABLE IN ACCORDANCE WITH ITS TERMS.  AND
4 ALTHOUGH THERE IS A SEPARATE BODY OF LAW CONCERNING
5 UNCONSCIONABILITY, THAT HASN'T BEEN ARGUED.  IT'S A
6 RELATED THEME IN THE LAW, BUT IS NOT APPLICABLE
7 HERE.
8        THE COURT DETERMINES -- THOSE ARE THE
9 RULES.  I'VE CITED THE TESTIMONY.  I'LL GIVE MY
10 CONCLUSION ON THAT NOW AND THEN MOVE TO OTHER
11 ISSUES.
12        THE COURT DOES DETERMINE THAT THE GENERAL
13 SPECIFICATIONS -- AND IN DOING THIS I'VE CONSIDERED
14 ALL THE EVIDENCE AND WEIGHED THE TESTIMONY OF ALL
15 WITNESSES AND READ ALL THE DOCUMENTS, ALL THE BRIEFS
16 EXHAUSTIVELY.
17        THE COURT DETERMINES THAT THE GENERAL
18 SPECIFICATIONS FOUND IN EXHIBIT 3 ARE NOT PART OF
19 THE CONTRACT SIGNED BY THE PARTIES.  THAT CONTRACT
20 BEING EXHIBIT NUMBER 156.  THE PLAINTIFF HAS
21 RATIFIED ON SEVERAL OCCASIONS THAT THE ONLY TERMS OF
22 THE PURPORTED CONTRACT UPON WHICH IT BRINGS CLAIM
23 ARE FOUND IN EXHIBIT 3, AND, THEREFORE, BY
24 DEFINITION THE CLAIM FAILS.
25        THE COURT ADOPTS THE ANALYSIS OF
26 KALEIDESCAPE'S TRIAL BRIEF, FILED ON MARCH 20TH OF
27 2007, AND THE BRIEF ON, QUOTE, DETERMINING THE
28 WRITINGS OF THE CONTRACT, CLOSE QUOTE, FILED ON
62

1 MARCH 27, 2007.  WITHOUT READING THEM OUT LOUD,
2 THE -- THOSE BRIEFS ADEQUATELY STATE IN DETAIL
3 WITHOUT BEATING YOU OVER THE HEAD WITH IT THE
4 COURT'S ANALYSIS ON THE PROPER CONSTRUCTION, IN
5 ADDITION TO WHAT I'VE DONE MYSELF HERE IN COURT.
6        IN MAKING THIS DETERMINATION FINDING, THE
7 COURT HAS RESOLVED IN ITS MIND THE FACTUAL
8 RESOLUTION ON EACH OF THESE RULES OF INTERPRETATION
9 AND CONSIDERED THE CASE FILE, ALL THE DOCUMENTS THAT
10 WERE THE SUBJECT OF JUDICIAL NOTICE, THE EXHIBITS
11 SUBMITTED WITHOUT NOTATION, THE BROAD SCOPE OF
12 EVIDENCE SUBMITTED FOR THE COURT'S CONSIDERATION
13 WITHOUT OBJECTION, AND RESOLVES ALL CREDIBILITY IN
14 FAVOR OF EVERY FINDING, EXPRESS, IMPLIED, NECESSARY
15 OR APPROPRIATE TO THIS COURT'S DETERMINATION.
16        I WILL JUST GO BACK FOR A MOMENT ON A
17 COUPLE OF THESE POINTS.  I THINK I'VE ALLUDED TO
18 THEM, CERTAINLY THE TESTIMONY OF DEFENSE WITNESSES,
19 TO THE EFFECT THE PLAINTIFF ASSERTS, THE COURT DOES
20 NOT ADOPT THAT INTERPRETATION.  I SAW THIS AS A CASE
21 IN WHICH EVERYONE TRIED TO DO DISCOVERY IN A WAY TO
22 KIND OF MAKE UP FOR THE FACT THAT NOBODY SAT DOWN
23 AND MET AND TALKED.
24        AND I DO ADOPT AND FIND CREDIBLE NOT THE
25 CLAIM THAT THE DEFENDANT CORPORATION AB INITIO, OR
26 AS THEY SAY, FROM THE BEGINNING, CONSPIRED AND
27 PLANNED -- I'M SOMEWHAT OVERSTATING, BUT NOT MUCH --
28 THE PLAINTIFF'S THESIS TO DODGE AND WEAVE AND
63

1 VIOLATE THE TERMS OF THE CONTRACT.  BUT RATHER THAT
2 HARD MONEY WAS PUT DOWN IN AN ENTREPRENEURIAL
3 ENVIRONMENT TAKING A RISK, THAT THAT RISK WAS
4 ENHANCED BY THE FACT THAT THEY REALLY COULDN'T GET
5 ANSWERS IN THE CONTRACT FORMATION PROCESS.  THAT THE
6 DOCUMENTS WERE DELIVERED AND ANALYZED.  AND I'VE
7 HEARD THE TESTIMONY OF EVERYONE AT THE DEFENDANT WHO
8 SAID THEY TRIED TO ANALYZE IT.  THE COURT FINDS IT
9 CREDIBLE.
10        I GIVE CREDIT TO THE -- AND RESOLVE THE
11 CONFLICT IN EXPERTS NOT IN FAVOR OF BRIAN BERG, BUT
12 IN FAVOR OF DANIEL HARKIN'S INTERPRETATION.  IT
13 MAKES SENSE THAT THIS IS A CONTRACT THAT IS NOT
14 TOUCHY FEELY, BUT IS STRONG AND NORMATIVE AND TELLS
15 PEOPLE WHAT THEIR OBLIGATIONS ARE.
16        ESPECIALLY -- AND I DO FIND THAT THE --
17 THAT THERE IS REALLY NO CONFLICT.  HAVING RESOLVED
18 IT, THE COURT'S QUITE READILY ABLE TO DETERMINE THIS
19 WITHOUT RESORT TO 1654, BUT THE COURT DOES RESORT TO
20 THAT AS WELL BECAUSE THE LAWYERS SAY THERE'S AN
21 AMBIGUITY.  AND THAT IS THAT THIS WAS A PRODUCT
22 CREATED BY A COMMITTEE OF LAWYERS.  AND IF A
23 COMMITTEE OF LAWYERS MEETING ON -- AND THIS IS
24 NO CRITICISM OF THE PARTIES.  IT IS JUST ONE OF
25 THOSE THINGS GETS DELEGATED.
26        ON OCCASION AS A SOLO PRACTITIONER IT
27 WOULD BRING JOY TO MY HEART WHEN THERE WERE 27 ON
28 THE OTHER SIDE.  I MIGHT HAVE A CHANCE WINDING MY
64

1 LITTLE DINGHY THROUGH THE PROCESS BECAUSE AT LEAST I
2 KNEW WHAT WAS IN MY MIND.  I'M NOT BEING -- TRYING
3 TO MAKE LIGHT OF IT.
4         BUT THE PLAINTIFF HAD EVERY ADVANTAGE, THE
5 RESOURCES OF THE WHOLE INDUSTRY AND THREE OF THEM TO
6 COME TOGETHER.  AND IN A WAY, IT'S AS IF EVERYBODY
7 IS RESPONSIBLE, BUT NOBODY IS RESPONSIBLE.  THE BEST
8 LAWYERS WHO WERE ATTAINABLE FROM EVERYBODY ON ALL
9 SIDES OF THIS CASE HAD ACCESS TO WHAT THEY BELIEVE
10 ARE THE BEST LAWYERS.  I'M NOT CRITICIZING ANYBODY.
11 THEY CAME TOGETHER ON OVER A HUNDRED OCCASIONS.
12         NOW, IN EVALUATING THE BELIEVABILITY OF
13 THIS, IT ALMOST SEEMS SELF-EVIDENT THAT THERE IS
14 POTENTIAL FOR CONFUSION.  IT SEEMED TO ME IN READING
15 THESE DOCUMENTS KIND OF LIKE HEDGING THE BETS, THAT
16 CLEAR, UNEQUIVOCAL, DECISIVE DECISION WAS NOT MADE.
17 AND THE LANGUAGE OF 156 WHEN IT CALLS OUT WORDS, THE
18 ATTACHMENT -- AND AFTER ALL, THE QUESTION BEFORE THE
19 COURT IS -- IS RESOLVED IN MANY WAYS ON WHAT'S
20 CALLED THE BURDEN OF PROOF.
21         I HEARD SOMETHING ON C-SPAN.  SOMEBODY WAS
22 TELLING ME ABOUT ONE OF THESE CONTINUING EDUCATION
23 COURSES.  ONE JUDGE, A NEW JUDGE, WAS VEXED BY THE
24 PROBLEMS OF UNDERSTANDING.  AND AN OLD LINE, 5TH
25 CIRCUIT FEDERAL JUDGE SAID, WE'VE HAD THIS PROBLEM
26 FOR A HUNDRED YEARS.  IT'S RESOLVED BY WHAT IS
27 CALLED THE BURDEN OF PROOF.  IT IS THE OBLIGATION OF
28 LAWYERS AND PARTIES TO MAKE THEMSELVES UNDERSTOOD IN

