# EXHIBIT 6

Dockets.Justia.com

JAMES A. DiBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105

Attorneys for Plaintiffs
REALNETWORKS, INC. and
REALNETWORKS HOME ENTERTAINMENT, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, UNIVERSAL CITY STUDIOS LLLP, PARAMOUNT PICTURES CORPORATION, TWENTIETH CENTURY FOX FILM CORPORATION, SONY PICTURES TELEVISION INC., COLUMBIA PICTURES INDUSTRIES, INC., SONY PICTURES ENTERTAINMENT INC., DISNEY ENTERPRISES, INC., WALT DISNEY PICTURES, and WARNER BROS. ENTERTAINMENT INC., <br><br> Plaintiffs, <br><br> v. <br><br> REALNETWORKS, INC.; and REALNETWORKS HOME ENTERTAINMENT, INC., <br><br> Defendants. | **CASE NO.:** <br> **2:08-cv-06412 SJO AJWx** <br><br><br> **DEFENDANTS REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC.'S OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION FOR A TRO** |

Defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real" or "Defendants") submit the following in opposition to Plaintiffs *Ex Parte* Application for Temporary Restraining Order:

## INTRODUCTION

Plaintiffs filed a complaint and sought a TRO today seeking to disrupt Real's in-progress launch of RealDVD this morning. Plaintiffs have known since the first week of September that Real was planning to launch the RealDVD product by today, and as is evident from the volume and content of Plaintiffs' *ex parte* papers (comprising a 25-page brief and four inches of supporting documents), they have been preparing their papers for quite some time. Yet, they chose not to share those papers with Real until approximately 10:00 am this morning, in an apparent effort to block any possibility of a response from Real.

Given these time constraints, Real has only had enough time to address here a few of the highlights demonstrating why Plaintiffs' *ex parte* application should be denied. Accordingly, Real requests that if the Court is inclined to grant Defendants' *ex parte* application for a TRO, that Real be given an opportunity to appear before the Court to address the issues more fully.

## I. This Action Should Be Dismissed In Favor Of The Action Filed by Real in the Northern District of California.

This action should be dismissed in favor of the first filed, properly venued action initiated by Real today (September 30, 2008) at 9:04 a.m. in the Northern District of California. The action initiated by Real raises issues virtually identical to those presented here, but also includes a necessary party to the resolution of these issues, the DVD Copy Control Association ("DVD CCA"), the party that licenses the CSS technology at issue. Real's action seeks a declaratory judgment that RealDVD is in compliance with the CSS License Agreement and the DMCA. Federal courts recognize a doctrine of federal comity that permits district courts to

decline jurisdiction when a complaint involving the same parties and issues has already been filed in another court.

Plaintiffs suggest that Real's declaratory judgment action should be dismissed as an "anticipatory filing." Plaintiffs are dead wrong. Pursuant to the agreement of the parties, neither party could file an action until this morning, when Real filed its declaratory judgment action.[1] More importantly, Real filed its declaratory judgment action in the *only* county where all the necessary parties could be venued. Plaintiffs filed in Los Angeles to avoid joining the DVD Copy Control Association ("DVD CCA") – a necessary party to the claim for breach of the CSS License Agreement – because the DVD CCA was only amenable to suit in Santa Clara County. That agreement is fundamental and dispositive to the parties' dispute. Section 10.4(b) of the CSS License Agreement *mandates* that actions between Real and the DVD CCA be litigated in the state and federal courts in Santa Clara County. *See* Pomerantz Decl., Exh. F. Thus, the Northern District of California is the only appropriate venue for these claims. Real filed its declaratory judgment action in the Northern District of California out of necessity, not out of bad faith or a desire to forum shop.

## II.    RealDVD Fully Complies With The CSS License Agreement And Therefore Is Not "Circumventing" The CSS Technology.

Plaintiffs' argument depends on the assertion that Real is "circumventing" CSS technology. Plaintiffs' assertions are both conclusory and wrong. Real's use of the CSS technology is licensed under the CSS License Agreement ("CSS Agreement"), and Real complies with the requirements of that license. There is therefore no legitimate argument that Real is circumventing the CSS technology when it uses that technology pursuant to a valid license.

Plaintiffs seek to wave away the CSS Agreement and ask this Court to look

---

[1] Prior to receiving any correspondence from Plaintiffs' counsel, Real initiated its preparation for filing its declaratory judgment action on the day it was to launch RealDVD.

solely to copyright law. But the CSS Agreement must be the starting point of the analysis, as it sets forth the parameters of Real's obligations with respect to the CSS technology. As set forth in the Declaration of Jeffrey Buzzard, Real has a license to the CSS technology, received the technical specifications for implementing the CSS technology, and designed its product in compliance with the CSS Agreement – all to work with the CSS technology utilized on DVDs according to the specifications, not to circumvent that technology. RealDVD is therefore fully compliant with the requirements of that Agreement. Because Real is authorized by its licensor, DVD CCA, to do everything it is doing with respect to the CSS technology, there is no legitimate basis to contend that it is somehow "circumventing" that technology. The entire basis for Plaintiffs' DMCA argument is based on this false premise – without that premise, Plaintiffs' argument collapses.

In an effort to confuse the issue, Plaintiffs assert that – regardless of the terms of the actual CSS Agreement and the actual performance and capabilities of CSS technology for licensed users –CSS technology was (according to Plaintiffs) *intended* to protect against any DVD copying whatsoever. Thus, Real must be circumventing *something*. But, again, Plaintiffs are wrong. The question is not what CSS is intended to do in the abstract, but what CSS permits *licensed* CSS users to do.

First, if CSS were supposed to prevent copying by a licensed user, the CSS Agreement would prohibit such conduct. But, the CSS Agreement does not contain such a prohibition. Plaintiffs attempt to construct a copying prohibition from two fragments in the CSS Agreement (one taken from a recital of the CSS Agreement and another taken from a technical specification). But the recital relied upon by Plaintiffs (Mot. at 8, citing Pomerantz Exh. F) describes the intention of two non-parties to the contract, Matshushita and Toshiba, to prohibit *unauthorized* copying – not all copying. And, the technical specification, which merely describes the purpose of a certain type of authentication, suffers from the same flaw. (*See* Mot. at

1   4, citing Pomerantz Exh. G).  RealDVD performs that authentication as required by

2   the license agreement.  Whether that authentication process may prevent **unlicensed**

3   users from copying is simply irrelevant to what a licensed user may do under the

4   terms of the CSS Agreement.

5   Indeed, whether the CSS Agreement prohibits copying was recently litigated

6   by the actual licensor to the CSS Agreement (the DVD Copy Control Association),

7   and the Santa Clara Superior Court found after a full trial that there existed no such

8   prohibition.  *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, Santa Clara

9   Superior Court Case No. 1-04-CV031829.  Kaleidescape continues to be accessible

10  today.  Indeed, Plaintiffs have neither asserted any DMCA claims against

11  Kaleidescape nor sought an injunction against their product.

12  Second, as explained in Mr. Buzzard's declaration, it is simply not true that

13  the CSS protection scheme prevents copying by **licensed** CSS users.  As Mr.

14  Buzzard explained, the CSS system controls access to a DVD and decryption of

15  content by licensed applications.  This distinction is critical and removes this case

16  from the ambit of cases such as *Universal City Studios, Inc*. v. *Corley,* 273 F.3d 429

17  (2nd Cir. 2001) and *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D.

18  Cal. 2004), cited by Plaintiffs involving unlicensed products.  In *321 Studios*, for

19  example, the Court recognized that CSS does not, in fact, prevent copying of DVD

20  content.  Instead, the Court noted that the unlicensed copy would be useless without

21  licensed copies of the correct CSS keys.  That reasoning simply does not apply here,

22  where Real is a licensed CSS user with licensed access to the correct content keys.[2]

23  Plaintiffs' reliance on case law regarding unlicensed users is entirely misplaced.

24  In sum, RealDVD fully complies with and functions within the scope of the

25  CSS Agreement, works with the CSS technology on a DVD, and does nothing to

26

27  [2] Contrary to the claims of the Plaintiffs, RealDVD does not strip or remove the CSS encryption from the image of the DVD created on a user's storage medium. *See* Buzzard Decl., ¶9.

28

circumvent any such technology.  There is therefore no DMCA violation.

