1 | JAMES A. DiBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
2 | COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
3 | MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
4 | TRACY TOSH LANE, State Bar No. 184666
Email: ttosh@wsgr.com
5 | WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
6 | One Market Street
Spear Tower, Suite 3300
7 | San Francisco, CA 94105

8 | Attorneys for Plaintiffs and
Counterclaim Defendants
9 | REALNETWORKS, INC. and
REALNETWORKS HOME
10 | ENTERTAINMENT, INC.

11 |                    UNITED STATES DISTRICT COURT

12 |                   NORTHERN DISTRICT OF CALIFORNIA

13 |

14 | REALNETWORKS, INC., a Washington          )    CASE NO.: C 08 04548 MHP
Corporation; and REALNETWORKS HOME           )
15 | ENTERTAINMENT, INC., a Delaware           )    **PUBLIC REDACTED VERSION OF
corporation,                                  )    PLAINTIFFS AND
16 |                                          )    COUNTERCLAIM DEFENDANTS'
                                              )    OPPOSITION TO DEFENDANTS'
17 |          Plaintiffs and Counterclaim      )    APPLICATION FOR A
             Defendants,                       )    TEMPORARY RESTRAINING
18 |                                          )    ORDER**
             v.                                )
19 |                                          )
DVD COPY CONTROL ASSOCIATION, INC.,           )    **Date: October 7, 2008
20 | a Delaware nonprofit corporation, DISNEY  )    Time: 2:00 p.m.**
ENTERPRISES, INC., a Delaware corporation;    )    **Courtroom 15, 18th Floor**
21 | PARAMOUNT PICTURES CORP., a Delaware       )
corporation; SONY PICTURES ENTER., INC., a    )
22 | Delaware corporation; TWENTIETH CENTURY    )
FOX FILM CORP., a Delaware corporation;       )
23 | NBC UNIVERSAL, INC., a Delaware            )
corporation; WARNER BROS. ENTER., INC., a     )
24 | Delaware corporation; and VIACOM, Inc., a  )
Delaware Corporation.                         )
25 |                                          )
26 |          Defendants and Counterclaim       )
             Plaintiffs.                        )
27 |                                          )
28 |                                          )

---

PLAINTIFFS' OPP'N. TO TRO APPLICATION                    CASE NO. 08-cv-04548 MHP

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.   Real Is A Licensee To The Relevant CSS Technology ............................... 3

II.   RealDVD Is CSS-Licensed Software That Protects Copyrighted Content ............. 3

ARGUMENT ........................................................................................................... 4

I.   RealDVD Fully Complies With The CSS License Agreement And Therefore Is Not "Circumventing" The CSS Technology ....................................... 4

    A.   RealDVD Complies with the DVD CAA License ...................................... 5

    B.   The CSS License Agreement Does Not Prohibit Making A Back-up Copy Of DVD Content ........................................................................ 7

    C.   Defendants Cannot Maintain Any Claim Under 17 U.S.C. § 1201(a) ...... 10

    D.   Defendants Cannot Maintain Any Claim Under 17 U.S.C. § 1201(b) ...... 13

II.   The Defendant Studios Have Failed to Demonstrate Any Cognizable Harm, Much Less Irreparable Harm .............................................................. 16

    A.   RealDVD Does Not Threaten Imminent, Irreparable Harm ..................... 17

        1.   Because The Primary Use For Which RealDVD Is Intended Is Protected, RealDVD Does Not Threaten Any Cognizable Harm. ............................................................................... 17

        2.   RealDVD Does Not Threaten To Contribute To Piracy Because Better Piracy Tools Have Long Existed in the Marketplace. ........................................................................ 18

        3.   RealDVD Does Not Threaten Defendants' "Less Mature Markets" ......................................................................... 20

        4.   The Availability of RealDVD Does Not Threaten Consumers' Attitudes Regarding the Legality of Piracy .............. 21

    B.   The Harms Claimed by Defendants Are Compensable In Damages And Do Not Justify An Injunction ........................................................ 22

    C.   The Balance of Hardship Weighs Strongly Against Entry of An Injunction ...................................................................................... 23

    D.   The Public Interest Militates Against An Injunction ................................ 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004) ........................ passim

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987) ........................................... 16

*Chamberlain Group, Inc. v. Skylink Tech., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) ....................... 15

*Cotter v. Desert Palace, Inc.*, 880 F.2d 1142 (9th Cir. 1989) ................................................ 21, 22

*DVD Copy Control Association, Inc. v. Bunner*, 116 Cal. App. 4th 241 (2004) .......................... 19

*eBay Inc. v. MercExchange*, 547 U.S. 388 (2006) ................................................................. 16, 17

*Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005) ............... 11, 12, 13, 14

*Global Horizons, Inc. v. U.S. Dept. of Labor*, 510 F.3d 1054 (9th Cir. 2007)............................. 17

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
      497 F. Supp. 2d 627 (E.D.Pa. 2007) ......................................................................... 13, 14

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
      118 F.3d 199 (4th Cir. 1997)............................................................................................ 16

*ICU Medical Inc. v. Alaris Medical Systems, Inc.*,
      No. CV 04-689, 2004 WL 1874992 (C.D. Cal. July 30, 2004) ....................................... 22

*I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.*,
      307 F. Supp. 2d 521 (S.D.N.Y. 2004)........................................................... 11, 12, 13, 14

*LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006) ................. 14

*Metro-Goldwyn-Mayer Studios , Inc. v. Grokster, Ltd.*,
      518 F. Supp. 2d 1197 (C.D. Cal. 2007)............................................................................ 16

*Reilly v. Medianews Group, Inc.*,
      No. C 06-04332, 2006 WL 2419100 (N.D. Cal. July 28, 2006) ................................ 21, 22

*S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989)............................................................ 14

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ............................................. 25

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ................... 2, 15, 18

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001)................................ 2, 12, 16

*Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000) ................... 12, 13, 16

1

**STATUTES**

2    17 U.S.C. § 1201(a) ......................................................................................... 10, 11

3    17 U.S.C. § 1201(a)(2) ........................................................................................... 10

4    17 U.S.C. § 1201(a)(3)(B) ....................................................................................... 11

5    17 U.S.C. § 1201(b) ................................................................................... 13, 15, 16

6    17 U.S.C. §1201(b)(1)(B) ....................................................................................... 16

7

**MISCELLANEOUS**

8    *DVD Copy Control Assoc., Inc. v. Kaleidescape, Inc.*, 1:04 CV 031829 (Santa

9       Clara County) .................................................................................... 1, 8, 9, 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## APPENDIX OF EXHIBITS TO DEFENDANTS' *EX PARTE* APPLICATION

2   The Defendant Movie Studios attached as exhibits to their *Ex Parte* Application for

3 Temporary Restraining Order all of the papers previously filed by the parties in connection with

4 the Studios' *Ex Parte* Application filed in the District Court for the Central District of California.

5 Plaintiffs provide this Appendix correlating the exhibit numbers with the title of the earlier-filed

6 documents for easier reference.

7

8

| DOCUMENT TITLE | EXHIBIT NUMBER |
|---|---|
| Declaration of Dr. Alex E. Bell In Support of Ex Parte Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction Thereof ("**Bell Decl.**") | Exhibit 2 |
| Declaration of Jeffrey Buzzard On Behalf Of Defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc.'s Opposition to TRO ("**Buzzard Decl.**") | Exhibit 8 |
| Declaration of Michael Dunn In Support of Ex Parte Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction Thereof ("**Dunn Decl.**") | Exhibit 3 |
| Declaration of Dr. John P.J. Kelly In Support of Ex Parte Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction Thereof ("**Kelly Decl.**") | Exhibit 4 |
| Declaration of Gordon Klein In Opposition to *Ex Parte* Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("**Klein Decl.**") | Exhibit 9 |
| Declaration of Jacqueline Lang In Opposition to *Ex Parte* Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("**Lang Decl.**") | Exhibit 7 |
| Declaration of Glenn D. Pomerantz In Support of Ex Parte Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction Thereof ("**Pomerantz Decl.**") | Exhibit 5 |
| Notice of Application and Ex Parte Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction; memorandum of Points and Authorities In Support Thereof ("**TRO App.**") | Exhibit 1 |
| Defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc.'s Opposition to Plaintiffs' *Ex Parte* Application For A TRO ("**Opp.**") | Exhibit 6 |
| Plaintiffs' Reply Brief In Support of Plaintiffs' *Ex Parte* Application for TRO ("**Reply**") | Exhibit 10 |

1   Plaintiffs RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real" or

2   "Plaintiffs") submit the following in opposition to Defendants' Application for Temporary

3   Restraining Order, scheduled to be heard by this Court on Tuesday, October 7, 2008 at 2:00 p.m.:

4   **INTRODUCTION**

5   After Real launched its RealDVD software product on September 30, 2008, Defendants

6   began to seek a TRO stopping its distribution.  Defendants are simply not entitled to the injunctive

7   relief requested.  Defendants have already caused significant irreparable harm to Real by

8   prevailing upon this Court to institute a temporary halt to sales of RealDVD since the evening of

9   Friday, October 3, 2008.  The grant of a further TRO or preliminary injunction now will devastate

10   Real's ability to ever launch RealDVD successfully or to capitalize on its lead over competitors.

11   Defendants have not established a likelihood of success on the merits of the claims they

12   advance in their TRO papers.  Defendants claim that Real is "circumventing" the technological

13   measures used with DVDs to control access to the contents of the DVDs – namely, the Content

14   Scramble System ("CSS") technology.  Defendants thus argue that Real is liable for

15   "circumvention" under § 1201 of the Digital Millennium Copyright Act (the "DMCA").

