# EXHIBIT A
# PART 2

Dockets.Justia.com

### 3.   The General Specifications Document Is Non-Contractual "Proprietary Information"

The General Specifications document thus lies outside the path of references and definitions leading from the License Agreement to the CSS Specifications to the seven Technical Specifications Titles.  The License Agreement, however, provides that a licensee will receive additional, non-contractual documents that are not part of the CSS Specifications.

Section 4.1 of the License Agreement explains that upon execution of the License Agreement, DVD CCA will provide licensees like Kaleidescape not just with the CSS Specifications but also with additional forms of "Proprietary Information:"

> 4.1   Upon Licensee's selection of one or more Membership Categories . . . , Licensor shall distribute to Licensee the portions of Proprietary Information and/or CSS Specifications appropriate to its Membership Category or Categories . . . .

RA10; *see also* RA8 (License Agreement § 2.2; "the CSS Specifications and other documentation, including Proprietary Information").

Section 1.21 in turn defines "Proprietary Information" to include not only the CSS Specifications but also many other forms of non-contractual confidential information:

> 1.21   "Proprietary Information" shall mean any and all information relating to CSS made available to Licensee . . . including, without limitation, CSS Specifications, Software, Hardware, documentation, designs, flow charts, technical data, outlines, blueprints, notes, drawings, prototypes, templates, systems, manuals, know-how, processes, and methods of operation.

RA5; *see also* RA4, 5 (License Agreement §§ 1.6, 1.17; Proprietary Information includes both "Confidential" and "Highly Confidential" information).

The License Agreement thus anticipated that DVD CCA would provide its licensees with confidential information of all sorts in addition to the technical information provided in the CSS Specifications. This additional information, because it was not part of the CSS Specifications, would not impose obligations on a licensee's products, but was nonetheless of such a nature that DVD CCA wished to maintain its confidentiality.

Thus, DVD CCA's argument that any and all confidential information provided by DVD CCA to Kaleidescape is necessarily part of the Technical Specifications is erroneous. The License Agreement expressly contemplates that Kaleidescape will receive, in addition to the binding, contractual CSS Specifications, other non-binding, non-contractual "documentation," "manuals," "technical data," "flow charts," and "drawings." The General Specifications document is documentation of such a nature. The General Specifications document is part of the non-contractual Proprietary Information other than CSS Specifications that DVD CCA provided to Kaleidescape.

DVD CCA's only response to this and all the other conclusive language of the contract is to misleadingly rewrite section 4.1 of the License Agreement by deleting the crucial words "Proprietary Information" from the key phrase "Proprietary Information and/or CSS Specifications." DVD CCA's altered version is:

> 4.1   Upon Licensee's selection of one or more Membership Categories . . . and the payment of the appropriate Administration Fee(s), Licensor shall distribute to Licensee

33

the portions of . . . CSS Specifications appropriate to its

Membership Category or Categories[.]

AOB at 7; *see also* AOB at 26 (making same deletions from section 4.1).

DVD CCA's central "incorporation by osmosis" argument that whatever unknown documents it chooses to deliver to a licensee become part of the CSS Specifications rests entirely on its deletion of the words "Proprietary Information" from section 4.1. AOB 7-8, 25-26. The intent of DVD CCA's deletion is to make it appear, erroneously, that the License Agreement provides that *every document* that a licensee receives from DVD CCA after signing is a "CSS Specification." Not so.

Once the deleted words are restored and DVD CCA's contorting of section 4.1 is undone, its argument collapses. Section 4.1 instead makes clear that after Kaleidescape executed the License Agreement, DVD CCA was to send Kaleidescape not just the two Technical Specification Titles for the two Membership Categories Kaleidescape licensed but also additional Proprietary Information outside the CSS Specifications like the General Specifications and General Description documents. In the end, DVD CCA's attempted suppression of the words "Proprietary Information" in section 4.1 only serves to highlight that the terms of the four undisputed contract documents are contrary to its position in every respect.

**E.    The General Specifications Document Fails To Satisfy The *Amtower* Requirements For Incorporation By Reference**

The DVD CCA's opening brief omits any discussion of the body of California law governing incorporation of documents into contracts by reference. In *Amtower*, this Court reiterated the law governing incorporation by reference. The Court concluded that an integrated Affiliate Agreement executed by the parties did not incorporate by reference a separate Merger Agreement, even though the parties were aware

of the Merger Agreement and its terms at the time they executed the Affiliate Agreement and the Affiliate Agreement mentioned the Merger Agreement: "[W]e find nothing in the plain language of the Affiliate Agreement to suggest that the parties intended to incorporate" the Merger Agreement. *Amtower*, 158 Cal.App.4th at 1609.

In reaching that conclusion, this Court held that, for an unexecuted document like the General Specifications document to be incorporated into a contract, it must satisfy four separate requirements, none of which is present here:

- "the reference must be clear and unequivocal:" The License Agreement and the CSS Specifications document make no reference at all, much less a clear and unequivocal reference, to the General Specifications document, unlike their express reference to the seven Technical Specifications Titles. "[I]t is not simply the party's awareness of the other document that is required. To impliedly incorporate an external document by reference, the subject document must contain some clear and unequivocal reference to the fact that the terms of the external document are incorporated." *Amtower*, 158 Cal.App.4th at 1608.

- "the reference must be called to the attention of the other party:" This requires that the reference in the document executed by the parties (here the License Agreement) "specifically direct[] the parties' attention to the terms of the external document in a manner that could be construed as eliciting the parties' consent to its separate terms." *Id.* at 1609. Nothing in the License Agreement would have directed Kaleidescape's attention to the terms of the General

Specifications document and elicited Kaleidescape's consent
to its terms.

- "he must consent thereto:"  Because there was no reference of
  any kind to the General Specifications document, it was
  impossible for Kaleidescape to consent to its incorporation.

- "the terms of the incorporated document must be known or
  easily available to the contracting parties:"  To be "known or
  easily available," the incorporated document must be
  available or "provided before or at the time [the incorporating
  document executed by the parties] was presented for
  signature."  *Baker v. Osborne Development*, 159 Cal.App.4th
  884, 896 (2008); *Wolschlager v. Fidelity National Title
  Insurance*, 111 Cal.App.4th 784, 791 (2003) (incorporated
  document must be available to the parties before they enter
  into contract).  In *Amtower* the Court found no incorporation
  even though parties were aware of the external document and
  its terms.  Here, not only did DVD CCA withhold the
  contents of the General Specifications document from
  Kaleidescape, it did not even disclose the document's
  existence until two weeks after Kaleidescape signed the
  contract.

Because the *Amtower* requirements are absent here, DVD CCA's argument
that the General Specifications document was incorporated by reference
fails as a matter of law.  As in *Amtower*, nothing in the "plain language" of
the License Agreement suggests that the parties intended to incorporate the
General Specifications document into the contract.

Because none of these four requirements is present here, other cases
finding an incorporation by reference are readily distinguishable.

36

*Wolschlager* addressed whether a preliminary title report incorporated by reference a title insurance policy. *Wolschlager*, 111 Cal.App.4th at 790. This Court held that the policy was incorporated because the title report mentioned the policy several times, admonished that the policy "should be read," told where the policy could be found, and the policy was "easily available" before the parties formed the contract. *Id*. at 791. None of these circumstances is present here.

In *Shaw v. Regents of University of California*, 58 Cal.App.4th 44 (1997), the court addressed whether a single-page patent agreement between a university and a professor incorporated by reference the terms of a university patent policy printed on the back of the agreement. *Id*. at 47-48. The court held that the parties intended to incorporate the patent policy into the agreement because the policy was available before the parties entered into the agreement, and the agreement made specific reference to the patent policy (stating "Please read the Patent Policy on the reverse side and above" and "I understand I am not waiving any rights to a percentage of royalty payments . . . as set forth in [the] . . . Policy"). *Id*. at, 48 54-55. Again, nothing similar is present here.[3]

---

[3] Nor does *Myers Building Industries v. Interface Technology*, 13 Cal.App.4th 949 (1993), a case relied on by DVD CCA below but not on appeal, support DVD CCA's position. Because of the exigencies of commercial construction, the construction contract in that case had a unique dis-integration clause providing that construction documents created after the parties entered into the contract would become part of the contract: "the intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work." *Id*. at 967. The CSS licensing contract, to the contrary, contains a standard integration clause. Moreover, unlike the General Specifications document here, the incorporated document in *Myers* described the contract as "*this* contract" as opposed to "*the* contract." *Id*.

