Dockets.Justia.com

1  GLENN D. POMERANTZ (SBN 112503)
   Glenn.Pomerantz@mto.com
2  BART H. WILLIAMS (SBN 134009)
   Bart.Williams@mto.com
3  KELLY M. KLAUS (SBN 161091)
   Kelly.Klaus@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Thirty-Fifth Floor
   Los Angeles, CA  90071-1560
6  Telephone:    (213) 683-9100
   Facsimile:    (213) 687-3702
7
8  ROBERT H. ROTSTEIN (SBN 72452)
   rxr@msk.com
9  ERIC J. GERMAN (SBN 224557)
   ejg@msk.com
   BETSY A. ZEDEK (SBN 241653)
10 baz@msk.com
   MITCHELL SILBERBERG & KNUPP LLP
11 11377 West Olympic Boulevard
   Los Angeles, California  90064-1683
12 Tel: (310) 312-2000; Fax: (310) 312-3100

13 GREGORY P. GOECKNER (SBN 103693)
   gregory_goeckner@mpaa.org
14 DANIEL E. ROBBINS (SBN 156934)
   dan_robbins@mpaa.org
15 15301 Ventura Boulevard, Building E
   Sherman Oaks, California  91403-3102
16 Tel: (818) 995-6600; Fax: (818) 285-4403

17 Attorneys for Defendants and Counterclaim-Plaintiffs

18
                   UNITED STATES DISTRICT COURT
19
                  NORTHERN DISTRICT OF CALIFORNIA
20

21
   REALNETWORKS, INC., a Washington          CASE NO.  C 08-4548-MHP
22 Corporation; and REALNETWORKS
   HOME ENTERTAINMENT, INC., a               **PUBLIC REDACTED VERSION**
23 Delaware corporation,
                                             **DEFENDANTS AND COUNTERCLAIM-**
24            Plaintiffs and Counter-        **PLAINTIFFS' REPLY IN SUPPORT OF**
                      Defendants,            **MOTION FOR TEMPORARY**
25                                           **RESTRAINING ORDER**
          vs.
26                                           Date:    October 7, 2008
   DVD COPY CONTROL ASSOCIATION,             Time:    2:00 p.m.
27 INC., a Delaware nonprofit corporation,   Crtrm:   15 (Hon. Marilyn Hall Patel)
   DISNEY ENTERPRISES, INC., a
28 Delaware corporation; PARAMOUNT

                                             CASE NO. C 08-4548-MHP
                                             REPLY IN SUPP. OF TRO MOT.

1   PICTURES CORP., a Delaware
corporation; SONY PICTURES
2   ENTERTAINMENT, INC., a Delaware
corporation; TWENTIETH CENTURY
3   FOX FILM CORP., a Delaware
corporation; NBC UNIVERSAL, INC., a
4   Delaware corporation; WARNER BROS.
ENTERTAINMENT, INC., a Delaware
5   corporation; and VIACOM, Inc., a
Delaware Corporation,

6

            Defendants and
7           Counter-Complainants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    For more than a decade, every industry participant (from the consumer electronics,

2    computer hardware and software, and entertainment industries to the hundreds of entities that

3    have licensed CSS), and every court to consider CSS, has recognized that CSS technology exists

4    to allow "a DVD player or a computer DVD drive to decrypt, unscramble and play back, *but not*

5    *copy*, motion pictures on DVDs." *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211,

6    214 (S.D.N.Y. 2000) (emphasis added).  Grasping to be a "first mover" based on one state trial

7    court decision, Real obtained a CSS license under the pretense of building a DVD player and

8    instead built a product that bypasses CSS's access- and copy-control restrictions to make

9    *permanent*, *playable* copies of DVD content.

10    Real has no authority to do so.  The Studios have not given Real the required

11    authorization.  And Real does not, and cannot, find any affirmative authorization in the DVD

12    CCA license.  Real's argument boils down to a claim that, because it has a limited license to use

13    CSS technology for *certain* purposes, Real may use that technology for *any* purpose – even one

14    that directly undermines CSS's *core* purpose.  That core purpose, as stated on the face of the

15    license (in contrast to speculation and surmise from Real's witnesses) is to "

16                                                     ."  Pomerantz Decl. Ex. G (emphasis added).[1]

17    Unsurprisingly, Real's argument finds no support in the well-established and well-

18    reasoned case law construing the DMCA.  While Real doubly emphasizes Judge Illston's finding

19    in *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D. Cal.

