Pages 1 - 122

United States District Court

Northern District of California

Before The Honorable Marilyn Hall Patel

| | |
|---|---|
| Real Networks,<br>Incorporated,<br><br>        Plaintiff,<br><br>  vs.<br><br>DVD Copy Control<br>Associates, et al.,<br><br>        Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)     No. C08-4548 MHP<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Tuesday, October 7, 2008

### Reporter's Transcript Of Proceedings

**Appearances**:

For Plaintiff
RealNetworks, Inc.
and RealNetworks
Home Entertainment,
Inc.,:

                Wilson, Sonsini, Goodrich & Rosati
                One Market Street
                Spear Tower, Suite 3300
                San Francisco, California  94105
      By:  **James A. DiBoise, Esquire**
           **Colleen Bal, Esquire**
           **Michael A. Berta, Esquire**
           **Tracy Tosh Lane, Esquire**
           **Bryan Ketroser, Esquire**

**Reported By:**      ***Sahar McVickar, RPR, CSR No. 12963***
                ***Official Reporter, U.S. District Court***
                ***For the Northern District of California***

(Computerized Transcription By Eclipse)

```
 1    Appearances, continued:

 2    For Defendant
      DVD Copy Control
 3    Association and
      Disney Enterprises,
 4    Inc.,:                    Munger, Tolles & Olson
                                355 South Grand Avenue, 35th Floor,
 5                              Los Angeles, California  90071
                           By:  Bart Harper Williams, Esquire
 6                              Kelly Max Klaus, Esquire

 7                              Motion Picture Association of America
                                15301 Ventura Boulevard, Bldg. E
 8                              Sherman Oaks, California  91403
                           By:  Dan Robbins, Esquire
 9                              Gregory Goeckner, Esquire

10                              Mitchell Silberberg & Knupp, LLP
                                11377 West Olympic Boulevard
11                              Los Angeles, California  90064
                           By:  Robert H. Rotstein, Esquire
12
      Also Present:             Robert Kimball, Esquire
13                              Senior Vice President/General Counsel
                                RealNetworks, Inc.
14
                                Bill Way, Esquire
15                              Vice President/Deputy General Counsel
                                RealNetworks, Inc.
16

17

18                              ---o0o---

19

20

21

22

23

24

25
```

```
 1   Tuesday, October 7, 2008                          2:00 p.m.

 2                      P R O C E E D I N G S

 3             THE CLERK:  Calling civil 08-4548, RealNetworks,

 4   Inc., versus DVD Copy Control Associates, et al.

 5             THE COURT:  May I have your appearances, please.

 6             MR. DIBOISE:  Good afternoon, Your Honor.

 7             My name is James DiBoise.  I'm with Wilson, Sonsini

 8   Goodrich & Rosati.

 9             With me are my colleagues, Michael Berta, Colleen

10   Bal and Bryan Ketroser.

11             Also with me are the general counsel of

12   RealNetworks, Bob Kimbell and the deputy general counsel,

13   Bill Way.

14             THE COURT:  Good afternoon.

15             MR. WILLIAMS:  Bart Williams from Munger Tolles &

16   Olson, along with Kelly Klaus and Rohit Singla and Mr. Bob

17   Rotstein.

18             We are also joined at counsel table by Mr. Greg

19   Goeckner and Mr. Dan Robbins.

20             THE COURT:  Who are?

21             MR. WILLIAMS:  They are lawyers for the MPAA

22   representing, in this capacity, the individual defendants and

23   counter-complainant studios.

24             THE COURT:  Okay, thank you.

25             Now, I've received a fair amount of paper, not a lot
```

1   of time to read it.  It seems as though there is some

2   difference of opinion as to how this real DVD operates.

3          Am I correct in that, Mr. DiBoise?

4          **MR. DIBOISE:**  Your Honor --

5          **THE COURT:**  In other words, as -- if I listen to

6   each side, I would think that these were two different pieces

7   of software or instrumentalities, or whatever.

8          **MR. DIBOISE:**  The -- the actual implementation of

9   real DVD is characterized correctly by Mr. Buzzard's

10  declaration.  I do not know that there is any technical

11  complaint by the studios as to what Mr. Buzzard says; however,

12  they do characterize and mischaracterize certain aspects of how

13  the Real DVD player works.

14         Having said that, I can understand Your Honor's

15  confusion, because it does appear from the studio's papers that

16  they mischaracterized certain steps that the Real DVD takes.

17         **THE COURT:**  I didn't say that; I said there is a

18  difference of opinion.

19         **MR. DIBOISE:**  Difference of opinion, Your Honor.

20         **THE COURT:**  As to how it operates.

21         Is that correct?

22         **MR. WILLIAMS:**  That is correct, Your Honor.  I think

23  there is a fundamental difference of opinion, at least as

24  stated in the briefs, as to how the process works, although our

25  position is that there are a number of concessions in

1  Mr. Buzzard's declaration.  When it really gets down to the

2  weeds, as to how the authentication and encryption works, we

3  actually believe that there is some agreement by their expert

4  on some critical issues.  But, I think it's fair to say that

5  the plaintiffs and counter-defendants believe, as stated in

6  their papers, that we have mischaracterized the workings of

7  this product, and we don't believe we have.

8          *THE COURT:*  Now, there also seems to be some

9  difference of opinion as to what is allowable under the

10  agreement.

11          For want of a better term, I can call it the CSS

12  agreement; would that be appropriate?

13          *MR. DIBOISE:*  That is absolutely correct, Your

14  Honor.

15          *THE COURT:*  And that is what it's called.

16          I was looking at whether it was DVDC -- what is it,

17  DCCA, or whatever it is?

18          *MR. DIBOISE:*  DVD CCA --

19          *THE COURT:*  Yes.

20          *MR. DIBOISE:*  -- is a defendant, but that is the

21  entity that licenses the CSS encryption.

22          *THE COURT:*  Is there, in fact, a difference in what

23  this allows --

24          *MR. DIBOISE:*  Yes.

25          *THE COURT:*  -- with respect to copying, et cetera?

1          **MR. DIBOISE:**  Yes.  That's the core issue, Your

2    Honor.

3          **THE COURT:**  Get to the core of it, then, right?

4          Is that correct, there is a disagreement?

5          **MR. WILLIAMS:**  Yes, there is a disagreement, Your

6    Honor.

7          **THE COURT:**  Okay.  Wherein does it say either that

8    it does allow for copying or does not allow for copying?

9          **MR. DIBOISE:**  Your Honor, nowhere in the agreement

10   does it say thou shalt not copy.

11         **THE COURT:**  It doesn't say thou shalt anywhere in

12   the agreement, as I recall, so --

13         **MR. DIBOISE:**  What it does --

14         **THE COURT:**  Does it say anything about copying?

15         **MR. DIBOISE:**  Not in any of the specific provisions

16   of the CSS license does it say you shall not use this

17   technology to make copies.

18         **THE COURT:**  What does it say in that respect?

19         **MR. WILLIAMS:**  Sure, Your Honor.

20         If I may, is there any way I could use the overhead

21   to point the Court to specific provisions?

22         **THE COURT:**  I've got it in front of me; I can read

23   sections, numbers, and things like that.

24         **MR. WILLIAMS:**  Very well, Your Honor.

25         **THE COURT:**  Okay.

1          **MR. WILLIAMS:**  The first thing we point the Court to

2    is the name of the entity, that is, the licensor in this case,

3    that is the DVD CCA, the CCA --

4          **THE COURT:**  Yes.

5          **MR. WILLIAMS:**  Right?  The idea behind the whole

6    organization is to protect copies.  That's the Copy Control

7    Association is the name of the organization.  And, it is an

8    organization, association, that we say exists for the purpose

9    of controlling copies, so I would start there.

10         The next specific provisions I would point the Court

11   to is the very first recital, and this is Exhibit F to

12   Mr. Pomerantz's declaration.  The recital A, on the very first

13   page, says that, "CSS was developed to provide reasonable

14   security for content on DVD discs and thereby, together with

15   the terms and conditions of this agreement, to provide

16   protection for such copyrighted content against unauthorized

17   consumer copying."  The entire fabric of this agreement is to

18   prevent unauthorized consumer copying.

19         The next provision that I would refer the Court to

20   is paragraph 9.2 of that same document.  It appears on page 22

21   of 33 of the document.  And, it's under the heading, "Equitable

22   Relief."  This is a provision that refers to, specifically, the

23   category of people that are -- consist of my clients, that is,

24   people who are eligible licensees under the agreement, that is,

25   the studios.

1          What it notes here in paragraph 9.2 is the lasting

2     effect and harm of widespread unauthorized copying of

3     copyrighted content.  And indeed, it goes on to say, in that

4     section, that to the extent there are any violations of any of

5     the provisions of this agreement, that the harm would be

6     irreparable.

7          And it specifically states that the licensor and the

8     licensee recognize that; thus, we would argue that irreparable

9     harm is assumed if the licensee, in this case, Real, violates

10    the license.

11         *THE COURT:*  Well, is there -- is there any place in

12    the agreement where it defines unauthorized copying or copying?

13         *MR. WILLIAMS:*  Not -- not as terms, no, Your Honor.

14    There is no callout, there is no separate definition section

15    that deals with those specific terms.

16         *THE COURT:*  And, is there anything in the agreement

17    that incorporates by reference the DMCA or references the DMCA?

18         *MR. WILLIAMS:*  Umm, there is nothing in the

19    agreement that specifically refers to the DMCA with respect to

20    the notion of copying, no, there is not, but the DMCA is a

21    statute that has specifically been described in various cases

22    as a statute that is meant to prohibit trafficking in a device

23    that circumvents technical measures, such as the CSS controls,

24    that is, the Content Scramble System controls that are dealt

25    with under this license.

1           So, in cases like Judge Illston's opinion in ***321***

2   ***studios***, which was a couple of years ago from this district,

3   that case specifically held that the CSS controls are

4   specifically meant to be technical measures.  And so, if you

5   violate those technical measures by trafficking in a device

6   that contravenes the DMCA, that is a violation of that statute.

7           If I may, Your Honor, there is one more provision

8   that I wanted to refer to that is probably the strongest

9   provision.  It's not in the publicly-filed papers, but it's in

10  the confidential papers the are filed because it includes a

11  technical specification under the CSS.

12          *THE COURT:*  Is this in the agreement itself between

13  RealNetworks and --

14          *MR. WILLIAMS:*  It is referenced --

15          *THE COURT:*  DCAA --

16          *MR. WILLIAMS:*  I'm sorry, Your Honor.

17          *THE COURT:*  -- whatever?

18          *MR. WILLIAMS:*  It is referenced in the agreement.

19          If you'll note, Your Honor, paragraph 1.13 of that

20  agreement --

21          *THE COURT:*  Um-hmm.

22          *MR. WILLIAMS:*  -- specifically incorporates by

23  reference various procedural specifications and technical

24  specifications.  It specifically incorporates those by

25  reference.

```
1              One of the technical specifications --
2              THE COURT:  Which section of the agreement are you
3    referring to?
4              MR. WILLIAMS:  That is section 1.13 of that same
5    Exhibit N.
6              THE COURT:  Okay, I see what you are talking about.
7              MR. WILLIAMS:  Okay?
8              MR. DIBOISE:  Exhibit N?
9              MR. WILLIAMS:  Yes.
10             MR. DIBOISE:  I think you mean Exhibit F.
11             MR. WILLIAMS:  Oh, pardon me.  Exhibit F, the CSS
12   license agreement that you have in front of you.
13             MR. DIBOISE:  Your Honor, if I might respond?
14             THE COURT:  Well, I don't think -- are you finished?
15             MR. DIBOISE:  Sorry.
16             MR. WILLIAMS:  No, I wasn't.
17             THE COURT:  Sort of sounded like he finished in
18   mid-sentence, there.
19             MR. WILLIAMS:  One of the technical specifications
20   that we refer to and that we filed under seal, and this is
21   Exhibit G to Mr. Pomerantz's declaration --
22             THE COURT:  Um-hmm.
23             MR. WILLIAMS:  -- specifically talks about this
24   particular environment and making digital-to-digital copying of
25   protected content in the environment of a personal computer.
```

1    And, it indicates that the whole idea of the authentication and

2    encryption, that is part of the CSS protections, is to prevent

3    that type of digital-to-digital copying.  And we would refer

4    Your Honor to that --

5             **THE COURT:**  Do you have a copy there?

6             **MR. WILLIAMS:**  Yes, I do.

7             May I hand it to your clerk, Your Honor?

8             **THE COURT:**  Yes.

9             **MR. WILLIAMS:**  Counsel?

10            **MR. DIBOISE:**  I have one.

11            **MR. WILLIAMS:**  Okay.

12            And, it's under section 1.1 there, Your Honor.

13            **THE COURT:**  And, you're referring me to what

14   portion?

15            **MR. WILLIAMS:**  Under section 1.1, there is a

16   paragraph the begins "the objectives" --

17            **THE COURT:**  Yes?

18            **MR. WILLIAMS:**  And it goes on.  I would refer the

19   Court to the four lines that are indented there, where there is

20   a reference to a particular type of authentication and

21   encryption.  It defines the purpose of this technical

22   specification that is part of the CSS and we feel makes clear

23   that the purpose of the CSS protections is to prevent copying

24   of -- digital-to-digital copying -- of DVDs onto personal

25   computers.

1    **THE COURT:**  And, how do we know that this is, in

2  fact, what is referred to in 1.13 when it uses the terms

3  "procedural specifications" or "technical specifications" or,

4  quote "CSS specifications"?

5    **MR. WILLIAMS:**  Your Honor, let me -- let me tell you

6  what I know about it, and perhaps one of my colleagues can give

7  more information, but here's what I know:  We had to

8  specifically make a request to get this technical specification

9  going through the DVD CCA, signing agreements that we would not

10  disclose the technical specifications.  We asked for all the

11  technical specifications and then reviewed them when they were

12  sent to us just in the past week or so, and this is one of the

13  technical specifications.

14    And, I'm looking at my colleagues.  Mr. Singla may

15  have a more specific description of how it is we got this copy.

16    **MR. SINGLA:**  Well, Your Honor --

17    **THE COURT:**  I'm not so concerned right now, unless

18  somebody calls to my attention some reason why I should be.

19    What I want to know is, then, how do we know that

20  that is a part of this contract?  For example, there are some

21  membership categories that are appended to the contract.  And

22  then -- and I assume these are -- in connection with

23  RealNetworks that certain of these are checked off and a number

24  of others are not; is that correct?

25    **MR. WILLIAMS:**  That's correct.

1      **MR. DIBOISE:**  Yes, Your Honor.

2      Let me back --

3      **THE COURT:**  Those particular designations as to, I

4   gather, what it is that RealNetworks said it was going to be

5   doing, that resulted in these particular membership categories

6   being checked off; is that correct?

7      **MR. DIBOISE:**  They are checked off, but you need to

8   understand the mechanism by which this license is created.

9      **THE COURT:**  Um-hmm.

10      **MR. DIBOISE:**  The only thing that Real DVD -- I'm

11  sorry, that RealNetworks saw at the time that it signed the

12  license with the DVD CCA is the material that is attached to

13  Exhibit F.  None of the technical specifications or procedural

14  specifications were part of the agreement that they saw at the

15  time they saw it.

16      The technical specifications, as Mr. Williams

17  indicated, are tightly controlled by the DVD CCA and weren't

18  sent to anyone at RealNetworks until after the agreement had

19  been signed by RealNetworks.

20      **THE COURT:**  But, at some point, then, after you

21  signed that agreement you came in possession of --

22      **MR. DIBOISE:**  Mr. --

23      **THE COURT:**  Of what is contained in this Exhibit G.

24      **MR. DIBOISE:**  I saw Exhibit G when Mr. Pomerantz

25  filed his declaration in the Central District of California on

```
 1   September 30th, 2008.  That is the first time that anyone --

 2              THE COURT:  Well --

 3              MR. DIBOISE:  I'm --

 4              THE COURT:  Did someone from RealNetworks come into

 5   possession of this, not you personally?

 6              MR. DIBOISE:  Mr. Buzzard saw them.

 7              THE COURT:  Um-hmm.

 8              MR. DIBOISE:  And was part of the team that devised

 9   and designed and created Real DVD.  He was in possession of

10   that specification.

11              THE COURT:  I see.  That's what I want to know,

12   okay.

13              So, at time after having become a party to this

14   license agreement and received this -- these specifications; is

15   that correct?

16              MR. DIBOISE:  Yes.

17              THE COURT:  Okay.

18              MR. DIBOISE:  And --

19              THE COURT:  And they are deemed incorporated by

20   reference to paragraph 1.13?

21              MR. DIBOISE:  That's the position of the studios and

22   the DVD CCA.

23              THE COURT:  Is that incorrect?

24              MR. DIBOISE:  We would dispute some aspects of that.

25              THE COURT:  Well, what purpose do they serve if they
```

1    are not the specifications referenced in 1.13?   What are they?

2              **MR. DIBOISE:**   They -- I may have misspoken a bit.

3              We don't dispute that the technical specifications

4    say what they say.   They are designed to teach the technical

5    people how to build a product in compliance with the license.

6              We do disagree with the studio's characterization of

7    the content of those specifications, so that when Mr. Buzzard

8    at RealNetworks and the team of engineers who were authorized

9    to have access to that -- to the technical specifications,

10   that's the document that they used in order to blueprint what

11   it was that we should do in Real DVD.

12             That aspirational, in a sense, nature of the

13   document that is before you I am sure, and I know from

14   Mr. Buzzard's declaration, that as far as bus authentication

15   goes and the bus decryption, both of those procedures are

16   followed within Real DVD.   And that's the only evidence before

17   the Court today, is that Mr. Buzzard's declaration says we

18   followed faithfully these specifications to make the product.

19             What the studios are trying to do is to take this

20   technical specification and somehow or other bootstrap it into

21   the entire purpose of the agreement, which is where Your Honor

22   started out this question, which is, where in this agreement

23   does it say that the purpose of the agreement, or that the

24   purpose -- the agreement itself prohibits copying?

