UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN H. PATEL, JUDGE

| | |
|---|---|
| RealNetworks, Inc., et al, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 08-cv-04548 MHP |
| ) | |
| DVD Copy Control Association, ) | |
| Inc., et al, ) | |
| ) | |
| Defendants ) | |
| _____) | |

San Francisco, California
Tuesday, February 3, 2009

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES BY PHONE:**

For Plaintiffs            WILSON SONSINI GOODRICH & ROSATI
                          A Professional Corporation
                          One Market Street
                          Spear Tower, Suite 3300
                          San Francisco, CA 94105
                     BY:  **COLLEEN BAL, ESQ.**

For Defendant            MUNGER TOLLES & OLSON
Studios                  560 Mission Street
                         27th Floor
                         San Francisco, CA 94105
                     BY:  **ROHIT K. SINGLA, ESQ.**

For Defendant            AKIN GUMP STRAUSS HAUER AND FIELD, LLP
DVD CCA, Inc.            580 California Steet
                         15th Floor
                         San Francisco, CA 94104
                     BY:  **REGINALD DAVID STEER, ESQ.**

Reported By:             **CHRISTINE TRISKA, CSR, RPR**
                         Pro-Tem Reporter

Dockets.Justia.com

1   Tuesday, February 3, 2009

2                                          2:04 P.M.

3                   **P R O C E E D I N G S**

4           THE COURT:  Good afternoon.

5           MR. STEER:  Good afternoon, your Honor.

6           THE COURT:  This is Judge Patel.  May I have your

7   appearances, please?

8           MS. BAL:  Good afternoon, your Honor.  This is Colleen

9   Bal, B-A-L, from Wilson Sonsini on behalf of the RealNetworks

10  plaintiff.

11          MR. SINGLA:  This is Rohit Singla of Munger, Tolles &

12  Olson with the studio defendants.

13          MR. STEER:  And this is Reginald Steer of Akin Gump on

14  behalf of the DVD CCA.

15          THE COURT:  Okay.  I think most of this comes up

16  between the studios and RealNetworks, and it stems from a letter

17  dated January 23rd with respect -- and maybe you've got this all

18  worked out, but this has to do with some discovery related to

19  the ARccOS and RipGuard technologies and the need for certain

20  documents in preparation for the upcoming motions, and then

21  suggesting that there may need to be either an extension or some

22  adjustment to the schedule.

23          So let's see who wrote this letter.  Mr. Cunningham

24  wrote the letter, but I gather, Ms. Bal, you're going

25  to -- first of all, is the situation the same as set forth in

1   your January 23rd letter?

2           MS. BAL:  The situation is the same.  We have received

3   some documents since the date of that letter, but the situation

4   is the same in that we are in a position of getting ARccOS and

5   RipGuard documents extremely late to the point -- and we now

6   have -- I think in the past week and a half the studios alone

7   have produced close to 40,000 pages of documents.  We have not

8   had an opportunity to sift through all of those, although we

9   are, of course, working at a frantic pace to get through them.

10  I believe there is -- we need to separate the wheat from the

11  chaff, and there will be a lot of chaff, I suspect, although,

12  what we can tell already is that the documents are not complete.

13  We do not have, for example, the technical specifications for

14  either of the new technologies, and we also know that the

15  studios' production is not yet complete.

16          THE COURT:  Well, just a moment.  When you're talking

17  about "new technologies," are you talking about new technologies

18  related to ARccOS and RipGuard, or are you talking about some

19  other newer technologies than those?

20          MS. BAL:  No.  Excuse me, your Honor.  I'm referring

21  to ARccOS and RipGuard as the new technologies.

22          THE COURT:  Okay.

23          MS. BAL:  They were just -- you heard about them for

24  the first time from us at the December 22nd hearing because

25  RealNetworks had only heard a few days prior that the studios

1    wanted to add those technologies to the preliminary injunction

2    proceedings, and I'm referring to them as new technologies

3    because they were never part of the studios' complaint or part

4    of the TRO, and because we never received a single document from

5    the studios relating to ARccOS and RipGuard until January 22nd,

6    even though at the December 22nd hearing your Honor required

7    both parties to produce to each other documents by January 9th

8    so that we could try to be prepared for the March 3rd hearing

9    date.

10           THE COURT:  Well, Mr. Singla, before responding to

11   what Ms. Bal has just said, what role do these ARccOS and

12   RipGuard technologies play?  Because as I understand it, these

13   are technologies that were developed either by Sony or others of

14   the studios or companies, I guess, working under their direction

15   for essentially guarding against or preventing ripping.

16           MR. SINGLA:  Yes, your Honor.

17           THE COURT:  Is that correct?

18           MR. SINGLA:  Yes, your Honor.  ARccOS and RipGuard are

19   both technologies that sit on top of CSS to prevent the ripping

20   of DVDs.  They were developed not at the studios' direction.

21   They were developed by independent companies, one Macrovision,

22   and the second is Sony DADC, which is based particularly in

23   Australia and is not part of Sony Motion Pictures, and these

24   are --

25           THE COURT:  But it's a Sony-affiliated company,

1  obviously.

2          MR. SINGLA:  Obviously.  Yes, it is a part of the

3  Sony -- sort of larger Sony ambient company.

4          But these technologies are then sold, or studios

5  buy them from Macrovision and Sony DADC, and use them on the

6  disk -- the DVD they distribute.

7          So the technical specifications, for example, that

8  Ms. Bal referred to -- studios don't have those, the

9  technical details to these technologies.  To the extent that

10 they are even relevant to the DMCA issues -- frankly, I don't

11 know that they are, but even if they were, we won't have

12 those specifications.  Macrovision and Sony DADC did not

13 provide them to us.

