1  LEO P. CUNNINGHAM, State Bar No. 121605
   Email: lcunningham@wsgr.com
2  COLLEEN BAL, State Bar No. 167637
   Email: cbal@wsgr.com
3  MICHAEL A. BERTA, State Bar No. 194650
   Email: mberta@wsgr.com
4  TRACY TOSH LANE, State Bar No. 184666
   Email: ttosh@wsgr.com
5  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
6  One Market Street
   Spear Tower, Suite 3300
7  San Francisco, CA 94105

8  Attorneys for Plaintiffs and
   Counterclaim Defendants
9  REALNETWORKS, INC. and
   REALNETWORKS HOME
10 ENTERTAINMENT, INC.

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13 REALNETWORKS, INC., a Washington    ) Case Nos. C08 04548 MHP;
   Corporation; and REALNETWORKS HOME  )           C08 04719 MHP
14 ENTERTAINMENT, INC., a Delaware     )
   corporation,                        ) **OPPOSITION TO DEFENDANTS'**
15                                     ) **MOTION FOR SANCTIONS FOR**
                  Plaintiffs,          ) **SPOLIATION OF EVIDENCE**
16                                     )
           v.                          ) Date:       March 16, 2009
17                                     ) Time:       2:00 p.m.
   DVD COPY CONTROL ASSOCIATION, INC., a) Courtroom:  15
18 Delaware nonprofit corporation, DISNEY)
   ENTERPRISES, INC., a Delaware corporation;) Before: Hon. Marilyn Hall Patel
19 PARAMOUNT PICTURES CORP., a Delaware )
   corporation; SONY PICTURES ENTER., INC., a)
20 Delaware corporation; TWENTIETH CENTURY) **[PUBLIC REDACTED VERSION]**
   FOX FILM CORP., a Delaware corporation; NBC)
21 UNIVERSAL, INC., a Delaware corporation;)
   WARNER BROS. ENTER. INC., a Delaware )
22 corporation; and VIACOM, Inc., a Delaware )
   Corporation,                         )
23                                      )
                 Defendants.             )
24                                       )
   _____ )
25                                       )
                                         )
26 AND RELATED CASES                     )
                                         )
27 _____ )

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

I. EVENTS BEFORE LAWSUIT AND REAL'S PRESERVATION EFFORTS ............. 2

II. NO DOCUMENTS RELATING TO THIS LITIGATION WERE INTENTIONALLY DESTROYED AND RELEVANT INFORMATION WAS NOT LOST ...................................................................................................................... 6

ARGUMENT .............................................................................................................................. 7

I. THERE IS NO SPOLIATION: REAL IMPLIMENTED A DOCUMENT HOLD AND KEY EMPLOYEES RETAINED THEIR DOCUMENTS ................................. 7

II. THERE WAS NO WILLFUL DESTRUCTION OF DOCUMENTS ........................... 10

    A. Phil Barrett Did Not Instruct Employees to Destroy RealDVD Documents. ....... 10

    B. Real Did Not Willfully Destroy Any of Ms. Hamilton's Notebooks, If They Ever Existed. ........................................................................................................ 11

    C. Neither Mr. Basche nor Mr. Wolpert Willfully Destroyed Documents. .............. 13

        1. Basche .................................................................................................... 13

        2. Wolpert .................................................................................................. 14

    D. Real Has Produced the ARccOS file to the Studios. ............................................ 14

CONCLUSION ......................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

### CASES

*AAB Joint Venture v. United States*, 75 Fed. Cl. 432 (2007) .......................................................... 9

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614 (D. Colo. 2007) .................................................................................................................................. 8

*Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759 (E.D. Ark. Aug. 29, 1997) ............................................................................................... 9

*Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW, 2005 WL 3481423 (N.D. Cal. Dec. 20, 2005) ................................................................................ 12

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038 (N.D. Cal. 2006) ..................... 8

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ..................... 1, 7, 11

*Kwiatkowski v. Bear Stearns & Co.*, No. 96 Civ. 4798, 2000 WL 502856 (S.D.N.Y. Apr. 26, 2000) ..................................................................................................................... 8

*Leon v. IDX Systems Corp*, 464 F.3d 951 (9th Cir. 2006) ............................................................ 14

*Nursing Home Pension Fund v. Oracle Corp.*, 2008 WL 4093497 (N.D. Cal. 2008) .................. 14

*Rev 973 LLC v. Mouren-Laurens*, No. CV 98-10690, 2009 WL 273205 (C.D. Cal. Feb. 2, 2009) ................................................................................................................... 12

*Toste v. Lewis Controls, Inc.*, No. C-95-01366, 1996 WL 101189 (N.D. Cal. Feb. 27, 1996) ........................................................................................................................ 11

*United States v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) ....................................... 8

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ............................................... 7

RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real" or the "Company") respectfully submit this Opposition to the Motion for Sanctions for Spoliation of Evidence ("Motion" or "Mot.") filed on behalf of Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, NBC Universal, Inc., Warner Bros. Entertainment, Inc., and Viacom, Inc. (collectively, the "Studios").

