Realnetworks, Inc. et al v. DVD Copy Control Association, Inc. et al          Doc. 199 Att. 3



# EXHIBIT Y
# PART 2

Dockets.Justia.com

## REALNETWORKS, INC. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Sale of Non-Controlling Interest in Rhapsody America | Deferred Stock-Based Compensation | Accumulated Other Comprehensive Income (Loss) | Retained Earnings (Deficit) | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | |
| **Balances, December 31, 2005** | 166,037 | 166 | 805,067 | — | (19) | 26,724 | 9,795 | 841,733 |
| Common stock issued for exercise of stock options and employee stock purchase plan | 9,067 | 8 | 54,921 | — | — | — | — | 54,929 |
| Common shares repurchased | (11,836) | (12) | (98,864) | — | — | — | — | (98,876) |
| Shares issued for director payments | 10 | — | 97 | — | — | — | — | 97 |
| Stock-based compensation | — | — | 18,132 | — | 19 | — | — | 18,151 |
| Unrealized loss on investments, net of income tax | — | — | — | — | — | (14,399) | — | (14,399) |
| Translation adjustment | — | — | — | — | — | 11,160 | — | 11,160 |
| Tax benefit from stock option exercises | — | — | 11,755 | — | — | — | — | 11,755 |
| Net income | — | — | — | — | — | — | 145,216 | 145,216 |
| **Balances, December 31, 2006** | 163,278 | 162 | 791,108 | — | — | 23,485 | 155,011 | 969,766 |
| Common stock issued for exercise of stock options, employee stock purchase plan, and vesting of restricted shares | 2,747 | 3 | 15,868 | — | — | — | — | 15,871 |
| Common shares repurchased | (23,780) | (23) | (178,769) | — | — | — | — | (178,792) |
| Common shares awarded | 40 | — | 260 | — | — | — | — | 260 |
| Shares issued for director payments | 13 | — | 74 | — | — | — | — | 74 |
| Stock-based compensation | — | — | 23,918 | — | — | — | — | 23,918 |
| Unrealized loss on investments, net of income tax | — | — | — | — | — | (8,482) | — | (8,482) |
| Translation adjustment | — | — | — | — | — | 2,729 | — | 2,729 |
| Tax benefit from stock option exercises | — | — | 1,445 | — | — | — | — | 1,445 |
| Net income | — | — | — | — | — | — | 48,315 | 48,315 |
| **Balances, December 31, 2007** | 142,298 | 142 | 653,904 | — | — | 17,732 | 203,326 | 875,104 |
| Common stock issued for exercise of stock options, employee stock purchase plan, and vesting of restricted shares | 1,990 | 2 | 9,547 | — | — | — | — | 9,549 |
| Common shares repurchased | (9,955) | (10) | (50,189) | — | — | — | — | (50,199) |
| Common shares awarded | 6 | — | 21 | — | — | — | — | 21 |
| Shares issued for director payments | 15 | — | 110 | — | — | — | — | 110 |
| Stock-based compensation | — | — | 23,531 | — | — | — | — | 23,531 |
| Unrealized loss on investments, net of income tax | — | — | — | — | — | (2,320) | — | (2,320) |
| Translation adjustment | — | — | — | — | — | (64,141) | — | (64,141) |
| Tax deficiency from stock option exercises | — | — | (1,600) | — | — | — | — | (1,600) |
| Sale of non-controlling interest in Rhapsody America | — | — | — | 7,381 | — | — | — | 7,381 |
| Net loss | — | — | — | — | — | — | (243,878) | (243,878) |
| **Balances, December 31, 2008** | 134,354 | $ 134 | $ 635,324 | $ 7,381 | $ — | $ (48,729) | $ (40,552) | $ 553,558 |

See accompanying notes to consolidated financial statements.

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
Years ended December 31, 2008, 2007, and 2006

### Note 1.   Description of Business and Summary of Significant Accounting Policies

*Description of Business.*   RealNetworks, Inc. and subsidiaries (RealNetworks or Company) is a leading creator of digital media services and software. Consumers use the Company's services and software, such as Rhapsody, RealArcade, and RealPlayer to find, play, purchase, and manage free and premium digital content, including music, games, and video. Broadcasters, cable and wireless communications companies, media companies and enterprises use the Company's digital media applications and services to create, secure and deliver digital media to PCs, mobile phones, portable music players and other consumer electronic devices and to provide entertainment services to their subscribers.

Inherent in the Company's business are various risks and uncertainties, including limited history of certain of its product and service offerings and its limited history of offering premium subscription services on the Internet. The Company's success will depend on the acceptance of the Company's technology, products and services and the ability to generate related revenue.

*Basis of Presentation.*   The consolidated financial statements include the accounts of the Company and its wholly-owned and majority-owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

On August 20, 2007, RealNetworks and MTV Networks, a division of Viacom International Inc. (MTVN), created Rhapsody America LLC (Rhapsody America) to jointly own and operate a business-to-consumer digital audio music service. RealNetworks held a 51% interest in Rhapsody America as of December 31, 2008 and December 31, 2007. Rhapsody America's financial position and operating results have been consolidated into RealNetworks' consolidated financial statements since its formation in August 2007. The minority interest's proportionate share of income (loss) is included in Minority interest in Rhapsody America in the consolidated statements of operations and comprehensive income. MTVN's proportionate share of equity is included in Minority interest in Rhapsody America in the consolidated balance sheets.

The Company acquired 99.7% of WiderThan Co., Ltd. (WiderThan) during the three months ended December 31, 2006. The Company acquired substantially all of the remaining shares of WiderThan during the three months ended June 30, 2007. The accompanying consolidated financial statements include 100% of the financial results of WiderThan from the date of acquisition. The minority interest in the earnings of WiderThan for the year ended December 31, 2007 was nominal. The minority interest liability related to WiderThan as of December 31, 2006 was nominal.

*Use of Estimates.*   The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. In addition, current economic conditions may require the use of additional estimates, and certain estimates the Company currently makes are subject to a greater degree of uncertainty as a result of the current economic conditions.

*Cash, Cash Equivalents, and Short-Term Investments.*   The Company considers all short-term investments with a remaining contractual maturity at date of purchase of three months or less to be cash equivalents.

The Company has classified as available-for-sale all marketable debt and equity securities for which there is determinable fair market value and there are no restrictions on the Company's ability to sell. Available-for-sale securities are carried at fair value, based on quoted market prices, with unrealized gains and losses reported as a separate component of shareholders' equity, net of applicable income taxes. All short-term investments have remaining contractual maturities of five years or less. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in other income, net.

64

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Realized and unrealized gains and losses on available-for-sale securities are determined using the specific identification method.

*Trade Accounts Receivable.* Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts and sales returns is the Company's best estimate of the amount of probable credit losses in the Company's existing accounts receivable. The Company determines the allowance based on analysis of historical bad debts, customer concentrations, customer credit-worthiness and current economic trends. The Company reviews its allowance for doubtful accounts quarterly. Past due balances over 90 days and specified other balances are reviewed individually for collectability. All other balances are reviewed on an aggregate basis. Account balances are written off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Company does not have any off-balance sheet credit exposure related to its customers.

*Concentration of Credit Risk.* Financial instruments that potentially expose the Company to concentrations of credit risk consist primarily of cash and cash equivalents, short-term investments, and accounts receivable. The Company maintains its cash and cash equivalents with high credit quality financial institutions, but due to current economic conditions, the Company faces the risk that it may not be able to access its cash balances if these financial institutions nationalize or fail. Short-term investments consist of U.S. government and government agency securities and corporate notes and bonds. The Company derives a significant portion of its revenue from a large number of individual subscribers spread globally. The Company also derives revenue from several large customers. If the financial condition or results of operations of any one of the large customers deteriorates substantially, the Company's operating results could be adversely affected. To reduce credit risk, management performs ongoing credit evaluations of the financial condition of significant customers. The Company does not generally require collateral and maintains reserves for estimated credit losses on customer accounts when considered necessary.

*Depreciation and Amortization.* Depreciation and amortization of equipment, software, and leasehold improvements are computed using the straight-line method over the lesser of the estimated useful lives of the assets or the lease term. Approximate useful life of equipment and software is three to five years and for leasehold improvements is one to ten years.

Depreciation expense during the years ended December 31, 2008, 2007, and 2006 was $23.1 million, $20.7 million, and $13.5 million, respectively.

*Equity Investments.* The cost method is used to account for equity investments in companies in which the Company holds less than a 20 percent voting interest, does not exercise significant influence, and the related securities do not have a quoted market price. The Company uses the equity method investment under APB No. 18, *The Equity Method of Accounting for Investments in Common Stock* , in circumstances where it has the ability to exert significant influence over but not control the investee or joint venture. Under this method, the Company records its investment at the amount of capital contributed plus its percentage interest in the investee or joint venture's income or loss.

*Other Intangible Assets.* Other intangible assets consist primarily of the fair value of customer agreements and contracts, developed technology, patents, trademarks and tradenames acquired in business combinations. Other intangible assets are amortized on a straight line basis over one to seven years, which approximates their estimated useful lives.

*Goodwill.* Goodwill represents the excess of the purchase price over the fair value of identifiable tangible and intangible assets acquired and liabilities assumed in business combinations. Goodwill is tested at least annually for impairment and more frequently if events and circumstances indicate that it might be impaired. The annual impairment test is performed in the fourth quarter of the Company's fiscal year. Factors

65

**REALNETWORKS, INC. AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

the Company considers important which could trigger an impairment review include, but are not limited to, the following:

- poor economic performance relative to historical or projected operating results;

- significant negative industry, economic or company specific trends;

- changes in the manner of our use of the assets or the plans for our business; and

- loss of key personnel.

*Long-Lived Assets.* The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets held and used is measured by a comparison of the carrying amount of the assets to the estimated undiscounted future cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds their fair value.

*Fair Value of Financial Instruments.* Effective January 1, 2008, the Company adopted SFAS 157, except as it applies to the nonfinancial assets and nonfinancial liabilities subject to FSP No. 157-2. SFAS No. 157 clarifies the definition of fair value, prescribes methods for measuring fair value, establishes a fair value hierarchy based on the inputs used to measure fair value, and expands disclosures about fair value measurements. The three-tier fair value hierarchy, which prioritizes the inputs used in the valuation methodologies, is:

Level 1 — Valuations based on quoted prices for identical assets and liabilities in active markets.

Level 2 — Valuations based on observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

Level 3 — Valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants. These valuations require significant judgment.

Prior to the adoption of SFAS 157, the Company had the following financial instruments: cash and cash equivalents, short-term investments, accounts receivable, accounts payable, and accrued liabilities. The carrying value of cash and cash equivalents, accounts receivable, accounts payable, and accrued liabilities approximates their fair value based on the liquidity of these financial instruments or based on their short-term nature. Short-term investments are carried at fair value based on quoted market prices. The fair value of convertible debt, which had a carrying value of $100.0 million, was $98.7 million at December 31, 2007 and 2006, respectively. Due to current economic conditions, the Company faces the risk that some of our short-term investments may no longer be liquid if we experience an inability to access or liquidate the investments due to nationalization or failure of the financial institutions where the investment is held.

*Research and Development.* Costs incurred in research and development are expensed as incurred. Software development costs are capitalized when a product's technological feasibility has been established through the date the product is available for general release to customers. The Company has not capitalized any software development costs, as technological feasibility is generally not established until a working model is completed, at which time substantially all development is complete.

*Restructuring and Other Charges.* During the years ended December 31, 2008 and December 31, 2007, the Company recorded restructuring charges of $4.0 million and $3.7 million, respectively. These charges were a result of workforce reductions and other realized synergies among our recent acquisitions. Severance charges

66

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

accounted for the majority of the expense recorded. All charges were recorded in accordance with SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*. Also included in these charges for the year ended December 31, 2008 was $2.8 million related to the write-off of capitalized transaction-related costs associated with the plan to separate the Games business from the Company. No such amounts were incurred during the year ended December 31, 2006.

*Revenue Recognition.* The Company recognizes revenue in accordance with the following authoritative literature: AICPA Statement of Position (SOP) No. 97-2, *Software Revenue Recognition;* SOP No. 98-9, *Software Revenue Recognition with Respect to Certain Arrangements* ; SOP No. 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* ; Securities and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) No. 104, *Revenue Recognition in Financial Statements* ; Financial Accounting Standards Board's (FASB) Emerging Issues Task Force (EITF) Issue No. 00-21, *Revenue Arrangements with Multiple Deliverables;* and EITF Issue No. 99-19, *Reporting Revenue Gross as a Principal versus Net as an Agent* . Generally the Company recognizes revenue when there is persuasive evidence of an arrangement, the fee is fixed or determinable, the product or services have been delivered and collectability of the resulting receivable is reasonably assured.

Consumer subscription products are paid in advance, typically for monthly, quarterly or annual periods. Subscription revenue is recognized ratably over the related subscription period. Revenue from sales of downloaded individual music tracks, albums and games are recognized at the time the music or game is made available, digitally, to the end user.

The Company recognizes revenue under the residual method for multiple element software arrangements when vendor specific objective evidence (VSOE) exists for all of the undelivered elements of the arrangement, but does not exist for one or more of the delivered elements in the arrangement, under SOP No. 97-2. Under the residual method, at the outset of the arrangement with a customer, the Company defers revenue for the fair value of the arrangement's undelivered elements such as post contract support (PCS), and recognizes revenue for the remainder of the arrangement fee attributable to the elements initially delivered, such as software licenses. VSOE for PCS is established on standard products for which no installation or customization is required based upon amount charged when PCS is sold separately. For multiple element software arrangements involving significant production, modification, or customization of the software, which are accounted for in accordance with the provisions of SOP No. 81-1, VSOE for PCS is established if customers have an optional renewal rate specified in the arrangement and the rate is substantive.

The Company has arrangements whereby customers pay one price for multiple products and services and in some cases, involve a combination of products and services. For arrangements with multiple deliverables, revenue is recognized upon the delivery of the individual deliverables in accordance with EITF Issue No. 00-21. In the event that there is no objective and reliable evidence of fair value of the delivered items, the revenue recognized upon delivery is the total arrangement consideration less the fair value of the undelivered items. The Company applies significant judgment in establishing the fair value of multiple elements within revenue arrangements.

The Company recognizes revenue on a gross or net basis in accordance with EITF Issue No. 99-19. In most arrangements, the Company contracts directly with end user customers, is the primary obligor and carries all collectability risk. In such arrangements the Company reports revenue on a gross basis. In some cases, the Company utilizes third-party distributors to sell products or services directly to end user customers and carries no collectability risk. In such instances the Company reports revenue on a net basis.

Revenue generated from advertising on the Company's websites and from advertising included in its products is recognized as revenue as the delivery of the advertising occurs.

*Advertising Expenses.* The Company expenses the cost of advertising and promoting its products as incurred. These costs are included in sales and marketing expense and totaled $61.9 million in 2008,

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

$56.2 million in 2007, and $51.2 million in 2006. The Company also incurred $44.2 million and $24.4 million of advertising expenses with MTVN, a related party, in 2008 and 2007, respectively. No such amounts were recorded in 2006.

*Foreign Currency.* The functional currency of the Company's foreign subsidiaries is the local currency of the country in which the subsidiary operates. Assets and liabilities of foreign operations are translated into U.S. dollars using rates of exchange in effect at the end of the reporting period. The net gain or loss resulting from translation is shown as translation adjustment and included in accumulated other comprehensive income in shareholders' equity. Income and expense accounts are translated into U.S. dollars using average rates of exchange. Gains and losses from foreign currency transactions are included in the consolidated statements of operations. There were no significant gains or losses on foreign currency transactions in 2008, 2007, and 2006.

*Derivative Financial Instruments.* The Company conducts business internationally in several currencies. As such, it is exposed to adverse movements in foreign currency exchange rates. A portion of these risks are managed through the use of financial derivatives, but fluctuations could impact the Company's results of operations and financial position. The Company's foreign currency risk management program reduces, but does not entirely eliminate, the impact of currency exchange rate movements.

Generally, the Company's practice is to manage foreign currency risk for the majority of material short-term intercompany balances through the use of foreign currency forward contracts. These contracts require the Company to exchange currencies at rates agreed upon at the contract's inception. Because the impact of movements in currency exchange rates on forward contracts offsets the related impact on the short-term intercompany balances, these financial instruments help alleviate the risk that might otherwise result from certain changes in currency exchange rates. The Company does not designate its foreign exchange forward contracts related to short-term intercompany accounts as hedges and, accordingly, the Company adjusts these instruments to fair value through results of operations. However, the Company may periodically hedge a portion of its foreign exchange exposures associated with material firmly committed transactions and long-term investments.

All derivatives, whether designated in hedging relationships or not, are recorded on the balance sheet at fair value. If the derivative is designated a hedge, then depending on the nature of the hedge, changes in fair value will either be recorded immediately in results of operations, or be recognized in accumulated other comprehensive income until the hedged item is recognized in results of operations.

