GLENN D. POMERANTZ (SBN 112503)
Glenn.Pomerantz@mto.com
BART H. WILLIAMS (SBN 134009)
Bart.Williams@mto.com
KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Tel: (213) 683-9100; Fax: (213) 687-3702

ROBERT H. ROTSTEIN (SBN 72452)
rxr@msk.com
ERIC J. GERMAN (SBN 224557)
ejg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Tel: (310) 312-2000; Fax: (310) 312-3100

GREGORY P. GOECKNER (SBN 103693)
gregory_goeckner@mpaa.org
DANIEL E. ROBBINS (SBN 156934)
dan_robbins@mpaa.org
15301 Ventura Boulevard, Building E
Sherman Oaks, California 91403-3102
Tel: (818) 995-6600; Fax: (818) 285-4403

Attorneys for Motion Picture Studio Plaintiffs/Declaratory Relief Claim Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REALNETWORKS, INC., et al.,

Plaintiffs,

vs.

DVD COPY CONTROL ASSOCIATION, INC., et al.

Defendants.

CASE NO. C 08-4548-MHP

**NOTICE OF MOTION AND MOTION OF STUDIO PLAINTIFFS FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: April 1, 2009
Time: 9:00 a.m.
Ctrm: 15 (Hon. Marilyn Hall Patel)

UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, et al.,

Plaintiffs,

vs.

REALNETWORKS, INC., et al.

Defendants.

CASE NO. C 08-4719-MHP

[Filed concurrently herewith:
1) Declaration of Jonathan H. Blavin;
2) Declaration of Mark Hollar;
3) Declaration of Robert Schumann;
4) Declaration of Jeffrey S. Miller;
5) [Proposed] Order]

Dockets.Justia.com

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on April 1, 2009, at 9:00 a.m. or as soon thereafter as counsel may be heard in Courtroom 15 of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs and Declaratory Relief Claim Defendants Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Warner Bros. Entertainment Inc., Disney Enterprises, Inc., Sony Pictures Television Inc. and Columbia Pictures Industries, Inc. (collectively, "the Studios") will and hereby do move for a preliminary injunction restraining and enjoining RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real") and all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privity with any of them, from developing, maintaining, supplying, promoting, trafficking or providing to any person or entity, or participating in the development, maintenance, supply, promotion, trafficking or provision to any person or entity of the product known as RealDVD (whether termed [redacted] [redacted], or any other code name), or any substantially similar software application, or any software that circumvents a technological measure that effectively controls access to or copying of the Studios' copyrighted content on digital versatile discs ("DVDs").

Good cause exists for the foregoing order. As set forth in the accompanying Opening Brief in Support of Motion for Preliminary Injunction and supporting papers filed herewith, Real will continue to violate 17 U.S.C. § 1201, *et seq.*, by manufacturing, offering to the public, providing, or otherwise trafficking in a program entitled "RealDVD." RealDVD is (a) designed and produced, (b) marketed by Real, and (c) has no other commercially significant purpose other than to circumvent the Content Scramble System, ARccOS and RipGuard technologies that controls access to and/or copying of the Studios' works protected under Title 17 of the United States Code when those works are encrypted onto DVDs. Unless restricted, Real's conduct will cause immediate and irreparable harm to the Studios.

This motion is based on this Notice of Motion and Motion, the attached Opening Brief, the Declarations of Jonathan H. Blavin, Robert Schumann, Mark Hollar, Jeffrey S. Miller, and Michael Dunn, the pleadings on file in this action, and on such other and further matters as may

be presented at or before the hearing on this motion.

DATED: March 19, 2009

/S/

GLENN D. POMERANTZ
MUNGER, TOLLES & OLSON LLP

Attorneys for Motion Picture Studio Plaintiffs/Declaratory Relief Claim Defendants

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. The Studios' Use of Technological Measures To Safeguard Their Copyrighted Content .......... 2

1. CSS — The Content Scramble System .......... 3

2. ARccOS and RipGuard .......... 4

B. Real's Circumvention Products: RealDVD .......... 5

1. "Vegas" — Real's Illicit Gamble .......... 5

2. [redacted] .......... 6

3. Real Obtains A CSS License To Try To Exploit A "Loophole" .......... 6

4. Real Seeks to Evade ARccOS/RipGuard .......... 7

C. The Studios' Suit And This Court's TRO .......... 8

III. ARGUMENT .......... 9

A. The Studios Are Likely To Succeed On Their DMCA Claim .......... 9

1. RealDVD Circumvents CSS's Access- And Copy-Control Measures In Violation Of Sections 1201(a)(2) And 1201(b)(1) .......... 9

a. CSS Is A "Technological Measure" That Both "Effectively Controls Access" To Copyrighted Works And "Effectively Protects A Right Of A Copyright Owner" .......... 9

b. RealDVD Circumvents Both The Access-Control And Copy-Control Technological Measures Of CSS .......... 10

c. RealDVD's Circumvention Is Without Authorization .......... 11

(1) RealDVD Circumvents "Without The Authority Of The Copyright Owner," In Violation Of Section 1201(a)(2) .......... 11

