JAMES A. DiBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
LEO CUNNINGHAM, State Bar No. 121605
Email: lcunningham@wsgr.com
COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
TRACY TOSH LANE, State Bar No. 184666
Email: ttosh@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market St., Spear Tower, Suite 3300
San Francisco, CA 94105
Bus:   (415) 947-2000
Fax:   (415) 947-2099

Attorneys for Plaintiffs and Counterclaim Defendants
REALNETWORKS, INC. and REALNETWORKS
HOME ENTERTAINMENT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware Corporation,<br><br>Defendants.<br><br>AND RELATED CASES | Case Nos.   C08 04548 MHP;<br>             C08 04719 MHP<br><br>**DECLARATION OF GORDON L. KLEIN IN SUPPORT OF REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   April 1, 2009<br>Time:   9:00 a.m.<br>Dept:   15 |

I, Gordon L. Klein, declare as follows:

## I. PROFESSIONAL BACKGROUND

1. I am a faculty member at UCLA's Anderson School of Management, where I have taught 11 accounting, tax, business law, and entrepreneurship courses in the undergraduate program and MBA Program since 1981. Specifically, I have taught small business management, profit forecasting, market segmentation, and business plan development in forecasting sales, incremental costs, consumer behavior, risk-adjusted discounting, and statistical analysis. I was a faculty member from 1987 to 2000 at UCLA's Law School, where I taught courses in accounting, taxation, and financial analysis. I taught similar courses as an Adjunct Professor in the LLM in Taxation Program at Loyola Law School in Los Angeles, California during fall 2001 and 2002. I am a member of the California Bar (inactive), admitted in 1979, and a C.P.A., certified in the state of Illinois in 1979. I have conducted executive education seminars in financial and tax aspects of business management to, among others, partners at PricewaterhouseCoopers, members of the German Bundestadt governing body, and the Finance Committee of the People's Republic of China. I have authored several books concerning managerial accounting, cost accounting, introductory accounting, managerial finance, and statistics, as identified in my curriculum vitae. I earned a B.B.A. from the University of Michigan Business School in 1976, graduating Phi Beta Kappa, and I earned a J.D. from the University of Michigan Law School in 1979. My curriculum vitae, including a list of my publications over the last ten years, is attached hereto as Exhibit 1.

2. I have served as an expert witness in various cases, including cases in Federal Court and in Los Angeles Superior Court, and I have served as a Superior Court referee in Los Angeles and Orange Counties in cases involving damages calculations. I have served as an expert in the area of damages in many cases, several of which involve media and consumer behavior, including *Redondo Beach v. Carpenter*, *Sharon Lechter v. Kiyosaki*, and *Digital Jukebox v. Anheuser Busch*. I have testified in several major matters that involve profit forecasting, including *Country Pine Finance v. Internal Revenue Service* and *Auerbach*

*Associates v. Greg Daily*. A list of my expert testimony experience for the last four years is attached hereto as Exhibit 2.

## II. SCOPE OF WORK AND ANALYSIS

3. I have been asked to address the Studios' claims that RealDVD's presence in the marketplace threatens immediate and irreparable harm to the Studios. Specifically, the Studios have asserted two broad forms of harm which they allege will arise from the sale of RealDVD: 1) that RealDVD will economically harm the Studios' new and planned channels of distribution such as "Digital Copy," "Managed Copy," "Burn-to-DVD," via flash drives, and via stand-alone kiosks, by usurping these future sales opportunities, and 2) that RealDVD will reduce the Studios' DVD sales by encouraging piracy among consumers, including "rent-rip-return" and "borrow-rip-return" behavior, whereby consumers make permanent electronic copies of movies they borrow or rent.

4. In addition, I understand that another RealNetworks product named "Facet" has been added to the case. I further understand that the Studios may claim harm from the presence of Facet in the market. To the extent that the Studios' claims with respect to Facet are analogous to their claims with respect to RealDVD, my opinions (expressed in detail below) apply to both products.

