1   JAMES A. DiBOISE, State Bar No. 83296
    Email: jdiboise@wsgr.com
2   LEO CUNNINGHAM, State Bar No. 121605
    Email: lcunningham@wsgr.com
3   COLLEEN BAL, State Bar No. 167637
    Email: cbal@wsgr.com
4   MICHAEL A. BERTA, State Bar No. 194650
    Email: mberta@wsgr.com
5   TRACY TOSH LANE, State Bar No. 184666
    Email: ttosh@wsgr.com
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
7   One Market St., Spear Tower, Suite 3300
    San Francisco, CA 94105
8   Bus:   (415) 947-2000
    Fax:   (415) 947-2099
9
    Attorneys for Plaintiffs and Counterclaim Defendants
10  REALNETWORKS, INC. and REALNETWORKS
    HOME ENTERTAINMENT, INC.
11

12                      UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

| | | |
|---|---|---|
| 15  REALNETWORKS, INC., a Washington | ) | Case Nos.   C08 04548 MHP; |
| Corporation; and REALNETWORKS HOME | ) | C08 04719 MHP |
| 16  ENTERTAINMENT, INC., a Delaware corporation, | ) | |
| | ) | |
| 17              Plaintiffs, | ) | **DECLARATION OF LARRY** |
| | ) | **GERBRANDT IN SUPPORT OF** |
| 18       v. | ) | **REALNETWORKS, INC. AND** |
| | ) | **REALNETWORKS HOME** |
| 19  DVD COPY CONTROL ASSOCIATION, INC., a | ) | **ENTERTAINMENT, INC.'S** |
| Delaware nonprofit corporation, DISNEY | ) | **OPPOSITION TO MOTION FOR** |
| 20  ENTERPRISES, INC., a Delaware corporation; | ) | **PRELIMINARY INJUNCTION** |
| PARAMOUNT PICTURES CORP., a Delaware | ) | |
| 21  corporation; SONY PICTURES ENTER., INC., a | ) | Date:    April 1, 2009 |
| Delaware corporation; TWENTIETH CENTURY | ) | Time:    9:00 a.m. |
| 22  FOX FILM CORP., a Delaware corporation; NBC | ) | Dept:    15 |
| UNIVERSAL, INC., a Delaware corporation; | ) | |
| 23  WARNER BROS. ENTER. INC., a Delaware | ) | |
| corporation; and VIACOM, Inc., a Delaware | ) | |
| 24  Corporation, | ) | |
| | ) | |
| 25              Defendants. | ) | |
| | ) | |
| 26 | ) | |
| _____ | ) | |
| 27 | ) | |
| AND RELATED CASES | ) | |
| 28 | ) | |

1    I, Larry Gerbrant, declare as follows:

2        1.    For more than 25 years, I have worked as a media and entertainment analyst and

3    as a research and publishing executive. I am the founder and principal of Media Valuation

4    Partners, which provides valuation, market research, and litigation support. As a media and

5    entertainment executive and research analyst, I have focused on the economic and strategic

6    implications of the intersection between traditional media and emerging content delivery

7    technologies. My background includes experience in film and video production, commercial

8    photography, cable TV system operations, and magazine publishing. In 1984, I joined Kagan

9    World Media, a media research organization. As senior analyst and senior vice president of

10   Kagan's entertainment division, I oversaw more than two dozen of its newsletters and databooks

11   and led its valuation practice. In 2000, after Kagan's sale to Primedia, I became the Chief

12   Operating Officer and led Kagan's integration into Primedia's MediaCentral division. Upon

13   Kagan's subsequent sale to MCG Capital, I joined AlixPartners to lead its entertainment

14   consulting and litigation support practice. In 2005 I was recruited by The Nielsen Company to

15   become senior vice president and general manager of Nielsen Analytics, focusing on emerging

16   media technology economics and conducting primary research on consumer adoption of new

17   media platforms. I have been widely quoted as an expert on trends in and the economics of the

18   media and entertainment industries, and have served as a moderator of more than 200 industry

19   panels and conferences. I am also a graduate of Regis University with a bachelor's degree in

20   business administration.

