JAMES A. DiBOISE, State Bar No. 83296
Email: jdiboise@wsgr.com
LEO CUNNINGHAM, State Bar No. 121605
Email: lcunningham@wsgr.com
COLLEEN BAL, State Bar No. 167637
Email: cbal@wsgr.com
MICHAEL A. BERTA, State Bar No. 194650
Email: mberta@wsgr.com
TRACY TOSH LANE, State Bar No. 184666
Email: ttosh@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market St., Spear Tower, Suite 3300
San Francisco, CA 94105
Bus: (415) 947-2000
Fax: (415) 947-2099

Attorneys for Plaintiffs and Counterclaim Defendants
REALNETWORKS, INC. and REALNETWORKS
HOME ENTERTAINMENT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware Corporation, <br><br> Defendants. <br> _____ <br> AND RELATED CASES <br> _____ | Case Nos.  C08 04548 MHP; <br> C08 04719 MHP <br><br> **REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:  April 1, 2009 <br> Time:  9:00 a.m. <br> Dept:  15 <br><br> **[PUBLIC REDACTED VERSION]** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 5

I.     REALNETWORKS ........................................................................................ 5

II.    DEVELOPMENT OF THE REALDVD PRODUCTS .................................... 5

III.   CSS TECHNOLOGY AND ITS ROLE IN THE REALDVD PRODUCTS ................... 6

       A.     Description of CSS Technology ................................................. 7

       B.     Real Executed the DVD CCA Standard Form CSS Agreement ............................. 8

       C.     Real Developed the RealDVD Products to Comply With The CSS Agreement ................................................................................ 9

IV.    REALDVD PRODUCTS:  FUNCTIONALITY AND BUILT-IN PROTECTIONS AGAINST PIRACY ....................................................... 10

       A.     The RealDVD Products Protect Against Unauthorized Copying .......................... 11

       B.     Distinctions Between Facet and Vegas ................................... 12

       C.     Unlicensed "Ripper" Products Do Not Implement These Protections Against Unauthorized Copying ....................................... 14

V.     THE STUDIOS CHANGED THEIR CIRCUMVENTION THEORIES TO ADD "ARCCOS" AND "RIPGUARD" ................................................. 15

       A.     Real's Knowledge Of ARccOS and RipGuard ....................... 15

       B.     ARccOS and RipGuard Are Purposeful Errors Designed to Allow Some Methods of Access to DVD Content and Interfere With Other Methods of Access ................................................................... 16

VI.    VEGAS WAS MARKETED TO PROMOTE FAIR USE ............................. 18

VII.   REAL APPROACHED THE STUDIOS BEFORE RELEASING VEGAS ................... 18

ARGUMENT ......................................................................................................... 20

I.     LEGAL STANDARD ................................................................................... 20

II.    THE STUDIOS AND DVD CCA HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................................ 20

       A.     Creating Personal Backup Copies of Purchased DVDs is a Fair Use ................. 20

       B.     Facet and Vegas Comply with the CSS Agreement .............. 22

              1.     The CSS Agreement Is A Contract of Adhesion That Must Be Construed According to Real's Reasonable Interpretation ....................... 22

2.  Real's Interpretation of the CSS Agreement Is Reasonable ..................... 23

3.  The RealDVD Products Comply with the CSS Agreement ..................... 24

    a.  The RealDVD Products Implement The Required Steps and Comply With The Restrictions Of The CSS Documentation ....... 24

    b.  The CSS Agreement Permits The Functionality of Storing Encrypted, Secure Content to A Hard Drive ................................ 25

    c.  The Evidence Confirms Real's Interpretation of the Agreement ................................................................................ 27

4.  Real Did Not Circumvent CSS Technology Under the DMCA By Trying to Implement It In Accordance With The License ........................ 30

    a.  Even If Real Failed to Comply With the CSS License, There Would Be No Circumvention Claim, Only a Claim For Breach ........................................................................................ 30

    b.  Faithful Implementation of the CSS Technology Cannot Violate the DMCA ...................................................................... 31

        i.  The RealDVD Products Do Not Violate § 1201(a) ........... 32

        ii.  The RealDVD Products Do Not Violate § 1201(b) ......... 33

C.  The Studios Cannot Show A Likelihood of Success On The New Theories Regarding ARccOS and RipGuard ............................................................ 34

    1.  ARccOS And RipGuard Techniques Are Not Eligible For DMCA Protection Because They Expressly Permit Access – And Enable Copying – For DVD Video Compliant Devices ........................................ 35

    2.  Facet and Vegas Do Not "Circumvent" ARccOS and RipGuard Errors ............................................................................................... 36

        a.  Facet ............................................................................................ 36

        b.  Vegas .......................................................................................... 37

    3.  Facet and Vegas Are Not Primarily Designed, Used or Marketed for Use with Discs Containing ARccOS or RipGuard ................................... 38

    4.  Neither ARccOS Nor RipGuard "effectively protects a right of a copyright holder" ...................................................................................... 39

III.  THE BALANCE OF HARMS REQUIRES DENIAL OF A PRELIMINARY INJUNCTION ........................................................................................................ 41

A.  The Studios Have Failed to Demonstrate Any Cognizable Harm, Much Less Irreparable Harm ....................................................................................... 42

    1.  There is No Presumption of Irreparable Harm ........................................... 42

    2.  There is No Evidence that the RealDVD Products will Hurt Studio Sales ........................................................................................................... 43

3.    The Studios Have Adduced No Evidence that RealDVD Will
Appeal To Users Interested In Stealing Movies......................................43

