1   JAMES A. DiBOISE, State Bar No. 83296
    Email: jdiboise@wsgr.com
2   LEO CUNNINGHAM, State Bar No. 121605
    Email: lcunningham@wsgr.com
3   COLLEEN BAL, State Bar No. 167637
    Email: cbal@wsgr.com
4   MICHAEL A. BERTA, State Bar No. 194650
    Email: mberta@wsgr.com
5   TRACY TOSH LANE, State Bar No. 184666
    Email: ttosh@wsgr.com
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
7   One Market St., Spear Tower, Suite 3300
    San Francisco, CA 94105
8   Bus:   (415) 947-2000
    Fax:   (415) 947-2099
9
    Attorneys for Plaintiffs and Counterclaim Defendants
10  REALNETWORKS, INC. and REALNETWORKS
    HOME ENTERTAINMENT, INC.
11

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15   REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME<br>16   ENTERTAINMENT, INC., a Delaware corporation,<br><br>17                    Plaintiffs,<br><br>18        v.<br><br>19   DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY<br>20   ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware<br>21   corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY<br>22   FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation;<br>23   WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware<br>24   Corporation,<br><br>25                    Defendants.<br><br>26   ────────────────────────────────<br>27   AND RELATED CASES<br>     ────────────────────────────────| Case Nos.   C08 04548 MHP;<br>               C08 04719 MHP<br><br>**REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       April 1, 2009<br>Time:      9:00 a.m.<br>Dept:      15<br><br>**[REVISED PUBLIC REDACTED VERSION]** |

28

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 5

I.     REALNETWORKS .................................................................................... 5

II.    DEVELOPMENT OF THE REALDVD PRODUCTS ...................................... 5

III.   CSS TECHNOLOGY AND ITS ROLE IN THE REALDVD PRODUCTS ................... 6

     A.    Description of CSS Technology............................................................ 7

     B.    Real Executed the DVD CCA Standard Form CSS Agreement ............... 8

     C.    Real Developed the RealDVD Products to Comply With The CSS
          Agreement ............................................................................................... 9

IV.   REALDVD PRODUCTS:  FUNCTIONALITY AND BUILT-IN PROTECTIONS
     AGAINST PIRACY.............................................................................. 10

     A.    The RealDVD Products Protect Against Unauthorized Copying ............ 11

     B.    ████████████████████████ ........................... 12

     C.    Unlicensed "Ripper" Products Do Not Implement These Protections
          Against Unauthorized Copying ............................................................. 14

V.    THE STUDIOS CHANGED THEIR CIRCUMVENTION THEORIES TO ADD
     "ARCCOS" AND "RIPGUARD"............................................................ 15

     A.    Real's Knowledge Of ARccOS and RipGuard ...................................... 15

     B.    ARccOS and RipGuard Are ████████████████████████
          ████ ..................................................................................... 16

VI.   VEGAS WAS MARKETED TO PROMOTE FAIR USE ................................. 18

VII.  REAL APPROACHED THE STUDIOS BEFORE RELEASING VEGAS ............... 18

ARGUMENT ...................................................................................................... 20

I.     LEGAL STANDARD ............................................................................. 20

II.    THE STUDIOS AND DVD CCA HAVE NO LIKELIHOOD OF SUCCESS ON
     THE MERITS ...................................................................................... 20

     A.    Creating Personal Backup Copies of Purchased DVDs is a Fair Use ......... 20

     B.    █████ Vegas Comply with the CSS Agreement............................ 22

          1.    The CSS Agreement Is A Contract of Adhesion That Must Be
                Construed According to Real's Reasonable Interpretation ...................... 22

| | | 2. | Real's Interpretation of the CSS Agreement Is Reasonable ..................... 23 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.    Real's Interpretation of the CSS Agreement Is Reasonable ..................... 23

3.    ■ RealDVD ■ Comply with the CSS Agreement ...................... 24

    a.    ■ RealDVD ■ Implement The Required Steps and Comply With The Restrictions Of The CSS Documentation ....... 24

    b.    The CSS Agreement Permits ■■■■■■■■■■ ........................... 25

    c.    The Evidence Confirms Real's Interpretation of the Agreement ..................................................................... 27

4.    Real Did Not Circumvent CSS Technology Under the DMCA By Trying to Implement It In Accordance With The License ....................... 30

    a.    Even If Real Failed to Comply With the CSS License, There Would Be No Circumvention Claim, Only a Claim For Breach ........................................................................... 30

    b.    Faithful Implementation of the CSS Technology Cannot Violate the DMCA ................................................... 31

        i.    The RealDVD Products Do Not Violate § 1201(a) .......... 32

        ii.    The RealDVD Products Do Not Violate § 1201(b) ......... 33

C.    The Studios Cannot Show A Likelihood of Success On The New Theories Regarding ARccOS and RipGuard .......................................................... 34

1.    ARccOS And RipGuard Techniques Are Not Eligible For DMCA Protection Because ■■■■■■■■■■■■■■■■■■■ ........................... 35

2.    ■ Vegas Do Not "Circumvent" ARccOS and RipGuard Errors .......................................................................... 36

    a.    ■ ........................................................................... 36

    b.    Vegas ..................................................................... 37

3.    ■ Vegas Are Not Primarily Designed, Used or Marketed for Use with Discs Containing ARccOS or RipGuard ..................................... 38

4.    Neither ARccOS Nor RipGuard "effectively protects a right of a copyright holder" .......................................................... 39

III.    THE BALANCE OF HARMS REQUIRES DENIAL OF A PRELIMINARY INJUNCTION ................................................................................ 41

A.    The Studios Have Failed to Demonstrate Any Cognizable Harm, Much Less Irreparable Harm ........................................................................ 42

1.    There is No Presumption of Irreparable Harm ............................. 42

2.    There is No Evidence that ■ RealDVD ■ will Hurt Studio Sales ..................................................................................... 43

3.   The Studios Have Adduced No Evidence that RealDVD Will Appeal To Users Interested In Stealing Movies ........................................ 43

4.   The Studios Have Adduced No Evidence that Consumers of RealDVD Will "Rent-Rip-and-Return" .................................................. 45

B.   ARccOS and RipGuard Are ██████████████████████ Cannot Justify An Injunction Under Any Circumstances ..................................... 45

C.   Any Harms Claimed by the Studios Would Be Compensable In Damages And Would Not Justify An Injunction ................................................. 46

D.   The DVD CCA Has Provided No Evidence of Harm ............................................ 47

E.   The Harm To Real if Preliminarily Enjoined Would Outweigh Any Legitimate Threat to the Studios or DVD CCA ..................................... 48

F.   An Injunction Would Harm Consumers .............................................................. 50

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. MGM Studios, Inc.*,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 37, 38

*Acorn v. Household Int'l Inc.*,
    211 F. Supp. 2d 1160 (N.D. Cal. 2002) ........................................................................ 27

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987) ..................................................................................................... 46

*Armendariz v. Found. Health PsychCare Servs., Inc.*,
    24 Cal. 4th 83 (2000) ................................................................................................... 26

*Baker v. Osborne Dev. Corp.*,
    159 Cal. App. 4th 884 (2008) ...................................................................................... 28

*Belushi v. Woodward*,
    598 F. Supp. 36 (D.C.D.C. 1984) ................................................................................ 50

*Cariaga v. Local No. 1184 Laborers Int. Union of No. Am.*,
    154 F.3d 1072 (9th Cir. 1998) ...................................................................................... 28

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) ................................................................................... 46, 47

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004) ................................................................................... 45

*Chan v. Drexel Burnham Lambert Inc.*,
    178 Cal. App. 3d 632 (1986) ....................................................................................... 28

*Cotter v. Desert Palace, Inc.*,
    880 F.2d 1142 (9th Cir. 1989) ..................................................................................... 51

*DVD Copy Control Association, Inc. v. Bunner*,
    116 Cal. App. 4th 241 (2004) ......................................................................... 10, 52, 53

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256 (10th Cir. 2004) ................................................................................... 52

*eBay Inc. v. MercExchange*,
    547 U.S. 388 (2006) ..................................................................................................... 46

*Egilman v. Keller & Heckman, LLP*,
    401 F. Supp. 2d 105 (D.D.C. 2005) ............................................................................ 37

*Firemen's Ins. Co. of Newark v. Keating*,
    753 F.Supp. 1146 (S.D. N.Y. 1990) ........................................................................... 52

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944 (2003) ............................................................. 27

*Graham v. Scissor-Tail, Inc.,*
   28 Cal. 3d 807 (1981) ..................................................................... 26

*Guz v. Bechtel Nat'l, Inc.,*
   24 Cal. 4th 317 (2000) .................................................................... 31

*Healthcare Advocates, Inc. v. Harding, Early, Follmer & Frailey,*
   497 F. Supp. 2d 627 (E.D. Pa. 2007) ............................................. 37

*ICU Med. Inc. v. Alaris Med. Sys., Inc.,*
   No. SA CV 04-689, 2004 WL 1874992 (C.D. Cal. July 30, 2004) ............... 51

*I.M.S. Inquiry Mgmt. Sys. Ltd. v. Berkshire Infor. Sys.,*
   307 F. Supp. 2d 521 (S.D. N.Y. 2004) ..................................... 36, 37

*Inland Steel Co. v. U.S.,*
   59 S. Ct. 415 (1930) ...................................................................... 51

*Jacobsen v. Katzer,*
   535 F.3d 1373 (Fed. Cir. 2008) .................................................... 35

*Johnson v. Cal. State Bd. of Accountancy,*
   72 F.3d 1427 (9th Cir. 1995) ........................................................ 24

*Lasercomb Am., Inc. v. Reynolds,*
   911 F.2d 970 (4th Cir. 1990) ........................................................ 55

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   387 F.3d 522 (6th Cir. 2004) ............................................. 37, 39, 45

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) ................................................ 46, 47

*Madden v. Kaiser Found. Hosp.,*
   17 Cal. 3d 699 (1976) ................................................................... 26

*Markovits v. Venture Info Capital, Inc.,*
   129 F. Supp. 2d 647 (S.D.N.Y. 2001) ......................................... 52

*Miller Harness Company v. Arcaro & Dan's Saddlery, Inc.,*
   142 F. Supp. 634 (E.D.N.Y. 1956) .............................................. 50

*Oakland Tribune, Inc. v. The Chronicle Publ'g. Co.,*
   762 F.2d 1374 (9th Cir. 1985) ................................................ 46, 47

*Oestreicher v. Alienware Corp.,*
   502 F. Supp. 2d 1061 (N.D.Cal. 2007) ........................................ 26

*Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Maryland,*
   744 F. Supp. 1311 (D. N.J. 1990) ................................................ 27

