1   Pages 1 - 47

2                      UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4              BEFORE THE HONORABLE MARILYN H. PATEL

5   REALNETWORKS, INC.,                    )
                                           )
6                   Plaintiffs,            )
                                           )
7             vs.                          )NO. C 08-4548 MHP
                                           )
8   DVD COPY CONTROL ASSOCIATES, et        )
    al.,                                   )
9                                          )SAN FRANCISCO, CALIFORNIA
                    Defendant.             )Monday, March 23, 2009
10                                         )2:41 P.M.
    _____)
11                                         )
    UNIVERSAL CITY STUDIOS PRODUCTIONS,)
12                                         )
                    Plaintiffs,            )
13                                         )
              vs.                          )NO. C 08-4719 MHP
14                                         )
    REALNETWORKS, INC.,                    )
15                                         )
                    Defendant.             )
16  _____)

17

                          (HEARING ON MOTIONS)
18  **APPEARANCES:**

19  **For RealNetworks Entities:**

20                    Wilson, Sonsini, Goodrich & Rosati, PC,
                      One Market Street, Spear Tower - Suite 3300
21                    San Francisco, CA 94105
                      (415)947-2200
22                    BY:  **MICHAEL A. BERTA, ESQ.**
                      and  **LEO P. CUNNINGHAM, ESQ.**

23

24  *Reported by:*        *MARGARET "MARGO" GURULE, CSR #12976*
                          *Pro Tem Court Reporter - US DISTRICT COURT*

25

                                                                        1

1    __APPEARANCES CONTINUED__:

2    **For Realnetworks Entities:**

3                     Bartlit, Beck, Herman, Palenchar & Scott
                     1899 Wynkoop Street - 8th Floor
4                     Denver, CO 80202
                     (303)592-3100
5                     BY:  **DONALD SCOTT, ESQ.**

6    **For Disney Enterprises, et al.:**

7                     Munger, Tolles & Olson
                     560 Mission Street
8                     27th Floor
                     San Francisco, CA 94105
9                     (415)512-4032
                     **BY:  ROHIT K. SINGLA, ESQ.**
10                    and  **BART H. WILLIAMS, ESQ.**

11   **For DVD Copy Control Association, Inc.:**

12                    Akin, Gump, Strauss, Hauer & Feld, LLP
                     580 California Street - 15th Floor
13                    San Francisco, CA 94104
                     (415)765-9500
14                    BY:  **REGINALD D. STEER, ESQ.**

15

16

17

18

19

20

21

22

23

24

25

                                                                    2

1        March 23, 2009; 2:42 p.m.; Courtroom #15, 18th Floor

2              TONY BOWSER - Courtroom Deputy

3                     o0o

4                **P R O C E E D I N G**

5        **THE CLERK:**  Calling Civil 08-4548, Civil 08-4719,

6  Realnetworks, Inc. vs. DVD Copy Control Associates, et al.

7        **THE COURT:**  May I have your appearances, please.

8        **MR. CUNNINGHAM:**  Leo Cunningham from Wilson, Sonsini,

9  Goodrich & Rosati on behalf of the RealNetworks entities, and I

10  have some other people to introduce, if I may.

11        **THE COURT:**  Yes.

12        **MR. CUNNINGHAM:**  So to my right is Robert Kimball.

13  Mr. Kimball is the Senior Vice-President and General Counsel of

14  RealNetworks.  He came down from Seattle at the Court's

15  direction for this hearing.

16        **THE COURT:**  Very good.  Thank you.

17        **MR. CUNNINGHAM:**  And also here is William Way.

18        **THE COURT:**  You guys are going to have some

19  responsibilities when you walk out of here today.  Yes.

20        **MR. KIMBALL:**  Thank you.

21        **MR. CUNNINGHAM:**  William Way is the Deputy General

22  Counsel from RealNetworks who also came down from Seattle for

23  the hearing.

24        **THE COURT:**  And thank you.

25        **MR. CUNNINGHAM:**  And to my left is new counsel

PDF created with pdfFactory trial version www.pdffactory.com

1   joining our team, Mr. Don Scott, from the Colorado Bar, who has

2   been admitted pro hac vice for this matter.

3          **MR. SCOTT:**  Good afternoon, Your Honor.

4          **THE COURT:**  Good afternoon.

5          **MR. CUNNINGHAM:**  And I believe my partner, Mike

6   Berta, is also here.

7          **THE COURT:**  Yes.  Good afternoon.

8          **MR. WILLIAMS:**  Good afternoon, Your Honor.  Bart

9   Williams on behalf of the defendants and counter-complainants,

10  Motion Picture Studios.

11         **THE COURT:**  Good afternoon.

12         **MR. STEER:**  And I'm Reginald Steer on behalf of the

13  DVD Copy Control Association, Your Honor.

14         **THE COURT:**  Good afternoon.  Who is going to be heard

15  on the motion to dismiss?

16         **MR. CUNNINGHAM:**  Your Honor, we attempted to withdraw

17  that motion on Friday.

18         **THE COURT:**  Oh, really?  Um-hum.  Okay.

19         **MR. STEER:**  And we stated to counsel that we did not

20  oppose the withdrawal of their motion.

21         **THE COURT:**  Well, I would assume that if they're

22  going to withdraw it, you don't have any opposition.  Is that

23  right, Counsel?  And excuse me.  Well, that makes it easy,

24  because you probably would have lost that one anyway.  And

25  maybe you saw the handwriting on the wall on that one.  But I

4

1   don't know about how you can decide, you know, whether it's a

2   contract of adhesion or not on a motion to dismiss.  You need a

3   few facts.

4           **MR. CUNNINGHAM:**  I thought that might be the case,

5   Your Honor, and I'm sorry we put you through the effort of

6   figuring that out.

7           **THE COURT:**  Well, we might just issue the order

8   anyway, but we'll see.

9           **MR. STEER:**  We would not object to that, Your Honor.

10          **THE COURT:**  We will weigh that one over, having gone

11  through it.  So then what we're in here about is both, I guess,

12  setting a new date for the preliminary injunction motion, which

13  at this point seems like we should be up to the permanent

14  injunction motion.  And then the discovery that goes -- you

15  know, the issues, I guess, that go along with that.  Is that

16  correct?  And then, of course, the spoliation issue.

17          **MR. CUNNINGHAM:**  I believe those are the issues, Your

18  Honor.

19          **MR. WILLIAMS:**  That's right, Your Honor.

20          **THE COURT:**  That's correct.  Well, maybe what we

21  ought to do is work from this.  We are going to need a new

22  date.  I understand a whole slew of papers came in, and I don't

23  know what your briefing schedule is or if the briefing is

24  completed on the preliminary injunction.

25          But as you know, I'm not available on the 1st.  And

PDF created with pdfFactory trial version www.pdffactory.com

1    that's awfully short after this.  And I thought you'd probably

2    need some time in between.  In addition, I'm not sure if all

3    the discovery is done for the preliminary injunction motions.

4           MR. SINGLA:  Your Honor, this is Rohit Singla,

5    Munger, Tolles and Olson.  I think I forgot to make an

6    appearance.

7           THE COURT:  You didn't make an appearance.

8           MR. SINGLA:  I apologize, Your Honor.  I believe the

9    discovery is done, substantive discovery, on the motion.  But I

10   understand the Court -- we understand the Court is not

11   available, and we've been speaking to RealNetworks, the Wilson

12   Sonsini firm, about a new date.

13          And I think we have, at least from the defendant's

14   perspective, a date to propose.  We would propose a date at the

15   end of April, we believe April 27th, which I understand is

16   available on the Court's calendar.  I believe that the defense

17   counsel and the witnesses are generally available during that

18   period.

