1  GLENN D. POMERANTZ (SBN 112503)    ROBERT H. ROTSTEIN (SBN 72452)
   Glenn.Pomerantz@mto.com    rxr@msk.com
2  BART H. WILLIAMS (SBN 134009)    ERIC J. GERMAN (SBN 224557)
   Bart.Williams@mto.com    ejg@msk.com
3  KELLY M. KLAUS (SBN 161091)    MITCHELL SILBERBERG & KNUPP LLP
   Kelly.Klaus@mto.com    11377 West Olympic Boulevard
4  MUNGER, TOLLES & OLSON LLP    Los Angeles, California  90064-1683
   355 South Grand Avenue, 35th Floor    Tel: (310) 312-2000; Fax: (310) 312-3100
5  Los Angeles, CA  90071-1560
   Tel: (213) 683-9100; Fax: (213) 687-3702
6

7  GREGORY P. GOECKNER (SBN 103693)
   gregory_goeckner@mpaa.org
8  DANIEL E. ROBBINS (SBN 156934)
   dan_robbins@mpaa.org
9  15301 Ventura Boulevard, Building E
   Sherman Oaks, California  91403-3102
10 Tel: (818) 995-6600; Fax: (818) 285-4403

11 Attorneys for Motion Picture Studio Plaintiffs/Declaratory
   Relief Claim Defendants
12

13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16 REALNETWORKS, INC., et al.,          CASE NO.  C 08-4548-MHP

17              Plaintiffs,             **PUBLIC REDACTED VERSION:
                                        SUPPLEMENTAL DECLARATION OF
18        vs.                           JONATHAN H. BLAVIN IN SUPPORT OF
                                        STUDIO PLAINTIFFS' MOTION FOR
19 DVD COPY BATES ASSOCIATION,          PRELIMINARY INJUNCTION**
   INC., et al.
20                                      Date:  April 24, 2009
              Defendants.              Time: 9:00 a.m.
21                                      Ctrm: 15 (Hon. Marilyn Hall Patel)

22
   UNIVERSAL CITY STUDIOS                CASE NO.  C 08-4719-MHP
23 PRODUCTIONS LLLP, et al.,

24              Plaintiffs,

25        vs.

26 REALNETWORKS, INC., et al.

27              Defendants.

28
                                        SUPP. BLAVIN DECL. ISO MOTION FOR
   7568312.1                            PRELIMINARY INJUNCTION
                                        CASE NO. C 08-4548-MHP

**SUPPLEMENTAL DECLARATION OF JONATHAN H. BLAVIN**

I, Jonathan H. Blavin, declare:

1.      I am an attorney associated with the law firm of Munger, Tolles & Olson LLP, counsel of record for Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Sony Pictures Television Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc., Walt Disney Pictures, Warner Bros. Entertainment, Inc., Universal City Studios Productions LLLP, Universal City Studios LLLP, and Viacom, Inc. ("the Studios") in the above-captioned matter.  I make this Supplemental Declaration based upon my own personal knowledge, and if called upon to do so, I could and would testify competently to the matters stated herein.

2.      Attached hereto are true and correct copies of excerpts of the following transcripts of depositions and proceedings in this litigation:

Exhibit 1:      Final Transcript of Deposition of Phillip Barrett.

Exhibit 2:      Final Transcript of Deposition of James Bielman.

Exhibit 3:      Final Transcript of Deposition of Jeffrey Buzzard.

Exhibit 4:      Final Transcript of Deposition of Jeffrey Chasen.

Exhibit 5:      Final Transcript of Deposition of Douglas Dixon.

Exhibit 6:      Final Transcript of Deposition of Robert Glaser.

Exhibit 7:      Final Transcript of Deposition of Gordon Klein.

Exhibit 8:      Reporter's Transcript of Proceedings dated October 7, 2008.

3.      Attached hereto are true and correct copies of the following documents produced by Real to the Studios in this litigation:

Exhibit 9:      Email dated January 15, 2008 produced by Real in this litigation
                bearing the Bates numbers REAL074747-48.

Exhibit 10:     Email dated July 30, 2007 produced by Real in this litigation
                bearing the Bates numbers REAL098684-85.

4.      Attached hereto as Exhibit 11 is a true and correct copy of the Reporter's Transcript of Proceedings in *RealNetworks, Inc. v. Streambox, Inc.*, No. C. 99-2070 (W.D. Wash.

SUPP. BLAVIN DECL. ISO MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. C 08-4548-MHP

1  2000), dated January 7, 2000.

2           5.       Attached hereto as Exhibit 12 is a true and correct copy of the press

3  release, "RealNetworks Introduces RealDVD: The Best Way to Watch DVDs," available at

4  http://www.realnetworks.com/company/press/releases/2008/realdvd.html, dated September 8,

5  2008.

6           6.       Attached hereto as Exhibit 13 is a true and correct copy of the press release

7  "Survey: Consumers Demanding More from Their DVD Collections," available at

8  http://www.nclnet.org/news/2009/dvd_survey_04062009.htm, dated April 6, 2009.

