1  REGINALD D. STEER (SBN 056324)                WILLIAM SLOAN COATS (SBN 94864)
   rsteer@akingump.com                           wcoats@whitecase.com
2  MARIA ELLINIKOS (SBN 235528)                  MARK WEINSTEIN (SBN 193043)
   mellinikos@akingump.com                       mweinstein@whitecase.com
3  **AKIN GUMP STRAUSS HAUER & FELD LLP**        MARK F. LAMBERT (SBN 197410)
   580 California Street, 15th Floor             mlambert@whitecase.com
4  San Francisco, California 94104-1036          **WHITE & CASE LLP**
   Telephone:    (415) 765-9500                  3000 El Camino Real
5  Facsimile:    (415) 765-9501                  5 Palo Alto Square, 9th Floor
                                                 Palo Alto, California 94306
6  EDWARD P. LAZARUS (SBN 212658)                Telephone:    (650) 213-0300
   elazarus@akingump.com                         Facsimile:    (650) 213-8158
7  STEPHEN MICK (SBN 131569)
   smick@akingump.com
8  MICHAEL SMALL (SBN 222768)
   msmall@akingump.com
9  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   2029 Century Park East, Suite 2400
10 Los Angeles, California 90067-3012
   Telephone:    (310) 229-1000
11 Facsimile:    (310) 229-1001

12 Attorneys for Defendant and Counterclaimant
   DVD COPY CONTROL ASSOCIATION, INC.
13

14                       UNITED STATES DISTRICT COURT

15                      NORTHERN DISTRICT OF CALIFORNIA

16 REALNETWORKS, INC., a Washington          Case No. C08 04548 MHP
   Corporation; and REALNETWORKS HOME        Related Case No. C08 CV 04719 MHP
17 ENTERTAINMENT, INC., a Delaware corporation,

18                 Plaintiffs,               **RESPONSE MEMORANDUM IN**
                                             **SUPPORT OF MOTION OF DVD COPY**
19       v.                                  **CONTROL ASSOCIATION, INC. FOR**
                                             **PRELIMINARY INJUNCTION**
20 DVD COPY CONTROL ASSOCIATION, INC., a
   Delaware nonprofit corporation, et al.    Date:  April 24, 2009
21                                           Time:  9:00 A.M.
                   Defendants.               Ctrm:  15
22
                                             **Hon. Marilyn Hall Patel**
23
   AND RELATED CASES
24

25                        PUBLIC REDACTED VERSION

26

27

28

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

Dockets.Justia.com

# TABLE OF CONTENTS

Page No.

INTRODUCTION ........................................................................................................ 1

I.    DVD CCA IS LIKELY TO SUCCEED ON THE MERITS. ................................... 1

    A.    The Agreement's Language Prohibits CSS Implementations That Copy Protected DVD Content To Computer Hard Drives For Playback Without the DVD Disc. ........................................................................................... 3

        1.    RealDVD Does Not Comply With The Language Of the Agreement. ................................................................................ 7

        2.    RealNetworks' Challenges To DVD CCA's Interpretation Of The Language Of The Agreement Are Meritless. ................................... 9

    B.    The Extrinsic Evidence Shows That RealNetworks Was Aware That DVD CCA Understood The Agreement To Prohibit Applications That Copy Protected DVD Content For Playback Without Any Further Need For The Physical DVD Disc. ....................................... 10

    C.    RealNetworks' Grounds for Its Interpretation Of The Agreement Are Untenable. ........................................................................................... 13

        1.    The Confidential CSS Specifications Are Part Of The Agreement. 13

        2.    The Trial Court Decision In *Kaleidescape* Does Not Rescue RealDVD. ................................................................................ 16

        3.    RealNetworks' Adhesive Contract Theory Would Undermine The Societal Benefits Achieved Through Uniform Arrangements For the Licensing Of Intellectual Property And, In Any Event, Misapprehends The Rules Governing The Interpretation Of Standardized Agreements. ............................................................. 17

    D.    RealDVD Breaches The Implied Covenant Of Good Faith And Fair Dealing. ......................................................................................... 20

II.    THE EQUITIES COMPEL ENTRY OF PRELIMINARY RELIEF. .................... 20

III.    CONCLUSION ........................................................................................ 25

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

## TABLE OF AUTHORITIES

Page No.

### CASES

*24 Hour Fitness, Inc. v. Superior Court,*
    66 Cal. App. 4th 1199 (1998) .................................................................................. 19

*A&L Technology v. Resound Corp.,*
    No. C93-00107, 1995 U.S. Dist. LEXIS 22442, *12 (N.D. Cal. March 15, 1995) ....... 24

*Acorn v. Household Int'l, Inc.,*
    211 F. Supp. 2d 1160 (N.D. Cal. 2002) ............................................................... 18, 20

*Armendariz v. Foundation Health PsychCare Servs., Inc.,*
    24 Cal. 4th 83 (2000) ........................................................................................... 17, 18

*Badie v. Bank of America,*
    67 Cal. App. 4th 779 (1998) .................................................................................. 19

*Chow v. Levi Strauss & Co.,*
    49 Cal. App. 3d 315 (1975) ................................................................................... 20

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
    356 F.3d 1256 (10th Cir. 2004) ............................................................................ 21

*DVD Copy Control Ass'n, Inc. v. Brunner,*
    116 Cal. App. 4th 241 (2004) ............................................................................... 22

*eBay, Inc. v. Bidder's Edge, Inc.,*
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) ................................................................ 23

