1   JAMES A. DiBOISE, State Bar No. 83296
    Email: jdiboise@wsgr.com
2   LEO CUNNINGHAM (SBN 121605)
    Email: lcunningham@wsgr.com
3   COLLEEN BAL (SBN 167637)
    Email: cbal@wsgr.com
4   MICHAEL A. BERTA (SBN 194650)
    Email: mberta@wsgr.com
5   TRACY TOSH LANE (SBN 184666)
    Email: ttosh@wsgr.com
6   WILSON SONSINI GOODRICH & ROSATI PC
    One Market Street, Spear Tower, Suite 3300
7   San Francisco, CA 94105
    Bus: (415) 947-2000
8   Fax: (415) 947-2099

9   Attorneys for Plaintiffs
    REALNETWORKS, INC. and
10  REALNETWORKS HOME ENTERTAINMENT

11

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15  REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME | Case Nos. C08 04548 MHP; C08 04719 MHP |
| 16  ENTERTAINMENT, INC., a Delaware corporation, | |
| 17                    Plaintiffs, | **REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC'S** |
| 18         v. | **RESPONSE TO STUDIOS AND DVD CCA'S MOTIONS FOR** |
| 19  DVD COPY CONTROL ASSOCIATION, INC., a | **PRELIMINARY INJUNCTION** |
| 20  Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; | **[PUBLIC REDACTED VERSION]** |
| 21  PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a | Before:  Honorable Marilyn H. Patel |
| 22  Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC | Date:    April 24, 2009 |
| 23  UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware | Time:    9:00 a.m. |
| 24  corporation; and VIACOM, Inc., a Delaware Corporation, | Dept:    Courtroom 15 |
| 25 | |
| 26                   Defendants. | |
| 27  AND RELATED CASES | |
| 28 | |

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................1

ARGUMENT ........................................................................................................2

I.    DEFENDANTS HAVE NOT AND CANNOT DEMONSTRATE THAT THE
      REAL PRODUCTS FAIL TO COMPLY WITH THE CSS AGREEMENT.....................2

      A.    The Purpose of CSS Is to Protect Unencrypted Content............................2

      B.    Defendants' Interpretation of CSS Documentation Is Contrary to the Facts..........6

      C.    The RealDVD Products Comply with the Specific Terms of the CSS
            Agreement ................................................................................9

            1.    The CSS Documentation Does Not Have A "Disc-in-Tray"
                  Requirement ................................................................10

            2.    The CSS Documentation ███████████████████████████████
                  ███████████████████████████████████..........................12

            3.    The RealDVD Products ████████████████████████████
                  ..........................14

            4.    There is No ██████████████████████ In the CSS Documentation........15

            5.    The RealDVD Products Comply With The License Requirements
                  And Thus Do Not "Circumvent" CSS Under The CSS Agreement .........18

            6.    The RealDVD Products Do Not "Remove" or "Bypass" CSS .................18

      D.    The Defendants Cannot Imply Restrictions Into the CSS Agreement .................19

            1.    Real's Awareness Of The DVD CCA's Loss In *Kaleidescape* Does
                  Not Impose Additional Obligations On Real .............................19

            2.    Contractual Terms Cannot Be Implied Based on One Party's Intent........21

            3.    New Contractual Terms Cannot Be Added Under the Guise of the
                  Covenant of Good Faith and Fair Dealing ................................23

II.   THE REALDVD PRODUCTS DO NOT VIOLATE THE DMCA .................................24

      A.    The RealDVD Products' Implementation of CSS Is Not Circumvention............24

            1.    The Studios Misapply § 1201(a)(2) to Real's Licensed Use of CSS ........24

            2.    The Studios Misapply § 1201(b) to Real's Implementation of CSS.........27

            3.    CGMS is irrelevant to a DMCA analysis.................................29

      B.    The RealDVD Products' ████████████████████████ is not Circumvention of
            ARccOS or RipGuard.....................................................30

| | | 1. | The Studios Misapply § 1201(b) to ARccOS and RipGuard ███ ..........30 |
| | | 2. | ARccOS and RipGuard ███ Are Not Effective Technological Measures...................................................................................32 |
| | | 3. | ██████ ████ Do Not "Circumvent" ARccOS or RipGuard ███.....35 |
| | C. | | The RealDVD Products Primarily Enable "Fair Use" ...........................37 |
| III. | | | THE BALANCE OF HARDSHIPS REQUIRES LIFTING THE INJUNCTION ...........43 |
| | A. | | The RealDVD Products Do Not Harm the Legitimate Interests of the Studios.......................................................................................43 |
| | | 1. | There is no Presumption of Irreparable Harm...........................43 |
| | | 2. | The Studios Have No Evidence that Sales of RealDVD Products Will Affect Consumer Perception of Copying ...........................45 |
| | | 3. | There is No Evidence That RealDVD Products Will Decrease Studios' Sales ......................................................................46 |
| | | 4. | Even if RealProduct Did Decrease Sales Such Harm Would Be Purely Economic and Compensable In Damages .....................46 |
| | | 5. | A Preliminary Injunction Would Irreparably Harm Real..........................48 |
| | | 6. | A Preliminary Injunction Would Harm Consumers..................48 |
| | B. | | The DVD CCA Has Provided No Evidence of Harm ...........................49 |
| CONCLUSION | | | ............................................................................................50 |

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*321 Studios v. Metro-Goldwyn-Mayer Studios, Inc.,*
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ............................................................ 26, 27, 38
    47

*A&M Records, Inc. v. Napster,*
    114 F. Supp. 2d 896 (N.D. Cal. 2000) ................................................................ 45, 47

*Agfa Monotype Corp. v. Adobe Sys., Inc.,*
    404 F.Supp.2d 1030 (N.D. Ill. 2005) ........................................................................ 29

*Bedrossian v. Nw. Mem'l Hosp.,*
    409 F.3d 840 (7th Cir. 2005) ...................................................................................... 44

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,*
    222 Cal. App. 3d 1371 (1990) .................................................................................... 23

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.,*
    381 F.3d 1178 (Fed. Cir. 2004) ................................................................................ 41

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................................ 43, 44

*Founding Members of the Newport Beach Country Club v.*
    *Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944 (2003) ............................ 22

*Guz v. Bechtel Nat'l, Inc.,*
    24 Cal. 4th 317 (2000)................................................................................................ 23

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey,*
    497 F. Supp. 2d 627 (E.D. Pa 2007) ......................................................................... 26

*Jacobsen v. Katzer,*
    535 F.3d 1373 (Fed. Cir. 2008)................................................................................. 44

*Jacobsen v. Katzer,*
    No. C 06-01905 JSW, 2009 WL 29881 (N.D. Cal. Jan. 5, 2009)..................................... 44

*Johnston v. Comm'r of Internal Revenue,*
    461 F.3d 1162 (9th Cir. 2006)................................................................................... 22

*Kansas City Southern v. Grupo TMM, S.A.,*
    No. Civ. A. 20518-NC, 2003 WL 22659332 (Del. Ch. Nov. 4, 2002) ............................ 49

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    387 F.3d 522 (6th Cir. 2004)............................................................................... 31, 39

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980)................................................................................... 48

*Macrovision v. Sima Products Corp.*,
    No. 05 Civ. 5587, 2006 WL 1063284 (S.D.N.Y. Apr. 20, 2006) ...............42, 44

*Merced County Sheriff's Employee's Ass'n v. County of Merced*,
    188 Cal. App. 3d 662 (1987)...............21

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007)...............43

*Microsoft Corp. v. EEE Business Inc.*,
    555 F. Supp. 2d 1051 (N.D. Cal. 2008) ...............26

*N. Cheyenne Tribe v. Hodel*,
    851 F.2d 1152 (9th Cir. 1988)...............44

*National League of Junior Cotillions, Inc. v. Porter*,
    No. 3:06-cv-508-RJC, 2007 WL 2316823 (W.D. N.C. Aug. 9, 2007) ...............44

*Oritani Sav. & Loan Ass'n v. Fid.& Deposit Co. of Maryland*,
    744 F. Supp. 1311 (D.N.J. 1990) ...............22

*RealNetworks, Inc. v. Streambox, Inc.*,
    No. 2:99CV02070, 2000 WL 127311 (W.D. Wash. Jan. 18, 2000) ...............29, 30

*Recording Industry Ass'n of America v. Diamond Multimedia Systems, Inc.*,
    180 F.3d 1072 (9th Cir. 1999)...............42, 43

*Searle v. Allstate Life Ins. Co.*,
    38 Cal. 3d 425 (1985)...............21

Sony Corporation of America v. Universal City Studios, Inc.,
    464 U.S. 417 (1984) ...............*passim*

*State Farm Fire and Cas. Co. v. Keenan*,
    171 Cal. App. 3d 1 (1985)...............22

*Sun Optics, Inc. v. FGX Int'l, Inc.*,
    No. 07-137-SLR, 2007 WL 2228569 (D. Del. Aug. 2, 2007)...............43

*Tahoe Nat'l Bank v. Phillips*,
    4 Cal. 3d 11 (1971)...............21

*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.*,
    164 Cal. App. 3d 1122 (1985)...............22

*Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*,
    491 F. Supp. 2d 871 (D. Minn. 2007) ...............43

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ...............27, 39, 42, 43

*United Teachers of Oakland v. Oakland Unified School District*,
    75 Cal. App. 3d 322 (1977)...............21

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ................................................................ 38

*Universal City Studios, Inc. v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................ 27, 38

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) ............................................................. 43

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ........................ 44, 45

**STATUTES**

17 U.S.C. §117 ................................................................................................ 43

17 U.S.C. §1201(a)(2) ............................................................................. 32, 38

17 U.S.C. §1201(a)(3)(A) ............................................................................. 25

17 U.S.C. §1201(a)(3)(B) ............................................................................. 32

17 U.S.C. §1201(b)(2)(A) ............................................................................. 28

17 U.S.C. §1201(b)(2)(B) ....................................................................... 31, 32

17 U.S.C. §1201(c)(3) .................................................................................... 30

**MISCELLANEOUS**

Notice Pursuant to the National Cooperative Research and Production Act of 1993;
    DVD Copy Control Ass'n,
    66 Fed. Reg. 40, 729 (Aug. 3, 2001) ............................................................ 8

144 Cong. Rec. S4890 (daily ed. May 14, 1998)
    (statement of Sen. Ashcroft) ...................................................................... 41

H.R. Rep. No. 105-551, pt2 (1998) ............................................................. 41

144 Cong. Rec. H10621 (daily ed. Oct. 12, 1998)
    (statement of Rep. Klug) ........................................................................... 41

144 Cong. Rec. H7094 (daily ed. Aug. 4, 1998) (statement of Rep. Bliley) ................ 41

S. Rep. No. 105-190 (1998) ........................................................... 24, 40, 41

**INTRODUCTION**

This dispute is about RealNetworks technology that faithfully follows the CSS License specifications but does so to accomplish something the Studios dislike: allowing consumers to save a copy of DVDs they own to their hard drives. This fair-use copying is not prohibited by the CSS License and need not be authorized by the Studios.

The CSS License makes clear that CSS technology is intended to prevent "unauthorized" copying. Hence the question – what is "unauthorized" copying? The CSS documentation provides no simple sound bite of a definition, but it does provide a simple answer: an unauthorized copy is a copy that does not meet the requirements of the CSS specifications. A copy that can be made by complying with the detailed technical specifications is authorized. The RealDVD Products comply to the letter. Using that technology in compliance with the License cannot be circumvention under the DMCA. Implementing CSS in accordance with detailed specifications is the opposite of circumventing CSS.

ARccOS and RipGuard are different from CSS. The Studios stumbled onto their ARccOS and RipGuard theories during discovery and seek to make their case by mischaracterizing that discovery. But ARccOS and RipGuard ▮▮▮▮ are not "effective technological measures" protected under the DMCA because they are inherently limited: ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ARccOS and RipGuard are thereby rendered *per se* ineffective.

