Volume 1

Pages 1 - 256

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

REALNETWORKS, INC., a        )
Washington Corporation; et   )
al.,                         )
                             )
        Plaintiffs and       )
        Counter-Defendants,  )
                             )
     v.                      )   No. C 08-4548 MHP
                             )       C 08-4719 MHP
DVD COPY CONTROL ASSOCIATION,)
INC., a Delaware nonprofit   )
corporation; et al.,         )
                             )
        Defendants and       )
        Counter-Complainants.)
_____)   San Francisco, California
                                 Friday, April 24, 2009


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs/**          WILSON SONSINI GOODRICH & ROSATI
**Counter-Defendants:**      650 Page Mill Road
                             Palo Alto, California  94304-1050
                   **BY:   LEO P. CUNNINGHAM, ESQUIRE**
                           **COLLEEN BAL, ESQUIRE**
                           **MICHAEL A. BERTA, ESQUIRE**




(Appearances continued on next page)

**Reported By:**             KATHERINE SULLIVAN, CSR, RPR, CRR
                             BELLE BALL, CSR, RMR, CRR
                             OFFICIAL REPORTERS

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Plaintiffs/**<br>**Counter-Defendants:** | BARTLIT BECK HERMAN PALENCHAR & SCOTT<br>1899 Wynkoop Street, 8th Floor<br>Denver, Colorado  80202<br>    BY:  **DONALD E. SCOTT, ESQUIRE** |

BARTLIT BECK HERMAN PALENCHAR & SCOTT
54 West Hubbard Street
Chicago, Illinois  60610
    BY:  **MARK S. OUWELEEN, ESQUIRE**

**For Studio Defendants/**
**Counter-Complainants:**    MUNGER, TOLLES & OLSON
560 Mission Street, 27th Floor
San Francisco, California  94105-2907
    BY:  **BART WILLIAMS, ESQUIRE**
       **ROHIT K. SINGLA, ESQUIRE**

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
    BY:  **KELLY M. KLAUS, ESQUIRE**

MITCHELL, SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California  90064
    BY:  **ROBERT H. ROTSTEIN, ESQUIRE**

**For Defendant/**
**Counter-Complainant**
**DVD CAA:**    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
580 California Street, Suite 1500
San Francisco, California  94104-1036
    BY:  **REGINALD D. STEER, ESQUIRE**

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
2029 Century Park East, Suite 2400
Los Angeles, California  90067-3012
    BY:  **STEPHEN R. MICK, ESQUIRE**

WHITE & CASE LLP
3000 El Camino Real
Five Palo Alto Square, 9th Floor
Palo Alto, California  94306
    BY:  **MARK F. LAMBERT, ESQUIRE**

1                    **P R O C E E D I N G S**

2   **APRIL 24, 2009**                              **9:46 A.M.**

3            **THE CLERK:**  Calling Civil 08-4548, Civil 08-4719,

4   RealNetworks versus DVD Copy Control Association, et al.

5            **THE COURT:**  May I have your appearances, please.

6            **MR. CUNNINGHAM:**  Leo Cunningham for the RealNetworks

7   entities.

8            **THE COURT:**  Good morning.

9            **MR. SCOTT:**  Don Scott for RealNetworks, Your Honor.

10            **THE COURT:**  Good morning.

11            **MR. SCOTT:**  Good morning.

12           **MR. WILLIAMS:**  Good morning, Your Honor.  Bart

13   Williams on behalf of defendants and cross-complainant Motion

14   Picture Studios.

15            **THE COURT:**  Good morning.

16           **MR. STEER:**  Good morning, Your Honor.  Reginald Steer

17   on behalf of the DVD CCA.

18            **THE COURT:**  Good morning.

19           **MR. WILLIAMS:**  In addition, Your Honor, on behalf of

20   the studios is Mr. Rohit Singla and Mr. Kelly Klaus.

21            **MR. SINGLA:**  Good morning, Your Honor.

22            **THE COURT:**  Good morning.

23           **MR. WILLIAMS:**  Also, Mr. Bob Rotstein, from the

24   Mitchell Silberberg firm, is here on behalf of the studios.

25            **THE COURT:**  Good morning.

PROCEEDINGS

```
 1              You have some other people at your table who are?

 2         MR. STEER:  And I would like to introduce them.

 3         THE COURT:  Oh, you are going to do that.  Okay.

 4         MR. STEER:  First is my partner, Steven Mick.

 5         MR. MICK:  Good morning, Your Honor.

 6         THE COURT:  Good morning.

 7         MR. STEER:  And Mark Lambert of White & Case.

 8         MR. LAMBERT:  Good morning, Your Honor.

 9         MR. SINGLA:  Your Honor, one last introduction.  Mr.

10  Shannon Bales will be running our computer systems.

11         MR. CUNNINGHAM:  And, if I may, Your Honor.

12         THE COURT:  Yes.

13         MR. CUNNINGHAM:  Bob Kimball, the general counsel in

14  RealNetworks, whom you've met before, is here at our table.

15         THE COURT:  Yes.  Good morning.

16         MR. KIMBALL:  Good Morning.

17         MR. CUNNINGHAM:  From my firm, Michael Berta and

18  Colleen Bal.

19         THE COURT:  Good morning.

20         MS. BAL:  Good morning, Your Honor.

21         MR. BERTA:  Good morning, Your Honor.

22         MR. CUNNINGHAM:  And Mr. Scott's partner, Mark

23  Ouweleen.

24         THE COURT:  Yes.  Good morning.

25         MR. OUWELEEN:  Good morning.
```

PROCEEDINGS

 1          **THE COURT:**  Are you, in fact, going to be using some
 2  kind of a screen for some of the presentation?

 3          **MR. WILLIAMS:**  Yes, Your Honor.

 4          **MR. CUNNINGHAM:**  Yes.

 5          **THE COURT:**  Which screen are you using?  Are you
 6  using the big drop-down or using the computer ones?

 7          **MR. WILLIAMS:**  There's one feature, if I may bring to
 8  the Court's attention.  There are some highly confidential
 9  documents that will be referred to in our opening statement.
10  And we've already spoken with Mr. Bowser about displaying those
11  only to the Court and to counsel, and not displaying it on the
12  screens that are to the gallery.

13          **THE COURT:**  Do we have those screens set up so that,
14  in fact, you can do that, accomplish that?

15          **MR. WILLIAMS:**  I believe so, Your Honor, yes.

16          **MR. STEER:**  In addition, Your Honor, if I may raise
17  this issue now.  Our one witness to be presented in court is
18  Dr. John Kelly, a computer scientist; an expert.

19          His testimony, which we expect to put on this
20  afternoon, is going to involve entirely highly confidential
21  information both of DVD CCA and, I believe, of RealNetworks,
22  having to do with the technical specifications of DVD CCA,
23  which have been, in a number of cases, ruled to be trade
24  secrets and which have always been filed under seal in this
25  matter and also with respect to the way RealNetworks' products

PROCEEDINGS

```
 1  at issue in this case function.

 2           And we would ask that the courtroom be sealed during

 3  his testimony.

 4           THE COURT:  Maybe you should have got a private

 5  judge.  This is a public forum.  Right?

 6           MR. CUNNINGHAM:  Your Honor, we're not requesting

 7  that the courtroom be sealed with respect to any of our

 8  information.  But his request is what it is.

 9           THE COURT:  Will some of his testimony at least not

10  be of that nature?

11           MR. STEER:  Very little.  The introductory portion,

12  of course.  But we'll get directly to what the specifications

13  require, and in detail.

14           THE COURT:  Well, we'll see how we can handle that,

15  and whether or not it can be handled in some way so that it's

16  just submitted to the Court.

17           MR. STEER:  Thank you, Your Honor.

18           Again, our client is a defendant in this action,

19  didn't choose to come here.  So we feel compelled to protect

20  those trade secrets.

21           THE COURT:  Well, are these the DVD CCA trade

22  secrets?

23           MR. STEER:  They are.

24           THE COURT:  And are their RealNetworks trade secrets

25  involved here, as well?  I assume so.
```

PROCEEDINGS

```
 1          MR. CUNNINGHAM:  There's information that in a

 2   perfect world we would rather not share.  But in this context

 3   it's a public courtroom; it's a public reading.  We don't have

 4   a private judge, and we're prepared to incur that cost.

 5          THE COURT:  And what is your position with respect to

 6   the DVD CCA's highly confidential --

 7          MR. CUNNINGHAM:  If I may, I have a non-spirited

 8   opposition to it.  I oppose it, but I appreciate their concern.

 9          THE COURT:  Well, and I suppose one of the questions,

10   and who would be the person to answer those questions, is the

11   degree to which that confidentiality has been maintained.

12          MR. STEER:  I think Mr. Lambert can address that.  He

13   has litigated other matters on behalf of DVD CCA, and I'm

14   informed has made every evident to maintain that

15   confidentiality.

16          I believe the --

17          THE COURT:  Not just in the courtroom but just

18   generally in terms of parties who had access to that particular

19   information.  I'm not suggesting we necessarily need to take

20   that up right now, but I think at some point before that

21   testimony we should take that up.  And that is the degree to

22   which this information is available outside of DVD CCA,

23   essentially.

24          MR. STEER:  Generally, Your Honor, it is not

25   available outside of DVD CCA.  And, in fact, part of the
```

PROCEEDINGS

1   evidentiary presentation in this case will have to do with the

2   way these technical specifications were provided to

3   RealNetworks.  Great care was taken not to disclose them

4   publicly.  In fact, in my opening statement I will show the

5   Court a Federal Express receipt having to do with just that

6   issue.

7            **MR. CUNNINGHAM:**  Your Honor, it is the case that our

8   client has always treated these materials as confidential.

9   However, the reality is that the CSS technology was cracked a

10  long time ago, and it's well-known.  A California court has

11  ruled it's not a trade secret.

12           So there's a little bit of being on the dark side of

13  the moon here.  We behave as if these things are secret.

14  Hence, why we filed things under seal.  And we respect their

15  request.

16           But the reality is, and I think if we were to voir

17  dire perhaps even Dr. Kelly on this, it would come out that

18  this information is widely known.  So that might be a way to

19  handle this matter.

20           **THE COURT:**  Well, that is what I'm talking about, is

21  essentially in the form of a proffer with regard to that and,

22  also, then with some foundational testimony with regard to what

23  degree of confidentiality or secrecy have these "trade

24  secrets" -- and I'm putting that in quotes right now -- been

25  maintained?

PROCEEDINGS

1        Not just in connection with this litigation, but in

2   connection with the licensing that is done, the other parties

3   that may have access to this information, other lawsuits, as

4   well.  So I guess what we would need is some foundational

5   testimony from somebody.

6        **MR. LAMBERT:**  And in anticipation of that, one

7   distinction ought to be made.  And that is, the information

8   that is purported to be publicly known has to do with certain

9   keys, certain algorithms, particulate matter from the CSS

10  technology.

11       That is distinguishable from the documentary

12  technical specifications that include those things but much,

13  much more, which are -- which have been filed under seal in

14  numerous proceedings, which are maintained under seal, which

15  have withstood challenges to be unsealed.

16       And, in fact, there's a California Court of Appeals

17  from 2006, from the Kaleidescape case, when Kaleidescape tried

18  to get the documents unsealed.  And they failed at both the

19  trial court level, and the Court of Appeal upheld the trial

20  court's decision to keep the documents under seal because of

21  this distinction.

22       **THE COURT:**  But I think we need some testimony on

23  that.

24       So are we ready, then, to proceed?  And with respect

25  to the motions in limine, I don't really see a basis for

1   getting into Mr. Pak's testimony regarding AMX, or whatever

2   it's called.   AMX.

3           What I want to hear, first of all, is what goes to

4   the likelihood of success?  And this really goes, I assume, to

5   the issue of the extent to which -- what do I call you,

6   defendants, plaintiffs, the studios -- you know, have attempted

7   to enforce their copyright.

8           I'm assuming that's what that all goes to.  And that

9   seems to me is at the tail end of this case.  But I think

10  that's more of a sideshow and really unnecessary.

11          Now, with respect to the evidence regarding

12  settlement discussion, I'm a little concerned.  I mean,

13  generally, I think, you know, we would just flatly exclude that

14  kind of testimony.

15          On the other hand, if -- and that's what I would be

16  inclined to do, generally.  But if, in fact, there are

17  statements that were made that somebody gets on the stand and

18  testifies, and testifies to the contrary, and they have in fact

19  in those settlement negotiations said something else about the

20  very fundamentals about how the RealNetworks system works,

21  something along those lines, then, you know, I may be inclined

22  to allow some impeachment with respect to that.

23          But, certainly, with regard to any actual settlement

24  discussions, of course, that's not going to come in.  But I'd

25  hate to see somebody get on the stand and testify one way

PROCEEDINGS

1  about, you know, how RealNetworks works, the DVD works, or

2  something like that.  I'm using that because I'm not sure

3  exactly what that person might testify to, but something of

4  that nature.  And then, you know, it turns out to be totally

5  contrary to what that person or substantially contrary to what

6  that person has previously said even in settlement negotiation.

7           With a proffer, I would be inclined to let that in.

8           **MR. WILLIAMS:**  That's acceptable to the studios, Your

9  Honor.

10          **THE COURT:**  Okay.

11          **MR. CUNNINGHAM:**  Your Honor, I have a hunch that's

12  going to work with our witnesses.  Just let me clarify though,

13  because, the Court has used the phrase "the settlement

14  discussions."And, in fact, there's a long chronology here, and

15  the chronology matters.

16          That is, my client first went to the studios in

17  August -- let me tell you what the milestone date is.  The

18  milestone date is September 6th.  That's the date this tolling

19  agreement and code of silence descended.  So it's not until

20  September 6 that the parties are having what might be called

21  settlement discussions.

22          We started on August 15, and prior to September 6,

23  but in the first week of September, we talked to a number of

24  studios.  I may misremember them, but I think it was Sony, NBC,

25  and Warner.

PROCEEDINGS

1          So we would like to present evidence about stuff that

2    is unambiguously not settlement discussions.  We'll talk about

3    in truth what those are were.

4          THE COURT:  Excuse me.  Clearly, we have a tolling

5    agreement.  Nobody is disputing that, right?

6          MR. KLAUS:  No one is disputing --

7          THE COURT:  There have been discussions about tolling

8    agreements, perhaps, communications between companies and so

9    forth.

10         And I would assume that we're not talking about that

11   to the extent that's relevant.  It's when it gets to the point

12   of having some discussions whether they were settlement or

13   whether they were trying to resolve issues in some way related

14   to the litigation that I think that the motion is well-taken.

15         Is that understood?

16         MR. CUNNINGHAM:  Your Honor, I would have more to

17   say, but I would probably be repeating what's in my papers.

18         THE COURT:  Well, then, I think what we do is, if you

19   feel that with those parameters you're not going into dangerous

20   territory -- and I'm not going to strike you dead if we do

21   that.

22         MR. CUNNINGHAM:  Thank you for that, Your Honor.

23         (Laughter)

24         THE COURT:  A bolt of lightening comes out of the

25   ceiling.  But I assume there will be an objection, and then I

PROCEEDINGS

 1  will rule on it.  Sort of hard to do in the abstract.

 2            MR. CUNNINGHAM:  Thank you, Your Honor.

 3            THE COURT:  Okay.

 4            MR. KLAUS:  That's fine.  Thank you, Your Honor.

 5            THE COURT:  That sort of sets the general parameters.

 6            We are aware there have been discussions.  But not

 7  every discussion, not every communication is -- because, after

 8  all, they would have to show they were enforcing their

 9  copyrights, as well.

10            But not every discussion or communication is a

11  settlement discussion.  And we have to parse out what was

12  communications that don't fall within that rubric and what do.

13            MR. KLAUS:  Right.  And the only thing I would add to

14  what Mr. Cunningham said is, he says the chronology starts on

15  August 15th.  The chronology with our product actually started

16  in January of 2007, and there were 18 months of development,

17  and work contacting lots of third parts.

18            THE COURT:  My guess, I'm going to hear about that,

19  right?

20            MR. KLAUS:  Yeah.

21            THE COURT:  So how are we going to proceed?

22            MR. WILLIAMS:  We're ready with opening statements,

23  Your Honor.

24            THE COURT:  This is your motion.

25            MR. WILLIAMS:  It is.  And we are ready with a

PROCEEDINGS

```
1   15-minute --

2           THE COURT:  You are the one who has to start the ball

3   rolling.  Are you going to make a brief opening statement?

4           MR. WILLIAMS:  Yes, 15 minutes, Your Honor, and then

5   we're ready to call our first witness.

6           THE COURT:  Are you going to each make an opening

7   statement?

8           MR. WILLIAMS:  Yes.

9           MR. STEER:  Yes, Your Honor.  We had discussed this

10  with the Court in our last appearance.  And you agreed that we

11  could have 10 minutes --

12          THE COURT:  Each at the outset.  And then you will

13  respond to each of their opening statements --

14          MR. CUNNINGHAM:  We will.

15          THE COURT:  -- in a non-argumentative fashion.

16          MR. CUNNINGHAM:  We will try to be non-argumentative,

17  Your Honor, as is our style.

18          THE COURT:  That comes later.

19          MR. CUNNINGHAM:  If I could indulge on one point.

20  That is, Mr. Scott and I will be sharing the opening.  And we

21  may run a little bit over what is 15, in response to their 25.

22  I hope you won't strike us dead for that.  And if anyone wants

23  to extract that time from our case later on, so be it.

24          THE COURT:  I'll give you a total of 20 minutes.

25          MR. CUNNINGHAM:  Thank you.
```

1    **THE COURT:**  Since each of them have 15.  So that

2    gives you 10/10, right?

3    **MR. CUNNINGHAM:**  Thank you.

4    **MR. WILLIAMS:**  Thank you, Your Honor.

5    **THE COURT:**  Who is going to start this ball rolling?

6    You, Mr. Williams?

7    **MR. WILLIAMS:**  I am, Your Honor.

8    **THE COURT:**  You may proceed.

9                          **OPENING STATEMENT**

10   **MR. WILLIAMS:**  Thank you, Your Honor.

11   Your Honor, the motion picture studios put

12   technologies on DVDs that prevent people from copying them.

13   And Congress passed a statute in 1998, the DMCA, that

14   makes it unlawful to traffic in devices that circumvent that

15   technology.

16   Now, Real wants to do exactly what Congress said they

17   cannot do.  They would like to sell a device that is used to

18   circumvent copy control technology.

19   You received a lot of briefing, about 200 pages

20   worth.  And I'm certainly not going to repeat what was said

21   there.  But, instead, I would like to give Your Honor a roadmap

22   to what we're going to prove through the witnesses and exhibits

23   at the hearing.

24   In this hearing, the studios will prove three things:

25   Number one, RealDVD is a device for circumventing the

1   Content Scramble System, or CSS, which all of the studios place

2   on all of their DVDs.

3          Number two, RealDVD is a device for circumventing

4   ARccOS and RipGuard, which are additional technologies that are

5   used on a number of DVDs by some of the studios on some of

6   their DVDs.

7          Number three, Real's excuses for their conduct are

8   just that.  They are excuses.  They do not erase the harm to

9   the studios from using RealDVD.  And they just don't hold up to

10  close scrutiny for reasons that I'll describe.

11         On the first point, when we were here at the TRO

12  hearing back in October, we told you that it was apparent that

13  RealDVD is used to circumvent numerous protections.  And we

14  listed them.  And some of them are showing on your screen now.

15         There were at least four ways that Real DVD avoids or

16  bypasses CSS's protections.  And we expect that Mr. Steer, from

17  the Copy Control Association, will explain them in greater

18  detail.  They have to do with authentication, bus encryption,

19  and the like.

20         But you will hear evidence that each of the things

21  that we said about how RealDVD works back in October is true.

22  And, in fact, they are undisputed.

23         One of the experts that we will call, Mr. Robert

24  Schumann, will walk you through Real's circumvention of all of

25  these protections.  And, in fact, Real's expert, Dr. Bishop,

 1  will admit that RealDVD does not implement any of the

 2  protections that we outlined in October, at the time that a DVD

 3  plays back a movie.

 4      One of the questions that Your Honor has raised in

 5  the past is whether the license at issue here authorizes Real

 6  to build a product like RealDVD, which we call a copying

 7  product.  It does not.

 8      And by the end of this preliminary injunction hearing

 9  we're very, very confident that you will be firmly convinced

10  that any way you look at the CSS license, whether you look at

11  it down in the weeds, or if you take a big step back and look

12  at the purpose for those protections, either way you go it

13  cannot possibly be read to expressly authorize someone to build

14  a DVD copier as distinct from a DVD player.

15      We will show this to you through the terms of the

16  license and the specifications.  And you're going to hear

17  testimony, I think this afternoon -- maybe this morning, with

18  any luck -- from Dr. John Kelly.  He will walk you through the

19  specific terms of the license.  Mr. Steer will examine him.

20  And the evidence will show you that Real is not complying with

21  numerous requirements.

22      So what will Real's response be?  Well, we believe

23  that by the end of the hearing next week that you will conclude

24  that Real's responses come down to semantics and word games

25  about the structure and the words that appear in the CSS

1  license.  We believe that we will prove that those ignore the

2  purpose of the license, which is a pretty simple one.

3          Real will say, effectively, Look, we do everything

4  that the license says.  If the license says there are nine

5  steps, we do all nine of the steps.  There's no problem.  But,

6  oh, by the way, between steps seven and eight of those nine

7  steps, we make a copy of the DVD, a complete, pristine, perfect

8  copy that is permanent, that resides on someone's hard drive.

9          We will show you, first, that Real does not comply

10  with those steps.  That will be the point of our experts.

11          But the other point will be that even if Real were

12  right that it complied with all of those steps, the fact is

13  that it has no affirmative authorization from anyone to build a

14  device that is a DVD copier, even for one copy.

15          Real's argument will make no sense.  And we're

16  confident that by the end of this hearing you'll be convinced

17  of that.

18          It will be clear from all of the evidence that the

19  entire purpose of CSS and the CSS system is to prevent exactly

20  the type of copying that Real does.  It's clear from the very

21  first page of the license.

22          (Document displayed.)

23          And what I've called up here is the first page of the

24  license.  You can see in the very first paragraph, one of the

25  parties, it starts there, is the DVD Copy Control Association.

 1  It is an association that exists for the purpose of controlling

 2  copies of DVDs.

 3        And the license says in its very first recital --

 4  still on that very first page, you see the language here --

 5  that it is to provide reasonable security for content on DVD

 6  discs and, thereby, together with the terms and conditions of

 7  this agreement to provide protection for such copyrighted

 8  content against unauthorized consumer copying.

 9        There's more.  You will hear this morning from

10  someone who was present at the creation of this CSS license.

11  You will hear from Ms. Marsha King.  And she is literally a

12  framer of the license in the organization.  And she is going to

13  give the Court undisputed evidence of what the expressed intent

14  was of the founders.

15        And from day one, moment one, Your Honor, the idea

16  was to prevent consumer copying.  That was the one thing that

17  this license was intended to accomplish.

18        And there's not just language and there's not just

19  evidence of the intent of the framers of this license, there's

20  performance under the license, as well, Your Honor.  Because we

21  will prove that for more than a decade everyone who took a CSS

22  license and made part of this system made the components of

23  this system, understood that you couldn't make a DVD copier.

24        Up until the Kaleidescape case -- which Real uses as

25  a role model -- all of the licensees understood that you get

1    authorization to make a player and not a copier.

2         But there's more.  Because there's also undisputed

3    evidence about what the studios do with the packaging of their

4    content.  And it starts with the actual DVD itself, and the

5    casing.

6         This is "Eyes Wide Shut," (indicating).  This is one

7    of the DVDs that was mentioned in one of the declarations

8    provided by Real.

9         It says right on the back that there shall be no

10   copying.  It has a disc-to-disc copying with a circle, red

11   circle around it, with a slash through it, that tells you that

12   you're not supposed to copy the DVD.

13        And here you can also see that it's on the DVD

14   itself, there's indication that you're not supposed to copy.

15        And when you actually put the DVD into a player and

16   play it, there's a warning that says that you're not supposed

17   to copy.