65

1 ACCORDANCE WITH THE BURDENS OF PROOF.
2         IF THIS WERE A JURY TRIAL, I WOULD HAVE
3 INSTRUCTED YOU IN ACCORDANCE WITH THE JURY AND IN
4 ACCORDANCE WITH A STANDARD INSTRUCTION, THAT A PARTY
5 MUST PERSUADE YOU BY THE EVIDENCE PRESENTED IN COURT
6 THAT WHAT HE OR SHE IS REQUIRED TO PROVE IS MORE
7 LIKELY TO BE TRUE THAN NOT TRUE.  THIS IS REFERRED
8 TO AS THE BURDEN OF PROOF.  AFTER WEIGHING ALL THE
9 EVIDENCE, IF YOU CANNOT DECIDE THAT SOMETHING IS
10 MORE LIKELY TO BE TRUE THAN NOT TRUE, YOU MUST
11 CONCLUDE THAT THE PARTY DID NOT PROVE IT.  YOU
12 SHOULD CONSIDER ALL OF THE EVIDENCE, NO MATTER WHICH
13 PARTY PRODUCED THE EVIDENCE.
14         AND, OF COURSE, JUDGES DON'T LOSE SIGHT OF
15 THAT OBLIGATION.  THE COMMITTEE OF LAWYERS WORKED ON
16 THIS.  IT ULTIMATELY WAS PRESENTED FOR PEOPLE TO
17 TAKE IT OR NOT.  I ASSIGN NO WEIGHT TO THE FACT THAT
18 MEMOS WERE BEING PREPARED IN KALEIDESCAPE, OR
19 PH.D.'S AND MATH, LOGIC AND EVERYTHING ELSE, MBA'S
20 TALKING ABOUT WHAT THEY COULD DO AND NOT DO.  NONE
21 OF THAT REALLY ADDS TO WHAT WAS IN THE CONTRACT.
22         I DO UNDERSTAND -- I'LL NOW MOVE BRIEFLY
23 TO SOME OTHER ISSUES.  BECAUSE THAT SINGLE GROUND IS
24 SUSTAINABLE, IT DISPENSES OF ALL CLAIMS.  THE
25 PLAINTIFF UNCONDITIONALLY AND FOREVER GAVE UP ITS
26 CLAIM WHICH COULD HAVE BEEN LITIGATED HERE CLAIMING
27 MONEY RELIEF.
28         THE QUESTION ARISES WHETHER THERE IS

66

1 IRREPARABLE HARDSHIP.  I'M SIMPLY MAKING CUMULATIVE
2 FINDINGS NOW BECAUSE I THINK THE CLASSIC ISSUE IS,
3 WAS THERE A CONTRACT?  I WILL SAY AS AN ALTERNATIVE
4 FINDING, THAT IF BY LEGAL COMPULSION THIS SUPPOSEDLY
5 FACT-INTENSIVE DETERMINATION WERE FOUND NOT TO BE
6 SUSTAINABLE, THEN ANOTHER RULE IS INVOKED, AND THAT
7 IS THAT SPECIFIC PERFORMANCE CANNOT BE GRANTED
8 UNLESS THE TERMS OF THE CONTRACT ARE SUFFICIENTLY
9 DEFINITE FOR THE COURT TO KNOW WHAT TO ENFORCE.
10 THAT'S FOUND IN CIVIL CODE 3390, PARENTHESIS 5,
11 CLOSE PAREN.
12         IT'S NOT DEFINITE TO ME.  THESE WORDS SEEM
13 TO BE STATEMENTS OF WHAT THE COMPUTER SCRAMBLING
14 DEVICE IS SUPPOSED TO DO.  DOCUMENT 3, ITSELF,
15 REFERS -- NOT TO THIS CONTRACT, BUT THERE IS ANOTHER
16 CONTRACT WHICH VERY MUCH APPLIES.  IT IS OUTSIDE OF
17 THAT DOCUMENT.  IT'S JUST A BIG OMISSION IF THE
18 LAWYER COMMITTEE IN A HUNDRED MEETINGS DIDN'T DO IT.
19 THAT'S -- THEY PRESENTED TO THE PLAINTIFF'S
20 CORPORATION -- IT'S NO CRITICISM OF MR. HOY, OF
21 COURSE.  THIS IS A DOCUMENT OF THE COMMITTEE,
22 EVERYBODY OR NOBODY PREPARED.  AND THIS IS WHAT YOU
23 GIVE TO PEOPLE.  THEY CAN SIGN IT OR NOT.
24         OF COURSE, I'VE DETERMINED ON THE MERITS
25 THAT THE PLAINTIFF CANNOT ASSERT A CLAIM, BUT
26 SOMETIMES PEOPLE DO MEDIATE OR DISCUSS THINGS IN THE
27 SHADOW OF UNCERTAINTY.  BUT ACCORDING TO THE
28 DEFENDANTS, THERE WAS NEVER REALLY A CHANCE TO DO

67

1 THAT.
2         IN LOOKING TO THE OTHER MATTERS OF
3 IRREPARABLE HARDSHIP, I BELIEVE THAT THE -- FROM ALL
4 THE PAPERS THAT I HAVE READ, THAT THE COURT SHOULD
5 GIVE DEFERENCE TO A CONTRACTUAL PROVISION AND EACH
6 PROVISION.
7         I DO BELIEVE FROM THE CASES CITED, AND
8 THERE WAS ONE OF THE CASES CITED BY THE PLAINTIFF
9 FROM THE CHANCERY COURT.  I DIDN'T KNOW IF IT WAS
10 SHEPHERDIZED BECAUSE A LATER CASE WAS CITED.  I HOPE
11 AND TRUST THAT PLAINTIFF'S COUNSEL HAD NO KNOWLEDGE
12 OF THAT.  I SHOULD BE GUIDED IN THE DIRECTION OF THE
13 TRUTH.  I MAKE NO BAD ASSUMPTION ABOUT THAT.
14         IT SEEMS TO ME THAT THE QUESTION I ASKED
15 ON THE FIRST DAY OF TRIAL, THAT ON THE ISSUE OF
16 IRREPARABLE HARDSHIP, IS THERE ANY LAW THAT WOULD
17 GUIDE ME IN THE DIRECTION OF WHETHER THE CONTRACTUAL
18 PROVISION IS DISPOSITIVE OR ONE FACTOR TO BE
19 CONSIDERED?
20         IT SEEMS TO ME FROM READING THE CASES, NO
21 CALIFORNIA CASE BEING PRECISELY ON POINT, AND GIVEN
22 THE IMPORTANT OBLIGATIONS OF THE COURT TO TAKE GREAT
23 CARE IN ROBUSTLY EXERCISING AUTHORITY THAT IS
24 LAWFULLY AND APPROPRIATELY GIVEN OR REFRAINING FROM
25 DOING SO, THAT THE -- THAT THE GREAT MODERN TREND
26 AND THE MAJORITY RULE SEEMS TO BE, THAT PARTIES
27 CANNOT CONTROL THE SOUND EXERCISE OF JURISDICTION BY
28 THE TRIAL COURT ACTING IN EQUITY.

68

Exhibit M, Page 173

**Page 69**

```
 1          AND THAT MEANS THAT I WOULD CONSIDER THAT
 2   PROVISION IN LIGHT OF ALL THE FACTS AND
 3   CIRCUMSTANCES.  IT'S ACADEMIC -- BUT I SHOULD
 4   ANNOUNCE ON EACH OF THE CONTESTED ISSUES.  IT'S
 5   ACADEMIC BECAUSE I BELIEVE MY CONTRACT DETERMINATION
 6   IS FULLY DISPOSITIVE.  BUT IT WAS ONE OF THE
 7   SUBSTANTIAL CONTROVERTED ISSUES PRESENTED.  AND IT
 8   SEEMS TO ME I SHOULD GIVE APPROPRIATE CONSIDERATION
 9   TO THE CONTRACT AND ALL THE FACTS AND CIRCUMSTANCES
10   SURROUNDING IT, WHICH I DESCRIBED IN DETAIL OR
11   TOUCHED UPON IN DETAIL.
12          AND IN THAT REGARD, I DID NOT FIND
13   PERSUASIVE THE CLAIM OF IRREPARABLE HARM.  I DID
14   INDICATE AND WAS CORRECTED.  IT'S NO OFFENSE.  I
15   ASKED THE QUESTION OF COUNSEL CONCERNING
16   MS. SUNDERLAND'S TESTIMONY.  AND HER STATEMENT CAN
17   BE FAIRLY READ, OFFER AN OPINION THAT IT'S POSSIBLY
18   TRUE THAT THESE ROGUES OUT THERE WHO DO ALL SORTS OF
19   PIRATING, HAVE NOT ADVERSELY IMPACTED THIS
20   CONTRACTUAL ARRANGEMENT AND HAVE NOT HURT THE
21   PLAINTIFF FOR THE REASONS THAT SHE SAID.
22          TO THE -- I DON'T RECALL EXACTLY, BUT
23   ASSUMING THAT SHE OFFERED AN OPINION THAT ANY BREACH
24   WOULD IRREPARABLY HARM THE PLAINTIFF, AS OTHERS DID
25   TESTIFY TO, SO IT'S NOT THAT THERE IS AN OMISSION IN
26   THE RECORD ON THAT.  I CREDIT THAT AS BEING THE
27   SINCERE BELIEF OF THOSE PARTIES NOT CONTROLLING ON
28   THE COURT.
```