## III.    The Balance of Hardships Favors Defendants

### A.    The Harms Claims by Plaintiffs Are Compensable or Illusory.

Plaintiffs contend that "starting today," DVD users are able to copy for the first time DVD content onto their computer drives as a result of the product launch of RealDVD.  Mot. at 1.  According to Plaintiffs, this will suddenly change consumers' attitudes about DVD copying, irreparably harm sales of DVDs and the rental market, and irreparably harm the Plaintiffs' developing markets.  Plaintiffs' argument ignores reality.  Unlicensed DVD software products that decrypt and remove the encryption of CSS ("rippers") have been available, widely used and discussed in the media for years.  Plaintiffs themselves claim to have "lost" $2.3 billion in revenue to Internet piracy in 2005 alone (a statement which not only illustrates the state of the industry prior to the launch of RealDVD, but also undercuts Plaintiffs' claim that alleged damages here are somehow new and immeasurable). [*See* Motion Picture Association of America website, www.mpaa.org.].

As noted in the recent article in PC Magazine, unlicensed "rippers" provide much greater flexibility, often for free, to those willing to use an unlicensed product:

> Unfortunately, the resulting [RealDVD] movie files are locked up tighter than Hannibal Lecter; you can play them on up to five licensed PCs, but you can't watch them on your iPod or other device.  As such, RealDVD doesn't really give users what they want:  a way to put their purchased movies on their PCs and move them to iPods, iPhones, PSPs, and network attached devices . . .  Essentially, we want the same freedom with DVDs that we have with CDs, and there are lots of DVD-ripping and file-converting tools online that give users that freedom.

1    Many of the best ones are free or accept donations  . . ."[3]

2  RealDVD does not offer any new or attractive options to users interested in piracy.

3  To the contrary, RealDVD is targeted precisely to those users who have avoided

4  rippers, and are instead simply looking to make a backup copy of what is notoriously

5  fragile, cumbersome and inconvenient to use in today's digital world – a DVD disc.

6  *See* Declaration of Gordon Klein, ¶¶5-9.  Backup copies made with RealDVD

7  simply will not work in any hard drive other than the one upon which they were

8  initially created and cannot be disseminated on the Internet to others for use.  This is

9  not piracy – this use is well within the fair use exception to copyright infringement.

10  *See, e.g., Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417

11  (1983).[4]

12    In addition, Plaintiffs undercut their own claims of irreparable harm.

13  Plaintiffs claim that RealDVD will upset Plaintiffs' licensing schemes with others.

14  But, the fact of these licensing schemes with Apple or Amazon only confirms that

15  what is at issue here, if anything, is calculable damages, not unquantifiable harm.  In

16  fact, as explained in the Klein Declaration, Plaintiffs' declarant Dunn provides

17  specific data that could be used to quantify the alleged harm to Plaintiffs.  *See, e.g.,*

18  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("'The key word in this consideration is

19  irreparable.  Mere injuries, however substantial, in terms of money, time and energy

20  necessarily expended … are not enough.'")

21    More importantly, Plaintiffs' argument mixes the markets for digital

22  downloads with the market for sales or rentals of DVDs.  For example, one does not

23  purchase a digital download of the same movie that one bought on DVD.  The user

24  ─────────────

25    [3] Monson, Kyle, "Tools for Ripping Your DVDs," 9/11/08 PC Magazine,
http://www.pcmag.com/print_article2/0,1217a%253D231870,00.asp

26    [4] Indeed, had there existed any real threat of irreparable harm from the violation of the
27  DMCA that Plaintiffs claim here, Plaintiffs should have brought this suit long ago against
Kaleidescape rather than acquiesce to Kaleidescape's continued presence in the market to this
28  day.

can watch the DVD.  At best, the user only purchases the digital download of a previously purchased DVD for a transformative use, *i.e.*, to play on an iPod.  RealDVD does NOT permit transformative uses – a RealDVD will not work on an iPod.  Therefore claims of harm regarding the digital downloads are simply misplaced.

Plaintiffs' claims of harm are at best compensable, but more likely entirely illusory.  Either way, Plaintiffs cannot and have not met their burden to justify the entry of the extraordinary remedy of a temporary restraining order.  *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374 (9th Cir. 1985) ("Under any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury.")

## B.    Real Would Suffer Irreparable Injury If An Injunction Were Entered.

An injunction against RealDVD would be devastating to Defendants, as they would be forced to pull from the market a product which was announced and publicized in early September, and whose launch was already delayed once in a failed effort to appease the Plaintiffs.  As explained in the Declaration of Jacqueline Lang ("Lang Dec."), Real initially planned to launch RealDVD upon the announcement of the product at a technology conference on September 8, 2008.  Lang Dec., ¶ 2.  Real made a tremendous public relations and advertising push to prepare for the initial RealDVD launch, including securing press regarding RealDVD in dozens of publications (including the New York Times, Business Week, Newsweek, PC World and USA Today), giving demonstrations of the product and answering technical questions.  Lang Dec., ¶ 4.

Prior to the September 30th launch of RealDVD, Real attempted to recreate as much as possible the initial publicity "buzz" that surrounded RealDVD at the time of the planned initial September 8 launch.  Lang Dec., ¶ 7.  In the days leading up to the September 30th launch, Real's PR department and outside PR agencies again

1    contacted numerous media outlets encouraging them to write articles regarding

2    RealDVD.  While Real made extensive PR efforts for the September 30th launch,

3    many of the publications which had already generated press regarding RealDVD

4    were not willing to run second articles on the product.  *Id.*

5          If RealDVD were enjoined, thereby undermining its second effort to launch

6    the product, Real will lose credibility with its customers and potential customers,

7    shareholders, analysts, advertising partners, PR contacts and the market generally.

8    Much of the goodwill that Real has developed over the years would be lost.  Even if

9    Real were ultimately allowed to resume sales of the product, the ultimate success of

10   RealDVD, Real's image, and perhaps other Real offerings, would be irreparably

11   impaired.   Lang Dec., ¶ 8.  Real would most certainly not be able to successfully

12   execute a "third" publicity blitz and launch of the product after having been tainted

13   with the mislabel of an illegal product following two aborted launches.

14         Most importantly, Real currently has a "first mover advantage" with respect to

15   the RealDVD product as there are no licensed competitive products at this price

16   point. Lang Dec., ¶ 9.  In promoting the release of RealDVD, Real has explained its

17   product in detail to the market (and to its competitors), provided demonstrations and

18   answered technical questions.  While the technical details of RealDVD have not

19   been released, competitors were alerted in early September both to the feasibility and

20   the attractiveness of a similar product.  *Id.*  Any further delay in the release of

21   RealDVD will pose an unacceptable business risk to Real, as Real could lose its first

22   mover advantage which could never be recovered.

23

24

25

26

27

28

1    **CONCLUSION**

2        For the foregoing reasons, Defendants respectfully request that the Plaintiffs'

3    *ex parte* application be denied.

4

5    Dated:  September 30, 2008          WILSON SONSINI GOODRICH & ROSATI
                                         Professional Corporation

6

7                                        By: /s/Colleen Bal

8                                            Colleen Bal
                                             cbal@wsgr.com

9                                        Attorneys for Defendants
                                         REALNETWORKS, INC. AND
10                                       REALNETWORKS HOME
                                         ENTERTAINMENT, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

1  JAMES A. DIBOISE, State Bar No. 83296
   Email:  jdiboise@wsgr.com
2  COLLEEN BAL, State Bar No. 167637
   Email:  cbal@wsgr.com
3  MICHAEL A. BERTA, State Bar No. 194650
   Email:  mberta@wsgr.com
4  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
5  One Market, Spear Tower, Suite 3300
   San Francisco, CA 94105
6  Telephone:  (415) 947-2000
   Facsimile:   (415) 947-2099
7
   Attorneys for Defendants
8  REALNETWORKS, INC. and
   REALNETWORKS HOME
9  ENTERTAINMENT, INC.

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                   WESTERN DIVISION

13  UNIVERSAL CITY STUDIOS          )  Case No: CV-08-06412 SJO AJW
    PRODUCTIONS LLLP, UNIVERSAL     )
14  CITY STUDIOS LLLP, PARAMOUNT    )
    PICTURES CORPORATION,           )  **DECLARATION OF**
15                                  )  **JACQUELINE LANG IN**
    TWENTIETH CENTURY FOX FILM      )  **OPPOSITION TO *EX PARTE***
16  CORPORATION, SONY PICTURES      )  **APPLICATION OF**
    TELEVISION INC., COLUMBIA       )  **PLAINTIFFS FOR**
17  PICTURES INDUSTRIES, INC., SONY )  **TEMPORARY RESTRAINING**
                                    )  **ORDER AND ORDER TO**
18  PICTURES ENTERTAINMENT, INC.,   )  **SHOW CAUSE RE**
    DISNEY ENTERPRISES, INC., WALT  )  **PRELIMINARY INJUNCTION**
19  DISNEY PICTURES and WARNER      )
20  BROS. ENTERTAINMENT, INC.,      )
                                    )
21          Plaintiffs,             )
                                    )
22       v.                         )
                                    )
23  REALNETWORKS, INC., and         )
24  REALNETWORKS HOME               )
    ENTERTAINMENT, INC.             )
25                                  )
26          Defendants.             )

27

28

I, Jacqueline Lang, declare as follows:

1. I am the Vice President of Marketing for Real Networks, Inc. ("Real"), and have been employed by Real since February of 2001. I have personal knowledge of the facts stated herein. I am over the age of eighteen, and would and could testify truthfully thereto if called as a witness.