16   Defendants' claims have no merit for a self-evident reason:  Real is a *licensee* to the CSS

17   technology and has the right to implement and use CSS technology pursuant to that license.  Real

18   complies with the CSS license, performs all of the technical steps as outlined by the CSS license

19   and does not perform any actions on the CSS technology that are proscribed by the CSS license.

20   Further, Defendants cannot maintain a claim that Real or RealDVD is out of compliance with the

21   CSS License Agreement.  Real does nothing more than operate RealDVD in the same manner as

22   the product offered by Kaleidescape – a company which already litigated and prevailed on the

23   same compliance question in *DVD Copy Control Assoc., Inc. v. Kaleidescape, Inc.*, 1:04 CV

24   031829 (Santa Clara County) (Nichols, J. presiding).  There, after a seven day trial, Judge Nichols

25   found that the Kaleidescape product, which is identical in all relevant respects to RealDVD, was

26   compliant with the CSS license agreement.  Defendants cannot show any likelihood of success

27   advancing the same losing argument from the *Kaleidescape* case.

28   Defendants thus have no claim for circumvention under the DMCA.  That fact is confirmed

1   by the very cases on which Defendants rely (and in which many of Defendants were parties).

2   Those cases, including *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004)

3   and *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001). *321 Studios* have found

4   that **unlicensed** persons who create software to break through CSS encryption are in violation of

5   the DMCA, relying on Defendants' own assertions in those cases "that CSS prevents access to

6   DVDs in the absence of the proper CSS keys, and that **only licensed DVD players can legally**

7   **access the CSS keys** in order to play DVDs." But here, Real is a CSS licensee and RealDVD

8   performs only authorized, licensed actions on the CSS technology.  No published case anywhere,

9   ever, has held that a CSS licensee in compliance with the CSS License Agreement can be found

10  liable for circumvention of CSS under the DMCA.

11          Defendants' DMCA claims also fail on numerous other grounds, including that Defendants

12  have no copyright right implicated by the design and marketing of RealDVD.  RealDVD affords its

13  users the ability to make a personal backup copy of DVDs.  Those backup copies are encrypted

14  and locked to the user's hard drive; they cannot be uploaded to the Internet; accessed over a

15  network; or shared with a friend.  RealDVD even admonishes users not to copy discs they do not

16  own.  In short, the commercially significant purpose of RealDVD is activity which is clearly a "fair

17  use" copy of a DVD under the Supreme Court's landmark decision of *Sony Corp. of America v.*

18  *Universal City Studios, Inc.*, 464 U.S. 417 (1984).  Defendants have no copyright right to prevent

19  such fair use and cannot avail themselves of the DMCA as an end-run around fair use.

20          Equally defective are Defendants' claims of supposed irreparable harm.  Defendants

21  contend that RealDVD will suddenly enable rampant piracy in the movie industry.  Not only does

22  Defendants' theory of harm ignore the numerous restrictions on copies made by RealDVD, but it

23  also ignores the current state of the market.  The availability of RealDVD could not possibly cause

24  imminent irreparable harm – if piracy were one's goal, the market has been replete with better

25  ways to accomplish that goal for years.  Further, Defendants' own papers establish that if any

26  cognizable and compensable harm to the studios were to occur, such harm is capable of calculation

27  and thus not irreparable.  For these reasons, this Court should deny Defendants' requested TRO.

28

# BACKGROUND

## I.   Real Is A Licensee To The Relevant CSS Technology

Movies distributed on DVD discs are encrypted using an encryption system known as the "Content Scramble System" or "CSS." CSS technology was developed by two technology companies, Matsushita Electric Industrial Co., Ltd. ("MEI") and Toshiba Corporation. *See* Pomerantz Decl., Ex. F at Recitals, ¶ A; § 2.1(a). In order to manufacture DVDs or make consumer electronic devices or computer software that interact with the DVDs, manufacturers must all be able to use the CSS technology. Lane Decl., Ex. A at 9. The DVD Copy Control Association, Inc. (the "DVD CCA") is an organization that was created to manage the licensing rights to the CSS technology. *Id.* The DVD CCA is a membership corporation with approximately 350 member-licensees that is governed by a twelve member board of directors. *Id.* Movie studios hold six of these Board seats, and the consumer electronics industry and computer industry each gets three seats. *Id.*

MEI and Toshiba licensed to the DVD CCA rights to the CSS technology they developed. In turn, the DVD CCA promulgated a CSS License Agreement that grants rights to this technology to licensees. Licensees must take the CSS License Agreement as it comes, and do not have the ability to negotiate terms of the license agreement. Indeed, licensees do not even have access to certain of the documents (specifically, the Technical Specifications) that form part of the CSS License Agreement until after they execute a license agreement in the first place. *Id.* at 9-10. Real executed the CSS License Agreement that became effective on August 23, 2007. Pomerantz Decl., Ex. F.

## II.   RealDVD Is CSS-Licensed Software That Protects Copyrighted Content

RealDVD is software which permits consumers to create on a storage medium, such as a computer's hard drive a single, private, encrypted and secure copy of DVDs that the consumer owns. RealDVD permits consumers to conveniently save, manage and play their entire collection of DVDs, without worrying about storing, damaging or losing the fragile physical DVD disks. Supp. Lang Decl., Ex. B. RealDVD also offers users a variety of other appealing functions, including the ability to: (1) watch DVDs from the laptop using less battery power, (*id.*); (2) control

1    the types of movies children can access through "Parental Controls," (*id.*); browse DVDs by title,

2    genres and actors; (3) look up information about the DVD from Internet databases; and (4) provide

3    links to various information websites relevant to the chosen DVD.   Buzzard Decl., ¶ 3.

4        RealDVD does all of these things in a manner compliant with the CSS License Agreement

5    and, in fact, RealDVD protects DVD content far more securely than the CSS technology alone.

6    Buzzard Decl., ¶¶ 6, 10-12.  For example:

- RealDVD stores DVD content securely on a hard drive in the original CSS encrypted form. Buzzard Decl., ¶ 9. RealDVD also adds a layer of security to the CSS protection by further encrypting the CSS encrypted content and the keys to unlock the content with its own proprietary encryption system. Buzzard Decl., ¶ 11.

- RealDVD "locks" the playback of the encrypted copies to a single RealDVD user account. Thus, saved DVD content cannot be played back from another user's computer with another user's RealDVD account.  Buzzard Decl., ¶ 12.

- RealDVD is a "closed system", which does not allow DVD content to be sent through a network or uploaded to an internet site and viewed by any other person. Buzzard Decl., ¶ 15.

- The copy made by RealDVD cannot be stored on any storage device other than the storage device onto which it was originally copied.  Buzzard Decl., ¶ 14.  Thus, it is impossible to transfer DVD content onto a device like an iPod, or to "burn" copies of DVDs. RealDVD cannot be used to create pirate or counterfeit DVDs.

16    Indeed, with respect to making a backup copy of a DVD, RealDVD is designed and

17    marketed to customers only to make such copies *of the customers' own DVDs*. RealDVD's

18    marketing materials clearly convey this intention, and RealDVD even provides an admonition in

19    the operation of the software reminding users of this restriction on use of RealDVD.  *See* Supp.

20    Lang Decl., ¶ 5 (Admonition states that "RealDVD is for saving a DVD that you own.  If you do

21    not own this DVD, select Play.").  As explained in more detail below, RealDVD offers a safe,

22    effective way for users to create a fair-use backup copy of their DVDs that is fully compliant with

23    CSS technology and the CSS License Agreement and does not violate the DMCA.

## ARGUMENT

**I.    RealDVD Fully Complies With The CSS License Agreement And Therefore Is Not "Circumventing" The CSS Technology**

Defendants' argument that RealDVD violates the DMCA depends upon a showing that

Real is "circumventing" CSS technology.  Simply put, Defendants cannot make such a showing.