**F.   Not Only Was There No "Clear And Unequivocal" Expression Of Mutual Intent To Incorporate The General Specifications Document, Any Such Mutual Intent Was Impossible Under The Circumstances Imposed By DVD CCA**

Under the circumstances of contracting imposed by DVD CCA and the terms of the License Agreement and CSS Specifications it drafted, it was impossible that there could be any mutual expression of intent by both parties at the time of contracting to incorporate the General Specifications document into the contract. DVD CCA maintains a firm policy of never negotiating with potential licensees. DVD CCA refuses to discuss or negotiate the terms of the CSS licensing contract with prospective licensees, does not discuss whether particular products contemplated by the licensee conform to the CSS Specifications, and does not offer any technical or contract compliance advice to licensees. 5RT427:5-16, 432:15-20, 437:15-25; 4RT374:1-4, 388:4-14, 389:7-13.

As the trial court found, DVD CCA adhered fully to this policy in the case of Kaleidescape. 8RT877:4-5 (Kaleidescape "really couldn't get answers [from DVD CCA] in the contract formation process."), 879:16-17 (the contract "ultimately was presented for people to take it or not"), 880:22-23, 884:19-22. DVD CCA refused to engage in negotiations or substantive communications with Kaleidescape before Kaleidescape entered into the CSS licensing contract. DVD CCA President Hoy refused to meet with Kaleidescape, DVD CCA refused to answer Kaleidescape's inquiries regarding the meaning of the terms and conditions of the contract, it refused to provide Kaleidescape with technical assistance or to review Kaleidescape's products for compliance with the contract, and it failed to disclose the existence of the General Specifications document to Kaleidescape at the time of contracting. 4RT387:22-391:28, 373:11-17; 5RT425:25-427:16; 6RT589:20-590:3, 594:4-596:14.

38

Because DVD CCA would not negotiate or communicate with Kaleidescape, the only contemporaneous, objective manifestation of the parties' mutual intent are the words of the License Agreement and the CSS Specifications document, the two contract documents that Kaleidescape had access to before it entered into the CSS licensing contract.  At the time it executed the License Agreement, Kaleidescape knew that the License Agreement and the CSS Specifications document were part of its contract with DVD CCA.  Kaleidescape also knew that it would receive Technical Specification Titles 609 and 809, which it had requested, and that these two documents also would be part of the contract.  But Kaleidescape was not aware, and had no reason to be aware, of the General Specifications document.  Kaleidescape had no reason to believe the General Specifications document would be one of the documents of the contract, since the other documents of the contract make no reference to the General Specifications document and DVD CCA had never disclosed the document's existence.

Thus, the parties expressed no mutual, objectively manifested intent at the time of contracting that the General Specifications document should be incorporated into the contract.  To the contrary, in the language of the four undisputed contract documents they unequivocally and affirmatively excluded the General Specifications document from incorporation by limiting the Technical Specifications to the seven documents identified in Exhibit C.

**II.   Because The CSS Specifications Are Uniform Licensing Terms That Can Be Modified Only With The Consent Of Other Licensees, Their Objective Meaning Cannot Be Varied By Extrinsic Evidence Relating To A Particular Licensee**

As the above analysis demonstrates, the objective meaning of the contract language refutes DVD CCA's contention that the General

39

Specifications document is incorporated by reference into the contract as part of the Technical Specifications. In the ordinary case, the next step would be to consider whether extrinsic evidence demonstrates that the parties nonetheless agreed at the time of contracting to give the contract a private, idiosyncratic meaning—different than its objective meaning—that expands the Technical Specifications to incorporate the General Specifications document.

This is not the ordinary case, however, because under both the License Agreement and the DVD CCA's corporate By-Laws, DVD CCA and Kaleidescape are prohibited from bilaterally expanding the scope of the CSS Specifications to incorporate additional documents like the General Specifications document. Instead, the CSS Specifications, including the Technical Specifications, are uniform licensing terms that can only be modified with the consent of the other CSS licensees. DVD CCA's intention that the CSS Specifications be uniform terms for all licensees thus precludes it from relying on extrinsic evidence unique to a single licensee to give the Technical Specifications a different meaning unique to that licensee.

Section 4.2 of the License Agreement ensures that the content of the CSS Specifications, including the Technical Specifications, shall be uniform for all licensees by requiring that any changes or additions to the CSS Specifications occur only through a formal and complicated multistage amendment procedure set forth in DVD CCA's By-Laws: "Changes to the CSS Specifications shall be made in accordance with procedures set forth in the By-laws. . . . All changes shall be applied on a non-discriminatory basis among all CSS licensees." RA11 (License Agreement § 4.2.2). A licensee also has no duty to comply with any modifications to the CSS Specifications except those that have been made through the By-Laws

40

procedure: "Licensee shall comply with the CSS Specifications, as may by amended from time to time in accordance with the By-Laws." RA10 (License Agreement § 4.2.1). The definition of "CSS Specifications" also confirms that they can be modified only through the By-Laws procedure, as section 4.2 requires: " 'CSS Specifications' shall mean the documentation relating to CSS entitled 'CSS Specifications' . . . as such documentation may be revised from time to time consistent with Sections 4.2 and 10.7 hereof." RA4 (License Agreement § 1.13).

The By-Laws amendment procedure for the CSS Specifications involves submission of the proposed amendment to a special committee of DVD CCA member-licensees and notice to member-licensees, approval or rejection of the amendment by the committee, a right of member-licensees to reject the amendment, and, if not rejected by the member-licensees, final adoption or rejection of the amendment by the board of directors. 1AA223 to 254 (By-Laws, art. 6); 1AA205 (By-Laws, art. 3.2.1).

Hoy confirmed that the contract terms, which include the CSS Specifications, are uniform for all licensees: "Q. So the standard license such as Exhibit 156 is essentially was once a negotiated document, but now for those who want to become licensees they have to agree to the currently existing terms; is that correct? A. Each licensee has to sign the same agreement. Q. So all roughly 350 licensees are subject to the same standard terms? A. That is correct." 5RT432:6-14. Hoy also confirmed that the CSS Specifications could be modified only "if the rules in the bylaws for modifying the agreement were followed." 5RT432:22-433:21.

The License Agreement's requirement that any changes to the CSS Specifications be made only through the By-Laws amendment procedure and not by mutual agreement with individual licensees makes sense given that the purpose of the contract is to impose uniform obligations on all

41

licensees.  The consequence of these provisions prohibiting private modification is that the subjective intent of any particular licensee is irrelevant to determining the meaning of the CSS Specifications.  The only way the By-Laws amendment limitation and the uniformity of the CSS Specifications can be maintained is to interpret the CSS Specifications uniformly according to the objective language of the contract without resort to extrinsic evidence peculiar to a particular licensee.