20    2004), that "only licensed DVD players can legally access the CSS keys," *see* Opp. at 2, Real

21    ignores the import of the rest of the sentence: *"in order to play DVDs "* — not to make

22    permanent, playable copies of them.  307 F. Supp. 2d at 1095 (emphasis added).

23    Real's liability is clear.  The injury that RealDVD inflicts is obvious and irreparable, and

24    the law does not permit Real to evade injunctive relief by pointing fingers at other entities which

25    are violating the DMCA.  As was the case last Friday, the balance of hardships is not close.  The

26    Court should continue the TRO and set this case on an expedited preliminary injunction schedule.

27
─────────────────────
[1] Notably, this provision of the CSS specifications applicable to Real was not at issue in
28    *Kaleidescape*, much less mentioned by the trial court in that case.

## I.   REAL HAS NO AUTHORITY TO BYPASS CSS'S TECHNOLOGICAL MEASURES TO MAKE PERMANENT, PLAYABLE COPIES OF DVDs

### A.   Real Has To Show Authorization – Not The Absence Of A Prohibition – To Make Permanent, Playable Copies Of DVD Content

Real's central defense continues to be that, under state-law breach of contract principles enunciated by the *Kaleidescape* trial court, Real "does not perform any actions on the CSS technology that are *proscribed* by the CSS license." Opp. at 1 (emphasis added). Thus, Real argues, it is free to use that technology to build and distribute a product that avoids, removes, and deactivates technological measures in order to copy DVD movies. But the Studios' TRO motion is based on *federal* law – the DMCA – not state contract law.[2] The issue is not *proscription* but *authorization*. This is clear from the text of § 1201(a)(3)(A), which provides that "circumvention" includes "avoid[ing] [or] bypass[ing]" a technological measure "*without the authority of the copyright owner*" (emphasis added). It also is clear from the Ninth Circuit's decision in *S.O.S. v. Payday*, as well as substantial federal case law concerning federally created intellectual property rights (copyrights as well as patents), that holders of such rights are deemed to retain any rights they do not expressly grant. Mot. at 17-18. While on one hand trying to rely on copyright fair use law, Real simultaneously dismisses the *S.O.S. v. Payday* line of cases as "fruitless" because they arose in the copyright context. *See* Opp. at 14 n.7. But those cases are highly relevant here where the statutory question expressly centers on a *copyright owner's authorization*. § 1201(a)(3)(A).[3]

Real studiously avoids – because it cannot answer – the question that establishes Real's liability under the DMCA: Where have the Studios given "authority" to RealDVD or anyone else to make *permanent, playable copies* of their copyrighted content from DVDs? Real cannot point to any such authorization. Its attempt to derive such authority from the CSS license fails because the Studios are not the licensors, the DVD CCA is. And even if it were proper to look to the

---

[2] Contrary to Real's unsubstantiated assertions, its product is not the "the same" as the product the *Kaleidescape* trial court reviewed. *See* Supp. Bell. Decl. at ¶¶ 3-4.

[3] Real's focus on the CSS license, rather than the statute, is unavailing as the license *itself* expressly includes both copyright and patent licenses, *see* Pomerantz Decl. Ex. F §§ 2.2 and 2.3, which thereby directly implicate the federal DMCA statute. In addition, the CSS license expressly provides that all licenses not expressly granted are reserved. *Id.* § 2.5.

license for the authorization *by the Studios*, Real still cannot find any.  Not one of Real's declarants – including Mr. Buzzard, who had access to the CSS specifications for many months while he built Real's DVD copier – even tries to point to anything in the specifications as authorizing the creation of a machine to copy DVD movies.  The actual language – which the Studios cited and Real does not even attempt to refute – all points the opposite way:

- CSS's objective expressly is to "                                                    ." Pomerantz Decl. Ex. G (emphasis added).

- CSS was "developed" to "provide reasonable security for content on DVD Discs and thereby, *together with the terms and conditions of this Agreement*, to provide protection for *such copyrighted content against unauthorized consumer copying.*" Pomerantz Decl. Ex. F at 1 (Recital A) (emphasis added).