25             This doesn't prohibit copying, it just says if

1    you're going to read data from your DVD drive to the personal

2    computer, you must make certain that that bus, the connector,

3    the road that takes that data from the DVD to the computer

4    itself, must be encrypted.  And, in fact, the Real DVD does

5    that.

6              *MR. WILLIAMS:*  Your Honor, if I may respond?

7              *THE COURT:*  Yes.

8              *MR. WILLIAMS:*  The response to that is this is one

9    of the specific places where the parties are in disagreement as

10   to how the Real DVD product works.  In the declarations that we

11   have provided from Dr. Bell and Dr. Kelly, they take great

12   pains, and they go very, very -- step by step in describing

13   exactly how it is that this technology does not use, in fact,

14   bus authentication or bus encryption from the point in time

15   that a copy has been made of a DVD.

16             Mr. Singla is the technical lawyer here who can go

17   into the real details of it, but I can tell you this, that the

18   way that this product works is they have a license that allows

19   them to access some of the encryption codes and the keys, the

20   CSS keys -- by "they," I mean RealNetworks.  RealNetworks uses

21   those keys, accesses those keys in a manner that was not

22   contemplated by their license, because, after all, their

23   license was for the purpose of allowing RealNetworks to make a

24   DVD player.

25             So, what they do is, they designed a technology that

1   allows one to make a copy onto a hard drive of a computer of a

2   DVD.  And, after that copy is made, and we can go step by step

3   with an overhead that I think really would illustrate it, after

4   that copy is made, Your Honor, neither bus encryption nor bus

5   authentication, none of those things take place, because once

6   it goes onto the hard drive of a computer, there is not even a

7   DVD disc drive the one typically uses when you insert it into

8   the tray of a DVD.

9            There is normally a communication, an

10   authentication, if you will, between the player, on the one

11   hand, and the disc drive on the other.  What Real does is, they

12   say, well, once we have made the copy, we don't need to use the

13   player -- or, excuse me, the disc drive, and therefore, all the

14   technical specifications that require that a disc drive be used

15   and that authentication occur no longer have to be used.

16            And so, by that sleight of hand, they say, look, we

17   are compliant.  We used all those authentication measures at

18   the beginning, before the copy was made.  But, Your Honor, once

19   that copy is made, and there is nothing in Mr. Buzzard's

20   declaration that contradicts this, once that copy is made, none

21   of those protections except for the encryption of the content

22   of the movie, that is the only protection that remains, once

23   the copy is made onto a hard drive of the computer.

24            There are about you three or four others that

25   Mr. Singla can describe whenever Your Honor would like, if

```
 1   you'd like, that are not used once the copy is made, and that
 2   is the manner in which there is a bypassing or an avoidance of
 3   the CSS protective measures.
 4        THE COURT:  Well, is -- is there anything in the
 5   agreement that, as far as you read it, your interpretation of
 6   it, proscribes their making a copy, or copying, I should say,
 7   to the hard drive?
 8             MR. WILLIAMS:  No.  In fact, there is not --
 9        THE COURT:  Does the agreement prevent that, prevent
10   copying, as you interpret it?  Does it prevent or bar copying
11   to the hard drive?
12        MR. WILLIAMS:  Yes, it does.  It prevents copying of
13   any type in a playable form.  So, if a copy is made of a DVD
14   that can be played, that is prohibited because of the passages
15   that I already described to you, the recital at the beginning,
16   I believe it was section 9.2, and other sections, the technical
17   specifications that specifically say that the purpose of this
18   whole framework of protections is to prevent unauthorized
19   copying of the DVDs.  That's the whole purpose of it.
20        THE COURT:  Well, what is meant by -- it says
21   "unauthorized consumer copying"; what is meant by that?
22        MR. WILLIAMS:  Very simple:  Unauthorized consumer
23   copying is exactly what Real DVD does.
24        THE COURT:  No, no, that's not what I asked you.
25   What does it mean?  Does it mean any copying of any copyrighted
```

```
 1   work that is on -- that is on DVD and that can, you know, be
 2   played?
 3              MR. WILLIAMS:  That's correct, Your Honor.  It's the
 4   first thing that shows up on a DVD when you play it on a
 5   computer.  It says that this is copyrighted material.  The
 6   copyright owner is whatever studio or whomever owns that movie.
 7   That may be played only on a player that is a licensed player
 8   that has worked with DVD CCA in order to have the codes that
 9   allow the DVD to be played.
10              If you take a DVD that you purchase at a store and
11   you put it on your computer and you put it in the disc drive
12   and play it, there is nothing that allows you to make a copy of
13   that DVD, and, indeed, all of these protections prevent one
14   from making a copy of that DVD that can be played.
15              The way that RealNetworks tries to finesse that is
16   by saying that, well, any computer can make a copy of the data
17   that constitutes the content of a movie.  And that's true, but
18   they can make a copy by using the Microsoft Windows, for
19   example.  They can make a copy, but it is not a copy that can
20   be played, it's a copy that is jumbled and that needs these
21   access codes in order to be played.
22              THE COURT:  And then, that's how the decryption that
23   they are doing essentially unscrambles it for the purpose of
24   allowing it to be played; is that it?
25              MR. WILLIAMS:  That's correct, that's exactly right.
```

1    And that decryption, that you just mentioned, is the final step

2    before it's actually played onto the screen.

3            There are two or that other steps that have to take

4    place as different layers of protection before it can be

5    played; what Real DVD does is it eliminates those first three

6    or four protections, maintains the encryption protection to

7    which they have the access codes, and then it is employed by

8    the consumer, bypassing those first three.  Because the whole

9    idea, as you can see from the technical specification, is that

10   the protections are meant to prevent digital-to-digital copying

11   in the personal computer environment.  That's the whole idea of

12   these protections, and they have been bypassed in that way.

13           *MR. DIBOISE:*  Your Honor, if I might?

14           *THE COURT:*  Hold on.

15           I gather that there are any number of different

16   types of parties, and then they would become types of members,

17   I guess, that can sign onto or enter into this license

18   agreement.  And, for example, some of the lists, those included

19   on the list are DVD player manufacturer, DVD driver

20   manufacturer, et cetera, right?

21           *MR. WILLIAMS:*  That's correct, Your Honor.

22           *THE COURT:*  Now, and you referred -- I thought you

23   referred to RealNetworks as having signed this agreement and

24   being a DVD manufacturer, or DVD -- but they are not

25   manufacturing DVDs or players or drivers, or anything like

```
 1   that, right?

 2              MR. WILLIAMS:  Well, actually --

 3              THE COURT:  What they've signed up for and what I

 4   would like to know is the significance of this is a descrambler

 5   manufacturer, and what are you descrambling, in this context,

 6   that is legitimate for the purposes of what you say the

 7   agreement is supposed to achieve?  What is a descrambler

 8   manufacturer do?  And, I have no clue either as to what an

 9   authenticator module for CSS decryption module, what it does.

10              MR. DIBOISE:  Your Honor --

11              THE COURT:  I think Mr. Singla is jumping up behind

12   you.

13                        (Laughter.)

14              MR. WILLIAMS:  Sure, Your Honor.

15              THE COURT:  I want to get this straightened out and

16   then I'll talk to you.

17              MR. DIBOISE:  The reason I'm sitting down is I just

18   have a hip problem, and it occasionally relieves --

19              THE COURT:  No, that's fine, you may sit down.  If

20   you want to stay seated and use the mic, you can do that as

21   well.

22              MR. DIBOISE:  It's just my --

23              THE COURT:  Okay sure, have a seat.

24              MR. SINGLA:  As Mr. Williams mentioned, my purpose

25   here is just to try to help explain some of this technology and
```

1   what all these terms mean.

2              So, the Court, having very correctly referenced the

3   fact that the categories include DVD player and DVD drive, so

4   the CSS's license envisions that the term "DVD Player," with a

5   capital "P" is someone who -- may I put up a slide just to

6   illustrate?

7              **THE COURT:**  Yes, yes.

8              What are you using here?

9              **MR. SINGLA:**  We're going to use the TV screen here.

10             **THE COURT:**  You're going to use this one here?

11             **MR. SINGLA:**  Yes, I think that should work.

12             If we get Slide 15 up?

13             **THE COURT:**  Can you turn that so that -- well, isn't

14   it playing on your -- should be playing on your screens there.

15   No?

16             **MR. DIBOISE:**  I can see it now, Your Honor.

17             **THE COURT:**  Okay.  Okay.

18             **MR. SINGLA:**  So, on the left you'll see what is

19   called a DVD player.

20             **THE COURT:**  Right.

21             **MR. SINGLA:**  In the context of the CSS license, the

22   capital P, player.  Those are like the Sony box you have

23   underneath your computer, okay?  That is not what this case is

24   about.  Those machines have a relative low risk of copying

25   because it's a closed box system, there is no computer

```
 1   programs, you can't attach a hard drive.

 2            What this case is about is the right category, which

 3   is when you have a computer system with a DVD drive attached to

 4   it.  We call that DVD Player, they call that DVD player, with a

 5   small "P."  It's not a DVD player, as that term is defined in

 6   the CSS license, unfortunately, the way that both parties have

 7   been talking about this.

 8            THE COURT:  Okay.

 9            MR. SINGLA:  Under the CSS license, a software

10   player, not a Sony box, but a software player like Real DVD, is

11   known as a descrambler and an authenticator of module for a

12   de-encryption module.

13            THE COURT:  Who knew.

14                      (Laughter.)

15            THE COURT:  Certainly not I.

16            MR. SINGLA:  And, this is explained in Dr. Bell's

17   declaration, which was submitted on Friday.  But the idea is

18   that the authenticator module is the part of their program that

19   talks to the DVD drive and authenticates.  And, the descrambler

20   module is the part of their program that knows how to take the

21   movie and decrypt it, undo the encryption and reveal what it

22   shows, and play it up on a screen.

23            If we could get Slide 17?

24            So, this is a DVD.  And what Real has been talking

25   about is, you see it says "encrypted movie data"?
```

1               *THE COURT:*  Um-hmm.

2               *MR. SINGLA:*  The data that constitutes the movie is

3    encrypted.  And that is one form of protection provided by the

4    CSS technology.  And that is what Real focuses on because they

5    maintain that.  In the copy they make -- we don't deny they

6    keep on their copy.  The copy that they make is still

7    encrypted.

8               And so, they say, their declarant said, in their

9    papers they say we don't circumvent anything, we maintain the

10   CSS protections, but there are many, as Mr. William mentioned,

11   there are many other layers to CSS protections that are

12   completely circumvented.

13              And, I don't think there is a factual dispute, when

14   you dig down and see what they are saying.  For purposes -- I

15   think we are accepting, really, their own characterization and

16   the way their witness described it.

17              If we could get the next slide?

18              There is also on the disk, and this is not in

19   dispute, what is called a "secure lead-in area."  These are all

20   protections that were designed as part of CSS to protect movies

21   from copying.  And, the secure lead-in area are the keys, the

22   codes that allow the decryption module, that part of the

23   program, to unlock the movie, decrypt the movie, okay?

24              We have a next set?

25              That is half the equation under the CSS

1    technological system.  The second half of the protections are

2    contained in the DVD drive.  And this is all, again, in

3    Dr. Bell's declaration.  He is one of the people, and he is

4    here today, he is one of the people who led the committee in

5    the mid '90s to develop this entire system.  He worked at IBM

6    at the time, and to give the studios comfort that they could

7    release movies on DVD.  And his declaration explains all of

8    this.

9           So, there is a series of protection layers that

10   are -- this is the physical drives that come in your computer.

11   And our laptops have a DVD drive in them, or an external one.

12   One is a drive with that locking mechanism.  The second is

13   authentication protocols; that is what talks to the

14   authentication module in the program.  And, the third is the

15   bus encryption, and I'll talk about that a bit more.  That's a

16   way in which the communication between the drive and the

17   computer are themselves rescrambled to make additionally sure

18   that nobody can tap into that line and get access to the movie.

19           If we can go to the next slide?

20           I think it's worthwhile, in listening to the Court's

21   questions, to kind of go through just a high level how CSS

22   works.  I don't really think this is in dispute.  I think it's

23   in Dr. Felten's declaration also.  I don't think he really

24   disputes this.

25           **THE COURT:**  I think in reality it probably helps to

```
 1    see it as opposed to having a jumble of words, some of which

 2    makes sense and some of which doesn't.

 3              MR. SINGLA:  It took us a while as the lawyers tried

 4    to understand this from Dr. Bell.

 5              The first thing is when you put a DVD in the drive

 6    the drive locks; the drive will physically lock.  It will

 7    refuse to let you look at any part of the DVD.  That is the

 8    first layer of protection that is provided.

 9              The next step?

10              The drive goes in and it locks.  Cute little

11    animation.

12              The next step?

13              Now, once the drive locks, it will not unlock until

14    there is authentication.  Authentication is a computer science

15    term that is used in computer science to mean having two

16    entities talk to each other, have a dialogue and make sure that

17    they can verify the other entity that they are dealing with is

18    legitimate, trustworthy.  So there is a conversation.  And

19    again, I don't think this is in dispute.

20              The DVD drive asks the player, this is the Real DVD

21    player they would ask, for example, their software, for some

22    security codes.  And the Real DVD player sends them security

23    codes.  And then, the player does another thing where it takes

24    those security codes and encrypts them, sends it back and says

25    encrypt this for me, and it does that.  And it's doing this to
```

1  make sure that the player knows CSS, is CSS compliant,

2  understands the algorithms, and is a legitimate entity for it

3  to deal with and to send the movie to.

4          The next slide.

5          At that point, the drive will unlock.  And at that

6  point, the computer can read what is on the DVD.  And when

7  Dr. Felten and Real says the movie can be copied at this stage,

8  that's what they are saying; at this stage, once there is an

9  authentication protocol that takes place, the movie file can be

10  literally copied.

11          But what can't be copied is the lead-in area.  If

12  you recall the last slide, there was a part of the disc that

13  has secret keys, those are physically blocked from being read

14  at this stage.  You, as a consumer, when you open up a DVD on

15  your computer, even if it's been authenticated and unlocked,

16  you still can't get to those keys, so you still can't watch the

17  movie.  That is, again, another security feature in CSS.  The

18  idea here is that just encryption alone was not considered

19  enough.  People wanted layers of protection, locks upon locks.

20          If you go to the next slide?

21          What happens is --

22          I'm sorry, go back one, if possible.  There we go.

23          -- is that the player and the drive negotiate a,

24  agree on bus encryption, which is a way to further protect

25  those keys, you know, sort of the jewels, the keys.  And they

```
1    are transmitted over the wire between the drive and the

2    computer, right?

3            This is another layer of protection on top of all

4    the other encryption.  They make sure that -- and the reason

5    is, literally, and it says this in the specification, if

6    someone were to tap into that line, you know, insert themselves

7    in between the drive and the computer, the CSS specifications

8    and technology wants to make sure that that person can't make

9    any use of this, so they have a further layer of encryption

10   there.

11           Next slide.

12           It's only after all of that is done that the keys,

13   and you can see a little animation -- our IT people love this

14   kind of thing -- is finally sent to the player.  And it's only

15   at this stage the movie can be played.  What happens after that

16   is then the DVD will actually encrypt the movie.  So as the

17   Court can see, there are layers of encryption here protection

18   here beyond just the encryption.

19           Next step, here.

20           Now, what -- one form of circumvention that is going

21   on, and this is what Mr. Williams and Mr. DiBoise we're arguing

22   about, is whether -- and we don't dispute this, when Real does

23   all this, they do all this, they do all this just as it's

24   specified in the specifications, but they do it to make a copy.

25   And so, our contention is that that's not authorized, to use it
```

```
1    this to make a copy.  That is one form of circumvention that

2    relies upon the license, the language of the license, how you

3    interpret it our view of federal law that says that when you

4    have a copyright or patent license, anything that is not given

5    expressly is retained by the copyright holder.  But, there are

6    other forms of circumvention that don't rely upon that license.

7    I think if that's the concern, that don't rely upon the

8    license -- and again, I don't think this is really in dispute.

9              MR. DIBOISE:  It is, Your Honor.

10             MR. SINGLA:  We can talk about it, you can respond.

11             Why don't we talk about the next -- get the next

12   slide.

13             THE COURT:  Well, so far, in terms of how the Real

14   DVD operates, is this a correct?

15             MR. DIBOISE:  At 30,000 feet, yes.

16             THE COURT:  Um-hmm.

17             MR. DIBOISE:  So Your Honor's question was where in

18   this license does it say thou shalt not --

19             THE COURT:  I know.  That was back sometime ago.

20             MR. DIBOISE:  Well, that's the point, Your Honor,

21   because they can't point to anything in this agreement that

22   says you shall not make a copy.  What they want to do is go

23   through the secret handshake and these other points.

24             The only point I want to make is --

25             THE COURT:  I didn't cut them off from that.  You
```

1   know that I can perfectly well cut them off if I want to.

2          **MR. SINGLA:**  I'm sorry, Your Honor.

3          **THE COURT:**  Yes?

4          **MR. SINGLA:**  There are ways in which they

5   circumvent.  This is the one form of circumvention, we contend,

6   at least, and they dispute, is that there is -- this is done to

7   make a copy instead of playing the movie.

8          If we get to the next slide, this is another form of

9   circumvention.  I don't really think there is a dispute, and

10  this is very little to do with the license, and that is when

11  they play back the copy, now they have made a copy onto the

12  hard disc using all of these protocols, all the information

13  they learned from the license, they go through all that.

14  Instead of playing the movie, they copy it onto their hard

15  drive.

16         When they do that, and play the movie back from the

17  hard drive, none of those layers of protection are maintained.

18  They don't exist anymore on the drive, they've been removed.

19  Circumvention under the DMCA is not just unencrypted; the DMCA

20  defines circumvention to mean removing a protection,

21  deactivating a protection, impairing a protection.  So the

22  movie on a hard drive -- the hard drive doesn't lock.  They

23  don't say it does.  There is no declaration or contention by

24  the other side saying that the hard drive copy, the hard drive

25  will physically lock the way the DVD drive did.  The hard drive

1   doesn't authenticate with the player the way the DVD drive did.