14         The RealNetworks' plaintiffs have subpoenas on

15 January 9.  They finally subpoenaed Macrovision and Sony

16 DADC.  My understanding is that those companies fully

17 complied with subpoenas and produced their documents to

18 RealNetworks.

19         We have produced all our documents to -- related to

20 ARccOS and RipGuard except for a handful of documents we can

21 talk about to RealNetworks.

22         The only reason there was a "delay," quote,

23 unquote, is because we were on the road to producing the

24 documents that we thought were relevant to this case about

25 ARccOS RipGuard when RealNetworks asked on January 5th for a

1   much broader collection.  We agreed to do that much broader

2   collection, but it took time.

3           But obviously -- now I'm hearing them complain that

4   there are too many documents.  But that's a function of the

5   fact that they asked us on January 5th for a very, very broad

6   collection, whereas we had been trying to undertake after the

7   December 22nd hearing a much more targeted collection of

8   documents that actually related to the issues here.

9           THE COURT:  Well, Ms. Bal, did you get what you were

10  seeking with respect to these two technologies of -- pursuant to

11  the subpoena?

12          MS. BAL:  Well, I can't answer that.

13          We just received literally about an hour ago

14  documents from the Sony affiliate.  So we obviously haven't

15  been able to go through all of those.

16          And we have received some documents from

17  Macrovision, but we still do not have the technical

18  specifications or other technological documents relating to

19  ARccOS and RipGuard, and I would also say that the studios

20  have told us that they are withholding certain, what they

21  term "sensitive documents" relating to ARccOS and RipGuard

22  because -- for certain confidentiality reasons, even though

23  we have a protective order in place.

24          So we -- you know, we have gotten documents now.  As I

25  said, we just got documents in about an hour ago from the Sony

1  affiliate.  We now have, you know, tens of thousands of pages

2  that were produced by the studios very, very late to our

3  prejudice, because we have not been able to review them and go

4  through them, and we certainly haven't been able to engage in

5  fact discovery or prepare our expert reports or engage in expert

6  discovery under the schedule that we had tried to work out to

7  meet the March 3rd deadline.

8          So we are at an extreme disadvantage at this point,

9  and I don't think there's any question that the studios'

10  production is late, the ARccOS and RipGuard production is

11  late, that it is continuing, and that they have produced to

12  us tens of thousands of documents in the last week or so.

13  The real issue before us is what to do about it.

14          THE COURT:  Well, first of all -- okay.  First of all,

15  Mr. Singla, what are the documents you say that you're

16  withholding or still haven't been turned over?  And are those

17  the documents that are at least in part the subject of what Ms.

18  Bal is talking about that they haven't received?

19          MR. SINGLA:  No, your Honor, they are not.

20          Those are documents that we have told the Wilson

21  Sonsini firm now that we would be willing to give them to

22  Wilson Sonsini so Wilson Sonsini could review them themselves

23  and determine whether there's really an issue here.

24          These are documents that do not have technical

25  specifications -- I have them on my desk.  I looked at them

1  this morning -- that have the technical specifications that

2  Ms. Bal is talking about.

3         These are documents that relate to antipiracy

4  analyses by the studios; for example, things like how they go

5  into Russia and try to spy on people ripping DVDs or figure

6  out who's ripping and how they're ripping, or documents that

7  have instructions or information from which someone could

8  learn how to rip DVDs.

9         They are not the kinds of things that Wilson

10  Sonsini, the RealNetworks' firms have been asking for in

11  terms of ARccOS and RipGuard, but they are documents that my

12  clients are very reluctant to hand over to a company like

13  RealNetworks that is actually trying to build circumvention

14  technology.

15         We will show them to them.  We've offered for a

16  week to show them to the Wilson Sonsini lawyers so they can

17  make their own judgments.

18         THE COURT:  Well, then, let's set a date by which that

19  is going to be done.

20         MR. SINGLA:  We're ready.

21         THE COURT:  You're in Palo Alto, Ms. Bal?

22         MS. BAL:  I'm in San Francisco right now, your Honor.

23         THE COURT:  Your offices are generally in Palo Alto?

24         MS. BAL:  That's true.  So I can take them in Palo

25  Alto or San Francisco.  I know Mr. Singla is in San Francisco so

1   he can --

2              THE COURT:  Okay.  So then you can meet in San

3   Francisco.  Can you do that within the week?

4              MR. SINGLA:  We can do that, your Honor.

5              MS. BAL:  We can do that certainly, but let me say the

6   issue is there are all these hurdles that, in addition to

7   producing all of this massive amount of documents late to us

8   there are all these hurdles -- and this is just one of them --

9   that the studios are erecting to make it difficult for us to get

10  through to the ARccOS and RipGuard technology to try to

11  understand.

12             This is just one of them.  They are saying that the

13  lawyers can view it, but they are also saying that our

14  experts, who are obviously the people who would most

15  relevantly review these documents --

16             THE COURT:  But Ms. Bal, Ms. Bal, hold on.

17             Did you hear what he said?  He said they are not

18  technical documents, and he gave you some idea just generally

19  of what they may relate to.

20             The first thing to do is to sit down with

21  Mr. Singla, or someone from his firm, and go over those

22  documents and see if they are even responsive to your

23  discovery requests.

24             MS. BAL:  Well, I agree that that would be a start,

25  your Honor.  It's my understanding that those documents, as

1   they've been explained by the studios, detail the supposed means

2   of circumventing ARccOS and RipGuard or other copy protection

3   schemes, and so I believe that there would be something that our

4   experts would need to review.  But certainly we will look at

5   them to see if that is an issue.