## INTRODUCTION

The Studios' motion should be denied. The motion is based primarily on the false assumption that Real took no steps to preserve documents relevant to this litigation. In fact, shortly after this litigation was filed, Real distributed a comprehensive document retention memorandum instructing relevant employees to retain documents related to this dispute. While the Studios seek to impose a duty upon Real to preserve documents back to April 2007 – a year and a half before this litigation was filed – the law, including this Court's decision in the *Napster* case, does not support such a sweeping duty. At most, Real had an obligation to preserve documents starting in September 2008, and the declarations of Real's employees demonstrate that employees kept relevant documents from that time and before.

The Studios also falsely accuse Real of willfully destroying documents, and their claim is largely based on the false deposition testimony of a disgruntled former employee (Nicole Hamilton) about supposed instructions to employees to destroy documents. That never happened. Ms. Hamilton's story regarding the instruction to destroy documents is contradicted by the sworn testimony of at least a dozen Real employees and by the existence of the very documents that were purportedly subject to the instructions. Ms. Hamilton's testimony about the alleged destruction of her multiple notebooks is also wrong. The remaining allegations concerning the documents of Todd Basche (a consultant whose routine practices resulted in his innocent failure to retain some of his documents well before Real had any duty to preserve) and Richard Wolpert (a consultant who did not destroy relevant documents) similarly do not support a claim of willful spoliation.

## BACKGROUND

### I. EVENTS BEFORE LAWSUIT AND REAL'S PRESERVATION EFFORTS

Real began developing the RealDVD products in 2007. While some Real employees recognized that licensing negotiations or litigation concerning these products was a possible risk – as it is with many new products – Real did not begin discussions with the Studios until August 2008. These discussions included a series of meetings between September 3 and 5, when Elizabeth Coppinger, Real's Vice President of Video Services, met in New York and Los Angeles with representatives of CBS, NBC, Lionsgate, Warner Brothers, Sony and Universal Studios. Declaration of Elizabeth Coppinger ¶ 3. During these meetings, Ms. Coppinger discussed the concept of RealDVD and discussed Real's plans to announce the product on September 8. *Id.* None of the representatives from the studios threatened litigation during these meetings. *Id.*

Shortly before the planned announcement of RealDVD (then scheduled for September 8), Real was contacted by various studios objecting to the release of the product and expressing concerns that RealDVD violated the terms of the CSS license agreement. Real decided to postpone the product announcement to allow time to address the Studios' concerns. Declaration of Jacqueline Lang, Docket No. 28, at ¶ 7. On September 6, Real and certain of the Studios entered into a tolling agreement concerning RealDVD. *See* Docket No. 15 at 1:8-9.

On September 25, counsel for the Studios sent a letter to Real informing it that the Studios intended to file a lawsuit against Real and seek injunctive relief. Declaration of Tracy Tosh Lane filed concurrently herewith ¶ 15, Ex. F. On September 30, Real filed a complaint for declaratory relief. The same day, the Studios filed a complaint and applied *ex parte* for a Temporary Restraining Order and order to show cause why a preliminary injunction should not issue. On October 2, the Court entered a TRO.

On October 6, Real's legal department distributed a document preservation memo to members of the RealDVD team, among other employees. The document preservation memo was forwarded to Richard Wolpert, a consultant, on October 10. Declaration of Lindsey Godfrey Decl. ¶ 2. The preservation memo instructed recipients to preserve all documents and electronic

and hard copy data from July 2007 to the present relating to any aspect of RealDVD, the CSS License Agreement and the DVD CCA. Godfrey Decl., Ex. A. On October 8, Real's CEO, Rob Glaser, in an email to employees about these legal proceedings, instructed all employees to "retain all email and documents relating to RealDVD." *Id.* ¶ 3.