*Accounting for Gains on Sale of Subsidiary Stock.* The effects of any changes in the Company's ownership interest resulting from the issuance of equity capital by consolidated subsidiaries are accounted for as either a gain or loss in the statement of operations pursuant to SAB No. 51, *Accounting for the Sales of Stock of a Subsidiary* . SAB No. 51 requires that the difference between the carrying amount of the parent's investment in a subsidiary and the underlying net book value of the subsidiary after the issuance of stock by the subsidiary be reflected as either a gain or loss in the statement of operations if the appropriate recognition criteria has been met or reflected as an equity transaction. RealNetworks has elected to reflect SAB No. 51 gains or losses in its statement of operations when the appropriate criteria have been met. As described in Note 3, the sale of stock in Rhapsody America met the gain recognition criteria for all periods through September 30, 2008 and these gains were included in the consolidated statements of operations and comprehensive income. Beginning in the fourth quarter of 2008, the gain recognition criteria in SAB No. 51 were no longer met and the sales of ownership interests in Rhapsody America were accounted for as equity transactions and reflected in shareholders' equity in the consolidated balance sheets.

*Accounting for Taxes Collected from Customers.* The Company collects various types of taxes from its customers, assessed by governmental authorities, which are imposed on and concurrent with revenue-producing transactions. Such taxes are recorded on a net basis and are not included in net revenue of the Company.

68

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Income Taxes.* The Company computes income taxes using the asset and liability method, under which deferred income taxes are provided for temporary differences between financial reporting basis and tax basis of the Company's assets and liabilities and operating loss and tax credit carryforwards. A valuation allowance is established when necessary to reduce deferred tax assets to the amount expected to be realized. Deferred tax assets and liabilities and operating loss and tax credit carryforwards are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences and operating loss and tax credit carryforwards are expected to be recovered or settled.

The Company files numerous consolidated and separate income tax returns in the United States Federal, as well as state, local, and foreign jurisdictions. With few exceptions, the Company is no longer subject to United States Federal, state, local, or foreign income tax examinations for years before 1993. The Company is currently under audit by the California Franchise Tax Board for the consolidated group RealNetworks, Inc. and subsidiaries for the years ended December 31, 2005 and 2006. During the third quarter of 2008, an income tax audit by the United States Internal Revenue Service for the Company's wholly-owned subsidiary WiderThan Americas, Inc. for the period ended December 31, 2005 was closed with no adjustments.

*Stock-Based Compensation.* Effective January 1, 2006, the Company adopted the provisions of, and began accounting for stock-based compensation in accordance with, Statement of Financial Accounting Standards (SFAS) No. 123R — revised 2004. *Share-Based Payment* , which replaced SFAS 123, *Accounting for Stock-Based Compensation* and supersedes Accounting Principles Board Opinion (APB) No. 25, *Accounting for Stock Issued to Employees* . Under the fair value provisions of this statement, stock-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense over the requisite service period, which is the vesting period. The Company uses the Black-Scholes option-pricing model to determine the fair-value of stock-based awards under SFAS No. 123R, consistent with that used for pro forma disclosures under SFAS No. 123. The Company utilized the modified prospective transition method, which requires that stock-based compensation expense be recorded for all new and unvested stock options and employee stock purchase plan shares that are ultimately expected to vest as the requisite service is rendered beginning on January 1, 2006, the first day of the Company's 2006 fiscal year. Stock-based compensation expense for awards granted prior to January 1, 2006 is based on the grant date fair-value as determined under the pro forma provisions of SFAS No. 123.

In accordance with SFAS No. 123R, the Company presents excess tax benefits from the exercise of stock-based compensation awards as a financing activity in the consolidated statement of cash flows for periods in which an excess tax benefit is recorded. As a result of the implementation of SFAS No. 123R, cash benefits of $0.1 million, $0.6 million and $39.2 million were recorded during the years ended December 31, 2008, 2007 and 2006, respectively, which resulted in a decrease in operating cash flows and an increase in financing cash flows.

At December 31, 2008, the Company had six stock-based employee compensation plans, which are described more fully in Note 15.

*Minority Interests.* The Company records minority interest expense (benefit) which reflects the portion of the earnings (losses) of majority-owned entities which are applicable to the minority interest partners in accordance with Accounting Research Bulletin No. 51, *Consolidated Financial Statements* (ARB 51) and EITF Topic No. D-98, *Classification and Measurement of Redeemable Securities* (EITF D-98). Redeemable minority interests that are redeemable at either fair value or are based on a formula that is intended to approximate fair value follow the Company's historical disclosure only policy for the redemption feature and the current redemption amount of the redeemable minority interests is disclosed on the face of the balance sheet. Redeemable minority interests that are redeemable at either a fixed price or are based on a formula that is not akin to fair value are reflected as an adjustment to income attributable to common shareholders based on the difference between accretion as calculated using the terms of the redemption feature and the accretion entry for a hypothetical fair value redemption feature with the remaining amount of accretion to redemption value

69

Table of Contents

## REALNETWORKS, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

recorded directly to equity. Minority interest expense (benefit) is included within the consolidated statement of operations and comprehensive income for 2008 and 2007.

As of December 31, 2008 and 2007, the Company's minority interests solely related to redeemable minority interests in Rhapsody America. See Note 3 for further discussion of the redeemable minority interest treatment.

*Net Income Per Share.* Basic net income (loss) per share is computed by dividing net income (loss) by the weighted average number of common shares outstanding during the period. Diluted net income (loss) per share is computed by dividing net income (loss) by the weighted average number of common and dilutive potential common shares outstanding during the period. The share count used to compute basic and diluted net income per share is calculated as follows (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2008 | 2007 | 2006 |
| Shares used to compute basic net income (loss) per share | 140,432 | 151,665 | 160,973 |
| Dilutive potential common shares: |  |  |  |
| Stock options and restricted stock | — | 3,995 | 7,558 |
| Convertible debt | — | 10,750 | 10,750 |
| Shares used to compute diluted net income (loss) per share | 140,432 | 166,410 | 179,281 |

Approximately 39.5 million, 22.5 million, and 8.5 million shares of common stock potentially issuable from stock options during the years ended December 31, 2008, 2007 and 2006, respectively, are excluded from the calculation of diluted net income (loss) per share because of their antidilutive effect.

*Accumulated Other Comprehensive Income (loss).* The Company's accumulated other comprehensive income (loss) as of December 31, 2008 and 2007 consisted of unrealized gains (losses) on marketable securities and foreign currency translation gains (losses). The tax effect of unrealized gains (losses) on investments and the foreign currency translation gains (losses) has been taken into account, if applicable.

The components of accumulated other comprehensive income are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Unrealized gains on investments, net of taxes of $(846) in 2008 and $470 in 2007 | $ 3,516 | $ 5,836 |
| Foreign currency translation adjustments | (52,245) | 11,896 |
| Accumulated other comprehensive income (loss) | $(48,729) | $17,732 |

*Reclassifications.* Certain reclassifications have been made to the 2006 and 2007 consolidated financial statements to conform to the 2008 presentation.

*New Accounting Pronouncements.* In December 2007, the FASB issued SFAS No. 141R, *Business Combinations* (SFAS 141R), which establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in an acquiree, including the recognition and measurement of goodwill acquired in a business combination. The requirements of SFAS 141R are effective for periods beginning after December 15, 2008. Early adoption is prohibited. The impact of the adoption of SFAS 141R on the Company's consolidated financial statements will largely be dependent on the size and nature of the business combinations completed after the adoption of this statement.

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interest in Consolidated Financial Statements, an amendment of ARB No. 51* (SFAS 160), which will change the accounting and reporting for minority interests, which will be recharacterized as noncontrolling interests and classified as a component of equity within the consolidated balance sheets. SFAS 160 requires that changes in a parent's ownership interest while the parent retains its controlling financial interest shall be accounted for as equity transactions. As a result, the gain on sales of interest in Rhapsody America will be reflected as a component of shareholders' equity. The requirements of SFAS 160 are effective for periods beginning after December 15, 2008. Early adoption is prohibited. The Company does not believe that this guidance will have a material impact on its financial position or results of operations except as noted above.

In April 2008, the FASB issued FSP No. 142-3, *Determination of the Useful Life of Intangible Assets* (FSP 142-3). FSP 142-3 amends the factors that should be considered in developing renewal or extension assumptions used to determine the useful life of a recognized intangible asset under FASB Statement No. 142, *Goodwill and Other Intangible Assets* . FSP 142-3 is effective for financial statements issued for fiscal years beginning after December 15, 2008. Early adoption is prohibited. The Company does not expect the pronouncement to have a material effect on its consolidated financial statements.

**Note 2. Stock-Based Compensation**

The Company accounts for stock-based compensation in accordance with SFAS No. 123R — revised 2004, *Share-Based Payment* . Under the fair value provisions of the statement, stock-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense over the requisite service period, which is the vesting period. The Company uses the Black-Scholes option-pricing model to determine the fair-value of stock-based awards under SFAS No. 123R. The Company recognizes compensation cost related to options granted on a straight-line basis over the applicable vesting period.

The expected term of the options represents the estimated period of time until exercise and is based on historical experience of similar awards, including the contractual terms, vesting schedules, and expectations of future employee behavior. Expected stock price volatility is based on a combination of historical volatility of the Company's stock for the related expected term and the implied volatility of its traded options. The risk-free interest rate is based on the implied yield available on U.S. Treasury zero-coupon issues with a term equivalent to the expected term of the stock options. The Company has not paid dividends in the past.

The fair value of options granted was determined using the Black-Scholes model and the following weighted average assumptions:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2008 | 2007 | 2006 |
| Expected dividend yield | 0% | 0% | 0% |
| Risk-free interest rate | 2.60% | 4.47% | 4.75% |
| Expected life (years) | 4.2 | 4.1 | 4.3 |
| Volatility | 45% | 42% | 49% |

71

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Stock-based compensation expense recognized in the Company's consolidated statements of operations is as follows (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2008** | **2007** | **2006** |
| Cost of service revenue | $ 2,570 | $ 769 | $ 257 |
| Research and development | 8,410 | 7,314 | 6,512 |
| Sales and marketing | 5,860 | 9,373 | 7,152 |
| General and administrative | 6,691 | 6,462 | 4,230 |
| Total stock-based compensation expense | $23,531 | $23,918 | $18,151 |

No stock-based compensation was capitalized as part of the cost of an asset as of December 31, 2008, 2007 or 2006. As of December 31, 2008, 2007 and 2006, $36.0 million, $45.9 million and $41.2 million, respectively, of total unrecognized compensation cost, net of estimated forfeitures, related to stock options. The unrecognized compensation cost is expected to be recognized over a weighted-average period of approximately two years, three years and two years for the years ended December 31, 2008, 2007 and 2006, respectively.

For further information related to the Company's equity compensation plans see Note 15.

## Note 3. Rhapsody America

*Formation*

On August 20, 2007, RealNetworks and MTVN created Rhapsody America to jointly own and operate a business-to-consumer digital audio music service. Under the Rhapsody America venture agreements:

- RealNetworks contributed its Rhapsody service subscribers, certain RadioPass subscribers, cash of $16.4 million, contracts, revenue from existing Rhapsody subscribers, marketing materials, player hardware, rhapsody.com and related URLs, certain liabilities, and distribution arrangements in exchange for a 51% equity interest in Rhapsody America. RealNetworks also licensed certain assets to Rhapsody America, including Rhapsody content, Rhapsody technology, the Rhapsody brands and related materials.

- MTVN contributed its URGE service subscribers, cash, contracts, marketing materials, revenue from existing URGE subscribers, certain liabilities, plus the note payable described below, in exchange for a 49% equity interest in Rhapsody America. MTVN has also licensed certain assets to Rhapsody America, including URGE content, brands and related materials.

- In addition to the assets described above, MTVN also contributed a $230 million five-year note payable in consideration for acquiring MTVN's interest in the venture. Rhapsody America must use the proceeds from the note solely to purchase advertising from MTVN. As MTVN makes payments on the note, Rhapsody America records equity and RealNetworks realizes an immediate appreciation in the carrying value of the Company's interests in the venture and recognizes a gain if the gain is reasonably assured in accordance with SAB No. 51. As of December 31, 2007, $25.0 million in payments were made on the note and RealNetworks realized and recorded a gain of $12.8 million during the year ended December 31, 2007 as all of the SAB No. 51 gain recognition criteria were met. For the first nine months of the year ended December 31, 2008, RealNetworks realized and recorded a gain of $14.5 million as all of the SAB No. 51 gain recognition criteria were met. Each quarter the Company evaluates the gain recognition criteria in SAB No. 51 and determined for the fourth quarter of 2008 that recognition of the gain in the statement of operations was no longer appropriate, as certain of the criteria in SAB No. 51 were no longer met. During the fourth quarter, the Company revised its long

72

## REALNETWORKS, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

term operating plan, including a detailed cash flow projection for the business. The expected impact from significant declines observed in the broader economy, including but not limited to, a deteriorating advertising market and reduced consumer discretionary spending were reflected in the plan and resulted in an assumed overall decline in market value. Under the venture agreements, neither RealNetworks nor MTVN has future commitments to fund additional cash needs of the business. Additionally, as described more fully below, in the fourth quarter the Company assessed the impact of the preferred return associated with the put option held by MTVN and the related likelihood that RealNetworks would be required to repurchase the MTVN interests. These factors, combined with the overall decline in the market, caused the Company to conclude that gain recognition under SAB No. 51 was not appropriate for the fourth quarter. As a result, for the three months ended December 31, 2008, the sale of ownership interests in Rhapsody America have been reflected as an equity transaction and $6.6 million has been recorded directly to shareholders' equity.

Subsequent to December 31, 2008, RealNetworks and MTVN signed an amendment to the Rhapsody America venture agreement. Included in the amendment was a reduction in the MTVN note payable from $230.0 million to $213.8 million over the same five-year term.

The assets and liabilities contributed by RealNetworks to Rhapsody America have been recorded at their historical cost basis as RealNetworks maintained a controlling interest in the assets and liabilities. The assets and liabilities contributed by MTVN to Rhapsody America have been recorded at their estimated fair values in the consolidated balance sheets. MTVN's contribution included identifiable intangible assets with estimated fair values of $7.6 million. The respective estimated fair values were determined by management as of the date of the acquisition. RealNetworks realized an immediate appreciation in the carrying value of its interests in Rhapsody America and recognized a gain on sale of music interests upon formation of $3.9 million under SAB No. 51 as all of the gain recognition criteria were met.

A summary of the intangible assets contributed by MTVN is as follows (in thousands):

| | |
|---|---|
| Trade Name and Trademarks | $4,000 |
| Existing Technology | 1,900 |
| Existing Subscribers | 1,680 |
| Total Identifiable Intangible Assets | $7,580 |

The identified intangible assets had a weighted average estimated useful life of 4.1 years. All of the intangible assets are being amortized over their estimated useful lives on a straight line basis. During the fourth quarter of 2008, the remaining net book value of these intangible assets were deemed to be impaired pursuant to the application of SFAS No. 144 as described in Note 10. As of December 31, 2008, the remaining balance of the intangible assets was $0.

As part of the initial formation of Rhapsody America, RealNetworks and MTVN provided additional funding in the quarter ended December 31, 2007, for future operations of $17.4 and $16.7 million, respectively. No additional funding was provided during the year ended December 31, 2008.

*Call/Put Rights*

Pursuant to the terms of the Rhapsody America limited liability company agreement, RealNetworks has the right to purchase from MTVN, and MTVN has a right to require RealNetworks to purchase, MTVN's interest in Rhapsody America. The Company has evaluated the terms of the call and put rights under applicable accounting literature, including SFAS No. 133, A *ccounting for Derivatives and Hedging Activities* , and SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity* , and concluded that neither of these rights represent freestanding financial instruments or derivatives that should be accounted for separately.

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

These call and put rights are exercisable upon the occurrence of certain events any time after January 1, 2011 and during certain periods in each of 2012, 2013 and 2014 and every two years thereafter, and are not exercisable any time prior to January 1, 2011. If MTVN exercises its put right, RealNetworks has the right to pay a portion of the purchase price for MTVN's interest in cash and shares of RealNetworks capital stock, subject to certain maximum amounts with the balance (if any) paid with a note. If RealNetworks exercises its call right, MTVN has the right to demand payment of part of the purchase price for its membership interest in shares of RealNetworks' capital stock. If a portion of the purchase price for MTVN's interest is payable in shares of RealNetworks' capital stock, such shares could consist of our common stock representing up to 15% of the outstanding shares of RealNetworks' common stock immediately prior to the transaction, and shares of our non-voting stock representing up to an additional 4.9% of the outstanding shares of RealNetworks' common stock immediately prior to the transaction representing a maximum of 19.9% of RealNetworks' capital stock. If RealNetworks pays a portion of the purchase price for MTVN's membership interest in shares of RealNetworks' common stock and non-voting stock, RealNetworks other shareholders' voting and economic interests in RealNetworks could be diluted and MTVN will become one of RealNetworks' significant shareholders.