(2) Real Cannot Find Authorization In The CSS License .......... 12

d. Real's Others Defenses Are Meritless. .......... 14

2. RealDVD Circumvents ARccOS And Ripguard In Further Violation Of Section 1201(b) .......... 15

a. ARccOS And Ripguard Are "Technological Measures" That "Effectively Protect A Right Of A Copyright Owner" .......... 15

b. RealDVD Circumvents ARccOS And Ripguard .......... 17

3. Real's Appeal To "Fair Use" Is Irrelevant Under The DMCA .......... 18

B. The Studios Will Suffer Irreparable Injury Absent An Injunction .......... 19

1. Irreparable Injury Is Presumed Based On The Studios' Showing Of Likely Success On The Merits .......... 19

2. The Studios Have Shown That Real's Manufacturing And Trafficking In RealDVD Will Cause Irreparable Harm .......... 20

# TABLE OF CONTENTS
(continued)

Page

3. Real's Attempts To Wave Off Irreparable Injury Are Unavailing ........... 23
C. The Balance Of Hardships Decidedly Favors The Studios.................................. 25
IV. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004) ........ *passim*

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*, No. 1:05-cv-1071-ODE, 2007 WL 5011980 (N.D. Ga. Feb. 23, 2007). ........ 22

*A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000) ........ 23

*Burlington Northern R.R. Co. v. Department of Revenue of State of Wash.*, 934 F.2d 1064 (9th Cir. 1991) ........ *passim*

*Cook Inc. v. Boston Scientific Corp.*, 208 F. Supp. 2d 874 (N.D. Ill. 2002) ........ 13

*eBay Inc. v. MercExchange*, 547 U.S. 388 (2006) ........ 19, 20

*Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005) ........ 15

*I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004) ........ 15

*In re CFLC, Inc.*, 89 F.3d 673 (9th Cir. 1996) ........ 13

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) ........ 19

*Landesman v. Keys Condominium Owners Ass'n*, No. C04-2685 PJH, 2004 WL 2370638 (N.D. Cal. 2004) ........ 20

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) ........ 19

*LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006) ........ 13

*Macrovision v. Sima Products Corp.*, No. 05 CIV 5587 (RO), 2006 WL 1063284 (S.D.N.Y. 2006) ........ 19, 20

*MGM v. Grokster, Ltd.*, 545 U.S. 913 (2005) ........ 23

*Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051 (N.D. Cal. 2008) ........ 15, 16

*Nat'l League of Junior Cotillions, Inc. v. Porter*, No. 3:06-cv-508-RJC, 2007 WL 2316823 (W.D.N.C. 2007) ........ 20

*Nike, Inc. v. McCarthy*, 379 F.3d 576 (9th Cir. 2004) ........ 9

*Paramount Pictures Corp. v. 321 Studios*, No. 03 cv-8970 (RO), 2004 WL 402756 (S.D.N.Y. Mar. 3, 2004) ........ 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*RealNetworks, Inc. v. Streambox, Inc.*
2:99 CV2078, 2000 WL 127311 (W.D. Wash. 2000) .......... 19, 20

*S.O.S. Inc. v. Payday, Inc.*,
886 F.2d 1081 (9th Cir. 1989) .......... 13

*Sony Computer Entertainment America, Inc. v. Gamemasters*,
87 F. Supp. 2d 976 (N.D. Cal. 1999) .......... 20

*Star Fuel Marts, LLC v. Sam's East, Inc.*,
362 F.3d 639 (10th Cir. 2004) .......... 20

*Susanville Indian Rancheria v. Leavitt*,
No. 2:07-cv-259 GEB DAD, 2008 WL 58951 (E.D. Cal. 2008) .......... 20

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......... 20

*Tivo, Inc. v. Echostar Communications Corp.*,
446 F. Supp. 2d 664 (E.D. Tex. 2006) .......... 22

*Trailer Train Co. v. State Bd. of Equalization*,
697 F.2d 860 (9th Cir. 1983) .......... 20, 25

*United States v. Elcom Ltd.*,
203 F. Supp. 2d. 1111 (N.D. Cal. 2002) .......... 19

*United States v. Estate Preservation Servs.*,
202 F.3d 1093 (9th Cir. 2000) .......... 20

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) .......... *passim*

*Universal City Studios, Inc. v. Reimerdes*,
111 F. Supp. 2d 294 (S.D.N.Y. 2000) .......... 1, 3, 17, 19

*Universal City Studios, Inc. v. Reimerdes*,
82 F. Supp. 2d 211 (S.D.N.Y. 2000) .......... *passim*

**FEDERAL STATUTES**

17 U.S.C.
§ 1201 .......... 9
§ 1201(a)(2) .......... 9, 11
§ 1201(a)(3)(A) .......... 11
§ 1201(b) .......... 15
§ 1201(b)(1) .......... 9
§ 1201(b)(2) .......... 16
§ 1201(b)(2)(A) .......... 10
§ 1201(b)(2)(6) .......... 16
§ 1203(b)(1) .......... 20

**OTHER MATERIALS**

House Comm. on Judiciary, Section-by-Section Analysis of H.R. 2281
(Comm. Print 1998) H.R.2281 (Comm. Print 1998) .......... 17, 18

Copyright Office Recommendations of the Register of Copyrights .......... 17, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Last October, this Court enjoined RealNetworks ("Real") from trafficking in RealDVD because of "serious questions" about its legality under the Digital Millennium Copyright Act ("DMCA"). Discovery has now confirmed that:

- RealDVD enables exactly what the Studios' primary level of access and copy protection for DVDs — the Content Scramble System ("CSS") — was designed to prevent: the making of permanent, playable copies of DVDs;
- RealDVD enables DVD copying in ways that unquestionably circumvent critical CSS specifications in the license agreement provided by the DVD Copy Control Association ("DVD CCA") ("CSS License");
- Real obtained these confidential CSS specifications by signing up as a CSS licensee under the false pretense that it was going to make a DVD *player* when in fact it really wanted the specifications so that it could create a DVD *copier*; and
- Real knew all along that obtaining a CSS License did not authorize Real to build a DVD copier.