## III. ALLEGED DAMAGE TO NEW AND PLANNED CHANNELS OF DISTRIBUTION

5. The Studios assert that the presence of the RealDVD product in the marketplace will negatively impact the profits the Studios expect to earn on new and planned channels of distribution, including "Digital Copy," "Managed Copy," "Burn-to-DVD," sales made on flash drives, and sales made via stand-alone kiosks. Furthermore, the Studios allege that projecting profits from these products would be "premature" because the products are "too new to allow for a meaningful estimate of revenue to the Studios" and thus the harm would be irreparable.

6. To the extent that products or services have not been introduced into the marketplace, it is indeed difficult to quantify harm associated them. However, such an absence of meaningful data concerning prices, costs, and consumer demand often exists in lost profits

cases, including copyright and patent infringement, trade defamation, and intentional interference with prospective economic advantage. I am unaware of any cases where an absence of precise quantifiability was an adequate basis for demonstrating irreparable harm. Rather, in my experience as a Superior Court Referee and expert witness, courts require only <u>reasonable</u> certainty of estimation, not <u>absolute</u> certainty. Indeed, absolute precision in forecasting lost profits and damages associated with a non-existent product would impose an essentially impossible standard that few plaintiffs and damages experts could ever satisfy.

7. Nevertheless, it is my opinion that, to the extent damages exist, if at all, they can be quantified by integrating the same four elements that frequently and recurringly are at issue when estimating damages resulting from diverted sales. Those elements are:

(1) The differential in price received by a plaintiff between the lost product sales and the actual product sales;

(2) The attendant costs associated with lost product sales and actual product sales to compute lost profits;

(3) The size of the population subset that engages in behavior leading to diverted sales; and

(4) The quantity of sales diverted by this population subset.

8. The price differential element can be determined by comparing the prices at which the Studios sell or intend to offer these new and planned services to consumers, to the prices the Studios actually receive on the products they sell instead, if any. The Studios' Mr. Dunn, for example, discusses the price difference between copies of *What Happens in Vegas* with and without Digital Copy—$23.99 versus $19.99, respectively.[1] Mr. Dunn also testified that a plan entitled "DVD Managed Copy Service Proposal" suggested that the Managed Copy service be offered at $3 retail or $1.43 for the content owners (i.e., the Studios).[2] I understand

---

[1] Declaration of Michael Dunn in support of *Ex Parte* Applications of Plaintiffs for Temporary Retraining Oder and Order to Show Cause re: Preliminary Injunction Thereof ("Dunn Decl.") at 7:16-19.

[2] Deposition of Michael Dunn (December 12, 2008) at 62-3.

from Larry Gerbrandt, an expert for RealNetworks, that the Studios likely possess robust data concerning the price at which they offer or intend to offer these new services. In addition, to the extent that the Studios are currently offering these new products for sale, I understand from Mr. Gerbrandt that the Studios likely receive detailed price information from their licensees, for example for movie downloads sold online. Moreover, services such as RoyaltySource collect publicly available data regarding license and royalty terms which may be helpful in estimating the price at which the Studios sell or plan to sell these new services.

9. The costs to the Studios associated with the sale or rental of new products can be readily determined. Detailed cost of goods sold data, as well as related costs, are required to be maintained under Generally Accepted Accounting Principles ("GAAP") and tax rules. To the extent that the Studios have begun selling these new products (as in the case of Digital Copy), these costs can be determined with the Studios' own data. It is my experience that publicly-held companies like the Studios customarily prepare detailed projections and feasibility studies before introducing new products. To the extent that new products have yet to be offered by the Studios, their attendant costs may be estimated by using data from such projections.

10. The quantity of RealDVD licensees can also be readily determined; it is my understanding that RealNetworks tracks each RealDVD download, including both paid subscriptions and unpaid trial subscriptions. Again, RealNetworks, a publicly-traded company, is required to maintain records of these sales under GAAP and tax rules; similarly, RealNetworks will also be required to maintain records of Facet sales.