21       2.    I have served as an expert witness, including on behalf of some of the movie

22   studios who are defendants in this action, in the areas of media, entertainment, cable,

23   broadcasting, motion picture, home video, television programming, and emerging technologies

24   and have not only addressed forensic analyses of each of these sectors but revenue projections

25   for them, including estimates of the revenue potential of new entertainment technologies. I have

26   also overseen consumer surveys for use in litigation settings and designed market research

27   studies related to the adoption of new entertainment products and services. Attached as Exhibit 1

28   is my curriculum vitae and a list of my expert testimony experience.

LARRY GERBRANT DECL. IN OPP. TO DEFENDANTS'        -2-
MTN FOR PRELIMINARY INJUNCTION
CASE NOS. C08 04548 MHP; C08 0417 MHP

3.      I have been asked to address consumer behavior regarding RealDVD, the impact of RealDVD on DVD sales, and the impact of RealDVD on new technologies to be introduced by the Studios.  In addition, I have been asked to opine about data and information that is available to the Studios or is collected and maintained by the Studios.  My opinions in this matter are set forth below.

### The Features and Functions of RealDVD and Facet Demonstrate That They are Designed and Intended to Be Used To Back Up DVDs For Personal Use

4.      I believe that consumers generally prefer to watch movies and television shows on a television screen when they have the opportunity to do so.  However, given the evolution of technology, consumers have also come to desire and expect that they should be able to watch movies and television shows wherever and whenever they want on a variety of mobile devices, including iPods, PDAs, laptop computers and cell phones.  There are many available products – some authorized by the content providers and others not – that give customers the ability to obtain movie and television content and transfer it to such platforms.

5.      For those willing to pay for movie and television content – sometimes for the second time if they have already purchased the content in a prior form (such as on a DVD) – they may download the content from a download-to-own Internet site, such as Apple's iTunes, Amazon's UnBox and download services developed by Netflix and Blockbuster.  Such content is playable on a range of devices depending on the applicable business rules, including iPods to iPhones to Apple TVs to other portable media players and media centers from companies such as Roku, LG Electronics and Archos.  Similarly, consumers may also purchase a "digital copy" of a movie or television show (*i.e.*, a second copy of content found on a second disc that is made available with a limited number of DVDs), which can also be transferred to a computer or mobile device.

6.      Other consumers are not willing to pay for movie or television content a second time, or even a first time.  Those consumers who are willing to steal digital content have numerous options available to them.  Many download (and/or upload) content onto the Internet, especially using peer-to-peer ("P2P") file sharing networks such as BitTorrent.  As discussed

more fully below, the overwhelming majority of movie piracy occurs in this manner on the Internet.  Indeed, high quality copies of blockbuster movies are commonly available on the Internet before and during the "theatrical window" (the three or four month period when the movies are still only available in theaters), long before they are made available for sale to consumers on DVDs.  High quality copies of movies have also been ripped from DVD "screeners" sent out by the Studios and TV networks to members of the various motion picture and television academies, often well before these titles become available to the general public.

7.      There is also a vast array of software available to copy DVDs.  Unlike RealDVD and Facet, the overwhelming majority of these products (commonly called "rippers") make copies that can be freely re-copied and shared, including over the Internet, because they remove the CSS encryption.  These products permit consumers to play copies of digital content on various platforms, including mobile devices like iPods and PDAs.  There are literally hundreds of software rippers.  Attached hereto as Exhibit 2 is a listing of certain software rippers.   Such products may be found in mainstream retail outlets such as Best Buy or Costco, and are commonly reviewed in mainstream magazines.  Attached hereto as Exhibit 3 are examples of mainstream media reviews of ripper software.