4.    The Studios Have Adduced No Evidence that Consumers of
RealDVD Will "Rent-Rip-and-Return" ....................................................45

B.    ARccOS and RipGuard Are Used on Only a Tiny Fraction of DVDs and
Cannot Justify An Injunction Under Any Circumstances .....................................45

C.    Any Harms Claimed by the Studios Would Be Compensable In Damages
And Would Not Justify An Injunction .................................................................46

D.    The DVD CCA Has Provided No Evidence of Harm ...........................................47

E.    The Harm To Real if Preliminarily Enjoined Would Outweigh Any
Legitimate Threat to the Studios or DVD CCA ...................................................48

F.    An Injunction Would Harm Consumers.................................................................50

CONCLUSION.................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. MGM Studios, Inc.,*
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................. 37, 38

*Acorn v. Household Int'l Inc.,*
    211 F. Supp. 2d 1160 (N.D. Cal. 2002) ....................................................... 27

*Amoco Prod. Co. v. Village of Gambell,*
    480 U.S. 531 (1987) ..................................................................................... 46

*Armendariz v. Found. Health PsychCare Servs., Inc.,*
    24 Cal. 4th 83 (2000) ................................................................................... 26

*Baker v. Osborne Dev. Corp.,*
    159 Cal. App. 4th 884 (2008) ...................................................................... 28

*Belushi v. Woodward,*
    598 F. Supp. 36 (D.C.D.C. 1984) ................................................................ 50

*Cariaga v. Local No. 1184 Laborers Int. Union of No. Am.,*
    154 F.3d 1072 (9th Cir. 1998) ..................................................................... 28

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ................................................................. 46, 47

*Chamberlain Group, Inc. v. Skylink Techs., Inc.,*
    381 F.3d 1178 (Fed. Cir. 2004) ................................................................... 45

*Chan v. Drexel Burnham Lambert Inc.,*
    178 Cal. App. 3d 632 (1986) ....................................................................... 28

*Cotter v. Desert Palace, Inc.,*
    880 F.2d 1142 (9th Cir. 1989) ..................................................................... 51

*DVD Copy Control Association, Inc. v. Bunner,*
    116 Cal. App. 4th 241 (2004) .......................................................... 10, 52, 53

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
    356 F.3d 1256 (10th Cir. 2004) ................................................................... 52

*eBay Inc. v. MercExchange,*
    547 U.S. 388 (2006) ..................................................................................... 46

*Egilman v. Keller & Heckman, LLP,*
    401 F. Supp. 2d 105 (D.D.C. 2005) ............................................................ 37

*Firemen's Ins. Co. of Newark v. Keating,*
    753 F.Supp. 1146 (S.D. N.Y. 1990) ............................................................ 52

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944 (2003) ................................................. 27

*Graham v. Scissor-Tail, Inc.,*
   28 Cal. 3d 807 (1981)................................................................. 26

*Guz v. Bechtel Nat'l, Inc.,*
   24 Cal. 4th 317 (2000)............................................................... 31

*Healthcare Advocates, Inc. v. Harding, Early, Follmer & Frailey,*
   497 F. Supp. 2d 627 (E.D. Pa. 2007) ....................................... 37

*ICU Med. Inc. v. Alaris Med. Sys., Inc.,*
   No. SA CV 04-689, 2004 WL 1874992 (C.D. Cal. July 30, 2004) ................... 51

*I.M.S. Inquiry Mgmt. Sys. Ltd. v. Berkshire Infor. Sys.,*
   307 F. Supp. 2d 521 (S.D. N.Y. 2004).................................. 36, 37

*Inland Steel Co. v. U.S.,*
   59 S. Ct. 415 (1930) .................................................................. 51

*Jacobsen v. Katzer,*
   535 F.3d 1373 (Fed. Cir. 2008)................................................ 35

*Johnson v. Cal. State Bd. of Accountancy,*
   72 F.3d 1427 (9th Cir. 1995)..................................................... 24

*Lasercomb Am., Inc. v. Reynolds,*
   911 F.2d 970 (4th Cir. 1990).................................................... 55

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   387 F.3d 522 (6th Cir. 2004)......................................... 37, 39, 45

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980)............................................. 46, 47

*Madden v. Kaiser Found. Hosp.,*
   17 Cal. 3d 699 (1976)................................................................ 26

*Markovits v. Venture Info Capital, Inc.,*
   129 F. Supp. 2d 647 (S.D.N.Y. 2001) ...................................... 52

*Miller Harness Company v. Arcaro & Dan's Saddlery, Inc.,*
   142 F. Supp. 634 (E.D.N.Y. 1956)........................................... 50

*Oakland Tribune, Inc. v. The Chronicle Publ'g. Co.,*
   762 F.2d 1374 (9th Cir. 1985)............................................. 46, 47

*Oestreicher v. Alienware Corp.,*
   502 F. Supp. 2d 1061 (N.D.Cal. 2007) .................................... 26

*Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Maryland,*
   744 F. Supp. 1311 (D. N.J. 1990) ............................................ 27

*RealNetworks, Inc. v. Streambox, Inc.,*
   No. 2:99CV02070 2000 WL 127311 (W.D. Wash. 2000)................. 46

*Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys., Inc.,*
   180 F.3d 1072 (9th Cir. 1999)............................................. 24, 25

*Reilly v. Medianews Group, Inc.*,
    No. C 06-04332, 2006 WL 2419100 (N.D. Cal. July 28, 2006) ....................................... 51