*RealNetworks, Inc. v. Streambox, Inc.,*
   No. 2:99CV02070 2000 WL 127311 (W.D. Wash. 2000) ............... 46

*Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys., Inc.,*
   180 F.3d 1072 (9th Cir. 1999) ................................................ 24, 25

1    *Reilly v. Medianews Group, Inc.,*
        No. C 06-04332, 2006 WL 2419100 (N.D. Cal. July 28, 2006) ....................... 51
2
     *Smith, Bucklin & Assocs., Inc. v. Sonntag,*
3       83 F.3d 476 (D.C. Cir. 1996) ........................................................................ 52

4    *Sony Corp. of America v. Universal City Studios,*
        464 U.S. 417 (1984) ............................................................................... 24, 44
5
     *State Farm Fire & Cas. Co. v. Keenan,*
6       171 Cal. App. 3d 1 (1985) .......................................................................... 27

7    *Storage Techn. Corp. v. Custom Hardware Eng. & Consulting, Inc.,*
        421 F.3d 1307 (Fed. Cir. 2005) ................................................................... 45
8
     *Sun Microsystems, Inc. v. Microsoft Corp.,*
9       81 F. Supp. 2d 1026 (N.D. Cal. 2000) .......................................................... 34

10   *Sun Microsystems, Inc. v. Microsoft Corp.,*
        188 F.3d 1115 (9th Cir. 1999) ..................................................................... 34
11
     *Thayer Plymouth Ctr. Inc. v. Chrysler Motors Corp.,*
12      255 Cal. App. 2d 300 (1967) ...................................................................... 52

13   *Ting v. AT&T,*
        319 F.3d 1126 (9th Cir. 2003) ..................................................................... 26
14
     *U.S. v. Elcom Ltd,*
15      203 F. Supp.2d 1111 (N.D. Cal. 2002) .......................................................... 24

16   *Williams Constr. Co. v. Standard Pac. Corp.,*
        254 Cal. App. 2d 442 (1967) ...................................................................... 28
17
     *Z4 Technologies, Inc. v. Microsoft Corporation,*
18      434 F. Supp. 2d 437 (E.D. Tex. 2006) .......................................................... 50

19                                          **STATUTES**

20   17 U.S.C. §101 ............................................................................................. 24

21   17 U.S.C. §106 ............................................................................................. 44

22   17 U.S.C. §107 ............................................................................................. 44

23   17 U.S.C. §117 ............................................................................................. 24

24   17 U.S.C. §1201(a)(3)(A) .......................................................................... 36, 37

25   17 U.S.C. §1201(b) ....................................................................................... 45

26   17 U.S.C. §1201(b)(1) ............................................................................... 43, 44

27   17 U.S.C. §1201(b)(2)(A) .............................................................................. 37

28   17 U.S.C. §1204 ........................................................................................... 35

1

## INTRODUCTION

2        The question at the heart of this case is whether the Studios can force consumers to pay

3   twice for the same content – to pay once for a DVD, and then to pay *again* for the fair use right to

4   back up that DVD to, and watch it from, a hard drive.  RealNetworks ("Real") has developed two

5   innovative products (collectively, the "RealDVD Products") that allow consumers to exercise their

6   right to do this without paying twice.  This motion is an effort by the Studios to eliminate those

7   products.  They are not entitled to do so.

8        The first challenged product, released in September 2008, is software for a Windows PC

9   called Vegas.  ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████  Both of the RealDVD Products

11  were designed from the ground up to comply with technology known as "CSS" ("Content

12  Scramble System"), which has been licensed to Real, and which is used by the Studios to protect

13  DVD content.  Not only do both Products strictly comply with CSS at all times, when they save a

14  movie using CSS it is *far more* secure than it was on the original DVD.

15       The products increase the security of a saved movie in two ways.  ████████████████

16  ████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ████████████████  And second, both products absolutely prevent the distribution of a saved

19  movie.  DVDs saved using the RealDVD Products:

20       • cannot be posted to peer-to-peer ("P2P") networks or otherwise distributed via the
           Internet;

21       • cannot be played if moved to any other hard drive;

22       • cannot be burned to a recordable DVD; and

23       • cannot be shared over a home network.

24  The Studios nonetheless seek to position this as a case about piracy.  It is not.  The RealDVD

25  Products were designed to *prevent* piracy.  To be sure, movie piracy thrives on the Internet.  But

26  the RealDVD Products will not contribute to that piracy.  They cannot – movie content that is

27  saved using the RealDVD Products is locked to those products and cannot be shared at all, much

28  less over the Internet.  Nor can there be any claim that the RealDVD Products will be used to

1    create counterfeit DVDs that are resold on the streets. That is not possible with these products

2    since they do not permit burning to a DVD.

3         Left without the piracy "hooks," the Studios claim to be concerned about what they term

4    "rent-rip-and-return" -- the possibility that consumers might use the RealDVD Products to save a

5    copy of a movie they have rented and return the rented copy. But the Studios have failed to show

6    that "rent-rip-and-return" is at all likely to increase—or even occur—using the RealDVD

7    Products, much less that it would displace any movie sales or otherwise cause the Studios harm.

8         This failure of evidence is not for a lack of opportunity. More than four years ago, a

9    company called Kaleidescape released a CSS-licensed product that, like the RealDVD Products,

10   allows consumers to securely save DVDs to a hard drive. Other companies, including AMX and

11   Telestream, have also released CSS-licensed products with similar functionality. Yet the Studios

12   have done nothing to prevent the sale or distribution of these products and have no evidence that

13   they have caused the Studios any harm, whether by "rent-rip-and-return" or otherwise.

14        To the extent "rent-rip-and-return" is even a potential problem, it is a problem the Studios

15   have always had the power to eliminate. ████████████████████████████████████████████

16   ████████████████████████████ Were they to do so, the RealDVD Products could easily be

17   updated to detect that a DVD was rented and then prevent it from being saved. To date, the

18   Studios have refused to implement this simple fix. The idea of "rent-rip-and-return" is worth

19   more to them as a live legal argument against the RealDVD Products than as a dead threat in the

20   real world.

21        Real, therefore, has adopted its own safeguards to ensure that the RealDVD Products

22   cannot and will not be used for "rent-rip-and-return." Before saving a DVD, users are reminded

23   by a "splash screen" to only save DVDs that they own. They are also required by contract to

24   agree to save only DVDs that they own. Given these legal restrictions, and the tight security

25   safeguards built into the RealDVD Products, it is no surprise that market research conducted by

26   Real confirms that the consumers most interested in the RealDVD Products are those who care

27   about legality and actively avoid stealing movie and television content.

28

1    The reality is that there is no cognizable harm that could result from the use of the

2  RealDVD Products.  Consumers have long known that they have the right and permission to make

3  a fair use copy of DVDs that they purchase, whether to back up a safety copy of the notoriously

4  fragile DVD medium or to enable them to watch content at their convenience.

5    The Studios, of course, know this as well.  And when it suits them, they pay lip service to

6  fair use rights.  For instance, to the Supreme Court in *MGM v. Grokster*, counsel for the Studios

7  (including some of the plaintiffs in the present case – Disney, Paramount and 20th Century Fox

8  Film) stated:

9    The record companies, my clients, have said, for some time now, and it's been on
     their Website for some time now, that it's perfectly lawful to take a CD that you've
10    purchased, upload it onto your computer, put it onto your iPod. There is a very,
     very significant lawful commercial use for that device, going forward.

11

12  But when it comes to DVDs, the Studios would like to pretend that fair use does not exist.  Why?

13  The Studios realize that if they prevent consumers from making a digital copy of their purchased

     DVDs, the Studios can *sell* those rights to consumers a second time.  It's all about money.

14

15    They (and the DVD CCA) have come up with two theories to try to prevent Real from

16  ensuring that DVD consumers only have to pay once.  The first is a claim that *any* product that

17  allows DVD content to be copied to a hard drive violates the CSS Agreement.  The Defendants

18  are wrong.  Real is a CSS Licensee, and the RealDVD Products comply with the CSS License

19  Agreement ("CSS Agreement").  The RealDVD Products even comply with all of the restrictions

20  and requirements that are kept secret from CSS Licensees until after execution and payment of the

21  License (and thus are not even part of the CSS Agreement at all).

22    The Defendants know this to be true.  The DVD CCA has already made the same

23  arguments that they and the Studios are advancing in this case to a California Court applying

24  California law to this California contract.  And there, Judge Nichols of Santa Clara County

25  determined that the DVD CCA was wrong.  He found that the DVD CCA failed to prove that the

26  product in that case – the Kaleidescape system that also makes a copy of a DVD to a hard drive –

27  violated the CSS Agreement.  Significantly, in 2007, after that decision was handed down

28  following a full trial on the merits, the DVD CCA attempted to pass amendments to the CSS

     Agreement prohibiting saving DVD content to a hard drive.  Those Amendments failed.  Now, the

1    Studio Defendants and DVD CCA are resurrecting the same arguments two years later, essentially

2    asking this Court to do what the DVD CCA itself tried and failed to do – rewrite the CSS License.

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ███████████████████████████████████████

7    ███████████████████████████████████

8    ██████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ██████████████████

15           Recognizing that their CSS License claims cannot withstand close scrutiny, the Studios

16   changed the nature of this case in December 2008; they now claim that the RealDVD Products

17   should be enjoined because they supposedly circumvent two third-party products called

18   "ARccOS" and "RipGuard."  But this argument fails as well. ████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ██████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   _____

28   [1] All references to ("Ex. ___") are attached to the Declaration of Christopher F. Nelson, filed herewith.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ For all these reasons, a preliminary injunction must be denied.

## FACTUAL BACKGROUND

### I.    REALNETWORKS

Real is not a company operating on the fringes of the Internet.  During its nearly 15 year history, Real has been a leading innovator in digital entertainment.  Its "RealPlayer" software has been downloaded hundreds of millions of times over the years.  Real's "Rhapsody" music service is the second largest online music business next to iTunes and delivered more than 1 billion song plays in 2008.  Real currently provides music and video services for many major mobile phone companies including Verizon, T-Mobile, AT&T, Vodafone and SK Telecom, and it delivers nearly 1 billion mobile messages every day for its carrier customers.  In short, Real is a digital media company at the center of creating legal digital entertainment services.

### II.    DEVELOPMENT OF THE REALDVD PRODUCTS

The RealDVD products were the brainchild of a handful of Real's senior executives, including its CEO, Rob Glaser ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ Since 2000, Real's major competitors released product after product designed to save, organize, and play back digital movies, music and games, by connecting a device containing a large-capacity hard drive to a TV.  But none, in Glaser's view, had figured out how to make digital video "really take off."  *Id.* at 10:18-11:19.