19          THE COURT:  What date?  That's a Monday.

20          MR. SINGLA:  I'm sorry.  Starting on the 28th, then.

21          THE COURT:  Starting the 28th.  I don't know.  Have

22   you checked with Mr. Bowser on that?

23          MR. SINGLA:  We did check with Mr. Bowser.

24          THE COURT:  What did he say?

25          MR. SINGLA:  I believe Mr. Bowser said on Friday,

PDF created with pdfFactory trial version www.pdffactory.com

1    Thursday, that those dates were available.  We do have one

2    witness from the defense side, Ms. Marsha King, we are trying

3    to track down and confirm.  We believe she will be available

4    during that week, but that's one small caveat from our side.

5              I understand from opposing counsel, Mr. Cunningham,

6    that they are available that day except for their new

7    co-counsel.  But we have struggled very mightily over the

8    weekend with Mr. Cunningham to try to find dates that worked

9    for everybody and all the witnesses, and that seems, from our

10   perspective at least, to be the least problematic dates.

11             **MR. STEER:**  Your Honor, if I may add -- it's Reg

12   Steer speaking on behalf of the DVD CCA.  Our expert,

13   Dr. Kelly, is in trial that week.  We think we can work to

14   schedule him so that he can handle both matters.  Nevertheless,

15   our acquiescence is subject to his availability.

16             **MR. CUNNINGHAM:**  Your Honor, that week is problematic

17   for us --

18             **THE COURT:**  Oh, it is?

19             **MR. CUNNINGHAM:**  Yes, it is, because of Mr. Scott's

20   unavailability.  Although he's new to the case, he had arranged

21   his schedule in light of the prior scheduling decisions that

22   had been made, and therefore had to make commitments in at

23   least another court around that week.

24             So I know that he does not have the entirety of that

25   week available.  I don't know whether he can press anything to

PDF created with pdfFactory trial version www.pdffactory.com

1    get some aspect of it available.  So I think you're going to

2    hear that we probably need to do a little bit more conferring.

3    I will note that I think that we had initially been opposed to

4    doing a piecemeal hearing and had requested that the days be

5    continuous or contiguous.  We no longer have any objection to

6    picking days as we can in order to make it a little easier to

7    work with so many lawyers and witness's schedules.

8            **THE COURT:**  Well, what we need to do instead of

9    increasing the number of lawyers is decreasing the number of

10   lawyers, and that might also assist in the objective.

11           But Tony, what does that week, in fact, look like?

12   Can I see the calendar?

13           **THE CLERK:**  Sure.

14           **THE COURT:**  That's the 27th?

15           **THE CLERK:**  That's the 29th.

16           **THE COURT:**  Um-hum.  29th.  Um-hum.  Well, can you --

17   so Tuesday, Wednesday, Thursday are available.  We might be

18   able to do Friday.  I'm not suggesting we're going to take all

19   of those days, but how many days do you think we need?

20           **MR. SINGLA:**  Your Honor, we believe we need two days.

21   The Court had indicated, I believe back in October, that the

22   issues in which the Court was interested in hearing live

23   testimony was the technology, our DVD function.  There is a

24   dispute among the lawyers at least at that time about how it

25   functioned, and also the license and some questions about the

1   license.  And we think both sides can put forward one or two

2   experts and a couple of fact witnesses to deal with that in two

3   days.

4            **THE COURT:**  Now, is this also going to include the

5   Facet technology, as well?

6            **MR. SINGLA:**  Yes, Your Honor.  It's based on your

7   rulings on December 22nd, the last hearing.  We are prepared to

8   discuss and address the Facet issue also.

9            **THE COURT:**  How different is that technology from the

10  Real DVD technology?

11           **MR. SINGLA:**  There are differences.  There are

12  specific differences, for example, on how we believe it

13  circumvents *ARccOS* and *RipGuard*.  But fundamentally they do

14  pretty much the same thing.  And so we think they can be

15  addressed together in one hearing.

16           **THE COURT:**  What do you think?

17           **MR. CUNNINGHAM:**  We have no doubt they can be

18  addressed together in one hearing and should be.  I'm skeptical

19  that we can complete it in two days.  I would have said three

20  and maybe a little bit more.  I'm assuming three full days of

21  evidence when I say a three-day hearing, and assuming there

22  would need to be some additional time before and after for

23  opening and argument.

24           None of the parties have ever worked through, nor

25  have we invited the Court to direct us as to how you feel about

PDF created with pdfFactory trial version www.pdffactory.com

1   openings, closings and further briefing.

2          **THE COURT:**  Openings, we don't need.  You know, we

3   know what this case is about.  Let's just get to the evidence.

4          Closings, I'll give you -- you know, I think it would

5   be helpful probably.

6          **MR. CUNNINGHAM:**  Okay.

7          **MR. SINGLA:**  Your Honor, in terms of the timing and

8   the length of the hearing, from our perspective, we continue to

9   believe this can be done in two days easily.  We put on two

10  experts and a couple of fact witnesses to talk about the

11  technology and the license, maybe some videotapes of some of

12  the witnesses.

13         Now, RealNetworks has identified about 16 or 17

14  witnesses designated for the hearing, 6 experts and something

15  like 9 or 10 fact witnesses.  And very frankly, from our

16  perspective, a lot of that seems very duplicative.  And given

17  that there is extensive briefing, declarations from the various

18  witnesses, depo excerpts, it doesn't seem to us the Court needs

19  three or four days of witnesses coming in and telling the

20  Court -- fundamentally, we believe that, on the technology,

21  there's actually not a lot of room between the experts and the

22  witnesses.

23         I believe the Court will see that there is a lot of

24  agreement about what Real DVD does, some disagreement about how

25  you apply the law to those facts.

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. CUNNINGHAM:**  Your Honor, I believe that the

2   actual number of witnesses we're likely to call is about a

3   quarter of the 16 or so that we've disclosed.  So

4   realistically, I think it's going to be far fewer than that.  I

5   still think it would be a mistake for people to plan their

6   lives as if it will only take two days.

7          **THE COURT:**  Well, what days that week, if any -- I'm

8   sorry, is it Mr. Scott -- yes, you -- are you available?

9          **MR. SCOTT:**  Your Honor, I had a hearing at a court in

10  Delaware set for April 1st and 2nd.  And my request, that Court

11  moved it to -- I'm sorry -- yes, March 30th and April 1st were

12  the dates that the Court gave me.

13         **THE COURT:**  Well, we're talking about the week of

14  April the 27th.

15         **MR. SCOTT:**  My -- I'm sorry.  April 30th and May 1st.

16  I don't have a calendar in front of me.  April 30th and

17  May 1st, whatever days of the week those fall upon.

18         **THE COURT:**  That would be Thursday and Friday, I

19  believe.  Is that correct, Tony?

20         **MR. SCOTT:**  I thought so.

21         **THE CLERK:**  That's correct, Your Honor.

22         **MR. SCOTT:**  I could participate earlier in the week.

23         **THE COURT:**  Tuesday and Wednesday?  Monday, we do fun

24  things like this.  But Tuesday and Wednesday of that week,

25  which would be the 28th and the 29th.  And what's the following

11

PDF created with pdfFactory trial version www.pdffactory.com

1  week like if we didn't quite finish?  I would like to do it as

2  contiguously, consecutively as possible.

3          **MR. WILLIAMS:**  Your Honor, Bart Williams on behalf of

4  the defendants.  I have a trial starting on May 4th, Monday,

5  May 4th in Los Angeles.

6          **THE COURT:**  Is it going to go?