9           7.       Attached hereto as Exhibit 14 is a true and correct copy of the

10 Supplemental Declaration of Dr. John P.J. Kelly in Support of Studios' Motion for Sanctions for

11 Spoliation of Evidence, filed in this action, dated March 17, 2009.

12           I declare under penalty of perjury under the laws of the United States and

13 California that the foregoing is true and correct and that this Declaration was executed this 10th

14 day of April 2009, in San Francisco, California.

15

16                                          _/s/ Jonathan H. Blavin_
                                            JONATHAN H. BLAVIN
17

18

19

20

21

22

23

24

25

26

27

28

SUPP. BLAVIN DECL. ISO MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. C 08-4548-MHP

REDACTED

EXHIBIT 1

# REDACTED

# EXHIBIT 2

REDACTED

EXHIBIT 3

REDACTED

EXHIBIT 4

REDACTED

EXHIBIT 5

REDACTED

EXHIBIT 6

REDACTED

EXHIBIT 7

EXHIBIT 8

Pages 1 - 122

United States District Court

Northern District of California

Before The Honorable Marilyn Hall Patel

Real Networks,                )
Incorporated,                 )
                              )
          Plaintiff,          )
                              )
  vs.                         )          No. C08-4548 MHP
                              )
DVD Copy Control              )
Associates, et al.,           )
                              )
          Defendant.          )
_____)

                              San Francisco, California
                              Tuesday, October 7, 2008

### Reporter's Transcript Of Proceedings

**Appearances**:

For Plaintiff
RealNetworks, Inc.
and RealNetworks
Home Entertainment,
Inc.,:                 Wilson, Sonsini, Goodrich & Rosati
                       One Market Street
                       Spear Tower, Suite 3300
                       San Francisco, California  94105
            By:  **James A. DiBoise, Esquire**
                 **Colleen Bal, Esquire**
                 **Michael A. Berta, Esquire**
                 **Tracy Tosh Lane, Esquire**
                 **Bryan Ketroser, Esquire**


*Reported By:        Sahar McVickar, RPR, CSR No. 12963*
                     *Official Reporter, U.S. District Court*
                     *For the Northern District of California*

(Computerized Transcription By Eclipse)

```
 1   Appearances, continued:

 2   For Defendant
     DVD Copy Control
 3   Association and
     Disney Enterprises,
 4   Inc.,:                    Munger, Tolles & Olson
                               355 South Grand Avenue, 35th Floor,
 5                             Los Angeles, California  90071
                          By:  Bart Harper Williams, Esquire
 6                             Kelly Max Klaus, Esquire

 7                             Motion Picture Association of America
                               15301 Ventura Boulevard, Bldg. E
 8                             Sherman Oaks, California  91403
                          By:  Dan Robbins, Esquire
 9                             Gregory Goeckner, Esquire

10                             Mitchell Silberberg & Knupp, LLP
                               11377 West Olympic Boulevard
11                             Los Angeles, California  90064
                          By:  Robert H. Rotstein, Esquire
12
     Also Present:             Robert Kimball, Esquire
13                             Senior Vice President/General Counsel
                               RealNetworks, Inc.
14
                               Bill Way, Esquire
15                             Vice President/Deputy General Counsel
                               RealNetworks, Inc.
16

17

18                            ---o0o---

19

20

21

22

23

24

25
```

1  permanent copy on that user's hard drive.

2          THE COURT:  Which is not the case when you play a

3  DVD in a regular DVD player.  Once you take it out, it's gone,

4  right?

5          MR. DIBOISE:  Right, but you have the DVD.

6          THE COURT:  Well --

7          MR. DIBOISE:  There is no difference, Your Honor.

8          THE COURT:  You have the DVD, yes.

9          MR. DIBOISE:  Yes.  And all those protections that

10  were on the --

11          THE COURT:  Or I suppose if you rent it, you don't

12  have the DVD, right?

13          MR. DIBOISE:  You had it at the time you watched

14  it --

15          THE COURT:  Yeah.

16          MR. DIBOISE:  And, at the time you made the copy.

17          THE COURT:  And now that it resides on your hard

18  drive, you can give back the DVD, but you will have it forever,

19  right?

20          MR. DIBOISE:  To -- yes, to watch, not to do

21  anything else with.

22          THE COURT:  Except that, except that you can use, by

23  way of your external hard drive or thumb drive, or whatever,

24  what, for an additional $19.99 you can copy it, correct?

25          MR. DIBOISE:  To an account that is authorized to

 1    be a rush to market.  You could have waited to have that

 2    decision made.  Having only been out in the market a short

 3    period of time, I think the harm is far less to RealNetworks in

 4    this case than it would be to having who knows how many copies

 5    out there, which might then be found to be unauthorized copies.

 6             And, it's not very persuasive to say, well, you see,

 7    you know, you're not saying maybe we're legitimate, you're

 8    saying you are legitimate but comparing yourselves to all those

 9    illegitimate companies out there.  And this ought to be looked

10    at more favorably because you've got all those other people who

11    are ripping and doing these illegal things, and, therefore, I

12    should, apparently, in looking at the balance of hardships and

13    looking at whether -- you know, who is going to suffer the

14    greater injury, looking at the fact that you're apparently

15    going to supplant some part of the illegal market.