*Founding Members of the Newport Beach Country Club v.*
    *Newport Beach Country Club, Inc.,*
    109 Cal. App. 4th 944 (2003) ............................................................................... 18, 20

*Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan,*
    329 F.Supp.2d 1198 (C.D. Cal. 2004) .................................................................. 19

*Graham v. Scissor-Tail, Inc.,*
    28 Cal. 3d 807 (1981) ........................................................................................... 18, 19

*Inspection Management Sys., Inc. v. Open Door Inspections, Inc.,*
    No. 2:09-cv-00023, 2009 WL 805813, * 4-5 (E.D. Cal. March 26, 2009) ............. 21

*Kennecott Corp. v. Union Oil Co.,*
    196 Cal. App. 3d 1179 (1987) ............................................................................... 15

*Madden v. Kaiser Foundation Hosp.,*
    17 Cal. 3d 699 (1976) ........................................................................................... 18, 19

*Oestreicher v. Alienware Corp.,*
    502 F. Supp. 2d 1061 (N.D. Cal. 2007) ............................................................... 17, 19

*Oritani Savings & Loan Ass'n v. Fidelity & Deposit Co. of Maryland,*
    744 F. Supp. 1311 (D.N.J. 1990) ......................................................................... 18, 20

ii

*Rainier Credit Co. v. W. Alliance Corp.*,
    171 Cal. App. 3d 255 (1985) ............................................................................20

*Southern Cal. Edison Co. v. Superior Court*,
    37 Cal. App. 4th 839 (1995) ...........................................................................15

*State Farm Fire & Casualty Co. v. Keenan*,
    171 Cal. App. 3d 1 (1985) ........................................................................18, 20

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003) ...................................................................17, 19

*Triad Sys. Corp. v. Southeastern Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) ..........................................................................24

*Utility Consumers' Action Network, Inc. v. AT&T Broadband of Southern California, Inc.*,
    135 Cal. App. 4th 1023 (2006) .......................................................................21

*Winet v. Price*,
    4 Cal. App. 4th 1159 (1992) ..............................................................................2

**STATUTES**

Cal. Civ. Code § 1636 .................................................................................................2

Cal. Civ. Code § 1638 .................................................................................................2

Cal. Civ. Code § 1641 .................................................................................................2

Cal. Civ. Code § 1649 .................................................................................................2

Cal. Civ. Code § 1654 ...............................................................................................19

**OTHER AUTHORITIES**

Nimmer, *Licensing in the Contemporary Information Economy*,
    8 Wash. U. J.L. & Pol'y 99 (2002)................................................................18

*Restatement (Second) of Contracts* § 201(2)(a) (1981) .............................................2

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

INTRODUCTION

RealNetworks concocted RealDVD -- its software product that makes playable copies of DVDs on computer hard drives -- months before it applied for the license to the CSS technology that DVD playback devices require to unlock and play the content of CSS-protected DVDs, and without regard for the terms of the license. RealNetworks sought the license after-the-fact so that it could advertise its product as "legal," in contrast with illegal "rippers." But the terms of the license do not authorize copying products like RealDVD. The Agreement explicitly states its anti-copying purpose and requires DVD playback devices to perform specific operations in a prescribed sequence, precisely so that protected content on DVDs must be played directly from the DVD Disc itself. RealNetworks incorrectly claims that RealDVD performs these operations when it accesses the content of the DVD Disc to save it to a computer hard drive or other storage medium. RealDVD does not -- and cannot, by definition -- perform the contractually required operations when it plays back the DVD content from the hard drive. RealNetworks' interpretation of the Agreement as permitting DVD copiers like RealDVD is contrary to critical contractual provisions, which RealNetworks' opening memorandum carefully avoids. RealNetworks' interpretation also is vitiated by its own extrinsic evidence, which shows that RealNetworks created RealDVD knowing that the product contradicted DVD CCA's understanding of the Agreement and did not disclose that it held a contrary understanding. Basic contract law principles bind RealNetworks to DVD CCA's understanding of the Agreement.

On the equities, RealNetworks attempts to brush aside the Agreement's irreparable injury stipulation but does not dispute the evidence that release of RealDVD would seriously threaten the vitality of the DVD CCA. On the other hand, RealNetworks grossly exaggerates the hardship to itself if RealDVD is enjoined. By its own account, RealNetworks is a major player in the digital entertainment industry, with numerous successful products, and there is nothing to indicate that it will not continue to thrive after it is preliminarily enjoined from selling RealDVD.

I.    DVD CCA IS LIKELY TO SUCCEED ON THE MERITS.

It is undisputed that RealNetworks' DVD playback device, RealDVD ("RealDVD" refers to both "Facet" and "Vegas"), uses the Content Scramble System ("CSS") licensed from DVD CCA to enable

1

1   consumers to make lasting, digital copies of DVDs on a computer hard drive or other storage media and

2   to view the copied DVD content without any further need for the physical DVD Disc.  RealNetworks

3   contends that this "core functionality" of RealDVD does not breach the Agreement.  RealNetworks, Inc.