The Studios have already achieved much through this litigation. They obtained a temporary restraining order last year after telling the Court that Real was "rushing" its product to market. The Studios hid the facts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ The next day, they filed suit claiming that "misuse of Plaintiffs'

1   content is of no real concern to Real" and that "RealDVD's assault on the market for DVDs is

2   obvious:  the ability to use RealDVD to 'rent (or borrow), rip, and return' motion picture content

3   released on DVD fundamentally changes the economic equation of buying DVDs." Complaint

4   ¶¶3, 5.  They said at the TRO hearing that Real was "winking" at piracy.  TRO Hrg. (10/7/08)

5   Tr. at 100-101. ███████████████████████████████████

6   ████████████████████████████████████████████████████

7   ███████████████████

8           The pretense continues today.  The Studios say Real "shrugged off" the threat of "rent-

9   rip-and-return" as "not our problem" knowing it is untrue.  Studio Br. at 21.  They want the

10  supposed "threat" of "rent-rip-and-return" to stay alive.  Real preferred then and prefers now to

11  eliminate it, but cannot do so without the Studios' cooperation.

12          The only party harmed here is Real, which has been under an injunction for 6 months ███

13  ████████████████████  Meanwhile, the Studios have been busy offering competing

14  products such as Digital Copy.  Digital Copy is functionally identical to RealDVD but less

15  restrictive with DVD content – Digital Copy is not AES encrypted, permits DVD content to be

16  transferred between  portable devices, and allows play back on multiple PCs.  Ex. 63.  Although

17  the Studios refused to provide meaningful discovery of their competitive offerings, it is clear that

18  they are offering Digital Copy so they can be paid (again) for the fair use back-up copy of a

19  consumer's DVD.  The only "harm" to the Studios from lifting the injunction is that they could

20  no longer avoid fair competition.

**ARGUMENT**

21

22  **I.     DEFENDANTS HAVE NOT AND CANNOT DEMONSTRATE THAT THE REAL
        PRODUCTS FAIL TO COMPLY WITH THE CSS AGREEMENT**

23

24      **A.     The Purpose of CSS Is to Protect Unencrypted Content**

25          As shown below, the purpose of the CSS system is to protect against the dissemination of

26  *unencrypted* (raw) DVD content—to prevent, in other words, the kind of peer-to-peer piracy and

27  content theft that would be possible without CSS encryption.  With CSS in place, there are only

28  two paths to piracy:  either (1) break through the CSS algorithms or steal the CSS keys in order

1   to make unencrypted copies of video content; or (2) intercept and copy video data after it has

2   been decrypted by a CSS-licensed system (for example, as it is passed to a TV or other screen).

3   The CSS documentation has been clearly and carefully drafted to close off these paths while still

4   allowing licensees needed freedom in handling *encrypted* data, which poses no threat of piracy.

5   The RealDVD Products have been designed accordingly.

6          The design and focus of CSS is made clear to prospective licensees from the start. The

7   License itself stresses the importance of the secret keys and algorithms by setting forth numerous

8   requirements that have been designed to ensure their safe handling. (Ex. 8 at 3.)[1] Section 5.2 of

9   the License requires licensees to, among other things, (i) prevent employees from "intentionally

10  memoriz[ing]" or photocopying keys and algorithms; (ii) maintain keys and algorithms in a

11  "secure location," whether in encrypted digital form or in a "locked safe"; and (iii) at all times

12  limit access to keys to the "strictest minimum possible number of full-time employees," all of

13  whom must be disclosed to the DVD CCA, must have an "absolute need to know," and must

14  execute the confidentiality agreement that is attached as Exhibit B to the License. (Ex. 8 at 11-

15  13.)[2] There is no claim that Real has breached any of these provisions.

16         The Procedural Specifications—also available to prospective licensees—set limits on the

17  handling of unencrypted data and add additional protections to the secure keys. The Procedural

18  Specifications define the "Copy Protection Functions" that keep copyrighted content within the

19  CSS-licensed universe – "regional playback control," "recordable media playback control,"

20  "digital and analog output restrictions and protections," and "internal data and signal restrictions

21  and protections. Ex. 64 at A-2, ¶ 1.8. The Procedural Specifications go on to explain that these

22  restrictions govern the handling of "CSS Data," which is defined as "digital data *originally*

23  _____

24         [1]  References to "Ex. ___" correspond to the exhibits attached to the March 19, 2009 and April
       10, 2009 declarations of Christopher Nelson. Exhibits 1-62 were attached to the March 19, 2009
25     declaration of Mr. Nelson [Docket No. 217, as modified by Docket No. 234], and to avoid
       confusion are not resubmitted with this reply brief. Exhibits 63 - 113 are attached to Mr. Nelson's
26     April 10, 2009 declaration, which is submitted herewith.

         [2]  Other sections prevent licensees from "reverse engineering" the keys and algorithms (Section
27     5.3), require "controls against theft" of licensed products (Section 5.5), and require the return of all
       keys and algorithms within 30 days of any termination of the License (Section 6.3). (Ex. 8 at 16,
28                                                                                          (continued...)

1    *scrambled* on a DVD Disc using CSS"—in other words, unencrypted data. Ex. 64 at A-2, A-9

2    (emphasis added).  Regional playback control requires that DVD players play DVDs only for the

3    geographic region intended.  *See id.* at A-10, § 6.2.1.4.  Recordable media playback control

4    requires that DVD players not play back DVDs that are written to recordable DVDs, thus

5    preventing DVD disc piracy.  *See id.* at ¶ 6.2.1.5.  Digital and analog output controls ensure that

6    unencrypted content is protected as it is sent to a non-CSS device (such as a TV), thereby closing

7    off another path to digital piracy.

8           The Procedural Specifications close off the final path by requiring that the secret keys and

9    algorithms be protected from disclosure to non-licensees (the "internal data and signal restrictions

10   and protections.").  For example, Section 6.2.4.2 provides that licensed devices must "[p]rotect

11   keys and algorithms against being revealed," but leaves to licensees the discretion to achieve this

12   by "[a]ny method," including by "encrypt[ing]" the CSS keys as they are handled.  Ex. 64 at A-26.

13   Section 6.2.4.2 likewise requires that licensed devices be designed to protect the "flow of

14   *unscrambled* content . . . against being intercepted and copied," and in particular requires that

15   "*unscrambled* compressed data representing video content or keys *initially encrypted* using CSS,"

16   in other words, <u>unscrambled</u> or <u>unencrypted</u> data of any kind, "not be carried on a user accessible

17   bus."  (*Id.* (emphasis added).)  It is undisputed that the RealDVD Products never pass unscrambled

18   or unencrypted data of any kind over such a bus. Ex. 65 (Kelly Dep.) at 194:7-19; Ex. 66

19   (Schumann Dep.) at 135:9-18; *see also infra*, p. 13.[3]  In fact, Real's use of AES-128 encryption

20   provides far more security than is provided by CSS.  March 18, 2009 Declaration of Edward W.

21   Felten ("Felten Dec."), submitted herewith, Ex. A at ¶ 55.  Similarly, § 6.2.5.2 reinforces the CSS

22   documentation's focus on protecting unencrypted data and keys.  Hardware devices must take

23   _____

24        (...continued from previous page)
     17, 20.)  These provisions, too, are designed to protect the keys and algorithms from being
     improperly discovered.

25
       [3]  Section 6.2 also prevents unlicensed devices from accessing the data on a DVD (including
26   the keys) without first "authenticating" with the drive.  Authentication plays a gate keeping role,
     much like a password.  Ex. 65 (Kelly Dep.) at 49:4-18.  The DVD CCA and Studios have
27   attempted to transform this authentication requirement into a requirement that the secure keys
     cannot be stored elsewhere after being correctly obtained from the DVD itself.  (*See* DVD CCA
28   Br. at 4, 6; Studio Br. at 4.)  As set forth below, *see infra*, p, 14, the CSS documentation contains
     no such restriction.

1    steps to ensure that hackers cannot use "tools" to gain access to internal components, and also

2    require that "*decrypted* DVD keys" never be made available "outside integrated circuits," where

3    they would be vulnerable to those hacker tools. (Ex. 64 at A-31, -32 (emphasis added).)  Section

4    6.2.5.2 (like Section 6.2.4.2) also prohibits "unscrambled . . . [v]ideo [d]ata" from being passed

5    over a user accessible bus.

6            The various technical specifications, which are only shown to licensees after execution of

7    the CSS License,[4] further reinforce the focus of CSS on the unencrypted content and keys.

8    ███████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ███████████████████████████████████

18           It is not at all surprising that the purpose of CSS is to protect the "decrypted keys" and

19   "unscrambled" data.  A principal objective of CSS is to prevent "unauthorized" access to or

20   copying of DVD content—that is, access or copying by non-licensees, who have not agreed to

21   safeguard the keys and raw data like licensees (such as Real) have.  Ex. 8 at 1.  The RealDVD

22   Products plainly satisfy this objective, as they scrupulously adhere to the actual specifications of

23   the Agreement and also add an additional layer of security to the keys and raw data.

24

25

26

27      [4] As explained in Real's Opening Brief, because the undisclosed Technical and General
     Specifications were not incorporated into the CSS Agreement they can impose no restrictions on
28   Real as a matter of law.  Real Br. at 24, n. 11.

**B.      Defendants' Interpretation of CSS Documentation Is Contrary to the Facts**

The Defendants insist incorrectly that the "intent" or "purpose" of the CSS License is to ensure that a "playable" copy of a DVD cannot be made by a "casual user." (DVD CCA Br. at 2, 8, 16.); (Studio Br. at 1). This theory is wrong. It is contrary to the plain language of the CSS documents (even those that are not part of the License). Nowhere in the hundreds of pages of documentation – including in the defined "Copy Protection Functions" for CSS technology – is the term "playable copy" used, much less defined, much less prohibited.[5] On that basis alone, Defendants must fail. But Defendants also fail because (1) their own attempted revisions to the CSS License show them to be wrong; (2) the functional requirements of CSS technology as provided in the License Agreement show them to be wrong; and (3) their own pre-litigation statements show them to be wrong.

First, Defendants' distortion of the CSS documentation is made clear by the fact that factions within the DVD CCA have *twice* attempted to amend the CSS documentation to add such "playable copy" and "disc in tray" restrictions that they now say are *already there*. Real Br. at 29-30. Those amendments failed to pass on <u>both</u> occasions. *Id.* It follows that (i) a "playable copy" prohibition is not currently in the CSS documentation; and (ii) the current DVD CCA membership (as opposed to the Studio faction) <u>does not want</u> such a prohibition. The Defendants only answer to this—that the twice offered amendments failed to pass because the membership recognized that such prohibitions are already in the CSS documentation—is unsupported by any evidence, and is, frankly, ridiculous. Ex. 65 (Kelly Dep.) at 234:20-22.

Aside from the failed amendments, the CSS documentation never once uses the phrase "playable" copy, even though there are literally dozens of different points in the CSS documents where such a prohibition could have been made. Instead, the CSS documents refer to the goal of preventing "unauthorized" copies, not "all" copies or "playable" copies. (*See, e.g.,* Ex. 8 at 1 (CSS intended to provide protection against "unauthorized" copying); ███████████████

---

[5] It is also far from clear what Defendants mean by the term "playable copy." Is it encrypted CSS data, unencrypted CSS data, or both? Does it include keys or not? "Playable" by licensed devices only, or by any device that can read video data?

1   ████████████████████████████████████████████. This careful word

2   choice—the result of negotiation between industry constituents with "widely differing

3   perspectives" (DVD CCA Br. at 1) and applied to all licensees in the uniform, non-negotiable

4   contract of adhesion—cannot be reinterpreted such that "unauthorized" means "playable."

5        The question is <u>what kind</u> of copying is "authorized," as that term is used in the License.

6   "Authorized" is not an expressly defined term.  However, the terms "authorized" and

7   "unauthorized" are used elsewhere in the CSS documentation to distinguish between *licensed*

8   and *unlicensed* devices or actors doing something.  In the CSS License, "Authorized Employees"

9   are employees who have signed the CSS confidentiality agreement (Ex. 8 at 13); ████████

10  ████████████████████████████████████████

11  ██████████████████████████████████████████

12  ██████████████████████████████████████████

13  ████████████████████████████████████████

14  ██████████████████████████████████████████

15  ██████████████████████████████████████████

16  ████████████████████████████████

17       The correct reading of the DVD CCA documentation is this:  licensed devices may copy

18  the contents of a DVD, so long as the technical terms of the License—including the prohibitions

19  and restrictions on handling and transferring *unscrambled* data and keys—are followed.  This

20  reading is not only supported by the plain language of the CSS documents, it is consistent with

21  how a DVD player works. ████████████████████████████

22  ██████████████████████████████████████████

23  ██████████████████████████████████████████

24  ███████████████████████████████████████████

25  ███████████████████████████████████████████

26  ██████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████████

1    ████████████████████████████████████████. It is

2    therefore impossible—either from a technical standpoint or from a plain reading of the text of the

3    CSS documents—to conclude that all copying is prohibited. The CSS documentation allows (as

4    it must) scrambled and encrypted data to be copied, as long as the unscrambled or decrypted data

5    is protected. Which is no more and no less than what the RealDVD Products do.