18        Sometimes this warning appears at the very beginning

19   of the DVD.  Sometimes it appears at the end.  But the fact of

20   the matter is that one is not supposed to copy the DVD.  And

21   that's exactly what RealDVD does.

22        Your Honor will also see it through Real's own

23   documents, that they knew that the license did not authorize

24   them to build a copier.  They thought -- and we'll show you

25   with documents -- that they were exploiting a loophole.

1          Well, that is not the law because Real needs to show

2    that it was authorized to build a device that is used to

3    circumvent the protections of CSS; that it was authorized to

4    build a copier.  And that they cannot do.  So that's CSS.

5          The second point we will show is that RealDVD is used

6    to circumvent ARccOS and RipGuard.  And I want to be clear

7    about what those protections are.

8          All of the things we told you in October about CSS,

9    that relate to authentication, bus encryption and the like,

10   those are not relevant to ARccOS and RipGuard.  These are

11   different technological protection measures.

12         And ARccOS and RipGuard add an additional level of

13   protection for DVDs.  They are two similar technologies, one to

14   the other, ARccOS and RipGuard.  But they protect DVDs against

15   copying by encoding various obstacles onto the DVDs themselves,

16   which frustrate and in some instances completely block copies.

17         You'll hear on Tuesday from the studios' expert,

18   Mr. Hollar, about the variety and effectiveness of those

19   techniques.

20         But unlike CSS, Real does not have a license to hide

21   behind when it comes to ARccOS and RipGuard.  So what will Real

22   do?  We expect the evidence will be the following:

23         Real witnesses will pretend that they don't know what

24   ARccOS is, or RipGuard.  They will say, just as they did in

25   their brief at page 16, pages 14 through 15, these engineers

 1  knew next to nothing about ARccOS and RipGuard, with reference

 2  with to their own engineers.

 3          In fact, we will provide the Court with evidence --

 4  now, Mr. Bowser, if we could switch it over.

 5          We will provide evidence, Your Honor, that the actual

 6  specifications that are used by RealDVD in internal documents,

 7  the one that is in front of Your Honor right now, is an

 8  October 2007 document.  It's 150 pages long.  It's an internal

 9  Real documents that is a handbook for RealDVD, in which they

10  describe precisely what ARccOS does.

11          And when you hear the experts describe what ARccOS

12  does, they will do no better job than this first paragraph that

13  describes it as a system that is used to corrupt sectors on

14  DVDs.  They knew what it was.

15          **THE COURT:**  Excuse me.

16          **MR. WILLIAMS:**  Yes.

17          **THE COURT:**  What you are displaying now is what

18  exhibit number?

19          **MR. WILLIAMS:**  What we are displaying now does not

20  yet have an exhibit number.  Oh, excuse me.  It was from

21  Mr. Buzzard's deposition, Exhibit No. 50.

22          And they will say, in addition to saying that, "We

23  don't know what ARccOS and RipGuard are" -- the very engineers

24  who prepared these type of documents and who studied ARccOS --

25  they will also say they did not believe that ARccOS was a copy

 1  protection system.  That's how they testified in their

 2  depositions.

 3        But Real repeatedly recognized in their internal

 4  documents that ARccOS and RipGuard are, in fact, copy

 5  protection systems.

 6        The document that's in front of you now -- and this

 7  is from Mr. Barrett's deposition, Exhibit 5 -- is a

 8  presentation that describes DVD protection schemes, in those

 9  words, as DVD protection schemes, referring to ARccOS, RipGuard

10  and others.

11        There will be no dispute that these are, in fact, DVD

12  protection schemes.

13        The next document here is not yet marked, I don't

14  believe.  We will mark it at this examination.  This is Section

15  6.4.1 of another internal document at Real, that describes copy

16  protection schemes, in those terms.  And it lists ARccOS and

17  RipGuard.

18        And it says, RealDVD will properly support playing

19  and saving of DVDs authored with the following copy protection

20  schemes.  They knew what they were.

21        So we will prove that the same engineers who gave

22  testimony in this case in December 2008, that they really

23  didn't know what ARccOS and RipGuard were, wrote documents

24  describing ARccOS and RipGuard accurately, studied ripping

25  devices, some of them illegal, designed to get around ARccOS

1    and RipGuard.

2           And, in fact, we will prove that Real engineers

3    actually purchased from computer hackers in the Ukraine, a

4    company called Rocket Division, instructions for bypassing

5    ARccOS.

6           And we believe you will be moved by the exhibits, by

7    the evidence that are internal e-mails from Real, because they

8    make crystal clear that Real knew exactly what it was doing,

9    that it was trying to circumvent this copy protection scheme.

10          In short, ARccOS and RipGuard are copy protection

11   technologies.  RealDVD is used to circumvent them.  And that is

12   an independent basis for Real's liability under the DMCA.

13          The studios will also make a clear showing of the

14   likelihood of success on the merits.  The studios have a clear

15   case of harm.

16          First, RealDVD is circumvention device.  So

17   trafficking in that device threatens the studios' businesses,

18   existing businesses, where the studios can through iTunes or

19   through Amazon.com, consumers can actually purchase movies.

20   They can rent them if they want.  They can buy them if they

21   want.

22          But in those instances, as distinct from RealDVD, the

23   content owners, the studios, get paid by iTunes or Amazon.com.

24   The entire business model for RealDVD is for that not to occur.

25          So I've talked about some of Real's excuses in this

 1  case.  And let me talk for a few minutes about some of the

 2  others that we believe will come up.  They came up over and

 3  over again in their briefing.  And they come up in their

 4  depositions when witnesses testify.

 5          Excuse number one is, Look, we as Real are just

 6  trying to help consumers to make a fair use of these products.

 7  It's fair use copying.

 8          Well, to begin with, Your Honor -- and we won't argue

 9  the law now, but at the end we will -- fair use is not a

10  defense to trafficking in circumvention technology under the

11  DMCA.  It's clear from the statute, from the legislative

12  history.  It's clear from a decade's worth of cases.

13          And Real knows that that is the law.  Because when

14  the shoe was on the other foot, when Real was worried about the

15  technology that it used to protect copyrighted works, Real said

16  that an end user's fair use claim is irrelevant.

17          What you have before you here is a transcript of

18  Mr. Diboise, formerly the lead counsel in this case for Real,

19  arguing to the Court that there is no fair use defense to the

20  Digital Millennium Copyright Act.

21          So what we have is Real taking an inconsistent

22  position in this case from when they were trying to protect

23  other copyrighted works, when it suited their purposes.

24          And, in fact, the court agreed in that case.  It's

25  called Stream Box.  And Real is, we would argue, just playing

OPENING STATEMENT / WILLIAMS

1  fast and loose in this case, making the exact opposite

2  argument.

3          But not only is fair use irrelevant, Real doesn't

4  even bother, in their papers, Your Honor, trying to prove that

5  copying DVDs is a fair use.  It is not.  And, indeed, they do

6  not even mention any of the four factors that are supposed to

7  be considered about fair use in their papers.  It is not fair

8  use to copy any DVD.

9          Now, all of Real's arguments about fair use are about

10  copies that someone owns.  Real does not bother to try to say

11  that there is a fair use when someone rents a DVD or borrows a

12  DVD from a friend, and then use Real's product.

13          Which leads me to excuse number two.  In response to

14  the fact that RealDVD permits consumers to rent a DVD or to

15  borrow one, to copy it and then return to their friend the

16  borrowed DVD, or to Netflix the rented DVD, Real says:  Don't

17  worry.  You can trust us.  People will not do that.

18  Law-abiding people will not do that.  They will not rip, rent

19  and return.

20          But, in fact, Real knows that's not so.  They did a

21  focus group themselves, back in May of 2008, which was produced

22  in discovery.  And in that document, one of those documents --

23  there are several.  The one that's before you now is from

24  May 2008.

25          And in that focus group they learned that consumers

1  told Real that copying their own DVDs is of limited value

2  because the content has often already been viewed by the person

3  who owns the DVD.

4  So that leads me to excuse number three.  What they

5  argue here, Your Honor -- and you'll hear it -- "We're not as

6  bad as Napster, in the music industry matters, because people

7  can't use RealDVD for viral distribution."

8  First of all, there is no requirement of viral

9  distribution under the DMCA.  And, in fact, there was were no

10  peer-to-peer services at all when the DMCA was passed in 1998.

11  But, moreover, RealDVD is subject to its own viral

12  distribution, because the same DVD can be passed around without

13  limit, in a dorm, amongst friends, et cetera.

14  And the way that would work, Your Honor, is that a

15  single DVD is used by an individual who signs up for Real.

16  That individual may use that and copy that DVD onto up to five

17  different computers.  They can be laptops.  They can travel.

18  But then the same DVD could be borrowed, could be

19  rented, could be owned, could be given to someone else who also

20  has RealDVD.  And so on and so on and so on.  And you can

21  clearly see how there could be a viral dissemination of the

22  copyrighted works, of the content.

23  That, we would argue, is inappropriate.  But the

24  whole argument about how there is no viral distribution, or

25  it's only five copies, or we only allow one copy but you can

1   use it on five different computers, all of that is window

2   dressing that they put onto the product in order to survive a

3   legal challenge.

4          Because, remember, at the end of this proceeding

5   Real's view of the license, Your Honor, will be that it does

6   not put any limits on copying; that there is no limitation in

7   the license.

8          So if Real's reading of the license were correct, it

9   would mean that tomorrow or six months from now or a year from

10  now Real could, in its discretion, turn a switch and allow

11  RealDVD to make hundreds of copies or thousands of copies,

12  because there is no principled basis for their arbitrary

13  limitation on the copying.

14         Finally, excuse number four.  They will argue that

15  this is really all about just the studios trying to make money

16  improperly themselves.

17         But that's wrong.  Because the studios have every

18  right to get paid for additional copies of their copyrighted

19  content.  That is what the whole copyright system is built

20  upon.

21         And, as I mentioned earlier, one can get copies of

22  DVDs through Amazon.com, iTunes, and other methods.  Sometimes

23  from the studios themselves.  A person can pay for it and

24  download an additional copy of the content.

25         Real knows that.  And the irony is that when Real is

1  the copyright owner, it doesn't say, Go ahead and make a

2  convenience copy.  When Real is the copyright owner, they

3  charge $20 for an additional copy.

4          That's how their product works.  It's $30 to buy it.

5  "If you want to put it on another computer, you've got to pay

6  us another 20.  Another computer, another 20.  Another

7  computer, another 20."  So they understand how that works when

8  it comes to material that they believe they have copyrighted.

9          So Real's objective on this is to make money off the

10  studios' investment without having to pay for it.

11          And when Real sells a copy of RealDVD, and someone

12  uses that machine to make copies of movies, Real gets to

13  pockets $30.

14          But Real didn't make any investment in the movies.

15  They didn't pay anything to the studios at all.  And, indeed,

16  that is what's going to be used under their scheme to entice

17  consumers to use their product.

18          But Real's play here is much broader than just the

19  $30 they get for actually buying the device.  This document

20  before you, Your Honor, is an October 2008 document.

21          It is after the launch of the product.  After they

22  launch this product.  And it tells you what, how, and why they

23  intend to make money.

24          And they intend to do that by getting their foot in

25  the door.  But the key point is -- there are two points about

1   this document.

2          In the top bullet, I would refer you to the third

3   sentence that refers to the fact that their format is protected

4   by what they will tell you is a second layer of protection.

5   And what they will argue to you, Your Honor, is that that

6   second layer of protection is just to make sure that this

7   product can't get out.  Almost as though they are trying to do

8   the studios a favor by putting this second layer, called

9   AES128, as an encryption layer.

10         But, Your Honor, their own documents will make clear

11   that the idea behind that is to put this in a format that is

12   protected and owned by Real so that once someone is locked into

13   Real, Real can start to sell those people other products,

14   because the consumer stays connected to what we'll call mother

15   Real once they buy the product.

16         The second major bullet point on that document before

17   you explains how they intend to make money.  And this is the

18   hook.  Because they intend to make even more money than the

19   money that's paid to actually buy the product, because the

20   whole idea is that they are going to leverage the existing

21   consumer's DVD collection.

22         That is the studios' product.  That is their crown

23   jewels, is the content for their movies.  And they are going to

24   use that to entice people to buy the product because they can

25   make a copy of it up to five, and then pass it on.

1          But the whole idea is that that will then, in turn,

2    lead Real to being able to sell other products and rent other

3    products and videos over both their personal computer and over

4    other devices.

5          So the hook --

6          **THE COURT:**  Now, can those five copies be copied?  Or

7    is there any protection in those five copies that prevents them

8    from being copied?

9          **MR. WILLIAMS:**  The way the Real product works, Your

10   Honor, and there will be testimony about it, is that the DVD is

11   placed into the machine.  The DVD is copied.  Thereafter, that

12   copy of the DVD can be placed upon five -- up to four other

13   computers, for a total of five.

14         Once that is placed on the other computers, that

15   computer cannot be used to make an additional copy.  But the

16   same DVD, assume it's borrowed, assume it's rented, or even if

17   it's owned, can be given to someone else who also has Real, and

18   additional copies can be made.

19         So from a single DVD that was purchased, an unlimited

20   number of copies could be paid.  It just is a question of

21   passing the DVD around.  That's the way in which, we would

22   argue, there could be viral proliferation --

23         **THE COURT:**  Passing around to other people who have a

24   RealDVD player?

25         **MR. WILLIAMS:**  That's correct, Your Honor.

 1          **THE COURT:**  So not each one of the those RealDVD

 2   players has its own key, different from other RealDVD players?

 3          **MR. SINGLA:**  Your Honor, if I could address the

 4   Court's question.

 5          **THE COURT:**  Yes.  I assume we are going to get some

 6   evidence on this, and I should not bother you with that.

 7          **MR. SINGLA:**  Mr. Schumann will be testifying --

 8   hopefully this afternoon, maybe Tuesday morning -- on exactly

 9   the question that the Court asked.

10          Very briefly, each copy of RealDVD shares the same

11   key.  So all copies of RealDVD sold use the same key.

12          What Mr. Schumann will explain is, if someone got

13   access to that key, they could unlock and use all the copies

14   made by anyone anywhere.  That's the second question the Court

15   asked.

16          The first question the Court asked is:  Can you copy

17   the copies?  I believe that's what the Court was trying to get

18   at.

19          What Mr. Schumann will explain and show the Court is,

20   yes, you can copy the copies.  You take a DVD, make a copy on a

21   thumb drive.  You can take that, return the DVD to Netflix.

22   And you can make as many copies from that thumb drive as you

23   want.

24          However, what RealNetworks has done, on their own, is

25   locked those copies down so they can only be played, right now,

1  on the thumb drive, the first drive.  They can't be played off

2  the other copies.

3          But what Mr. Schumann will explain is, it will be

4  trivial for RealDVD in the future to change that.  And they

5  could make it easily so that any copy could be played, and you

6  could, you know, have these things copied willy-nilly.  It

7  would work on all the different computers with Vegas.  And

8  that's something they could change easily in their product in

9  the future.

10         **MR. SCOTT:**  That, Your Honor, is mistaken.  That's

11  mistaken.

12         **THE COURT:**  I will hear from you all after I hear

13  from these people.  You may address those matters in your

14  opening.

15         Yes.

16         **MR. WILLIAMS:**  Thank you, Your Honor.  Let me just

17  say that in the end, this case will be about how Real tries to

18  take money that is not theirs, by asking consumers to pay Real

19  for the right to access and copy movies, instead of paying the

20  people who paid for the movies, who made the movies, who took

21  the risks, and own the rights to those movies.  And those are

22  our clients, the motion picture studios.

23         We look forward to speaking with you later.  Thank

24  you.

25         **THE COURT:**  Thank you.

1          I guess we are going to hear from you now, Mr. Steer.

2                          **OPENING STATEMENT**

3          **MR. STEER:**  Thank you, Your Honor.

4          As I said earlier, we represent the DVD CCA.  DVD CCA

5    is a nonprofit association in which members are companies,

6    businesses in the consumer electronics, computer and IT, and

7    movie production, movie studio fields.

8          The DVD CCA came into existence back in the 1990s, as

9    a result of the need to figure out a way to control the copying

10   of the digital movies.

11         Everyone knows what a wonderful advance digitization

12   is because it allows for features that were never imagined

13   before and quality that was never imagined to be available for

14   consumers for use in their own homes.

15         The problem with digitation, of course, is, once you

16   have a digitized movie out there, it can be -- unlimited

17   numbers of perfect copies can be made, unless there is a

18   protection system.

19         So the protection system that was created is the

20   Content Scramble System, or CSS as I will refer to it

21   throughout this hearing.

22         That system came about through long negotiations

23   between the companies, many of them, many companies in the

24   categories that I described to you earlier.

25         The technology locks the DVDs so that the content

1   cannot be copied by the consumers.  But the consumers can watch

2   the movies that are on the DVDs and enjoy the other features.

3          The result of this, of the creation of this

4   technology, has been sales of hundreds and hundreds of millions

5   of DVDs -- there's 68,000 titles available now on DVD -- broad

6   access by consumers, for consumers, to movie and television

7   titles; and a great convenience that didn't exist previously.

8          The protection that was created was intended to be

9   sufficient so that the studios would feel safe in selling their

10  products in DVD format, and, at the same time, to establish a

11  system that would allow consumer electronics and IT and

12  computer companies to manufacture the products that would be

13  needed to play the DVDs.

14         And, as I say, it's been an extremely successful

15  system.

16         **THE COURT:**  Excuse me.  You mentioned members.  And I

17  understand studio members, and so forth, and who may be

18  included in that group.

19         But with respect to consumer electronics or

20  technology companies, can you give me a few examples.

21         **MR. STEER:**  Absolutely.

22         **THE COURT:**  For example, would RealNetworks be a

23  member, or is it a member?

24         **MR. STEER:**  RealNetworks is a member, Your Honor.

25  There are many.  Hewlett-Packard.  IBM.  Intel.  Microsoft.

1   Pioneer.  Matsushita, Toshiba.

2           It includes, Your Honor, to cut to the chase, many

3   companies that could have manufactured a DVD copier long ago.

4   There's no question that these companies have great resources

5   and technical skills.  They didn't do that because they adhere

6   to the rules.  And that's the point I'm getting to, the first

7   point.

8           The CSS license establishes a set of rules, agreed to

9   by all sides, that are designed to protect against copying.

10  That's why my client is called the "Copy Control Association."

11          This lawsuit is about RealNetworks' intentional

12  violation of those rules.  Under the rules, CSS licensees can

13  use CSS to build devices that play back DVDs.

14          But the rules do not allow -- and Dr. Kelly will

15  explain why this is so -- licensees to use CSS to build devices

16  that copy DVDs.  Everyone has understood that.  It's clearly

17  stated in the license document and the specifications.

18          And the first document on the screen here is a

19  recital from the start of the CSS license.  And what it says,

20  Your Honor, is that:

21          "Matsushita Electric, Ltd. and Toshiba Corporation

22  have developed a Content Scramble System, as defined below, to

23  provide reasonable security for content on DVD discs, and,

24  thereby, together with the terms and conditions of the

25  agreement to provide protection for such copyrighted content

1   against unauthorized consumer copying, and have filed patent

2   applications with respect to the Content Scramble System."

3          Now, Matsushita Electric and Toshiba made the

4   technology available to the DVD CCA to license to companies

5   like RealNetworks.  So that's the first point here.

6          I would like to now turn -- and if Mr. Bowser will

7   switch to the confidential mode here -- to another provision,

8   which is section 1.2 of the general specifications.

9          May I do that, Mr. Bowser?

10         **THE CLERK:**  It's done.

11         **MR. STEER:**  As I said earlier, the general

12  specifications and the other specifications to which

13  RealNetworks subscribed are highly confidential.

14         But the objective that I just described in the

15  introduction to the license agreement, which is publicly

16  available, is also stated here.

17         And I won't read it aloud, Your Honor, because I do

18  want to attempt to preserve the highly confidential nature.

19         **THE COURT:**  Can you help me out for a moment.

20         **MR. STEER:**  Absolutely.

21         **THE COURT:**  I have my own printed copy here, as well.

22  And I sometimes like to mark that up.  And I'm looking at 1.2.

23  And my 1.2 in this document, in the agreement itself, is not

24  the same.

25         This is from the license agreement?

1          **MR. STEER:**  It's from the general specifications,

2   Your Honor.  It's not in the license agreement.

3          The overall contract between the companies is a

4   multi-part contract.  There is a license agreement that

5   generally describes the relationship.  Anybody can get that off

6   of the Internet.

7          There are procedural specifications also public.

8   They tell people what you have to do, how you behave, how you

9   get licensed, et cetera.

10         And then there are technical specifications, the

11  highly confidential things, including the general

12  specifications and, in this case, the two categories for which

13  RealNetworks signed up, which are authenticator and descrambler

14  specifications.

15         And those, of course, are technical terms.  And,

16  again, I'll defer to Dr. Kelly rather than get into them now.

17         **THE COURT:**  Right.  But the general specification,

18  however, is -- what exhibit is this in the exhibits that you

19  have submitted to the Court?

20         **MR. STEER:**  Right.  It's Exhibit L to the declaration

21  of Jacob Pak on March 19th of this year.

22         **THE COURT:**  Okay.  Thank you.

23         **MR. STEER:**  The screen -- and if it would be helpful

24  to the Court, I actually have poster boards that would make it

25  easier for the Court to follow.

1          THE COURT:  That's fine.

2          MR. STEER:  Good.

3          THE COURT:  I like this little copy to mark up here

4     myself.

5          MR. STEER:  I understand.

6          THE COURT:  I didn't bring out all the exhibits, so

7     we'll pull it at the next break.

8          MR. STEER:  Your Honor --

9          THE COURT:  He's holding up an extra copy there.

10         MR. STEER:  My partner, Mr. Mick, always a step ahead

11    of me, has a spiral bound copy of the declaration of Mr. Pak,

12    which, if I may, I would like to hand to the Court.

13         THE COURT:  Thank you.

14         And then I can follow along and mark up as well.

15         MR. STEER:  Absolutely.

16         THE COURT:  May I have this one then?

17         MR. STEER:  It's yours to enjoy.

18         (Laughter)

19         THE COURT:  That's so exciting.

20         MR. STEER:  That's the only misleading statement I'll

21    make in this presentation, Your Honor.

22         (Laughter)

23         THE COURT:  Okay.  Go ahead, please.

24         MR. STEER:  Do you need a moment to read section 1.2

25    of the objectives?

1          **THE COURT:**  No, that's fine.  I have read it from
2    here.  Thank you.
3          **MR. STEER:**  And I'll also state that the same
4    objective, essentially which is to prevent copying, is stated
5    repeatedly throughout these highly confidential and
6    nonconfidential documents.
7          And, again, when Dr. Kelly testifies, we'll show the
8    Court a number of instances.  They're expressed in different
9    language in the different specifications because these are
10   technical documents that we're talking about here.  And exactly
11   how the principle is stated reflects the different technical
12   focus of each of these documents.
13         So what did RealNetworks do in this case, that led to
14   this case?  It decided, in early 2007, to make a DVD copier, a
15   device that makes lasting, playable copies of DVDs to computer
16   hard drives so that the movie can be played back without any
17   further need for the DVD disc.
18         I think that's obvious.  And there's no dispute about
19   that.  There's no dispute about what the RealDVD products do.
20         Real created a prototype code for RealDVD, using
21   illegal ripper software long before it became a CSS licensee.
22   And after that, it applied for a CSS license in order to try to
23   cloak its illegal product in a license that is designed to
24   prohibit the very thing that RealDVD does.
25         And what it is doing is using the license to

1    advertise its product as a legal product, in contrast with the

2    illegal rippers that it says are available on the Internet.

3    That's for its commercial advantage, Your Honor.

4            RealDVD signed up for a license to manufacture

5    CSS-compliant authenticators and descramblers.  And, as

6    Dr. Kelly will explain, those are components in the playback

7    mechanisms for DVDs.  It did not sign up for a license to

8    manufacture a DVD copier.  There is no such thing.

9            This is the DVD Copy Control Association.  It doesn't

10   license copying.

11           So the DVD CCA, we will submit, will be entitled to

12   preliminary relief because RealNetworks' creation of a DVD

13   copying machine breaches the contract under which the CSS

14   license was given to RealNetworks.  And DVD CCA will suffer

15   irreparable harm if preliminary relief is not granted.