**Page 70**

```
 1          AND BALANCING -- IT SEEMS TO ME THAT
 2   ESSENTIALLY EVERY WITNESS SAID, THESE ARE THE BAD
 3   THINGS THAT WILL CERTAINLY HAPPEN.  AND I BELIEVE
 4   THAT I'M ENTITLED TO TAKE INTO ACCOUNT THOSE BAD
 5   THINGS THAT HAVE NOT BEEN -- HAVE NOT BEEN
 6   DEMONSTRATED TO HAVE OCCURRED IN THE SEVERAL YEARS
 7   SINCE THIS DISPUTE AROSE.  IN ASSESSING AND
 8   INTERPRETING THIS ALL IN THE CONTEXT OF WHEN IT CAN
 9   BE DONE, IN A WAY SO AS TO PROMOTE THE PUBLIC
10   INTEREST, THE COURT SHOULD DO THAT IF IT CAN WITHOUT
11   VIOLENCE TO THE CONTRACT AND ALL OF THE FACTS.
12          AND I HAVE NOT BEEN SATISFIED THAT THERE
13   IS IRREPARABLE HARM OR AT THIS POINT ANY
14   DEMONSTRATED HARM.  ALTHOUGH I RECOGNIZE THE
15   FORECASTS; I ALSO RECOGNIZE FULLY TO THE EXTENT THAT
16   THE LAW PERMITS AND IT IS SAID TO PERMIT IT ON
17   SPECIFIC PERFORMANCE.  AND IF SPECIFIC PERFORMANCE
18   IS NOT ISSUED, MY ANALYSIS ON INJUNCTIONS AND
19   WHETHER THERE IS A CONTRACT TO ENFORCE FULLY ARE
20   EQUITABLE HERE.  THAT TO THE EXTENT THE COURT IS
21   PERMITTED TO BALANCE HARDSHIP, IT DOES APPEAR THAT
22   THERE WOULD BE A GREAT HARDSHIP OVERCOMING ANY CLAIM
23   OF HARM THAT WOULD BEFALL THE DEFENDANT CORPORATION
24   AND ITS EMPLOYEES.
25          I CREDIT DR. MALCOLM'S OPINION THAT THE
26   CORPORATE -- CORPORATION WOULD BE DRAMATICALLY
27   SCALED BACK.  I RECOGNIZE THAT AS A RISK OF DOING
28   BUSINESS.  THAT IF I FOUND A STRONG CLAIM OF THE
```

**Page 71**

```
 1   EXISTENCE OF A CONTRACT, AND IF I HAD MADE OTHER
 2   ANALYSES, IT WOULD NOT HAVE FORECLOSED ME IN MY VIEW
 3   FOR GRANTING INJUNCTIVE RELIEF OR SPECIFIC
 4   PERFORMANCE RELIEF.
 5          IT ALL FITS IN IN EVALUATING THIS VERY
 6   BROADLY, MY DETERMINATION THAT THERE HAS BEEN NO
 7   SHOWING OF BAD FAITH BY THE DEFENDANT OR ANY OF ITS
 8   REPRESENTATIVES.  AND OBVIOUSLY, IF THAT WERE A
 9   DIFFERENT FINDING, IT COULD HAVE LED TO A DIFFERENT
10   RESULT.
11          I DON'T MEAN TO BE AMBIGUOUS, MYSELF,
12   ABOUT THAT.  I'VE MADE MY STRONG DETERMINATIONS ON
13   THE CONTRACT ISSUE.  BUT I THINK I LOOK TO THE WHOLE
14   ISSUE OF GOOD FAITH IN GOING FORWARD.  AND CERTAINLY
15   I DO NOT CAST ASPERSION UPON MR. HOY, OBVIOUSLY.
16   YOU KNOW, I THINK THAT THIS ALL IN MANY WAYS
17   HAPPENED BEFORE HIS TIME IN THE SENSE THAT THE
18   PRODUCT WAS DELIVERED.  THE PRODUCT WAS THE
19   CONTRACT.  AND I BELIEVE THAT THE DEFENDANT WAS ABLE
20   AND PERMITTED, NEVER HAVING GOTTEN A VOICE WITH
21   ANYBODY, TO READ THE CONTRACT, RELY UPON IT, AND
22   WHAT IT SAID.
23          EQUITIES ARE STRONGLY IN FAVOR -- IN
24   CONTRACT INTERPRETATION ISSUES ARE STRONGLY IN FAVOR
25   OF THE DEFENSE AND AGAINST THE PLAINTIFF ON THAT
26   ISSUE.
27          THERE WASN'T A LOT OF TESTIMONY ON THIS,
28   BUT IT DOES -- FROM WHAT I HAVE HEARD AND EVERYTHING
```

**Page 72**

```
 1   THAT I'VE HEARD IN THIS CASE, THERE IS NOTHING THAT
 2   I HEARD THAT SUGGESTS THAT THE PUBLIC INTEREST IS
 3   ADVERSELY AFFECTED BY HONORING THIS CONTRACT AS
 4   INTERPRETED.  AND I'VE REALLY HEARD NOTHING HERE
 5   THAT WOULD EQUATE IN THIS TRIAL THE CONDUCT OF
 6   KALEIDESCAPE AND ITS AGENTS AND EMPLOYEES WITH
 7   ROGUES OR PIRATES.
 8          AND OBVIOUSLY, AS I SAID, WHETHER THE
 9   EVIDENCE CAPTURES A KIND OF A VISUAL DEPICTION IN
10   ONE'S MIND DOES MATTER.  AND THERE IS NO SENSE OF
11   THAT.  THAT I HAVE RIGHTFULLY CREDITED THE STATEMENT
12   THAT THEY INTEND TO CREATE A ROBUST, VIABLE BUSINESS
13   ENTERPRISE, TAKE RISKS AND LIVE WITH RISKS.  BUT THE
14   ISSUE WAS SHARPLY JOINED BY THE PLAINTIFF'S ACTION,
15   AND THEY HAVE DEFENDED SUCCESSFULLY.  ALBEIT, I FIND
16   THAT THE CROSS-COMPLAINT IS WITHOUT MERIT BASED UPON
17   MY LEGAL RULING.
18          AS TO THE FAIR USE ISSUE, THAT GETS EVEN
19   FURTHER ATTENUATED IN TERMS OF THE NECESSITY FOR THE
20   COURT TO RULE.  I THINK IN LIGHT OF MY FINDINGS THAT
21   THERE IS NO NECESSITY FOR RULING.  IT'S JUST THAT MY
22   UNDERSTANDING OF THE POSTURE OF THE CASE IS THAT THE
23   PLAINTIFF DID NOT SEEK TO INVOKE THE COPYRIGHT
24   STATUTE AS A SWORD IN THE CASE.
25          I UNDERSTAND THE DEFENDANT'S BRIEF DID
26   RAISE THE COPYRIGHT MATTER AS A DEFENSIVE MATTER.
27   THE MOST RECENT BRIEF FILED BY THE DEFENDANT
28   INDICATES THAT FAIR USE IMPLICATES THE FULL RANGE OF
```