2. Real was ready to officially release its RealDVD product on September 8, 2008 ("initial launch"). Real carefully planned the release of RealDVD for months, and timed the initial launch to coincide with the "DEMO Fall 08" Conference on September 8, where Real's Chairman and CEO, Rob Glaser, was a speaker. The DEMO Fall 08 Conference was held in San Diego, California, and promoted itself as "The Launchpad for Emerging Technology." Real intended for Mr. Glaser to announce RealDVD while speaking at the conference, and at the same time, Real would release the product and make it available to consumers. Real has consistently followed this practice, as timing the release of a new product with a technology conference permits Real to capitalize on the publicity surrounding a conference and reach an interested audience.

3. Shortly before the initial launch, Real was contacted by various studio plaintiffs, who objected to the release of the product, and expressed concerns that RealDVD violated the terms of the standard CSS license agreement with the DVD Content Control Association, as well as copyright law. The evening before the initial launch date of September 8, Real decided to abort the initial launch in order to try to resolve its differences with the studios in good faith. Instead of releasing RealDVD as planned on September 8, Real made last minute changes to its September 8, 2008 press release, announcing that the product would "be available this month." This was the first time that Real had ever announced a product without simultaneously making it available to end users, and therefore, Real stated that it would release RealDVD during the month of September.

4. Real expended considerable effort and resources to prepare for the initial launch of RealDVD that ultimately were not optimized when the launch was pulled in order to address the studios' concerns. For example, in preparation for the planned September 8 launch, Real's public relations department worked with an outside PR agency to reach dozens of different publications and encourage them to generate press regarding RealDVD. Leading up to the planned September 8 initial launch, Real's PR department and outside agency worked furiously promoting the product, giving demonstrations of the product and answering technical questions. Upon the September 8 announcement of RealDVD and in the days that followed, press regarding RealDVD appeared in the New York Times, Business Week, Newsweek, PC World and USA Today, among others. While these articles undoubtedly generated interested potential customers, such customers had no way to purchase RealDVD as the product was being held back by Real in an attempt to resolve the concerns of the studios.

5. Real also committed advertising resources to the planned initial September 8 launch. Real purchased approximately $175,000 of web media and ads throughout the Internet to be run on certain specific days around September 8 to promote RealDVD. When Real decided to abort the initial product launch, Real was forced to pull back all of its advertising efforts and ask its advertising partners to delay the committed-to advertising. Such advertisers were under no obligation to delay the planned RealDVD advertising, and Real expended significant goodwill in asking its advertising partners to try to find other sponsors on virtually no notice to fill the ad spots for the committed days.

6. In keeping with its public statements that it would release the RealDVD product during the month of September, Real released and made the RealDVD product available for download on September 30, 2008, at 8:00 a.m. EST.

7. In anticipation of the September 30 launch, Real made a tremendous PR push to attempt to recreate as much as possible the initial publicity "buzz" that

surrounded RealDVD at the time of the planned initial September 8 launch. In the days leading up to the September 30 launch, Real's PR department and outside PR agencies again contacted numerous media outlets encouraging them to write articles regarding RealDVD. While Real made extensive PR efforts for the September 30 launch, many of the publications which had already generated press regarding RealDVD were not willing to run second articles on the product. Real also engaged in extensive advertising efforts related to the September 30 launch of RealDVD, including purchasing advertising space and key word searches.

8. If Real were enjoined from distributing RealDVD, the results to Real would be devastating. Particularly in light of Real's good faith decision to pull the September 8 launch to try to accommodate the plaintiff studios, the failure to successfully launch RealDVD on this second effort would cause Real irreparable loss of credibility with its customers and potential customers, shareholders, analysts, advertising partners, PR contacts and the market generally. Much of the goodwill and trust Real has developed over the years would be lost. Even if Real were ultimately allowed to resume sales of the product, the ultimate success of RealDVD, and perhaps other Real offerings, would be irreparably impaired.

9. In addition, Real currently has a "first mover advantage" with respect to the RealDVD product as there are no legal competitive products at this price point. In promoting the release of RealDVD, Real has explained its product in detail to the market (and to its competitors), provided demonstrations and answered technical questions. While the technical details of RealDVD have not been released, competitors have been alerted both to the feasibility and the attractiveness of a similar product. Any further delay in the release of RealDVD will pose an unacceptable business risk to Real, as Real could lose its first mover advantage which could never be recovered.

10. Further, it is critical for the success of RealDVD that the product gain traction in the market prior to the holiday season. As is the case with most

1   companies, Real's financial expectations for RealDVD include strong holiday sales
2   which it would almost certainly fail to achieve if the product were not available to
3   consumers during the next few months leading up to the holidays (when holiday
4   purchases are made).  Real expects that sales of RealDVD in the fourth quarter of
5   2008 will account for 25%-40% of its sales of that product on an annual basis.

6          11. Finally, if distribution of the newly-released RealDVD product were
7   enjoined, Real would be forced to cancel its advertising commitments and halt its
8   media campaign for a second time.  If the distribution of RealDVD were enjoined,
9   Real would almost certainly not be able to engage in a successful PR campaign
10  relating to RealDVD for a third time, which would irreparably impair the ultimate
11  success of RealDVD in the market.

12

13         I declare under penalty of perjury that the foregoing is true and correct.
14  Executed at Bellevue, Washington on September 30, 2008.

15

16                                          _Jacqueline Lang_____
17                                               Jacqueline Lang

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JACQUELINE LANG          -5-                          3489494

# EXHIBIT 8

JAMES A. DIBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105

Attorneys for Plaintiffs
REALNETWORKS, INC. and
REALNETWORKS HOME ENTERTAINMENT, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, UNIVERSAL CITY STUDIOS LLLP, PARAMOUNT PICTURES CORPORATION, TWENTIETH CENTURY FOX FILM CORPORATION, SONY PICTURES TELEVISION INC., COLUMBIA PICTURES INDUSTRIES, INC., SONY PICTURES ENTERTAINMENT INC., DISNEY ENTERPRISES, INC., WALT DISNEY PICTURES, and WARNER BROS. ENTERTAINMENT INC., <br><br> Plaintiffs, <br><br> v. <br><br> REALNETWORKS, INC.; and REALNETWORKS HOME ENTERTAINMENT, INC., <br><br> Defendants. | **CASE NO.:** <br> **2:08-cv-06412 SJO AJW** <br><br><br> **DECLARATION OF JEFFREY BUZZARD ON BEHALF OF DEFENDANTS REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC. OPPOSITION TO TRO** |

1   I, Jeff Buzzard, declare as follows:

2       1.      I am a Software Engineer. I have personal knowledge of the facts
3   stated herein. I am over the age of eighteen, and would and could testify truthfully
4   to the facts and matters stated in this declaration if called as a witness in this matter.

5       2.      RealDVD has been in development for approximately the last 12
6   months. I have been involved in the development process of RealDVD from the
7   beginning.

8       3.      RealDVD is software that can be purchased and downloaded from
9   Real Home's website on the Internet. RealDVD has a variety of different functions,
10  including the playback of DVDs placed into a computer's DVD drive, looking up
11  information about the DVD from Internet databases, providing links to various
12  information websites relevant to the chosen DVD, and storing an image of the
13  copy-protected DVD to a computer hard drive for safekeeping and later playback
14  purposes.

15

16  **RealDVD is CSS Compliant**

17      4.      The sellers of DVDs utilize a technological access protection measure
18  termed the Content Scramble System ("CSS") on their DVDs to prevent
19  unauthorized access to the content of a DVD. CSS was developed by Matsushita
20  Electric Industrial Co., Ltd. and Toshiba Corporation, and intellectual property
21  associated with CSS has been licensed to the DVD Copy Control Association
22  ("DVD CCA") to license to others to use in the manufacture and use of DVDs.