Real is a ***licensee*** to the relevant CSS technology by virtue of a CSS License Agreement granted

1   by the DVD CCA to Real, and Real's use of CSS technology complies with the CSS License

2   Agreement. Because Real complies with the requirements of the CSS License Agreement, there is

3   no legitimate basis to argue that Real is circumventing CSS technology or is in violation of any

4   provision of the DMCA.

5        **A.   RealDVD Complies with the DVD CCA License**

6        The CSS License Agreement grants a non-exclusive license to "use and implement" the

7   intellectual property rights for CSS technology developed by Matsushita Electric Industrial Co.,

8   Ltd. and Toshiba Corporation. Pomerantz Decl., Ex. F at Recitals, ¶ A; § 2.1(a). In exchange for

9   these CSS technology rights, a licensee agrees to be compliant with the Procedural and Technical

10   Specifications for the CSS technology. *Id.* at § 4.2.

11        Here, Defendants have not and cannot establish that RealDVD performs any action with

12   respect to CSS technology that is not in compliance with the CSS License Agreement and the

13   Procedural and Technical Specifications. As explained in the Buzzard Declaration, Real complies

14   with the CSS Procedural and Technical Specifications provided by the DVD CCA for every

15   instance of access through, and decryption of, CSS technological measures in the operation of the

16   RealDVD software. Because RealDVD complies with the CSS Procedural and Technical

17   Specifications for each RealDVD function that involves CSS technology, RealDVD does not

18   "circumvent" CSS technology. *See also* Felten Decl., *passim.*

19        To invent a claim of "circumvention," Defendants make a number of conclusory and

20   factually incorrect assertions regarding RealDVD's use of the licensed CSS technology. As an

21   initial matter, Defendants' assertions can be disregarded in their entirety for the simple reason that

22   Defendants' technical declarants, Drs. Kelly and Bell, do not address the actual CSS License

23   Agreement provisions that govern Real's use of CSS technology. Indeed, neither declarant

24   indicates they have the necessary familiarity with the applicable specifications of the CSS License

25   Agreement, much less discuss whether RealDVD complies with those specific specifications.

26   Thus, those declarations should be seen for what they are -- a general discussion of CSS technology

27   and how it might prevent ***unlicensed*** persons from performing various actions on DVD content.

28   That analysis has no relevance here where Real is a CSS licensee. Instead, as discussed in more

1   detail below and in the Buzzard and Felten Declarations, Defendants' claims of circumvention –

2   when applied to a CSS licensee such as Real – are simply wrong.

3   For example, Defendants assert that Real "impairs" the CSS technological measure that

4   controls authenticating a DVD drive. This is false. RealDVD authenticates a DVD drive in the

5   manner provided in the Technical Specifications for the "Authenticator on DVD Drive" as

6   provided by the CSS License Agreement. Buzzard Decl., ¶ 8-9; *see also* Felten Decl., ¶ 31.

7   RealDVD does not perform authentication in any way other than that provided in the Technical

8   Specifications in RealNetworks' CSS License Agreement. Buzzard Decl., ¶ 8-9. Thus, as a DVD

9   CCA licensee, Real does not "impair" the technological measures of CSS regarding authentication

10   of a DVD drive. *See* Felten Decl., ¶¶ 31, 38-44, 49-54.

11   Similarly, Defendants also assert that RealDVD "bypasses" technological restrictions that

12   control the use of a "content key" that is used to descramble the DVD content, which is scrambled

13   and can only be unlocked in a licensed manner by using the particular "content keys" provided

14   with a DVD. Again, this is not correct. RealDVD accesses the "content keys" for a particular

15   DVD in the manner provided by the Technical Specifications for the "Authenticator Module for

16   CSS Decryption Module." Buzzard Decl., ¶ 8-9. RealDVD uses those "content keys" in the

17   manner described by the Technical Specifications for the DVD-Video Descrambler. *Id.* RealDVD

18   does not access the "content keys" on a DVD in any manner other than that provided by the

19   Technical Specifications in RealNetworks' CSS License Agreement and thus does not "bypass"

20   this technological measure. *Id., see also* Felten Decl., ¶ 32-34, 38-44.

21   Defendants also assert that RealDVD bypasses the CSS authentication process in the

22   playback of DVD content. Again, this is incorrect. RealDVD obtains the correct access keys and

23   content keys for playback from the DVD and DVD drive in the manner described by the Technical

24   Specifications, as discussed above. RealDVD does not perform authentication or access "content

25   keys" from the DVD and the DVD drive in any manner other than that provided in the Technical

26   Specifications of RealNetworks' CSS License Agreement. Indeed, Defendants' contention that

27   RealDVD removes or alters any CSS encryption on DVD content is simply a false representation

28   of RealDVD's functionality. RealDVD ***does not*** strip or remove any CSS encryption from an

1   image of the DVD that can be created as a backup copy on a user's storage medium. *See* Buzzard

2   Decl., ¶9. For these reasons, Defendants' claim that RealDVD "bypasses" these technological

3   measures is false. *See also* Felten Decl., ¶ 32-34, 38-44. Because Real is in compliance with the

4   License, and the License grants Real the ability to "use and implement CSS" (*see* CSS License at

5   § 2.1), Real is simply not circumventing CSS technology.

6       **B.      The CSS License Agreement Does Not Prohibit Making A Backup Copy Of
            DVD Content**

7           With no evidence that Real is circumventing any CSS technology under the terms of the

8   CSS License Agreement, Defendants argue that RealDVD must be 'circumventing' CSS

9   technology because RealDVD allows users to make a backup copy of a DVD. According to

10  Defendants, CSS technology prevents copying of DVD content so, if RealDVD allows a copy of

11  DVD content, Real must therefore be circumventing CSS. Defendants' argument is based on a

12  false premise. Specifically, Defendants are conflating two separate issues – the issue of what CSS

13  technology prevents as against an *unlicensed person* on the one hand and the issue of what a

14  *licensee* must do to comply with the CSS License Agreement on the other hand. Even assuming

15  that CSS technology has the ability to prevent *unlicensed* persons from making a copy of a DVD,

16  that fact has no relevance in this case, where Real is *not* an unlicensed person.[1] Because

17  Defendants cannot establish that the RealDVD software performs any action in making a backup

18  copy that is not in compliance with the Procedural and Technical Specifications of the CSS

19  License Agreement, Defendants cannot establish that Real is out of compliance with the CSS

20  License Agreement. Buzzard Decl., ¶¶ 8-9; Felten Decl., ¶¶ 31-34, 38-54. If Real is within the

21  license agreement and does not circumvent any of the CSS access measures even though it makes a

22  backup copy of a DVD, then Defendants' premise is false. The CSS technology simply does not

24      [1]  Importantly, as explained in the Felten Declaration, Defendants' claims that CSS even
25  prevents the copying of DVD content are specious. As Mr. Felten discusses, by the *automatic*
    operation of *preinstalled* Windows software on most (if not all) personal computers purchased
26  today, any time a person places a copy of a DVD into a personal computer, the DVD drive is
    activated and the content of the DVD is automatically made available for copying to the
27  computer. Felten Decl., ¶ 16. While such copies retain the CSS encryption, they are
    nevertheless copies. Defendants cannot credibly contend that CSS prevents the copying of DVD
28  content where Defendants surely realize that the personal computers available today
    automatically allow such copying to occur.

1  prevent *licensees* from making backup copies. There is no technological measure that has been

2  circumvented. Felten Decl., ¶¶ 48, 54.

3        To get around this problem, Defendants also argue that the CSS License Agreement

4  contains a prohibition on making backup copies of DVDs. Defendants' assertion is wrong. The

5  CSS License Agreement contains no such prohibition. Indeed, the precise issue of whether the

6  CSS Agreement prohibits such copying was recently litigated by the actual licensor of the CSS

7  Agreement, the DVD CCA.[2] In 2004, the DVD CCA brought an action in the Superior Court of

8  Santa Clara County against Kaleidescape, Inc. ("Kaleidescape"), alleging that by selling a product

9  similar in all relevant respects to RealDVD, Kaleidescape breached the CSS License Agreement.