Thus, even by express agreement, DVD CCA and Kaleidescape could not amend the CSS Specifications to incorporate the General Specifications document.  Because the parties cannot modify the CSS Specifications, once it is determined that the objective meaning of that term excludes the General Specifications document, interpretation is at an end and extrinsic evidence is irrelevant.[4]

## III.  The Extrinsic Evidence Confirms That The Contract Does Not Incorporate The General Specifications Document

The trial court determined that the language of the contract, both when considered alone and after weighing the conflicting extrinsic evidence, does not incorporate the General Specifications document.  8RT864:20-25, 875:12-876:5; 3AA689-690.  "As I've said, based upon the writing alone, that is [the License Agreement], it appears that [the General Specifications document] is not part of the contract.  However, it appears that much extrinsic evidence was introduced not to vary the terms of the

---

[4] For this reason, DVD CCA contradicts itself when it argues at length both that the CSS licensing contract should be interpreted uniformly for all licensees (AOB 30-33) and that it should also be interpreted according to extrinsic evidence unique to a particular licensee alleged to show that licensee's subjective intent (AOB 34-36).  The two positions are irreconcilable, and, given section 4.2 of the License Agreement, only the former is correct.

writing, but to assist the court in its fact-finding and interpretation of contract duties." 8RT865:15-20.

Having received and weighed both parties' extrinsic evidence, the trial court determined that, like the contract language, the extrinsic evidence it found credible also demonstrated that the General Specifications document was not part of the contract. 8RT875:12-876:15. The court concluded there was "no conflict" between the extrinsic evidence it found credible and the objective language of the contract. 8RT877:17.

That determination is supported by substantial evidence and cannot be disturbed on appeal. "[W]hen, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact . . . ." *City of Hope National Medical Center v. Genentech*, No. S129463, 2008 Cal. LEXIS 4435, 40-41 (Supreme Court, April 24, 2008); *accord, Sunniland Fruit v. Verni*, 233 Cal.App.3d 892, 898 (1991) ("when the meaning of a contract is uncertain, and contradictory evidence is introduced to aid in the interpretation, the question of meaning is one of fact properly assigned to the fact finder"). Accordingly, "the appellate court must defer to a trial court's assessment of the extrinsic evidence, as it defers to other factual determinations." *Solis v. Kirkwood Resort Co.*, 94 Cal.App.4th 354, 360-361 (2001). "When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence." *Winet*, 4 Cal.App.4th at 1166.

The substantial evidence test is highly deferential and does not involve weighing the evidence: " ' "[W]hen a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether

there is any substantial evidence contradicted or uncontradicted which will
support the finding of fact." ' " *Ajaxo Inc. v. E\*Trade Group*,
135 Cal.App.4th 21, 49-50 (2005) (emphasis original); *accord, People v.
Semaan*, 42 Cal.4th 79, 88 (2007). "Once such evidence is found, the
substantial evidence test is satisfied." *People v. Barnwell*, 41 Cal.4th 1038,
1052 (2007).

### A. The Great Weight Of The Evidence Supports The Trial Court's Conclusion That The Contract Does Not Incorporate The General Specifications Document

The great weight of the evidence supports the trial court's
interpretation of the contract. In concluding that the extrinsic evidence
showed that the General Specifications document was not part of the
contract, the trial court made the determination that Kaleidescape's account
of how it analyzed the documents received from DVD CCA was credible:
"[T]he documents were delivered and analyzed. And I've heard testimony
of everyone at the defendant who said they tried to analyze it. The court
finds it credible." 8RT876:1-15.

Specifically, the evidence showed that the two Technical
Specifications titles, the General Specifications document, the General
Description document, and the other documents DVD CCA sent to
Kaleidescape after the contract was executed were initially received by
Cheena Srinivasan of Kaleidescape. 4RT374:27-375:26. Srinivasan "never
read them" and instead sent them on to Kaleidescape co-founder Daniel
Collens. 4RT377:25-378:12; 6RT596:2-25.

Collens, the Director of Engineering, was the person at Kaleidescape
charged with reviewing all of the documents received from DVD CCA,
determining which documents were "incorporate[d] by reference" into the
License Agreement, and designing the Kaleidescape System to comply with

44

the contract. 5RT494:22-495:17; 6RT591:25-595:21, 599:17-602:1; 609:9-14. Collens read and analyzed the documents received after Kaleidescape entered the contract, together with the License Agreement and the CSS Specifications. 6RT596:2-597:12, 598:9-599:1.

Collens found that the path of incorporating references led from the License Agreement to the CSS Specifications to the Technical Specifications Titles—not to the General Specifications. 6RT600:16-602:1; 8RT853:12-27. He specifically concluded that the term "Technical Specifications . . . incorporates two documents; one [Technical Specifications Title] for the DVD Descrambler and one [Technical Specifications Title] for the Authenticating Module." 6RT601:24-26. As Collens testified:

> The word 'review' there, we heard earlier that it's difficult to read a document like this like a novel and so a lot of my review of the license, in fact, the primary way I interacted with the License Agreement and CSS Specifications was by working my way through it by different references.
>
> So, you know, certainly I've made a careful review and reference to that document dozens of times. When I say 'that document' I mean the License Agreement and the documents it incorporates by reference.
>
> . . .
>
> What I settled on based on my training in mathematics and logic was, okay, what's the document that we executed and Cheena signed what we call the License Agreement, and then I worked through the very different areas and clauses of that agreement to find out what rights and obligations they -- they expressed.

45

And that's what led me through these references to the CSS Specifications. The bulk of the normative language there is in the Procedural Specification section and then from . . . section 2 of the CSS Specifications there are references to the Technical Specifications, and that incorporates two documents; one for the DVD Descrambler and one for the Authenticating Module.

6RT600:18-601:26.

After the Kaleidescape System was designed, Kaleidescape's Chief Technology Officer, Dr. Stephen Watson, double-checked its compliance with the contract. Like Collens, Dr. Watson testified that his analysis of the obligations imposed by the contract led him from the License Agreement to the CSS Specifications document to the two Technical Specifications Titles. 6RT622:7-633:22.

The trial court also found guidance in a concept introduced by Collens in the passage above and amplified by Kaleidescape's expert Harkins and Michael Malcolm: the observation that the CSS Specifications are framed in "normative" language, i.e., "must" and "must not." 6RT669:19-671:11; 6RT554:4-19. The trial court, from its examination of the General Specifications document, concluded it lacked the normative language that the contract documents possessed. 8RT877:13-15 ("this is a contract that is not touchy feely, but is strong and normative and tells people what their obligations are").

Other significant evidence demonstrating that the General Specifications document is not incorporated into the contract includes the following: Kaleidescape did not participate in the drafting of the License Agreement (5RT432:6-20); DVD CCA offered the contract on a non-negotiable, adhesive, "take it or not" basis and refused to discuss the meaning of its terms or answer Kaleidescape's questions (5RT425:25-

46

427:16; 8RT852:1-5, 868:17-26, 877:3-5, 879:16-17); DVD CCA failed to
disclose the existence of the General Specifications document and failed to
disclose any intent to incorporate the General Specifications document into
the contract (8RT868:11-26, 884:17-22); Kaleidescape did not learn of or
receive the General Specifications document until weeks after it executed
the License Agreement (1AA184); and the language of the General
Specifications document (which is itself extrinsic evidence), as discussed
previously, is an aspirational overview and speaks of the contract as
something of which the General Specifications document is not a part
(1AA78).

    DVD CCA's "CSS Technology License Procedure" document also
supports the trial court's conclusion that the General Specifications
document is not incorporated as part of the Technical Specifications. It
states that "DVD CCA will: 1. Send Technical Specifications, *titles
requested*, once receipt of payment is verified" and that licensees must pay
$500 for each Technical Specifications document. 2AA322, 2AA325
(emphasis added). This, too, confirms that the Technical Specifications are
the "titles requested" by the licensee from the list of Technical
Specifications Titles in Exhibit C, which does not include the General
Specifications document. As DVD CCA's President Hoy acknowledged,
the General Specifications document was not and could not have been one
of the "titles requested" on Exhibit C by Kaleidescape. 5RT419:25-420:20.

    The delivery receipt prepared by DVD CCA when it delivered the
two Technical Specifications Titles after the contract was executed also
supports the trial court's objective reading of the contract. 1AA184. This
receipt lists not only the two Technical Specifications Titles but also other
non-contractual Proprietary Information not part of the CSS Specifications,

e.g., the General Description document. *Ibid.*; 4RT389:14-21; 6RT596:2-25.