- Real agreed in the license that equitable relief to enforce it was appropriate given the "lasting effect" and "harm" of "*widespread unauthorized copying of copyrighted content.*" *Id.* at 22 (§ 9.2) (emphasis added).

In sum, the Studio copyright-owners never authorized RealDVD's circumvention.

**B.    Real's Authority To Use The CSS Keys For Some Purposes Cannot Be Bootstrapped Into Authority To Use Them For Any Purpose**

Recognizing it will not find the necessary authorization in the Studios' actions or the CSS license, Real takes a different tack.  Real argues that because it has a license to use the CSS keys for some purposes, Real can use those keys for *any* purpose, even those that run counter to the obvious and decade-long understood purpose of CSS.  *See* Opp. at 11 (relying on *I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004) and *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005)).  Although § 1201 defines "circumvention" to include "avoid[ing]" and "bypass[ing]," the courts in those cases held that the unauthorized use of validly issued passwords to gain access to password-protected websites "did not *surmount* or *puncture* or *evade* any technological measure" and thus did not constitute "circumvention" within the meaning of section 1201.  *I.M.S.*, 307 F. Supp. 2d at 532-33 (emphasis added); *Egilman*, 401 F. Supp. 2d at 113-114.

*I.M.S.* and *Egilman* are not even analogous to what Real is doing.  In those cases, at least, there was no dispute that someone had been authorized to do what the defendants were doing

1    with the passwords – just not the defendants.  Here, in contrast, Real is making a use of the CSS

2    keys (to create permanent, playable copies) that *no one* has ever been authorized to make.[4]

3            More fundamentally, however, the logic of these cases and of Real's argument – that

4    making an unauthorized use of an authorized key is not circumvention because there is no

5    "puncturing" of code – has been soundly rejected by courts that have been faithful to the statutory

6    language.  In *321 Studios*, for example, it was undisputed that 321 Studios used valid CSS keys

7    without authorization to do so.  The court squarely rejected 321's argument (echoed in Real's

8    argument here) that the software did not "circumvent" CSS because it "simply uses the authorized

9    key to unlock the encryption." *Id.* at 1098.  The court held that "while 321's software does use the

10   authorized key to access the DVD, *it does not have authority to use this key*" and "it therefore

11   *avoids and bypasses CSS*." *Id.* (emphasis added).  *Accord Microsoft Corp. v. EEE Business Inc.*,

12   555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) ("[b]y distributing" the valid "VLK *without*

13   *authorization*," defendant "effectively circumvented Microsoft's technological measure to control

14   access to a copyrighted work in violation of the DMCA") (emphasis added).[5]  The only difference

15   between Real and the defendants in *321 Studios* and *Microsoft* is that Real obtained a license to

16   the confidential CSS keys and algorithms for developing a player, whereas those defendants had

17   no authorization to use the keys for any purpose.  That is a distinction without a difference.  Real,

18   just like the *321 Studios* and *Microsoft* defendants, does not have authorization to use the CSS

19   keys to build a circumvention product, and Real's liability under the DMCA is clear.

20   **II.    REAL CIRCUMVENTS CSS'S ACCESS- AND COPY-CONTROL MEASURES**

21           Beyond authorization, Real makes the meritless contention that making permanent,

22   playable copies of DVDs does not bypass or remove technological measures.  Its arguments fail.

---

[4] *I.M.S.* and *Egilman* also are inapposite by their own terms.  CSS involves encryption and decryption, not passwords.  The *I.M.S.* court itself stated that unlike use of a simple website password, "decryption" is a "form[] of circumvention" and that DeCSS (which, as noted below, uses valid CSS keys) is a "decryption program," using a "skeleton key that can open a locked door." *I.M.S.*, 307 F.Supp.2d at 532-33.

[5] If accepted, Real's argument would mean that even DeCSS, the decryption software at issue in *Reimerdes* would not "circumvent" CSS, because DeCSS, like RealDVD, uses authorized CSS keys but without authorization for the use DeCSS makes of them.  Unsurprisingly, *I.M.S.* has been criticized.  *See* Stephen M. Kramarsky, *Intellectual Property Password Sharing*, New York Law Journal, Vol. 231, p. 2 (March 23, 2004).

CASE NO. C 08-4548-MHP
REPLY IN SUPP. OF TRO MOT.