2   Again, this is a protection in the CSS technology that is no

3   longer there in the copy.  It has nothing to do with the

4   license.

5               THE COURT:  Well, is there any kind of encryption or

6   any kind of locks that are left?

7               MR. SINGLA:  Yes, there is.

8               THE COURT:  Once it is, in fact, on the hard drive?

9               MR. SINGLA:  Yes, Your Honor.

10              So, the -- the bottom-most layer of protection

11  provided by the CSS system is the encryption of movie itself.

12  And that is maintained.  They maintain that.  They maintain the

13  CSS encryption; they made a decision to keep that.  But, all of

14  the other protections are removed.

15              And, you know, the Court has asked for language from

16  the contract.  Now, again, it's our position that if the

17  contract doesn't give them explicit license to do this, to make

18  these copies and deactivate these protections, then they don't

19  have, you know, they are not authorized.  They are not,

20  literally, authorized.

21              But, there is language in the specification that are

22  clearly violated by what they do.  So one example --

23              If we can get Slide 26?

24              This is an excerpt from the procedural

25  specification.  It was submitted this morning attached to

```
 1   Mr. Pomerantz's supplemental declaration.  I can give the Court
 2   a copy, if it needs.
 3              Does the Court need a copy?
 4              THE COURT:  Well, I will tell you in a minute.
 5              Is that Exhibit A?
 6              MR. SINGLA:  I believe it is Exhibit A.
 7              THE COURT:  Yes?
 8              MR. SINGLA:  What that is, Your Honor, that is one
 9   page of those procedural specifications.  I have the entire
10   document, if the Court likes.  I think it was an error on our
11   part to just give the Court one page.
12              THE COURT:  Yes.  It always makes me a little
13   nervous to see one extracted page without reference to
14   anything.
15              MR. SINGLA:  This is a copy for the Court, and I
16   have a copy for Counsel, obviously.
17              If the Court turns to section 6.2.3, which I believe
18   is on Slide 26 up here, the Court will see the language there
19   that says, and I want to -- and I kind of went through some of
20   that, frankly, to help the Court -- help me explain to the
21   Court this language because it is a little technical.  So I'm
22   going to translate this into English.
23              It says, "the authenticator in a CSS description
24   module shall correctly engage in and complete the
25   authentication process with the DVD drive and ensure that the
```

1   CSS keys are received by the descrambler only if the

2   authentication process is successful."

3          So, what this is saying, Your Honor, is that the

4   part of their program called the authentication module that

5   they've licensed from the DVD CCA, it should only be handing

6   over those CSS keys, the secret keys, to the descrambler

7   module, the other part of their program they licensed from DVD

8   CCA, if the authorization of the drive took place.  That is the

9   requirement.  It says that right there, uses the word "shall,"

10  "shall correctly engage and shall hand them over only if the

11  authentication process is successful."

12         Now, when they play back a movie that they have

13  copied from the hard disc, this doesn't happen, because the

14  consumer -- this isn't in dispute, either, in fact, they

15  advertise this as a feature of their product.  If the consumer

16  copies the movie with their program onto the hard disc, they

17  can unplug that drive, turn the computer offer, turn it on and

18  play it, but there is no DVD drive there for the authenticator

19  module to authenticate anything.  But, they still hand over

20  these keys to the descrambler module.

21         Similarly, they say they can take a movie, their

22  program allows them to take a movie, and copy it onto a thumb

23  drive, one of those little USB drives, and take that into

24  another computer that the consumer owns and plug it in.  Now

25  that computer maybe has never even had a DVD drive attached to

1   it, and yet the copy of Real DVD on that computer, the

2   authenticator hands over those keys to the descrambler module

3   without any authentication, without any drive because there is

4   no drive there.

5          And this is -- again, we certainly don't hang our

6   hat on the idea there has to be expressed prohibitions in the

7   license, but, to the extent the Court is asking, are for the,

8   you know, specific examples, or they are suggesting there is

9   nothing, I mean, these are -- this is just a flat-out place in

10  which they violate the terms of the contract.  Section 4.2 of

11  the license says they have to comply with every part of the

12  specifications, including this, and they don't do that.

13         I could also, if the Court wants, walk the Court

14  through the specification, and there is section after section

15  after section designed to prevent copying.  I mean, the

16  specifications, this document right here, has things about how,

17  when you play a DVD, the computer, if it outputs something to

18  the television has to make sure that it's -- it can't be

19  copied, that when you copy -- when you read a DVD disc and

20  you -- it looks like someone has made a copy of a movie onto

21  that disc, you can't read it.  I mean, there is section after

22  section that would be rendered pointless if they were right,

23  and they were permitted to just freely make copies of movies.

24         There is a third circumvention that takes place

25  that, again, is independent of this license.

1           Can I get Slide 27?

2           Every DVD has on it as part of the DVD format what

3    are called "CGMS signals."  This is in Dr. Fenten's

4    declaration, their expert's, and it's in Dr. Bell's

5    declaration, our expert, one of the people who helped develop

6    the entire DVD and CSS formats.  He was the co-chair of a

7    120-person committee who designed that.

8           And the CGMS signals are all over this.  There is,

9    like, literally, more than a million of them.  And every place

10   in the disc it says, on a DVD disc it says, don't copy this.

11   You can set to 0-0, do make copies, or 1-1, don't make a copy.

12   And it's all over the disc, these markings.  And the Real

13   program circumvents that. It still makes a copy, even though

14   the DVDs are marked all over the place, "don't copy," they have

15   signals, do not copy.

16           The irony here, Your Honor --

17           If I could get --

18           Well, the Court may have seen in our papers

19   something that the other side didn't even respond to, which is

20   they brought a lawsuit under the DMCA against a company called

21   StreamBox, this was back 7 or 8 years ago.  And I believe

22   attached as Exhibit N to Mr. Pomerantz's declaration is the one

23   public document we have been able to get from the lawsuit just

24   from PACER or maybe West Law, which is the -- which is the

25   reply brief that they submitted in support of a preliminary

```
 1   injunction.  They got a preliminary injunction against this
 2   company, StreamBox, for violating the DMCA.  And the basis for
 3   that, Your Honor, was, at that time, when the shoe was on the
 4   other foot, when someone is trying to circumvent their copy
 5   protection technologies, their video streams that they would
 6   allow users to view, consumers on view on the computer, were
 7   marked with something they called a "copy switch," exactly the
 8   same thing as the CGMS signals on DVDs.  It was a little
 9   switch -- I have a copy I can just hand up to the Court, since
10   we can't seem to get the -- may I hand this up?
11            THE COURT:  Yes.
12            MR. SINGLA:  This is Exhibit N to Mr. Pomerantz's
13   declaration.  And I apologize, it has two little marks from me
14   for the passage I'd like to point the Court to.
15            Now, the Court sees, I believe on page 2 there.
16            THE COURT:  Yes?
17            MR. SINGLA:  Forget this technology, we'll just look
18   at it.
19            They say there in the second paragraph that this VCR
20   program that they sued on, they got an injunction against this
21   company, that it circumvents their security system, and the
22   secret handshake, that is an authentication protocol.  That is
23   what I was just saying that they don't respect in the CSS
24   system.
25            And then it says, "It is precisely because a Real
```

1    player is not on the receiving end that the user is able to

2    copy the streaming content, even though the content owner has

3    left the copy switch off."

4              This copy switch is the exact same thing as the CGMS

5    signals.  They had a little place in their video stream where

6    the content provider of Real or a movie or television station

7    on the Internet could put a little signal saying don't copy

8    this.  And just like we have on DVDs a little signal, in fact,

9    millions of them, that say don't copy this.

10             And this program, this VCR program that they

11   enjoined, didn't respect that circumvented that, made a copy

12   anyways.  And Real said to the Court, "The VCR thus circumvents

13   both the access and copy protection."

14             And -- I'm sorry, can we switch back to the slides?

15             And then they won on that argument, Your Honor.

16   That very argument they won --

17             Slide 29.

18             They got a decision in the **StreamBox** case in the

19   year 2000, enjoining this company, StreamBox, and they

20   persuaded the Court successfully that the copy switch in the

21   ordinary course of its operation, when it is on, restricts and

22   limits the ability of people to make perfect digital copies of

23   copyrighted material.  The copy switch therefore constitutes a

24   technological measure that effectively protects a copyright

25   owner's rights."

```
 1              And the Court held that circumventing this was a
 2    violation of the DMCA that required an injunction, a permanent
 3    injunction -- sorry, TRO.  And that was exactly what is going
 4    on here, we have these CGMS signals all over our DVDs saying
 5    don't copy, and they bypass and circumvent that and makes
 6    copies anyways.
 7              So --
 8              THE COURT:  Now, I'm giving a little time to be
 9    heard from Mr. DiBoise also.
10              MR. SINGLA:  Yes, Your Honor.
11              THE COURT:  But, in talking about these
12    specifications and these additional documents that are not a
13    part of the actual licensing agreement, would I be correct in
14    assuming that what really incorporates these by reference, if
15    you will, is what is contained in paragraph 4?
16              MR. SINGLA:  4.2, yes, Your Honor.
17              THE COURT:  Of the CSS specification -- where the
18    heading is CSS specification?
19              MR. SINGLA:  Yes, Your Honor.
20              THE COURT:  And refers to delivery and compliance;
21    is that --
22              MR. SINGLA:  Let me pull my copy here.
23              Yes, so 4.2 -- and the Court is ahead of me here on
24    getting the page number.
25              MR. WILLIAMS:  4.2.
```

1     **MR. SINGLA:**  4.2 says, "license see shall comply

2   with the CSS specifications."  4.21, under "General."

3     **THE COURT:**  Yes.

4     **MR. SINGLA:**  "As may be amended from time to time."

5     And then 1. -- Mr. Williams will help me out here.

6     **MR. WILLIAMS:**  13.

7     **MR. SINGLA:**  1.13.

8     **THE COURT:**  That one we have had reference before.

9     **MR. SINGLA:**  So that is the provision --

10     **THE COURT:**  That one is a little less specific

11   than --

12     **MR. SINGLA:**  Right.  That just defines the term.

13     **THE COURT:**  Um-hmm.

14     **MR. SINGLA:**  The Court is correct.  This is here,

15   the Court is absolutely correct, in 4.1 and 4.2, which says

16   they shall comply.

17     **THE COURT:**  Hold just one moment, both of you,

18   please.

19     **MR. SINGLA:**  Yes, Your Honor.

20     **(Court and clerk confer.)**

21     **THE COURT:**  In addition to copying to the hard

22   drive, and you referred to copying, for example, to a thumb

23   drive or to an external hard drive, or whatever, you know, that

24   it is owned by the person who has purchased, I guess, the Real

25   DVD, is there any reason why copies cannot be made to other

```
 1    thumb drives, I mean, that you can take a thumb -- you know,

 2    you can have 90 friends and invite them over with their thumb

 3    drives and wine.

 4              MR. SINGLA:  That is an excellent question.

 5              THE COURT:  And you got 90 copies floating around

 6    out there.

 7              MR. SINGLA:  Right, now you can make 90 copies, but

 8    you can only play them back on five computers.  So they have

 9    voluntarily --

10              THE COURT:  Is that it?  They can only play them

11    back on five computers?

12              MR. SINGLA:  That is our understanding from what

13    they are saying.  We accept that for purposes of this hearing.

14              THE COURT:  I see.

15              MR. SINGLA:  We haven't had discovery yet.  They say

16    you can only play it back on five, so we accept that for now.

17              THE COURT:  Why five?

18              MR. SINGLA:  That's question that we had, Your

19    Honor.

20              THE COURT:  Is that the $19.99 piece that you have

21    to buy and put on each computer, then, or something?

22              MR. SINGLA:  Yes, Your Honor.

23              And if you -- exactly.  If you took their arguments

24    literally, that the license allows them to just use these

25    specifications and secret information and codes to make copies
```

```
 1   at will, why not 100?  Why not 1000?  According to them, they
 2   could remove even the CSS encryption and allow consumers to
 3   make freely copyable, freely playable movies.  And there's
 4   nothing in the CSS license, according to them, that would
 5   prevent that.
 6          I mean, what they are saying, their argument is that
 7   basically, the CSS license, by taking a license they have
 8   gotten free, quote "authorization," end quote, to just ignore
 9   the DMCA and ignore the entire copy protection scheme and do
10   whatever they want.
11          THE COURT:  Well, do you understand the technology
12   to be such that, in fact, if someone else had paid the $29.99
13   for their computer, what is that protecting? "X" number of
14   computers --
15          MR. SINGLA:  My understanding from their web site is
16   today, they way they have implemented it for now, at least, is
17   that when you pay $29.99, you can play movies back on one
18   computer, the same computer from which you made the copy.
19          THE COURT:  Um-hmm.
20          MR. SINGLA:  And if you want to pay $19.99 more, you
21   can add up to five computers.  It doesn't have to be your own;
22   could be your dormmates, your roommates, your friends down the
23   street, your sister, your cousin, up to five other computers
24   that you could play copies made --
25          THE COURT:  Okay, my question is, okay, so then
```

```
1   you're willing to splurge and spend another $29.99 --

2           MR. SINGLA:  I believe it's just five.

3           THE COURT:  No, but this is a whole new purchase

4   now, a new transaction, $29.99 and another five.

5           MR. DIBOISE:  It's $100, if you want five.

6           THE COURT:  Yeah.  I mean, I can figure that out.

7   It's almost $20, right, plus the $29.99.  And you buy that,

8   that you can copy to all of those what you had, in fact, copied

9   to the hard drive on number one, or does that only allow you to

10  access those, quote, "five"?

11          MR. SINGLA:  No, I think you're right.  What would

12  happen is, you could download one copy of Real DVD and four

13  connected ones, put those on four computers of your friends,

14  and you could download another $29.99, exactly what the Court

15  is saying, version, put that on your computer, that would be

16  set B, and then you could have four more computers.  And you

17  could do that ad infinitum, as we understand their technology.

18          The other thing is, the five, as the Court

19  indicated, what their position is is that they are just sort of

20  voluntarily, as a good Samaritan, limiting it to five, and

21  tomorrow they could change it to 20 or a hundred or a thousand.

22          THE COURT:  Maybe that's how they determined how to

23  define -- and I'll let him tell me that, but define parameters

24  of fair use.

25          MR. SINGLA:  Perhaps, Your Honor.
```

1              **THE COURT:**  Is that what it is?

2              **MR. DIBOISE:**  Certainly, in part, that is what it

3    is.

4              **THE COURT:**  First of all, with respect to how all of

5    this operates as has been described, not with respect to these

6    last few questions I asked, but is there a dispute about what

7    Mr. Singla showed us on the, you know, on the videos here with

8    the animations, and so forth?

9              **MR. DIBOISE:**  Yes.

10             **THE COURT:**  Is that an accurate --

11              **MR. DIBOISE:**  No, it's not.

12             **THE COURT:**  -- in terms of how the encryption works

13   and opens up.

14             **MR. DIBOISE:**  Oh --

15             **THE COURT:**  The various levels of encryption or

16   layers of encryption?

17             **MR. DIBOISE:**  With respect to the actual

18   specifications on how to implement this and the actual language

19   and the technical specifications, we don't dispute what they

20   say.  We do dispute what they interpret that language to mean.

21   So, for example, I could just show you one example and perhaps

22   emphasize this.

23             Could I have your slide back up that shows 6.2.3.

24             **MR. SINGLA:**  It's Slide, Shannon -- just one second.

25             **MR. WILLIAMS:**  Twenty-nine?

1          **MR. SINGLA:**  Twenty-nine -- no, that's not it.

2          **MR. DIBOISE:**  Your Honor, it is the part of --

3          **MR. WILLIAMS:**  Twenty-six.

4          **MR. DIBOISE:**  Twenty-six?

5          **MR. SINGLA:**  It's got my notes.

6          **THE COURT:**  There it is.

7          **MR. SINGLA:**  That's right, 26.

8          **MR. DIBOISE:**  So where it says -- sorry, this is

9    difficult, "The authenticator in a CSS decryption module shall

10   correctly engage in the" -- "in and complete the authentication

11   process with the DVD drive and ensure that the CSS keys are

12   received by the descrambler only if the authentication process

13   is successful."

14         We are in absolute -- Real DVD does every word of

15   that specification.  They interpret that specification to mean

16   that you have to do, have to have the physical DVD in a

17   physical DVD drive each time there is a play back.  That is not

18   in that specification.

19         At the time Real DVD gets the key for the

20   authentication, it goes through all the authentication steps

21   that are required by the technical specification.  And there is

22   nothing in that specification that -- or elsewhere in the

23   agreement that says physical disc, the DVD, has to be in a

24   drive when you access those keys.

25         **MR. SINGLA:**  I think --

1            *MR. DIBOISE:*  It just means that --

2            *THE COURT:*  Hold on.

3            *MR. SINGLA:*  Okay.

4            *MR. DIBOISE:*  -- that you have to make certain, when

5    you access that lead-in area where these keys are hidden, that

6    you go through the authentication process.  And, in fact, Real

7    DVD does that.

8            *MR. SINGLA:*  If I could --

9            *THE COURT:*  But then you can essentially copy, not

10   with impunity, but copy 1 plus 4; is that -- is that correct?

11           *MR. DIBOISE:*  You mean make five copies?

12           *THE COURT:*  Yeah.

13           *MR. DIBOISE:*  This doesn't have anything to do with

14   making copies.

15           *THE COURT:*  I know it doesn't have anything to do

16   with making copies, but, once you get past all the scrambling,

17   and so forth, or descramble, decrypt, then, do you have to --

18   what happens to all of that encryption, then?

19           *MR. DIBOISE:*  It's right on the copy on the hard

20   drive.

21           *THE COURT:*  All of it?

22           *MR. DIBOISE:*  All of it.

23           *THE COURT:*  And everything that enables you to

24   essentially unlock and open up and go in, and the various

25   layers that he was talking about?

1    You don't dispute that there are all those various

2  layers, right?

3          **MR. DIBOISE:**  No, we don't.  And, when we play it

4  back, we go through each --

5          **THE COURT:**  You are saying that all of those layers

6  remain there?