6          But this is just one of the barriers that the

7   studios have erected to make it difficult for us to try to

8   get to the hearing date, among them, we were supposed to have

9   our documents by January 9th.

10          THE COURT:  I understand that, and we'll take care of

11  that in a moment.  Take care of one thing at a time --

12          MS. BAL:  Okay.  Yeah.

13          THE COURT:  -- in terms of what you haven't received

14  that you think you are entitled to.

15          First of all, it may turn out after you review the

16  documents that Mr. Singla just talked about that some them

17  you don't need, some of them you think are responsive or

18  whatever, and if it becomes, then, a question of the expert

19  and the expert seeing them, then I think Mr. Singla, what you

20  need to do is work out some sort of stipulation limiting, you

21  know, the access to a single expert or something like that

22  with appropriate -- with an appropriate confidentiality

23  agreement.

24          MR. SINGLA:  Okay.

25          THE COURT:  So you can work that out, then, within the

1   next week.  You'll sit down and take care of it.

2            MS. BAL:  Understood your Honor.

3            THE COURT:  Okay.  Now, with regard to what you got

4   from -- it sounds like you got a lot.  Maybe -- did you get

5   everything from, you know -- is it Macrovision?

6            MS. BAL:  We did not get everything from Macrovision.

7            THE COURT:  Well, what didn't you get that you need?

8            MS. BAL:  Again, we did not get key technical

9   documents that describe the actual operation of RipGuard.

10           THE COURT:  And they have some reluctance in turning

11  those over; correct?  I mean, they don't want somebody else to

12  rip off their RipGuard; right?

13           MS. BAL:  I think -- I believe that that's true.  We

14  have a protective order in place, and we have been working with

15  them on confidentiality issues.  But we just don't have all the

16  documents that we need from them.

17           THE COURT:  And they are not a party here, so if

18  there's going to be any enforcement of the subpoena we'd either

19  have to see a motion to quash from them, if they have a

20  complaint, or else a motion from you to enforce since they are

21  not a party.

22           MS. BAL:  That's right, your Honor.

23           THE COURT:  But what I think you need to do -- have

24  you met and conferred with them?

25           MS. BAL:  We have met and conferred with them

1  extensively.  We are still trying to meet and confer with them.

2          THE COURT:  And how about ARccOS?

3          MS. BAL:  ARccOS --

4          THE COURT:  That's one that you didn't -- you received

5  some documents but not everything?

6          MS. BAL:  We just -- that was when I referred to the

7  fact that about an hour ago something was delivered to our

8  office that's -- that was the ARccOS documents from the Sony

9  DADC.  We obviously have not had any opportunity to look at

10 those or even to determine the volume or what might be in there.

11         THE COURT:  Well, then, clearly you have to go over

12 those and figure out what's in there, and then see if they

13 are -- you know, if they are missing something and try to -- who

14 is representing ARccOS?

15         MS. BAL:  Well, one of the firms that is representing

16 the studios is also representing ARccOS -- the Sony DADC, the

17 Mitchell Silberberg firm.

18         THE COURT:  Well, then, you're going to need to sit

19 down, meet with them and go over what you don't have and work

20 out some kind of a confidentiality order.

21         Who's representing RipGuard?

22         MS. BAL:  Macrovision.  It's just their in-house

23 counsel --

24         THE COURT:  Macrovision.  I see.  Okay.  Well, so

25 you're going to do these things.

1          Now, it appears that -- and then we can go back to

2    whether there's any other discovery that's missing

3    from -- from either side.

4          But given that, as I understand it, you're willing

5    to continue the current preliminary injunction and keep it in

6    place while we set some other dates, if we have to, is there

7    any reason why we can't come up with a schedule that is more

8    feasible?

9          MS. BAL:  Your Honor, that's what we would like to do,

10   and we have said all along, "We are the party under the

11   injunction, and we are in the unenviable position of having to

12   ask for an extension, even though that injunction is going to

13   stay in place.

14         And so what we would like to do is either exclude

15   ARccOS and RipGuard, or postpone the hearing to give us a

16   reasonable amount of time to get to where we need to be so we

17   have a level playing field for the hearing.

18         MR. SINGLA:  Your Honor, may I --

19         THE COURT:  Who is this?

20         MR. SINGLA:  This is Rohit Singla.

21         THE COURT:  Oh, yes, Mr. Singla.  Okay.  Now I'm

22   hearing you better.  It was very faint.

23         MR. SINGLA:  I'm sorry.

24         THE COURT:  Is there any reason why we can't pick a

25   date that would make, you know, more sense given -- without

```
 1  going into who's responsible for what and all of that -- just a
 2  date that is more reasonable --
 3           MR. SINGLA:  Yes.
 4           THE COURT:  -- particularly given the fact that the
 5  preliminary injunction is going to stay in place?
 6           MR. SINGLA:  Obviously we understand where the Court
 7  is coming from.  We had offered three weeks to deal with
 8  whatever concerns that RealNetworks had with document production
 9  issues.  And that's fine.  We can certainly figure out a date.
10  I'm hopeful three weeks from the current date maybe.
11           THE COURT:  Well, they are proposing April the 14th
12  for hearing with a series of other dates in the letter.
13           Do you have that letter with those proposed dates?
14           MR. SINGLA:  I do, your Honor.  I think April 14 is
15  problematic for most of the counsel on the defendants' side in
16  terms of schedules.
17           What I wanted to raise --
18           THE COURT:  Are you all going on a skiing trip or
19  something?
20           MR. SINGLA:  Well, I don't think it's a group trip,
21  your Honor.  I have plans with my kids for spring break.
22           THE COURT:  Is that a spring break week?
23           MR. SINGLA:  It is a spring break week here, at least
24  in the East Bay, and I know Mr. Speer is out.  Mr. Williams is
25  in a two-month trial starting April 13th.
```