Further, key members of Real's product teams, as a matter of practice, maintained documents related to RealDVD. Both before and after receiving the document hold emails, these employees did not delete relevant emails or other documents. *See* Declaration of Phil Barrett ¶ 4; Declaration of Brent Wood ¶ 4; Declaration of Jeff Albertson ¶ 3; Declaration of John Moore ¶ 4; Declaration of David Watson ¶ 3; Declaration of Jeff Chasen ¶ 3; Coppinger Decl. ¶ 5; Declaration of Jim Brennan ¶ 3; Declaration of James Bielman ¶ 3; Declaration of Jeff Leitner ¶ 5; Declaration of Jeff Buzzard ¶ 3; *see also* Declaration of Richard Wolpert ¶ 4.

These employees were never instructed to delete any documentation related to the RealDVD projects and are not aware of anyone else being instructed to delete or destroy relevant documentation. *See* Barrett Decl. ¶ 5; Wood Decl. ¶ 5; Albertson Decl. ¶ 3; Moore Decl. ¶ 5; Watson Decl. ¶ 4; Chasen Decl. ¶ 4; Wolpert Decl. ¶ 6; Coppinger Decl. ¶ 5; Brennan Decl. ¶ 4; Bielman Decl. ¶ 4; Leitner Decl. ¶ 6; Buzzard Decl. ¶ 4; Declaration of Dale DeWhitt ¶ 13; *see also* Declaration of Todd Basche ¶ 3.

Nicole Hamilton, a former employee whose deposition testimony is the basis for much of the Studios' Motion, worked as the program manager of Facet (one of the RealDVD projects) for approximately one year, through late June 2008. In June 2008, ████████████████████ ████████████████████████████████████████████████████ Ms. Hamilton transferred within Real to work on the Helix product team, a product unrelated to RealDVD. DeWhitt Decl. ¶¶ 3-4. At the time of her transfer, Ms. Hamilton was instructed to transition all of her work and materials related to Facet to her supervisor, Brent Wood. DeWhitt Decl. ¶ 5; Wood Decl. ¶ 6.

In approximately August 2008, Mr. Wood himself asked Ms. Hamilton to provide all of her Facet materials to him. Wood Decl. ¶ 6. Ms. Hamilton provided Mr. Wood with a CD containing what Mr. Wood believed to be all of her documents related to Facet and one notebook

1  that contained only a short sign-out list. *Id.* Mr. Wood subsequently provided these materials to
2  Real's legal department. *Id.* Mr. Wood and Dale DeWhitt (Real's Director of Human
3  Resources) both believed that Ms. Hamilton had followed their instructions and provided *all* of
4  her documentation relevant to her work on the Facet program to members of the Facet team. *Id.*;
5  DeWhitt Decl. ¶ 5. Moreover, not once between June and September 2008 did Ms. Hamilton
6  inform Mr. Wood or Mr. DeWhitt (or anyone else at Real) that she had notebooks containing
7  information related to her work on Facet.[1] Wood Decl. ¶ 6; Mathew Decl. ¶ 6. In her
8  deposition, when asked about these supposed notebooks, Ms. Hamilton said: "█████
9  █████████████████████████████████████████████████████
10 █████████████████████████████" Lane Decl., Ex. G (quoting
11 Hamilton Depo. Tr. at 86:6-9).
12      In September 2008, ███████████████████████████████████.
13 DeWhitt Decl. ¶ 7. On September 24, ████████████████████████████
14 █████████████████████████████████████████████████████
15 █████████████████████████████████████████████████████
16 █████████████████████████████████████████████████████
17 █████████████████████████████████████████████████████
18 █████. *Id.*; DeWhitt Decl. ¶ 7. During the course of the meeting, Ms. Hamilton handed the
19 single notebook over to Mr. DeWhitt. DeWhitt Decl. ¶ 9; Mathew Decl. ¶ 4. Mr. DeWhitt, in
20 turn, handed this notebook to Mr. Mathew, who placed the notebook in Ms. Hamilton's office.
21 Mathew Decl. ¶ 4; DeWhitt Decl. ¶ 9. Neither Mr. DeWhitt nor Mr. ███████████
22 ██████████████████████████████████ recall seeing any other
23 notebooks in her office. Mathew Decl. ¶ 5; DeWhitt Decl. ¶ 9.
24
25 ─────────────────
26 [1] Ms. Hamilton never mentioned her supposed notebooks until one week before her
   deposition, which, as discussed below, ████████████████████████████
27 █████████████████████████████████████████████████████.
28