The redemption prices of MTVN's interest in Rhapsody America under both the call and put rights are calculated based on the provisions within the limited liability agreement, as amended, and are impacted by the total appraised value of Rhapsody America and assume repayment of the $213.8 million five-year note payable from MTVN. Once the call right becomes exercisable, the redemption price of MTVN's interest in Rhapsody America under the call right will be equal to the greater of $213.8 million or the appraised value of MTVN's interest in Rhapsody America at the redemption date.

Once the put right becomes exercisable, the redemption price of MTVN's interest in Rhapsody America under the put right will be based on a formula that is dependent on the appraised value of MTVN's interest in Rhapsody America. If the appraised value of Rhapsody America at that time is equal to or greater than $436.3 million, the implied fair value of the venture at its inception, then the exercise price of the put is equal to the appraised value. If the appraised value of Rhapsody America at the redemption date is less than $436.3 million, then the exercise price of the put includes a preferred return due to MTVN.

For the period from August 20, 2007 (inception of the venture) through September 30, 2008, the Company determined that the value of the Rhapsody America venture had not declined from its initial implied fair value and assessed the probability that the put would include a preferred return as remote. The formula that determined that put redemption amount was considered to approximate fair value for this period. However, beginning with the fourth quarter of 2008, the current appraised value of Rhapsody America was determined to have declined to the point where the Company has determined that the likelihood of the put triggering the preferred return when exercisable was no longer remote and considered the put formula to no longer approximate fair value. Beginning with the fourth quarter of 2008, the Company has accounted for the minority interest as having a fixed price redemption feature.

The hypothetical current redemption price of MTVN's interest in Rhapsody America under the put right at December 31, 2008 before consideration of the remaining payments due on the note was approximately $81.4 million. The current redemption price has been adjusted under the formula in the limited liability agreement for the remaining outstanding amounts due of $144.4 million on the note payable as of December 31, 2008. At December 31, 2008, these outstanding amounts due on the note payable exceed the value of MTVN's interest in the venture. The Company has elected to accrete any excess of the redemption value over the carrying amount as an adjustment to income attributable to common shareholders and has adjusted earnings per share for the current quarter's accretion of the difference between accretion as calculated using the terms of the redemption feature and the accretion entry for a hypothetical fair value redemption feature. For 2008, this amount was nominal to the consolidated financial statements. At December 31, 2007,

74

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

the hypothetical redemption price of MTVN's interest in Rhapsody America under the put right was approximately $59.9 million.

**Note 4.  Business Combinations**

*Business Combinations in 2008*

There were no significant acquisitions in 2008.

*Business Combinations in 2007*

Game Trust

In October 2007, the Company acquired all of the outstanding securities of Game Trust, Inc. in exchange for $20.5 million in cash payments, including $304,000 in direct acquisition related costs consisting primarily of professional fees.

Game Trust, Inc. is headquartered in New York, New York and is a developer and provider of software infrastructure for community and commerce applications in online casual games. The Company believes that combining Game Trust's assets and technology with its existing business will enhance the Company's casual game offerings in the Company's existing markets. The results of Game Trust's operations are included in the Company's consolidated financial statements starting from the date of acquisition.

A summary of the preliminary purchase price is as follows (in thousands):

| | |
|---|---:|
| Cash paid at acquisition | $20,225 |
| Estimated direct acquisition costs | 304 |
| Total | $20,529 |

The aggregate purchase consideration has been allocated to the assets and liabilities acquired, including identifiable intangible assets, based on their respective estimated fair values as summarized below. The respective estimated fair values were determined by management as of the date of acquisition and resulted in excess purchase consideration over the net tangible and identifiable intangible assets acquired of $15.9 million. Goodwill in the amount of $15.9 million is not deductible for tax purposes.

A summary of the preliminary allocation of the purchase price is as follows (in thousands):

| | |
|---|---:|
| Current assets | $ 747 |
| Property and equipment | 34 |
| Intangible assets subject to amortization: | |
| Technology | 4,540 |
| Customer relationships | 950 |
| Trade name and trademarks | 190 |
| Goodwill | 15,859 |
| Other long-term assets | 589 |
| Total assets acquired | 22,909 |
| Liabilities | (2,380) |
| Net assets acquired | $20,529 |

75

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The technology, customer relationships and trade name and trademarks intangibles have a weighted average estimated useful life of five years. All of the intangible assets are being amortized over their estimated useful lives on a straight line basis.

Pro forma results are not presented as they are not material to the Company's overall consolidated financial statements.

Sony NetServices GmbH

In May 2007, the Company acquired all of the outstanding securities of Sony NetServices GmbH (SNS) in exchange for $13.7 million in cash payments, including $902,000 in direct acquisition related costs consisting primarily of professional fees.

SNS is located in Salzburg, Austria and is a provider of digital music services to mobile operators in Europe. The Company believes that combining SNS' assets and technology with its existing business will enhance the Company's digital music offerings in the European market. The results of SNS' operations are included in the Company's consolidated financial statements starting from the date of acquisition.

A summary of the preliminary purchase price is as follows (in thousands):

| | |
|---|---|
| Cash paid at acquisition | $12,795 |
| Estimated direct acquisition costs | 902 |
| Total | $13,697 |

The aggregate purchase consideration has been allocated to the assets and liabilities acquired, including identifiable intangible assets, based on their respective estimated fair values as summarized below. The respective estimated fair values were determined by management as of the date of acquisition and resulted in excess purchase consideration over the net tangible and identifiable intangible assets acquired of $10.2 million. Goodwill in the amount of $10.2 million is not deductible for tax purposes.

A summary of the preliminary allocation of the purchase price is as follows (in thousands):

| | |
|---|---|
| Current assets | $ 5,110 |
| Property and equipment | 2,351 |
| Intangible assets subject to amortization: | |
| Technology | 1,760 |
| Customer relationships | 1,610 |
| Goodwill | 10,212 |
| Total assets acquired | 21,043 |
| Current liabilities | (7,346) |
| Net assets acquired | $13,697 |

Technology has weighted average estimated useful life of seven years. Customer relationships have weighted average estimated useful lives of nine years. All of the intangible assets are being amortized over their estimated useful lives on a straight line basis.

Pro forma results are not presented as they are not material to the Company's overall consolidated financial statements.

76

Table of Contents

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Exomi Oy

In June 2007, the Company acquired all of the outstanding securities of Exomi Oy (Exomi) in exchange for $11.2 million in cash payments, including $468,000 in direct acquisition related costs consisting primarily of professional fees. The Company may be obligated to pay an additional €3.6 million ($5.0 million at December 31, 2008) over a three-year period, dependent on whether certain performance criteria are achieved. Such amounts are not included in the initial aggregate purchase price and no such payments were accrued during the period ended December 31, 2008.

Exomi is located in Helsinki, Finland and is a provider of short message service (SMS) messaging and wireless application protocol gateway products and services to mobile network operators primarily in Europe and Latin America. The Company believes that combining Exomi's assets and network with the Company's products and services will enhance its presence in the European and Latin American markets. The results of Exomi's operations are included in the Company's consolidated financial statements starting from the date of acquisition.

A summary of the purchase price is as follows (in thousands):

| | |
|---|---:|
| Cash paid at acquisition | $10,745 |
| Estimated direct acquisition costs | 468 |
| Total | $11,213 |

The aggregate purchase consideration has been allocated to the assets and liabilities acquired, including identifiable intangible assets, based on their respective estimated fair values as summarized below. The respective estimated fair values were determined by management as of the date of acquisition and resulted in excess purchase consideration over the net tangible and identifiable intangible assets acquired of $2.9 million. Goodwill in the amount of $2.9 million is not deductible for tax purposes.

A summary of the allocation of the purchase price is as follows (in thousands):

| | |
|---|---:|
| Current assets | $ 5,409 |
| Property and equipment | 265 |
| Other long-term assets | 109 |
| Intangible assets subject to amortization: | |
| Customer relationships | 3,270 |
| Technology | 2,545 |
| Tradenames and trademarks | 287 |
| Non-compete agreements | 80 |
| Goodwill | 2,852 |
| Total assets acquired | 14,817 |
| Current liabilities | (1,761) |
| Net deferred tax liabilities | (1,472) |
| Other long-term liabilities | (371) |
| Total liabilities assumed | (3,604) |
| Net assets acquired | $11,213 |

Customer relationships have weighted average estimated useful lives of eight years. Technology and tradenames and trademarks have weighted average estimated useful lives of four years. Non-compete

77

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

agreements have weighted average estimated useful life of one year. All of the intangible assets are being amortized over their estimated useful lives on a straight line basis.

Pro forma results are not presented as they are not material to the Company's overall consolidated financial statements.

**Note 5.   Fair Value Measurements**

Effective January 1, 2008, the Company implemented SFAS No. 157, *Fair Value Measurement* (SFAS 157), for its financial assets and liabilities that are re-measured and reported at fair value at each reporting period, and non-financial assets and liabilities that are re-measured and reported at fair value at least annually. In accordance with the provisions of FSP No. FAS 157-2, *Effective Date of FASB Statement No. 157* , the Company elected to defer implementation of SFAS 157 as it relates to its non-financial assets and non-financial liabilities that are recognized and disclosed at fair value in the financial statements on a nonrecurring basis until January 1, 2009.

The adoption of SFAS 157 with respect to financial assets and liabilities and non-financial assets and liabilities that are re-measured and reported at fair value at least annually did not have an impact on the financial results of the Company in 2008. The Company does not expect the adoption of FAS 157 for non-financial assets and non-financial liabilities to have an effect on our consolidated financial statements. However, due to current economic conditions, the Company faces the risk that some of our short-term investments may no longer be liquid if we experience an inability to access or liquidate the investments due to nationalization or failure of the financial institutions where the investment is held.

SFAS No. 157 establishes a hierarchy that prioritizes fair value measurements based on the types of inputs used for the various valuation techniques (market approach, income approach and cost approach). The levels of the hierarchy are described in more detail within Note 1.

The following table presents information about the Company's financial assets that have been measured at fair value as of December 31, 2008 and indicates the fair value hierarchy of the valuation inputs utilized to determine such fair value.

| | Fair Value Measurements as of December 31, 2008 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| | | (In thousands) | | |
| Cash equivalents | | | | |
| Money market funds | $157,063 | $157,063 | $ — | $ — |
| U.S. government agency securities | 4,292 | 4,292 | — | — |
| Short-term investments | | | | |
| U.S. government agency securities | 84,330 | 84,330 | — | — |
| Corporate notes and bonds | 53,436 | 53,436 | — | — |
| Equity investments | | | | |
| Publicly traded investments | 13,903 | 13,903 | — | — |
| Total | $313,024 | $313,024 | $ — | $ — |

Investments in marketable securities classified as short-term investments and equity investments of public companies are measured at fair value using quoted market prices and are classified within Level 1 of the valuation hierarchy. The Company carries its equity investments in private companies at cost and these investments are excluded from the provisions of SFAS 157. The Company has consistently applied these valuation techniques in all periods presented.

78

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### Note 6. Cash, Cash Equivalents, Short-Term Investments, and Restricted Cash Equivalents

Cash, cash equivalents, short-term investments, and restricted cash equivalents as of December 31, 2008 consist of the following (in thousands):

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| Cash and cash equivalents: | | | | |
| Cash | $ 71,613 | $ — | $ — | $ 71,613 |
| Money market mutual funds | 156,803 | 260 | — | 157,063 |
| U.S. government agency securities | 4,203 | 89 | — | 4,292 |
| Total cash and cash equivalents | 232,619 | 349 | — | 232,968 |
| Short-term investments: | | | | |
| Corporate notes and bonds | 54,685 | 154 | (1,403) | 53,436 |
| U.S. Government agency securities | 83,920 | 410 | — | 84,330 |
| Total short-term investments | 138,605 | 564 | (1,403) | 137,766 |
| Total cash, cash equivalents, and short-term investments | $371,224 | $ 913 | $ (1,403) | $370,734 |
| Restricted cash equivalents | $ 14,742 | $ — | $ — | $ 14,742 |

Cash, cash equivalents, short-term investments, and restricted cash equivalents as of December 31, 2007 consist of the following (in thousands):

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| Cash and cash equivalents: | | | | |
| Cash | $105,615 | $ — | $ — | $105,615 |
| Money market mutual funds | 198,148 | — | — | 198,148 |
| Corporate notes and bonds | 172,934 | — | — | 172,934 |
| Total cash and cash equivalents | 476,697 | — | — | 476,697 |
| Short-term investments: | | | | |
| Corporate notes and bonds | 43,552 | — | (981) | 42,571 |
| U.S. government agency securities | 37,296 | 65 | — | 37,361 |
| Total short-term investments | 80,848 | 65 | (981) | 79,932 |
| Total cash, cash equivalents, and short-term investments | $557,545 | $ 65 | $ (981) | $556,629 |
| Restricted cash equivalents | $ 15,509 | $ — | $ — | $ 15,509 |

At December 31, 2008 and 2007, restricted cash equivalents represent cash equivalents pledged as collateral against two letters of credit for a total of $14.7 million and $15.5 million, respectively, in connection with two lease agreements.

Realized gains or losses on sales of available-for-sale securities for 2008, 2007, and 2006 were not significant.

79

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Changes in estimated fair values of short-term investments are primarily related to changes in interest rates and are considered to be temporary in nature.

The contractual maturities of available-for-sale debt securities at December 31, 2008 are as follows (in thousands):

|  | Amortized Cost | Estimated Fair Value |
|---|---|---|
| Within one year | $ 85,420 | $ 85,823 |
| Between one year and five years | 53,185 | 51,943 |
| Total short-term investments | $138,605 | $137,766 |

During 2007, the Company purchased and sold trading securities and realized a gain of $8.2 million. At December 31, 2008 and 2007, no investments in trading securities were held by the Company.

Due to current economic conditions, the Company faces the risk that some of our short-term investments may no longer be treated as cash equivalents if the Company experiences an inability to access or liquidate the investments due to nationalization or failure of the financial institutions where the investment is held. In addition, the Company faces the risk that the short-term investments held as debt securities issued by financial institutions may become worthless if the financial institutions nationalize or fail.

## Note 7. Allowance for Doubtful Accounts Receivable and Sales Returns

Activity in the allowance for doubtful accounts receivable is as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Balance, beginning of year | $1,117 | $1,101 | $1,340 |
| Additions charged to expenses | 2,759 | 278 | 596 |
| Amounts written off | (469) | (265) | (835) |
| Effects of foreign currency translation | 125 | 3 | — |
| Balance, end of year | $3,532 | $1,117 | $1,101 |

Activity in the allowance for sales returns is as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Balance, beginning of year | $ 1,338 | $ 1,389 | $ 1,633 |
| Additions charged to revenue | 3,102 | 2,980 | 4,898 |
| Amounts written off | (3,347) | (3,048) | (5,142) |
| Effects of foreign currency translation | 6 | 17 | — |
| Balance, end of year | $ 1,099 | $ 1,338 | $ 1,389 |

At December 31, 2008, one customer in the United States accounted for 20% of trade accounts receivable. At December 31, 2007, one international customer accounted for 19% of trade accounts receivable.

One customer accounted for approximately 13% of total revenue during the year ended December 31, 2007. No one customer accounted for more than 10% of total revenue during the years ended December 31, 2008, and 2006.

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Note 8.  Deferred Costs

Deferred costs, consisting of costs being amortized over the respective contract lives, are as follows (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
| --- | --- | --- |
| Deferred costs | $10,146 | $12,482 |
| Less current portion | 4,026 | 6,408 |
| Deferred costs, non-current portion | $ 6,120 | $ 6,074 |

The Company defers certain costs on projects for service revenues and system sales. Deferred costs consist primarily of direct and incremental costs to customize and install systems, as defined in individual customer contracts, including costs to acquire hardware and software from third parties and payroll and related costs for employees and other third parties. Deferred costs are capitalized during the implementation period.

The Company recognizes such costs in accordance with its revenue recognition policy by contract. For revenue recognized under the completed contract method, costs are deferred until the products are delivered, or upon completion of services or, where applicable, customer acceptance. For revenue recognized under the percentage of completion method, costs are recognized as products are delivered or services are provided. For revenue recognized ratably over the term of the contract, costs are also recognized ratably over the term of the contract, commencing on the date of revenue recognition. At each balance sheet date, the Company reviews its deferred costs to ensure they are ultimately recoverable. Any anticipated losses on uncompleted contracts are recognized when evidence indicates the estimated total cost of a contract exceeds its estimated total revenue or if actual deferred costs exceed contractual revenue. As of December 31, 2008, the Company determined that the total estimated costs associated with certain projects exceeded the total estimated revenues expected to be recognized on those projects. As a result, the Company impaired approximately $10.8 million in deferred project costs. In addition, the Company assessed the recovery of recoupable royalty advances paid to certain content providers. As of December 31, 2008, the Company determined that approximately $8.8 million in royalty advances was not recoverable and therefore charged to expense. Both charges were included in impairment of deferred project costs and prepaid royalties in the accompanying consolidated statements of operations and comprehensive income for the year ended December 31, 2008. No such charges existed in 2007 or 2006.