These facts alone demonstrate that the Studios are likely to succeed on the merits of their DMCA claim. Courts repeatedly have recognized that CSS is a technological measure designed to control access to and copying of DVDs under the DMCA and therefore routinely have enjoined the trafficking in other similar products that enable end users to copy DVDs.[1]

But discovery has revealed that circumvention of CSS is only part of Real's wrongdoing. In fact, we now know RealDVD was intentionally designed to defeat and circumvent two additional layers of copy protection: ARccOS and RipGuard. These additional technological protections are placed on many DVDs to frustrate the illegal ripping software that has been unlawfully distributed to circumvent the CSS protections. Discovery has shown that Real clearly understood that it could not successfully market a DVD copier without defeating the additional

---

[1] *See Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211 (S.D.N.Y. 2000) and 111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001); *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.Supp. 2d 1085 (N.D. Cal. 2004).

ARccOS and RipGuard protections because consumers would not pay for a DVD-copying product that did not successfully rip each and every commercial DVD they wanted to copy. Therefore, Real spent a significant portion of its development time figuring out how to circumvent ARccOS and RipGuard ([redacted]). Real cannot hide behind the CSS License to justify its circumvention of ARccOS and RipGuard, because the CSS License has nothing to do with ARccOS or RipGuard. Real's circumvention of these additional protections provides another independent ground for enjoining Real.

The Studios are likely to succeed on the merits of their DMCA claim twice over, due to Real's circumvention of (1) CSS; and (2) ARccos and RipGuard. Therefore, irreparable injury may be presumed as a matter of law under the DMCA. But even without this presumption, the record shows that distribution of RealDVD will irreparably harm the Studios. The illegal copies that RealDVD makes will supplant demand for the Studios' legitimately distributed products in existing as well as emerging markets. To cite but one example, the Studios currently offer a "Digital Copy" product that allows consumers to transfer legally a digital copy of a movie to their computer hard drives — just as RealDVD does. With RealDVD, Real seeks to illegally and unfairly appropriate for itself the value that consumers place on obtaining copies of the Studios' copyrighted works; instead, this value legitimately belongs to the copyright owners who invested in and created the works. Real's campaign to try and convince consumers that DVD copying is "legal" and "100% legit" threatens to affect consumer perceptions (and thus behavior), which threatens the viability of the DVD market and the Studios' ability to obtain a return on their investment in the creative works embodied in the DVD product. The slew of putative "expert" reports Real has thrown into the record do nothing to rebut the Studios' showing of harm.

For all of the reasons discussed below, the Court should enter a preliminary injunction barring Real from manufacturing and distributing RealDVD.

## II. BACKGROUND

### A. The Technological Measures Safeguarding The Studios' Copyrighted Content

The advent of digital media and the resulting ease of making and disseminating perfect digital copies of copyrighted content have enabled rampant piracy. *See Corley*, 273 F.3d at 436.

The Studios and other content owners rely on multiple layers of technological protections — backed up by the DMCA — to protect their works from copying.

**1. CSS — The Content Scramble System**

The primary layer of access- and copy-control protections on DVDs is "CSS." CSS is the result of a cross-industry effort over many years by the (i) consumer electronics, (ii) computer software and hardware ("IT"), and (iii) motion picture industries to create a secure system for the dissemination and playback of copyrighted content on DVDs. *Id.*

The importance of CSS to the commercialization of DVDs cannot be overstated. Marsha King, a former Studio executive present at the creation of CSS and the CSS License, testified that the Studios "[redacted] *accord Corley*, 273 F.3d at 436. Andrew Parsons, a Senior Vice President at Pioneer Electronics representing the consumer electronics industry in the drafting of the CSS License, also testified that the goal of CSS was "[redacted]." [redacted].

CSS licensees (such as Real) could not possibly be confused about the overriding anti-copying goal of CSS. The Specifications repeatedly explain that CSS's purpose is to "[redacted]." *See, e.g.,* Blavin Decl., Ex. 15 at § 1.1. As courts recognize, CSS implements an integrated system of locks-upon-locks so "appropriately configured hardware . . . [can] decrypt, unscramble and play back, *but not copy*" DVDs. *Reimerdes*, 111 F. Supp. 2d at 308 (emphasis added). The CSS License itself states at the outset that CSS was "developed . . . to provide reasonable security for content on DVD Discs and . . . provide protection for such copyrighted content against unauthorized consumer copying." Blavin Decl., Ex. 21 at Recital A. The CSS License is for "DVD Products," such as DVD Players, DVD Drives, and DVD Discs, but notably not "DVD copiers." *Id.* § 1.15.

The technical details of CSS are explicated in detail in the brief filed by the DVD CCA, and in the declaration of the Studios' technical expert, Robert Schumann. The critical features of

CSS at issue in this case include the following:

(1) **Content Encryption.** [redacted] Declaration of Robert Schumann ("Schumann Decl."), Ex. A at ¶ 26; *Corley*, 273 F.3d at 437-38.

(2) **Drive Locking.** [redacted] Schumann Decl., Ex. A at ¶¶ 25, 28-30.

(3) **Protection of Decryption Keys.** [redacted] *Id.* ¶ 27.