11. Lastly, to the extent that consumers use RealDVD and/or Facet to copy traditional DVDs rather than purchase the products the Studios are offering or intending to offer, this number can be determined, if it is even material, by using well-established analytical techniques. I am aware that the Studios have commissioned studies by outside consultants on consumer behavior, including LEK, Solutions Research Group, and Futuresource Consulting. I have also reviewed or am aware of marketing and consumer behavior studies conducted by third parties such as Kagan SNL, PricewaterhouseCoopers, NPD, and others. Finally, it is my experience that market surveys can be designed and used to effectively estimate consumer behavior, including

the use of products and their features. While such surveys should be treated with caution and only relied upon if they are methodologically sound, sound surveys can be constructed to estimate potential damages, if any, that would arise from RealDVD or Facet sales.

## IV. ALLEGED DAMAGES ARISING FROM PIRACY

12. The Studios also claim that RealDVD will encourage piracy, including an increase in the "rent-rip-return" and "borrow-rip-return" behaviors described above, and result in lower DVD sales. It is my opinion that, to the extent damages exist, if at all, they can be quantified by integrating the same four elements discussed above.

13. One, the price differential element can be determined by comparing the price at which the Studios sell DVDs to the price earned by the Studios from additional rentals of DVDs, if any. In his TRO declaration, Mr. Dunn asserts that DVDs were sold at "an average price of $18.50" and DVDs were rented at "an average price of $3.25."[3] I note that while the retail prices identified by Mr. Dunn are not a measure of the different prices collected by the Studios, these retail prices can be readily converted into the Studios' wholesale prices using data that the Studios customarily maintain in the ordinary course of business and are required to report under applicable SEC and tax rules. Moreover, I have reviewed or am aware of data collected by third parties, such as RoyaltySource and Kagan, which may be helpful in estimating the price at which the Studios sell or rent DVDs.

14. Two, as with the Studios' nascent or planned distribution methods, the costs to the Studios associated with the sale or rental of a DVD can be readily determined. Detailed cost of goods sold data, as well as related costs, are required to be maintained under GAAP and tax rules. In addition, in my experience, publicly-held companies such as the Studios customarily prepare detailed product-by-product cost analyses, both on a historical and on a forecasting, or so-called *pro forma*, basis. Additionally, Mr. Gerbrandt observes that the Studios often track cost data in order to comply with profit sharing agreements, and receive detailed cost data from

---

[3] Dunn Decl. at 9:1-2.

licensees. Finally, Mr. Gerbrandt notes that the Studios regularly prepare "Ultimates," detailed reports which contain, among other data, cost information.

15. Three, as discussed above, the quantity of RealDVD licensees can also be readily determined since RealNetworks tracks each RealDVD download, including both paid subscriptions and unpaid trial subscriptions. Again, RealNetworks, a publicly-traded company, is required to maintain records of these sales under GAAP and tax rules. Similarly, RealNetworks will also be required to maintain records of Facet sales.

16. Four, the displacement of DVD sales by consumers renting or borrowing rather than buying DVDs can be determined, if material, by well-established analytical techniques used by the Studios in internal marketing studies and financial analysis. I am also aware that the Studios and the MPAA have commissioned numerous studies by outside consultants on the scope and breadth of the impact of piracy worldwide. These include LEK, Solutions Research Group, and Futuresource Consulting. In my opinion, performing assessments of worldwide studio losses to piracy, and determining the amount of piracy on a country by country basis, is a far more difficult analytical challenge than estimating harm from the possible diversion of DVD sales by the use of RealDVD or Facet. This is especially true considering the required data, since the selling prices and rental prices of DVDs, the costs of production, and the number of RealDVD licensees and sales of Facet are readily known.

////

////

////

17. Furthermore, I have reviewed or am aware of marketing and consumer behavior studies conducted by third parties such as Kagan SNL, PricewaterhouseCoopers, Macrovision, NPD, and others, which contain data that would be helpful in calculating the quantity, if any, of diverted sales. I have also reviewed public press and academic papers which estimate piracy more broadly, and note that these studies, too, contain information that is relevant to the task of estimating potential damages. It is my experience that market surveys can be designed and used to effectively estimate consumer behavior, including the use of products and their features.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 17th day of March, 2009 in Los Angeles, California.

_____
Gordon L. Klein