8.      In marked contrast, the restrictions imposed by RealDVD and Facet on copies of content demonstrate that those copies are intended solely as backup or convenience copies. RealDVD and Facet retain CSS encryption on copied content, add additional encryption, and lock the content to the particular hard drive on which it was made.  The products also warn users whenever they seek to save a movie that the user is only permitted to save content from a DVD they own.  The resulting copies cannot be copied, cannot be moved to any other hard drive other than the one on which they were made, much less to iPods, PDAs or cell phones, and cannot be shared over the Internet.   For many consumers, these attributes would be unacceptable for anything other than a backup of a DVD.

**The Studios' Contention that RealDVD/Facet Will Result In Widespread Piracy Is False**

9.      The vast majority of movie piracy occurs on P2P sites, a point which is well known in the entertainment industry.  In general, the challenge for persons who participate in this

1    type of movie piracy is to post the best quality copy of a popular movie as early as possible.

2    Being the first to do so is a point of pride among movie pirates.

3         10.    We generally see four "spikes" in Internet activity regarding any particular movie

4    title, all before the movie is released to the public on DVD: (1) a pre-theatrical spike, (2) an

5    early theatrical spike, (3) an academy screener spike, and (4) a spike just before the movie is

6    released on DVD to the public. Because these spikes in Internet activity occur before the movie

7    is even released to the public for sale on DVDs, we know that they are not the result of casual

8    users making copies from DVDs using ripper software. To the contrary, the first three spikes

9    reflect copies from movies that are leaked by individuals with access to a movie just before or

10   just after it is shipped to movie theaters or that were recorded using a camcorder brought into a

11   movie theatre. The fourth spike probably reflects a leak from someone in the DVD retail

12   distribution channel who obtained a copy of the movie on DVD during its initial distribution to

13   retail outlets, in the weeks prior to sale to the public on DVD.

14        11.    RealDVD and Facet obviously would do nothing to encourage or promote such

15   piracy. Because copies made using RealDVD and Facet are encrypted and locked to the hard

16   drive on which they were made, they are useless for Internet distribution.

17   **RealDVD and Facet Will Be Used Primarily To Make Backup Copies of Purchased DVDs**

18        12.    I understand that the movie studios contend in this lawsuit that RealDVD and

19   Facet will encourage people to steal movies. I disagree. Given the restrictions on copies made

20   using these products – including that they provide no flexibility regarding the device on which

21   the consumer can watch the movie; do not allow the user to share the movie over the Internet;

22   and do not allow a copy of the copy to be made – I do not believe that they will appeal to persons

23   interested in stealing movies or engaging in movie piracy. Generally, those interested in

24   stealing/distributing movie content seek to eliminate all forms of digital rights management

25   ("DRM") and other protection schemes in order to upload and share the movies. They also want

26   to freely burn new discs, move files to portable media players (such as iPods), and upload

27   movies and television shows to various P2P file-sharing networks.

28

LARRY GERBRANT DECL. IN OPP. TO DEFENDANTS'          -5-
MTN FOR PRELIMINARY INJUNCTION
CASE NOS. C08 04548 MHP; C08 0417 MHP

1        13.     Given the array of alternatives already available to consumers to obtain, transfer

2 and distribute digital content, I believe that the only people who are likely to use RealDVD and

3 Facet are those who care about legality and actively avoid stealing movie and television content.

4 To anyone else, the restrictions imposed by RealDVD and Facet are likely to be unacceptable.

5 Indeed, following RealDVD's initial release on September 30, 2008, there were numerous public

6 postings regarding the product's perceived "inferior" capabilities. An example of one such

7 article is attached hereto as Exhibit 4. Dedicated rippers and collectors have already decided

8 what programs to use and have no reason to switch to RealDVD.