*Smith, Bucklin & Assocs., Inc. v. Sonntag*,
    83 F.3d 476 (D.C. Cir. 1996) ....................................................................................... 52

*Sony Corp. of America v. Universal City Studios*,
    464 U.S. 417 (1984) ............................................................................................ 24, 44

*State Farm Fire & Cas. Co. v. Keenan*,
    171 Cal. App. 3d 1 (1985) ........................................................................................... 27

*Storage Techn. Corp. v. Custom Hardware Eng. & Consulting, Inc.*,
    421 F.3d 1307 (Fed. Cir. 2005) ................................................................................... 45

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    81 F. Supp. 2d 1026 (N.D. Cal. 2000) ........................................................................ 34

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999) ..................................................................................... 34

*Thayer Plymouth Ctr. Inc. v. Chrysler Motors Corp.*,
    255 Cal. App. 2d 300 (1967) ....................................................................................... 52

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003) ..................................................................................... 26

*U.S. v. Elcom Ltd*,
    203 F. Supp.2d 1111 (N.D. Cal. 2002) ........................................................................ 24

*Williams Constr. Co. v. Standard Pac. Corp.*,
    254 Cal. App. 2d 442 (1967) ....................................................................................... 28

*Z4 Technologies, Inc. v. Microsoft Corporation*,
    434 F. Supp. 2d 437 (E.D. Tex. 2006) ......................................................................... 50

**STATUTES**

17 U.S.C. §101 ..................................................................................................................... 24

17 U.S.C. §106 ..................................................................................................................... 44

17 U.S.C. §107 ..................................................................................................................... 44

17 U.S.C. §117 ..................................................................................................................... 24

17 U.S.C. §1201(a)(3)(A) ............................................................................................... 36, 37

17 U.S.C. §1201(b) .............................................................................................................. 45

17 U.S.C. §1201(b)(1) ..................................................................................................... 43, 44

17 U.S.C. §1201(b)(2)(A) .................................................................................................... 37

17 U.S.C. §1204 ................................................................................................................... 35

**INTRODUCTION**

The question at the heart of this case is whether the Studios can force consumers to pay twice for the same content – to pay once for a DVD, and then to pay *again* for the fair use right to back up that DVD to, and watch it from, a hard drive. RealNetworks ("Real") has developed two innovative products (collectively, the "RealDVD Products") that allow consumers to exercise their right to do this without paying twice. This motion is an effort by the Studios to eliminate those products. They are not entitled to do so.

The first challenged product, released in September 2008, is software for a Windows PC called Vegas. ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ Both of the RealDVD Products were designed from the ground up to comply with technology known as "CSS" ("Content Scramble System"), which has been licensed to Real, and which is used by the Studios to protect DVD content. Not only do both Products strictly comply with CSS at all times, when they save a movie using CSS it is *far more* secure than it was on the original DVD.

The products increase the security of a saved movie in two ways. ████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████ And second, both products absolutely prevent the distribution of a saved movie. DVDs saved using the RealDVD Products:

- cannot be posted to peer-to-peer ("P2P") networks or otherwise distributed via the Internet;
- cannot be played if moved to any other hard drive;
- cannot be burned to a recordable DVD; and
- cannot be shared over a home network.

The Studios nonetheless seek to position this as a case about piracy. It is not. The RealDVD Products were designed to *prevent* piracy. To be sure, movie piracy thrives on the Internet. But the RealDVD Products will not contribute to that piracy. They cannot – movie content that is saved using the RealDVD Products is locked to those products and cannot be shared at all, much less over the Internet. Nor can there be any claim that the RealDVD Products will be used to

1  create counterfeit DVDs that are resold on the streets.  That is not possible with these products

2  since they do not permit burning to a DVD.

3       Left without the piracy "hooks," the Studios claim to be concerned about what they term

4  "rent-rip-and-return" -- the possibility that consumers might use the RealDVD Products to save a

5  copy of a movie they have rented and return the rented copy.  But the Studios have failed to show

6  that "rent-rip-and-return" is at all likely to increase—or even occur—using the RealDVD

7  Products, much less that it would displace any movie sales or otherwise cause the Studios harm.

8       This failure of evidence is not for a lack of opportunity.  More than four years ago, a

9  company called Kaleidescape released a CSS-licensed product that, like the RealDVD Products,

10  allows consumers to securely save DVDs to a hard drive.  Other companies, including AMX and

11  Telestream, have also released CSS-licensed products with similar functionality.  Yet the Studios

12  have done nothing to prevent the sale or distribution of these products and have no evidence that

13  they have caused the Studios any harm, whether by "rent-rip-and-return" or otherwise.

14       To the extent "rent-rip-and-return" is even a potential problem, it is a problem the Studios

15  have always had the power to eliminate.  ███████████████████

16  ████████████████  Were they to do so, the RealDVD Products could easily be

17  updated to detect that a DVD was rented and then prevent it from being saved.  To date, the

18  Studios have refused to implement this simple fix.  The idea of "rent-rip-and-return" is worth

19  more to them as a live legal argument against the RealDVD Products than as a dead threat in the

20  real world.

21       Real, therefore, has adopted its own safeguards to ensure that the RealDVD Products

22  cannot and will not be used for "rent-rip-and-return."  Before saving a DVD, users are reminded

23  by a "splash screen" to only save DVDs that they own.  They are also required by contract to

24  agree to save only DVDs that they own.  Given these legal restrictions, and the tight security

25  safeguards built into the RealDVD Products, it is no surprise that market research conducted by

26  Real confirms that the consumers most interested in the RealDVD Products are those who care

27  about legality and actively avoid stealing movie and television content.