███████████████████████████████████████████

███████████████████████████████. The Kaleidescape system lets consumers back up and store their entire collection of CDs and DVDs on a group of hard drives, catalogue and

1   organize their collection, and play it back in any room of the house at any time.  Ex. 4.  ████

2   ████████████████████████████████████████████████████████████

3   ██████████████████████████

4         The first problem is that Kaleidescape is expensive; it is marketed for installation in the

5   "home, yacht, or private jet."  Ex. 53.  A newly-installed system costs thousands of dollars, ████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ██████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████In March 2007, the *Kaleidescape* Court ruled that the

11  Kaleidescape product did not violate the CSS Agreement; rejecting the DVD CCA's claim that the

12  Agreement prohibited copying DVDs.  Ex. 5 at 875-880.  ████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████

15  ██████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ██████████████████████████

24  **III.    CSS TECHNOLOGY AND ITS ROLE IN THE REALDVD PRODUCTS**

25        The Studios use the Content Scramble System ("CSS") to protect DVD content.  In order

26  to manufacture DVDs or make consumer electronic devices or computer software that interact

27  _____

28     [2] Vegas was released to the public and referred to internally as "RealDVD," and as such, much of the evidentiary record in this case uses "RealDVD" interchangeably with "Vegas."

1   with DVDs, manufacturers must obtain a license to use CSS technology, which is licensed by the

2   DVD CCA.[3] ████████████████████████████████████████

3   ████████████████████████████████████████ Real is one of them.

4       **A.      Description of CSS Technology**

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ██████████████████████████████████

17  ████████████████████████████████████████

18

19  ████████████████████████████████████████

20  ████████████████ The document explaining how to protect the Keys and video content

21  from unauthorized interception is known as the Procedural Specifications.   Together, the

22

23  ─────────────────────────

24  [3] ████████████████████████████████████████

25  ████████████████████████████████████████

26  [4] ████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████

1   Technical and Procedural Specifications set forth a long and detailed set of requirements,

2   including but not limited to the steps required to:

- Unlock a DVD that is inserted into a drive;

- Pass the Keys and scrambled content to a licensed device;

- Protect the Keys and content once in the device; and

- Secure the unscrambled content as it is sent to the display.

7   The RealDVD Products comply with each of these steps at all times, whether they are playing or

8   saving a DVD, despite the fact that the Technical Specifications do not form part of the contract

9   between Real and the DVD CCA. █████████████████████████

10  █████████████████████████████████████████

11  ████████████████████████████████████████████

12  ███████████████████████████████████████

13  **B.    Real Executed the DVD CCA Standard Form CSS Agreement**

14      The CSS Agreement is a non-negotiable form agreement ████████████

15  ████████████████████████████

16  ██████████████████████████████████

17  █████████████████████████████████

18  ████████████████████████   The Technical and General Specifications – which the

19  DVD CCA contends Real has violated – were not disclosed to Real until <u>after</u> Real executed the

20  contract and paid the DVD CCA over $30,000.  *Id; Ex.* 8.

21      ████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████

24  ███████████████████████████████████

25  ██████████████████████████████  With only

26  limited information regarding the contents of the specifications documents and no power to

27  negotiate the terms of the license agreement, Real executed the CSS License Agreement in August

28

1    2007 so that it could move forward with developing the RealDVD Products. ███████

2    ███████████

3    **C.    Real Developed the RealDVD Products to Comply With The CSS Agreement**

4    The RealDVD Products were developed to be fully compliant with Real's DVD CCA

5    license and the related CSS technical specifications.  Real did not even begin to seriously

6    consider developing the RealDVD Products until after the California court first resolved the

7    DVD CCA's challenge to the legality of the Kaleidescape system in Kaleidescape's favor in

8    March 2007. ██████████████████

9    Thereafter, each of the engineers responsible for writing code for the RealDVD Products

10   was instructed to follow the CSS specifications promulgated by the DVD CCA. ███████

11   ████████████████████████████████████

12   █████████████████████████████████████████

13   ███████████████████████████████████

14   ████████████████████████████████████████

15   ██████████████████████████████████████████

16   ██████████████████

17   ████████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████████████████████████████

20   ██████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████

23   ███████████████████████████

24   Real employed 23 software designers, full time, to write the code for both RealDVD

25   Products from scratch so that it would comply with the CSS specifications. When the CSS

26   specification or DVD CCA license presented some ambiguity, both the Vegas ████████

27   were instructed to, and did, consult with James Burger, one of the primary drafters and negotiators

28   of the CSS License.

1    While the RealDVD Products strictly comply with the license █████████████

2    ████████████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████. In 1999, the "DeCSS"

4    computer program, which permits the playing of a CSS encrypted DVD, was posted on the

5    Internet.  The California Court of Appeal denied the DVD CCA a preliminary injunction against

6    the "DeCSS" program based on the finding that CSS had, *even as of nearly ten years ago*, likely

7    lost any trade secret status.[5] ███████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████

### IV.   REALDVD PRODUCTS:  FUNCTIONALITY AND BUILT-IN PROTECTIONS AGAINST PIRACY

Real has no interest in making anything but legitimate, legal products.[6] ████████

████████████  When Real began developing the RealDVD Products, the Internet was replete

with free unlicensed products to copy DVDs ("rippers").  By contrast, the RealDVD Products are

designed and marketed to customers only to make a copy *of the customers' own DVDs.*

---

[5] *See DVD Copy Control Asso'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 253 (2004) ("[T]he evidence demonstrates that in this case, the initial publication was quickly and widely republished to an eager audience so that DeCSS and the trade secrets it contained rapidly became available to anyone interested in obtaining them.").

[6] Real is not alone in its understanding that the CSS License permits making secure, CSS-scrambled back-up copies of DVD content.  Since at least 2004, other companies have offered CSS-licensed products with this functionality.  For instance, AMX Corporation provides CSS-compliant software and hardware products that allow back-up copies of movies. ███████████ ████████ Drive-In is a CSS-licensed product offered by a company called Telestream for backing up CSS-scrambled DVDs on Apple computers.  Ex. 18 .  It is promoted for sale on Apple's website. Ex. 19 ("Drive-In is an innovative application that allows you to store your personal DVD movie library on your Mac.").  Kaleidescape has offered its CSS-licensed hardware system for placing back-up copies of CSS-scrambled movies on a home network since 2003.  Ex. 20 at REAL004543; Ex. 4.

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████ A

3   picture of the DVD cover appears, along with a description of the movie, and links to reviews and

4   more information on the DVD.  March 19, 2009 Declaration of Jeff Chasen, submitted herewith

5   ("Chasen Decl.") ¶¶ 4-5.  This information does not come from the DVD itself but is an

6   enhancement created by Real.  *Id.*  Real obtains all this information about the movie, the reviews,

7   and the cover art from a licensed third-party Internet database.  *Id.*; Ex. 21 (Coppinger Dep.) at

8   149:12-17.  When the user has saved several movies, the collection can be browsed by cover art,

9   genre, title, rating, or actors.  Ex. 3 (Glaser Dep.) at 61:18-62:4; March 19, 2009 Declaration of

10  James Brennan, submitted herewith ("Brennan Decl.") ¶ 4.

11       When a movie or television show is playing, the RealDVD Products remember what the

12  viewer has watched, allowing users to stop in the middle then pick up later where they left off.

13  Chasen Decl., ¶ 6.  The RealDVD Products will organize a television series by season and

14  episode, and remember which episode was last watched.  *Id.*  They also offer parental controls to

15  make certain selections unavailable to children.  The RealDVD Products add these enhancements

16  to the movie and television watching experience to make the user's DVD collection more

17  accessible, more reliable and more enjoyable to use.  In short, the RealDVD Products permit

18  consumers to conveniently save, manage and play their collection of DVDs, without worrying

19  about storing, damaging or losing the fragile DVD disks.

20       **A.    The RealDVD Products Protect Against Unauthorized Copying**

21       The RealDVD Products offer all of this functionality in a manner compliant with the CSS

22  Agreement and the law.  In fact, the RealDVD Products contain restrictions that protect DVD

23  content far more securely than the CSS technology alone.  For example:



24

25

26

27

28

1

2

3

4

5

6

7 The RealDVD Products are designed only for fair use, and Real specifically reminds users of this

8 purpose. Ex. 3 (Glaser Dep.) at 170:12-171:4. Before users purchase a RealDVD product, they

must contractually agree: "You may use the saving functionality of the Software only with

9 DVDs that you own. You may not use the Software to save DVDs that you do not own, such as

10 rental or borrowed DVDs." Ex. 22 at § 2(b). Users running the RealDVD Products are also

11 presented with an "admonition screen": "RealDVD should only be used to save discs you own.

12 If you do not own this DVD, please select Play."

13

14

15

16 

17

18

19

20 The RealDVD Products also preserve the FBI Warning Screen that warns viewers that

21 unauthorized copying is strictly prohibited and a punishable criminal offense. Most importantly,

22 the RealDVD Products are built to prevent piracy. They make a secure copy of a movie for the

23 owner's personal use and lock that copy to a single hard drive – but do not permit further

24 dissemination of DVD content.

25

26

27

28

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  █████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  █████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████ When a movie is saved to the internal hard

14 drive of a laptop, for example, it is locked there and can only be played from that hard drive, on

15 that computer.  Buzzard Decl., ¶¶ 4, 10. The Vegas software, however, also offers the ability to

16 save the movies to an *external* hard drive.  The hard drive containing the movies may then be

17 removed from the first computer and attached to a different computer ***licensed to the same***

18 ***RealDVD account*** (with a maximum of five licensed computers in total) for playback only.  *Id.*

19 This enables users to play their movies on both their home PC and on the road with their laptop.

20     With Vegas, while the external hard drive may be moved, the digital copy of a saved

21 movie remains locked on the single hard drive where it was originally saved, and thus, it can only

22 be used with *one* computer at a time.  Buzzard Decl., ¶¶ 4, 10.  This is like a DVD, which can be

23 carried from DVD player to DVD player.  If the movie is moved or copied to another hard drive,

24 it will not play.  If it is sent over the Internet or a home network, it will not play.  *Id.*  Nor can the

25 copy be further copied and played back.