7          **MR. WILLIAMS:**  I think so.

8          **THE COURT:**  May I look at your calendar, Bart?

9          **MR. WILLIAMS:**  Sure.

10         **THE COURT:**  If we back up and -- April 30th.

11         **MR. CUNNINGHAM:**  Your Honor, while you're looking, my

12  understanding was that the prior week, the reason it was

13  problematic for certain of the parties was the unavailability

14  of a particular expert witness.  It may be more than that, and

15  I don't mean to belittle anyone's schedule.

16          So that made me invite the consideration that if we

17  could stagger the days, perhaps we could even move things up a

18  little bit, go without the witness who I understood is an

19  expert named Tollar, I think with an A-R, and then perhaps pick

20  up that week of the 27th.

21         **THE COURT:**  Well, that's what we were just looking to

22  see, if we could put it on some Thursday or Friday?

23         **THE CLERK:**  Thursday we have a hearing at 2:30.

24         **THE COURT:**  That's in the afternoon?

25         **MR. SINGLA:**  Your Honor, perhaps we could --

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:** Could we do Friday and then Tuesday and

2    Wednesday of the following week?

3          **MR. SCOTT:** Yes.

4          **MR. CUNNINGHAM:** Yes.

5          **THE COURT:** Would that work?

6          **MR. WILLIAMS:** That would work for us, Your Honor.

7          **THE COURT:** Then why don't we plan that? So it will

8    be Friday the 24th and then Tuesday and Wednesday, the 28th and

9    29th. Okay?

10          **MR. STEER:** Again, Your Honor, those dates are all

11   difficult for our expert, Dr. Kelly. And so subject to his

12   availability, what I would like to have, you know, is a

13   representation of some flexibility among the parties that we

14   may need to put him on out of order in order to accommodate

15   him.

16          **MR. CUNNINGHAM:** No problem.

17          **THE COURT:** Well, that's fine. It's a bench hearing.

18          **MR. STEER:** Of course.

19          **THE COURT:** But tell him to be available one of those

20   days, whichever one it is, I don't care.

21          **MR. SINGLA:** Would the Court expect the schedule to

22   be 8:00 to 1:00 or 9:00 to 2:00 or something like that on those

23   days?

24          **THE COURT:** We might just do it most of the day, you

25   know, because it's -- you know, I do that -- I have that

13

PDF created with pdfFactory trial version www.pdffactory.com

1   practice with respect to jury trials for the convenience of the

2   jurors.  So I would rather just get through this rather than

3   use that other schedule.  So probably it would be 8:30 or 9:00

4   to 4:00, 4:30 or 5:00, whatever.

5           **MR. SINGLA:**  Your Honor, then one last issue before

6   we turn to the spoliation issues, just one procedural issue

7   that we'd like to raise.  If it's true that RealNetworks would

8   really only be having four or so witnesses out of the sixteen

9   or so they've designated, we'd like to get those names so that

10  we can start preparing, we can decide which witnesses we need

11  to bring, start getting all those schedules done.

12          And we haven't been able to get to an agreement with

13  the other side about disclosure and exchange of witness names

14  for live testimony.  So I would ask the Court if there is a way

15  to have an agreement that those names be disclosed in the next

16  day or two so that we can start planning.

17          **THE COURT:**  Well, we can set some dates by which

18  those things need to be accomplished --

19          **MR. SINGLA:**  Thank you, Your Honor.

20          **THE COURT:**  -- and also the briefing schedule.  But

21  before doing that, I understood there were some issues with

22  respect to this -- the nonCSS technologies and whether there

23  was still some remaining discovery with regard to -- was it

24  ARccOS and -- the other name is escaping me.

25          **MR. CUNNINGHAM:**  RipGuard.

14

1          **THE COURT:**  RipGuard.  How could I forget that?  But

2    wasn't there some discovery issues with regard to getting that

3    done before the preliminary injunction?

4          **MR. SINGLA:**  I believe the discovery about ARccOS and

5    RipGuard has been completed.  We've had expert reports

6    exchanged.  We have had expert witnesses deposed.  I know that

7    both sides have complaints.  You know, we wanted to depose some

8    of their people.  They may want to -- I don't know -- maybe

9    depose some of our people some more.  But we were all prepared,

10   both sides, to go forward next week.  We've filed opening

11   papers --

12          **THE COURT:**  Okay, fine.  Is that correct?

13          **MR. CUNNINGHAM:**  It is, Your Honor.  We think that we

14   haven't been provided with certain kinds of particulars about

15   those technologies that we would have expected.  But that may

16   be an argument that is going more to the merits than to the

17   status of discovery.  So everyone who has been identified by

18   any party has now been deposed in the documents such as they

19   are -- have been provided and exchanged.

20          **THE COURT:**  Well, maybe we can do this also.  First

21   of all, what is the briefing situation?  Is all the briefing

22   done now?

23          **MR. SINGLA:**  Opening papers have been filed, Your

24   Honor.  The parties had agreed -- I believe the Court has

25   ordered that a mutual exchange of opening papers and then a

PDF created with pdfFactory trial version www.pdffactory.com

1   mutual exchange of responsive papers.  So the responsive papers

2   have not yet been filed.  We held off when we found out that

3   the April 1st hearing was being moved.  We do need a date for

4   exchange of those.

5           THE COURT:  Okay.  Well, when can those be filed?

6           MR. SINGLA:  I believe, Your Honor, from our

7   perspective, it's really up to when the Court would like them.

8   If the hearing is on the 24th, perhaps the 17th or earlier that

9   week, just as much time as the Court needs to review the

10  papers.

11          THE COURT:  Well, give us a little more than that.

12          MR. SINGLA:  Okay.

13          THE COURT:  Usually we have two weeks.

14          MR. SINGLA:  Okay.  Well, we can certainly do it by

15  the 10th.

16          THE COURT:  I think for a full-blown hearing, it

17  would be helpful.

18          MR. SINGLA:  How about the 10th, Your Honor?

19          THE COURT:  The 10th?

20          MR. CUNNINGHAM:  That's fine for us.

21          THE COURT:  Do you think that's adequate?

22          MR. CUNNINGHAM:  That's fine.

23          THE COURT:  Okay.

24          MR. CUNNINGHAM:  That's fine.  Thank you, Your Honor.

25          MR. SINGLA:  Thank you, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  The person who's got the first crack at

2    them, you know, has to have the time, you know.  Tell me what I

3    don't need to look at.  "It's a waste."  "This is important."

4          Now, how soon can each of you prepare the list of

5    witnesses that you intend to call at the hearing and a brief,

6    you know, synopsis statement of what they're going to testify

7    to?

8          **MR. SINGLA:**  Your Honor, we could do that within a

9    couple of days.

10         **THE COURT:**  And how about for you?

11         **MR. CUNNINGHAM:**  I would like until next week to do

12   that.

13         **THE COURT:**  You want to respond first, since you're

14   the ones who are seeking the preliminary injunction, and do it

15   in a couple of days?  So, by Wednesday, Thursday of this week?

16   Give me a day.

17         **MR. SINGLA:**  That's fine.  Thursday, Your Honor.

18         **THE COURT:**  Thursday?  And then by Tuesday of next

19   week?

20         **MR. CUNNINGHAM:**  Yes.

21         **THE COURT:**  Okay.  Now, and the briefs, you know,

22   just a brief summary of what they're going to testify to, just

23   generally.  I don't want, you know, paragraphs and paragraphs

24   and pages.