16             The problem is that there are serious questions here

17    about copyright violations, about DMCA violations, violations

18    of this contract, by a company who rushed to market and didn't

19    wait for any kind of an adjudication, by a company that can

20    stop right now, early in the inceptions of what it's doing,

21    rather than having us trying to figure out, down the road, how

22    many copies, and something that may be very difficult to

23    determine, how many copies of copyrighted material are out

24    there, and what the injuries are that are sustained as a result

25    of that.

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar McVickar
_____

Sahar McVickar, RPR, CSR No. 12963

October 9, 2008

REDACTED

EXHIBIT 9

REDACTED

EXHIBIT 10

EXHIBIT 11

1

1                   UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON

2

3   REALNETWORKS, INC.,               )
                                  )

4                    Plaintiff, ) Docket No. C 99-2070 P
                                  )

5             v.               ) Seattle, Washington

6   STREAMBOX INC.,               )

7                   Defendant. )

8

9   BEFORE THE HONORABLE MARSHA J. PECHMAN, UNITED STATES DISTRICT
                             JUDGE

10

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                JANUARY 7, 2000

13

14

15   APPEARANCES:

16   For the Plaintiff:       JAMES DiBOISE
                            ROB STEWART
17                        DAVID KRAMER

18   For the Defendant:       ROBERT CARLSON
                            CHUN NG
19

20

21

22   Court Reporter:          Laurene Kelly, RDR, CRR
                          Room 600
23                        1010 Fifth Avenue
                        Seattle, WA  98104
24                        (206) 553-1899

25   Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

**ORIGINAL**



WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1 talk about who's going first.

2         MR. DiBOISE: How about the moving party?

3         MR. CARLSON: Have at it.

4         THE COURT: All right.

5         MR. DiBOISE: Good morning, Your Honor.

6         THE COURT: Good morning.

7         MR. DiBOISE: The Internet is in a sense a new

8 development and a new mechanism for permitting the distribution

9 of information and communication among many people in varied

10 locations.

11         With the advent of the Internet it became possible to

12 broadcast sound recordings, video recordings, any type of

13 speech in a digital format that sounded better than the format

14 that was available over the analog radio and television

15 broadcast signals. Because of the Internet's ability to

16 distribute content throughout the world, people were interested

17 in making certain that content was available for people to

18 view. The end user, the listener, the viewer wanted to see as

19 much content as possible.

20         But content owners were worried. They were worried

21 because if the end user got digital copies or received a

22 digital signal of their works subsequent copies could be made

23 without any degradation of the signal or the work itself.

24         So the clear analogy would be if you tape a

25 television program broadcast freely over the airwaves and you

1    tape it on your VCR you get an analog copy of what was

2    transmitted.  If you then try and copy that copy, the signal

3    degrades.  The copy degrades.  And you can't make additional

4    near perfect copies.

5          Unlike that analog copy, digital copying makes near

6    perfect copies, and that's the great fear that content owners

7    have, that someone can take their signal, take the recording,

8    and literally remaster it and be able to distribute copies

9    throughout the world.

10          The incentive to create is impacted by the inability

11    of content owners to control that copy.  What people want to do

12    on the one hand is to make works that people will buy, and if

13    they can't control the distribution of that work then they lose

14    the right that's granted them under the Copyright Act to

15    control the distribution and sale of their works.

16          This tension between what an end user wants to see

17    and what content owners are willing to provide freely led to

18    the debates that led to the creation of the Digital Millennium

19    Copyright Act, and it's that tension between end users wanting

20    to see content freely and in good quality and content owners

21    who want to protect the right to distribute their work that led

22    to the compromise that's embodied in the Digital Millennium

23    Copyright Act.

24          The Digital Millennium Copyright Act that we're

25    talking about here, Sections 1201 A 2 and 1201 B, really

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    address not the issue of copying but the protections that

2    content owners place on their recordings to prevent copying.

3    And that's an important distinction, given the opposition that

4    Streambox has made to RealNetworks' motion, and it's important

5    because there is no fair use defense to the Digital Millennium

6    Copyright Act and that there is no fair use, there is no right

7    to copy a digital stream like there is a right to copy the

8    analog stream that either can emanate from their speakers or

9    over the broadcast airwaves.  And the reason there is no fair

10   use right to do that is because the Digital Millennium

11   Copyright Act said, you can't do it.  Congress has made that

12   decision for us.

13          So if you really step back from this case and look at

14   it in its first blush characteristic, if there is no right to

15   copy, there is no fair use in making a copy, then the case

16   becomes fairly simple.  You look at what Streambox has done

17   with its VCR, its Ripper, and its Ferret, the VCR and the

18   Ripper, and compare that to the Digital Millennium Copyright's

19   prohibitions, and you see that in fact they violate the act.

20          I want to save the Ferret because I want to use a

21   graphical exhibit to show you, I think, what really happens

22   here and may help you understand it a bit better.  But to

23   answer your first question about how the Internet and the

24   Digital Millennium Copyright Act interact, that's the basic

25   understanding, is that it's this tension between being able to

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1  mix and match the ability to take Aretha Franklin and mix it

2  with the Beatles?