4   and RealNetworks Home Entertainment, Inc.'s Opposition to Motion for Preliminary Injunction

5   ("RealNetworks Mem.") at 22.  This contention is wrong under basic principles of contract

6   interpretation, which require contracts to be interpreted so as to honor the mutual intent of the parties at

7   the time of contracting.  Cal. Civ. Code § 1636.  The starting point for ascertaining the parties' intent in

8   any contract is the language of the agreement, *id.* at § 1638, which must be interpreted as a whole to

9   give effect to each provision.  *Id.* at § 1641.  If the language of the contract is reasonably susceptible to

10  more than one interpretation, it is ambiguous and the court is then required to consider extrinsic

11  evidence of the parties' respective understandings of the contract.  *Winet v. Price*, 4 Cal. App. 4th 1159,

12  1165 (1992).  When the extrinsic evidence reveals that one party understood that the other party

13  interpreted the contract in a particular way, then the latter's interpretation shall control.  Cal. Civ. Code §

14  1649; *Restatement (Second) of Contracts* § 201(2)(a) (1981).  By the same token, a party's

15  uncommunicated subjective understanding of a contract cannot be used to support the interpretation of

16  the contract asserted by that party in litigation.  *Winet*, 4 Cal. App. 4th at 1166 n.3.

17       The Agreement's language is not ambiguous because it is not reasonably susceptible of

18  RealNetworks' interpretation.[1]

19

20  [1]



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP



RealNetworks' effort to justify its interpretation of the Agreement rests on a set of erroneous propositions. RealNetworks falsely claims that the CSS Specifications that prescribe the playback sequence of devices like RealDVD somehow are not part of the Agreement; it seeks refuge in the narrow (and incorrect) state trial court ruling in *Kaleidescape* which, in any event, does not apply here; and its assertion that its interpretation must control because the Agreement supposedly is "adhesive" ignores the rules governing the interpretation of uniform contracts like the Agreement and threatens the economic and societal benefits of standardized intellectual property licenses.

A.  **The Agreement's Language Prohibits CSS Implementations That Copy Protected DVD Content To Computer Hard Drives For Playback Without the DVD Disc.**



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1

2

3

4

5

6        Consistent with these requirements, the Procedural Specifications provide that, "The

7   Authenticator in a CSS Decryption Module shall correctly engage in and complete the authentication

8   process *with the DVD Drive* and ensure that the CSS Keys are received by the Descrambler *only if the*

9   *authentication process is successful.*"  Pak Dec., Exh. P at DVD016784 (§ 6.2.3) (emphasis added).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

³

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1 ██████████

2     Moreover, DVD CCA's interpretation of the contract documents carries out the central objective

3 of the Agreement: ████████████████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████████████████

6     In contrast, RealNetworks' interpretation cannot be squared with the language of the

7 Agreement and violates its explicitly stated overarching purpose.

8     1.    RealDVD Does Not Comply With The Language Of the Agreement.

9 ████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████████████████████████████

21

22 [4] ██████████████████████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████████████████████████

24 [5] ██████████████████████████████████████████████████████████████████████

25 [6] ██████████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████████████

27 [7] ████████████████████████████████████████████████████████████████████████████

28

7

RealNetworks' recitation of what RealDVD does is a sideshow.  RealNetworks Mem. at 24-25.
It ignores what RealDVD fails to do – namely, implement CSS in the manner required by the language
of the Agreement.  RealNetworks never actually explains how the text of the Agreement supports its
argument.

8

1

2

3



4

2.   <u>RealNetworks' Challenges To DVD CCA's Interpretation Of The Language Of The Agreement Are Meritless.</u>

5

6   In addition to its primary (and profoundly mistaken) contention that its interpretation of the

7   Agreement is reasonable because the contract does not state explicitly that "DVDs must be played back

8   from the physical DVD Disc and not a computer hard drive," RealNetworks levies a series of attacks

9   on DVD CCA's interpretation of the Agreement.  Each of these attacks misfires.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Parsons and Pak are not attesting to the meaning of the language of the Agreement.  Parsons'

26   declaration describes the purpose of CSS and the formation of the DVD CCA.  Pak's describes the

27   process for becoming a CSS licensee and the documentation that DVD CCA provides to licensees.

28

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1

2

3

4

**B.**    The Extrinsic Evidence Shows That RealNetworks Was Aware That DVD CCA
Understood The Agreement To Prohibit Applications That Copy Protected DVD Content
To Computer Hard Drives For Playback Without Any Further Need For The Physical
DVD Disc.

7

8

9

10

11

12

13

14

15

16

There is no evidence whatsoever that RealNetworks informed DVD CCA that it had a contrary

interpretation.  Under California rules of contract interpretation, RealNetworks is bound by its own

understanding of DVD CCA's understanding of the Agreement.  RealNetworks' subjective construction

of the Agreement, which it did not disclose to DVD CCA, cannot be used to support the interpretation

that RealNetworks is advancing in this litigation.[8]

22

23

24

---

[8]



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP



RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

**C.**   RealNetworks' Grounds for Its Interpretation Of The Agreement Are Untenable.

In ducking critical provisions of the Agreement and the extrinsic evidence of the parties' understanding, RealNetworks rests its interpretation of the Agreement on the following three grounds: (a) the confidential CSS Specifications are not part of the Agreement, and thus do not constrain the core functionality of RealDVD; (b) the California state trial court ruling in the *Kaleidescape* case allegedly rejected DVD CCA's interpretation of the Agreement and thereby renders RealDVD contractually lawful; and (c) the Agreement is a contract of adhesion and therefore must be construed according to RealNetworks' interpretation.   None of these grounds holds water.

**1.**   The Confidential CSS Specifications Are Part Of The Agreement.

RealNetworks argues that the confidential CSS Specifications -- the Technical Specifications applicable to the particular membership categories that RealNetworks selected and the CSS General Specifications applicable to all CSS licensees -- impose no restrictions on RealDVD because RealNetworks did not receive those documents prior to executing the CSS License Agreement and thus they "were not properly incorporated into the CSS Agreement."   RealNetworks Mem. at 24. RealNetworks is wrong.   Both the CSS Technical Specifications and the CSS General Specifications are very much part of the Agreement.