6         And the Defendants know this too. The DVD CCA has represented to the United States

7    government—in connection with its application for an antitrust exemption—that "[t]he nature

8    and objectives of the [CSS system] are to provide an encryption technology designed to prevent

9    unlawful or <u>unauthorized</u> copying <u>by</u> encrypting digital files that can be decrypted only on

10   <u>licensed</u> equipment." Ex. 70 (emphasis added). In this far more candid forum the Defendants do

11   not claim that the purpose of CSS is to prevent all copies or even all "playable" copies from

12   being made.

13        Finding no support in the actual CSS documents, the Defendants cherry-pick a portion of

14   an email from Real engineer Phil Barrett to argue that Real itself believed that the License

15   prohibits playback of DVD content from a hard drive. At page 14 of their Brief, the Studios

16   make the following claim:

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19        In fact, the Studios have omitted critical portions of the email, which Mr. Barrett sent to

20   correct a misstatement in an article forwarded by a colleague about Kaleidescape. Read in full,

21   the email actually evidences the *opposite* belief:

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   The statements by Mr. Barrett are in fact entirely consistent with the CSS License – the License

26   does not allow licensed products to **remove** CSS protections, but does allow licensed products to

27   store a ***CSS-encrypted*** copy of DVD content on a hard drive, and to play the copy back without a

28   DVD "present in the drive."

1    Of course, not every form of copying is "authorized," and Real does not contend

2    otherwise.  It would be explicitly contrary to the CSS documentation to, for example, make a

3    copy of *unscrambled* DVD content on a hard drive (as "DVD rippers" do), to make a copy in

4    such a fashion that leaves the CSS keys vulnerable to compromise, or to otherwise make a copy

5    that could be pirated on the Internet.  Neither of the RealDVD Products does any of these things.

6    On the contrary, both Products not only comply with the actual intent of the CSS License, they

7    *amplify* the ultimate goal of maintaining the secrecy of the keys, and the security of DVD

8    content, by first complying with the required security specifications, and then, where appropriate,

9    adding an additional measure of security to those specifications.

10    C.    **The RealDVD Products Comply with the Specific Terms of the CSS Agreement**

11

12    Defendants seek to rewrite the CSS License Agreement, importing restrictions and

13    requirements that simply do not exist, in order to create a claim of non-compliance by the

14    RealDVD Products.  The CSS License and associated documents are long and complicated.

15    Defendants seek to use this to their advantage by making various claims regarding what the

16    documents require and then throwing out handfuls of citations as alleged support.  But a

17    comparison of the documents themselves to Defendants' manufactured language shows that the

18    CSS License does not, in fact, contain any restrictions preventing the specific functionality

19    provided by the RealDVD Products.

20    For instance, the DVD CCA asserts that the "CSS Specifications state that licensees must

21    prevent unauthorized copying of DVDs."  DVD CCA Brief at 5 & n. 6.  That is incorrect.

22    Nowhere in the CSS documents is there language requiring licensees to "prevent unauthorized

23    copying."  That is a stated goal of CSS technology (*see, e.g.* Ex. 8 at Recital A), but it is a goal

24    that is met by following the specific technical implementations set forth in the remainder of the

25    documents.  There is no requirement (and the Defendants cite none) requiring a licensee to take

26    general, unspecified additional measures to "prevent unauthorized copying" – licensees are simply

27    required to implement CSS correctly.  And the RealDVD Products do.

28

The DVD CCA goes on to claim five reasons that the RealDVD Products violate the CSS License Agreement by saving a CSS-encrypted copy of DVD content to a hard drive.  As discussed below, each claim misstates either the requirements of the CSS documentation or the challenged functionality of the RealDVD products.

### 1. The CSS Documentation Does Not Have A "Disc-in-Tray" Requirement

First, the DVD CCA asserts that ███████████████

███████████████████████████████████

█████████████████████████████

██████████████████████████████████

████████████████████████████

███████████  This is the same "disc-in-tray" argument advanced by the DVD CCA in the *Kaleidescape* trial and that was the subject of the (failed) amendments that certain DVD CCA members sought to pass in 2007 after the *Kaleidescape* loss.  Real Br. at 29-30.  There is no such requirement in the CSS documentation.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    A careful review of the actual contractual language demonstrates that there is no "disc-in-

2  tray" requirement in the CSS documentation.  Had the drafters wanted to include such a

3  requirement, it would have been simple to do so in the hundreds of pages of CSS documentation.

4  It is simply not there.  The only documents containing such a requirement are the proposed

5  amendments that the DVD CCA members twice rejected.  Real Br. at 29-30.

6          **2.      The CSS Documentation Allows** ████████████████████████████
    █████████████████████████████████████████████████

7

8    Claiming support from various portions of the ██████████████████████████

9  ██████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 That is not what the CSS documentation provides.  ████████████████████████████

12 ██████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████  The RealDVD Products comply with these requirements and

15 restrictions.  Felten Dec., Ex. A at ¶ 113.

16          ██████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 █████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 █████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ██████████████████

27    ████████████████████████████████████████

28 ███████████████████████████████████████████████

1  

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 . Because Real adds AES

25 encryption to protect the keys, its implementation is far more secure than simply using CSS

26 scrambling.  Felten Dec., Ex. A at ¶¶ 49-51, 55-56.

27

28

1      **3.      The RealDVD Products Only** ██████████████████████

2

3      The DVD CCA also asserts that the ████████████████████

4      ████████████████████████████████████

5      ████████████████████████████████████████████

6      ██████████████████████████

7          ████████████████████████████████████████

8      ████████████████████████████████████████████

9

10     Ex. 64 at A-25.  The DVD CCA asserts that this process is absent in the RealDVD Products.  It is

11     not.  ████████████████████████████████████████

12     ██████████████████████████████████████████

13     ██████████████████████████████████████████

14     ██████████████████████████████████████

15     ██████████████████████████████████████

16     ██████████████████████████████████████████████

17     ████████████████████████████████

18         To even make this claim, the DVD CCA must read requirements into the CSS

19     documentation that simply do not exist.  Felten Dec., Ex. B at ¶¶ 43, 63.  The DVD CCA contends

20     that, ████████████████████████████████

21     ██████████████████████████████████

22     ██████████████████████████████████

23     ████████████████████████████████████

24     ██████████████████████████████████

25     ████████████████████████████████████

26     ████████████████████████████████████

27     ██████████████████████████████████

28     ██████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████.

4          Thus, the DVD CCA's assertion that the RealDVD Products do not meet the plain

5 language of this requirement is incorrect.  This argument is merely another version of the same

6 "disc-in-tray" argument that the DVD CCA advanced in *Kaleidescape* and ██████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ██████████████████████████████████████  The RealDVD

12 Products comply with all obligations that are actually contained in the cited language.  Felten

13 Dec., Ex. B at ¶¶ 63-65.

14          **4.      There is No** ██████████████████ **In the CSS Documentation**

15          The DVD CCA's fourth assertion is that the CSS documentation requires that ███████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ██████████████████████████████████████  It is again

20 rewriting the CSS documents to add nonexistent requirements.

21          The ████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ██████████████████████████████████████████████

28 ████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 _____

25  6

26

27

28



1   ████████████████████████████ The RealDVD Products perform all of the

2   mechanisms that are provided as the means to achieve the objectives of the CSS technology.

3   Bishop Dec., Ex. A at ¶¶ 72-73 ████████████████████████████████

4   ████████████████████████████ Moreover, RealDVD Products actually make

5   the security effective by adding AES encryption. Felten Dec., Ex. A at ¶¶ 49-51, 55-56.

6         Once again, the DVD CCA twists the meaning of this section by again adding language

7   that does not exist in the actual documentation. Nowhere in the section is there any requirement

8   of a ████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ██████████████████████████████████████

12  ████████████████████████████████ The RealDVD

13  Products perform the required mechanisms. ████████████████████

14  ████████████████████████████████████████████████

15  ███████████████████████████████████████████

16  ███████████████████████████████████████

17  ██████████████████████████████

18        The same holds true for copying. ████████████████████

19  ███████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ██████████ If it did, every computer handling CSS content would be unable to function because

23  all computers and DVD players must copy CSS data in order to function. *See supra*, pp. 7-8. █

24  ████████████████████████████████████████████████

25  ███████████████████████████████████████████

26  ███████████████████████████████████████████

27  ███████████████████████████████████████████

28  ████████████████████████████████████████████████

1 ██████████████████████████████████████████

2 ████████████████████ The RealDVD Products perform the required mechanisms in the

3 manner prescribed, and therefore do not commit any forbidden copying.

        **5.**        **The RealDVD Products Comply With The License Requirements And Thus Do Not "Circumvent" CSS Under The CSS Agreement**

6       The final argument of the DVD CCA relies on language in the CSS Agreement that states

7 that licensees cannot ████████████████████████

8 ████████████████████████████████████████ The

9 DVD CCA claims that the RealDVD Products "circumvent" CSS and thus violate the CSS

10 Agreement because the RealDVD Products ███████████████████ *Id.* at

11 17. This circular argument is meritless. The DVD CCA cannot identify any part of the CSS

12 documentation that the RealDVD Products violate – ████████████████

13 CSS data and do not make impermissible copies of CSS data. The DVD CCA only gets to its

14 conclusion by adding language to the CSS documentation that does not exist, and deleting

15 language that is inconsistent with its arguments. Because the RealDVD Products do not violate

16 any of the *actual* language of the Agreement (*see supra*, pp. 10-17), they do not "circumvent" it.

        **6.**        **The RealDVD Products Do Not "Remove" or "Bypass" CSS**

18       Relying on the DVD CCA arguments, the Studios claim that the RealDVD Products

19 "avoid" or "bypass" various CSS protections. Specifically, the Studios contend that the RealDVD

20 Products ██████████████████████████████

21 ██████████████████ Not so. As discussed above (*supra*, pp.10-17) and in

22 RealNetworks' opening papers (Real Br. at 24-26), the RealDVD Products comply with every

23 requirement and prohibition in the CSS License. The RealDVD Products ████████████

24 ████████████████████████

25 ██████████████████████████████

26 ██████████████████████████████ *Id.*

27 The RealDVD Products also retain CSS encryption on the contents (including the secret keys) of

28 the DVD, and add an additional layer of encryption, AES. The Studios do not – because they

1    cannot – point to any CSS security that the RealDVD Products fail to implement according to the

2    extensive and exhaustive instruction manual that is the CSS documentation.  There is no basis to

3    claim that the RealDVD Products "bypass" CSS technology.

4        **D.**    **The Defendants Cannot Imply Restrictions Into the CSS Agreement**

5            **1.**    **Real's Awareness Of The DVD CCA's Loss In *Kaleidescape* Does Not Impose Additional Obligations On Real**

6

7           Defendants argue that Real was aware of the DVD CCA's interpretation of the CSS

8    Agreement advanced in the *Kaleidescape* litigation at the time Real executed the CSS Agreement,

9    yet failed to alert the DVD CCA to its contrary reading of that Agreement.  They contend that the

10   DVD CCA's positions in *Kaleidescape* should therefore be imported into the CSS Agreement.

11   That argument is belied by the facts and the law.

12          What was actually public knowledge at the time Real executed the CSS Agreement was

13   that (1) the CSS License documents available pre-execution (like those available post-execution)

14   had no "disc-in-tray" or "playable copy" restrictions; (2) a California judge applying California

15   law to this California contract rejected the DVD CCA's claims to the contrary in *Kaleidescape*;

16   and that (3) the DVD CCA membership rejected a proposed amendment to place these restrictions

17   in the CSS License Agreement after the *Kaleidescape* decision.  Even if Real employees had an

18   informed understanding about the DVD CCA's lawyers' <u>claims</u> in Kaleidescape (which the

19   evidence shows they did not)[7], that purported knowledge cannot outweigh the decision reached by

20   the DVD CCA to reject incorporating those claimed restrictions into the CSS License.