16           So our breach of contract argument is based on three

17   main points, which I'll go through quickly.

18           First, a DVD-copying device like RealDVD violates the

19   explicitly stated contractual objectives of the CSS licensing

20   system.

21           The objectives are front and center in the license --

22   you have already read them in two different forms -- no

23   copying.  There is no ambiguity in those provisions that state

24   the contractual objections.

25           CSS is made available for the playback of DVDs, not

1  for copying.  And, indeed, Judge Illston said exactly that in

2  the 321 Studios case which she decided just a few years ago.

3          So RealNetworks violates the agreement because it

4  makes a device that allows consumers to copy DVDs.

5          Second basis for our contract violation claims:

6  RealDVD violates the agreement because it does not comply with

7  the technical description of the authorized product that is

8  contained in the CSS specifications for which it signed up.

9          Mr. Williams prefaced his statements by saying that I

10  will talk about details of the CSS system.  And I will, but,

11  Your Honor, I think it's premature to do it now.  I think using

12  Dr. Kelly as the vehicle will make a lot more sense and allow

13  the Court to ask questions and get into the details and have a

14  stronger understanding.  I am not suggesting that this is

15  simple stuff.  It's technical.

16          So RealNetworks' principal argument on this point is

17  that RealDVD does comply with the CSS specifications, but only

18  because, as they argue, there is no explicit prohibition

19  against making copies of the DVD on a hard drive.

20          That argument is wrong.  And there are two simple

21  reasons why it's wrong.

22          First, the statements of objectives that you've seen

23  present those clear prohibitions.  But, secondly, the technical

24  specifications that RealNetworks signed up for provide an

25  engineering description of what an authorized product can do.

1          If you follow the sequence of steps that set forth in

2     those technical specifications, the end result is a product

3     that plays back DVDs, not a product that copies DVDs.

4          Dr. Kelly will explain the specifications and how

5     Real fails to comply with them, how it circumvents them.

6          Mr. Williams said a few words.  He's correct in what

7     he said.  There's more detail.

8          So this is a second reason why a device that copies

9     DVDs for playback without the disc is contractually foreclosed.

10          And, third, Your Honor, even if there was some

11     ambiguity with the language of the agreement -- and

12     RealNetworks doesn't identify any actual ambiguity -- the

13     evidence of the contractual intent of the parties and their

14     mutual understanding of the contract supports DVD CCA's

15     interpretation.

16          The intent to prevent consumer copying of DVDs is

17     stated right in the documents.  It's undisputed that

18     RealNetworks was well aware of DVD CCA's interpretation of the

19     contract when it signed on to the license.

20          And, by law, we'll submit that the Court should

21     construe the contract in a manner consistent with the stated

22     intent and with DVD CCA's known and publicly expressed

23     understanding of the contract.

24          Now, for all these reasons, we are entitled to

25     preliminary relief.  But I want to go back for a moment to make

 1   another -- to the point of addressing:  What exactly is the

 2   license?

 3           You've seen recital A.  I'd like to go to section 4.2

 4   of the CSS license agreement.

 5           This is public, so, Mr. Bowser, you can go back to

 6   that.

 7           And that, Your Honor, is Mr. Pak's declaration,

 8   Exhibit J.

 9           **THE COURT:**  This is of the license agreement itself?

10           **MR. STEER:**  In the license agreement itself, yes,

11   correct.

12           **THE COURT:**  Okay.  Thank you.

13           **MR. STEER:**  And you'll see it says, "Compliance with

14   CSS specifications."  And general, "Licensee shall comply with

15   the CSS specifications as may be amended by the licensor from

16   time to time in accordance with the bylaws.  Each DVD product

17   shall comply with the version of the CSS specifications which

18   is in effect at the time such DVD product is manufactured,

19   taking into account specific effective date provisions and

20   amendments to the CSS specifications."

21           Well, there is a very straightforward statement.

22   It's in the license agreement.  It was public.  They had it

23   before they received the technical specifications, the highly

24   confidential ones.  And it says, You're going to have to comply

25   with the specifications in order to be in compliance with this

1    contract.

2            Now, if I may go to the next slide, there's a long

3    series of definitions.  And, again, this is Mr. Pak's, Exhibit

4    J.

5            And definition 1.13, Your Honor, defines CSS

6    specifications.  And it says, "CSS specifications shall mean

7    the documentation relating to CSS, entitled 'CSS

8    specifications,' including the procedural specifications and

9    the technical specifications that licensor makes available to

10   licensee, as such documentation may be revised from time to

11   time," and so on and so forth.

12           So, that leads us to the question:  What was made

13   available to RealNetworks?  And my next slide will address

14   that.

15           Here, again, this is documentation that was produced

16   by RealNetworks.  This is a copy of a receipt of documents.

17   And this receipt of documents, Your Honor, is an exhibit to the

18   Hamilton deposition.  And I'm sure it appears in association

19   with -- excerpts of that deposition, in our March 19 filing.

20   It was, as I say, produced by RealNetworks.

21           And if the Court can see this -- actually, if you

22   can't see it, I have a poster board.

23           After they signed up, they received -- and I

24   mentioned this earlier -- a Federal Express package.  And that

25   Federal Express package was signed for by Nichole Hamilton, who

1  was the project manager at RealNetworks, who was responsible

2  for taking Real through the license sign-up procedures and for

3  compliance.

4          And you will see that the purpose of this blow-up

5  here is to cross-reference.  The first item here is the general

6  specifications that were delivered.  And they are numbered.

7  The number on the receipt corresponds to the number on the

8  general specifications.

9          In addition, there are two other documents, which I

10 haven't put on the screen here but could.  And they are the

11 authenticator specifications and the scrambler specifications.

12 And those are -- those documents correspond to items 2 and 3 on

13 this list.

14         So in September they received, knowing full well what

15 the agreement is going to be, they received these documents.

16 What did they do?  Did they return any of them and say, "Oh,

17 no, we aren't not going to abide by this"?  No.  Not a word.

18 Did they say, "We want something different"?  Well, later they

19 did order something different.  That's not really relevant to

20 this lawsuit.

21         Nothing.  There was no indication that they disagreed

22 with DVD CCA's explicitly-stated position as to what is the

23 agreement between the parties.  They had it all in hand.  And

24 they didn't have any problem understanding it.

25         So going back to why we're entitled to preliminary

1   relief, Your Honor, we have an additional point.  And that is

2   the violation of the covenant of good faith and fair dealing.

3   This, Your Honor, is a classic case of violation of the implied

4   covenant.

5          In this case, RealNetworks entered into its

6   agreement, its contract with DVD CCA with the intent from the

7   very beginning of depriving DVD CCA of the explicit benefit of

8   that contract, which is abiding by rules that prevent copying.

9          And it goes to the very heart of the DVD CCA's

10  existence.  Because, Your Honor, if anybody -- if they can --

11  if RealNetworks can manufacture DVD copiers and do so lawfully,

12  so can all these other members.

13         And a system that's been in effect for many years

14  now, and has been extremely effective and beneficial not only

15  to the companies involved but to consumers, is likely to fall

16  apart.

17         And so on that basis, Your Honor, we will ask the

18  Court to issue preliminary injunctive relief.  And I thank you.

19         **THE COURT:**  Thank you.

20         Mr. Cunningham, are you up next?

21                      **OPENING STATEMENT**

22         **MR. CUNNINGHAM:**  Thank you, Your Honor.

23         RealNetworks, my client, is a company that respects

24  copyrights.  It's a technology company.  It's been in existence

25  for about 15 years.  And during those 15 years it's, among

 1  other things, produced technologies that animate the Internet

 2  by allowing streaming audio content and streaming video

 3  content.  It provides technologies that have made the Internet

 4  come alive and make it worthwhile for something other than

 5  reading documents.

 6          To do that, Real has had to have a healthy and

 7  symbiotic relationship with content providers.  And it has had

 8  such a relationship.

 9          The products in this case, Vegas, Facet -- sometimes

10  we call them RealDVD collectively -- were conceived more than

11  two years ago.  And that was in the spring of 2007.

12          And the idea behind them was that they were part of a

13  strategy to take advantage of what was foreseen as a potential

14  new market that would be created by interactive TV.  And we're

15  not going to spend much time, if any, talking about interactive

16  TV.

17          But Real wanted to have -- establish a presence in

18  the consumer's living room.  And the way to do that was to

19  replace a device that's already there.  The device to be

20  replaced was the video player.  So RealNetworks was going to

21  provide a better DVD player, and a DVD player that has the

22  features that we'll describe.

23          That box, that replacement DVD player, is the Facet

24  product.  And we'll show it to you and demonstrate to you what

25  it can do.

 1          Real saw that there was an unmet consumer need.  And

 2   that need was for the in-home management of a consumer's DVD

 3   collection.

 4          So it turns out that Americans have a lot of DVDs.

 5   The average household has more than 50.

 6          **THE COURT:**  Can you hold one moment.  Can you have a

 7   seat somewhere.  There are seats here.  It's not a drop-in

 8   clinic.

 9          **MR. CUNNINGHAM:**  May I, Your Honor?

10          **THE COURT:**  Fine.  Thank you.

11          **MR. CUNNINGHAM:**  So Real's product was intended to be

12   attractive to consumers and enhance the value of a DVD.  It

13   would do that by allowing the content of the DVD to be

14   transferred onto a hard drive.  And once that happens, the

15   consumers can do a lot of things that they couldn't do before.

16          In the first place, they can now protect their DVD

17   collection because the chances of a smudge or a scratch or

18   getting lost are much smaller with a hard drive.  It also let

19   the consumer manage their DVD collection with searchability

20   functions and parental controls, and things like that.

21          And with respect to the Vegas product, which is the

22   software, it made the transportation or portability of the DVD

23   content much simpler.

24          And in contrast to existing software that was already

25   available, Real's products were designed to prevent piracy.

1          The movies that are copied from DVD are locked down

2   to a single hard drive.  They can only be played from that one

3   drive.

4          Your Honor has enjoined a product and is being asked

5   to further enjoin two products.  These are real products with

6   real features, not hypothetical products.  And we'll explain to

7   you how these products work.

8          But the fact of the matter is, once a copy is made on

9   a hard drive, that copy cannot be copied in a playable way.  So

10  we're not going to have an explosion of copying based on our

11  product.  Nor can a playable copy be distributed on a network,

12  any network.  And that includes the Internet.

13         So, in short, there's nothing about our product that

14  makes it attractive to the criminal that wants to steal movies.

15  That person, the thief, they already have a software, that's

16  just a few clicks away on the Internet, if what they want to do

17  is steal movies.  And they can steal them in ways that don't

18  impose limitations that our product imposes.

19         Now, skipping to last summer, in August of 2008,

20  that's when Real began sharing with the studios its plans to

21  release the software product.

22         Real didn't go to the studios because it was looking

23  for permission to launch the product.  It didn't need their

24  permission.  It went to the studios because it recognized that

25  there were potential business relationship, win/win situations,

1   that Real and the studios could have.

2           For example, Real believed that the studios could

3   sell to consumers right in the consumer's living room, taking

4   advantage, perhaps, if a viewer watches Sopranos Season One,

5   might, on an impulse, then, be interested in buying Sopranos

6   Season Two.  That's the kind of thing the product could enable,

7   and that would create win/win with the studios.

8           So Real described the product to the studios.

9           **MR. WILLIAMS:**  Excuse me, Your Honor.  Objection.  I

10  just want to interpose an objection on the settlement

11  communications, with respect to these conversations.

12          **THE COURT:**  Well, I don't think we've got into that.

13          **MR. WILLIAMS:**  Just for the record.  Sorry to

14  interrupt.

15          **THE COURT:**  Yes.

16          **MR. CUNNINGHAM:**  So Real described the product to the

17  studios; made engineers available to discuss it; and discussed

18  these kinds of marketing ideas.

19          Real described how the products were intended to

20  enable a consumer fair use, and how they were designed to limit

21  the potential for piracy.

22          Once the studios understood how the product really

23  was locking down the copies, they focused on the possibility of

24  a consumer renting, copying, and then returning a movie, the

25  rent, rip and return phenomenon.

1          There is a reasonable solution to that problem.  And

2    the reasonable solution to that problem is for the studios to

3    code their rental product, and then our client respecting that

4    coding by disabling the possible copying or saving of the

5    electronically-marked rentals.

6          Real delayed launching its product for about three

7    weeks, in order to work things out with the studios.  And,

8    ultimately, that fix that was uniquely within the studios'

9    control was not implemented.

10          So what's driving --

11          **THE COURT:**  I think you've danced about as close as

12   you can.

13          **MR. CUNNINGHAM:**  And now I'm moving on, Your Honor.

14          (Laughter)

15          **THE COURT:**  I hope so.

16          **MR. CUNNINGHAM:**  What's behind this lawsuit is the

17   studios' desire to serve that market for in-home management of

18   DVDs.  They want that market to themselves, without the

19   competition of a technology company like Real.

20          The case isn't about rent, rip and return.  And it's

21   really not going to end up being about the CSS specs.  And it's

22   obviously not about security for DVDs, because -- I think we're

23   now going to have testimony this afternoon, as part of the voir

24   dire process -- CSS was cracked a long time ago.  So DVDs can

25   be freely had on the Internet.

 1          The evidence or, really, the lack of it, shows that

 2   RealNetworks poses no threat to the established DVD business.

 3   What the studios are calling the threat here is the legitimate

 4   competition that my client's technology allows with similar

 5   products that the studios want to offer.

 6          For example, they have something that they call

 7   Digital Copy.  They sell another version of the movie with or

 8   on the DVD, side-by-side DVD.  And that product allows the same

 9   manageability and flexibility and portability that our product

10   enables consumers to make.

11          And while we've been enjoined, the studios have been

12   aggressively marketing that product --

13          **THE COURT:**  Well, but isn't the difference that they

14   have the copyright?

15          **MR. CUNNINGHAM:**  So, Your Honor, I think that we're

16   getting down to what the nub of the --

17          **THE COURT:**  That's the issue here, right?  They have

18   the copyright.

19          **MR. CUNNINGHAM:**  That is, of course, an issue here

20   and --

21          **THE COURT:**  Gives you the right to exclude, right?

22          **MR. CUNNINGHAM:**  But it doesn't.  It doesn't, Your

23   Honor.

24          And the reason for that, the reason for that is

25   within the fair use doctrine, which is not a defense, if you

 1  will, to the DMCA, but it matters here.

 2          So with respect to the copyrighted content, our

 3  product will enhance its value because it makes it more

 4  attractive to consumers.  Consumers will want to buy DVDs.

 5          **THE COURT:**  It's even more attractive to consumers if

 6  you can get everything for free.  Right?

 7          **MR. CUNNINGHAM:**  That's not good for anyone in this

 8  room, if people get everything for free, Your Honor.  Because

 9  we're a commercial enterprise, and we want to make money by

10  working with content providers.  That's what we've done for 15

11  years.

12          So, no, there is no reason to let people get stuff

13  for free.  At least not in this business context.

14          The issue that Your Honor has put her finger on is

15  whether or not the studios get to extend their legitimate

16  monopoly in the copyrighted content to the fair use.

17          That is, if a consumer wants to make a backup, secure

18  copy of something they already own, do the studios get to

19  charge them again for that?

20          And we submit that the evidence and then the argument

21  at the end about fair use is going to show, no, they can't

22  charge them again for that.  That's a right that the consumer

23  has.  It's a fair use right.  And it's no longer part of the

24  legitimate monopoly of the studios.

25          So that's the nub of the thing.  Ultimately, the

 1   fight is about:  Who's going to prevail in the market for

 2   technology that allows you to protect your DVD collection and

 3   manage it and provide portability for it?

 4        So with that, let me turn it over to Mr. Scott.

 5   Thank you.

 6        **THE COURT:**  Mr. Scott.

 7                    **OPENING STATEMENT**

 8        **MR. SCOTT:**  Good morning, Your Honor.  And thank you

 9   again.

10        **THE COURT:**  Good morning.

11        **MR. SCOTT:**  I remember courtesy in accommodating my

12   schedule last time I was before you and that has been

13   invaluable to me and I thank you again for that.

14        Coming forth, I do want to try to clarify a few

15   things that come before me.  You can already see that the

16   parties give the Court different answers to the question what

17   this case is all about.  And because of that, I want to address

18   some things the evidence will cover in outline form but also

19   their larger import.

20        Mr. Cunningham has already talked about the purpose

21   of Real's product.  And that's why I have this on the screen

22   just in summary.  It is designed to maximize the appeal of DVD

23   owners and minimize the appeal to the rippers.  And for that

24   reason, the significance of this is that from the start we are

25   trying to target the fair use market.

1          Now, Mr. Williams made an interesting point that we

2    addressed in our brief and I want to argue it now.  It's a

3    legal point, but I want to identify it for the Court, which is,

4    it is apparently the studios' position that RealNetworks, as a

5    licensee to implement the CSS system in building a product,

6    must also have embedded within that license agreement an

7    express license from the studios for the consumers to make

8    copies for their own personal backup use.

9          And, he is conflating the question of whether we are

10   licensed and complying with that license to implement the

11   specifications with whether or not the studios have given an

12   express license for consumers to make copies, which, as the

13   Court knows, raises the issue of whether or not the consumers

14   have that right, or if it's the studios' right to grant it or

15   withhold it.  And that's where we came to fair use.  And I'll

16   leave that for today, to address the evidence here.

17          In terms of what our product does, Mr. Cunningham

18   said it locks a copy down to a single hard drive.  And you

19   asked, you asked Counsel whether or not copies could be made of

20   copies.  And Mr. Singla rose to tell you, yes, they could.

21          Except, copies made of copies are unplayable.  The

22   only playable copy is the one locked down to a single hard

23   drive, which can then be shared among five registered devices,

24   presumably the same family from one single hard drive that must

25   be shared, in the PC Vegas version of this.  That is the

1  product that has no appeal to rippers.

2       Moving on to CSS --

3       **THE COURT:**  Can that copy be played -- or any of the

4  copies that are made, be played on other Real DVD players other

5  than in this family of -- of players?

6       **MR. SCOTT:**  My understanding, to be confirmed by the

7  witnesses, is that in the Vegas product, which is not the hard

8  box but is the software, it is locked down to a single hard

9  drive, which could be internal to that machine or an external

10 drive.

11      In that machine are up to five ckck that are

12 registered to play from that one hard drive.  If they have that

13 one hard drive, can play it.  The family's home theater, the

14 kids' computer in their bedroom, or taking it on a vacation

15 with the family.

16      If it were somebody outside family, that's possible

17 too, but that's not the intention.  It must be played from that

18 one shared hard drive.

19      **THE COURT:**  It's not a question of intention, it's

20 what can happen.  Right?  So what I'm asking is, can other

21 persons who have RealDVD players -- you know, your next-door

22 neighbor or the person down the street -- can they play a copy

23 that's been made on your RealDVD player?

24      **MR. SCOTT:**  If they had my hard drive, and they are

25 one of the five registered computers.  It could be somebody --

OPENING STATEMENT / SCOTT

```
 1  somebody next-door instead of in the family, is my
 2  understanding.  But it must be that hard drive, and they must
 3  be registered, up to five.  Which is the same feature I
 4  understand the studios are offering on their digital copy,
 5  playing on five, five devices.
 6          Now, on CSS, Mr. Steer's comments, there's an issue
 7  about -- first, the issue whether CSS prohibits all copying,
 8  and secondly, whether we comply with the technical terms.
 9          The most popular language for the Defendants in this
10  case is what Mr. Steer showed you, to prevent
11  digital-to-digital copying.  I always have trouble with that
12  phrase, the digital-to-digital copying in a PC environment.
13          And what I'm going to show you in a moment from the
14  document that you had before you, Your Honor, is that that is
15  specifically explained in that specification as providing
16  security from non-CSS-licensed reception or interception.
17          And also in the evidence, though I won't spend time
18  this morning laying this out, there is nothing in the specs
19  that requires disc in the drive or disc in the tray while
20  playing.  Not explicitly, nor by technological requirement.
21  Because, in fact, the CSS specifications say nothing pro or con
22  about whether a copy can be made by a licensed device to the
23  hard drive for storage.
24          On the screen now -- this needs to go to the
25  confidential version, Mr. Bowser.  This is from the general
```

1  specifications.

2          Is this showing up?

3          **UNIDENTIFIED MAN:**  Yes, it is.

4          (Off-the-Record discussion)

5          **MR. SCOTT:**  Your Honor, you were looking at this a

6  few moments ago with Counsel, where the numbered paragraphs

7  only were shown, reciting the objectives of CSS, where the

8  first one is to make them playable only on devices subject to

9  the license terms.  Secondly, to prevent digital-to-digital

10  copying in a personal computer environment.

11          These specifications are written by engineers for

12  engineers, for other engineers.  And this document goes on to

13  state exactly how Objective (2) is to be implemented, to

14  explain what it means.

15          Going down two paragraphs, in support of Objective

16  (2), the bus authentication and bus encryption.  Bus

17  authentication is to check the validity of the recipient before

18  sending the data, to make sure it's CSS-licensed.

19          Bus encryption is to prevent unauthorized

20  interception after the authentication occurs.  Don't send it to

21  unlicensed people, don't let unlicensed people intercept it.

22          These specifications, when they talk about copying,

23  the engineers talking to each other about how to implement it,

24  are about not having interception of the data by unauthorized

25  people.  Has nothing do with whether or not the CSS licensee

1   within this circle of licensed people can copy down to hard

2   drive, and lock in a copy in that fashion.

3           They don't say you can; they don't say you can't.

4   Because that's not what these specs are about.  They're about

5   the DVD data and keys not getting into the hands of unlicensed

6   people.  That's what they're about.

7           But in fact, those general specifications -- we can

8   go back on the regular screen, Mr. Bowser.

9           General specifications are not the ones that really

10  deal with copy protection.  You have seen what they do -- what

11  they say when they do talk about it.  It is -- the general

12  specifications are part of the group below the dotted line that

13  came to RealNetworks after it signed the license.

14          The ones that talk about copy protection are the

15  procedural specifications, which are part of the package that

16  we got before signing.  And there, in the procedural

17  specifications, they go through in detail exactly what the DVD

18  CCA is saying should be done about copy protection.  What the

19  concerns are, and what the solutions.

20          In particular, on the screen here right now, from the

21  procedural specs, Section 1.8 goes to the copy protection

22  functions that are expected of a licensee.  And just by

23  illustration, everything in Section 1.8 has an implementing

24  paragraph.

25          For example, regional playback control has an

 1   implementing paragraph I've highlighted there.  6.2.1.4.  I'm

 2   not going through content now, Your Honor, but to illustrate

 3   the way these are put together.

 4            **THE COURT:**  Uh-huh.

 5            **MR. SCOTT:**  Recordable media playback control, the

 6   next concern, has an implementing paragraph as to what that's

 7   that is about.  Don't write them down to playable DVD's.  And

 8   so on, right through that paragraph, a lengthy section, 6.2,

 9   implementing all the concerns about copy protection that are in

10   the CSS.

11            So, CSS does deal with copy protection, and tells

12   exactly what it's concerned about, and exactly how to implement

13   it.  And nothing in the CSS system has to do with making copies

14   to hard drive.  It's about keeping it away from unlicensed

15   people.  By sending it to them erroneously, or interception.

16            CSS as protective technology, do we comply?  And, we

17   will show you, although I won't detail it today, that we comply

18   fully with the CSS as it is written.

19            There's one overarching fact, though, Counsel have

20   not mentioned, Counsel for Defendants.  Which is that as soon

21   as RealNetworks' device retrieves RealNetworks CSS-protected

22   data, the keys or the data, it encrypts it further immediately

23   in the authenticator module with AES 128 government-approved

24   encryption for classified information.  This happens

25   immediately.