**Page 73**

1  EQUITABLE PRINCIPLES.  AND ALL I NEED SAY AT THIS
2  TIME IS THAT I HAVEN'T SEEN ANYTHING THAT DEFENDANT
3  HAS DONE IS UNFAIR WITHOUT TIPTOEING INTO THE AREA
4  OF -- OBTUSE AREAS OF FEDERAL COPYRIGHT LAW, NIMMER
5  ON COPYRIGHT OR ANYTHING ELSE. I'M NOT GOING TO NEED
6  THAT.  IT'S UNNECESSARY TO THE COURT'S
7  DETERMINATION.  AND FRANKLY, I THINK IT BOLSTERS THE
8  DEFENSE BECAUSE I'M ACCEPTING THE PLAINTIFF'S
9  ARGUMENT FOR THIS PURPOSE THAT IT IS NOT NECESSARY
10 IN INTERPRETING THIS OR RULING ON THE CLASSIC STATE
11 LAW ISSUES TO DO THAT.  SO THERE IS NO ERROR IN
12 FAILING TO DO SO, AT LEAST IN TERMS OF FRAMING THE
13 COURT'S JUDGMENT.
14         IN CONSIDERING THE NO HARM AND GOOD FAITH,
15 I DID CONSIDER, AMONG OTHERS, OF COURSE, MR. JEFFREY
16 FRANKLIN.  HE'S REPRESENTATIVE OF MANY OF THE PEOPLE
17 OUT THERE DOING THEIR WORK.  AND IT REALLY SEEMS TO
18 ME THAT MUCH OF THIS DISPUTE, AT LEAST BASED ON THE
19 EVIDENCE PRESENTED HERE, IS AT PRESENT MORE IN THE
20 NATURE OF AN ACADEMIC INQUIRY THAN ANY DEMONSTRATION
21 OF ACTUAL HARM.
22         IT DOES APPEAR THAT THESE CUSTOMERS ARE
23 HIGH-END CUSTOMERS.  AND I HAVEN'T HEARD ANYTHING
24 THAT PERSUADES ME -- ALTHOUGH THERE IS A POSSIBILITY
25 THAT THE PRICE WILL RAPIDLY FALL, IT'S FAR BEYOND MY
26 COMPETENCE TO -- THAT'S NOT A SUBSTANTIAL
27 CONTROVERTED ISSUE.  MIGHT HAPPEN; MIGHT NOT.  THE
28 BUSINESS MIGHT BE HERE TODAY, GONE TOMORROW.  AND IF

73

**Page 74**

1  SO, THOSE ARE THE HAZARDS OF DOING BUSINESS IN THE
2  VALLEY.  SOME PEOPLE GET OBSCENELY RICH.  THERE IS
3  NOTHING WRONG WITH PEOPLE GOING BROKE IN THE
4  ENTERPRISE, AND WE NEED ALL OF US.
5         SO I BELIEVE THAT IN DOING THIS I HAVE NOW
6  ATTENDED TO ALL OF THE ISSUES DESCRIBED AS
7  SUBSTANTIAL CONTROVERTED ISSUES.  WHAT I WANT TO DO
8  IS GO OFF THE BENCH FOR FIVE MINUTES AND GIVE YOU A
9  CHANCE TO RECONNOITER AND ASK ME IF THERE ARE OTHER
10 ISSUES THAT YOU WANT ME TO ADDRESS.  IF NOT, ON THE
11 FACE OF IT, I'LL ACCEPT THE CONCEPT.  YOU CAN FILE
12 PAPERS.  I'VE GIVEN THE WHOLE LEGAL TEAMS ON EACH
13 SIDE THE OPPORTUNITY TO POINT OUT ANY SUBSTANTIAL
14 OMISSIONS OR AMBIGUITY, FAILINGS.  THIS IS A
15 SUBSTANTIAL STATEMENT OF DECISION, AND I'LL SAY NO
16 MORE.  I'LL BE IN A SHORT RECESS.
17         (WHEREUPON, A SHORT RECESS WAS TAKEN,
18 AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)
19         THE COURT:  IS THERE ANYTHING ELSE THAT
20 YOU REQUIRE?
21         MR. COATES:  NOT AT THE MOMENT, YOUR
22 HONOR.
23         THE COURT:  YOU'LL ASSESS THIS?
24         MR. COATES:  EXACTLY.
25         THE COURT:  THAT'S FINE.
26         MR. MOORE:  NOT FROM THE DEFENSE, YOUR
27 HONOR.
28         THE COURT:  I WANTED TO JUST ADD ONE

74

**Page 75**

1  STATEMENT.  ON THIS WHOLE ISSUE OF GOOD FAITH AND
2  IRREPARABLE HARDSHIP, I'VE BEEN QUITE COMPREHENSIVE
3  IN AN ATTEMPT TO COVER EVERY DETAIL.  BUT,
4  SPECIFICALLY, I FIND AND BELIEVE THAT THE TESTIMONY
5  CONCERNING THE FOUR INTERACTIONS OVER THE SEVERAL
6  YEARS WITH DEALERS AND THE ONE INTERACTION WITH
7  MR. COLLENS SHOWS TO ME THAT THE COMPANY, FAR FROM
8  ATTEMPTING TO DO ANYTHING BAD, SEEMS TO HAVE
9  INTERNAL PROCEDURES TO CARRY OUT WHAT THEY SAY
10 THEY'RE TRYING TO DO, WHICH IS TO PROCEED IN AN
11 ENTIRELY COMPLIANT, LAWFUL, AND ETHICAL WAY.  AND IT
12 SUGGESTS TO ME THAT THERE BEING ONLY FOUR OF THOSE
13 DOCUMENTED SITUATIONS, THAT THINGS ARE NOT AS DIRE
14 AS THE PLAINTIFF OPINES.
15         THANK YOU.
16         I WILL ASK IF THERE IS ANYTHING FURTHER.
17 I WILL PROBABLY DELEGATE -- I'LL INDICATE NOW I'LL
18 ASK COUNSEL TO WORK TOGETHER IN PREPARING AN
19 APPROPRIATE FORM OF JUDGMENT.  IT SHOULD ACKNOWLEDGE
20 THE COURT'S RESOLUTION ON THE NONSUIT.  IT SHOULD
21 ACKNOWLEDGE THE COURT'S RESOLUTION ON THIS MATTER.
22         IF THERE ARE NO FURTHER REQUESTS, THE
23 COURT HAVING GIVEN AN OPPORTUNITY TO CLARIFY IT FACE
24 TO FACE WITH EVERYBODY RIGHT NOW, THEN YOU'LL MAKE
25 THEM.  I'D PREFER TO DO AS MUCH AS I CAN HERE WHILE
26 THE PARTIES ARE HERE AND HAVE A CHANCE TO APPRAISE
27 MY CONDUCT AND WHILE I HAVE THE DOCUMENTS PRESENT.
28 AND I REALIZE PEOPLE SHOULD BE ABLE TO CONFER WITH

75

**Page 76**

1  THEIR CLIENTS.
2         I WOULD ENCOURAGE VOLUNTARY RESOLUTION
3  BETWEEN THE PARTIES, OF COURSE.  IF MY WORDS HAVE
4  BEEN PERSUASIVE, FINE.  I MEAN THAT IN A TRUE SENSE.
5  IF NOT, PEOPLE WILL PROCEED AS THEY DEEM
6  APPROPRIATE.  BUT ONE THING THAT IS REQUIRED IS
7  THAT, OF COURSE, IF THERE IS NO FURTHER REQUEST,
8  THEN THE STATEMENT OF DECISION I'M ANNOUNCING ON
9  THIS DAY SHALL BE THE STATEMENT OF DECISION UNLESS
10 YOU PROCEED WITHIN THE TIMELINES SUGGESTED.  I DEFER
11 TO THE RULES, BUT I ORDINARILY WOULD SEE THOSE AS
12 POINTING AT ANY SUBSTANTIAL OMISSION OR AMBIGUITY.
13         AND FROM YOUR PERSPECTIVE, HAVE I TOUCHED
14 ON WHAT WERE THE SUBSTANTIAL CONTROVERTED ISSUES?
15         MR. MOORE:  YES, YOU HAVE, YOUR HONOR.
16         THE COURT:  ALL RIGHT.  IF THERE ARE OTHER
17 PROPOSALS, FINE.  I'VE DONE THIS IN ORAL FORM.  IT'S
18 NOT NECESSARY THAT THE TRANSCRIPT BE PLACED IN THE
19 OFFICIAL CASE FILE AS FAR AS I'M CONCERNED FOR THE
20 BENEFIT OF THE PARTIES.  BUT IF ANYONE CHALLENGES
21 THIS, WITH ALL RESPECT OF COURSE, I WOULD PROBABLY
22 DELEGATE TO PLAINTIFF TO JUST BILL IT OUT, TURN THE
23 CRANK, DO WHAT YOU DO.
24         I'VE TRIED TO SAVE EVERYTHING DISCUSSED
25 FOR THE PARTIES USING THIS AS A TEMPLATE.  YOU DON'T
26 HAVE TO GO THROUGH ALL THE MATTERS.  A STATEMENT OF
27 DECISION CAN BE A WHOLE LOT SHORTER THAN WHAT I'VE
28 DONE.  I'VE TRIED TO BE REALLY COMPREHENSIVE.