23      5.      For DVDs to be useful, an end-user must be able to access the content
24  of the DVD to, for example, play the DVD. For DVDs that use CSS protection
25  such protection must be navigated by licensed and authorized playback
26  mechanisms. Just like all other DVD players, RealDVD is a licensed and
27  authorized DVD player that appropriately navigates the CSS protection on the DVD
28  to permit access to the DVD contents on a computer or other similar device. There

BUZZARD DECL.                    -1-              CASE NO. 08-cv-06412-SJO-AJW

1  are many DVD Players on the market who, like RealDVD, allow interaction with

2  DVD content from a personal computer.

3        6.    RealDVD was designed to be compliant with the DVD CCA license

4  agreement and designed to work with and not circumvent the CSS technology

5  utilized on the DVDs. Specifically, after RealNetworks, Inc. obtained a license from

6  the DVD CCA, engineers received the technical specifications for the Descrambler

7  and the Authenticator Module for CSS Decryption Module. These specifications

8  allowed us to design a DVD CCA-compliant system for accessing DVD content. In

9  designing RealDVD, we reviewed the technical specifications provided with the

10  DVD CCA license and followed those specifications precisely in order to make sure

11  that we were compliant with the technical specifications of the license.

12        7.    Because RealDVD allows the user to make a personal copy of the

13  DVD on the user's own storage device, Real Home designed RealDVD so that it

14  would preserve the CSS protection included on the original DVD on the back-up

15  copy saved to the target storage medium. In other words, when RealDVD makes a

16  copy of the content on a DVD, it copies the CSS-encrypted data in the same format

17  onto the storage device without decrypting the CSS protection, so that the licensed

18  CSS decryption scheme must still be used in order to play back the encrypted file

19  from the storage device.

20        8.    RealDVD does not circumvent or bypass the CSS authentication

21  process for accessing DVD content, as provided by the DVD CCA license and

22  technical specifications. Instead, RealDVD follows the outlined procedures for

23  authentication of a DVD drive and, in the authentication process, receives from the

24  DVD the keys necessary for decryption of DVD content. Then, when accessing

25  DVD content (whether on a disc drive or on a hard drive) RealDVD uses the

26  provided keys from the DVD to access the DVD contents consistent with the

27  technical specifications of the DVD CCA license.

28

1      9.    RealDVD does not circumvent or bypass CSS protections in copying

2 DVD content to a backup copy on a hard drive. RealDVD performs the

3 authentication required by the technical specifications to be allowed access to the

4 contents of the DVD and, once access has been properly granted under the technical

5 procedures outlined in the DVD CCA license, RealDVD provides an option to play

6 the DVD content and/or make a backup copy of the content. CSS protection does

7 not prevent or prohibit the ability to copy DVD content once RealDVD has

8 performed the licensed CSS authentication procedures. Indeed, in performing a

9 requested back-up copy function, RealDVD copies the DVD content with the CSS

10 protections intact.

11

12 **RealDVD Adds Additional Security To Complement CSS And Prevent**

13 **Dissemination of Digital Copies of DVDs**

14      10.    RealDVD adds additional levels of security to the CSS protection to

15 ensure not only that the back-up copy of a DVD cannot be accessed without CSS,

16 but also that the copy cannot be played on a different RealDVD account than the

17 account of the user and the copy cannot be used on any storage device other than

18 the storage device onto which the encrypted DVD content was originally copied.

19      11.    As part of the additional security measures, RealDVD encrypts the

20 CSS encrypted content on the DVD and the keys to unlock the CSS encryption with

21 its own proprietary encryption system. Real's encryption system utilizes the

22 highest level of security permitted by the United States government for commercial

23 entities.

24      12.    RealDVD also "locks" the playback of the encrypted copies to a

25 single RealDVD user account. This protection prevents the RealDVD copy from

26 being played back from another user's computer with another user's RealDVD

27 account.

28

13.   For the convenience of authorized RealDVD users and for the safety of their purchased DVDs, RealDVD also allows a user to play the RealDVD copy from the hard drive on which it was saved on from one to five "authorized" computers. These computers could, for example, be in different rooms of the user's home, or could be the user's laptop computer (if the user originally saved the copy on his or her home computer). Thus the authorized user could avoid the potential for damage or loss of the original DVD when physically changing his or her location when playing back the RealDVD copy.

14.   However, the RealDVD user can only use the original hard drive on which a RealDVD copy was stored to playback the DVD content on a different, but "authorized" computer. The RealDVD system does not permit the creation of a copy of the DVD content that can be played from a different storage device or hard drive other than the one in which it was originally stored. Also, the DVD content cannot be played from the hard drive on which the back-up copy is stored over a network – the back-up hard drive must be physically connected to the authorized computer through a USB cable or the like.

15.   To accomplish this goal, RealDVD was designed as a closed system. For example, the RealDVD play function for a DVD placed in a disk drive and accessed through RealDVD does not allow the DVD to be sent through a network to be viewed, but can only be viewed on the computer screen of the computer in which the DVD is physically attached. In addition, if a customer chooses to store a copy of their DVD to a computer hard drive, that copy is secure. It cannot be copied again from the original hard drive to another hard drive and then accessed and used. In addition, the stored copy cannot be uploaded to an internet site and used by any other person to view the DVD content.

From:RealNetworks                    206 441 0417            09/30/2008 15:54 #048 P.006/006

1

2      I declare under penalty of perjury under the laws of the State of California

3  that the foregoing is true and correct.

4

5      Executed on September 30, 2008 in Seattle, Washington.

6

7                                  Jeffrey Buzzard

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 9

JAMES A. DIBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

Attorneys for Defendants
REALNETWORKS, INC. and
REALNETWORKS HOME
ENTERTAINMENT, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, UNIVERSAL CITY STUDIOS LLLP, PARAMOUNT PICTURES CORPORATION, TWENTIETH CENTURY FOX FILM CORPORATION, SONY PICTURES TELEVISION INC., COLUMBIA PICTURES INDUSTRIES, INC., SONY PICTURES ENTERTAINMENT, INC., DISNEY ENTERPRISES, INC., WALT DISNEY PICTURES and WARNER BROS. ENTERTAINMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> REALNETWORKS, INC., and REAL NETWORKS HOME ENTERTAINMENT, INC. <br><br> Defendants. | **CASE NO.:** <br> **CV 08-06412 SJO AJWx** <br><br><br> **DECLARATION OF GORDON KLEIN IN OPPOSITION TO *EX PARTE* APPLICATION OF PLAINTIFFS FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

3489494

I, Gordon Klein, declare as follows:

1.      I am a faculty member at UCLA's Anderson School of Management, where I have taught 11 accounting, tax, business law, and entrepreneurship courses in the undergraduate program and MBA Program since 1981. In addition, I was a faculty member from 1987 to 2000 at UCLA's Law School, where I taught courses in accounting, taxation, and financial analysis. I taught similar courses as an Adjunct Professor in the LLM in Taxation Program at Loyola Law School in Los Angeles, California during fall 2001 and 2002. I am a member of the California Bar (inactive), admitted in 1979, and a C.P.A., certified in the state of Illinois in 1976. I have conducted executive education seminars in financial and tax aspects of business management to, among others, partners at PricewaterhouseCoopers, members of the German Bundestadt governing body, and the Finance Committee of the People's Republic of China. I have authored several books concerning managerial accounting, cost accounting, introductory accounting, and managerial finance, as identified in my curriculum vita. I earned a B.B.A. from the University of Michigan Business School in 1976, graduating Phi Beta Kappa, and I earned a J.D. from the University of Michigan Law School in 1979. My curriculum vita, including a list of my publications over the last ten years, is attached at the end of this report as Exhibit 1.

2.      I have served as an expert witness in various cases, including cases in Federal Court and in Los Angeles Superior Court, and I have served as a Superior Court referee in Los Angeles and Orange Counties. I have testified in several major tax matters, including testifying on behalf of the US Attorney's Office in the case *United States v. Mitchelson*. A list of my expert testimony experience for the last four years is attached hereto as Exhibit 2. I am being compensated at a rate of $550 per hour for my independent review and analysis provided in this case.

3. I have been asked to address issue of the Studios' claims that RealDVD's presence in the marketplace threatens immediate and irreparable harm to the Studios.

4. I understand that the Studios have represented that the threat of "rent-rip-return" behavior is the most obvious and ominous.[1] I further understand that the Studios have represented that RealDVD is improperly holding itself out to consumers as a "legal" product.

5. Based on my understanding, it is my opinion that the Studios' analysis confuses two distinct markets: the legal market which RealDVD addresses and the illegal market.

6. I have examined the characteristics of several products which enable the copying of DVD files. Attached as Exhibit 3 is a table comparing these products.

7. From an economic point of view, these products represent two different markets because consumers who wish to operate in an illegal environment are not aided by RealDVD.