10        There, as Defendants do here, the DVD CCA argued that the CSS License Agreement

11  contained prohibitions on copying of DVD content. The *Kaleidescape* Court, applying California

12  law, disagreed. On March 29, 2007, after a seven day trial, Judge Leslie C. Nichols held that the

13  DVD CCA had failed to prove that the CSS License Agreement prohibited copying. Specifically,

14  Judge Nichols found that a "General Specifications" document relied upon by the DVD CCA to

15  support its supposed anti-copying prohibition was not, in fact, part of the CSS License Agreement

16  at all. Pomerantz Decl., Ex. L at 131. The Court further held that even if the General

17  Specifications were part of the CSS License Agreement, they did not impose obligations upon

18  Kaleidescape which were sufficiently clear and definite to support an anti-copying prohibition.

19  Pomerantz Decl., Ex. M at 2; Ex. L at 136. In finding that the CSS License Agreement does not, in

20  fact, prohibit copying, the Court noted that the CSS License Agreement was drafted by the DVD

21  CCA over the course of 100+ meetings and was presented to potential licensees on a take-it-or-

22  leave-it basis. Pomerantz Decl., Ex. L at 134-145. Thus, the DVD CCA (and the Studio Board

23  members) had *every* opportunity to include an explicit prohibition against copying in the license

24  agreement but instead failed to do so. The Court stated:

25          But the plaintiff [DVD CCA] had every advantage, the resources of the whole
        industry . . . I'm not criticizing anybody. They came together on over a hundred

26          occasions . . . It seemed to me in reading these documents kind of like hedging the

27     [2] There is substantial identity between the DVD CCA and Defendants, and Defendants'

28  interests were represented in the Kaleidescape case.

1   bets, that clear, unequivocal, decisive decision was not made.
                                    * * *
2   [S]pecific performance cannot be granted unless the terms of the contract are
    sufficiently definite for the court to know what to enforce . . . Its not definite to
3   me. These words seem to be statements of what the computer scrambling device
    is supposed to do . . . It's just a big omission if the lawyer committee in a hundred
4   meetings didn't do it.

5   Pomerantz Decl., Ex. L at 134-136.

6       Indeed, after the *Kaleidescape* ruling, the DVD CCA considered fixing the "omission"

7   found by the Court in the CSS License Agreement by amending the Agreement to clearly

8   prohibited licensees from selling systems that allow users to copy and store CSS-encrypted

9   movies. *See* Lane Decl., Ex. B. However, both proposed amendments failed. *Id.* Defendants'

10  assertions that such a prohibition exists – in support of a request for extraordinary preliminary

11  relief and in the face of a contrary Court ruling and two failed attempts to amend the CSS License

12  Agreement accordingly – should be rejected. Indeed, even today, Defendants have never asserted

13  any DMCA claims against Kaleidescape nor sought an injunction against its product, belying their

14  assertion that a DMCA violation can be maintained against a CSS licensee merely because the

15  licensee makes a copy of a DVD.[3]

16      For these reasons, Defendants' argument that RealDVD is not in compliance with the CSS

17  License Agreement because RealDVD permits the creation of a backup copy of DVD content has

18  no basis within the CSS License Agreement itself. And, as explained below, Defendants' efforts to

19  manufacture a DMCA violation should be rejected.

20      **C.    Defendants Cannot Maintain Any Claim Under 17 U.S.C. § 1201(a)**

21      Under the DMCA, 17 U.S.C. § 1201(a)(2), a person may not traffic in technology that is

22

23  ----
    [3] Here, seeking an apparent redo of the issue already litigated in the *Kaleidescape* case,
24  Defendants attempt to construct a copying prohibition from two fragments in the CSS
    Agreement (one taken from a recital of the CSS Agreement and another taken from a
25  specification). These arguments can be rejected for the same reasons as in *Kaleidescape*. First,
    the recital relied upon by Defendants (TRO App. at 8, *citing* Pomerantz Decl., Exh. F) describes
26  the intention of two non-parties to the contract, Matsushita and Toshiba, to prohibit *unauthorized*
    copying – not all copying and not copying by a licensee. Second, a passage from a Technical
    Specification that Defendants also rely on (*See* TRO App. at 4, citing Pomerantz Decl., Exh. G)
27  suffers from the same flaw. RealDVD performs the referenced authentication step in the manner
    outlined by the Technical Specifications. Whether that authentication process is intended to
28  prevent *unlicensed* users from copying is simply irrelevant to what a licensed user may do under
    the terms of the CSS Agreement.

1    "primarily designed or produced for the purpose of circumventing a technological measure that

2    effectively controls access to a work protected under this title." In this context, to "circumvent a

3    technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or

4    otherwise to avoid, bypass, remove, deactivate, or impair a technological measure." A

5    technological measure "effectively controls access to a work" if the measure requires "the

6    application of information, or a process or a treatment, with the authority of the copyright owner,

7    to *gain access to the work*."

8         Here, Defendants assert that RealDVD is circumventing the access protections of CSS. As

9    explained above, this is wrong as a factual matter. Further, Defendants do not point to any specific

10   *access* step taken by RealDVD that is performed contrary to the CSS License Agreement

11   Technical or Procedural Specifications. For this reason alone, Defendants cannot maintain a claim

12   under 17 U.S.C. § 1201(a).

13        Defendants seek to avoid the import of the statutory language by the further assertion that

14   RealDVD must be nevertheless circumventing the access protections of CSS because, after lawful

15   and licensed access under the terms of the CSS License Agreement, RealDVD permits the making

16   of a backup copy of the DVD content. *See* TRO App. at 15 (acknowledging that "Real has

17   authorization under the CSS license to use the decryption keys and licensed technology to play

18   content on DVDs"). This argument should be rejected. As explained above, the fact that a CSS

19   licensee sells a product that permits the making of a copy of a DVD is not a violation of the CSS

20   License Agreement. Further, this activity does not circumvent any CSS technology (even

21   assuming that CSS technology prevents such a copy in the first place, which it does not (*see* Felten

22   Decl, ¶ 16)). Finally, the argument that a DMCA "access" violation under 1201(a) can be

23   maintained by relying on the *purpose* for the access has no statutory support; has been rejected by

24   Courts that have considered it; and is not supported by the cases on which Defendants rely.

25        First, under the DMCA, the access provisions of 1201(a) self-evidently apply in instances

26   where a technological measure controls "access" to a work. But here, RealDVD gains access in

27   the manner specified by the CSS License Agreement. Specifically, as discussed above, RealDVD

28   accesses DVD content by using the specific CSS protocols for access provided to it by the CSS

1    License Agreement. Because this access is permitted by the CSS License Agreement, there is no

2    circumvention of any CSS access restriction by RealDVD. Defendants cannot bootstrap their way

3    to an "access" violation by relying on what RealDVD does (allowing a backup copy to be made)

4    *after* it gains lawful and licensed access to DVD content pursuant to the CSS License Agreement.

5    Such a reading would improperly read out of § 1201(a) the key operative language specifying that

6    1201(a) applies to technological measures that protect "access to the work." 17 U.S.C.

7    § 1201(a)(3)(B).

8          This plain language meaning of what is required to "circumvent" an "access" restriction

9    under 17 U.S.C. § 1201(a) has been affirmed in two cases that have addressed this issue. As

10   provided in both *I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.*,

11   307 F. Supp. 2d 521 (S.D.N.Y. 2004) and *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d

12   105 (D.D.C. 2005), even a supposedly "unauthorized use" of a valid access mechanism is simply

13   not a circumvention under 17 U.S.C. § 1201(a). In *Egilman* and *I.M.S.*, the accused parties used

14   valid passwords to gain access to copyrighted works protected by a computer security system.

15   However, the accused parties supposedly did not possess any authority to use the passwords and

16   had no authority to view, copy or download the protected copyright works secured behind the

17   password-protected security systems. In *both* cases, the Courts held that there was no violation of

18   17 U.S.C. § 1201(a) because there was no "circumvention" of the *access* protections used by the

19   computer security systems. As the *I.M.S.* Court held, "a cause of action under the DMCA does not

20   accrue upon unauthorized and injurious access alone; rather, the DMCA 'targets the circumvention

21   of digital walls guarding copyrighted materials.'" *I.M.S.*, 307 F. Supp. 2d at 532. Where the

22   defendant "did not surmount or puncture or evade any technological measure" but instead "used a

23   password intentionally issued by plaintiff to another entity," the "DMCA and the anti-

24   circumvention provision at issue do not target this sort of activity." *Id.* at 532-33. Similarly, in

25   *Egilman*, the Court held that because "the username/password combination used to access

26   Egilman's website itself was authorized, the 'technological measure' employed by Egilman to

27   control access to his computer was not 'circumvented' by defendants." *Egilman*, 401 F. Supp. 2d

28   at 114. Here, of course, not only is RealDVD accessing DVD content in the exact manner

1   provided by the CSS License Agreement, RealDVD is doing so with the authority **granted to**

2   **RealNetworks by the DVD CCA** to do so – unlike the defendants in *Egilman* and *I.M.S.*

3       Defendants' reliance on cases such as *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d

4   1085 (N.D. Cal. 2004) and *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001)

5   (and the corresponding district court decision in *Universal City Studios v. Reimerdes*, 111 F. Supp.