All of this extrinsic evidence supporting the trial court's conclusion amply satisfies the substantial evidence test.[5]

### B.   The Extrinsic Evidence DVD CCA Relies On Is Insufficient To Create An Ambiguity

Because substantial evidence supports the trial court's resolution of the extrinsic evidence, DVD CCA has failed to meet its burden on appeal. Its contention that other extrinsic evidence supports its interpretation is immaterial under the substantial evidence test.

The trial court expressly considered all of the extrinsic evidence put before it in reaching its interpretation of the contract—the second stage of the *P.G. & E.* inquiry.  3AA689, 3AA690, 3AA694.  DVD CCA's contention that the trial court should have focused on whether the CSS licensing contract was "reasonably susceptible" to the interpretations proffered by the parties—the first stage of the *P.G. & E.* inquiry—is therefore misplaced.  That issue would arise on appeal only if the trial court had excluded extrinsic evidence or refused to interpret the contract using extrinsic evidence, neither of which happened here.  Contrary to DVD CCA's protestations (AOB 3, 17, 19, 34, 35), the trial court never excluded any of DVD CCA's evidence as irrelevant; rather, the trial court considered the evidence but simply did not find it persuasive.

In any event, the extrinsic evidence DVD CCA relies on is too insubstantial even to carry its threshold burden under *P.G. & E.* of

---

[5] By failing to completely and fairly present the evidence supporting the trial court's judgment, DVD CCA has waived any argument that the judgment is not supported by substantial evidence. *Foreman & Clark Corp. v. Fallon*, 3 Cal.3d 875, 881 (1971); *Ajaxo*, 135 Cal.App.4th at 50.

demonstrating ambiguity.  DVD CCA sought to prove two facts by extrinsic evidence:  the intention that DVD CCA held and the intention that Kaleidescape held *at the time of contracting* regarding whether the General Specifications document was incorporated into the contract.  Much of the "evidence" it puts forth proves upon inspection to be irrelevant, incompetent, or outside the trial court record.  Properly winnowed, the extrinsic evidence is woefully insufficient to carry DVD CCA's threshold burden of showing that the contract is reasonably susceptible to its interpretation.

1.    **DVD CCA Presented No Relevant Extrinsic Evidence Of Its Own Intent**

DVD CCA presented no evidence that at the time of contracting it subjectively intended that the General Specifications document should be a part of the contract.  Moreover, because DVD CCA never communicated any such intent to Kaleidescape at or before the time of contracting, any such evidence would be irrelevant.

DVD CCA's opening brief asserts that its president, Hoy, testified "that the General Specifications were the generally applicable Technical Specifications."  AOB at 27, citing 5RT420:8-17 and 5RT421:11-17; *see also* AOB at 7 (asserting Hoy testified that the General Specifications were "overarching Technical Specifications").  Hoy never so testified.

In the first passage, Hoy actually testified:  "The CSS General Specification is intended for use by all functional categories that *also* receive a Technical Specification."  5RT420:10-12 (emphasis added).  This is not an assertion that the General Specifications document is a part of the Technical Specifications; to the contrary, it is an assertion that the General Specifications document is something different than and in addition to "a Technical Specification."  The court then asked, "with reference to the

49

General Specifications is there some document that shows that Kaleidescape, quote, requested that document?" 5RT421:3-5. Hoy's answer, the second passage DVD CCA relies on, is: "In the process of selecting functional categories to which there was an associated Technical Specification they would then automatically be sent by DVD CCA the General Specification." 5RT421:11-14. Hoy's answer again differentiates the General Specifications document from the Technical Specifications, and also confirms that each of the Technical Specifications is "associated" with a Membership Category.

Neither of these statements is an assertion "that the General Specifications were the generally applicable Technical Specifications," contrary to DVD CCA's characterization, AOB at 27. To the contrary, Hoy's testimony is consistent with the License Agreement provisions discussed above establishing that licensees, in addition to receiving the CSS Specifications, also receive auxiliary, non-contractual materials like the General Specifications and General Description documents.

DVD CCA also presented as witnesses members of its board of directors, all of whom voted to file this lawsuit against Kaleidescape. 2RT91:19-24, 3RT114:3-27, 122:14-17 (Director Sunderland of Fox); 3RT142:16-20, 162:27-163:15, 167:8-22 (Director Perry of Paramount); 4RT276:28-277:4, 289:26-290:7 (Director Hannibal of Universal); 4RT331:4-9, 333:14-19, 344:25-345:2 (Director Parsons of Pioneer). None of them asserted that the General Specifications document was part of the Technical Specifications or part of the contract.

DVD CCA thus presented no evidence that it intended the General Specifications document to be part of the Technical Specifications as defined by the contract. Even if DVD CCA had presented extrinsic evidence demonstrating at the time of contracting it intended for the

50

General Specifications document to be incorporated into the contract, such evidence would be irrelevant and inadmissible because, as discussed above, DVD CCA never communicated any intent to Kaleidescape and refused to discuss the proposed contract or its terms. As the trial court found, "the defendant received no information and would have no basis to know what the plaintiff believed." 8RT868:24-26 (DVD CCA repeatedly misquotes this passage, substituting "Kaleidescape" (the defendant) for "plaintiff." AOB 19, 35). For this reason, *any* evidence of DVD CCA's intent is irrelevant and as a matter of law cannot support its proposed interpretation of the contract. "[I]t was not competent extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." *Winet*, 4 Cal.App.4th at 1166 n.3; *see also Reigelsperger v. Siller*, 40 Cal.4th 574, 579 (2007) ("uncommunicated subjective intent is irrelevant"); *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club*, 109 Cal.App.4th 944, 956 (2003) (same); *Alex Robertson Co. v. Imperial Casualty & Indemnity*, 8 Cal.App.4th 338, 346 (1992) (same); *Sunniland Fruit*, 233 Cal.App.3d at 898-99 (same).

    2.    **The Extrinsic Evidence Of Kaleidescape's Post-Contract Statements Is Insufficient To Sustain DVD CCA's Burden Of Showing Ambiguity**

DVD CCA introduced no extrinsic evidence of statements or other expressions of intent made by Kaleidescape regarding the General Specifications *at* or *before* the time of contracting. It presented only statements made by Kaleidescape employees long *after* the parties entered into the contract. Contrary to DVD CCA's assertions, the trial court fully considered this evidence but found it unpersuasive. 8RT871:2-6, 875:12-16, 876:17-20, 879:17-21. This evidence is insufficient to sustain DVD

CCA's threshold burden of showing that the contract is ambiguous and reasonably susceptible to its interpretation.

DVD CCA, in its AOB at 15-16 and 27-28, relies on the following extrinsic evidence of statements it attributes to Kaleidescape, most of which were never admitted into evidence at trial.[6] The first is Exhibit 276, a compliance analysis document prepared by Dr. Watson in May 2003, after Collens had performed his analysis and the Kaleidescape System had been designed. (The substance of this document is the same as Trial Exhibit 344, 6RT651:2-652:17, and most of Dr. Watson's testimony regarding it refers to Exhibit 344.) Dr. Watson's purpose was to explain why the Kaleidescape System qualified for the Membership Categories Kaleidescape had selected and how it complied with the requirements for products in those categories set forth in the Procedural Specifications and the Technical Specifications Titles. 1AA265-272; 6RT621:23-633:26. In the course of this analysis, Dr. Watson "came to the belief that the overall intent of the CSS license is to protect the signal path between the DVD Disk and the display devices." 6TR622:7-15. In preparing Exhibit 276, Dr. Watson reviewed the set of documents DVD CCA provided, including the

---

[6] Although DVD CCA includes in its Appellant's Appendix (1AA100-126; 1AA185-86) and discusses in its statement of facts (AOB 10-11) four memoranda by Kaleidescape employees and two by its consultant Bryant, it properly does not assert that these are extrinsic evidence of Kaleidescape's intent regarding the General Specifications document. These memoranda are from 2001, a year before Kaleidescape first learned of the existence and contents of the General Specifications document when, after entering into the contract, it received the document. The memoranda thus are not relevant evidence of Kaleidescape's intent regarding the General Specifications document; in addition, whatever speculation they contain about the constraints the CSS licensing contract might impose on licensees is just that—speculation by persons who lacked full access to the contract documents. 4RT361:5-17, 364:3-5, 365:23-364:1.