**A.    Access Control:  Real Admits It Bypasses Numerous Protections on Playback**

Real admits that RealDVD does not authenticate the drive on playback, claiming this is justified because RealDVD does not "need to use the drive at all."  Felten Decl. at ¶ 51.[6]  But that is the whole point: circumvention under the DMCA includes the "removal" or "deactivation" of a technological protection.  Authentication is a critical component of the copy-protection measures making up the CSS system.  RealDVD removes and deactivates it in the copies it makes.  RealDVD also thus removes and deactivates other layers of protection enforced by the DVD drive, such as bus encryption.

Even Real does not claim that any license authorizes such conduct.  And indeed the license *prohibits* the removal of the authentication protections. Under the license, RealDVD, like all software DVD players, includes a "Descrambler" (the part that decrypts and plays CSS-encrypted movies) and an "Authenticator Module for CSS Decryption Module" (the part that authenticates with a DVD Drive and obtains the decryption keys for the Descrambler).  *See* Pomerantz Decl., Ex. F. at 57-58.  The CSS license mandates authentication before playback:

> The Authenticator in a CSS Decryption Module *shall correctly engage in and complete the authentication process with the DVD Drive* and ensure that the CSS Keys are received by the Descrambler *only if the authentication process is successful.*

*See* Supp. Pomerantz Decl. Ex. A § 6.2.3.[7]  Thus, the license requires that RealDVD's Authenticator module provide keys to the Descrambler and permit playback "only if authentication . . . is successful."  By removing and deactivating the authentication layer of the protections, Real not only circumvents CSS, but also violates an express term of the license.

**B.    Access Control:  Real Admits it Accesses Permanent, Playable Copies of DVD Content**

Even if the CSS's license's DVD drive authentication requirement were optional (which it is not); and even if the making of bit-for-bit copies of DVD content (including the associated

---

[6] Felten does not claim even to have used – much less tested and analyzed – RealDVD.  He instead bases his opinions solely upon having "discussed the relevant technologies" with a Real executive.  *See* Felten Decl. at ¶ 6.

[7] This document is incorporated by reference in the CSS license agreement.  Pomerantz Decl. Ex. F at 2 (§ 1.13).

keys) were not to circumvent a copy control (which it is, *see* Section C, *infra*), RealDVD would still circumvent CSS's access control functions when it plays back the copies it makes.  The CSS license does not say – or even suggest – that CSS Descramblers can operate without regard to where the CSS data they are descrambling are located.

If Real were correct that it can use the secret codes and algorithms obtained from becoming a licensee for any purpose not specifically and expressly prohibited, that would mean that Real's self-imposed restrictions (only five copies tied to five computers) on making and accessing copies are optional; it would mean that RealDVD could in the future copy and play back CSS-protected movies freely, regardless of whether the movies are downloaded from the Internet, copied endlessly around a college dorm or even remotely located halfway around the world.  Real would protest that its RealDVD product today allows no such thing.  But Real is proposing that nothing defines or limits the circumstances under which it can copy, or playback copies, of DVDs.  Real's inability to identify any principled limits on its supposed freedom to undermine CSS-copy protection measures — using the very information learned from its license to enforce CSS — illustrates the error of its position:  CSS would be quickly rendered useless — no longer an access control or a copy control.  That cannot be what the DMCA permits.

### C.    Copy Control:  Real Copies Disc Keys From The Secure Lead-in Area, Thus Bypassing Copy-Control Technologies

Relying on Felten, Real repeatedly tells the Court that even without RealDVD, "the content of [a] DVD is automatically made available for copying to [a] computer."  Opp. at 7 n.1; Felten Decl. at ¶ 16.  The reality is that, as Felten artfully avoids, a user can only copy the encrypted movie from what Felten calls "the main area" — but not the secure lead-in area that has the CSS decryption keys.  *Id.*  What neither Felten nor Real tells the Court is that the resulting copy is *useless* and *unplayable*, having been stripped of the CSS keys.  RealDVD bypasses the technological restrictions on copying the CSS decryption keys, i.e., that DVD drives will *not* permit someone to copy the lead-in area, to makes a copy that is permanent *and playable*.

The *321 Studios* court expressly rejected the very argument that Real and Felten are making, *viz.*, if something (even something useless) can be copied, then CSS is no copy control:

1   "321 claims that CSS does not prevent copying, since it does not prevent copying the encrypted

2   data on the DVD.  *However, as 321 admits[,] 'that copying is not particularly useful,' as any*

3   *copy made without circumventing CSS could not be accessed or viewed.*"  *321 Studios*, 307 F.