7          **MR. DIBOISE:**  On the copy on the hard drive.  And

8  they have to be there -- sorry, Your Honor, I apologize.

9          They have to be there in order to play back, whether

10  it's on computer one or computer five that you are authorized

11  to use.

12          That is why we are in compliance with the license

13  agreement; if there were a specific requirement that said there

14  must be a physical DVD in the DVD drive at the time that you do

15  this, they would point it out to you. It isn't there.

16          And another reason we know it's not there is because

17  every DVD player, now I'm talking about the stand-alone

18  machines that you can buy and come with your computer, makes a

19  copy, at a minimum, into the RAM of the computer or into

20  whatever buffer area exists in a stand-alone DVD player so that

21  it doesn't prohibit the making of a copy because there is a

22  copy being made in the normal legitimate way of the playback of

23  a DVD.

24          What they are concerned about is the fact that the

25  copy on the hard drive created by Real DVD is persistent, is a

```
 1   permanent copy on that user's hard drive.

 2            THE COURT:  Which is not the case when you play a

 3   DVD in a regular DVD player.  Once you take it out, it's gone,

 4   right?

 5            MR. DIBOISE:  Right, but you have the DVD.

 6            THE COURT:  Well --

 7            MR. DIBOISE:  There is no difference, Your Honor.

 8            THE COURT:  You have the DVD, yes.

 9            MR. DIBOISE:  Yes.  And all those protections that

10   were on the --

11            THE COURT:  Or I suppose if you rent it, you don't

12   have the DVD, right?

13            MR. DIBOISE:  You had it at the time you watched

14   it --

15            THE COURT:  Yeah.

16            MR. DIBOISE:  And, at the time you made the copy.

17            THE COURT:  And now that it resides on your hard

18   drive, you can give back the DVD, but you will have it forever,

19   right?

20            MR. DIBOISE:  To -- yes, to watch, not to do

21   anything else with.

22            THE COURT:  Except that, except that you can use, by

23   way of your external hard drive or thumb drive, or whatever,

24   what, for an additional $19.99 you can copy it, correct?

25            MR. DIBOISE:  To an account that is authorized to
```

1    you.

2              **THE COURT:**  Well, that's --

3              **MR. DIBOISE:**  So for $19.99.

4              **THE COURT:**  That's what I want to know, number one.

5    Is -- and is that, you know, I guess what you are saying is

6    that that's fair use?

7              **MR. DIBOISE:**  The ultimate copy is fair use.  The

8    end user's copy is fair use.

9              **THE COURT:**  How about all the rest of these copies

10   for $19.99?

11             **MR. DIBOISE:**  There aren't additional -- there is

12   only, at most, five copies.

13             **THE COURT:**  Okay, that the's what I mean.

14             **MR. DIBOISE:**  Those five copies we submit --

15             **THE COURT:**  Are all fair use.

16             **MR. DIBOISE:**  In the consumer's hands are fair use.

17             **MR. WILLIAMS:**  Your Honor, if I may --

18             **THE COURT:**  Yes.

19             **MR. WILLIAMS:**  May I be heard on the issue of fair

20   use?

21             **THE COURT:**  Yes.

22             **MR. WILLIAMS:**  There is no question in the papers

23   that have been provided by RealNetworks that they try to go

24   into the realm of fair use and whether or not their intention,

25   or purported intention, that the ultimate user of this

1    technology be someone who is just making copies of DVDs that

2    they own --

3                **THE COURT:**  Um-hmm.

4                **MR. WILLIAMS:**  But the case law is pretty clear.

5    And there is case after case that says in the DMCA context

6    there is no defense of fair use.  And, we cite in our papers

7    case after case after case that suggests that.  And the reason

8    for that is that the device under the DMCA is trafficking in a

9    technology --

10               **THE COURT:**  Um-hmm.

11               **MR. WILLIAMS:**  -- that circumvents.

12               So as long as we establish, and we think that it's

13   manifest that we do, and I wanted to get back to one point that

14   Counsel made, as long as we establish, and I would say the

15   burden is not on us, but to the extent that the Court believes

16   that we have established that there are any of these

17   authentication or encryption procedures that are bypassed after

18   the copy is made, the fact that Real intends, or purports to

19   intend, that the use will be made is for folks who own the DVD

20   is of no moment one way or the other.  The violation of Section

21   1201(a)(2) and 1201(b)(1) occurs at the time that you enter

22   into the marketplace a device that circumvents.

23               If I may --

24               **THE COURT:**  I understand what --

25               **MR. WILLIAMS:**  Okay.

1      **THE COURT:**  -- you're saying, but somehow I got a

2  feeling that they were working fair use into this somehow.

3      **MR. WILLIAMS:**  That's right.

4      **MR. DIBOISE:**  Fair use drives the product, not

5  whether or not Real DVD complies with the CSS license to do

6  what we do.  Remember, Your Honor, this is an issue of whether

7  what Real DVD does, the device that is alleged to be sold to

8  circumvent certain access protections, does that illegally.

9  And, our submission is that, if you are authorized to do what

10  Real DVD does, we are not circumventing anything.

11      **THE COURT:**  Well, this is an interesting question:

12  What are you authorized to do?

13      **MR. DIBOISE:**  That's in the agreement.  In the

14  agreement, it tells us what we need to do to be able to read a

15  DVD and be able to play it back.  And the Real DVD player

16  follows faithfully the specifications in the agreement with

17  respect to what we must do to be able to read a DVD and be able

18  to play it back.

19      **THE COURT:**  Doesn't say anything about copying.

20      **MR. DIBOISE:**  Doesn't say anything about copying and

21  the copy -- which is what Real wants to do.  I mean, after all,

22  Your Honor, Real is a half billion-dollar company whose entire

23  business is dependent on preserving the protection and security

24  of digital content.  That's what it distributes.

25      Here we are taking every step to make certain that

```
 1    what is on the DVD, whatever encryption scheme that is on the
 2    DVD, remains on the copy that is made by Real DVD.  There is no
 3    circumvention. We have to come back --
 4              To get on to the fair use issue, is because they
 5    want to say because you make a copy, you therefore are
 6    circumventing protection.  And ipso facto, if there is a copy
 7    made, it means you violate the DMCA.  That's not the inquiry,
 8    it's whether or not there is something in this agreement that,
 9    since we are licensed to do what we do, we can make a copy as
10    long as we preserve all the restrictions on playback.  That's
11    the issue that you have to decide, not whether or not fair use
12    copies, whether five is fair use, whether three is fair use,
13    whether one is fair use.
14              THE COURT:  Well, I'm trying to get at what you
15    thought you were doing and whether or not that was something --
16              MR. DIBOISE:  Right, obviously, Your Honor --
17              THE COURT:  -- that was lurking there.
18              MR. DIBOISE:  -- in the minds of the designers of
19    the product as well as the marketing folks, we wanted to make
20    certain that what we ultimately place in the hands of the
21    consumer would comply with the legitimate legal fair use.  And,
22    that is why they are protections built into the entire product
23    as well as limiting the number of times computers you can have
24    to play it back on.
25              I submit, Your Honor, with respect to, I think a
```

1    question was in your mind, is that spending $100 to be able to

2    view one copy on five different computers is a lot more

3    expensive than going to handbrake- or download.com and

4    downloading a program for free that would enable you to play a

5    DVD on a thousand computers.

6              *THE COURT:*  Is that legitimate?

7              *MR. DIBOISE:*  No, because those rippers don't

8    maintain --

9              *THE COURT:*  Then why are you comparing yourself to

10   those that are, you know, whatever billion dollars or however

11   billion dollars you say your company is?

12             *MR. DIBOISE:*  Because that's the harm --

13             *THE COURT:*  Were why are you measuring yourself

14   against those who are not legitimate?

15             *MR. DIBOISE:*  Because that's harm that they complain

16   of.  They say if you allow Real DVD to be downloaded, look at

17   what's going on in this marketplace.  What we are saying is we

18   maintain the protection; we are not part of that marketplace.

19             *THE COURT:*  Well, the recitals in the license

20   agreement talk about providing protection for such copyrighted

21   content against unauthorized consumer copying. Can a consumer

22   who gets a DVD, whether they buy one or whether they rent it,

23   are they authorized to copy that?

24             *MR. DIBOISE:*  Yes, under -- if they purchase it,

25   they are authorized to copy it.  As far as I understand it,

```
 1    once you have rented it, you can copy it as well.  But I could
 2    stand corrected on that one.
 3              MR. WILLIAMS:  No.
 4              If I may, Your Honor, a consumer may not copy.  That
 5    is the first thing that comes up on a DVD.  If you play it --
 6    you are allowed to play it if you own it, you are not allowed
 7    to copy it if you -- if that were true, then nobody --
 8              THE COURT:  You wouldn't need all this.  You'd burn
 9    a bunch of CDs and give them away, I suppose.
10              MR. WILLIAMS:  Sorry, Your Honor.
11              THE COURT:  You were wrong, right?
12              MR. DIBOISE:  No.
13              THE COURT:  No?
14              MR. DIBOISE:  That's not what the product is
15    marketed for.
16              THE COURT:  That's not the question.  The question I
17    asked is what is unauthorized consumer copying?  Because the
18    purpose of this section is to provide protection against that
19    unauthorized copying.
20              MR. DIBOISE:  And, the only point that I'm corrected
21    on is that, as far as we know, there is no case that has
22    interpreted that in terms of fair use.
23              MR. WILLIAMS:  Your Honor --
24              THE COURT:  I'm not talking about fair use now.
25              MR. DIBOISE:  That would be the protection.
```

1          **THE COURT:**  I'm talking about what is unauthorized

2    consumer copying?  It's copying of anything that is

3    copyrighted, right, without authorization, correct?

4          **MR. WILLIAMS:**  That's correct, Your Honor.

5          **MR. DIBOISE:**  Correct, but we don't circumvent that

6    protection.

7          **MR. WILLIAMS:**  Well --

8          **MR. DIBOISE:**  I mean, that's the whole point of the

9    license, Your Honor.  It says in order to do that, here are the

10   protections and the provisions you must comply with in order to

11   accomplish that goal.  We accomplished that goal.

12         Now, I think what's bothering Your Honor is that

13   there may be some wiggle room here in the license agreement.

14   And, in fact, the studios knew that there was wiggle room in

15   the license agreement, and they tried twice in 2007 to amend

16   the DVD CCA license agreement to put in an explicit no copying

17   provision; both of those attempts failed.

18         The issue is -- I understand Your Honor's concern

19   with unauthorized copying, but what we do to prevent

20   unauthorized copying is follow faithfully every part of the CSS

21   encryption scheme in compliance with every technical

22   specification that they set out for us.

23         We have done what they asked us to do to prevent

24   unauthorized consumer copying.  The fact that they didn't write

25   in big bold letters or include a clause that says you must have

```
 1   a physical DVD in a DVD drive when you play this back is not
 2   Real's fault.  We faithfully follow the license terms.
 3              MR. WILLIAMS:  Your Honor, may I respond?
 4              THE COURT:  Yes.
 5              MR. WILLIAMS:  Here is the fundamental difference:
 6   You just heard Mr. DiBoise say that we, the studios, needed to
 7   put into the CSS license language in big bold letters that says
 8   you may not copy, and that fundamentally reverses the way that
 9   the law works when we are dealing with federal copyright law.
10   That is the whole reason we are here today.
11              We are here today because RealNetworks saw that
12   there was a State Court judge, Judge Nichols in Santa Clara,
13   who found that this CSS license, in his opinion, was not
14   violated by making of copies.  He did that, and he got to that
15   conclusion in his own way.
16              But, the reason why this Court should not allow that
17   fact to get around the protections of the DMCA is the
18   following:  Under federal copyright law, it is manifest under
19   SOS versus Payday, a Ninth Circuit case from 1989, that
20   copyright licenses are assumed to prohibit that which is not
21   authorized.
22              The issue is not prohibition, the issue is
23   authorization.  And it is fair to say that over the last week
24   these parties have pointed to every provision in the CSS
25   license that bears on this question of copying.  We have gone
```

1   to great lengths to give you recital No. 1, the technical

2   specification, section 93.2.

3            Juxtaposed against that, the best that RealNetworks

4   can do in responding appears on page 14 of their brief, where

5   they write as follows, and I quote, this is line 10 through 12

6   on page 14 of their brief:

7            "The CSS license agreement authorizes Real to,

8   quote, 'use and implement,' closed quote, "CSS technology.  And

9   there is no limitation on these rights if Real complies with

10  the specifications as required."In other words, there is

11  nothing in the license that allows them to copy.

12           For purposes of federal law, Your Honor, the inquiry

13  is whether it is authorized, not whether it is prohibited; that

14  is to say, the burden is on them to establish that it is

15  authorized, and they cannot establish that.

16           **THE COURT:**  What are they authorized to do under

17  this agreement?

18           **MR. WILLIAMS:**  What they are authorized to do are

19  the things that are checked at the back of the CSS license;

20  that is, they are make a player, small "p," as Mr. Singla

21  described it, they are making a DVD player of that type.  And

22  they are not authorized -- and they are allowed to show it --

23  they are not authorized to make a copy.

24           In direct response to the question that you posed to

25  Mr. DiBoise as to whether or not a consumer can copy

1    copyrighted material, the answer, of course, is, no, a consumer

2    may not copy a copyrighted material.  What Real DVD does is it

3    allows a consumer to do just that; you take the DVD that you

4    have either purchased or rented or borrowed, you put it into

5    the machine, it says play or save and play, if you hit save,

6    that is a buzzword for copy.  And every time there is a

7    advertisement for Real DVD that says you may save, that means

8    that you are making a copy.  That is unauthorized.

9           The difference here, the question that's before the

10   Court is whether or not there are protections that are

11   violated, and there are once the copy is made.  You heard

12   Mr. DiBoise say that there is nothing in this license that says

13   that you have to have a player -- excuse me, a disc drive that

14   is hooked up to the machine; well, actually, Mr. Singla showed

15   you some provisions of the license that talk about how you have

16   to go through the authentication process.

17          And even in the declarations from Mr. Buzzard that

18   they provided, and we ask the Court to look at paragraphs 8 and

19   9 of Mr. Buzzard's declaration, even his declarations do not

20   say that these authentications and bus encryption and bus

21   authentication measures are done after the copy is made.  And

22   how could they be?  Because if they were done after the copy of

23   the movie were made, the computer would lock.  There would be

24   no ability for the player and the drive to communicate because

25   there is no drive, they have taken the drive out.  They have

1    thus by-passed or avoided the protections.

2            What we would suggest, Your Honor, is that there are

3    already cases that have been decided that deal with this

4    question of whether or not you can make a copy versus whether

5    you can make a watchable copy.  And, one of the cases we cited

6    is a Southern District of New York case, ***Macrovision versus***

7    ***Sima Products Corporation*** from 2006.  The issue in that case

8    was that Macrovision is a manufacturer of its own protection

9    scheme called ACP.  And this ACP system prevents the making of

10   a watchable copy of a video over an analog system as opposed to

11   a digital system.

12           What the Court found -- that was Judge Owen in the

13   Southern District of New York, he found that Macrovision's ACP

14   system only prevented the making of watchable copies, it did

15   not prohibit copying, per se.  But the court held that

16   Macrovision, quote, "has made a clear showing that Sima is in

17   violation of 1201(a)(2) of the DMCA and for making a

18   technology" -- excuse me, "for making a technology that

19   rendered those copies watchable."  And it makes perfect sense,

20   that is exactly what is going on in this case.

21           What they are doing is making a copy, and their

22   response is theoretically, at least, a computer can always make

23   a copy, but it cannot make a watchable copy.  And, that is what

24   they are doing, a watchable copy that one may watch without

25   even having a DVD introduced into the system.

1        So, if the Court applies the federal law as opposed

2    to the state law that was being applied in the *Kaleidescape*

3    case by Judge Nichols, who specifically said he was not -- he

4    used the phrase "tip-toeing into the area of federal copyright

5    law," he said he was applying California state law.

6        What Real did was they saw that decision, they

7    immediately then and only then went out and got a license from

8    DVD CCA.  They put their technical people on it, and they

9    devised a system that instead of just being a player was a

10   copier.  And then they are going to sell it to the public and

11   intervene on the profits of the companies that took all the

12   risk, that made the movies, most of which flopped, some of them

13   make it.

14       And, instead of the studio clients getting paid,

15   some portion of it the money goes to Real because all that

16   happens is that a person puts this on -- this equipment on

17   their machine.  There are 3000 some-odd who already have it.

18   Each of them can put it on five computers, that is 15,000

19   copies.  And then there is an unlimited number of movies that

20   can be done for each of those individuals making the copies.

21   And that is the vice of this system.

22       **THE COURT:**  How does the technology here differ from

23   what was involved in *Kaleidescope* *(sic)* or *Kaleidescape*, I

24   guess it is.

25       **MR. SINGLA:**  Your Honor, that is addressed in Mr. --

1    Dr. Bell's declaration.

2             **THE COURT:** I know, but that --

3             **MR. SINGLA:** I'll just explain at a high level,

4    sure.

5             In the **Kaleidescape** litigation, it was a very large

6    $10,000 system.  And it was a self-contained system.  It's not

7    a computer, it's more like a DVD drive that you buy from Sony

8    to attach to your TV.  So it's this huge box, and it has a slot

9    where you put in DVDs.  And, it will copy them onto hard discs

10   maintained inside that box, and it will put them and play them

11   on your television.

12            So, it's not a system that is part of a computer

13   system, so it's covered by different provisions of the CSS

14   specifications.  And the Court will recall, there a slide that

15   I put up with a stand-alone player versus the software player,

16   so there is different CSS provisions that applied to both.

17            So the **Kaleidescape** case didn't involve some of the

18   same provisions that we are talking about today that apply to

19   software players.  It was not a descrambler module and

20   authenticator module for decryption module, because it was a

21   stand-alone player.

22            **MR. DIBOISE:** Your Honor, if I might?

23            **THE COURT:** Yes.