1          If we could get something in the week of March 23rd
2   perhaps that would give RealNetworks another three weeks from
3   the current time frame.
4          One issue, before we get to scheduling, your Honor,
5   that I wanted to raise -- the reason the studios, in addition to
6   these scheduling details, have opposed further -- yet another
7   extension, is that we are learning increasingly that
8   RealNetworks is taking action that we believe is inconsistent
9   with our understanding of the TRO.  And we are very concerned
10  that the longer this drags out the more and more prejudiced the
11  studios are by these kinds of actions?
12         For example, on Friday I took a deposition of the
13  business development lead for the facet project at
14  RealNetworks, and he very candidly said that since the TRO,
15  he has made trips many places overseas.  He is sending
16  contracts, negotiating contracts, trying to get companies to
17  buy the facet software.  The TRO prohibits offering or
18  selling anything like RealDVD, and that's exactly what they
19  are doing.
20         MS. BAL:  Your Honor, may I respond to that?
21         THE COURT:  Yes.
22         MS. BAL:  I was at the deposition as well, and what
23  the witness testified to, this is with respect to the facet
24  product.  And as was discussed at the December 22nd hearing, the
25  facet product is a manufactured standalone box.  And the what

1   the witness testified to is that he has been working to try to

2   find a manufacturer for the facet product.  These are not sales.

3   These are manufacturing partners.

4          MR. SINGLA:  Your Honor, the statute prohibits

5   manufacturing the circumvention devices.

6          So you don't have -- however they want to

7   characterize it -- and I would say there was testimony -- the

8   witness was very clear that he was trying to sell it to his

9   customers, who are manufacturers.

10          DMCA prohibits the manufacture, the importation,

11   the offering, the sale of any circumvention device, and that

12   is what we are learning has been going on and has been going

13   on since the TRO.

14          MS. BAL:  But -- first of all, the facet -- you have

15   taken the position that the facet product is not within the

16   scope of that TRO.  You have taken the position that the facet

17   product is not within the scope of that TRO.

18          And, of course, we have to get to the place where

19   we can work with partners to have the product manufactured.

20   We are not manufacturers.  We are talking to manufacturers to

21   have the product manufactured.

22          And let me also say that the current TRO, even if

23   it covered facet -- which you have agreed it does not --

24   prohibits selling or otherwise trafficking in software

25   products known as RealDVD or any products substantially

```
 1   similar.
 2               There is no suggestion that we are doing anything
 3   of the sort.  We are not -- we are certainly not in violation
 4   of the TRO with respect to facet with respect to our efforts
 5   to find a manufacturing partner.
 6               THE COURT:  Well, Mr. Singla, if we put this over to
 7   some reasonable date, maybe a little earlier in April to avoid
 8   that week because apparently Easter is the 12th?
 9               So very --
10                        (There was a discussion off the record.)
11               THE COURT:  But April the 12th is Easter, so generally
12   there are some schools that have the week before.  There are
13   some schools that have the week after Easter as a spring break.
14
15               But could we do something the week of -- but you're
16   talking about the date of the 14th.
17               What about the week of April the 6th?
18               MR. SINGLA:  I believe that's also -- with the dates
19   that we were going to suggest, your Honor, are based on -- we
20   had checked with Mr. Bowser about the Court's schedule,
21   working -- if not March 23rd then April 1, 2, which I believe is
22   open on the calendar, and at least for all of the defense
23   counsel I checked with works for everybody.
24               I believe one of the DVD CCA counsel would be
25   unavailable April 6th.  Mr. Williams would also be
```

1   unavailable April 6th.  I think that would greatly prejudice

2   --

3          THE COURT:  Okay.  How about -- Ms. Bal, how about

4   April the 1st or the 2nd?

5          MS. BAL:  Your Honor, it's not enough time.  We have

6   mapped out the amount of time that we need based on where we are

7   now, and certainly -- it's a tight schedule, and we would not be

8   asking for more time if we did not need it, because we are under

9   an injunction.  But we simply don't think that that is enough

10  time.

11         MR. SINGLA:  Your Honor, we have looked at their

12  schedule, and we have a proposal of an April 1 hearing date

13  which gives them every single date that they have asked for for

14  discovery.  And the only thing we would suggest would be for

15  April 1st is to condense the time period for briefing -- to give

16  the parties a little more time for briefing, and to get the

17  papers to the Court -- get the reply papers to the Court a week

18  before the hearing, instead of -- they propose two weeks before

19  the hearing.  We can get an April 1st date and give them all the

20  time they say they want for discovery.

21         MS. BAL:  Well, let me say this.  We still don't know

22  if we have everything we need.  We still have disputes with the

23  studios relating to the 30(b)(6) witnesses, relating to, you

24  know, what our experts can and cannot see.

25         So we gave your Honor a schedule beginning on

1  April 14th begrudgingly, because we don't want to extend this

2  any longer than we have to, but to give us just enough time

3  to get there with a level playing field.

4          So moving it to April 1st and 2nd doesn't work for

5  us.  It's not enough time.

6          THE COURT:  How about the week of April the 20th?

7          MR. SINGLA:  Your Honor, I can respond.

8          THE REPORTER:  Can you please identify who's speaking?

9          THE COURT:  Yes.

10          MR. SINGLA:  I'm sorry.  This is Rohit Singla for the

11  studios.  If I could just respond for one moment, your Honor.