█████████████████████████████████████, Real kept her former office locked for several months. Mathew Decl. ¶ 5; DeWhitt Decl. ¶ 9. In late December 2008, the office was re-assigned to another employee on the Helix project and the single notebook, which was not believed to have any information relevant to this litigation, was apparently cleaned out of the office and has not been found. Mathew Decl. ¶ 6; DeWhitt Decl. ¶ 12. When Mr. DeWhitt approved re-assigning the office, he did not believe that there was any documentation in the office that could be relevant to the ongoing litigation because he understood and was informed that Ms. Hamilton had previously turned over all of her Facet materials to Mr. Wood. DeWhitt Decl. ¶ 11. Both Mr. DeWhitt and Mr. Mathew believed that single notebook they had seen was unrelated to RealDVD. *Id.*; Mathew Decl. ¶ 6.

During her employment at Real, Ms. Hamilton did not express any concerns regarding the legality of Facet or imply or suggest that Real's work on Facet was illegal or unethical. *See, e.g.,* Wood Decl. ¶ 6; Brennan Decl. ¶ 5; Buzzard Decl. ¶ 5; Watson Decl. ¶ 5; DeWhitt Decl. ¶ 13. Similarly, Ms. Hamilton did not report that she had been instructed to destroy documents relevant to this litigation or otherwise. Had she done so, Real would have investigated. DeWhitt Decl. ¶ 13. Ms. Hamilton had a duty under Real's code of ethics to report such matters. *Id.*

When the Studios sought Ms. Hamilton's deposition, Real contacted her, and later, the lawyer of her choosing, Peter Chu, in an attempt to structure a relationship that would assure the protection of the considerable attorney-client privileged communications to which Ms. Hamilton had been privy as a Real employee. Way Decl., ¶ 2; Lane Decl. ¶ 2. ███████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[2] It is worth noting that both Ms. Hamilton and her attorney have remarkably characterized Real's demand for the return of its confidential information as a request to "destroy" evidence (Lane Decl, ¶¶ 8, 12, Exs. B, C and E), which demonstrates that Ms. Hamilton is, at least, reckless in her use of allegations of document destruction.

1  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

## II. NO DOCUMENTS RELATING TO THIS LITIGATION WERE INTENTIONALLY DESTROYED AND RELEVANT INFORMATION WAS NOT LOST

The Studios also contend that two individuals who worked on the products at issue – Todd Basche and Richard Wolpert – destroyed relevant documents. Mot. at 9.

**Basche.** Todd Basche worked as a consultant for Real, interacting primarily with Jeff Chasen and Richard Wolpert on RealDVD. Basche Decl. ¶ 2. Mr. Basche's consulting engagement ended in April 2008 – approximately five months before the Studios threatened litigation and before this case was filed. *Id.* ¶ 3. Mr. Basche testified that when his engagement ended, he destroyed all of his materials regarding Real as part of his normal practice when he ends any engagement with a client. *Id.* At that time, Mr. Basche believed that Real employees had copies of the documents he had deleted. *Id.* In preparation for submitting a declaration in support of this Opposition, Mr. Basche has now located a back-up of many of his documents related to his Real work. *Id.*

Mr. Basche generated few documents during his engagement with Real, and he believes his work product for RealDVD was sent primarily either to Mr. Chasen or to Mr. Wolpert, who have retained their documents. *Id.* ¶ 2; Chasen Decl. ¶ 6; Wolpert Decl. ¶ 5. Furthermore, while Mr. Basche did use and review a beta version of the Vegas product early in 2008, Mr. Basche never modified the beta version, was not entrusted with the only copy of that software, and, contrary to what the Studios have suggested in questions at Mr. Basche's deposition (Basche Depo. Tr. at 234:21-235:6 (Lane Decl. Ex. H)), the early versions of the software's source code have not been destroyed. Basche Decl. ¶ 5(c); Chasen Decl. ¶ 6.

**Wolpert.** Richard Wolpert, an advisor to Real on RealDVD, works on strategic issues for the Company. The Studios contend that Mr. Wolpert destroyed relevant documents. Mot. at 9, 15. Although Mr. Wolpert testified ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Mot. at 9, 15

1  (quoting deposition testimony)), the documents that Mr. Wolpert deleted were *unrelated* to this
2  case, and he has not deleted documents related to RealDVD. Wolpert Decl. ¶ 7.
3        **ARccOS.** The Studios complain in their Motion about an ARccOS.zip file. On March 4,
4  Real produced this electronic file to the Studios. Lane Decl. Ex. I.