Assessing the recoverability of deferred project costs and prepaid royalty advances is based on significant assumptions and estimates, including future revenue and cost of sales. Significant or sustained decreases in revenue or increases in cost of sales in future periods could result in additional impairments of deferred project costs and prepaid royalty advances. The Company cannot accurately predict the amount and timing of such impairments. Should the value of deferred project costs or prepaid royalty advances become impaired, the Company would record the appropriate charge, which could have a material adverse effect on its financial condition or results of operations.

### Note 9.  Equity Investments

The Company has certain equity investments that are accounted for under the cost method of accounting. The cost method is used to account for equity investments in companies in which the Company holds less than a 20 percent voting interest, does not exercise significant influence, and for which the related securities do not have a quoted market price.

The Company has certain equity investments in publicly traded companies in which the Company holds less than a 20 percent voting interest. The investments are accounted for at market value. Changes in the market value of the investments are recognized as unrealized gains (losses), net of income tax, and are

81

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

recorded in the accompanying consolidated balance sheets as a component of accumulated other comprehensive income.

During the quarter ended March 31, 2006, the Company established Beijing RealNetworks Technology Co., Ltd., a Wholly Owned Foreign Entity (WOFE) which operates an Internet retail website in the People's Republic of China (PRC) in cooperation with a PRC affiliate. The results of operations of the WOFE have been included in the Company's consolidated results since the establishment date of the WOFE. The PRC regulates the WOFE's business through regulations and license requirements restricting: (i) the scope of foreign investment in the Internet, retail and delivery sectors; (ii) Internet content; and (iii) the sale of certain media products. In order to meet the PRC local ownership and regulatory licensing requirements, the WOFE's business is operated through a PRC affiliate which is owned by nominee shareholders who are PRC nationals and RealNetworks employees. The WOFE does not own any capital stock of the PRC affiliate, but is the primary beneficiary of future losses or profits through contractual rights. As a result, the Company consolidates the results of the PRC affiliate in accordance with FIN No. 46R, *Consolidation of Variable Interest Entities* . The net assets and operating results for the PRC affiliate were not significant during the years ended December 31, 2008 and 2007.

Summary of equity investments is as follows (in thousands):

| | 2008 | | 2007 | |
|---|---|---|---|---|
| | Cost | Carrying Value | Cost | Carrying Value |
| Publicly traded investments | $10,765 | $13,903 | $ 933 | $ 8,085 |
| Privately held investments | 5,695 | 4,679 | 2,740 | 1,891 |
| Total equity investments | $16,460 | $18,582 | $3,673 | $ 9,976 |

Privately held investments include investments accounted for using the cost and equity methods.

As of December 31, 2008 and 2007, the carrying value of equity investments in publicly traded companies consists primarily of approximately 11.0% of outstanding shares of J-Stream Inc. (J-Stream), a Japanese media services company and Loen Entertainment, a Korean digital music distribution company. These equity investments are accounted for as available-for-sale. The market value of the shares of J-Stream has increased from the original cost of $812,000 and $933,000, resulting in a carrying value of $4.6 million and $8.1 million as of December 31, 2008 and 2007, respectively. The investment in Loen Entertainment occurred in the quarter ended December 31, 2008, at a cost of $9.9 million and its current carrying value is $9.2 million. The market for these investments is relatively limited and the share price is volatile. Although the carrying value of the total investments was $18.6 million at December 31, 2008, there can be no assurance that a gain of this magnitude, or any gain, can be realized through the disposition of these shares.

Based upon an evaluation of the facts and circumstances during the quarter ended December 31, 2006, the Company determined that an other-than-temporary decline in fair value had occurred in one of its privately-held investments, resulting in an impairment charge of $3.1 million to reflect changes in the fair value of the investment. If the current economic downturn continues or worsens, the Company may incur impairment charges relating to its privately-held investments in future periods.

82

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Note 10. Other Intangible Assets**

Other intangible assets consist of the following (in thousands):

| | Gross Amount | Accumulated Amortization | Net |
|---|---|---|---|
| Customer relationships | $ 34,004 | $ 21,705 | $ 12,299 |
| Developed technology | 28,673 | 23,849 | 4,824 |
| Patents, trademarks and tradenames | 8,556 | 7,176 | 1,380 |
| Service contracts | 3,711 | 3,487 | 224 |
| Total other intangible assets, December 31, 2008 | $ 74,944 | $ 56,217 | $ 18,727 |
| Total other intangible assets, December 31, 2007 | $149,256 | $ 41,579 | $107,677 |

Amortization expense related to other intangible assets during the years ended December 31, 2008, 2007, and 2006 was $22.9 million, $24.5 million, and $7.4 million, respectively.

As of December 31, 2008 estimated future amortization of other intangible assets is as follows (in thousands):

| | |
|---|---|
| 2009 | $ 8,603 |
| 2010 | 4,291 |
| 2011 | 2,146 |
| 2012 | 1,919 |
| 2013 | 1,522 |
| Thereafter | 246 |
| Total | $18,727 |

In accordance with SFAS No. 144, the Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate the carrying amount of such assets may not be recoverable. If the carrying amount of an asset is not recoverable, an impairment loss is recognized based on the excess of the carrying amount of the long-lived asset over its respective fair value, which is generally determined as the present value of estimated future undiscounted cash flows. The impairment analysis is based on significant assumptions of future results made by management, including operating and cash flow projections. During the quarter ended December 31, 2008, the Company revised its long term operating plan. The Company's operating plan was a significant input in assessing the recoverability of the Company's long-lived assets. The expected impact resulting from the significant declines observed in the broader economy during the fiscal fourth quarter of 2008 were reflected in the Company's plan. Additionally, in light of the uncertainty regarding the extent of future economic declines, the Company applied discount rates in its discounted cash flow analysis that appropriately reflected the possibility that cash flows from future operations may not be fully realized. Based on this assessment, the Company concluded that the net book value related to certain intangible assets exceeded the fair value attributable to such intangible assets. As a result, the Company recorded charges of $57.6 million as impairments of long-lived assets within its consolidated statements of operations and comprehensive income in 2008. No such impairments were recognized in either 2007 or 2006.

The impairment analysis for long-lived assets is based on significant assumptions of future results made by management, including revenue and cash flow projections. Significant or sustained declines in future revenue or cash flows, or adverse changes in the Company's business climate, among other factors, could result in the need to perform an impairment analysis under SFAS No. 144 in future interim periods. The Company cannot accurately predict the amount and timing of any impairment of long-lived assets. Should the

83

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

value of its long-lived assets become impaired, it would record the appropriate charge, which could have an adverse effect on its financial condition and results of operations.

**Note 11.  Goodwill**

Changes in goodwill are as follows (in thousands):

|  | 2008 | 2007 |
|---|---|---|
| Balance, beginning of year | $ 353,153 | $309,122 |
| Increases due to current year acquisitions | 781 | 28,924 |
| Adjustments to the purchase price for Game Trust | (475) | — |
| Adjustments to the purchase price for SNS | (872) | — |
| Adjustments to the purchase price for WiderThan | — | (1,727) |
| Purchase of additional shares of WiderThan | — | 1,160 |
| Increases for accruals and payments related to the acquisition of Zylom | (172) | 12,471 |
| Impairment of goodwill | (135,070) | — |
| Effects of foreign currency translation | (42,081) | 3,203 |
| Balance, end of year | $ 175,264 | $353,153 |

In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* (SFAS 142), goodwill is required to be tested for impairment annually and if an event or conditions change that would more likely than not reduce the fair value of a reporting unit below its carrying value. The Company performs its annual goodwill impairment test during its fiscal fourth quarter.

A two step process is used to test for goodwill impairment under SFAS 142. The first step is to determine if there is an indication of impairment by comparing the estimated fair value of each reporting unit to its carrying value including existing goodwill. Goodwill is considered impaired if the carrying value of a reporting unit exceeds the estimated fair value. Upon an indication of impairment from the first step, a second step is performed to determine the amount of the impairment. This involves calculating the implied fair value of goodwill by allocating the fair value of the reporting unit to all assets and liabilities other than goodwill and comparing it to the carrying amount of goodwill. The Company has four reporting units: Music, Technology Products and Solutions, Games, and Media Software and Services.

To estimate the fair value of the reporting units for step one, the Company utilized a combination of income and market approaches. The income approach, specifically a discounted cash flow methodology, included assumptions for, among others, forecasted revenues, gross profit margins, operating profit margins, working capital cash flow, growth rates and long term discount rates, all of which require significant judgments by management.

During the quarter ended December 31, 2008, the Company revised its long term operating plan. The Company's operating plan was a significant input in evaluating the fair value of the Company's reporting units for the purpose of assessing goodwill for possible impairment. The expected impact resulting from the significant declines observed in the broader economy during the fiscal fourth quarter of 2008 were reflected in the plan. Additionally, in light of the uncertainty regarding the extent of future economic declines, the Company applied discount rates in its income approach that appropriately reflected the possibility that cash flows from future operations may not be fully realized. As a result, it was determined that the carrying value for the Games and Technology Products and Solutions reporting units exceeded their respective fair values, indicating that goodwill within each reporting unit was potentially impaired. No impairments were indicated under the first step for the Music and Media Software and Services reporting units. As required, the Company initiated the second step of the goodwill impairment test for the Games and Technology Products and

84

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Solutions reporting units. The Company determined that the implied fair value of goodwill for its Technology Products and Solutions and Games reporting units was less than the carrying value by approximately $97.0 million and $38.1 million, respectively, which was recorded as an impairment of goodwill during the quarter ended December 31, 2008. No impairments were recognized in either of the years ended December 31, 2007 or 2006.

The testing of goodwill and other intangible assets for impairment requires the Company to make significant estimates about its future performance and cash flows, as well as other assumptions. These estimates can be affected by numerous factors, including changes in economic, industry or market conditions, changes in business operations, changes in competition or potential changes in the share price of its common stock and market capitalization. Significant and sustained declines in the Company's stock price and market capitalization, a significant decline in its expected future cash flows or a significant adverse change in the Company's business climate, among other factors, could result in the need to perform an impairment analysis under SFAS No. 142 in future interim periods. The Company cannot accurately predict the amount and timing of any impairment of goodwill or other intangible assets. Should the value of goodwill or other intangible assets become impaired, the Company would record the appropriate charge, which could have an adverse effect on its financial condition and results of operations.

### Note 12. Accrued and Other Liabilities

Accrued and other liabilities consist of (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| Royalties and costs of sales and fulfillment | $ 55,247 | $ 37,554 |
| Employee compensation, commissions and benefits | 21,679 | 21,639 |
| Sales, VAT and other taxes payable | 13,784 | 18,156 |
| Income taxes payable | 3,017 | 1,819 |
| Legal fees and contingent legal fees | 3,290 | 3,439 |
| Accrued charitable donations | — | 268 |
| Other | 21,671 | 31,261 |
| Total | $118,688 | $114,136 |

### Note 13. Loss on Excess Office Facilities

The accrued loss of $7.2 million for estimated future losses on excess office facilities located near the Company's corporate headquarters in Seattle, Washington at December 31, 2008, is shown net of expected future sublease income of $5.0 million, which was committed under sublease contracts at the time of the estimate. The Company regularly evaluates the market for office space in the cities where it has operations. If the market for such space declines further in future periods, the Company may have to revise its estimates further, which may result in additional losses on excess office facilities.

| | |
|---|---|
| Accrued loss, December 31, 2007 | $10,700 |
| Less amounts paid on accrued loss on excess office facilities, net of sublease income | 3,490 |
| Accrued loss, December 31, 2008 | 7,210 |
| Less current portion | 4,317 |
| Accrued loss, non-current portion | $ 2,893 |

85

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Note 14.  Convertible Debt**

During 2003, the Company issued $100.0 million aggregate principal amount of zero coupon convertible subordinated notes due July 1, 2010, pursuant to Rule 144A under the Securities Act of 1933, as amended. The notes were subordinated to any Company senior debt and are also effectively subordinated in right of payment to all indebtedness and other liabilities of its subsidiaries. The notes were convertible into shares of the Company's common stock based on an initial effective conversion price of $9.30 if (1) the closing sale price of the Company's common stock exceeds $10.23, subject to certain restrictions, (2) the notes are called for redemption, (3) the Company makes a significant distribution to its shareholders or becomes a party to a transaction that would result in a change in control, or (4) the trading price of the notes falls below 95% of the value of common stock that the notes are convertible into, subject to certain restrictions; one of which allows the Company, at its discretion, to issue cash or common stock or a combination thereof upon conversion. During the quarter ended September 30, 2008, the Company repurchased $100.0 million of its outstanding convertible debt. After the repurchase, no convertible debt remains outstanding. These notes were included in current liabilities as of December 31, 2007. As a result of this issuance, the Company received proceeds of $97.0 million, net of offering costs. The offering costs are included in other assets and are being amortized over a 5-year period. Interest expense from the amortization of offering costs in the amounts of $0.3 million, $0.6 million and $0.6 million is recorded in interest income, net during each of the years ended December 31, 2008, 2007, and 2006, respectively.

**Note 15.  Shareholders' Equity**

*Preferred Stock.*  Each share of Series A preferred stock entitles the holder to one thousand votes and dividends equal to one thousand times the aggregate per share amount of dividends declared on the common stock. There are no shares of Series A preferred stock outstanding.

Undesignated preferred stock will have rights and preferences that are determinable by the Board of Directors when determination of a new series of preferred stock has been established.

*Shareholder Rights Plan.*  On December 2, 2008, the Company and Mellon Investor Services LLC entered into an Amended and Restated Shareholder Rights Plan (Amended and Restated Rights Plan) which amended and restated the existing Shareholder Rights Plan dated December 4, 1998, as amended (Existing Rights Plan). In connection with the Existing Rights Plan, on October 16, 1998, the Company's board of directors declared a dividend of a right to purchase one one-thousandth of a share of the Company's Series A preferred stock (Right) for each outstanding share of the Company's common stock on December 14, 1998 (Record Date). Each share of common stock issued after the Record Date will be issued with an attached Right. The Rights will not immediately be exercisable and detachable from the common stock. The Rights will become exercisable and detachable only following the earlier of the acquisition of the Company by a person or a group of 15 percent or more of the outstanding common stock or ten days following the announcement of a tender or exchange offer for 15 percent or more of the outstanding common stock (Distribution Date). Notwithstanding the foregoing, the Company's Chairman and Chief Executive Officer, Robert Glaser, is excluded as a person who can trigger the Distribution Date so long as he does not increase his beneficial ownership of shares of the Company's common stock above the number of shares he holds as of the date of the Amended and Restated Rights Plan, except for shares of the Company's common stock he acquires from the exercise of stock options or from stock awards granted to him in connection with his employment with the Company. After the Distribution Date, each Right will entitle the holder to purchase for $30.00 (Exercise Price) one one-thousandth (1/1000th) of a share of the Company's Series A preferred stock with economic terms similar to that of one share of the Company's common stock. Upon a person or a group acquiring 15 percent or more of the outstanding common stock, each Right will allow the holder (other than the acquirer) to purchase common stock or securities of the Company having a then current market value of two times the Exercise Price of the Right. In the event that following the acquisition of 15 percent of the

86

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

common stock by an acquirer, the Company is acquired in a merger or other business combination or 50 percent or more of the Company's assets or earning power are sold, each Right will entitle the holder to purchase for the Exercise Price, common stock or securities of the acquirer having a then current market value of two times the Exercise Price. In certain circumstances, the Rights may be redeemed by the Company at a redemption price of $0.001 per Right. If not earlier exchanged or redeemed, the Rights will expire on December 2, 2018.

*Equity Compensation Plans.* The Company has five equity compensation plans (Plans) to compensate employees and Directors for past and future services. Generally, options vest based on continuous employment, over a four or five-year period. The options expire in either seven, ten, or twenty years from the date of grant and are exercisable at the fair market value of the common stock at the grant date.

*Restricted Stock Units and Awards.* In 2008, 2007 and 2006, the Company granted restricted stock units and awards representing 926,351, 49,457 and 80,834 shares of common stock, respectively, pursuant to the Company's 2005 Stock Incentive Plan (2005 Plan). The weighted average fair value of restricted stock units and awards granted was $6.08, $6.58 and $11.38 in 2008, 2007 and 2006, respectively. Each restricted stock unit granted or cancelled in 2006 reduced or increased the shares available for grant under the 2005 Plan by 1.6 shares. The factor by which restricted stock units affect the shares available for grant was changed from 1.6 shares to 2.2 shares as of June 25, 2007.