(4) **Authentication.** [redacted] *Id.* ¶¶ 28-30.

(5) **Bus Encryption.** [redacted] *Id.* ¶¶ 31-33.

**2. ARccOS and RipGuard**

To supplement the protections of CSS, various Studios utilize two other technological measures to guard against copying: "ARccOS," released by Sony DADC and "RipGuard," released by Macrovision. [redacted]



B. Real's Circumvention Products: RealDVD

1. "[REDACTED]" — Real's Illicit Gamble

permits unlimited copying of a single DVD to an unlimited number of computer hard drives, USB thumb drives, or other external storage drives. Real currently allows each one of those copies to

be played back on up to five computers registered to the same RealDVD account. (Ironically, Real charges consumers a separate fee for each copy of its copyrighted software on these five computers registered to a single account, even though it allows consumers to make free copies of the Studios' copyrighted works on these computers).

Although many of Real's witnesses tried to deny that RealDVD "rips" or copies movies, Real's documents tell a different story. The copying engine for RealDVD, for example,

**2.**

**3. Real Obtains A CSS License To Try To Exploit A**

As a purported cover for its planned circumvention devices, Real began monitoring a case pending in state court in Santa Clara County, *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, Case No. 1-04-CV 031829, a breach of contract action between the DVD

CCA and a CSS licensee that had used the licensed CSS technology to build a high-end (starting price $10,000) device to copy DVDs. In a confidential internal email,

Unlike Kaleidescape, at the time Real obtained its CSS License from the DVD CCA, Real unquestionably knew the DVD CCA's position on the CSS license. Real knew, for example, that the overriding objective of CSS was to prevent copying of DVD content, that the DVD CCA believed the license expressly prohibited making playable copies of DVDs, and that the DVD CCA vigorously disagreed with the state trial court's erroneous reading of the CSS License.

Real nonetheless signed up for a CSS License, concealing that its true intention was to obtain access to the secret CSS technology needed to finalize the design of RealDVD.

Although Real wishfully referred to Kaleidescape's position as a

**4. Real Seeks to Evade ARccOS/RipGuard**

CSS was not the only copy protection technology standing between Real and its goals.

Real quickly recognized there were, in its own words,

C. **The Studios' Suit And This Court's TRO**

Despite Real's knowledge that RealDVD was of dubious legality, Real rushed it to market. It also launched an aggressive public relations campaign, touting RealDVD as a "legal" and "100% legit" way to copy DVDs. *Id.*, Exs. 65, 66. Real was fully cognizant that RealDVD could and would be used by its customers to make free copies of the Studios' DVDs, including DVDs rented or borrowed from friends. Its response was a tacit wink-and-nod, as exemplified by CEO Rob Glaser, who said publicly, "If you want to steal, we remind you what the rules are and

we discourage you from doing it, *but we're not your nanny*." *Id.*, Ex. 67 (emphasis added).

Real released RealDVD on September 30, 2008, the same day these actions were filed. On October 3, this Court enjoined Real from [REDACTED] The Court extended its order on October 7. For the reasons discussed below, the TRO should be converted to a preliminary injunction.

## III. ARGUMENT

The Court may issue a preliminary injunction on a showing of "(1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the moving party's] favor." *Nike, Inc. v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004) (quotations omitted). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.*

### A. The Studios Are Likely To Succeed On Their DMCA Claim

RealDVD is primarily designed and has been (and without further relief, will be) marketed by Real for use in unlawfully circumventing (1) CSS and (2) ARccOS and RipGuard, both of which effectively control access to and protect the content of DVDs. As to each technology, Real violates one or both of the DMCA's prohibitions regarding trafficking in access-control, 17 U.S.C. § 1201(a)(2), or copy-control, *id.* § 1201(b)(1), devices.[2]

#### 1. RealDVD Circumvents CSS's Access- And Copy-Control Measures In Violation Of Sections 1201(a)(2) And 1201(b)(1)

##### a. CSS Is A "Technological Measure" That Both "Effectively Controls Access" To Copyrighted Works And "Effectively Protects A Right Of A Copyright Owner"

It is well settled that CSS is an effective technological access- and copy-control measure. *See 321 Studios*, 307 F. Supp. 2d at 1095; *Reimerdes,* 111 F. Supp. 2d at 317-18. [REDACTED]

[2] The complete text of 17 U.S.C. § 1201 is set forth in an appendix to this brief.

[redacted]

**b. RealDVD Circumvents Both The Access-Control And Copy-Control Technological Measures Of CSS**

"Circumvention" under the DMCA includes "avoid[ing], bypass[ing], remov[ing], deactivat[ing]," or otherwise "impair[ing]" the technological measure that provides the control. 17 U.S.C. §§ 1201(a)(3)(A), 1201(b)(2)(A). Discovery has shown that the way in which RealDVD operates with respect to CSS is not in dispute, and that undisputed evidence establishes that RealDVD circumvents CSS in at least three ways.

First, RealDVD's [redacted] The purpose of the CSS access-control is to "[redacted]t." *See, e.g.*, Blavin Decl., Ex. 15 at § 1.1. Yet [redacted] All of these acts constitute circumvention. *See 321 Studios*, 307 F. Supp. 2d at 1098 (unauthorized use of valid CSS keys is circumvention). Were misuse of these items not circumvention, any ripping company could simply pay a license fee to DVD CCA and sell all the DVD copying software it wanted.