9        14.     I understand that the movie studios contend that RealDVD and Facet will cause

10 honest people to steal movies. Again, I disagree. Notwithstanding the widespread availability of

11 products which permit illegal sharing or copying of movies, there is a huge legal market for sell

12 through DVDs. In the United States alone, it is approximately $10 billion/year. The vast

13 majority of people in this country do not behave illegally when acquiring movie content. While

14 consumers may not be able to draw fine lines about the limits of legality or fair use, they can be

15 fairly certain about what clearly falls into the illegal category, like copying movies they don't

16 own or obtaining commercial movies off BitTorrent. This is reflected, for example, in the Smith

17 Geiger study which was commissioned by RealNetworks prior to launch of RealDVD, a copy of

18 which is attached here to as Exhibit 5. I have reviewed the results of the study as well as the

19 underlying methodology, and find them sound. The study found that a large percentage of

20 respondents are interested in a product that they know will not violate copyright restrictions.

21        15.     Furthermore, even with all the tools available to illegally copy movie content,

22 only a minority of consumers do so. According to a forensic analysis published by PC Pitstop,

23 only 15% of the computers in the sample have ripping software on them. I have reviewed the

24 results of the analysis as well as the underlying methodology, and find them sound. The 15%

25 figure serves as an upper-bound estimate to DVD copying because it is likely that not all of

26 consumers who have ripping software on their computers copy movies they do not own. I expect

27 that the self-selected individuals whose computers were analyzed as part of the PC Pitstop

28 analysis would be more likely to have ripper software than the general population of computer

LARRY GERBRANT DECL. IN OPP. TO DEFENDANTS'   -6-
MTN FOR PRELIMINARY INJUNCTION
CASE NOS. C08 04548 MHP; C08 0417 MHP

1    owners.   Other consumer surveys support the observation that DVD ripping is an activity

2    pursued by a small minority of PC owners.   For example, an NPD Group study of 12,000

3    Americans reported in the New York Times found only 1.5% had DVD ripping software on their

4    computers and only two-thirds of them had used it in the quarter prior to the 2007 survey.   A

5    copy of the PC Pitstop results is attached hereto as Exhibit 6.  A copy of the New York Times

6    article is attached hereto as Exhibit 7.

7            16.      I understand that the movie studios contend that RealDVD and Facet will

8    encourage rent/rip/return behavior.  Again, I disagree.  First, that argument relies on the

9    assumption that a digital copy of a movie on a hard drive is interchangeable with owning a

10   movie on a DVD disc.  I believe that is a faulty assumption.  In my experience, people purchase

11   movies (as opposed to renting them) because they want to own the physical copy of the disc in

12   the case with the packaging to keep in their collection.  Indeed, this is one of the often-cited

13   reasons why the electronic sell through market for movie content has historically been relatively

14   small.  Another reason consumers have historically not built large libraries of movies in

15   electronic format is the physical size limitations of hard drives, especially on laptops and

16   notebooks, where keeping a significant number of stored movies is simply not practical.

17           17.      Second, I have found that the decision to buy or rent a movie depends in large

18   part on whether the consumer wishes to own the physical copy of the DVD.  Thus, it is the

19   renting decision itself that displaces any purchase or subsequent purchase of the DVD, not the

20   theoretical ability to copy the rented movie onto a hard drive.

21           18.      Third, the movie studios' argument ignores the fact that hard drive space is

22   limited, expensive and requires a significant up-front expenditure.  To many, these

23   considerations, among others, would outweigh any perceived "benefits" of renting and copying a

24   DVD, rather than simply purchasing it.

25                          **RealDVD and Facet Will Encourage DVD Sales**

26           19.      RealDVD and Facet will enhance the value of DVDs to their purchasers.  Among

27   other things, they help to keep discs safe, provide convenience and organization, and allow for

28

1  parental controls. Because RealDVD and Facet will make DVDs more valuable to consumers,

2  they are likely to encourage their owners to purchase more DVDs.

3

4  **Data and Information Collected and Maintained by Studios**

5      20.    Information regarding piracy, actual and forecasted sales and revenue for existing

6  and emerging technologies and markets, as well as cost data is available to the Studios.