28

1    The reality is that there is no cognizable harm that could result from the use of the

2    RealDVD Products.  Consumers have long known that they have the right and permission to make

3    a fair use copy of DVDs that they purchase, whether to back up a safety copy of the notoriously

4    fragile DVD medium or to enable them to watch content at their convenience.

5    The Studios, of course, know this as well.  And when it suits them, they pay lip service to

6    fair use rights.  For instance, to the Supreme Court in *MGM v. Grokster*, counsel for the Studios

7    (including some of the plaintiffs in the present case – Disney, Paramount and 20th Century Fox

8    Film) stated:

9           The record companies, my clients, have said, for some time now, and it's been on
             their Website for some time now, that it's perfectly lawful to take a CD that you've
10          purchased, upload it onto your computer, put it onto your iPod. There is a very,
             very significant lawful commercial use for that device, going forward.
11

12   But when it comes to DVDs, the Studios would like to pretend that fair use does not exist.  Why?

13   The Studios realize that if they prevent consumers from making a digital copy of their purchased

14   DVDs, the Studios can *sell* those rights to consumers a second time.  It's all about money.

15   They (and the DVD CCA) have come up with two theories to try to prevent Real from

16   ensuring that DVD consumers only have to pay once.  The first is a claim that *any* product that

17   allows DVD content to be copied to a hard drive violates the CSS Agreement.  The Defendants

18   are wrong.  Real is a CSS Licensee, and the RealDVD Products comply with the CSS License

19   Agreement ("CSS Agreement").  The RealDVD Products even comply with all of the restrictions

20   and requirements that are kept secret from CSS Licensees until after execution and payment of the

21   License (and thus are not even part of the CSS Agreement at all).

22   The Defendants know this to be true.  The DVD CCA has already made the same

23   arguments that they and the Studios are advancing in this case to a California Court applying

24   California law to this California contract.  And there, Judge Nichols of Santa Clara County

25   determined that the DVD CCA was wrong.  He found that the DVD CCA failed to prove that the

26   product in that case – the Kaleidescape system that also makes a copy of a DVD to a hard drive –

27   violated the CSS Agreement.  Significantly, in 2007, after that decision was handed down

28   following a full trial on the merits, the DVD CCA attempted to pass amendments to the CSS

Agreement prohibiting saving DVD content to a hard drive.  Those Amendments failed.  Now, the

1   Studio Defendants and DVD CCA are resurrecting the same arguments two years later, essentially

2   asking this Court to do what the DVD CCA itself tried and failed to do – rewrite the CSS License.

3

4

5

6

7

8

9

10

11

12

13

14

15          Recognizing that their CSS License claims cannot withstand close scrutiny, the Studios

16   changed the nature of this case in December 2008; they now claim that the RealDVD Products

17   should be enjoined because they supposedly circumvent two third-party products called

18   "ARccOS" and "RipGuard."  But this argument fails as well.

19

20

21

22

23

24

25

26

27   _____

28   [1] All references to ("Ex. __") are attached to the Declaration of Christopher F. Nelson, filed
     herewith.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████ For all these reasons, a preliminary

5 injunction must be denied.

**FACTUAL BACKGROUND**

**I.     REALNETWORKS**

Real is not a company operating on the fringes of the Internet.  During its nearly 15 year history, Real has been a leading innovator in digital entertainment.  Its "RealPlayer" software has been downloaded hundreds of millions of times over the years.  Real's "Rhapsody" music service is the second largest online music business next to iTunes and delivered more than 1 billion song plays in 2008.  Real currently provides music and video services for many major mobile phone companies including Verizon, T-Mobile, AT&T, Vodafone and SK Telecom, and it delivers nearly 1 billion mobile messages every day for its carrier customers.  In short, Real is a digital media company at the center of creating legal digital entertainment services.

**II.    DEVELOPMENT OF THE REALDVD PRODUCTS**

The RealDVD products were the brainchild of a handful of Real's senior executives, including its CEO, Rob Glaser, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Since 2000, Real's major competitors released product after product designed to save, organize, and play back digital movies, music and games, by connecting a device containing a large-capacity hard drive to a TV.  But none, in Glaser's view, had figured out how to make digital video "really take off."  *Id.* at 10:18-11:19.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23 [2]

24 **III.    CSS TECHNOLOGY AND ITS ROLE IN THE REALDVD PRODUCTS**

25     The Studios use the Content Scramble System ("CSS") to protect DVD content.  In order

26 to manufacture DVDs or make consumer electronic devices or computer software that interact

27 ────────────

28     [2] Vegas was released to the public and referred to internally as "RealDVD," and as such, much of the evidentiary record in this case uses "RealDVD" interchangeably with "Vegas."

1   with DVDs, manufacturers must obtain a license to use CSS technology, which is licensed by the

2   DVD CCA.[3] ████████████████████████████████████████████████████

3   ████████████████████████████████████. Real is one of them.

4        **A.**    **Description of CSS Technology**

5        ██████████████████████████████████████████████████████████

6   █████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████

8   ███████████████████████████████████████████

9        █████████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ████████████████████████████████████████████████:

17          ████████   ████████   ████████████

18

19  ████████████████████████████████████████████████████████

20  ████████████████████.[4]  The document explaining how to protect the Keys and video content

21  from unauthorized interception is known as the Procedural Specifications.  Together, the

22

23  _____

24  [3] ███████████████████████████████████████████████████.