26 ████████████████████████████████████████████████

27 ███████████████████████████████████████████████

28 ████████████████████████████████████████████████

C.      **Unlicensed "Ripper" Products Do Not Implement These Protections Against Unauthorized Copying**

There are hundreds of unlicensed products that allow users to copy DVDs but do not implement the protections that the RealDVD Products do.  *See* March 18, 2009 Declaration of Larry Gerbrandt, submitted herewith ("Gerbrandt Decl.") ¶ 7 and Ex. 2 thereto.  Many are offered for free on the Internet.  They do not have a CSS license.  They do not maintain CSS encryption.  They do not have technical restrictions to prohibit sharing of saved content over the Internet.  They do not "lock" the saved content to a particular hard drive to prevent a playable copy from being made of a copy (nor do they lock the copy to a particular user's account).  They do not limit the number of devices on which a saved DVD may be played back.  *See* Gerbrandt Decl., ¶ 7.

The RealDVD Products' limitations and protections against unauthorized copying place them in a completely different category from these widely-available unlicensed DVD rippers, as the following table demonstrates.

| Feature | RealDVD Products | DVD "Rippers" |
|---|---|---|
| Can share playable copy over the Internet | NO | YES |
| Can play saved copy on more than one computer simultaneously | NO | YES |
| Can transmit playable copy to another computer, hard drive or thumb drive | NO | YES |
| Permits playback on unlimited number of computers | NO | YES |
| Can save to a shared network of computers | NO | YES |
| Can save to a portable device (e.g., iPod) | NO | YES |
| Can make a playable copy of a copy | NO | YES |
| Maintains CSS encryption | YES | NO |

Given the availability of rippers and the restrictions imposed by the RealDVD Products, the RealDVD Products are unlikely to appeal to any persons interested in stealing DVD content.  Bresnahan Decl., ¶ 18; Gerbrandt Decl., ¶¶ 7-8, 13.

## V.  THE STUDIOS CHANGED THEIR CIRCUMVENTION THEORIES TO ADD "ARCCOS" AND "RIPGUARD"

Months after the Studios obtained a TRO, recognizing the weakness in their CSS claims, the Studios sought to dramatically alter the focus of their circumvention claims.  In mid-December, just as fact discovery was originally set to close, the Studios indicated their intent to contend that ███████ Vegas circumvent purported "content protection" schemes marketed by Sony DADC and Macrovision as, respectively, "ARccOS" and "RipGuard."  Ex. 23.  The new theories formed no part of the Complaint filed by the Studios, no part of the TRO proceedings, and no part of the temporary injunction that resulted and is still in effect.  In late December, the Court allowed the new ARccOS and RipGuard claims ████████████████████ ████████████ but also extended discovery to allow the parties to prepare.

### A.  Real's Knowledge Of ARccOS and RipGuard

_____

[7]



**B.** **ARccOS and RipGuard Are**

1

2

3          DVD player and DVD software product manufacturers use the DVD Video Specifications

4   to understand how to build products that can access DVDs.  Ex. 28 at ¶¶ 32-34

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28      [8]  These marketing promises have not always been kept.  For example, NBC/Universal has
     only used RipGuard techniques on a handful of DVDs during a six-month trial period in 2006.
                                                                                  (continued...)

1    ██████████████████████████████████████ precludes them

2 from being considered "effective technological measures" under the DMCA.

## VI.   VEGAS WAS MARKETED TO PROMOTE FAIR USE

4    As it prepared to release Vegas (known to the public as "RealDVD"), Real began

5 promoting the product and educating the market (and the movie studios) about its functionality.

6 Understanding that its target market consisted of law-abiding users wishing to make back-up

7 copies of DVDs that they owned, Real marketed Vegas only in the context of fair use copying of

8 the user's own DVD collection.  Gerbrandt Decl. ¶ 14.  None of Real's marketing materials

9 suggest that Vegas could be used to compile libraries of rental or borrowed DVDs – to the

10 contrary, Real explains precisely why RealDVD is "legal" and both advises and requires that users

11 only save DVDs they own.  *Id.*; *see also*, *supra* at 11-12.  Real emphasizes this same point both

12 through the end-user license agreement and on the "admonition screen" when a customer is using

13 ████ Vegas.  *See id.*; Ex. 22.  Real's marketing is entirely consistent with RealDVD's fair use

14 purpose and the opposite of condoning or encouraging piracy.

## VII.   REAL APPROACHED THE STUDIOS BEFORE RELEASING VEGAS

16    Before it launched Vegas, Real contacted the Studios ███████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ██████████████████████

23

24 _____

25    (...continued from previous page)

25 ██████████████████████████████████████████████

26 ██████████████████████████████████████████████

27 ██████████████████████████████████████████████

28 ██████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   [9] Real and the Studios entered a standstill and nondisclosure agreement limiting disclosure of

27   some, but not all, of the parties' discussions.  That agreement no longer binds Real in light of the
      Studios' breach of it, including by disclosing it to the Court in the Central District of California
      (before this case was transferred to the Northern District).  Ex. 35.  To avoid a sideshow on this

28   issue, however, Real is limiting its discussion here, quoting only testimony elicited by the
      Studios, and so doing for no purpose inconsistent with Federal Rule of Evidence 408.

1  ████████████████████████████████████████████████ The

2  Studios could and should take simple steps and work with Real to address this red herring issue –

3  instead, the Studios have exploited it in this litigation.

**ARGUMENT**

4

5  **I.    LEGAL STANDARD**

6          Two tests determine whether to grant a preliminary injunction.  Under the first test, the

7  studios must demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of

8  irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships

9  favoring the plaintiff, and (4) advancement of the public interest (in certain cases)."  *Johnson v.*

10  *Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).  "Alternatively, a court may

11  issue a preliminary injunction if the moving party demonstrates *either* a combination of probable

12  success on the merits and the possibility of irreparable injury *or* that serious questions are raised

13  and the balance of hardships tips sharply in his favor."  *Id.* (citations and quotations omitted).

14  **II.   THE STUDIOS AND DVD CCA HAVE NO LIKELIHOOD OF SUCCESS ON
        THE MERITS**

15

        **A.    Creating Personal Backup Copies of Purchased DVDs is a Fair Use**

16
            At least since the U.S. Supreme Court ruled in *Sony Corp. of Am. v. Universal City*

17  *Studios,* 464 U.S. 417 (1984) that consumers have a fair use right to make a copy of broadcast

18  television using their VCRs, consumers have come to expect that they can make a backup copy of

19  media that they have legitimately obtained.  The policy of permitting a back up copy of digital

20  content is explicitly endorsed in the Copyright Act itself.  Pursuant to Section 117, the owner of a

21  copy of a computer program – and the contents of a DVD are a computer program – is authorized

22  to make an additional copy for archival purposes.[10]  17 U.S.C. §117.

23          That is consistent with what other courts have said about personal backup copies of other

24  types of purchased electronic media.  For instance, in *U.S. v. Elcom Ltd.*, 203 F. Supp. 2d 1111,

25

26  _____

27      [10] A DVD qualifies as a "computer program" under §117.  17 U.S.C. §101 defines a
    "computer program" as "a set of statements or instructions to be used directly or indirectly in a
    computer in order to bring about a certain result."  Any DVD that can be played on a software

28  DVD player (*i.e.*, all DVDs) satisfies that definition.

1    1135 (N.D. Cal. 2002), a case involving "ebooks" (digital books to be read on computers), the

2    court noted:  "Courts have been receptive to the making of an archival copy of electronic media in

3    order to safeguard against mechanical or electronic failure."  The *Elcom* court wrote: "Making a

4    back-up copy of an ebook, for personal noncommercial use would likely be upheld as a non-

5    infringing fair use."  *Id.* at 1135.

6         In *Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072 (9th

7    Cir. 1999), the defendant manufactured and sold a product called the "Rio," a portable device for

8    playing digital music, like the iPod.  *Id.*  Interpreting the Audio Home Recording Act of 1992, not

9    the Copyright Act, the Ninth Circuit noted that "[t]he Rio merely makes copies in order to render

10   portable, or 'space-shift," those files that already reside on a user's hard drive."  *Id.*  This use, the

11   Ninth Circuit concluded, is "paradigmatic noncommercial personal use."  *Id.*

12        When it suits their purposes, the Studios *expressly* permit the copying of digital content.

13   Such was the case during oral argument before the Supreme Court in *Metro-Goldwyn-Mayer*

14   *Studios v. Grokster.  See, supra* at 3.  Likewise, Sony BMG posted the following message on its

15   website:

16        "SonyBMG wants music to be easily transferable to any device that supports secure
          music.  Currently, music from our protected CDs may be transferred to hundreds of
17        such devices, as both Microsoft and Sony have assisted to make the user experience
          on our discs as seamless as possible with their secure formats."
18
19   Ex. 37.

20        Even with movie content, the Studios have created an atmosphere in which consumers

21   believe that back-up copying, as well as space and timing shifting, are authorized.  The Studios

22   provide movie and television content in partnership with cable and satellite companies to

23   consumers, and that content is freely copyable and storable <u>forever</u> using Tivos or other home

24   digital video recorders (DVRs).  Gerbrandt Decl., ¶ 32.  Consumers can also transfer that content

25   to DVD discs or to their computers.  The movie and television content copied in this manner is

26   often *identical* to the content the same consumer might otherwise purchase on a DVD.  *Id.*  The

27   Studios also provide movie and television content on such services as iTunes at the same price as

28   a DVD or less.  Consumers are then free to make unlimited copies of that content, back it up to

     any number of computers, and space-shift that content on up to five of a variety of portable

1  devices. *Id.*, ¶ 5.  Again, that content is often *identical* to the content the same consumer might

2  otherwise purchase on a DVD.  Given this behavior, the Studios are not in a position to claim that

3  copying of this content for time-shifting or space-shifting is not fair use.

4     **B.**  ███████  **Vegas Comply with the CSS Agreement**

5     The core functionality of ███████Vegas ███████████████████████

6  ███████████████████does not violate the CSS Agreement.  The DVD CCA cannot show

7  any likelihood—let alone a substantial one—of prevailing on a theory of breach because: ██████

8  ███████Vegas comply with the CSS Agreement and associated technical documentation; (ii)

9  ████████████████████████████████████████████████████and (iii)

10  given that the CSS Agreement as a quintessential contract of adhesion, it must be construed

11  according to Real's reasonable interpretation and against the DVD CCA.

12     **1.   The CSS Agreement Is A Contract of Adhesion That Must Be
         Construed According to Real's Reasonable Interpretation**

13

14     Because the CSS Agreement is a contract of adhesion, it must be construed consistent with

15  Real's reasonable interpretation of its terms.  Contracts of adhesion are agreements offered by a

16  party of superior bargaining strength on a "take it or leave it basis."  *Ting v. AT&T*, 319 F.3d

17  1126, 1149 (9th Cir. 2003); *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1069-70 (N.D.