25         **MR. SINGLA:**  You want those filed with the Court,

17

1    Your Honor?

2         **THE COURT:**  Yes, and filed with the Court.  And then

3    I think what you can do is, to the extent there may be some

4    issue with regard to RipGuard and ARccOS, you would take a look

5    and see whether you have what you need, and if there are going

6    to be any witnesses on that list that are going to shed any

7    light on it and whether you need to take the depositions.  But

8    I presume that the witnesses you're calling, you will have

9    taken their deposition.  Somebody will have deposed them.

10        **MR. CUNNINGHAM:**  That's right.  I will be shocked if

11   there are further depositions to be taken.

12        **THE COURT:**  Yeah.  Okay.  But I was going to say, if

13   you have to, you can squeeze one in between now and then, and

14   the hearing, if there is somebody that shows up on the list

15   that you haven't deposed.  You can work that out, I presume,

16   without a discovery battle.

17        **MR. CUNNINGHAM:**  We could.

18        **THE COURT:**  You will work that out without a

19   discovery battle.

20        **MR. CUNNINGHAM:**  Thank you, Your Honor.

21        **THE COURT:**  Would that be the better way to say it?

22   **MR. SINGLA:**  Yes.

23        **THE COURT:**  Okay.  All right.  Now, anything else we

24   need to worry about in terms of that hearing?

25        **MR. SINGLA:**  I don't think so, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1        **MR. CUNNINGHAM:**  No.

2        **THE COURT:**  And at the hearing, is there enough in

3    the depositions if all these people have been deposed to use

4    their depositions to put them on the stand with or to have a

5    declaration or something like that --

6        **MR. WILLIAMS:**  Your Honor --

7        **THE COURT:**  -- to put them on the stand with and then

8    make them available for cross-examination, and then, of course,

9    you'll have at them as far as redirect and then re-cross.

10        **MR. WILLIAMS:**  Right.  Your Honor, what we had

11    thought might be helpful -- I realize that the Court has

12    indicated that you aren't inclined to allow openings.  But

13    since there a number of witnesses who we think will appear only

14    in the form of their deposition testimony, we thought that a

15    very short opening statement to put in context who you are

16    going to be hearing from and what it means, 20 minutes,

17    something like that, would be helpful, because at least in our

18    presentation -- and we're the moving party -- that's what we

19    anticipated doing, putting a number of witnesses in front of

20    Your Honor, via the deposition testimony, then calling a few

21    live witnesses and then allowing some of the experts.  We could

22    do some of that, I think, by affidavit, and some by live

23    testimony.

24        **THE COURT:**  Were these depositions videoed?

25        **MR. SINGLA:**  Yes, Your Honor.

                                                                    19

 1          **MR. STEER:**  Yes, Your Honor, all of them were.

 2          **THE COURT:**  Well, I don't even need you here if I

 3   have the depositions, do I?  I'll just watch them.

 4          **MR. WILLIAMS:**  It would take a long time.

 5          **THE COURT:**  So you would rather that I spend it with

 6   you and the deponent rather than just by myself and the

 7   deponent.  Is that it?

 8          **MR. WILLIAMS:**  No.  We think we can cut them down.

 9          **THE COURT:**  You think you can shorten it?

10          **MR. WILLIAMS:**  Yes.

11          **THE COURT:**  Well, we'll see.  I'll give you 15

12   minutes opening, okay, each of you.

13          **MR. WILLIAMS:**  Okay.

14          **THE COURT:**  Now, where does that put Mr. DVD here --

15   I'm sorry.

16          **MR. STEER:**  Steer.

17          **THE COURT:**  -- Steer?

18          **MR. SINGLA:**  Although we do call him "Mr. DVD."

19          **MR. STEER:**  I'm flattered to be called "Mr. DVD,"

20   Your Honor.

21          I would like to have part of that opening, as well.

22   I don't think it will be imposing on the Court if we each, each

23   of the three parties, has 15 minutes.  I'll do my best to make

24   it even shorter than that.