3      MR. DiBOISE:  They could do that.  You could

4  basically take down -- if you could find the source files in an

5  unprotected format or if you could find sites that streamed

6  every song you wanted to listen to, you can make your own CD

7  without ever paying any copyright royalties to any of the

8  artists through these products.

9      What you do is you stream the first song you want to

10  hear, use the VCR to grab it, make a copy of it, translate it

11  into a whatever format, and then use a CD burner, CD writer to

12  write it onto a CD ROM drive that would literally make the CD

13  disk you put into your car player or into your Walkman.  And

14  again it's taking the rights of the copyright holder, the

15  content owner, and depriving them of the ability to achieve the

16  royalties they would ordinarily get from buying a copy of their

17  CD.

18      The Ripper lets you do whatever you want to do with

19  the content owner's content, with the copyrighted material, and

20  the Copyright Act said that's a right that's reserved to the

21  copyright holder.  It's the creation of these derivative works.

22  Changing the format creates a derivative work.  It creates a

23  different form than the content owner has given you permission

24  to listen to.  And those acts are taken in derogation of their

25  rights.

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1          And that's what Section 1201 B of the DMCA says you

2     can't do. You cannot manufacture a device that is primarily

3     used to do that. You can't do it. And that's why I say the

4     case becomes very simple after you understand what it is

5     they're doing and what use people make of these products, to

6     see that if you'd simply apply those facts to the statute the

7     conclusion is inescapable. They violate the act.

8          The Ferret is different because it violates the

9     Copyright Act itself and RealNetworks' own copyright in the

10    RealPlayer software. That is a direct violation of the

11    Copyright Act and not the violation of the DMCA, but again it's

12    the same right of the content holder to be able to determine

13    the derivative works that Ferret interferes with.

14         We've submitted declarations from many content owners

15    detailing why it is they chose to use RealNetworks' products in

16    providing their protected works over the Internet. They only

17    chose to put those works on the Internet under the assumption

18    that someone could not copy them, change the format, and then

19    freely redistribute them. And that's exactly what the VCR and

20    the Ripper do.

21         And it's for that reason that those products need to

22    be enjoined and removed from the marketplace, because they

23    violate the act. 1203 gives you the authority to enjoin them.

24         And it's clear that irreparable injury is occurring

25    every day that someone can rip off the content owner's

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1    recording and give it -- even if they give it to their friends

2    it's still in derogation of the copyright holder's rights.

3              1201 A 1 again controls the access, the secret

4    handshake.  1201 B is a provision that says you cannot

5    circumvent any copy-protected feature.

6              Our papers talk about a lot of rebuttal to what

7    Streambox has submitted in its opposition.  I don't want to

8    repeat that here.  I do want to emphasize one important point,

9    though.  A lot of time has been spent, a lot of declarations

10   have been submitted by Streambox detailing what they contend is

11   a fair use of and what's protected by fair use.

12             The DMCA does not have a fair use exception.  All it

13   has and part of the compromise that was engaged in in Congress

14   is a list of specific exemptions of the act, and they're all in

15   the act, 1202 -- I think 1201 and the letters I think starts

16   with K through M or N are the specific exemptions.  1203 or

17   1201 A 3 says that this act doesn't change the fair use law.

18   It doesn't say we're importing the fair use doctrine into the

19   DMCA.

20             All it says is that this statute, this modification

21   to the Copyright Act doesn't change the actual fair use

22   doctrines applied to actual infringement under the Copyright

23   Act, a different analysis, and it's that analysis that the

24   Court, the Supreme Court considered in the Sony Betamax case.

25   It did not have in the Sony Betamax case this direct indication

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   the DMCA -- doesn't really enter into the equation.  The

2   statute says you may not defeat the circumvention, the access

3   control, and that's what VCR does.  Its only purpose in life is

4   to enable somebody to copy a RealNetworks stream.

5          THE COURT:  Well, counsel, your opposition has

6   basically outlined radio stations.  They want their material to

7   be listened to.

8          MR. DiBOISE:  You can broadcast and you can listen to

9   the stream.  Sitting at your computer.  Just like you can sit

10  in front of your radio or sit in your car or sit wherever you'd

11  like to sit and listen to your radio.  Absolutely no

12  prohibition.

13         THE COURT:  But doesn't the VCR simply allow you time

14  shift the way the other case law --

15         MR. DiBOISE:  Time shifting doesn't apply to the

16  DMCA, because in order to time shift you have to make a copy,

17  and the whole act was designed to make certain that products

18  could not be made, distributed that permit you to defeat the

19  access controls and the rights of the copyright holder to say

20  whether or not you can copy.

21         If someone broadcasts a recording, a speech, you

22  could stick a microphone in front of your speaker and make an

23  analog copy of it, or you can make even a digital copy of the

24  analog stream, the analog sound coming out of the speaker.