As a threshold matter, RealNetworks' "incorporation" argument is specious.   Whether the Agreement separately and individually "incorporates" the CSS Technical Specifications and CSS General Specifications verbatim is not the relevant inquiry.   It is undisputed that Section 4.2 of the CSS License Agreement requires all licensees to comply with the "CSS Specifications."   Pak Dec., Exh. J at Real001418.   Thus, the relevant inquiry is whether the CSS Technical Specifications and the CSS General Specification are themselves "CSS Specifications."   They are.

RealNetworks' argument that the CSS Technical Specifications are not part of the Agreement is absurd.   The CSS Technical Specifications that RealNetworks received from DVD CCA after executing

13

1   the CSS License Agreement -- the Authenticator Specifications and the Descrambler Specifications --

2   were the very CSS Technical Specifications that RealNetworks knew it would be getting because those

3   documents corresponded to the DVD CCA membership categories that RealNetworks had selected. The

4   language of the CSS License Agreement underscores this fundamental point. That document defines

5   "CSS Specifications" as "documentation relating to CSS entitled 'CSS Specifications' (including the

6   Procedural Specifications and the *Technical Specifications that [DVD CCA] makes available to*

7   *Licensee. . . .*" Pak Dec., Exh. J at Real001412 (emphasis added). Thus, as a procedural matter, when it

8   executed the CSS License Agreement, RealNetworks was aware that DVD CCA subsequently would

9   "make available" to it the CSS Technical Specifications applicable to the membership categories that

10  RealNetworks selected. *Id.* at Real001443. As a substantive matter, RealNetworks was aware that these

11  CSS Technical Specifications would provide RealNetworks with the confidential information necessary

12  to ensure that its device would be in "technical compliance" with the Agreement. Pak Dec., Exh. G. at

13  Real001732. All told, RealNetworks was not caught by surprise when it acknowledged receipt of the

14  CSS Technical Specifications from DVD CCA on September 10, 2007. DVD CCA Mem. at 8-9 & n.9.

15      The infirmity of RealNetworks' position is compounded by what RealNetworks itself says it did

16  after receiving the CSS Technical Specifications. RealNetworks did not contact DVD CCA to ask "what

17  are these documents – we did not know that we would be getting them" or to inquire whether

18  compliance with the CSS Technical Specifications was necessary under the Agreement.

19

20

21  _____

22  10

23

24

25

26

27

28

14



This evidence further undermines RealNetworks' interpretation of the Agreement as somehow excluding the CSS Technical Specifications. *See Southern Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 851 (1995) ("'The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.'") (internal quotations omitted); *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (1987) (t]he conduct of the parties *after execution of the contract and before any controversy has arisen as to its effect* affords the most reliable evidence of the parties' intentions.") (emphasis added).

RealNetworks' argument that the CSS General Specifications are not part of the Agreement fares no better. RealNetworks received the CSS General Specifications along with the CSS Technical Specifications on September 10, 2007, as part of a single package. Pak Dec. ¶ 21, ▬. The "Receipt of Documents" that RealNetworks then executed and returned to DVD CCA explicitly identifies the CSS General Specifications as a "CSS Specification." *Id*. And after it had the package in hand, RealNetworks did nothing to suggest that it believed that the CSS General Specifications were not CSS Specifications with which it had to comply pursuant to Section 4.2 of the CSS License Agreement.

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1

2

3

4

5

6

7

8      2.      The Trial Court Decision In *Kaleidescape* Does Not Rescue RealDVD.

9          RealNetworks' suggestion that its interpretation of the Agreement was adopted in the March

10   2007 state trial court decision in the *Kaleidescape* case is wrong.  RealNetworks Mem. at 27-28.  DVD

11   CCA's theory of breach in *Kaleidescape* was limited to the contention that the Kaleidescape system

12   violated Sections 1.5 and 2.1.2 of the CSS General Specifications.  The trial court decision in

13   *Kaleidescape* was confined to that theory:  it held only that the General Specifications are not CSS

14   Specifications with which licensees must comply.[11]  In contrast, DVD CCA's charges against

15   RealNetworks are not limited solely to violations of the CSS General Specifications.  DVD CCA

16   alleges that, in designing RealDVD, RealNetworks violated not only the CSS General Specifications,

17   but also the Procedural Specifications, the CSS License Agreement, and the category-specific

18   Technical Specifications that RealNetworks selected.  Even if the trial court's ruling in *Kaleidescape*

19   that the CSS General Specifications are not "CSS Specifications" were affirmed on appeal, it could

20   have no conceivable bearing on the applicability of these other contract provisions to RealDVD.[12]

21          Moreover, even as to the applicability of the CSS General Specifications themselves, the trial

22

23

24   _____

25   [11] As mistaken as its decision was, the trial court in *Kaleidescape* did not go so far as to adopt
     RealNetworks' thesis that the CSS Technical Specifications are excluded from the Agreement -- it held
     only that the CSS General Specifications are not part of the Agreement.

26   [12]

27

28
                                              16

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1   court decision in *Kaleidescape* does not shelter RealDVD.[13]

[black redacted block spanning lines 1-8]

9          By contrast, there is no evidence that DVD CCA was aware that RealNetworks had a

10   contrary understanding of the Agreement.  On these uncontested facts, California contract law binds

11   RealNetworks to its understanding of DVD CCA's understanding, *i.e.* that the Agreement requires that

12   devices play back CSS protected content directly from a DVD Disc.