21          Specifically, just two months prior to Real's execution of the CSS Agreement, the DVD

22   CCA <u>rejected</u> an amendment to the CSS Agreement that would have added <u>the precise restrictions</u>

23   <u>the Defendants seek to imply here</u>.  In June 2007, the DVD CCA membership considered an

24

25       [7] The Real witnesses cited by Defendants state only that they were generally aware of the

26   *Kaleidescape* litigation, not that they knew or understood the contractual interpretations advocated by the DVD CCA's lawyers.  Ex. 71 (Barrett Dep.) at <u>265:13-16, 265:24-266:6, 266:20-267:6,</u>

27   <u>267:12-24;  Ex. 72 (Hamilton Dep.) at 235:17-236:4.</u> ████████████████████████████████

28   ████████████████████████████ Ex. 73 (Glaser Dep.) at 57:10-58:16. █████████████

1  amendment that would have prohibited the descrambling of CSS data "when the DVD Disc . . . is

2  not physically present in the DVD Player or DVD Drive," and which also mandated that "a DVD

3  Product shall not be designed to make or direct the making of a persistent copy of CSS Data . . ."

4  Ex. 74. That amendment failed (and, similar amendments failed again in November 2007). Real

5  Br. at 29-30; Ex. 75; Ex. 76.

6       Knowledge of lawyers' interpretation – whether known or not – can not impose new terms

7  on Real. The CSS Agreement is an adhesive form contract, which the DVD CCA admits is a

8  ███████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████ Because it

10 is a non-negotiable, standardized agreement, all licensees "are subject to the same structure for the

11 license's use." Ex. 79 at 3. ███████████████████████████████████████

12 ███████████████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████; Ex. 81 (Parsons

15 Dep.) at 173:20-174:4; 175:10-13; Ex. 78 (Pak Dep.) at 169:18-23; 175:6-176:23; Ex. 79 at ¶6

16 and p. 2.

17      By the DVD CCA's own admissions, the CSS Agreement cannot properly be interpreted

18 to impose additional, unagreed obligations on Real because *every CSS licensee enters the same*

19 *agreement*. Thus, the DVD CCA's current effort to discriminate against Real based on Real's

20 supposed "awareness" of the DVD CCA's claimed intent at a specific point in time must be

21 rejected. The position advocated by the DVD CCA would improperly bind Real to license terms

22 inapplicable to the hundreds of other CSS licensees which have entered into the Agreement over

23 the past 10 years, including AMX and Telestream, which make products functionally identical to

24 the RealDVD Products.[8] Real Br. at 27-28. The language of the take-it-or-leave-it CSS

25

26 _____

27 [8] Equally unsupportable is the Defendants' assertion that Real obtained its CSS License under
   "false pretenses." Studio Br. at 1. The DVD CCA does not and did not ask the applicant's intent,
   and Real stated no intent when it applied. Real chose between a finite number of pre-defined

28 "membership categories" and selected the categories it believed were necessary for building
   RealDVD. Further ████████████████████████████████████████

(continued...)

1   Agreement controls and must be construed against the drafter (*i.e.*, the DVD CCA)[9] to prohibit

2   imposition of additional obligations on particular licensees. *See* Real Br. at 22-23.

### 2. Contractual Terms Cannot Be Implied Based on One Party's Intent.

4   No case cited by the Defendants found that one party's intent (known or otherwise) could

5   imply new terms into a contract. At most, the cases stand for the unremarkable proposition that

6   extrinsic evidence of agreement may be considered to interpret ambiguous contractual provisions,

7   and that one party's unexpressed subjective intent cannot vary the parties' agreement. For

8   example, *Merced County Sheriff's Employee's Ass'n v. County of Merced*, 188 Cal. App. 3d 662

9   (1987) involved a dispute over the proper application of a contractual term, namely a formula

10   governing salary increases. *Id.* at 665-66**.** During the lengthy negotiations, the parties'

11   representatives had discussed the disputed provision and <u>agreed upon its proper interpretation</u>. *Id.*

12   at 666. The defendant's representative, however, had presented a different interpretation in the

13   process obtaining board approval for the contract. The Court found that the defendant was aware

14   of the plaintiff's interpretation – since it was explicitly discussed and agreed – and thus the

15   agreed-upon interpretation controlled, despite defendant Board's contrary mistaken (and

16   unexpressed) understanding. *Id.* at 672-673. Another case cited by the DVD CCA, *United*

17   *Teachers of Oakland v. Oakland Unified School District*, 75 Cal. App. 3d 322 (1977) involved a

18   dispute over regulations applicable to teachers. Again, the Court found that the <u>agreed</u> upon

19   understanding of the disputed provisions controlled: it was "uncontroverted" that "the intent and

20   understanding" of <u>both</u> parties was that the regulations would be applied in a certain manner. *Id.*

21   at 330. None of the cases cited by the DVD CCA imported new terms into an agreement because

22   

---

23   (...continued from previous page)

24   ████████████████████████████████████████████████

25   [9] The DVD CCA seeks to avoid the rule that contracts of adhesion are construed against the
    drafter by arguing that "contra proferentem is a rule of last resort." DVD CCA Br. at n. 15.

26   Separately, it is an established rule of California law that contracts of adhesion must be construed
    against the drafter. *Tahoe Nat'l Bank v. Phillips*, 4 Cal. 3d 11, 20 (1971) (confirming "principles

27   of construing documents against the party who drafts and selects them" with respect to an adhesive
    contract). Thus, if there is any ambiguity regarding the meaning or purpose of the CSS License

28   Agreement, it is only "'poetic justice' ... if such ambiguity is construed in favor of the [licensee]."
    *Id.* at 20; *see also Searle v. Allstate Life Ins. Co.*, 38 Cal. 3d 425, 444 (1985).

1   of <u>one</u> party's supposedly public but un-negotiated intent as the DVD CCA suggests; rather, they

2   looked to extrinsic evidence to construe what <u>agreement</u> was actually made regarding disputed

3   contractual terms.[10]   Notably, none of the DVD CCA's cases involved form contracts of adhesion

4   which were offered without negotiation on a take-it-or-leave-it-basis.

5          In this case, the DVD CCA cannot point to any agreed upon intent of the parties, nor any

6   supposedly ambiguous contractual provisions in the CSS Agreement which can be explained by

7   extrinsic evidence of intent.  Indeed, Real and the DVD CCA could never have agreed upon intent

8   of the CSS Agreement because neither party's intent was ever discussed.  And the imposition of

9   new restrictions into the comprehensive, detailed, and specific CSS License is entirely improper.

10  California law recognizes the "objective theory of contracts under which '[i]t is the objective

11  intent, as evidenced by the words of the contract, rather than the subjective intent of one of the

12  parties, that controls interpretation.'"  *Founding Members of* the *Newport Beach Country Club v.*

13  *Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) (quoting *Titan Group, Inc.*

14  *v. Sonoma Valley County Sanitation Dist.*, 164 Cal. App. 3d 1122, 1127 (1985)).  This general

15  principle takes on additional nuances when applied to an unambiguous contract of adhesion, such

16  as the CSS Agreement.  *See Oritani Sav. & Loan Ass'n v. Fid.& Deposit Co. of Maryland*, 744 F.

17  Supp. 1311, 1315 (D.N.J. 1990) ("[T]he subjective intent of a person drafting a contract is not, by

18  any means, determinative as to the meaning of the contract especially where, as here, the contract

19  is one of adhesion.").  If intent is to be considered at all, the CSS Agreement must be interpreted

20  in light of the reasonable expectations of Real as the *adhering* party, and not according to the

21  expectations of the DVD CCA.  *State Farm Fire and Cas. Co. v. Keenan*, 171 Cal. App. 3d 1, 14

22  (1985) (contract of adhesion interpreted in light of the reasonable expectations of the adhering

23  party and not "from the subjective intent of the people who drew up those policies of adhesion.").

24  There is no legal basis for importing new contract terms into the detailed and adhesive CSS

25  License as a result of DVD CCA's supposed general intent for the Agreement – new terms which

26

27      [10] Another case cited by the Studios, *Johnston v. Comm'r of Internal Revenue*, 461 F.3d 1162
     (9th Cir. 2006), actually supports Real's interpretation of the CSS Agreement, as it advocates

28   looking to the "four corners" of an unambiguous contract and not to the unexpressed subjective
     intent of a party.  *Id.* at 1163, 1165.

1 | are undisputedly absent, which Real never agreed to, and which the DVD CCA rejected through

2 | the amendment process.

### 3. New Contractual Terms Cannot Be Added Under the Guise of the Covenant of Good Faith and Fair Dealing

The Defendants also cannot rely upon the covenant of good faith and fair dealing to add new terms to the CSS Agreement. While such a covenant is implied by law in every contract, it "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original) (approving denial of summary judgment on implied covenant claim). The covenant is not a vehicle for implying additional terms on which the parties never agreed. Hence, the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* at 349-50; *see also Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). As drafter of the CSS License Agreement, DVD CCA had every opportunity to expressly define the substantive duties and limits on the contracting parties. Thus, DVD CCA cannot now turn to an implied covenant to add the terms omitted from the CSS Agreement – particularly considering the *Kaleidescape* decision and that fact that the DVD CCA has twice failed to pass amendments to the CSS Agreement which would have explicitly included the terms at issue. This history establishes that the DVD CCA and Real never shared a common belief or had an agreement regarding the CSS Agreement's so-called "purpose of preventing copying." DVD CCA Br. at 19. To the contrary, the DVD CCA admits that the parties held opposite interpretations concerning the requirements DVD CCA now asks the Court to impose. DVD CCA Counterclaims ¶ 26. Because the parties did not reach agreement on those unwritten terms or purposes DVD CCA now seeks to imply, DVD CCA's proposed covenant cannot be implied as a matter of law. *See Guz*, 24 Cal. 4th at 349-50 (implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.").

## II.     THE REALDVD PRODUCTS DO NOT VIOLATE THE DMCA

Because Real is a compliant CSS Licensee, the Studios have no viable claim for *circumvention* under the DMCA. *See* Real Br. at 30-39. Even setting aside Real's status as a CSS Licensee, the Studios have not made out a DMCA claim against the RealDVD Products.

### A.     The RealDVD Products' Implementation of CSS Is Not Circumvention

#### 1.     The Studios Misapply § 1201(a)(2) to Real's Licensed Use of CSS

The Studios argue that Real does not have the "authority of the copyright owner" to implement CSS technology in any way that allows consumers to copy CSS-protected DVD content. They therefore contend that Real should be found liable under § 1201(a)(2) for "circumventing" CSS. Studio Br. at 11. That argument confuses Real's authority to *use and implement CSS* with a consumer's authority to *make a copy of a purchased movie*. Real does not need the Studios' permission to use and implement CSS. It already has that authority from the DVD CCA pursuant to its CSS license. Ex. 8 at §§ 2.1(a), 1.15. No case has ever held, and no dictum suggests, that a licensee violates the DMCA by accessing copyrighted works with the very technology it is licensed to use.

The Studios assert that courts have "routinely" enjoined products that enable end users to copy DVDs. (Studio Mem. at 1, citing *Reimerdes*, *Corley*, and *321 Studios*). In reality, what the courts have "routinely" confronted in past cases are defendants who provided technology to break into DVDs without a license. Unauthorized access has been the paradigmatic violation of §1201(a)(2) from the beginning. *See* Ex. 82 (S. Rep. No. 105-190 (1998)) (analogy to breaking into a house or creating tools for that primary purpose). This paradigm appeared in each of the Studios' page 1-cited cases:

| § 1201(a)(2) – circumvention of access controls | |
|---|---|
| • Hacking into CSS to access DVDs without a license | <u>Reimerdes</u> (SNDY); <u>Corley</u> (2nd Cir.) |
| • Using CSS key to access DVDs without license to use that key | <u>321 Studio</u> (ND Cal) |

The same paradigmatic facts are found in other non-CSS §1201(a)(2) cases cited elsewhere in the Studios' brief:

| § 1201(a)(2) – circumvention of access controls | |
|---|---|
| • Tricking Real Media's Secret Handshake to gain access and to remove copy controls | <u>RealNetworks v. Streambox</u> (WD Wash) |
| • Removing ACP protection to access the unprotected analogue output signal from DVDs | <u>Macrovision v. Sima</u> (SDNY) |

In contrast to these cases, Real obtained a CSS license, and that license conveyed the copyright owners' authority to access DVD content through CSS. The Studios do not dispute this fact or even discuss "access" – which is what §1201(a)(2) is all about. Instead, they switch subjects from having authority to *access* DVDs to having authority to *copy* DVDs. They write:

> The DMCA defines "circumvention" for purposes of Section 1201(a)(2)(access control) as **conduct** effected "without authority of the copyright owner." 17 U.S.C. §1201(a)(3)(A). There is no evidence that any Studio has authorized *any* user of RealDVD (or anyone else) to **circumvent CSS for the purpose of copying** the Studios' copyrighted content."