OPENING STATEMENT / SCOTT

```
 1           We also put on the CSS encryption, the bus
 2   encryption, because it's required.  And we take it off when
 3   it's required to be taken off.  But throughout the whole
 4   process, we put AES on it.  And it stays on that data as long
 5   as it's in Real's possession in that device.
 6           Now, AES -- we know CSS was broken ten years ago.
 7   AES is an encryption approved by the government that -- I say
 8   this not metaphorically, but mathematically -- is like 30
 9   septillion times harder to break than CSS, based upon the
10   permutations that are involved in that code.  It's never been
11   broken.  Breaking it is a hypothetical, but it's never been
12   broken.
13           And this is why this case is not about security of
14   the DVD, as Mr. Cunningham said.  Because the safest time in
15   the life of a DVD movie is when it's in the hands of RealDVD.
16   Its most vulnerable time is when the cellophane wrapper is
17   taken off of that, when it's protected only by CSS.  And that's
18   the reality.  The case is not about security.  And I think --
19   it's not about security.
20           The situation about ARccOS and RipGuard, the question
21   of whether or not Real DVD circumvents an effective
22   technological measure by the means it takes to respond to
23   ARccOS and RipGuard, there's that question.
24           And I want to say this to orient the Court to the
25   evidence you will hear.  You are aware already, we have two
```

1   different kinds of devices.  They handle ARccOS and RipGuard,

2   they handle errors in completely different ways.

3          The hard box Facet was designed first, by a different

4   design team -- they had different design teams -- and they

5   wrote their source code first, and from scratch.

6          And the copy function, when a consumer presses "Save"

7   in Facet, the software will just go through to save everything,

8   regardless of errors.

9          If it hits a hitch, if it runs into something,

10  whether it's a scratch, or something else, or an

11  intentionally-put-in problem, it will stop cold.  It doesn't go

12  around anything.  It stops cold, it throws out the partial

13  copy, and then it implements the save by walking through the

14  DVD playable sectors according to the DVD specifications of

15  which we are a licensee.  And it never, ever encounters ARccOS

16  and RipGuard in doing that.

17         Facet does not circumvent anything.  Vegas was --

18  called RealDVD in many of the documents -- does it differently.

19  In that design process, a different team was writing code

20  around an existing piece of software from a vendor.

21         And when they did that, the approach they took to

22  responding to errors, be they ARccOS or scratches, was to skip

23  over that cell.  And they -- they do that, they did it knowing

24  ARccOS was the there.  They do it the same way for

25  unintentional errors, like scratches, or for intentional ones.

1           The question on Vegas is different.  Facet does not
2    circumvent anything.  On Vegas, the question will be, is that
3    circumvention of an effective technological meaning --
4    technological measure within the meaning of the DMCA.  Where,
5    where in fact Vegas or RealDVD could have been and could be
6    rewritten to do it the same way that Facet does, which is just
7    to implement the DVD playback protocol, just copy the playable
8    sectors, and never, ever encounter ARccOS and RipGuard.

9           And this is perhaps why these technologies, ARccOS
10   and RipGuard, are very little used by the studios.  And as far
11   as I can tell, the studios don't take it seriously anywhere,
12   except as an argument to make to this Court in this lawsuit.

13          Finally, on irreparable harm -- I'm running a little
14   over our time, Your Honor.  I am appreciate your indulgence.  I
15   will be done in two minutes, with your indulgence.

16          On irreparable harm, the evidence will not show that
17   Real causes an attitude shift as the studios allege, because
18   it's the evidence, in fact, that the consumer already believes
19   he or she has a right to make a backup fair-use copy.  We're
20   not changing any attitudes about that; there's no evidence of
21   that.

22          It's not about RealDVD harming the studios by
23   reducing their security.  We enhance their security, of the
24   DVDs.  It's not even about the studios believing that they can
25   stop the promulgation of technology, to manage these in-home

1  DVDs and have backup copies.  It's about who will do it, as

2  Your Honor realizes, I believe.

3           We actually enhance the value of copyrights on the

4  original DVD, as sold.  It's the question of who's providing

5  this non-copyrighted service of creating a safe backup,

6  managing it, parental controls, and portability.  And whether

7  or not the studios have a legal right to do that without

8  competition.

9           And in that sense, the stakes in the hearing are

10 high.  We have been enjoying, for six months -- they are

11 running out their products, trying to close the window on us

12 commercially as fast as they can.  And, grant our preliminary

13 injunction will be the death knell of our product.  Denial, we

14 would hope, would open the market to competition.

15          Thank you, Your Honor.

16          **THE COURT:**  Thank you.  Now, ready to call your first

17 witness?  I guess we have enough changeability here of court

18 reporters so that we can proceed.

19          Okay.  Yes.

20          **MR. SINGLA:**  Your Honor, while we are waiting for

21 Ms. King, I would like to raise two logistical issues, if I

22 may, with the Court.

23          **THE COURT:**  Yes.

24          **MR. SINGLA:**  The first is we have agreed -- the Court

25 had asked about witness lists a few weeks back.  And we have an

PROCEEDINGS

1   agreement with RealNetworks, they are going to provide us

2   Sunday morning a list of all of their witnesses, in appearance

3   order.  First item.

4          The second is with respect to exhibits.  I notice the

5   Court asked during opening about exhibit numbers.

6          **THE COURT:**  Uh-huh.

7          **MR. SINGLA:**  And we were trying, the parties, to

8   decide how to deal with this.  This is an unusual situation,

9   since it's not a formal trial.

10          Our thought had been, because there are many

11   documents submitted to the Court in stacks and stacks of

12   documents, certainly less will be used here at the hearing, and

13   also there will be some documents at the hearing that I think

14   were not submitted as part of the preliminary injunction

15   papers, to use the numbering system used in the depositions,

16   Deposition Exhibit Such-and-such, and at the end, provide the

17   Court with a stack of those.

18          Or even when the witnesses get on the stand, to

19   provide the Court a binder with the documents the witness would

20   be referring to.  Would that be acceptable?  Does that make

21   sense?

22          **THE COURT:**  Only as long as we can have them

23   essentially in one location at some point.

24          **MR. SINGLA:**  Yes.

25          **THE COURT:**  In other words, not having, you know,

PROCEEDINGS

```
1  bits and pieces, so we have to look for one deposition with one
2  exhibit, and then another deposition for another exhibit and so
3  forth.
4          You can just renumber them as Trial 1, 2, 3,
5  et cetera, too, T1, T whatever, so that we know what they are.
6          MR. SINGLA:  What we would suggest, Your Honor, is we
7  use the same exhibit numbers during all of our depositions that
8  we took.  So, Exhibit 50 is Exhibit 50 in every one of the
9  depositions.
10         THE COURT:  I see.
11         MR. SINGLA:  So we thought that would make it easy
12 for the Court if here we refer to it as Exhibit 50.  At the
13 end, we could give the Court a binder or a stack of all those
14 exhibits referred to, with the numbers.  And you can refer back
15 in the depositions, they've the same numbers.
16         THE COURT:  And then what I would do with respect to
17 those, then, is just for the -- the purposes of the Record
18 here, is to -- those that are admitted into evidence would be
19 indicated as Trial Exhibit with T or something.
20         MR. SINGLA:  Okay, certainly.
21         THE COURT:  That doesn't mean, then, that because we
22 have admitted a T50 that we necessarily have a 49.
23         MR. SINGLA:  Certainly, Your Honor.
24         THE COURT:  We understand that that may be an exhibit
25 that does not come in as a Trial Exhibit, but at least we will
```

PROCEEDINGS

```
 1  be able to tell what came in at trial.

 2         MR. SINGLA:  That's a very good idea.

 3         THE COURT:  Okay?

 4         MR. SINGLA:  Yes, Your Honor.

 5         THE COURT:  Now, are we going to number them both,

 6  whether they're your exhibits or Real's exhibits?

 7         MR. SINGLA:  Our numbers go to about 700, from 1 to

 8  about 700.  So Real could number them however it wishes.

 9         MR. CUNNINGHAM:  Yes, and I suspect that the bulk of

10  our documentary exhibits are going to come out of what is

11  already submitted, and we numbered our preliminary injunction

12  submission exhibits sequentially.

13         So, we have two issues here.  We have the labeling

14  for clarity, and then we have the availability.  I think we can

15  work this all out.  I understand the Court's concerns.

16         THE COURT:  As long as we have them available.  But

17  also, at the end of the day, for the Record, then we have what

18  is clearly Trial Exhibits and were admitted only at trial, and

19  were not just used in depositions.  Or whatever.  Other

20  purposes that may have been raised.

21         MR. CUNNINGHAM:  Yes.

22         THE COURT:  I'm saying "trial," I'm talking about the

23  preliminary injunction.  But we know what we are talking about,

24  right?

25         MR. CUNNINGHAM:  Yes.
```

 1          THE COURT:  All right.  Now, what in fact is your

 2   order of witnesses today?

 3          MR. SINGLA:  Your Honor, the order of witnesses for

 4   the Defendants is Ms. Marsha King, and then Dr. Kelly.  DVD CCA

 5   will be presenting Mr. Kelly.

 6          Then we have a video we would like to present from

 7   Ms. Nicole Hamilton, who is an employee of RealNetworks.  Our

 8   portion of that video is about 25 minutes.  RealNetworks asked

 9   us to include about 20 minutes of material, so we have included

10   that in our video.

11          THE COURT:  Are you intending to play it here or just

12   give it to me, and I can --

13          MR. SINGLA:  We could just give it to Your Honor on

14   DVD.  We are happy do that.

15          The testimony of Ms. Hamilton I think directly

16   addresses a lot of the issues that were raised in opening

17   statements, so we think it is -- it would be very helpful and

18   interesting for the Court to see how a former Real engineer

19   explains exactly what was going on inside RealNetworks.  If the

20   Court does not want to take up time, we can provide a DVD, if

21   that's better.

22          After Ms. Hamilton, we have Mr. Schumann, an expert

23   for the Studio Defendants.  And the final witness from the

24   studio perspective, putting aside any depositions or video,

25   final live witness, is Mr. Hollar.  H-O-L-L-A-R.

PROCEEDINGS

```
 1            THE COURT:  A-R?

 2            MR. SINGLA:  A-R.  Yes, Your Honor.

 3            THE COURT:  Okay.  Then we can get started with

 4   Ms. King?

 5            MR. WILLIAMS:  Thank you, Your Honor.

 6            Your Honor, we call Ms. Marsha King to the stand.

 7   She just came into the courtroom.

 8            THE COURT:  Yes.

 9            (Witness placed under oath)

10            THE CLERK:  Please state your full name, and spell

11   your last name.

12            THE WITNESS:  Marsha K. King, K-I-N-G.

13            (Short off-the-Record discussion)

14                        MARSHA K. KING,

15   called as a witness for the Defendants herein, having been

16   first duly sworn, was examined and testified as follows:

17                      DIRECT EXAMINATION

18   BY MR. WILLIAMS:

19   Q    Good morning, Ms. King.

20   A    Good morning.

21   Q    Please describe for the Court a little bit about your

22   background after college.

23   A    I graduated from USC, with a BA.  I did my master's at USC

24   in special education.  And then I received my law degree in

25   1984 from Harvard Law School.
```

1  Q   What did you do after you took the bar exam?

2  A   After I took the bar exam, I was employed as an associate

3  as Rosenfeld, Meyer & Susman in Beverly Hills from 1984 to

4  1987.  Then from 1987 to 1990, I was at Twentieth Century Fox

5  Film Corporation as counsel, and then senior counsel.

6      Then in 1990 all the way to 2006, I was at Warner

7  Brothers, in a variety of capacities.  Starting out as the

8  general counsel of the video division, and ending up as the

9  executive vice-president and general manager of the video

10 division.

11     And then from 2006 to 2007, I was executive

12 vice-president, worldwide business affairs, for Paramount

13 Pictures.

14 Q   During your career at Warners, were you involved in the

15 development of the DVD?

16 A   Yes.

17 Q   How were you involved?

18 A   From my arrival, my first meeting with my boss, Warren

19 Lieberfarb, who is known as the godfather of DVD, he told me he

20 wanted to put a movie on a CD, and that he wanted me to be

21 involved in all the legal and business aspects of going about

22 doing that.  So it started, my first week on the job.

23 Q   And your job at that time, just to repeat where we were in

24 your career, when you first were there at Warner, having this

25 meeting with Mr. Lieberfarb?

1   A    I was the general counsel of the video group.

2            **THE COURT:**  And that was what year?

3            **THE WITNESS:**  1990.

4   **BY MR. WILLIAMS:**

5   Q    When you want to work for Warners, what were your

6   responsibilities with respect to this new DVD format?

7   A    I was responsible for all the agreements we entered into

8   with consumer electronics companies to develop the format.  And

9   everything that had to do with DVD that had a legal or

10  negotiating aspect, I was brought in.

11  Q    Were there any particular legal issues related to DVDs

12  that were important at the time, to the studio, to Warner?

13  A    Any legal issues that were important --

14  Q    Yes.

15  A    Well, first of all, there were lots of legal issues that

16  were important, because we were one of the creators of the

17  format.  So, Time Warner's position in all the groups that

18  developed the format was important, whether we had patents or

19  whether we had copyrights.

20       And the other important aspect of -- from a legal

21  standpoint was the protection of our copyrights in a new

22  format.

23  Q    Did you have discussions with Mr. Lieberfarb regarding

24  copy protection?

25  A    I did.

1  Q     And what was the -- putting aside those conversations,

2  just generally speaking, from a high level, what was copy

3  protection about from the studio's standpoint, specifically

4  Warner?

5  A     It was about protecting our content in that -- securing

6  our content in the digital domain.  Because digital copies are

7  perfect.  Analog copies deteriorate, we had certain protections

8  for video cassettes, but digital copies are absolutely perfect,

9  and we needed some protections if we were going to go on to a

10 new digital format.

11 Q     Why does the fact that those copies were perfect, as

12 opposed to VHS copies, a greater concern?

13 A     Well, they never deteriorate.  So, if you have a copy of a

14 movie, first of all, that we had anti-copying devices like

15 Macrovision was one of them, that would deteriorate the copy.

16       But even if there was no Macrovision, if you go tape to

17 tape to tape, they get worse each time.  And they deteriorate.

18 Whereas, a copy in digital media is perfect, all through the

19 342nd generation.

20 Q     Did Warner make a decision, one way or the other, about

21 whether it would release its movies on DVDs without an

22 acceptable form of copy protection?

23 A     Yes.  It decided it would not release its movies on DVD

24 until we had acceptable copy protection, which was -- which

25 they decided early on.

1  Q    And during this time period, were you in discussions with

2  other motion picture studios, other industry personnel,

3  regarding their position on whether DVDs would be released to

4  the market without copy protection?

5  A    From around 1995 when the format was accepted, and was one

6  format -- there has been a format war, and it resolved about

7  1995 -- the other studios became very involved in deciding if

8  they were going to put product out on DVD or not.

9       And a fundamental, absolute fundamental rule was they

10  wanted no perfect copies, no copies at all of their product

11  made, if they were going to put their product onto the DVD

12  disc.

13  Q    Let me ask you to focus your attention on approximately

14  1995.  Do you have that time frame in mind?

15  A    Yes.

16  Q    Can you explain to the Court how the copy protection

17  effort of Warner and the other studios and other stakeholders

18  in the area evolved?

19  A    First, the studios were contacted by an organization

20  called the Consumer Electronics Manufacturing Association,

21  called CEMA.  And these were the consumer electronics

22  manufacturers.  You've heard their names, Sony, Matsushita,

23  Toshiba, Philips, Thompson, the big -- the big makers of what

24  was VHS cassettes, that would then become DVD players.

25       And they came to us to offer them -- to offer the studios

1  an idea of copy protection with a similar protection to what

2  they have on CDs.  We at Warner, and other studios, including

3  Disney, said "Wait a minute, this is going -- this new DVD is

4  going to be -- this new -- new disc is going to be playable

5  also on computers.  So, where's the computer industry here?"

6         And so, we reached out at that time to the computer

7  industry.  And representatives from many companies in the

8  computer industry then came and joined us in discussing how to

9  protect our property.

10        And, these are the major computer companies, you know,

11 like Microsoft, IBM, Apple.  Any -- anyone could come to our

12 meetings, but they were all -- all the major players were

13 there.

14 Q   Let me stop you for a second.

15        Are you familiar with the Copy Protection Technical

16 Working Group?

17 A    I am.

18 Q    What is that group?

19 A    That group was formed once the computer industry came in

20 with their very strong opinions about what they thought could

21 be done to their computers, in order to help us protect our

22 copyright works.  And we formed the Copy Protection Technical

23 Working Group in around '95.

24        And, it was an open group.  In other words, anybody could

25 come to be part of -- it's sort of a standard-setting group.

1  And it had in it the Motion Picture Association of America; the

2  Recording Industry Association; CEMA; the computer companies;

3  the Recording Rights Coalition, which represented consumers,

4  all came to the meetings to decide how we could protect in the

5  new media.

6  Q   Were you personally involved or present during those CPTWG

7  meetings?  I'll call them the working group meetings.

8  A   Okay.  Yes, I was.  I was there with what I called my

9  partner at the time from Warner Brothers, a gentleman by the

10 name of Chris Cookson.

11 Q   Approximately how many working group meetings would you

12 estimate you attended after 1995?

13 A   I don't know.  Twenty, 30.

14 Q   And, were -- I take it there were -- were there any other

15 discussions outside of the big formal meetings, amongst the

16 members of the working group?

17 A   There were discussions all the time.  The motion picture

18 companies met separately to discuss what was being proposed,

19 what technologies were being proposed to protect their product.

20     I met, myself, individually with computer companies, with

21 consumer electronics companies, because to get what became the

22 three-pronged approach to our protection meant that you were

23 constantly negotiating and talking to everyone, so you had all

24 the information.

25 Q   Let me ask you about that three-pronged approach in a

1   moment.

2        But first, over what period of months or years did the

3   Copy Protection Technical Working Group meet?

4   A    I'm not exactly sure of the dates, but it met through '96.

5   '95 and '96, is to the best of my recollection.

6   Q    You mentioned that there was a three-pronged approach that

7   was ultimately developed.  Can you describe what that -- what

8   you are referring to there?

9   A    In order to get real protection in the digital domain,

10  first we needed technological protection.  And, the three

11  different industries proposed an encryption or a scrambling of

12  the picture.

13       Then, to enforce the technological protection, we had a --

14  we would have licensing, where the owners of the technological

15  protection would license it to anyone who wanted to make DVD

16  players, DVD drives, DVD discs.

17       And then those people that got the information of how to

18  unlock the encryption to make it so that you could see it,

19  they'd follow by all the rules that were contained in that

20  license agreement.

21       And the third step was, out there in the real world there

22  are people that don't come to you for licenses, and may want to

23  hack your movies.  In other words, break into the encryption,

24  just ruin it, rip it, whatever.

25       And for them, we proposed legislation that would make

1   circumventing our encryption against the law.

2   Q    Let me take you back to the first leg of that stool, about

3   some of the technology.

4        Were there discussions in the working group phrase, about

5   encryption systems?  The types of encryption systems that could

6   be used?

7   A    Yes.

8   Q    What kind of conversations or issues were raised by the

9   computer companies in response to the request that computers

10  have copy protections for DVDs?

11  A    Well, at the very beginning, when the consumer electronics

12  companies were proposing a one-bit CD-like protection, the

13  computer industry said no, no, no, no, because it would have

14  meant, to recognize the one bit, that they would have had to

15  change the architecture on all their computers, whether the

16  computer was playing a DVD or whether the computer was a

17  medical imaging system.

18       And so, we then sat down to talk about what type of

19  encryption could they have that wouldn't disable computers that

20  were not involved with the entertainment product, and we came

21  up with the idea of an encryption system that you could opt in

22  or opt out.

23       So a computer manufacturer, if they wanted to make their

24  drives so that the consumer could watch a movie on their PC,

25  they could get a license and get the keys to decrypt it so that

1  it could be seen on the computer monitor, but if they wanted to

2  use -- make a medical imaging system that had nothing to do

3  with us, they wouldn't have to change anything.

4  Q    Are you familiar -- strike that.

5       Through your work with the working group that included the

6  computer companies and IT companies, did you become familiar

7  with the term "buffering" as it relates to DVDs?

8  A    I did.

9  Q    How did you become familiar with it?

10 A    I became familiar with it because the studios were very

11 adamant about no copies.  And we were sitting with a lot of

12 computer industry attorneys who said "There's a little problem

13 with saying 'no copies,' because when you put a picture up on a

14 computer monitor" -- and I'm not a technologist, so excuse me

15 for being broad.

16      But when you put it up, there's something called buffering

17 or caching, where it's temporarily copied.  But it's not a

18 persistent, sustainable copy, it's just there for a second.

19      So there was an exception made in the license agreement so

20 we weren't pulling in honest computer manufacturers for caching

21 or buffering.

22 Q    Let me turn to the -- well, still on that first layer or

23 part of the stool, with respect to the protections, was there

24 ultimately some type of protection that was agreed upon by the

25 members of the working group?

1  A     Yes.

2  Q     What was that?

3  A     It was called The Content Scramble System, or CSS.

4  Q     And what was the intention behind that system?

5  A     Well, the intention behind that system was to make it

6  difficult for a person to undo the encryption and make copies

7  of copyrighted works.

8        However, there were a lot of considerations that went into

9  what type of encryption we could use.  For example, there were

10  government rules on the level of encryption, there were cost

11  factors for both the consumer electronics companies and the

12  computer companies.  There were how robust the studios wanted

13  it.

14       So we came up with the idea that -- what I understood, and

15  I went to a lot of the technology meetings, along with Chris

16  Cookson, coming to a lot of the policy and legal meetings, was

17  that we wanted to keep honest people honest.

18       We knew that the graduate student at Berkeley that had

19  unlimited processing capability probably could hack any type of

20  encryption, but we wanted to keep the regular consumer away

21  from doing that.

22            MR. SCOTT:  Your Honor, I hesitate to interrupt.

23            THE COURT:  Yes.

24            MR. SCOTT:  I would just like clarity to who "we" is

25  so we can differentiate knowledge from hearsay.  Just that last

KING - DIRECT EXAMINATION / WILLIAMS

1  answer --

2          **THE COURT:**  I think in terms of using "we," let's

3  finds out who we are talking about.

4          **MR. WILLIAMS:**  Sure.

5  **BY MR. WILLIAMS:**

6  Q   When you say "we" in reference to the discussions

7  regarding the level of encryption, to whom are you referring?

8  A   I'm referring to the Copy Protection Technical Working

9  Group, which means the multiple industries.  I mean, when you

10  put together all their interests -- and the interests were

11  different.

12      I mean, the manufacturers, whether they are computer

13  manufacturers or hardware manufacturers, they were interested

14  in cost.  And time to get to market.  The studios were

15  interested in "We don't want copies made of our product,

16  period, end of story.  We want it as robust as we can get it."

17      And so, there were compromises made.  And so, the "we" was

18  the groups working together, on that answer.

19  Q   Let me move to the second prong or second leg of the

20  stool.

21      You mentioned the desire to get a license or develop a

22  license.  How did that come about -- let me lay some

23  foundation.

24      Were you involved in the process of developing the

25  ultimate license that was developed to relate to these

1   protections?

2   A     Yes.

3   Q     How were you involved?

4   A     There were members from each studio, and both legal

5   members from each studio, attorneys, and also technological

6   members from each studio that participated.  As well as

7   representatives from the other industries, the computer

8   industry, and the consumer electronics industry.

9         And we decided as we got very close to accepting the

10  Content Scramble System, which was originally owned by

11  Matsushita and Toshiba, that we would sit down and work out a

12  license that would be acceptable to all the parties involved.

13  Q     Did you personally participate in the negotiation of that

14  license?

15  A     I did.

16  Q     Let me more for now, I'll show it to you in a minute.  But

17  let me for now move on to the third leg.  That is the legal

18  protection.

19        Did you have involvement in that development?

20  A     I did.

21  Q     What was your involvement there?

22  A     I worked with our representatives that were working in

23  Washington to propose legislation to protect against

24  circumvention of our product through perhaps hacking,

25  anti-circumvention legislation.

1      A gentleman by the name of Art Sackler at Time Warner, and

2  a gentleman by the name of Dean Marks, who was also with Time

3  Warner at the time.

4  Q    What legislation ultimately resulted, if any, from those

5  efforts?

6  A    The Digital Millennium Copyright Act.

7  Q    Do you know when that act was passed?

8  A    I think it was passed in 1998.

9          **MR. WILLIAMS:**  Your Honor, I would like to show the

10 witness, if I may, what we have marked as Hearing Exhibit

11 No. 1.  And I have an extra copy for the Court.

12         **THE COURT:**  Yes.