76

**Exhibit M, Page 175**

1    IF EITHER PARTY UPON THE EXECUTION OF A
2  JUDGMENT, WHICH SHOULD BE SUBMITTED IN THE TIME
3  FRAME REQUIRED, AND I'LL DELEGATE THAT TO -- THE
4  LABORING ORE, TO DEFENSE COUNSEL TO INITIATE THIS,
5  WHICH SHOULD ALSO ENCOMPASS THE COURT'S RESOLUTION
6  AGAINST THE CROSS-COMPLAINT, ONE FINAL JUDGMENT.
7    THEN IF THERE ARE ATTORNEY'S FEE REQUESTS,
8  THAT YOU HOPEFULLY CAN NEGOTIATE.  YOU HAVE A LITTLE
9  TIME TO DO THAT.  BUT IF THAT IS NOT RESOLVED TO
10 YOUR SATISFACTION, YOU CAN TEE THAT UP.  AS FAR AS
11 I'M CONCERNED, YOU CAN DO IT ON A COST BILL LISTING
12 THE COSTS THAT YOU BELIEVE WERE SUBJECT TO BEING
13 CLAIMED.
14    FRANKLY, ON EACH PARTY PREVAILING ON SOME
15 ISSUE, I WOULD THINK MOST OF THE TIME PEOPLE CAN
16 RECOGNIZE THAT THE PROCESS OF BILLING ATTORNEY'S
17 FEES OVER COSTS FAR OUTWEIGHS USUALLY THE DISPUTED
18 ITEMS.  BUT I SEE MANY A DISPUTE OVER SMALL ITEMS,
19 PEOPLE REFER TO LITIGATION.  BUT ON THE ATTORNEY
20 FEES ISSUES, HOPEFULLY YOU CAN RECOGNIZE THAT I'VE
21 MADE A DETERMINATION ON THE MERITS AGAINST THE
22 CROSS-COMPLAINT.  I SEE THAT AS A SMALL PART OF THE
23 CASE, BUT, HOPEFULLY, YOU CAN MERGE THESE ISSUES.
24    IF YOU COME TO AGREEMENT ON COSTS AND
25 ATTORNEY'S FEES -- OF COURSE, IT'S NOT ACQUIESCENCE
26 IN THE JUDGMENT.  PEOPLE WOULD THEN HAVE THEIR FULL
27 RIGHTS OF REVIEW, IF YOU BELIEVED ON EVERYTHING I'VE
28 SAID THERE WAS A GOOD BASIS; OR IF NOT, YOU CAN

77

1  STILL DO IT.
2    THE -- JUST ONE SECOND.  WHEN THE JUDGMENT
3  IS PREPARED AND ENTERED, I WOULD DIRECT THE OFFICIAL
4  PREPARATION OF A NOTICE OF ENTRY OF JUDGMENT.
5  BECAUSE IT'S VERY IMPORTANT THAT THE PARTIES KNOW
6  THAT FROM THIS COURT'S PERSPECTIVE I LIKE THE CASE
7  TO MOVE ALONG.  MANY TIMES LAWYERS JUST LEAVE IT OUT
8  THERE, SIX-MONTH APPEAL PERIODS.  NO, IT SHOULD BE A
9  60-DAY PERIOD FROM NOTICE OF ENTRY OF JUDGMENT SO
10 PARTIES CAN FISH OR CUT BAIT AND GET ON WITH THEIR
11 LIVES.
12    THANK YOU.  THANK YOU SO MUCH.
13    MR. MOORE:  THANK YOU, YOUR HONOR.
14    MR. COATES:  THANK YOU, YOUR HONOR.
15    THE COURT:  LOOKING FORWARD TO HAVING THE
16 PRIVILEGE OF WORKING WITH YOU AGAIN ON ANY ISSUE
17 THAT WOULD COME UP.  THANK YOU.
18    MR. MOORE:  THANK YOU, YOUR HONOR.
19    MR. COATES:  THANK YOU, YOUR HONOR.
20    (WHEREUPON, PROCEEDINGS WERE CONCLUDED.)

78

STATE OF CALIFORNIA  )
                     )  SS.
COUNTY OF SANTA CLARA)

4    I, MICHELLE V. LARIOS, DO HEREBY CERTIFY
5  THAT THE FOREGOING IS A FULL, TRUE AND CORRECT
6  TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
7  WITHIN-ENTITLED ACTION HELD ON THE 29TH DAY OF
8  MARCH, 2007;
9    THAT I REPORTED THE SAME IN STENOTYPE
10 BEING THE QUALIFIED AND ACTING OFFICIAL COURT
11 REPORTER OF THE SUPERIOR COURT, IN AND FOR THE CITY
12 AND COUNTY OF SANTA CLARA, APPOINTED TO SAID COURT,
13 AND THEREAFTER TRANSCRIBED INTO TYPEWRITING AS
14 HEREIN APPEARS.
15    I FURTHER CERTIFY THAT I HAVE COMPLIED
16 WITH CCP 237(A)(2) IN THAT ALL PERSONAL JUROR
17 IDENTIFYING INFORMATION HAS BEEN REDACTED IF
18 APPLICABLE.
19
20    DATED:  APRIL 2, 2007.
21
22
23    MICHELLE V. LARIOS,C.S.R.
24    LICENSE NO. 9244, C.R.P.
25    NO. 043

79

| IN THE SUPERIOR COURT OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SANTA CLARA | **F I L E D**<br>Date: APR 1 3 2007<br>KIRI TORRE<br>Chief Executive Officer Clerk<br>Superior Court of CA County of Santa Clara |
|---|---|
| Plaintiff: DVD Copy Control Association, Inc., | |
| Defendant: Kaleidescape, Inc., | By: _____**ULATE**_____<br>, Deputy |
| **PROOF OF SERVICE BY MAIL OF:**<br> Addendum to Statement of Decision | **Case Number:**<br> 1-04-CV 031829 |

CLERK'S CERTIFICATE OF SERVICE:   I certify that I am not a party to this case and that a true copy of this document was mailed first class, postage fully prepaid, in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on : 13 April 2007

Kiri Torre, Chief Executive Officer/Clerk

BY _____**ULATE**_____, Deputy
(Ulate)

William Sloan Coats, Esq.
WHITE & CASE LLP          ✓
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, Ca., 94306

Thomas E. Moore, III
The Moore Law Group
228 Hamilton Avenue,
Third Floor
Palo Alto, Ca., 94301

ORIGINAL

Hon. Marsha Pechman

CPY TO JUDGE   MR

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JAN 06 2000   MR

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REALNETWORKS, INC., | No. C99-2070P |
| Plaintiff, | |
| v. | REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION |
| STREAMBOX, INC., | |
| Defendant. | |

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Exhibit N, Page 178

1    In Streambox's world, end-users would be free to copy and modify copyright protected digital

2    content as they see fit.  But in enacting the DMCA, Congress made clear that the decision whether to

3    permit copying and modification rests with copyright holder.  Congress made this decision to prevent

4    widespread piracy and protect the economic incentive to create with the advent of the Digital

5    Millennium.  Under the DMCA, where content owners use measures to prevent the copying or

6    modification of their works, it is unlawful to distribute products that enable end-users to override the

7    content-owners' preferences.  That is precisely what the *VCR* and *Ripper* do; that is what they were

8    designed to do; and that is what they are marketed to do.  Because the products violate the DMCA

9    and cause RealNetworks irreparable harm and because Congress has determined that the public

10   interest is served by outlawing such products, their manufacture, marketing and distribution must be

11   enjoined.

12   In Streambox's world, end-users would be free to use the *Ferret* to modify RealNetworks'

13   copyrighted RealPlayer by adding files to it, because the modification supposedly benefits those users.

14   But again, Congress has left the decision of whether to allow such modifications to the copyright

15   holder, RealNetworks, not to end-users.  Because those modifications are not authorized, and indeed

16   breach the RealPlayer license agreement, use of the *Ferret* infringes RealNetworks' copyright and

17   causes RealNetworks irreparable harm.

18   **I.    STREAMBOX'S MANUFACTURE AND DISTRIBUTION OF THE *VCR* VIOLATES**
     **THE DIGITAL MILLENNIUM COPYRIGHT ACT.**
19
     Nowhere in Streambox's opposition papers does it contradict RealNetworks' declarants who
20
     described the operation and impact of Streambox's *VCR*.  That undisputed testimony is dispositive of
21
     RealNetworks' claims that the product violates the DMCA.
22

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 1

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816
**Exhibit N, Page 179**

**A.    Streambox's Manufacture And Distribution of the *VCR* Violates Sections 1201(a)(2) and 1201(b) Of The DMCA.**

The RealNetworks' security system includes both an access control mechanism and a copy protection feature which work in tandem to safeguard millions of copyrighted works against unauthorized copying and redistribution.  Without a RealPlayer, a user cannot access protected content because a RealServer should not stream the content unless the "Secret Handshake" is completed.[1]  With a RealPlayer, the user cannot make a copy of protected content, because the RealPlayer automatically reads the "Copy Switch" and does not enable a user to record that which the content owner has not copy-enabled.