8. In a recent article published in PC Magazine, the author states, "Unfortunately, the resulting [RealDVD] movie files are locked up tighter than Hannibal Lecter; you can play them on up to five licensed PCs, but you can't watch them on your iPod or other device. As such, RealDVD doesn't really give users what they want: a way to put their purchased movies on their PCs and move them to iPods, iPhones, PSPs, and network attached devices....Essentially, we want the same freedom with DVDs that we have with CDs, and there are lots of DVD-ripping and file-converting tools online that give users that freedom. Many of the best ones are

---

[1] Declaration of Michael Dunn in support of *Ex Parte* Applications of Plaintiffs for Temporary Retraining Oder and Order to Show Cause re: Preliminary Injunction Thereof, p. 4 lns. 10-11.

free or accept donations…"[2]  Another article states that RealDVD is "a [really] more cumbersome way of doing something that [consumers have] already been doing for years now with DVD Decrypter, AnyDVD, Handbrake, MacTheRipper, RipIt and the like."[3]

9.  Based on this information, it is my opinion that RealDVD wouldn't have any significant impact on the end-user's choice between illegal encryption-stripping products which enable a bit-for-bit copying of a DVD file and RealDVD player which 1) is more expensive ($30 compared to mostly freeware) and 2) has results which are inferior (i.e., more restrictive) compared to those obtainable by one of the other products.

10.  In addition, I have been asked to address the Studios' allegations that damages are not quantifiable if they are significant at all.  In his declaration, Mr. Michael Dunn articulates many facts that assist in this exercise.  For instance, he states that last month DVD rentals were 175 million at an average price of $3.25. He also states that 50 million new DVD movies were sold at an average price of $18.50.  Assuming *arguendo* that the RealDVD player might increase the number of "rent-rip-return" events, Mr. Dunn's information provides important data to quantify lost revenues associated with consumers' actions in copying a rented DVD in lieu of purchasing it outright.

/ / /

/ / /

---

[2] Monson, Kyle, "7 Tools for Ripping Your DVDs," 9/11/08, PC Magazine, accessed 9/25/08, http://www.pcmag.com/print_article2/0,1217,a%253D231870,00.asp

[3] Paczkowski, John, "Rent. Rip. Return.", 9/8/08, All Things Digital, accessed 9/30/08, http://digitaldaily.allthingsd.com/20080908/rent-rip-return/



11.　　It is my opinion that there are also a number of ways to quantify damages which meet the legal requirement of reasonable certainty. For example, one could conduct surveys of potential users to estimate possible diverted units. This data, when coupled with pricing data and cost data customarily maintained by the Studios in the ordinary course of business, would allow for damages to be ascertained with a reasonable degree of certainty.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Gordon Klein                                    September 30, 2008

**EXHIBIT 1**

# Exhibit 1

## GORDON L. KLEIN

24724 Calle Conejo
Calabasas, CA 91302

Phone: (818) 222 8357
Fax: (310) 825 3165
gklein@anderson.ucla.edu

## SUMMARY

Gordon Klein has 25 years' experience as a faculty member at UCLA's Law School and Anderson School of Management, CPA, lawyer, court-appointed referee, arbitrator, State Bar consultant, and television commentator. He has extensive experience teaching and testifying in the areas of accounting, finance, damages, intellectual property, commercial law, marital dissolutions, professional responsibilities, and entrepreneurship.

## PROFESSIONAL DESIGNATIONS

- Certified Public Accountant  (registered in Illinois)

- Attorney  (non-practicing, California)

## EDUCATION

University of Michigan Law School   (J.D., 1979)

University of Michigan Business School  (B.B.A, 1976)

## HONORS

- Phi Beta Kappa
- Beta Alpha Psi
- Burroughs Corporation Scholar
- Branstrom Scholar
- Regents-Alumni Scholar

# Exhibit 1

**EMPLOYMENT**

**UCLA, Anderson School of Management** (1981 - present)
Teach 15 different courses in accounting, business law, tax planning, financial
statement analysis. Topics include compensation planning, cost accounting, quantitative
aspects of marketing, financial derivatives, LLC and partnership dissolution, investments,
valuation, new venture initiation, contracts, profit forecasting, and entrepreneurship.
Granted security of employment in 1988.

**UCLA School of Law** (1987 – 2000)
Law and Financial Analysis instructor. Course emphasizes how financial and statistical
data should be analyzed and presented in trial advocacy. Topics include damage
calculations, profit forecasting, valuation, bankruptcy, and marital dissolutions.

**Loyola Law School** (2001 - 2002)
Adjunct Professor, LL.M. in Taxation Program. Tax Planning and Accounting for
Lawyers. Courses focus on structuring corporate, partnership, and LLC transactions,
financial statement analysis, professional and fiduciary duties, and trial advocacy.

**Expert Witness/Arbitrator/Referee** (1986-present)
Have testified as an expert in federal and state court in several well-publicized cases,
including US v. Marvin Mitchelson and Rothenberg v. Roseanne Barr.

Have served as an arbitrator in over 150 commercial cases, involving contract, securities,
and partnership disputes. Member of the Accounting, Commercial Arbitration, and IRS
Tax Shelter Dispute Panels of the American Arbitration Association. Also have served as
an LA Superior Court referee and Orange County Superior Court referee.

**Public Speaker/Media Commentator** (1986-present)
Conducted seminars for numerous organizations, including the California Society of
CPAs, Deloitte and Touche, the Finance Ministry of the People's Republic of China,
members of the German Bundestadt (Parliament), Head Start Advanced Management
Conference, JP Morgan, KPMG, Merrill Lynch, and Price Waterhouse Coopers.

Expert on the CPA exam and accountant liability. Have trained over 14,000 California
financial professionals to pass the CPA exam.

Nationally recognized investment and accounting expert who frequently appears on
CNBC and CNN Radio. Has also has appeared in the Wall Street Journal, New York
Times, Forbes, Fortune, Business Week, Los Angeles Times, People, Bloomberg News,
and on CNN, NPR, MTV, and ABC Nightly News.

# Exhibit 1

**Corporate Officer/Director**                                            (1989 – present)
Co-founder, director, or CFO of various closely-held enterprises, including Accounting
Opportunities Advisors, Inc, a hedge fund management company; Accounting
Opportunities Fund, LLC, a hedge fund; Accounting Value Fund, LLC, a hedge fund;
BackupNet International, a data backup software licensor; and Westin Communications,
a financial publishing company.

**Investment Banking Consultant**                                         (2004 –present)
Serve as an expert consultant to investment banks, hedge funds, and other pooled
investment organizations. Affiliated with the Gerson Lehrman Group.

**California State Bar Enforcement Division**                             (2001)
Forensic investigator. Evaluated whether a suspended attorney had complied with the
financial and ethical requirements to merit reinstatement.

**Attorney**                                                             (1979-1980)
Tax attorney. Ervin, Cohen, and Jessup, Beverly Hills, CA. Currently non-practicing
status.

## BOOKS AUTHORED

- Business Law
- Business Statistics
- Cost Accounting
- Introductory Accounting
- Introductory Economics
- Managerial Finance
- Managerial Accounting
- Contributing Editor, The Knowledge Exchange's Encyclopedia of Business

# Exhibit 1

**UNIVERSITY COURSES TAUGHT / EXPERTISE**

### Accounting for Lawyers

The record-keeping process, auditor's liability, asset valuation, financial ratios, liability determination, discount rate determination, contract interpretation of financial covenants and accounting, usury and interest rate analysis, cash flow analysis, and accrual determinations of income and expense.

### Advanced Accounting

Mergers and acquisition techniques, consolidated reporting, professional responsibilities, fiduciary reporting, foreign currency transactions, bankruptcy and insolvency reporting, partnership accounting, intangibles valuation, government-wide statements, nonprofit accounting, earn-outs, contingent price adjustments, and goodwill determination.

### Business Plan Development

The venture capital process, structuring the marketing, sales, and general business strategy of an emerging or expanding business enterprise

### Cost Accounting

Sales and operational budgeting, profit forecasting, cost behaviors and allocations, breakeven analysis, net present value analysis, evaluating division and executive performance.

### Intermediate Accounting I

Revenue recognition, accounting estimates, intangibles valuation including goodwill, contingent liabilities, realization and matching principles, royalty income, accounting theory, asset swaps, depreciation, time value of money, research and development, patents, and trademarks.

### Intermediate Accounting II

Bonds and other financing instruments, convertible securities, stock options, equity, Statement of Cash Flows, operating and capital leases, sale-leasebacks, and real estate financing techniques, pensions, and deferred taxes.

# Exhibit 1

**Law for Entrepreneurs**

Contract liability and remedies, enterprise organization, agency, secured financing, bankruptcy, debt collection, the Uniform Commercial Code, unfair competition, price discrimination, antitrust, and the rights and duties of partners, officers, directors and shareholders.

**Managerial Accounting**

Core principles of accounting. Required of all MBA candidates.

**Small Business Management**

Quantitative analysis with imperfect information, market analysis, statistical analysis of data, Internet and e-commerce opportunities, workers' compensation, independent contractors, intellectual property, business strategy, franchises, goodwill valuation and determination, OSHA, personnel issues, labor relations, wrongful termination, employment contracts, and the regulatory environment.