6   2d 294 (S.D.N.Y. 2000)), to argue that Real is circumventing CSS access restrictions is entirely

7   misplaced. Each of those cases involved **unlicensed** computer programs that were designed to

8   break through CSS access restrictions and encryption to both access and make **unencrypted** copies

9   of DVD content. Such is not the case here, where RealDVD is a licensed product under the CSS

10  License Agreement and performs access and decryption pursuant to the instructions provided in

11  the Technical Specifications of the license.

12      Indeed, Defendants own assertions in *321 Studios* and *Corley/Reimerdes* illustrate the lack

13  of merit in Defendants' claims here. For example, in *321 Studios*, the same studios as in this case

14  asserted "that CSS prevents access to DVDs in the absence of the proper CSS keys, and that only

15  licensed DVD players can legally access the CSS keys in order to play DVDs." *321 Studios*, 307

16  F. Supp. 2d at 1094-95. The same was true in *Reimerdes*, where that Court relied on (the same)

17  Defendants' arguments to note that "one cannot lawfully gain access to the keys except by entering

18  into a license with the DVD CCA under authority granted by the copyright owners or by

19  purchasing a DVD player or drive containing the keys pursuant to such a license." *Reimerdes*, 111

20  F. Supp. 2d at 317-18. It is necessarily implicit in Defendants' arguments in those cases that the

21  circumvention at issue arose because the programs at issue were **not licensed** to access the CSS

22  technology. In complete accord with Defendants' arguments in those cases, RealDVD is not

23  circumventing CSS technology because it has the very license with the DVD CCA that Defendants

24  acknowledged provided lawful access to the relevant CSS keys in *321 Studios* and

25  *Corley/Reimerdes*. Defendants' reliance on case law regarding unlicensed users to argue that Real

26  – a licensed user – is circumventing CSS is misplaced.[4]

27

28     [4] Arguably, there is some tension between *321 Studios* and *I.M.S./Egilman* on the issue of whether unauthorized use of a correct password/key can be a violation of the DMCA. *I.M.S.* and

(continued...)

1  **D.    Defendants Cannot Maintain Any Claim Under 17 U.S.C. § 1201(b)**

2        Defendants' claims under 17 U.S.C. § 1201(b) similarly lack merit.  First, as discussed

3  above, Defendants cannot show that Real operates outside of the CSS License Agreement and in

4  any way circumvents the technology it uses pursuant to the license.  Defendants' argument that

5  RealDVD must be circumventing CSS because it enables users to make a copy – and Defendants

6  do not want RealDVD to be able to make a copy – entirely misses the point of the DMCA.  If Real

7  is following the CSS Specifications, it is not circumventing CSS, even if RealDVD allows

8  customers to do something that Defendants do not want.  *See I.M.S.*, 307 F. Supp. 2d 521;

9  *Egilman*, 401 F. Supp. 2d 105.  This point was also driven home by the court in *Healthcare*

10  *Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627 (E.D.Pa. 2007).

11  There, the Court affirmed that a DMCA violation cannot be created by the mere fact that a party

12  takes an action inconsistent with the *intention* of a copyright holder.[5]  So too here.  Defendants'

13  protestation that they have not given RealNetworks permission to make a digital copy of a DVD is

14  simply immaterial to a DMCA claim and does not establish that RealDVD circumvents CSS

15  ─────────────────────────────────

16        (...continued from previous page)
*Egilman* affirm that there is no violation in such circumstances.  However, the *321 Studios* Court

17  concluded that, even though the 321 Studios software uses "the authorized key to unlock the
encryption" on DVD content, such use was improper because "while 321's software does use the

18  authorized key to access the DVD, it does not have authority to use this key, as licensed DVD
players do, and it therefore avoids and bypasses CSS." *321 Studios*, 307 F.Supp.2d at 1098.

19  First, this tension can be explained by the fact that, even if the 321 Studios product uses the
correct content keys to decrypt CSS-encoded content on a DVD, 321 Studios broke through CSS

20  protections to access the DVD *to obtain the content keys in the first place*.  Second, any such
tension is immaterial here, where RealNetworks *is* authorized to access and use the correct

21  content keys as a DVD CCA licensee.

22        [5]  In that case, the defendants used an Internet search engine (the "Wayback Machine" at
www.archive.org) to access copyrighted material on historical versions of plaintiff's website that

23  were blocked from access on the current version of plaintiff's website.  There, plaintiff had even
implemented a technological measure (a "robots.txt" file) that acted to prevent Internet searchers

24  using the "Wayback Machine" from access to copyrighted content on the historical versions of
the websites stored at www.archive.org.  However, the "robots.txt" file did not work as planned,

25  and the defendants were able to access the copyrighted content on plaintiff's website through the
Wayback Machine.  Nevertheless, despite the fact that there was evidence showing that

26  defendants were aware that plaintiff's website had access protections, the *Healthcare Advocates*
Court affirmed, consistent with *Egilman* and *I.M.S.*, that "lack of permission is not

27  circumvention under the DMCA." *Id.* at 646.  Instead, the court found that a "person
circumvents a technological measure only when he affirmatively performs an action that disables

28  or voids the measure that was installed to prevent them from accessing the copyrighted
material." *Id.* at 644.

1   protection.  Without a circumvention of the CSS technological measures, there is no violation of

2   the DMCA.

3          In addition, as explained in Mr. Buzzard and Mr. Felten's declarations, it is simply not true

4   that the CSS protection scheme prevents copying by *licensed* CSS users.  The CSS system controls

5   access to a DVD and decryption of content by licensed applications.[6]  RealDVD follows these

6   procedures.  CSS technology does not prevent licensed users from enabling the making of copies

7   of DVDs.  Thus, making a copy of a DVD is not a circumvention of CSS for a CSS licensee.  *See*

8   *Kaleidescape* discussion, *supra*.  Defendants' argument that Real must be circumventing CSS

9   because the CSS License Agreement supposedly does not specifically authorize copying of DVD

10  content is again wrong.  The CSS License Agreement authorizes Real to "use and implement" CSS

11  technology and there is no limitation on these rights if Real complies with the specifications as

12  required.[7]

13         Finally, Defendants claims under 1201(b) fail for a third separate reason.  Under 1201(b),

14  liability can only be found for alleged "circumvention" of a "technological measure" where the

15  "technological measure" "effectively protects a right of a copyright owner under this title."  As the

16  Federal Circuit has noted in *Chamberlain*, a claimed circumvention of a technological measure

17  under the DMCA must have a nexus with a copyright right that the copyright holder actually

18  possesses.  *See Chamberlain Group, Inc. v. Skylink Tech., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004)

19  (upholding a rejection of a claimed DMCA violation for a lack of nexus between the supposed

20  violation and any copyright right, and also noted that plaintiff had not brought any copyright

---

[6] And, as discussed *supra* (*see* n.1), it is simply not true that CSS prevents copying of the contents of a DVD in any event.  Felten Decl., ¶ 16.

[7] Defendants' appeal to cases such as *S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989) and *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006) to argue the contrary is fruitless.  Those cases are not DMCA circumvention cases in any respect.  To the contrary, those cases stand for the unremarkable proposition that an affirmative defense of license to a claim of copyright infringement depends on the copyright rights granted under the license at issue.  That rule of law has no application here, where Defendants have not asserted that Real is infringing Defendants' copyrights or that Defendants have not granted Real a copyright license.  Rather, the issue pertinent to this case is that Real's compliance with the terms of the CSS License Agreement means that RealDVD is not circumventing CSS technology under the DMCA.  Defendants' cases provide no authority to the contrary.

1  infringement or contributory copyright infringement claims). Here, the Defendants have no

2  copyright interest to protect that is implicated by the intended and commercially significant uses of

3  the RealDVD software to play DVDs, to retrieve on-line information and content about DVDs or

4  to make a secure, non-transferable backup copy of a DVDs for a Real account-holder's personal

5  use. Backup copies of DVDs made with RealDVD:

6  - Are *not* playable over the Internet or even over a network.

7  - *Cannot* be copied to any other hard drive or other storage medium (such as an iPod)
8  and used.