General Specifications document, and made two passing references to the General Specifications document.

The trial court expressly rejected the conclusion regarding Kaleidescape's intent at the time of contracting that DVD CCA sought to draw from this document: "I assign no weight to the fact that memos were being prepared in Kaleidescape, or Ph.D.'s and math, logic and everything else, MBA's talking about what they could do and not do. None of that really adds to what was in the contract." 8RT879:17-21. The trial court's assessment of the evidence was correct.

Exhibit 276 does not analyze or purport to determine whether the General Specifications document is or is not part of the Technical Specifications and incorporated into the contract. Exhibit 276 does not review the definition of Technical Specifications, the definition of CSS Specifications, or any of the contract provisions relevant to determining whether the General Specifications document is within the contract's definition of Technical Specifications. Its four pages make only two passing references to the General Specifications document. The first reference notes an agreement between the definitions of "CSS Decryption Module" in the Procedural Specifications and in the General Specifications. 1AA270. The second reference notes similarities between a drawing in Technical Specifications Title 809 and drawings in the General Specifications document. 1AA272. To the extent Exhibit 276 describes the General Specifications as part of the Technical Specifications ("the CSS General Specifications part of TS," 1AA270; "the CSS General Specifications of TS," 1AA272), that description is an unanalyzed assumption, not a reasoned conclusion. Nor does Exhibit 276 suggest that the General Specifications document imposes any contractual obligation on Kaleidescape.

53

The rest of the extrinsic evidence DVD CCA relies on was never offered at trial or considered by the trial court. For the reasons set forth in Kaleidescape's accompanying Motion to Strike, this evidence is outside the trial evidentiary record and cannot be considered on appeal. It is hornbook law that a judgment after a trial on the merits may not be overturned by evidence that the losing party possessed but chose not to introduce into the evidentiary record. *Stonelight Tile v. California Insurance Guarantee Ass'n*, 150 Cal.App.4th 19, 34 n.6 (2007); *Frank v. County of Los Angeles*, 149 Cal.App.4th 805, 815 (2007); *Pulver v. Avco Financial Services*, 182 Cal.App.3d 622, 631-32 (1986); *USLIFE Savings & Loan Ass'n v. National Surety Corp.*, 115 Cal.App.3d 336, 343 (1981).

Thus, DVD CCA may not rely on the deposition excerpt of Dr. Watson at 3AA581-83, which was never offered or admitted at trial. *Frank*, 149 Cal.App.4th at 815; *Ponce v. Black*, 224 Cal.App.2d 159, 164-65 (1964). Likewise, DVD CCA may not rely on statements by Kaleidescape's trial counsel in pretrial papers (2AA374-461, 484-507) it never introduced at trial. *Frank*, 149 Cal.App.4th at 815. Moreover, trial counsel are not witnesses, and statements by counsel in the course of litigation are not relevant extrinsic evidence of the parties' mutual intent at the time of contracting.

Only part of the Srinivasan deposition excerpt at 3AA585-87 on which DVD CCA relies was read into the record at trial, and only that part may be considered on appeal. Srinivasan testified at trial he never read the General Specifications document or the two Technical Specifications Titles and thus had no basis for judging whether the General Specifications document was part of the Technical Specifications as defined by the contract ("I never read them myself so I cannot testify that one implies the other."). 4RT375:27-379:3. Instead, Srinivasan had forwarded the General

54

Specifications document to Collens upon receiving it from DVD CCA. 6RT596:2-25. DVD CCA then read into the record a deposition question in which Srinivasan was asked whether he had "any reason to doubt that [the General Specifications] document is a CSS Technical Specification received by Kaleidescape from DVD CCA?" and answered "No." 4RT375:27-379:3. As the trial court concluded, because Srinivasan had never read the General Specifications document, his answer to the deposition question was consistent with his trial testimony. 4RT379:2-3 (The Court: "I hear a different question [in the deposition excerpt] than you asked here.").

The trial court found that this deposition testimony of Srinivasan and other deposition testimony of Dr. Watson that DVD CCA did introduce into evidence did not demonstrate that at the time of contracting Kaleidescape intended to incorporate the General Specifications into the contract: "[C]ertainly the testimony of defense witnesses, to the effect the plaintiff asserts, the Court does not adopt that interpretation." 8RT876:18-20. That conclusion is correct. Indeed, it is logically impossible for Kaleidescape to have intended at the time of contracting to incorporate the General Specifications document because it did not learn of the document's existence until two weeks after it entered into the contract.

### 3. DVD CCA Fails To Carry Its Burden Of Showing Ambiguity

"Parol evidence is admissible only to prove a meaning to which the contractual language is 'reasonably susceptible'; not to flatly contradict the express terms of the agreement." *Consolidated World Investments v. Lido Preferred*, 9 Cal.App.4th 373, 379 (1992). "Courts will not strain to create an ambiguity where none exists." *Waller v. Truck Insurance Exchange*, 11 Cal.4th 1, 18-19 (1995). "[D]isagreement concerning the meaning of a

phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning" does not create an ambiguity. *Powerine Oil v. Superior Court*, 37 Cal.4th at 390-91 (quotation marks omitted).

The foregoing analysis of the extrinsic evidence demonstrates that DVD CCA has failed to carry its threshold burden of showing that the contract is ambiguous and reasonably susceptible to its proposed interpretation. Instead, DVD CCA is attempting to "flatly contradict" the words of the License Agreement and rewrite the definition of "CSS Specifications" to read "the Procedural Specifications and the Technical Specifications *and the General Specifications*." The language of the contract, however, strongly and consistently excludes the General Specifications document from incorporation into the contract as part of the Technical Specifications. The extrinsic evidence relied on by the trial court reinforces that conclusion. The extrinsic evidence relied on by DVD CCA, reduced to that which is competent, relevant, and actually admitted at trial, is too insubstantial when weighed against the clear and definite contract language and the contrary extrinsic evidence to make the contract reasonably susceptible to DVD CCA's interpretation.

Finally, even if DVD CCA had succeeded in demonstrating that the term "Technical Specifications" was ambiguous as to whether it incorporated by reference the General Specifications document and if all of the other barriers to DVD CCA's interpretation set forth above did not exist, this ambiguity would have to be construed against DVD CCA, the drafter of the contract.

"In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted *most strongly* against the party who caused the uncertainty to exist." Civil Code § 1654 (emphasis added).

56

Moreover, the License Agreement is an adhesion contract, i.e., "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-Tail*, 28 Cal.3d 807, 817 (1981). "The rule requiring the resolution of ambiguities against the drafting party 'applies with peculiar force in the case of a contract of adhesion. Here the party of superior bargaining power not only prescribes the words of the instrument but the party who subscribes to it lacks the economic strength to change such language.' " *Id.* at 820 n.16. The trial court, although it concluded that DVD CCA's proposed interpretation had already failed, noted that this rule would have compelled rejection of DVD CCA's interpretation in any event. 8RT877:16-21.

## IV.   The Trial Court's Alternative Holding That DVD CCA Was Not Entitled To Equitable Relief Was A Proper Exercise Of Its Equitable Discretion

At trial, DVD CCA disclaimed its prayer for damages and sought only equitable relief. In an alternative holding, the trial court concluded that even if DVD CCA had succeeded in demonstrating that the General Specifications document was incorporated into the contract and that Kaleidescape had breached its terms, it would not be entitled to equitable relief for three independent reasons: DVD CCA failed to show irreparable harm; the General Specifications document was too uncertain for specific performance; and the balance of equities favored Kaleidescape.