4   Supp. 2d at 1097 (emphasis added).  *Accord Macrovision v. Sima Prods. Corp.*, 2006 WL

5   1063284, at *1-2 (S.D.N.Y. Apr. 20, 2006) (holding defendant liable for circumvention of

6   technology that prohibited making of "watchable" copies).  By storing the content key in a secure

7   area of a DVD *incapable* of being accessed by unauthorized programs (including Windows), CSS

8   ensures that such copying will be useless.  *See* Bell Decl. at ¶ 13(c).  RealDVD exploits access

9   granted to authorized players and copies those content keys – and that is circumvention.

**D.      Copy Control:  Real Bypasses the CGMS-D "CopyNever" Marker**

11          Felten also makes the groundless claim that RealDVD "does not circumvent CGMS-D"

12   technology because it is not an "encryption technology" and because RealDVD includes the

13   CGMS signals in the copies that RealDVD makes.  *See* Felten Decl. at ¶ 47.  But the DMCA is

14   not limited to encryption measures.  And the critical point that Felten (and Real) try to slide by is

15   that RealDVD bypasses the CGMS signals which specify, up to more than a million times per

16   DVD, that the content is not to be copied.  *See* Supp Bell Decl. at ¶ 9.

17          In the ultimate irony, Real itself established the principle that bypassing such copy

18   protection markers or switches violates the DMCA.  In *RealNetworks, Inc. v. Streambox, Inc.*,

19   2000 WL 127311 (W.D. Wash. 2000), when the shoe was on the other foot, RealNetworks sued

20   to enjoin distribution of a program that copied RealNetworks' streamed video files despite the

21   presence of a "CopySwitch" indicating that copying was prohibited.  Real argued to the court:

> Under the DMCA, where content owners use measures to prevent the copying . . .
> of their works, it is unlawful to distribute products that enable end-users to
> override the content-owners' preferences.

24   Pomerantz Decl. Ex. N at 1:5-7.  The court subsequently held in Real's favor that the

25   "CopySwitch" was a copy-control mechanism that could be enforced under § 1201(b)(2)(b), *see*

26   2000 WL 127311 at *7, and that the Streambox VCR illegally "circumvent[ed] the Copy Switch

27   [by] enabling a user to make a copy of a file that the copyright owner has sought to protect."  *Id.*

28          The CGMS-D "CopyNever" signals encoded onto Plaintiffs' DVDs are functionally

1    identical to Real's own "CopySwitch": both are "a piece of data . . . that contains the content

2    owners' preference regarding whether or not the [file] may be copied by end-users." *Id.* at *2.

3    Under the law that Real itself made, when it wanted others to respect its copy protection

4    measures, Real is violating the DMCA by bypassing the "CopyNever" signals on DVDs.

### III.    REAL'S EFFORTS TO BOOTSTRAP FAIR USE INTO THE DMCA INQUIRY CONTRADICT THE STATUTE AND ESTABLISHED CASE LAW

7         Real's brief is strewn with references to RealDVD as a "backup" device, purportedly

8    intended to save people the inconvenience of broken DVDs.  Real's "backup" mantra is belied by

9    the fact that the same user account – not the same user, but just the computers registered to that

10   same account – can make copies of the same DVD onto as many as four additional computers.

11   *See* Supp. Kelly Decl. at ¶ 4.[8]   One hardly needs five copies to make a "backup."

12        Real's focus on backups is irrelevant to DMCA liability in any event.  The law is clear

13   that Real cannot rely on alleged "fair uses" by downstream users to justify its own trafficking in a

14   circumvention device.  *See* Mot. at 19-20 (citing *321 Studios*, 307 F. Supp. 2d at 1097-98;

15   *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001); *United States v. Elcom*

16   *Ltd.*, 203 F. Supp. 2d. 1111, 1120 (N.D. Cal. 2002); *Macrovision*, 2006 WL 1063284 at *3).

17   Real is no stranger to this rule, having won the point in *Streambox* that a DMCA defendant may

18   not rely on downstream uses because the "DMCA does not have a 'fair use' exception allowing

19   individuals to circumvent access and copy protection measures."  Pomerantz Decl. Ex N at 3.