24            **MR. DIBOISE:** That's incorrect.  The license that

25   **Kaleidescape** had checked the identical boxes that Real DVD

```
 1    checked in order to get the specifications.  And the

 2    distinction about whether it's a PC or some other type of

 3    operating system, I think, is a distinction without a

 4    difference.  It's a computer system, it just happens not to use

 5    Windows --

 6              THE COURT:  It must have some computerized function

 7    in order to be able to do what it did.

 8              MR. DIBOISE:  But before --

 9              THE COURT:  But it saves a copy to something

10    equivalent to a hard drive, right?

11              MR. DIBOISE:  It saves it right to a hard drive,

12    many hard drives.  It is a hard drive.

13              THE COURT:  And that's it, it's not making any other

14    copies?

15              MR. DIBOISE:  It goes right to that hard drive.

16              THE COURT:  Um-hmm.

17              MR. DIBOISE:  Now, that hard drive in a Kaleidescape

18    home can be networked, and the signal sent to as many players

19    or outlets as one wants to build into your home or your boat or

20    any other system that you have.

21              I do want to return to one question, Your Honor, if

22    I might.  You asked me, what is unauthorized copying, and the

23    reason that is important and I want to come back to it is I

24    think you need to be in the proper framework.  If this were

25    about unauthorized copying, which is copying thousands --
```

1   making thousands of copies and distributing them and making

2   money from those copies, you know, that would be a copyright

3   infringement or a contributory infringement case.  This is a

4   DMCA alleged violation.  This issue is whether we are

5   circumventing anything to be able to do what we do.  And again,

6   that is why it's a license case, it's what we are authorized or

7   not authorized to do under the CSS license.  To talk about the

8   copies only has relevance here to the extent that there is

9   something specifically in the agreement that says a copy is not

10  permitted.

11          THE COURT:  Well, the DMCA was not adopted in a

12  vacuum.

13          MR. DIBOISE:  Well, no, Your Honor, but it does say

14  unauthorized copies.

15          THE COURT:  It is intended to protect copyrighted

16  works and to prevent use of various kinds of --

17          MR. DIBOISE:  Correct.

18          THE COURT:  -- devices, and so forth, to get around

19  that or to --

20          MR. DIBOISE:  Correct.

21          THE COURT:  -- avoid.

22          MR. DIBOISE:  To avoid unauthorized --

23          THE COURT:  Unauthorized copies.

24          MR. DIBOISE:  -- copies.  And the Real DVD makes

25  authorized copies from the DMCA perspective because we don't do

1   anything to violate the license we have.

2           The studios don't like that, but does it violate the

3   DMCA?  The issue is whether we circumvent, not whether we make

4   copies or enable consumers to make copies.

5           And, Your Honor, if we are in compliance with the

6   agreement, then we are not circumventing their technology.

7   Even if it permits, for lack of a better word, an authorized

8   copy here, because remember, this is not a copy, this is

9   literally a bit-for-bit image of the DVD that has all of the

10  protections on it, you can't take that image that is created

11  and play it on anything other than the four other authorized

12  accounts.

13          *THE COURT:*  Do we know that?

14          *MR. DIBOISE:*  That's -- yes, that is in

15  Mr. Buzzard's declaration.

16          *THE COURT:*  Do we know that?

17          *MR. SINGLA:*  Your Honor, for current purposes, we

18  don't know that for sure.  We haven't had discovery, but we

19  take them at their word, I think for current purposes, that is

20  the case.

21          Of course, as the Court indicated, you could buy

22  another five and put out five more computers.  And the five, of

23  course, is a completely arbitrary limit that they have set

24  themselves.

25          *MR. DIBOISE:*  You can't do that, Your Honor.  You

```
1    can't take it and play it on five more if you authorize it.
2    It's tied to your personal computer and your personal account,
3    so it's not being multiplied.  The maximum amount of any one
4    copy where it can be played is five.
5              MR. SINGLA:  One thing I want to clear up that came
6    up a while ago, and then I'm going to turn it over to
7    Mr. Williams, because I'm just here to talk about the
8    technology, I want to make sure that there is not confusion
9    about the technology because I don't think there really is,
10   although I'm afraid the way it's being described might create
11   some confusion.
12             If you look at Mr. Buzzard's declaration --
13   Mr. Fenten's declaration -- Dr. Fenten's declaration, these are
14   their witnesses, their witnesses.  Their witnesses do not
15   dispute that when there is a copy made by Real DVD and that
16   copy is played back, no authentication takes place, no bus
17   encryption takes place, the drive does not lock, the keys are
18   not held in a lead-in area.  They don't say that; they don't
19   claim that.  There is no such contention that those protections
20   are maintained on the copies.  That is simply indisputably not
21   true.  But --
22             MR. DIBOISE:  Your Honor --
23             THE COURT:  Hold on.
24             MR. SINGLA:  What they say is -- Mr. Williams
25   referred to this earlier -- is, well, we don't need to maintain
```

1    those protections anymore because we don't have a DVD drive

2    involved.  But that is our whole point; half of the CSS

3    protections are enforced and implemented by the DVD drive.

4    And, by bypassing the drive, removing the drive from the system

5    in the language of the DMCA, they have removed, bypassed

6    deactivated all of those protections.

7            This is not -- I mean, we would encourage the Court

8    to look at Mr. Buzzard and Dr. Fenten's declaration because

9    they never claim that they do these steps once a copy is made.

10   For example, you can take a thumb drive of a movie, you copy --

11   this computer, take it over to this computer over here that has

12   never ever had a DVD drive attached to it, ever, and maybe it

13   doesn't even have an outlet for a DVD drive, and you can still

14   watch that movie.  So there is no way that the computer and the

15   version of the descrambler on that computer could have

16   authenticated with the drive, encrypted anything on a bus or

17   done any of those protections.  That's the only point I wanted

18   to make.

19           **MR. DIBOISE:**  Those protections aren't bypassed.

20   And I do disagree, RealNetworks disagrees with what most of

21   what Mr. Singla just said about the way our product operates.

22           **THE COURT:**  Well, maybe that is really one of the

23   critical questions.

24           **MR. DIBOISE:**  Your Honor --

25           **THE COURT:**  And, maybe, there really is a dispute

1    among the experts.  And, maybe, the Court should just

2    appointment its own expert and find out exactly how it does

3    operate.

4              **MR. DIBOISE:**  It is Dr. Felten, and not Dr. Fenten.

5    And if I might, Your Honor --

6              **THE COURT:**  Um-hmm.

7              **MR. DIBOISE:**  The example that Mr. Singla just gave

8    about taking a thumb drive here and going over and putting it

9    in there, if this computer over here is playing Real DVD, the

10   authentication step has taken place.  And it can't play back

11   without the authentication step having taken place.

12             **THE COURT:**  What is the authentication?  That

13   machine also plays Real DVD?

14             **MR. DIBOISE:**  No, that the descrambler -- I'm sorry

15   -- yeah, the descrambler is receiving a signal that it is

16   authorized to receive.  That's the authentication process.  And

17   that step takes place when Real DVD pulls the bit-for-bit image

18   off of the DVD and places it, again, bit-for-bit encrypted into

19   the hard drive.  Because what happens in the playback, as I

20   understand it, is that the lead-in keys, the lead-in area is

21   there as well so that the authentication step takes place.  It

22   just doesn't take place with the DVD drive, but that

23   authentication step takes place.

24             **MR. SINGLA:**  If you look at their --

25             **MR. DIBOISE:**  And you can't play it there.

1          **MR. SINGLA:**  If you look at their expert's

2     declaration --

3          **THE COURT:**  And that's -- but what we are seeing as

4     a result of that is an authorized copy; is that your position?

5          **MR. DIBOISE:**  If you want to adopt that language

6     from this license agreement, the answer to that is yes, because

7     it is authorized use and implementation of the CSS license

8     agreement.

9          **MR. SINGLA:**  I --

10         **MR. DIBOISE:**  From a copyright end user perspective,

11    and, if they were bringing a claim for copyright infringement

12    or inducing copyright infringement or contributory copyright

13    infringement, then we would be talking about more their use --

14    but that is not the issue, it's whether we're circumventing any

15    technological step -- tech -- sorry, can't get it out.

16         **THE COURT:**  Technological, something like that?

17         **MR. DIBOISE:**  Thank you.

18         Right.  It's whether we faithfully put those steps

19    onto the copies that is on the hard drive.

20         So you have to be a licensed authenticator and a

21    licensed descrambler and a licensed descriptor to be able to

22    play it back with Real DVD.  None of those things are necessary

23    if all you are doing is making copies.

24         **THE COURT:**  Okay.

25         **MR. WILLIAMS:**  Yes, Your Honor, I would like to put

1    this issue to bed because counsel has said, at least three

2    times, that they do not make any changes, that authentication

3    takes place with the use of the DVD player, and I just want to

4    refer the Court to paragraph 51 of Dr. Felten's declaration,

5    and I'll read it.  Dr. Felten, their expert's declaration says.

6           "Real DVD does not need to authenticate to the drive

7    in these cases because it does not need to use the drive at

8    all.  I understand that the DVD specifications only require

9    software players to authenticate themselves to the drive when

10   they are going to use the drive.  This rule is consistent with

11   common sense.

12          He then goes on to use an analogy, and he says, "If

13   I stay at home from work today, this is not a circumvention of

14   the lock on my office door.  To say otherwise defies logic,

15   especially in light of the fact that I have a lawfully acquired

16   key to the office and am authorized to use that key to enter

17   the office."

18          The point I am making, Your Honor, is that this is

19   their expert saying that Real DVD does not need to authenticate

20   to the drive.  Now, that is a declarative sentence by their

21   expert conceding that they do not authenticate to the drive,

22   they do not authenticate to anything once the copy is made

23   because if they did, the program would seize up and stop.

24          As for the analogy that Dr. Felten uses, the facts

25   are inapposite.  The question is not whether Dr. Felten decides

1  to go to work and thereby bypasses the lock on his door, this

2  is more akin, this situation is more akin to a custodian who

3  has a key to the door, who has a license to be inside of

4  Dr. Felten's office, but for a specific purpose, the purpose

5  being to clean it, the purpose being to dust it, perhaps, but

6  not to sit in Dr. Felten's chair and put his legs up and read

7  the materials there, and certainly not to steal any materials

8  inside Dr. Felten's office.

9          Yet that's exactly what they do in this case: they

10  use the authentication keys, it's given to the consumer, a copy

11  is made, and then the consumer goes inside that door by making

12  the copy up to five, could be 20, could be 100.  That's just

13  out of the goodness of their hearts.  It's not based on any

14  principled limitation on the law or the number of copies they

15  could make.  So, we do dispute the issue that there is

16  authentication going on under the Real DVD system once the copy

17  is made.

18          **MR. SINGLA:**  And, Your Honor --

19          **MR. DIBOISE:**  So, if I might --

20          **MR. SINGLA:**  Just one little point.

21          **THE COURT:**  Hold on one moment.

22          What is it?

23          **MR. SINGLA:**  The slide that is still up --

24          **THE COURT:**  Um-hmm.

25          **MR. SINGLA:**  And we keep coming back to this only

1    because Real's defense is that there is nothing that they are

2    doing that violates the CSS specification.  And again, we

3    believe they haven't pointed to anything that says you can make

4    a copy that authorizes a copy.  But, even under their reading

5    of the law, it says, "the authenticator in the CSS decryption

6    module shall correctly engage in and complete the

7    authentication process with the DVD drive before the keys are

8    given to the descrambler."

9              It doesn't say when you need to use the drive.  It

10   says it would only hand over the keys if it authenticates.  And

11   Dr. Felten, as Mr. Williams said, he indicates they don't

12   authenticate with the drive once they made a copy.  You can

13   take the thumb drive -- I'm just making the same point because

14   I don't understand how they are testing this because their own

15   expert admits this:  Once you take that thumb drive and you

16   move it to a second computer, there is no DVD drive there,

17   doesn't need to be.  There is no way there could be any

18   authentication, and that is what he is saying here.  And that

19   is completely inconsistent with 6.23.  So, just from a

20   technical perspective, I want to make sure that's --

21             *THE COURT:*  Okay we are here, essentially, on a TRO;

22   I don't know that, really, it's going to be possible to resolve

23   this in any authoritative way without having -- setting some

24   time for the testimony of the experts and taking their

25   testimony and/or my appointing my own expert to essentially

```
 1   take a look at what the technology does.  And, because, it

 2   seems to me, that there really is a significant dispute about

 3   what it does and what it's capable of doing, and I think that

 4   is what is critical.

 5              But, I have to say that I think this notion that you

 6   can somehow look at what, you know, DMCA provides for with

 7   respect to the technology involved cannot be looked at separate

 8   and apart from the copyright laws and the fact that -- and the

 9   question of whether or not there is authorized or unauthorized

10   copying.

11              I mean, the DMCA is not there in a vacuum; it was

12   put there for a purpose.  And, it has to do to with the means

13   by which certain technologies were making it possible, in the

14   digital age, to gain access to materials that are copyrighted

15   in ways that have the potential to violate the, you know, the

16   copyright laws.  So, I mean, it's not -- we can't just look at

17   it, as I said, in a vacuum.  I don't know how it can really be

18   resolved without doing that.  And I may want to just appoint my

19   own expert --

20              MR. DIBOISE:  Your Honor, if I --

21              THE COURT:  -- to take a look at all of this and see

22   what he or she has to say.

23              MR. DIBOISE:  I just want to make is certain that

24   Your Honor is clear on the mechanism of these copies that

25   everyone keeps talking about.
```

```
 1              When Real DVD --

 2         THE COURT:  I'm clear on what you are saying, and

 3    I'm clear on what they are saying --

 4         MR. DIBOISE:  Well --

 5         THE COURT:  What I'm saying is everybody has an

 6    expert and everybody's got their own idea about how to be

 7    persuasive, but somewhere in between it all, the Court has to

 8    filter out what is true and what isn't.

 9         MR. DIBOISE:  I just want to make certain Your Honor

10    understands that the copy that is made by Real DVD cannot be

11    copied by anybody, right?  That copy, that -- so you copy it to

12    the thumb drive, you cannot copy from that thumb drive to

13    another hard drive, to another thumb drive.  It can only be

14    coped to one thumb drive.

15         THE COURT:  Or four.

16         MR. DIBOISE:  No.  You can play it back from that

17    one drive on the other four computers.  So there are not five

18    copies being made, there is one copy being made that can be

19    viewed on up to five computers.

20         THE COURT:  Well, you're downloading it onto a thumb

21    drive, right?

22         MR. DIBOISE:  Yes.

23         THE COURT:  Okay, what is downloading it?

24         MR. DIBOISE:  It's copied.

25         THE COURT:  Yes.  Voila.
```

1     **MR. DIBOISE:**  I'm saying one copy is made onto the

2    thumb drive, not five copies on five different thumb drives.

3     **THE COURT:**  Well, but if you've got another thumb

4    drive or you have some other kind of external hard drive,

5    you're downloading it to that one.  I mean --

6     **MR. DIBOISE:**  You would have to go through the whole

7    process of taking it off the DVD itself again to make another

8    copy.

9     **THE COURT:**  Well, you would have to -- all you have

10   to do is you got all those, you know, wonderful little plugs on

11   the side, whatever you want to call them --

12    **MR. WILLIAMS:**  Ports.

13    **THE COURT:**  Ports, right.  Thank you -- putting in,

14   you know, and accessing -- putting your thumb drive in on one

15   side, your can put your external hard drive in over here, with

16   any luck, you probably got a couple more ports you can use, and

17   each one of those you are downloading separately.

18    **MR. DIBOISE:**  Can't do that.

19    **THE COURT:**  Oh, well --

20    **MR. DIBOISE:**  You can copy it to one device.

21    **THE COURT:**  Talk to your expert, then.

22    **MR. DIBOISE:**  My experts and Mr. Buzzard says that

23   in their declarations.

24    **THE COURT:**  Then I would like to have another expert

25   questioned -- or I would like to question them, because I think

```
 1    that's a --

 2              Do you agree, Mr. Singla, with what I just said?

 3              MR. SINGLA:  No, Your Honor, with that exact

 4    statement I do not agree.  In fact, there's a declaration --

 5              THE COURT:  Do you agree with him?

 6              MR. SINGLA:  I don't agree.

 7              THE COURT:  You agree with me?

 8              MR. SINGLA:  Yes, Your Honor, I agree with you.

 9              THE COURT:  That's what I wanted you to say.

10                        (Laughter.)

11              THE COURT:  You don't have to, you don't have to,

12    but tell me if --

13              MR. SINGLA:  No, the Court's exactly right.

14              THE COURT:  I mean, this is -- I can't believe what

15    I'm hearing.

16              MR. SINGLA:  Yeah, the Court is exactly right.  In

17    fact, our experts -- this is in their literature.

18              THE COURT:  If I take out one thumb drive and put

19    another thumb drive in, I'm going to have to download it again.

20              MR. DIBOISE:  Yes, you have to make another copy.

21              THE COURT:  I make another copy.

22              MR. SINGLA:  Exactly.

23              THE COURT:  Yes.

24              MR. DIBOISE:  Of --

25              THE COURT:  Is that the magic there, another copy?
```

```
 1              MR. DIBOISE:  But, that copy still can only be
 2   played -- it doesn't do you any good to have to have another
 3   copy.  It can only be played on the same five computers.
 4              THE COURT:  Well, that's what I would like to find
 5   out.
 6              MR. DIBOISE:  Well -- I understand but, Your Honor,
 7   that is what our declarants say.  They don't dispute that they
 8   say that.
 9              THE COURT:  Well, every expert says something that
10   satisfies their client.  And I, you know, and the expert on the
11   other side will say something to satisfy their client.  I would
12   like to be able to get to the truth.
13              MR. DIBOISE:  I understand that, Your Honor, but --
14              THE COURT:  To the extent that you are going to let
15   me --
16              MR. DIBOISE:  I --
17              THE COURT:  And believe me, you will let me.
18                   (Laughter.)
19              MR. DIBOISE:  I will, of course, Your Honor.  I'm
20   just saying that Mr. Buzzard was the person who had the specs
21   in front of him, who designed and implemented the Real DVD, and
22   is the person who had in front of him the specifications.
23   Mr. Kelly did not have in front of him, I believe, the actual
24   technical specifications.
25              THE COURT:  We'll get to the bottom of it, I'm sure.
```

```
 1              Is there anything else that needs to be addressed
 2   today?
 3              MR. DIBOISE:  Depends on who your thoughts are about
 4   setting another hearing.
 5              THE COURT:  Well, why don't you talk among
 6   yourselves.  Let's take a short break and see if you can talk
 7   among yourselves.
 8              There is a period -- and you can talk to
 9   Mr. Bowser -- there is a period of time coming up fairly soon
10   when I'm not going to be available for a short while, so I
11   think what we have to do is keep the TRO in place until we have
12   a hearing.
13              MR. DIBOISE:  Your Honor, can we be heard on that
14   issue with respect to --
15              THE COURT:  Not right now, we'll take a break.
16              MR. DIBOISE:  That's fine.
17              MR. SINGLA:  A procedural question.
18              THE COURT:  Yes.
19              MR. SINGLA:  What is the Court -- is the Court
20   envisioning a hearing with experts on both sides, and we are
21   trying to get timing for that?
22              THE COURT:  Possibly.
23              MR. SINGLA:  Okay.
24              THE COURT:  If you have some other thoughts or -- as
25   I said, I will possibly appoint my own expert --
```

 1          **MR. SINGLA:**  Okay.