12          There is two issues here.  The first is the studios

13  -- I don't want to get into whose fault any of this is -- the

14  studios should not be prejudiced by a delay that has

15  Mr. Williams, our lead counsel, unavailable.  He's starting a

16  two-month jury trial in San Francisco Superior Court in

17  April.  So we would strongly request that the hearing be

18  before April 3rd so that he can participate as the studios'

19  representative.

20          Having said that, we can come up with a schedule --

21  I will propose one right now -- that gives RealNetworks every

22  single date they want for discovery, experts, fact discovery,

23  depositions -- everything they want.  The only thing we need

24  to change is --

25          THE COURT:  Well, but what about documents and the

1  whole issue with regard to -- the whole issue with regard to

2  experts and confidentiality orders?

3         MR. SINGLA:  Let me respond, your Honor.

4         THE COURT:  And also the 30(b)(6) witness

5  designations, et cetera.

6         MR. SINGLA:  That's fair, your Honor.  Let me respond

7  to -- on the dot, we have completed our production.  The only

8  documents that we know of is the handful that we spoke about

9  that have this -- that have this -- I'll show Ms. Bal this

10 afternoon if she wants -- that we don't think are relevant.  And

11 if she disagrees we'll figure that out as the Court has

12 suggested.

13        Second, on expert confidentiality -- I believe that

14 was motivated by Macrovision and Sony DADC.  I understand

15 that both of them have now agreed that all of Real's experts

16 can see these documents.  I don't believe there is any issue

17 there.

18        THE COURT:  And they will have to sign off on the

19 confidentiality order; correct?

20        MR. SINGLA:  Yes, your Honor.

21        MS. BAL:  Your Honor, we are where we are because of

22 the studios' failure to produce these documents to us earlier,

23 the studios saying, "Well, we've produced everything."

24        Well, we haven't gone through that, and what we

25 know right now is we don't think we have everything.

```
1              THE COURT:  Maybe you don't need everything.  Maybe
2    you have what you need.
3              MS. BAL:  Maybe we do.  I hope that's true, but --
4              THE COURT:  Well, you're asking everybody to move the
5    scheduled based upon what you're not sure you have.
6              MS. BAL:  Well -- because we are where we are now
7    because of -- and I can't say with more specificity because we
8    have just gotten these governments, because the studios have
9    produced tens of thousands of pages in the last few days.
10             THE COURT:  What date did you get those?
11             MS. BAL:  We got documents -- I have a list here.
12             MR. SINGLA:  Your Honor, I have to say that --
13             THE COURT:  No.  Hold on just a minute.  I asked her a
14   question.  Let her respond.
15             MS. BAL:  We got documents on the 22nd, on the 26th,
16   on the 28th, on the 30th.  So we are -- you know, it's the
17   second or the third right now.  So we have just gotten these
18   documents.
19             THE COURT:  Well, some them you got two weeks ago,
20   then.
21             MS. BAL:  Well --
22             THE COURT:  What you got on the 22nd.
23             MS. BAL:  The 22nd is the earliest.  So that's 12 days
24   ago.  That's right.  It's a massive volume of documents.
25             And we also have these additional discovery issues,
```

1   and what I would say is that if -- you know, I'm perplexed by

2   what Mr. Singla said about Mr. Williams' schedule, because at

3   the December 22nd hearing Mr. Williams, I believe, said that

4   he had a trial starting in March for two months.  So I think

5   the information is a little bit different.

6         But regardless, if there is a problem in scheduling

7   then the alternative is to keep the hearing date where we are

8   and exclude ARccOS and RipGuard.

9         We're ready to go on CSF.  We've been ready to

10  go -- we actually offered to exchange expert reports

11  yesterday with the studios and the DVD CCA.  So if they claim

12  that they are being prejudiced for having to wait for the

13  hearing, and if they claim there is a problem with

14  scheduling, let's go with CSS, and let's wait and put ARccOS

15  and RipGuard aside for the time being, and maybe that hearing

16  with CSS with respect to facet, and RealDVD will inform the

17  thinking with respect to ARccOS and RipGuard.  Maybe another

18  hearing won't even be necessary.

19        MR. SINGLA:  Your Honor, if I could respond?

20        THE COURT:  Name, please.

21        MR. SINGLA:  Yes.  This is Rohit Sing.

22        THE COURT:  I mean, the reporter has to get down the

23  correct attribution, otherwise the transcript is going to be a

24  mess.

25        MR. SINGLA:  Of course, your Honor.  I apologize.  I

1    had not realized this was being reported.

2              THE COURT:  Oh, yes.

3              MR. SINGLA:  Rohit Singla for the studio.

4              Let me just be clear so we go through this one

5    thing at a time.  With documents -- we had completed our

6    production.  There are no more -- if they have the

7    documents -- if there was a lot of documents it's because

8    they asked for a lot of documents.

9              We were prepared to give a much more targeted

10   production much earlier.  That is what it is.  If they say

11   there's been a delay, it's been at most two weeks, three

12   weeks.  We're offering from March 3rd through April 1st --

13   that's a one-month delay in the hearing for a two- or

14   three-document delay.

15             In terms of 30(b)(6) witnesses, we have given them

16   names.  The Court can look at the e-mail attached to

17   RealNetworks' own declaration.  We gave them more than a week

18   ago a list of people, a list of topics.  Those witnesses are

19   available whenever RealNetworks wants to proceed.