## ARGUMENT

### I. THERE IS NO SPOLIATION: REAL IMPLIMENTED A DOCUMENT HOLD AND KEY EMPLOYEES RETAINED THEIR DOCUMENTS

      The Studios' Motion is based primarily on the assumption that Real took no steps to preserve documents relevant to this litigation. *See, e.g.*, Mot. at 1-2. The Studios are wrong. As described above, Real issued comprehensive document hold notices on October 6, 2008, shortly after this lawsuit was filed. Godfrey Decl. ¶¶ 2, 3. Those notices instructed people to maintain "any document or computerized information" about RealDVD, the CSS License Agreement, and the DVD CCA. *Id.* On October 8, 2008, Real's CEO, sent an email instructing all employees to "retain all email and documents relating to RealDVD." *Id.* ¶ 3. Moreover, starting in October 2008, Real imaged the computers of key employees. *See, e.g.*, Barrett Decl. ¶ 4; Coppinger Decl. ¶ 4; Leitner Decl. ¶ 6; Chasen Decl. ¶ 3; Albertson Decl. ¶ 3; Brennan Decl. ¶ 3; Wolpert Decl. ¶ 4.

      In an effort to create a spoliation issue, the Studios argue that Real had a duty to preserve documents from April 2007 – a year and a half before the lawsuit was filed. Mot. at 3, 9-10. In doing so, the Studios place great weight on this Court's decision in the *Napster* litigation, in which the Court explained that "[t]he duty to preserve documents attaches 'when a party should have known that the evidence may be relevant to future litigation.'" *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). In *Napster*, the Court found that an investment fund had a duty to preserve documents as of the date (i.e., June 2000) when it had received a subpoena and had been expressly threatened with litigation. 462 F. Supp. 2d at 1069.

      Applying that standard to this case, the earliest Real could have had a duty to preserve documents was early September 2008. As discussed above, Real's first discussions with the

1  Studios took place in August and September. After those meetings, the Studios expressed

2  concern that RealDVD violated the CSS License Agreement and the parties entered a tolling

3  agreement. *See* Docket No. 15 at 1:8-9. On September 25, lawyers for the Studios expressly

4  threatened litigation in a letter to Real. No duty to preserve existed prior to these events in

5  September 2008.

6        The Studios invite the Court to adopt a rule that a corporation in which some employees

7  believe litigation is possible or a risk – prior to any actual threat or notice – must act to save all

8  of its documents. That is not, and should not be, the law. For example, in *Hynix Semiconductor*

9  *Inc. v. Rambus, Inc.*, plaintiff brought a declaratory judgment action against defendants, who

10  then counterclaimed for patent infringement. 591 F. Supp. 2d 1038 (N.D. Cal. 2006). The court

11  held that, even though defendant had developed a "litigation strategy" for bringing patent

12  infringement lawsuits against numerous manufacturers of DRAM in 1998, litigation did not

13  become "probable" until late 1999, just before defendant began interviewing litigation counsel.

14  *Id.* at 1064; *see also United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)

15  (holding that too low a threshold for "potential litigation" would require entities to essentially

16  keep documents "in perpetuity").

17        Indeed, the rule offered by the Studios would lead to an absurd result: companies,

18  especially in the high-tech arena, would have to retain all documents on many new products,

19  from the start of development, since there is often a high risk of intellectual property or similar

20  litigation. As one court explained:

21      [A] party's duty to preserve evidence in advance of litigation must be predicated
    on something more than an equivocal statement of discontent, particularly when
22      that discontent does not crystallize into litigation for nearly two years. Any other
    conclusion would confront a putative litigant with an intractable dilemma: either
23      preserve voluminous records for an indefinite period at potentially great expense,
    or continue routine document management practices and risk a spoliation claim at
24      some point in the future.

25  *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007)

26  (holding that duty to preserve did not begin until complaint was filed and denying request for

27  sanctions based on conduct before lawsuit); *see also Kwiatkowski v. Bear Stearns & Co.*, No. 96

28  Civ. 4798, 2000 WL 502856, at *5 (S.D.N.Y. Apr. 26, 2000) ("While it is conceivable that

plaintiff may have pondered the possibility of a dispute between the parties here arising by virtue of the extraordinary magnitude of the transactions at stake, such reflection or abstract possibility alone is not tantamount to mutual anticipation of impending litigation, or sufficient grounds to put one party on notice, thereby triggering an immediate obligation to preserve records of all relevant transactions between the parties."); *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 442 (2007) ("The Court agrees with Defendant that the duty to preserve evidence did not attach until July 2002, when the [request for equitable adjustments] were filed and when Defendant could reasonably have anticipated the instant litigation.").[3]