A summary of stock options and restricted stock units activity is as follows:

| | Shares Available for Grant in (000's) | Options Outstanding | | Weighted Average Fair Value Grants |
|---|---|---|---|---|
| | | Number of Shares in (000's) | Weighted Average Exercise Price | |
| Balances, December 31, 2005 | 14,474 | 35,622 | $ 6.95 | |
| Options granted at or above common stock price | (12,913) | 12,913 | 10.05 | $ 4.53 |
| Restricted stock units granted | (129) | | | 11.38 |
| Options exercised | — | (8,854) | 5.99 | |
| Options cancelled | 3,953 | (3,953) | 6.81 | |
| Balances, December 31, 2006 | 5,385 | 35,728 | 8.31 | |
| Additional shares authorized in the 2005 Plan(1) | 12,048 | | | |
| Options granted at common stock price | (14,937) | 14,937 | 7.02 | 2.71 |
| Stock awards granted | (109) | | | 6.58 |
| Restricted stock units cancelled | 35 | | | |
| Options exercised | — | (2,447) | 5.77 | |
| Options cancelled | 5,723 | (5,723) | 10.23 | |
| Balances, December 31, 2007 | 8,145 | 42,495 | 7.76 | |
| Options granted at common stock price | (7,397) | 7,397 | 6.08 | 2.38 |
| Stock awards and restricted stock units granted | (2,038) | | | 6.08 |
| Stock awards and restricted stock units cancelled | 171 | | | |
| Options exercised | — | (1,526) | 5.23 | |
| Options cancelled | 8,831 | (8,831) | 8.22 | |
| Balances, December 31, 2008 | 7,712 | 39,535 | 7.41 | |

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

(1) At the June 25, 2007 Annual Meeting of Shareholders, the Company's shareholders approved an amended and restated 2005 Stock Incentive Plan that authorized a total of 15 million shares, including any shares that were available for grant prior to the approval.

The following table summarizes information about stock options outstanding at December 31, 2008:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Prices | Number of Shares (in 000's) | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Number of Shares (in 000's) | Weighted Average Exercise Price |
| $0.02 — $5.07 | 4,668 | 6.81 | $ 4.35 | 3,411 | $ 4.23 |
| $5.08 — $5.78 | 4,730 | 7.76 | 5.66 | 2,159 | 5.59 |
| $5.81 — $5.97 | 4,244 | 8.86 | 5.90 | 1,907 | 5.90 |
| $5.98 — $6.36 | 4,208 | 8.31 | 6.12 | 1,774 | 6.12 |
| $6.38 — $7.22 | 6,365 | 9.63 | 6.91 | 3,724 | 7.08 |
| $7.23 — $8.00 | 4,496 | 5.15 | 7.71 | 2,091 | 7.76 |
| $8.04 — $10.06 | 6,153 | 4.71 | 9.20 | 3,861 | 9.25 |
| $10.06 — $11.49 | 4,089 | 4.74 | 10.93 | 2,137 | 10.94 |
| $11.55 — $46.00 | 572 | 9.51 | 25.75 | 534 | 26.76 |
| $46.18 — $46.19 | 10 | 10.69 | 46.19 | 10 | 46.19 |
| | 39,535 | 7.07 | $ 7.41 | 21,608 | $ 7.64 |

The aggregate intrinsic value of options outstanding and options exercisable as of December 31, 2008 was $1.0 million and $1.0 million, respectively.

*Employee Stock Purchase Plan.* In 2007, the Company adopted the 2007 Employee Stock Purchase Plan (2007 ESPP) to replace the 1998 Employee Stock Purchase Plan, which expired on December 31, 2007 following the conclusion of the final offering period. There are 1.5 million shares of common stock reserved for issuance under the 2007 ESPP, and there were 4.0 million shares of common stock reserved for issuance under the 1998 ESPP. Under the 1998 ESPP and the 2007 ESPP, an eligible employee may purchase shares of common stock, based on certain limitations, at a price equal to 85 percent of the fair market value of the common stock at the end of the semi-annual offering periods. Under the 2007 ESPP, 394,000 shares at a weighted average fair value of the employee stock purchase rights of $0.72 were purchased during the year ended December 31, 2008. Under the 1998 ESPP, 285,000, and 213,000 shares at a weighted average fair value of the employee stock purchase rights of $1.06, and $1.62 were purchased during the years ended December 31, 2007, and 2006, respectively.

*Repurchase of Common Stock.* The Company's Board of Directors has authorized share repurchase programs for the repurchase of its outstanding common stock, and all repurchases have been made pursuant to these authorized programs. During 2006, the Company purchased 11.8 million shares for an aggregate value of $98.9 million at an average cost of $8.35 per share. During 2007, the Company repurchased 23.8 million shares for an aggregate value of $178.8 million at an average cost of $7.52 per share. During 2008, the Company repurchased 10.0 million shares for an aggregate value of $50.2 million at an average cost of $5.04 per share. The purchases made through December 31, 2008 completed the authorized amount for all of the repurchase programs.

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Note 16.  Income Taxes**

Components of income (loss) before income taxes are as follows (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| United States operations | $ (46,737) | $77,167 | $228,668 |
| Foreign operations | (171,313) | (1,396) | (915) |
| Income (loss) before income taxes | $(218,050) | $75,771 | $227,753 |

Components of income tax expense are as follows (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| Current: | | | |
| United States federal | $ 6,360 | $31,266 | $20,683 |
| State and local | (2,449) | 1,291 | 3,643 |
| Foreign | 10,333 | 4,448 | 3,225 |
| Total current | 14,244 | 37,005 | 27,551 |
| Deferred: | | | |
| United States federal | 33,603 | (6,298) | 53,648 |
| State and local | 1,044 | (58) | 3,206 |
| Foreign | (23,063) | (3,193) | (1,868) |
| Total deferred | 11,584 | (9,549) | 54,986 |
| Total income tax expense | $ 25,828 | $27,456 | $82,537 |

Income tax expense differs from "expected" income tax expense (computed by applying the U.S. federal income tax rate of 35%) due to the following (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| United States federal tax expense (benefit) at statutory rate | $(76,318) | $26,520 | $79,714 |
| State taxes, net of United States federal tax benefit | (1,405) | 1,233 | 3,127 |
| Change in valuation allowance | 50,154 | (2,262) | 1,757 |
| Non-deductible stock compensation | 1,758 | 1,601 | 912 |
| Non-deductible goodwill impairment charge | 38,750 | — | — |
| Impact of non-U.S. jurisdictional tax rate difference | 13,666 | 182 | 471 |
| Other | (777) | 182 | (3,444) |
| Total income tax expense | $ 25,828 | $27,456 | $82,537 |

89

Table of Contents

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Net deferred tax assets are comprised of the following (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| **Deferred tax assets:** | | |
| United States federal net operating loss carryforwards | $ 18,740 | $ 20,332 |
| Deferred expenses | 19,509 | 14,641 |
| Net unrealized loss on investments | 10,924 | 10,924 |
| Capital loss carryforwards | 9,910 | 2,359 |
| Accrued loss on excess office facilities | 2,650 | 3,874 |
| Stock-based compensation | 14,977 | 11,431 |
| State net operating loss carryforwards | 4,756 | 3,973 |
| Foreign net operating loss carryforwards | 6,524 | 8,378 |
| Deferred revenue | 627 | 4,494 |
| Equipment, software, and leasehold improvements | 8,514 | 4,262 |
| Basis difference in majority owned partnership | 3,355 | 140 |
| Other | 5,382 | 2,372 |
| Gross deferred tax assets | 105,868 | 87,180 |
| Less valuation allowance | 90,986 | 39,742 |
| Gross deferred tax assets, net of valuation allowance | 14,882 | 47,438 |
| **Deferred tax liabilities:** | | |
| Other intangible assets | (4,521) | (27,232) |
| Net unrealized gains on investments | (1,043) | (2,250) |
| Other | (446) | (94) |
| Prepaid expenses | (3,053) | (2,657) |
| Gross deferred tax liabilities | (9,063) | (32,233) |
| Net deferred tax assets | $ 5,819 | $ 15,205 |

Income tax receivables were $7.3 million and $5.5 million at December 31, 2008 and 2007, respectively. The Company records a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of the deferred tax assets depends on the ability to generate sufficient taxable income of the appropriate character in the appropriate taxing jurisdictions. In 2008, the Company has continued to provide a valuation allowance on the deferred tax assets that the Company believes are not more likely than not to be realized.

The net increase in valuation allowance was $51.2 million and $4.5 million during the years ended December 31, 2008 and 2007, respectively. The 2008 net increase in valuation allowance is caused by the Company not being able to project future taxable income in most jurisdictions. The 2007 net increase in the valuation allowance is comprised of an increase of $10.1 million due primarily to acquired net operating losses (NOLs) from acquisitions in 2007 not more likely than not to be realized, an increase of $0.9 million for foreign losses unutilized, a decrease in state NOLs due to their value and projected utilization of $0.9 million, a decrease of $3.1 million for the utilization of capital loss carryovers previously expected to go unutilized and $2.5 million due to the expiration of capital losses.

The Company's United States federal net operating loss carryforwards totaled $53.5 million and $58.1 million at December 31, 2008 and 2007, respectively. These net operating loss carryforwards begin to

90

## REALNETWORKS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

expire between 2010 and 2026. In 2008, the remaining net operating loss carryforwards are from acquired subsidiaries that are limited under Internal Revenue Code Section 382. In the event that the Company generates taxable income to utilize these net operating loss carryforwards, income tax expense will be reduced by approximately $12.8 million.

The Company has not provided for U.S. deferred income taxes or withholding taxes on certain non-U.S. subsidiaries' undistributed earnings. These earnings are intended to be permanently reinvested in operations outside of the U.S. If these amounts were distributed to the U.S., in the form of dividends or otherwise, the Company could be subject to additional U.S. income taxes. It is not practicable to determine the U.S. federal income tax liability or benefit on such earnings due to the availability of foreign tax credits and the complexity of the computation, if such earnings were not deemed to be permanently reinvested.

The Company adopted the provision of Financial Standards Accounting Board Interpretation No. 48 *Accounting for Uncertainty in Income Taxes* (FIN 48) an interpretation of FASB Statement No. 109 on January 1, 2007. As of December 31, 2008, and 2007, the Company had $10.5 million and $9.0 million of unrecognized tax benefits, respectively. The total amount of unrecognized tax benefits that would affect the Company's effective tax rate if recognized is $9.5 million as of December 31, 2008 and $8.4 million as of December 31, 2007.

In accordance with FIN 48, the Company elected to recognize accrued interest and penalties related to unrecognized tax benefits as a component of income tax expense. As of December 31, 2008 and 2007, the Company had approximately $1.4 million and $687,000 of accrued interest and penalties related to uncertain tax positions, respectively. To the extent interest and penalties are not assessed with respect to uncertain tax positions, amounts accrued will be reduced and reflected as a reduction of the overall income tax provision. The Company does not anticipate that total unrecognized tax benefits will significantly change within the next twelve months.

A reconciliation of the beginning and ending balances of the total amounts of unrecognized tax benefits is as follows (in thousands):

|  | Years Ended December 31, | |
| --- | ---: | ---: |
|  | 2008 | 2007 |
| Balance, beginning of year | $ 8,931 | $7,501 |
| Increases related to prior year tax positions | 586 | — |
| Decreases related to prior year tax positions | (241) | — |
| Increases related to current year tax positions | 1,179 | 1,430 |
| Settlements | — | — |
| Expiration of the statue of limitations | — | — |
| Balance, end of year | $10,455 | $8,931 |

91

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Note 17. Commitments and Contingencies**

*Commitments.* The Company has commitments for future payments related to office facilities leases and other contractual obligations. The Company leases office facilities under various operating leases expiring through September 2014. The Company also has other contractual obligations, primarily relating to minimum contractual payments due to content and other service providers, expiring over varying time periods in the future. Future minimum payments are as follows (in thousands):

|  | Office Leases | Other Contractual Obligations | Total |
|---|---|---|---|
| 2009 | $14,831 | $ 32,926 | $ 47,757 |
| 2010 | 13,204 | 10,820 | 24,024 |
| 2011 | 8,674 | 250 | 8,924 |
| 2012 | 6,790 | —— | 6,790 |
| 2013 | 6,790 | — | 6,790 |
| Thereafter | 9,649 | — | 9,649 |
| Total minimum payments | 59,938 | 43,996 | 103,934 |
| Less future minimum receipts under subleases | 4,985 | — | 4,985 |
| Net | $54,953 | $ 43,996 | $ 98,949 |

Of the total net office lease future minimum payments, $7.2 million is recorded in accrued loss on excess office facilities at December 31, 2008.

Rent expense during the years ended December 31, 2008, 2007, and 2006 was $12.6 million, $11.2 million, and $8.5 million, respectively.

In addition to the amounts shown in the table above, $10.5 million of unrecognized tax benefits have been recorded as liabilities in accordance with FIN 48, and the Company is uncertain as to if or when such amounts may be settled. The Company cannot make a reasonably reliable estimate of the amount and period of related future payments for such liability.

The Company has a commitment to purchase $144.4 million over the next five years from MTVN related to the Rhapsody America venture. The $144.4 million is excluded from the table above as the timing and amount of these payments will vary.

*Borrowing Arrangements.* The Company's subsidiary, WiderThan, has entered into lines of credit with two Korean domestic banks with an aggregate maximum available limit of $1.6 million at interest rates of approximately 2.9% over the rate earned on the underlying deposits. WiderThan has entered into a separate line of credit with a Korean domestic bank with maximum available limit of $0.8 million bearing interest at 7.3%. During the years ended December 31, 2008 and 2007, the Company did not draw on these lines of credit and there were no balances outstanding as of December 31, 2008 or December 31, 2007.

The Company's subsidiary, WiderThan, uses corporate charge cards issued by a Korean domestic bank with an aggregate line of credit of up to $4.0 million. The charged amounts are generally payable in the following month depending on the billing cycle and are included in accounts payable in the accompanying unaudited condensed consolidated balance sheets. In general, the term of the arrangement is one year, with automatic renewal in April of each year. The arrangement may be terminated in writing by mutual agreement between the bank and the Company. The Company is not subject to any financial or other restrictive covenants under the terms of this arrangement.

92

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The Company's subsidiary, WiderThan, has a letter of credit of up to $5.0 million with a Korean domestic bank for importing goods, with one-year maturity (renewable every April), which bears interest at 2.5% over the London Inter-Bank Offer Rate (LIBOR). Borrowings under this letter of credit are collateralized by import documents and goods being imported under such documentation. To the extent that the Company has any outstanding balance, the Company is subject to standard covenants and notice requirements under the terms of this facility, such as covenants to consult with the lender prior to engaging in certain events, which include, among others, mergers and acquisitions or sale of material assets or to furnish certain financial and other information. The Company is not, however, subject to any financial covenant requirements or other restrictive covenants that restrict the Company's ability to utilize this facility or to obtain financing elsewhere. The Company did not draw on the letter of credit and there was no balance outstanding as of December 31, 2008 or December 31, 2007.

The Company's subsidiary, WiderThan, has purchased guarantees amounting to $1.4 million from Seoul Guarantee Insurance which guarantees payments for one year under certain supply contracts the Company has with a customer in Korea.

*401(k) Retirement Savings Plan.* The Company has a salary deferral plan (401(k) Plan) that covers substantially all employees. Under the plan, eligible employees may contribute up to 50% of their pretax salary, subject to the Internal Revenue Service annual contribution limits. During the years ended December 31, 2008, 2007 and 2006 the Company matched 50% of employee contributions to the 401(k) Plan, on up to three percent of participating employees' compensation, and contributed $1.6 million, $1.0 million and $858,000, respectively, in matching contributions. The Company can terminate the matching contributions at its discretion. The Company has no other post-employment or post-retirement benefit plans.

*Litigation.* On September 30, 2008, the Company filed a declaratory action against Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc., Warner Bros. Entertainment, Inc., and Viacom, Inc. and the DVD Copy Control Association (DVD CCA) in the Northern District of California relating to the Company's RealDVD product, which, among other things, allows consumers to securely store DVD content on their hard drives. On the same day, various movie studios filed suit against the Company in the Central District of California. The Company's suit asks the court to find that the RealDVD product does not breach the license agreement that the Company entered into with the DVD CCA. The movie studios' suit alleges that by offering the RealDVD product, RealNetworks has violated the Digital Millennium Copyright Act. The movie studios' suit was subsequently transferred to the Northern District of California. On October 3, 2008, the Studios obtained a temporary restraining order (TRO) requiring the Company to cease distribution of its RealDVD product. The TRO was extended on October 7, 2008. The Court scheduled a preliminary injunction hearing to address the movie studios' claim that RealDVD should not be sold pending a final judicial determination of the underlying claims between the parties. The Company believes that RealDVD complies with the law, and the Company intends to vigorously defend the preliminary injunction request and, if necessary, pursue its declaratory judgment action.

On April 25, 2007, a lawsuit was filed by Greenville Communications, LLC in Greenville, Mississippi against a number of cell phone carriers, including the Company's partners T-Mobile USA, Inc. and Alltel Corporation, alleging that they infringe its patents by providing ringback tone services. The Company agreed to indemnify T-Mobile and Alltel against the claims based on an indemnity that appears to be owed by Real's subsidiary, WiderThan. On August 27, 2007, the Company's motion to transfer this matter to the District of New Jersey was granted. The parties have briefed claim construction, but the case has been stayed pending reexamination of the patents at issue. The Company disputes the plaintiff's allegations regarding both the validity of its patents and its claims of infringement against the Company's partners.