Second, [redacted] This is the

quintessence of circumvention under the DMCA, *i.e.*, "removing," "deactivating," and "otherwise impairing" the technological measures implemented by CSS.

Third, [redacted] *See* Schuman Decl., Ex. A ¶¶ 72-75.

**c. RealDVD's Circumvention Is Without Authorization**

**(1) RealDVD Circumvents "Without The Authority Of The Copyright Owner," In Violation Of Section 1201(a)(2)**

The DMCA defines "circumvention" for purposes of Section 1201(a)(2) (access control) as conduct effected "without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). There is no evidence that any Studio has authorized *any* user of RealDVD (or anyone else) to circumvent CSS for the purpose of copying the Studios' copyrighted content. The opposite is true: the Studios have consistently and explicitly *forbidden* users of DVDs to make permanent, playable copies of CSS-protected DVDs. Anyone who has ever watched a DVD has seen the FBI warning that it is illegal to copy a DVD. The packaging of the Studios' DVDs likewise makes clear that copying is strictly prohibited. *See* Blavin Decl., Ex. 69 ("Unless expressly authorized in writing by the copyright owner, *any copying* . . . of this product or any part of it is strictly prohibited." (emphasis added)); *see also 321 Studios*, 307 F. Supp. 2d at 1096 ("the purchase of a DVD does not give to the purchaser the authority of the copyright holder to decrypt CSS").

Further, as discussed at the TRO hearing, commercial movie DVDs [redacted]

[3] [redacted]

[4] The final transcript for Mr. Dixon's deposition was not available at the time of this filing. It will be submitted with the Studios' responsive papers next week.

The *absence* of any "authority of the copyright owner" to circumvent CSS-protected Studio DVDs could not be clearer.

(2) **Real Cannot Find Authorization In The CSS License**

Real's primary defense, relying entirely on the *Kaleidescape* ruling, is that enabling consumers to copy DVDs is not expressly "*proscribed* by the CSS license" and that this purported "loophole" immunizes Real from DMCA liability. Opp. to TRO at 1 (emphasis added). First, as discussed in detail in the DVD CCA's separate brief, the CSS License in fact bars Real's conduct in multiple respects. *See* DVD CCA Brief at 17-20; *see also 321 Studios,* 307 F.Supp at 1097 ("Licensed DVD players . . . must adhere to strict prohibitions on copying"). Moreover, whether or not the *Kaleidescape* trial court correctly construed the CSS License as to Kaleidescape (and that construction was wrong), when *Real* entered into the License in August 2007, Real knew full well that the DVD CCA understood the agreement to forbid *exactly* what RealDVD does. As the DVD CCA brief explains, Real is bound by its understanding of the DVD CCA's interpretation of the License as a matter of contract law, given that Real knowingly hid from the DVD CCA its contrary intention. *See* DVD CCA Brief at 15-17.

But even if Real's "loophole" argument were correct — and it is not — there is nothing in the CSS License that could give Real the right to produce and traffic in RealDVD. As discussed, the Studios have not authorized the users of RealDVD to access copyrighted DVD content to make permanent, playable copies. Real's argument apparently boils down to the claim that if the CSS License does not somehow expressly prohibit devices that copy DVDs, then the manufacture and use of Real's products to access and copy DVDs is impliedly authorized by the Studios. For Real to interpret *silence* in the CSS License — to which the Studios are not licensors, either to Real or the users of RealDVD — as somehow overriding or superseding that lack of authorization is nonsensical. It also is exactly contrary to controlling federal law: authorization under the CSS

license must be *affirmatively granted*; it cannot be inferred from the absence of *proscription*.[5]

This rule is clear from the Ninth Circuit's decision in *S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989). There, the district court held that the defendant's "license to use" a software program implicitly authorized it to copy and modify the program. Just like the *Kaleidescape* decision and Real's position here, the district court had reasoned that "the burden" under California law was on the copyright holder, as the drafter of the license, "explicitly to restrict" licensees "from making modifications," and that "absent" a "restriction in the contract," the defendant "acquired the unrestricted right to adopt and utilize the program." *Id.* at 1087. In reversing, the Ninth Circuit emphasized that the "license to use" the software implicated "federal copyright policy," and thus "must be construed in accordance with the purposes underlying federal copyright law," chief among which "is the protection of the author's rights." *Id.* at 1088. The Ninth Circuit held that the district court's reasoning that S.O.S. granted "any right which it did not expressly retain" was "*contrary to federal copyright policy: copyright licenses are assumed to prohibit any use not authorized*" and the legality of Payday's conduct would need to be determined "unshielded by any license." *Id.* at 1089 (emphasis added). *Accord LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156-57 (9th Cir. 2006).[6]

This principle applies here. The express objective of the CSS License is to "provide protection" for "copyrighted content" on DVDs "against unauthorized consumer copying." CSS License, Recital A. And the claim here arises under the DMCA, which is intended to "protect copyrights and intellectual property rights." *321 Studios*, 307 F. Supp. 2d at 1101. Hence, authorization to circumvent CSS and enable copying of the Studios' content cannot be inferred;

[5] *Kaleidescape* has no bearing on federal copyright or DMCA law, and not just because it is a state trial court decision and on appeal. The court there emphasized that it was not "tiptoeing" into federal intellectual property law and that its judgment was "framed" solely by "classic state law issues." Blavin Decl., Ex. 70 at 72:18-73:13.