7      21.    Data and information regarding movie piracy can be estimated through various

8  means including, but not limited to, consumer behavior studies and market surveys. Indeed, the

9  MPAA reports data of this type to Congress as part of the MPAA's lobbying activities, and the

10  movie studios rely on it the regular course of their business. For example, I believe that a

11  consumer survey could be developed to accurately estimate the displacement of sales of DVDs

12  or other studio products caused by use of RealDVD and/or Facet, if any.

13      22.    I am also aware that revenue and price forecast data is available. There are

14  numerous companies that track existing entertainment technology and markets, as well as

15  provide forecasts for emerging entertainment technologies and markets. These companies

16  include, but are not limited to: PricewaterhouseCoopers, Veronis Suhler, SNL Kagan, Adams

17  Media Research, Jupiter, Forrester, Yankee Group, eMarketer, Parks Associates, ABI, and The

18  Diffusion Group. In addition, the major Wall Street firms release reports that contain forecasts

19  for emerging entertainment markets.

20      23.    The Studios also prepare "Ultimates" in the ordinary course of business.

21  "Ultimates" are projections done on a per-title, per-ancillary-market basis and may include units,

22  revenue, and market penetration. It is customary for "Ultimates" to include existing and

23  expected ancillary markets. I have personally utilized "Ultimates" to appraise film libraries.

24  Studios also receive forecasts of demand for products and services from technology vendors and

25  suppliers.

26      24.    In addition, as publicly traded companies, the Studios are required to comply with

27  Generally Accepted Accounting Principles ("GAAP") and Statement of Position 00-2 ("SOP 00-

28  2"). Under SOP 00-2, Studios must amortize costs using the "individual-film-forecast-

1   computation-method." This method requires that studios accrue costs in the same ratio as actual

2   revenue is recognized over ultimate estimated revenue. In order to comply with GAAP

3   requirements for cost recognition, I understand that it is necessary for firms to project revenue

4   for the life of each individual film.

5       25.     With respect to new products and technologies, it is customary for the Studios

6   and/or third parties to prepare forecasts of revenue and cost data. I am personally familiar with

7   forecasts for new products and technologies such as the pre-DVD launch consumer surveys and

8   studies conducted by Studios which predicted, among other things, the number of DVDs to be

9   purchased per year. Further, I have prepared forecasts in Kagan reports that included units,

10  price, and market penetration for a wide range of emerging media technologies that were

11  purchased by studios.

12      26.     The Studios also have detailed knowledge of what they sell of existing products

13  such as DVDs. I am personally familiar with sources of sales and revenue data such as

14  VideoScan, which is a Nielsen product, and Rentrak which generally reports box office, DVD

15  sales (except Wal-Mart) and DVD rentals. In my experience, it is customary for movie studios

16  to subscribe to these sources of data. Further, as members of the MPAA, studios report their

17  worldwide revenue for all release windows and markets to the MPAA. The MPAA then

18  aggregates the proprietary studio data. The MPAA releases an abstract of top-line data to the

19  press and analysts; however more granular data is available internally to studio members. In

20  connection with prior assignments, I have reviewed this type of detailed data acquired from the

21  MPAA members.

22      27.     As for other existing products, such as download-to-own, video-on-demand, and

23  pay-per-view, the studios have access to detailed sales and revenue information. Because studios

24  are part of profit-participation and/or revenue-sharing arrangements for these technologies and

25  markets, they receive reports from licensees (*e.g.*, Apple iTunes, CinemaNow, Amazon,

26  Blockbuster, etc.). In addition, for video-on-demand and pay-per-view services both Rentrak

27  and Nielsen collect this information and studios receive pay-per-view and video-on-demand

28  sales reports directly from cable and satellite operators and from aggregators such as iN Demand.