25  [4] ████████████████████████████████████████

26  █████████████████████████████████████████████████████

27  █████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1   Technical and Procedural Specifications set forth a long and detailed set of requirements,

2   including but not limited to the steps required to:

- Unlock a DVD that is inserted into a drive;

- Pass the Keys and scrambled content to a licensed device;

- Protect the Keys and content once in the device; and

- Secure the unscrambled content as it is sent to the display.

7   The RealDVD Products comply with each of these steps at all times, whether they are playing or

8   saving a DVD, despite the fact that the Technical Specifications do not form part of the contract

9   between Real and the DVD CCA. ███████████████████

10  █████████████████████████

11  █████████████████████████

12  ███████████████████████

13  **B.    Real Executed the DVD CCA Standard Form CSS Agreement**

14      The CSS Agreement is a non-negotiable form agreement ████████████

15  ████████████████. ███████████████

16  ████████████████████████

17  ██████████████████████

18  ████████████████ The Technical and General Specifications – which the

19  DVD CCA contends Real has violated – were not disclosed to Real until <u>after</u> Real executed the

20  contract and paid the DVD CCA over $30,000. *Id;* Ex. 8.

21  ████████████████████

22  █████████████████████████

23  ███████████████████████

24  ███████████████████████

25  ███████████████████ With only

26  limited information regarding the contents of the specifications documents and no power to

27  negotiate the terms of the license agreement, Real executed the CSS License Agreement in August

28

1    2007 so that it could move forward with developing the RealDVD Products. ███

2    ████████

3    **C.    Real Developed the RealDVD Products to Comply With The CSS Agreement**

4    The RealDVD Products were developed to be fully compliant with Real's DVD CCA

5    license and the related CSS technical specifications.  Real did not even begin to seriously

6    consider developing the RealDVD Products until after the California court first resolved the

7    DVD CCA's challenge to the legality of the Kaleidescape system in Kaleidescape's favor in

8    March 2007. ████████████████.

9    Thereafter, each of the engineers responsible for writing code for the RealDVD Products

10   was instructed to follow the CSS specifications promulgated by the DVD CCA. ████

11   ███████████████████████████████████████████

12   █████████████████████████████████████████████

13   ███████████████████████████████████

14   ████████████████████████████████████████████

15   █████████████████████████████████████████████

16   ████████████████

17   ██████████████████████████████████████

18   █████████████████████████████████████████████

19   ████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ███████████████████████████████████████████

22   ██████████████████████████████████████

23   ████████████████████████████

24   Real employed 23 software designers, full time, to write the code for both RealDVD

25   Products from scratch so that it would comply with the CSS specifications. When the CSS

26   specification or DVD CCA license presented some ambiguity, both the Vegas and Facet teams

27   were instructed to, and did, consult with James Burger, one of the primary drafters and negotiators

28   of the CSS License.

1    While the RealDVD Products strictly comply with the license, ████████████

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████. In 1999, the "DeCSS"

4    computer program, which permits the playing of a CSS encrypted DVD, was posted on the

5    Internet.  The California Court of Appeal denied the DVD CCA a preliminary injunction against

6    the "DeCSS" program based on the finding that CSS had, *even as of nearly ten years ago*, likely

7    lost any trade secret status.[5] ████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████

## IV.   REALDVD PRODUCTS:  FUNCTIONALITY AND BUILT-IN PROTECTIONS AGAINST PIRACY

Real has no interest in making anything but legitimate, legal products.[6] ████████

████████████████   When Real began developing the RealDVD Products, the Internet was replete

with free unlicensed products to copy DVDs ("rippers").  By contrast, the RealDVD Products are

designed and marketed to customers only to make a copy *of the customers' own DVDs*.

---

[5]  *See DVD Copy Control Assoc'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 253 (2004) ("[T]he evidence demonstrates that in this case, the initial publication was quickly and widely republished to an eager audience so that DeCSS and the trade secrets it contained rapidly became available to anyone interested in obtaining them.").

[6]  Real is not alone in its understanding that the CSS License permits making secure, CSS-scrambled back-up copies of DVD content.  Since at least 2004, other companies have offered CSS-licensed products with this functionality.  For instance, AMX Corporation provides CSS-compliant software and hardware products that allow back-up copies of movies. ████████
████████████████████████████████████████████████████████████████████████
████████   Drive-In is a CSS-licensed product offered by a company called Telestream for backing up CSS-scrambled DVDs on Apple computers.  Ex. 18 .  It is promoted for sale on Apple's website.  Ex. 19 ("Drive-in is an innovative application that allows you to store your personal DVD movie library on your Mac.").  Kaleidescape has offered its CSS-licensed hardware system for placing back-up copies of CSS-scrambled movies on a home network since 2003.  Ex. 20 at REAL004543; Ex. 4.

1    ████████████████████████████████████████

2    ████████████████████████████████████████ A

3    picture of the DVD cover appears, along with a description of the movie, and links to reviews and

4    more information on the DVD.  March 19, 2009 Declaration of Jeff Chasen, submitted herewith

5    ("Chasen Decl.") ¶¶ 4-5.  This information does not come from the DVD itself but is an

6    enhancement created by Real.  *Id.*  Real obtains all this information about the movie, the reviews,

7    and the cover art from a licensed third-party Internet database.  *Id.*; Ex. 21 (Coppinger Dep.) at

8    149:12-17.  When the user has saved several movies, the collection can be browsed by cover art,

9    genre, title, rating, or actors.  Ex. 3 (Glaser Dep.) at 61:18-62:4; March 19, 2009 Declaration of

10   James Brennan, submitted herewith ("Brennan Decl.") ¶ 4.

11        When a movie or television show is playing, the RealDVD Products remember what the

12   viewer has watched, allowing users to stop in the middle then pick up later where they left off.