18  Cal. 2007).  In this case, access to CSS technology is *essential* for anyone intending to

19  manufacture legally a DVD playback device for CSS-protected discs.  To make a viable DVD

20  product, Real had to acquire a CSS License. Ex. 6 (Pak Dep.) at 49:11-20.  That requirement, and

21  the absence of any alternatives, eliminated Real's bargaining power (and the DVD CCA permitted

22  no bargaining).  *Madden v. Kaiser Found. Hosps.*, 17 Cal. 3d 699, 711 (1976) ("In many cases of

23  adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any

24  realistic opportunity to look elsewhere for a more favorable contract.").  That is no less true

25  because Real is a well-counseled corporation.  Real had no choice but to accept the CSS

26  Agreement as is.  *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 818 (1981).

27     The CSS Agreement is a 'take-it-or-leave-it' contract. ████████████████████

28  ██████████████████████████████████████████████

1   ██████████████████████ Under these circumstances, the CSS Agreement

2   is a "standardized contract, imposed upon the subscribing party without an opportunity to

3   negotiate the terms" – the very definition of a contract of adhesion. *Armendariz v. Found. Health*

4   *PsychCare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000).

5          Because it is a contract of adhesion, it must be interpreted consistent with Real's

6   reasonable expectations of its terms. *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1173

7   (N.D. Cal. 2002) (adhesive agreement will be interpreted according to the reasonable

8   interpretation of the adhering party); *State Farm Fire & Cas. Co. v. Keenan*, 171 Cal. App. 3d 1,

9   14 (1985) (contract of adhesion interpreted in light of the reasonable expectations of the *adhering*

10  parties, and not "from the subjective intent of the people who drew up those policies of

11  adhesion"). Any ambiguities must be interpreted against the DVD CCA. *Acorn*, 211 F. Supp. 2d

12  at 1173; Cal. Civ. Code §1654. The undisclosed subjective intent of the DVD CCA and Studios is

13  irrelevant. *Founding Members of the Newport Beach Country Club v. Newport Beach Country*

14  *Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003); *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit*

15  *Co. of Md.*, 744 F. Supp. 1311, 1315 (D. N.J. 1990) ("[T]he subjective intent of a person drafting

16  a contract is not, by any means, determinative as to the meaning of the contract especially where,

17  as here, the contract is one of adhesion.").

18          **2.      Real's Interpretation of the CSS Agreement Is Reasonable**

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ██████████████████████ Because it is a contract of adhesion, the Real engineers' reasonable

28  interpretation of the CSS License is the interpretation the Court must apply.

### 3.    The RealDVD Products Comply with the CSS Agreement

No claim can be based on any contention that Vegas █████ fails to comply with the General or Technical Specifications.  Those specifications were not properly incorporated into the CSS Agreement, so they imposed no restrictions on Real.[11]  Real nevertheless produced products that fully satisfied those specifications as well as the requirements of the Procedural Specifications and the CSS Agreement itself.

### a.    The RealDVD Products Implement The Required Steps and Comply With The Restrictions Of The CSS Documentation

████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ perform every required function contained within the various documents associated with the CSS Agreement; the products do not perform any function that is forbidden in any of the documents associated with the CSS Agreement; and the products meet all of the stated goals in the various documents associated with the CSS Agreement by performing each and every

---

[11] To incorporate by reference, four requirements must be met: (1) the reference to incorporation must be clear and unequivocal, (2) the reference must be called to the attention of the other party, (3) the other party must consent to the incorporation, and (4) the terms of the incorporated document must be known or easily available to the contracting parties.  *Chan v. Drexel Burnham Lambert Inc.*, 178 Cal. App. 3d 632, 641 (1986) *quoting Williams Constr. Co. v. Standard Pac. Corp.*, 254 Cal. App. 2d 442 (1967); *Cariaga v. Local No. 1184 Laborers Int'l. Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998) (same).  Both the General and Technical Specifications fail to meet these requirements.  As the *Kaleidescape* court found after trial on the merits, the General Specifications are not incorporated by reference into the CSS Agreement.  Ex. 5 at 875.  The General Specifications do not meet any of the four *Chan* requirements: ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████ Thus, the Technical Specifications are also not incorporated into the agreement between Real and the DVD CCA.  *Chan*, 178 Cal. App. 3d at 641; *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 896 (2008).

1    process and providing each and every protection stated as the means to accomplish those goals.



13   As explained by these independent experts and as confirmed by Real's engineers, the RealDVD

14   Products comply with the requirements of the CSS documentation.

15                          b.        **The CSS Agreement Permits**



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      **The Evidence Confirms Real's Interpretation of the Agreement**

The DVD CCA (and Studios) nevertheless contend that the CSS Agreement prohibits playback of DVD content from a hard drive. They base this on the supposed existence of two requirements they wrongly assert are in the CSS documentation: ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████  And, such terms cannot be implied into this contract of adhesion.[12]

There is ample independent evidence that the DVD CCA is wrong and that RealDVD Products' implementation of CSS is reasonable and conforms to the CSS License. Real sought the opinions of two independent experts for purposes of this litigation. One of these experts has deep expertise in software development and the other has deep expertise in cryptography and encryption mechanisms. Bishop Decl., ¶ 1; Felton Decl., ¶ 1. Neither has had any prior affiliation with Real or with the Studios. Both experts reached the same conclusion as Real's engineers – the RealDVD Products' implementation of CSS conforms to the CSS documentation requirements. Bishop Decl., ¶ 3; Felton Decl., ¶ 3.

This conclusion has also been reached by other independent parties unaffiliated with this litigation, including a California Superior Court judge examining identical issues to those raised here. There are also at least three other manufacturers who are CSS Licenses and who offer products designed to make a back-up copy of DVD video content on a hard drive for playback. *See supra* at n.6. The AMX system offers customers the ability to record DVDs onto a server hard drive for playback and is a CSS Licensee. Ex. 17; Ex. 41 at 154-55. Telestream, Inc. (also

---

[12] The CSS Agreement was a negotiated compromise among various industry participants, including the Studios, various consumer electronics companies and various technology companies. Ex. 40. The drafting efforts of these different industries yielded a very detailed and specific set of requirements and prohibitions that cannot be varied through implication. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000) (implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.").

1   CSS Licensee) makes a product, Drive-In, that is similar to Vegas as it allows a user to make

2   locked copy to a computer hard drive.  It is different from Vegas in that the software is for the

3   Mac, as opposed to the PC. ████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████

9       Of course Kaleidescape has also offered a product ██████████ since 2003.

10  Kaleidescape is also a CSS Licensee.  Ex. 20 at REAL004543.  The DVD CCA sued

11  Kaleidescape in 2004 for breach of the CSS Agreement.  The DVD CCA there, as here, claimed

12  that the Kaleidescape system violated the CSS Agreement because it "creates an illegal copy of

13  the DVD disk," it "allows users to play movies without the physical disk" and that a "physical

14  disk is no longer required for playback."  Ex. 41 at 184-186.

15      After a full trial on the merits, Judge Nichols of the Superior Court of California, Santa

16  Clara County, disagreed, finding that the DVD CCA had failed to establish that the Kaleidescape

17  system violated the CSS License.  Ex. 43 at 2; Ex. 5 at 875, 880.  As Judge Nichols noted, the

18  DVD CCA and Studios had hundreds of meetings with the best legal minds – if they wanted to

19  prohibit copying, they surely could have said it.  *Id*. at 878-889 ("But the plaintiff [DVD CCA]

20  had every advantage, the resources of the whole industry . . . I'm not criticizing anybody.  They

21  came together on over a hundred occasions . . . It seemed to me in reading these documents kind

22  of like hedging the bets, that clear, unequivocal, decisive decision was not made.").

23  ████████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████

1 

2 

3 

4 

5 

6 

7 

8 

9       However, because this is a contract of adhesion, these experts' opinions are irrelevant.

10 The question is not whether someone can concoct an interpretation of the CSS documentation that

11 supports the Defendants' interpretation. The question is whether the interpretation of Real's

12 engineers (and of the engineers at AMX, Drive-In and Kaleidescape), of two independent experts,

13 and of Judge Nichols is reasonable.

14       The DVD CCA and the Studios have implicitly admitted that the requirements they would

15 read into the CSS documentation in this case do not exist. Specifically, in May 2007, shortly after

16 Judge Nichol's ruling in the *Kaleidescape* matter in March 2007, certain DVD CCA members

17 sought to amend the Procedural Specifications by adding the following provision:

18 

19 

20 

21 

22 

23 

24 

25 

26 

27 

28

1   ████████████████████████████████████

2   ████████████████████████

3        Because ████████ Vegas satisfy any reasonable interpretation of the license, Defendants

4   have tried to torture the interpretation to create implied terms the license does not contain.  The

5   evidence is, however, overwhelming that a reasonable person would understand the requirements

6   of the Agreement exactly as Real implemented them.  On this contract of adhesion, Real's

7   reasonable interpretation must prevail.

8            **4.      Real Did Not Circumvent CSS Technology Under the DMCA By**
             **Trying to Implement It In Accordance With The License**
9
                 **a.      Even If Real Failed to Comply With the CSS License, There**
10                          **Would Be No Circumvention Claim, Only a Claim For Breach**

11        '   Even if Real's execution of CSS fell short of the specifications (and it does not), there

12   would still be no viable claim for *circumvention* under the DMCA.  The CSS Agreement granted

13   to Real a license to use all intellectual property held by the DVD CCA, including all patent rights,

14   copyrights and trade secret rights, to "use and implement CSS to develop, design, manufacture

15   and use DVD Products that are in the Membership Categories selected by Licensee . . ." and "to

16   distribute, offer to sell, sell, import and otherwise transfer DVD Products made in accordance with

17   this Agreement . . ."  Ex. 8, § 2.1 (a)-(b).  As a licensee acting within the scope of its license, Real

18   would at most be subject to a claim for breach of contract if it failed to comply with the

19   specifications of the CSS Agreement.  *See, e.g., Sun Microsystems, Inc. v. Microsoft Corp.*, 188

20   F.3d 1115, 1121 (9th Cir. 1999) ("Generally, a 'copyright owner who grants a nonexclusive

21   license to use his copyright material waives his right to sue the licensee for copyright

22   infringement' and can sue only for breach of contract."); *see also Sun Microsystems, Inc. v.*

23   *Microsoft Corp.*, 81 F. Supp. 2d 1026, 1032 (N.D. Cal. 2000) (license compatibility requirements

24   constitute separate covenants and not conditions of, or restrictions on, the license grant); *Jacobsen*

25   *v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008) (where terms of license are "merely covenants,"

26   they are "governed by contract law.").  There can be no claim for circumvention; especially here,

27   where Real has gone to great lengths to preserve and enhance CSS.