25          **THE COURT:**  Well, how significantly different are

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    your arguments going to be from the Studios'?
 2              MR. STEER:  The Studios, Your Honor, have additional
 3    issues that they need to cover in some depth.  Our argument has
 4    to do with the license agreement and the law that applies to
 5    it.
 6              THE COURT:  I'll give you ten minutes.  How's that?
 7              MR. STEER:  Ten minutes will do.  Thank you.
 8              THE COURT:  That's all you need.  That's all you're
 9    getting.
10              Okay.  Now, anything else we need to do as far as
11    that hearing is concerned right now?
12              MR. CUNNINGHAM:  I think that does it.
13              THE COURT:  Okay.  And I think since this is a bench
14    trial, let's just do it at 9:00.  So you show up at 9:00 on
15    Friday the 24th, I guess it is, and we will plan to go through
16    the day.  You know, we will take a break for lunch and come
17    back -- I don't know, recess around 4:30, 5:00, something like
18    that.  Okay?  So maybe we can get through with it in a shorter
19    time than certainly when I use my trial schedule, jury trial
20    schedule.
21              So then we're to the issue of spoliation, right?
22              MR. WILLIAMS:  Yes, Your Honor.
23              THE COURT:  Now, as I understand it, an actual order
24    with respect, internally, with respect to preservation took
25    place for the first time on October 6, 2008, correct?
```

                                                                    21

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. CUNNINGHAM:  That's right, Your Honor.

2        THE COURT:  And these lawsuits were being filed when,

3  in September?

4        MR. CUNNINGHAM:  September 30th.

5        THE COURT:  And when was -- when was your lawsuit

6  filed?  This was -- your suit was filed in Central District,

7  right, and then transferred up here?

8        MR. WILLIAMS:  It was the same day.

9        THE COURT:  So the same day?

10        MR. WILLIAMS:  Yes.

11        THE COURT:  Um-hum.  In the proverbial race to the

12  courthouse?

13        MR. WILLIAMS:  That's right.

14        THE COURT:  Okay.  You had different targets, I

15  guess, but in any event, there is some discussion in your

16  papers about, you know, there -- for example, among, I guess

17  employees and there was testimony by at least one of the

18  employees and perhaps others that there had been discussions

19  about a fear of litigation, right, just sort of talking

20  about -- but a generalized fear is not the same thing as a

21  specific threat of litigation.

22        MR. WILLIAMS:  That's true, Your Honor.

23        THE COURT:  So when would this obligation to preserve

24  have arisen?

25        MR. WILLIAMS:  The obligation arose, Your Honor, when

PDF created with pdfFactory trial version www.pdffactory.com

1   the litigation was anticipated and when that anticipated

2   litigation threat was real.  And here the evidence is pretty

3   clear that, from the very beginning, the planning stages for

4   this product that Real DVD anticipated litigation, they

5   anticipated litigation with regard to this specific product,

6   litigation with the motion pictures studios, the content

7   holders of this protected material.

8           So this was not some theoretical possibility, but

9   rather part of the business plan.  And indeed, the business

10  plan documents that have been produced by Real evidence that

11  anticipation of litigation.  And I can point the Court to

12  specific documents that speak to that and make it far different

13  from speculation, but rather part of the actual business plan,

14  if I may, if the Court is interested in hearing those or having

15  me focus on those.

16          **THE COURT:**  No, we have those.

17          **MR. WILLIAMS:**  Um-hum.

18          **THE COURT:**  But still, my question is:  You know,

19  aren't those really more of a -- yes, they know who would be

20  suing them, I guess, because the nature of what -- you know, if

21  there was going to be any litigation, they would have a sense

22  of who it would be because of the nature of the equipment

23  that's at issue, right?  I mean, we're not talking -- you know,

24  we're not talking about copying shoes here.  We're talking

25  about copying movies and whether or not movies can be copied,

PDF created with pdfFactory trial version www.pdffactory.com

1    you know, once for fair use or whether this was essentially a

2    copying that will allow a much more wholesale kind of

3    distribution system, correct?

4            **MR. WILLIAMS:**  Well, a couple of points, Your Honor.

5    First, Ms. Nichole Hamilton, who was one of the project

6    managers for the Facet Program --

7            **THE COURT:**  How disgruntled is she?

8            **MR. WILLIAMS:**  I think it's fair to say she's pretty

9    angry at the company.  I think that's fair to say.  But the key

10   components, though, of her testimony, at least as far as we are

11   concerned, are corroborated by documents that existed at the

12   time.

13           For example, Ms. Hamilton says that, from the very

14   beginning of the project, she was told, in no uncertain terms,

15   there is going to be litigation here.  It's almost certain.

16   Her testimony was that she was told that by Mr. Barrett, who is

17   the person who was running the so-called Facet Program.

18           There is a document that was produced in discovery

19   that was actually written by Ms. Hamilton.  It's Exhibit A to

20   our reply brief and the declaration of Mr. Katz from our firm.

21   And there is a sentence I would like to read that puts in

22   perspective exactly what the anticipated litigation would be.

23           It says, under the heading "Competition" -- and

24   again, this is Ms. Hamilton writing for the Facet Program --

25   "What is likely keeping these other larger entrants" -- that

PDF created with pdfFactory trial version www.pdffactory.com

1    is, other larger companies that could make a product similar to

2    Real DVD -- "what's likely keeping these other larger entrants

3    at bay is the threat of a lawsuit.  Risk of damaging business

4    relationships with content providers and/or desire to avoid

5    doing anything that might breathe new life into

6    current-generation DVDs, slowing the shift to blue ray or

7    HD/DVD.  Facet is intended to be the first to market with a

8    modest cost-consumer device while the political landscape is

9    still unsettled before any of the other larger competitors

10   enter the market."  In other words, it was specifically part of

11   the business plan that what they were going to try to do at

12   Real was to get ahead of the other competitor companies,

13   knowing --

14          **THE COURT:**  Isn't that what companies do all the

15   time?

16          **MR. WILLIAMS:**  No, Your Honor.  They don't enter

17   markets where they know that the other side's position is that

18   you are stealing their content, anticipating that the

19   litigation is going to be there, and developing their product

20   for a year and a half, with all of the e-mails, the engineering

21   documents that are produced as part of that, and then not start

22   a litigation hold until they, in fact, file their lawsuit, or

23   rather until after they file their lawsuit.

24          Clearly, Your Honor, the record is replete with

25   evidence that this was much more than the possibility that

PDF created with pdfFactory trial version www.pdffactory.com

1   there was going to be litigation.  In fact, there was

2   discussion about it.  There were plans about how to speak,

3   what language to use in e-mails that were written during that

4   time.  And a totally separate point is the fact that when they

5   finally did put in the litigation hold in October of 2008, a

6   year and a half after the project began, they made it

7   retroactive, Your Honor, back to July of 2007.

8         No real reason for July 2007, but they made it

9   retroactive, meaning that they recognized that there was prior

10  documentation that would have been developed in that

11  year-and-a-half period.  They recognized that by virtue of the

12  date that they chose for the litigation hold, but that doesn't

13  have any principal basis either because the program started in

14  January of 2007, and there are documents from back in that time

15  period that they were tracking the Kaleidescape litigation,

16  that they had tracked the fact that there had been a decision

17  Kaleidescape.

18        And so you have to go way back before the actual

19  lawsuit was filed in order to determine when this particular

20  plaintiff, on these particular facts, in fact, anticipated the

21  litigation, knew it was going to happen, with whom, and over

22  what.  Because the whole idea for this --

23        **THE COURT:**  Okay.  I got it.

24        **MR. WILLIAMS:**  You think you get it, Your Honor?

25  Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Mr. Cunningham.

2          **MR. CUNNINGHAM:**  If I may, because Mr. Williams' use

3     of the term "business plan," I think, directs us right to the

4     key case which our San Jose's Judge White has published the

5     Hynix vs. Rambus decision.  And I think it would be helpful, if

6     I may, if I could hand the Court a chronology.

7          **THE COURT:**  I'm just glad he had that litigation, not

8     me.  What a task that was.

9          **MR. CUNNINGHAM:**  Your Honor, in the *Hynix* case, we

10    had a situation where there wasn't just a company with a

11    business plan to bring litigation.  We had a company that was

12    there to litigate.  It was going to enforce a patent portfolio.

13    So the record in that case was replete with discussions about a

14    litigation strategy.