25         But the real threat, the reason the DMCA was enacted

1   was to deal with the fact that there were digital streams that

2   permitted digital copying that would create copies that would

3   be perfect copies, and the tension that was struck between end

4   users who wanted to make those copies and the content owners

5   who wanted to prohibit those copies is what resulted in the

6   DMCA.

7         So when counsel says to you that there is no law,

8   there is nothing that stops an end user from making a copy of a

9   broadcast stream, he's wrong.  The DMCA says you can't do it.

10   And if we go back to -- this VCR, this box here exists only to

11   replace this box, and it's this box that performs all of the

12   circumvent -- all of the access control defenses and the copy

13   defenses.

14         The content holder makes the decision that it wants

15   to encode, to modify its work into a protected file format, the

16   RealAudio file format.  And it's that format that is broadcast.

17         If the content owner wanted to allow you to make a

18   copy, to download, to do whatever you wanted to do with their

19   work, there are lots of open formats they could choose to

20   record and distribute their content.  MP3 is an example.  If

21   the Backstreet Boys wanted you and everybody else in the world

22   to be able to download for a limited period of time or forever

23   a snippet of a song or a complete song, they could post it on a

24   server and allow you to download a MP3 file.  But they didn't.

25         The people who have .RA files, the people who choose

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   to encode, to protect their copyrighted works by making them

2   into a RealAudio file, chose to do so, and it's their right

3   under the Copyright Act to protect that work and to protect it

4   from reproduction or the creation of derivative works.  And

5   clearly changing the file format, changing the ability to make

6   derivative works copies and changing it from a .RA file to a

7   MP3 file is the right of the content owner, not the end user.

8           What you hear today from Streambox's counsel and

9   Streambox is I'm the end user.  I want what I can get.  And I

10  don't care if it's in derogation of the rights of the content

11  holder, the copyright holder, because that's what they have

12  said.  They have said if it's broadcast it should be mine.

13          Well, in the Sony decision there are some aspects of

14  that, and there was some testimony and there was some evidence

15  that the Supreme Court considered that the content owners

16  weren't offended by the notion of time share.

17          But this is different.  Here we have content owners

18  who have seen the statute, who were there at the birth of the

19  statute and the debates in Congress as to what the statute was

20  going to say, and who have now made available for streaming

21  purposes their content under the belief that it will be

22  protected.  And it would be protected but for the VCR and the

23  Ripper.

24          The point is that they have made the choice, the

25  copyright holder has made the choice, has come to RealNetworks

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

1   and has said, we're going to use your services to protect our
2   material so that it can be streamed so we don't have to worry
3   about it being copied, and what they have now is a device, what
4   they see themselves faced with now is a device that circumvents
5   the access control and circumvents the copy protection features
6   which are reserved to the copyright holder.

7          Those two things are exactly what Section 1201 A 2
8   prevents and 1201 B prevents of the Digital Millennium
9   Copyright Act.  That's what that law was designed to do.  It
10  was enacted after the Sony decision and it was enacted after
11  much debate.

12         It's not a question of Congressional intent.  It's
13  clearly in the statute.  There is no fair use to circumvent
14  access controls or copy protection features.  All the fair use
15  that we're talking about is if you happen to get a copy of a
16  file you can make another copy of that file, but it doesn't say
17  it's fair to try and defeat my protections that I've built into
18  that broadcast to make a copy.  It is not fair to do that,
19  because the DMCA says you're not allowed to do it.

20         And it's a different -- apples and oranges when you
21  talk about fair use.  There is no fair use to circumvent.
22  There is fair use to make use of works that have been broadcast
23  and you have a copy of them.

24         Again the distinction comes back to analog copies
25  versus digital copies.  There is a greater fear.  Congress made

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

72

1          THE COURT:  Let me advise you of that.  I'll do that

2     through Mr. Ward.

3          MR. DiBOISE:  Thank you.

4          THE COURT:  Okay.  Counsel, I have a continuation of

5     a suppression hearing that's going on here.  The marshals, I'm

6     sure, are waiting to get in.  So if I could have you vacate as

7     quickly as possible.  I don't mean to give you the bum's rush,

8     but I need to have the courtroom.  We'll be at recess.

9          (At 11:02 a.m. proceedings were adjourned.)

10                         --oOo--

11          I certify that the foregoing is a correct transcript

12     from the record of proceedings in the above-entitled matter.

13     _____

                    Laurene Kelly
14

15          This 9th day of JANUARY, 2000.

16

17

18

19

20

21

22

23

24

25

WITHOUT REPORTER'S ORIGINAL SIGNATURE
THIS TRANSCRIPT IS NOT CERTIFIED

EXHIBIT 12



Worldwide | Login | ☑ Contact Us

**HOME**  **PRODUCTS & SERVICES**  **INDUSTRY SOLUTIONS**  **SUPPORT**  **COMPANY**

# 2008 PRESS RELEASES

↑ **Company**

↑ **Press Room**

→ **Press Releases**

:: **2008**

   2007

   2006

   2005

   2004

## REALNETWORKS INTRODUCES REALDVD: THE BEST WAY TO WATCH DVDS

RealDVD Lets Consumers Save, Organize and Watch DVDs On Their PC and On The Go

**SAN DIEGO, CA, DEMOFall — September 8, 2008** — Digital entertainment services company RealNetworks® today unveiled RealDVD™, the first mainstream PC application allowing consumers to easily save their DVDs to their hard drive. RealDVD makes it easy to save DVDs to a PC or portable hard drive and watch them later without the physical discs. Unlike existing consumer applications on the market today, RealDVD is licensed DVD software that saves a secure copy of a DVD to the hard drive without removing or altering the CSS encryption.