13          3.      RealNetworks' Adhesive Contract Theory Would Undermine The Societal Benefits
                    Achieved Through Uniform Arrangements For the Licensing Of Intellectual Property
14                  And, In Any Event, Misapprehends The Rules Governing The Interpretation Of
                    Standardized Agreements.
15

16          RealNetworks claims that because the Agreement is "adhesive," its interpretation is dispositive.

17   RealNetworks Mem. at 22-23.  RealNetworks bases its argument on a series of cases that primarily

18   involved boilerplate agreements between an individual, on the one hand, and a large company, on the

19   other.  In each of these cases there was no question that the agreements met the definition of a contract

20   of adhesion: "a standardized contract, which, imposed and drafted by the party of superior bargaining

21   strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."

22   *Armendariz v. Foundation Health PsychCare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000) (internal quotations

23   and citation omitted).[14]  RealNetworks cites no cases, however, involving agreements for the licensing

24

---

25          [13] As DVD CCA pointed out in its opening memorandum, the *Kaleidescape* case is on appeal and
      thus the trial court's ruling is not final under California law for purposes of res judicata and collateral
26   estoppel.  DVD CCA Mem. at 18 n.20.

          [14] The cases involving consumers on the one hand, and corporations on the other, that
27   RealNetworks cites are:  *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) (consumer telephone services
      contract with telephone company ); *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061 (N.D. Cal.
28   2007) (consumer computer purchase contract with computer seller); *Madden v. Kaiser Foundation*

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1    of intellectual property to sophisticated companies, such as RealNetworks. Its attempt to fit unique and

2    vitally important uniform technology licenses into the adhesive contract mold misses the mark.

3         By their very nature, uniform intellectual property licenses can rarely, if ever, be subject to

4    separate negotiation with each prospective licensee. It is instead essential that licensors of intellectual

5    property have the latitude to set uniform rules governing use of that property. This approach is fair to

6    the licensor because what the licensee buys is not the intellectual property per se (unlike in a sale of

7    goods where a consumer actually acquires the good), but permission to use the property within the

8    limits of the license terms. *See* Nimmer, *Licensing in the Contemporary Information Economy*, 8

9    Wash. U. J.L. & Pol'y 99, 123, 136-37, 162-65 (2002). It is also fair to licensees because the

10   uniformity ensures a level playing field on equal terms for all licensees -- large companies and start-ups

11   alike, and across multiple industries. Furthermore, it is widely acknowledged that the setting of

12   standards for the use of intellectual property pursuant to uniform licensing arrangements can lead to

13   profound societal benefits by producing efficiencies, increasing innovation, and fostering increased

14   access to new technology. *See* Nimmer, 8 Wash. U. J.L. & Pol'y at 104 (uniform licensing of

15   intellectual property "contributes to the efficient tailoring of an information product and its cost to meet

16   diverse market demands").

17        The CSS License administered by the DVD CCA is a classic example of a uniform agreement

18   that provides equal access to technology by parties from multiple industries that has created enormous

19   societal benefits -- namely, the advent of the market for DVDs and devices that play them. The notion

20   that RealNetworks' interpretation controls because the Agreement is not negotiated, and hence is

21   "adhesive," if accepted, would seriously impair the ability of DVD CCA to safeguard the dissemination

22

23   *Hosp.*, 17 Cal. 3d 699 (1976) (arbitration provision in employment contract); *Armendariz, supra* (same);
     *State Farm Fire & Casualty Co. v. Keenan*, 171 Cal. App. 3d 1 (1985) (individual's fraud claim against
24   flight service company and insurer); *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160 (N.D. Cal.
     2002) (agreement to arbitrate disputes arising from loan agreement between consumers and financial
25   institution). RealNetworks also cites three adhesive contract cases that did not pit consumers against a
     corporation. *See Oritani Savings & Loan Ass'n v. Fidelity & Deposit Co. of Maryland*, 744 F. Supp.
26   1311 (D.N.J. 1990) (agreement between financial institution and surety); *Graham v. Scissor-Tail, Inc.*,
     28 Cal. 3d 807 (1981) (agreement between concert promoter and music performer); *Founding Members
27   of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944 (2003)
     (agreement memorializing regulations governing a private club). But for the reasons set forth below,
28   these cases are of no help to RealNetworks either.

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

of CSS. More fundamentally, RealNetworks' position would have pernicious consequences beyond

this litigation, and serve to unravel the benefits that may be achieved through standard licensing

arrangements. Under RealNetworks' theory, individual licensees would be empowered to impose their

own self-serving, idiosyncratic terms of use of the licensed technology, which is supposed to be made

available to all comers under uniform terms, and would thereby diminish the likelihood that owners of

intellectual property will agree to license its use.

This Court need not, however, resolve whether the Agreement is adhesive, because

RealNetworks is wrong on the implications of calling a contract "adhesive." Contrary to

RealNetworks' supposition, adhesive contracts are not automatically construed according to the

adhering party's interpretation, and none of the cases that RealNetworks cites holds otherwise. Indeed,

as the California Supreme Court stated in one of the cases on which RealNetworks relies, "[t]o describe

a contract as adhesive in character is not to indicate its legal effect. It is, rather, the beginning and not

the end of the analysis . . . ." *Graham*, 28 Cal. 3d at 819 (internal quotations omitted). That same case

states unequivocally that, in analyzing an adhesive contract, courts generally should enforce the

agreement "according to its terms," *id.*,[15] and that the terms of the agreement are to be construed

"under established principles" of contract interpretation, just like any other agreement. *Id.* at 819 n.16;

*see Badie v. Bank of America*, 67 Cal. App. 4th 779, 798 (1998) (applying "standard rules of contract of

interpretation" in construing an adhesive consumer banking agreement); *24 Hour Fitness, Inc. v.