(Studio Mem. at 11). The boldfaced words show how the Studios try to rewrite the statute. They hook the statutory phrase "without authority of the copyright owner" onto a non-statutory word of their choosing, "conduct," which is broad enough to include "copying."

What §1201(a)(2) actually says is that no person shall traffic in technology that is primarily designed "for the purpose of circumventing a technological measure that effectively controls *access* to a work protected under this title."[11] Section 1201(a)(3)(A) defines "circumventing" to mean "to *descramble* a scrambled work, to *decrypt* an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, ***without the authority of the copyright owner***." (Emphasis added) Before the Studios laid hands on it, §1201(a)(2) was unambiguously a statute about overcoming a "technological measure" like CSS, without authority, so as to obtain access to copyrighted works. Real has express authority to descramble CSS, decrypt CSS, and otherwise obtain access to the protected works.

---

[11] The text quotes §1201(a)(2)(A), but the language of interest is identical in sub-sections (A), (B), and (C).

1    Having rewritten §1201(a)(2) to mean what they wish, not what it says, the Studios argue

2    that they have never authorized Real or anyone else to sell technology that enables users to make

3    archival copies of DVDs.  But we already know the Studios do not want users to be able to make

4    fair-use copies.  If authority to copy for fair use were theirs to give, the Studios clearly would not

5    give it for free.  But authority to copy for fair use is not for the copyright owner to give or

6    withhold.  *See* pp. 41-42, *infra*, discussing *Sony*.

7    Regardless, the question whether the RealDVD Products should permit an archival copy of

8    the Studios' content to be made after authorized access to such content is irrelevant to the

9    §1201(a)(2) circumvention analysis.  *See Healthcare Advocates, Inc. v. Harding, Earley, Follmer*

10   *& Frailey*, 497 F. Supp. 2d 627, 646 (E.D. Pa 2007) ("Even if the [defendants] knew that

11   [plaintiff] did not give them permission to see its archived screenshots, lack of permission is not

12   circumvention under the DMCA.").  Real does not circumvent the access protections of CSS when

13   it designs products to access CSS-protected DVDs that it is expressly licensed to access.

14   The Studios purport to rely on *321 Studios* for the proposition that Real's licensed use of

15   CSS to allow for fair use copying by consumers constitutes circumvention.  Studio Br. at 14-15.

16   But that decision is no help to the Studios.  In *321 Studios*, Judge Illston not only expressly held

17   that the defendant's use of valid CSS keys constituted circumvention *because the defendant was*

18   *not licensed to use or implement CSS,* but also implicitly recognized that a licensed user like Real

19   could *not* be found to circumvent.  *321 Studios v. Metro-Goldwyn-Mayer Studios, Inc.*, 307 F.

20   Supp. 2d 1085, 1096-98 (N.D. Cal. 2004) ("321's software does not have [a CSS] license, and

21   therefore does not have the authority of the copyright owner."); *see also id.* at 1098.  Likewise

22   unavailing is the Studios' reliance on *Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051

23   (N.D. Cal. 2008), which unlike this case, involved *unauthorized* use of technology controlling

24   access to software illegally imported into the United States.  *Microsoft Corp.*, 555 F. Supp. 2d at

25   1059 ("By distributing a [volume license agreement] *without authorization*, Wang effectively

26   circumvented Microsoft's technological measure to control access to a copyright work in violation

27   of the DMCA") (emphasis added).

28

1    In short, Real does not need any permission from the Studios in order to avoid liability

2    under § 1201(a)(2) for circumvention of CSS. Real has all the permission it needs in the form of

3    its CSS license from the DVD CCA, which it implements faithfully.

4              **2.        The Studios Misapply § 1201(b) to Real's Implementation of CSS**

5         The Studios contend that Real violates "copy control" features of CSS, and therefore

6    "circumvents" CSS under §1201(b). They are mistaken.

7         Two decisions by judges of this Court illustrate the "circumventions" of copy controls that

8    are targeted by §1201(b). In *321 Studios*, Judge Illston found violations of both §1201(a)(2) and

9    §1201(b) by a company, 321, that sold software to access and copy CSS-protected DVDs. 321

10   used an access key for which it had no authority. With respect to the §1201(b) claim for copying,

11   "while 321's software does use the authorized key to access the DVD, it does not have authority

12   to use this key, as licensed DVD players do, and it *therefore* avoids and bypasses CSS." 307 F.

13   Supp. 2d at 1098 (emphasis added).

14        In *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002), Judge Whyte

15   denied motions to dismiss an indictment under §1201(b) against a company -- subsequently

16   acquitted, Elcom -- that sold software permitting users to remove use and copy restrictions from

17   Adobe Acrobat ebook files. Elcom's software left the ebook "in a 'naked PDF' format that is

18   readily copyable, printable, and easily distributed electronically." *Id.* at 1118. The software

19   enabled purchasers to make "fair use" of ebooks but also "to engage in copyright infringement by

20   making and distributing unlawful copies of the ebook." *Id.* at 1118-19. Against this backdrop, the

21   court analyzed "fair use" (*see infra*, pp. 38-40) and denied a pre-trial motion to dismiss the

22   indictment on the grounds the DMCA was unconstitutional. [12]

23        Both cases differed markedly from the present one. The RealDVD Products do not avoid

24   CSS as in *321*; rather, it implements CSS as a licensee. The RealDVD Products do not create

25   

---

26   [12] The Studios quote *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 308 (S.D.N.Y. 2000) for its finding that CSS is a system that allows hardware to play back "but not

27   copy." (Studio Mem. at 3) The court in *Reimerdes* based its recital of CSS facts on the unopposed statements of the studios' witnesses, since defendants Corley, et al. were hackers, not CSS

28   licensees, and had no reason to know or care what the CSS specifications actually said. (*See Reimerdes*, 111 F. Supp. 2d at 310, nn. 61-62, quoting King and citing unspecified documents)

1   naked digital files for easy distribution as in *Elcom*; instead, they lock down copies on the hard

2   drive, preserve CSS, and add AES-128 encryption for better protection than CSS ever provided.

3   Real set out to implement its CSS license and specifications accurately, recognizing that their

4   goal, as written, was to keep CSS-protected DVDs secure within the CSS-licensed universe.

5   Because Real complies with CSS, the Studios cannot credibly maintain that Real "circumvents"

6   CSS as by, *e.g.*, "avoiding" or "bypassing" or "deactivating" CSS. 17 U.S.C. §1201(b)(2)(A).

7          The Studios try again to change the statutory question into whether the copyright owners

8   have given "authority to copy." That is not the question under §1201(b) any more than it was

9   under §1201(a)(2). The question under §1201(a)(2) was having authority to access the DVD –

10  authority explicitly granted to Real by the CSS license. The issue of "circumvention" under

11  §1201(b) does not raise any question at all of a copyright owner's authority. Unlike 1201(a),

12  circumvention as defined in 1201(b) lacks the phrase "without authority of the copyright owner:"

13              As used in this subsection – (A) to "circumvent protection afforded by a
                technological measure means avoiding, bypassing, removing, deactivating, or
14              otherwise impairing a technological measure"

15  17 U.S.C. §1201(b)(2)(A).

16         The Studios struggle to make "circumvention" into "authority to copy" because they want

17  to change the issue about the CSS Agreement. They want the issue not to be whether the CSS

18  Agreement forbids CSS-protected archival copies but whether the Studios have affirmatively

19  consented to such copies. The Studios say that Real is liable for "circumventing" CSS because

20  the CSS License does not expressly authorize copying of the Studios' DVD content. Studio Br.

21  at 12-13. That is not the relevant inquiry under the DMCA.

22         There is only one license at issue in this case: Real's CSS license with the DVD CCA. It

23  is undisputed that the CSS Agreement is by its express terms construed under California law. Ex.

24  8 at §10.4(a); DVD CCA Br. at 14 n. 15; *id.* at 14-19 (DVD CCA purporting to apply California

25  law to interpret the CSS Agreement). What is *not* at issue in this case is any license to use the

26  Studios' copyrighted movie content. Thus, the Studios' reliance on federal copyright licensing

27  cases such as *S.O.S. Payday* and *LGS Architects* – to argue that the CSS Agreement must

28  expressly authorize copying of the Studios' movie content – is badly misplaced. *See* Studio Br. at

13-15.  The fact that the CSS Agreement neither authorizes nor prohibits copying of the Studios'

movie content is irrelevant to the issue of whether the RealDVD Products circumvent CSS.  The

Studios are wrong that Real's license to use CSS must also incorporate an express license from the

Studios for a consumer to make fair-use copies.  *If* this were a copyright infringement case, and *if*

it involved a copyright license to Real for the Studios' copyrighted content, then arguably the

Court might need to decide whether such a hypothetical license expressly authorized Real to use

the Studios' movie content.  This is not such a case.  Thus, the Studios' legal authority regarding

how to interpret a hypothetical copyright license for the Studios' content is irrelevant.

Real is affirmatively authorized to use CSS precisely as it does.  The inquiry need go no

further.

### 3.    CGMS is irrelevant to a DMCA analysis

The Studios also contend that the Court should take into account the existence of CGMS-

D copy flags as part of the circumvention analysis.  Studio Br. at 11-12.  They are mistaken.

First, CGMS-D copy flags are not "technological measures" within the meaning of the

DMCA.  As the Studios admit, ████████████████████████████████████

████████████████████████████████  In other words, copy flags are akin to a sign posted

on a DVD that may be read by a DVD player.  All the CSS specifications require is that ██

████████████████████████████████████████████ Ex. 83 at ¶¶ 47-

48; Felten Dec., Ex. A ¶¶ 152-54 and Ex. B ¶¶ 67-72.  Neither CSS nor the law requires any active

response by Real.  A contrary finding would violate Section 1201(c)(3), which recognizes that

computer and consumer products cannot be burdened with providing particular responses to passive

technological measures.  17 U.S.C. §1201(c)(3).

Copy flags do not control access to DVDs or protect copying or any other rights held by

copyright owners.  Standing alone, copy flags therefore cannot form the basis of a circumvention

claim.  *Agfa Monotype Corp. v. Adobe Sys., Inc.*, 404 F. Supp. 2d 1030, 1036 (N.D. Ill. 2005)

(rejecting claim that 2-bit embedding bit "similar to a Copy Switch" constituted technological

measure under 1201(a)(2)(A) because imbedding bits were a "passive entity" that did nothing by

themselves); *see also RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070, 2000 WL 127311,

1    at *7 (W.D. Wash. Jan. 18, 2000) (finding that "[i]n conjunction with the Secret Handshake, the

2    Copy Switch is a 'technological measure' that effectively protects the right of a copyright owner to

3    control the unauthorized copying of its work.") (emphasis added).

4           Second, to the extent that the Studios contend that CGMS-D flags communicate a user's

5    authority to make a copy of a DVD, that contention is irrelevant to the analysis of whether the

6    RealDVD Products circumvent CSS. *See* Studio Br. at 11. Yet again, the Studios confuse

7    authority to use technology with authority to copy content. The RealDVD Products do not

8    circumvent CSS technology under §1201(a)(2) or (b) because Real is licensed to implement CSS

9    exactly as it does.