13 **BY MR. WILLIAMS:**

14 Q    Ms. King, I've handed you a multi-page document that's

15 been marked Hearing Exhibit No. 1.  It's called, bears a

16 heading, "Amended and Restated CSS Interim License Agreement."

17     Are you familiar with this document?

18 A    Yes, I am.

19 Q    How are you familiar with it?

20 A    I was involved in many, many meetings to negotiate this

21 agreement.  I wasn't the only one from Warner, but I was

22 involved.

23 Q    Who else was involved from other studios?  Not by name,

24 but could you list the studios and other participants who were

25 involved in negotiating this?

1  A    Well, the studios were the major motion picture studios.

2  Sony, Twentieth Century Fox, Disney, Universal.  Who am I

3  leaving out?  MGM.

4  Q    Is it fair to say that all of the major motion picture

5  studios were involved in those negotiations?

6  A    Yes.  And the MPAA was involved.  Plus outside counsel.

7  Q    Are you familiar with the terms of this license?

8  A    Yes, generally.

9  Q    What do you mean by "generally"?

10  A    It's been a long time.

11  Q    Just, can you describe the level of your understanding of

12  the terms of this license?  Let me put it --

13  A    I understand it very well.  I spent a tremendous amount of

14  my time working on this document.

15  Q    And again, which years would this have covered, your

16  involvement in working on the document?

17  A    '96 to '97.

18       MR. WILLIAMS:  Your Honor, we would offer Hearing

19  Exhibit 1.

20       MR. SCOTT:  No objection.

21       THE COURT:  Exhibit 1 is admitted.

22       (Exhibit 1 received in evidence)

23       THE COURT:  There's no objection, as I understand?

24       MR. SCOTT:  No objection, right.

25       THE COURT:  And this is your witness, correct?  Well,

 1   for exam -- cross-examination?

 2              **MR. SCOTT:**  Yes, it is.

 3              **THE COURT:**  Okay.  Because, no double-teaming.  I

 4   didn't tell you the rule, did I, that if you object it's your

 5   witness whether you planned on that or not.

 6              So, if Mr. Cunningham had jumped up, he would be in

 7   trouble then.

 8              **MR. SCOTT:**  Thank you, Your Honor.

 9              **THE COURT:**  Okay, that's fine.  I know he -- it's his

10   witness in terms of calling.  But I think you're going into the

11   substance of the agreement.

12              **MR. WILLIAMS:**  I am, Your Honor.

13              **THE COURT:**  Who else -- you got information regarding

14   major motion picture companies.  But who else was involved in

15   negotiating the agreement?

16              Were there other parties, for example, from the

17   computer and electronics?

18              **THE WITNESS:**  Yes.  The consumer electronics industry

19   was represented in negotiating this agreement.  Matsushita and

20   Toshiba especially, because they owned the underlying

21   intellectual property for the Content Scrambling System.

22              But the other consumer electronics companies were

23   there, too.  Philips, other ones that were interested.  Also,

24   the computer companies were -- were very vital there too,

25   Intel, Microsoft, IBM, and anyone who wanted to participate in

 1    a strong basis.

 2              And they were represented -- each industry was also

 3    represented by their industry group, like the MPAA and the

 4    BSA -- and I don't know what BSA stands for, but it's the

 5    computer industry.  And the CEMA group, and their outside

 6    counsel.

 7              **THE COURT:**  This would include computer software and

 8    hardware manufacturers?

 9              **THE WITNESS:**  Yes.

10              **MR. WILLIAMS:**  Thank you, Your Honor.

11    **BY MR. WILLIAMS:**

12    Q    Let me ask you to look at Recital A on first page of the

13    document.

14         Actually, before I do that, you see at the top there that

15    it's an agreement that is made and entered into as of -- and

16    there's a blank for the date?

17    A    Uh-huh.

18    Q    And then it says "by and between," and it lists Matsushita

19    Electric Industrial Company, LTD?

20    A    Uh-huh.

21    Q    Do you see that?

22    A    Yes.

23    Q    Why is that -- why is Matsushita listed there?

24    A    I think Toshiba assigned, however they did it, their part

25    of owning the intellectual property for purposes of entering

1  the license agreement to Matsushita, and Matsushita was going

2  to handle the licensing until a copy protection group that

3  represented all the industries that were involved could be put

4  together.

5       And, so, Matsushita was the original.  They owned the

6  intellectual property, so they were the original licensor for

7  the interim license.

8  Q    And do you see there that the other party to this contract

9  is left blank?

10 A    Yes.

11 Q    Why is that?  Is this a model of some kind?

12 A    Because, because this is a model of the contract that

13 would be used, whether it was signed by a computer company or

14 by a -- a motion picture studio, or by a replicator, which are

15 the people who put the movies on the disc replicator.

16 Q    Let me refer you now to Recital A, which says (As read):

17             "MEI and Toshiba have developed a

18             Content Scramble System, as defined below,

19             to provide reasonable security to the

20             contents of DVD discs, and thereby provide

21             protection for copyrighted content against

22             unauthorized consumer copying."

23       And it goes on.  Do you see that?

24 A    Yes, I do.

25 Q    What was the reason for that provision?

1  A    The reason for that provision, and the reason it's first,

2  is -- the main reason for all of this was for copy protection.

3  So in other words, it was only what the copyright owners

4  authorized that could be done, according to this agreement.

5      And the only thing we authorized when we did the agreement

6  was no copies.  You're able to play the disc on either a

7  monitor or a TV, but you cannot make copies of it.

8  Q    And why was the word "unauthorized" included here?

9  A    Well, it was --

10      **MR. SCOTT:**  Objection, Your Honor.  First of all,

11  that question is calling for speculation, why something was

12  included.  There's no foundation for that.

13      And we're talking about interim agreements.  I think

14  this should be made clear in this line of questioning.

15      **THE COURT:**  Well, if this is -- is this a term that

16  ends up in the final agreement, that's relevant here?  Yes.  I

17  mean, it's a term that's in final agreement as well.

18      And I think, given her testimony -- you can go into

19  it on cross-examination.  But given her testimony about her

20  involvement in the development of this, I think she certainly

21  can testify to it.

22      **MR. SCOTT:**  The interim.

23      **THE COURT:**  Yes, yes.

24      **MR. SCOTT:**  Okay.

25

1   **BY MR. WILLIAMS:**

2   Q    First of all, Ms. King, were you involved in the

3   negotiation of the final interim agreement?

4        In other words, was there a final version of the interim

5   agreement?

6              **THE COURT:**  That's sort of inconsistent, with "final

7   interim."

8   **BY MR. WILLIAMS:**

9   Q    Well, my question to you is, did the parties come to rest

10  on what the form of agreement would be with respect to the CSS

11  license?

12  A    Yes.  Can I explain?

13       This was called the interim agreement because the parties

14  contemplated forming the DVD Copy Control Association, which

15  was formed in due time.

16       But in the meantime, as an interim step -- that's why it's

17  called the interim license agreement -- Matsushita stepped up

18  and said that they would handle the licensing.

19       The agreement was heavily, heavily, heavily negotiated.

20  When I say a lot of meetings, you can imagine, with all those

21  different industries and parties negotiating, this wasn't an

22  easy agreement to come up with.

23       The final agreement which was brought into play by the DVD

24  CCA -- are you calling that something shorter?  I don't know --

25  DVD CCA is very similar to this.  And in all the major points,

1  including this recital (Indicating), is essentially the same.

2  Q    Okay.  So, let's keep our focus on this one, then.  We

3  will get to that agreement from the DVD CCA later.

4        But with respect to this agreement, did you personally

5  participate in the negotiations with respect to the inclusion

6  or non-inclusion of the word "unauthorized" --

7  A    Yes.

8  Q    -- before the word "copy"?

9  A    Yes.

10  Q    How did you participate in those discussions?

11  A    Well, the wording is very important.  And the -- there's a

12  couple of reasons why the word "authorized" or "unauthorized"

13  is in here.

14        First, there was already the Audio Home Recording Rights

15  Act, which was entered into in 1992, between -- which is

16  legislation that affects the music industry.  And that

17  authorizes one copy of a CD, which is one copy of a digital

18  media.  So you can -- you can take a CD, and you can put -- you

19  can make one copy onto a -- a cassette or a tape.

20        The studios wanted no part of that.  So, they're

21  recognizing that you can authorize something, but if it's not

22  authorized in here, it's not authorized.  So it's sort of

23  recognizing for the consumer electronics company that you can

24  authorize something.

25        There was also a forward-future thinking in the studios.

 1   I mean, you have to go back to 1995.  And they were thinking,

 2   "Well, digital media is coming on board, they keep talking

 3   about electronic distribution, which keeps coming every five

 4   years but never seems to take off.  We might at one point want

 5   to authorize the making of a copy."

 6        So, they used the word "authorize."

 7   Q    Was there any -- you have testified earlier about the

 8   concept of buffering or caching.  Do you recall that?

 9   A    Yes.

10   Q    Was there any connection between those phrases and the

11   word "unauthorized" in those discussions?

12   A    That's the third piece, is the caching.  The caching was

13   specifically authorized somewhere in here.  And so, that fell

14   as an exception to the "unauthorized."  So, the word was used

15   in that context.

16   Q    Did there ever come a time where Warner decided against

17   releasing movies on DVD because it felt it did not yet have

18   adequate protections from one or more of the legs of the stool?

19   A    Warner, who had been one of the creators of DVD, wanted to

20   launch the product in 1995, because we -- we felt we had to

21   have copy protection.

22        We were delayed for over two years, making copy protection

23   happen.  So, I was under great pressure to try to get this

24   done.

25        But all of the studios had said they wouldn't even think

 1  about putting out their product, including Warner, until we had

 2  copy protection.

 3  Q    How many legs of the stool were in place, the three legs,

 4  before Warner actually started distributing DVDs?

 5  A    The technology for CSS was in place, you could get it.

 6  One of Warner's sister companies, WEA Manufacturing, was one of

 7  the developers of how to put the encryption on to a disc.  So

 8  we had that.

 9       The amended and restated license agreement was done.

10  Although we hadn't quite signed it yet, it was done, and had

11  been fully negotiated.

12       However, the legislation was not in place yet, but Warner

13  felt that they had enough protection at that time to go ahead

14  and to launch in March of 1997.  And just a year later, the

15  DMCA came into play.

16  Q    Let me direct your attention in this document to Page 21

17  of the interim license agreement.  And I'll ask you to look at

18  Section 9.2.

19       This is a section that's entitled Equitable Relief.  Do

20  you see that?

21  A    Yes.

22  Q    Did you have any involvement in the negotiation of this

23  section of the license?

24  A    Yes.

25  Q    What was your involvement?

1  A    I, along with the other motion picture studios, felt it

2  was very important to have the ability to get equitable relief.

3  Q    Let me ask you, putting aside why you had it in there --

4  I'll get to that, but I just want to lay the foundation for

5  your level of involvement with respect to this section.

6  A    Uh-huh.

7  Q    What did you do in connection with this section?

8  A    I was there in -- in negotiating this section, with all

9  the -- all the various industries that were negotiating it.

10      I wasn't a drafter.  I just want to make that clear.

11  Bruce Turnbull from CEMA, who represented Matsushita, was the

12  primary drafter.  And Jon Baumgarten represented the motion

13  picture companies, and was a secondary director.

14      So we were all there, but -- and we all gave comments, you

15  know.  We all told everyone, "Oh, change this word," or "Do

16  this."  But I wasn't a drafter.

17  Q    Now, could you tell us, what was the reason for including

18  this portion of the agreement?

19          (Witness examines document)

20  A    Warner and -- and since I worked for two of the other

21  motion picture companies, I can say this for them as well.

22      In the motion picture industry, if your product goes out

23  and is not stopped from going out immediately, and is copied,

24  you can lose a tremendous amount of the value of your

25  investment when it -- it gets transferred all over the world to

```
 1   who knows how many people.  So, you need to stop the
 2   dissemination quickly.
 3       And so, equitable relief gives you the ability to go in
 4   and do that.
 5   Q   Let me direct your attention to about five, five lines
 6   down.  It's a really long sentence, but I'm going to pick it up
 7   on the fifth line down.
 8       There's a line that says "CSS" and then there's a comma.
 9   And after it, it says (As read):
10           "In the event that licensee breaches its
11       obligations under Section 2.1, 2.3, 2.5, 4.2, 5 or 10
12       hereof, money damages alone will not adequately
13       compensate an injured party, including an injured
14       eligible licensee, pursuant to Section 9.4, and that
15       injury to such party will be irreparable."
16       And that's something which the licensee and MEI agree to
17   in the first line of the section, is that correct?
18   A   Correct.
19   Q   Were there other parties involved in the negotiations,
20   other than the movie studios to which you just referred, in
21   connection with this section?
22       That is, were the other stakeholders that you have
23   outlined -- the computer industry, the consumer electronics
24   industry -- were they participants in this discussion, as well?
25   A   They were.
```

1 Q    Finally, let me ask you to look at Section 9.4 --

2 A    Yes.

3 Q    -- which is listed as Third-party Beneficiary Rights.  Do

4 you see that one?

5 A    Yes.

6 Q    About six or seven lines down, there's a sentence that

7 begins (As read):

8         "As part of the consideration of the licenses

9      granted herein, licensee, for itself and its

10      permitted sublicensees, hereby confers a third-party

11      beneficiary right upon certain CSS licensees that

12      fall into one of two classes."

13      And then the first class is content providers.  Do you see

14 that?

15 A    Yes.

16 Q    Did you participate in the negotiation of this section

17 relating to third-party rights?

18 A    Yes, I did.

19 Q    What was your involvement in that discussion?

20 A    I was there to make sure that a third-party beneficiary

21 right was given to the studios, because they didn't want any

22 organization to have to vote on whether to bring actions.  They

23 wanted the right to go after any real damage that could occur

24 to their copyrighted works.

25      The studios felt very strongly about the need to be a

1   third-party beneficiary to this agreement.

2   Q    Was there discussion at the level of the working group,

3   the Copy Protection Technical Working Group, about how the

4   studios might be harmed if someone were to copy their content?

5   A    Yes, there was.  I mean, there was constant discussion

6   about that.  I mean, part of the reason it says, you know,

7   monetary damages will not be enough, is that it is just so

8   difficult to measure theft.  And, and who has your product and

9   who doesn't have your product, and how well your product would

10  have done if it hadn't been stolen and distributed.

11         So, this was all made very clear.  I remember a little

12  story, that I attended a technology meeting up at Microsoft at

13  the very beginning of the CPTWG, and the engineers were trying

14  to figure out what they could do to help the problems of the

15  motion picture companies.  And they were talking about, well,

16  the reason -- the way we --

17         MR. SCOTT:  Your Honor, this is a story from

18  Microsoft.  I think it is hearsay.

19         THE COURT:  Well, was this -- this was in the

20  context, though, of the working group.

21         Is that correct?

22         THE WITNESS:  Yes, that's correct.

23         THE COURT:  All right.

24         THE WITNESS:  And they were talking about how they

25  upgrade their products, software products.  Just happened to be

1  at Microsoft.  I don't know if they did that.

2        And I -- I mentioned that that's great way to protect

3  computer software, but we can't do a Version 3.2 of *Gone With*

4  *the Wind*.  And so, they began to understand that due to the

5  expense of a motion picture, and what it was -- you know, it's

6  a package, it's all put together, it's a creative, long film --

7  that we couldn't just upgrade it.  That we would lose our

8  investment.

9  **BY MR. WILLIAMS:**

10 Q    After you -- you indicated that you worked on these

11 licenses or the interim license between 1996 and 1997.  Is that

12 correct?

13 A    Yes, that's correct.

14 Q    What was your involvement with respect to the Copy Control

15 Association, the DVD Copy Control Association, if any, after

16 1997?

17 A    Well, my involvement in these particulars groups were

18 taking up so much of my time that I was pulled back to do some

19 of my other work.

20        And I -- a gentleman by the name of Dean Marks was much

21 more involved in putting together -- from the legal and policy

22 standpoint -- the DVD CCA.

23 Q    And, to whom did Mr. Marks report?

24 A    Hmm.  At that time, I think he reported to the general

25 counsel of Time Warner.  He's now a Warner Brothers attorney.

```
 1  Q    Uh-huh.  Did you review the DVD CCA license that

 2  ultimately was entered into, once the DVD CCA was established?

 3  A    In general I have reviewed it.

 4  Q    Did you review it at the time?

 5  A    No.

 6  Q    Have you reviewed it since?

 7  A    Yes.

 8  Q    When did you do that?

 9  A    Last night, I looked at some of the sections.

10  Q    With respect to the sections that I've shown you, which,

11  for the Record, are the Recital A -- first of all -- I'll take

12  them one at a time.

13       With respect to the Recital A that appeared on the first

14  page of Exhibit No. 1, did you compare the interim license with

15  the DVD CCA license?

16  A    I did.

17  Q    What did you find?

18  A    I found minor word changes, but generally, it was the

19  same.

20  Q    How about the language that talks about providing

21  protection for copyrighted content against unauthorized

22  consumer copying?

23  A    It's the same.

24  Q    With respect to Paragraph 9.2 of the agreement?

25  A    Yes.
```

```
 1  Q    Did you review that one, which is the section entitled
 2  Equitable Relief?
 3  A    I did.
 4  Q    What did you find?
 5  A    I found, again with the exception of minor commas and
 6  maybe changes in reference to paragraphs, that it's basically
 7  the same.
 8  Q    And how about Section 9.4, the Third-party Beneficiary
 9  Rights section?
10  A    The numbering changed, I believe, to 9.5 in the new one.
11  But -- and I think there was an added paragraph that didn't
12  really change anything in here.  Otherwise it was essentially
13  the same.
14  Q    With respect to the reference to the two classes of
15  licensees including content providers who would have a right to
16  bring claims, did that change?
17  A    No, it didn't.
18          MR. WILLIAMS:  Your Honor, I would ask to place
19  before the witness what was Deposition Exhibit 7 to her
20  deposition, which is the CSS license agreement with
21  RealNetworks.  May I do that?
22          THE COURT:  Yes, okay.
23  BY MR. WILLIAMS:
24  Q    Ms. King, is that the agreement that you reviewed and
25  compared to the interim license agreement that you negotiated?
```

1  A    Yes.

2         MR. WILLIAMS:  Your Honor, I would offer this hearing

3  exhibit as Exhibit No. 7 to Ms. King's deposition, either

4  through her, or we can get it in -- or we can get it in later,

5  but I would offer it.

6         MR. SCOTT:  No objection.

7         THE COURT:  I assume there's no objection to it

8  coming in, in any event.  So it will be admitted, and then we

9  are going to figure out the numbering, I guess, on that.

10         MR. WILLIAMS:  Right.  Thank you, Your Honor.

11         (Exhibit 7 received in evidence)

12         (Off-the-Record discussion)

13  BY MR. WILLIAMS:

14  Q    Ms. King, from the beginning of your involvement with the

15  working group up until the time that you had your last

16  involvement with that group, and these agreements, was there

17  ever a period of time when the movie studios, or Warner in

18  particular, authorized anyone to make a permanent playable copy

19  of content owned by the studios?

20  A    No.

21         MR. WILLIAMS:  No further questions, Your Honor.

22         THE COURT:  Okay.  And I gather from your testimony,

23  then, that the license agreement that we had before us that's a

24  license agreement with Real Networks, if you were to answer

25  with regard to Recital A and 9.2 and 9.5, your testimony with

1   regard to the final agreement would be the same.  Is that --

2           **THE WITNESS:**  That's correct.

3           **THE COURT:**  Correct?  Okay.  I just want to be clear

4   on that.  Thank you.

5           **MR. SCOTT:**  Your Honor, this is my first time before

6   you in a trial.  And, what is your preference for the lunch

7   hour?

8           **THE COURT:**  I don't -- I don't have any set rule with

9   regard to that.

10          How long do you expect you're going to be with this

11  witness?  That may tell us when we will take lunch.

12          **MR. SCOTT:**  Well --

13          **THE COURT:**  Or dinner.

14          **MR. SCOTT:**  No, I would expect about 40, 45 minutes.

15          **THE COURT:**  Okay.  Why don't we do that.

16          **MR. SCOTT:**  Do that now?

17          **THE COURT:**  Proceed with your examination now.

18          **MR. SCOTT:**  Thank you.

19                      **CROSS EXAMINATION**

20  BY MR. SCOTT:

21  Q    I guess it's good afternoon, Ms. King.  This is the first

22  time we've met.

23  A    Yes.

24  Q    Nice to meet you.

25  A    Nice to meet you, too.

1   Q    Thank you for coming.

2        Just briefly, in terms of your career history in the

3   industry, as I heard you, you were with Warner Brothers and

4   then with Paramount, is that right?

5   A    Yes.

6   Q    And was there a time you were with Twentieth Century Fox,

7   also?

8   A    Yes, before I went to Warner Brothers.

9   Q    So your involvement, then, with the DVD product and

10  consumer electronics has been working for the major studios?

11  A    That -- that's correct.

12  Q    And you retired from Paramount in the fall of 2007, is

13  that right?

14  A    At the end of October, 2007.

15  Q    And since that time, have you been working with the

16  lawyers for the movie studios in this case?

17            MR. WILLIAMS:   Objection; vague and ambiguous.

18            THE COURT:   Objection is overruled.  You may answer.

19            THE WITNESS:   In respect to this case?

20  BY MR. SCOTT:

21  Q    Yes, ma'am.

22  A    Yes.

23  Q    And in fact, that's been your only job outside the house

24  since you retired from Paramount in October of 2007, is that

25  right?

```
 1  A    I moved east because I became a new grandma.

 2  Q    Congratulations.

 3  A    For the first time.  So --

 4  Q    Congratulations.

 5  A    I'm not working in the industry right now.

 6  Q    Other than working with the lawyers for the movie studios

 7  in this case.

 8  A    That's correct.

 9  Q    And are you in fact being compensated for your time to

10  appear?

11  A    I am.

12  Q    For the work you've done with the lawyers, and for

13  appearance here?

14  A    Yes.

15  Q    At the rate of $450 an hour?

16  A    Yes.

17  Q    And you're not appearing as an expert witness, are you?

18  A    No, I'm not.

19  Q    You are appearing as a fact witness.

20  A    Yes.

21  Q    Do you have an estimation of how much money you have

22  been -- you have received from the law firms for the movie

23  studios in connection with this case?

24  A    Oh, I have a great estimation.  Zero.  I haven't been paid

25  yet.
```

1  Q    Have you billed them yet?

2  A    Yes, I did.  But I know how long it takes the studios.

3  Q    I'm sorry?

4  A    I know how long it takes the studios.

5  Q    How much was your bill?

6  A    What -- gee.  Less than 20,000.  Maybe 16, $17,000 so far.

7  Q    Now, you've testified in response to Mr. Williams about

8  your work on the interim agreement for CSS.

9        Is it true that you did not participate in negotiating the

10 final agreement; it came afterwards?

11 A    That's correct.

12 Q    Uh-huh.  And, until Mr. Williams showed you last night the

13 three portions he just questioned you about, is it true that

14 you had not reviewed the final CSS license agreement?

15 A    That's correct.

16 Q    Is it also correct that you have not reviewed the general

17 specifications that go along with the final CSS license

18 agreement?

19 A    The final specifications?

20 Q    The general specifications that go with the agreement,

21 yes, ma'am.

22 A    Which agreement?  The final agreement?  Or the interim

23 agreement?

24 Q    The final agreement.  The one that RealNetworks signed.

25 A    No, I haven't -- I consider that part of the agreement.

1  So, I have not reviewed it.

2  Q    And, have you ever seen the procedural specifications that

3  go with the final CSS license agreement?

4  A    No.

5  Q    Have you reviewed any of the current technical

6  specifications that go along with the agreement?

7  A    Aren't the technical specifications part of the procedural

8  and general specifications?  I don't -- I don't think there's a

9  third piece.

10  Q    Well, whatever they are, you've not reviewed of any of the

11  specifications, by whatever name, is that true?

12  A    Yes.

13  Q    We were looking -- I'm sorry, you were looking at the

14  interim agreement, with Mr. Williams.