The *VCR* undermines this security system by circumventing the "Secret Handshake," and tricking RealServers into streaming protected content even though a RealPlayer is not on the receiving end.  And it is precisely because a RealPlayer is not on the receiving end that the user is able to copy the streaming content, even though the content owner has left the "Copy Switch" off.  Accordingly, the *VCR* "circumvents" both the access control and copy protection measures that RealNetworks affords to content owners.  *See* §§1201(a)(3)(A), 1201(b)(2)(A) ("circumvention" is any means of avoiding, bypassing, removing deactivating or impairing an access control measure or a means of protecting the exercise of a copyright holders' rights).

Contrary to Streambox's claims, the *VCR* is quite unlike the "GetRight" program.  GetRight facilitates the downloading (i.e. copying) of files that content owners have made freely available for download from ordinary web servers.  Decl. of Dion O'Neill at ¶¶ 3-6.  In such cases, the content owner has not chosen to protect the content.  *Id.*  The *VCR*, by contrast,  enables users to obtain copy-

---

[1] Streambox suggests that the "Secret Handshake" is no different than the protocol used by fax machines to recognize one another.  The difference is plain--the "Secret Handshake" is "secret" while the fax protocol is an open standard known throughout the world. Decl. of Dion O'Neill at ¶ 7.

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 2

LAW OFFICES OF
McNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816
Exhibit N, Page 180

1  protected files that are available only for <u>streaming</u> from <u>RealServers</u>. *Id.* That is, unlike GetRight,

2  the *VCR* enables users to copy content that the content owner has indicated should not be copied.

3       It is no accident that the *VCR* somehow bypasses the "Secret Handshake" and ignores the

4  "Copy Switch." The only reason for the product to have that capability is to enable users to gain

5  access to content stored on RealServers and copy that content regardless of the content-owner's copy

6  protections. Streambox's has plainly marketed the products to end-users as a means of gaining access

7  to and copying these <u>protected</u> RealMedia files. Way Decl., Ex. K. *See also* Exhibit A hereto

8  (excerpts of *VCR* end-users comments showing how they use the *VCR*). If the files discussed in

9  Streambox's marketing materials were not protected by RealNetworks' security system, end-users

10 would not need the *VCR* to "download" and "control" them "just like any other file." The Streambox

11 marketing tells the end-user they can copy otherwise unobtainable files; files that are unobtainable

12 because the content owners want it that way.

13 **B.     There is no Fair Use Defense for the *VCR*.**

14      Streambox claims that it should be permitted to resume the manufacture and distribution of the

15 *VCR* and *Ripper* products because the use to which those products are put is somehow "fair."

16 However, the DMCA does not have a "fair use" exception allowing individuals to circumvent access

17 and copy protection measures. *cf.* 17 U.S.C. §107 (setting forth a defense to claims of <u>copyright</u>

18 <u>infringement</u> under §§106 and 106A, but making no reference to a defense to violations of §1201). In

19 the DMCA, Congress banned the act of circumvention and the tools by which it is accomplished,

20 enumerating specific exceptions, none of which is remotely applicable here. All § 1201(c) preserves is

21 the general fair use exception to copyright infringement. By itself, Congress' omission of a general

22 fair use exception to Section 1201 of the DMCA dooms Streambox's fair use argument.

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 3

LAW OFFICES OF
McNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 181**

1  In any event, there is nothing "fair" about the use to which the *VCR* is put.  End-users employ

2  the *VCR* to obtain and redistribute copies of that which copyright owners have made clear they do not

3  want copied.  In most cases, copyright owners enable any user with a RealPlayer to "stream" or play

4  their works for free at an Internet site as a means of attracting visitors to that site.  Supp. Decl. of

5  Alben at ¶ 5.  Those content owners rely on increased visits to the site to earn revenues from

6  advertising or from the sale of copies of the work or other merchandise available there. *Id.*  Other

7  copyright owners may elect to impose a pay-per-view charge for certain content.  *Id.* at ¶ 6.  In either

8  case, the access and copy protection features offered by RealNetworks empower the copyright owner

9  to determine how to distribute the content and how to obtain remuneration for it.

10  A copyright owner wishing to allow end-users to copy its content can do so easily, either by

11  turning on the copy switch in a RealMedia file, or by distributing the content in an "open" format that

12  allows users to make their own copies.  Supp. Alben Decl. at ¶¶ 3-4.  When a copyright owner instead

13  chooses to use the RealMedia format and elects not to turn on the copy switch, that copyright owner is

14  making clear that it does not want its content to be copied.

15  The only reason the *VCR* mimics a RealPlayer and circumvents the "Secret Handshake" is to

16  override the copyright owners' preferences and allow end-users to make copies of copy-protected

17  content.  By making these unauthorized and infringing copies of content, an end-user avoids the need

18  to visit copyright owners' web sites, and deprives content owners of the revenues earned from such

19  visits.  To make matters worse, those who possess illicit copies of a work can supplant the market for

20  the copyrighted original by posting the work on their own sites to attract visitors and earn the

21  accompanying revenues.

22  Streambox would have the Court believe that this capability of the *VCR* merely allows end-

23  users to "time-shift" RealMedia files, much like the Sony betamax enabled the "time-shifting" of free

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 4

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 182**

1   television content.  Thus, according to Streambox, it should enjoy the same "fair use" protections the

2   Supreme Court afforded to the betamax in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417

3   (1984).  But the two cases could not be more different:

4   •First, the *Sony* Court relied on the lack of a Congressional prohibition on time-shifting as
     a justification for its decision.  *Sony*, 464 U.S. at 447.  Here, however, Congress has

5   spoken directly on the issue presented.  In enacting the DMCA, it expressly outlawed
     products such as the *VCR* that serve to promote the unauthorized copying and distribution

6   of copyrighted works.  A decision permitting the distribution of such a product would
     ignore Congress' clear directive and eviscerate the DMCA.

7

8   •Second, the *Sony* decision turned in large part on a finding that substantial numbers of
     copyright holders who broadcast their works either had authorized or would not object to
     having their works time-shifted by private viewers.  *Sony*, 464 U.S. at 443, 446.  Here, by

9   contrast, content owners have specifically chosen to prevent the copying enabled by the
     *VCR* by putting their content in the RealMedia format and leaving the copy switch off.

10  Thus, the affected content owners here are nothing like the free-TV broadcasters in *Sony*.
     To the contrary those who own RealMedia content are akin to cable broadcasters who

11  scramble their signals to prevent their content from being accessed and copied only to
     discover companies distributing unauthorized descramblers.

12

13  •Third, the time-shifting in *Sony* allowed users to view programs and advertising that they
     otherwise would not have seen, thereby increasing the copyright holder's audience and
     potential advertising revenues.  *Sony*, 464 U.S. at 443, 446.  Streambox's products, by

14  contrast, undermine the economic incentives for copyright holders, because they allow
     end-users to remove copyrighted works from the sites at which they are accessible, and

15  thereby bypass the advertising and merchandise sales upon which the copyright holders
     depend for remuneration.

16

17  •Finally, unlike the diminished quality recognized in each successive copy of a television
     recording, Streambox's *VCR* allows end-users to make exact digital copies that can be
     redistributed to countless others at the touch of button, compounding the harm to copyright

18  holders exponentially.  *Cf. Sony*, 464 U.S. at 425 (specifically noting that the fair use
     decision concerned only on the copying of content for personal use, not the transfer of

19  tapes to other persons).

20  In short, that end-users have the right to time-shift free television content is beside the point.  They do

21  not have the right to circumvent access and copy protections to copy content that copyright holders

22  have made clear they do not want copied.  That is what Congress specifically outlawed in enacting the

23  DMCA.  That is all that the *VCR* does and that is all that is at issue in this motion.

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 5

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Exhibit N, Page 183

II.   **STREAMBOX'S MANUFACTURE AND DISTRIBUTION OF THE *RIPPER* VIOLATES SECTION 1201(b) OF THE DIGITAL MILLENNIUM COPYRIGHT ACT.**

As it did in its discussion of the *VCR*, Streambox attempts to justify the existence of the *Ripper* by highlighting uses to which end-users might put it. But the "other uses" which Streambox discusses merely highlight the basis for its liability.

Section 1201(b) of the DMCA imposes liability for devices designed to circumvent measures used to protect <u>any</u> the of rights held by a copyright holder. 17 U.S.C. §1201(b)(1)(A-C), (b)(2)(B) (prohibiting circumvention of a measure that prevents, restricts or otherwise limits others from exercising a right of a copyright owner granted under title 17). One of the copyright holder's exclusive rights is the right to make derivative works such as translations or modifications. 17 U.S.C. §106(2); 101 (defining "derivative work" as a work based on one or more preexisting works such as a translation...abridgement, condensation or any other form in which a work may be recast, transformed or adapted.") And as RealNetworks explained in its opening papers, the RealMedia format itself safeguards that right.