**Structuring Entrepreneurial Deals**

Valuation and organization of closely-held enterprises, bootstrap financing, ownership and profit allocation, nontraditional valuation techniques, valuing unproven technologies, valuing intellectual property, the cost of capital, capital structure decisions, estate planning, retirement planning, securities laws, insider trading, and Section 1244 stock.

**Tax Principles and Policy**

Individual tax planning, tax return preparation, the alternative minimum tax, tax aspects of real estate investing and financing, timing assets acquisitions and dispositions, like-kind exchanges, capital gains versus ordinary income characterizations, professional duties of tax preparers, defined benefit and defined contribution plans, tax aspects of the employment and independent contractor relationships, and deferred compensation.

**Taxation and Management Decisions**

The formation and liquidation of enterprises, dividend distributions, stock redemptions, acquisition techniques, and analyzing partnership, S corporation, and LLC agreements.

**EXHIBIT 2**

# Exhibit 2

<u>PREVIOUS TESTIMONY</u>

Within the past four years, I have served as a testifying expert in the following matters:

<u>Daut v. Eastern Star Homes</u>, Superior Court, Orange County, case #05CC09116

Summary: Wrongful termination in violation of public policy; tax fraud; damages

<u>DR Management, LLC v. United States</u>, US District Court, Northern District of California, Oakland Division, case #05-01010 MMC

Summary: real estate tax planning; existence of income and character as capital gain

<u>Kerr, et al v. CBIZ Southern California LLC</u>, Superior Court, Los Angeles County, case #BC356298

Summary: Investors' reasonable reliance on financial data; trustee's fiduciary duty

<u>Swain, et al v. American Capital Strategies</u>, Superior Court, Los Angeles County, case #BC352310

Summary: Damages; llost business opportunities; business valuation

<u>PHC Sharp Holdings, Inc. v. Wenk</u>, Superior Court, Orange County, case #07CC09285

Summary: Damages re fraud; business valuation

<u>Lechter v. Kiyosaki, et al</u>, District Court, Clark County, NV, case #A549886

Summary: Fiduciary duty; reasonableness of compensation

<u>Wilson v. Alterna, Inc.</u>, Superior Court, Los Angeles County

Summary: Securities law; damages; fiduciary duty

# Exhibit 2

<u>BHE v. MTS Products and Ben Hsia</u>, Superior Court, Los Angeles County, case #EC 041097

Summary: Damages; business valuation

<u>Auerbach Acquisition Assoc., Inc  v. Daily</u>, Superior Court, Los Angeles County, case # BC285134

Summary: Venture capital; business valuation; derivatives valuation; financial resources; borrowing capability

<u>Williams, Trustee v. Gannon</u>, Second District Court, Montana, case #DV 02 201

Summary: Bankruptcy; cash flow; business forecasting

<u>Casey, Trustee v. US Bank</u>

Summary: Damages; embezzlement, cash flow forecasting and tracing

**EXHIBIT 3**

# Exhibit 3
# Feature Matrix of RealDVD Competitors

## PC Software

| No. | Name of Product | Cost | Copies CSS Discs | Burns DVDs | Browse / Playback Option | Format Conversion Transfer |
|---|---|---|---|---|---|---|
| 1 | Me Too Software 1 Copy DVDs 2 Standard Edition | $29.99 - $89.99 | Yes | Yes | No | Yes |
| 2 | Slysoft AnyDVD | $72.25 | Yes | No | No | No |
| 3 | Slysoft Clone DVD | $59.50 | Yes | Yes | No | No |
| 4 | Roxio Easy DVD Copy 4 | $49.99 | No | Yes | No | Yes |
| 5 | Corel DVD Copy 6 | $29.99 - $49.00 | No | Yes | No | Yes |
| 6 | RealDVD | $39.99 | Yes | No | Yes | n/a |
| 7 | Magic DVD Ripper | $34.97 | Yes | Yes | No | Yes |
| 8 | Bling Software Limited 123 Copy DVD '08 | $29.99 | Yes | Yes | No | Yes |
| 9 | Bling Software Limited 123 Movies 2 PsP | $9.99 | Yes | No | No | Yes |
| 10 | Handbrake 0.9.2 | Free | Yes | No | No | Yes |
| 11 | DVD43Free | Free | Yes | No | No | No |
| 12 | DVD Decrypter | Free | Yes | No | No | No |
| 13 | Boooya.com add in | Free | Yes | No | No | No |
| 14 | Lightning UK | Free | Yes | Yes | No | No |

## Home Media Servers

| No. | Name of Product | Cost | Copies CSS Discs | Burns DVDs | Browse / Playback Option | Format Conversion Transfer |
|---|---|---|---|---|---|---|
| 1 | Fusion Research | Approx. $8,000 and up | Yes | No | Yes | No |
| 2 | Escient | Approx. $1,000 and up | Yes | No | Yes | No |
| 3 | Kaleidescape | Approx. $10,000 and up | Yes | No | Yes | No |
| 4 | AMX | Approx. $14,000 and up | Yes | No | Yes | No |

# EXHIBIT 10

1  GLENN D. POMERANTZ (SBN 112503)
   *Glenn.Pomerantz@mto.com*
2  BART H. WILLIAMS (SBN 134009)
   *Bart.Williams@mto.com*
3  KELLY M. KLAUS (SBN 161091)
   *Kelly.Klaus@mto.com*
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, Thirty-Fifth Floor
5  Los Angeles, CA 90071-1560
   Tel: (213) 683-9100; Fax: (213) 687-3702
6
   ROBERT H. ROTSTEIN (SBN 72452)
7  *rxr@msk.com*
   ERIC J. GERMAN (SBN 224557)
8  *ejg@msk.com*
   BETSY A. ZEDEK (SBN 241653)
9  *baz@msk.com*
   MITCHELL SILBERBERG & KNUPP LLP
10 11377 West Olympic Boulevard
   Los Angeles, California 90064-1683
11 Tel: (310) 312-2000; Fax: (310) 312-3100
12 GREGORY P. GOECKNER (SBN 103693)
   gregory_goeckner@mpaa.org
13 DANIEL E. ROBBINS (SBN 156934)
   dan_robbins@mpaa.org
14 15301 Ventura Boulevard, Building E
   Sherman Oaks, California 91403-3102
15 Tel: (818) 995-6600; Fax: (818) 285-4403
16
   Attorneys for Plaintiffs
17

18                    UNITED STATES DISTRICT COURT

19                  CENTRAL DISTRICT OF CALIFORNIA

20                          WESTERN DIVISION

21
   UNIVERSAL CITY STUDIOS              CASE NO.  CV 08-06412 SJO AJWx
22 PRODUCTIONS LLLP, UNIVERSAL
   CITY STUDIOS LLLP, PARAMOUNT
23 PICTURES CORPORATION,              PLAINTIFFS' REPLY BRIEF IN
   TWENTIETH CENTURY FOX FILM         SUPPORT OF PLAINTIFFS'
24 CORPORATION, SONY PICTURES         *EX PARTE* APPLICATION FOR TRO
   TELEVISION INC., COLUMBIA
25 PICTURES INDUSTRIES, INC., SONY
   PICTURES ENTERTAINMENT INC.,
26 DISNEY ENTERPRISES, INC., WALT
   DISNEY PICTURES and WARNER
27 BROS. ENTERTAINMENT INC.,

28                  Plaintiffs,

1

2          vs.

3     REALNETWORKS, INC. and
      REALNETWORKS HOME
4     ENTERTAINMENT, INC.,

5              Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs submit this reply brief to correct misstatements of fact and law in Real's opposition papers.

**<u>Timing of TRO Request</u>:**  In the introductory paragraph of its opposition brief, Real asserts that Plaintiffs knew "since the first week of September" that RealDVD would be launched on September 30.  Opp. at 1.  Based on that statement, Real suggests throughout their papers that the Plaintiffs held off filing a request for a TRO for tactical reasons.  Real knows the facts are otherwise.

Here's what really happened:  Real and Plaintiffs entered into a standstill agreement on September 6, to facilitate settlement discussions.  In that agreement, the parties expressly agreed that neither party would argue "that any delay in asserting any claim during the [t]olling period is germane" to any issue in any litigation.  Real's suggestion in its papers that Plaintiffs delayed in seeking the TRO runs afoul of this commitment.[1]

The truth is that Plaintiffs have acted promptly and in the utmost good faith.  The parties tried for two weeks to resolve their dispute without Court intervention.  On September 22, Real terminated the standstill agreement, which under the terms of the agreement meant that the parties were free to file a lawsuit on Tuesday, September 30.  Three days after the September 22 termination notice, Plaintiffs asked Real to delay its launch by a few weeks to allow for expeditious and orderly briefing and consideration of Plaintiffs' request for immediate injunctive relief.  Pomerantz Decl. Ex. A.  Real refused to do so, and also refused to provide details on the ease with which it can disable the RealDVD software from its servers once the software has been distributed (a fact it still fails to disclose in its opposition papers).  Plaintiffs also informed Real last week that they would file their lawsuit Tuesday morning in this Court, and then worked around the clock to draft TRO

---

[1] The parties also agreed that the standstill agreement was confidential (which is why Plaintiffs did not mention it in their opening papers), but could be disclosed to enforce its terms.  If the Court would like to review a copy of the standstill agreement, Plaintiffs will file it promptly under seal.