   - Can *only* be used with the RealDVD account-holder's account.
9
   - Include not only the original CSS encryption but also include far more stringent
10 additional security measures to *prevent dissemination* of useable copies on the
   Internet or anywhere else.
11
   - Are intended and marketed solely for use as a backup copy for the users' *own*
12 DVDs.

13 Buzzard Decl., ¶¶ 9-15; Supp. Lang Decl., ¶ 5. As stated by PC Magazine, RealDVD backup

14 copies "are locked up tighter than Hannibal Lecter." Klein Decl., ¶ 8; *see also* Felten Decl., ¶ 37

15 ("[v]ideo content protected by RealDVD is *more secure* than the same video content would be on

16 a DVD"). This is why Defendants (1) did not bring a contributory copyright infringement claim

17 against Real and (2) fail to meet the requirements of 17 U.S.C. § 1201(b) for a DMCA violation.

18 Specifically, Defendants cannot show that the "commercially significant purpose" of RealDVD –

19 to make a personal backup copy of a DVD – violates any copyright right of Defendants in the

20 DVD content. To the contrary, making such a secure backup copy is quintessential fair use under

21 *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). Cf. *321 Studios*, 307

22 F. Supp. 2d at 1096 ("[p]laintiff notes that making personal backup copies of DVDs is expressly

23 authorized under the copyright laws as fair use."). Under *Sony*, Defendants do not possess the

24 right under the copyright laws to prevent users from making such a backup copy. And here,

25 because the copy function of RealDVD is designed to limit any copying solely to such a fair-use

26 backup, nothing that RealDVD is designed to do implicates a copyright right of Defendants.[8]

27

28     [8] Courts have previously held that the fact that a user of a technology *might* use a challenged
technology in a manner consistent with the fair use exception to the copyright laws does not
                                                                    (continued...)

1   Because RealDVD does not affect the "exercise of a right of a copyright owner under the copyright

2   laws," Defendants cannot maintain a violation of the DMCA under 17 U.S.C. § 1201(b).

**II.    The Defendant Studios Have Failed to Demonstrate Any Cognizable Harm, Much Less Irreparable Harm**

        Defendants argue that a presumption of irreparable harm applies upon a showing of

likelihood of success on the merits. TRO App. at 20. That is false. In *eBay Inc. v.*

*MercExchange*, 547 U.S. 388 (2006), the Supreme Court rejected the notion that a presumption

could substitute for a careful analysis of the four equitable factors relevant to entry of an

injunction in copyright cases. *Id.* at 392-93 (reversing a permanent injunction in a patent case,

and noting that the Court "has consistently rejected invitations to replace traditional equitable

considerations with a rule that an injunction automatically follows a determination that a

copyright has been infringed.") (citing cases); *see also Metro-Goldwyn-Mayer Studios , Inc. v.*

*Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214 (C.D. Cal. 2007) ("Based on *eBay* and *Amoco*

*[Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)], there is no language in the text of

the Copyright Act that would permit a departure from traditional equitable principles such that a

presumption of irreparable harm would be allowed in any injunctive context."). The two out-of-

circuit cases upon which Defendants rely for the presumption of irreparable harm predate *eBay*

and do not reflect current law. To be entitled to the extraordinary remedy of an injunction,

Defendants must demonstrate (1) imminent, irreparable injury, (2) that money damages are

inadequate, (3) that the balance of hardships favors an injunction, and (4) that the public interest

would not be disserved by an injunction. *See, e.g., Global Horizons, Inc. v. U.S. Dept. of Labor*,

510 F.3d 1054, 1057 (9th Cir. 2007). Defendants fail to make this showing.

---

        (...continued from previous page)

insulate that technology from challenge under the DMCA. *See Corley, 321 Studios*. To be clear, Real does not challenge this finding here. Rather, the point here is that because RealDVD is designed and marketed in order to make "fair use" copies, and has technological measures (such as restrictions on how copies can be used, where they can be played and restrictions prohibiting transfers of copies off of the hard drive on which they were made) to prevent the creation and use of non-fair use copies, the "commercially significant purpose" of RealDVD is to make a "fair use" copy under 17 U.S.C. §1201(b)(1)(B). Because **the sole intended use of RealDVD** is to make a fair use copy, RealDVD does not implicate a copyright right that Defendants possess and thus Defendants have no claim for circumvention under §1201(b).

### A.   RealDVD Does Not Threaten Imminent, Irreparable Harm

#### 1.   Because The Primary Use For Which RealDVD Is Intended Is Protected, RealDVD Does Not Threaten Any Cognizable Harm.

Tellingly, Defendants do not even claim that RealDVD causes any harm if RealDVD is used for the principle purpose for which RealDVD is designed and marketed. As discussed in the Buzzard and Supplemental Lang Declarations, RealDVD is designed and marketed for users to back up their personal DVD collections. Among other things, a digital backup copy made using RealDVD allows users to travel without carrying cumbersome DVD discs, to save battery life on their laptops (since a spinning disc uses more battery power), to permit parental controls on movies available to their children, and to protect their DVDs from scratches and damage. Supp. Lang Decl., Ex. B. The message that RealDVD is intended to back up personal DVD collections – and is not intended for piracy – is apparent throughout Real's marketing and from the user interface on RealDVD itself. *Id.*, ¶ 5. And, indeed, RealDVD prohibits capabilities most useful for DVD pirates or others who seek to make copies of DVDs they do not own. As explained previously, RealDVD adds material additional levels of security on top of the original CSS protections to ensure that the backup copy made is locked to the specific hard drive upon which it is copied. Buzzard Decl., ¶¶10-15.

Not surprisingly, Defendants do not claim any harm resulting from use of RealDVD to backup personal DVD collections, nor could they. This use is well within the fair use exception to copyright infringement. *See, e.g., Sony Corp.*, 464 U.S. 417.

#### 2.   RealDVD Does Not Threaten To Contribute To Piracy Because Better Piracy Tools Have Long Existed in the Marketplace.

Because Defendants cannot claim to be harmed from RealDVD's primary use, they seek to paint RealDVD as a tool for computer pirates. Defendants' principal theory of harm is to their "DVD sales and rental market." TRO App. at 21. They argue that the availability of RealDVD will immediately cause customers to stop purchasing DVDs, because customers "for the first time" have the ability to make a permanent copy of a rented or borrowed DVD. TRO App. at 21 ("Beginning today, RealDVD threatens to convert a portion of those 175 million $3.25 rentals into $3.25 *purchases* . . . ) (original emphasis). Defendants' theory ignores reality.

1    As an initial matter, Defendants have provided no evidence that customers who have just

2  rented a movie (or borrowed it from a friend) would actually purchase the same movie absent the

3  availability of RealDVD. Common sense suggests the contrary is true. And, indeed,

4  Defendants' sole declarant on alleged harm frankly concedes that Defendants have no way to

5  know whether RealDVD would cause *any harm* to DVD sales or rentals.[9] Thus, the entire

6  premise for Defendants' claim of imminent irreparable harm to their DVD sales fails from the

7  outset because Defendants have no evidence of "but for" causation.

8    Even if one were to accept the notion that customers are likely to rent and purchase (or

9  borrow and purchase) the same movie, the availability of RealDVD could not possibly cause

10 imminent irreparable harm to Defendants because, if piracy is one's goal, the market has been

11 replete with better ways to accomplish it for many years. There exist dozens of unlicensed

12 products (known as "rippers") that strip CSS encryption from DVDs to allow unlicensed

13 copying, as well as numerous file sharing and peer-to-peer web sites from which Defendants'

14 movies may be accessed for free. Felton Decl., ¶¶24-28 and Exhs. B and C. Examples of rippers

15 include DVD X Ripper, Slysoft AnyDVD, Magic DVD Ripper, Plato DVD Ripper,

16 MacTheRipper, HandBrake, and DVD Ripper. *Id.*, ¶¶24-26 and Exhs. B and C. These are not

17 little-known fringe products that are hard to find. *Id.* As of October 5, 2008, the Handbrake

18 website had been viewed 11,271,355 times since August 27, 2007.[10] *Id.*, Exh. E.

19   For those customers inclined to copy movies they have not purchased, rippers and

20 unauthorized downloads are cheaper (often free) than RealDVD (which retails between $30-

21 
---

22   [9] *See* Declaration of Michael Dunn, ¶25 (acknowledging that any decline in Defendants'
   sales might as easily be attributed to "fluctuations in the economy; competing entertainment
23 options; consumer tastes and desires; or any of a number of other factors.").