Each of these determinations was well within the court's equitable discretion and should be affirmed. The trial court's denial of equitable relief is reviewed for an abuse of discretion. *Professional Engineers v. Department of Transportation*, 15 Cal.4th 543, 562 (1997) (equitable relief "rests in the sound discretion of the trial court upon a consideration of all

57

the particular circumstances of each individual case"); *Palo Alto-Menlo Park Yellow Cab v. Santa Clara County Transit District*, 65 Cal.App.3d 121, 132 (1976) ("In an equity case the trial court has broad and flexible discretionary powers, and can, and undoubtedly would, deny injunctive relief where such relief would be inequitable." (quotation marks omitted)).

## A. Irreparable Harm Is An Essential Prerequisite For Equitable Jurisdiction

The existence of irreparable harm that that cannot be compensated by damages is a fundamental prerequisite to a trial court's equity jurisdiction. In its absence, a court of equity can proceed no further.

"'[I]n . . . actions upon contracts, inadequacy of the legal remedy to compensate for the breach is the keystone of equitable jurisdiction.'" *Wilkison v. Wiederkehr*, 101 Cal.App.4th 822, 831 (2002) (citation omitted). "Perhaps the most basic rule governing equity jurisdiction is that '. . . there is no right to equitable relief or an equitable remedy when there is an adequate remedy at law.'" *Martin v. County of Los Angeles*, 51 Cal.App.4th 688, 696 (1996).

Irreparable harm is required for both injunctive relief and specific performance. *Intel v. Hamidi*, 30 Cal.4th 1342, 1352 (2003) (injunctive relief). *Morrison v. Land*, 169 Cal. 580, 586 (1915) (specific performance). Injunctive relief is barred if specific performance is unavailable. Code Civil Pro. § 526, subd. (b)(5); Civil Code § 3423, subd. (e).

The trial court found that DVD CCA had failed to demonstrate any harm, much less irreparable harm. 8RT882:12-883:14 (8RT883:12-14: "I have not been satisfied that there is irreparable harm or at this point any demonstrated harm."); 3AA694 ("the claimed damage was hypothetical, contingent, academic, and not clearly established—certainly not to the degree to support equitable relief"). This factual finding is supported by

substantial evidence. The record is utterly devoid of *any* evidence of actual harm suffered by DVD CCA, much less irreparable harm that could not be remedied by damages.

The Kaleidescape System was introduced in August 2003, and at the time of trial it had been on the market for over three and one-half years. Yet DVD CCA could demonstrate no injury of any sort to itself—no lost licensing revenues, no licensees who failed to renew their licenses, no prospective licensees who decided not to enter into licenses, none of the losses that one would expect a licensor to allege from breach of a technology license.

DVD CCA President Hoy presented no evidence of any actual harm to DVD CCA or any illegal copying of movies by Kaleidescape users. Director Sunderland offered only speculation about hypothetical future harm; she could not point to any actual harm to DVD CCA and when asked by the Court admitted that there had been none. 3RT101:20-104:9. Director Perry, too, could only speculate about potential future harm, and when asked by the court admitted that the CSS Specifications could be amended under the By-Laws to address any harms, if the members of DVD CCA so wished. 3RT145:5-148:28.

DVD CCA's expert Bell offered only his abstract, speculative, and conclusory opinion that *any* breach of *any* provision of the CSS licensing contract by *any* licensee would necessarily cause irreparable harm to DVD CCA. 4RT304:27-306:25; 308:25-309:9. Bell identified no actual harm suffered by DVD CCA as a result of the Kaleidescape System, and identified no instance in which the single specific hypothetical harm he suggested, a reduction in movies released on DVDs (4RT306:12-20), had actually occurred in the three and one-half years the Kaleidescape System has been on the market. Nor did he link up his free-floating, hypothetical

opinions to the actual capabilities and operation of the Kaleidescape System (which he learned about only in the middle of the trial), to any effect of the Kaleidescape System on DVD CCA or on the market for DVDs and DVD products, or to the specific breaches alleged against Kaleidescape. 4RT308:25-309:23; *see also* 8RT843:20-27.

Bell formed his opinions in the abstract, before knowing the nature of the Kaleidescape System, and had no idea whether any feature of the Kaleidescape System even breached the contract. 4RT308:25-309:23. As the court found: "It really seems to me that much of this dispute, at least based on the evidence presented here, is at present more in the nature of an academic inquiry than any demonstration of actual harm." 8RT886:17-21.

Moreover, Director Sunderland admitted that unlicensed CSS decryption software ("DVD ripping software") used for copying DVDs was easily available to consumers, including the program "DeCSS." 3RT135:14-3RT136:4; *see also* 5RT459:27-460:8. She further admitted that the copying of DVD movies by users of DeCSS and other DVD ripping software had not eroded the trust of movie studios in the DVD format. 3RT136:5-12; *see also DVD CCA v. Bunner*, 116 Cal.App.4th 241, 246 (2004) (noting that DVD CCA had alleged that DeCSS, available since 1999, would prove " 'fatal to the DVD video format and the hundreds of computer and consumer electronics companies' ").

Because DVD CCA could not demonstrate any harm at all, of necessity it could not demonstrate that its nonexistent harms were irreparable. Although Bell offered another untethered opinion that money damages would be inadequate if the vague and speculative harms he hypothesized were to actually occur (4RT307:26-308:10), he offered no grounding in fact for that assertion.

Kaleidescape, by contrast, presented evidence of the measures it takes to deter users from importing DVDs they do not own into their Kaleidescape Systems and thereby protect DVD CCA and its members from harm, including a warning screen that appears whenever a DVD is being imported telling the user not to import DVDs not owned by the user, the Service and License Agreement prohibiting dealers and users from importing DVDs they do not own, and Kaleidescape's policing of its dealers and users to ensure that they do not import DVDs they do not own. 3RT208:27-209:23, 215:8-15; 4RT380:3-384:17, 394:18-395:28; 5RT518:20-26, 521:7-523:10; 6RT603:25-606:5, 683:15-684:10. Kaleidescape presented unrebutted evidence that users of the Kaleidescape System do not use it to import DVDs that they do not own and often purchase hundreds of additional DVDs simply to import onto their Systems. 5RT515:4-13, 535:2-5; 7RT706:21-27, 710:24-711:18. The court found that, because of these measures aimed at preventing importing of DVDs not owned by the Kaleidescape user, "things are not as dire as the plaintiff opines." 8RT888:1-14.

The court summarized: "[E]ssentially every [DVD CCA] witness said, these are the bad things that will certainly happen. And I believe that I'm entitled to take into account those bad things that have not been – have not been demonstrated to have occurred in the several years since this dispute arose." 8RT883:1-7. That determination was well within the trial court's discretion.

### B.   The Trial Court Correctly Held That Private Parties Cannot Compel A Court To Order Equitable Relief

Unable to show any harm, DVD CCA sought to substitute a recital in section 9.2 of the License Agreement that, in the case of a future breach of section 4.2, "harm will be irreparable." RA24. DVD CCA argued that

the trial court was compelled by this provision to find that DVD CCA was irreparably harmed.  The court disagreed and held that, while section 9.2 was certainly "one factor to be considered" (8RT881:18-19, 881:2-6) in determining whether irreparable harm existed, "the parties cannot control the sound exercise of jurisdiction by the trial court acting in equity" (8RT881:26-28).

The trial court was correct.  Its conclusion is the only one that preserves the autonomy of the court's equitable discretion and the limitations upon its equitable jurisdiction.  The irreparable harm requirement is a jurisdictional limitation; where, as here, it is not satisfied, the court is without jurisdiction to decree equitable relief: " 'The jurisdiction of a court of equity to decree specific performance . . . depend[s] . . . altogether upon the question whether the breach complained of cannot be adequately compensated in damages.' "  *Morrison*, 169 Cal. at 587-88.  Moreover, it is well settled that the parties cannot confer jurisdiction on the court by consent or agreement.  *Summers v. Superior Court*, 53 Cal.2d 295, 298 (1959).