20        Real tries to evade clear law by arguing that because the purported "*sole intended use of

21   RealDVD*" is to make an allegedly "fair use" backup copy, RealDVD does not implicate a

22   "copyright right," and thus Real is not liable under the DMCA.  Opp. Brief at 15-16 n.8

23   (emphasis in original).  Real's argument confuses the relevant question for DMCA liability –

24   whether RealDVD is designed and marketed as a *circumvention product* (which RealDVD clearly

---

26   [8] Dr. Kelly obtained the add-on copies and found that they each made additional copies after the
     Studios filed their opening TRO motion.  The fact that RealDVD enables copying on multiple

27   computers registered to the same account means, for example, that five friends could register
     themselves as one account with four add-on copies of RealDVD, and thereby each make their

28   own permanent copies of the same rented or borrowed DVDs.

1  is) – with one irrelevant to DMCA liability – whether Real designs or markets its product for

2  users to engage in infringing uses.

3        This sleight-of-hand has been rejected repeatedly by the courts.  In *Reimerdes* (*Corley*),

4  for example, there was testimony that DeCSS was "created . . . in order to make a DVD player

5  that would operate on a computer running the Linux operating system," not to permit copying of

6  DVDs.  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 311 (S.D.N.Y. 2000);

7  273 F.3d at 437.  In finding liability, however, the court stated that the "fact remains" that DeCSS

8  was created "in the full knowledge" that the "files, once decrypted, could be copied like any other

9  computer files," and the "question whether the development of a Linux DVD player motivated

10  those who wrote DeCSS is immaterial to the question" of liability under the DMCA.  *Reimerdes,*

11  111 F. Supp. 2d at 311, 319.  Similarly, in *Macrovision*, the defendant argued that "it only

12  intends" its device "to enable 'fair use' copying of copyrighted works."  2006 WL 1063284 at *2.

13  The court held that this was "no defense at all – . . . the DMCA provides no exception to its

14  prohibition of the manufacture of these devices."  *Id.* (further noting lack of "authority . . . for the

15  proposition that 'fair use' includes the making of a backup copy").[9]

16  **IV.    THE STUDIOS HAVE ESTABLISHED IRREPARABLE HARM**

17       ***Irreparable Harm May Be Presumed*** – Real asserts that it is no longer the rule in this

18  Circuit that irreparable harm may be presumed upon a showing of likely success on the merits.

19  Opp. at 16.  The Federal Circuit – having examined the same Ninth Circuit cases cited by Real –

20  held that Ninth Circuit law continues to apply a presumption at the preliminary injunction stage.

21  *See Jacobsen v. Katzer*, 535 F.3d 1373, 1378 (Fed. Cir. 2008).  The presumption ends the inquiry.

22       ***Harm Has Been Demonstrated*** – Real tortures the plain logic in Mr. Dunn's declaration:

23      • Even if RealDVD users really *were* to use it only to make five permanent playable

24

---

25  [9] Real claims to find support for its argument in *Chamberlain Group, Inc. v. Skylink Tech., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004), and its statement that there must be a "nexus" between the

26  alleged circumvention and the underlying "right protected by the Copyright Act."  *Id.* at 1203-04.
*Chamberlain* is completely inapposite for numerous reasons, including the fact that it expressly

27  cited CSS as a paradigmatic example of copy-*control* measures and copy*rights*, *id.* at 1198, and
(more to the point) because the court expressly declined to "reach the relationship between § 107

28  fair use and violations of § 1201."  *Id.* at 1200 n.14.

1  copies of DVDs onto five computer hard drives, such copying would deprive the Studios of

2  income from many of the new digital markets that they have entered to sell digital content.

3  • Real argues that the Studios have offered "no evidence" that RealDVD threatens to

4  supplant demand for DVD purchases.  The threat of consumers choosing to obtain a permanent

5  copy of a given movie for $3 (by renting and copying it) instead of $20 (by buying it) requires no

6  more than common sense.  To the extent evidence is necessary, it is supplied by Mr. Dunn based

7  on more than two decades of experience marketing home video products to consumers.

8  • Real's claim that "there are other pirates out there already" is hardly deserving of reply.