 2          **THE COURT:**  -- to essentially do what is necessary

 3   and report to the Court.

 4          And Mr. Klaus, you might even know who that expert

 5   might be, since he served the Court very well and he is

 6   available, I understand.

 7          **MR. DIBOISE:**  Might we know who that is, Your Honor?

 8          **THE COURT:**  Well, let me see what you have to say

 9   when you come back after the break, about ten minutes.

10          **MR. WILLIAMS:**  Thank you, Your Honor.

11          **THE COURT:**  Okay.  Thank you.

12               **(Recess taken at 3:41 p.m.)**

13               **(Proceedings resumed at 4:00 p.m.)**

14          **THE COURT:**  Just a couple of questions to see if I

15   can understand what you're saying.

16          First of all, is it unauthorized copying if, say,

17   you have the Real DVD player, and you -- I'm not talking now

18   about having bought a video or rented a video, or whatever, and

19   accessing in the fashion you have talked about, but you have a

20   friend who has several videos, and you want to -- you want to

21   save them and use your Real DVD player; can you do that?

22          **MR. DIBOISE:**  Yes.

23          **THE COURT:**  Okay.  And then you can essentially also

24   access it in the same way with -- if you've got the four

25   external hard drives, whatever they may be.  And I know you

```
 1    don't want to say that is copying --

 2              MR. DIBOISE:  No, no, I'm just not certain --

 3              THE COURT:  -- downloading.  And you could download

 4    those friends' videos or movies, right?

 5              MR. DIBOISE:  I understand, Your Honor.  I think you

 6    don't grasp -- when you said "four hard drives" is where I

 7    think that Your Honor has an incorrect exception.

 8              THE COURT:  I said external hard drives.

 9              MR. DIBOISE:  I understand.

10              THE COURT:  You know, I mean, they are very small.

11              MR. DIBOISE:  You could do that, Your Honor.

12              THE COURT:  You could download things to those or

13    you could download them to flash drives, or thumb drives, or

14    whatever you want to call them, right?

15              MR. DIBOISE:  You could.

16              If you owned a DVD --

17              THE COURT:  Um-hmm.

18              MR. DIBOISE:  -- just like you could give that DVD

19    to every friend that you had, 20, 100, a thousand, if you had

20    that many friends, you could give that DVD, and they could

21    share it, pass it along to everyone else, that's true.  The

22    copy that can be made from that is really -- it's exactly what

23    was in front of the Court in *Sony v. Betamax* because you can't

24    make a copy of your copy to pass on to another thousand friends

25    to -- and have them make another copy of a copy of a copy.  Our
```

1    system is locked to that first copy you make, or a second copy

2    you make, but the second copy you make can still only be played

3    on your five authorized machines.

4            And, I don't know whether this was in the minds of

5    the designers, or whatever, but it acts just like *iTunes* does

6    from Apple; you can authorize up to five of your computers to

7    play back digital content that you download in *iTunes*.  And the

8    number 5 is probably not magic, it was determined from probably

9    a product perspective as well as mindful of the ultimate --

10           **THE COURT:**  Somebody in marketing, probably.

11           **MR. DIBOISE:**  Correct.  So, but the copy you make is

12   locked in.

13           And Judge, this is not just sticking something in

14   the drive and, boom, it's copied. To download a movie of seven

15   gigabytes can take anywhere from, depending upon the speed of

16   your processor, four, six, seven hours, depending upon what

17   they have put on -- how much data is really in the disc.  So

18   it's not a process that just gets multiplied and multiplied

19   where you go and have a thousand machines hooked up, and you

20   just put one disc in and it's copied to a thousand, you know,

21   or burned to a thousand DVDs at a time, or something. That's

22   not this product.  It's really tied to you, the one user.  You

23   could, if you wanted to, make another copy, but again, that

24   copy on that machine still tied to your five machines.

25           **MR. WILLIAMS:**  Your Honor, our declarants --

1          **THE COURT:**  Yes --

2          **MR. DIBOISE:**  Now --

3          **THE COURT:**  Yes, go ahead.

4          **MR. WILLIAMS:**  I'm sorry.

5          Our declarants say that, as a matter of fact, it

6    only takes 20 to 40 minutes to download a movie.  They did it

7    using the actual product on several movies.  And I just wanted

8    to clear that up.  It's not a matter of four to seven hours per

9    movie.

10          **THE COURT:**  Well, some people have a lot of time on

11   their hands, and, unfortunately, it appears that there are more

12   and more people who have more time on their hands, regrettably.

13          And also, is it your contention that all of these

14   various accesses, if I may call them that, that are used, in

15   other words, all of these various encryptions that essentially

16   have to be bypassed -- not bypassed, but accessed, you know,

17   when you step through those various encryptions that are used,

18   all the protections that we saw, you know, for example, in the

19   animation, that all of those are maintained all the way

20   through, you know, whether you download this to another drive

21   or if you just maintain it on your computer, all of those

22   encryption and locks, so to speak, remain in place?

23          **MR. DIBOISE:**  Yes, to the extent that the slides you

24   saw are faithful to what the CSS license actually says.

25          **THE COURT:**  What does that mean?

1          *MR. DIBOISE:*  It means --

2          *THE COURT:*  I mean, there are various layers of

3     encryption, right?

4          *MR. DIBOISE:*  So, let's take the one that everyone

5     was talking about that was up here:  If you take the

6     authenticator having to access the DVD drive --

7          *THE COURT:*  Um-hmm.

8          *MR. DIBOISE:*  -- it doesn't say every time it has to

9     access the DVD drive at all, it just says when you do it, you

10    have to access and get the authenticator codes.  Every time

11    Real DVD plays back, it has to access that specific code that

12    was on the DVD but now resides on the hard drive to be able to

13    get the secret handshake so you can decrypt.

14         *THE COURT:*  How many of those so-called "codes" are

15    there, and are all of them retained?

16         *MR. SINGLA:*  Your Honor, if I could just --

17         *MR. DIBOISE:*  Yes.

18         *THE COURT:*  Hold on.

19         *MR. DIBOISE:*  I mean, I don't know the number of

20    them.  If we think through the process, I'll try and do it out

21    loud with you.

22         *THE COURT:*  Um-hmm.

23         *MR. DIBOISE:*  At the time the drive is inserted, the

24    disc is inserted into a DVD drive, it is locked, it receives a

25    access code from the DVD player --

1          **THE COURT:**  Um-hmm.

2          **MR. DIBOISE:**  -- and that unlocks the disc so it

3     spins.

4          Then, when it asks to access the content on the DVD,

5     it asks for you to, one, authenticate again that you are a

6     authorized person to be able to access the content on the DVD.

7     Then, it lets you access the actual content that's encrypted,

8     and it gives you the key to be able to decrypt that content.

9          As this information is passing back and forth

10    between the DVD and the computer where the -- the computer, the

11    display mechanism in this case, there is a bus, a road, pathway

12    that has -- that is encrypted.

13         **THE COURT:**  Um-hmm.

14         **MR. DIBOISE:**  That step is complied with.

15         When it gets onto the hard drive, the encryption is

16    retained on the bus as well, but that encryption resides in the

17    microprocessor within your computer, there is no external drive

18    that you access.

19         So, while it did comply with the specification when

20    it came off the DVD drive, because there is no drive there we

21    don't go through that step again because it's just in the

22    driver.  And when it plays back, it uses our authorized keys to

23    be able to decrypt the actual content on the DVD or on the hard

24    drive to be able to transform it into something that is

25    playable.  So each step is complied with.

1           **MR. WILLIAMS:**  Your Honor --

2           **MR. DIBOISE:**  The only step that they contend isn't

3   complied with is going to a DVD drive when you play back from

4   the hard drive.  And that's purpose of Mr. -- Dr. Felten's

5   declaration, is that you don't go to the DVD drive if you are

6   playing back from your copy that maintains all of these

7   protections, you just don't do it because you don't have to do

8   it.  I mean, it's not circumventing anything; it's just there

9   isn't a DVD drive to handshake with.

10          **MR. WILLIAMS:**  Your Honor --

11          **MR. DIBOISE:**  And, there is nothing in that spec

12  that we kept looking at that says you have to go back there

13  every time you play back.  It comes back to what the

14  permissible uses are within the license agreement.

15          **THE COURT:**  Well, let me ask you this:  Without a

16  license agreement, could you, without violating the copyright

17  laws, copy a movie to your computer's hard drive?

18          **MR. DIBOISE:**  Who's the "you," Your Honor?

19          **THE COURT:**  You, any of us.

20          **MR. DIBOISE:**  Yes, I can do it.

21          **THE COURT:**  You can do it, physically, without being

22  in violation?

23          **MR. DIBOISE:**  I can make a fair use copy of a DVD

24  without using Real DVD.

25          **THE COURT:**  Okay.

1              **MR. SINGLA:**  There is, of course, the DMCA, that

2     would prevent a consumer, anybody, from making a copy of a DVD.

3              **THE COURT:**  How many of those copies could you make?

4              **MR. DIBOISE:**  If one -- Your Honor, if I might

5     change this into the speculative consumer?  If one might, using

6     any of these other rippers, could make as many copies as they

7     had media to store them on --

8              **THE COURT:**  I'm talking about and not violate the

9     copyright laws.

10             **MR. DIBOISE:**  Oh, they could make one, maybe two,

11    maybe three.  Depends on what the spectrum of fair use is in

12    that context.

13             **THE COURT:**  Yes?

14             **MR. WILLIAMS:**  Your Honor, the point I was going to

15    make is -- well, let me deal with this last issue first.

16             A person could not legally make a copy of their DVD

17    onto their hard drive.  First, the copy that they would make

18    would not be a playable copy unless they used one of these

19    ripper-type softwares.  The copy would not be playable.  If

20    they were to make a copy for a so-called "fair use," the fact

21    that they are making a copy for a fair use using Real DVD

22    violates DMCA, that is our contention.

23             If you take the Real DVD out of the equation, my

24    understanding is that the copy that one could make onto their

25    hard drive from a DVD that they owned or rented, the copy that

```
 1   they made would not be a playable copy.

 2                THE COURT:  Is that what you understand to be the

 3   case?

 4                MR. DIBOISE:  You can make a copy without --

 5                THE COURT:  In other words, there would have to be

 6   some device, and it may be some device the violates the DMCA,

 7   right?

 8                MR. DIBOISE:  Right, you can make a copy without

 9   violating the DMCA of the DVD; whether you can play it back and

10   see something that is useful to see might, and probably does,

11   violate the DMCA.

12                MR. WILLIAMS:  And if I may --

13                MR. DIBOISE:  Unless you were authorized --

14                THE COURT:  Violation the copyright laws.

15                MR. DIBOISE:  Well, no --

16                THE COURT:  You are saying --

17                MR. DIBOISE:  Violates the DMCA.

18                THE COURT:  You would have to have a device that

19   allows you to do that and thereby violating the copyright laws.

20                MR. DIBOISE:  No, violating the DMCA.  The copyright

21   law is not violated; it's circumventing the encryption that is

22   against the law.

23                You could still make your --

24                THE COURT:  Okay, I see --

25                MR. DIBOISE:  -- fair use right --
```

1          **THE COURT:**  I see what you are saying.  Okay, I see

2     what you're saying.

3          **MR. DIBOISE:**  -- of the copy.  You have to come back

4     to the DMCA on that point.

5          Again, that point is crucial, because that is why

6     what Real DVD does is legal, because we are licensed to do that

7     decryption for playback.

8          **THE COURT:**  Now, you did not seem to have any

9     difficulty, though, in discussing these CSS specifications

10    in -- pretty much you didn't come right out and say it, but I

11    got the sense you don't disagree, let's put it that way, with

12    the fact that these specifications --

13                    *(Holding up document.)*

14         **THE COURT:**  -- are referenced in and therefore a

15    part of the license agreement; is that correct?

16         **MR. DIBOISE:**  Your Honor, you are asking an ultimate

17    legal question.

18         **THE COURT:**  Um-hmm.

19         **MR. DIBOISE:**  At this point in the case --

20         **THE COURT:**  You are a lawyer.

21                    **(Laughter.)**

22         **MR. DIBOISE:**  I understand.

23                    **(Laughter.)**

24         **MR. DIBOISE:**  At this point in the case, we haven't

25    examined all the arguments we might have to contend that some

1   of the super secret, you know, technical specifications that we

2   didn't see until after we signed the license agreement don't

3   form a part of the contract.

4          **MR. SINGLA:**  Your Honor, the document that the Court

5   held up is not super secret.  It was not filed under seal.

6   That's not one of these documents.

7          If you are asking about that document --

8          **MR. DIBOISE:**  Your Honor --

9          **MR. SINGLA:**  That is a public document.

10         **MR. DIBOISE:**  That document we saw and signed it.

11         **THE COURT:**  Yeah, okay, okay.

12         **MR. DIBOISE:**  But there is nothing in that document

13  that prohibits what Real DVD does.

14         **THE COURT:**  Okay.

15         Yes?

16         **MR. WILLIAMS:**  Your Honor, may I just go back to

17  what Mr. DiBoise was saying when he recounted the different

18  protections just a couple of minutes ago and make just this

19  point:  When I heard him describe it this last time after we

20  came back from the break, it's fairly clear to me, I think,

21  that we are in total agreement, actually, and that our experts

22  are in total agreement with what they said, which is to say

23  that when they first access the DVD, they use all of these

24  different encryption codes and protections.  But, just as I

25  said before the break, once the copy is made, those

```
 1    protections, authentication, bus encryption, et cetera, are not
 2    done by Real DVD.
 3              And I believe I heard Mr. DiBoise say, and the
 4    record will --
 5              THE COURT:  And, by the copy that is then on the
 6    hard drive.
 7              MR. WILLIAMS:  Correct.  And, so once it's on the
 8    hard drive, I believe I heard him to say that the only
 9    authentication that takes place is a Real DVD authentication as
10    opposed to a CSS authentication.  And, I believe I heard him
11    say that the justification for that is that, well, we aren't
12    using a hard drive anymore, just as in paragraph 52 of
13    Dr. Felten's declaration which I pointed the Court to, we don't
14    need to use those authentication measures because we aren't
15    using a hard drive --
16              MR. SINGLA:  A disc drive.
17              MR. WILLIAMS:  A disc drive.  Pardon me.
18              So, I believe that the parties are in agreement on
19    that.  And, I just wanted to let the Court know.
20              MR. SINGLA:  Right.  It's like they are saying they
21    don't need it:  If you took the lock off the door, and now you
22    say I don't need to use the key, I don't need to do anything, I
23    haven't circumvented anything, they have -- in the copy they
24    made, I think Mr. Williams is exactly right, that Mr. DiBoise
25    now agrees that the copy that they made no longer has bus
```

```
 1   encryption, the authentication protocols, the drive locking.
 2   None of that is there anymore.
 3              THE COURT:  I understood that it had one layer of --
 4              MR. DIBOISE:  Your Honor --
 5              THE COURT:  Of encryption.
 6              MR. SINGLA:  Yes.
 7              MR. WILLIAMS:  That's true.
 8              THE COURT:  In other words --
 9              MR. DIBOISE:  I'm sorry, Your Honor, there are two
10   layers of encryption --
11              THE COURT:  Two layers?
12              MR. DIBOISE:  On the Real DVD.
13              Let's come back to this analogy.
14              THE COURT:  Um-hmm.
15              MR. DIBOISE:  It isn't that you take the lock off
16   the door. The answer to that analogy is there is no door,
17   because you don't have to go through it.
18              The actual bus authentication and the actual
19   authentication with the DVD itself is maintained by Real DVD
20   when it accesses the DVD in the DVD drive.  When it goes to the
21   copy on the hard drive, there is no bus going to a DVD drive
22   and no DVD drive there for us to authenticate against.
23              MR. SINGLA:  There is a bus, Your Honor --
24              MR. DIBOISE:  Do you mind, sir?
25              THE COURT:  Hold on, please.
```

1          **MR. DIBOISE:**  There is no DVD drive bus for us to

2     authenticate against, that's the point.  They are trying to

3     take that clause and say that that requires a DVD and a DVD

4     drive in order for you to comply with the specifications, but

5     that specification does not say that.  It just says when you

6     access the DVD drive, you must perform these steps, and Real

7     DVD does that.

8          Now, when Real DVD accesses the copy on the hard

9     drive, we take their encryption and then re-encrypt it again,

10    using our own proprietary encryption process, which is a lot

11    harder -- well, frankly, Your Honor, it hadn't been cracked.

12    And that is in Dr. Felten's declaration, that the AES128

13    encryption scheme has never been cracked.  And that is what we

14    put -- when it's stored on our drives, that encryption sits on

15    top of the CSS encryption.  And, the only bus that exists is

16    between the hard drive on the system and the microprocessor.