20             The schedule that we're proposing on April 1st --

21   we'll give them all of the time they want for fact discovery.

22   I'm not proposing to short any of the time for fact

23   discovery.  There is just no reason that we can't get this

24   done by April 1st.  And Mr. Williams did have a trial

25   scheduled for mid March that was moved by Judge Kramer to

1   April 13, which is now we understand a confirmed date that

2   will not be moved --

3             THE COURT:  Well, I'll be seeing Judge Kramer tonight

4   so I'll ask him.

5             MR. SINGLA:  Just ask him.  It's the *Rambus*

6   litigation.

7             THE COURT:  I don't think *Rambus* is going anywhere.  I

8   think that *Rambus* is going down the tubes.

9             MR. SINGLA:  The litigation -- the trial in the

10  antitrust case is scheduled to start on April 13, and so I don't

11  see why we can't have this hearing by April 1st.

12            MS. BAL:  Your Honor, Mr. Singla -- this is Colleen

13  Bal again.  Mr. Singla has said they have completed the

14  production of what they are planning to give us in essence.  We

15  have previously had to go back to them repeatedly after they

16  claim that they've given us everything to get everything that we

17  need.  I don't want every document.  In fact, I think I have

18  more documents right now --

19            THE COURT:  He says he's given you everything except

20  there's a handful.  You are going to meet this week, and that

21  should be -- you should be able to do that, and then it seems to

22  me that you can work out the rest of these dates along the

23  schedule that you've given.  But then you'd have to work out

24  dates for when your submissions are going to be here, because

25  obviously, your briefing is going to have to be different, Mr.

1   Singla.  That's one of the problems.

2          MR. SINGLA:  But your Honor, what we suggest is we

3   keep all of the dates that RealNetworks has proposed, make the

4   opening papers, opening briefs due March 11 instead of March 17,

5   responsive papers due March 25th instead of March 31st, and we

6   believe that if the Court is amenable to getting the papers at

7   least before the hearing, that would allow an April 1st hearing

8   date without having to shortchange RealNetworks by one day of

9   what it's asking for from the fact discovery.

10          THE COURT:  Well, that does mean that some of that

11   fact discovery would be spilling over into the time when their

12   briefing is going to be due; correct?

13          MR. SINGLA:  I don't believe so, your Honor.

14          THE COURT:  Some of the depositions?

15          MR. SINGLA:  The schedule they proposed is expert

16   depositions ending March 10th, and we can make our witnesses

17   available earlier if they want, or on the early part of the

18   expert depositions schedule and have papers due on the 11th or

19   the 12th.

20          MS. BAL:  We have -- we have -- we have heard from

21   them that they won't even allow our expert who has been already

22   cleared to view their ARccOS and RipGuard documents.  And so let

23   me just tell you that finding an expert -- finding experts in

24   this case is extremely difficult for us because experts don't

25   want to cross the studios.  They are afraid of it.  So we have a

1   problem with respect to what our experts can see.

2           We have a problem with respect to the Rule 30(b)(6)

3   depositions, because they have -- they know that we have

4   limited to -- we are limited to six depositions.  And in

5   response to our notices, which are quite limited they offered

6   11 witnesses and simultaneously pointed out to us that we

7   could only take six.

8           But if you look at the 11 witnesses they gave us

9   they seem calculated to undermine our ability to take

10  testimony.  There are numerous witnesses offered to testify

11  for just one topic.  There are numerous witnesses offered to

12  testify on exactly the same topic.  We have a problem.

13          THE COURT:  Have you met and conferred on this?

14          MS. BAL:  We have talked to them about this issue -- I

15  don't think --

16          THE COURT:  Have you met and conferred within the

17  meaning of that term?

18          MS. BAL:  Not fully, your Honor, because we just got

19  their objections I think on Tuesday or Wednesday last week.  So,

20  no; that's not fully met and conferred.

21          But what I'm trying to do is give you a sampling of

22  the issues that we are facing --

23          THE COURT:  Well, as I understand it they've agreed --

24  they've with respect to the expert or expert seeing pursuant to

25  the confidentiality order, whatever it is that there's been a

1  problem before.

2          MR. SINGLA:  That's right, your Honor.

3          THE COURT:  They have agreed to -- well, and they will

4  agree to sit down -- because you will meet and confer ASAP,

5  maybe when you're exchanging those documents or even earlier on

6  these 30(b)(6) witnesses, because if there's a limit of six

7  that's it.

8          And you can tell them who are the -- you know,

9  where the strong suits are, and be honest, Mr. Singla, about

10  it, that you're wasting your time maybe to take witness X

11  when witness Y would really provide more information, et

12  cetera; okay?

13          MR. SINGLA:  Yes, your Honor.

14          THE COURT:  You sit down and you get that straightened

15  out.

16          MS. BAL:  May I seek clarification with respect to one

17  of the things your Honor just said?

18          With respect to the witness I just want to make

19  sure that Mr. Singla has confirmed that our expert,

20  Mr. Felton, can see all of the documents.

21          MR. SINGLA:  Your Honor, from the studios' perspective

22  there is no objection.  The only objection I understood was from

23  Macrovision and Sony DADC.

24          My understanding was that -- Ms. Bal has been

25  dealing with them independently, not through us, and my

1  understanding is that Macrovision and Sony DADC have both

2  agreed -- although Ms. Bal would know better -- that

3  Mr. Felton can see those documents.

4         MS. BAL:  That's not actually true.  The issue came

5  from the studios, not from the third parties.  So there's no

6  issue from the studios, and I think that we've erased that

7  issue.