Therefore, Real respectfully submits that the earliest Real could have had a duty to preserve documents was September 2008. While Real's document hold was issued on October 6, there is no evidence that documents were destroyed between September and early October. To the contrary, as explained in their declarations submitted herewith, key employees at Real continued to maintain – consistent with their regular practices – all emails and other documents that were relevant to RealDVD even before September 2008. *See* Barrett Decl. ¶ 4; Wood Decl. ¶ 4; Albertson Decl. ¶ 3; Moore Decl. ¶ 4; Watson Decl. ¶ 3; Chasen Decl. ¶ 3; Wolpert Decl. ¶ 4; Coppinger Decl. ¶ 5; Brennan Decl. ¶ 3; Bielman Decl. ¶ 3; Leitner Decl. ¶ 5; Buzzard Decl. ¶ 3.

---

[3] As another court explained:

> [T]o hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail. . . . Any corporation the size of Defendant (or even much smaller) is going to be frequently involved in numerous types of litigation. Whether it be patent, trademark, labor or antitrust suits, the threat of litigation is ever present for large, successful corporations. Arguably, most e-mails, excluding purely personal communications, could fall under the umbrella of relevant to potential future litigation. . . . Thus, it would be necessary for a corporation to basically maintain all of its e-mail. Such a proposition is not justified.

*Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *4-5 (E.D. Ark. Aug. 29, 1997) (internal quotation marks omitted) (partially denying motion to compel in respect to email deleted prior to filing of the action and denying request for spoliation jury instruction).

## II. THERE WAS NO WILLFUL DESTRUCTION OF DOCUMENTS

The Studios also base their motion on the alleged destruction of documents at the purported instruction of Phil Barrett and the alleged destruction of documents belonging to Nicole Hamilton, Todd Basche, and Richard Wolpert. As explained below, the truth is different and does not warrant the imposition of sanctions.

### A. Phil Barrett Did Not Instruct Employees to Destroy RealDVD Documents.

The Studios' primary allegation of willful destruction is that Phil Barrett instructed employees to destroy evidence that he thought would be unhelpful in the litigation. Mot. at 7. This allegation is based solely on the deposition testimony of Nicole Hamilton. *Id.* at 7-8. Importantly, Ms. Hamilton did not report during her employment at Real that she or anyone else had been instructed to destroy documents, even though she had a duty to do so under the Company's code of ethics. DeWhitt Decl. ¶ 13; Albertson Decl. ¶ 4; Basche Decl. ¶ 5(d); Buzzard Decl. ¶ 4; Wood Decl. ¶ 6; Bielman Decl. ¶ 5; Brennan Decl. ¶ 5; Chasen Decl. ¶ 4; Coppinger Decl. ¶ 6; Leitner Decl. ¶ 7; Moore Decl. ¶ 5; Watson Decl. ¶ 4; Wolpert Decl. ¶ 6.

In any event, Ms. Hamilton's testimony is directly refuted by more than a dozen Real employees who worked with Mr. Barrett and Ms. Hamilton. Uniformly and unequivocally, these employees deny that Mr. Barrett – or anyone else at Real –instructed anyone to delete emails or other documents relating to RealDVD. *See* Barrett Decl. ¶ 5; Wood Decl. ¶ 5; Albertson Decl. ¶ 3; Moore Decl. ¶ 6; Watson Decl. ¶ 4; Chasen Decl. ¶ 4; Wolpert Decl. ¶ 6; Coppinger Decl. ¶ 5; Brennan Decl. ¶ 4; Bielman Decl. ¶ 4; Leitner Decl. ¶ 6; Buzzard Decl. ¶ 4; DeWhitt Decl. ¶ 13; *see also* Basche Decl. ¶ 3. Therefore, the crux of the Studios' allegation of willful destruction is baseless. Indeed, the very documents Ms. Hamilton claims would have been destroyed actually exist, were produced in this litigation, and include documents introduced by the Studios at Ms. Hamilton's deposition. *Compare* Hamilton Depo. Tr. at 39:23-41:4 ("█████████ █████████ █████████") *with* Hamilton Depo., Ex. 27 (█████████ █████).

1   █████████████████████████████████████

2  ████.