In April 2007, the Copyright Royalty Board (CRB) issued a decision setting new royalty rates for the use of sound recordings in Internet radio from 2006 through 2010. These rates are still under appeal. Additionally, in a separate proceeding, the CRB held hearings to determine mechanical royalty rates associated with the

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

statutory license for digital phonorecord deliveries, including tethered downloads. These rates have also been subject to industry-wide settlement negotiations. A partial settlement was reached with respect to on-demand streaming and tethered downloads between the Digital Media Association (DiMA), the Recording Industry Association of America (RIAA) and the National Music Publishers Association (NMPA), among others. This settlement was published by the CRB in an administrative judicial proceeding supervised by the U.S. Copyright Office. This settlement, with some modifications, is part of the CRB's final determination as published in the Federal Register, but it may be appealed. In addition, the U.S. Copyright Office has raised legal challenges to the CRB's final determination, creating some uncertainty as to the applicability of the settlement terms set forth in CRB's final determination. Finally, the Company has been involved in a proceeding in the Southern District of New York to determine a royalty rate for the public performance of music contained in the American Society of Composers, Authors and Publishers (ASCAP) catalogue. In April 2008, the district court issued a preliminary ruling that sets forth, among other things, a methodology to be used to calculate the royalties owed to ASCAP. The methodology to be used to calculate the royalties was incomplete and contained elements that required negotiation and agreement by the parties in addition to further hearings and decisions by the district court. On July 16, 2008, the court issued an additional ruling relating to the application of the new rates and issued further rulings on September 10, December 8 and December 12, 2008. After working with ASCAP to make a final determination of amounts due under the court's rulings, the Company reached a partial agreement with ASCAP on January 12, 2009. The Company believes it has sufficiently accrued for expected royalties under the agreement, but we are appealing some aspects of the court's rulings that underlie the agreement, and the rulings remain subject to appeal and challenge by other participants.

In June 2003, a lawsuit was filed against the Company and Listen.com, Inc. (Listen) in federal district court for the Northern District of Illinois by Friskit, Inc. (Friskit), alleging that certain features of the Company's and Listen's products and services willfully infringe certain patents relating to searching and streaming media files. On July 26, 2007, the court granted the Company's motion for summary judgment and invalidated all claims on grounds of obviousness. On January 12, 2009, the Federal Circuit affirmed the District Court's dismissal of the suit and invalidation of all asserted claims.

In December 2003, the Company filed suit against Microsoft in the U.S. District Court for the Northern District of California, pursuant to U.S. and California antitrust laws, alleging that Microsoft has illegally used its monopoly power to restrict competition, limit consumer choice, and attempt to monopolize the field of digital media. On October 11, 2005, the Company and Microsoft entered into a settlement agreement pursuant to which the Company agreed to settle all antitrust disputes worldwide with Microsoft, including the U.S. litigation. Upon settlement of the legal disputes, the Company and Microsoft entered into two commercial agreements that provide for collaboration in digital music and casual games. The combined contractual payments related to the settlement agreement and the two commercial agreements to be made by Microsoft to the Company over the terms of the agreements are $761.0 million. The Company had received such payments in full as of March 31, 2007. The Company recorded gains of $60.7 million, $220.4 million and $422.5 million during the years ended December 31, 2007, 2006, and 2005, respectively. These amounts are included within the consolidated statement of operations and comprehensive income as antitrust litigation benefit, net.

From time to time the Company is, and expects to continue to be, subject to legal proceedings and claims in the ordinary course of its business, including employment claims, contract-related claims, and claims of alleged infringement of third-party patents, trademarks and other intellectual property rights. These claims, including those described above, even if not meritorious, could force the Company to spend significant financial and managerial resources. The Company is not aware of any other legal proceedings or claims that the Company believes will have, individually or taken together, a material adverse effect on the Company's business, prospects, financial condition or results of operations. However, the Company may incur substantial expenses in defending against third-party claims and certain pending claims are moving closer to trial. The Company expects that its potential costs of defending these claims may increase as the disputes move into the trial phase of the proceedings. In the event of a determination adverse to the Company, the Company may

94

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

incur substantial monetary liability, and/or be required to change its business practices. Either of these could have a material adverse effect on the Company's financial position and results of operations.

**Note 18.  Guarantees**

In the ordinary course of business, the Company is not subject to potential obligations under guarantees that fall within the scope of FIN No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others — an interpretation of FASB Statements No. 5, 57, and 107 and rescission of FASB Interpretation No. 34*, except for standard indemnification and warranty provisions that are contained within many of the Company's customer license and service agreements, and give rise only to the disclosure requirements prescribed by FIN No. 45.

Indemnification and warranty provisions contained within the Company's customer license and service agreements are generally consistent with those prevalent in the Company's industry. The duration of the Company's product warranties generally does not exceed 90 days following delivery of the Company's products. The Company has not incurred significant obligations under customer indemnification or warranty provisions historically and does not expect to incur significant obligations in the future. Accordingly, the Company does not maintain accruals for potential customer indemnification or warranty-related obligations.

**Note 19.  Segment Information**

SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information* (SFAS 131), establishes standards for the way in which public companies disclose certain information about operating segments in their financial reports. After the formation of Rhapsody America in August 2007, the Company has defined three reportable segments consistent with SFAS 131, based on factors such as how the Company manages its operations and how its Chief Operating Decision Maker reviews results. The Company's Chief Operating Decision Maker is considered to be the Company's CEO Staff (CEOS), which includes the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Executive Vice Presidents and Senior Vice Presidents. The CEOS reviews financial information presented on both a consolidated basis and on a business segment basis, accompanied by disaggregated information about products and services and geographical regions for purposes of making decisions and assessing financial performance. The CEOS reviews discrete financial information regarding profitability of the Company's Music, Consumer and Technology Products and Solutions segments and, therefore, the Company reports these as operating segments as defined by SFAS 131. The accounting policies used to derive segment results are generally the same as those described in Note 1.

The Music segment includes the operations of Rhapsody America as well as the aspects of its music business not included as part of Rhapsody America. The revenue and costs from these businesses include: digital media subscription services such as Rhapsody and RadioPass and sales of digital music and advertising. These products and services are sold and provided primarily through the Internet, and the Company charges customers' credit cards at the time of sale. Billing periods for subscription services typically occur monthly, quarterly or annually, depending on the service purchased.

The Consumer segment primarily includes revenue and costs from: the sale of individual games through the Company's RealArcade service and its Games related websites; the Company's game subscription services; the Company's SuperPass premium subscription service; RealPlayer Plus and related products; sales and distribution of third-party software products; and all advertising other than that related directly to the Company's Music business. These products and services are sold and provided primarily through the Internet, and the Company charges customers' credit cards at the time of sale. Billing periods for subscription services typically occur monthly, quarterly or annually, depending on the service purchased.

95

REALNETWORKS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Technology Products and Solutions segment includes revenue and costs from: sales of ringback tone, music-on-demand, video-on-demand and messaging services; sales of media delivery system software, including Helix system software and related authoring and publishing tools, both directly to customers and indirectly through original equipment manufacturer channels; support and maintenance services sold to customers who purchase software products; broadcast hosting services; and consulting and professional services that are offered to customers. These products and services are primarily sold to corporate customers.

Amounts that are not included within the above segment descriptions are shown below as Reconciling Amounts. Included within these amounts are items such as interest income and net antitrust litigation benefit.

Segment income (loss) before income taxes for the year ended December 31, 2008, is as follows (in thousands):

| | Music | Consumer | Technology Products and Solutions | Reconciling Amounts | Consolidated |
|---|---|---|---|---|---|
| Net revenue | $160,721 | $237,522 | $ 206,567 | $ — | $ 604,810 |
| Cost of revenue | 91,067 | 56,351 | 85,826 | | 233,244 |
| Impairment of deferred costs and prepaid royalties | 1,000 | 7,829 | 10,837 | — | 19,666 |
| Gross profit | 68,654 | 173,342 | 109,904 | — | 351,900 |
| Advertising with related party | 44,213 | — | — | — | 44,213 |
| Restructuring and other charges | — | — | — | 6,833 | 6,833 |
| Impairment of goodwill and long-lived assets | 4,753 | 46,056 | 141,867 | — | 192,676 |
| Other operating expenses | 101,022 | 170,149 | 123,507 | 905 | 395,583 |
| Operating income (loss) | (81,334) | (42,863) | (155,470) | (7,738) | (287,405) |
| Other income, net | 56,057 | — | — | 13,298 | 69,355 |
| Income (loss) before income taxes | $(25,277) | $(42,863) | $ (155,470) | $ 5,560 | $ (218,050) |

Segment income (loss) before income taxes for the year ended December 31, 2007, is as follows (in thousands):

| | Music | Consumer | Technology Products and Solutions | Reconciling Amounts | Consolidated |
|---|---|---|---|---|---|
| Net revenue | $149,126 | $211,851 | $ 206,643 | $ — | $ 567,620 |
| Cost of revenue | 81,462 | 39,840 | 92,189 | — | 213,491 |
| Gross profit | 67,664 | 172,011 | 114,454 | — | 354,129 |
| Advertising with related party | 24,360 | — | — | — | 24,360 |
| Restructuring and other charges | — | — | — | 3,748 | 3,748 |
| Other operating expenses | 103,482 | 142,749 | 130,551 | (58,060) | 318,722 |
| Operating income (loss) | (60,178) | 29,262 | (16,097) | 54,312 | 7,299 |
| Total non-operating income, net | 36,194 | — | — | 32,278 | 68,472 |
| Income (loss) before income taxes | $(23,984) | $ 29,262 | $ (16,097) | $ 86,590 | $ 75,771 |

96

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Net revenue by segment is as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Music | $160,721 | $149,126 | $123,033 |
| Consumer | 237,522 | 211,851 | 199,739 |
| Technology Products and Solutions | 206,567 | 206,643 | 72,489 |
| Total net revenue | $604,810 | $567,620 | $395,261 |

The Company's customers consist primarily of end users located in the U.S., Republic of Korea, and various foreign countries. Revenue by geographic region is as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| United States | $403,799 | $360,676 | $283,433 |
| Europe | 107,223 | 84,368 | 62,270 |
| Republic of Korea | 50,443 | 82,549 | 18,597 |
| Rest of the World | 43,345 | 40,027 | 30,961 |
| Total | $604,810 | $567,620 | $395,261 |

Long-lived assets, consisting of equipment, software, leasehold improvements, other intangible assets, and goodwill by geographic region are as follows (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| United States | $163,730 | $186,665 |
| Republic of Korea | 51,508 | 235,728 |
| Europe | 37,315 | 87,181 |
| Rest of the World | 4,445 | 7,753 |
| Total long-lived assets | $256,998 | $517,327 |

Net assets including minority interest by geographic location are as follows (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| United States | $463,209 | $557,381 |
| Republic of Korea | 64,824 | 228,153 |
| Europe | 20,201 | 79,410 |
| Rest of the World | 5,324 | 10,160 |
| Total | $553,558 | $875,104 |

97

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Goodwill is assigned to the Company's segments as follows (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| Music | $ 37,029 | $ 37,029 |
| Consumer | 88,302 | 129,621 |
| Technology products and solutions | 49,933 | 186,503 |
| Total goodwill | $175,264 | $353,153 |

## Note 20.  Related Party Transactions

*Transactions with MTVN.*  As part of the formation of Rhapsody America, MTVN contributed a $230 million five-year note payable in partial consideration for acquiring MTVN's interest in the venture. Subsequent to December 31, 2008, RealNetworks and MTVN signed an amendment to the Rhapsody America venture agreement which reduced the amount payable under the MTVN note payable to $213.8 million over the original five-year term. During the years ended December 31, 2008 and 2007, Rhapsody America received $44.4 million and $25.0 million in cash as note payments and has spent $44.2 million and $24.4 million, respectively, in advertising with MTVN.

MTVN provides various support services directly to Rhapsody America for which it bills the venture directly. Included within the support services are items such as facilities, personnel and overhead which are allocated based on various measures depending on the service provided, including employee headcount, or number of users of a service. Costs for the support services for the years ended December 31, 2008 and 2007 were $0.9 million and $0.6 million, respectively. These amounts are included in the consolidated financial statements within the related party payable of $13.2 million and $17.2 million as of December 31, 2008 and 2007, respectively.

The Company also agreed to grant options to acquire shares of RealNetworks, Inc. common stock to Rhapsody America employees as part of the venture with MTVN and has included the expense associated with these options in its statement of operations and comprehensive income. MTVN's share of the expense associated with the stock options granted to Rhapsody America employees is calculated based on its ownership percentage and is billed directly by the Company to MTVN under a separate agreement. The Company has charged $0.8 million to MTVN in 2008 related to stock options since the formation of the venture. MTVN paid $0.2 million in full prior to December 31, 2008. The remaining $0.6 million receivable is netted within the related party payable of $13.2 million as of December 31, 2008.

RealNetworks also provides various support services, including items such as facilities, information technology systems, personnel and overhead, directly to Rhapsody America. The allocation of other support service costs are based on various measures depending on the service provided, including employee headcount, time employees spend on providing services to Rhapsody America, server usage or number of users of a service. The allocations of these costs are billed directly to Rhapsody America. RealNetworks has treated these allocations as intercompany transactions and all such transactions were eliminated in consolidation.

98

**REALNETWORKS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Note 21.   Quarterly Information (Unaudited)

The following table summarizes the unaudited statement of operations for each quarter of 2008 and 2007 (in thousands, except per share data):

|  | Total | Dec. 31 | Sept. 30 | June 30 | Mar. 31 |
|---|---|---|---|---|---|
| **2008:** | | | | | |
| Net revenue | $ 604,810 | $ 152,644 | $151,955 | $152,648 | $147,563 |
| Gross profit | 351,900 | 72,936 | 89,791 | 97,003 | 92,170 |
| Operating loss | (287,405) | (236,199) | (26,971) | (12,693) | (11,542) |
| Net income (loss) | (243,878) | (240,499) | (4,500) | (1,305) | 2,426 |
| Basic net income (loss) per share(1) | (1.74) | (1.78) | (0.03) | (0.01) | 0.02 |
| Diluted net income (loss) per share(1) | (1.74) | (1.78) | (0.03) | (0.01) | 0.02 |
| **2007:** | | | | | |
| Net revenue | $ 567,620 | $ 156,882 | $145,095 | $136,171 | $129,472 |
| Gross profit | 354,129 | 95,177 | 88,451 | 86,972 | 83,529 |
| Operating income (loss) | 7,299 | (25,881) | (15,386) | (5,177) | 53,743 |
| Net income | 48,315 | 2,685 | 4,342 | 1,327 | 39,961 |
| Basic net income per share(1) | 0.32 | 0.02 | 0.03 | 0.01 | 0.25 |
| Diluted net income per share(1) | 0.29 | 0.02 | 0.03 | 0.01 | 0.22 |

(1) The sum of the quarterly net income per share will not necessarily equal the net income per share for the year due to the effects of rounding.

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**The Board of Directors and Shareholders**
**RealNetworks, Inc.:**

We have audited the accompanying consolidated balance sheets of RealNetworks, Inc. and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for each of the years in the three year period ended December 31, 2008. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of RealNetworks, Inc. and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the years in the three year period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), RealNetworks, Inc.'s internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2009 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

Seattle, Washington
February 27, 2009

100

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders
RealNetworks, Inc.:

We have audited RealNetworks, Inc.'s internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). RealNetworks, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying form 10-K. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, RealNetworks, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of RealNetworks, Inc. and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008, and our report dated February 27, 2009 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

Seattle, Washington
February 27, 2009

101

**Item 9.**  *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

Not applicable.

**Item 9A.**  *Controls and Procedures*

**Disclosure Controls and Procedures**

The Company's management, with the participation of the principal executive officer and principal financial officer, has evaluated the effectiveness of the Company's "disclosure controls and procedures" (as such term is defined under Rule 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the Exchange Act)). Based on their evaluation, the principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective for the purpose of ensuring that the information required to be disclosed in the reports that the Company files or submits under the Exchange Act (1) is recorded, processed, summarized, and reported within the time period specified in the Securities and Exchange Commission rules and forms and (2) is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, our management concluded that, as of December 31, 2008, RealNetworks maintained effective internal control over financial reporting.

KPMG LLP, an independent registered public accounting firm, has issued an attestation report on the effectiveness of our internal control over financial reporting as of December 31, 2008. This attestation is included within Item 8.

**Changes in Internal Control over Financial Reporting**

The Company's management, with the participation of the principal executive officer and principal financial officer, has evaluated the changes to the Company's internal control over financial reporting that occurred during the fiscal quarter ended December 31, 2008 as required by paragraph (d) of Rules 13a-15 and 15d-15 of the Exchange Act and has concluded that there were no such changes that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B.**  *Other Information*

None.

## PART III.

**Item 10.**  *Directors, Executive Officers and Corporate Governance*

The information required by this Item is contained in part in the sections captioned "Election of Director(s)-Nominee(s) for Director," "Board of Directors-Continuing Directors-Not Standing for Election This Year," "Board of Directors-Committees of the Board," "Board of Directors-Code of Business Conduct and Ethics" and "Voting Securities and Principal Holders-Section 16(a) Beneficial Ownership Reporting Compliance" in the Proxy Statement for RealNetworks' Annual Meeting of Shareholders scheduled to be held on or around June 9, 2009, and such information is incorporated herein by reference.