[6] This same rule applies under federal patent law: "Any right not specifically granted by the licensor remains with the licensor, and the rights granted in the license cannot expand beyond the boundaries delineated in the agreement." *Cook Inc. v. Boston Scientific Corp.*, 208 F. Supp. 2d 874, 879 (N.D. Ill. 2002); *see also In re CFLC, Inc.*, 89 F.3d 673, 677 (9th Cir. 1996) (state law does not govern "construction of a patent license . . . where state law 'would be inconsistent with the aims of federal patent policy'"). The CSS License itself includes patent licenses, *see* Blavin Decl., Ex. 21 (at §§ 2.2, 2.3), providing an additional reason why this rule should apply here.

Real must demonstrate express authorization to do so. Real does not and cannot do this. *Nothing* in the CSS License affirmatively authorizes what RealDVD is doing. Real's discovery responses *See* Blavin Decl., Ex. 64. And Real's own senior executives *Id.* at Ex. 24 (at REAL078281) (emphases added).

**d. Real's Other Defenses Are Meritless**

Real has argued in marketing materials and pleadings that RealDVD is not used to "circumvent" CSS, because RealDVD (1) retains the content encryption on the audiovisual data copied to the hard drive; (2) uses keys and CSS algorithms obtained from the DVD CCA; and (3) limits use of each DVD copy made to five registered computers (each of which must pay for a copy of the RealDVD software). These arguments are specious.

As to the first argument, although RealDVD maintains the CSS content encryption on the hard drive copy, RealDVD Saving one layer of protection and evading all the others does not magically convert circumvention into lawful conduct.

Real's second argument — that RealDVD cannot circumvent because Real obtained keys and algorithms from the DVD CCA — is also wrong as a matter of law because, as noted, Real can point to nothing in the CSS License that authorizes it to use the secret information provided by the DVD CCA to make DVD-copying machines. In *321 Studios*, for example, it was undisputed that 321 Studios used valid CSS keys. Judge Illston nonetheless squarely rejected 321's argument (echoed in Real's argument here) that the software did not "circumvent" CSS because it "simply uses the authorized key to unlock the encryption." *321 Studios*, 307 F. Supp. 2d at 1098. Judge Illston held that because 321 Studios "does not have authority to use this key,"

it "therefore avoids and bypasses CSS." *Id.*; *Accord Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008).[7]

Finally, that Real has *currently* chosen to restrict playback of movies copied to thumb or external hard drives to five computers is irrelevant. Nothing in the CSS License or the DMCA turns on the number of people who can use the copies RealDVD makes. Real has, moreover, reserved the right to change that number to 50 or 5000 or to remove the limit altogether. Under Real's theory, if it has the right to traffic in a product that can copy one DVD, it has the right to make an unlimited number of copies. Real's own expert Blavin Decl., Ex. 13 (Felten Depo.) at 141:10-20. If correct, there would be no protection for the content on DVDs, an absurd result.

**2. RealDVD Circumvents ARccOS And Ripguard In Further Violation Of Section 1201(b)**

**a. ARccOS And Ripguard Are "Technological Measures" That "Effectively Protect A Right Of A Copyright Owner"**

ARccOS and RipGuard are copy protection measures. *See id.*,

Real has argued that ARccOS/RipGuard are not "effective" under the DMCA. The

[7] Real relies on *I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004) and *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005). But those cases involved the simple misuse of passwords. CSS involves encryption and encryption-based authentication, not passwords. While using someone else's password may not involve "evading" a technological measure, RealDVD removes or impairs numerous layers of the CSS system in the copies it makes. The *I.M.S.* court itself recognized that the technologies were inapposite and distinguished the CSS cases because, unlike use of a simple website password, "decryption" is a "form[] of circumvention." *I.M.S.*, 307 F. Supp. 2d at 532-33.

DMCA defines a technological measure as "effective" if it "in the ordinary course of its operation, *prevents, restricts, or otherwise limits* the exercise of a right of a copyright owner under this title," including, at issue here, the right of reproduction. § 1201(b)(2)(b) (emphasis added). A technical measure need not be impervious to sophisticated counter-attacks in order to be "effective" under this standard, and indeed, the effectiveness of ARccOS and RipGuard are best demonstrated

Real argues that these technologies are not "effective" because illegal rippers have been able, eventually, to find ways around them. This turns the DMCA on its head. No system is perfect, and hackers such as those employed by Real can, with effort, circumvent any copy protection technology. As the

district court held in *Reimerdes*,

> [i]f a technological means of access control is circumvented, it is, in common parlance, ineffective. Yet defendants' construction, if adopted, would limit the application of the statute to access control measures that thwart circumvention, but withhold protection for those measures that can be circumvented. In other words, *defendants would have the Court construe the statute to offer protection where none is needed but to withhold protection precisely where protection is essential.*

*Reimerdes*, 111 F. Supp. 2d at 318 (emphasis added); *see also* House Comm. on Judiciary, Section-by-Section Analysis of H.R.2281 at 10 (Comm. Print 1998) (technological measure "effectively controls access" to a copyrighted work if its "function" is to control access).

They are effective measures under the DMCA.

**b. RealDVD Circumvents ARccOS And Ripguard**

That RealDVD circumvents ARccOS and RipGuard can be seen by the simple fact that

Real's defense appears to be that

That argument is contrary to all the evidence.