LARRY GERBRANT DECL. IN OPP. TO DEFENDANTS'          -9-
MTN FOR PRELIMINARY INJUNCTION
CASE NOS. C08 04548 MHP; C08 0417 MHP

28.     In addition to sales and revenue data, cost data is available for existing and emerging entertainment technologies and markets such as Digital Copy.  During his deposition, Michael Dunn testified, "We would look at the cost of the digital copy in a P&L that includes both the regular version and the digital copy version."[1]  Further, it is my experience that cost data is tracked for DVD sales on a per-title basis so that the move studios can comply with profit-participation agreements.  This data is also needed for other purposes such as royalty audits, slate financing, and insurance.

29.     With respect to DVD rentals, download-to-own, video-on-demand, and pay-per-view technologies and markets, the move studios have access to detailed cost data.  Because studios are part of profit-participation and/or revenue-sharing arrangements, they receive reports from licensees (*e.g.,* Apple, CinemaNow, Netflix, Blockbuster, etc.).

30.     As for emerging entertainment technologies and markets such as Digital Copy, it is my experience that Studios customarily prepare forecasts for other new products and these include cost projections and also obtain estimates and forecasts from entertainment technology vendors.

**The Availability of RealDVD and Facet Will Not Change Consumer Attitudes About the Legality of Copying DVDs**

31.     I understand that the movie studios claim that the availability of RealDVD and Facet in the market will alter consumer attitudes concerning the legality of copying DVDs, and in particular, cause them to believe that it is permissible to copy DVDs they do not own.  I disagree.

32.     First, I believe that consumers already generally believe that it is permissible to make backup and convenience copies of content that they legally obtain.  For instance, consumers long ago became accustomed to the legality of videotaping broadcast television on their video cassette recorders (VCRs) for later viewing.  Similarly, consumers today are accustomed to copying movie and television content using their home digital video recorders

---

[1] Deposition of Michael Dunn (December 12, 2008) at 112:9-11.

1  (DVRs) for later viewing. Indeed, movies or television shows that a consumer would copy from

2  cable television using a DVR may be *identical* to content that they might otherwise purchase on

3  a DVD. There is no particular reason why a consumer would believe that copying identical

4  content would be permissible in the first instance and not in the second, simply because the

5  digital content in the second instance was distributed on a DVD. As another example,

6  consumers have become accustomed to buying music online or on compact discs, and in each

7  instance, being able to copy and transfer that music to various mobile and other devices so they

8  can listen to it where ever and whenever they chose.

9        33.    The corollary to the expectation that one can permissibly make backups of

10  purchased digital content for their personal convenience and enjoyment is that one cannot

11  permissibly make copies of content that one did not purchase. I believe that consumers already

12  generally believe that they cannot permissibly make copies of content that they did not purchase.

13  For all the reasons described previously regarding the attributes and features of RealDVD and

14  Facet, including the warning message displayed to users that they should not save a copy of a

15  DVD unless they own it, these products reinforce these existing expectations.

16        34.    Second, the Studios have produced in this case many marketing surveys

17  concerning customer behavior. Without access to the methodologies and underlying data for

18  those studies, I approach these surveys with caution and generally would not be comfortable

19  relying on them. However, I would note that all of the studies which address the issue recognize

20  that there currently exists a level of consumer DVD copying in the United States and that a

21  significant percentage of that copying is reported to be for purposes of backing up purchased

22  DVDs. This supports the view that consumers already believe they have an existing right to

23  make copies of purchased content for their personal use.

24

25  ///

26  ///

27  ///

28

1        35.    Third, DVD copying products such as rippers (that remove CSS protection) and

2    other products such as Kaleidescape, DriveIn, and AMX (that do not) are well known and

3    discussed and available in mainstream outlets.  The existence of additional products with similar

4    copying capability is unlikely to cause consumers to have a more liberal attitude toward copying,

5    particularly given the well-documented restrictions imposed by RealDVD and Facet.

6

7

8        I declare under penalty of perjury under the laws of the state of California that the

9    foregoing is true and correct.

10       Executed this 18th day of March, 2009 in Los Angeles, California.

11

12

13

14

15   _____

16                   Larry Gerbrandt

17

18

19

20

21

22

23

24

25

26

27

28