13   Chasen Decl., ¶ 6.  The RealDVD Products will organize a television series by season and

14   episode, and remember which episode was last watched.  *Id.*  They also offer parental controls to

15   make certain selections unavailable to children.  The RealDVD Products add these enhancements

16   to the movie and television watching experience to make the user's DVD collection more

17   accessible, more reliable and more enjoyable to use.  In short, the RealDVD Products permit

18   consumers to conveniently save, manage and play their collection of DVDs, without worrying

19   about storing, damaging or losing the fragile DVD disks.

20        **A.    The RealDVD Products Protect Against Unauthorized Copying**

21        The RealDVD Products offer all of this functionality in a manner compliant with the CSS

22   Agreement and the law.  In fact, the RealDVD Products contain restrictions that protect DVD

23   content far more securely than the CSS technology alone.  For example:

24   ●   ███████████████████████████████████████
25       ███████████████████████████████████████

26   ●   ███████████████████████████████████████
27       ███████████████████████████████████████

28

1

• ████████████████████████████████████████████
2  ████████████████████

3

• ████████████████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████

The RealDVD Products are designed only for fair use, and Real specifically reminds users of this

purpose.  Ex. 3 (Glaser Dep.) at 170:12-171:4.  Before users purchase a RealDVD product, they

must contractually agree:  "You may use the saving functionality of the Software only with

DVDs that you own.  You may not use the Software to save DVDs that you do not own, such as

rental or borrowed DVDs."  Ex. 22 at § 2(b).  Users running the RealDVD Products are also

presented with an "admonition screen":  "RealDVD should only be used to save discs you own.

If you do not own this DVD, please select Play."



The RealDVD Products also preserve the FBI Warning Screen that warns viewers that

unauthorized copying is strictly prohibited and a punishable criminal offense.  Most importantly,

the RealDVD Products are built to prevent piracy.  They make a secure copy of a movie for the

owner's personal use and lock that copy to a single hard drive – but do not permit further

dissemination of DVD content.

**B.**  ████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████

5      ████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████

12    ████████████████████████████████████████████

13 ████████████████████████████   When a movie is saved to the internal hard

14 drive of a laptop, for example, it is locked there and can only be played from that hard drive, on

15 that computer.  Buzzard Decl., ¶¶ 4, 10. The Vegas software, however, also offers the ability to

16 save the movies to an *external* hard drive.  The hard drive containing the movies may then be

17 removed from the first computer and attached to a different computer ***licensed to the same***

18 ***RealDVD account*** (with a maximum of five licensed computers in total) for playback only.  *Id*.

19 This enables users to play their movies on both their home PC and on the road with their laptop.

20     With Vegas, while the external hard drive may be moved, the digital copy of a saved

21 movie remains locked on the single hard drive where it was originally saved, and thus, it can only

22 be used with *one* computer at a time.  Buzzard Decl., ¶¶ 4, 10.  This is like a DVD, which can be

23 carried from DVD player to DVD player.  If the movie is moved or copied to another hard drive,

24 it will not play.  If it is sent over the Internet or a home network, it will not play.  *Id*.  Nor can the

25 copy be further copied and played back.

26    ████████████████████████████████████████████

27 ████████████████████████████████████████████

28 ████████████████████████████████████████████

1

2

**C.    Unlicensed "Ripper" Products Do Not Implement These Protections Against Unauthorized Copying**

There are hundreds of unlicensed products that allow users to copy DVDs but do not implement the protections that the RealDVD Products do.  *See* March 18, 2009 Declaration of Larry Gerbrandt, submitted herewith ("Gerbrandt Decl.") ¶ 7 and Ex. 2 thereto.  Many are offered for free on the Internet.  They do not have a CSS license.  They do not maintain CSS encryption. They do not have technical restrictions to prohibit sharing of saved content over the Internet. They do not "lock" the saved content to a particular hard drive to prevent a playable copy from being made of a copy (nor do they lock the copy to a particular user's account).  They do not limit the number of devices on which a saved DVD may be played back.  *See* Gerbrandt Decl., ¶ 7.

The RealDVD Products' limitations and protections against unauthorized copying place them in a completely different category from these widely-available unlicensed DVD rippers, as the following table demonstrates.

| Feature | RealDVD Products | DVD "Rippers" |
|---|---|---|
| Can share playable copy over the Internet | NO | YES |
| Can play saved copy on more than one computer simultaneously | NO | YES |
| Can transmit playable copy to another computer, hard drive or thumb drive | NO | YES |
| Permits playback on unlimited number of computers | NO | YES |
| Can save to a shared network of computers | NO | YES |
| Can save to a portable device (e.g., iPod) | NO | YES |
| Can make a playable copy of a copy | NO | YES |
| Maintains CSS encryption | YES | NO |

Given the availability of rippers and the restrictions imposed by the RealDVD Products, the RealDVD Products are unlikely to appeal to any persons interested in stealing DVD content. Bresnahan Decl., ¶ 18; Gerbrandt Decl., ¶¶ 7-8, 13.

## V.   THE STUDIOS CHANGED THEIR CIRCUMVENTION THEORIES ████

Months after the Studios obtained a TRO, recognizing the weakness in their CSS claims, the Studios sought to dramatically alter the focus of their circumvention claims.  In mid-December, just as fact discovery was originally set to close, the Studios indicated their intent to contend that ████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 23.  The new theories formed no part of the Complaint filed by the Studios, no part of the TRO proceedings, and no part of the temporary injunction that resulted and is still in effect.  In late December, the Court allowed the new ARccOS and RipGuard claims ████████████████████████ ████████████████ but also extended discovery to allow the parties to prepare.