28

1    Transforming an alleged breach of contract into a DMCA violation would be particularly

2 inappropriate given the contract at issue and the ramifications of a DMCA violation. As noted,

3 every entity intending to manufacture a CSS product is *required* to obtain a CSS license and to

4 implement CSS according to the terms of that license, without any assistance understanding those

5 terms – which are confusing and complex – from its licensor, the DVD CCA. The court in

6 *Kalidescape* itself had difficulty understanding the CSS Agreement, and found that it did not

7 impose obligations upon Kaleidescape which were "sufficiently definite for the Court to know

8 what to enforce." Ex. 5 at 880. The Studios' view of the law would transform a breach of the

9 license into a crime. 17 U.S.C. §1204. Even if Real failed to implement the CSS specification in

10 some way, it cannot, therefore, be considered a circumvention in violation of the DMCA.

11    **b.    Faithful Implementation of the CSS Technology Cannot Violate the DMCA**

12

13    Here, however, Real did comply. And, Real's <u>successful</u> implementation of the CSS

Technology also cannot constitute circumvention of a technology. █████████████████

14 ███████████████████████████████████████████████████

15 Real, as a CSS Licensee, received a license to "use and implement" that technology. *Id.* at

16 § 2.1(a). And the RealDVD Products, as discussed above, implement and comply with the

17 requirements and prohibitions set forth in the CSS documentation. Thus, there can be no claim for

18 "circumvention" of CSS technology that the RealDVD Products implement correctly. To describe

19 technology that faithfully implements specifications as circumvention is wrong. No court has ever

20 found a licensee's use of licensed technology to be a circumvention under the DMCA. This Court

21 should not be the first.

22    Analysis of the DMCA confirms that ████ and Vegas do not "circumvent" CSS. Section

23 1201 of the DMCA divides technological measures into two categories addressed separately in

24 subsections (a) and (b). Section 1201(a) relates to measures protecting "access," while §1201(b)

25 relates to technological measures that protect "a right of a copyright owner." Here, ████

26 Vegas do not "circumvent" any access measure or any technological measure that protects "a

27 right of a copyright owner."

28

1        i.    **The RealDVD Products Do Not Violate § 1201(a)**

2        The access provision, Section 1201(a), provides that "[n]o person shall circumvent a

3    technological measure that effectively controls access to a work protected under this title." As

4    defined in §1201(a), "to 'circumvent a technological measure' means to descramble a scrambled

5    work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a

6    technological measure, without the authority of the copyright owner." 17 U.S.C. §1201(a)(3)(A).

7        This provision has been analogized to a prohibition against breaking and entering.  As

8    discussed in the House Committee Report on the DMCA: "The act of circumventing a

9    technological protection measure put in place by a copyright owner to control access to a

10    copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a

11    copy of a book." H.R. Rep. No. 105-551, pt. 1, at 17 (1998).  In contrast, it is not circumvention

12    to use the keys to open the door.

13        Courts have declined to apply §1201(a) to situations where even *unauthorized* persons use

14    the technology, so long as they do not break or impair it.  In *I.M.S. Inquiry Mgmt. Sys. Ltd. v.*

15    *Berkshire Info. Sys.*, 307 F. Supp. 2d 521 (S.D. N.Y. 2004), the court held that it was not a

16    circumvention under 1201(a) to use a password to access the website even though the defendant

17    was not authorized to use the password.  The court noted that by using the password the defendant

18    "did not surmount or puncture or evade any technological measure" to gain access to plaintiff's

19    website; "instead, it used a password intentionally issued by plaintiff to another entity." *Id.* at

20    533.  The court went on to hold that "[w]hatever the impropriety of defendant's conduct, the

21    DMCA and the anti-circumvention provision at issue [§1201(a)] do not target this sort of

22    activity." *Id.*; *see also Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 113-14 (D.D.C.

23    2005) ("using a username/password combination as intended-by entering a valid username and

24    password, albeit without authorization-does not constitute circumvention under the DMCA.");

25    *Healthcare Advocates, Inc. v. Harding, Early, Follmer & Frailey*, 497 F. Supp. 2d 627, 646 (E.D.

26    Pa. 2007) ("lack of permission is not a circumvention under the DMCA").

27    ████████████████████████████████████████

28    ████████████████████████████████████████

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████

4      Real also does not violate the DMCA because Real is *authorized* to use CSS.  As defined

5 in §1201(a), one can only circumvent a technological measure if it does so "without the authority

6 of the copyright owner."  17 U.S.C. §1201(a)(3)(A).  As a CSS licensee, Real has the authority to

7 "use and implement" CSS on DVD Products, which expressly includes the DVDs with Studio

8 content.  Ex. 8 §§ 2.1(a), 1.15.  For this additional reason, Real does not circumvent CSS under

9 §1201(a).  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir.

10 2004) ("[O]ne would not say that a lock on any door of a house 'controls access' to the house after

11 its purchaser receives the key to the lock."); *compare 321 Studios v. MGM Studios, Inc.*, 307 F.

12 Supp. 2d 1085, 1096 (N.D. Cal. 2004) ("321's software does not have [a CSS] license, and

13 therefore does not have the authority of the copyright owner.").

14          **ii.     The RealDVD Products Do Not Violate § 1201(b)**

15      Section 1201(b) prohibits persons from making products that are "primarily designed or

16 produced for the purpose of circumventing protection afforded by a technological measure that

17 effectively protects a right of a copyright owner."  "To 'circumvent protection afforded by a

18 technological measure' means avoiding, bypassing, removing, deactivating, or otherwise

19 impairing a technological measure."  17 U.S.C. §1201(b)(2)(A).  The circumvention inquiry under

20 §1201(b) is whether the products avoid, bypass, remove, deactivate, or impair CSS.  The products

21 do not because, as discussed above, the products perform each CSS step when and as required and

22 they preserve CSS encryption.  They thus do not "circumvent" CSS under §1201(b).

23      In addition, § 1201(b) only concerns the circumvention of "a technological measure that

24 effectively protects a right of a copyright owner."  The RealDVD Products do not circumvent any

25 "right of a copyright holder." ███████████████████████████████

26 ███████████████████████████████████████████████████████

27 ███████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████████████

2 ████████████████████████████████ As explained in the

3 legislative history of the DMCA: "[I]f an effective technological protection measure limits access

4 to the plain text of a work only to those with authorized access, but provides no additional

5 protection against copying . . ., then a potential cause of action against the manufacturer of a

6 device designed to circumvent the measure lies under subsection 1201(a)(2), but not under

7 subsection 1201(b)." S. Rep. No. 105-190, at 12 (1998). ███████████████████

8 ███████████████████████████████████████████████████████████

9 ████████████████████████████████████████████

10      **C.      The Studios Cannot Show A Likelihood of Success On The New Theories
              Regarding ARccOS and RipGuard**

11         In their counter-complaint and in the TRO, the Studios contended that only CSS was

12 circumvented. Having learned through discovery that Vegas and ████ implement CSS according

13 to the terms of the CSS Agreement, the Studios have turned to two third-party products called

14 "ARccOS" and "RipGuard" to find something that might be "circumvented" in violation of the

15 DMCA. ARccOS (marketed by Sony DADC) and RipGuard (marketed by Macrovision) are the

16 brand names used to describe ██████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ██████████████████ The Studios cannot show a likelihood of establishing that Vegas ████████

22 circumvents ARccOS or RipGuard.

23

24

25 _____

26 [13] This case bears no relation to *Universal City Studios Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), or to *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004), where the

27 products at issue were placing ***unscrambled*** and ***unencrypted*** copies of DVD content on a hard drive in contravention of the CSS requirements. That is not what the RealDVD Products do; and

28 they even add additional encryption so the movie can never be compromised, even by those who are able to break CSS encryption.

1   **1.    ARccOS And RipGuard Techniques Are Not Eligible For DMCA**
         **Protection Because** ████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   Consequently, they do not constitute *effective* technological measures under the DMCA.  Sections

5   1201(a) and (b) both prohibit only the circumvention of technological measures that are

6   "effective."  Section 1201(a) prohibits products that circumvent technology that "effectively

7   ***controls access*.***"  Section 1201(b) prohibits products that circumvent technology that "effectively

8   ***protects a right of a copyright owner*.***"  ████████████████████████████████████.

9       A technology that "restricts one form of access, but leaves another route wide open" does

10  not "effectively" control access.  *Lexmark*, 387 F.3d at 547 (vacating grant of preliminary

11  injunction).  The *Lexmark* court analogized the DMCA to a partially-locked house and held:

12      [§1201(a)] does not naturally apply when the 'work protected under this title' is
        otherwise accessible. Just as one would not say that a lock on the back door of a house
13      'controls access' to a house whose front door does not contain a lock and just as one
        would not say that a lock on any door of a house 'controls access' to the house after its
14      purchaser receives the key to the lock, it does not make sense to say that this provision of
        the DMCA applies to otherwise-readily-accessible copyrighted works.
15

16  *Id.  Lexmark* was explicitly addressing §1201(a) (access), but the analysis is equally applicable to

17  the § 1201(b)(right of a copyright owner).  The opinion recognized that a copyright owner can

18  invoke the anticircumvention statute only if the copyright owner has actually prevented the

19  "'ability to [] obtain' a copy of the work."  *Id.*  The various ARccOS and RipGuard techniques

20  cannot be considered an "effective" protection under § 1201(a) or (b ██████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25

26  _____

27  [14] ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████



2.      Vegas Do Not "Circumvent" ARccOS and RipGuard

-36-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17        **b.     Vegas**

18

19

20

21

22

23

24

25

26

27

28

1 ████████████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████████

4     ████████████████████████████████████████

5 █████████████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████████████████████████████

8 ██████████████████████████████████████

9 █████████████████████████████████████

10 ████████████████████████████████████

11     ██████████████████████████████████████████

12 ██████████████████████████████████████

13 █████████████████████████████████████████

14 █████████████████████████████████████████

15 █████████████████████████████████████████

16 ████████████████████████████████████████

17 █████████████████████████████████████████

18 ████████████████████████████████████████

19 ██████████████████████████████████████████

20 ████████████████████████████████████

21 **3.** ████████ **Vegas Are Not Primarily Designed, Used or Marketed for Use with Discs Containing ARccOS or RipGuard**

Regardless of ████████████ that are put on ARccOS or RipGuard DVDs or the method of operation of ██████ Vegas, the RealDVD Products do not violate § 1201(b) for the further reason that DVDs with ARccOS and RipGuard ████████████████ ████████████.

Section 1201(b) is only directed to a product that is "primarily designed or produced for the purpose of circumventing"; "has only limited commercially significant purpose or use other than to circumvent"; or "is marketed … for use in circumventing." 17 U.S.C. §1201(b)(1). Such

1 | is not the case here



24 | On this record, there is no basis to conclude that the RealDVD Products were primarily designed

25 | for the purpose of "circumventing" "ARccOS" and "RipGuard," because they were not.