15         The issue was whether or not a document retention

16    policy that resulted in something called "Shred Days" at the

17    company, all of which were, under advice of counsel, plainly

18    happened and were part of anticipating some kind of litigation,

19    whether or not that constituted spoliation.  And what Judge

20    White rightly recognized is you can talk about and think about

21    litigation all you want.  It can be part of your business plan,

22    part of your strategy, like it was in Rambus.

23         But you've got to get down -- to make a -- to trigger

24    the document-preservation obligation and to define what

25    probable or reasonably foreseeable is under the spoliation

PDF created with pdfFactory trial version www.pdffactory.com

1   standard, you have to have eliminated critical contingencies

2   that might prevent, avoid or resolve the litigation short of it

3   happening.

4          And so if we look at our chronology, one of the

5   factors that Judge White keyed in on in the *Hynix v. Rambus*

6   litigation was:  When did *Rambus* have a litigation budget.  And

7   in our case, we didn't have a litigation budget.

8          And Mr. Kimball is a for-real, honest-to-God general

9   counsel.  He's held accountable for his budgets.  He has to

10  budget.  He doesn't get to just ignore it.  He didn't have a

11  budget for litigation in this case until after the lawsuits

12  were filed and until after the document preservation notices

13  went out.

14         Your Honor, it is the case that litigation counsel in

15  this case, my firm, we didn't get involved in this case until

16  September 7th.  And the reason, even though there was all sorts

17  of talk about the fact that the studios might well sue in this

18  case, the reason we didn't know -- we didn't think litigation

19  was probable, or that the company didn't, was because they knew

20  that, at the right point, there was going to be a negotiation

21  with the studios.  And that began in August, in August of 2008.

22  And quite frankly, it started off on a pretty good foot.

23         And at one point, there was a deal in principal with

24  Viacom.  So this whole mess might well have been avoided.  The

25  parties entered into a standstill agreement, and that was

PDF created with pdfFactory trial version www.pdffactory.com

1   reflected on September 9th.  Negotiations continued.  They

2   broke down.

3        The Munger Tolles lawyers wrote the threatening

4   letter on September 25th.  And that's the day, September 25th,

5   that is unambiguously the day that our duty to preserve should

6   have begun.  And we were a little late, but it won't matter

7   here.  It's that September 25th date.  And I think if you were

8   to go back --

9        **THE COURT:**  Why wouldn't it matter?  Because nothing

10  was destroyed?

11       **MR. CUNNINGHAM:**  Because nothing was destroyed in the

12  subsequent period.  The alleged -- if I may, the alleged

13  destruction by Basche and deleting emails by Hamilton, all of

14  that had to have been long before June, June of 2008.  And on

15  my very fancy graphic here, I've tried to put events of

16  destruction, purported destruction on one side, and the events

17  in the litigation on the other side.

18       So I really think that the *Hynix* decision is a

19  perfect roadmap for how this Court should resolve this case.

20  And the answer is we don't have -- you know, this

21  foreseeability of litigation is like a proximate cause

22  standard.  You have to bounce it around for policy

23  considerations.  It's unworkable to have every company being

24  developed preserving documents from whenever.

25       Mr. Williams thinks that it's probative that we

                                                            29

PDF created with pdfFactory trial version www.pdffactory.com

1    selected that July date in our document preservation notice.

2    All you do is you go back a reasonable amount of time.  That

3    doesn't mean anything.  That doesn't mean that you should

4    always start preserving at the time that your subsequent notice

5    says, "Might include relevant evidence."  It's got nothing to

6    do with it.

7              Anyway, I would direct Your Honor to a reading of the

8    *Hynix Rambus* case.

9              THE COURT:  When did the negotiations of the studios

10   break down?

11             MR. CUNNINGHAM:  They really broke down after the

12   9th.  I think it was about the 24th, 25th of September.  There

13   was a lot of intense negotiation going on, and I could be off

14   by a few days.  But it was --

15             THE COURT:  Were there discussions about litigation

16   during those negotiations?

17             MR. CUNNINGHAM:  Well, there was enough of a

18   discussion that there was a standstill and forbearance

19   agreement entered into among all of the studios and

20   RealNetworks.  That happened on September 9th.

21             THE COURT:  And did that also include anything about

22   preservation?

23             MR. CUNNINGHAM:  That was not included, Your Honor.

24             THE COURT:  And that was September --

25             MR. CUNNINGHAM:  9th.

PDF created with pdfFactory trial version www.pdffactory.com

1        **THE COURT:**  -- 9th?  And do you know, were any

2    documents destroyed between September 9th and October 6th, I

3    guess it is?

4        **MR. CUNNINGHAM:**  I believe that none were, Your

5    Honor, and I believe that not just because I'm optimistic, but

6    because, as we've been pressed to provide declarations

7    regarding relevant persons' document maintenance habits, it

8    turns out we have a number of pack-rats at the RealNetworks in

9    Seattle.  So I think it's very unlikely that anything was

10   destroyed, and there has certainly been no indication that

11   anything was destroyed.

12       **THE COURT:**  Now, with respect to Ms. Hamilton's

13   notebooks, the ones that are missing --

14       **MR. CUNNINGHAM:**  Yes.

15       **THE COURT:**  -- anything further on that?

16       **MR. CUNNINGHAM:**  If I could speak to the notebooks, I

17   would like to.  So we know about one notebook for sure.  That

18   was a book that Ms. Hamilton tendered to the HR person whose

19   name is Dewitt and is a declarant and her then current boss

20   whose name is Ricci Matthews.

21       Ms. Hamilton had been off the relevant projects for

22   three months.  So she left.  She was part of the Facet team.

23   That's the hardware product team.  She had left on June 18th in

24   a blowup with her management, and she went to a project called

25   Helix.  Helix has nothing to do with Real DVD, Facet or Vegas.

1          So for 90 days, she was working on Helix.  She gets

2   terminated on September 24th, and she brings with her to the

3   meeting where she's terminated her then current notebook, and

4   that's the -- that notebook hasn't been found.

5          There is no reason to think that that notebook had

6   anything to do with Real DVD, be it Facet or Vegas, not just

7   because 90 days have passed, but for the further reason that

8   Ms. Hamilton was asked by her former boss to give him

9   everything related to Facet at a particular point in time, and

10  it was about --

11         THE COURT:  Was this before her reassignment, or at

12  about that time?

13         MR. CUNNINGHAM:  It was actually six weeks after her

14  reassignment.  Her boss thought that he would find a

15  replacement and that she could give her stuff to the

16  replacement.  He didn't find the replacement.  So he eventually

17  said, "Give it to me."  And he says in his declaration, and

18  it's Mr. Woods who is the declarant on this, he says in his

19  declaration, That was about six weeks after her termination on

20  June 18th, which puts it right at the beginning of August.

21         So there is no reason to think that the one notebook

22  that we know about had anything to do with anything that might

23  conceivably be at issue in this case.

24         THE COURT:  Does she indicate otherwise,

25  Mr. Williams, in her deposition --

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. WILLIAMS:**  Yes, she does, Your Honor.

2          **THE COURT:**  -- with regard to the contents of that

3    missing notebook.

4          **MR. WILLIAMS:**  Well, what she testified to, I

5    believe, and Mr. Singla is the one who took the deposition, but

6    I believe that she testified that she had a total of three

7    notebooks that she believed related to this project.  She

8    believe that had she had one of them on her last day, and we

9    don't know whether she had the same notebook for the Facet

10   Program and then used the same notebook when she moved on to

11   the new program to which she had been reassigned.  But totally

12   separate and apart from that single notebook which she tendered

13   on that date that she was terminated is that fact that she had

14   two other notebooks that relate to the Facet project that were

15   in her office that have not been produced.  And she testified

16   clearly that it had all, in chronological fashion, all of the

17   dates of meetings, determinations about what would be done and

18   what would not be done.

19         **THE COURT:**  Well, that's what I'm talking about, are

20   the ones that are missing that were believed to have something

21   related to the Real DVD and Facet.  What about those?

22         **MR. WILLIAMS:**  Her testimony is that all three of the

23   notebooks, the one that she tendered on her last day, and the

24   other two that she had prepared over the course of her time

25   with the company, that all of them would have information

PDF created with pdfFactory trial version www.pdffactory.com

1    relating to Facet.

2            That is what she testified to, and I know Mr. Singla

3    will correct me if I'm wrong.  But the critical thing is that