"RealDVD gives consumers a great new way to get more out of their DVDs," said Rob Glaser, chairman and CEO of RealNetworks. "RealDVD continues in Real's tradition of consumer innovation over the past 15 years alongside RealAudio, RealJukebox, RealArcade, Rhapsody, and, most recently, RealPlayer 11."

RealDVD eliminates the hassle of searching through piles of DVD cases to find a missing disc and the disappointment of finding a favorite disc scratched and unplayable. Saving DVDs lets consumers create a valuable back-up copy of their digital library on their computer or portable drive for playback at home or on the road. RealDVD is ideal for traveling on business or entertaining the kids on a long trip with instant access to a variety of content and no physical discs to manage. Laptop users will appreciate improved battery life as the disc drive is no longer needed for video playback. Saving DVDs to portable hard drives creates an easy to manage personal library that is great for travel. Content saved to portable drives can be played on up to five machines licensed to an individual user.

**Fast Facts:**

* RealDVD saves an exact copy of the DVD image to a PC's internal or portable hard drive. Users can simultaneously watch and save a DVD

* Saved DVDs are then encrypted and locked again to make sure they cannot be shared or stolen

* Saving DVDs takes an average of 10-40 minutes, and takes up roughly 4-8 gigs of space

* 
  RealDVD lets users pause and auto resume playback where they

left off

* DVDs saved on a portable hard drive can be played on up to 5 PCs per user with an authorized copy of RealDVD

* Watching a saved DVD uses less battery life than viewing content from a disc in the drive

* Browse cover art, genre, title rating and actor information, imported automatically during saving

* Parental controls ensure children only access entertainment that is appropriate for their age

* Fifty percent of U.S. broadband households have over 50 DVDs in their collections, and last year consumers spent more than $16 billion purchasing DVDs *(According to TDG Reports & Screen Digest)*

* Hollywood shipped 1.1 billion DVD discs in 2007 — nearly 30 million more than in 2006 *(According to Screen Digest)*

In 1995 RealNetworks gave the Internet a voice with the first-ever Internet broadcast via the release of the RealAudio® Player, an innovation that garnered Real a coveted Emmy Award® by The National Academy of Television Arts & Sciences. Two years later RealNetworks became the first to bring streaming video to the Web with RealPlayer®, and followed that innovation with RealJukebox®, one of the first products allowing consumers to save their CDs to PCs, build media libraries and transfer to devices. Last year Real re-introduced a new version of RealPlayer, featuring a consumer-friendly download button that made it one-click simple to save Web video. RealDVD is the next step in bringing video entertainment to the PC.

RealDVD will be available this month from www.realdvd.com. Consumers can register to be one of the first to receive RealDVD for a limited-time discount offer of $29.99 ($20.00 off the retail price of $49.99). Additional licenses [up to 4] are available at a discounted price of $19.99.

**ABOUT REALNETWORKS**
RealNetworks, Inc. delivers digital entertainment services to consumers via PC, portable music player, home entertainment system or mobile phone. Real created the streaming media category in 1995 and has continued to lead the market with pioneering products and services, including: RealPlayer®, the first mainstream media player to enable one-click downloading and recording of Internet video; the award-winning Rhapsody® digital music service, which delivers more than 1 billion songs per year; RealArcade®, one of the largest casual games destinations on the Web; and a variety of mobile entertainment services, such as ringback tones, offered to consumers through leading wireless carriers around the world. RealNetworks' corporate information is located at www.realnetworks.com/company.

EXHIBIT 13

Case 3:06-cv-04648-MHP   Document 246    Filed 04/10/09   Page 36 of 42

about NCL»  publications»  NCL news»  join NCL»  search»  contact us»





NCL home

## Survey: **Consumers Demanding More from Their DVD Collections**

*Near-Unanimous Agreement: Consumers Believe Backing up DVD Content is a Right; Many Bothered by Inability to Do So*

Release Date: April 6, 2009
Contact: 202-835-3323, media@nclnet.org

Washington, DC—Americans' attitudes towards DVDs are evolving and driving expectations about their use, according to a new survey released today by the National Consumers League. The Opinion Research Corporation survey of 1,000 consumers, aged 18-64, who own a personal computer, conducted March 11-16, finds that—amidst a backdrop of a slowing market and troubled economy, when consumers' satisfaction may be more important than ever—Americans are overwhelmingly interested in the ability to copy or back up their DVDs to their computers and laptops.

With 69 percent of respondents reportedly watching DVDs on their computers, and with more than a third saying they've had to repurchase lost or damaged DVDs in the past, consumers are resoundingly interested in the ability to back-up their DVD content. According to the survey, 90 percent (and 93 percent of those with children in the household) agree that DVD owners should be able to copy a DVD to their computer in the same way that they save music from a CD.