Superior Court*, 66 Cal. App. 4th 1199, 1214 (1998) (applying "standard rules of contract

interpretation" in construing an adhesive health club membership agreement). The interpretive rule of

last resort known as the doctrine of contra proferentem states that ambiguities in an agreement are to be

construed against the drafter, including the drafter of an adhesive contract.[16] This doctrine, however,

---

[15] An adhesive contract is unenforceable if it (i) "does not fall within the reasonable expectations of the. . . 'adhering' party," or (ii) "is unduly oppressive or 'unconscionable.'" *Graham*, 28 Cal. 3d at 820. RealNetworks is not arguing that the Agreement is unenforceable. To the contrary, RealNetworks affirmatively seeks to enforce the Agreement based on its interpretation of the Agreement. Thus, RealNetworks' reliance on a series of cases addressing the enforceability of adhesive contracts, as opposed to their interpretation, is misplaced. RealNetworks Mem. at 22-23 (citing *Ting, Oestreicher*, and *Madden*).

[16] Cal. Civ. Code § 1654; *Badie*, 67 Cal. App. 4th at 800; *Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan*, 329 F. Supp. 2d 1198, 1216 (C.D. Cal. 2004).

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1  comes into play *only* when the meaning of an adhesive contract cannot be ascertained through the

2  agreement's text and the extrinsic evidence of the parties' understanding.[17]

3          The application of basic interpretive principles to adhesive contracts is illustrated in *Founding*

4  *Members*, which RealNetworks cites. In that case, the plaintiff argued that the contract was adhesive.

5  109 Cal. App. 4th at 962. But the court did not just adopt the plaintiff's interpretation of the

6  agreement; instead, it used standard rules of contract interpretation to determine the meaning of the

7  agreement by ascertaining the parties' intent. To that end, the court first examined the language of the

8  contract. *Id.* at 956-57. The court then considered extrinsic evidence of the parties' understanding of

9  the contract. *Id.* at 957-60. Based on the language and the extrinsic evidence, the court construed the

10 contract according to the interpretation advanced by the defendant, which had drafted the contract. *Id.*

11 at 961. The court held that the doctrine of contra proferentem was inapplicable because there was no

12 material ambiguity to construe against the drafting party. *Id.* at 962.[18]

13         D.    RealDVD Breaches The Implied Covenant Of Good Faith And Fair Dealing.

14         RealNetworks does not seriously contest DVD CCA's claim that RealDVD breaches the implied

15 covenant of good faith and fair dealing. RealNetworks devotes just a footnote to that claim, in which it

16 asserts that the implied covenant does not impose duties that are not part of the express terms of the

17 contract. RealNetworks Mem. at 27 n.12. As DVD CCA showed in its opening memorandum, however,

18 RealNetworks' creation of a device that does exactly what the terms of the Agreement forbid frustrates

19 DVD CCA's legitimate contractual expectations and thereby breaches the covenant of good faith and fair

20 dealing. DVD CCA Mem. at 18-19.

21 II.    THE EQUITIES COMPEL ENTRY OF PRELIMINARY RELIEF.

22         As DVD CCA showed in its opening memorandum, RealNetworks' multiple breaches of the

23 Agreement entitle DVD CCA to a preliminary injunction under the parties' stipulation in Section 9.2 of

24

25      [17] *Chow v. Levi Strauss & Co.*, 49 Cal. App. 3d 315, 325 (1975); *Rainier Credit Co. v. W. Alliance Corp.*, 171 Cal. App. 3d 255, 263 (1985).

26      [18] *State Farm v. Keenan*, *Oritani*, and *Acorn*, *supra* note 12, also cited by RealNetworks, are in the same vein as *Founding Members*. The contracts in those three cases were said to be adhesive. But

27 as in *Founding Members*, the courts in *Keenan*, *Oritani*, and *Acorn* applied basic rules of contract interpretation to ascertain the meaning of the agreement -- they did not adopt the adhering party's

28 interpretation merely because the agreement was adhesive.

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

1   the CSS License Agreement that DVD CCA would suffer irreparable injury from those breaches.  DVD

2   CCA Mem. at 20.  RealNetworks blithely dismisses the legal effect of the stipulated irreparable injury

3   provision as "just one factor in the analysis" of whether injunctive relief should be entered.

4   RealNetworks Mem. at 47.  The case law is not on RealNetworks' side.  Most of the courts nationwide

5   that have addressed the enforceability of stipulated irreparable injury provisions have held that such

6   provisions are dispositive and should be honored, without any need to evaluate the evidentiary basis for

7   the irreparable injury claim.  DVD CCA Mem. at 20-21.  Although not explicitly making the

8   connection, courts in this line of precedent have essentially treated stipulated irreparable injury

9   provisions like liquidated damages provisions, which courts generally honor without analyzing the

10  evidentiary basis for the amount of damages claimed.  *See, e.g., Utility Consumers' Action Network,*

11  *Inc. v. AT&T Broadband of Southern California, Inc.*, 135 Cal. App. 4th 1023, 1038 (2006).