10          **B.      The RealDVD Products' ███████████████████ is not Circumvention of
                      ARccOS or RipGuard**

11

12          The Studios have failed to establish a claim under the DMCA against the RealDVD

13   Products by the Studios' use of ARccOS and RipGuard errors on a handful of DVDs. As

14   discussed in Real's opening papers, there is no "ARccOS" or "RipGuard" technology. ████

15   ████████████████████████████████████████████████████████████████████

16   ████    The Studios do not make out a claim as to what all of these ████ specifically are; how

17   each ████ is intended to function; why each ████ should qualify as an "effective technological

18   measure" under the DMCA; which DVDs use which of these ████████████████████, if

19   anything, with respect to any particular ████; or why the specific functionality ██████████

20   is circumvention under the DMCA. Instead, the Studios seek to back their way into a DMCA

21   claim by characterizing Real's limited awareness of ARccOS and RipGuard ████ as an

22   admission of liability. The Studios' arguments fail. Even with the limited record on ARccOS and

23   RipGuard ████, they cannot qualify as effective technological measures under the DMCA.

24          **1.      The Studios Misapply § 1201(b) to ARccOS and RipGuard ████**

25          The dispositive fact about ARccOS and Ripguard is what they are intended – and designed

26   – not to do. ARccOS and RipGuard ████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28

1  ████ They are not, therefore, something capable of being "circumvented" because they

2  cannot "effectively protect[] a right of a copyright owner." 17 U.S.C. §1201(b)(2)(B).

3        The most instructive authority is *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

4  387 F.3d 522 (6th Cir. 2004), which vacated a preliminary injunction issued by a district court

5  under §1201(a)(2).  Lexmark manufactured printers and replacement toner cartridges for those

6  printers. It placed a microchip in its toner cartridges to keep them from functioning with cartridges

7  refilled by its competitors. Lexmark's chip used a secret-handshake authentication sequence with

8  its Printer Engine Program located in Lexmark printers, and failing this authentication, the

9  cartridge would not work in the printer.

10        SCC broke Lexmark's authentication code and sold microchips to be used by Lexmark's

11  competitors selling refilled cartridges. The district court preliminarily enjoined the sale of SCC's

12  chips as "circumventing" the access protections to the Printer Engine Program. The Sixth Circuit

13  reversed because Lexmark's authentication sequence did not "effectively control access" to the

14  program as required by §1201(a)(2)(B). The program itself could be read, copied and used directly

15  from the printer's memory, without ever needing the authentication sequence.  "The

16  authentication sequence, it is true, may well block one form of 'access' … [b]ut it does not block

17  another relevant form of 'access.'" *Lexmark,* 387 F.3d at 546-47. By analogy, the court explained:

18  "Just as one would not say that a lock on the back door of a house 'controls access' to a house

19  where the front door does not contain a lock … it does not make sense to say that this provision of

20  the DMCA applies to otherwise-readily-accessible copyrighted works." *Id.* at 547.

21        DVDs treated with ARccOS or RipGuard ████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████ Studio Br. at 5. ██████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████ but there is no reason to doubt that a person who has paid $18.50 for a DVD will watch

27  it at least once. ████████████████████████████████████████████████

28

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3      The *Lexmark* court found no case that applied the DMCA "to a situation where the access-

4 control measure left the literal code or text of the computer program or data freely readable." 387

5 F.3d at 547. Similarly here, the copy-control measures of ARccOS and RipGuard, whatever else

6 they may do, leave all of the playable sectors of a DVD freely copyable. ████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████

9      No material difference between the "effectively controls" requirements of §1201(a)(2) and

10 §1201(b) can distinguish *Lexmark* from the present case.[13] The overarching issue decided in

11 *Lexmark* was that "technological measures" to block access (or, here, to block archival copies) do

12 not protect the copyrighted work from unauthorized access (or copying) when another "door" is

13 left wide open and unprotected.

    **2.**    **ARccOS and RipGuard ████ Are Not Effective Technological**
14              **Measures**

15

16      Ignoring the facts regarding what ARccOS or RipGuard ████ actually do and do not

17 accomplish, the Studios attempt to concoct a DMCA violation by mischaracterizing the testimony

18 and documents of Real's engineers.  For example, the Studios contend that "ARccOS and

19 RipGuard are copy protection measures," but in support they rely solely on misleading snippets of

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 _____

25 [13] The statutory definition for §1201(a)(2) in *Lexmark* inquired whether the "technological *measure*" (the authentication sequence) "in the ordinary course of its operation, requires the

26 application of information, or a process or treatment, with the authority of the copyright owner, to gain access to the work." *See* §1201(a)(3)(B). Here, the statutory definition for §1201(b) inquires

27 whether the "technological *measure*" (ARccOS and RipGuard) "in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under

28 this title." *See* §1201(b)(2)(B). In each, the "measure" might be effective in deterring access or deterring copies by one path, but it left another path open.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████.

6 Even the Studio lawyers get it wrong.  The sole document cited by the Studios' to support the

7 claim that RipGuard and ARccOS are a "copy protection measure" (*see* Studio Br. at 15 ██████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10      Similarly, the Studios argue that ARccOS and RipGuard ██████████████████

11 ██████████████████████████████████████████████

12 ██████  Studio Br. at 16.  Again, this mischaracterizes the record.  As noted, ████████████

13 ████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ██████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ██████████████████████████████████████

25 ───────────────────────

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████████████████



The Studios resort to arguing that the Court should infer that ARccOS and RipGuard are effective because ████████████████████████████████████████████████████████████ ████████████████████████████████████████ This also mischaracterizes the record. As explained in Real's opening papers, ████████████████████████████████

The legislative history confirms:

[T]hose measures that cause noticeable and recurring adverse effects on the authorized display or performance *should not be deemed to be effective* … [because] such measures may cause severe 'playability' problems. … The

1    Committee has a strong, long-standing interest in encouraging the introduction in
     the market of exciting new products.

2    Nimmer, Melville B., *Nimmer on Copyright*, CR1:6-55 (Vol. CR1 2000).  ARccOS and

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████ .

5            **3.    ████████████ Do Not "Circumvent" ARccOS or RipGuard ██████**

6    The Studios use the same type of facile mischaracterization to argue that ████████████

7    "circumvent" ARccOS and RipGuard ████ .  Their showing fails.

8    ██████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   suggestion to the contrary is wholly unsupported.  The truth is that ████████████████

14   ██████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ██████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ██████████████████████████████████████████████████████████████████

1 █████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 █████████████████████

4   ████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 █████████████████████████████████████████████████████

8 █████████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 █████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ██████████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████

16      Nor should the Court credit the Studios' circular argument that ████████████ must

17 "circumvent" ARccOS and RipGuard errors because the products allegedly "successfully copy

18 discs protected by either technology."  Studio Br. at 17.  The contention is nothing more than *ipse*

19 _____

20  15 █████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ███████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████

1   *dixit* and is also belied by the relevant chronology.  For example, ████████████

2   ███████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████████

15  ███████████████████████████████████████

16      ████████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████

25  ███████████████████████████████████████████

26      **C.     The RealDVD Products Primarily Enable "Fair Use"**

27          There is little dispute among the cases, albeit in dicta, that it is lawful fair use for the

28  purchaser to make a back-up copy of electronic media for personal use.  The more fundamental

1    question is this: Can it violate §1201(b) for Real to design products having the primary purpose of

2    enabling DVD purchasers to gain authorized access to DVDs and then to make fair-use archival

3    copies?

4         The case law remains divided. The Studios dismiss fair use as irrelevant to the DMCA,

5    and they have some support in the cases for saying so.  Certainly it is easy for the Studios to

6    quote broad dicta from cases that were rightly decided on their facts but did not address facts

7    anything like Real's facts here.  It is harder, but appropriate, to question the basis for dicta that

8    sweep away the explicit legislative intent behind §1201(b) – which supports Real.

9         The DMCA cases on "fair use" have usually involved software that enabled users, who

10   did not pay for access, to gain unauthorized access to copyrighted works and to copy them.

11   Those cases begin with a wrong (breaking into the copyrighted work), and then ask whether

12   users' right of fair use can shield the software seller from its own wrong.  That was the issue

13   decided in §1201(a)(2) access-control cases like *Universal City Studios, Inc. v. Reimerdes,* 111

14   F. Supp. 2d 294, 322 (S.D.N.Y. 2000), where hackers devised the DeCSS program to allow

15   unlicensed devices to play and freely copy DVDs.  Affirming *Reimerdes,* the court in *Universal*

16   *City Studios, Inc. v. Corley,* 273 F.3d 429 (2d Cir. 2001), originated the language – to be

17   repeated in later cases – that the DMCA "does not concern itself with the *use* of those

18   [copyrighted] materials after circumvention has occurred." 273 F.3d at 443 (emphasis in

19   original).  The court was rejecting the defendants' argument that hacking to gain unauthorized

20   access to DVDs was made exempt from the DMCA by other people's subsequent fair use. *Id.*

21        The answer seems correct on *Corley*'s facts. The wrong under §1201(a)(2) was to give

22   unauthorized access to copyrighted material, which is a wrong independent of the users' rights or

23   wrongs.  Under §1201(b), however, the wrong is defined expressly by reference to the rights of

24   the copyright owner, which depend in part on the use made of the copyrighted material.  *Corley*

25   did not speak to §1201(b). Subsequently, *United States. v. Elcom, Ltd.* and *321 Studios v. Metro*

26   *Goldwyn Mayer Studios, Inc.* extended *Corley's* thought – that the DMCA does not concern

27   itself with "use" of copyrighted materials – to §1201(b).  Because *321 Studios* relied largely on

28   *Elcom* and *Corley* for this point, *see* 307 F. Supp. 2d at 1097, we focus on *Elcom*.

1   *Elcom* rejected a void-for-vagueness challenge against §1201(b).[16]  The court put §1201(b)

2   together with §106 of the Copyright Act, as follows:  it bars (i) trafficking in a technology (ii) that

3   is primarily designed[17] to circumvent protection afforded by a technological measure, (iii) which

4   technological measure effectively protects a right of a copy right owner; and (iv) from §106, "a

5   right of a copyright owner" includes the "exclusive right" "to reproduce the copyrighted work."

6   203 F. Supp. 2d at 1123-24.  The court imported §106 "rights" into §1201(b), but not §106's

7   limitation of copyright owners' exclusive rights ("[s]ubject to sections 107 through 122"),

8   including the "fair use" limitation in §107.  By so doing, the court concluded that a device would

9   be prohibited if designed to "circumvent," so long as the "technological measure" being

10  circumvented could protect copyright owners' rights from some amount of infringement, no

11  matter the intended or likely use of the device.  Thus: "Nothing within the express language would

12  permit trafficking in devices designed to bypass use restrictions in order to enable a fair use, as

13  opposed to an infringing use." *Id.* at 1124.

14      *Elcom* found the statutory language "clear." *Id.*  However, another District Judge, sitting

15  by designation in the *Lexmark* appeal, reached the opposite result.  Judge Feikens opined that the

16  plaintiff, on remand, would fail to show a likelihood of success under §1201(b) if the trial court

17  found that "fair use" supplied a defense to infringement. *Lexmark*, 387 F.3d at 562 (Feikens, J.,

18  concurring in pertinent part; dissenting in part).[18]  The House Commerce Committee's report had

19  "stated explicitly that the aim of §1201(b) was to restrict devices used primarily for piracy, and

20  not those that facilitate legal use of products." *Id.* at 564.

21      *Elcom*'s analysis was the literal one – a deconstruction of the clauses and qualifiers of

22  §1201(b).  The result was a statutory construction under which a device is judged by its bare

23  potentiality to aid infringers, but not its primary purpose or effect. The court believed this also was

24  the legislative intent. *See* 203 F. Supp. 2d at 1124.  That question is an important one, because

26  [16]  Subsequently in *Elcom* there was a trial, acquittal, and no appellate review.

27  [17]  The text quotes § 1201(a)(2)(A), but the language of interest is identical in sub-sections (A), (B) and (C).

28  [18]  The majority opinion in *Lexmark* did not reach "fair use." 387 F.3d at 544.

1    *Elcom*'s reading means that Congress intended §1201(b) to be a law of conscious overkill.  Did

2    Congress really intend for §1201(b) to ban consumer-friendly tools meant wholly for fair use

3    because they could also, even occasionally or rarely, be used by an infringer?