15        **MR. SCOTT:**  Am I correct this is called Hearing

16  No. 1, Mr. Williams?

17        **MR. WILLIAMS:**  Yes, it is.

18        **MR. SCOTT:**  Okay.  The Defendant's Hearing Exhibit

19  No. 1.

20  **BY MR. SCOTT:**

21  Q    And in the recitals, you discussed with him the reference

22  to "unauthorized consumer copying."

23        Does the interim agreement someplace in here define what

24  is meant by "unauthorized consumer copying"?

25  A    I don't think so.

1  Q    Does it define what's meant by "authorized consumer

2  copying"?

3  A    I think it's self-explanatory.

4  Q    Is there a definition anyplace in here, or an explanation?

5  A    I -- I don't remember.

6  Q    Do you know, from your limited review of the final license

7  agreement, whether it anywhere defines what is authorized or

8  unauthorized in terms of copying?

9  A    No.  I mean, I didn't read it all.

10 Q    Do you know whether the interim agreement that you worked

11 on with the working group has any provision in it you can show

12 us that requires that the DVD disc be in the drive or tray

13 during playback?

14 A    I -- I cannot name a specific provision.

15 Q    You testified in response to Mr. Williams, that there was

16 much discussion about making an exception for copying into a

17 temporary buffer or cache.  Is that right?

18 A    Yes.

19 Q    And are you aware of any provision in the interim

20 agreement that you worked on, that reflects an exception for

21 copying into cache or buffer?

22 A    I know that was allowed, and I don't know the technical

23 and procedural specs.  I know that was an exception, an

24 authorization that the attorneys for the computer industry felt

25 very strongly had to be there.

1      It was a general principle, just like the studios'

2  principle that no copies were to be made.  So, that was an

3  authorized exception.

4  Q    Are you telling the us that you believe that's an

5  exception because the studios' lawyers told you so?

6  A    No, I believe it's in there somewhere.

7  Q    Can you help us out and tell us where it is, or --

8  A    I -- I don't know specific provisions.  I didn't go back

9  and review them in that kind of detail.  And, we were

10  negotiating this in 1996.

11  Q    Do you believe you have seen such a provision in the past?

12  A    Well, I believe that -- that caching was allowed.  I mean,

13  that was discussed, it was debated, in the -- on the

14  technological side when I was in the room.

15      So, I mean, I know that was in here.  And I know that

16  everyone agreed it was okay, because I was in the room for

17  that, too.

18  Q    I understand that's what you believe.  Now, you said it

19  was discussed.  Right?

20  A    Absolutely.

21  Q    Temporary caching.

22  A    Yes.

23  Q    Have you ever seen a provision in the interim or final

24  agreement that reflects such an exception?

25  A    I don't know the specific provisions.

1  Q    Do you remember -- and I can show you if you would like,

2  in your deposition -- that you told lawyers that you believed

3  that there was a prohibition on copying because there was a

4  reference to no digital-to-digital copying?

5  A    Right.

6  Q    Have you ever seen that phrase in the agreements you've

7  read?

8  A    I haven't read the agreements recently.  But there were no

9  digital-to-digital copyings allowed, or digital-to-analog.

10 There was no copying allowed, period.

11 Q    Ms. King, that was not my question.  My question was

12 whether you've seen that in any of the agreements you have

13 read, that phrase, "prevent digital-to-digital copying"?

14 A    Not that I recall.

15 Q    Now, there is such a phrase in one of these sets of -- one

16 or more of the sets of specifications which you have not read.

17       Was the phrase "no digital-to-digital copying" something

18 that the studios lawyers told you about?

19         **MR. WILLIAMS:**  Excuse me.  Object to form of the

20 question.  It's argumentative, with the preface.

21         **THE COURT:**  Well, there was a little bit of testimony

22 at the beginning of that question.

23         Can you rephrase the question?

24         **MR. SCOTT:**  I certainly can.

25

 1 | BY MR. SCOTT:

 2 | Q    If you've not read the phrase "no digital-to-digital

 3 | copying" --

 4 | A    I have read the phrase.

 5 | Q    Can you tell us where you've found -- where you've seen

 6 | that?

 7 | A    It was long ago, and there were a lot of documents.  So I

 8 | don't know if I remember it from reading technical

 9 | specifications, whether they were procedural or general, or

10 | whether I remember it from documents in the negotiation.

11 |      But I knew that was a general premise that was part of the

12 | agreement.

13 | Q    So you have seen that phrase somewhere, at some time?

14 | A    Absolutely.

15 | Q    All right.

16 |      MR. SCOTT:  Bear with me, Your Honor.  I'm shortening

17 | up some things right here.

18 |      THE COURT:  Okay.

19 | BY MR. SCOTT:

20 | Q    Now, do you recall that in your deposition -- again, I'll

21 | show it if you wish -- you told us that there was some

22 | negotiation on the question whether the CSS agreement should

23 | prohibit copying of a DVD to the hard drive, that that was

24 | discussed.  Negotiated.

25 |      MR. WILLIAMS:  Objection, Your Honor.  Calls for

1   hearsay.  It's not proper impeachment.

2           **THE COURT:**  Objection is overruled.

3           You may answer.

4           **THE WITNESS:**  Could you show me where I say that in

5   the deposition?

6   **BY MR. SCOTT:**

7   Q    Sure.  In fact, I can quickly put it on the screen, but

8   I'll just let you look it up on Page 76 --

9           **MR. SCOTT:**  May I approach, Your Honor?

10          **THE COURT:**  Yes, you may.  And you don't have to

11  repeat the request.

12          **MR. SCOTT:**  Thank you.

13  **BY MR. SCOTT:**

14  Q    I think you will find it on Page 76.  Let me look at that

15  with you.

16          (Witness examines document)

17  Q    Yes, on Page 76, at Line 19 -- and I'm just refreshing you

18  here, I'm not seeking to contradict anything you have said.

19          Do you remember that you agreed that there were

20  negotiations as to whether the CSS interim license agreement

21  shall prohibit copying of DVDs to the hard drive?

22  A    Yes.

23  Q    So, that was discussed.  Did a provision about whether or

24  not to copy to the hard drive ever make it into the CSS interim

25  or final agreement?

1  A    Without looking at my own testimony, the studios were

2  adamant, especially in the computer environment, that there

3  would never be a copy made to the hard drive, because these

4  were perfect copies that could be distributed -- we used to use

5  the term "to your millions of your best friends around the

6  world."

7       And so, no copy was allowed to be made to the hard drive.

8  I mean, that was the whole purpose of the license agreement.

9  That was the whole purpose of the encryption.  I mean, it was

10 the basic premise.

11 Q    I understand the studios were adamant.

12 A    And, and, and, if you were to ask the -- the other people

13 who were involved, they would say that they agreed to it, I

14 mean, because that was the premise.

15         **MR. SCOTT:**  Your Honor, I move to strike.  No

16 foundation for that.

17         **THE COURT:**  The last sentence is stricken.

18         **MR. SCOTT:**  Thank you.

19 **BY MR. SCOTT:**

20 Q    Now, I understand, you say the studios were adamant.

21 A    Uh-huh.

22 Q    Did a provision on the subject of copying DVDs to hard

23 drive appear in the interim agreement that you worked on?

24 A    Yes.  It's not authorized.

25 Q    Is it -- is there a discussion you can show us, any

1  provision in the interim agreement?

2  A    Yes.  Their first recital.

3  Q    Okay.  You are referring, then, to Recital A against

4  unauthorized consumer copying?

5  A    Yes.

6  Q    Is there any further explanation of that, as to hard drive

7  or otherwise that you know of, in this interim agreement?

8  A    It was never authorized.  So it's not authorized within

9  the agreement.

10  Q    Can you answer my question?

11  A    It's unauthorized.

12  Q    Can you answer my question, please?

13       Is there any further discussion in this interim agreement

14  of what's authorized or unauthorized, beyond Recital A?

15  A    I don't know.

16  Q    Is there any discussion in the interim agreement beyond

17  Recital A on the subject of copying to hard drive?

18  A    Could you repeat that question?

19  Q    Yes.

20  A    I'm sorry.

21  Q    Is there any further discussion in the interim agreement

22  beyond Recital A on the subject of whether or not copies can be

23  made to hard drive?

24  A    Not that I know, but if you're asking me other than

25  Recital A is there anything in the agreement, it's kind of like

 1   saying "Other than the First Amendment, where does it talk

 2   about free speech?"

 3       I mean, it was the first recital in the agreement that the

 4   studios had to authorize any kind of copying.  Never was it

 5   authorized.

 6       It's -- the fundamental issue of copy protection is that

 7   it's protected unless it's authorized.

 8   Q   Do you know why the reference to recitals in Recital A,

 9   unauthorized copying, is not explained or discussed again in

10   the terms of the agreement (Indicating)?

11   A   I -- I can't -- I can't relate to certain provisions,

12   because I just don't know them by heart.

13   Q   So, if I understand, then, the provisions of the interim

14   agreement, to your knowledge, don't discuss copies to hard

15   drive or copies to cache anywhere within their terms.

16   A   I don't know that it doesn't do that.

17   Q   But you don't remember any provision that does it.

18   A   Well, caching probably -- I would think would be in the

19   technical specifications.  I don't remember one that gives

20   authorization to copy to a hard drive anywhere in here

21   (Indicating).

22   Q   The reason I'm staying with the subject, Ms. King, is

23   because you said it was actually discussed whether or not there

24   could be copies to hard drive.

25       And I just was hoping you could help us on the subject of

1    whether it made it into the agreement.

2    A    Well, the reason -- the reason -- the reason the word

3    "authorized" was used is I know that at least Warner Brothers

4    -- I can speak for my own company at the time -- was looking in

5    the future, and said, "Well, some day we may authorize this."

6        You know, as the computer companies say, "Well, maybe

7    you'll want to have a consumer make a copy."

8        I mean, the times have really changed.  We are sitting

9    here in 2009, and an electronic distribution is much -- is

10   coming into play, just as we thought it would back then.  But

11   we didn't authorize it.

12   Q    Uh-huh.

13   A    The only thing we authorized was playback of the movie.

14   No persistent copies on a hard drive or anywhere else.

15   Q    Is there anything you know of, in the interim or final

16   license agreement, talking about no persistent copies?

17   A    Well, since the exception was caching, what was not an

18   exception was no persistent copies.

19   Q    And is there any exception written in the agreement for

20   caching?

21   A    I -- I answered that.  I don't know.  I think there is.  I

22   don't know.  I don't recall.

23   Q    Changing subjects, in fact, the studios are now marketing

24   products that will provide copies of DVDs in other formats.

25   Isn't that true?

1   A      Do you mean the digital copy?

2   Q      Digital copy is one.  You're familiar with that?

3   A      Yes, I am.

4   Q      And the studios, a number of the studios are selling discs

5   now at a premium price with a second copy of a disc?

6   A      Yes.  The key word is "premium price."  So it has become a

7   business model for the studios.

8   Q      And, this kind of digital copy, provides an extra disc

9   that can be copied onto the PC or on to the iPod, is that

10  right?

11  A      Yes, that was -- that was contemplated as a future way in

12  which the studios recoup their investment in their movies.

13  Q      Uh-huh.  Did you have reason to believe that a person who

14  buys one DVD disc to play in a PC would actually buy a second

15  one to play in iTunes?  Any market research or knowledge on

16  that?

17          **MR. WILLIAMS:**  Objection.  Vague and ambiguous, Your

18  Honor.  Pardon me.

19          **THE COURT:**  Well, that objection is not well taken,

20  so objection is overruled.

21  **BY MR. SCOTT:**

22  Q      Ms. King?

23  A      That -- the question is hard for me to understand.

24  Because --

25          **THE COURT:**  Then maybe it is vague and ambiguous.

 1          **MR. SCOTT:**  That's what I was waiting for the witness

 2     to tell me, Your Honor.

 3          **THE COURT:**  There are other bases for objecting, but

 4     it's not up to me to do that.

 5     **BY MR. SCOTT:**

 6     Q    Do you know of any market research on the subject of

 7     whether people who buy one DVD to play on their PC are also in

 8     the market to buy a second DVD for other devices like iPods?

 9          **MR. WILLIAMS:**  Objection.  Relevance.

10          **THE WITNESS:**  No.

11          **THE COURT:**  I'll allow the answer.

12          **MR. SCOTT:**  Thank you.

13          **THE COURT:**  Objection is overruled.

14     **BY MR. SCOTT:**

15     Q    And, if I --

16     A    But --

17     Q    If I could confirm, we were talking about managed copy.

18     When this -- a DVD is purchased from the studios through

19     managed copy, for iPod, can other copies be made?

20     A    Each -- for iPod.  When I was at Paramount, they did an

21     agreement with Apple, and it was -- and I had responsibility

22     for the legal and business affairs for the video-on-demand

23     group that did electronic distribution as well.

24          From my recollection, they can play it on a few different

25     devices.  At least through the Paramount agreement.  And that's

1  a confidential agreement.  But, it does give some flexibility.

2  Without getting into more detail.

3  Q    In the marketing of managed copy for iPod, it can be

4  played on -- copied to five different devices, can't it?

5  A    Correct.

6  Q    Then again changing subjects --

7          **MR. SCOTT:**  And coming to a conclusion, Your Honor --

8  **BY MR. SCOTT:**

9  Q    -- are you aware of any analysis done by the studios on

10 the harm they expect to face if RealDVD is released?

11 A    I was not in the studios when this issue came up.  No.

12 Q    And you have been working with the lawyers since October

13 of 2007?

14 A    No.  Since -- in 2008.  You mean, these lawyers for this

15 case?

16 Q    Since you retired in 2007.

17 A    I haven't been working with them since 2007.

18 Q    Okay.  I agree.  You didn't say that, that was my mis- --

19 mishearing of you.

20 A    No, it's more recent than that.

21 Q    But you are not aware of any study done by the studios, or

22 in fact, by anyone, of harm the studios face from a release of

23 RealDVD.  Isn't that true?

24 A    No, but I can tell you what I know of the harm.

25 Q    Well, would you agree that you're not aware of any study

1  done of harm?

2  A    I'm not aware of the study done.

3  Q    By yourself or anyone.

4  A    By myself or anyone.

5  Q    And what you would want to tell us would be your belief,

6  your theory of how harm would happen.  Is that right?  Is that

7  true?

8  A    Due to my 20 years of experience in the video industry.

9         **MR. SCOTT:**  Your Honor, I pass the witness.

10        **THE COURT:**  Do you have anything further,

11  Mr. Williams?

12        **MR. WILLIAMS:**  Very briefly, Your Honor.

13                    <u>**REDIRECT EXAMINATION**</u>

14  **BY MR. WILLIAMS:**

15  Q    Ms. King, you were asked some questions about whether you

16  were aware of any documents that reflected a reference to

17  digital-to-digital copying.

18        Do you recall that line of questioning?

19  A    Yes.

20  Q    Was your knowledge about language referring to

21  digital-to-digital copying based upon anything that I said to

22  you?

23  A    No.

24  Q    What was it based upon?

25  A    It was based upon, first of all, my experience in all

1   those meetings of the CPTWG, and negotiating this agreement,

2   and all my conversations that I had with Chris Cookson, who is

3   our chief technology officer at Warner Brothers.  Plus my

4   review of just certain materials from that time period.

5   Q    You were asked a series of questions about whether you

6   were aware of any provision in the license that expressly

7   prohibited copying to hard drive.

8        Do you recall that line of questioning?

9   A    Yes.

10  Q    Are you aware of any provision in this license that

11  expressly authorizes copying a movie to a hard drive?

12  A    There is no -- no express authorization of copying a movie

13  to a hard drive.

14  Q    With respect to the discussions that did happen, that

15  you've testified to on direct examination, on the topic of

16  caching or buffering, were there members of the -- strike that.

17       With respect to the discussions that you had regarding

18  caching and buffering, what was the connection, if any, between

19  those discussions and authorization or non-authorization of

20  copying?

21       What was the link?

22  A    No copying was authorized.

23           MR. SCOTT:  Object to form, Your Honor.  We need some

24  foundation on this.  Is he talking about discussions now?  Or

25  documents?  What connection is ambiguous, and we don't know

1    what foundation they have for this.

2            **THE COURT:**  Are you asking about the working group?

3    Or are you asking about in some other context?

4            **MR. WILLIAMS:**  I was asking about the discussions.

5    And I believe I prefaced it with "discussions," but yes, of the

6    working group.

7            **THE COURT:**  Yeah.  We need to take make it clear.

8            **MR. SCOTT:**  Thank you, Your Honor.

9            **THE COURT:**  Thank you.

10           You may answer the question.

11           **THE WITNESS:**  What I recall, and it's my

12   recollection, is that the studios felt I can't tell you how

13   strongly that no copy should be made of this new technology

14   which had perfect copies for generations and generations.  So,

15   there was a mantra of "No copies."

16           The lawyers for the computer industry said -- you

17   know, lawyers are very careful about wording.  And when you're

18   saying, you know, "No copies," "Okay, well, there's something

19   that's called caching."  And I remember talking to someone from

20   one of the computer companies, who explained it to me at the

21   time.  And they said, that's kind of an exception.

22           And we said, "Okay, we will authorize" -- the studio

23   said, "We will authorize your ability to cache, because that's

24   the only way you can see it on the monitor."

25           So, that's how it relates to authorization.  But

1  that's the only authorization there ever was.

2  **BY MR. WILLIAMS:**

3  Q    Final questions.  You were asked a few questions about how

4  studios now are permitting -- or selling, excuse me -- copies

5  that can be downloaded to hard drives.

6      Do you recall that line of questioning?

7  A    Yes.

8  Q    Are studios paid for -- by consumers, for that right?

9  A    Yes, they are.

10 Q    How are they paid?

11 A    They are paid -- if you download it, and you download it

12 for -- there's lots of models, at least when I was still with

13 the studios.

14     If you're downloading for a 24-hour period, you pay a

15 certain amount, whether it's $2, three -- I don't know the

16 amounts the studios are charging.  If you download it

17 permanently, you're charged a different amount.

18     And, there's various ways you can do this.  The Apple way

19 is one way.

20 Q    Throughout the entire period that you were involved in

21 discussions with the members of the working group, was there

22 ever any discussion about permitting a consumer to use some

23 kind of device to make a copy of a movie without paying the

24 content on your own?

25 A    Never.

1          **MR. WILLIAMS:**  No further questions, Your Honor.

2          One further question.  Pardon me.

3          (Off-the-Record discussion)

4    **BY MR. WILLIAMS:**

5    Q    Based upon your conversations with the working group

6    members, was there ever a time when the working group members

7    discussed that making a single copy, as opposed to multiple

8    copies, would be okay?

9    A    No.  I -- well -- we knew at the time that -- that the

10   computer industry -- the music industry had allowed one copy.

11   The studios really did not want to go down that path.

12   Q    You were asked some questions about whether a disc was

13   required -- whether there was any specific provision requiring

14   that a disc be included in the tray.

15        Do you recall that line of questioning?

16   A    Yes.

17   Q    Was there any discussion about being able to play the DVD

18   without putting a disc in a tray?

19   A    Yes.  You weren't -- you couldn't make a copy, so you

20   could never play it without the DVD being there.

21        Don't forget, a DVD is portable.  I mean, you can take

22   your DVD and watch it on a television set.  And then you can

23   take it and put it into your computer.

24        So, you know, it was a very multi-use friendly,

25   user-friendly product, priced inexpensively, and usable in both

1    computers.  There's never been a product like that.

2         As a matter of fact, it's the most successful consumer

3    electronics product ever.

4              **MR. WILLIAMS:**  Thank you.  No further questions, Your

5    Honor.

6              **MR. SCOTT:**  I have one.

7              **THE COURT:**  Yes.

8                          **RECROSS EXAMINATION**

9    BY MR. SCOTT:

10   Q    Ms. King, you were asked whether there was discussion

11   about being able to play the DVD without putting a disc in the

12   tray.

13        And you answered, "Yes, you weren't -- you couldn't make a

14   copy," so you could never play it without" -- you take your own

15   DVD and watch it on your television set.

16        Let me ask you this.  There was discussion about being

17   able to play with a disc not in the tray.  Did the license

18   agreement or the interim agreement ever discuss that subject?

19   A    I don't believe so, because it was never authorized.

20   Q    To be clear, the question of whether or not there needs to

21   be a disc in the tray for playback is a subject that is not

22   touched upon in the interim agreement that you worked upon.

23        Isn't that true?

24   A    I don't recall it being there.

25             **MR. SCOTT:**  Thank you.

PROCEEDINGS

```
 1            Nothing further, Your Honor.
 2            MR. WILLIAMS:  Nothing, Your Honor.
 3            THE COURT:  Okay.  May this witness be excused --
 4            MR. SCOTT:  Yes.
 5            THE COURT:  -- without being subject to being
 6   recalled?
 7            MR. SCOTT:  Yes, Your Honor.
 8            MR. WILLIAMS:  Yes, Your Honor.
 9            THE COURT:  You are excused, Ms. King.  But do not
10   discuss your testimony with any other persons who may be
11   witnesses until the trial is over.
12            And if you have any exhibits up there, you can just
13   leave them and the court reporter will get them.
14            THE WITNESS:  Oh, okay.  Thank you.
15            THE COURT:  Thank you.
16            (Witness excused)
17            THE COURT:  Is this a good time to take lunch?  And
18   return at 1:30?
19            Now, to sum up here, a little quickly and
20   perfunctorily, is it sort of a theme here, or theory, that the
21   contract has to say "Thou shalt not copy," and it doesn't say
22   "Thou shalt not copy"?  And then, we're relying upon
23   "unauthorized copying" in the recital over here?
24            Is that a little bit of what's going on?
25            MR. SCOTT:  Yes, Your Honor.  If I could perhaps
```

PROCEEDINGS

1  clarify from my point of view, the CSS agreement and

2  specifications are about the implementation of the CSS

3  protection.  They are not addressing the question of hard drive

4  copies by licensees, one way or another.

5          And, the -- they're dealing with a different subject,

6  which is unauthorized, non-licensee people getting digital

7  copies of the data or the keys, for distribution in the clear.

8          The -- the studios, I do understand, are contending

9  that, "Well, we can't make it -- 'we,' Real Networks, violate

10 the CSS license, although it's silent on hard drive copies, we

11 violate it unless there's express authorization for consumers

12 who buy DVDs to make copies," which they don't grant, because

13 -- and that means they claim the right to withhold or grant

14 fair use, if it's fair use.

15         So, I believe, I believe that the idea that the CSS

16 license or specifications bar copying or suggest it should not

17 be done onto hard drive by a CSS licensee is not present in

18 that agreement.  That's not what it's about.

19         **THE COURT:**  Yes.

20         **MR. WILLIAMS:**  Your Honor, if I may, I know that

21 Mr. Steer would like to be heard on this, as well.

22         It's not just the license, though.  It's -- under the

23 DMCA.  It is, our point is that under *S.O.S. v. Payday* and

24 other authorities, there has to be an express authorization in

25 order for a licensee to make such a use.

```
 1            And so, that's why we believe that in the absence of
 2    an express authorization to make a copy, it is not permissible
 3    for Real to use a license that says "You may make a player, if
 4    you follow these steps," it's not appropriate for them -- not
 5    legal for them to make a copy of it.
 6            That's the essence of our claim.  It's almost like if
 7    you had a person who's a security officer at a home, who can go
 8    into the home if he does certain steps under certain
 9    circumstances, if you've got an alarm going or something, he
10    can go inside, check the perimeter, turn off the alarm, check
11    to make sure there are no intruders, and then leave.  And if he
12    follows those steps, okay, he's doing his job.
13            But there's nothing that permits the security officer
14    to go in the home and then do all those steps, but then walk
15    out with a safe, the family's safe, out the front door.
16            Under their theory, that's perfectly okay, because
17    the --
18        THE COURT:  Aren't you better off without analogies?
19        MR. WILLIAMS:  Right.
20        THE COURT:  It's pretty clear.
21        MR. WILLIAMS:  Under their theory, they'd be okay.
22    But as a legal matter, as a legal matter, under the DMCA, if
23    you traffic in a device that circumvents, there's a violation.
24            That's the point I want to make, Your Honor.
25        THE COURT:  Okay.  And I just wanted to see if I
```

1   understood what was going on here, a little bit.