Because the RealMedia format is proprietary, end-users cannot translate or alter a work once the copyright holder has put it in that format. To be sure, end-users may listen to the content if they have a RealPlayer, and can even obtain a copy if the content-owner has turned on the "Copy Switch" (or placed the content on an ordinary web server for download). What end-users cannot do, however, is modify the content by, for example, removing advertisements from it, redistributing portions of it, using portions as part of a different work, or translating it into a different format either to avoid the copy protection it enjoys or to render the content playable on a portable device such as an MP3 player. *Cf RIAA v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (holding merely that a portable digital music player is not a "digital recording device" under a separate statute, the

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 6

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 184**

1    Home Recording Act, but saying nothing about the impact of copyright law on end-users who

2    translate works without the copyright holder's consent); 17 U.S.C. § 117 (entitling lawful possessor of

3    computer program to make an archival backup, but saying nothing about translating the program into

4    an alternative format or fair use). The creation of these derivative works without the content owner's

5    authorization is only possible when the content is translated from the proprietary RealMedia format

6    into an open format such as MP3 or WAV. And that, according to Streambox itself and as shown in

7    its supporting declarations, is precisely what the *Ripper* enables.

8          By Streambox's own admission, the *Ripper* is designed to translate a work from the protected

9    RealMedia format into an unprotected format, circumventing the protections that the proprietary

10   format affords content owners against the creation of unauthorized derivative works.   Again,

11   Streambox trumpets this capability to end-users in its marketing: (i) "CONVERT REALAUDIO TO

12   MP3" (ii) "The main features of Streambox *Ripper* are: . . . Converts RealAudio (G2) or audio

13   portions of any RealMedia file to MP3...Converts RealAudio to uncompressed WAV" (iii)

14   "Streambox *Ripper* is a revolutionary new program that **rips** (converts) CD and RealAudio files to

15   these new formats: WAV, MP3, WMA. This allows users to listen to millions of previously

16   unavailable audio files." Way Decl., Exh. K; Exh. A hereto. Because of its design and marketing of

17   the *Ripper*, Streambox violates Section 1201(b) by manufacturing and distributing the product. *See*

18   17 U.S.C. §1201(b)(1)(A),(C).

19   **A.      The *Ripper* is the Only Product RealNetworks Knows Of That Performs An
              Unauthorized Translation of RealMedia Content.**

20         Streambox charges RealNetworks with "misrepresenting" and "concealing from the Court" the

21   existence of a product supposedly sold by RealNetworks that is supposedly functionally identical to

22

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 7

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 185**

1  the *Ripper*.  While the existence of such a product would not afford any defense to Streambox's

2  violation of the DMCA, Streambox's arguments are also wrong.

3  WavConvertPro is manufactured by a third party, and is available, along with hundreds of

4  other third party products, at a web site maintained by RealNetworks called the RealStore.

5  RealNetworks does not own the product nor set the price.  It simply provides a venue at which the

6  product is made available.  According to the product's manufacturer, Waves, the WavConvertPro

7  product available through the RealStore (which Streambox supposedly downloaded and tested) does

8  not enable users to translate RealMedia files into WAV files.  Rather, it allows users to translate files

9  in the open WAV format to the protected RealMedia format.  Indeed, that is the only translation

10  mentioned in the product's marketing materials.  Declaration of James Owenby.

11  If the product available through the RealStore somehow works as Streambox claims, or the

12  translation function is performed by a version of the program that Streambox obtained elsewhere

13  without mentioning that detail, such features constitute a plain breach of the developer's license that

14  Waves was required to sign in order to obtain and use RealNetworks' proprietary information.  And it

15  would constitute a breach of the agreement manufacturers must sign in order to sell their products

16  through the RealStore.

17  **III.    THE REQUESTED INJUNCTION SERVES THE PUBLIC INTEREST.**

18  By circumventing protections for copyright holders, Streambox's *VCR* and *Ripper* enable the

19  widespread infringement of works that were not supposed to be copied or modified by end-users.  It

20  has been "virtually axiomatic that the public interest can only be served by upholding copyright

21  protections and, correspondingly, preventing misappropriation of the skills, creative energies, and

22  resources which are invested in the protected work."  *Apple Computer v. Franklin Computer Corp.*,

23  714 F.2d. 1240, 1255 (3d Cir. 1983).  When the advent of digital technology and the Internet rendered

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 8

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Exhibit N, Page 186

1    the Copyright Act insufficient to serve the public's interest in the protection of copyrighted work,

2    Congress responded by passing the DMCA.

3         The DMCA is not intended merely to safeguard the rights of copyright holders.   It is also

4    designed to encourage copyright holders to make their content available in digital form to speed the

5    growth of the Internet.  In signing the DMCA, President Clinton identified both the public's interest in

6    the growth of the Internet and the danger posed by the kind of digital piracy promoted by Streambox's

7    products:

8         [T]echnological innovations present us with great opportunities for the global
         distribution of copyrighted works. These same technologies, however, make it

9         possible to pirate copyrighted works on a global scale with a single keystroke.

10   Remarks of the President at the signing of the DMCA, October 28, 1998, available on the Internet at

11   "http://www.ari.net/hrrc/presidn.html."  Congress, too, made it clear that the DMCA "is designed to

12   facilitate the robust development and world-wide expansion of electronic commerce, communications,

13   research, development, and education in the digital age." S. Rep. No. 190, 105TH Cong., 2ND Sess.

14   1998, 1998 WL 239623, *1 (Purpose).

15        It is odd that Streambox points out the DMCA's mention of "black-box" technologies "such as

16   those designed to receive unauthorized cable television service or to descramble cable programming."

17   Def. Opp. Brief at 14;  *cf.*  17 U.S.C. §1201(a)(3)(A) (making clear that the DMCA is not limited to

18   descramblers or decryption devices, and also covers any device that avoids, bypasses, removes,

19   deactivates or impairs technological measures restricting access).  Streambox's *VCR* is precisely

20   analogous to that "black box," though it operates through the Internet instead of through a cable

21   system.   Through the device supplied by a cable company, authorized users can access certain content

22   while other content is scrambled and cannot be accessed or copied.  Through the RealPlayer,

23   authorized users can similarly access and view certain content, but certain content cannot be copied.

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 9

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 187**

Streambox recognizes that the public interest is harmed when a "black-box" circumvents access and/or copy protections on a protected cable transmission. That same public interest is harmed in the same manner when the Streambox's *VCR* circumvents security measures on a protected media stream.

## IV.   STREAMBOX'S MANUFACTURE AND DISTRIBUTION OF THE *FERRET* CONSTITUTES CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT.

Streambox makes only a single argument in defense of the charge that it is contributorily and vicariously liable for the copyright infringement end-users commit by installing Streambox's *Ferret* product. According to Streambox, it has no derivative liability because end-users do not infringe RealNetworks' copyright by installing the *Ferret* and adding files to the RealPlayer. Streambox's contention, however, ignores the 9th Circuit's controlling decision in *Micro Star v. Formgen Inc.,* 154 F.3d 1107 (9th Cir. 1998). In *Microstar*, the court held that the defendant's computer programs created an infringing derivative work by adding additional files to plaintiff's existing computer game program. *Id. at 1112*. As Streambox admits, that is what is taking place when a user installs the *Ferret*. Opp. at 23. And it is no different than adding paragraphs or chapters to a copyrighted novel. Indeed, in this case, the addition of the files not only impacts the literary work itself, but also makes a critical change to the RealPlayer's copyrighted graphical user interface.

These modifications to the RealPlayer are without RealNetworks' authorization. Indeed, they constitutes an explicit breach of the license agreement end-users must agree to in order to obtain the RealPlayer. See Exh. B hereto. Accordingly, when end users modify the RealPlayer by installing the *Ferret*, they commit copyright infringement. *See* 17 U.S.C. §106(2) (granting copyright holder exclusive right to prepare derivative works); *See also Microstar at 1112* (adding files to existing program creates fixed derivative work; distinguishing *Galoob*, the only case cited by Streambox,

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 10

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Exhibit N, Page 188

1   because the modifications made there were ephemeral).  Streambox is contributorily and vicariously

2   liable for that infringement.