PLAINTIFFS' REPLY BRIEF

1  papers, which were finalized in the early morning hours of Tuesday, September 30,

2  and provided to Real's counsel as soon as they were completed, even before they

3  were filed.

4  **Venue:**  Footnote 2 of Plaintiffs' opening papers explains why Real's

5  anticipatory declaratory action brought in the Northern District (which it brought

6  only after Plaintiffs told Real it would be filing in Los Angeles) is an improper

7  attempt to forum-shop.  *See also  Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d

8  1188, 1192-93 (C.D. Cal. 2006) ("Anticipatory suits . . . are viewed with disfavor

9  as examples of forum shopping and gamesmanship.").  Also, Real's opposition

10  never explains why venue of its *contract* claim against the DVD CCA matters to

11  this TRO request, which is based *solely* on a *DMCA* claim by Plaintiffs against

12  Real, over which venue is clearly proper in this district.  And even as to the contract

13  claim, Real's opposition overlooks the dispositive venue provision in the CSS

14  license.  Real itself has signed a license agreement that expressly provides that

15  Plaintiffs, as third-party beneficiaries of the CSS license, can file an action in Los

16  Angeles to enforce the terms of the license.  Pomerantz Decl. Ex. F at 23-25 (§ 9.5).

17  That is precisely what Plaintiffs have done in their second cause of action.[2]

18  **Likelihood of Success on Merits:**  Real does not seriously dispute that

19  RealDVD evades the technological protections of CSS.  It artfully says that

20  "RealDVD does not strip or remove the CSS *encryption* from the" copy it creates.

21  Opp. at 4 n.2 (emphasis added).  But Plaintiffs have demonstrated that RealDVD

22  avoids and bypasses all the *other* technological protections—e.g., drive locking,

23  authentication, bus encryption, the secure lead in area—that CSS provides and that

24  RealDVD circumvents CSS's core copy protection function.  *See* Pls' Memo. at 13-

25  14.  Neither Real nor its declarants deny that.

26

27  [2] Indeed, Plaintiffs have filed 10 other CSS lawsuits against other CSS licenses in
Los Angeles under the third-party beneficiary venue provisions of the CSS license,
and not one of those licensees claimed that venue was improper or that the DVD

28  CCA was a necessary party.

PLAINTIFFS' REPLY BRIEF

1    Real's central argument is that it is not circumventing CSS because it
2    "complies with the requirements" of the CSS License Agreement, and "if CSS were
3    supposed to prevent copying by a licensed user, the CSS Agreement would *prohibit*
4    *such conduct*." Opp. at 2-3 (emphasis added). Real does not dispute, however, that
5    under federal law the question is not whether the license *prohibits* the conduct, but
6    rather whether it affirmatively *authorizes* it. *See* Pls' Memo. at 16-19 (citing *S.O.S.*
7    *Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989); *LGS Architects, Inc. v.*
8    *Concordia Homes of Nevada*, 434 F.3d 1150, 1156-57 (9th Cir. 2006)). Real points
9    to no language in the license that *affirmatively authorizes* a CSS licensee to enable
10   consumers to freely make permanent, playable copies of DVDs. And for good
11   reason, because that is contrary to the entire purpose of CSS—developed by the
12   *Copy Protection* Technical Working Group and managed by the DVD *Copy*
13   *Control* Association. All the language regarding copying in the license is designed
14   to prohibit consumer copying. *See* Pls' Memo. at 18 (quoting Pomerantz Decl. Ex.
15   F at 1 (Recital A), 22 (§ 9.2)); *see also id.* at 4 (quoting Pomerantz Decl. Ex. G).

16   Real's Buzzard Declaration only confirms this. He admits RealDVD is a
17   "licensed and authorized *DVD player*." Buzzard Decl. ¶ 5 (emphasis added). He
18   does not suggest that Real has been licensed to distribute a DVD *copier*. As he
19   admits, once "access has been properly granted" under the playback license,
20   RealDVD uses that access to "make a backup copy of the content." *Id.* ¶ 9.
21   Because RealDVD exceeds the scope of its license, Real is using the CSS keys for a
22   prohibited purpose and, under well-settled law, is liable under the DMCA. *See* Pls'
23   Memo. at 15 (citing *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.
24   Supp. 2d 1085, 1098 (N.D. Cal. 2004); *Microsoft Corp. v. EEE Business Inc.*, 555
25   F. Supp. 2d 1051, 1059 (N.D. Cal. 2008)).

26   **<u>Irreparable Injury</u>:** The thrust of Real's argument on irreparable injury is
27   that Plaintiffs will suffer no harm because *illegal* DVD ripping software has been
28   available for years, and already costs the Plaintiffs dearly. The argument misses the

point entirely.  RealDVD is the *first* such branded product from a recognized company that holds itself out as "legal."  As Real frankly concedes, it is "targeted precisely to those users who have avoided rippers[.]"  Opp. at 6.  That is exactly the concern expressed by Mr. Dunn in his declaration: that the broad sweep of *law-abiding* consumers will now be likely to start copying DVDs, causing Plaintiffs irreparable injury above and beyond that caused by illegal rippers.  Dunn. Decl. ¶¶ 5, 27-28.  Real simply does not address that serious threat.  Real's "two wrongs make a right" argument should be rejected.

The only supposed "evidence" submitted by Real regarding irreparable injury is a declaration by Gordon Klein, a lawyer and accountant.  There is nothing apparent in Mr. Klein's background that even *might* permit him to opine authoritatively or reliably about the marketplace for home video products or services, or the effect of RealDVD on that marketplace.  His declaration does not set forth any relevant work or academic experience that would qualify him as an expert in any area relating to the market for entertainment products or, specifically, home entertainment products.  Nor does he indicate that he has previously qualified as an expert in the area.

In any event, in opining that damages are likely to be quantifiable, Mr. Klein simply points to the fact that there are *some numbers* in Mr. Dunn's declaration, and completely ignores the specific factors that Mr. Dunn points to in explaining why economic damages would be extraordinarily difficult to measure in this specific market, which he knows well after twenty-one years.  He also does not even purport to address Mr. Dunn's testimony about the irreparability of harm to nascent markets, or harm flowing from changes in consumer attitudes and behavior.  The numerous cases cited on page 22 of Plaintiffs' opening brief make clear that this is precisely the type of harm that warrants immediate injunctive relief.

**Balance of Hardship:**  The only evidence of harm that Real even purports to offer is the Lang Declaration.  Ms. Lang, however, points to supposed harm that

-4-                                    PLAINTIFFS' REPLY BRIEF

flowed from the decision to delay the launch of RealDVD past September 8.  To her credit, Ms. Lang acknowledges that the decision was *Real's*.  Lang Decl. ¶ 3. This hardship, however, has nothing to do with the granting or denying of injunctive relief; it is something Real voluntarily chose to do.  The only issue now is what harm, if any, Real will suffer if the launch is pushed back by a few more weeks to allow for consideration of the merits of a preliminary injunction motion. As to that issue, Ms. Lang's declaration offers very little.

Ms. Lang says that Real tried to re-interest the press in advance of the September 30 re-launch, but candidly admits that many publications "were not willing to run second articles."  *Id.*, ¶ 7.  Although she alludes to some unspecified "advertising efforts" around the September 30 re-launch, she does not quantify or detail any.

Ms. Lang also insists that Real will suffer hardship because it will lose its "first mover advantage."  The law is clear, however, that a party is not entitled to any advantage as a result of being the "first mover" in the market for an unlawful product or service.[3]

Perhaps most important, Real's opposition papers do nothing to respond to the risk of irreparable harm that the Plaintiffs explained in detail in the declaration of Mr. Dunn and that other courts have found exists when they have addressed similar situations.  *See* Pls' Memo. at 22.  The balance of hardships clearly tilts in favor of issuance of a temporary restraining order.

---

[3] *See, e.g., Power-One, Inc. v. Artesyn Techs., Inc.*, 2008 WL 1746636, *1, n.1 (E.D. Tex. 2008); *Warrior Sports, Inc. v. STX, L.L.C.*, 2008 WL 783768, *12 (E.D. Mich. 2008); *Tivo, Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664, 669-670 (E.D.Tex. 2006); *Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 2002 WL 32157203, *1 (N.D. Tex. 2002).