24   [10] Thus, contrary to Defendants' claim that RealDVD will, "for the first time," cause
   consumers to create massive movie libraries of rented or borrowed DVDs (TRO App. at 1), a
25 consumer, if so inclined, could have done so years ago. Indeed, the notorious and worldwide
   public availability of an early ripper known as "DeCSS" led the California Court of Appeal to
26 deny a preliminary injunction to the DVD CCA, based on the finding that CSS had, *even as of
   nearly ten years ago*, likely lost any trade secret status. *DVD Copy Control Association, Inc. v.
27 Bunner*, 116 Cal. App. 4th 241, 253 (2004) ("[T]he evidence demonstrates that in this case, the
   initial publication was quickly and widely republished to an eager audience so that DeCSS and
28 the trade secrets it contained rapidly became available to anyone interested in obtaining them.").

1   $50). These rippers also provide much greater flexibility to the user because, unlike the copy of

2   a movie made using RealDVD – which, as noted, contains significant playback prohibitions, and

3   may only be used on certain platforms (not including iPods and iPhones) (*see* Buzzard Decl.,¶14)

4   – a copy made using a ripper or downloaded from the Internet is not burdened with any such

5   restrictions. Felton Decl., ¶29. Rippers allow unlimited unsecured copying to unlimited

6   numbers of hard drives, which may be shared across a computer network or even the Internet,

7   and used on multiple platforms. *Id.*

8       Thus, RealDVD provides no new or attractive options to those users desiring to make

9   unlicensed copies or engage in piracy because it is not intended to meet the needs of those users.

10  *See* Bresnahan Decl., ¶19; Klein Decl., ¶¶4-9. As noted in a recent article in PC Magazine,

11  RealDVD does not give those willing to engage in unlicensed copying what they want:

12          Unfortunately, the resulting [RealDVD] movie files are locked up tighter than
            Hannibal Lecter; you can play them on up to five licensed PCs, but you can't watch
13          them on your iPod or other device. As such, RealDVD doesn't really give users
            what they want: a way to put their purchased movies on their PCs and move them
14          to iPods, iPhones, PSPs, and network attached devices . . . Essentially, we want the
            same freedom with DVDs that we have with CDs, and there are lots of DVD-
15          ripping and file-converting tools online that give users that freedom. Many of the
            best ones are free or accept donations . . ."
16
    Klein Decl., ¶ 8. As a result, RealDVD will not contribute to an increase of unlicensed copying
17
    or piracy. For those consumers who are willing to make unlicensed copies or engage in piracy,
18
    RealDVD offers no benefit that has not been available for free for years. Bresnahan Decl., ¶19.
19
    To the contrary, from the perspective of the unlawful copier, RealDVD is an inferior product. *Id.*
20
        RealDVD is instead targeted to those DVD owners who are not interested in making
21
    unlawful copies, and are instead simply looking to make a backup copy of what is notoriously
22
    fragile, cumbersome and inconvenient to use in today's digital world – a DVD disc. *See* Supp.
23
    Lang Decl., ¶ 5, Ex. B; Buzzard Decl., ¶¶10-15. This is fair use, not piracy, and causes no
24
    cognizable harm to Defendants. Moreover, because the presence of RealDVD increases the
25
    value of purchased DVDs to these law abiding consumers (by adding numerous convenience and
26
    safety benefits to purchased DVDs), RealDVD will tend to increase the demand for purchased
27
    DVDs. Bresnahan Decl., ¶17.
28

1            **3.    RealDVD Does Not Threaten Defendants' "Less Mature Markets"**

2            Defendants also claim that Real is harming their "less mature markets" for distributing

3    digital movie content, including download services on iTunes and Amazon, video-on-demand,

4    and DVDs which permit the making of digital copies. TRO App. at 23. But these arguments

5    suffer from precisely the same defects as Defendants' arguments concerning claimed harm to the

6    DVD sales and rental market: (1) they rest on the entirely baseless and illogical claim that, in a

7    world without RealDVD, a customer who rented or borrowed a DVD would also purchase the

8    same movie through one of Defendants' newer digital formats; (2) they ignore the dozens of

9    rippers and download sites that allow users to copy movies for free without any restrictions on

10    use; and (3), they ignore the fact that RealDVD backup copies cannot be transferred to an iPod

11    and are only created by people who already have the DVD. For the same reasons discussed

12    above, RealDVD creates no risk of imminent irreparable harm to Defendants' newer methods for

13    distributing digital movie content.

14            Adding to the illogic of their argument regarding these newer products, Defendants

15    complain that they will inevitably lose sales of their digital content as a result of RealDVD's

16    presence in the market because Real supposedly has greater brand loyalty and more established

17    distribution channels than the likes of Walt Disney Pictures, Sony Pictures and Universal City

18    Studios selling through iTunes and Amazon. TRO App. at 24. This argument is simply

19    specious. Defendants have failed to provide any evidence of harm, or even to articulate a

20    credible theory of irreparable harm caused by RealDVD. What Defendants instead complain of

21    is Real's alleged usurpation of their digital content sales. Dunn Decl., ¶¶ 13-14. This is simply a

22    damages argument which, if proven, is compensable. *See, e.g., Cotter v. Desert Palace, Inc.,*

23    880 F.2d 1142, 1145 (9th Cir. 1989) ("Injuries compensable in monetary damages are not

24    normally considered irreparable.") (internal quotation marks and citation omitted); *Reilly v.*

25    *Medianews Group, Inc.,* No. C 06-04332, 2006 WL 2419100, at *5 (N.D. Cal. July 28, 2006) ("It

26    is well established, however, that an injury that is solely financial and that is compensable by

27    monetary damages cannot constitute irreparable injury.").

28

### 4. The Availability of RealDVD Does Not Threaten Consumers' Attitudes Regarding the Legality of Piracy

Defendants next argue that RealDVD should be enjoined because Real's *statements* concerning the legality of using RealDVD will irreparably alter consumers' copying behavior. TRO App. at 20 ("Real's (false) prophesies of legality have the likely potential of altering consumer attitudes towards DVD copying, and, accordingly, consumer behavior."). As an initial matter, even if any supposed harm resulted from Real's *statements* about its product, such harm would not weigh in favor of enjoining Real's *product* on a claim for alleged circumvention of technology. In any event, Defendants' characterizations about Real's marketing claims are, at best, only half true. Defendants' fail to acknowledge that Real markets RealDVD as "legal" and "100% legit" only in the context of *fair use copying of the user's own DVD collection.* Supp. Lang Decl., ¶ 5 and Exhs. A-B. Examples of Real's actual marketing include:

- Q: Is it legal to save copies with RealDVD?
  A: Yes, provided that you are the owner of the original DVD and you use your saved copy solely for your personal use. (*Id.*, Exh. A);

- "No more searching through boxes, scratching, damaging and losing your discs. Your entire collection is safe, manageable and viewable anywhere and anytime you want. And it's completely legal."

*Id.*, Exh. B. Real emphasizes the same point on screen when a customer is using RealDVD. *Id.*, ¶ 5 ("RealDVD is for saving a DVD that you own. If you do not own this DVD, select Play."). This is exactly the opposite of condoning or encouraging piracy.

Finally, rebutting their own arguments, Defendants acknowledge that they spend millions educating consumers on their views about "pirating and unauthorized copying of movies." Dunn Decl., ¶28. Given these efforts, and the substantial publicity surrounding this litigation – which makes crystal clear that the Defendants do not view RealDVD as "legal" or "100% legit" – Defendants' claim of advertising harm, even if relevant to the current motion, cannot be credited.

### B. The Harms Claimed by Defendants Are Compensable In Damages And Do Not Justify An Injunction

It is axiomatic that alleged harms compensable in damages do not support entry of an injunction. *See, e.g., Cotter,* 880 F.2d at 1145; *Reilly,* 2006 WL 2419100, at *5. Defendants concede that the only harms of which they complain (other than the supposed harm to "consumer

1   attitudes" caused by Real's marketing) are alleged economic harms.  *See* TRO App. at 21-24

2   (alleging harm to DVD sales, rental market, and market for newer forms of digital movie

3   delivery).  To try to justify an injunction, Defendants characterize these economic harms as

4   "irreparable" on the ground that they are supposedly not easy to measure.  TRO App. at 21-22.

5          Even if purported difficulty in calculating damages could substitute for irreparable

6   harm,[11] the type of damages Defendants claim here can be quantified using data known to the

7   parties and well-established analytical techniques.  Klein Decl., ¶11; Supp. Klein Decl., ¶¶6-11.