The court's ruling accords with the well-established majority rule from other jurisdictions that parties cannot contractually enlarge the court's equitable jurisdiction and the availability of equitable relief by dispensing with the necessity of showing irreparable harm.  "While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief."  *Dominion Video Satellite v. Echostar Satellite*, 356 F.3d 1256, 1263-64 (10th Cir. 2004); *see, e.g., Smith, Bucklin & Assoc. v. Sonntag,* 83 F.3d 476, 481 (D.C. Cir. 1996) ("an insufficient prop");

62

*Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987);
*Boston Laser v. Qinxin Zu*, 2007 U.S. Dist. LEXIS 78021, at *39-40 (N.D.
N.Y. 2007); *Traders Int'l, Ltd. v. Scheuermann*, 2006 U.S. Dist. LEXIS
61995, at *26 (S.D. Tex. 2006); *Outcomes Pharm. Health Care. v. Nat'l
Community Pharmacists Ass'n*, 2006 U.S. Dist. LEXIS 92927, at *36-37
(S.D. Iowa 2006); *Markovits v. Venture Info Capital*, 129 F.Supp.2d 647,
661 (S.D. N.Y. 2001); *Dice v. CliniCorp.*, 887 F.Supp. 803, 810 (W.D. Pa.
1995); *Kansas City Southern v. Grupo TMM*, 2003 Del. Ch. LEXIS 116, at
*21 (Del. Ch. 2003); *Ed Bertholet & Assocs. v. Stefanko*, 690 N.E.2d 361,
364 (Ind. Ct.App. 1998); *Stokes v. Moore*, 77 So.2d 331, 335 (Ala. 1955).[7]

---

[7] Most of the decisions cited by DVD CCA, AOB at 47 n.19, similarly treat
a contract recital of irreparable harm as only one factor to be considered
and found that actual harm existed before awarding equitable relief, unlike
here where there is no evidence of actual harm and the plaintiff's own
witnesses admit there is no harm. *Ticor Title Insurance v. Cohen*, 173 F.3d
63, 68-69 (2d Cir. 1999) ("irreparable harm was *shown* to be present in this
case;" contract recital "might *arguably* be viewed as an admission"
(emphasis added)); *Verizon Communications v. Pizzirani*, 462 F.Supp.2d
648, 658 (E.D. Pa. 2006) (finding "Plaintiff has demonstrated irreparable
harm" in addition to considering contract recital); *Estee Lauder v. Batra*,
430 F.Supp.2d 158, 174 (S.D. N.Y. 2006) (same); *Peabody Holding v.
Costain Group*, 813 F.Supp. 1402, 1421 (E.D. Mo. 1993) (same). *Cirrus
Holding v. Cirrus Indus.*, 794 A.2d 1191, 1209 (Del. Ch. 2001) denied
injunctive relief on other grounds; *Hough Assocs. v. Hill*, 2007 Del. Ch.
LEXIS 5, at *66 n.94 (Del. Ch. 2007) granted a preliminary injunction
without a showing of actual harm but acknowledged that " 'a contractual
stipulation as to the irreparable nature of the harm that would result from a
breach cannot limit this Court's discretion to decline to order injunctive
relief.' "

Finally, *Pacific Realty Trust v. APC Invest.*, 685 F.2d 1083, 1086 (9th Cir.
1982); *PAM, S.p.A. v. U.S.*, 347 F.Supp.2d 1362, 1365 (Ct. Int'l Trade
2004); and *Mann v. Johnson Memorial Hospital*, 611 N.E.2d 676, 679 (Ind.
Ct.App. 1993), have no relevance because they were not pre-dispute
contract recitals of irreparable harm but irreparable harm stipulations made
during litigation.
*(footnote continued on following page)*

Nor does DVD CCA's invocation of liquidated damages and consent decrees advance its argument that parties may compel a court to order equitable relief.  Liquidated damages are a legal, not an equitable, remedy.  *Beasley v. Wells Fargo Bank*, 235 Cal.App.3d 1383, 1392 (1991).  Further, they are specifically authorized by statute, Civil Code § 1671, and are subject to judicial review, *Ridgley v. Topa Thrift & Loan*, 17 Cal.4th 970, 977 (1998).

A consent decree also presents no usurpation of the equity jurisdiction of the court.  It is a *post-dispute* agreement to settle litigation.  The court must exercise its discretion in deciding whether to enter a consent decree; the parties cannot compel it to do so.  *CSAA Inter-Insurance Bureau v. Superior Court*, 50 Cal.3d 658, 664 (1990) ("entry [of a consent decree] is a judicial act that a court has discretion to perform. . . . 'the court cannot surrender its duty to see that the judgment to be entered is a just one, nor is the court to act as a mere puppet in the matter.' " (citations omitted)).[8]

---

*(footnote continued from preceding page)*

[8] None of DVD CCA's other authorities (AOB 51-52) is relevant.  *Jefferson v. Department of Youth Authority*, 28 Cal.4th 299 (2002), involved enforceability of a claims release in a post-dispute settlement, not whether a court can be compelled by a pre-dispute contract to impose equitable relief in the absence of actual harm.  *Kristine H. v. Lisa R.*, 37 Cal.4th 156 (2005), was a collateral attack on a judgment.  Evidence Code § 622 does not apply to the contract recital because it applies only to "*facts* recited in a written instrument." (Emphasis added).  A "fact" is something that actually exists; a past or present state of affairs, not a prediction of the future like the recital that "harm will be irreparable" (License Agreement § 9.2).  *See also Bruni v. Didion*, 160 Cal.App.4th 1272, 1291 (2008) (section 622 does "not apply to recitals in an adhesion contract").  *Palermo v. Pyke*, 111 Cal.App.2d 350 (1952), involved a recital of *past* harm completed before the time of contracting, not a prediction of future harm.

64

Accordingly, the fact that the License Agreement purports to authorize equitable relief for certain future breaches is ineffectual to expand the equity jurisdiction of the court or to empower it to grant equitable relief where DVD CCA has failed to show irreparable harm.

### C.    The Trial Court Properly Found The General Specifications Too Uncertain For Specific Performance

Even where the jurisdictional prerequisite of irreparable harm exists, equitable relief remains discretionary. In addition to the absence of irreparable harm, the trial court denied equitable relief on the additional ground that the portion of the General Specifications document invoked by DVD CCA was too uncertain to be enforced by specific performance. 8RT880:7-14. The trial court's determination was correct.

Civil Code section 3390 forbids specific enforcement of "[a]n agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable." " 'That a greater degree or amount of certainty is required in the terms of an agreement which is to be specifically executed in equity than is necessary in a contract which is the basis of an action at law for damages' has often been declared. [Citations.] The contract may be valid and yet because of its inherent nature or because it lacks the necessary degree of definiteness may be unenforceable either by a direct decree of specific performance, or indirectly by means of a prohibitory injunction." *Long Beach Drug Co. v. United Drug Co.*, 13 Cal.2d 158, 164 (1939).

DVD CCA alleged that Kaleidescape breached two sections of the General Specifications document: sections 1.5 and 2.1.2. AOB at 14. Section 2.1.2 applies only to two defined categories of devices: i) DVD-Video Players, and ii) the combination of a DVD-Video Drive with a DVD-Video CSS Decryption Module. 1AA84. Kaleidescape's expert

Harkins testified that the Kaleidescape System is not a DVD-Video Player; he further testified that it is not a combination of a DVD-Video Drive with a DVD-Video CSS Decryption Module because it does not incorporate a DVD-Video CSS Decryption Module. 6RT664:26-667:16.

The trial court credited Harkins' testimony fully and rejected the testimony of DVD CCA's expert Berg, who had testified (3RT230:22-232:1) to the contrary that the Kaleidescape System was a combination of a DVD-Video Drive with a DVD-Video CSS Decryption Module. 8RT877:10-12 ("I give credit to the — and resolve the conflict in experts not in favor of Brian Berg, but in favor of Daniel Harkin's interpretation."). The court's determination that the Kaleidescape System does not include a CSS Decryption Module is a factual finding supported by substantial evidence; DVD CCA does not challenge it. Accordingly, section 2.1.2 does not apply to the Kaleidescape System.