9  On one hand, Real argues that it is unlikely to cause harm because its product is inferior to

10  existing illegal ripping software.  Opp. at 19.  At the same time, Real clearly believes RealDVD

11  holds "first mover" promise among consumers who wish to act *lawfully*, which can only be

12  because of the novelty of such a purportedly legal ripping product – a point that Real concedes.

13  Opp. at 23.

14  • Mr. Bresnahan's declaration adds nothing of value.  Buried in it are three express

15  assumptions: (i) RealDVD users will only use the product to make back-up copies of movies they

16  own, *see* ¶ 8; (ii) using RealDVD to make such copies is lawful, *see id.* ¶ 12; and

17  (iii) consumers have a legitimate "fair use" right to make such back-up copies, *see id.* ¶ 24.[10]

18  Thus having assumed all the issues away, Mr. Bresnahan goes on to opine that RealDVD will not

19  cause any legally cognizable harm to Plaintiffs.

20  ***Harm To The Movants Is Irreparable*** – The Studios have demonstrated that damages due

21  to lost market share, customers, opportunities and profits will be difficult to quantify (if such

22  quantification is possible), and have thus shown irreparable harm.  *See e.g., eBay, Inc. v. Bidder's*

23  *Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and

24  lost customer goodwill is irreparable because it is neither easily calculable, nor easily

25  compensable and is therefore an appropriate basis for injunctive relief"); *see also* authorities cited

26  on page 22 of the Studios' opening brief.  A few additional points:

27  _____

[10] There is no conceivable foundation for Mr. Bresnahan, a non-lawyer, to be expressing opinions
28  about what uses are or are not fair under the copyright laws.

CASE NO. C 08-4548-MHP
REPLY IN SUPP. OF TRO MOT.

1    • Real does not and cannot rebut Mr. Dunn's point regarding the irreparable nature of

2    changes in consumer perception and behavior caused by the presence in the market of supposedly

3    legal DVD ripping software. In *Napster,* this Court recognized that, "defendant has contributed

4    to a new attitude that digitally-downloaded songs ought to be free - an attitude that creates

5    formidable hurdles for the establishment of a commercial downloading market." *A&M Records,*

6    *Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 910-11 (N.D. Cal. 2000). Change the phrase

7    "digitally-downloaded songs" to "digitally-copied movies," and the same conclusion follows

8    here. Such harm, standing alone, would support the grant of a TRO.

9    • In addressing harm to existing markets, Real – in something of a *non sequitur* – points

10   to a survey by the MPAA that attempts to estimate worldwide damage caused by bootlegging,

11   illegal copying *and* internet piracy, in the aggregate. The survey begins by noting that the

12   MPAA's estimate of $6.1 *billion* is "consistent" with an estimate of $5.4 *billion* by one

13   investment bank. Opp. at 22-23 n.13. By its terms, the survey is intended to present *estimates*,

14   not proof of harm sufficient to recover money damages following a trial; one wonders whether, in

15   litigating damages, Real would be willing to ignore a $700 million "inconsistency."

16   • As for emerging markets, Real does not even attempt to show that money damages

17   would be sufficient to compensate the Studios for the harm they are likely to suffer. Once again,

18   Mr. Bresnahan simply waves such harm away by assuming that RealDVD is lawful, and that it

19   will only be used to make back-up copies of owned movies.

20   ## V.    THE EQUITIES AND RELATIVE HARDSHIPS ARE NOT CLOSE

21   The relative hardships on this motion are not close. If Real resumes sending out

22   RealDVD and is enjoined on a preliminary injunction, there is no way to get back the thousands

23   of copies of RealDVD that Real will have distributed in the interim. Real has never said that it

24   would have the ability to disable such copies or otherwise stop the people who have them from

25   permanently using them to copy movies from DVDs. In contrast, Real's assertions of the

26   inconvenience and credibility hit it claims it will take from having to await a "third launch" are

27   speculative and entirely the result of Real's opportunistic decision to distribute now, worry about

28   legality later.

1

2   DATED: October 7, 2008                    MUNGER, TOLLES & OLSON LLP

3                                             MITCHELL SILBERBERG & KNUPP LLP

4                                             GREGORY P. GOECKNER
                                              DANIEL E. ROBBINS

5

6                                             By:_____/s/ Rohit K. Singla_____
                                                       ROHIT K. SINGLA

7                                             Attorneys for Defendants and Counterclaim-
                                              Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. C 08-4548-MHP
REPLY IN SUPP. OF TRO MOT.