17         And, over that bus, again, it's the AES128

18    encryption protects any transfer that is going on there from

19    Real DVD.  There is no a way that somebody could circumvent our

20    system to be able to stream out --

21         **THE COURT:**  When you say "AES," what do you mean by

22    AES?

23         **MR. DIBOISE:**  That is a specific encryption program

24    that is utilized by Real DVD to protect the copy that is placed

25    onto a hard drive.  Dr. Felten describes that in his

1    declaration, paragraph --

2            *THE COURT:*  Is there any of the original encryption

3    that is left?

4            *MR. DIBOISE:*  It's all there.

5            So we encrypted --

6            *THE COURT:*  Hold on.

7            Is there any of the original encryption that is left

8    on top of which -- well, in other words, you would have to

9    access through this AES encryption, which you have it now on

10   your hard drive.  And then, having penetrated that, do you

11   also, then, have to penetrate the original encryption that is

12   on the disc?

13           *MR. DIBOISE:*  Yes.

14           *THE COURT:*  Okay, somebody at your table agrees with

15   you.

16           *MR. SINGLA:*  That's right, Your Honor.

17           The thing is, there are these layers of

18   protection --

19           *THE COURT:*  Right.  So some of the layers are gone.

20           *MR. SINGLA:*  One layer is preserved; the other three

21   are gone.  I mean, there is not really a dispute here.  Their

22   argument is that is okay because we no longer have a drive

23   involved so we don't need to do it; our position is, I mean,

24   just very frankly, our position is, no, those are parts of the

25   CSS system.  We use the drive to enforce them.  When you take

1   the drive out of the loop, you have removed, deactivated,

2   impaired these protections we put in place.  They say there is

3   no longer a drive, so we don't need to do it.

4          So I think, really, there is not a dispute of how it

5   works, sounds like.  I think we agree with what most of what

6   Mr. DiBoise is saying.  It's really is that circumvention from

7   our perspective; that is, you take the component that enforces

8   a lot of the protection, if you take it out of the loop, to us

9   that is circumventing, impairing the protections.  They say

10  it's not.

11         **MR. DIBOISE:**  Your Honor, the -- every DVD player

12  today -- I'm sorry, yeah, DVD player, stand-alone, buy it from

13  Matsushita, wherever you buy it from, takes that authentication

14  key and sticks it in its buffer.  And, from that, pointed

15  forward as the movie is played back, it's not going to the

16  lead-in area to read the keys, but looking to its unencrypted

17  buffer.

18         So, if what they are saying is true here, then every

19  other DVD player is, you know, utilizing and not accessing the

20  actual lead-in area of the DVD when they play it back.  It's

21  accessing the RAM of either the player or the computer that you

22  are playing it back on.

23         That's -- the reason I bring that up, and it's

24  hyper-technical, is because the license agreement permits DVD

25  players to do that.  It doesn't say you shall not do that.  And

1    they, those DVD player manufacturers use and implement the CSS

2    license to preserve the encryption content, just as Real DVD

3    uses and implements, which is what the contract says, those

4    encryption processes to make certain that no one can take that

5    copy and make thousands of other copies and play them back.  We

6    lock down the copy to the system that makes the copy.

7              **THE COURT:**  Well, but, do the same provisions that

8    apply to manufacture of a DVD player under this agreement apply

9    to someone who manufactures software of this nature, of the

10   nature we are talking about here?

11             **MR. DIBOISE:**  There are -- sorry, I don't know if

12   you are finished.

13             **THE COURT:**  Yeah, no, that's okay.

14             **MR. DIBOISE:**  There are additional specifications, I

15   believe, technical specifications that must be complied with by

16   the stand-alone DVD players that we, as a software

17   implementation, don't have to comply with.

18             Is that correct?

19             **MR. SINGLA:**  That's right.  And visa-versa; there

20   are specifications that the software players comply with that

21   the hardware players don't have to comply with because it's a

22   different environment, different risks of copying, different

23   ways they work.  So there is overlap in the specifications, but

24   there is differences also.

25             **MR. WILLIAMS:**  And the reason -- if I may, the

1    reason why it matters, that those layers of bus encryption and

2    authentication that are removed after the copy is made, the

3    reason that matters is that the whole purpose of the CSS system

4    is to prevent unauthorized consumer copying.  It all works

5    together so that the consumer may not make a copy.

6            Under this system, the consumer is allowed to make a

7    playable copy where you don't even have a DVD in the system

8    whatsoever.  That is the vice.  That is the reason why it is a

9    violation.

10           And, you don't have to take our word for it, there

11   are those provisions we put in front of you, the technical

12   spec, that talks specifically about the personal computer

13   environment and the notion that the whole purpose is to prevent

14   digital-to-digital copying in the personal computer

15   environment.

16           *THE COURT:*  Now, where does this leave us with

17   respect to what we need to do what we need with respect to a

18   motion for preliminary injunction?

19           *MR. DIBOISE:*  Your Honor, before we get there --

20           *THE COURT:*  We are on the tail end of, or in the

21   middle, I guess, of a TRO here.

22           *MR. WILLIAMS:*  We did some discussing in the

23   hallway.

24           *THE COURT:*  What did you come up with?

25           *MR. DIBOISE:*  Your Honor, part of it -- I think

1   we're pretty much in agreement with what I -- the parts of our

2   discussion that we have heard.  I think it should be a

3   reasonable schedule, to get the information, present it to you

4   in an orderly fashion, and with enough time for us to make

5   certain that we can present to you clear arguments and clear

6   facts.

7            **THE COURT:**  And testimony.

8            **MR. DIBOISE:**  Sorry?

9            **THE COURT:**  And testimony.

10           **MR. DIBOISE:**  And, we are also happy to embrace your

11   idea, if the Court wants its own technical expert to vet what

12   each side presents, we are happy to do that as well.  And, I

13   think we could probably work out an agreement subject to

14   whatever your court calendar is like.

15           But the issue, from our perspective that I didn't

16   want to lose sight of is the harm, the balance of the harms

17   here if you continue the temporary ban.  We don't believe that

18   they are suffering anywhere near the harm that Real suffers by

19   continuing this temporary ban on the availability of the

20   product.

21           Crucial issues on that are two-fold.  One, it's the

22   incremental harm that Real DVD presents to them that you should

23   take into account, not this billions of dollars of copying the

24   are thrown about by the MPAA and other entities.  It is solely

25   the incremental threat caused by Real DVD.

1          That's the point that Mr. Klein, Dr. Bresnahan's --

2    sorry, Dr. Klein and Dr. Bresnahan's testimony to you in our

3    declarations.  There are so many copies out there.

4          If there was one thing that I would suggest that

5    Your Honor read, we submitted in Mr. Klein -- Dr. Klein's

6    original declaration, in Dr. Bresnahan's declaration in our

7    opposition brief, there's an article, a short review in *PC*

8    *Magazine*, a mainstream computer publication reviewing this

9    product, in which the author literally says that comparing Real

10   DVD to be locked down to the same extent as Hannibal Lecter was

11   locked down; this product does not present any incremental harm

12   to the studios.  You can go to download.com and find dozens of

13   DVD rippers that will do everything and plus that Real DVD

14   does.

15         So, unless they can point to any specific

16   incremental harm caused by our product, they can't show any

17   injury.  And there is no injury caused specifically by this

18   product.  The only thing that they say in their briefing is

19   that there is some reputational harm, that some how or another

20   RealNetworks is such a force in the marketplace that we are

21   going to charge the consumer's perceptions about what is or

22   isn't available -- what is or isn't legal about making a copy

23   of a DVD.

24         I mean, if you step back and think about it, every

25   movie that you watch tells you not to make a copy.  They and

1    the studios might empower -- in controlling this marketplace

2    has so much more effect than RealNetworks can possibly have on

3    this issue.

4              You know, we have a product; other people are out

5    there readying another product that is going to look just like

6    it.  We are heading into the Christmas season; we anticipate

7    making at least half of our profits off this product by being

8    able to set sell it, at this point in time, as we head into the

9    season.  And, to stop us from being able to make sales now when

10   the harm to them, you know, I don't think they can really even

11   quantify it in the context of whether or not we cause any more

12   harm or any incremental additional harm.

13             And then finally, on the harm issue, you know, if we

14   did, I think that they would be able to have experts and people

15   try and come up with a methodology to quantify it.  They can

16   quantify the overall harm and have it come back to specific

17   countries, specific, you know, profiled users.  And, I think

18   that there is obviously a way to take survey data and other

19   methods to be able to quantify this harm, should they prevail

20   at trial, not at a TRO proceeding, that the harm in the short

21   term is much greater to RealNetworks than it is to the studios.

22             *MR. WILLIAMS:*  Your Honor, the harm --

23             *THE COURT:*  Yes.

24             *MR. WILLIAMS:*  -- to the studios is enormous, as the

25   Court, I believe was concluding at the last hearing, and here

1    is the reason:  In the last month, last month 175 million DVDs

2    were rented, and another 30 -- or, excuse me, 50 million

3    newly-released DVDs were purchased.  What this product allows

4    people to do is to rent a DVD and make the copy without having

5    to purchase it, that is point number one.

6            Point number two:  There are already 4000 -- 3000,

7    excuse me -- copies of this product in the marketplace; there

8    will be thousands and thousands more, presumably, if they are

9    allowed to sell it.  Every single person who buys it will have

10   the unlimited capacity to make copies of DVDs that they own,

11   rent or borrow.  That is undisputed.

12           To the extent there is a perception issue that we

13   have raised, here's the perception, and it's a little different

14   than I think Mr. DiBoise said the perception is, that right now

15   those who rip or have this ripping software, people understand

16   that that is illegal.  The entire advertising program of this

17   company is that this particular program is 100 percent

18   legitimate, 100 percent legal.  They say you may now make

19   copies of DVDs in a legal fashion.

20           If we could just put up Slide No. 9?

21           The advertisements all say that.  So, if they are

22   allowed to put this product on the market as it has been

23   marketed, they are trying specifically to take advantage of the

24   fact that there is a -- something different, something new

25   about this product, i.e., that it is 100 percent legitimate and

1  legal.

2          And they are basing all of that, of course, on the

3  **_Kaleidescape_** decision, which is not a decision that, by its

4  terms, even dealt with federal law, which is before Your Honor.

5          And so, in order to put this out on the market, what

6  would happen is that all of the current vehicles that people

7  have to download, rent a DVD onto their hard drive of their

8  computer, which can be done through _iTunes_ or amazon.com, for

9  those our clients get paid.  But, going into the future, if the

10  Court -- it's already lost three thousand of them, but if the

11  Court were to take off the TRO, then they continue to sell, and

12  people don't have to get rentals or purchases onto their

13  computer hard drive by paying our clients.

14          So, it's not just a harm to the studios, it's the

15  harm to the player manufacturers as well because the player

16  manufacturers go through this process of getting a license.

17  They are now going to be circumvented as well because people

18  will not want to use their products because they can use Real

19  DVD, a 100 percent legitimate, supposedly, program that allows

20  people to do the downloads.

21          So, the question is, what are the harms to them

22  under this scenario?  And the harms to them are purely

23  self-inflicted.  We suggested that before they release this

24  product that they wait and do exactly what we are doing right

25  now, have briefing, figure it out whether this thing is legal.

```
 1              Did they wait?  No.  They put it out on the market
 2    anyway, despite the fact that even though Mr. Pomerantz, our
 3    partner, wrote them and said, look, why don't we just have a
 4    shortened briefing schedule to figure this out in front of a
 5    district judge, and they said, no.  Why?  Because they wanted
 6    to get it out on the market.
 7              One point I haven't made, and this goes to the
 8    question of irreparable harm.
 9              If we could have Slide No. 12, please.
10              This entire framework, Your Honor, is based upon the
11    notion that there is a wink and a nod to people in the
12    marketplace about what they can do.  Slide No. 12 that we are
13    showing right now is a quote from the *Seattle Times* from
14    Mr. Rob Glaser, who is the CEO of RealNetworks.
15              What Mr. Glaser says is the equivalent, we would
16    argue, to a wink and a nod.  He says, look, we have this
17    technology, we ask people, we say to them, "If you want to
18    steal, we remind you what the rules are and we discourage you
19    from doing it, but we are not your nanny."
20              I mean, it might as well be, what happens in Vegas
21    stays in Vegas.  You don't tell my mom; I won't tell yours.  He
22    might as well be winking in the photo because the point is that
23    although they say that the purpose is for people who buy the
24    DVD, the technology doesn't have any way of determining whether
25    someone bought it or ripped it or borrowed it or rented it.
```

1    There is no way they can do that.  So, the people who will be

2    using the product under this system are people who have been

3    told it's legitimate and can use it in this other way.

4            The harm to the studios, to the manufacturers, would

5    be irreparable because they are losing for every single sale,

6    which we can't quantify.  Once they're purchased, once people

7    download this product, it's on their computer forever.  There

8    is no way that we can quantify how many DVDs they copied once

9    it's on the computer, the technology does not allow that.

10           So our ability to calculate those lost profit

11   damages is very suspect, and that is the reason why there would

12   be irreparable harm, and the TRO should be maintained for this

13   short period while we figure out -- while Your Honor satisfies

14   herself --

15           **MR. DIBOISE:**  The period is not going to be that

16   short, Your Honor.  And that is part of the problem here, it's

17   probably going to be 4 to 6 weeks.  We don't know what your

18   schedule is.  It may be longer, depending upon your schedule.

19           With respect to some of these comments, I mean, if

20   you go to *Google* and put in "DVD ripper" and just go to the

21   sponsored page sites, click on them and see the number of

22   rippers that are available that all say they are 100 percent

23   legal, legitimate.  They market it the exact same way.  There

24   is no difference in the way that the bad rippers market their

25   product versus Real DVD.

1          And, in fact, if you look at our actual product

2     literature that was submitted in the declaration of

3     Jacqueline Lang, we say right out front, you can only copy

4     this, we say only -- it's the reverse, if you don't own -- it

5     asks you if you own the DVD, if the answer is no, you are

6     supposed to press play, not save.  We say you may not use your

7     DVD to copy others -- I mean, sorry, your Real DVD to copy

8     others.

9          The reputational harm issue is too ephemeral as well

10    as it's going to be subject to so many different

11    interpretations.  But the key thing is, they are going to be

12    able to tell from the worse case scenario from their

13    perspective, rent, rip and return, if there is a significant

14    decrease in the number of purchases versus rental they are

15    going to be able to see that.  And then, we are going to have

16    something we can talk about to be able to present to you and

17    say, hey, this fear is Real.

18          You know, we have out there a Real world in which if

19    you choose to make a copy of a DVD you can do it.  That's what

20    these sales statistics and rental statistics all reveal.  And

21    let's see if the products out there in a month or a month and a

22    half from now, if there a variance in those numbers.  If there

23    is not --

24          **THE COURT:**  But the purpose of a TRO is not to

25    provide some control data for some survey or a study.  I mean,

```
 1   the question is whether, you know, issues such as likelihood of
 2   success on the merits and balance of hardships, you know all
 3   those factors.
 4            MR. DIBOISE:  Right, but it's also to preserve the
 5   status quo.
 6            THE COURT:  Well, the problem is how the status quo
 7   came to be, for one thing.  So, I am going to extend the TRO,
 8   and here are the reasons:  Because I'm not satisfied that, in
 9   fact, this technology is not -- is not in violation of the
10   DMCA; that, in fact, it does comply with what is a very lengthy
11   contract and some specifications that apparently there is some
12   dispute about, you know, whether they apply or not, but
13   certainly, they raise questions as well.
14            There was an opportunity before rushing to market to
15   have had these issues revolved, but that didn't happen.
16            MR. DIBOISE:  Your Honor --
17            THE COURT:  And now, having rushed to market, you
18   throw yourselves on the Court -- hold on, I'm not finished.
19            MR. DIBOISE:  I understand, Your Honor.
20            THE COURT:  And, when I finish, there will be no
21   need to say anything.
22            MR. DIBOISE:  But there is a factual
23   misunderstanding.
24            THE COURT:  Hold on.
25            There was a rush to market when there didn't need to
```

1    be a rush to market.  You could have waited to have that

2    decision made.  Having only been out in the market a short

3    period of time, I think the harm is far less to RealNetworks in

4    this case than it would be to having who knows how many copies

5    out there, which might then be found to be unauthorized copies.

6          And, it's not very persuasive to say, well, you see,

7    you know, you're not saying maybe we're legitimate, you're

8    saying you are legitimate but comparing yourselves to all those

9    illegitimate companies out there.  And this ought to be looked

10   at more favorably because you've got all those other people who

11   are ripping and doing these illegal things, and, therefore, I

12   should, apparently, in looking at the balance of hardships and

13   looking at whether -- you know, who is going to suffer the

14   greater injury, looking at the fact that you're apparently

15   going to supplant some part of the illegal market.

16         The problem is that there are serious questions here

17   about copyright violations, about DMCA violations, violations

18   of this contract, by a company who rushed to market and didn't

19   wait for any kind of an adjudication, by a company that can

20   stop right now, early in the inceptions of what it's doing,

21   rather than having us trying to figure out, down the road, how

22   many copies, and something that may be very difficult to

23   determine, how many copies of copyrighted material are out

24   there, and what the injuries are that are sustained as a result

25   of that.

```
 1              I'm not persuaded that the TRO should not stay in

 2     place.

 3              MR. DIBOISE:  Understood.

 4              THE COURT:  So, it will stay in place.

 5              The question is, what needs to be done in order to

 6     prepare for a hearing.

 7              MR. DIBOISE:  Your Honor, accepting your order --

 8              THE COURT:  Yes.

 9              MR. DIBOISE:  And understanding that the TRO stays

10     in place.

11              THE COURT:  Um-hmm.

12              MR. DIBOISE:  One, I just want to make certain the

13     Court is clear that there was at least about a 30-day period of

14     time in which the parties discussed this.  And --

15              THE COURT:  I understand that.

16              MR. DIBOISE:  Fine.

17              THE COURT:  I understand.

18              MR. DIBOISE:  There was no rush, it just was the

19     earliest point --

20              THE COURT:  Nobody rushed into court during that

21     period of time to try to get it resolved.

22              MR. DIBOISE:  We couldn't.  There was an agreement

23     not to.

24              THE COURT:  Well, okay.

25              Then once that stand -- once that standstill
```

1   agreement came to an end, instead of going into court, you

2   rushed to market.