8         THE COURT:  Well, then, there you are.  Okay.

9         MS. BAL:  But let me still say that we are -- we still

10  don't know if we have all the documents that we need.  I heard

11  Mr. Singla say --

12         THE COURT:  You have all the documents I think you're

13  going to get except for the ones that you're going to go over

14  with Mr. Singla; okay?  Now let's move on.  I've heard enough,

15  you know, of this now.  I think we've got to move on.

16         So we'll set it for April the 2nd.

17         Where is April 2nd?

18         MS. BAL:  April the 2nd is a Thursday.

19         THE COURT:  Right.

20         MS. BAL:  So what, then, happens -- you know, we have

21  previously had three days of hearing time for this.

22         THE COURT:  I'm not sure I want to hear you all for

23  three days.

24         MR. SINGLA:  I don't believe there were three days

25  scheduled, your Honor.

```
 1               THE COURT:  No.  I think -- how many did we have --
 2               MS. BAL:  There were three days scheduled.  We had
 3     January 27, 28 and 29.  And the last time that we talked to your
 4     Honor, your Honor said that we would have --
 5               THE COURT:  I'll set it for April the 1st.  But
 6     believe me, I'll cut you off when I think I've heard enough.
 7               MR. SINGLA:  Your Honor, I believe it was three
 8     half-days in January, and we were thinking a day and a half
 9     would be adequate.
10               MS. BAL:  It was not three half-days, Mr. Singla.  It
11     was three full days.
12               THE COURT:  Do you have to argue about everything?
13               MS. BAL:  I'm sorry.
14               THE COURT:  Maybe it's a good idea to listen for a
15     while.  Try listening.
16               Now, I want you to meet and confer by the end
17     of -- let's see, what's today?  Tuesday -- by the end of this
18     week on those documents and on your 30(b)(6) witnesses and
19     get that straightened out.
20               And I expect you to work out everything else also,
21     because this is another one of those conversations that
22     probably wasn't necessary.
23               Understood?
24               MS. BAL:  Yes.  Understood, your Honor.
25               THE COURT:  So talk to each other and listen to each
```

```
 1  other.
 2          MR. SINGLA:  Your Honor, at the danger of trying the
 3  Court's patience there are -- that we had, the studios had that
 4  we haven't really --
 5          THE REPORTER:  I'm sorry, you're --
 6          MR. SINGLA:  I'm sorry.  This is Mr. Singla again.
 7          THE COURT:  You're cutting out.
 8          MR. SINGLA:  This is Rohit Singla, and there were two
 9  issues that the studios had that we have not really spoken
10  about.  I'm wondering if the Court --
11          THE COURT:  Where are those?  Did you submit those to
12  us?
13          MR. SINGLA:  Yes, we did, your Honor.  The first
14  issue -- what I mentioned earlier, the competing efforts by
15  RealNetworks to sell their facet product to these OEMs, who are
16  not subject to any injunction --
17          THE COURT:  Well, they are not selling the product.
18  They are trying to get the OEMs to manufacture; right?
19          MR. SINGLA:  Right, your Honor.  But manufacturing is
20  prohibited by the DMCA --
21          THE COURT:  That may be.  We'll take it up at the
22  hearing.  If anybody -- if they have to, as a result of anything
23  we do at the hearing or any rulings that are made they have to
24  cut off contracts, that will be their loss.  It comes out of
25  their pocket.
```

```
 1              Certainly not much of anything is going to get

 2    manufactured between now and the hearing date; right?  You

 3    know, if they have to terminate the contract that will be out

 4    of their pocket.

 5              MR. SINGLA:  Okay, your Honor.

 6              THE COURT:  So don't worry about it.

 7              MR. SINGLA:  The second issue is that we understand

 8    from what Mr. Cunningham told the Court on December 22nd that

 9    their defense -- one of their defenses on facet is going to

10    relate to the nature of the hardware -- the facet product is

11    both software, as Ms. Bal said, and a hardware box.  We

12    understand --

13              THE COURT:  We didn't get that.  Don't rustle your

14    papers while you're talking because we couldn't hear you.

15              MR. SINGLA:  I'm sorry, your Honor.  That was not me

16    --

17              MS. BAL:  That was somebody else.  But you cut out a

18    little bit so --

19              MR. SINGLA:  Right.  The real -- the facet product is

20    both software and hardware.  And we understand from

21    Mr. Cunningham that they are going to argue that part of their

22    defense relies on the specific hardware implementation that they

23    have, that it's not a PC or something.

24              If that's the case, if that is part of their

25    defense, then we believe we are entitled to see the actual
```

1    device that they propose is going to be sold to consumers.

2         And we have not seen that.  The witness on Friday

3    admitted that that will be decided by these manufacturers,

4    not by Real.  And so the prototype that we've seen from Real

5    is sort of their internal testing, but it's not the thing

6    that is going to be sold to consumers.  So we are put in a

7    real difficult position --

8         THE COURT:  But if it hasn't been manufactured yet,

9    how are you going to see it other than the prototype?

10        MR. SINGLA:  But we haven't seen the prototype.  The

11   prototype we've seen -- the designs we've seen are Real internal

12   testing, not what some company is going to then sell to

13   consumers.  So --

14        THE COURT:  Well, is there a prototype with respect to

15   this facet that you're seeking to have manufactured?

16        MR. SINGLA:  There's a box that they have that they

17   are using for internal testing and --

18        THE COURT:  Ms. Bal, is there a prototype?

19        MS. BAL:  Yes, your Honor, there is a prototype, and

20   we have given access on numerous occasions to Mr. Singla and his

21   expert as well as the DVD CCA to that prototype.