### B. Real Did Not Willfully Destroy Any of Ms. Hamilton's Notebooks, If They Ever Existed.

The Studios allege that Real willfully destroyed Ms. Hamilton's purported notebooks. The Studios argue – again solely based on Ms. Hamilton's testimony – that Ms. Hamilton turned over three or four notebooks that were "the only comprehensive documentation for the development of Facet" and that Real destroyed these notebooks. Mot. at 2, 5-6. Ms. Hamilton never mentioned the purported existence of her notebooks ████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████.

Contrary to her testimony, Ms. Hamilton did not give three or four notebooks to Mr. Mathew or Mr. DeWhitt. DeWhitt Decl. ¶ 9; Mathew Decl. ¶ 4.[4] At the time of ████████, and purported transfer of her notebooks, Ms. Hamilton had been off the Facet project for three months. DeWhitt Decl. ¶ 11; Mathew Decl. ¶ 6. What she actually handed Mr. DeWhitt during the meeting ████████████████████████ was a single notebook. That notebook was returned to her office. DeWhitt Decl. ¶ 9; Mathew Decl. ¶ 5. While the notebook cannot be located today, Real's employees did not believe it contained material related to Facet because Ms. Hamilton had not worked on Facet for three months and had previously been asked to turn over all of her Facet materials to the Facet team. DeWhitt Decl. ¶ 11; Mathew Decl. ¶ 6; Wood Decl. ¶ 6.

At most, the loss of Ms. Hamilton's single notebook was the result of inadvertence and not any intentional effort to destroy documents. *See, e.g., Napster*, 462 F. Supp. 2d at 1078 (adverse inference sanction requires culpable state of mind of at least gross negligence); *Toste v. Lewis Controls, Inc.*, No. C-95-01366, 1996 WL 101189, at *7 (N.D. Cal. Feb. 27, 1996) (denying spoliation sanctions where destruction of evidence was only inadvertent and where

---

[4] Neither Mr. DeWhitt nor Mr. Mathew worked on the RealDVD project. Also, neither is an "executive" of Real, as the Studios incorrectly contend. *See* Mot. at 2, 6, 7.

1  court could best determine at trial whether any evidentiary remedies were warranted); *Hamilton
2  v. Signature Flight Support Corp.*, No. C 05-0490 CW, 2005 WL 3481423, at *7-9 (N.D. Cal.
3  Dec. 20, 2005) (party's effort to seek issue preclusion sanctions were deemed "over-reaching"
4  where destruction of evidence was negligent and there were other and alternative sources of
5  evidence that had not been destroyed); *Rev 973 LLC v. Mouren-Laurens*, No. CV 98-10690,
6  2009 WL 273205, at *3-4 (C.D. Cal. Feb. 2, 2009) (denying motion for adverse inference
7  instructions for spoliation where destruction was at most negligent and resulted in no prejudice).

8        Other than Ms. Hamilton's and the Studios' self-serving characterizations, the evidence
9  strongly suggests that this single notebook was not related to her work on the Facet project she
10 left three months earlier. If Ms. Hamilton's account is to be believed, she would have had to
11 have secretly maintained this notebook in her office for three months, failed to give a copy to
12 Mr. Wood when he requested that she turn over all of her Facet materials, and ▌
13 ▌, notwithstanding
14 prior requests to turn over all of her relevant materials, suddenly decided to bring the notebook
15 with her down to Mr. DeWhitt's office. This story does not withstand a modicum of scrutiny.

16       In any event, even if there could have been some information relevant to Facet in this
17 notebook, far from being "the most comprehensive record of the development of the Facet
18 product," (Mot. at 7), Ms. Hamilton's notebook was just that – a collection of unspecified notes.
19 When asked about these notebooks in her deposition, Ms. Hamilton said: "▌
20 ▌
21 ▌ (quoting
22 Hamilton Depo. Tr. at 86:6-9). ▌,
23 the members of the team involved in the project state that the best and by far most
24 comprehensive "record" of the development of Facet is the source code itself, which has been
25 preserved and provided to the defendants. *See, e.g.*, Wood Decl. ¶ 8; Barrett Decl. ¶ 6; Basche
26 Decl. ¶ 5(c); Leitner Decl. ¶¶ 3-4. In addition to that code, Real has produced more than
27 100,000 pages of documents from more than a dozen custodians, including thousands of pages of
28 e-mails collected both from Ms. Hamilton and from the key members of the RealDVD teams.

Thus, the Studios' claim that Ms. Hamilton's notebooks were the only comprehensive record on the development of Facet is simply not credible.