The remaining information required by this Item is set forth in Part I of this report under the caption "Executive Officers of the Registrant."

## Item 11.  *Executive Compensation*

The information required by this Item is incorporated by reference to the information contained in the section captioned "Executive Compensation" of the Proxy Statement for RealNetworks' Annual Meeting of Shareholders scheduled to be held on or around June 9, 2009.

## Item 12.  *Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters*

The information required by this Item is incorporated by reference to the information contained in the section captioned "Voting Securities and Principal Holders" of the Proxy Statement for RealNetworks' Annual Meeting of Shareholders scheduled to be held on or around June 9, 2009.

## Equity Compensation Plans

As of December 31, 2008, we had awards outstanding under five equity compensation plans. These plans include the RealNetworks, Inc. 1995 Stock Option Plan (1995 Plan), the RealNetworks, Inc. 1996 Stock Option Plan, as amended and restated (1996 Plan), the RealNetworks, Inc. 2000 Stock Option Plan, as amended and restated (2000 Plan), the RealNetworks, Inc. 2005 Stock Incentive Plan, as amended and restated (2005 Plan), and the RealNetworks, Inc. 2002 Director Stock Option Plan (2002 Plan). In addition, the RealNetworks, Inc. 2007 Employee Stock Purchase Plan (2007 ESPP) became effective on January 1, 2008. The 1995 Plan, 1996 Plan, 2002 Plan, 2005 Plan and 2007 ESPP have been approved by our shareholders. The 2000 Plan has not been approved by our shareholders.

In 2005, our shareholders approved the 2005 Plan and upon this approval of the 2005 Plan, we terminated the 1995 Plan, the 1996 Plan, the 2000 Plan and the 2002 Plan. In 2007, our shareholders approved an amended and restated 2005 Plan, and upon this approval, we terminated the RealNetworks, Inc. Director Compensation Stock Plan. As a result of the termination of these Plans, all new equity awards will be issued under the 2005 Plan. In 2007, our shareholders also approved the 2007 ESPP. The initial offering period under the 2007 ESPP commenced on January 1, 2008.

The following table aggregates the data from our plans:

| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (in 000's)(a) | | Weighted-average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (in 000's)(c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 39,161 | $ | 7.39 | 7,712 |
| Equity compensation plans not approved by security holders | 374 | $ | 9.90 | — |
| Total | 39,535 | $ | 7.41 | 7,712 |

(1) On January 1, 2008, the 2007 ESPP became effective. Column (c) above excludes the 1,500,000 shares of the Company's common stock that are authorized for issuance pursuant to the 2007 ESPP.

(2) Includes shares available for future issuances pursuant to the Real Networks, Inc. 2007 Director Compensation Stock Plan (2007 Director Plan), a sub-plan that operates and is administered under the 2005 Plan. Under the 2007 Director Plan, outside directors may elect to receive all or a portion of his or her quarterly director compensation in shares of the Company's common stock in lieu of cash. Shares issued to directors under the 2007 Director Plan are issued from the shares reserved under the 2005 Plan.

*Equity Compensation Plans Not Approved By Security Holders.* The Board of Directors adopted the 2000 Plan to enable the grant of nonqualified stock options to employees and consultants of RealNetworks and its subsidiaries who are not otherwise officers or directors of RealNetworks. The 2000 Plan has not been approved by RealNetworks' shareholders. The Compensation Committee of the Board of Directors is the administrator of the 2000 Plan, and as such determines all matters relating to options granted under the 2000 Plan. Nonqualified stock options granted pursuant to the 2000 Plan were granted with exercise prices equal to the fair market value of RealNetworks' common stock on the date of grant and typically vest over five years as determined by the Compensation Committee or pursuant to delegated authority as provided in the 2000 Plan. In June 2005, the 2000 Plan was terminated and the remaining available shares were transferred to the 2005 Plan.

### Item 13.  *Certain Relationships and Related Transactions, and Director Independence*

The information required by this Item is incorporated by reference to the information contained in the section captioned "Executive Compensation-Policies and Procedures with Respect to Related Person Transactions," "Executive Compensation-Certain Relationships and Related Transactions" and "Election of Directors-Director Independence" of the Proxy Statement for RealNetworks' Annual Meeting of Shareholders scheduled to be held on or around June 9, 2009.

### Item 14.  *Principal Accountant Fees and Services*

The information required by this Item is incorporated by reference to the information contained in the section captioned "Ratification of Appointment of Independent Registered Public Accounting Firm-Fees Billed by KPMG LLP During 2007 and 2008" and "Ratification of Appointment of Independent Registered Public Accounting Firm-Pre-Approval Policies and Procedures" of the Proxy Statement for RealNetworks' Annual Meeting of Shareholders scheduled to be held on or around June 9, 2009.

## PART IV.

### Item 15.  *Exhibits and Financial Statement Schedules*

#### (a)(1) Index to Consolidated Financial Statements

The following consolidated financial statements of RealNetworks, Inc. and subsidiaries are filed as part of this report:

Consolidated Balance Sheets — December 31, 2008 and 2007

Consolidated Statements of Operations and Comprehensive Income — Years Ended December 31, 2008, 2007, and 2006

Consolidated Statements of Cash Flows — Years Ended December 31, 2008, 2007, and 2006

Consolidated Statements of Shareholders' Equity — Years Ended December 31, 2008, 2007, and 2006

Notes to Consolidated Financial Statements

Reports of Independent Registered Public Accounting Firm

#### (a)(2) Financial Statement Schedules

All financial statement schedules have been omitted since they are either not required, not applicable, or because the information required is included in the consolidated financial statements or the notes thereto.

(a)(3) **Index to Exhibits**

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger and Reorganization by and among RealNetworks, Inc., Symphony Acquisition Corp. I, Symphony Acquisition Corp. II, Listen.Com, Inc., Mellon Investor Services LLC, as Escrow Agent and Robert Reid, as Shareholder Representative dated as of April 21, 2003 (incorporated by reference from Exhibit 2.1 to RealNetworks, Inc.'s Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2003 filed with the Securities and Exchange Commission on August 14, 2003) |
| 2.2 | Combination Agreement by and among RealNetworks, Inc., RN International Holdings B.V. and WiderThan Co., Ltd. dated as of September 12, 2006 (incorporated by reference from Exhibit 2.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on September 14, 2006) |
| 3.1 | Amended and Restated Articles of Incorporation (incorporated by reference from Exhibit 3.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2000 filed with the Securities and Exchange Commission on August 11, 2000) |
| 3.2 | Amended and Restated Bylaws adopted April 24, 2007 (incorporated by reference from Exhibit 3.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on April 27, 2007) |
| 4.1 | Amended and Restated Shareholder Rights Plan dated as of December 2, 2008, by and between RealNetworks, Inc. and Mellon Investor Services LLC including the form of Certificate of Designation, the form of Rights Certificate and the Summary of Rights attached thereto as Exhibits A, B and C, respectively (incorporated by reference from Exhibit 4.1 to RealNetworks' Form 8-K filed with the Securities and Exchange Commission on December 3, 2008) |
| 4.2 | Registration Rights Agreement dated as of June 17, 2003, between RealNetworks, Inc. and Goldman, Sachs & Co. (incorporated by reference from Exhibit 4.3 to RealNetworks' Registration Statement on Form S-3 filed with the Securities and Exchange Commission on September 12, 2003) |
| 10.1† | RealNetworks, Inc. 1995 Stock Option Plan (incorporated by reference from Exhibit 99.1 to RealNetworks' Registration Statement on Form S-8 filed with the Securities and Exchange Commission on September 14, 1998) |
| 10.2† | RealNetworks, Inc. 1996 Stock Option Plan, as amended and restated on June 1, 2001 (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2001 filed with the Securities and Exchange Commission on August 13, 2001) |
| 10.3† | RealNetworks, Inc. 2000 Stock Option Plan, as amended and restated on June 1, 2001 (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2001 filed with the Securities and Exchange Commission on August 13, 2001) |
| 10.4† | RealNetworks, Inc. 2002 Director Stock Option Plan (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2002 filed with the Securities and Exchange Commission on July 25, 2002) |
| 10.5† | Form of Stock Option Agreement under the RealNetworks, Inc. 1996 Stock Option Plan, as amended and restated (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.6† | Form of Stock Option Agreement under the RealNetworks, Inc. 2000 Stock Option Plan, as amended and restated (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.7† | Forms of Stock Option Agreement under the RealNetworks, Inc. 2002 Director Stock Option Plan (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.8† | RealNetworks, Inc. 2007 Employee Stock Purchase Plan (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007 filed with the Securities and Exchange Commission on August 8, 2007) |

| Exhibit Number | Description |
|---|---|
| 10.9† | RealNetworks, Inc. 2007 Director Compensation Stock Plan (incorporated by reference from Exhibit 10.9 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2007 filed with the Securities and Exchange Commission on February 29, 2008) |
| 10.10† | RealNetworks, Inc. 2005 Stock Incentive Plan, as amended and restated effective June 25, 2007 (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on June 29, 2007) |
| 10.11† | Form of Non-Qualified Stock Option Terms and Conditions for use under the RealNetworks, Inc. 2005 Stock Incentive Plan (incorporated by reference from Exhibit 10.11 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 1, 2007) |
| 10.12† | Form of Restricted Stock Units Terms and Conditions for use under the RealNetworks, Inc. 2005 Stock Incentive Plan (incorporated by reference from Exhibit 10.12 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 1, 2007) |
| 10.13 | Lease dated January 21, 1998 between RealNetworks, Inc. as Lessee and 2601 Elliott, LLC, as amended (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2004 filed with the Securities and Exchange Commission on November 9, 2004) |
| 10.14† | Form of Director and Officer Indemnification Agreement (incorporated by reference from Exhibit 10.14 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.15 | Voting Agreement dated September 25, 1997 by and among RealNetworks, Robert Glaser, Accel IV L.P., Mitchell Kapor and Bruce Jacobsen (incorporated by reference from Exhibit 10.17 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.16 | Agreement dated September 26, 1997 by and between RealNetworks and Robert Glaser (incorporated by reference from Exhibit 10.18 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.17† | Offer Letter dated March 31, 2005 between RealNetworks, Inc. and John Giamatteo (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on June 6, 2005) |
| 10.18† | Offer Letter dated July 1, 2008 between RealNetworks, Inc. and John Giamatteo (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |
| 10.19† | Offer Letter dated September 18, 2003 between RealNetworks, Inc. and Dan Sheeran (incorporated by reference from Exhibit 10.18 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2005) |
| 10.20† | Offer Letter dated February 13, 2006 between RealNetworks, Inc. and Michael Eggers (incorporated by reference from Exhibit 10.19 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.21† | Offer Letter dated January 23, 2009 between RealNetworks, Inc. and Bob Kimball |
| 10.22† | Agreement dated February 1, 2006 between RealNetworks, Inc. and Rob Glaser (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on February 3, 2006) |
| 10.23† | Agreement dated November 30, 2005 between RealNetworks, Inc. and Bob Kimball (incorporated by reference from Exhibit 10.22 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.24† | Form of MBO Plan Document under the Real Networks, Inc. 2008 Executive Compensation Program (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |

| Exhibit Number | Description |
|---|---|
| 10.25† | Form of MBO Plan Document under the RealNetworks, Inc. 2008 Chief Executive Officer Compensation Program (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |
| 10.26† | Form of MBO Plan Document under the RealNetworks, Inc. 2009 Executive Compensation Program |
| 10.27* | Amended and Restated Settlement Agreement dated as of March 10, 2006 between RealNetworks, Inc. and Microsoft Corporation (incorporated by reference from Exhibit 10.24 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.28* | Transaction, Contribution and Purchase Agreement dated as of August 20, 2007 by and among Rhapsody America LLC, RealNetworks, Inc., RealNetworks Digital Music of California, Inc., Viacom International Inc. and DMS Holdco Inc. (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 10.29* | Limited Liability Company Agreement of Rhapsody America LLC dated as of August 20, 2007 among RealNetworks, Inc., RealNetworks Digital Music of California, Inc., Viacom International Inc. and DMS Holdco Inc. (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 10.30 | Stockholder Agreement by and between Viacom International Inc. and RealNetworks, Inc. dated as of August 20, 2007 (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 14.1 | RealNetworks, Inc. Code of Business Conduct and Ethics (incorporated by reference from Exhibit 14.1 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2003 filed with the Securities and Exchange Commission on March 15, 2004) |
| 21.1 | Subsidiaries of RealNetworks, Inc. |
| 23.1 | Consent of KPMG LLP |
| 24.1 | Power of Attorney (included on signature page) |
| 31.1 | Certification of Robert Glaser, Chairman and Chief Executive Officer of RealNetworks, Inc., Pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Michael Eggers, Senior Vice President, Chief Financial Officer and Treasurer of RealNetworks, Inc., Pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Robert Glaser, Chairman and Chief Executive Officer of RealNetworks, Inc., Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Michael Eggers, Senior Vice President, Chief Financial Officer and Treasurer of RealNetworks, Inc., Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

† Executive Compensation Plan or Agreement

* Portions of this exhibit are omitted and were filed separately with the Securities and Exchange Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Seattle, State of Washington, on February 27, 2009.

REALNETWORKS, INC.

By: /s/  ROBERT GLASER
Robert Glaser
Chief Executive Officer

## POWER OF ATTORNEY

Each person whose signature appears below hereby constitutes and appoints Robert Glaser and Michael Eggers, and each of them severally, his or her true and lawful attorneys-in-fact and agents, with full power to act without the other and with full power of substitution and resubstitution, to execute in his or her name and on his or her behalf, individually and in each capacity stated below, any and all amendments and supplements to this Report, and any and all other instruments necessary or incidental in connection herewith, and to file the same with the Commission.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated below on February 27, 2009.

| Signature | Title |
|---|---|
| /s/  ROBERT GLASER<br>Robert Glaser | Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/  MICHAEL EGGERS<br>Michael Eggers | Senior Vice President, Chief Financial Officer and Treasurer<br>(Principal Financial and Accounting Officer) |
| /s/  ERIC A. BENHAMOU<br>Eric A. Benhamou | Director |
| /s/  EDWARD BLEIER<br>Edward Bleier | Director |
| /s/  PRADEEP JOTWANI<br>Pradeep Jotwani | Director |
| /s/  JEREMY JAECH<br>Jeremy Jaech | Director |
| /s/  JONATHAN D. KLEIN<br>Jonathan D. Klein | Director |
| /s/  KALPANA RAINA<br>Kalpana Raina | Director |