---

[8] There is little evidence, in fact, that scratches or dirt hamper playback of DVDs. The Register of Copyrights has stated that it is "not persuaded" that "DVDs are so susceptible to damage and deterioration that a convincing case could be made that the practice of making preventive backup copies of audiovisual works on DVDs should be noninfringing." Recommendation of the Register of Copyrights in RM 2002-4 at 106, available at http://www.copyright.gov/1201/docs/registers-recommendation.pdf

Finally, even if Real's purpose were not specifically to circumvent ARccOS and Ripguard — an unbelievable assertion given the extensive evidence to the contrary — subjective intent is irrelevant under the DMCA. As the *Reimerdes* court explained, the motivation of the DeCSS authors was "immaterial to the question whether the defendants now before the Court violated the anti-trafficking provision of the DMCA." *Reimerdes*, 111 F. Supp. 2d at 319. "The offering or provision of the program is the prohibited conduct — and it is prohibited irrespective of why the program was written." *Id.*

**3. Real's Appeal To "Fair Use" Is Irrelevant Under The DMCA**

Real cannot rely on the alleged "fair use" defense that consumers can make copies of DVDs to avoid liability for trafficking in a circumvention product. *See, e.g., 321 Studios*, 307 F.

Supp. 2d at 1097-98 ( "downstream uses of the software by the customers of 321, whether legal or illegal, are not relevant to" DCMA claim); *United States v. Elcom Ltd.*, 203 F. Supp. 2d. 1111, 1120 (N.D. Cal. 2002) (same); *Macrovision v. Sima Products Corp.,* No. 05 CIV 5587 (RO), 2006 WL 1063284, at *2 (S.D.N.Y. 2006) (same). As the Second Circuit held, the plain language of the "DMCA targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the use of those materials after circumvention has occurred." *Corley*, 273 F.3d at 443.

Real is no stranger to this principle, having argued and won the same point in *RealNetworks, Inc. v. Streambox, Inc.*, 2:99 CV2078, 2000 WL 127311 (W.D. Wash. 2000): the "DMCA does not have a 'fair use' exception."[9] Blavin Decl., Ex. 74 (at 3.)

For all of the foregoing reasons, the Studios are overwhelmingly likely to prevail on their DMCA claim.

**B. The Studios Will Suffer Irreparable Injury Absent An Injunction**

**1. Irreparable Injury Is Presumed Based On The Studios' Showing Of Likely Success On The Merits**

Irreparable injury to the Studios is presumed for two independent reasons. First, in a DMCA case, irreparable injury for a preliminary injunction is presumed once the plaintiff shows likely success on the merits. *Jacobsen v. Katzer*, 535 F.3d 1373, 1378 (Fed. Cir. 2008); *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004); *Reimerdes*, 82 F. Supp. 2d at 215.[10] This remains true even after *eBay Inc. v. MercExchange*, 547 U.S. 388

[9] Even if it were not legally irrelevant, Real's appeal to end-users' claimed "fair uses" is erroneous. There is no support for Real's proposition that making extra free copies of DVD content meets the legal test for the fair use defense. *See Macrovision*, 2006 WL 1063284 at *2 (defendant "cites no authority, and this Court is aware of none, for the proposition that 'fair use' includes the making of a backup [DVD] copy"). The Register of Copyrights has rejected the claim that users have the fair use right to make additional copies of DVDs. *See, e.g.,* Copyright Office Recommendation of the Register of Copyrights in RM 2002-4 at 108, http://www.copyright.gov/1201/docs/registers-recommendation.pdf ("Register is aware of no authority that" additional DVD copies "are noninfringing"); *cf.* Recommendation of the Register of Copyrights in RM 2005-11 at 60, http://www.copyright.gov/1201/docs/1201_recommendation.pdf (noting that "there is no case that remotely reaches" a "holding" that "space shifting" constitutes "fair use" and "Register is skeptical that such conduct would be considered fair use").

[10] Courts repeatedly have granted preliminary injunctions to enjoin the sale and distribution of products that violate the DMCA's anti-circumvention provisions. *See RealNetworks,* 2000 WL

(2006), which dealt with the standard for *permanent* injunctions in patent cases.[11]

Second, because the injunction here "prevent[s] the violation of a federal statute" that "specifically authorizes a district court to grant injunctive relief to prevent a violation," the "standard requirements for equitable relief need not be satisfied." *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983). *See* 17 U.S.C. § 1203(b)(1) (authorizing Court to grant injunctive relief to "prevent or restrain a violation" of DMCA). "When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Burlington Northern R.R. Co. v. Department of Revenue of State of Wash.*, 934 F.2d 1064, 1074 (9th Cir. 1991).[12]

**2. The Studios Have Shown That Real's Manufacturing And Trafficking In RealDVD Will Cause Irreparable Harm**

Even if irreparable injury needed to be shown and were not presumed, the Studios have shown it. The harm to the Studios was established at the TRO stage through the declaration of Michael Dunn, President of Twentieth Century Fox Home Entertainment LLC, who has more than two decades of real-world experience providing consumers the means to access entertainment content. Mr. Dunn makes the self-evident and (as discussed below) un-rebutted points that Real's unrestrained dissemination of RealDVD will harm the Studios in at least three major respects; and that money damages cannot and will not compensate for them.

First, it is apparent that RealDVD materially changes the value of the Studios' product

---

127311, at *1; *Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 507 F. Supp. 2d 1096, 1111 (C.D. Cal. 2007); *Macrovision,* 2006 WL 1063284, at *3 (DVD copier); *Paramount Pictures Corp. v. 321 Studios,* 2004 WL 402756 (S.D.N.Y. Mar. 3, 2004) (DVD copier); *Reimerdes*, 82 F. Supp. 2d 211 (DVD copier); *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976 (N.D. Cal. 1999).