### A.   Real's Knowledge Of ARccOS and RipGuard

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

7

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    **B.**

19

20

21

22

23

24

25

26

27

28



3    DVD player and DVD software product manufacturers use the DVD Video Specifications

4    to understand how to build products that can access DVDs. Ex. 28 at ¶¶ 32-34.

(continued...)

1 ████████████████████████████████████████████

2 ███████████████████████████████████

## VI.   VEGAS WAS MARKETED TO PROMOTE FAIR USE

As it prepared to release Vegas (known to the public as "RealDVD"), Real began promoting the product and educating the market (and the movie studios) about its functionality. Understanding that its target market consisted of law-abiding users wishing to make back-up copies of DVDs that they owned, Real marketed Vegas only in the context of fair use copying of the user's own DVD collection.  Gerbrandt Decl. ¶ 14.  None of Real's marketing materials suggest that Vegas could be used to compile libraries of rental or borrowed DVDs – to the contrary, Real explains precisely why RealDVD is "legal" and both advises and requires that users only save DVDs they own.  *Id.*; *see also*, *supra* at 11-12.  Real emphasizes this same point both through the end-user license agreement and on the "admonition screen" when a customer is using Facet or Vegas.  *See id.*; Ex. 22.  Real's marketing is entirely consistent with RealDVD's fair use purpose and the opposite of condoning or encouraging piracy.

## VII.   REAL APPROACHED THE STUDIOS BEFORE RELEASING VEGAS

Before it launched Vegas, Real contacted the Studios ████████████████

17 ███████████████████████████████████

18 ████████████████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████████████████████

21 ████████████████████████████████████████

22 ███████████████████████████

23 _____

24

(...continued from previous page)

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28 ████████████████████████████████████████



1

2

3

4

**ARGUMENT**

**I.    LEGAL STANDARD**

Two tests determine whether to grant a preliminary injunction.  Under the first test, the studios must demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)."  *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).  "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."  *Id.* (citations and quotations omitted).

**II.    THE STUDIOS AND DVD CCA HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS**

**A.    Creating Personal Backup Copies of Purchased DVDs is a Fair Use**

At least since the U.S. Supreme Court ruled in *Sony Corp. of Am. v. Universal City Studios,* 464 U.S. 417 (1984) that consumers have a fair use right to make a copy of broadcast television using their VCRs, consumers have come to expect that they can make a backup copy of media that they have legitimately obtained.  The policy of permitting a back up copy of digital content is explicitly endorsed in the Copyright Act itself.  Pursuant to Section 117, the owner of a copy of a computer program – and the contents of a DVD are a computer program – is authorized to make an additional copy for archival purposes,[10]  17 U.S.C. §117.

That is consistent with what other courts have said about personal backup copies of other types of purchased electronic media.  For instance, in *U.S. v. Elcom Ltd.*, 203 F. Supp. 2d 1111,

_____

[10] A DVD qualifies as a "computer program" under §117.  17 U.S.C. §101 defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  Any DVD that can be played on a software DVD player (*i.e.*, all DVDs) satisfies that definition.

1135 (N.D. Cal. 2002), a case involving "ebooks" (digital books to be read on computers), the court noted: "Courts have been receptive to the making of an archival copy of electronic media in order to safeguard against mechanical or electronic failure." The *Elcom* court wrote: "Making a back-up copy of an ebook, for personal noncommercial use would likely be upheld as a non-infringing fair use." *Id.* at 1135.

In *Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072 (9th Cir. 1999), the defendant manufactured and sold a product called the "Rio," a portable device for playing digital music, like the iPod. *Id.* Interpreting the Audio Home Recording Act of 1992, not the Copyright Act, the Ninth Circuit noted that "[t]he Rio merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive." *Id.* This use, the Ninth Circuit concluded, is "paradigmatic noncommercial personal use." *Id.*

When it suits their purposes, the Studios *expressly* permit the copying of digital content. Such was the case during oral argument before the Supreme Court in *Metro-Goldwyn-Mayer Studios v. Grokster. See, supra* at 3. Likewise, Sony BMG posted the following message on its website:

> "SonyBMG wants music to be easily transferable to any device that supports secure music. Currently, music from our protected CDs may be transferred to hundreds of such devices, as both Microsoft and Sony have assisted to make the user experience on our discs as seamless as possible with their secure formats."

Ex. 37.

Even with movie content, the Studios have created an atmosphere in which consumers believe that back-up copying, as well as space and timing shifting, are authorized. The Studios provide movie and television content in partnership with cable and satellite companies to consumers, and that content is freely copyable and storable <u>forever</u> using Tivos or other home digital video recorders (DVRs). Gerbrandt Decl., ¶ 32. Consumers can also transfer that content to DVD discs or to their computers. The movie and television content copied in this manner is often *identical* to the content the same consumer might otherwise purchase on a DVD. *Id.* The Studios also provide movie and television content on such services as iTunes at the same price as a DVD or less. Consumers are then free to make unlimited copies of that content, back it up to any number of computers, and space-shift that content on up to five of a variety of portable

1   devices. *Id.*, ¶ 5. Again, that content is often *identical* to the content the same consumer might

2   otherwise purchase on a DVD. Given this behavior, the Studios are not in a position to claim that

3   copying of this content for time-shifting or space-shifting is not fair use.