26 | **4.    Neither ARccOS Nor RipGuard "effectively protects a right of a copyright holder"**

27 | Under §1201(b)(1), a technological measure "effectively protects a right of a copyright

28 | owner" if "the measure, in the ordinary course of its operation, prevents, restricts, or otherwise

1    limits the exercise of *a right of a copyright owner under this title.*" 17 U.S.C. §1201(b)(1).

2    Neither ARccOS nor RipGuard "effectively protects a right" here because ███████ RealDVD

3    do not have any effect on the rights of a copyright holder: the Studios have no right to prevent

4    consumers from exercising their fair use right to the back-up copy that ██████ Vegas enable.

5        In enacting the DMCA, Congress maintained the balance between protection of content

6    holders and protection of users. The text of the DMCA itself protects consumers' rights,

7    including fair use. By definition, a technological measure can only be circumvented under

8    §1201(b) if it "protects a right of a copyright holder under this title." A copyright owner does not

9    have the right to prohibit fair use. Section 1201(c) of the DMCA emphasizes that the

10    circumvention provisions cannot be used to undermine consumers' rights:

11        "Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright
infringement, including fair use, under this title."

12

13    The exclusive rights of copyright owners are enumerated in §106 of the Copyright Act and are

14    expressly "subject to sections 107 through 122." 17 U.S.C. §106. Section 107 is entitled

15    "Limitations on Exclusive Rights: Fair Use" and defines fair use rights. 17 U.S.C. §107. The

16    rights of copyright holders are, therefore, expressly defined in § 106 to *exclude* those rights

17    preserved for others, including under the doctrine of fair use. *See Sony Corp. of Am.*, 464 U.S. at

18    447 (discussing statutory framework).

19        To the extent ARccOS or RipGuard interfere with a consumer's exercise of their fair use

20    right, they are not "effectively protect[ing] a right of a copyright owner under this title" and

21    therefore cannot be circumvented under §1201(b)(1).[16] Section 1201 is designed to eliminate

22    tools that permit unauthorized copying of copyrighted works. This provision did not expand the

23    copyright owner's rights, or take away consumers' rights. *See Chamberlain Group, Inc. v. Skylink*

24    *Techs., Inc.*, 381 F.3d 1178, 1202 (Fed. Cir. 2004) ("The DMCA does not create a new property

25    right") (emphasis omitted). As the Federal Circuit observed in *Chamberlain*, the legislative

26

27

28      [16] This analysis applies equally to any claim of circumvention under § 1201(b) with respect
to CSS, where the RealDVD Products are only making a back-up copy.

1   history and statutory structure reveal that the DMCA does not rescind "the basic bargain granting

2   the public noninfringing and fair uses of copyright materials." *Id.*

3        Nor does the DMCA impose liability on entities, like Real, whose products do not

4   facilitate infringement but are rather designed to facilitate fair use rights. *Id.* at 1195 ("defendants

5   whose circumvention devices do not facilitate infringement are not subject to § 1201 liability");

6   *see also Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318

7   (Fed. Cir. 2005) (explaining that the DMCA does not create a new source of liability where

8   underlying copyright law is not at risk; "[C]ourts generally have found a violation of the DMCA

9   only when the alleged access was intertwined with a right protected by the Copyright Act.");

10  *Lexmark,* 387 F.3d at 562 (concurring opinion) ("[I]f the district court on remand were to find that

11  the merger, scenes a faire, or fair use doctrine supplied an adequate defense to infringement, given

12  the copying that went on in this case, I do not believe Plaintiff could meet its burden to show

13  likelihood of success under 17 U.S.C. § 1201(b), because there would be no "right of a copyright

14  owner" to prevent the [toner loading program's] use in this fashion." ).

15       If the Studios were to prevail in their claim that Vegas ▮▮▮▮ circumvent ARccOS or

16  RipGuard, they will have succeeded against products whose sole intent and function is to permit

17  non-infringing fair use back up copies.  That result cannot be squared with the language of the

18  statute or Congress's intent to maintain the balance between copyright owners and users.

19  **III.   THE BALANCE OF HARMS REQUIRES DENIAL OF A PRELIMINARY
        INJUNCTION**

20
21       In considering a preliminary injunction, a district court must "identify the harms which a

22  preliminary injunction might cause to" the party opposing the preliminary injunction and weigh

23  them against the other party's threatened injury. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l

24  Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (reversing and remanding grant of a

25  preliminary injunction for, among other things, failing to identify and weigh the harms that would

26  befall the non-movant); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 678 (9th

27  Cir. 1988) (same).  Further, the court "must consider the public interest as a factor in balancing the

28  hardships when the public interest may be affected." *Caribbean,* 844 F.2d at 674.  The balance in

    this case overwhelmingly militates against entry of an injunction.

**A.      The Studios Have Failed to Demonstrate Any Cognizable Harm, Much Less Irreparable Harm**

**1.      There is No Presumption of Irreparable Harm**

The presumption of irreparable harm formerly applied by some courts in copyright infringement cases has never applied in circumvention cases. *See, e.g., RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070, 2000 WL 127311, at *6 (W.D. Wash. Jan. 18, 2000).  Even with respect to copyright cases, the presumption is no longer valid after the Supreme Court decision in *eBay Inc. v. MercExchange*, 547 U.S. 388, 392-93 (2006).  *eBay* rejected the notion that a presumption could substitute for a careful analysis of the four equitable factors relevant to entry of an injunction in copyright cases. *Id.* at 392-93 (noting that the Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.") (citing cases).[17]

Thus, to be entitled to the extraordinary relief of a preliminary injunction, the Studios and DVD CCA must establish "a significant threat of irreparable injury." *Oakland Tribune, Inc. v. The Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Los Angeles Mem'l Coliseum*, 634 F.2d 1197 at 1201 (district court abused discretion in granting preliminary injunction without showing of irreparable injury).  Speculation that harm may occur does not satisfy the standard. *Carribbean*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").  The Studios and DVD CCA have not come close to meeting this standard.

The Studios cannot claim harm resulting from the use of these products to backup their own DVDs.  Any such "harm" is not cognizable. *See supra* at 20-22.  Instead, the Studios claim that these products may be used by consumers to steal copies of movies that they do not own.

---

[17] Although *eBay* concerned a permanent injunction, its rationale applies in the context of preliminary injunctions too.  The *eBay* Court relied on the *Amoco* case, which held that presumption of irreparable harm for a preliminary injunction is "contrary to traditional equitable principles." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  In *MGM v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214 (C.D. Cal. 2007) the court applied *eBay* and *Amoco* to conclude "there is no language in the text of the Copyright Act that would permit a departure from traditional equitable principles such that a presumption of irreparable harm would be allowed in *any* injunctive context." 518 F. Supp. 2d at 1214 (*emphasis added*).

**2.    There is No Evidence that the RealDVD Products will Hurt Studio Sales**

The Studios have *no evidence* that RealDVD would hurt Studio sales at all, much less increase any "piracy." To the contrary, ████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████ The harm analysis need go no further. Without evidence of imminent harm, the Studios' request for an injunction must be denied. *Oakland Tribune*, 762 F.2d at 1377.

This lack of evidence is unsurprising. Given the reality of the marketplace and the stringent content protections provided by RealDVD, it is unlikely these products would be used for the illegal conduct the Studios must posit to conjure up some harm.

**3.    The Studios Have Adduced No Evidence that RealDVD Will Appeal To Users Interested In Stealing Movies**

Persons interested in stealing movies already have many free available alternatives for obtaining, transferring and distributing digital content. The overwhelming majority of piracy in the United States occurs on P2P networking sites like BitTorrent. Gerbrandt Decl., ¶9. High quality copies of movies are commonly available over the Internet during the "theater window," long before those movies are available for sale to consumers on DVDs. *Id.*, ¶¶9-11. Such piracy would obviously be unaffected by RealDVD – which can only be used to save movies released on DVD, and does not allow sharing over the Internet. Gerbrandt Decl., ¶¶ 10-11.



1    In addition to P2P piracy, there are literally hundreds of software products that allow DVD

2    content to be "ripped" from DVDs so as to be saved to a hard drive without any encryption.  *See*

3    Gerbrandt Decl., ¶7 and Ex. 2; Bresnahan Decl., ¶ 7.  Such products are neither hard to find nor

4    difficult to use.  They may be purchased in mainstream retail outlets such as Best Buy or Costco,

5    downloaded (often for free) from the Internet, and are commonly reviewed in mainstream

6    magazines.  Bresnahan Decl., ¶ 19; Gerbrandt Decl., ¶7.

7    Unlike copies made using RealDVD, movies downloaded from the Internet or copied

8    using DVD rippers are generally free from CSS encryption and other forms of digital rights

9    management.  They can thus be freely re-copied and shared (including over the Internet), burned

10   onto DVDs, and played on a variety of mobile devices, including iPods, PDAs, laptop computers

11   and cell phones.  Gerbrandt Decl., ¶ 7.

12   Piracy is of course unacceptable even though it is widespread.  But RealDVD is aimed at

13   an entirely different user from someone who would pirate a movie, and it will not increase the

14   Studios' piracy issues.  For those consumers who are willing to make unlicensed copies or engage

15   in piracy, RealDVD offers no benefit that has not been available for years.  Bresnahan Decl., ¶ 17;

16   Gerbrandt Decl., ¶ 6.  For the unlawful copier, Vegas ███████ are inferior products: they provide

17   no flexibility regarding the device on which the consumer can watch the movie; do not allow the

18   user to share the movie over the Internet; and do not allow a copy of the copy to be made.  They

19   are, therefore, unlikely to appeal to persons interested in stealing movies or engaging in movie

20   piracy.  Bresnahan Decl., ¶ 18; Gerbrandt, ¶ 8.

21   The likely consumers of Vegas ██████ are those who care about legality, actively avoid

22   stealing movie and television content, and are simply looking to make a backup or convenience

23   copy of what is notoriously fragile, cumbersome and inconvenient to use in today's digital world –

24   a DVD disc.   Bresnahan Decl., ¶ 13; Gerbrandt, ¶ 8.  This is fair and permissible use, not piracy,

25   and it causes no cognizable harm to Defendants.  Moreover, because the presence of RealDVD

26   ██████ increases the value of purchased DVDs to these law abiding consumers (by adding

27   numerous convenience and safety benefits to purchased DVDs), they will tend to increase the

28   demand for purchased DVDs.  Bresnahan Decl., ¶ 16; Gerbrandt Decl., ¶ 19.