4    there are at least these two notebooks that were in her office

5    when she was escorted out of her building on the date in

6    question.  But those notebooks have not been produced.  There

7    has been no explanation at all for why we don't have them.

8            And one other point about that.  You know, Real has

9    taken to attacking Ms. Hamilton and selectively waiving any

10   sort of privilege that she might have and putting before the

11   Courts the parts of her personnel file that they want to put in

12   front of the Court.  But I would ask the Court to recognize

13   this fact:  At the time that Ms. Hamilton testified at her

14   deposition, she expected those notebooks to appear.  She

15   described what was in them, and she had no knowledge that Real

16   was going to represent to the Court that they couldn't find

17   them.  That wasn't the point at the time.  They were not

18   alleging at the time that they couldn't find them.  There was

19   no representation, in other words, that was made to the studios

20   about the status of those notebooks at the time that she

21   testified.  So --

22           **THE COURT:**  Well, what about the explanations for

23   their nonexistence?

24           **MR. CUNNINGHAM:**  Let me tell you what we know,

25   because it's a mystery.  And it doesn't require casting

                                                              34

PDF created with pdfFactory trial version www.pdffactory.com

1   aspersions on Ms. Hamilton on this occasion.  The fact is that,

2   on the day of her termination -- and her testimony was that the

3   Studios' briefs vary from what the actual testimony was on

4   that.  She said she gave one notebook over.  We've talked about

5   that.  The other two were in her desk drawer.  Two people

6   looked in her office that day, her then current manager,

7   Mr. Matthews and the HR representative, Mr. Dewitt.  Neither of

8   them recall seeing the notebooks in the office.  So we don't

9   think they were there on the day she was terminated.  Bear in

10  mind, she was supposed to have and purported to have turned

11  over everything relating to Facet in early August at her boss's

12  direction.  And parenthetically, what the company got from

13  Ms. Hamilton when she did provide that material, it was given

14  over to legal and has been preserved.  So there has been no

15  spoliation of any Hamilton notebooks.  It just hasn't happened.

16          **THE COURT:**  Well, but the notebooks have not been

17  found, right?

18          **MR. CUNNINGHAM:**  The notebooks have not been found.

19          **THE COURT:**  And it was -- she was asked to turn them

20  in when she left?

21          **MR. CUNNINGHAM:**  She was actually asked to turn those

22  notebooks in, in early August.

23          **THE COURT:**  Earlier than that?

24          **MR. CUNNINGHAM:**  Yes.

25          **THE COURT:**  And has there been enough of a -- do we

PDF created with pdfFactory trial version www.pdffactory.com

1    have really a strong declaration from somebody who has recently

2    gone through the files and the offices and whatever else and

3    talked with everybody they need to talk with to find out what

4    happened to those notebooks?

5              **MR. CUNNINGHAM:**  I think we have, because Your Honor,

6    when you get a spoliation motion, you're motivated to find what

7    you've allegedly spoliated.  So we've looked and we haven't

8    found it.  Now, I think the quality of our declarations on that

9    point is sufficient with respect to what Mr. Woods tells us,

10   what Mr. Matthews and Mr. Dewitt tell us, that we don't have tz

11   the notebooks; we don't believe they were there; and we don't

12   know where else to look.

13             **THE COURT:**  Are they the only persons who would know?

14             **MR. CUNNINGHAM:**  I believe that they are because of

15   this funny transition and the key event where she -- where

16   Mr. Woods says to her, "Give me the stuff that relates to

17   Facet."

18             **MR. SINGLA:**  Your Honor, one thing I think on this is

19   very interesting is they've put in numerous affidavits from

20   Ms. Hamilton's including many affidavits from Ms. Hamilton's

21   colleagues on the Facet Project.  And none of them deny,

22   although they had every intention to, none of them deny that

23   she had notebooks; that she took notes at these meetings.

24   There was no suggestion in the record that her testimony at

25   this point, disgruntled or not, is the absolute truth that she

PDF created with pdfFactory trial version www.pdffactory.com

1    kept comprehensive notebooks about all of her work and the

2    team's decision-making on Facet.  That's just not disputed in

3    the record.  Mr. Barrett put in a declaration saying it's not

4    true.  He didn't do that.  All of her colleagues say those

5    notebooks existed.

6            Second, she was let go literally days before they

7    sued us.  So even Mr. Cunningham, although we disagree with

8    this, but even Mr. Cunningham agrees that, at the very least,

9    they had an obligation to preserve evidence as of September

10   25th.  She was let go on September 24th.  There is no reason to

11   think that her testimony, that her notebooks, with all of the

12   information about Facet, were sitting in her office on

13   September 24th.  There is no reason to think that's not true.

14   And RealNetworks focuses, Mr. Cunningham, on Mr. Dewitt, the HR

15   manager.  But the obligation to preserve this evidence was not

16   just Mr. Dewitt's.

17           Ms. Hamilton's former boss, all of her colleagues,

18   they knew that she had these notebooks in every meeting.  And

19   when they were asked by the lawyers to produce all the evidence

20   relating to Facet, they had an obligation to say, "Oh, yeah.

21   Ms. Hamilton, she had those notebooks, where are they," and to

22   produce those notebooks.  The testimony and the -- from the

23   declarations say that the notebooks were destroyed sometime in

24   December or January, it looks like.  They say that her office

25   was locked in September -- on September 24th.  So where are the

PDF created with pdfFactory trial version www.pdffactory.com

1   notebooks?  They were in the office.  They were locked on

2   September 24th.  They sat there, apparently, for three or four

3   months, according to Real's declarations, until the office was

4   cleaned out.

5          Now, whether they were thrown away negligently or

6   however they're missing, they are missing and they went missing

7   during this case, while we're litigating, while we're taking

8   discovery.

9          **MR. CUNNINGHAM:**  Respectfully, there is a dispute in

10  the evidence regarding what Mr. Singla just said.  I'll remind

11  you, I said that we have declarations that say on the day she

12  was fired, the people who looked in her office didn't see those

13  notebooks.  So what was destroyed later on in December were the

14  content of the office.

15         There is no proof that when those contents were

16  destroyed, they included the notebooks.  There is evidence to

17  the contrary.

18         **THE COURT:**  Well, I think we're not going to get it

19  resolved here, either.  How many of these people may be called

20  to testify at the motion on the preliminary injunction; do you

21  know?  I'm not going to hear from any of them?

22         **MR. CUNNINGHAM:**  You wouldn't hear from Mr. Dewitt or

23  her then -- her boss at the time, no, you wouldn't hear from

24  either of them.

25         **THE COURT:**  Any of them?  Okay.  I mean, we have to

PDF created with pdfFactory trial version www.pdffactory.com

1    move on.  I haven't another -- just a few other matters on the

2    calendar.

3              With respect to this whole question of then the order

4    on October the 6th.  That did not include Facet at that time,

5    correct?

6              **MR. CUNNINGHAM:**  Your Honor, there were three

7    identical e-mails that were sent.  They did go to the Facet

8    team.  One of the Facet team members in his deposition,

9    Mr. Beilman, did not recall getting it.  In fact, if you look

10   at Exhibit A to Lindsey Godfrey's declaration, you will see

11   that there are the e-mails there, and Mr. Beilman, did, in

12   fact, get the e-mail.  So it did go to the Facet team.  The

13   company did all the right steps.  About eight days late, but it

14   took all the right steps.

15             **THE COURT:**  Now, also you mentioned earlier something

16   about -- and it sounded as if it was a decision that Real made

17   with regard to waiving the attorney-client privilege, you know,

18   with respect to Ms. Hamilton and Ms. Hamilton's testimony.

19             **MR. CUNNINGHAM:**  Yes.  I'm sorry --

20             **THE COURT:**  And did not that occur when, in fact, she

21   was testifying and allowed essentially to testify and go off

22   even after the attorney-client privilege was asserted?

23             **MR. CUNNINGHAM:**  No.  What happened at her deposition

24   was that the questions would be asked.  She would begin to

25   answer them, and our attorney would interpose instructions to

                                                                    39

1    cease the answer as she began to tread on privileged grounds.

2    Frankly, we think that she was someone artful in trying to

3    evade those directions, but that's neither here or nor.  The

4    fact is we tried to protect the privilege at her deposition.

5    We believe we have done so.  There has been no motion

6    suggesting that there has been a waiver.  And if there were, we

7    would contest it dramatically.

8         THE COURT:  How far -- how many times did she

9    overstep the lawyer?

10        MR. CUNNINGHAM:  I don't know.  I mean, I haven't

11   counted -- I think there were a number of times -- and I

12   actually thought that there might be subsequent litigation on