For years, consumers have been able to freely copy and back up the content on their compact disc (CD) collections to their hard drives and other devices. Given the growing availability of affordable hard drives capable of storing the contents of multiple DVDs, NCL wanted to examine whether the expectation of freedom of usage from the CD market is translating to the consumer DVD market.

Consumers currently have limited options for saving the contents of most commercial DVDs to their computers, whether for back up purposes or simply so that they can easily access their DVD library without carrying around the actual discs. Some "expanded" editions of DVDs, which are usually sold at an additional cost, come with the ability to save an additional copy to a computer. NCL, the nation's oldest consumer advocacy group, commissioned the study to examine consumers' opinions related to the entertainment content stored in their DVD collections.

"Clearly, advances in technology have left consumers expecting a great deal of freedom when it comes to movies that they've purchased," said Sally Greenberg, NCL Executive Director. "Consumers' attitudes towards saving content have been shaped by their ability to freely copy the contents of their CD collections to their computers and iPods. Our survey shows that they are eager to have that same ability with their DVDs and are frustrated that the market has not adapted to meet that desire."

**Survey Highlights: DVDs are in widespread use beyond the TV set**

More than a third (35 percent) of consumers surveyed reported owning more than 50 DVDs, with the average household owning 78 DVDs, but consumers are no longer exclusively using a conventional television-and-DVD-player configuration:

- 69 percent of respondents—and 74 percent of those with children—reported that they (or members of their family) use a computer to watch DVDs.

- Nearly a third of respondents (31 percent) use a portable or in-car DVD player regularly. For respondents with children in the household, portable DVD players are even more common, with 40 percent reporting regular use.

- More than a third (38 percent) of respondents reported that they have had to repurchase at least one DVD because it was lost or damaged. For respondents with children in the household, this number increased to 45 percent.

"Consumers are taking their DVDs on the road with them," said John Breyault, NCL's Vice President for Public Policy, Telecommunications and Fraud. "With the growth in popularity and affordability of hand-held and car-based DVD players and video-capable MP3 players, when and where consumers watch movies has changed dramatically."

**Survey Highlight: Consumers indicate a high desire to copy DVDs**

While the majority of consumers (82 percent) have never saved a copy of a purchased DVD to their computers' hard drives, and a small number (4 percent) has tried and failed, respondents demonstrated overwhelming interest in being able to do so:

- Nearly all (90 percent; 93 percent with kids in the house) say DVD owners should be able to copy a DVD to their computer in the same way that they save music from a CD.

- Half of those surveyed (51 percent) were bothered that they can't save most DVDs to their hard drives without cracking the encryption or purchasing an expanded version of the DVD; these numbers were higher among those respondents with children in the household (56 percent) or between the ages of 25 and 34 (67 percent). In this age group, 92 percent think they should have this right.

- Nearly half (46 percent) of those who said they should be able to save a copy of a DVD onto their hard drive have had to repurchase DVDs due to loss or damage.

**Survey Highlight: The economy and the DVD Market - Is there a further slow-down ahead?**

While the great majority of consumers (89 percent) are satisfied with the value they are getting out of the DVDs they purchase, many reported that the economy has changed their DVD buying habits:

- More than half of respondents (55 percent) said that they are currently purchasing fewer DVDs than they did a year ago.

- Four in ten (41 percent) said they expect to purchase fewer DVDs one year from now.

- However, 41 percent said the ability to save a copy of their DVDs to their computer or laptop would make their DVD collections more valuable, and 40 percent said it might cause them to buy more DVDs.

For complete survey results, including an executive summary and a copy of the questionnaire, visit www.nclnet.org/drm. The National Consumers League thanks RealNetworks for the unrestricted

educational grant that made this survey possible.

### 

---

**About the National Consumers League**
Founded in 1899, the National Consumers League is America's pioneer consumer organization. Its mission is to protect and promote social and economic justice for consumers and workers in the United States and abroad. NCL is a private, nonprofit membership organization. For more information, visit www.nclnet.org.

**Survey Methodology**
1,000 online surveys were administered to adults 18-64, who personally own a desktop or laptop computer, between Wednesday, March 11th and Monday, March 16th, 2009. Data was then weighted to better represent the national Internet population. Variables included in the weighting are gender, region, age, and race.

**About Opinion Research Corporation**
Opinion Research Corporation, an *info*Group company, has offered innovative solutions to the toughest market research challenges of clients worldwide since 1938. Since the 1960s, ORC has conducted CARAVAN®, the USA's longest continuously running consumer omnibus. In addition, the firm has been conducting national, speech reaction, state and flash/overnight polls for CNN since April 2006. To learn more, visit www.opinionresearch.com.