12        RealNetworks cites *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256

13  (10th Cir. 2004), as support for the proposition that the stipulated irreparable injury provision counts

14  for little in the equities equation.  That is not what *Dominion Video Satellite* says, however.  In that

15  case, the Tenth Circuit noted that courts generally have afforded weight to stipulated irreparable injury

16  provisions so as to honor the parties' up-front agreement on the impact of a breach.  *Id.* at 1266.  In that

17  regard, *Dominion Video Satellite* is in keeping with a second line of precedent, which, while holding

18  that stipulated irreparable injury provisions are not dispositive, state that such provisions should be

19  given their due, along with evidence of irreparable injury, in deciding whether to enter interim relief.

20  DVD CCA Mem. at 20 n.22 (citing *Dominion Video Satellite* and others cases in its line).[19]

21        DVD CCA is entitled to interim relief under either line of precedent.  Under the first line, the

22  stipulated irreparable injury provision in Section 9.2 of the CSS License Agreement itself justifies the

23  entry of a preliminary injunction.  In fact, enforcement of the stipulated remedy provision in this

24

_____

25  [19] A federal district court recently declined to give any weight to a stipulated irreparable injury

26  provision.  *Inspection Management Sys., Inc. v. Open Door Inspections, Inc.*, No. 2:09-cv-00023, 2009
    WL 805813, * 4-5 (E.D. Cal. March 26, 2009).  This decision is out of step both with the precedents that

27  consider such provisions to be dispositive and those that afford them significant weight.  The court based
    its wayward ruling on a misreading of *Dominion Video Satellite*, as well as on an unpublished Ninth

28  Circuit decision from 1995.  *Id.*

1  fashion is vitally important to the functioning of the Agreement as a whole. DVD CCA's insistence

2  that licensees adhere to the licensing requirements ensures the maintenance of the delicate balance that

3  the Agreement strikes to accommodate the interests of content providers, on the one hand, and the

4  consumer electronics and information technology companies that make the devices consumers use to

5  play back DVDs, on the other. If licensees are permitted to get around those requirements by making

6  and selling products that implement CSS to make unlawful copies of DVD content, the entire system is

7  undermined. Parsons Dec. ¶¶ 5-6. Instead of trying to guess upfront in a liquidated damages provision

8  as to the amount of damages such harm would cause, the Agreement provides a simple and fair

9  solution: the parties agreed in advance that a breach would result in irreparable injury and that the

10  remedy for that breach would be injunctive relief.[20]  The agreed stipulated remedy comprehensively

11  assesses the injury that DVD CCA will suffer from the degradation of its system for protecting

12  intellectual property, the attendant risk that other licensees will forsake their obligations and follow the

13  violator's lead, and the destruction of DVD CCA's critical trust relationships with other businesses.[21]

14      The result is the same under the second line of precedent. Applying these decisions, the

15  stipulated irreparable injury must be factored into the injunctive relief calculus, along with the evidence

16  that DVD CCA will incur irreparable injury in the absence of interim relief. RealNetworks alleges that

17  the "only harm articulated by the DVD CCA" is that some members of the DVD CCA "may . . .

18  question the terms of the Agreement" if RealDVD is allowed to go to market. RealNetworks Mem. at

19

20      [20] Although it denigrates the stipulated irreparable injury provision, RealNetworks does not assert that damages to DVD CCA from a breach of the Agreement could readily be calculated.

21      [21] RealNetworks argues that while a contractual stipulation to irreparable injury in the event of breaches of certain provisions of the Agreement may have made sense at the time the documents

22  originally were drafted, RealNetworks Mem. at 47-48, that is no longer the case because for over a decade, "'hundreds' of Web sites [have] posted a DVD copying product DeCSS, 'enabling untold

23  numbers of persons to download it and to use it.'" *Id.* at 48 n.21 (quoting *DVD Copy Control Ass'n, Inc. v. Brunner*, 116 Cal. App. 4th 241 (2004)). RealNetworks' attack on the premise of the stipulated

24  irreparable injury provision through invocation of DeCSS is misplaced. DeCSS made its way onto the internet through illicit cracking of the CSS code – unlike RealDVD, it was not the by-product of actions

25  of a rogue CSS licensee who deliberately misused the technology after obtaining a license from DVD CCA. *Brunner*, 116 Cal. App. 4th at 247-48. The threat that DeCSS poses to DVD CCA is thus very

26  different from the threat posed by RealDVD. DeCSS does not directly impinge on the CSS licensing arrangement. RealDVD does just that, however, because its "licensed" presence on the market would

27  upset the balance struck through the CSS licensing system, which binds all licensees to respect the anti-copying commands of the Agreement so as to safeguard protected content and facilitate the

28  dissemination of DVDs to the public.

22

1   48. There is much more evidence of harm than just that, but RealNetworks ignores it. The record

2   shows that if RealNetworks is permitted to launch its product and test its prediction of a strong

3   consumer response to a device that can make playable copies of DVDs, the integrity of the entire CSS

4   system will be fatally undermined, thus vitiating the purpose and mission of DVD CCA. Parsons Dec.