4            *Elcom*'s source was a quote from the Senate Judiciary Committee report to the effect that

5    "most acts" of circumvention will occur in the course of copyright infringement.  *Elcom*

6    concluded that: "Congress sought to ban all circumvention tools because most of the time those

7    tools would be used to infringe a copyright."  *Id.* at 1124-25.  This was a pivotal misreading of the

8    legislative history of §1201(b).  It reflects confusion between the Senate report's discussion of

9    sellers' liability for *devices* of circumvention (our topic) and its discussion – quoted in *Elcom* – of

10   users' potential liability for *acts* of circumvention.[19]  The court's quoted sentence from the Senate

11   report is the one appearing below between the two italicized sentences:

12           Unlike subsection (a), which prohibits the circumvention of access control
             technologies, *subsection (b) does not, by itself, prohibit the circumvention of*
13           *effective technological copyright protection measures*.  It is anticipated that most
             acts of circumventing a technological copyright protection measure will occur in
14           the course of conduct which itself implicates the copyright owners [sic] rights
             under Title 17.  *This subsection is not intended in any way to enlarge or diminish*
15           *those rights*.  Ex. 82 at 29 (S. Rep. No. 105-190 (1998)).

16   The Senate report was not speaking here of devices or tools of circumvention.  Instead, it was

17   explaining that §1201(b) did not create standalone liability for *users* who commit acts of

18   circumvention with such devices, since their liability was controlled by the existing law of

19   copyright infringement and fair use.

20           The legislative intent in §1201(b) was not, in fact, to bar all "circumvention" products –

21   those meant for legal use as well as those meant for piracy.  The same Senate report quoted

22   above also stated: "Subsection 1201(a)(2) is designed to protect access to copyrighted works.

23   Section 1201(b) is designed to *protect the traditional copyright rights of the copyright owner*."

24   Ex. 82 at 12 (S. Rep. No. 105-190 (1998)) (emphasis added).  And in the next paragraph: "The

25   device limitation in 1201(b) *enforces the longstanding prohibitions on infringements*."  *Id.*

26

----

27       [19] Congress banned a user's circumvention of *access* control measures in §1201(a)(1) because
     such conduct was not subject to the copyright law.  But §1201(b) did not ban a user's
28   circumvention of *use* restrictions, as such conduct was already subject to the copyright laws.

1    Congress did not choose overkill.  After the Senate report of May 11, 1998, the original

2    Senate sponsor, Senator Ashcroft, confirmed that "neither section 1201(a)(2) nor section1201(b)

3    should be read as outlawing any device with substantial non-infringing uses."  Ex. 95 (144 Cong.

4    Rec. S4890 (daily ed. May 14, 1998) (statement of Sen. Ashcroft)).  Both House committees

5    responsible for H.R. 2281 (the bill enacted as the DMCA) reaffirmed the same intention.  The

6    House Commerce Committee wrote that §1201(b) "is not aimed at products that are capable of

7    commercially significant noninfringing uses."[20]  Ex. 84 at 38-40 (H.R. Rep. No. 105-551, pt 2

8    (1998)).  The House Commerce Committee's Chairman, Rep. Bliley, said the same.  Ex. 98 (144

9    Cong. Rec. H7094 (daily ed. Aug. 4, 1998) (statement of Rep. Bliley)).

10    As the court said in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.,* 381 F.3d

11    1178, 1192 (Fed. Cir. 2004), the DMCA's anti-circumvention provisions "do not establish a new

12    property right" for copyright owners.  Rather, "[s]tatutory structure and legislative history both

13    make it clear that §1201 [referencing both §1201(a) and (b)] applies only to circumventions

14    reasonably related to protected rights." 381 F.3d at 1195.

15    Because the "device limitation" of §1201(b) was "designed to protect the traditional

16    copyright rights of the copyright owner," Ex. 82 (S. Rep. No. 105-190 (1998)), the proper

17    question is what devices have the purpose to promote infringement of those "traditional" rights.

18    To answer this question, the road inevitably leads back to *Sony*, where the Supreme Court

19    defined what are, and are not, a copyright owner's protected rights:  "All reproductions of the

20    work, however, are not within the exclusive domain of the copyright owner; some are in the

21    public domain.  Any individual may reproduce a copyrighted work for a 'fair use;' the copyright

22

23
_____

24    [20] This standard is identical to the standard for devices that contributorily infringe copyrights.
     *See Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417, 442 (1984)
25    (devices "such as copying equipment" do not contributorily infringe "if capable of substantial non-
     infringing uses"). The legislative statements confirm that Congress intended to have the same basic
26    standard for judging devices under the DMCA as under the Copyright Act, except that the DMCA
     could reach and stop "circumvention" devices before any direct infringement occurred. Legislators
27    stated that *Sony* remained valid law. *See, e.g.,* Ex. 96 (144 Cong. Rec. S11888 (daily ed. Oct. 8,
     1998) (statement of Sen. Ashcroft); Ex. 97 (144 Cong. Rec. H10621 (daily ed. Oct. 12, 1998)
28    (statement of Rep. Klug) ("I'm very pleased that the conferees have meaningfully clarified that the
     *Sony* decision remains valid law")).

1    owner does not possess the exclusive right to such a use." The Court held consumers' use of

2    Sony's VCR to "time-shift" copyrighted TV broadcasts was fair use. 464 U.S. at 454-55.

3        Interpreting §1201(b) to ban devices whose primary purpose it to enable "fair use" cannot

4    be reconciled with *Sony* – not its letter and certainly not its spirit. Such an interpretation would

5    deliver a new property right and power to copyright owners to use tools of law to limit fair use,

6    which belongs to the public. We are witnessing such an attempt in the present case. But

7    Congress expressed no such intent for §1201(b). It said the opposite.

8        RealDVD was designed to *maximize* its attraction to the lawful fair-user: conveniences

9    and features for an individual DVD owner. Real Br. at 10-14. It was designed to *minimize* its

10   attraction to the ripper-infringer: strong AES-128 encryption, anti-copying restrictions, lock-

11   downs, blocks on Internet or network distribution, and product warnings. *Id.* The Studios have no

12   argument that RealDVD has the purpose or primary effect of enabling fair use. They cite one

13   court that knew of "no authority" for fair-use backup copies of video media. *Macrovision v. Sima*

14   *Products Corp.*, No. 05 Civ. 5587, 2006 WL 1063284 (S.D.N.Y. April 20, 2006). But the

15   authorities are there nonetheless. *Sony* upheld "fair use" video recordings to allow time-shifting

16   of television broadcasts. Although the facts differ, the Court's sentiment is clear. Judge Whyte in

17   *Elcom* spoke plainly that: "[m]aking a back-up copy of an ebook, for personal noncommercial use

18   would likely be upheld as a non-infringing fair use." 203 F. Supp. 2d at 1135.

19       The Ninth Circuit's sentiment was clear, too, in *Recording Industry Ass'n of America v.*

20   *Diamond Multimedia Systems, Inc.,* 180 F.3d 1072 (9th Cir. 1999). Brought under the Audio

21   Home Recording Act ("AHRA") of 1992, *RIAA* challenged the Rio portable music player that

22   downloaded MP3 audio files, including copyrighted music, from the Internet. It arose under a

23   different statute, and therefore the Ninth Circuit did not explicitly address fair use under the

24   Copyright Act. However, it noted that the Rio – consistent with the AHRA's main purpose of

25   "ensuring the right of consumers to make analog or digital audio recordings of copyrighted music

26   for their *private, noncommercial use"* – was for the facilitation of personal use. The Ninth Circuit

27   specifically drew a comparison to the fair use doctrine under the Copyright Act in finding that

28   "[t]he Rio merely makes copies in order to render portable, or 'space-shift,'" those files that

1    already reside on a user's hard drive." *RIAA*, 180 F.3d at 1079 (citing *Sony Corp. of America v.*

2    *Universal City Studios*, 464 U.S. 417, 455 (1984)). This use, the Ninth Circuit concluded, is

3    "paradigmatic noncommercial personal use." *RIAA*, 180 F.3d at 1079.[21]

4          RealDVD is a product to foster lawful fair uses of DVDs. What it seeks to do, in the

5    Ninth Circuit's words, is the "facilitation of personal use" – consistently with the Copyright Act,

6    with *Sony*, and with the Congressional intent in the DMCA.

7    **III.    THE BALANCE OF HARDSHIPS REQUIRES LIFTING THE INJUNCTION**

8          **A.    The RealDVD Products Do Not Harm the Legitimate Interests of the Studios**

9               **1.    There is no Presumption of Irreparable Harm**

10         Even if Defendants were able to show a likelihood of success on the merits, Defendants

11   are not entitled to a presumption of irreparable harm. The Supreme Court rejected the

12   presumption formerly applied in some copyright cases in *eBay Inc. v. MercExchange, L.L.C.*, 547

13   U.S. 388, 392-93 (2006), finding that a presumption could not substitute for a careful analysis of

14   the equitable factors relevant to entry of an injunction in copyright cases. There is "no language

15   in the text of the Copyright Act that would permit a departure from traditional equitable principles

16   such that a presumption of irreparable harm would be allowed in any injunctive context," whether

17   preliminary or permanent. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d

18   1197, 1213-14 (C.D. Cal. 2007). *eBay* was not limited to permanent injunctions as the Studios

19   contend, and numerous cases have followed *eBay* in a preliminary injunction context.[22] Nor is a

20

21   ───────────────

[21] The Studios argue that making a backup copy of a DVD is not fair use because the Registrar of
22   Copyrights is "not persuaded" that DVDs are so susceptible to damage that a backup copy is
necessary. Studio Br. at 17 n. 8. First, it is the Congress and courts, not the Registrar of
23   Copyrights, which establish the scope of fair use. Users have the fair use right to make a copy of
a purchased DVD under § 107 of the Copyright Act. Second, the Studios' argument does not
24   address the fact that DVD owners have an additional statutory right to make a backup copy
because a DVD qualifies as a "computer program" under § 101 of the Copyright Act. 17 U.S.C. §
25   117. That right does not depend on susceptibility to damage of a DVD. *Vault Corp. v. Quaid*
*Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988). In fact, the Copyright Office Circular
26   discussing registration of computer programs expressly recognizes that motion pictures may
constitute computer programs, as may audiovisual works on DVDs. Ex. 99 at 4.

27   [22] *See, e.g., Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 881 (D. Minn.
2007); *Sun Optics, Inc. v. FGX Int'l, Inc.*, No. 07-137-SLR, 2007 WL 2228569, at *1 (D. Del.
28   Aug. 2, 2007).

1    presumption appropriate to prevent the "violation of a federal statute" that "specifically authorizes

2    a district court to grant injunctive relief . . ." is the Studios contend.  Studio Br. at 20.  *eBay* itself

3    involved the violation of a federal statute that authorizes injunctive relief (the Patent Act. 35

4    U.S.C. §283) and rejected the very presumption the Studios' advocate.  *See also Weinberger v.*

5    *Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary

6    and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that

7    jurisdiction is to be recognized and applied.'").  Irreparable harm must be established, and

8    numerous courts following *Romero-Barcelo* have required such a showing under statutes that

9    specifically provide for injunctive relief.  *See e.g.*, *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840,

10   843 & n.1 (7th Cir. 2005) ("countless decisions (including *Romero-Barcelo*) have required a

11   showing of irreparable harm under statutes that specifically provide for injunctive relief");  *N.*

12   *Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1156 (9th Cir. 1988) (citing *Romero-Barcelo*) (district

13   court has discretion to deny injunctive relief for violations of federal law).

14         The Studios offer no reliable authority to the contrary.  Eleven of their cases predate *eBay*

15   and are therefore no longer good law on the point.  In *National League of Junior Cotillions, Inc. v.*

16   *Porter*, No. 3:06-cv-508-RJC, 2007 WL 2316823 (W.D. N.C. Aug. 9, 2007), the district court was

17   careful to note that it did not "rest any conclusion that the plaintiff [had] suffered irreparable harm

18   solely on the presumption." *Id.* at *6.  In *Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008), the

19   district court concluded on remand: "[T]he governing law has changed.  Now, a plaintiff is not

20   granted the presumption of irreparable harm upon a showing of likelihood of success on the

21   merits."  *Jacobsen v. Katzer*, No. C 06-01905 JSW, 2009 WL 29881, at *8 (N.D. Cal. Jan. 5,

22   2009).  Two of the cases cited by the Studios explicitly found "no authority" that DMCA

23   violations lead to a presumption of irreparable harm.  *Macrovision*, 2006 WL 1063284, at *3 n.6;

24   *RealNetworks*, 2000 WL 127311, at *6.  In short, *eBay* controls and requires the Defendants to

25   show irreparable injury in order to obtain a preliminary injunction.