2           And I know what your position is also, right?

3           **MR. STEER:**  Well, I say at the time, Your Honor, the

4   point is there is that supervening provision, no copying.  And

5   then the agreement says you must obey --

6           **THE COURT:**  What supervening --

7           **MR. STEER:**  The introductory --

8           **THE COURT:**  The recital.

9           **MR. STEER:**  The recital to the license agreement, and

10  other provisions, as we have discussed.

11          And then it says, if you're a licensee, you have to

12  follow the specifications.  You have to adhere to them.

13          And our position is this, and that's what Dr. Kelly

14  is going to talk about.  It's like a recipe for engineers.

15  When they open those specifications, they're required to take

16  Step A, B, C, D.  And if they do that, they cannot copy.

17          **THE COURT:**  Okay.

18          **MR. STEER:**  That's what it's about.

19          **THE COURT:**  Okay.  So, there we are.

20          And after lunch, we are coming back to hear -- let's

21  see, who was it here?

22          **MR. SCOTT:**  Dr. Kelly, Your Honor.

23          **THE COURT:**  Dr. Kelly?  Dr. Kelly?  Okay, fine.

24  Thank you.

25          So, what did I say?  1:30?  Well, let's say 1:45.

PROCEEDINGS

1    What time is that?  12:30?

2              THE CLERK:  12:41.

3              THE COURT:  Okay, 1:45.

4              MR. SCOTT:  Thank you, Your Honor.

5              THE COURT:  Okay, thank you.

6              (Recess taken from 12:41 to 1:48 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2   APRIL 24, 2009                              1:48 P.M.

3

4          THE COURT:  Are you ready to call your next witness?

5          MR. WILLIAMS:  Yes, Your Honor.

6          THE COURT:  And that is?  And who is calling that

7   next witness?

8          MR. STEER:  We are calling Dr. Kelly, Your Honor, but

9   we do have to address the issue of highly confidential

10  information that I raised this morning.

11         THE COURT:  Well, how long is it going to take before

12  you get into that?

13         MR. STEER:  Not long.  I think, from the standpoint

14  of the clarity of the presentation and the narrative, it would

15  be better to address the issue in advance.  And we're prepared

16  to do that.

17         THE COURT:  Well, why don't we just order the

18  courtroom cleared, and we'll see what happens.

19         Who is in the courtroom that it's appropriate that

20  they be privy to this?

21         (Multiple people in the audience stand.)

22         MR. STEER:  The attorneys who have -- attorneys and

23  parties who have been authorized under the protective order --

24         THE COURT:  Well, there are a bunch of people

25  standing up, but I have no idea who they are.
```

1          **MR. STEER:**  Neither do I.

2          **THE COURT:**  Well, if that's going to be everybody in

3    the courtroom, why don't we just, you know --

4          **THE CLERK:**  There's a couple of reporters in the back

5    row.

6          **MR. SANDOVAL:**  Judge, my name is Greg Sandoval.  I'm

7    a reporter with cnetnews.com.  We are a division of CBS.

8          **THE COURT:**  Yes.  Well, good for you.

9          **MR. SANDOVAL:**  And we respectfully ask you to

10   consider that the Ninth Circuit has procedural and substantive

11   requirements must be met before you close the court.

12         We also would like to remind you that the MPAA, the

13   encryption, has been cracked years ago in the public domain.

14   And also remind you that the Kaleidescape trial was open to the

15   public, the entire trial, with just a couple of exhibits that

16   were sealed.

17         **THE COURT:**  Thank you.

18         **MR. LAMBERT:**  DVD CCA is prepared to address those

19   procedural issues, if you would like to hear from us.

20         **THE COURT:**  Yes, please.

21         **MR. LAMBERT:**  Your Honor, we can proceed with this in

22   two ways.  Just for the record, I'm Mark Lambert for the DVD

23   CCA.

24         We have a motion with supporting testimony from the

25   former president of the DVD CCA, Mr. John Hoy, which was

PROCEEDINGS

1   submitted in the Kaleidescape case to prevent the documents,

2   the confidential specification documents, from being unsealed

3   from nonpublic filing in that case.

4           We're prepared to submit that motion.  And I'm

5   prepared to tell you what is in the contents of that motion and

6   the contents of that declaration that addresses the core point

7   here, which is that certain documents which are -- I think you

8   have a spiral bound copy of Mr. Pak's declaration.

9           **THE COURT:**  Yes.

10          **MR. LAMBERT:**  It would be the testimony, the

11  confidential testimony from DVD CCA's standpoint, that

12  Dr. Kelly would be presenting addresses with respect to Exhibit

13  L, Exhibit M, and Exhibit N.  Exhibit O is also a confidential

14  document, but it is not the topic of Dr. Kelly's testimony.

15          These are specification documents, Your Honor, that

16  are maintained by the DVD CCA and its license administrator.

17  They are the subject of section 5.2 of the CSS license

18  agreement, which is Exhibit J to the Pak declaration, which

19  constitutes a nondisclosure agreement that every licensee must

20  sign and be bound to with respect to CSS confidential

21  information, which these documents, Exhibits L, M, and N, which

22  are the subject of Dr. Kelly's testimony, are.

23          They're labeled as confidential.  Each one has a

24  unique serial number.  There is no other source except the DVD

25  CCA, through its license administrator, to obtain these

PROCEEDINGS

1   documents.

2         These are not documents that have ever appeared on

3   the Internet.  The information that a member of the press

4   mentioned a moment ago, that did appear on the Internet, is not

5   these documents.

6         It is other information about CSS, that was hacked by

7   a user who was able, one way or another, to pry into a device

8   and obtain some information about CSS that he or she then

9   posted on the Internet.  That is not these documents.

10        These documents have never been on the Internet.

11  They are trade secrets, and they are closely guarded by the DVD

12  CCA, and not given to anybody without a nondisclosure

13  agreement, which RealNetworks, in its licensing procedure, has

14  signed.

15        So that is the foundation for the motion that I'm

16  prepared to file.  Your Honor asked for a witness.  We've been

17  able to, in the few hours before -- well, since this morning,

18  to have an officer of the DVD CCA, who is the secretary, who

19  also works with LMI, who is the license administrator, to go

20  through the points that are in Mr. Hoy's declaration, if you

21  think that indulgence is necessary.

22        But we submit there is a huge distinction, a

23  fundamental distinction, between the information and the

24  hacking code called DeCSS, that is on the Internet, and the

25  confidential official technical specifications that are in

1    documentary form, that are provided to licensees upon their

2    signing of an NDA.

3            **THE COURT:**  Do you have a copy of the motion that you

4    say you have?

5            **MR. LAMBERT:**  Yes.

6            **THE COURT:**  Was that filed or presented?

7            **MR. LAMBERT:**  We prepared this this morning, since --

8            **THE COURT:**  I see.

9            **MR. LAMBERT:**  Yes.

10           **THE COURT:**  Now, has Dr. Kelly's deposition been

11   taken?

12           **MR. STEER:**  It has, Your Honor.

13           **MR. LAMBERT:**  Here's a proposed order (indicating).

14           **THE COURT:**  Is there any reason why his deposition

15   couldn't be used, without his live testimony?

16           **MR. LAMBERT:**  Well, I think that it's very

17   important -- DVD CCA thinks it's crucially important that

18   Dr. Kelly testifies directly.  He's submitted an extensive

19   declaration.  But we think that his explanation of the

20   technology is essential to a full understanding of the

21   specifications which are a -- which are an essential and

22   critical part of the agreement.

23           **THE COURT:**  Yes.

24           **MR. STEER:**  That's right, Your Honor.

25           We didn't take his deposition.  We did submit his

1  declaration in support of our motion for a preliminary

2  injunction.  But even that is not, I think, as helpful to the

3  Court as his live testimony would be.  Of course, all of that

4  was under seal.  And the deposition was highly confidential,

5  without any dispute.

6          THE COURT:  And was there any review of the order

7  that you submitted?

8          MR. LAMBERT:  Yes.  In an unpublished opinion, in the

9  Sixth Circuit Court of Appeal upheld the lower court's

10  decision.  I have a copy of that order.

11          THE COURT:  Do you have a copy of that?

12          MR. LAMBERT:  Yes, I do.

13          I seem to have lost it in the pile of emergency

14  motion papers. Here it is, Your Honor.

15          THE COURT:  And, Mr. Cunningham, does RealNetworks

16  wish to be heard on this issue?

17          MR. SCOTT:  I would.

18          MR. CUNNINGHAM:  Yes.

19          MR. SCOTT:  Yes, we will.

20          THE COURT:  Go ahead, Mr. Scott.

21          MR. SCOTT:  Yes, Your Honor.  Perhaps I could just

22  begin with a question for Mr. Lambert, so I know where we are

23  in terms of the factual representation and factual record.

24          It's my understanding I've been hearing that the

25  technical and general specifications are not on the Internet,

 1  even though the keys and the algorithms have been for some

 2  time.

 3       **MR. LAMBERT:**  The first part is true.  None of the

 4  general specifications -- notwithstanding the debate over their

 5  status, the specifications are still confidential information

 6  under the agreement.  So for purposes of trade secrecy, the

 7  same confidentiality applies to those.

 8       With respect to the second thing that Mr. Scott says,

 9  about the keys and the algorithms being all over the Internet,

10  we don't think there's any support for saying -- there are

11  hundreds of keys.  A small number of them have been -- have

12  been disclosed on the Internet.  It is still -- the

13  technology -- even years after that, the technology has been

14  ruled by courts as an effective copy protection technology.

15       We're not disputing that -- that information has been

16  either reverse engineered or hacked out of devices that use

17  CSS, and then published on the Internet.  But to say that the

18  keys and the algorithms is a collective statement is simply not

19  accurate.

20       And there's much more information that's inside the

21  technical specifications that is not among the information

22  that's been disclosed.

23       And, Your Honor, this is critical to -- this is

24  critical to our ability to be heard on this, because our

25  argument is that section 4.2 of the agreement, which I think

1    you have seen, says you must follow the CSS specifications.

2            To understand what the licensees obligations really

3    are with respect to this technology and its implementations, a

4    full understanding of the specifications, which dictate how the

5    technology is implemented, is necessary to be presented.  And

6    we that it is essential to our ability to be heard on this

7    important issue to our client.

8            **MR. STEER:**  It's not just limited to this particular

9    study, Your Honor.

10           Dr. Bishop, RealNetworks' expert, opines at length

11   about the very same things.  Is there compliance with the

12   technical specifications?  Et cetera, et cetera.

13           So it would completely change this hearing if we were

14   not able to continue with the security -- with the certainty

15   that these things will be protected.

16           **THE COURT:**  Yes, Mr. Scott.

17           **MR. SCOTT:**  Yes, Your Honor.  Again, as

18   Mr. Cunningham said, I don't want to see anyone prejudiced.  We

19   oppose the closing of the courtroom, but not adamant, is just

20   to provide the other side of the story.

21           Two things.  One is that the California Court of

22   Appeals for the Sixth District in **DVD Copy Control Association**

23   **vs. Bunner**, B-u-n-n-e-r, 2004 116 Cal.App 4th 241, at page 255,

24   in its conclusion, was reversing a preliminary injunction.  And

25   in its conclusion I want to say acknowledged it had a limited

1   record.

2           But with that caveat, it said, and I quote,

3   Furthermore, there is a great deal of evidence to show that by

4   the time DVD CCA sought the preliminary injunction prohibiting

5   disclosure of the DeCSS program, DeCSS had been so widely

6   distributed that the CSS technology may have lost its trade

7   secret status.  There is no evidence at all to the contrary.

8   Closed quote.

9           Now, I recognize the Court acknowledges on a limited

10  record.  But that's what the Court had before it at that time,

11  speaking of CSS technology.

12          It is my understanding that the algorithms of CSS,

13  and at least some keys sufficient for getting into it, have

14  been cracked and on the Internet for a long time.

15          And as to the distinction between algorithm and keys

16  on the one hand and the CSS specs on the other, which is the

17  reason I asked Mr. Lambert the question I did, I'm looking at

18  the general specifications, which is here in Exhibit 1, you

19  already have, Your Honor, from this morning's testimony,

20  section 1.5, at page GEN4.  And section 1.5, subsection 2,

21  says --

22          **MR. LAMBERT:**  Again --

23          **MR. SCOTT:**  It's just one sentence about the

24  security.

25          **MR. LAMBERT:**  I understand that.  But I think

 1  there's -- we don't want to fall into a path of incrementalism,

 2  where some of the contents of the specs are read in open court.

 3          **MR. SCOTT:**  May I show it to the Court?

 4          **THE COURT:**  Well, we have it here, I assume, don't

 5  we?

 6          **MR. SCOTT:**  It's the first sentence, "General

 7  Specifications," which is hearing Exhibit No. 1.

 8          **THE COURT:**  You have it on yours, but we don't

 9  have --

10          **MR. LAMBERT:**  If you have Mr. Pak's spiral bound --

11          **THE COURT:**  Yes.

12          **MR. LAMBERT:**  If you take a look at Exhibit --

13          **THE COURT:**  M?

14          **MR. LAMBERT:**  Exhibit L.

15          **THE COURT:**  L.

16          **MR. LAMBERT:**  And it would be section 1.5, I think --

17          **MR. SCOTT:**  Yes.

18          **MR. LAMBERT:**  -- is what Mr. Scott is referring to.

19          **MR. SCOTT:**  There are page numbers in the center of

20  the bottom, Your Honor, that begin "GEN."  This is GEN4.

21          **THE COURT:**  Right.

22          **MR. SCOTT:**  Just the very bottom paragraph of the

23  page, the first sentence.

24          **THE COURT:**  "The security of ..."

25          **MR. SCOTT:**  "The security of ..."  That's what I'm

1   referring to.  And I don't pretend any special knowledge of

2   this.  I'm just calling that to your attention.

3        **THE COURT:**  Well, I think to some extent you know

4   that, for example, with this paragraph, that argument may be

5   overstated.

6        But I certainly understand your argument,

7   Mr. Lambert, with respect to the actual specification, those

8   kinds of things, that -- but this is more of a general

9   statement, this paragraph that Mr. Scott has referred to.

10        And to the extent that there may be some of those

11   general statements, I don't think that that necessarily would

12   be foreclosed.

13        I know you are talking about incrementalism.  But in

14   looking through a lot of what is in this Exhibit L, I would say

15   that there are a number of general statements.  And then, you

16   know, there's much else that I'm sure is in fact clearly

17   protected.

18        The question is:  Parsing out what is clearly

19   protected from what is more generalized, you know, information

20   that even though it's in a protected document, is in and of

21   itself somewhat innocuous.

22        **MR. LAMBERT:**  I understand the distinction

23   intellectually.

24        As a practical matter, Dr. Kelly will be testifying

25   about some of these general, overarching -- overarching

1    provisions of the general specifications.

2            There are some overarching, broadly stated provisions

3    in the other technical specifications as well.  But he will be

4    doing so at the same time, while he illuminates the details of

5    what a compliant system is required to do in implementing the

6    processes that are very detailed.  And which is, essentially,

7    where the rubber hits the road on whether or not the

8    RealNetworks device complies.

9            And in order for -- so, logistically, I'm not quite

10   sure how Dr. Kelly testifies in the first part of the sentence

11   about an overarching policy statement or broadly stated

12   requirement and then has a subordinating clause that

13   illuminates that in a very detailed and technical portion of

14   the document that is the secret.

15           **THE COURT:**  I will tell you what I think we need to

16   do.  And it may sort of interfere in some respects with how you

17   intended to conduct the examination.  But you're a lawyer.

18   You're supposed to figure out how to overcome those problems

19   when either the other side or the judge throws you a curve.

20   Right?

21           So I think that to the extent that there's some

22   governing principles in these documents that are sort of -- you

23   refer to them as overarching, or whatever, and I would say

24   general enough that you would expect those kinds of things to

25   be in such a document, that you examine him -- first, I assume

PROCEEDINGS

 1   you're going to examine him on his credentials and so forth,

 2   and go through that.  And there may be some other material you

 3   can -- you were going to cover with him that is nonprivileged

 4   or nonconfidential.  And then you can ask him about those

 5   overarching principles or general principles that are set forth

 6   in the document, without going into any of the details that

 7   would clearly be what the trade secret protection is all about,

 8   is for.

 9          And then we will excuse any people who are not -- you

10   know, have not signed on to a protective order and are entitled

11   to access to this, and let him testify about those overarching

12   principles and how they link up with what's in the document,

13   the specifics and details.

14          Can we do something like that?

15          MR. STEER:  Your Honor, I'm sorry, but I don't think

16   that's practical.  And I'll explain the way I have structured

17   his examination.

18          THE COURT:  I really don't -- with all due respect, I

19   don't care how you have structured it.  There are other rules

20   we have to play by, as well.

21          MR. STEER:  The point is that the great bulk of his

22   testimony has to do with the details.

23          THE COURT:  Well, then the rest -- that's what he

24   will testify to, without having other people who don't have

25   access to that in the courtroom.

```
 1              And the person who stood up, you tell me why that

 2   doesn't satisfy your purposes.

 3          MR. SANDOVAL:  Judge, all we're asking for is to make

 4   the MPAA, file a motion and so we have a chance to respond.  We

 5   don't get a chance to respond.  We don't get a chance to see if

 6   what they are saying is on the Internet or not.

 7          THE COURT:  And you may never know, right?  That's

 8   for you to figure out.  It's not for me to broadcast it to the

 9   world on their behalf, when they have a secret that they --

10   trade secret that they have kept trade secret.

11              And with respect to the Bunner case, I mean, it

12   didn't get very far, in seeing the review of the Kaleidescape

13   case.  By that time, the plaintiff had voluntarily dismissed

14   that action, apparently.  So the real issue of whether or not

15   there were secrets there apparently, you know, was not really

16   governing.  Correct?

17          MR. SCOTT:  It was not finally decided, from what I

18   have seen, Your Honor.

19          THE COURT:  Yes.  Right.  Right.

20          MR. LAMBERT:  Your Honor, it's the same six appellate

21   panel who issued the Bunner -- I think it's the same panel,

22   certainly the same court that issued the Bunner decision that

23   Mr. Scott referred to early in the decade.  And then in 2006,

24   whatever -- whatever they had decided previously, it was

25   separate from the specifications.
```

```
 1            There's -- in fact, that's profound that whatever the

 2   court was opining on, or whatever that dicta was about the

 3   limited record and what -- and sort of its feel for the case,

 4   it was distinguishable and had no impact whatsoever on keeping

 5   the documents and the contents of the documents that we're

 6   talking about here under seal, out of the public record.

 7            THE COURT:  Okay.  So what I'm going to let you do is

 8   call the witness and go forward in the manner I have described.

 9   And then when you get to the point where the matters that

10   follow thereafter are the trade secrets, the guts of the trade

11   secrets I was talking about, as opposed to some overarching

12   principles that probably nobody would be surprised about, then

13   I will exclude from the courtroom any persons who are not

14   parties to the protective order.

15            But, I mean, this is a fairly large group of people

16   who stood up.  Who are all these people?  Protective order is

17   spread pretty thin.

18            MR. LAMBERT:  Or, Your Honor, nondescript people who

19   have signed -- people who are with companies who are authorized

20   through the execution of a nondisclosure agreement.

21            But the press, at least with respect to a trade

22   secret, is -- you know, is -- we have -- there's --

23            THE COURT:  I know.  I know.

24            MR. LAMBERT:  That's a problem for us.

25            THE COURT:  That's the purpose of publishing, right?
```

1   Which is exactly the opposite of what you're trying to do with

2   a trade secret.

3          And they are legitimate trade secrets.  And I am not

4   going to try to parse out, at this point, what is a trade

5   secret and what is not, bit by bit by bit.  That's excruciating

6   detail.

7          There has been no briefing, no submissions by any

8   third parties, et cetera.  And I'm not going to hold up this

9   proceeding for that purpose.

10         I mean, this case has been set on this calendar for a

11  long time, and would be quite apparent, from any review of the

12  docket, for anybody who was interested in investigating at all,

13  that there are a lot of documents that are characterized as

14  highly confidential and have been -- have been sealed for the

15  reasons as stated in a nonconfidential document that they

16  reflect trade secrets.

17         So with that, when you get to that part of the

18  examination, you tell me, and then I will order that everybody

19  else leave the courtroom.

20         **MR. STEER:**  And that's how we'll proceed, Your Honor.

21  Thank you.

22         **THE COURT:**  Yes.

23         **MR. STEER:**  Before we do begin, I've had prepared a

24  print-out of the slides that we plan to use with Dr. Kelly.

25  And the great majority of them come from the general

```
 1   specifications and other technical specifications which are
 2   before Your Honor as exhibits to the Pak declaration.
 3            I would like to provide this to the Court because it
 4   will ease your task in following along with Dr. Kelly's
 5   testimony.  But, of course, my plan had been to show these on
 6   the video system.  And we can limit that.
 7            THE COURT:  But you don't have to.
 8            MR. STEER:  Well, actually, some of these include
 9   animations, if I may.
10            THE COURT:  Well, I've got an imagination, okay.
11   I'll try to use it.
12            MR. STEER:  I don't doubt that.  But, still --
13            THE COURT:  Oh, I see.  I have a follow-up question
14   to that?
15            MR. LAMBERT:  Your Honor, before we proceed --
16            THE COURT:  Yes.
17            MR. LAMBERT:  -- is it okay if I -- if I tell
18   Ms. Johnson, who came here in the event you needed live
19   testimony about the treatment and the handling of the
20   documents -- can she go?
21            THE COURT:  Well, let's hold on until we've got into
22   Dr. Kelly's testimony.
23            MR. LAMBERT:  Okay.
24            THE COURT:  Hold on for a little while.  We will
25   review that request a little later.
```

PROCEEDINGS

```
 1         MR. STEER:  Your Honor, later we would like to have

 2    this compilation of slides marked as an exhibit, but under

 3    seal, under highly confidential --

 4         THE COURT:  We'll figure out what do with the

 5    documents.  Let's just move forward.

 6         Is someone getting Dr. Kelly?

 7         MR. STEER:  I think Dr. Kelly is in the courtroom.

 8         THE COURT:  Okay.  Fine.  Step up here and be sworn.

 9         THE CLERK:  Raise your right hand.

10                         JOHN KELLY,

11    called as a witness for the Defendant herein, having been first

12    duly sworn, was examined and testified as follows:

13         THE WITNESS:  I do.

14         THE CLERK:  State your full name, and spell your last

15    name for the record.

16         THE WITNESS:  My name is John Kelly, K-e-l-l-y.

17         THE COURT:  You can have a seat here, please.

18         THE WITNESS:  Thank you.

19                     DIRECT EXAMINATION

20    BY MR. STEER:

21    Q.  Good afternoon, Dr. Kelly.

22         Would you please tell the Court what your -- what is your

23    current occupation?

24    A.  I am the CEO of the Kelly Technology Group in Santa

25    Barbara, California.
```

1   Q.    And what does the Kelly Technology Group do?

2   A.    We are a high-technology consulting firm.  And we consult

3   in matters of computer hardware and software.

4   Q.    Do you -- would you please summarize your educational

5   history.

6   A.    Certainly.  I was born and raised in England.  I have a

7   bachelor's and master's degree in mathematics from the

8   University of Cambridge in England.  And I have a Ph.D. in

9   computer science from UCLA.

10  Q.    And when did you obtain those degrees?

11  A.    I was at -- the bachelor's degree was in 1975.  The

12  master's degree in '77.  And Ph.D. in 1982.  Twenty-seven years

13  ago, I guess.

14  Q.    And have you taught?

15  A.    Yes.  After I finished my -- I taught as a graduate

16  student.  But I was a professor in the computer science

17  department at UCLA for four years, after I finished my Ph.D.

18  And then I transferred to UC Santa Barbara, to the electrical

19  and computer engineering department.  And I received tenure

20  there.  I left the University in 1997.

21  Q.    Is it accurate to say that you've spent your adult life in

22  high-technology?

23  A.    Yes, in terms of my professional career, certainly.

24  Q.    And have you had experience with DVD technology before

25  becoming involved in this litigation?

1   **A.**   Yes, I have.

2   **Q.**   And would you describe it, please.

3   **A.**   Yes.  I was involved in -- in analysis of DVD drives and

4   the firmware and hardware in them.  And I was also involved in

5   another project that involved the computer side of playing DVD

6   movies.  And I've done work with DVD drives as an optical

7   storage mechanism from time to time.

8   **Q.**   And you have been hired in connection with this matter to

9   act as a consultant and testifying witness by the attorneys for

10  DVD CCA, correct?

11  **A.**   That's correct.

12  **Q.**   When did you begin your assignment?

13  **A.**   Last September.

14  **Q.**   And what assignment were you given, more specifically?

15  **A.**   I was asked to examine the CSS specifications and look at

16  the RealNetworks RealDVD products, the Facet product, and the

17  Vegas product, and then determine if those products complied

18  with the specifications.

19  **Q.**   And what sorts of materials and devices have you reviewed

20  and examined in connection with your work?

21  **A.**   Well, in terms of the CSS specifications, I've looked at

22  the general specification, the procedural specification, and

23  then the more detailed module specifications, the authenticator

24  and the descrambler.  And I've also looked at the license

25  agreement.