3   **V.   STREAMBOX'S MISCONDUCT IS CAUSING IRREPARABLE HARM.**

4   As RealNetworks demonstrated in its opening papers, the harm Streambox is causing through

5   its violations of copyright law is presumptively irreparable.  *Triad Systems Corp. v. Southeastern*

6   *Express*, 64 F.3d 1330, 1335 (9th Cir. 1995); *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824

7   (9th Cir. 1997), *cert. denied*, 118 S. Ct 1795 (1998).  The presumption of irreparable harm is

8   appropriate in this case, as each of Streambox's products creates enormous potential for the

9   infringement of RealNetworks' own copyrighted materials as well as millions of other copyrighted

10  works safeguarded in the RealMedia format.  But Judge Coughenour did not rest his Temporary

11  Restraining Order on a mere presumption of irreparable harm.  Rather, the Court recognized that

12  Streambox's distribution of its illicit products is causing RealNetworks actual irreparable harm,

13  undermining its relationships with content owners and its exclusive search provider, Snap.  Streambox

14  does not even address the substantial harms that RealNetworks has demonstrated.  Its claim that

15  RealNetworks has knowingly allowed and promoted the distribution of products similar to the *VCR*

16  and *Ripper* is demonstrably false.  Its reference to an unauthorized referral of a single customer to

17  Streambox by a low-level outside consultant in a foreign country, while embarrassing, hardly

18  overrides the compelling evidence RealNetworks has put forth.  Decl. of David Hardwick.

19  Accordingly, RealNetworks showing of irreparable injury stands unrebutted.

20  **VI.   STREAMBOX'S REMAINING ARGUMENTS ARE WITHOUT MERIT.**

21  At the end of its oversized brief, Streambox adopts a kitchen sink approach to its defense,

22  these last gasp arguments are not availing.

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 11

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 189**

**A.      Section 1201(c)(3) is Inapplicable.**

Streambox argues that Section 1201(c)(3) permits allows it to create a product that ignores RealNetworks' "CopySwitch," claiming that its products need not respond "to any particular technological measure." Streambox is misreads the statute. The purpose of this provision is to allow product manufacturers and copyright owners, rather than Congress, to evaluate whether or not a particular protection mechanism is worth using. 1 *Nimmer on Copyright*, §§12A.03, 12A.05. Congress thus refrained from mandating any particular protection mechanism. But as the remainder of the statute and the leading copyright commentator make clear, Section 1201(c)(3) does not provide immunity for products that circumvent technological measures in violation of Sections (a)(2) or (b)(1). *See* 17 U.S.C. §1203(c)(3) (a product need not respond to a particular measure "so long as such...product...does not otherwise fall within the prohibitions of subsections (a)(2) or (b)(1)." (emphasis added); 1 *Nimmer on Copyright*, §12A.05. If the statute meant what Streambox suggests, it would allow any manufacturer to avoid liability simply by claiming it chose not to respond to the particular protection that it circumvents. As detailed above, the *VCR* falls squarely within the prohibitions of subsections 1201(a)(2) and 1201(b)(1). Accordingly, Section 1201(c)(3) affords Streambox no defense.

**B.      RealNetworks' Access Control and Copy Protection Measures Are "Effective."**

Streambox next claims that RealNetworks' security measures are not "truly effective" because a user can obtain a "copy" of a protected RealMedia file by using a tape recorder to record the output from his or her computer as the file is streaming. As an initial matter, Streambox ignores the fact that its product circumvents the "Secret Handshake" to gain access to RealMedia files in the first place. That alone is sufficient for liability. Moreover, Streambox fails to mention that the resulting "copy" of the file in that circumstance would be an analog as opposed to a digital copy and would thus be of

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 12

LAW OFFICES OF
McNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 190**

1    much lower quality and unsuitable for redistribution.  Indeed, the poor quality of such analog copies is

2    the reason the *VCR* exists; it allows for the creation of perfect digital copies.

3        In enacting the DMCA, Congress' clearly was concerned with protecting content owners from

4    the unauthorized, <u>digital</u> copying and redistribution of their works.  That intent is clear from the title

5    of the legislation itself.  It is also clear from the lengthy discussion in the DMCA about the security

6    measures used by content owners to prevent the digital copying of video cassettes.  *See* 17 U.S.C.

7    §1201(k) (discussing "automatic gain control technology" throughout the subsection as a means of

8    copy protection).  Obviously, this video cassette security system cannot prevent people from using

9    camcorders to make poor-quality recordings of rented movies as the movies are played on their

10   television sets.[2]  Nevertheless, the DMCA makes clear that the videocassette security system

11   "effectively" protects video cassettes from piracy, and that the sale of devices circumventing that

12   security are unlawful.  17 U.S.C. §1201(k)(1)(A), (B).  That is precisely the case here.

13       In addition, Streambox ignores the expansive category of technological measures that

14   Congress deemed were "effective" in protecting the rights of copyright owners.  According to Section

15   1201(b)(2)(B), a measure is "effective" if it "prevents, restricts or otherwise limits the exercise of a

16   right of a copyright owner." 17 U.S.C. 1201(b)(2)(B).  Thus, on its face the statute does not require

17   that protection measures entirely preclude copying, redistribution or modification of a protected work.

18   Rather, it is sufficient that the measures "restrict or otherwise limit" others from exercising those

19   rights. Given the degraded quality of analog recordings, they are hardly a substitute for a legitimate,

20   digital copy of the original.  By preventing users from making digital copies RealMedia files, the

21

22   _____

[2] Likewise, despite the scrambling of a pay-per-view movie, a user can record a copy of the audio and a badly distorted
23   visual image using a video camera.  That does not mean that the scrambling is not an "effective" access control or copy
     protection measure.

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 13

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 191**

1    "Secret Handshake" and the "Copy Switch" effectively protect copyright holders.   Accordingly,

2    Streambox may not manufacture or distribute products to circumvent these measures.

3    **C.    RealNetworks Has Standing.**

4            Streambox also argues that only copyright owners have standing to bring an action under the

5    DMCA, and only if their copyrights have been infringed.  That argument cannot be reconciled with

6    the plain language of the statute.  Section 1203 of the DMCA states that "any person injured by a

7    violation of section 1201 or 1202 may bring a civil action in an appropriate United States District

8    Court," and may obtain temporary or permanent injunctions to prevent or restrain such violations.  17

9    U.S.C. §1203(a)(1)-(2) (emphasis supplied).  Congress did not limit standing to "any copyright

10   holder," as Streambox would have the statute read.   Its expansive language was intended to protect

11   any person harmed by illicit circumvention. *See Blue Shield of Virginia v. McReady*, 457 U.S. 465,

12   472 (1982) (holding that a "lack of restrictive language reflects Congress' 'expansive remedial

13   purpose'" in enacting the Clayton Act with a damages provision to compensate any person damaged

14   by a violation); *cf.* 17 U.S.C. § 1009.[3]

15   **D.    This Case Has Nothing to Do With Excluding People From Using the RealMedia Format.**

16           The notion that RealNetworks has filed this suit to prevent people from using the RealMedia

17   format makes no sense.  RealNetworks distributes versions of tools for formatting, distributing and

18   listening to RealMedia content for free, enabling, indeed encouraging anyone to use the format.

19   RealNetworks' only motive for this suit is to halt the spread of products that Streambox has developed

20

21   [3] The DMCA's standing provision contrasts sharply with the standing limitations Congress imposed for copyright
     infringement actions in 17 U.S.C. §501(b).  There, Congress limited the ability to institute an action for copyright

22   infringement to the legal or beneficial owner of the copyright.  *Id.*  Congress did not include any such limitation in the
     DMCA.

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 14

LAW OFFICES OF
MCNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 192.**

1   and marketed as tools for violating the intellectual property rights of RealNetworks' customers and

2   RealNetworks itself.  RealNetworks is asserting rights that Congress specifically created for that

3   purpose.  The assertion of those rights hardly support Streambox's vague and irresponsible claim that

4   some monopolistic motive is at work.  *See Prof. Real Estate Investors Inc. v. Columbia Pictures*

5   *Indus. Inc.*, 508 U.S. 49 (1993) (Noerr Pennington doctrine provides antitrust immunity for copyright

6   actions brought in good faith).

7       DATED this 6th day of January, 2000.

8
                        McNAUL EBEL NAWROT HELGREN
9                       & VANCE PLLC

10
                  By: _____
11                      Robert D. Stewart, WSBA No. 8998

12                      Attorneys for Plaintiff

13  Of Counsel:

14  WILSON SONSINI GOODRICH & ROSATI

15  By: _____
16      James A. DiBoise
        Carl Baier
17      David H. Kramer
        650 Page Mill Road
18      Palo Alto, CA  94304-1050
        Telephone:  650-493-9300
19      Facsimile:  650-565-5100

20  Attorneys for Plaintiff REALNETWORKS, INC.

21

22

23

REPLY BRIEF IN SUPPORT OF
PRELIMINARY INJUNCTION – Page 15

LAW OFFICES OF
McNAUL EBEL NAWROT HELGREN
& VANCE, P.L.L.C.
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

**Exhibit N, Page 193**

# The Real Network

## 2008 Media Kit

real™





# The Real Network Traffic

| Unique Audience | 32 MM |
|---|---|
| Active Reach | 19.4% |
| Web Page Views | 264 MM |
| Web Pages per Person | 16 |
| Time per Person | 34 min |

Source: Nielsen Online//NetView, July 2008

**Exhibit O, Page 195**