1    DATED: October 1, 2008         MUNGER, TOLLES & OLSON LLP

2                                     MITCHELL SILBERBERG & KNUPP LLP

3

4                                     GREGORY P. GOECKNER
DANIEL E. ROBBINS

5

6                                     By:  /s/

7                                             GLENN D. POMERANTZ

8                                     Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          PLAINTIFFS' REPLY BRIEF

# EXHIBIT 11

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**JS-6**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

**CASE NO.:**  <u>CV 08-06412 SJO (AJWx)</u>          **DATE:** <u>October 2, 2008</u>

**TITLE:**     <u>Universal City Studios Productions, LLLP, et al. v. RealNetworks, Inc., et al.</u>

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                          Not Present
Courtroom Clerk                           Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**       **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                               Not Present

========================================================================
**PROCEEDINGS (in chambers):**
ORDER TRANSFERRING ACTION TO NORTHERN DISTRICT OF CALIFORNIA

        This matter is before the Court on Plaintiffs Universal City Studios Productions LLLP, Universal City Studios LLLP, Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Sony Pictures Television Inc., Columbia Pictures Industries, Inc., Sony Pictures Entertainment Inc., Disney Enterprises, Inc., Walt Disney Pictures and Warner Bros. Entertainment, Inc.'s (collectively "Plaintiffs") Application for Temporary Restraining Order ("TRO"), and Order to Show Cause re: Preliminary Injunction, filed September 30, 2008.  Defendants RealNetworks, Inc. And RealNetworks Home Entertainment, Inc. (collectively "RealNetworks") filed an Opposition, to which Plaintiffs replied.  Because of the following reasons, Plaintiffs' Application and Complaint action are hereby TRANSFERRED to the Northern District of California.

I.     <u>BACKGROUND</u>

        On September 30, 2008, RealNetworks began selling a software product entitled "RealDVD," which enables users to make copies of DVDs on their computer hard drives.  (Pls.' P. & A. 1.)  RealNetworks created this product using DVD Content Scramble System ("CSS") technology, which it obtained pursuant to an agreement with the DVD Copy Control Association ("DVD CCA"), which licenses the use of CSS.  (Pls.' P. & A. 8.)  The terms of RealNetworks' agreement with DVD CCA provide that disputes between RealNetworks and DVD CCA must be litigated exclusively in Santa Clara County, California.  (CSS License Agreement, filed as Pomerantz Decl. Ex. F, at 26.)  The agreement also provides that disputes between RealNetworks and third party beneficiaries may be brought in courts located in Los Angeles, Santa Clara, or San Francisco counties.  *Id.*

        RealNetworks originally planned to release RealDVD on September 8, 2008, but delayed the release at Plaintiffs' request.  (Letter from James DiBoise to Glenn Pomerantz, Sept. 25, 2008, filed as Pomerantz Decl. Ex. C.)  On September 6, 2008, Plaintiffs and RealNetworks entered into a "standstill agreement" under which all parties agreed to refrain from bringing suit to facilitate

__ : __

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JS-6

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 08-06412 SJO (AJWx)          DATE: October 2, 2008**

settlement discussions.  (Pls.' Reply 1, Defs.' Opp'n 2.)   According to Plaintiffs, RealNetworks terminated the standstill agreement on September 22, 2008, which under the terms of the agreement meant the parties could bring suit beginning September 30, 2008.  Plaintiffs then asked RealNetworks to delay its release of RealDVD until late October so they could seek injunctive relief, and informed RealNetworks that they intended to file suit in Los Angeles on September 30, 2008.  (Letter from Glenn Pomerantz to Robert Kimball, Sept. 25, 2008, filed as Pomerantz Decl. Ex. A.)  RealNetworks refused to delay the launch.  (Pls.' P. & A. 1.)

On September 30, 2008, at 9:05 a.m. in the Northern District of California, RealNetworks filed a complaint seeking a declaratory judgment against Plaintiffs, DVD CCA, and Viacom, Inc., that RealDVD does not violate the Digital Millennium Copyright Act ("DMCA") or the CSS License Agreement.  (08-04548, Docket No. 1.)  At 10:21 a.m., Plaintiffs filed their Application in the Central District of California.

II.    DISCUSSION

The "first to file" rule is a generally recognized doctrine of federal comity that permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district.  *Mediostream, Inc. v. Priddis Music, Inc.*, No. 07-2127, 2007 U.S. Dist. LEXIS 73707, at *6 (N.D. Cal. Sept. 24, 2007) (citing *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 679 F.2d 93, 94-5 (9th Cir. 1982)).  The rule allows a court to dismiss, transfer, or stay an action when a similar complaint has been filed in another district.  *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 623 (9th Cir. 1991).  This doctrine "serves the purpose of promoting efficiency well and should not be disregarded lightly."  *Church of Scientology of California v. United States Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979).  In applying the "first to file" rule, courts look to three threshold factors: (1) the chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues.  *Greenline Industries v. Agri-Process Innovations, LLC*, No. 08-2438, 2008 U.S. Dist. LEXIS 60504, at *8 (N.D. Cal. July 28, 2008).  Even if the threshold factors are met, a court may dispense with the "first to file" rule if the first suit filed is anticipatory, meaning the plaintiff filed it "upon receipt of specific, concrete indications that a suit by [the] defendant was imminent."  *Xioxide, Inc. v. Ford Motor Co.*, 448 F. Supp 2d. 1188, 1192 (C.D. Cal. 2006).

In deciding whether to transfer an action based on the "first to file" rule, the court in the second-filed action normally does not consider the respective convenience of the two courts.  *Alltrade*, 946 F.2d at 628 ("As for the respective convenience of the two courts, normally this argument should be addressed to the court in the first-filed action.  Apprehension that the first court would fail to appropriately consider the convenience of the parties and the witnesses should not be a matter for our consideration.")

Here, RealNetworks filed suit in the Northern District at 9:05 a.m. on September 30, 2008 ("Case 1").  Plaintiffs filed their action and Application at 10:21 a.m. on the same day, in the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: <u>CV 08-06412 SJO (AJWx)</u>     DATE: <u>October 2, 2008</u>**


Central District. ("Case 2"). The parties in both cases are substantially the same: in Case 1, RealNetworks brought suit against Plaintiffs and two additional parties, DVD CCA and Viacom, Inc. In Case 2, Plaintiffs brought suit against RealNetworks. In addition, the issues in both cases are identical. In Case 1, RealNetworks seeks a declaratory judgment that its RealDVD violates neither the CSS License Agreement nor the DMCA. (08-4548 Compl. 9.) In Case 2, Plaintiffs allege RealNetworks violates both the CSS License Agreement and the DMCA. (Compl.15.) Thus, the threshold requirements are met.

Plaintiffs contend that the Court should disregard the "first to file" rule because Case 1 was anticipatory. (Pls.' Reply 2.) In support, they point to the fact that RealNetworks filed its action "only after Plaintiffs told RealNetworks it would be filing in Los Angeles." *Id.* Indeed, Plaintiffs informed RealNetworks that it would be filing suit in Los Angeles in a letter dated September 25, 2008. (Letter from Glenn Pomerantz to Robert Kimball, filed as Pomerantz Decl. Ex. A.) However, Plaintiffs and RealNetworks had a "standstill agreement" under which all parties agreed to refrain from filing suit until September 30, 2008. (Pls.' Reply 1.) In this agreement, the parties agreed that "neither party would argue that any delay in asserting any claim during the tolling period is germane to any issue in any litigation." *Id.* Despite this, Plaintiffs now argue that because RealNetworks waited to file suit until the date agreed upon by the parties, that suit is improper. *Id.* RealNetworks maintains that it "initiated its preparation for filing its declaratory judgment action prior to receiving any correspondence from Plaintiffs' counsel" and that the only reason it did not file earlier is because of the standstill agreement. (Defs.' Opp'n 2.) Plaintiffs themselves rely on this agreement to explain their delay in seeking a TRO. (Pls.' Reply 1.) In other words, both parties intended to file suit on September 30, irrespective of Plaintiffs' letter to RealNetworks. As such, it does not appear that RealNetworks filed suit in response to Plaintiffs' letter, and thus the action was not anticipatory.

In addition, the Court finds that judicial economy favors transferring Case 2 to the Northern District, because that is the only district where DVD CAA may be joined as a party, pursuant to the CSS Licensing Agreement. Therefore, were this Court to decline to transfer Case 2, Case 1 and Case 2 could not be consolidated and the identical issues of the legality of RealDVD under the DMCA and the CSS License Agreement would have to be litigated twice, in two separate courts.

III.   RULING

For the foregoing reasons, the Court hereby TRANSFERS this action to the Northern District of California.

IT IS SO ORDERED.