8   As if to emphasize the point, Defendants have demonstrated no difficulty assessing their claimed

9   losses due to "illegal copying" and related activity with detailed numerical specificity when it

10  suits their purposes.  One example is the "Worldwide Study of Losses to the Film Industry and

11  International Economies Due to Piracy; Pirate Profiles," a study commissioned by major motion

12  picture studios (including many of the Defendants) and performed by the Motion Picture

13  Association of America.[12]  *See* Supp. Klein Decl., ¶11 and Exh. 3.  The study recites that it

14  provides "an *accurate and detailed assessment* of the film industry's worldwide losses to piracy

15  and the demographic profile of those engaged in piracy" and a "comprehensive study examining

16  a more complete picture of piracy including specifics about which countries have the biggest

17  problems with piracy; the impact on the economy; losses to industries in various countries as

18  well as losses to the major studios and a profile of the typical pirate."  *Id.*

19

20      [11] Asserted difficulty in calculating damages is insufficient to establish irreparable harm.  *See*
     *ICU Medical Inc. v. Alaris Medical Systems, Inc.*, No. CV 04-689, 2004 WL 1874992, at *25
21   (C.D. Cal. July 30, 2004) ("[N]either the difficulty of calculating losses in market share, nor
     speculation that such losses might occur, amount to proof of special circumstances justifying the
22   extraordinary relief of an injunction prior to trial.").

23      [12] The MPAA is not the only organization that has prepared or commissioned studies on the
     impact of movie piracy.  Organizations such as Solutions Research Group and Futuresource
24   Consulting have prepared reports that identify the average number of movies copied, organized
     by date of release and selected countries.  These studies, as well as the MPAA study, identify the
25   demographic character of a typical movie-downloader.  An article published in the respected
     academic journal, *Journal of Marketing*, cites various other motion picture industry studies that
26   have reached detailed numerical conclusions about the impact of illegal movie copying on the
     purchase and rental patterns of consumers.  These studies were done or commissioned by the
27   MPAA and by the German Federal Film Board and cover the displaced consumption of motion
     pictures through other distribution channels, including DVD rental and DVD purchases,
28   attributable to movie copying activity in an eight-country study and "on a global level."

1    Performing an "accurate and detailed assessment" of worldwide studio losses to piracy,

2  painstakingly determined country by country, is a far more difficult analytical challenge than

3  estimating harm from the possible diversion of DVD sales to rentals.[13]  *Id.*, ¶12.  That is

4  especially true here, where the selling prices and rental prices of DVDs appear to be readily

5  known, the costs of production appear to be readily known, and the number of RealDVD

6  licensees is readily known.  *Id.*  Thus, the supposed difficulty of measuring Defendants' claimed

7  damages, if causation is established, comes nowhere close to justifying an injunction.

8    **C.    The Balance of Hardship Weighs Strongly Against Entry of An Injunction**

9    In contrast to Defendants' compensable, if not wholly illusory, claims of harm, an

10  injunction against RealDVD would be devastating.  As discussed at length in the Supp. Lang

11  Declaration, an injunction against RealDVD would foreclose Real's ability to secure early

12  agreements for the distribution of RealDVD – which are critical to the success of RealDVD.

13    As a relatively small software company competing in an industry dominated by larger

14  companies such as Microsoft, Apple and Adobe, Real is able to effectively compete by producing

15  innovative products and being the first to market with its innovations.  Supp. Lang Decl., ¶ 2.

16  Real's strategy is to bring its products to market quickly, and to negotiate relatively long term

17  contracts for the distribution of its products.  Such distribution contracts allow Real to "lock" its

18  products into distribution channels before larger, more powerful companies have a competitive

19  product to sell, which prevents Real's product from being easily displaced.  *Id.*  While there have

20  been DVD "rippers" (which copy and decrypt DVD content) available for years, Real anticipated

21  being the first CSS licensed product available at a price point of approximately $30-$50.  *Id.*, ¶ 3.

22    Prior to the planned release of RealDVD on September 8, 2008 (the "initial launch"), Real

23

---

24    [13] Demonstrating the precision of the analysis performed in the Defendants' study, it
determines the average age and gender of a "pirate" participating in various copying activities

25  (broken down into the subsets downloading, marking a copy, receiving a copy, or bootlegging)
compared to the average age of "non-pirates" in 22 countries.  *Id.*  According to the study,

26  MPAA studios lost $6.1 billion to piracy in 2005, of which $1.3 billion came from piracy in the
United States.  *Id.*  These numbers were further subset by three different categories of illicit

27  activity and arrayed by varying geographic areas.  *Id.*  This study even expressly states the lost
tax revenues suffered by various countries, which confirms that the Defendants are capable of

28  estimating the prices, costs, extend of pirated activities, and lost profit-making opportunities that
are foundational elements in computing lost tax revenues.  *Id.*

1   began negotiating distribution contracts with attractive partners.  Real is currently in distribution

2   negotiations with a

3

**REDACTED**

4

5                                                                  Supp. Lang Decl., ¶ 4.  Real

6   anticipates that some of these deals will be consummated prior to the 2008 holiday season.  *Id.*

7   These opportunities will be completely foreclosed if RealDVD is enjoined.  *Id.*, ¶ 16.

8          It is critical for Real to have the opportunity to negotiate distribution contracts for

9   RealDVD now, while it still has "first mover advantage" of being the only CSS licensed product at

10  this price point. In promoting the release of RealDVD, Real has explained its product in detail to

11  the market (and to its competitors), provided demonstrations and answered technical questions.

12  While the technical details of RealDVD have not been released, competitors have been alerted

13  both to the feasibility and the attractiveness of a similar product.  It is only a matter of time before

14  a larger and more powerful company releases a similar product.  Even a brief interruption in Real's

15  ability to distribute RealDVD, gain momentum in the market, and execute distribution deals poses

16  an irreparable risk to Real.  *Id.*  As Defendants acknowledge, "market harm is particularly acute

17  where the targeted consumers are not yet attached to a brand and/or the consumers are unlikely to

18  easily switch to a competitor's product once investing in a first purchase." TRO App. at 22.[14]  It is

19  similarly imperative that RealDVD gain traction prior to the holiday season, since 25%-40% of its

20  sales will be made during the fourth quarter of 2008.  Supp. Lang Decl., ¶ 17.

21         An injunction against RealDVD will also cause Real to lose credibility with its customers

22  and potential customers, shareholders, analysts, advertising partners, PR contacts and the market

23  generally.  Supp. Lang Decl., ¶18.  As explained in the Supp. Lang Declaration, Real voluntarily

24  cancelled the launch of RealDVD at the eleventh hour in order to attempt to resolve the

25  Defendants' concerns with the product.  *Id.*, ¶¶ 6-9.  This last minute cancellation already has

26

27  [14] Defendants' argue that Real is not entitled to a first mover advantage if its product is
    unlawful. Reply TRO App. at 5.  That is no response, since under the balancing of hardship
28  analysis, the harm to Real of a *wrongfully entered* injunction is at issue.  *See, e.g., Save Our
    Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005).

1  undermined Real's goodwill and impaired its relationships with advertising partners. *Id.*, ¶9.

2  Real's goodwill and reputation took another significant blow from the temporary halt to sales of

3  RealDVD required by the Court's October 3, 2008 ruling.[15]  The grant of a TRO or preliminary

4  injunction now will devastate Real's ability to ever launch RealDVD successfully.  Supp. Lang

5  Decl., ¶¶ 13-14.   Even if Real were ultimately allowed to resume sales of the product, the success

6  of RealDVD, Real's image, and perhaps other Real offerings, would be irreparably impaired. *Id.*,

7  ¶ 18.  Real would most certainly not be able to successfully execute a "third" launch after having

8  been tainted with the mislabel of an illegal product following two aborted launches.

9  **D.   The Public Interest Militates Against An Injunction**

10         Defendants nowhere address the public's interest in the grant or denial of the injunction

11  they seek.  That omission speaks volumes.  RealDVD gives users the ability to exercise fair use

12  rights to make a DVD backup copy.  The Defendants' seek to deny those rights to further their

13  economic interests, in an effort to extend their copyright monopoly beyond the breaking point.

14  The public interest weighs strongly against an injunction here.

15                               **CONCLUSION**

16         For the foregoing reasons, Plaintiffs respectfully request that the Defendants' TRO

17  application be denied.

18  Dated:  October 6, 2008                    WILSON SONSINI GOODRICH & ROSATI
19                                             Professional Corporation

20

21                                             By: /s/ James A. DiBoise
22                                                 James A. DiBoise
                                                   jdiboise@wsgr.com
23                                             Attorneys for Plaintiffs
24                                             REALNETWORKS, INC. AND
                                               REALNETWORKS HOME ENTERTAINMENT,
25                                             INC.

26  _____
    15

27                      **REDACTED**

28                                                              *Id.*, ¶13.