Because the trial court found that the Kaleidescape System was not a device to which section 2.1.2 applied, its determination that the General Specifications document was too uncertain for specific performance was made with respect to section 1.5. The trial court's determination is correct and amply supported by the evidence.

Regarding section 1.5, DVD CCA alleged breach of and sought specific performance of the following sentence: "The DVD-Video Content Scramble System is intended to prevent casual users from the unauthorized copying of copyrighted materials recorded on DVD-Video/Audio Discs." 7RT748:5-9. Kaleidescape's expert Harkins testified that section 1.5 was informative, not normative (i.e., not obligatory), and therefore imposed no obligation of compliance on anyone, including Kaleidescape. 6RT669:19-671:11. Harkins testified that there was no specific, definite obligation stated in section 1.5—it has no "must" or "should" or "must not"

66

or "should not." 6RT669:19-670:9. "There are no key words in here that
would guide an implementor into what he must, should or may do. It
merely specifies the reasoning behind having something like the DVD
Video Content Scrambling System."[9] 6RT671:7-11. That is the very
definition of uncertainty: "terms [] which are not sufficiently certain to
make the precise act which is to be done clearly ascertainable." Civil Code
§ 3390.

    The sentence in section 1.5 that DVD CCA sought to enforce is not
capable of specific performance. Unlike the detailed requirements of the
Technical Specifications Titles and the Procedural Specifications, a decree
stating that "CSS is intended to prevent casual users from the unauthorized
copying of copyrighted materials recorded on DVD discs" would not tell a
licensee bound to obey it under penalty of contempt what it could and could
not do in designing its products. Nor is a copy made by a Kaleidescape
System user an "unauthorized copy[] of copyrighted materials," because
such copies are authorized by the copyright law doctrine of fair use and by
section 117 of the Copyright Act. 17 U.S.C. §§ 107 ("fair use . . . is not an
infringement of copyright"); 117 (copies made under this section are "not
an infringement").

    Indeed, DVD CCA was unable to craft its proposed specific
performance decree, 3AA617, without adding significant new terms not
found in the General Specifications document. These new terms would
explicitly forbid the permanent copying of data from a DVD and would
require the physical presence of a DVD whenever a movie is played, two
requirements found nowhere in the General Specifications document. This

---

[9] The trial court restated Harkin's testimony when it held: "These words
seem to be statements of what the computer scrambling device is supposed
to do." 8RT880:12-14.

is an implicit admission that the language of the General Specifications document is too uncertain to be enforced.  Such a decree also would have amounted to a prohibited amendment of the CSS Specifications outside of the By-Laws procedure, imposing on Kaleidescape terms not applicable to any other licensee.

**D.    The Trial Court Correctly Balanced The Equities And Found They Favored Kaleidescape**

As yet another ground for denying equitable relief, the trial court balanced the equities and found that they weighed in Kaleidescape's favor. The trial court's exercise of its discretion was proper.

Balancing the equities is an essential precondition before a court can award equitable relief.  "A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute. . . . '[T]he court should weigh the competing equities which bear on the issue . . . and should then grant or deny injunctive relief depending on the overall balance of those equities.' "  *Cortez v. Purolator Air Filtration Products*, 23 Cal.4th 163, 180 (2000).  "In short, consideration of the equities between the parties is necessary to ensure an equitable result." *Id.* at 181.

"[A] court of equity may deny injunctive relief and relegate the plaintiff to his remedy at law, if the benefit resulting to him from the granting of the injunction will be slight as compared to the injury caused the defendant thereby." *Wright v. Best*, 19 Cal.2d 368, 386 (1942) (citations omitted).

Nothing in the License Agreement purports to excuse or prohibit the court from balancing the hardships.  To the contrary, section 9.2 of the License Agreement acknowledges that equitable relief requires a "showing to the relevant court's satisfaction that applicable factors other than the fact

that harm will be irreparable ... have been fulfilled." RA24. The other "applicable factors" include balancing the hardships.[10]

At trial, DVD CCA failed to carry its burden of demonstrating that the balance of equities favored equitable relief. The record is utterly devoid of *any* actual harm suffered by DVD CCA at any time since the Kaleidescape System first went on the market in August 2003. By contrast, the record contains undisputed evidence, described above, of the measures taken by Kaleidescape to discourage copying of DVDs not owned by Kaleidescape users.

The trial court also had to weigh the undisputed evidence that the equitable relief DVD CCA requested would likely be the end of Kaleidescape, would at minimum throw almost all of its employees out of work, would harm Kaleidescape's dealers and customers, and would harm innovation. 5RT532:23-535:9. It found that the harm to Kaleidescape and its employees was alone sufficient to tilt the balance of hardships in Kaleidescape's favor, 8RT883:20-27, found that the public interest was not

---

[10] DVD CCA's contention that it was improper for the trial court to balance the equities as the law requires before awarding equitable relief thus lacks merit. Its assertion that Kaleidescape was a " 'defendant who engages in deliberate misconduct,' " AOB at 56, is contrary to the trial court's factual findings of Kaleidescape's good faith. 8RT:884:5-10, 885:4-10; 888:7-11; 3AA694. Nor is it being " 'required to contract a second time' " with Kaleidescape or "being compelled to do . . . business . . . under a different license" (AOB at 56); the parties' contract remains unchanged. DVD CCA was free to, and did, elect its remedies. It could have chosen the certainty of damages but instead chose the uncertainty of seeking only equitable remedies that by their nature are discretionary. But its election did not excuse it from having to satisfy the prerequisites to equitable relief that every suitor in equity must satisfy, nor did it handcuff the trial court from exercising its discretion to deny relief even if DVD CCA had carried its burden of demonstrating the existence of those prerequisites.

adversely affected by continued sales and use of the Kaleidescape System, 8RT885:1-4, and found that Kaleidescape had acted in good faith, 8RT:884:5-10, 885:4-10. "[T]he company, far from attempting to do anything bad, seems to have internal procedures to carry out what they say they're trying to do, which is to proceed in an entirely compliant, lawful, and ethical way." 8RT888:7-11.

Given the absence of any actual harm to DVD CCA, the trial court acted well within its discretion in concluding that the demonstrated harm equitable relief would cause to Kaleidescape outweighed the gossamer of speculative harms spun by DVD CCA. "[N]othing [Kaleidescape] did, as shown by the evidence, was unfair." 3AA694.

## CONCLUSION

The trial court's judgment should be affirmed.

Dated: May 16, 2008

Respectfully submitted,

Richard R. Wiebe

THOMAS E. MOORE III (SBN 115107)
NICOLE V. ECONOMOU (SBN 154485)
THE MOORE LAW GROUP
228 Hamilton Avenue, 3rd Floor
Palo Alto, CA 94301
Telephone: (650) 798-5352
Facsimile: (650) 798-5001

RICHARD R. WIEBE (SBN 121156)
LAW OFFICE OF RICHARD R. WIEBE
425 California Street, Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

KEITH SLENKOVICH (SBN 129793)
THELEN REID BROWN RAYSMAN &
STEINER LLP
225 West Santa Clara Street, Suite 1200
San Jose, CA 95113
Telephone: (408) 292-5800
Facsimile: (408) 278-8221

Attorneys for Defendant and Respondent Kaleidescape, Inc.

70

## CERTIFICATE OF COMPLIANCE

Pursuant to subdivision (c)(1) of Rule 8.204 of the California Rules of Court, I certify that this brief contains 17,864 words. Concurrently with the filing of this brief, respondent Kaleidescape, Inc. has applied pursuant to subdivision (c)(5) of Rule of Court 8.204 for leave to file an oversize brief.

Richard R. Wiebe