3           And, you are the new boys on the market, and I think

4   that there is far less -- I mean, it's not like some startup

5   company that doesn't have, you know, other -- other products

6   out there on the market, and so forth.  But, the copying --

7   bringing back copies -- it's impossible to bring back that

8   which has been copied after it's been copied and copied

9   illegally, so we need to get those issues resolved.  And, I'm

10  not persuaded to my satisfaction that they are resolved in

11  favor of RealNetworks at this point.

12          So what do you need to know and do before we could

13  have such a hearing?  Do you need to take any depositions of

14  any of the experts?

15          *MR. SINGLA:*  Yes, Your Honor.  We have been thinking

16  about this quite a bit during the break and since the break,

17  and as I understand what the Court is asking, if I'm

18  understanding correctly, the Court wants to get to the bottom

19  of what exactly does Real DVD do.

20          *THE COURT:*  And I think cross-examination helps, you

21  know?

22          *MR. SINGLA:*  Certainly, Your Honor.

23          *THE COURT:*  There is something about that process

24  that seems to help, you know?

25                    **(Laughter.)**

```
 1              MR. DIBOISE:  I think there are some folks in

 2    England the came up with that.

 3              THE COURT:  Yeah, yeah.

 4              MR. SINGLA:  We are all for cross-examination.

 5              THE COURT:  Doesn't always get to the truth, but it

 6    sheds light, anyway.

 7              MR. SINGLA:  We are at a real disadvantage on that

 8    issue because they obviously know exactly how their product

 9    works, and we don't.  We haven't done any discovery.  Our

10    papers and our arguments have been based on -- as I said, we

11    have taken them at their word about how their product works.

12    We have had no way to test it.  And there is a lot of details

13    about it that we haven't -- you know, they are not in the

14    product or promotion literature.

15              So, to answer the question the Court has raised, as

16    I understand it, we are going to need details about their

17    product, design documents, specifications, source code.  I

18    think if the Court appoints it own special master or expert in

19    the case, he is going to need their source code and have time

20    and the ability to analyze and see exactly what it does.

21              For example, just as an example, they say they

22    maintain the CSS encryption on the copies; we haven't disputed

23    that because we believe them.  But, we have no way to test that

24    right now.  If we are going to litigate this and have a

25    hearing, we need the ability to make sure that's true.  And the
```

1    only way to do that, that I know of, is to have access to their

2    source code, to their design specifications, and to be able to

3    depose their people.

4              *THE COURT:*  Would it move things faster if, instead

5    of all of that, I just appointed a court-appointed expert that

6    everybody agreed to do the delving and digging, and so forth,

7    to make a report?  But that, then, that would be in lieu of

8    having your experts testify and, you know, having them deposed,

9    and all of that, and I don't know whether you want to do that.

10             *MR. SINGLA:*  Our view, Your Honor, we have thought

11   about that, is that would make sense, except I think the

12   difficulty for the special master is not going to be he is not

13   going to have a record on which to make the analysis.  I think

14   that we're going to need to -- he is going to need the same

15   data and documents.

16             *THE COURT:*  Right.

17             *MR. SINGLA:*  But, I think he is also going to need

18   deposition records, testimony.  So we may get source code and

19   design records to understand those, even for him to understand

20   them.

21             I've been involved in cases involving source code

22   and these kinds of design specifications, and someone like

23   Mr. Buzzard, he might not be the right person, whoever it is,

24   we will need to depose that person and make sure we understand

25   what is going on and make sure the special master can then, you

1  know, read the deposition and make sure he understands what is

2  going on so he can report back to the Court.

3          So that is our concern, is that we are going to need

4  some discovery from RealNetworks.

5          **MR. DIBOISE:**  Your Honor, we don't dispute this.  I

6  think we don't need to take the Court's valuable time on this

7  sort of issue.  We agree that discovery is appropriate as long

8  as it's going to be equal, as long as the issues we delve into

9  are equal.

10         **THE COURT:**  That's fine.  The problem is that we

11  have a TRO --

12         **MR. DIBOISE:**  We understand, Your Honor.

13         **THE COURT:**  -- and time limits.  And it's going to

14  have to be extended beyond that.

15         **MR. DIBOISE:**  We understand that.

16         **THE COURT:**  You want to stay here today, and work

17  with Mr. Bowser on your schedule --

18         **MR. DIBOISE:**  That sounds terrific, Your Honor.

19         **THE COURT:**  -- and a date with him?  Although he has

20  family responsibilities as well, so --

21         **MR. DIBOISE:**  Your Honor, the real issue is what

22  your availability is.

23         We have talked about it, they have talked about it

24  with us; we believe it's going to be in November, you know, or

25  maybe even late November.  So it's just a question of trying to

```
 1    match our schedules with counsels' schedules and with the

 2    Court.

 3              THE COURT:  After -- I'll be back here after

 4    November 17th.

 5              MR. DIBOISE:  I think that is enough to tell us what

 6    we need to do.

 7              MR. SINGLA:  Perhaps what we could do is counsel and

 8    we could speak in the next couple of days, try to work out,

 9    hash out a process.  They can tell us how long they need to

10    give us the discovery we need.  We can think about exactly what

11    we would ask for and what your master, if you appoint one,

12    would need.  We can talk about whether the special master makes

13    sense, try to map out the time line, and maybe have a phone

14    conference, or something, and try to figure out a date.

15              Does that make sense?

16              MR. DIBOISE:  Sure.  The only thing I can think of

17    that would involve the Court is if we can't agree on whatever

18    discovery everybody wants.

19              THE COURT:  Let's keep it to what is absolutely

20    necessary for preliminary injunction.  And, we might not even

21    need to plug a special master in, at this point, but see how

22    things look in connection with a preliminary injunction and

23    then make a ruling there.  And, if we need to go beyond that

24    with the special master, we could do it at that time.

25              MR. DIBOISE:  I don't want to sandbag anyone:  We
```

```
1    also have a slight problem in getting to the DVD CCA CSS
2    license specifications.
3              THE COURT:  Um-hmm.
4              MR. DIBOISE:  The entity is a defendant, but hasn't
5    appeared yet.  They have very onerous controls over who can see
6    the documents from the DVD CCA.  Half of the board of the DVD
7    CCA I believe is represented by their clients.
8              We are going to need access to those folks, as well
9    in the discovery process, so I don't want to have a fight and
10   come back to you, we might as well have it now, if they are
11   going to contest our ability to take testimony from the folks
12   who implemented it and wrote these specifications.
13             And, I think we are happy to enter into whatever
14   protective order we need and present it to Your Honor to
15   preserve the security of this information, but we need to have
16   access to these folks.
17             THE COURT:  Well, first of all, if there are DCAA --
18             MR. DIBOISE:  DVD CCA.
19             THE COURT:  DVD --
20             MR. DIBOISE:  DVD CC --
21             THE COURT:  The DVD I got, but it's how many As?
22             MR. DIBOISE:  One A.
23             MR. SINGLA:  Copy Control Association.
24             THE COURT:  Oh, oh, that's easy, then.  I was
25   putting on more As.  Okay, CCA, let's call it CCA.
```

1                  If, in fact, there were CCA specifications that you

2       did not see, then I don't know how you can be held, you know,

3       liable for not complying with them.

4                  **MR. DIBOISE:**  We are talking about the lawyers here.

5                  **THE COURT:**  No.

6                  **MR. DIBOISE:**  We haven't seen them.

7                  **THE COURT:**  Oh, you haven't seen them.

8                  **MR. DIBOISE:**  Mr. Buzzard, who has submitted a

9       declaration, has seen them.

10                 **THE COURT:**  And the principles of the company, they

11      signed off, they saw them, et cetera.

12                 **MR. DIBOISE:**  No, they didn't see them.  So there

13      are very few people that the DVD CCA actually permits --

14                 **THE COURT:**  I see.

15                 **MR. DIBOISE:**  -- access to those specifications.

16                 So, for example, as I understand it, the lawyers to

17      my right here don't have access to the complete set of

18      specifications, either.

19                 **THE COURT:**  Okay, I noticed, for example, on the

20      agreement there were several employees; I have no idea what

21      their respective positions were, but I assume they were

22      employees of RealNetworks that signed off on these --

23                 **MR. DIBOISE:**  Yes.

24                 **THE COURT:**  -- license agreement authorizations.

25                 **MR. DIBOISE:**  To make that issue crystal clear --

1          **THE COURT:**  Um-hmm?

2          **MR. DIBOISE:**  Exhibit G that we talked about a

3     lot --

4          **THE COURT:**  Yeah?

5          **MR. DIBOISE:**  -- is in the technical specifications.

6          **THE COURT:**  Um-hmm.

7          **MR. DIBOISE:**  The only lawyers that got to see them

8     before they were filed with the Court --

9          **THE COURT:**  Um-hmm --

10         **MR. DIBOISE:**  -- were the folks for the studios.

11    The DVD CCA would not permit us to see that document.  And the

12    first time saw it was when it was filed on September 30.

13         **THE COURT:**  But my question is who in the company,

14    then, saw this?  Because how could you comply with something if

15    you never saw it?

16         **MR. DIBOISE:**  Four to five engineers.

17         **THE COURT:**  I see.  And is that -- would that be the

18    people that signed off on these authorization agreements?

19         **MR. DIBOISE:**  Yes.

20         **THE COURT:**  I see.

21         So, first of all, certainly, you should have access

22    to, and I'm sure you can come up with a confidentiality

23    agreement that would allow you to have access to this

24    information so that you can review it in preparation.  But, I

25    say that if, in fact, the persons who signed off and agreed to

```
 1  this on behalf RealNetworks never saw certain documents, I'd
 2  have a real problem with saying that they are bound by those
 3  documents because that -- but that's another issue, I guess.
 4          MR. DIBOISE:  It may not be.  We'll have to wait and
 5  see, Your Honor, what comes out.
 6          THE COURT:  But certainly for those that you have
 7  not been privy to and that you need to have, you should be able
 8  to come up with some kind of air protective order.
 9          MR. SINGLA:  Your Honor, if I could just try to --
10          THE COURT:  Yes.
11          MR. SINGLA:  Some facts on this:  So there is the
12  license; there is the procedural specifications; that is all
13  public, we all have that.  And then, there are these technical
14  specifications.
15          THE COURT:  Um-hmm.
16          MR. SINGLA:  Now, the technical specifications their
17  clients have that, our clients didn't have, don't have today,
18  we didn't have.
19          THE COURT:  Have you ever seen them?
20          MR. SINGLA:  We just got them yesterday morning.
21          THE COURT:  Um-hmm.
22          MR. SINGLA:  When RealNetworks convinced --
23          MR. DIBOISE:  I'm sorry, sir, you filed one of them.
24          MR. SINGLA:  We got one page.  The lawyers got one
25  page from DVDCC.
```

1           **THE COURT:**  Was that Exhibit G?

2           **MR. SINGLA:**  Exactly.  I stand corrected.  Other

3    than that one page, we haven't seen them until yesterday

4    morning.

5           And then, the further -- so those documents, now, I

6    think both sides' lawyers have and their client has.  Our

7    clients don't yet, but we'll have to deal with that issue if we

8    have to deal with it.

9           Then, there is a further level of specifications

10   that our clients don't have, we don't have, their client does

11   have.  These are these highly confidential, they're actually

12   literally the codes, you know, that we are talking about that

13   go another level of detail: the secret codes.  And so, we'll

14   have to deal with DVD CCA and RealNetworks and figure it out.

15          But, I just want to make clear:  The only party who

16   doesn't have those are the studios; we are the ones who don't

17   have those documents.

18          **MR. DIBOISE:**  Except for Dr. Bell, who is part of

19   the committee who helped draft -- Your Honor, I don't know why

20   we're arguing about that.

21          **THE COURT:**  I'm just trying to get some framework.

22          If they are necessary to the adjudication, then they

23   are going to have to be turned over under confidentiality

24   orders.  And so, I don't want to hear any noise that this is so

25   top secret that we can't -- but it be under confidentiality

```
 1   orders, eyes only.  Or, I would say eyes only and expert's
 2   plus, you know --
 3              MR. DIBOISE:  In-house counsel?
 4              THE COURT:  A couple of experts.
 5              MR. DIBOISE:  The two in-house counsel in the room
 6   with us?
 7              MR. SINGLA:  I think this is an issue that should be
 8   litigated.  And then, why don't we talk about this offline with
 9   DVD CCA and then --
10              THE COURT:  Come to some agreement.  The fewer
11   people, the better.
12              MR. SINGLA:  We don't have these documents.
13              MR. DIBOISE:  I understand that point.  I think he
14   is trying to say that they don't control the DVD CCA.  Whether
15   they do or don't I don't know, but we need some access to them.
16   They are a party to this litigation.
17              THE COURT:  Who is representing them?
18              MR. DIBOISE:  They just haven't appeared.  We just
19   served them --
20              Anybody know?
21              THE COURT:  Who generally represents them; do you
22   know?
23              MR. DIBOISE:  We know that Mr. Coats said -- White &
24   Case represented them in the Nichols trial and he represents
25   them on the appeal -- I'm sorry, the *Kaleidescape* case.
```

1          *THE COURT:*  Um-hmm.

2          *MR. DIBOISE:*  I could call them and ask if he's been

3   engaged.

4          We have spoken to a lawyer, at Bryan Cave in

5   St. Louis, who was representing them.  We can ask them.

6   They've told us that they're representing them.  We can ask

7   them as well.  We can all work with them.

8          *THE COURT:*  However you are going to do this.

9          At any rate, with respect to -- I don't know how

10  large this board is, I would certainly say if you are going to

11  have to depose any of them, fine, but it should be a discreet

12  number.  So try to pick the ones who are most knowledgeable.  I

13  hope you don't have to do a PMK deposition just to figure that

14  out.

15         *MR. DIBOISE:*  We don't want to spend any more money

16  than we have to.  I'm sure they don't, either.

17         *THE COURT:*  Or time.

18         *MR. DIBOISE:*  Or time.

19         We'll try and do that.  I just don't think we

20  need -- other than having the broad outlines of what we want to

21  do, as I said, I didn't want them to be sandbagged, or the

22  Court to understand that we might need some information outside

23  the control of the lawyers here in this room.

24         *THE COURT:*  No, I understand.  I understand.

25         *MR. SINGLA:*  I think we can get all these issues --

1          **THE COURT:**  So with all of those issues -- you know,

2    and I don't do discovery motions.  And I don't want to you

3    waste your time on them, because that takes too much paper, and

4    it's unnecessary, and some of them are silly.  Really try to

5    work them out.  If you have made an effort to and you get

6    stuck, then contact Mr. Bowser, my courtroom deputy, and we'll

7    have a phone conference and we will deal with it.

8          And even though I'm not going to be available some

9    of this time, I will be in the country back in DC and New York,

10   and you can contact me by phone, or they can contact by phone

11   and let me know, and we'll set up a phone conference.

12         **MR. SINGLA:**  One thing, I think, would be helpful

13   is, just to confirm my understanding with the Court, that the

14   focus of the hearing of the Court is asking for, or is

15   ordering, is on sort of these technical issues we've been

16   talking about and going back and forth.  In other words, how

17   does it work, how many copies can be made, how those copies

18   function, what do the specifications say, maybe some license

19   issues?  It's all of that.

20         **THE COURT:**  But, it's also some interpretation of

21   the license.

22         **MR. SINGLA:**  Certainly.

23         **THE COURT:**  And, any arguments, you know, that may

24   be appropriate about the license and its intersection with the

25   DMCA.

1          MR. SINGLA:  Thank you.

2          THE COURT:  Okay?

3          MR. DIBOISE:  Understood, Your Honor.

4          THE COURT:  Does that take care of it?

5          MR. DIBOISE:  I think so.

6          THE COURT:  So, then, under the same terms and

7    conditions the TRO will remain in effect.  And --

8          MR. DIBOISE:  The bond will continue?

9          THE COURT:  And the bond will continue.

10          And, you'll get a date from Mr. Bowser about as soon

11    as you think, you know, you are ready for it, but, of course,

12    when I get back.

13          MR. WILLIAMS:  We just want to make the point that

14    the last hearing was confidential; we wanted to point out that,

15    even at the last hearing, there was some press here.  I'm sure

16    there is some press here today as well.

17          THE COURT:  Well, the courtroom is packed.  I have

18    no idea who is here.

19          MR. DIBOISE:  That's right.  So I just wanted to --

20          THE COURT:  Lawyers with nothing better to do or the

21    press, I'm not sure.

22          MR. DIBOISE:  Your Honor, unfortunately the hearing

23    that was sealed, I didn't know since I participated by

24    telephone from Chicago, there was a reporter here, in the

25    courtroom.

1          **THE COURT:**  Was there?

2          **MR. DIBOISE:**  And, an article appeared on Monday

3  that revealed the number, which is why I didn't object when

4  they talked about the 3000 sales.

5          So at this point, Your Honor, we don't believe there

6  should be any restrictions --

7          **THE COURT:**  Well, I don't think you can do that

8  anymore.  I think what happened --

9          **MR. DIBOISE:**  What happened, happened.  And, I think

10  both sides, if they want to talk -- I mean, we are going to get

11  so many questions, I think we ought to be able to respond to

12  the press if they have any more inquiry.

13          **THE COURT:**  That's fine.

14          **MR. DIBOISE:**  So, we are content to have a chat with

15  the reporters, and I'm sure they'll love it, too.

16          **THE COURT:**  What happened was -- this can be off the

17  record now.  You want to go back to record, let me know.

18                  **(Proceedings concluded at 4:59 p.m. with**

19                  **off-the-record discussion.)**

20

21                  **---o0o---**

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

<u>/s/ Sahar McVickar</u>

Sahar McVickar, RPR, CSR No. 12963

October 9, 2008