22        I think what Mr. Singla is referring to is, there

23   is another prototype on another chip set.  But what the

24   witness testified to on Friday was that the facet software

25   associated with those products is identical in functionality.

1           And what Mr. Singla said earlier that we have some

2    kind of defense based on the specific hardware implementation

3    is a misunderstanding.  We have the same exact facet software

4    with the exact same functionality that will be used that we

5    are just debugging now and seeking to have to get

6    manufacturers for.  And he has absolutely had more than one

7    occasion to review the prototype that we have that

8    demonstrates exactly the facet software and its

9    functionality.

10           THE COURT:  Well, is there another prototype out there

11   that is also going to use that same software?

12           MS. BAL:  There is another prototype out there that's

13   going to use the same software, but it is identical in

14   functionality.  The facet software is the same facet software,

15   and there's no difference -- there's no difference in terms of

16   what's being alleged here about the hardware.

17           The hardware is -- the hardware, you know, might be

18   a different size box.  A chip might be located here.  It

19   might be located there.  But there's no defense that we have

20   based on the hardware.  The hardware is essentially

21   irrelevant to what we're talking about.

22           THE COURT:  Is the defense based solely on the

23   software?

24           MS. BAL:  Well -- and there's not a PC, but that's the

25   difference between facet and RealDVD.  And I think what Mr.

1  Singla was referring to is that RealDVD is on a PC, and facet is

2  a standalone device.

3           THE COURT:  Okay.  But is there any aspect of the

4  facet -- of the hardware that's going to be used that is

5  susceptible to the same arguments that they are making with

6  respect to the software?

7           MS. BAL:  Well, aside from the fact that it is

8  hardware and it's not a PC, no.

9           MR. SINGLA:  I think that the --

10          THE COURT:  Well, what does the hardware do then?

11          MS. BAL:  It's looks like a DVD player, your Honor.

12 So it's a black box, and you would open it up, and you'd see a

13 disk drive, and there would be a CPU there, and there would

14 be -- I don't know -- some other -- like, yeah, a place for the

15 disk drive to go in.  I mean, it really would just be looking

16 like, you know -- to most people probably it would just be like

17 opening up a DVD player and looking inside a DVD player.

18          THE COURT:  Is that -- the prototype that he's already

19 seen, is that what you're describing?

20          MS. BAL:  I'm describing both prototypes, because they

21 look -- that's what they are.  And as I said, you know, it may

22 be that one box is bigger and one box is shinier, and it may be

23 that the chip set is located here instead of over there.

24          But it's functionally identical.  So there is --

25 you know, as the witness testified, what we're talking about

1  here is the facet software.  The facet software functions

2  identically.

3          THE COURT:  Well, Mr. Singla, if you are successful

4  with respect to the -- you know, the facet software, doesn't

5  that take care of it regardless of how it's housed, regardless

6  of what hardware it's -- you know, it uses?

7          MR. SINGLA:  Well, your Honor, that certainly is our

8  view that it's just software, and that's all that matters.

9          But what I heard Ms. Bal saying is the same thing I

10 heard Mr. Cunningham saying, which is to be very careful and

11 not say "just the software."

12         What they say is, it's the software plus the fact

13 that it's quote, "not a PC."  But the question of whether

14 something is a quote, "PC" or not a PC is something that I

15 expect we'll need to litigate here.  Now, if they don't want

16 to litigate that question, fine.  I don't need to see

17 anything more.

18         But if they were going to raise the defense that

19 "This is not a PC because of the specific hardware being

20 used," then we have the right to see the actual design for

21 the actual hardware that will be sold to consumers.

22         For example, can you attach a keyboard to it?  Can

23 you attach certain kinds of ports and devices to it?  The

24 prototypes that we've seen -- and Ms. Bal was there -- is

25 real internal prototypes.  It's not the design that Buffalo

1    or these other companies are going to sell to consumers.

2           So we don't know exactly what -- we're seeking to

3    enjoin this thing that they say is not a PC, what these

4    people like Buffalo are going to sell.  We haven't seen that.

5    In fact, RealNetworks' witness said -- the 30(b)(6) witness

6    said he doesn't even know.  Buffalo hasn't even told him yet.

7           So we're in a weird position where we're trying to

8    enjoin something they're saying is not a PC but we can't even

9    see it.

10          THE COURT:  Well, I think we go on what we have now,

11   and then at the hearing, depending on where we end up with the

12   software, if it's necessary to add anything to that we can deal

13   with it at that time.

14          MR. SINGLA:  Okay, your Honor.  Thank you.

15          THE COURT:  Okay?

16          MS. BAL:  Thank you, your Honor.

17          THE COURT:  I mean, this is -- you know -- I wish this

18   litigation were close-ended, but it does not appear to be,

19   so -- but you've got enough to work on now; okay?

20          MR. SINGLA:  Thank you, your Honor.

21          MS. BAL:  Thank you, your Honor.

22          THE COURT:  Does that take care of it?  And try to

23   work these things out yourselves by talking with each other and

24   listening to each other.  Thank you.

25          MS. BAL:  Thank you, your Honor.

1          THE COURT:  I'm going to cut out and you get to work.

2   You got your work cut out for you.

3          MS. BAL:  Okay.

4          THE COURT:  Bye-bye.

5               (The proceedings concluded at 2:48 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, CHRISTINE TRISKA, Pro-Tem Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in 08-cv-04548 MHP, RealNetworks, Inc. et al v. DVD Copy Control Association, Inc. et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____/S/ Christine Triska_____

Christine Triska, CSR 12826, CSR, RPR

Sunday, February 8, 2009