### C. Neither Mr. Basche nor Mr. Wolpert Willfully Destroyed Documents.

Finally, the Studios rely on the testimony of Mr. Basche and Mr. Wolpert in alleging that Real engaged in the willful destruction of documents. Mot. at 9. Again, the Studios are wrong.

#### 1. Basche

Mr. Basche was a consultant for Real on the RealDVD project. Basche Decl. ¶¶ 1, 2. Mr. Basche advised members of the engineering team responsible for developing Real's Windows-based software product known as Vegas, and he worked primarily with Jeff Chasen and Richard Wolpert. *Id.* ¶ 2. Mr. Basche's consulting engagement ended in April 2008, approximately five months before the litigation was filed. *Id.* ¶ 3. Mr. Basche testified that when his engagement ended, he destroyed all of his materials regarding Real as part of his normal practice when he ends any engagement with a client. *Id.* ¶ 4. Mr. Basche did not destroy documents to keep them from production in this case. *Id.* ¶ 3. Any documents that Mr. Basche destroyed (and copies of which cannot be located in other people's files) were lost months before Real had any duty to preserve them.

Moreover, Mr. Basche generated relatively few documents during his engagement, and his work product on Vegas was sent primarily to either Mr. Chasen or Mr. Wolpert, both of whom have retained materials relevant to this litigation. *Id.* ¶ 2; Chasen Decl. ¶ 6; Wolpert Decl. ¶ 5. For this reason, Mr. Basche believed that all of the materials that he destroyed were already in the possession of Real and would not be permanently lost. Basche Decl. ¶ 3. Furthermore, while Mr. Basche did use and review a beta version of the Vegas product early in 2008, Mr. Basche was not entrusted with the only copy of that software, and contrary to what the Studios have suggested, the early versions of the software's source code are still accessible. Basche Decl. ¶ 5(c); Chasen Decl. ¶ 6.

Finally, in preparation for submission of his declaration, Mr. Basche has located a back-up copy of a substantial number, if not all, of the non-email documents related to his work on

1  Vegas. Basche Decl. ¶ 4. Therefore, there will be little or no prejudice to the Studios from Mr.
2  Basche's initial destruction of documents.[5]

### 2. Wolpert

The Studios also contend that Mr. Wolpert destroyed documents and should therefore be precluded from testifying in this action. Mot. at 9, 15. The Studios' argument is based entirely on a grossly distorted view of Mr. Wolpert's deposition testimony in which he said that he ████████████████████. *Id.* at 9 (quoting Wolpert Depo. Tr. at 157:3-9). Citing the same deposition testimony, the Studios contend that the materials that Mr. Wolpert deleted were "relat[ed] to RealDVD," notwithstanding that the deposition transcript says no such thing. *Id.* The Studios' argument rests entirely on a distortion of his testimony.

In fact, Mr. Wolpert vigorously denies deleting any documents relating to RealDVD. Wolpert Decl. ¶ 3. The unspecified materials he deleted which he referenced in his deposition were unrelated to his work for Real. *Id.* ¶ 7. In short, Mr. Wolpert has not destroyed materials relevant to this case, and the Studios' request to exclude his testimony should be rejected.

### D. Real Has Produced the ARccOS file to the Studios.

Lastly, the Studios contend that Real has engaged in the willful destruction of documents because it has not produced an ARccOS.zip file. As explained above, on March 4, Real produced this electronic file.

## CONCLUSION

For the reasons set forth above, Real respectfully requests that the Court deny the Studios' Motion for Sanctions for Spoliation of Evidence. If the Court has any concern about

---

[5] The Studios rely on *Leon v. IDX Systems Corp*, 464 F.3d 951, 959 (9th Cir. 2006), and *Nursing Home Pension Fund v. Oracle Corp.*, 2008 WL 4093497 (N.D. Cal. 2008) for the proposition that the relevance of the destroyed documents may be presumed. *See* Mot. at 11-12. Both of those cases, however, involved <u>willful</u> destruction or nondisclosure of numerous documents after litigation had commenced and after a discovery order had been issued. Prejudice need not be presumed in a case such as this where the loss of documents – if any – is at most negligent.

1  maintaining relevant documents going forward, Real has no objection to a preservation order that
2  would apply to all of the parties, including the Studios.

4  Dated: March 11, 2009

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____/s/ Leo Cunningham_____

Attorneys for Plaintiffs and Counterclaim
Defendants
REALNETWORKS, INC. AND
REALNETWORKS HOME
ENTERTAINMENT, INC.