## Exhibits Index

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger and Reorganization by and among RealNetworks, Inc., Symphony Acquisition Corp. I, Symphony Acquisition Corp. II, Listen.Com, Inc., Mellon Investor Services LLC, as Escrow Agent and Robert Reid, as Shareholder Representative dated as of April 21, 2003 (incorporated by reference from Exhibit 2.1 to RealNetworks, Inc.'s Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2003 filed with the Securities and Exchange Commission on August 14, 2003) |
| 2.2 | Combination Agreement by and among RealNetworks, Inc., RN International Holdings B.V. and WiderThan Co., Ltd. dated as of September 12, 2006 (incorporated by reference from Exhibit 2.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on September 14, 2006) |
| 3.1 | Amended and Restated Articles of Incorporation (incorporated by reference from Exhibit 3.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2000 filed with the Securities and Exchange Commission on August 11, 2000) |
| 3.2 | Amended and Restated Bylaws adopted April 24, 2007 (incorporated by reference from Exhibit 3.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on April 27, 2007) |
| 4.1 | Amended and Restated Shareholder Rights Plan dated as of December 2, 2008, by and between RealNetworks, Inc. and Mellon Investor Services LLC including the form of Certificate of Designation, the form of Rights Certificate and the Summary of Rights attached thereto as Exhibits A, B and C, respectively (incorporated by reference from Exhibit 4.1 to RealNetworks' Form 8-K filed with the Securities and Exchange Commission on December 3, 2008) |
| 4.2 | Registration Rights Agreement dated as of June 17, 2003, between RealNetworks, Inc. and Goldman, Sachs & Co. (incorporated by reference from Exhibit 4.3 to RealNetworks' Registration Statement on Form S-3 filed with the Securities and Exchange Commission on September 12, 2003) |
| 10.1† | RealNetworks, Inc. 1995 Stock Option Plan (incorporated by reference from Exhibit 99.1 to RealNetworks' Registration Statement on Form S-8 filed with the Securities and Exchange Commission on September 14, 1998) |
| 10.2† | RealNetworks, Inc. 1996 Stock Option Plan, as amended and restated on June 1, 2001 (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2001 filed with the Securities and Exchange Commission on August 13, 2001) |
| 10.3† | RealNetworks, Inc. 2000 Stock Option Plan, as amended and restated on June 1, 2001 (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2001 filed with the Securities and Exchange Commission on August 13, 2001) |
| 10.4† | RealNetworks, Inc. 2002 Director Stock Option Plan (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2002 filed with the Securities and Exchange Commission on July 25, 2002) |
| 10.5† | Form of Stock Option Agreement under the RealNetworks, Inc. 1996 Stock Option Plan, as amended and restated (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.6† | Form of Stock Option Agreement under the RealNetworks, Inc. 2000 Stock Option Plan, as amended and restated (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.7† | Forms of Stock Option Agreement under the RealNetworks, Inc. 2002 Director Stock Option Plan (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2002 filed with the Securities and Exchange Commission on November 14, 2002) |
| 10.8† | RealNetworks, Inc. 2007 Employee Stock Purchase Plan (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007 filed with the Securities and Exchange Commission on August 8, 2007) |

| Exhibit Number | Description |
|---|---|
| 10.9† | RealNetworks, Inc. 2007 Director Compensation Stock Plan (incorporated by reference from Exhibit 10.9 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2007 filed with the Securities and Exchange Commission on February 29, 2008) |
| 10.10† | RealNetworks, Inc. 2005 Stock Incentive Plan, as amended and restated effective June 25, 2007 (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on June 29, 2007) |
| 10.11† | Form of Non-Qualified Stock Option Terms and Conditions for use under the RealNetworks, Inc. 2005 Stock Incentive Plan (incorporated by reference from Exhibit 10.11 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 1, 2007) |
| 10.12† | Form of Restricted Stock Units Terms and Conditions for use under the RealNetworks, Inc. 2005 Stock Incentive Plan (incorporated by reference from Exhibit 10.12 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 1, 2007) |
| 10.13 | Lease dated January 21, 1998 between RealNetworks, Inc. as Lessee and 2601 Elliott, LLC, as amended (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2004 filed with the Securities and Exchange Commission on November 9, 2004) |
| 10.14† | Form of Director and Officer Indemnification Agreement (incorporated by reference from Exhibit 10.14 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.15 | Voting Agreement dated September 25, 1997 by and among RealNetworks, Robert Glaser, Accel IV L.P., Mitchell Kapor and Bruce Jacobsen (incorporated by reference from Exhibit 10.17 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.16 | Agreement dated September 26, 1997 by and between RealNetworks and Robert Glaser (incorporated by reference from Exhibit 10.18 to RealNetworks' Registration Statement on Form S-1 filed with the Securities and Exchange Commission on September 26, 1997 (File No. 333-36553)) |
| 10.17† | Offer Letter dated March 31, 2005 between RealNetworks, Inc. and John Giamatteo (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on June 6, 2005) |
| 10.18† | Offer Letter dated July 1, 2008 between RealNetworks, Inc. and John Giamatteo (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |
| 10.19† | Offer Letter dated September 18, 2003 between RealNetworks, Inc. and Dan Sheeran (incorporated by reference from Exhibit 10.18 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2005) |
| 10.20† | Offer Letter dated February 13, 2006 between RealNetworks, Inc. and Michael Eggers (incorporated by reference from Exhibit 10.19 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.21† | Offer Letter dated January 23, 2009 between RealNetworks, Inc. and Bob Kimball |
| 10.22† | Agreement dated February 1, 2006 between RealNetworks, Inc. and Rob Glaser (incorporated by reference from Exhibit 10.1 to RealNetworks' Current Report on Form 8-K filed with the Securities and Exchange Commission on February 3, 2006) |
| 10.23† | Agreement dated November 30, 2005 between RealNetworks, Inc. and Bob Kimball (incorporated by reference from Exhibit 10.22 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.24† | Form of MBO Plan Document under the Real Networks, Inc. 2008 Executive Compensation Program (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |

110

| Exhibit Number | Description |
|---|---|
| 10.25† | Form of MBO Plan Document under the RealNetworks, Inc. 2008 Chief Executive Officer Compensation Program (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed with the Securities and Exchange Commission on August 11, 2008) |
| 10.26† | Form of MBO Plan Document under the RealNetworks, Inc. 2009 Executive Compensation Program |
| 10.27* | Amended and Restated Settlement Agreement dated as of March 10, 2006 between RealNetworks, Inc. and Microsoft Corporation (incorporated by reference from Exhibit 10.24 to RealNetworks' Annual Report on form 10-K for the year ended December 31, 2005 filed with the Securities and Exchange Commission on March 16, 2006) |
| 10.28* | Transaction, Contribution and Purchase Agreement dated as of August 20, 2007 by and among Rhapsody America LLC, RealNetworks, Inc., RealNetworks Digital Music of California, Inc., Viacom International Inc. and DMS Holdco Inc. (incorporated by reference from Exhibit 10.1 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 10.29* | Limited Liability Company Agreement of Rhapsody America LLC dated as of August 20, 2007 among RealNetworks, Inc., RealNetworks Digital Music of California, Inc., Viacom International Inc. and DMS Holdco Inc. (incorporated by reference from Exhibit 10.2 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 10.30 | Stockholder Agreement by and between Viacom International Inc. and RealNetworks, Inc. dated as of ·· August 20, 2007 (incorporated by reference from Exhibit 10.3 to RealNetworks' Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 filed with the Securities and Exchange Commission on November 9, 2007) |
| 14.1 | RealNetworks, Inc. Code of Business Conduct and Ethics (incorporated by reference from Exhibit 14.1 to RealNetworks' Annual Report on Form 10-K for the year ended December 31, 2003 filed with the Securities and Exchange Commission on March 15, 2004) |
| 21.1 | Subsidiaries of RealNetworks, Inc. |
| 23.1 | Consent of KPMG LLP |
| 24.1 | Power of Attorney (included on signature page) |
| 31.1 | Certification of Robert Glaser, Chairman and Chief Executive Officer of RealNetworks, Inc., Pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Michael Eggers, Senior Vice President, Chief Financial Officer and Treasurer of RealNetworks, Inc., Pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Robert Glaser, Chairman and Chief Executive Officer of RealNetworks, Inc., Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Michael Eggers, Senior Vice President, Chief Financial Officer and Treasurer of RealNetworks, Inc., Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

† Executive Compensation Plan or Agreement

* Portions of this exhibit are omitted and were filed separately with the Securities and Exchange Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

111

Exhibit 10.21

January 23, 2009

Robert Kimball
c/o RealNetworks
2601 Elliott Avenue
Seattle, WA 98121

Bob,

It is our great pleasure to offer you the position of Executive Vice President, Corporate Development and Law, General Counsel and Corporate Secretary. As a result of this promotion your annual salary will increase to $370,000 (subject to normal withholdings).

In addition, your Executive MBO target will increase from 45% to 75% of your new base salary. Your salary changes are retroactive to October 1, 2008. Your total target annual compensation will increase to $647,500.

The Compensation Committee of the Board of Directors has authorized a grant of equity in RN under the terms of RN's 2005 Stock Incentive Plan (the "Plan"). You will be given the opportunity, under separate cover, to make an irrevocable election to receive this award in the form of 130,000 stock options, 43,333 restricted stock units, or a combination of 65,000 options and 21,667 restricted stock units. This election must be made no later than February 13, 2009 with an effective date of February 14, 2009 (the "Grant Date"). Vesting will commence on the grant date according to the vesting rules and all other provisions contained in the Plan. Should you elect to receive your grant as stock options; the exercise price of the stock options granted to you shall be equal to the fair market value of RN's Common Stock on the Grant Date. Fair market value shall equal the last sale price for shares of RN's Common Stock on the Grant Date as reported on NASDAQ. Please be aware that unvested stock options are forfeited upon termination of employment.

This promotion has been approved by the Board of Directors and comes in recognition of the fine work you have done at Real.

Bob, please accept our congratulations on your promotion. We look forward to your continued contributions and future success.

Sincerely,

/s/ Sid Ferrales

Savino "Sid" Ferrales
SVP Human Resources
RealNetworks, Inc.



**RealNetworks Inc, Executive Compensation Program — 2009 MBO Plan Document**

### OBJECTIVE OF THE PLAN

The objective of the RealNetworks' FY 2009 Executive MBO Incentive Plan is to reward business leaders for their contribution to the Company's success and ensure market competitiveness as we work to attract and retain executive-level talent. RealNetworks has adopted this plan to reward high performance consistent with our core business objectives.

### EFFECTIVE DATE

The effective date of this Plan is January 1, 2009 — December 31, 2009.

### TARGET GOALS

Target goals for your plan will be based upon revenue and EBITDA targets at the corporate level.

Semi-annual assessment of goal attainment will be completed after the close of the six month period. Corresponding payout based on goal attainment will typically occur 30 to 45 days after the close of the six month period.

Your target MBO amount will be allocated as follows across these goals:

| Executive Level | Corporate | | Divisional | | BU | Sales | Discretionary |
| | Revenue | EBITDA | Revenue | EBITDA | Revenue | Revenue | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Corporate Leader | 50.0% | 50.0% | | | | | |
| Sr Divisional Leader | 25.0% | 25.0% | 25.0% | 25.0% | | | |
| BU Leader | 12.5% | 12.5% | | 37.5% | 37.5% | | |
| Sales Leader | 10.0% | 10.0% | | | | 80.0% | |
| Finance Leader | | | | | | | 100.0% |

### MBO PAYOUT MECHANICS

#### Revenue:

- Revenue — in order to maintain consistent revenue growth year over year, performance under 90% of the revenue target goal will not be rewarded

| Attainment | Incentive Payout |
| --- | --- |
| < 90% | No Payout |
| 90% — 100% | 70% — 100% |
| >100% —- 110% | 100% — 130% |
| >110% —- 120% | 130% —- 200% |

#### Example

| Actual Attainment | Actual Payout |
| --- | --- |
| 75% | No Payout |
| 98% | 94% |
| 110% | 130% |
| 115% | 165% |

#### EBITDA:

- EBITDA attainment will be paid out linearly to a maximum of 160% for profitable units. However, in order for the payout to exceed 100%, corresponding revenue attainment must be at or above 90%. There is no threshold for payout except in rare instances where the EBITDA target is a negative number.

| Attainment | Incentive Payout |
| --- | --- |
| 0 — 100% | 0 — 100% |
| 100% — 160% | 100% — 160%* |
| 160% — 200% | 160% — 200%* |

#### Example

| Actual Attainment | Actual Payout |
| --- | --- |
| 49.50% | 49.50% |
| 130% | 130% |
| 185% | 185% |



*EBITDA payout is capped at 100% unless revenue attainment is at or above 90% of target.

**Terms and Conditions**

- MBO calculations are completed and payments are made every six months with payout timing approximately 30 — 45 days after the close of the six month period. In all circumstances, any payouts that are earned in the plan year will be paid by March 15 of the following year, at the latest.

- You must be in an eligible position on the first and last day of the quarter to participate in the MBO program for that quarter.

- Salary, eligible position changes and/or transfers from one eligible group to another within a quarter will be based on salary and change at the beginning of the quarter. Changes after the first day of the quarter will be reflected in the next quarter.

- In order to receive a payout from the plan you must be on the company's payroll as of the last day of each six month period and on the company's payroll as of the date the award is paid, subject to the following. If your employment terminates due to your total and permanent disability or death, you or your estate, still may be eligible to receive any payout that otherwise was earned. If the Company terminates your employment other than for cause, you may also be eligible to receive any payout that was otherwise earned.

- Notwithstanding any other provision of the plan the Compensation Committee, in its sole discretion, may increase, reduce or eliminate a participant's award at any time before it is paid, whether or not calculated on the basis of pre-established performance goals or formulas.

- The Compensation Committee has all power and discretion to interpret and administer the Plan, including (but not limited to) the power to determine who is eligible for the Plan and the size of any payouts.

- The compensation Committee may delegate all or any part of its powers under the Plan to the company's CEO and SVP HR, except that the CEO and SVP HR may not administer the Plan with respect to participants who are executive officers of the company. (For this purpose, an individual will be considered an executive officer of the company if his or her role at the company falls within the definition of "officer" under Rule 16a-1(f) promulgated under the Securities Exchange Act of 1934, as amended.)

- The Compensation Committee reserves the right to adjust targets/measurements based on acquisition or disposition of businesses/assets.

EXHIBIT 21.1

## SUBSIDIARIES OF REALNETWORKS, INC.

| Name of Subsidiary | Jurisdiction of Incorporation |
| --- | --- |
| Atrativa Latin America Ltda. | Brazil |
| Audio Mill, Inc. | California |
| Beijing RealNetworks Technology Co. Ltd. | China |
| Exomi América Latina Industria, Comércio E Serviços LTDA | Brazil |
| Game Trust, Inc. | Delaware |
| HiFind Systems AG | Germany |
| Listen.com, Inc. | California |
| Mr. Goodliving Ltd. | Finland |
| PT WiderThan Indonesia | Indonesia |
| RealNetworks ApS (formerly Game Trust Europe ApS) | Denmark |
| RealNetworks Asia Pacific Co., Ltd. (formerly WiderThan Co., Ltd.) | Republic of Korea |
| RealNetworks Australia Pty. Limited | Australia |
| RealNetworks Digital Music of California, Inc. | California |
| RealNetworks Dijital Medya Yazilim Limited Sirketi | Turkey |
| RealNetworks E-Commerce LLC | Delaware |
| RealNetworks Global, Inc. | Delaware |
| RealNetworks GmbH | Germany |
| RealNetworks GmbH (formerly Sony NetServices GmbH) | Austria |
| RealNetworks Home Entertainment, Inc. | Delaware |
| RealNetworks Hong Kong, Limited | Hong Kong |
| RealNetworks India Pvt. Ltd. | India |
| RealNetworks International SARL | Luxembourg |
| RealNetworks Investments LLC | Delaware |
| RealNetworks K.K. | Japan |
| RealNetworks Korea, Ltd. | Republic of Korea |
| RealNetworks Ltd. | United Kingdom |
| RealNetworks of Brazil LtdA | Brazil |
| RealNetworks of Mexico, S. de R.L. de C.V. | Mexico |
| RealNetworks Oy (formerly Exomi Oy) | Finland |
| RealNetworks Singapore Pte. Limited | Singapore |
| RealNetworks, SARL | France |
| Rhapsody America LLC | Delaware |
| Rhapsody International SARL | Luxembourg |
| RN Acquisition Corp. | Washington |
| RN Gemco, Inc. | Delaware |
| RN International Holdings B.V. | The Netherlands |
| RN International Holdings C.V. | The Netherlands |

| Name of Subsidiary | Jurisdiction of Incorporation |
|---|---|
| TM Acquisition LLC | Delaware |
| Trymedia Systems Sarl | Switzerland |
| Trymedia Systems Sociedad Limitada | Spain |
| WiderThan Americas, Inc. | Delaware |
| WiderThan UK Ltd. | United Kingdom |
| Xing Technology Corporation | California |
| Real Games Europe B.V. (formerly Zylom Media Group B.V.) | The Netherlands |

**EXHIBIT 23.1**

### Consent of Independent Registered Public Accounting Firm

The Board of Directors
RealNetworks, Inc.:

We consent to the incorporation by reference in the registration statement (Nos. 333-108777 and 333-114088) on Form S-3 and (Nos. 333-42579, 333-53127, 333-63333, 333-55342, 333-102429, 333-128444 and 333-147279) on Form S-8 of RealNetworks, Inc. of our reports dated February 27, 2009, with respect to the consolidated balance sheets of RealNetworks, Inc. as of December 31, 2008 and 2007, and the related consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008, and the effectiveness of internal control over financial reporting as of December 31, 2008, which reports appear in the December 31, 2008 annual report on Form 10-K of RealNetworks, Inc.

/s/ KPMG LLP

Seattle, Washington
February 27, 2009

EXHIBIT 31.1

## CERTIFICATION PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Robert Glaser, certify that:

1.   I have reviewed this report on Form 10-K of RealNetworks, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ Robert Glaser
Robert Glaser
Title: Chairman and Chief Executive Officer
(Principal Executive Officer)

EXHIBIT 31.2

## CERTIFICATION PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Michael Eggers, certify that:

1.   I have reviewed this report on Form 10-K of RealNetworks, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ Michael Eggers
_____
Michael Eggers
Title: Senior Vice President, Chief Financial Officer and Treasurer
(Principal Financial and Accounting Officer)

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

I, Robert Glaser, Chairman and Chief Executive Officer of RealNetworks, Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of RealNetworks, Inc. on Form 10-K for the fiscal year ended December 31, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of RealNetworks, Inc.

Date: February 27, 2009

By:    /s/ Robert Glaser
Name:  Robert Glaser
Title:   Chairman and Chief Executive Officer
       (Principal Executive Officer)

A signed original of this written statement required by Section 906 has been provided to RealNetworks, Inc. and will be retained by RealNetworks, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
## (18 U.S.C. SECTION 1350)

I, Michael Eggers, Senior Vice President, Chief Financial Officer and Treasurer of RealNetworks, Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of RealNetworks, Inc. on Form 10-K for the fiscal year ended December 31, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of RealNetworks, Inc.

Date: February 27, 2009

By:     /s/ Michael Eggers
Name:   Michael Eggers
Title:  Senior Vice President,
        Chief Financial Officer and Treasurer
        (Principal Financial and Accounting Officer)

A signed original of this written statement required by Section 906 has been provided to RealNetworks, Inc. and will be retained by RealNetworks, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.