[11] *Nat'l League of Junior Cotillions, Inc. v. Porter*, 2007 WL 2316823, *5 (W.D.N.C. 2007) ("[T]he only Court of Appeals opinion to explicitly address the [*eBay*] decision suggests that, at the preliminary injunction stage, the presumption based on likelihood of success survives *eBay*.").

[12] *See also, e.g. United States v. Estate Preservation Servs*., 202 F.3d 1093, 1098 (9th Cir. 2000) ("The traditional requirements for equitable relief need not be satisfied [when a statute] expressly authorizes the issuance of an injunction"); *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004) (same); *Landesman v. Keys Condominium Owners Ass'n*, No. C04-2685 PJH, 2004 WL 2370638 at *5 (N.D. Cal. 2004) (same); *Susanville Indian Rancheria v. Leavitt*, No. 2:07-cv-259 GEB DAD, 2008 WL 58951 at *11 (E.D. Cal. 2008) (same).

offerings to consumers. The average price of a DVD today is $18.50. RealDVD effectively reduces the price to $3.25 (for consumers who copy from rented DVDs) or *zero* (for those who copy from borrowed DVDs). Declaration of Michael Dunn ("Dunn Decl."), ¶ 10.

Second, it is clear that RealDVD will harm nascent and developing legitimate markets for video content. Such markets include, among others, (i) Internet download services (through iTunes, Amazon and others); (ii) "digital copy," *i.e.*, DVDs sold — at a higher price — with a second copy that the consumer can move to their hard drive; and (iii) video-on-demand and pay-

[13]

[14]

[15] Of course, RealDVD threatens not only the existing market for DVD sales, but also other markets for viewing movies at different stages of their release, from video to pay television and ultimately over-the-air broadcast. Each of these opportunities to view content presents the customer with a different value proposition. RealDVD harms these markets by allowing consumers for the low price of renting a movie (or no price at all, in the case of borrowed DVDs) to retain a permanent, playable copy.

per-view services. Dunn Decl., ¶¶ 13-20 [redacted] the Studios' "digital copy" functionality in particular offers a virtually identical product — a digital version of the content on a DVD savable to a computer hard drive — that RealDVD enables users to obtain for free. [redacted]

RealDVD threatens to harm these markets in their infancy by adding to every DVD — whether borrowed, rented, or purchased — unlimited copying functionality where each copy may be played back on up to 5 RealDVD-enabled machines. Dunn Decl., ¶¶ 13-20, 24-26. Courts repeatedly have held that this threat of destroying opportunities in emerging markets constitutes irreparable injury justifying injunctive relief. *See, e.g.*, *Tivo, Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664, 669 (E.D. Tex. 2006) ("Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm"), *rev'd on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008); *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, No. 1:05-cv-1071-ODE, 2007 WL 5011980, at *6-7 (N.D. Ga. Feb. 23, 2007).

Third, the presence in the market of RealDVD pending a trial threatens to change ingrained consumer perceptions about what is lawful behavior. [redacted]

---

[16] [redacted]

[17] [redacted]

The threat of Real changing forever marketplace norms about what is lawful and what is not is irreparable harm in and of itself, as is attested to by the experience of the music industry over the last decade. *See A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 910 (N.D. Cal. 2000) ("[Napster] has contributed to a new attitude that digitally-downloaded songs ought to be free — an attitude that creates formidable hurdles for the establishment of a commercial downloading market"); *MGM v. Grokster, Ltd.*, 545 U.S. 913, 929 (2005) ("the indications are that the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection").

**3. Real's Attempts To Wave Off Irreparable Injury Are Unavailing**

Real attempts to dismiss these obvious, common-sense threats with a stable of "experts." When limited to their areas of expertise, their opinions do nothing to rebut or undermine the Studios' showing of irreparable harm.

Real points first to opinions offered by Gordon Klein, who teaches accounting and taxation classes at UCLA.

---

18

19

[redacted]

Real also relies on reports from Prof. Timothy Bresnahan (an economics professor) and Larry Gerbrandt (a professional expert who has held a hodge-podge of entertainment jobs) to assert that [redacted]

[20] [redacted]



Hence, there are some

categories of serious harm to the Studios that even Real's experts concede.

For all of the foregoing reasons, the threat of irreparable harm to the Studios is palpable and supports a continued preliminary injunction.

### C.    The Balance Of Hardships Decidedly Favors The Studios

The statutory injunction sought by the Studios does not require a balance of hardships analysis. *See Trailer,* 697 F.2d at 869; *Burlington*, 934 F.2d at 1074.  Nonetheless, the threat of harm to the Studios, as demonstrated above, is substantial.  The hardship to Real, by contrast, is non-existent.

Finally, Real's claims of harm are belied by the facts that Real continuously has pushed back the hearing date on the preliminary injunction motion and does not even have a concrete timeline for the launch of Facet.

## IV.    CONCLUSION

For all the foregoing reasons, the Studios respectfully request the Court enter the proposed injunction.

Case3:08-cv-04548-MHP Document202 Filed03/19/09 Page33 of 33

DATED: March 19, 2009

/S/

GLENN D. POMERANTZ
MUNGER, TOLLES & OLSON LLP

Attorneys for Motion Picture Studio Plaintiffs/Declaratory Relief Claim Defendants

26

STUDIOS' MOT. FOR P.I.
CASE NOS. C 08-4548-MHP/08-4719-MHP