4   **B.** ████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████

12   **1.    The CSS Agreement Is A Contract of Adhesion That Must Be
            Construed According to Real's Reasonable Interpretation**

13  Because the CSS Agreement is a contract of adhesion, it must be construed consistent with

14  Real's reasonable interpretation of its terms. Contracts of adhesion are agreements offered by a

15  party of superior bargaining strength on a "take it or leave it basis." *Ting v. AT&T*, 319 F.3d

16  1126, 1149 (9th Cir. 2003); *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1069-70 (N.D.

17  Cal. 2007). In this case, access to CSS technology is *essential* for anyone intending to

18  manufacture legally a DVD playback device for CSS-protected discs. To make a viable DVD

19  product, Real had to acquire a CSS License. Ex. 6 (Pak Dep.) at 49:11-20. That requirement, and

20  the absence of any alternatives, eliminated Real's bargaining power (and the DVD CCA permitted

21  no bargaining). *Madden v. Kaiser Found. Hosps.*, 17 Cal. 3d 699, 711 (1976) ("In many cases of

22  adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any

23  realistic opportunity to look elsewhere for a more favorable contract."). That is no less true

24  because Real is a well-counseled corporation. Real had no choice but to accept the CSS

25  Agreement as is. *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 818 (1981).

26  The CSS Agreement is a 'take-it-or-leave-it' contract. ████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1 ██████████████████████████████  Under these circumstances, the CSS Agreement

2 is a "standardized contract, imposed upon the subscribing party without an opportunity to

3 negotiate the terms" – the very definition of a contract of adhesion. *Armendariz v. Found. Health*

4 *PsychCare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000).

5      Because it is a contract of adhesion, it must be interpreted consistent with Real's

6 reasonable expectations of its terms. *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1173

7 (N.D. Cal. 2002) (adhesive agreement will be interpreted according to the reasonable

8 interpretation of the adhering party); *State Farm Fire & Cas. Co. v. Keenan*, 171 Cal. App. 3d 1,

9 14 (1985) (contract of adhesion interpreted in light of the reasonable expectations of the *adhering*

10 parties, and not "from the subjective intent of the people who drew up those policies of

11 adhesion"). Any ambiguities must be interpreted against the DVD CCA. *Acorn*, 211 F. Supp. 2d

12 at 1173; Cal. Civ. Code §1654. The undisclosed subjective intent of the DVD CCA and Studios is

13 irrelevant. *Founding Members of the Newport Beach Country Club v. Newport Beach Country*

14 *Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003); *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit*

15 *Co. of Md.*, 744 F. Supp. 1311, 1315 (D. N.J. 1990) ("[T]he subjective intent of a person drafting

16 a contract is not, by any means, determinative as to the meaning of the contract especially where,

17 as here, the contract is one of adhesion.").

18           **2.     Real's Interpretation of the CSS Agreement Is Reasonable**

19 ████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 █████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████

28 ██████████████████████████████████



**3.     The RealDVD Products Comply with the CSS Agreement**

**a.     The RealDVD Products Implement The Required Steps and Comply With The Restrictions Of The CSS Documentation**

---

[11] To incorporate by reference, four requirements must be met: (1) the reference to incorporation must be clear and unequivocal, (2) the reference must be called to the attention of the other party, (3) the other party must consent to the incorporation, and (4) the terms of the incorporated document must be known or easily available to the contracting parties. *Chan v. Drexel Burnham Lambert Inc.*, 178 Cal. App. 3d 632, 641 (1986) *quoting Williams Constr. Co. v. Standard Pac. Corp.*, 254 Cal. App. 2d 442 (1967); *Cariaga v. Local No. 1184 Laborers Int'l. Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998) (same). Both the General and Technical Specifications fail to meet these requirements. As the *Kaleidescape* court found after trial on the merits, the General Specifications are not incorporated by reference into the CSS Agreement. Ex. 5 at 875. The General Specifications do not meet any of the four *Chan* requirements:

Thus, the Technical Specifications are also not incorporated into the agreement between Real and the DVD CCA. *Chan*, 178 Cal. App. 3d at 641; *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 896 (2008).



b.     The CSS Agreement Permits The Functionality of Storing
Encrypted, Secure Content to A Hard Drive

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      **c.    The Evidence Confirms Real's Interpretation of the Agreement**







3632717_1



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





















1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28











[20] *Accord Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001); *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminary enjoined, this by itself is an insufficient prop."); *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("It is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [21] As the court noted in *DVD Copy Control Ass'n,* 116 Cal. App. 4th at 255, "hundreds" of Web
28   sites had, by 1999 – ten years ago – *already* posted a DVD copying product called DeCSS, "enabling
     untold numbers of persons to download it and to use it."



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    Permitting the Studios to appropriate fair use and sell it back to customers would be an

18  improper extension of the copyright rights.  It has long been recognized that such an extension of

19  the intellectual property grant harms the public interest and is contrary to public policy. *See,*

20  *e.g., Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 976 (4th Cir. 1990).

21                                      **CONCLUSION**

22    For the foregoing reasons, and based on the entire record in this case, the motion for

23  preliminary injunction should be denied and the temporary restraining order dissolved.

24
Dated:  March 19, 2009                      WILSON SONSINI GOODRICH & ROSATI
25                                            Professional Corporation

26
27                                          By: _____/s/_____
                                                 Leo P. Cunningham
28
                                            Attorneys for Plaintiffs
                                            REALNETWORKS, INC. and REALNETWORKS
                                            HOME ENTERTAINMENT, INC.