**4.      The Studios Have Adduced No Evidence that Consumers of RealDVD Will "Rent-Rip-and-Return"**

Vegas ███████ forbid "rent-rip-and-return" and Real's own studies have shown that its customers are unlikely to engage in such behavior. Gerbrandt Decl., ¶14 and Ex. 5. The Studios have no evidence to the contrary. Even if such behavior occurred, however, there is no evidence it would harm the Studios. The Studios would only be harmed by the copying of a rental disc if the copying (a) would not have occurred but for the RealDVD Products and (b) displaced a sale of the same movie. Gerbrandt Decl., ¶ 16. First, there is no evidence that consumers who do not steal would be made dishonest by the RealDVD Products. Second, there is no evidence that customers who have just rented (or borrowed) a movie would purchase the same movie absent the availability of the Products. Actual consumer behavior is to the contrary. The decision to buy or rent a movie depends in large part on whether the consumer wishes to own the physical copy of the DVD. Thus, it is the renting decision itself that displaces any purchase of the movie, not the theoretical ability to copy the rented movie onto a hard drive. Gerbrandt Decl., ¶ 17.

The Studios' own behavior provides persuasive evidence that rent-rip-and-return is not a significant concern, and certainly does not constitute imminent irreparable harm. The Studios have raised the specter of rent-rip-and-return for years. But, the Studios could have ████

███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

**B.      ARccOS and RipGuard Are ██████████████████████████ Cannot Justify An Injunction Under Any Circumstances**

No injunction could be based on alleged circumvention of ARccOS and RipGuard because

███████████████████████████████████████
███████████████████████████████████████████

1   ███████████████████████████████████████████.  The balance of

2   hardships requires denial of an injunction under these circumstances. *Belushi v. Woodward*, 598 F.

3   Supp. 36, 37 (D.C.D.C. 1984) (denying TRO for lack of irreparable injury where one photo in

4   defendant's book infringed copyright); *Miller Harness Co. v. Arcaro & Dan's Saddlery, Inc.*, 142

5   F. Supp. 634, 635 (E.D.N.Y. 1956) (denying injunction where only 25 of over 2000 items in a

6   catalog possibly infringed plaintiff's copyright); *see also z4 Techs., Inc. v. Microsoft Corp.*, 434 F.

7   Supp. 2d 437 (E.D. Tex. 2006) (money damages suffice where infringing component only small

8   portion of product).  This is particularly true considering the millions of consumers using the

9   billions of DVDs ███████████████ who would be deprived of use of Real's

10   innovative products.  For this reason alone, no injunction can issue based on alleged

11   circumvention of ARccOS or RipGuard.

        **C.**    **Any Harms Claimed by the Studios Would Be Compensable In Damages And Would Not Justify An Injunction**

13         Even if RealDVD would hurt the Studios by displacing DVD sales, that harm could be

14   quantified.  The ability to quantify damages precludes a preliminary injunction.  *See, e.g., Cotter*

15   *v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989) ("Injuries compensable in monetary

16   damages are not normally considered irreparable") (internal quotation markets and citation

17   omitted); *Reilly v. Medianews Group, Inc.*, No. C 06-04332, 2006 WL 2419100, at *5 (N.D. Cal.

18   July 28, 2006) ("It is well established, however, that an injury that is solely financial and that is

19   compensable by monetary damages cannot constitute irreparable injury.").

20         Damages – if any – could be calculated.  Klein Decl., ¶¶ 7, 12.  This would involve

21   considering the following factors:   (1) the differential in price received between the lost product

22   sales attributable to RealDVD and the actual product sales; (2) costs associated with lost product

23   sales and actual product sales to compute lost profits; (3) the size of the population subset that

24   engages in behavior leading to diverted sales; and (4) the quantity of sales diverted by this

25   population subset. *Id.*, ¶¶ 8-11, 13-16.  The data to determine these factors are readily available:

26   the Studios track and forecast price and cost data. *Id.*; *see also* Gerbrandt Decl., ¶¶ 20-22.  If the

27   data did not already exist, consumer surveys could be used. Gerbrandt, ¶ 21.  If harm from

28   competition were a cognizable injury, that, too, would be compensable in damages.  The Studios

1  have projections of costs, revenues and market share: Mr. Dunn testified that the Studios expected

2  millions of dollars in revenues from its entries in this market.  Ex. 62 (Dunn Dep.) at 76, 79; *see*

3  *also* Gerbrandt Decl., ¶ 28.

4          Lost revenues and future profits are routinely calculated for all manner of litigation.

5  Indeed, it seems certain that if the Studios were to win an injunction, they would certainly come to

6  this Court with a damages calculation that they would claim is reasonable.  Even if not precisely

7  quantifiable, the availability of money damages precludes preliminary equitable relief.  *See, e.g.,*

8  *ICU Med. Inc. v. Alaris Med. Sys., Inc.*, No. SA CV 04-689, 2004 WL 1874992, at *25 (C.D. Cal.

9  July 30, 2004) ("[N]either the difficulty of calculating losses in market share, nor speculation that

10  such losses might occur, amount to proof of special circumstances justifying the extraordinary

11  relief of an injunction prior to trial.").  *Thayer Plymouth Ctr. Inc. v. Chrysler Motors Corp.*, 255

12  Cal. App. 2d 300, 307 (1967) (reversing preliminary injunction where future damages were

13  calculable).

14          **D.      The DVD CCA Has Provided No Evidence of Harm**

15          Like the Studios, the DVD CCA has not and cannot demonstrate irreparable harm.  First,

16  the DVD CCA is not entitled to a presumption of irreparable harm based on Section 9.2 of the

17  CSS Agreement.  A contract provision addressing irreparable harm does not suffice to establish

18  such harm; it is just one factor in the analysis.  *Dominion Video Satellite, Inc. v. Echostar Satellite*

19  *Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("[w]hile courts have given weight to parties'

20  contractual statements regarding the nature of harm and attendant remedies that will arise as a

21  result of a breach of a contract, they nonetheless characteristically hold that such statements alone

22  are insufficient to support a finding of irreparable harm and an award of injunctive relief.").[20]

23  While it may have been the case that breach of certain of the provisions of the CSS Agreement

24  _____

25          [20] *Accord Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001);
   *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a

26  contractual provision that states that the company has suffered irreparable harm if the employee
   breaches the covenant and that the employee agrees to be preliminary enjoined, this by itself is an

27  insufficient prop."); *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y.
   1990) ("It is clear that the parties to a contract cannot, by including certain language in that contract,

28  create a right to injunctive relief where it would otherwise be inappropriate.").

1  (*e.g.*, confidentiality provisions) could have caused irreparable harm to the DVD CCA at the time

2  the Agreement was originally drafted, it is doubtful that is true today.[21]  Regardless, Real is not

3  threatening to disclose any of the DVD CCA's confidential information or doing anything else

4  that would hurt the licensing entity, so the DVD CCA will not be irreparably harmed.

5       The only harm articulated by the DVD CCA is that RealDVD evidences an interpretation

6  of the CSS Agreement contrary to the DVD CCA's interpretation, and may therefore cause other

7  members to question the terms of the Agreement. Ex. 6 (Pak Dep.) at 200:12-22; 196:12-20

8  ("Because since it has gone in a direction that is counter to what the association believes is the

9  correct interpretation, then this notion of a standard agreement that everybody abides by is

10  broken."). Even if questioning the terms of an agreement could ever be considered a cognizable

11  harm, that is not a "harm" caused by Real.  The California Superior Court's decision in the

12  *Kaleidescape* case at least calls into question the DVD CCA's interpretation of the CSS

13  Agreement – and with much greater authority than Real possibly could.  So, too, do the other

14  CSS-licensed products, currently on the market, which allow users to copy DVD content onto a

15  hard drive, including products from Kaleidescape, AMX and Drive In.  *See supra* at n.6.  That the

16  DVD CCA has acquiesced to the continued presence of these products – without any apparent ill

17  effects to its reputation or viability – speaks volumes as to existence of any supposed "irreparable

18  harm" to the DVD CCA caused by Real.  *Id.*, Ex. 6 (Pak Dep.) at 196:12-20; 200:12-22.

19  **E.    The Harm To Real if Preliminarily Enjoined Would Outweigh Any Legitimate Threat to the Studios or DVD CCA**

[21] As the court noted in *DVD Copy Control Ass'n,* 116 Cal. App. 4th at 255, "hundreds" of Web sites had, by 1999 – ten years ago – *already* posted a DVD copying product called DeCSS, "enabling untold numbers of persons to download it and to use it."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1    **F.    An Injunction Would Harm Consumers**

2        Consumers reasonably believe, based in part on the Studios' own actions, that in

3    purchasing a movie or television show on a DVD they have purchased the right to make a

4    personal copy of that content, just as they can make a copy of movies, television shows and other

5    digital content they have legally acquired through other forms of distribution.  That belief is

6    supported by law.  If the Studios prevail here, most consumers will have no legal way to exercise

7    their rights.  A ruling that RealDVD ███████████ illegal would mean that there is no legal way to

8    make a digital copy of a DVD for personal use.  The Studios' attempt to keep RealDVD ███████

9    out of the marketplace harms consumers by withholding innovative and relatively inexpensive

10   products.   Bresnahan Decl., ¶ 23.  An injunction would harm, not further, the public interest.

11       If Real were enjoined, the Studios would have no legitimate competition to their own

12   "digital copy" and "managed copy" solutions.  They could charge monopoly prices for fair use

13   copies, and such prices are not justified by the Studios' copyright grants, taking from consumers

14   (in the Studios' estimation) tens of millions of dollars in the process.  These profits will come

15   from eliminating the consumers' right to copy a DVD they have purchased, and then selling that

16   right back to consumers for a further profit.  Ex. 62 (Dunn Dep.) at 80:14-18; Ex. 62 at ¶¶ 14, 16.

17       Permitting the Studios to appropriate fair use and sell it back to customers would be an

18   improper extension of the copyright rights.  It has long been recognized that such an extension of

19   the intellectual property grant harms the public interest and is contrary to public policy.  *See,*

20   *e.g., Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 976 (4th Cir. 1990).

21                                    **CONCLUSION**

22       For the foregoing reasons, and based on the entire record in this case, the motion for

23   preliminary injunction should be denied and the temporary restraining order dissolved.

24   Dated:  March 23, 2009                    WILSON SONSINI GOODRICH & ROSATI

25                                             Professional Corporation

26

27                                             By: _____/s/_____
                                                        Leo P. Cunningham

28                                             Attorneys for Plaintiffs
                                               REALNETWORKS, INC. and REALNETWORKS
                                               HOME ENTERTAINMENT, INC.