13   the instructions that hadn't happened.

14        THE COURT:  I mean, were there times when you didn't

15   try to shut it down?

16        MR. CUNNINGHAM:  Your Honor, there was no time that

17   we did not try to shut it down, to the best of my recollection

18   of the transcript, and I was not at that deposition.  We were

19   attempting to protect the privilege.

20        MR. SINGLA:  Your Honor, we have grave concerns on

21   this issue that the Court has raised. it doesn't directly

22   relate to the spoliation motion, but this is an issue that we

23   have looked at very closely.  What we have seen is a pattern

24   both with respect to attorney-client privilege and asserting a

25   joint privilege and also documents relating to her termination

                                                              40

1    of selective waiver.  So, for example, attorney-client

2    privilege.

3            The testimony is very clear -- no denial from the

4    other side -- that their lawyers were trying from the very

5    beginning to teach the engineers the language to use, the kind

6    of e-mails to write, the kinds of words to use.  In some

7    depositions, with some of their witnesses, they allowed us to

8    ask, "What language did you guys use?  What were the

9    conversations between you about what language to use?  What did

10   Mr. Barrett tell you?"

11           In other depositions, like Ms. Hamilton's, they would

12   sometimes object and instruct witnesses not to answer and block

13   us from inquiring into these conversations about language to

14   use and how to tone and craft e-mails and documents.

15           So there has been this pattern across depositions,

16   not just within Ms. Hamilton's, of claiming privilege sometimes

17   and then allowing witnesses to answer -- different witnesses to

18   answer the same question.

19           **THE COURT:**  Was Mr. Barrett an attorney?

20           **MR. SINGLA:**  No, Mr. Barrett was not an attorney.

21           **THE COURT:**  Well, how does the attorney-client

22   privilege even get plugged in here if there were was no

23   attorney giving this advice?

24           **MR. SINGLA:**  Well, the assertion that Real has made

25   and Real's lawyers has made, in some depositions, for example,

PDF created with pdfFactory trial version www.pdffactory.com

1    sometimes in Ms. Hamilton's deposition, is that what

2    Mr. Barrett was telling these engineers about how to write

3    e-mails and the words to use and the ways to characterize

4    ARccOS or CSF, that he had gotten those views based on his

5    conversations with Real's lawyers at the beginning or

6    instigation of the project.  And so, therefore, when he told

7    somebody, "Don't use these words" --

8         **THE COURT:**  And we don't have time to go down that

9    road today.

10        **MR. SINGLA:**  Well, one other thing I would point out,

11   Your Honor, is with respect to Ms. Hamilton -- I took her

12   deposition.  I just want to respond to a question the Court

13   raised about whether she's disgruntled, and I understand that

14   she is somewhat disgruntled.

15        But on the substance of her testimony on which we

16   rely, there is very little objection from the other side.  For

17   example, she said that litigation, she thought, was inevitable.

18   She was told by Mr. Barrett that it was inevitable from the

19   beginning.  They don't deny that.  Mr. Barrett doesn't deny

20   that he told her that and that that was their view from the

21   beginning, that the litigation was inevitable.

22        **THE COURT:**  Okay.  You know, we have to wind this up.

23   I have another matter that was on the 2:00 calendar.  We still

24   haven't heard that one, to say nothing of 3:00 and 4:00.

25        **MR. WILLIAMS:**  I understand.  Your Honor, may I make

42

PDF created with pdfFactory trial version www.pdffactory.com

1    just one point with respect to the Hynix case that counsel was

2    able to discuss.  I just want to try to distinguish it, if I

3    may?

4              **THE COURT:**  Can you be brief?

5              **MR. WILLIAMS:**  Very brief.

6              **THE COURT:**  Because I'm going to cut you off.

7              **MR. WILLIAMS:**  Okay.  In that case, Your Honor, here

8    are some of the steps that had to be met before the Court was

9    going to find that there was no anticipated litigation.  In

10   that matter, patents had to be issued.  It was unclear whether

11   that was ever going to happen.  Patents had to cover the

12   products that were being discussed.  The company had to make a

13   decision about whether or not it was going to file a lawsuit.

14   Those are all hurdles or steps that had to happen before the

15   litigation would commence.

16             Here, it's totally different.  In this case, Real

17   knew that there had been litigation relating to Kaleidescape

18   because that's why they did this product.  They knew that there

19   would be a lawsuit pending.  And that's the distinction in the

20   case, Your Honor.

21             **THE COURT:**  Okay.  Thank you.

22             **MR. WILLIAMS:**  Thank you.

23             **THE COURT:**  And we've got dates for the preliminary

24   injunction, and we will issue an order on this.  And the thing

25   that I want to say is -- and what's your last name, Kimball?

                                                          43

PDF created with pdfFactory trial version www.pdffactory.com

1          **MR. KIMBALL:**  Kimball, Bob Kimball.

2          **THE COURT:**  -- it's either you or your colleague

3    here, I'm going to hold personally responsible for preservation

4    orders, enforcement of preservation orders, of discovery and

5    making sure that the discovery complies with what is required,

6    and that it is entirely produced so there is no gap between

7    outside counsel and in-house counsel.  You are responsible and

8    you're going to have to sign off on every discovery request or

9    not the request but the responses to requests yourself or

10   through -- I'm sorry, your name again.

11         **MR. WAY:**  Way, Your Honor.

12         **THE COURT:**  Mr. Way, is it?  How do you spell it?

13         **MR. WAY:**  W-A-Y.

14         **THE COURT:**  Mr. Way, A-Y.  Oh, that's easy.  Mr. Way,

15   one of you will have to sign off on it and be responsible so

16   that we don't have any gaps at all here about whether discovery

17   is being produced or whether, you know, the preservation orders

18   are being issued or complied with.

19         So it should have been clear, and hopefully it was

20   clear from what was said earlier, with regard to Facet, as well

21   any other product that may potentially be in litigation here,

22   that any and all documents, et cetera, are to be preserved.

23   And you know what those memos are supposed to look like.  And

24   they go out, I trust, over your signature.

25         **MR. KIMBALL:**  We have litigation counsel.  It went

44

PDF created with pdfFactory trial version www.pdffactory.com

1   out over her signature, but it certainly happened at my

2   direction, and the buck absolutely stops with me.  I will be a

3   responsible person.

4           **THE COURT:**  Is Mr. Way the second in command?

5           **MR. KIMBALL:**  Yes, he is.

6           **THE COURT:**  Okay.  You or Mr. Way, so I'll be looking

7   for one of your names.  Make sure that, you know, when you say

8   that every and all documents that have been sought and searched

9   for have, in fact, been turned over -- and I'm going to put the

10  responsibility on your shoulders and Mr. Way's to look for

11  those notebooks that Ms. Hamilton said -- and make sure that

12  every corner of that office or the offices, whatever, not just

13  her office, are turned to make sure that they aren't, you know,

14  somewhere in the office.

15          **MR. KIMBALL:**  I will insure that we do the most

16  detailed possible search for those documents when we get back,

17  and we will report back.

18          **THE COURT:**  Okay.  I expect you to respond and be

19  responsive.  Where are you a member of the bar.

20          **MR. KIMBALL:**  In Illinois and Washington.

21          **THE COURT:**  They're two states that we can --

22          **MR. CUNNINGHAM:**  He clerked in the Ninth Circuit,

23  however.

24          **MR. KIMBALL:**  I clerked for Judge Alarcon in the

25  Ninth Circuit, as well.

PDF created with pdfFactory trial version www.pdffactory.com

1          **THE COURT:**  Okay.  Well, very good.  Okay.  So we're

2   going to see you on the 24th, right?

3          **MR. CUNNINGHAM:**  Yes.

4          **THE COURT:**  Thank you.

5          **MR. WILLIAMS:**  Thank you, Your Honor.

6          **MR. CUNNINGHAM:**  Thank you, Your Honor.

7       *(Hearing concluded at 3:36 p.m.)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
1                    CERTIFICATE OF REPORTER

2            I, MARGARET "MARGO" GURULE, Pro Tem Court Reporter

3   for the United States Court, Northern District of California,

4   hereby certify that the foregoing proceedings in Case

5   No. CV 08-4547 Real Networks, Inc. v. DVD, Copy Control

6   Associates, et al. and a related case, were reported by me, a

7   Certified Shorthand Reporter, and were thereafter transcribed

8   under my direction into typewriting; that the foregoing is a

9   true record of said proceedings as bound by me at the time of

10  filing.

11           The validity of the reporter's certification of said

12  transcript may be void upon disassembly and/or removal from the

13  court file.

14

15

16                              /s/_____
                                MARGARET "MARGO" GURULE
17                              CSR No. 12976
                                March 30, 2009
18

19

20

21

22

23

24

25
```

47

PDF created with pdfFactory trial version www.pdffactory.com