EXHIBIT 14

1    GLENN D. POMERANTZ (SBN 112503)        ROBERT H. ROTSTEIN (SBN 72452)
     Glenn.Pomerantz@mto.com                rxr@msk.com
2    BART H. WILLIAMS (SBN 134009)          ERIC J. GERMAN (SBN 224557)
     Bart.Williams@mto.com                  ejg@msk.com
3    KELLY M. KLAUS (SBN 161091)            MITCHELL SILBERBERG & KNUPP LLP
     Kelly.Klaus@mto.com                    11377 West Olympic Boulevard
4    MUNGER, TOLLES & OLSON LLP             Los Angeles, California  90064-1683
     355 South Grand Avenue, 35th Floor     Tel: (310) 312-2000; Fax: (310) 312-3100
5    Los Angeles, CA  90071-1560
     Tel: (213) 683-9100; Fax: (213) 687-3702
6

7    GREGORY P. GOECKNER (SBN 103693)
     gregory_goeckner@mpaa.org
8    DANIEL E. ROBBINS (SBN 156934)
     dan_robbins@mpaa.org
9    15301 Ventura Boulevard, Building E
     Sherman Oaks, California  91403-3102
10   Tel: (818) 995-6600; Fax: (818) 285-4403

11   Attorneys for Defendants/Counterclaim-Plaintiffs/Plaintiffs
     COLUMBIA PICTURES INDUSTRIES, INC., DISNEY
12   ENTERPRISES, INC., PARAMOUNT PICTURES CORP.,
     SONY PICTURES ENTERTAINMENT, INC., SONY
13   PICTURES TELEVISION INC., TWENTIETH CENTURY
     FOX FILM CORP., NBC UNIVERSAL, INC., WALT
14   DISNEY PICTURES, WARNER BROS.
     ENTERTAINMENT, INC., UNIVERSAL CITY STUDIOS
15   PRODUCTIONS LLLP, UNIVERSAL CITY STUDIOS
     LLLP, AND VIACOM, INC.
16

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19

20   REALNETWORKS, INC., et al.,          |    CASE NO.  C 08-4548-MHP

21                Plaintiffs,             |    **SUPPLEMENTAL DECLARATION OF DR.**
                                          |    **JOHN P. J. KELLY IN SUPPORT OF**
22        vs.                             |    **STUDIOS' MOTION FOR SANCTIONS FOR**
                                          |    **SPOLIATION OF EVIDENCE**
23   DVD COPY CONTROL ASSOCIATION,        |
     INC., et al.                         |    Ctrm: 15 (Hon. Marilyn Hall Patel)
24
                                          |
25                Defendants.             |

26   AND CONSOLIDATED ACTIONS.            |

27

28
                                              SUPP. KELLY DECL. ISO SPOLIATION MOTION

## SUPPLEMENTAL DECLARATION OF DR. JOHN P. J. KELLY

I, Dr. John P. J. Kelly, declare as follows:

1.   I have previously filed Declarations in this matter, on September 30, 2008; October 6, 2008; and February 25, 2009.  I incorporate my background and credentials as summarized in those previous declarations.

2.   On March 10, 2009, my staff and I received a file named "ARccOS.zip" (the "Archive File") from Munger, Tolles & Olson, LLP as an attachment to an email.  I was informed that the Archive File was produced by RealNetworks.  I was also informed that RealNetworks contends that the Archive File is corrupted by computer virus.

3.   My testing and use of ARccOS.zip have indicated that neither the Archive File nor any of the files contained therein are infected by a virus or otherwise corrupted.  I have seen no evidence that would have supported RealNetworks' contention to the contrary.

4.   Upon receiving the Archive File, I scanned it with McAfee Total Protection Service software, version number 4.7.0.538 Patch 003b, for any computer viruses.  That software, which was updated as recently as March 8, 2009 at 11:42:31 PM, did not detect any computer virus in the Archive File, nor did it generate any other errors indicating corruption of the Archive File.

5.   After the virus-scanner indicated that the file was not infected with any computer virus or corrupted, I was easily and successfully able to extract all the files from the Archive File to a folder.  The resultant folder included several files and subfolders.  I scanned the resultant folder again with McAfee Total Protection Service software (mentioned above) for any computer virus.  The software did not detect any computer virus in any of the files in the folder, nor did it generate any other errors indicating corruption of such files.

6.   I was able to access all the files extracted from the "ARccOS.zip" Archive File.  The Archive File consists of several Microsoft-Windows-executable files such as "SetupDVDDecrypter_3.5.4.0", which is the installer file for the DVD ripper program "DVD Decrypter," as well as " FixVTS", "crc32" and "PgcEditPreview".  In addition, there are text files such as "psl2_install", which contains instructions to install the PSL2 (Anti-ARccOS) plug-in for PgcEdit and DVD Decrypter, and "lgpl" which contains the GNU Lesser General Public License.

1   The Archive File also includes "psl2_plugin.tcl", a file that appears to be software associated with

2   a PSL2 plug-in written in the TCL scripting language.  All of these files, and the others within the

3   Archive, were accessible and/or usable, and showed no signs whatsoever of corruption.

4       I declare under penalty of perjury under the laws of the United States that the foregoing is

5   true and correct and that this declaration was executed this 17th day of March, 2009 at Santa

6   Barbara, California.

_____

JOHN P. J. KELLY

    **SUPP. KELLY DECL. ISO SPOLIATION MOTION**