5   ¶ 7; ███████████████████████████████████████. DVD CCA was

6   formed to create an environment in which content providers could release their intellectual property on

7   the DVD format without fear of copying, and in which the consumer electronics and information

8   technology companies would be assured that there would be content available to be played back on

9   their products and that their products would be affordable. Parsons Dec. ¶¶ 4, 6. Allowing

10  RealNetworks to market a product capable of copying would poison the environment of trust essential

11  to DVD CCA's mission. *Id.* at ¶ 6. And absent that collective trust, DVD CCA will be irreparably

12  injured because its value as an organization hinges on its ability to enforce the Agreement and ensure

13  compliance with the CSS safeguards. *Id.* at ¶ 7. Simply put, the raison d'être of DVD CCA will be

14  gutted if licensees are permitted freely to violate the Agreement by selling a DVD copying machine.[22]

15  This injury to DVD CCA's reputation and goodwill alone warrants injunctive relief. *See eBay, Inc. v.*

16  *Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) (loss of customer goodwill is

17  irreparable "because it is neither easily calculable, nor easily compensable and is therefore an

18  appropriate basis for injunctive relief").[23]

19  _____

20  [22] ████████████████████████████████ Its governing Board of Directors consists of five Motion
    Picture Industry Directors; three Consumer Electronics Manufacturer Directors; three Computer

21  Manufacturer Directors; and one "At Large" Director. Declaration of Jacob Pak in Support of April 10,
    2009 Response Memorandum ("Pak Response Dec."), ¶¶ 2-3, Exh. A. The DVD CCA Bylaws contain

22  provisions defining Board quorum, two thirds majority voting with concurrence by one director from
    each group to ratify Board actions, and other procedural safeguards, as well as rules providing for

23  membership eligibility and privileges, and democratic processes for members to advance proposed
    amendments to the CSS Specifications. *Id.*

24  [23] RealNetworks states that DVD CCA's claim of economic harm is watered down as a result of

25  DVD CCA's supposed "acquiescence" to products offered for sale by CSS Licensees AMX and
    Telestream. RealNetworks Mem. at 48. RealNetworks has the facts wrong. DVD CCA has not

26  "acquiesced" to either the AMX product or the Telestream product, referred to as "Drive-in." ████

27  ███████████████████████████ Telestream became a CSS licensee in May
    2008, *id.* ¶ 5, and appears to have announced the commercial release of Drive-in September, 2008.

28  Ellinikos Response Dec., Exh. 9. DVD CCA first became aware of the existence of Drive-in only last

RESPONSE BRIEF OF DVD CCA IN SUPPORT OF PRELIMINARY INJUNCTION MOTION
CASE NO. C08 04548 MHP; C08 CV 04719 MHP

RealNetworks' plea that it will suffer "extreme hardship" if its launch of RealDVD is preliminarily enjoined rings hollow. The balance of the equities weighs against the party seeking to avoid an injunction when the harm of which that party complains is self-inflicted. *See, e.g., Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (party resisting injunction "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities") Here, RealNetworks has brought economic harm upon itself.

RealNetworks' decision was a calculated gamble. Having lost that bet, it now has to endure the consequences -- including what is says will be the loss of returns on its investment in RealDVD. *See Triad*, 64 F.3d at 1338 (party's claim that it will suffer lost profits as a result of injunction barring "an activity which has been shown likely to be infringing . . . merits little equitable consideration") (internal quotations omitted).

---

month, however, when RealNetworks mentioned the product in its brief in opposition to DVD CCA's preliminary injunction motion. Pak Response Dec. ¶ 5. DVD CCA has no intention of "acquiescing" to that product.

[24] Of course, any competitive advantage gained by RealNetworks would have come as a result of its breach of the Agreement and attendant erosion of the level playing field the Agreement seeks to foster. Any competitive disadvantaged suffered by RealNetworks as a result of the entry of a preliminary injunction is just the flip side of the fruits that it would have enjoyed in the absence of the injunction, and thus is entitled to no weight in the balance of the equities. *See A&L Technology v. Resound Corp.*, No. C93-00107, 1995 U.S. Dist. LEXIS 22442, at *12 (N.D. Cal. March 15, 1995)

1

2 ████████████████████████████████████████████ As it boasts elsewhere

3 in its memorandum, RealNetworks "is not a company operating on the fringes of the Internet," but

4 rather, has a solid and extensive track record of success in the digital entertainment business and offers

5 a wide variety of music and video services to huge numbers of individuals and corporate customers.

6 RealNetworks Mem. at 5.  A continued injunction on the sale of RealDVD will not constrain

7 RealNetworks' ability to profit from the provision of these other popular products.

8        From DVD CCA's side of the equities equation, RealNetworks' influence in the marketplace

9 makes the continuance of injunctive relief all the more imperative.  Consumer perception that it is

10 "legal" to copy DVDs on computers using RealDVD is likely to take hold precisely because

11 RealNetworks' products are so widely-known and used.  If an entrenched player in the digital media

12 industry like RealNetworks is promoting it, then such copying must be lawful -- or so people might

13 reasonably believe should this Court decline to issue a preliminary injunction and thereby permit

14 RealNetworks to flood the market with RealDVD.  *See* Memorandum of Studio Plaintiffs' in Support

15 of Motion for Preliminary Injunction at 22-23.

16 III.     CONCLUSION

17        For the reasons set forth in its Opening Memorandum and above, DVD CCA respectfully

18 submits that the Court should grant its motion for a preliminary injunction.

19

20 Dated: April 10, 2009                 Respectfully submitted,

21                                     AKIN GUMP STRAUSS HAUER & FELD LLP

22                                     WHITE & CASE LLP

23

24                             By _____/s/_____

25                                     Reginald D. Steer
                                Attorneys for Defendant and Counterclaimant
                                DVD COPY CONTROL ASSOCIATION, INC.

26

27

28