26

27

28

1    **2.    The Studios Have No Evidence that Sales of RealDVD Products Will
      Affect Consumer Perception of Copying**

2

3        The Studios claim that the RealDVD Products will alter prevailing consumer attitudes

4    about the legality of copying DVDs, and that the change in attitude will cause them to lose sales.

5    Studio Br. at 22-23.  But they have no evidence to demonstrate existing consumer attitudes,

6    much less that the RealDVD Products will affect those attitudes to the Studios' detriment.[23]  This

7    case thus stands in marked contrast to the *Napster* and *Grokster* cases on which the Studios rely,

8    in which the moving parties provided *evidence* supporting similar allegations.  *See* Studio Br. at

9    23.  In *Napster*, for instance, the plaintiffs offered an expert-sponsored survey of college students

10   that "either explicitly indicated or suggested that Napster displaces CD sales"; a second expert's

11   analysis of retail CD sales demonstrating that "on-line file sharing has resulted in a loss of album

12   sales within college markets"; and a third expert's economic analysis that online file-sharing

13   contributed to "a new attitude" among consumers that "create[d] formidable hurdles for the

14   establishment of a commercial downloading market."  *A&M Records, Inc. v. Napster*, 114 F.

15   Supp. 2d 896, 909-11 (N.D. Cal. 2000).

16       Here, the Studios have no survey evidence or analysis of any kind.  They have offered no

17   expert testimony on consumer attitudes or that the RealDVD Products are likely to alter those

18   attitudes; no evidence that any change in attitude, were it to occur, would harm the Studios; and

19   no evidence of harm resulting from the existence of other CSS-licensed products with similar

20   functionality that have been on the market for years.  *See* Real Br. at 27-28.

21       In fact, the only evidence of record demonstrates the lack of any such harm:

22   •



23

24

25   [23] The Studios submitted a TRO declaration from Fox executive Michael Dunn stating

26

27

28

1    ████████████████████████████████████████████████████████

2

3    • The Studios themselves have created the atmosphere that leads consumers to believe that
     copying a purchased DVD is permissible. Real Br. at 21-22. DVDs typically do not state
     that making a backup copy is prohibited. They instead state that "unauthorized copying"
4    or "unauthorized reproduction" is prohibited, or that the DVD is intended "for private
     home use only." Ex. 103. Similar language appears on the FBI warning at the beginning
5    of most DVDs, and does not purport to prohibit backup copies. Ex. 104. Further, some
     DVDs do not even contain the FBI warning. DeNatale Dec. ¶ 8.

6
     ████████████████████████████████████████████████████████
7    ████████████████████████████████████████████████████████
8    ████████████████████████████████████████████████████████

9    • There are several CSS-licensed products years in the market offering functionality similar
     to the RealDVD Products (see Real Br. at 27-28), yet the Studios have not sought action
10   against them, demonstrating the Studios' knowledge that the existence of claimed "legal"
     products that allow DVD copying are causing them no harm.

11
           **3.    There is No Evidence That RealDVD Products Will Decrease Studios'**
12                **Sales**

13
           Likewise, the Studios have no evidence, only unsupported speculation, that the RealDVD
14
     Products will displace sales of other Studio products due to "rent-rip-and-return." Real Br. at 45.
15
     The evidence instead demonstrates that consumers interested in purchasing the RealDVD
16
     Products are unlikely to engage in "rent-rip-and return". Real Br. at 45. Further, unlike the free
17
     downloading of music or other content from the Internet of the type at issue in *Napster* and
18
     *Grokster*, the RealDVD Products can only be used by customers who *already* have a copy of a
19
     DVD. There is no evidence that consumers who already possess a copy of a DVD (whether
20
     purchased, rented or borrowed) would have purchased a *second* copy of the same movie (on
21
     DVD or in some other digital form offered by the Studios) but for the RealDVD Products.
22
     Again, the evidence is to the contrary.[24]  Real Br. at 45; Ex. 100 (Dunn Dep.) at 120:6-10; *see*
23
     *also Sony Corp. of Am.*, 464 U.S. at 452-53 (affirming rejection of theory that use of VCR will
24
     cause decline in studio plaintiffs' sales).
25

26   _____
        [24] For this reason, the Studios' unsupported claim that college students might misuse the
27   RealDVD Products by copying rented or borrowed DVDs is *not* evidence of harm. *See* Studio Br.
     at 21. The Studios are not harmed unless the copying (1) would not have occurred but for the
28   RealDVD Products, and (2) displaced a sale of the same movie. *See* Real Br. at 45; Gerbrandt
     Dec., ¶¶16-17.

1    The Studios misleadingly suggest that research conducted by Real shows that ████

2    ███████████████████████████████████████████████████████████ .

3    ███████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    █████████████   This material should be ignored because (1) it is the opposite of impartial,

6    (2) the methodology used to "support" the statement is unknown, and (3) the Studios can offer

7    no expert or any other witness who can be cross-examined or vouch for its reliability.  *See*

8    *Napster*, 114 F. Supp. 2d at 910 & n.15 (rejecting defendant's expert's survey evidence).

9         In an apparent attempt to excuse their complete lack of evidence of harm, the Studios

10   seek to paint Real as behaving badly, "rushing to market," and disregarding the Studios' claimed

11   concern regarding "rent-rip-return."  Studio Br. at 21.  Again, the opposite is true.  The

12   undisputed evidence is that Real designed the RealDVD Products to prevent piracy, ██████

13   ████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████

18   █████████   That is hardly evidence of irreparable harm to the Studios or bad faith on Real's

19   part.

20        Finally, the Studios argue that the RealDVD Products should be enjoined because they

21   could *theoretically* be re-designed to permit unrestricted copying.  Studio Br. at 15.  That is

22   nonsense.  The RealDVD Products that the Defendants seek to enjoin are not hypothetical; they

23   are actual products designed to *prevent* piracy.  Real Br. at 11-12.  In fact, any copy made using

24   them is much *more* secure than any DVD saved with the DVD CCA's irrefutably broken and

25   compromised CSS technology because the RealDVD Products add a layer of AES encryption, a

26   point the Defendants notably failed even to mention in their extensive opening briefs.  To say

27   that different products might lead to a different legal analysis is grasping at straws.

28

1           **4.**      **Any Harm Would Be Purely Economic and Compensable In Damages**

2        Even if the Studios had evidence that they were or were likely to be harmed by displaced

3 sales, such harm would not constitute *irreparable* harm because it could be calculated and

4 compensated by money damages. Real Br. at 46-47. Tellingly, the Studios proffer no expert or

5 other evidence to dispute Real's showing. Apparently, they could find no expert willing to claim

6 that lost profits damages are incalculable.

7        Instead, the Studios' only response is to question whether a consumer survey measuring

8 displaced sales, if necessary, would be reliable. Studio Br. at 24. It is a curious position for the

9 Studios to take, considering that they ███████████████████████████████████████

10 ███████████████████████████████████████████████████████████████

11 ████████████████████████ Ex. 100 (Dunn Dep.) at 34:8-35:20, 38:25-39:11; Ex. 108

12 (Singer Dep.) at 159:12-21; Ex. 109; March 17, 2009 Declaration of Gordon Klein ("Klein

13 Dec.") [Docket No. 216] at ¶16; Gerbrandt Dec., ¶¶ 20-30. As Real's damages expert Gordon

14 Klein pointed out, the scope and breadth of the studies undertaken by the Studios are a far greater

15 analytical challenge than determining any lost profits in this case, particularly since the selling

16 prices and rental prices of DVDs, the costs of production, and the number of RealDVD licensees

17 and sales of █████ would be readily known here. Klein Dec., ¶16. Thus, even if the Studios

18 could demonstrate imminent harm at all, they have not and cannot demonstrate any imminent

19 *irreparable* harm, and their motion for injunction must therefore be denied. *Los Angeles Mem'l*

20 *Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980).

21           **5.**      **A Preliminary Injunction Would Irreparably Harm Real**

22        The Studios do not address the actual harms to Real of a preliminary injunction, ████

23 ███████████████████████████████████████████████████████████

24 ████████████████████████████████ That very real, imminent harm far outweighs

25 the theoretical and speculative harms claimed by the Studios.

26           **6.**      **A Preliminary Injunction Would Harm Consumers**

27        The Studios do not even purport to address the harm to consumers of a preliminary

28 injunction. As discussed, a ruling here would endorse the Studios' efforts to appropriate for

1   themselves consumers' fair use rights. Real Br. at 48-49. That improper extension of the

2   Studios' copyright monopoly would obviously harm consumers because it would allow the

3   Studios to monetize rights that do not belong to them, to consumers' detriment.

4   **B.     The DVD CCA Has Provided No Evidence of Harm**

5   The DVD CCA argues that the Court should *presume* irreparable harm, based on §9.2 of

6   the CSS Agreement. It is not entitled to that presumption. The DVD CCA's claim that "[m]ost

7   of the courts nationwide that have addressed the enforceability of stipulated irreparable

8   injunction provisions like Section 9.2 . . . have held that such provisions are dispositive . . ." is

9   false. DVD CCA Br. at 20. While it is true that *some* courts have automatically applied similar

10  provisions, as the *Kaleidescape* court that is hardly the majority rule:

> It seems to me from reading the cases, no California case being precisely on point,
> and given the important obligations of the court to take great care in robustly
> exercising authority that is lawfully and appropriately given or refraining from
> doing so, that the – that *the great modern trend and the majority rules seems to
> be, that the parties cannot control the sound exercise of jurisdiction by the trial
> court acting in equity. And that means that I would consider that provision in
> light of all the facts and circumstances.*

15  Ex. 5 at 881-82 (emphasis added). Here, taking into account "all the facts and circumstances,"

16  there is no justification for presuming irreparable harm. First, there are other CSS-licensed

17  products already in the market known to the DVD CCA which it has chosen *not* to pursue. Real

18  Br. at 27-28. The DVD CCA's brief is silent as to any supposed harm resulting from those

19  products. Second, section 9.2 is a provision in a contract of adhesion. It therefore does not

20  reflect a freely negotiated assessment by *both* parties that irreparable harm would result from any

21  contract breach. Third, section 9.2 expressly defers to the power and duty of the reviewing court

22  to independently assess all the prerequisites for equitable relief, stating that the moving party

23  may obtain injunctive relief only "upon showing to the relevant court's satisfaction that

24  applicable factors other than the fact that harm will be irreparable and that monetary damages are

25  not sufficient to remedy." [25]  The Court is therefore directed to consider other equitable factors,

---

[25] Even in jurisdictions that have previously upheld harm stipulations, courts refuse to enforce
such provisions when there is no evidence of harm. *See e.g. Kansas City Southern v. Grupo TMM,
S.A.*, No. Civ. A. 20518-NC, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2002) ("If the facts

(continued...)

1  such as (1) the irreparable harm *to Real* of an injunction, and (2) the harm to consumers of a

2  preliminary injunction. As discussed *supra*, these factors weigh strongly against an injunction.

3        Finally, the DVD CCA has not and cannot demonstrate *any harm*, much less irreparable

4  harm. The DVD CCA's theory that the existence of the RealDVD Products would undermine

5  some "collective trust" is creative to say the least. If the credibility of the DVD CCA is injured,

6  that is because CSS technology is so broken, defeated and beyond repair that the California Court

7  of Appeal has ruled that CSS likely lost trade secret status nearly ten years ago; the California

8  Superior Court has ruled that the CSS Agreement does not prohibit the conduct claimed by the

9  DVD CCA; ███████████████████████████████████████████

10 █████████████████████████████████████████████████

11 █████████████████████████████████████████████████

12 ████████████████████

13                                          **CONCLUSION**

14       For all of the foregoing reasons, and based on the entire record in this case, Defendants'

15 Motions for a Preliminary Injunction should be denied.

16 Dated:  April 10, 2009                WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation

17

18

19                                        By: /s/ Leo P. Cunningham
                                           Leo P. Cunningham

20                                      Attorneys for Plaintiffs
                                     REALNETWORKS, INC. and

21                                      REALNETWORKS HOME ENTERTAINMENT

22

23

24

25

26

27       (...continued from previous page)

28 plainly do not warrant a finding of irreparable harm, this Court is not required to ignore those
facts" just to uphold the stipulation).