```
 1       And, then, in terms of the RealDVD products, Facet and
 2   Vegas, I have looked at various internal documents.  And I have
 3   analyzed the source code, the actual computer source code for
 4   both of those products.
 5       I've operated the Vegas product.  That's the one that you
 6   could download onto a Windows PC.  And I have also  examined
 7   and run a prototype of the Facet product.
 8   Q.   And did you reach any conclusions from your analysis of
 9   the RealDVD products?
10   A.   Yes, I did.  And I prepared a slide to show those
11   conclusions.
12       And the first one is that the -- the CSS specifications
13   prohibit interception and copying of the content on a DVD disc,
14   including the keys required to descramble the A/V content, for
15   the purpose of playing back the movie without the presence of
16   the DVD.
17       That, I believe, is what the specifications say you cannot
18   do.  You cannot play back the movie without the presence of the
19   DVD.  And, in fact, the RealDVD products, Facet and Vegas, do
20   in indeed intercept and copy the contents of a DVD.  And they
21   do it for the purpose of playing it back without the presence
22   of the DVD disc.  And I believe that, therefore, they don't
23   comply with the CSS specifications.
24           THE COURT:  When you're using the term "CSS
25   specifications" are you referring to this whole array of
```

1   specifications you mentioned earlier, the technical, the

2   procedural and the module specifications?

3           **THE WITNESS:**  Yes, I am.  There are --

4           **THE COURT:**  And the general ones, as well, excuse me,

5   yes.

6           **THE WITNESS:**  That's correct.  I'm considering all of

7   the specifications.  There are specific parts of each

8   individual specification that -- that they don't comply with.

9   But when I say "CSS specifications" I'm thinking of all of

10  them.

11          **THE COURT:**  Now, for my information, are these

12  specifications in separate documents, like the general and then

13  the technical specifications, procedural specifications, each

14  of them is in a separate document.

15          **THE WITNESS:**  Yes, Your Honor.  There is a -- there

16  is -- each one has a set of pages with a different page

17  numbering system.  So they are separate documents.

18          **THE COURT:**  And how many such separate documents are

19  there with specifications in them?

20          **THE WITNESS:**  There are five that I reviewed.  And

21  there are four that I described a moment ago.  And there's a

22  fifth one that -- as I'll describe a little bit later on,

23  there's an authentication mechanism that occurs both on the DVD

24  drive and in the computer.  So there's a specification for each

25  one of those.

1          And I didn't mention the DVD drive specification, but

2    if you add that one in that would be a total of five that I

3    reviewed.

4          THE COURT:  Okay.  Thank you.

5          MR. STEER:  And, Your Honor, just for the Court's

6    ease of reference, again, those specifications to which Real

7    signed on are exhibits to the Pak declaration.  And, of course,

8    I showed this morning the receipt referencing the three

9    confidential packages or booklets that RealNetworks received.

10         THE COURT:  Yes, Exhibit L?

11         MR. STEER:  I think that's right.

12         THE COURT:  N, O, P, and so forth.

13         MR. STEER:  You read that.

14         THE COURT:  Okay.

15         MR. STEER:  Good.

16   BY MR. STEER:

17   Q.   So I would like to turn, then, to a basic overview of CSS.

18   And I think we can continue with this.  Before we get into the

19   details of your opinions, Doctor, can you describe for me in

20   general terms what CSS is?

21   A.   It's a -- CSS stands for Content Scramble System.  And it

22   is a system that is intended to protect the contents of a DVD

23   disc from being copied.

24         MR. STEER:  Your Honor, at this juncture, my plan was

25   to turn to Pak declaration Exhibit L, and bring back up section

1  1.2 for the general specifications.  And if the monitors can

2  simply be turned so that the public doesn't see them, we can

3  handle it the same way we did this morning.

4          **THE COURT:**  Yes.  Do you have -- Rowena, do you know

5  how to do that?

6          **THE CLERK:**  I believe I do.

7          **THE COURT:**  Try it.  What's up there now, can you

8  turn off the public display monitors.

9          **MR. STEER:**  Done.  Good.  Thank you.

10          **THE COURT:**  You've got the others up, though?  That's

11  easy.  Now the question is, can you turn on our monitors?  Now

12  can you turn that one off, the public ones off, and keep ours

13  on?  There is a way to do this somehow.

14          You did it.

15          **MR. STEER:**  Now it's done.

16          **THE COURT:**  You did it.

17          **MR. STEER:**  Good.

18          **THE COURT:**  Okay.

19  **BY MR. STEER:**

20  **Q.**  So let's talk about the purposes of CSS, Dr. Kelly.  And

21  forgive me for intruding on your control over the slides, but I

22  thought we ought to take care of that confidentiality issue

23  first.

24      Can you tell us what this first page of the general

25  specifications lays out?

1  **A.**    Sure.  This is -- this is -- this is page 1.  And you can

2  tell that because at the bottom it says, "GEN1."  And it

3  clearly states on the very first page what the objectives of

4  the DVD video Content Scramble System are.

5      Number one, to make playback of copyrighted material on a

6  DVD ROM disc possible only on devices subject to license terms

7  that protect certain rights to the copyrighted owner of that

8  material.

9      Number two, to prevent digital-to-digital copying in a

10  personal computer environment.

11  **Q.**    And can you identify the various components?

12      **MR. STEER:**    And now, Your Honor, what I had proposed

13  to turn to is a slide that is a graphic from the general

14  specifications, which I believe is highly confidential and

15  should not be publicly shared.

16      And from here on in, I think Dr. Kelly's testimony is

17  going to get into the details of implementation in a way that

18  makes it really impossible to talk about higher-level

19  principles without, you know, getting into trade secrets.

20      **THE COURT:**    And are there any other -- in any of

21  these other documents that he may be referencing, any other

22  generalized principles?

23      **MR. STEER:**    Well, we return, Your Honor, to his

24  conclusions.  But if you -- if you page through the slides that

25  I've provided, you'll see that almost all of them are diagrams

1   either from the general specifications or from the

2   authenticator module, so on and so forth.  In other words --

3           **THE COURT:**  Yes.

4           **MR. STEER:**  -- the -- the trade secrets.

5           **THE COURT:**  Yes.

6           **MR. STEER:**  There is a little bit of text here or

7   there, but, frankly, it would not make sense to skip to that

8   text and then come back to this, in my opinion, because it

9   would not be as illuminating as I would hope and as I'd like it

10  to be.

11          **THE COURT:**  I can understand that.  And I can follow

12  along.  But I think, for example, as I look through this -- and

13  I'm using it as a guide without having, you know, the benefit

14  of hindsight, but, for example, I know it's taking it out of

15  order but perhaps with respect to what's on page 18 he can

16  testify as to the general purposes of, et cetera.  And then

17  maybe there's some more general.  He probably knows even

18  better.  These are his slides.

19          Well, in this page 19, they are a summary of

20  conclusions.  For example, page 26, 27, which looks very much

21  like the earlier page I saw, and --

22          **MR. STEER:**  Well, in fact, Your Honor --

23          **THE COURT:**  Those kinds of things, if he can testify

24  to those general matters, and then we can get back to plugging

25  in the actual specifications.

1          **MR. STEER:**  He can do that.  And I'll ask him some

2     questions about those particular graphics.  But it takes them

3     out of sequence.

4          **THE COURT:**  I understand that.

5          **MR. STEER:**  And we'll have to return to that.

6          **THE COURT:**  I understand that.  Very quickly.  There

7     isn't that much, I think.

8          **MR. STEER:**  Right.

9     BY MR. STEER:

10    **Q.**  So, Dr. Kelly, can you turn to what we had identified as

11    slide number 18, which talks about the purposes of bus

12    authentication and bus decryption, please.

13         And maybe you should stay on the nonpublic version of

14    this, if possible.

15    **A.**  If I may, I would like to ask the video operator to do

16    that.  I can page through them, but then I'll have to display

17    the intermediate slides.

18    **Q.**  Right.  That's good.  Thank you.

19         First of all, if you wouldn't mind just explaining briefly

20    what bus authentication and bus decryption are.

21    **A.**  The DVD data is read from the DVD disc by a drive, by a

22    DVD drive.  And then that drive transfers the information to

23    the computer.  And there is -- there is a -- two processes that

24    are used to make that transfer more secure.  They're called bus

25    authentication and bus decryption.

1      And bus authentication, the basic idea is that the drive

2    and the computer exchange some handshakes to say that they

3    understand that each one is ready to proceed and knows what

4    they're doing.

5      And then bus decryption, basically, the idea there is that

6    now that these two devices are communicating, they can add a

7    layer of encryption on the bus.  And that's called "bus

8    encryption" at the drive, and "bus decryption" at the computer

9    side.

10      And that's basically what they are.  I can explain the

11   details a little bit later.

12            THE COURT:  Yes.  Thank you.

13            MR. STEER:  Well, going on to what I think is the

14   next logical slide that can be discussed publicly, it's number

15   26.  Your Honor, if you think there's something else you would

16   like to hear about that meets the -- you know, that can be

17   disclosed or, in your view, may be --

18            THE COURT:  No, I think that's fine.

19            MR. STEER:  We'll go on to number 26.

20   BY MR. STEER:

21   Q.   And, Dr. Kelly, if you wouldn't mind explaining what

22   that's all about.

23   A.   Sure.  The -- we just -- I just mentioned that the --

24   there is this authentication and bus encryption/decryption

25   process between the DVD drive and the computer.  And the piece

1   that does this in the computer is called the "authenticator."

2   And it's in something called the "CSS decryption module."  And

3   the section 6.2.3 in the procedural specification says that the

4   authenticator in a CSS decryption module shall correctly engage

5   in and complete the authentication process with the DVD drives,

6   and ensure that the CSS keys are received by the descrambler

7   only if the authentication process is successful.

8        So the descrambler, which is actually going to make sense

9   out of these keys and descramble the movie, should only get the

10  keys that it needs to do that job after the authenticator has

11  engaged in and completed the authentication process.

12          **THE COURT:**  In your parlance, what is the difference

13  between scrambling and encrypting or, you know, descrambling

14  and decrypting?

15          **THE WITNESS:**  In terms of the algorithms that are

16  used, in terms of the actual steps and the way that the keys

17  are used, actually, there's not that much difference.

18          And so we talk about scrambling and descrambling the

19  audio/video content, and we talk about encrypting and

20  decrypting the keys.

21          But, in reality, the operations are very similar.

22          **MR. STEER:**  Your Honor, if I turn to slide 36 in the

23  packet that you have, it's all about Vegas and Facet, and what

24  they do that violates the CSS agreement, and how they -- the

25  things they fail to do, that they should do in order to comply

 1   with it.

 2           And I'm happy to have Dr. Kelly state those

 3   conclusions, but we'll come back to it as we go through an

 4   explanation.

 5           **THE COURT:**  We'll to the conclusions later on.

 6           **MR. STEER:**  We'll get to the conclusions later.  So I

 7   don't know how helpful it would be to anybody to have these

 8   conclusions stated now.

 9           **THE COURT:**  And --

10           **MR. STEER:**  Before the conclusions you'll see a slide

11   that says, "Demonstration of Vegas."  And we had intended to

12   show you the actual operation.

13           **THE COURT:**  Okay.  Should I assume that what is on

14   page 33 -- I mean, certainly, what you refer to, page 33, 34,

15   and 36, probably fall in the category of documents I was

16   talking about before.  But, but, at least the last two of those

17   tend to be more the conclusions that are more appropriate at

18   the end of Dr. Kelly's testimony.

19           Is there any reason why page 33 -- is that a problem?

20   It's pretty much what he has already testified to.  A great

21   deal of that anyway, I think.

22           **MR. STEER:**  No, I think we can disclose that

23   information without much risk.

24           Page 34, as you know, is simply a repeat of the two

25   conclusions that he's already testified to.

1          **THE COURT:**  Yes.  Right.  I saw that.

2          **MR. STEER:**  And that's just because it was a logical

3  thing to state at that point in his testimony.

4          **THE COURT:**  The end.

5          **MR. STEER:**  Not quite the end.  The demo comes just

6  before the end.  Spice it up a little bit.

7  **BY MR. STEER:**

8  **Q.**    So, Dr. Kelly, turning to page 33, or slide 33, which is

9  entitled, "Protections CSS Provides for Encrypted Data," it

10  lists some examples.

11         And if you would explain those principles to the Court, in

12  as general terms as possible, I would appreciate it.

13  **A.**    Certainly.

14         The first example is that the various keys that -- some of

15  the keys that we've been talking about are stored on the DVD

16  disc itself.  They're stored in encrypted form.  But they're

17  also stored in hidden areas of the disc.  That's the first

18  point.

19         The second point is that the -- as I mentioned, there

20  are -- keys are transferred from the DVD drive to the computer.

21  And they're transferred in not only their encrypted form but

22  also with this further level of encryption called bus

23  encryption.  And, again, we'll, I hope, talk about the details

24  a little bit.

25         And then the last bullet point discusses the fact that

1    when the computer receives the bus encrypted title keys, it

2    removes the bus encryption.  It decrypts that part.  But what

3    remains is still an encrypted key.  And it sends that encrypted

4    key directly to the descrambler, without it appearing on a user

5    accessible bus.  That's what the specifications called for.

6            **THE COURT:**  Okay.

7            **MR. STEER:**  With that, Your Honor, I think the rest

8    of Dr. Kelly's testimony really does get into details of trade

9    secrets.

10           **THE COURT:**  That's what I can see.  First of all, for

11    the record, it should be clear that by allowing this testimony,

12    even though a couple of the areas of his testimony get into the

13    language of the document that we've been referring to as

14    containing the trade secrets, that that does not -- because it

15    was under order of the Court, it does not constitute a waiver

16    with respect to what is contained, you know, in that document

17    or any reference documents that do contain trade secrets.

18           I'm satisfied that what is now being pursued, about

19    to be pursued, does, in fact, meet the requirement for trade

20    secrets, absent some further showing by someone that, in fact,

21    there has been some disclosure that's something other than

22    inadvertent or the result of hacking or unlawful access, and

23    that proceeding in the manner in which we are proceeding is

24    sufficiently narrowly tailored to meet the requirements and

25    protect what needs to be protected.  And without that

1   protection, then, the meaning of "trade secrets" is essentially

2   meaningless.  So -- and there would be undue prejudice.

3        So with that, unless there is something further from

4   one of the parties, I'm going to order that anybody who is

5   not -- has not signed off on a disclosure, nondisclosure

6   agreement or confidentiality agreement with respect to these

7   matters, is ordered to leave the court.  So you know who you

8   are.

9        And then I think it's up to the parties to determine

10  whether there are other persons remaining in the court who

11  should be ordered to leave the court.

12       Do you know?  We still have a large number of people

13  in the court.  Is somebody taking a look around?  Okay.

14       Rowena, do you have a sign you can put on the door,

15  something to make sure people don't come in?  I'll keep an eye,

16  but you need to keep an eye also.

17       Yes, sir.  You're Mr. Lambert.

18       **MR. LAMBERT:**  Yes.  I was wondering if I could excuse

19  Ms. Johnson who has to travel down to the South Bay.

20       **THE COURT:**  I think so.  Does anyone know of any

21  reason why she needs to remain behind?

22       **MR. SCOTT:**  No objection, Your Honor.

23       **THE COURT:**  I just wanted to get this clarified on

24  the record.  And I'm sure I'll hear about it later.

25       **MR. LAMBERT:**  Thank you, Your Honor.

1              **THE COURT:**  Okay.  Thank you.  It's better than --

2    this is off the record.

3              (Discussion held off the record.)

4              (Pages 162 through 249 filed under seal.  Nothing

5              omitted.  Nothing deleted.  Please see next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1            (Nothing omitted.  Nothing deleted.)

2            //

3            //

4            //

5            //

6            //

7            //

8            //

9            //

10           //

11           //

12           //

13           //

14           //

15           //

16           //

17           //

18           //

19           //

20           //

21           //

22           //

23      **MR. SCOTT:**  Nothing further, Your Honor.

24      **THE COURT:**  Okay.

25      **MR. SINGLA:**  If I could just follow up.

1           THE COURT:  That's it.

2           MR. SINGLA:  Thank you, Your Honor.

3           THE COURT:  That's it.  That's it.  The tennis match

4   stops, you know.  And we have rules for when the tennis match

5   stops, and just doesn't keep going on.  Not state court.  I'm

6   sorry.  Thank you.

7           (Laughter)

8           But I was one of those, and I saw these practices of

9   jumping up for just one more question.  That's it.

10          Now, does Dr. Kelly need to be subject to being

11  recalled?

12          MR. SCOTT:  No, Your Honor.

13          MR. STEER:  No, Your Honor.

14          THE COURT:  So you are excused, but do not discuss

15  your testimony with any other persons who may be witnesses --

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  -- until the proceeding is over.

18          Thank you.

19          THE WITNESS:  Thank you.

20          THE COURT:  And we resume here on Tuesday.

21          MR. STEER:  Yes.

22          MR. SCOTT:  Yes.

23          THE COURT:  At 9:30, with Mr. or Dr. Schumann?

24          MR. SINGLA:  Yes, Your Honor, with Mr. Schumann.  But

25  we may -- and we told RealNetworks this.  We may start with

PROCEEDINGS

```
 1  Mr. Hollar.  He is available on Tuesday.

 2           MR. SCOTT:  We have no objections.

 3           MR. SINGLA:  We may start with Mr. Hollar and then go

 4  to Mr. Schumann.

 5           THE COURT:  And that's going to be the end of your

 6  witnesses.

 7           MR. SINGLA:  That will be the end of our live

 8  witnesses, yes, Your Honor.

 9           THE COURT:  Live witnesses.  Okay.

10           And will we get to your witnesses then, at least one

11  of them, on Tuesday, one or more?

12           MR. SCOTT:  We will be ready.  Whether we get passed

13  the baton, I can't speak to.

14           THE COURT:  You will have at least one here, or more,

15  so we can go?

16           MR. SCOTT:  Absolutely.

17           THE COURT:  I don't know how long they are going to

18  take.

19           You're going to give them your list of witnesses.

20  How many witnesses do you plan to call, live witnesses?

21           MR. SCOTT:  It's a discussion I haven't had with

22  folks yet, to nail it down.

23           THE COURT:  What's the hurry?

24           MR. SCOTT:  Five or -- you know, five or six.  I'd

25  like to reduce that, but five or six.
```

```
 1              THE COURT:  Okay.

 2              So you anticipate we'll finish up with all of that by

 3   Wednesday?

 4              MR. SCOTT:  No, I don't.

 5              THE COURT:  No?

 6              MR. SCOTT:  I hope so, but I don't -- video is going

 7   to take quite a while, I guess.  We'll see.

 8              THE COURT:  What is the video?  Is that a witness

 9   or --

10              MR. SCOTT:  The defendants' video depositions will

11   take time.

12              THE COURT:  How many of those are there?

13              MR. SINGLA:  Well, Your Honor, what we would like to

14   do is take the weekend, given how much time this has taken, and

15   try to see if we can pare all the video down and just show the

16   Court the little bits that we think are worth showing you.

17              THE COURT:  Yes.  And I can spend my evening hours, I

18   guess, with nothing better to do, instead of watching protected

19   content.

20              (Laughter)

21              MR. SINGLA:  Your Honor --

22              THE COURT:  We'll have to watch stuff that should be

23   protected.

24              (Laughter)

25              MR. SINGLA:  Your Honor, if I can make sure I
```

PROCEEDINGS

 1  understand what the Court is suggesting.

 2          One thought we had was maybe we could take some of

 3  the video and provide it to the Court on a DVD or something,

 4  non-CSS DVD.

 5          **THE COURT:**  Yes, absolutely.  Okay.  So then --

 6          **MR. WILLIAMS:**  Your Honor.

 7          **THE COURT:**  Anything else?

 8          **MR. WILLIAMS:**  I just wanted to raise the issue with

 9  respect to time.  I've talked with Mr. Scott about prospects

10  for closing.  I think it's the expectation of both parties we

11  would like to do some closing.  The prospects for doing that on

12  Wednesday seem a little --

13          **THE COURT:**  Probably dim.

14          **MR. WILLIAMS:**  -- a little dim.  So we were going to

15  talk about schedules, and so forth, after that.

16          **THE COURT:**  Okay.  Fine.

17          **MR. WILLIAMS:**  I just wanted -- the Court does intend

18  to hear some closing from the parties?

19          **THE COURT:**  Yes.  I said I prefer not to hear any

20  opening, but I'll hear closing.  So maybe I'll take some of the

21  closing out of the amount of opening.  But we'll figure that

22  out.  At least when it's a bench trial it's easier to maneuver

23  all of that.

24          So we will see you, then, on Tuesday morning.

25          **MR. SCOTT:**  Thank you, Your Honor.

1          **MR. WILLIAMS:**  Thank you, Your Honor.

2          (Counsel thank the Court.)

3          **THE COURT:**  Have a good weekend.

4          (Discussion held off the record.)

5          (At 5:25 p.m. the proceedings were adjourned until

6          Tuesday, April 28, 2009, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                **I N D E X**

2  Opening Statement by Mr. Williams                15        1
   Opening Statement by Mr. Steer                   34        1
3  Opening Statement by Mr. Cunningham              47        1
   Opening Statement by Mr. Scott                   55        1

4

5  **DEFENDANTS' WITNESSES**                        **PAGE**   **VOL.**

6  **KING, MARSHA K.**
   (SWORN)                                          70        1
7  Direct Examination by Mr. Williams               70        1
   Cross Examination by Mr. Scott                   101       1
8  Redirect Examination by Mr. Williams             118       1
   Recross Examination Resumed by Mr. Scott         123       1

9

10 **KELLY, JOHN**
   (SWORN)                                          146       1
11 Direct Examination by Mr. Steer                  146       1
   Cross Examination by Mr. Scott                   195       1
12 Redirect Examination by Mr. Steer                240       1
   Direct Examination by Mr. Singla                 245       1
13 Cross Examination by Mr. Scott                   247       1

14

15

16

17

18

19

20

21

22

23

24

25

## E X H I B I T S

| JOINT EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1 | | | 84 | 1 |
| 7 | | | 100 | 1 |

1

2                    **CERTIFICATE OF REPORTERS**

3          We, KATHERINE POWELL SULLIVAN and BELLE BALL, Official

4    Reporters for the United States Court, Northern District of

5    California, hereby certify that the foregoing proceedings in

6    08-4548 and 08-4719, RealNetworks, Inc., et al. vs. DVD Company

7    Control Association, Inc., et al. were reported by us,

8    certified shorthand reporters, and were thereafter transcribed

9    under our direction into typewriting; that the foregoing is a

10   full, complete and true record of said proceedings as bound by

11   us at the time of filing.

12

13                    s/b Katherine Powell Sullivan

14       _____

         Katherine Powell Sullivan, CSR #5812, RPR, CRR
15                    U.S. Court Reporter

16

17                         s/b Belle Ball

18       _____

         Belle Ball, CSR #8785, RPR, CRR
19                    U.S. Court Reporter

20

21                    Saturday, April 25, 2009

22

23

24

25

*Katherine Sullivan, CSR, CRR and Belle Ball, CSR, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*