Volume 4

Pages 852 - 1203

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

REALNETWORKS, INC., a          )
Washington Corporation; et     )
al.,                           )
                               )
        Plaintiffs and         )
        Counter-Defendants,    )
                               )
     v.                        )   No. C 08-4548 MHP
                               )       C 08-4719 MHP
DVD COPY CONTROL ASSOCIATION,  )
INC., a Delaware nonprofit     )
corporation; et al.,           )
                               )
        Defendants and         )
        Counter-Complainants.  )
_____)   San Francisco, California
                                   Thursday, May 7, 2009


TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs/**          WILSON SONSINI GOODRICH & ROSATI
**Counter-Defendants:**      650 Page Mill Road
                             Palo Alto, California  94304-1050
                    BY:  **LEO P. CUNNINGHAM, ESQUIRE**
                         **COLLEEN BAL, ESQUIRE**
                         **MICHAEL A. BERTA, ESQUIRE**



(Appearances continued on next page)

**Reported By:**             KATHERINE SULLIVAN, CSR, RPR, CRR
                             BELLE BALL, CSR, RMR, CRR
                             OFFICIAL REPORTERS

Dockets.Justia.com

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Plaintiffs/**<br>**Counter-Defendants:** | BARTLIT BECK HERMAN PALENCHAR & SCOTT<br>1899 Wynkoop Street, 8th Floor<br>Denver, Colorado  80202<br>BY: **DONALD E. SCOTT, ESQUIRE** |

BARTLIT BECK HERMAN PALENCHAR & SCOTT
54 West Hubbard Street
Chicago, Illinois  60610
BY: **MARK S. OUWELEEN, ESQUIRE**

**For Studio Defendants/**          MUNGER, TOLLES & OLSON
**Counter-Complainants:**          560 Mission Street, 27th Floor
San Francisco, California  94105-2907
BY: **BART WILLIAMS, ESQUIRE**
**ROHIT K. SINGLA, ESQUIRE**
**ASHLEY AULL, ESQUIRE**

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
BY: **KELLY M. KLAUS, ESQUIRE**

**For Defendant/**          AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**Counter-Complainant**          580 California Street, Suite 1500
**DVD CAA:**          San Francisco, California  94104-1036
BY: **REGINALD D. STEER, ESQUIRE**

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
2029 Century Park East, Suite 2400
Los Angeles, California  90067-3012
BY: **STEPHEN R. MICK, ESQUIRE**

WHITE & CASE LLP
3000 El Camino Real
Five Palo Alto Square, 9th Floor
Palo Alto, California  94306
BY: **MARK F. LAMBERT, ESQUIRE**

# P R O C E E D I N G S

**MAY 7, 2009**                                                                9:36 A.M.

       **THE COURT:**  We have everyone's appearances already on
the record.  So, if we're ready to start with the next witness
who is going to be called?

       **MR. WILLIAMS:**  Your Honor, I had one matter I wanted
to raise, if I may, before we begin.

       **THE COURT:**  Really?

       **MR. WILLIAMS:**  It is very brief.

       **THE COURT:**  Yes, what is it?  Is this trip necessary?

       **MR. WILLIAMS:**  Your Honor, it has to do with one of
the witnesses that's going to be called today by RealNetworks.
It's Mr. James Bielman.

       We noticed, actually yesterday, in really getting
ready for the cross-examination, that there are really only a
total of seven e-mails, distinct e-mails produced, that were
from Mr. Bielman; 18 overall, if you include the copies.

       And we simply wanted to get a representation from
Real that they have, in fact, done searches for all of the
search terms that were provided in November of 2008 and in
January of 2009, for Mr. Bielman.

       Because we suspect that, perhaps inadvertently, they
only did searches for Mr. Bielman relating to search terms from
January of 2009, and not from the earlier search terms, because

PROCEEDINGS

```
 1  Mr. Bielman is the person who is responsible for developing the
 2  ARccOS or antiARccOS effort for RealNetworks, and yet there are
 3  only these very few e-mails.
 4          THE COURT:  Well, have you talked to the other side?
 5          MR. WILLIAMS:  We asked them to confirm, but we
 6  didn't do it until last night.  And we were told that we would
 7  get a response, but we have not yet received a response.
 8          THE COURT:  Did you ask them this morning?  You were
 9  all here before I came out.
10          MR. WILLIAMS:  No, Your Honor.
11          THE COURT:  Well, you should do that.
12          And what is your answer?
13          MR. CUNNINGHAM:  Yes.  The answer, Your Honor, is
14  they've got it exactly right with respect to Mr. Bielman.  The
15  November searches were not run, not for any reason other than
16  Mr. Bielman wasn't added until after that.  So, we, the
17  lawyers, haven't had the documents from November.  But into the
18  wee hours of last night, as usual, in response we've been in
19  touch with our outside vendor, up in Seattle, who has the
20  database and is running -- probably now has run those search
21  terms.  And there are people back at the office who will take
22  the results.  And if there are additional documents, they'll be
23  provided as quickly as we can.
24          THE COURT:  So someone is going to get a vibration on
25  their cell phone that will tell them they need to run out and
```

1   check and see what's going to -- what the result is?

2          MR. CUNNINGHAM:  Yes.

3          THE COURT:  So, as we speak, Mr. Williams, okay,

4   there is your answer.

5          MR. WILLIAMS:  Thank you, Your Honor.

6          We'll get them and review them as soon as we can.  It

7   will be difficult for us to do the cross-examination, okay,

8   obviously until we get them.

9          THE COURT:  Fortunately, it's a bench trial.  So

10  there are ways of handling that, I suppose.

11         MR. WILLIAMS:  Right.

12         MR. CUNNINGHAM:  Could I raise a housekeeping issue?

13         THE COURT:  You mentioned a dirty word.  How about

14  "administrative matters"?

15         MR. CUNNINGHAM:  Thank you.

16         THE COURT:  Yes.  What is it?

17         MR. CUNNINGHAM:  The Court invited us to submit

18  proposed findings of fact and conclusions of law by tomorrow.

19  There's been some discussion, but -- whereby I think we all are

20  asking for some additional time.  We would like to submit them,

21  if we can, a week from tomorrow.  We've got lawyers

22  scattering -- it will be really hard to do by tomorrow.  Then

23  we have the lawyers scattered at the beginning of next week.

24         THE COURT:  Okay.  Fine.  Is that agreeable with

25  everyone?

PROCEEDINGS

1           MR. STEER:  It's agreeable, Your Honor.

2           MR. LAMBERT:  Agreeable.

3           THE COURT:  We are ready to start with our first

4    witness.  Who is that?

5           MR. BERTA:  Your Honor, Mr. Dixon.

6           THE COURT:  If you would step up here, Mr. Dixon, and

7    be sworn please.

8                        **DOUGLAS DIXON**,

9    called as a witness for the Plaintiffs herein, having been

10   first duly sworn, was examined and testified as follows:

11          THE WITNESS:  I do.

12          THE CLERK:  State your full name and spell your last

13   name for the record.

14          THE WITNESS:  Douglas Fremont Dixon.  D-i-x-o-n.

15          THE COURT:  Have a seat right here, please.

16          MR. BERTA:  Your Honor, I'll hand the witness a copy

17   of his transcript and his reports if they become necessary.

18          THE COURT:  Yes.

19          MR. BERTA:  Would the Court want a copy of his expert

20   reports, at this time?

21          THE COURT:  Yes.  Also, if the deposition is going to

22   be used at all, or referenced, probably -- usually that's in

23   cross-examination -- but if there is a copy of it, that will be

24   helpful to have.

25          MR. BERTA:  There is, Your Honor.

PROCEEDINGS

```
 1              THE COURT:  Is that an extra copy we can have?
 2              MR. BERTA:  It is.  Thank you.
 3              THE COURT:  Thank you.
 4         You may proceed.
 5              MR. BERTA:  Thank you, Your Honor.
 6                        DIRECT EXAMINATION
 7    BY MR. BERTA:
 8    Q.   Thanks for coming.
 9              Can you go ahead and just state your name for the
10    record, please.
11    A.   Douglas Dixon.
12    Q.   Mr. Dixon, at a high level, can you just give the Court an
13    idea of the subject of your testimony here today?
14    A.   I'll be talking about ARccOS and RipGuard and how they're
15    applied to DVDs.
16    Q.   Before we get started, can you give us a brief summary of
17    your educational background?
18    A.   I graduated in 1977, from Brown University, with a
19    bachelor's and a master's in computer science.
20    Q.   In computer science?
21    A.   In computer science.
22    Q.   Okay.  And since you graduated in 1977, has your work
23    history included any work with respect to digital media or DVD
24    technology?
25    A.   Yes.
```

DIXON - DIRECT EXAMINATION / BERTA

1  Q.   Can you give us a summary of some of the work that you

2  have done in those fields?

3  A.   Yes.  I started at RCA Laboratories, in Princeton,

4  New Jersey, which at the time was a central research facility

5  of RCA Corporation.  And I worked there for ten years, until

6  1988 or so.

7        The major project there was developing a digital

8  media technology called DVI, which actually put video on CDs.

9  So this was a decade ahead of DVD.

10  Q.   Okay.  And, after 1988, I think you said, what did you do

11  next, with respect to digital media or DVD technology, if

12  anything?

13  A.   Well, we took that technology, and it was acquired by

14  Intel Corporation.  And, so, the technology and the team moved

15  to Intel Corporation.

16        So I worked with Intel at -- in Princeton still, for

17  five years, taking that technology, turning it into products,

18  and co-marketing, co-developing those products with IBM.

19  Q.   The digital media products you were working on, did they

20  end up being commercialized?

21  A.   Yes.

22  Q.   What were they?

23  A.   The general product was called DVI, which stood for

24  "digital video interactive."

25  Q.   After you were at Intel for some amount of time, did you

1  continue doing work in the fields of digital media or DVD

2  technology?

3  **A.**   Yes.  I then moved back to the former RCA labs, which by

4  then, itself, had spun out as a separate research and

5  development company.  And I was there for another ten years,

6  until around 2003, developing a whole series of digital media

7  products -- projects, taking technology and turning them into

8  products, and then spinning them out to outside companies in

9  some cases.

10  **Q.**   During your time there, what kind of products did you work

11  on?

12  **A.**   Well, two examples are a product called VideoBrush, which

13  we actually licensed to companies, including Sony and Toshiba,

14  so that software was shipped with Sony digital cameras and

15  Toshiba laptops.

16          Then in 1999-2000, we worked on a project called Life

17  Clips, which was a very early project related to DVD.  And we

18  actually had technology that took consumer videotapes and

19  turned them into DVDs automatically, without human

20  intervention.

21  **Q.**   At your time at Sarnoff, which I guess had been RCA labs,

22  what was your title during that time?  What was your role on

23  those projects?

24  **A.**   Yes.  I was -- well, at Intel and then at Sarnoff, I was a

25  group leader.  I was a project manager for some of these

1   projects.  And I was a product manager, as well, in charge of

2   taking that product and bringing it to the market.

3   **Q.**   Did you get into the nitty-gritty of, you know, source

4   code writing, and stuff like that, at the time you were working

5   on these sorts of projects?

6   **A.**   Yes.  I began as a software developer.  I developed the

7   original software for the DVI technology.

8   **Q.**   So, aside from your work with Intel and RCA labs, and then

9   Sarnoff, have you had other professional experience in the

10  field of digital media or DVD technology?

11  **A.**   Yes.  After leaving Sarnoff in 2003, I became an

12  independent consultant/writer/editor and speaker in digital

13  media, and specifically in DVD.

14  **Q.**   What kind of companies have you provided consulting advice

15  or training services to?

16  **A.**   I've consulted to companies, including Adobe, and Intel,

17  and Sony, and Siemens, Sonic Solutions, and also NBC Universal,

18  among others.

19  **Q.**   Did these consulting gigs involves DVD technology or

20  digital media technology?

21  **A.**   Both, yes.

22  **Q.**   Have you done any writing in the field of DVD technology

23  or digital media technology?

24  **A.**   Yes.  Actually, beginning in 1999, I began writing

25  articles for general population.  Before that, with each major

1  project I worked on, I published technical papers.  So I've

2  published in the major journal in computer science.  I've

3  spoken at the major conference in computer graphics.

4          But, in '99, I started writing general articles.  So,

5  I've published about 250 articles concerning digital media and

6  DVD.

7          I've reviewed products.  I've talked to executives

8  and product managers.  I've explained new technology and new

9  developments in the field.

10 **Q.**   Sorry.  Besides the articles have you written any books on

11 DVD technology?

12 **A.**   Yes.  So, I've written four books.  I published four

13 books, two of which are specifically about DVD.

14          And I've also -- as part of all of this, I've also

15 done a lot of speaking and training and seminars in digital

16 media and DVD.

17          I've presented approximately a hundred talks and

18 seminars, including seminars specifically on DVD at national

19 conferences.

20 **Q.**   Setting aside the consulting work and the general

21 publication, for the last three years what have you been

22 engaged in doing, as well?

23 **A.**   Yes.  So, in addition to writing articles, for the past

24 three years I've been editor-in-chief of a magazine called

25 *Mediaware*.  And *Mediaware* is a trade magazine published for --

```
 1  in general, for the content and delivery industry.
 2  Q.   Okay.   What is the -- what is that industry?
 3  A.   The magazine is published by a trade association called
 4  CDSA, the Content Delivery and Storage Association.   We have a
 5  slide on that.
 6           (Document displayed.)
 7  Q.   Okay.   There's your slides.
 8  A.   One more.
 9  Q.   And these are slides you prepared?
10  A.   Yes.
11  Q.   Is this the one to which you were referring?
12  A.   Yes.   So, CDSA is a trade association which represents the
13  industries that have to do with creating content, getting it to
14  the market.
15           And, so, it has a number of -- it's -- a number of
16  its members are from the content industry.   So, that includes
17  the MPAAA, RIA, and content companies like Sony Pictures, and
18  NBC Universal, and Walt Disney, et cetera, as well as
19  Macrovision and Sony DADC, and then a large variety of other
20  companies having to do with manufacturing content, getting it
21  to the market, and storing content.
22  Q.   What kind of person is the intended person that's the
23  audience for Mediaware?
24  A.   Mediaware is published for executives in these industries.
25  And it carries stories about trends and new developments and
```

1   new products in these industries.

2   **Q.**   In your work with *Mediaware*, or in your other

3   article-writing and publishing, have you had the opportunity to

4   work with any of the executives of the studio defendants in

5   this case?

6   **A.**   Yes.  So, I've worked with, and my writers have worked

7   with, many of these companies.  We've interviewed them for

8   articles.  We've done cover stories and interviewed about major

9   developments in these industries.

10          And we've written about new developments, new

11  products, new technologies that they've been introducing to the

12  market.  So, I've talked to these people definitely.

13  **Q.**   So, at least before this case, you would say you had

14  cordial relations with the studio executives?

15  **A.**   Oh, yes.  Yes, of course.

16  **Q.**   Let me ask you something else.  Before you became involved

17  in this case, did you have any familiarity with this ARccOS

18  product that is marketed by Sony DADC?

19  **A.**   Oh, yes, yes.  I've worked with Sony DADC a lot with the

20  magazine.  We've interviewed their executives.  We've had them

21  on the cover.  We've covered new developments and new products,

22  new packaging, and things like that, they've done in their

23  business.

24          I've actually visited the major Sony DADC plant in

25  Terra Haute, Indiana.  I actually did an interview with them

1  early in the introduction of ARccOS, when they were publicizing

2  ARccOS.  So, I was certainly aware of it as a product and part

3  of their product line.

4  **Q.**   What about with respect to Macrovision, which puts out

5  this RipGuard product, were you aware of that product before

6  you became involved in agreeing to testify in this litigation?

7  **A.**   Yes.  The situation was very similar with Macrovision.

8  I've met with their executives at conferences both in this

9  country and overseas.

10         We've covered their general product line, new

11  products they've introduced.  Therefore, I was aware of

12  RipGuard as part of that.

13  **Q.**   Now, do you have some conclusions that you've reached over

14  the course of this litigation, with respect to those ARccOS and

15  RipGuard products?

16  **A.**   Yes.

17  **Q.**   What are they?

18  **A.**   That's shown on the next slide.

19  **Q.**   Okay.  What is the summary of your opinions that you're

20  addressing here today?

21         (Document displayed.)

22  **A.**   Well, there are three basic opinions here, that flow from

23  these products.

24         The fundamental opinion is that ARccOS and RipGuard

25  actually do not protect movie content.  You can actually get at

1  movie content without even noticing they're there.

2          The reason that that's true is that these products

3  are explicitly designed to not interfere with playback, so that

4  if you follow the DVD-video specification, you play through the

5  disc like a DVD player, you have total and complete access to

6  the content on the disc.

7          And the result of that, that's a result of the fact

8  that these products cannot block playback.  That's the whole

9  promise, they can't block playback.  And, therefore, they

10 cannot and do not block copying if you access discs in the

11 standard manner through the DVD specification.

12 Q.   In the course of this litigation, what kind of documents

13 or testimony, or other things, if any, have you been able to

14 review in order to reach the conclusions that you've expressed?

15 A.   I've reviewed materials from the studio defendants.  I've

16 reviewed materials from some of their experts, including

17 Mr. Hollar and Mr. Schumann and Mr. Kelly.  I've reviewed some

18 materials from RealNetworks, as well.

19 Q.   So we've heard from Mr. Schumann and Mr. Kelly.  Who is

20 Mr. Hollar?

21 A.   Oh, I'm sorry.  Mr. Hollar is the product manager at

22 Macrovision, for their RipGuard product.

23 Q.   Besides the testimony of those individuals and those

24 documents, is there any other outside references that you have

25 reviewed in the course of coming to your conclusions here?

1  **A.**   Oh, yes.  There's the DVD-video specification.  And

2  there's also general information about DVD.  In particular,

3  there's a book called *DVD Demystified*, demystified, which is

4  regarded as the bible of the DVD industry.

5         There's all kinds of gory technical detail about the

6  DVD format, as well as information about how it came to be and

7  how it's intended to be used.

8         The book is written by a gentleman named Jim Taylor,

9  who's regarded as the premiere technical resource in DVD.  He

10 works for a company called Sonic Solutions, which provides DVD

11 technology across the industry.  The book is now in its third

12 edition.

13 **Q.**   And Sonic Solutions, is that one of the companies that you

14 did some consulting for?

15 **A.**   Yes.

16 **Q.**   So I have a couple of follow-up questions on what you said

17 there.  First, you referenced something called the DVD-video

18 specifications.  What are those?

19 **A.**   Yes.  The whole premise of DVD is that it's this

20 interoperable standard which allows you to make compatible

21 equipment, discs and players and software that all work

22 together.

23         And, so, the DVD specification is a document that

24 describes how to put data on a disc so that all of these pieces

25 work together.  And it's actually part of a whole family of

 1  specifications that define the format of the data on the disc,

 2  the format of the physical disc, the format of the compressed

 3  video you put on the disc, and a whole lot of other details.

 4  **Q.**   Do you happen to know who controls or promulgates the

 5  DVD-video specifications?

 6  **A.**   Yes.  The DVD specification is managed by a group called

 7  the DVD FLLC, which is the Format Logo and Licensing group

 8  [sic].  And they're responsible for managing the DVD license

 9  and the DVD logo.

10  **Q.**   So what is it -- what are you required to do, or are there

11  requirements with respect to following the DVD-video

12  specifications?

13  **A.**   Yes.  The whole idea here is, if you license the format

14  and you implement whatever product you're implementing

15  according to the specification, then you have the right to

16  carry the DVD logo.  And it's that DVD logo on player equipment

17  and software, and on discs, that tells the consumer that this

18  is all compatible DVD products.

19  **Q.**   Do you have a general idea as to whether or not the

20  content put out by the studios on these optical discs does or

21  doesn't carry the DVD logo?

22  **A.**   Yes.  You should expect to see the DVD logo on the back of

23  commercial DVDs.

24  **Q.**   Do you have --

25          **THE COURT:**  Excuse me.  Is that license then obtained

 1  from this DVD FLLC?

 2          **THE WITNESS:**  That's how I understand it, yes.

 3  **BY MR. BERTA:**

 4  **Q.**   Do you know whether Real is a licensee to the DVD FLLC

 5  DVD-video specifications?

 6  **A.**   I understand they are.

 7          **THE COURT:**  You understand what?

 8          **THE WITNESS:**  They are.  Sorry.

 9  **BY MR. BERTA:**

10  **Q.**   I had two other follow-up questions.

11          One, with respect to that book, *DVD Demystified*, that

12  you had mentioned, how complete, if at all, is it with respect

13  to getting an understanding of what is in these DVD-video

14  specifications?

15          **MR. SINGLA:**  Objection.  Vague.

16          **THE COURT:**  Overruled.  You may answer.

17          **THE WITNESS:**  Thank you.  The DVD specification is

18  not a secret.  And Jim Taylor lays out, in exhaustive detail,

19  the different data structures and information that you store on

20  a DVD disc, and how they're accessed and how they're used.

21  It's a very thick book.

22  **BY MR. BERTA:**

23  **Q.**   Is it this thick (indicating).

24  **A.**   I believe that's the third edition, the most recent

25  edition, yes.  And there's also a DVD in the back, with more

1    information.

2    **Q.**    This is the DVD to which you were referring?

3    **A.**    Yes.

4    **Q.**    Another follow-up question on this issue.

5            The DVD-video specifications, are they the same or

6    different than the CSS specifications that have been the

7    subject of a lot of testimony here?

8    **A.**    They are different.

9    **Q.**    Do you know in your review either of the DVD

10   specifications themselves, or the *DVD Demystified* bible, as you

11   say, of the video specifications, are ARccOS and RipGuard

12   technologies anywhere expressly permitted by those

13   specifications?

14   **A.**    No.

15   **Q.**    Now, let me ask you, with respect to your review of the

16   materials in this case, did the documents that you've been able

17   to review include any documents from Macrovision or from Sony

18   DADC, as well?  Did they -- did you also review documents from

19   Macrovision and Sony DADC?

20   **A.**    Oh, I'm sorry, yes.

21   **Q.**    Okay.  And with respect to all the documents that you've

22   had the opportunity to review, did they give you the specific

23   technical details of all the different little tricks and traps

24   and errors that are within RipGuard and ARccOS?

25   **A.**    No.  Those documents are essentially marketing

1 presentations to their customers.  So they describe -- they

2 give examples of certain kinds of errors and techniques that

3 they use.  But they certainly don't exhaustively list all of

4 them.  And they certainly don't give all the technical detail.

5 **Q.**   Okay.  If you didn't have the ability to get an

6 understanding of all the specific technical details of ARccOS

7 and RipGuard, how were you able to come to these conclusions

8 that you have reached?

9 **A.**   These -- these conclusions flow from the basic premise of

10 these products.  These products are designed to try to impede

11 and slow down certain kind of ripper programs.  The product

12 name is RipGuard.  It's targeted at certain kinds of ripper

13 programs.

14       As a result, they scatter errors of different kinds

15 on a disc.  But the whole premise of the product, the guarantee

16 that these companies make to their customers, is that these

17 products will not impede standard playback of a disc.

18       And, as a result, my opinions flow from that

19 fundamental guarantee, that fundamental premise.

20 **Q.**   Let me ask you, did you need to review the source code for

21 Facet or for Vegas, the products at issue, in order to reach

22 the conclusions that you have about ARccOS and RipGuard?

23 **A.**   No.

24 **Q.**   So, I want to talk about your conclusions in a little bit

25 more detail.  Let's just start with the first one.  "ARccOS and

1   RipGuard do not protect movie content on a DVD."

2          And let me ask you, what do you mean by "protect"

3   there?

4   **A.**   There's a precise meaning of the word "copy" -- of the

5   term "copy protect," which is actually defined by the studios

6   in a document that describes their general strategy for content

7   protection.  And to protect content you need to lock it up.

8          But what ARccOS and RipGuard don't do is in any way

9   impede normal access to the normal content of a disc.  All the

10  data that was on the original disc is still there, completely

11  visible, untouched, and still completely available on a disc

12  that's been processed by these products.

13  **Q.**   Why does it need to be, if it does, why does it need to be

14  completely visible?

15  **A.**   Well, the whole point of these products is that they can't

16  impede normal playback.  The studios can't be release -- excuse

17  me, the studios can't be releasing discs that cause problems

18  when consumers play them.

19  **Q.**   You had mentioned something about a standard industry

20  guideline.  To what were you referring?

21  **A.**   There's a framework or architecture called the CPSA, which

22  stands for Content Protection System Architecture.  This was

23  developed by, actually, the broad industry, which included the

24  computer industry, the consumer electronics industry, the film

25  industry, and the record industry, the music industry, in 2000,

1  when they were in the midst of developing these new formats

2  like DVD-video and DVD-audio and they were introducing

3  different technologies and approaches to content protection in

4  the general sense of content protection.

5          And so they apparently thought it was a good idea to

6  write down the framework or model or general approach that they

7  were using in all of these.

8  **Q.**  In your understanding of that framework or approach, do

9  ARccOS and RipGuard meet what the industries, including the

10  movie industry, define to be content protection?

11  **A.**  No.  The document is very clear that copy protection

12  requires locking up content unless you -- unless there is an

13  authorized method of access to that content, unless there's

14  some kind of authentication.  So content must be encrypted.  It

15  must be locked up.  It must not be visible to casual view,

16  unless you have an authentication mechanism to access that

17  content.

18  **Q.**  I want to turn to your point two about why ARccOS and

19  RipGuard, in fact, allow content to be accessed and open to

20  view.

21          You say here, "ARccOS and RipGuard are designed to

22  allow access to DVD content by following the DVD-video

23  specification as a DVD player."

24          How have you been able to reach that conclusion with

25  respect to ARccOS?  Actually, let me back up a little bit and

1  do some background on DVD technology and what it is.

2          So, do you have an understanding of -- obviously,

3  it's a disc, but what's on that disc and how does one know, per

4  the DVD specifications, or if you are a DVD player, to get on

5  that disc and have a movie come out at the end of the day?

6  **A.**   Yes.  I've worked with lots of DVD players and DVD copy

7  programs over the years so, yes.

8  **Q.**   How does that happen?

9  **A.**   The next slide shows the basic -- the fundamental basic

10  characteristic of a DVD, which is it is a data disc.  It may

11  have video on it.  It may have other kinds of data.  But,

12  fundamentally, it's a data disc.

13          So, it's a removal medium like a thumb drive or a

14  hard drive.  It's just a way of storing data.  It's just it

15  happens to be a plastic disc, and the data is stored in pits

16  and grooves on that disc.

17          And, then, in terms of storing data, a single-layer

18  disc, the smallest size of -- standard size of DVD holds about

19  4.7 billion bytes of data.  The data spirals around the disc,

20  typically.

21          And the important thing, in terms of reading a disc,

22  is that the data is divided into chunks or blocks, or what are

23  called "sectors."  And that's the chunk that you read a disc

24  in.  And there's some 2 million such sectors on a disc.

25  **Q.**   So, if I am understanding your explanation correctly, the

1   DVD is just a big circle, around and around and around, getting

2   narrower and narrower, divided up into over 2 million sectors

3   that have these little pits that somehow contain data on them;

4   is that right?

5   **A.**   Typically, yes.

6   **Q.**   So you have this physical structure.  How do you then have

7   data on it -- how does one know how to then translate the data

8   in these pits to a movie?

9   **A.**   Well, that's all about the DVD specification and how you

10  lay out the elements of a disc.  And that's shown on the next

11  slide.

12          (Document displayed.)

13  **Q.**   Can you go ahead and explain what you're trying to

14  communicate here by this slide.

15  **A.**   Yes.  So, this is a screen shot.  It's an image from a

16  DVD-authoring tool or a design tool that a designer would use

17  to design a DVD.  The program is actually called "Adobe

18  Encore."  It was the subject of one of my books.

19          And this is how a DVD designer thinks about and

20  actually physically lays out a disc.  So, a disc has menus on

21  it.  For example, in the middle here there is a main menu.  It

22  has video clips on it.  And those are linked together by

23  buttons on the menu and links between the clips.

24          And so the DVD designer has to organize all those

25  elements and link them all together, and according to the rules

1  of the DVD specification as to how you can link things

2  together.

3  **Q.**  So let me ask you how this thing first play here.  How

4  does a DVD machine know what is the first play down there on

5  that data disc?

6  **A.**  Right.  So, after you finish designing a disc, you burn it

7  to a DVD.  And what that does is take all this data and

8  collapse it into the DVD data structures on the disc.

9        A DVD player then reads those DVD data structures.

10  And in those data structures, among other things, is the

11  information about how to start playing the disc.  What's the

12  first thing on the disc that you start with?

13        In this example, the first thing is the main menu,

14  which sort of makes sense.

15  **Q.**  Is it fair to say that all of this layout, of how one gets

16  to a movie from the first play through whatever's on the

17  content of that movie, is all laid out in a specified manner so

18  everyone knows what they're doing?

19  **A.**  Yes.  So, the DVD specification defines all those data

20  structures on the disc.  It also defines how you put files on

21  the disc, data files, with all of this information, all these

22  data structures in them.

23  **Q.**  So, what is the actual mechanism whereby whatever software

24  is inside a DVD player actually goes down to the DVD and gets

25  that stuff back?

DIXON - DIRECT EXAMINATION / BERTA

1  **A.**   Right.  So there's the DVD -- DVD data disc has a standard

2  directory on it called "VIDEO_TS."  And all the DVD video

3  elements are in that directory.  And then a DVD player

4  understands how to open up that directory and find those files

5  and play them.

6  **Q.**   Can you talk a little bit more about how that happens, how

7  the DVD player understands that?

8  **A.**   Yes.  That's shown on this diagram, which actually comes

9  from Jim Taylor's book, *DVD Demystified*.  And he's showing here

10  the general process of taking video off a disc, processing it

11  in DVD player software, and then displaying it onto the final

12  device.  We've annotated his diagram in blue here.

13  **Q.**   So that the little boxes on the disc, of presentation data

14  and navigation data, what are those and how are those stored on

15  the disc?

16  **A.**   Yes, the DVD has the VIDEO_TS folder, I mentioned before.

17  And in there are two different kinds of files.  So, in general,

18  the DVD organizes the navigational information, the navigation

19  data, in what's called the information file.  It's called an

20  IFO file.  I-F-O.  And those are relatively small files with

21  the information about the menus and the clips and the chapters

22  and the buttons, and all that kind of stuff.

23         And then the second kind of file on the disc actually

24  has the playable video data in it, the compressed video and

25  audio.  And those files are called video objects or VOBs,

1  V-O-B, files.

2           Just to be complete, the disc actually has a third

3  kind of file, because the designers of the DVD-video

4  specification understood the discs could be damaged.  So you're

5  required not only to have all those IFO files, but to have a

6  backup copy of all those IFO files.

7  **Q.**   One point of clarification.  With respect to the VOB

8  files, or the V-O-B files that contain the actual video data of

9  the movie, do those files also contain some navigational

10  information used by the DVD player?

11  **A.**   Yes.  The DVD-video specification actually intermixes

12  different kinds of data in these files, to make it more

13  efficient for a player to present.

14  **Q.**   So you have these files on the disc.  They have these

15  instructions and navigational data, and they are pulled up.

16  And you have, on this player box, two little inside boxes.

17  One's the presentation engine and one's the navigation manager.

18  What's the navigation manager?

19  **A.**   So, the navigation manager is also called the DVD virtual

20  machine.  So, this is the engine that understands the DVD-video

21  specification, understands the DVD-video data structures.  And

22  it can bring in those data structures, it can find the menus,

23  it can find the links, it can find the clips.

24           And in response to the remote control, for example,

25  it then navigates through the disc and decides what to be

1  presented.  The other box here, the presentation engine,

2  actually then decompresses that data and presents it.

3  **Q.**  Is it correct that the navigational part, the DVD virtual

4  machine part that figures out where to go, is, in some sense,

5  at least conceptually, separate from the presentation part of

6  when it comes out and it goes to movie land?

7  **A.**  Yes, right.  The DVD specification itself is -- and the

8  data structures are designed with this model in mind.  So it's

9  efficient to build a DVD player with software that works the

10  same way.

11  **Q.**  What's that other box over there, that says "remote

12  control"?

13  **A.**  Right.  So the third box, which is labeled "remote

14  control" or navigation software, typically would represent the

15  remote control that the user is using.

16          So, the user is pressing up, down, left, right.  But

17  it's the responsibility of the DVD virtual machine to actually

18  interpret those presses and decide what that means according to

19  the DVD data structures.

20  **Q.**  And so with all the --

21          **THE COURT:**  Excuse me.  Does presence of sectors have

22  anything at all to do with navigation --

23          **THE WITNESS:**  No.

24          **THE COURT:**  -- or is that totally independent?

25          **THE WITNESS:**  Yeah, the sectors are just the raw

1   data.  And once you unpack the data, you can find the DVD data

2   structures which can then tell you what the navigation is.  The

3   sectors are just the raw data.

4   **BY MR. BERTA:**

5   **Q.**  So, would it be correct to say that the navigation-type

6   data tells you which sectors to go to on the DVD?

7   **A.**  Yes.

8   **Q.**  So with all of this, you had testified earlier that ARccOS

9   and RipGuard essentially put errors on a DVD.  How can they do

10  that without affecting this ecosystem of the playback of a DVD?

11  **A.**  That's a huge challenge.  That's a huge, huge problem for

12  them.

13         There is this well-defined standard which works great

14  because there's all this DVD equipment all over the world and

15  new releases coming out all the time, and they can't break that

16  standard.  So, all they can do is apply clever tricks to the

17  disc, which they hope never interfere with standard playback.

18         And, so, the way they do those tricks is they look at

19  how ripper programs access discs, and they look at the behavior

20  of ripper programs, and they try to interfere with those, but

21  never interfere with standard playback, never interfere with

22  the fundamental DVD data structures.

23  **Q.**  Has there ever been an occasion where the Sony ARccOS

24  product or the Macrovision RipGuard product has introduced

25  errors into the playable portions of DVDs, to your knowledge?

1  **A.**    Well, there have been several highly public and

2  embarrassing cases where major releases caused problems with

3  consumers.    In particular, Sony was involved in the release of

4  about 20 discs, including Casino Royale, which was obviously a

5  major James Bond release.    And there were significant playback

6  problems with those releases.    Sony had to publicly admit that,

7  and had to set up a process for recalls and consumers calling

8  in and getting refunded discs.

9            And they also had difficulties or disputes, shall we

10  say, with the channels that delivered those products.    So, in

11  particular, Netflix, for example, had feedback from their

12  consumers, as well.    And you can still go to the Netflix site

13  and find where Netflix explains these problems.

14  **Q.**    So, let me ask you, with respect to these interspersed

15  errors, is there any reason that you might not know or be able

16  to determine that an error that's sitting on a disc isn't or is

17  an intentional error as opposed to an unintentional error?

18  **A.**    Well, if you are a consumer playing a disc, all you know

19  is that it's broken.    There's no identification on the

20  packaging that tells you that certain extra processing was done

21  on this disc.

22            There's no public information about which discs have

23  been processed in what way.    There's no standard way of marking

24  the data on this disc to tell it.    So, as far as a consumer is

25  concerned, it's just a bad disc and they have no idea why.

 1          And then they go online and complain to each other,

 2    and they eventually figure out that there's a problem, in this

 3    case, with the Sony releases.

 4    **Q.**   Okay.  So getting into the specifics, as it -- and when I

 5    say "specifics," I mean the general specifics, generally what

 6    are two types of errors used by ARccOS and RipGuard?

 7    **A.**   There's what are called physical errors.  These are the

 8    corrupted sectors that we've heard discussed.  So, if you try

 9    to read certain sectors of the disc, you get a read error.

10    It's impossible to read that data.

11          And, obviously, that data can't have anything to do

12    with the playable portion of the disc.  All of the sectors that

13    have playable data in them have to be accessible still.

14    **Q.**   And if you have a bad sector on a disc, is there any

15    reason that you might not be able to determine one way or the

16    other whether that bad sector is intentional?

17    **A.**   Oh, so if you're a piece of software trying to read the

18    disc, all you know is that you found an error.  You don't have

19    any understanding of how big that error, how many errors there

20    might be on the disc, what caused that error.  The only

21    information you have is that you found an error.

22    **Q.**   Okay.  And you had said there was another type of error

23    that they introduced onto DVDs, besides the physical sector

24    errors.  What's that?

25    **A.**   These are -- these are called logical errors.  So, these

1  are -- this is additional data mixed in with the DVD data

2  structures, but, obviously, carefully done in a way that

3  doesn't interfere with standard playback.

4          So, it's just extra junk thrown in the DVD data

5  structures, in the expectation that it will interfere with

6  certain kinds of programs.

7  **Q.**   Okay.  But it's the intention of it -- is it correct to

8  say that it's the intention of it not to interfere with access

9  by virtue of the DVD virtual machine or playback?

10 **A.**   The whole point of these products is they cannot interfere

11 with standard playback.

12 **Q.**   And, so, in your experience, these kinds of logical

13 errors, from what you've been able to learn of them, in ARccOS

14 or RipGuard, can those types of errors occur unintentionally as

15 well?

16 **A.**   Yes.  You can have extra stuff in a -- in DVD data

17 structures in a disc.

18 **Q.**   Okay.  And, so, we have all this stuff, but you're allowed

19 to do playback.  And, so, do you have a conclusion as to what

20 being able to do playback means with respect to copying the

21 information on a DVD that has ARccOS and RipGuard errors on it?

22 **A.**   The whole point is if you can play a disc, you can see all

23 the playable elements that are on a disc.  And, of course, if

24 you can see it, you can copy it.  It's totally accessible.

25 It's totally available.

1   Q.   Okay.  And is that -- that's your third point here on your

2   slide; is that right?

3   A.   Right.

4   Q.   Okay.  So, I want to talk in a little bit more detail

5   about that.  First, let me ask you, you had mentioned that

6   maybe one of the premises of ARccOS or RipGuard errors is to

7   interfere with certain methods of access used by what you

8   called ripper programs.

9        And so, first, what are the different kinds of

10  methods of access to the contents on a DVD for purposes of

11  copying?

12  A.   That's shown on the next slide.  So, there's a wide

13  variety of commercial programs available for consumers and also

14  professionals that allow you to copy discs.  I'm not talking

15  about studio releases.  I'm talking about personal discs.  And,

16  so, these programs support different kinds of copying for

17  different kinds of purposes.

18       And, so, just to summarize here, the first kind of

19  copying is what's called linear copy.  Or, you'll see the term

20  "ISO copy" used in the materials in this case.

21       And the idea here is you just treat the disc as a big

22  chunk of data.  You start at the beginning of the disc, you

23  copy all of the sectors until you get to the end of the disc.

24  That's a nice, efficient, fast way to copy a disc.

25  Q.   Is that the same thing as just sector-by-sector copying?

```
 1  A.    Yes, that's sector-by-sector copying, right.

 2  Q.    Okay.  So what's "file copy"?

 3  A.    File copy is used when you don't want the entire contents

 4  of the disc.  For example, it may have DVD audio or it may have

 5  computer files on it, as well.

 6         So, in that case, you just find the VIDEO_TS folder,

 7  which has all the DVD-video information on it, and you can just

 8  drag and drop or have a program that does the equivalent of

 9  drag and drop and it just copies all of those files.

10  Q.    What about "selective copy"?

11  A.    Selective copy is a really common feature.  Consumers like

12  this.  It's also used by professionals.

13         The example is, you've created a compilation disc, so

14  you have a disc with, for example, your kid's sporting event.

15  But there's other material on the disc, like a birthday party

16  or something like that.  And -- but you just want the sporting

17  event part because you want to make copies for a friend, or

18  something like this.

19         So, in this case, the software actually opens up the

20  DVD data structures and finds the different elements on the

21  disc and gives you the list.  And then you, the user, can

22  choose, well, I just want the main part, the main movie or the

23  main sporting event, or whatever.  You can then copy just that

24  part to a new DVD.  So that's the selective part of the copy,

25  just copy elements.
```

1   Q.    You mentioned something in there about -- in the slide

2   about "static analysis".  What is static analysis?  Is that the

3   same or different than playing back the DVD?

4   A.    No, that's different.  With selective copy, you open up

5   the disc and you basically look at the list of what's on the

6   disc.  So that's static.  You're not dynamically playing

7   through it.  You're just looking at it.  And then you use that

8   information to decide what to copy.

9   Q.    Okay.  So, then, if that's static analysis, what is "play

10  and save," the last category there?

11  A.    Right.  So play and save is the idea of copying while you

12  play.  And, so, as you play through a disc, as you see the

13  contents of a disc -- in the case of a DVD audio disc, you're

14  just listening to the audio; in the case of DVD-video, you're

15  watching video -- and while you see it, you can also save it.

16  Q.    Okay.  I want to talk about a couple of these methods of

17  access for purposes of copying.  Starting with the first one,

18  the linear copy or sector-by-sector copy --

19  A.    Right.

20  Q.    -- can ARccOS and RipGuard prevent making a

21  sector-by-sector copy of all the information on that DVD and

22  moving it over to a hard drive?

23  A.    No.

24  Q.    Why not?

25  A.    Well, any program that reads data from a disc understands

1  there can be bad data on a disc.  So, any copy program can

2  start at the beginning, start copying sectors.  If they find a

3  bad sector, they can just skip it and keep going.  And they'll

4  keep going to the end.

5          And when they are done, they will have copied all of

6  the good sectors on the disc, which in this case is all the

7  playable video data on the disc.

8  **Q.**   So, if there was a bad sector that was secretly

9  intentionally placed there by ARccOS and RipGuard, would that

10 affect the playability of the movie as you copied all the good

11 sectors to the hard drive?

12 **A.**   No.  I mean, the whole point is you can't have bad

13 playable sectors, because then they won't play, right.

14 **Q.**   Okay.  So I have a couple of questions about that.  The

15 first is, this sector-by-sector copying, where you just fight

16 through the bad sectors, does that have any effect on the time

17 of copying a DVD if you are going to use this method of access?

18 **A.**   Oh, certainly.  So, the number of bad sectors you run into

19 and the amount of time that you spend retrying to copy that

20 sector.

21 **Q.**   And, in general, how many bad -- how many sectors are

22 there on just a single-layer standard DVD?

23 **A.**   Some 2 million.

24      **MR. BERTA:**  Your Honor, I'm going to try to do this

25 in a way that comports with my understanding of what might be

1   confidential information here.  So, it may look a little weird,

2   but that's why I'm doing it.

3   **BY MR. BERTA:**

4   **Q.**   Do you know, according to Mr. Hollar, how many bad sectors

5   RipGuard actually puts on a DVD out of those 2 million bad

6   sectors?

7           **MR. SINGLA:**  Your Honor, on the confidentiality --

8   are you asking yes or no?

9           **MR. BERTA:**  Right now.

10          **THE COURT:**  Well, I thought the question was how

11  many.

12          **MR. BERTA:**  No, no, not yet.  Does he know.

13          **THE COURT:**  Does he know?

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  Okay.  Well, make sure we don't go there,

16  I gather.

17          **MR. BERTA:**  So, if he knows.  So, with your

18  indulgence, what I would want to do is just write the number

19  down here so it's not visible to the outside screen, so that --

20          **THE COURT:**  Okay.  So then can we shut off the two

21  large units, please.

22          **MR. SINGLA:**  This is Rohit Singla for the studio

23  defendants.

24          The one issue we would have with what Mr. Berta is

25  proposing is, with all due respect to counsel for RealNetworks,

```
 1  I understand Macrovision's position is that in-house counsel

 2  should not have access to this confidential information.

 3          It's my understanding they have no objection to,

 4  obviously, outside counsel, Wilson Sonsini or the Bartlit Beck

 5  firm.  But to the extent this information is going to be

 6  displayed to any of the in-house lawyers for RealNetworks, I

 7  think that would cause confidentiality issues.

 8          I'm fairly certain Mr. Berta and the lawyers at

 9  Wilson Sonsini have talked with the Macrovision lawyers about

10  this issue.

11          MR. BERTA:  In fact --

12          THE COURT:  Would you like to go get a cup of coffee

13  or something?

14          MR. KIMBALL:  I don't know what the number is, as I'm

15  sitting here today.  And I'm happy to step into the back so I

16  don't have access to the number.

17          MR. SINGLA:  Thank you.

18          MR. BERTA:  Can I just address this issue?

19          THE COURT:  Yes.

20          MR. BERTA:  In fact, that statement, I don't believe,

21  is correct because this is a number that was discussed in the

22  deposition of Mr. Hollar, and the Macrovision counsel agreed

23  that the deposition itself, minus the exhibits, could be viewed

24  by Real in-house counsel.

25          THE COURT:  Well, I'm not going -- I don't have any
```

1   way --

2            MR. BERTA:  Yeah.

3            THE COURT:  If he already knows it, then he doesn't

4   need to hear it again, right, or see it again?

5            MR. BERTA:  He does not.  He may not even care.

6            THE COURT:  Okay.  You may continue.

7            MR. BERTA:  Thank you, Your Honor.

8            So, sorry for the theatrics, Your Honor.

9            (Counsel writing number on screen.)

10  BY MR. BERTA:

11  Q.   Is that the number?

12  A.   As few as that many sectors, yes.

13  Q.   Out of how many?

14  A.   Out of 2 million.

15  Q.   Okay.  There was some testimony from Mr. Schumann that

16  putting these kinds of sector errors down on a disc could --

17  and I apologize, I don't remember the exact amounts, but it's

18  something like 20 or 15 hours, it would slow down the copying

19  of a DVD by that amount of time.  Given your knowledge of the

20  number of bad sectors actually used in this product, is that

21  correct?

22  A.   No.

23  Q.   How long -- if you were just going to fight through the

24  bad sectors, how long would it take to make a copy of all the

25  good, playable sectors on a DVD and move it over to a hard

1  drive?

2  **A.**    Well, if you do the math and you assume it takes 15

3  seconds or even 30 seconds, which is overestimating --

4        **MR. SINGLA:**  Your Honor, could I interrupt for a

5  second?

6        **THE COURT:**  That is going to get us to the number,

7  one way or the other, right?

8        **MR. SINGLA:**  I wanted to interrupt before the number

9  was said.  With all due respect, I do not believe this is in

10  Mr. Dixon's expert report or in the deposition or the

11  disclosures we have for Mr. Dixon, this idea of calculating the

12  time.  If it is, I would ask for a proffer.

13        **MR. BERTA:**  So, there's two issues with respect to

14  this, Your Honor.  Number one, it is.  Mr. Dixon, in his

15  opening report, discusses the idea of the time delay.

16        **THE COURT:**  Which page?

17        **MR. BERTA:**  Paragraph 13 of his opening report, Your

18  Honor.

19        **THE COURT:**  Paragraph 13?

20        **MR. BERTA:**  There at the back.  "Continuing the copy

21  process will still result in a copy of the disc, will take

22  significantly longer."

23        **THE COURT:**  "Significantly longer."  But he doesn't

24  actually put a number on it.  Is there some other place where

25  he mentions a number?

```
 1            MR. BERTA:  The second issue is, this testimony is in
 2   response to Mr. Schumann's testimony.  Mr. Schumann testified
 3   about this length of time.  There is nothing in Mr. Schumann's
 4   deposition or Mr. Schumann's report on this issue.  So, it went
 5   in.  We are allowed to rebut new testimony at the hearing that
 6   Mr. Schumann introduced, that was not anywhere in his reports.
 7            THE COURT:  So, the answer is, there's nothing in the
 8   report or his rebuttal report?
 9            MR. BERTA:  Right, Your Honor.  Because, I mean, as
10   it turns out, the Hollar deposition, where we learned this
11   information for the first time, I think, was after his rebuttal
12   report went in.  So, that's the time it was disclosed.
13            THE WITNESS:  It was never disclosed by Macrovision
14   prior to that time.
15            MR. SINGLA:  Your Honor, the date of the Hollar
16   deposition, which was a 30(b)(6) deposition as well as an
17   expert deposition, was set by Wilson Sonsini.
18            Mr. Hollar's offer up by Macrovision as a 30(b)(6)
19   witness was a month or so before Mr. Dixon's opening report.
20   So, they could have had this information earlier, if they
21   wanted to.
22            Secondly, Mr. Dixon's deposition was after
23   Mr. Hollar's deposition.  And in Mr. Dixon's deposition, I
24   explicitly asked him if he had anything further to say in
25   response to Mr. Hollar's deposition.  And he said no.  And I
```

1    don't think --

2          **THE COURT:**  What about the Schumann, the examination

3    of Mr. Schumann?

4          **MR. SINGLA:**  I do not believe we went beyond his

5    report.  If you give me a moment to find the paragraph, that's

6    the issue.

7          **THE COURT:**  Why don't we do this:  Rather than have

8    him testify as to how he gets to the results, why don't you

9    just have him testify as to the result.

10         And if there's something about that result that would

11   disclose, you know, the calculations, and so forth, have him

12   write it down and give it to you, or something like that, and

13   just put that in the record.

14         And if, in fact, Mr. Schumann didn't so testify --

15   because I'd have to go back to the transcript and the notes to

16   see -- if Mr. Schumann did not so testify, then I'll strike it.

17         **MR. BERTA:**  Fair enough, Your Honor.

18         **THE COURT:**  Okay.

19         **MR. SINGLA:**  Your Honor, my concern is that we've

20   never had a chance -- I have no idea what he's going to say

21   about how long it takes or how he came to that number.  We've

22   had no chance to evaluate that claim.

23         **MR. BERTA:**  And that's exactly the same position we

24   were in with respect to Mr. Schumann.

25         **THE COURT:**  Well, in cross-examination you can figure

```
 1   it out.  Not everything needs to be disclosed in discovery,

 2   sometimes.  There was a day when people tried cases without

 3   discovery.

 4          MR. SINGLA:  That was before my time, Your Honor.

 5          THE COURT:  Now all we do is discover, discover,

 6   discover.

 7          MR. SCOTT:  I was there.

 8          MR. SINGLA:  Well before my time, Your Honor.

 9          THE COURT:  So, at any rate, can you find some way of

10   doing it without disclosing any trade secrets, et cetera?

11          MR. BERTA:  I think I can, Your Honor.  So,

12   Mr. Schumann's testimony was that it takes 20 or 15 hours to do

13   a copy.

14          THE COURT:  I seem to recall there was some testimony

15   to that effect.

16          MR. BERTA:  That is at page 318 of the trial

17   transcript.

18   BY MR. BERTA:

19   Q.   Is that correct?

20   A.   No.

21          MR. SINGLA:  I'm going to make one last run at this,

22   Your Honor.

23          I believe what Mr. Berta was saying is that they

24   didn't have a chance to respond to this testimony or anticipate

25   the testimony.  But Mr. Schumann does talk in here about how
```

```
 1  the process slows down copying, to profoundly slow down,

 2  paragraph 86 of his report.

 3          THE COURT:  Well, but then he testified, apparently,

 4  according to this readback here, as to the amount of time.  So,

 5  okay, let's go forward in an appropriate manner.

 6          You understand what I mean by that, right?

 7          MR. BERTA:  I certainly hope so.

 8          THE COURT:  Okay.

 9  BY MR. BERTA:

10  Q.  So, 20 to 15 hours, correct or incorrect?

11  A.  Incorrect.

12  Q.  Significantly longer?  Significantly shorter?

13  A.  Shorter.

14  Q.  So if you do a sector-by-sector copy of a disc that has

15  these types of errors on it, at the end of the day, is it going

16  to take you a long time or not so very long to make that copy?

17  A.  Not -- it can't --

18  Q.  Or something else?  Sorry.

19  A.  It can take not very long.

20  Q.  Shorter or longer than playing back the movie?

21  A.  Uhm, let's say in the ballpark of playing back the movie.

22          THE COURT:  Let's talk about in terms of a busy

23  person who works full-time as opposed to somebody who's playing

24  around with computers all day.  Where would you put it then if

25  you're talking about the busy person?
```

 1             THE WITNESS:  You can --

 2             THE COURT:  "I don't have time for this."

 3             THE WITNESS:  Right, yes.

 4             THE COURT:  As opposed to, "I've got all the time in

 5    the world."  Right?

 6             THE WITNESS:  Yes.  You can set up your computer and

 7    go off for a long lunch and come back.

 8             THE COURT:  I see.  That's it?  Okay.

 9             THE WITNESS:  How's that?

10             THE COURT:  Thank you.

11    BY MR. BERTA:

12    Q.  So, let me ask you, this copy that's made by going just

13    sector by sector through all the sectors, fighting through the

14    bad sectors, however many there are, and moving it over to a

15    hard drive, is that copy on the hard drive playable even though

16    it's ARccOS or RipGuarded errorred?

17    A.  Yes.

18    Q.  Now, I want to ask you again, there was some testimony in

19    this court from Mr. Schumann saying that the copy -- if you go

20    sector by sector, the copy that you move over to the hard drive

21    isn't playable off the hard drive.  Is that correct?

22    A.  No.

23    Q.  And what evidence or testimony have you been able to

24    review in this case that shows that Mr. Hollar's testimony --

25    sorry, Mr. Schumann's testimony is incorrect?

 1  **A.**   Well, first of all, it's obvious from the fact that if you

 2  can -- if you have the same data, the same sector of data on a

 3  DVD that's also stored on some other source, all the data is

 4  still there.  But Mr. Hollar, as well, did discuss this.

 5       **MR. BERTA:**  So, there's some testimony from

 6  Mr. Hollar's deposition that we would like to play in lieu of

 7  having had Mr. Hollar here.  That has been marked as

 8  confidential.

 9       What I can do, instead, is just hand up the pages of

10  transcript, if the Court would prefer that.

11       **THE COURT:**  Well, either that or we're going to have

12  to clear the courtroom of people who don't have privileged

13  status.

14       **MR. BERTA:**  I mean, without Macrovision here -- I

15  mean, I don't know that this stuff is confidential.  All I know

16  is that it was designated, so without them here --

17       **THE COURT:**  Well, and then I think that's the wiser

18  choice.  So which do you want to do?

19          (The court reporter addresses the Court.)

20       **THE COURT:**  Then you would have to prepare a separate

21  transcript for that.

22       Well, why don't you just submit it then.  Can you do

23  that?

24       **MR. BERTA:**  Well, yeah.  I'm going to be referring to

25  pieces of it.  Let me try and see how it goes.

```
 1              THE COURT:  Okay.

 2              MR. MICK:  Mr. Berta, do you have a copy?

 3              MR. BERTA:  Actually, I don't even have a copy for

 4    me.  There is -- what I do have is a copy of the entire

 5    transcript.

 6              MR. MICK:  That's all right.

 7              MR. BERTA:  The pages I've handed up and handed to

 8    the witness and some opposing counsel are pages 51 to 54 of the

 9    deposition of Mark Hollar, taken in this case.

10              THE COURT:  Now, is it, in fact -- let's get it

11    clear -- is this, in fact, designated -- this particular

12    portion --

13              MR. BERTA:  They designated the entire transcript.

14              THE COURT:  -- designated as highly confidential, and

15    is there a reason for it?

16              MR. BERTA:  So, this testimony goes into no greater

17    detail than Mr. Schumann went into with the sort of general

18    references to the idea of techniques.

19              And I don't know whether the studios cleared

20    Mr. Schumann's testimony with Macrovision or not.  So, if that

21    is our guidance, I don't believe that this would be a problem

22    of confidentiality.  But, again, I can't -- I don't know

23    without Macrovision.

24              MR. SINGLA:  Your Honor, it's difficult for me to --

25    I cannot speak, obviously, for Macrovision.  We have been
```

 1   talking to Macrovision when we expect to use something of

 2   theirs at court, to make sure they're okay with it or whether

 3   they want it under seal.

 4        I would say that my view of this does go beyond what

 5   Mr. Schumann testified to on direct, at least, with respect to

 6   the level of detail that's being discussed in here.  There was

 7   one moment on cross where I think he was permitted to talk

 8   about a different issue, but in a little bit of detail.  But I

 9   do not believe this information is in the public record

10   currently.

11        **MR. BERTA:**  This -- to be specific, this information

12   does not talk about any particular techniques.

13        **THE COURT:**  I was going to say this strikes me as

14   being fairly general.

15        **MR. BERTA:**  It talks about techniques that aren't

16   there.

17        **THE COURT:**  I'm going to allow you to go ahead.

18        **MR. BERTA:**  Thank you, Your Honor.

19   **BY MR. BERTA:**

20   **Q.**  So, if you look on page 51 there, and there's a question

21   starting at line 8, this is generally with respect to the

22   subject matter we've been discussing about a copy, a

23   sector-by-sector copy of a DVD if you just ignore the bad

24   sectors.  And here I'm paraphrasing, so you know.  These are

25   not quotes.  And then I asked Mr. Hollar what he meant by that.

1  And he says, so, there are other techniques that may impact the

2  compression that goes on after it's been moved off to the hard

3  drive.

4          And so my question is, first of all, what's

5  "compression"?

6  **A.**    Compression is taking the digital video and audio data and

7  shrinking it down so that it will fit on a disc so you can play

8  it back.

9  **Q.**    Why do people compress DVD data, perhaps for nefarious

10  purposes?

11  **A.**    No, almost all the data, all the playable data on a disc

12  is compressed, because you want to cram more data on the disc.

13  You needed -- in particular, the studios wanted to have at

14  least a two-hour movie fit on a disc.

15  **Q.**    Okay.  So, the data that's actually on the DVD is already

16  compressed, correct?  And there is further compression that

17  people might want to do on a hard drive; is that right?

18  **A.**    The data on the DVD is already compressed, and it's not

19  uncommon to take compressed data and recompress it for various

20  purposes.

21  **Q.**    So, if it's sitting there -- the sector-by-sector copy of

22  all the good data is sitting on the hard drive, and you don't

23  further compress it, do you have any understanding as to

24  whether ARccOS or RipGuard can prevent the playability of that

25  copy off the hard drive without further compression?

1   **A.**   Oh, no.   If you can play the data sectors that are stored

2   on a DVD, those same sectors with exactly the same data are

3   just as playable, no matter where else they might be stored.

4   **Q.**   Okay.   And if I could direct your attention to the bottom

5   of page 53 of the transcript:

6              **"QUESTION:**   Okay.   And so other than

7              affecting compression of DVD -- of a -- of

8              DVD content that's been sector by sector

9              moved over to a hard drive, are there any

10             other techniques that RipGuard uses to keep

11             that copy just on a hard drive from being

12             playable?

13             **"ANSWER:**   No."

14             So, in your view of the evidence, is it correct or

15   incorrect that RipGuard and ARccOS have further techniques to

16   keep a sector-by-sector copy on a hard drive from being

17   playable?

18   **A.**   No.

19             **THE COURT:**   Well, as I understand it, though, the

20   testimony here, it's about RipGuard, okay, not about ARccOS.

21             **MR. BERTA:**   Yes.

22             **THE COURT:**   Okay.   So, if you'll deal with those

23   separately with this witness, then, please.

24             **MR. BERTA:**   Yes, Your Honor.

25

1  **BY MR. BERTA:**

2  **Q.**   Have you seen any evidence in the Sony DADC documents, to

3  your recollection, that would affect the playability of a

4  sector-by-sector copy moved over to a hard drive?

5  **A.**   No.

6  **Q.**   So, going back to the list of -- that's me -- the list of

7  methods of access, is there another method of access here on

8  this page that ARccOS and RipGuard errors cannot prevent a copy

9  from being made if you use that method of access?

10 **A.**   Well, the whole point of play and save is if you're

11 playing through a disc, ARccOS and RipGuard, by the very

12 premise of the products, don't interfere with that playback.

13 And if you can play a disc, you can see all the data in the

14 disc and, therefore, you can copy it.  So play and save.

15 **Q.**   And so --

16       **THE COURT:**  Excuse me.  What do you get when you

17 save -- when you play back the saved, whether it's -- it's on

18 your hard drive, I assume, right, or a hard drive?

19       **THE WITNESS:**  Yes.

20       **THE COURT:**  Do you then get the same playback, or do

21 you get an interference of the playback?

22       **THE WITNESS:**  No.  You get exactly the same playback

23 because you have exactly the same data as defined by the DVD

24 specification.  So you see exactly the same thing.

25       **THE COURT:**  And you see it in the same time frame?

 1  You don't have an interference from ARccOS or RipGuard?

 2          **THE WITNESS:**  No, not at all, because they -- the

 3  premise of these products is they never interfere.

 4  **BY MR. BERTA:**

 5  **Q.**  So, let me ask you sort of as an easy hypothetical.  If

 6  you're sitting at a computer, me sitting at a computer, and I

 7  have a DVD all teed up and ready to go on a piece of software,

 8  I find the main movie on that DVD software and then I use my

 9  mouse and I press "play" and the movie plays, okay --

10  **A.**  Right.

11  **Q.**  -- is there anything, in ARccOS or RipGuard, that can

12  prevent you from making a copy of all the sectors of that movie

13  as it's playing?

14  **A.**  No.  When you play a disc, you read the corresponding

15  sectors that have the playable data in them, so those sectors

16  are completely available to you and, therefore, you can copy

17  them.

18  **Q.**  Okay.  I want to change up the example a little bit.  Does

19  it require a human being to find the beginning of the movie and

20  press "play" in order to be able to play through a DVD and

21  access all of the playable content in copying?

22  **A.**  No.

23  **Q.**  Why not?

24  **A.**  Well, perhaps we could go back to the previous diagram.

25          A DVD playback is controlled by this navigation

1   engine.  All the user is doing is pressing buttons on a remote

2   control.  So, they are pressing up, down, left, right.  All

3   that does is send a signal to the navigation engine.  It's the

4   navigational engine that actually understands the DVD data

5   structures and understands what that signal is.

6          If you press "up" on a remote control, it's the DVD

7   data structures which define what up means.  And, so, it's the

8   computer and only the computer which understands.

9          The user doesn't even know, necessarily, what menus

10  are on the discs.  The user is just playing buttons and

11  exploring the disc.  So, all that information is available to

12  the navigational engine.  And, so, a piece of software can work

13  with a navigational engine and drive the playback.

14  **Q.**   I don't know if you were here when Mr. Schumann testified

15  that there's some walls or blueprints or something that prevent

16  a computer from being able to do what a human would do with

17  playback.  In your view, is that opinion correct?

18  **A.**   No.

19  **Q.**   Is there any other evidence that you've seen in this case

20  from people with percipient knowledge that says that

21  Mr. Schumann's opinion is incorrect?

22  **A.**   Yes, there is.

23          **MR. BERTA:**  I have another segment of Mr. Hollar's

24  deposition.  This has to do with the specifications and not

25  with ARccOS or RipGuard.

 1          **MR. SINGLA:**  Could you give us the page and line
 2   number before you play that, please?
 3          **MR. BERTA:**  Yes.  159, 9 to 13.
 4          **MR. SINGLA:**  9 to 13?  One moment, please.
 5          **THE COURT:**  Do you have a copy of his transcript --
 6          **MR. BERTA:**  I do.
 7          **THE COURT:**  -- I mean, of his deposition?  Excuse me.
 8   Thank you.  And what page is this?
 9          **MR. BERTA:**  Page 159, lines 9 to 13.
10          **MR. SINGLA:**  Your Honor, we'd ask for the next
11   question and answer to be played, also, for completeness.
12          **MR. BERTA:**  Your Honor, I think that's an issue of
13   cross.  I mean, the testimony is what the testimony is.  If
14   they want to show him something else, they can go ahead.
15          But, this is exactly what happened with respect to
16   Mr. Schumann's testimony, where they selectively -- not that
17   we're doing this selectively -- but played segments of
18   testimony.
19          **THE COURT:**  What's good for one is good for all,
20   right?
21          **MR. BERTA:**  Yeah.
22          **THE COURT:**  Go ahead and read both, okay, please.
23          (Video played as follows:)
24          "**QUESTION:**  Okay.  So, would you agree with
25          me that it doesn't require human interaction

```
 1               in order to figure out all the playable
 2               avenues on a disc; it just requires following
 3               the DVD-video specifications?
 4               "ANSWER:  That's correct."
 5  BY MR. BERTA:
 6  Q.   So, in your view --
 7               THE COURT:  Play the next question.  Okay.  "So if
 8  you had," is that what you're talking about?
 9               MR. SINGLA:  I believe so, Your Honor.  Okay.  "So if
10  you had," yes, Your Honor.
11               MR. BERTA:  I can go ahead and read it.
12               "QUESTION:  Okay.  So if you had -- let's say
13               Power DVD wasn't actually just a commercial
14               product, but was a ripper, and if power DVD
15               followed all the DVD specifications to
16               identify all the available areas of content
17               on the DVD and then copied them, that process
18               wouldn't see RipGuard either, right?
19               "MR. BARTH:  Object.  Vague and ambiguous.
20               It's lacking in foundation.  It's an
21               incomplete hypothetical."
22               "THE WITNESS:  (Answer)  I think it's a basic
23               fallacy in the question in that, you know,
24               we've never yet seen a ripper that actually
25               plays through the whole disc exactly like a
```

```
 1              player.  It's an extremely inefficient way of

 2              actually accessing the disc.  So, all the

 3              rippers that we have seen, even the ones that

 4              are trying to be smarter, are still trying to

 5              bring efficiency so that the ripping process

 6              is faster.  At the very least, most people

 7              are not going to sit for two hours and watch

 8              a DVD be ripped."

 9         THE COURT:  Okay.

10    BY MR. BERTA:

11    Q.    So whether or not rippers function as they function, is

12    the basic premise true or false that you do not -- it doesn't

13    require a human being in order to follow all the navigational

14    paths of a DVD, because you have the DVD specifications and the

15    DVD virtual machine?

16    A.    Mr. Hollar agrees with me on that.

17    Q.    Now, one of the last issues that was addressed was that

18    Mr. Schumann also said that there's some undefined mechanisms

19    in ARccOS and RipGuard that somehow prevent the copying of a

20    DVD, even if you access a DVD like a DVD player would.  Do you

21    remember that testimony?

22    A.    In general, yes.

23    Q.    Do you agree with that testimony?

24    A.    No.

25    Q.    Why not?
```

1   **A.**   The whole premise of these products is they have to allow

2   you to play an entire disc.  And if you can play a disc, you

3   have access to all the data, all the sectors of data associated

4   with playing the disc and, therefore, you can copy them.

5   **Q.**   Do you know whether or not Mr. Hollar again addressed this

6   issue in his deposition?

7   **A.**   Yes, he did.

8          **MR. BERTA:**  The next segment is page 300, lines -- I

9   think it's 12 to 301/17.

10          **MR. SINGLA:**  I'm sorry, 300 --

11          **MR. BERTA:**  Yeah, 300/12 to 301/17.

12          May I go ahead?

13          **MR. SINGLA:**  One moment, Your Honor, if I could have

14   a moment.

15          No objection, Your Honor.

16          **THE COURT:**  Where are you going to start, at 17, did

17   you say?

18          **MR. BERTA:**  It's at 301/12, but I actually think it

19   starts at -- I'm sorry, 300/12 is the actual question, but then

20   the --

21          **THE COURT:**  Well, why don't we drop down to 300/20 --

22          **MR. BERTA:**  Yes.

23          **THE COURT:**  -- because the question is asked again.

24          **MR. BERTA:**  It is, twice.  So I think, actually, the

25   recording is from the court reporter reading it back.

1          **THE COURT:**  We'll find out, I guess.  Okay.

2          (Video played as follows:)

3          **"QUESTION:**  So copying as a byproduct of

4          playing, if you're accessing a DVD -- again,

5          if you're accessing a DVD in a DVD-video

6          specification compliant manner, you would

7          agree that there's no current RipGuard

8          techniques that are directed to interrupting

9          that process, correct?

10         **"ANSWER:**  So there's no particular RipGuard

11         techniques that are designed to interfere

12         with playing, as we've discussed.

13         **"QUESTION:**  Yeah, I know, but the question

14         is:  For copying as a byproduct of that exact

15         playing, there's no current RipGuard

16         techniques that are addressed to that if the

17         playing is done in a DVD-video specification

18         compliant manner, correct?

19         **"ANSWER:**  So there's no techniques in current

20         RipGuard products that are designed to impact

21         copying during the process of playing."

22    BY MR. BERTA:

23    Q.   With respect to ARccOS, have you seen any evidence in the

24    Sony DADC documents that you've reviewed that suggests that

25    ARccOS has some secret technique to impact copying if you are

```
 1   copying while playing back the DVD in a DVD-video specification
 2   compliant manner?
 3   A.   No.
 4   Q.   Do you happen to know if any of the products in this
 5   litigation are designed with that principle in mind?
 6   A.   Yes, I understand the Facet product takes this general
 7   approach.
 8   Q.   Okay.  Now, with respect to -- you're aware that there's
 9   another product at issue in this case, called Vegas?
10   A.   Yes.
11   Q.   Okay.  And the Vegas product runs in a Windows
12   environment?
13   A.   I understand so, yes.
14   Q.   Is there any technical reason that a programmer couldn't
15   use this same type of play and save functionality in a Windows
16   environment, to your knowledge?
17   A.   No.  And, as I understand, the Vegas team understands
18   that, as well.
19   Q.   Is there evidence that the Vegas team understood that this
20   is something they could have done?
21   A.   Yes.
22            MR. BERTA:  I would like to put forth Chasen 104.
23            MR. SINGLA:  This is a document --
24            MR. BERTA:  It is.
25            MR. SINGLA:  Your Honor, as far as we know, this is
```

 1   not a document Mr. Dixon reviewed in preparing his expert

 2   opinions.  I'm not sure why it's being shown to the expert.

 3           **THE COURT:**  What is it?

 4           **MR. BERTA:**  It's a document showing exactly what he

 5   said, that there is evidence that the RealDVD people were aware

 6   that play and save is a way to access a DVD without seeing

 7   ARccOS and RipGuard.  They're not --

 8           **THE COURT:**  Well, okay.  Are you admitting this for

 9   the truth of what's contained there, or --

10           **MR. BERTA:**  This is -- it's funny, because when we

11   did the expert reports, we were on a pretty abbreviated

12   timetable --

13           **THE COURT:**  No, for what purpose are you seeking --

14   are you seeking to obtain his opinion about the accuracy of

15   this, or whether this informed his opinion, or what are you

16   using it for?

17           **MR. BERTA:**  Right.  So what I'm using it for is

18   whether this evidence is consistent with his opinion.

19           **MR. SINGLA:**  So, Your Honor, the only issue is, is

20   that this is not something that the witness, as an expert,

21   reviewed.  It's not in his list of reviewed materials.  We're

22   not objecting to it on hearsay grounds, I'm not, or on anything

23   like that.  We're just saying it's not something the expert

24   reviewed to prepare his reports.  That's it.

25           **MR. MICK:**  I haven't seen a copy of it, Your Honor,

```
 1   so I can't opine on whether I have an objection or not.

 2            THE COURT:  Well, why do we need to have testimony

 3   from someone else, to show if it's consistent with what he has

 4   already opined on himself?

 5            MR. BERTA:  Well, the reason is, Your Honor -- the

 6   reason is because you have some other experts in here, and they

 7   don't really know -- they've looked at what they've looked and

 8   said what they've said.  But, I think it's important to

 9   establish that Mr. Dixon is not out in the hinterland on his

10   opinion with respect to how someone can access a DVD and copy

11   without seeing ARccOS and RipGuard.

12            And if there's evidence in the record on this point

13   that people have understood this, then I think that goes to

14   Mr. Dixon's credibility versus other experts that have spoken

15   in this case.

16            THE COURT:  Okay.  Is this, in fact, in the record?

17            MR. BERTA:  They marked it at a deposition of

18   Mr. Chasen.

19            MR. MICK:  That's not the question, as I understand

20   it.

21            THE COURT:  Well, but is it in the record of the

22   proceeding here?

23            MR. BERTA:  It was not in our preliminary injunction

24   papers, no.

25            THE COURT:  Is it before the Court at all, or will it
```

1  be before the Court at all?

2           MR. BERTA:  Besides right now?

3           THE COURT:  Uh-huh.

4           MR. BERTA:  No.

5           THE COURT:  I don't understand why you're using it.

6  I'm really baffled.  It's not something he relied on,

7  apparently.  You're not going to elicit testimony from him that

8  it's something he relied upon.

9           MR. BERTA:  That's true, Your Honor.

10          THE COURT:  The Court interposes its own objection.

11 BY MR. BERTA:

12 Q.  Do you think it is common knowledge -- do you have any

13 understanding as to whether or not it's generally understood

14 that if you access a DVD compliant with the DVD-video

15 specifications, that ARccOS and RipGuard don't and cannot

16 prevent copying of the DVD through another method using that

17 access?

18 A.  Yes.  These technologies are understood in general.  You

19 can find them discussed in Wikipedia, for example, in terms of

20 scattering errors on a disc.

21          But the whole point of these products, as explained

22 in their own marketing literature, is they don't impede with

23 playback.

24          THE COURT:  How authoritative is Wikipedia?

25          THE WITNESS:  Well, it's in the public.  That's the

1  only point.

2          **THE COURT:**  Okay.  There's a lot that's out in the

3  public that's not particularly authoritative, though, right?

4          **THE WITNESS:**  Uh-huh, uh-huh.

5  **BY MR. BERTA:**

6  **Q**    With respect to the effectiveness, then, of ARccOS and

7  RipGuard in preventing copying, depending on how you -- what

8  method of access you use to get at the DVD, is there evidence

9  in the record that the Studio Defendants also agree that ARccOS

10  or RipGuard are not particularly effective?

11  **A**    Yes, I read that in the studio materials.

12  **Q**    Okay.  So, first, can you give us an idea, for example, in

13  the year 2008, how many Sony DVDs used ARccOS?

14  **A**    Sony reported they used four discs -- or four titles.

15  **Q**    In all of 2008?

16  **A**    In 2008.

17  **Q**    Okay.  And, to your knowledge, has Fox, one of the other

18  Defendants, ever used ARccOS or RipGuard in the United States?

19  **A**    Fox reported they have not used it.

20  **Q**    With respect to Paramount, one of the other Defendants, is

21  there any evidence in the record as to how often Paramount has

22  ever used either ARccOS or RipGuard, ever, on a DVD?

23  **A**    Paramount reported they've used one or the other a total

24  of three times.

25  **Q**    So three DVDs, ever?

1   A    Ever.

2   Q    With respect to Universal, is there evidence in the record

3   of how often Universal has put either ARccOS or RipGuard on a

4   DVD?

5   A    Universal reported they used them on five titles in 2006,

6   and not since.

7   Q    Is there any evidence in the record --

8        MR. MICK:  For clarity, Your Honor, when Mr. Berta is

9   saying "evidence in the record," where in the record are we

10  finding that?

11       MR. SCOTT:  In the PI papers.

12       THE COURT:  Is it in there, all in the PI?

13       MR. BERTA:  Yes.

14       THE COURT:  It's not in some other submission,

15  separately?

16       MR. BERTA:  No.  It's in the -- these are the backup

17  for all the materials in our preliminary injunction papers.

18       THE COURT:  Okay.

19  BY MR. BERTA:

20  Q    With respect to Universal DVDs, 2006, have you seen any

21  evidence as to what Universal thought about the Universal

22  RipGuard product (sic) that it used in 2006?

23       MR. SINGLA:  Your Honor, all of this testimony is,

24  again, beyond Mr. Dixon's reports and disclosures.  And, as

25  well, Mr. Berta's walking through the numbers of movies.  I

 1    have no objection, because it is in the papers.

 2          But now we're really starting to get into Mr. Dixon's

 3    effort to characterize evidence -- testimony by other witnesses

 4    that he didn't put in his reports.  And I don't believe he even

 5    reviewed the deposition, sometimes.

 6          **MR. BERTA:**  So, taking those in part, first of all,

 7    in the world of goose and gander, we spent hours with

 8    Mr. Schumann characterizing Mr. Chasen's e-mails, which were

 9    not in his report, about what he thought they meant about

10    retaining Ukrainian hackers, whether true or false.

11          So, second -- in fact, this is addressed by

12    Mr. Hollar, who was the studio expert that they pulled at the

13    last minute.  Mr. Dixon testified at his deposition he did, in

14    fact, review Mr. Hollar's transcript on this particular issue

15    of the Universal's view of the effectiveness of RipGuard.

16          I believe it is relevant to his opinion because it is

17    certainly information that is consistent with the conclusions

18    that he has drawn about these technologies.  And there's no

19    question, Mr. Hollar is their expert, so, like, it comes in.

20          **MR. SINGLA:**  Your Honor, Mr. Schumann did rely upon

21    that document.  It's listed in his report as a document he

22    relied upon, so there was a basis for his testimony.

23          **THE COURT:**  Which document?  Mr. Hollar's deposition?

24          **MR. SINGLA:**  No, no, I was responding to the

25    goose-and-gander argument (indicating quotation marks) that

 1  Mr. Berta was raising with Mr. Schumann's testimony.

 2          I think we can go back and -- we were very careful.

 3  Every document he relied upon, what he said, is in his report.

 4  The documents are listed in his list of materials reviewed.  So

 5  I don't think there's a goose-and-gander issue here.

 6          In terms of what Mr. Dixon is now trying to -- what

 7  they are trying to elicit from Mr. Dixon, it's not in his

 8  report.  In his report, he does not make these kinds of

 9  statements.  We had no notice that he was going to try to start

10  characterizing this evidence.

11          When he was deposed, after --

12          **THE COURT:**  Well, excuse me.  Is Hollar's deposition

13  going to be --

14          **MR. BERTA:**  We have submitted designations.

15          **THE COURT:**  You have submitted designations.  Then I

16  think that's the best way to do it.  And then you can argue it,

17  rather than having the expert now, when it's not in his report,

18  characterize it.  Okay?

19          So that's how you're going to have to handle it.

20          **MR. BERTA:**  Okay.  I will argue it.

21          **THE COURT:**  Okay.  You will argue it.  I'm sure you

22  will.

23          And, how much longer are you going to be with

24  Mr. Dixon?

25          **MR. BERTA:**  Moments, Your Honor.

1          I do have, then, with respect to this issue, there is

2     a document that we became aware of after the reports went in,

3     similar to this, that's not in his report, that also isn't in

4     our PI papers.  It's a studio document, so it is authentic, I

5     assume, and admissible, and an admission.

6          I would like to get that in the record.  I want to

7     have Mr. Dixon examine it.

8          **THE COURT:**  When did you get it?

9          **MR. BERTA:**  We got it at some point before the PI

10    papers.  There's no doubt about that, Your Honor.

11         But I think it's another document that we sort of

12    became aware of after going back through Mr. Hollar's

13    testimony, because he addressed some of the issues raised in

14    this thing.

15         Obviously, we could have used it with Mr. Hollar and

16    gotten it in through that, but -- but -- and I'm not suggesting

17    that we're trying to sneak it in through Mr. Dixon, but I do

18    think it is along the lines of something that we haven't --

19    it's a particular document, it's not in the record on our PI

20    papers, for whatever reason, because we were anticipating

21    getting it in through Mr. Hollar, because they said he was

22    coming.

23         And so I would -- either Mr. Dixon can talk about

24    what he thinks the document means, and if the Court is not

25    interested in that, I would just ask for -- just to be able to

 1  submit it so we can argue from it in closing.

 2          THE COURT:  And, any objection to his testifying

 3  about that?

 4          MR. BERTA:  I need to give the document.

 5          MR. SINGLA:  I don't know what the document is, Your

 6  Honor.

 7          THE COURT:  I guess we will find out when we get

 8  there.

 9          MR. SINGLA:  Yeah.

10          MR. BERTA:  Here you go.

11          For the Record, the document that I'm referencing has

12  a Bates number of MPAA-WAR-0010954.

13          (The Court examines document)

14          THE COURT:  Yes.

15          MR. SINGLA:  So, the subject matter of this document

16  is certainly something on which many studio executives were --

17  individuals, witnesses were deposed.

18          I am certain that Wilson Sonsini, RealNetworks, will

19  submit or has submitted deposition designations to the Court

20  relating to this issue.  I don't know about this specific

21  document, but on this issue I'm certain of that.

22          So, again, I'm not sure that it makes sense to have

23  Mr. Dixon testify about a document he's never seen before, and

24  that we had had no notice he was going testify about, and

25  that's not before the Court, to begin with.

 1          This issue, I can assure the Court, I know they will

 2  be arguing in closing, because they've discussed these kind of

 3  documents with our witnesses.

 4          **THE COURT:**  And are they able to get this in, this

 5  document in?

 6          **MR. SINGLA:**  This document?

 7          **THE COURT:**  Yeah.

 8          **MR. SINGLA:**  We have no objection to it coming in,

 9  Your Honor.

10          **THE COURT:**  Then there you are.

11          **MR. BERTA:**  So rather than walking through it with

12  Mr. Dixon, Your Honor, then I would move for admission of

13  MPAA-WAR-0010 --

14          **THE COURT:**  Hold on.  What number are we using for

15  this document?  That's not our numbering system.

16          **MR. BERTA:**  No, no.  I was just putting that in the

17  record.

18          **THE COURT:**  How about Real's next in order?

19          **MR. BERTA:**  E, Exhibit E.

20          **THE COURT:**  As in Edward.

21          **MR. BERTA:**  E as in Edward.  That's a lot easier than

22  the seven digits at the bottom of the page.  E is admitted.

23          (Exhibit E received in evidence.)

24          **MR. MICK:**  I'm going to object to E on the grounds

25  it's hearsay, Your Honor.

```
 1              THE COURT:  Objection is overruled.
 2   BY MR. BERTA:
 3   Q    So, based on the evidence that you have been able to
 4   review and the testimony, what's your -- what do you -- do you
 5   consider ARccOS and RipGuard to be copy protection measures?
 6   A    No, they're not.
 7              MR. BERTA:  I would like to mark Mr. Dixon's slides
 8   as Exhibit F for demonstrative purposes, Your Honor.
 9              THE COURT:  Okay.  They're so marked.
10              MR. SINGLA:  No objection, Your Honor.
11              MR. MICK:  No objection.
12              (Exhibit F marked for identification.)
13              THE COURT:  And that's it?
14              MR. BERTA:  Thank you, Your Honor.
15              THE COURT:  Okay.  Mr. Singla?
16              MR. SINGLA:  Yes, Your Honor.  I do have some
17   questions.
18              THE COURT:  I thought you might.
19              MR. SINGLA:  Your Honor, if I could have a moment to
20   just get organized?
21              THE COURT:  Yes.
22              (A pause in the proceedings)
23              (Off-the-Record discussion)
24              THE COURT:  Those are the slides, is that correct?
25   That's fine.  Thank you.  You may proceed.
```

<u>**CROSS EXAMINATION**</u>

**BY MR. SINGLA:**

**Q**    Good morning, Mr. Dixon.

**A**    Good morning.

**Q**    It's good to see you again.

        Now, you submitted two reports to the Court.  Right?

**A**    Yes.

**Q**    Under oath?

**A**    Yes.

**Q**    And one of the things that you discuss in those reports
that you submitted to the Court is your opinion that the way
that the Vegas system deals with bad sectors is a reasonable
approach to dealing with scratches and smudges.

        Do you recall that?

**A**    Yes.  Yes, I do recall that.

**Q**    It's one of the issues that RealNetworks asked you to
opine about.

        **MR. BERTA:**  Just for the Record, Your Honor, this is
obviously beyond the scope of the direct.  The Court is -- if
the Court will entertain that objection, I would like to make
it.

        **THE COURT:**  Well, entertain it, but it's overruled
because you did submit the reports.  Right?

        **MR. BERTA:**  For reference purposes, yes, Your Honor.

        **THE COURT:**  Okay.  Well, they're here, and they're in

 1  evidence.  So, you may proceed.

 2           **MR. SINGLA:**  Thank you, Your Honor.

 3  **BY MR. SINGLA:**

 4  **Q**    So, that's an issue that RealNetworks wanted you to look

 5  at.  Right?

 6  **A**    Could you restate the question?

 7  **Q**    Sure.  RealNetworks, one of the things they wanted you to

 8  opine about is that the Vegas system, the way it deals with bad

 9  sectors, is a reasonable approach to dealing with scratches or

10  smudges.  Right?

11  **A**    I don't know that I was asked to give an opinion about

12  that.  I was reading the record, and it struck me that that was

13  a reasonable thing to do.  And I noticed objections from the

14  other side about it, and so I was actually responding to those

15  objections.

16  **Q**    Now, you didn't address that opinion with Mr. Berta this

17  morning, right?

18  **A**    I believe not, yes.

19  **Q**    But because it is in your reports that you have submitted

20  to the Court, let's talk about it for a few minutes.

21           Now, you're not an expert in error management on

22  DVDs, are you?

23  **A**    No, I'm not.

24  **Q**    And when you wrote your report, you had no knowledge of

25  the kinds of error correction techniques used by DVD player

 1   software, did you?

 2   **A**    I wouldn't say that at all.  I have a general

 3   understanding.

 4   **Q**    Sir, you have no personal knowledge of the error

 5   correction techniques used in any other software, do you?

 6   **A**    I do not have personal knowledge of specific error

 7   correction techniques used in specific software, that's

 8   correct.

 9   **Q**    And before you started working on this case, you had not

10   done any work on error recovery techniques for playing a DVD.

11   **A**    That's correct.

12   **Q**    Or for copying a DVD.

13   **A**    Error correction techniques for copying a DVD?

14   **Q**    Right.

15   **A**    That's correct, too.

16   **Q**    You had not done any work on those subjects.

17   **A**    I still believe that's correct, yeah.

18   **Q**    Now, at the time of your report, you understood that the

19   Vegas system skips to the next cell when it hits a bad sector

20   during copying.  Right?

21   **A**    I understood that's part of their strategy, yes.

22   **Q**    Part of their strategy.

23   **A**    That's what I said.  Yes.

24   **Q**    All right.  Strategy to copy ARccOS- and

25   RipGuard-protected discs?

1  A     Part of their strategy to read discs.

2  Q     Now, you don't know any other player that takes that

3  approach to dealing with scratches or smudges, do you?

4  A     I don't know the details of how other players deal with

5  scratches and smudges.

6  Q     And you never thought about that issue before getting

7  involved in this case, did you?

8  A     Probably not.

9  Q     You never thought about whether skipping an entire cell is

10  a reasonable approach for handling errors before you got

11  working on this case.  Right?

12  A     That's probably correct, yes.

13  Q     And you never -- strike that.  Now, you didn't do any

14  testing or experiments to arrive at your conclusion that the

15  way Vegas handles bad sectors is a reasonable approach for

16  scratches.

17         You didn't do any testing or experiments to arrive at

18  that conclusion, did you?

19  A     No.  I was looking at the general strategy, and asking the

20  question of whether that was a reasonable approach.

21  Q     You didn't take some scratched discs and try to see how

22  programs handle them?

23  A     No.

24  Q     You didn't try scratch some discs up and see how programs

25  would respond?

1   **A**     No.

2   **Q**     You didn't really do anything other than just come to a

3   conclusion.   Right?

4   **A**     Based on my general understanding of DVDs and working with

5   many of these programs over the years, yeah.

6   **Q**     But sir, when you wrote your reports, you didn't even

7   really know how Vegas dealt with errors when playing a DVD, did

8   you?

9   **A**     Not sure whether that was covered.

10  **Q**     I'm sorry, sir.   When you wrote your reports, you did not

11  know how RealDVD deals with scratches on playback, did you?

12          **MR. BERTA:**   I'm sorry, did you say "report" or

13  "reports"?

14          **MR. SINGLA:**   "Reports."

15          **THE WITNESS:**   I don't remember the exact timing of

16  when I read that kind of information.

17  **BY MR. SINGLA:**

18  **Q**     And when you wrote your reports, you didn't know the exact

19  details of how Vegas -- Vegas's approach to errors when

20  copying, did you?

21  **A**     I certainly didn't know exact details, no.

22  **Q**     I mean, at the time of your deposition, sir, you had never

23  reviewed any RealNetworks documents at all, had you?

24  **A**     Again, I don't remember the timing.

25  **Q**     Well, sir --

1          **MR. SINGLA:**  Can we put up Mr. Dixon's opening

2   report?

3   **BY MR. SINGLA:**

4   **Q**    This is your opening report, sir?  If you will look on the

5   screen over there?

6          (Witness examines document)

7   **A**    Yes.

8   **Q**    Let's turn to the list of materials reviewed.  Is this the

9   list of materials reviewed in your report?

10  **A**    Yes.

11  **Q**    Now, this is the first page.  There's no documents from

12  RealNetworks listed, are there?

13         (Witness examines document)

14  **A**    Apparently not.  No.

15  **Q**    How about on the second page?

16  **A**    Apparently not.

17  **Q**    Can you go to the next page?  Review of the last page,

18  nothing else.  Nothing from RealNetworks, right?

19  **A**    That's correct.

20  **Q**    And if we looked at your rebuttal report, we also wouldn't

21  find any documents listed from RealNetworks, right?

22  **A**    As I said, I don't remember exactly.

23  **Q**    Do you have any doubts?  Should we go look at your

24  rebuttal report?

25  **A**    I'm happy to believe you on this topic.

1  Q    Well, let's just make sure there's no ambiguity.

2            **MR. SINGLA:**  If we could pull up the ELMO.

3  **BY MR. SINGLA:**

4  Q    So, this is your rebuttal report (Indicating).

5  A    Yes.

6  Q    This is the Exhibit 1 (Indicating).

7  A    Okay.

8  Q    These are the additional materials you reviewed.  Correct?

9            (Witness examines document)

10 A    Yes.

11 Q    And there's nothing in there, no documents from

12 RealNetworks, right?

13           (Witness examines document)

14 A    Well, there're depositions from RealNetworks.  That was my

15 confusion.

16 Q    Fair enough.  We'll put the depositions aside.  We'll get

17 to those.

18           No documents, right?

19 A    That's correct.

20 Q    In fact, you reviewed interrogatory responses from the

21 studios, right?

22 A    Yes.

23 Q    But you didn't review the interrogatory responses from

24 RealNetworks, did you?

25 A    No.

1   Q    So you didn't review the official Vegas technical

2   specification, did you?

3   A    No, I did not.

4   Q    You didn't review what it says about how and why Vegas

5   deals with ARccOS-protected discs, did you?

6   A    No, I did not.

7   Q    The lawyers didn't give you those documents, did they?

8   A    I don't believe I've seen those documents.

9   Q    Now, when you wrote your report, sir, you hadn't spoken to

10  any of the engineers at Real, either, had you?

11  A    My conclusions don't require details from source code.

12  They're general conclusions based on how products work, how DVD

13  products work.

14  Q    Well, sir, let's just make sure you understand my

15  question.

16       My question is, when you wrote your reports, you had

17  not spoken to any of the engineers at Real, had you?

18  A    That's correct.

19  Q    And, when you wrote your report and you opined by the way

20  Vegas was handling errors, you had not reviewed the deposition

21  of Mr. Buzzard, had you?

22  A    Again, I don't remember the timing.  Apparently not.

23  Q    And he was the individual who wrote the Vegas code that

24  deals with ARccOS- and RipGuard-protected discs, right?

25  A    I don't -- I'm not sure about that.

1  Q    Now, you're a computer scientist, right?

2  A    That's correct.

3  Q    You can read source code?

4  A    That's correct.

5  Q    You said, I think when Mr. Berta was examining you, that

6  you got involved, even -- even in recent memory, in the

7  nitty-gritty of software code?

8  A    Yes.

9  Q    But you didn't review the source code for Vegas, did you?

10 A    No.

11 Q    And you never tested Vegas on ARccOS-RipGuard-protected

12 discs, did you?

13 A    That's correct.

14 Q    In fact, you never even used Vegas at the time you wrote

15 your reports.  Right?

16 A    That's correct.

17 Q    You had never even seen it.

18 A    That's not correct.

19 Q    But you never used it, right?

20 A    I've never -- I had not personally used it at that time.

21 That's correct.

22 Q    Now, sir, you know, because you testified with Mr. Berta,

23 that ARccOS and RipGuard have more than just these bad sectors,

24 right?

25 A    That's correct.

1   Q    They have other errors on them, right?

2   A    That's correct.

3   Q    Other structures or changes to the logical DVD, right?

4   A    There are errors inserted in the DVD data structures.

5   Q    You know, false paths, so to speak?

6   A    Generally, yes.

7   Q    Things to throw rippers off?

8   A    Things designed to confuse some ripper programs, yes.

9   Q    And Vegas, in its code that deals with ARccOS- and

10  RipGuard-protected discs has to do more than just skip bad

11  sectors, right?

12          MR. BERTA:  Your Honor, I guess I just object on

13  foundation, since he's the one that established that Mr. Dixon

14  didn't look at the code.

15          THE COURT:  Objection is overruled.

16          You may answer.

17  BY MR. SINGLA:

18  Q    Let me rephrase my question.

19          You would agree that the Vegas program that deals

20  with ARccOS- and RipGuard-protected discs would have to do more

21  than just skip bad sectors, right?

22  A    Hmm, I'm not sure the -- the basis of that question, of --

23  the point I'm trying to make here is that if you play back a

24  disc, you don't see any of these errors.  So it's not a matter

25  of trying to skip them or avoid them or anything.  If you play

1  back a disc, you never see them.  They're totally invisible to

2  you.

3  Q    So, we'll get to that opinion.  I have -- I understand

4  that, and believe me, we'll get to that.

5        I want to talk right now, though, about Vegas, and

6  your opinion that the way Vegas copies ARccOS- and

7  RipGuard-protected discs is a reasonable approach to scratching

8  and smudges.  You remember, you gave that opinion?

9  A    Yes.

10 Q    So, I want to talk about that first.

11       Now, you would agree that the way Vegas copies

12 ARccOS- and RipGuard-protected discs requires it to do more

13 than simply deal with bad sectors.  It also has to deal with

14 these other techniques, right?  These false paths.

15 A    Again, I haven't read the code, but from my understanding

16 of trying to do a sector copy, if you're doing a sector copy,

17 the strategy they use is reasonable.

18 Q    But, Vegas doesn't do a sector copy, does it, sir?

19 A    Well, it skips bad sectors, yes.

20 Q    But it doesn't do a sector copy, does it, sir?

21 A    Oh, I understand what you are saying.  It -- it skips

22 multiple sectors, sometimes.  In an intelligent way.

23 Q    Right.

24 A    Uh-huh.

25 Q    And also, the method that Vegas use is not a

1   sector-by-sector copy.  It's a file mode copy, isn't it?

2   **A**    I don't know.

3   **Q**    Now, when Mr. Berta was examining you, he asked you if

4   there's a bed sector on the DVD, you can't tell whether that's

5   from a scratch or from ARccOS or RipGuard.

6           Do you remember he asked you that?

7   **A**    Yes, I do.

8   **Q**    And your answer was very interesting, very precise, I

9   thought.  You said, you can't tell if you are a consumer.

10  That's what you said, right?

11  **A**    Yes.

12  **Q**    Consumers can't tell, right?

13  **A**    Right.

14  **Q**    But you're not telling the Court, are you, that

15  RealNetworks didn't know that those discs had bad sectors put

16  on by ARccOS and RipGuard, right?  You're not telling the Court

17  that, are you?

18  **A**    I have no information about that.

19  **Q**    And, you said something about something about how software

20  programs would not be able to tell whether the bad sectors are

21  from ARccOS or RipGuard or from scratches.

22          Is that what you were telling the Court?

23  **A**    Yes.

24  **Q**    But, sir, you know and understand, don't you, that the

25  Vegas program, itself, takes different actions based on whether

```
 1    it thinks bad sectors are caused by ARccOS and RipGuard or by

 2    scratches.  You know that, don't you?

 3              MR. BERTA:  Objection.  No foundation.

 4              THE COURT:  The question is does he know that.  The

 5    objection is overruled.

 6              You may answer.

 7              THE WITNESS:  No, I don't know.

 8    BY MR. SINGLA:

 9    Q    Well, if you saw a specification for Vegas where it

10    explained that, then you would have to retract this opinion

11    that software can't tell, right?

12    A    No.  No, you're talking about different things here.

13    Q    Now, you're saying that Vegas skipping to the next cell is

14    a reasonable way to deal with scratches and smudges, right?

15    A    I'm saying the general strategy that Vegas -- that I

16    understand Vegas uses is a reasonable strategy.

17    Q    Now, you know that a cell of video can be many minutes

18    long, right?

19    A    Yes.

20    Q    So when Vegas does that, if it really was a scratch, you

21    would skip a whole chapter, wouldn't you?

22    A    You might, yes.

23    Q    So, don't you think that Vegas is skipping the cell

24    because it knows it's an ARccOS or RipGuard cell?  That's why

25    it's doing it?
```

1  **A**    That's ridiculous.

2  **Q**    Sir, ultimately you have no opinion, do you, on whether

3  Vegas circumvents ARccOS or RipGuard, do you?

4  **A**    In the legal sense, no.

5  **Q**    Now, I want to go to another subject.  You testified with

6  Mr. Berta, I think you were telling the Court that you think

7  ARccOS and RipGuard are not copy protection.

8          Am I understanding correctly?

9  **A**    Yes.

10 **Q**    Now, even you admit, though, that RipGuard and ARccOS are

11 sold by Sony DADC and Macrovision to the studios as copy

12 protection.  Right?  You admit that?

13 **A**    We had a long discussion at the deposition about what we

14 mean by these terms.  And in the strict term of "copy

15 protection," I say these are not copy protection.

16         But as we agreed at the deposition, if you use that

17 term very loosely, yes, Sony more than Macrovision tends to use

18 that term.

19 **Q**    I'm not asking what terms they tend to use, sir.  I'm

20 saying the reason that the studios pay lots of money to

21 Macrovision and Sony DADC for these technologies is to protect

22 the DVDs from being copied.  Right?

23         **MR. BERTA:**  With that, Your Honor, it's not a

24 do-you-know question, so there is no foundation.

25         **THE COURT:**  Objection -- objection is sustained.  He

 1  doesn't know if they spent a lot of money and -- so unload that

 2  question.

 3              MR. SINGLA:  Certainly, Your Honor.

 4  BY MR. SINGLA:

 5  Q    Sir, these products are marketed as rip-inhibitors, right?

 6  A    That kind of terminology, yes.

 7  Q    And that means programs to stop or technologies to stop

 8  copying.  Right?

 9  A    No, it means technologies intended to slow down certain

10  kind of ripper programs.

11  Q    They're marketed in terms of how well they stop or

12  retard -- impair, if you will -- impair popular ripping

13  programs.  Right?

14  A    Yes.

15  Q    You would agree that these technologies are designed to

16  impair the operation of ripping programs.

17  A    Some ripping programs, in some ways, yes.

18  Q    Now, you -- you said to Mr. Berta, and right now in

19  response to my question, that they just slow down copying.

20  Right?

21              ARccOS and RipGuard just slow down the copying?

22  A    Well, the term "impair" you used is good.  Depending on

23  which copy program it is.  Which version of which copy program,

24  and which version of ARccOS and RipGuard.

25              They may stop some programs, and they may slow down

 1  some programs, and they may not inhibit some other programs at

 2  all.

 3  Q    But you would agree that even lengthening copy times would

 4  discourage consumers from copying movies.  Right?

 5  A    Probably, yes.  I don't -- I don't have any information

 6  about that.

 7  Q    Well, sir, it's your view, is it not, that extending the

 8  copying time would discourage consumers from using copying

 9  programs?

10  A    It might discourage some consumers, yes.

11  Q    Now, you're giving the Court an opinion here about what's

12  copy protection and what's not.  But you don't consider

13  yourself an expert in copy protection, right?

14  A    This isn't my opinion.  This is me quoting from the CPSA

15  doc, specification.

16  Q    Okay, so there we go.  You're not saying it's your opinion

17  that ARccOS and RipGuard are copy protection or not, right?

18  A    That's not the question you asked before.

19  Q    I'll make sure.  Are you telling the Court that it's your

20  opinion that ARccOS and RipGuard are copy protection?  Or not?

21          Are you giving the Court that opinion?

22  A    I'm giving the opinion that they do not fit the

23  understanding of "copy protection" as explained in the CPSA

24  document.  That's correct.

25  Q    Okay.  So, we'll talk about the CPSA document in one

 1   second.

 2              I want to know, are you telling the Court that it's

 3   your opinion that ARccOS and RipGuard are not copy protection?

 4   **A**    Yes.  That's my opinion.

 5   **Q**    That's your opinion.

 6   **A**    That's my opinion.

 7   **Q**    That you have given the Court.

 8   **A**    Yes.

 9   **Q**    But you don't consider yourself an expert in copy

10   protection, right?

11   **A**    No.  I'm not an expert in copy protection.

12              **THE COURT:**  Are they a form of copy protection?

13              **THE WITNESS:**  Speaking very generally, they're, of

14   course, sold that way, and using that terminology.  But

15   speaking precisely, which is what I'm asked to do here, they

16   are not actually copy protection.  According to the industry.

17              **THE COURT:**  Are they an obfuscation?

18              **THE WITNESS:**  No.  They insert errors in the disc,

19   but they don't block -- in any way mix up the actual playable

20   data.

21   **BY MR. SINGLA:**

22   **Q**    Now, before getting involved in this case, the only work

23   you had done on copy protection on content protection was

24   writing a few articles, right?

25   **A**    And speaking to people in the industry.

1  Q    You had written one article discussing copy protection,

2  and mentioned it in passing in a few other articles, right?

3  A    I wrote one major article on copy protection.  I've also

4  done talks in that area.

5  Q    Well, let's look at some of the talks and presentations

6  and articles that you have written before you were hired in

7  this case, before you became an expert.

8           MR. SINGLA:  Could we put up Exhibit 623.

9           MR. BERTA:  Do you have a copy?

10          MR. SINGLA:  Yes.

11          MR. BERTA:  Thank you.  For Mr. Mick, too.

12          MR. SINGLA:  I will not deny Mr. Mick.

13  BY MR. SINGLA:

14  Q    Now, this is a presentation you gave, correct?

15  A    Yes.

16  Q    In 2006.

17  A    Yes.

18  Q    You think you gave this at Princeton.

19  A    Yes.

20  Q    Now, if we could turn to Page 9 of the document, Slide 18.

21  As I think Mr. Bales, could you blow that up?

22          MR. SINGLA:  Mr. Bales, could you blow that up?  It's

23  Page 9.  If you can blow up the bottom slide.

24  BY MR. SINGLA:

25  Q    Now, that's a slide where you are talking about content

1    protection technologies, right?

2    **A**    Yes.

3    **Q**    And you list, about three or four lines down, Sony DADC

4    ARccOS, Macrovision RipGuard.  Right?

5    **A**    Yes.

6    **Q**    They are a form of copy protection, aren't they, sir?

7    **A**    No, I list them here as a kind of content protection, in

8    the general sense.

9    **Q**    Let's look at Exhibit 235.

10            Just one moment.  Let me follow up on your last

11   comment there.  Now, whether you are going to call these copy

12   protection or content protection, you agree that these

13   technologies protect against certain ways -- at least certain

14   ways -- of copying DVDs.  Right?

15   **A**    They inhibit certain kinds of ways of copying DVDs, yes.

16   **Q**    Okay.

17           **THE COURT:**  Well, what do you mean -- what is the

18   distinction between content protection and copy protection?

19           **THE WITNESS:**  Right, right.  "Content protection," as

20   used in the CPSA document, "content protection system" is the

21   overall encompassing system which has to do with the

22   technology, but also the licensing and any other elements that

23   enforce that technology.

24           "Copy protection" strictly, according to the CPSA,

25   has to do with locking up the content so you cannot copy it

 1  unless there's some authentication mechanism like keys, for

 2  example, that allow that content to be unlocked.

 3         So, strictly, content protection is the big thing,

 4  copy protection is the precise thing.  But of course, the terms

 5  are used very loosely in the industry as well.

 6         **THE COURT:**  What good is content protection if you

 7  can't protect it against copying?

 8         **THE WITNESS:**  Right.  So, copy protection is part of

 9  content protection.  Maybe I should have said it that way.

10  **BY MR. SINGLA:**

11  **Q**    And what you're trying to say now, if I understood

12  correctly, in response to the Court's question, is that it is

13  your opinion now that ARccOS and RipGuard are content

14  protection, but not copy protection, right?

15  **A**    In a loose sense, yes.

16  **Q**    In a loose sense they're content protection?

17  **A**    They're -- they're a form of protecting content.

18  **Q**    And, now, are they, in a loose sense, copy protection

19  also?

20  **A**    In a very loose sense, a copy protection, they're -- these

21  companies call them copy protection.

22  **Q**    Do you call them copy protection?

23  **A**    In a loose sense, you could call them copy protection, I

24  agree with that.

25  **Q**    Well, this is an article that you have up on your website,

1   right, sir?

2           MR. SINGLA:  Let me give the Court, this is Exhibit

3   235.

4   BY MR. SINGLA:

5   Q    Right, sir?  This is something you have on your website?

6   A    Yes.

7   Q    And it was last edited in April, 2009?

8   A    Yes.

9   Q    That's after you learned everything you had learned about

10  ARccOS and RipGuard in this case?

11  A    Yes.

12  Q    Now, if we turn to Page 11 --

13          MR. SINGLA:  Mr. Bales, can you pull up the part that

14  begins, "Replicated DVD source protections"?

15  BY MR. SINGLA:

16  Q    Now, this is talking about ARccOS and RipGuard, right?

17  A    Yes.

18  Q    This is up on your website currently, today, right?

19  A    Yes.

20  Q    And it describes these things as passive protection.

21  Right?

22  A    Yes.

23  Q    Passive protection against copying, right?

24  A    Yes.

25  Q    And, if we look at the prior page, Page 10 -- I'm sorry,

 1  can we go back to Page 11 for one moment, pull that back up.

 2          Now, you quote there in the third paragraph, some

 3  language from Macrovision.  Do you see that, sir?

 4  **A**    Yes, I do.

 5  **Q**    That "...85 to 95 percent of consumers lack the patience

 6  and the technical know-how to break through the extra layer of

 7  DVD copy protection that RipGuard provides."

 8  **A**    Right.

 9  **Q**    Do you see that?

10  **A**    Uh-huh.

11  **Q**    That's something you put in your article, right?

12  **A**    That's something that Macrovision says, yes.

13  **Q**    Now, if we could go to Page 10.  And if we could pull up

14  the bottom part.

15          Now, you're saying here at the very bottom, that

16  "...content owners still desire stronger protection..."

17          Right?

18  **A**    Right.

19  **Q**    This is beyond CSS.

20  **A**    Right.

21  **Q**    And they have tried various third-party products to add

22  copy protection, right?

23  **A**    That's what I say, yes.

24  **Q**    And the copy protections that you mention that they have

25  tried include ARccOS and RipGuard.

1   **A**     Yes.

2   **Q**     Now, a little -- at the end of the second paragraph, you

3   mention the term "speed bump."

4   **A**     Yes.

5   **Q**     Now, a speed bump is something that prevents casual

6   consumer copying.  Right?

7   **A**     Yes.

8   **Q**     And that's a goal of copy protection in the DVD industry,

9   right, to provide speed bumps?

10  **A**     That's one way the industry describes what -- how

11  they're -- how, for example, they view CSS.  It may be broken,

12  but it still serves as speed bump, yes.

13  **Q**     The goal of the industry is to provide a speed bump.

14  That's the goal of copy protection, right?

15  **A**     I'm not sure I should be speaking to the goal of the

16  industry.

17  **Q**     Well, the goal is to increase the level of effort such

18  that consumers won't bother to make copies.  Right?

19  **A**     I'm sorry, the goal of what?

20  **Q**     The industry.

21  **A**     Could you rephrase that, in more -- more precise context?

22  **Q**     Sure, sure.  The term "speed bump" refers to a copy

23  protection technology that increases the level of effort such

24  that consumers won't bother to copy DVDs.  Right?

25  **A**     So that's the -- some consumers won't bother.  That it

 1   will slow down, yes.

 2   **Q**    Now, you mentioned *Mediaware* magazine?

 3   **A**    Yes.

 4            **MR. SINGLA:**  If we could look at Exhibit 225.

 5            **THE COURT:**  Well, if we can go back to these

 6   paragraphs.

 7            **THE WITNESS:**  Uh-huh.

 8            **THE COURT:**  Page 10, and 11.  Isn't there essentially

 9   almost an interchangeable use of the terms "content protection"

10   and "copy protection" here?

11            **THE WITNESS:**  Yes.  Yeah, they're used in very

12   general ways.

13            **THE COURT:**  But you've used them in these general

14   ways as well.

15            **THE WITNESS:**  Oh, yes.  Yeah, definitely.

16            **MR. SINGLA:**  Exhibit 235.  If we can put it up on the

17   screen, Mr. Bales, 235.

18            I'm sorry, 225.  My apologies.  This is Exhibit 225.

19   **BY MR. SINGLA:**

20   **Q**    Sir, the term "speed bump," that's a term for copy

21   protection, right?

22   **A**    Generally, yes.  Speaking generally.

23   **Q**    Now, let's turn to Page 7 of this exhibit.

24            Now, this is an article that you wrote, correct?

25   **A**    Yes.

 1  **Q**    About Sony ARccOS.

 2  **A**    Well it's actually the result of an interview with Sony

 3  ARccOS, so I'm telling the industry what Sony says about their

 4  products.

 5  **Q**    These are your words on the page, right, sir?

 6  **A**    Oh, yes.  Except for the quotes.  That's their words.

 7  **Q**    So, at the beginning, you say -- at the top, if we can

 8  just pull up the headline, you say that ARccOS is a speed bump

 9  to slow down casual copying.  Right?

10  **A**    That's what it says.

11  **Q**    That's what you wrote, right, sir?

12  **A**    Actually, the editor at the time may have written that.

13  So I'm not exactly sure whether those are my words.

14  **Q**    Did you review it before it was published?

15  **A**    Oh, yes.

16          **MR. SINGLA:**  And if we can pull out the bottom two

17  paragraphs on the left-most column.

18  **BY MR. SINGLA:**

19  **Q**    And there you say that "...the Sony technology aims to

20  discourage the casual DVD ripping and copying..."  Right?

21          Let me read that again.  I didn't read that very

22  well.  You say that the Sony technology -- that's ARccOS,

23  right?

24  **A**    Yes.

25  **Q**    It aims to discourage -- sorry, its aim is to discourage

 1  the casual DVD ripping and copying of DVDs by consumers.

 2  **A**     Yes.

 3          **MR. SINGLA:**  Your Honor, could we move for the

 4  admission of Exhibits 225, 235, and 623?

 5          **THE COURT:**  Any objection?

 6          **MR. BERTA:**  Your Honor, I think that -- technically

 7  hearsay of the studios.  I mean, so I'm not sure what they

 8  would be for.

 9          I mean, certainly they can use them with Mr. Dixon --

10          **THE COURT:**  I thought these were authored by this

11  witness.  I mean, he's got D point -- D.D. at the bottom of

12  this.

13          And that suggests that you authored this article,

14  right?

15          **THE WITNESS:**  Right.

16          **MR. BERTA:**  It's fine, Your Honor.

17          **THE COURT:**  And I thought that 225 is authored by --

18  235 is authored by him, and the others are his slides.  So,

19  objection is overruled.

20          (Exhibits 225, 235, 623 received in evidence.)

21  **BY MR. SINGLA:**

22  **Q**    Now, sir, I want to change subjects.  You testified with

23  Mr. Berta that you didn't get technical details of ARccOS and

24  RipGuard.  Is that what you said?

25  **A**    I didn't have full technical details.  That's correct.

1  Q    But, sir, first of all, you didn't review all of the

2  documents that Macrovision and Sony DADC produced in this

3  litigation, did you?

4  A    I -- I don't know.  I've reviewed what I've said I've

5  reviewed.

6  Q    Well, let's take a look.

7             MR. SINGLA:  Get the ELMO?

8  BY MR. SINGLA:

9  Q    This is your report, your opening report, and the Appendix

10 B.

11            And, do you see there, you list -- what is it, about

12 ten documents from Sony DADC?  Do you see that?

13 A    Okay, yes.

14 Q    Right?

15 A    Yes.

16 Q    And those are the only ones you reviewed, right?

17 A    Yes.

18 Q    And, do you see that, sir, that there are Bates numbers,

19 and there's numbers that you didn't review?  Like, you didn't

20 review 0 to 14 or 59 to 263?

21 A    Yes.

22 Q    Why don't we turn the page.  There's documents listed from

23 Macrovision?

24 A    Yes.

25 Q    It's, again, about seven on that page?  No, sorry, nine on

1    that page.  And another ten or so the next page, right?

2    **A**    Okay.

3    **Q**    But again, there's Bates numbers, numbers in between, that

4    you did not review.  Right?

5    **A**    That's correct.

6    **Q**    Okay.  And, you know, don't you, that RealNetworks

7    submitted questions to Sony DADC?

8    **A**    Yes.

9    **Q**    Written questions?

10    **A**    (No audible answer)

11    **Q**    Did you have a role in helping them draft those questions?

12    **A**    No.

13    **Q**    Did you ask to have a role?

14    **A**    No.

15    **Q**    Did you suggest to them there are things you would like to

16    learn about the technical details of these products?

17    **A**    No.

18    **Q**    Now, when you were deposed, you had not even reviewed the

19    answers, had you?

20    **A**    I believe that's correct.

21    **Q**    The fact is, sir, you didn't want deep technical

22    information about ARccOS and RipGuard, did you?

23    **A**    I didn't need deep technical information.

24    **Q**    Now, you also testified with Mr. Berta that the -- I don't

25    remember the exact words, but something about the way ARccOS

1  and RipGuard are applied to DVDs damages the DVD or violates

2  the DVD specifications?

3          Did you suggest that?

4  **A**   I believe I talked about introducing errors on the disc,

5  and that their goal was to not interfere with the -- the DVD

6  spec content on the disc.

7  **Q**   So, you're not suggesting to the Court that anything that

8  ARccOS or RipGuard does violates the DVD specifications issued

9  by the DVD FLLC.  Right?

10  **A**   Well, Mr. Schumann, in his testimony, gave an example

11  which does seem to violate the specifications.

12  **Q**   Well, sir, you know that -- that both Macrovision and Sony

13  DADC have received certifications from testing laboratories,

14  authorized testing laboratories, that their discs comply with

15  the DVD FLLC specifications.  Right?

16  **A**   I've seen one such certification from a while ago, which

17  obviously doesn't pertain to any new techniques that they have

18  since added to their products.

19  **Q**   Well, you saw one for ARccOS from February of this year,

20  right?

21  **A**   I'm not sure.

22  **Q**   You do remember seeing one about ARccOS?

23  **A**   There was one from Crest.  I don't remember which one that

24  was.

25          **MR. SINGLA:**  Well, if we can get the ELMO?

```
 1              Your Honor, this document is attached to Mr. Hollar's
 2    expert report.  So, we can mark it as an exhibit, but it's also
 3    before the Court as part of his expert reports.
 4              Should we mark it as an exhibit?
 5              THE COURT:  No, that's fine.
 6              MR. SINGLA:  Okay.
 7    BY MR. SINGLA:
 8    Q    Now, sir, am I right, this is the letter you reviewed?
 9    A    I believe so.
10              MR. SINGLA:  And I have a copy for the Court.
11              MR. BERTA:  Thank you.
12    BY MR. SINGLA:
13    Q    This is February, 2008, right?
14    A    That's what it say, yes.
15    Q    And this is the letter from Crest Digital certifying that
16    the ARccOS technology conforms with the DVD FLLC
17    specifications.
18    A    Yes.
19    Q    And you saw a similar letter from October, 2007 for
20    Macrovision, right?
21    A    I'm not sure.
22    Q    Okay.  Do you remember seeing this letter (Indicating)
23    from October, 2007?
24    A    Also from Crest.  I remember one letter from Crest.  I'm
25    not sure I saw them both.  So, I'm not sure which one is which.
```

1   Q    All right.  But you would agree, sir, that this is also a

2   letter from Crest Digital, certifying that RipGuard, as of

3   October, 2007, complied with the DVD FLLC specification.

4   A    As of that time, yes.

5           MR. SINGLA:  I'll hand this up to the Court.

6   BY MR. SINGLA:

7   Q    I would like to turn to the subject that you started

8   talking about earlier, which is -- and the Court asked you some

9   questions -- whether ARccOS and RipGuard are copy protection

10  under the CPSA.

11          You mentioned that a few times, right?

12  A    Okay.

13  Q    You're not really an expert in the CPSA, either, are you?

14  A    No.  I'm just reporting what it says.

15  Q    You have read the spec, and you're just telling the Court

16  what the spec says in your.

17  A    And how ARccOS and RipGuard relate to it, yes.

18  Q    Uh-huh.  But you would agree that the CPSA and ARccOS and

19  RipGuard are separate things.

20  A    Yes.

21  Q    They're independent from each other.  Right?

22  A    Okay.

23  Q    And the CPSA is just a general philosophy, right?

24  A    Yes, it's a -- yes.

25  Q    It's just a desire or recommendation of one industry

 1  group, right?

 2  A     It's -- it describes itself as the understanding of all

 3  four of those industries I mentioned.

 4  Q     It's just a desire or recommendation, right?

 5  A     Yes.

 6  Q     It's just one particular understanding of the term

 7  "content protection," right?

 8  A     Okay.

 9  Q     Is that right?

10  A     Yes.

11  Q     And "content protection," in your view, sir, can include

12  technology that do not meet this CPSA definition, right?

13  A     "Content protection" in the loose sense can include a

14  whole bunch of stuff.  Yes.

15  Q     Right.  We've seen writings from you where you describe

16  ARccOS and RipGuard as copy protection or content protection,

17  right?

18  A     In the loose sense, yes.

19  Q     So, whether something or not fits the CPSA specification,

20  that doesn't determine whether it's actually copy protection,

21  does it?

22  A     Determine to who?  I mean, that's the question, right?

23  Q     You know this case is about the DMCA, right?

24  A     I understand that's part of this case, yes.

25  Q     So whether it fits the CPSA definition or not, ARccOS and

 1  RipGuard, that has nothing to do with this case, does it?

 2  **A**   I -- I don't know the legal matters here.

 3  **Q**   Well, you're not going to suggest to the Court that

 4  whatever the CPSA says, that that trumps the definition of

 5  "copy protection" in the statute.

 6  **A**   I have no opinion on the legal matters here.

 7  **Q**   And when you were drafting your opinions, did the lawyers

 8  explain to you that the DMCA -- let me back up one second.  The

 9  other thing that you were telling the Court is that they're not

10  copy protection, because they don't restrict access to the DVD.

11  Right?

12  **A**   I -- because they don't lock up the content on the DVD.

13  Yes.

14  **Q**   So you were opining that they don't count as copy

15  protection, because although they stop copying, they don't stop

16  people from watching the DVD.  Right?

17  **A**   Right.

18  **Q**   They don't prohibit access to the DVD.

19  **A**   Okay.

20  **Q**   Right?

21  **A**   Yeah.

22  **Q**   Now, did you understand when you were drafting your

23  opinions, that the DMCA distinguishes between access controls

24  on one hand, and copy controls on the other hand?

25  **A**   That has nothing to do with what I'm stating here.

1   Q    So you did not understand that when you were drafting your

2   opinions.  Right?

3   A    That's not -- not related to my opinions.

4   Q    You have no opinion about whether the fact that the DMCA

5   distinguishes between access controls and copy controls relates

6   to your opinion.  You have no understanding of how that relates

7   to your opinions.

8   A    I'm not -- I'm not saying anything about the DMCA here.

9   Q    And do you understand that the -- strike that.

10        Did you review the Studio Defendants' claims in this

11  case?

12  A    No.

13  Q    Did you understand, when you were drafting your opinions,

14  that the studios are asserting that ARccOS and RipGuard are

15  circumvented by RealNetworks as a copy protection, but not as

16  an access protection under the DMCA?

17        Did you understand that?

18  A    I don't have any understandings of this.

19  Q    Well, did you understand that the studios are not

20  asserting that there's been a circumvention of ARccOS and

21  RipGuard as access controls?

22  A    As I said, I don't know anything about this.

23  Q    You didn't understand that the studios are only asserting

24  a circumvention of ARccOS and RipGuard under the copy control

25  provisions of the DMCA?

```
 1  A    You are stating facts here.  I don't know whether these
 2  are facts or not.  I don't have any understanding of them.
 3  Q    Okay.  Well, let's talk about ACP.  You're familiar with
 4  that, right, sir?
 5  A    Yes.
 6  Q    And you understand that the DMCA considers ACP to be a
 7  form of copy protection?
 8  A    No, I don't know that.
 9  Q    Do you know, sir, that the DMCA mandates the use of ACP as
10  a form of copy protection?
11  A    I don't know that.
12  Q    Okay.  Well, let's just talk about ACP.  Now, that's a
13  technology also sold by Macrovision.
14           MR. BERTA:  Your Honor, again, I don't -- I don't --
15  this is similar, that it has nothing to do with the direct.  I
16  don't know where we're going, I just want to lodge an objection
17  at this time that it's beyond the scope of everything.
18           THE COURT:  Well, where is it going?
19           MR. SINGLA:  Okay.
20  BY MR. SINGLA:
21  Q    Sir, in your reports, do you talk about ACP?
22  A    Excuse me?
23  Q    In your reports, do you talk about ACP?
24  A    Yes.
25  Q    Right?
```

```
1   A    Yes.

2   Q    And you analogize RipGuard and ARccOS to ACP?

3   A    Yes.

4   Q    Right?

5   A    Yes.

6   Q    Okay, let's talk about that for a minute.  Now, ACP is a

7   technology sold by Macrovision.

8   A    Yes.

9   Q    And, it's an analog copy protection, right?

10  A    That's how they sell it.  It is an analog.

11  Q    So, at a sort of deep technological level it's different

12  from ARccOS and RipGuard, right?

13  A    Okay, yes.

14  Q    Is that right?

15  A    Yes.

16  Q    It works differently.

17  A    Yes.

18  Q    But you analogized ARccOS and RipGuard to ACP, right?

19  A    Yes.

20  Q    And the reason you did is because what ACP does is not

21  interfere with somebody's ability to watch video.  Right?

22  A    Well, the analogy had more to do with the fact that both

23  of these were -- well, I use the word "hacks," that these that

24  were existing -- good existing standards for interoperability,

25  video format and DVD-video.  And, so, the engineers had to play
```

1  clever tricks to introduce errors that somehow didn't interfere

2  with playback, hopefully, but did interfere with other kinds of

3  access.  That was the analogy.

4  **Q**   Right.  So, in other words, if I understand you correctly,

5  you're saying that ACP is a technology that stops copying of

6  video.  Right?

7  **A**   It's intended to -- to interfere with some individual

8  taping of video, yes.

9  **Q**   But it does not interfere with watching video?

10  **A**   It's intended not to interfere with watching video.

11  That's correct.

12  **Q**   ARccOS and RipGuard are intended to stop copying, right?

13  **A**   No, they're intended to block certain kinds of access by

14  certain kind of ripper programs.

15  **Q**   They're intended to block copying by rippers, right?

16  **A**   Yes.

17  **Q**   And they're not intended to block watching of the video.

18  Right?

19  **A**   Correct.

20  **Q**   And so, you would agree that technologies like ACP, that

21  block copying but not watching, still constitute copy

22  protection.  Right?

23  **A**   Under the -- that's an interesting question.

24        The -- I'm sorry, from the point of view of the CPSA,

25  copy protection has to lock up all access to content, including

1  playback, unless it's authorized, unless -- unless there's some

2  authentication mechanism.  So, in that sense, ACP is not copy

3  protection because you can watch the video.

4  **Q**    Sir, you, it is your view, is it not, you would agree,

5  that ACP is one of Macrovision's copy protection technologies.

6  **A**    In the loose sense of "copy protection," yes.

7  **Q**    Okay.  So ACP counts as copy protection, right?

8  **A**    In the loose sense, yes.

9           **MR. SINGLA:**  Now, could we put up Mr. Dixon's Slide

10  18.

11          Actually, before we get to that, I'm sorry, take that

12  down.  I have another question I have for you.  Well, okay,

13  let's go ahead.  I'm sorry.  Slide 18.

14          I want to turn to Facet now.

15          **MR. BERTA:**  For the Record, Your Honor, this actually

16  was not used in his presentation.  So I don't know what he

17  means by Mr. Dixon's Slide 18.

18          We sent some demonstratives, but a lot of them

19  weren't used, just to clarify.

20          **THE COURT:**  Well, this is the one you referred to

21  earlier, right?

22          **MR. SINGLA:**  I thought those were shown on the

23  screen.

24          **MR. BERTA:**  No.

25          **MR. SINGLA:**  This was not shown on the screen?

1        **MR. BERTA:**  No.

2        **MR. SINGLA:**   Okay.

3  BY MR. SINGLA:

4  Q    This is one of the slides you prepared though, right, sir?

5        (Witness examines document)

6  A    Yes, this is a version of one of the slides I prepared.

7  We showed something slightly different.

8  Q    Okay.  Well, are you opining to the Court about Facet?

9  A    About Facet?

10 Q    Yeah.

11 A    No.

12 Q    No?

13 A    No.

14 Q    Okay.  About DVD Walk?

15 A    I'm describing DVD Walk.  Or -- excuse me.

16        I understand that DVD Walk implements or takes the

17 kind of approach that I'm talking about here.  But that's all I

18 know about DVD Walk.

19 Q    So, you're giving the opinion to the Court about how DVD

20 Walk functions?

21 A    How it is intended to generally function.  I don't know

22 the details.

23 Q    Okay, but again, you don't actually know anything about

24 DVD Walk, do you?

25 A    Not beyond what I'm saying here, no.

1 Q    We already established you never reviewed any RealNetworks

2 documents, right?

3 A    Okay.

4 Q    Is that right?

5 A    Yes.

6 Q    And you, so, never reviewed the Facet wiki?

7 A    No.

8 Q    The official technical specifications for Facet?

9 A    No.

10 Q    And you have not spoken to any of the engineers -- as of

11 the time of your reports, you hadn't spoken to any of the

12 engineers about Facet?

13 A    That's correct.

14 Q    Or DVD Walk?

15 A    That's correct.

16 Q    And you never looked at the DVD Walk source code.

17 A    That's correct.

18 Q    And, you never tried to rip a DVD with Facet, right?

19 A    That's correct.

20 Q    You never tried DVD Walk out on an ARccOS- or

21 RipGuard-protected disc, right?

22 A    That's correct.

23 Q    You never even saw Facet, did you?

24 A    That's correct.

25 Q    You simply did not know, at the time of your reports, the

1  details of how DVD Walk works, did you?

2  **A**    That's correct.

3  **Q**    You couldn't speak precisely to what DVD Walk does, could

4  you?

5  **A**    That's correct.

6  **Q**    You didn't have any specific information about DVD Walk,

7  did you?

8  **A**    No.  There was general information about how it worked.

9  **Q**    Sir, in your reports, when you prepared your reports, you

10 did not have specific information about DVD Walk, did you?

11 **A**    I had some details about it, but certainly not great

12 specific information about it.

13 **Q**    You did not have specific information, did you?

14 **A**    In the sense of gory detail, no, I did not.

15 **Q**    And in your reports, you're not talking about DVD Walk

16 specifically, right?

17 **A**    Except to say that it's an example of the kind of thing

18 I'm talking about here.

19 **Q**    You're just talking about the general concept of playing

20 and saving, right?

21 **A**    That's correct.

22 **Q**    Now, as with Vegas, you're not suggesting that when the

23 developers of RealNetworks wrote DVD Walk, that they didn't

24 know it was for copying ARccOS- and RipGuard-protected discs.

25 You're not saying that, right?

1  A    I don't have of any information about that.

2  Q    You're not suggesting that when they wrote DVD Walk, they

3  were trying to -- they thought they were dealing with

4  scratches.

5  A    I don't have any information on that.

6  Q    Right.  You're not denying that the engineers who

7  developed DVD Walk did so specifically to copy ARccOS- and

8  RipGuard-protected discs?

9  A    I don't have any information on that.

10 Q    Now, to change subjects again for a moment, with

11 Mr. Berta, you have this opinion that you offered about how you

12 can always make a sector-by-sector copy of an ARccOS- or

13 RipGuard-protected DVD.  Do you remember that?

14 A    Yes.

15 Q    And there was some testimony from Mr. Hollar that we saw?

16 A    Yes.

17 Q    Now, am I right that what Mr. Hollar said is if you could

18 copy the DVD sector by sector, then you could play it.  Right?

19 A    Not exactly sure.

20 Q    Now, you understand that DVDs protected by ARccOS and

21 RipGuard have not just bad sectors, but these other techniques,

22 right?

23 A    They use two different techniques, yes.

24 Q    And some of these techniques will prevent some copying

25 programs from copying the DVD altogether, right?

```
 1    A     Yes.

 2    Q     And then, you talked about the time it takes to copy these

 3    DVDs.

 4    A     Yes.

 5    Q     Now, I want to show you some testimony.  Do you know who

 6    Mr. Brennan is?

 7    A     Excuse me.

 8    Q     Do you know who Mr. Brennan is?

 9    A     I don't remember.

10    Q     He was the lead developer of Facet.  Do you remember that?

11    A     Vaguely.

12    Q     And you didn't review his deposition, right?

13    A     I don't think so.

14    Q     You weren't given the deposition to review, were you?

15    A     I don't think so.

16           MR. SINGLA:  Mr. Bales, could you play from

17    Mr. Brennan's deposition --

18           MR. BERTA:  Before we play it, can I get the lines

19    and numbers, and have a look at it?

20           MR. SINGLA:  Very fair, Your Honor.  Page 36, Lines 4

21    through 24.

22           THE COURT:  And do you have a copy of his deposition

23    so that I can follow along?

24           MR. SINGLA:  Oh, yes, Your Honor.  I apologize.

25           (Off-the-Record discussion)
```

 1          THE COURT:  I'll take a look at it, and then I'll

 2    hand it down, and you can take a look at it.  How's that?

 3          MR. SINGLA:  I have -- Mr. Berta, you can look at my

 4    copy if you want to ignore my notes.

 5          MR. BERTA:  I will not look at your notes.

 6          MR. SINGLA:  Hard not to, but I don't mind.  36, 4 to

 7    24.

 8          (Off-the-Record discussion)

 9          THE COURT:  Okay.

10          MR. SINGLA:  Yes, Your Honor.  So, Mr. Bales, can you

11    play Mr. Brennan, 36:4 through 37:2.

12          (Portion of videotaped deposition played in open

13          court:)

14          THE WITNESS:  "That's correct.

15          "QUESTION:   And did that linear DVD copy

16          approach, would it copy a DVD that had errors

17          on it?

18          "ANSWER:  Yes, it would, but it would take a

19          long time.

20          "QUESTION:   How long would it take?

21          "ANSWER:  It depended on the DVD.

22          "QUESTION:   Give me a range.

23          "ANSWER:  Anywhere from -- like an additional

24          30 minutes to, you know, eight hours.

25          "QUESTION:   Did you all think that was a

1           feasible approach, to have it take eight

2           hours to copy a DVD?

3               "MR. CUNNINGHAM:  Objection, lacks

4           foundation.

5           "ANSWER:  Could you clarify the question?

6           "QUESTION:    Sure.  Did you all think it

7           would be feasible in the final product that

8           you shipped to consumers, if it took eight

9           hours to copy DVDs?

10              "MR. CUNNINGHAM:  Objection, it's also

11          vague and ambiguous, and it calls for

12          speculation.

13          "ANSWER:  I think it's -- my opinion is that

14          that would not be a viable thing, but it's

15          not up to me to decide that.

16          "QUESTION:    Was it --

17          "ANSWER:  It's the customers and consumers

18          that would decide that."

19  BY MR. SINGLA:

20  Q    Sir, do you have any reason to disagree with

21  Mr. Brennan's -- the results of his development work, that it

22  took up to eight additional hours to copy these DVDs using a

23  linear approach?

24  A    As I tried to suggest before, depending on how many errors

25  are on the disc, and the way the software is written, it could

1  take different amounts of time to copy.  So, yes, it could be

2  maybe eight hours, but certainly not tens of hours.  And it

3  could be a very short amount of time, as he said, like 30

4  minutes.

5  **Q**     And it could be that it wouldn't copy at all, right?

6  **A**     Depending on the ripper program and the version of the

7  software, yes.

8          **MR. SINGLA:**  Could we see your slide -- Mr. Dixon's

9  Slide 13.  I'm sorry, 17.  My apologies.  17.

10 **BY MR. SINGLA:**

11 **Q**     So, this is a slide you prepared?

12          (Witness examines document)

13 **A**     Yes.

14 **Q**     And these are different ways of copying DVDs?

15 **A**     Yes.  Different ways of accessing DVDs, yes.

16 **Q**     And am I right that even you agree that ARccOS and

17 RipGuard are intended to cover the first two approaches, linear

18 copy and file copy?

19 **A**     Yes.  They address those two kinds.

20          **MR. SINGLA:**  Your Honor, in the slide packet that

21 RealNetworks handed the Court, it's Slide 9.

22          **THE COURT:**  Yes.  I was just going to ask you about

23 that.  And I think that they are in fact identical.

24          **MR. SINGLA:**  Yes, Your Honor.

25          **THE COURT:**  Okay, thank you.

1          **MR. SINGLA:**  We got the slides in a slightly

2    different format.

3          **THE COURT:**  I see.  Okay.

4          **MR. SINGLA:**  This is how we got them.

5    BY MR. SINGLA:

6    **Q**    So, you agree ARccOS and RipGuard are intended to stop

7    copying of those first two approaches, at least.

8    **A**    Stop or slow, yes.

9    **Q**    And, you agree that Vegas uses those approaches.

10   **A**    I -- I am not positive, but I think that's my

11   understanding.

12   **Q**    And, you notice, don't you, sir, that Facet actually uses

13   the linear copying.  Right?

14   **A**    Again, you're getting into details of these programs.  You

15   should ask the engineer.  But, that's my understanding.

16   **Q**    It is your understanding, right?

17   **A**    Yes.

18   **Q**    That Facet uses a linear copy.

19   **A**    I -- I believe so, but --

20   **Q**    And then when they hit a bad sector, an ARccOS or RipGuard

21   sector, then they switch to this DVD Walk.  Right?

22   **A**    It's my general understanding of their strategy that after

23   a certain number of bad sectors, whatever the cause, they do

24   switch to the DVD Walk kind of approach.

25   **Q**    Now, sir, you used the word "strategy."  Am I right that

1  this is a strategy to copy ARccOS- and RipGuard-protected DVDs?

2  **A**    You're talking to motivations here.  I can't speak to

3  that.

4  **Q**    What was the strategy you were talking about?

5  **A**    The strategy to deal with errors on a disc.  If all you

6  know is you have found an error, you don't know what caused

7  that error.

8  **Q**    Now, you have been giving the opinion through the direct

9  and cross-examination, that DVD Walk -- DVD Walk copies a movie

10 like a player.  Right?  That's what you have been saying?

11 **A**    I have been saying that DVD Walk is an example of this

12 play-and-save approach, as I understand it.  And they've taken

13 that general approach.

14 **Q**    Let's talk about this, make sure we all understand what

15 you're saying.

16         If I understand correctly, this play-and-save

17 approach is, you're saying because ARccOS and RipGuard allow

18 you to watch the movie, don't interfere with watching a movie,

19 it should be possible for someone to copy the movie while it's

20 being watched.

21         That's what you are saying?

22 **A**    Yes.

23 **Q**    Okay.  But that's not what DVD Walk does, does it?

24 **A**    I don't know the details.

25 **Q**    Well, when you use DVD Walk, you don't watch the movie

 1  while it's being copied, do you?

 2  **A**    Oh, okay.  So, now you are into the next step of

 3  play-and-save, which we discussed earlier, which is allowing a

 4  computer to actually drive a playback.

 5  **Q**    Well, let's take it one step at a time, though, sir.

 6  First of all, you would agree DVD Walk doesn't actually play

 7  any video.

 8  **A**    Again, I'm not positive, but I believe that's correct.

 9  **Q**    DVD Walk is a copier.  Right?

10  **A**    Hmm, I believe you can play or play and save.  So there's

11  a playback engine that plays the discs and then there's an

12  option to copy discs as well.

13  **Q**    Okay, so let me be clear.  So we are talking about the

14  Facet product.  Right?

15  **A**    Right, uh-huh.

16  **Q**    And the Facet product, you can play a DVD, right?

17  **A**    Right.

18  **Q**    Or you can play and watch it -- save it and watch it at

19  the same time, right?

20  **A**    Right.

21  **Q**    Or you can just copy it, right?

22  **A**    Right, uh-huh.

23  **Q**    Now, when you're copying the DVD and you hit an error, it

24  uses this program called DVD Walk.  Right?

25  **A**    Again, that's my general understanding.

1  Q    Okay.  Now, let's talk about DVD Walk.  DVD Walk, itself,

2  does not play any video, right?

3        MR. BERTA:  So, Your Honor, I object, because there

4  is no foundation for this question.

5        THE COURT:  Well, you may ask him if he knows.  If he

6  doesn't know, then --

7        MR. SINGLA:  Right.

8        THE COURT:  (Inaudible)

9  BY MR. SINGLA:

10 Q    That's your understanding, right?  That's your

11 understanding.

12 A    As I said before, if you're doing -- if you're playing and

13 saving is a byproduct of playing, then I guess you're playing

14 the video.  But again, I don't know.

15 Q    Let me put it this way.  You don't know whether DVD Walk

16 actually saves movies as a byproduct of playing.  Right?

17 A    No.  I'm saying that's my general understanding of what it

18 does.

19 Q    So -- okay.  So, I'm trying to understand this.  Your

20 understanding is that DVD Walk does save the movie while it's

21 being played?

22 A    Again, I don't know exactly how this product works.  I

23 understand there's a watch-movie-and-save-while-you-are-playing

24 mode in it.  But, you know, I don't know the details.

25 Q    Okay.  Now, if I can try to understand your theory, when

```
 1   you watch a DVD, a human being watches a DVD with a remote

 2   control (Indicating).  Right?

 3   A    Right.

 4   Q    And the human being makes choices.  "I want to watch a

 5   trailer," or "I want to watch, listen to the Spanish audio,"

 6   right?

 7   A    Right.

 8   Q    Or "I want to watch an extra feature."

 9   A    Right.

10   Q    Okay.  Now, RipGuard and ARccOS do not interfere with that

11   process.

12   A    Right.

13   Q    Now, you understand, don't you, sir, that the whole point

14   of RipGuard and ARccOS is to try to figure out the difference

15   between when a human being is watching a DVD and a computer

16   trying to copy the DVD?

17         You understand that that's what they're trying to

18   target.

19   A    To be more precise, they're trying to target the

20   difference between playback according to the specification and

21   the behavior of certain ripper programs.

22   Q    And it's your view that if a computer could accurately

23   mimic what a human being does when they press buttons on a

24   remote, then that could get around ARccOS and RipGuard easily.

25   Right?
```

1  **A**     It would never see ARccOS or RipGuard.  You would just

2  play the disc.

3  **Q**     Would never see ARccOS or RipGuard?

4  **A**     Right.

5  **Q**     That there could be this way of copying a DVD that would

6  never see ARccOS or RipGuard.  That's your testimony.

7  **A**     Yes.

8  **Q**     And you think someone could write such a program where you

9  would never see ARccOS or RipGuard.

10  **A**     Right.

11  **Q**     And, what they would do when they are writing this program

12  is try to mimic how a human being interacts with a DVD.

13  **A**     No, they would methodically move through the disc,

14  starting with the first menu and pushing the first button, and

15  then moving on to the next button that's defined in the DVD

16  data structures.

17  **Q**     Well, sir, you know that ARccOS and RipGuard do things to

18  the menu structures to try to make it look to a program like

19  there's a button there, or an option, but a human being

20  wouldn't see that.

21         You know that's one of the kinds of things these

22  technologies do, right?

23  **A**     They insert things, extra junk into the DVD data

24  structures.  But again, by the premise of these programs,

25  they're not linked into the navigation.  You can't get at them,

1  if you follow the navigation, whether it's a user pressing

2  buttons or whether it's a computer following the same

3  navigational links that a user follows.

4  **Q**    But know what the companies are trying to do with these

5  technologies is to put things in there that to a computer

6  programmer looks like a trailer or a button or an option, but

7  doesn't to a human being.  Right?  That's what they're trying

8  to do.

9  **A**    They're trying to insert -- well, to be precise here, we

10  talked earlier about static analysis.  They're trying to put

11  some extra junk in the disc, where if you just look at all the

12  stuff in the disc, you would find it.  But, if you follow the

13  navigation, whether -- again, whether it's a user following the

14  navigation or a computer following the navigation, you would

15  never find these elements.

16  **Q**    Okay.  So you're saying to the Court that there is some

17  way to write a copying program that would never see ARccOS or

18  RipGuard.  Right?

19  **A**    I'm just saying if you play a disc and copy it while you

20  play it, you'll never see ARccOS or RipGuard.

21  **Q**    It's the easiest thing in the world.  Right?

22  **A**    (Laughter)

23  **Q**    Right?

24  **A**    It takes work.  Of course it takes work.

25  **Q**    But there's some way -- you're telling the Court there's

1  some way out there to write a program that would just never see

2  ARccOS and RipGuard.  Right?

3  A    You can write a program that navigates an entire disc,

4  yes.

5  Q    And that would never see ARccOS or RipGuard?

6  A    And it would never see ARccOS or RipGuard.

7  Q    No matter what tricks or techniques they tried to throw at

8  this program, it would never be -- it would never see ARccOS

9  and RipGuard, because human beings don't see it.  Right?

10  A    If you can play a disc and move through all the

11  navigation, you would never -- by the premise of these

12  programs, you would never see it.  Yes.

13  Q    This program that you are hypothesizing would be kind of a

14  magic bullet, right?  It would render ARccOS and RipGuard

15  obsolete.  Right?

16  A    No.

17  Q    Well, if there was this program out there that could copy

18  DVDs, and you would never, ever see ARccOS or RipGuard, then

19  ARccOS and RipGuard would be rendered totally ineffective,

20  right?  That's what you are saying?

21  A    No, I'm not.

22  Q    Why not?

23  A    We get to this issue of how long it takes to copy, and the

24  features of a copy program, and all those kinds of things.

25  Users of copy programs like them to run quickly.

1  Q    So the issue is just how much time it takes.

2  A    That's one of the issues.

3  Q    Otherwise, you think there's this program out there that

4  could be written to just copy these DVDs without ever seeing

5  ARccOS or RipGuard.  Right?

6  A    Yes.

7  Q    But you have never written such a program, yourself, have

8  you, sir?

9  A    That's correct.

10 Q    And you don't know of any such program, do you, sir?

11 A    I know of programs like that.

12 Q    Well, do you know that there are companies out there that

13 sell DVD rippers?

14 A    Yes, I do.

15 Q    Companies like SlySoft?

16 A    I understand -- yes, I do.

17 Q    They're based in Antigua or Barbados, places like that?

18 A    Whatever.

19 Q    And you know that these companies are engaged in a, quote,

20 arms race with Sony DADC and Macrovision, right?

21 A    Yes.

22 Q    So, what happens is Sony or Macrovision put in a new

23 technique, the hackers figure it out and they release some

24 program that can get around that technique.  Right?

25 A    In general, yes.

 1  Q    And then Sony and Macrovision come out with another

 2  technique, and then eventually the hackers figure out how to

 3  get around that new technique.  Right?

 4  A    Okay.  Yes.

 5  Q    Is that right?

 6  A    Yes.

 7  Q    There's a constant arms race.  Right?

 8  A    In general, yes.

 9  Q    And you're saying that these companies engaged in this

10  arms race haven't figured out what you figured out, that

11  there's some way to copy these DVDs without ever seeing ARccOS

12  or RipGuard?

13  A    I'm not saying that at all.

14  Q    And you know that RealNetworks has spent a lot of time on

15  their Facet product, right?

16  A    I don't have information about that.

17  Q    They spent many, many months developing DVD Walk, right?

18  A    Okay.  I don't have the details about that.

19  Q    And you know that they still can't copy every ARccOS- and

20  RipGuard-protected DVD.  You know that, right?

21  A    Again, I don't have the details on that.

22  Q    Well, you have seen that in the testimony, haven't you

23  sir?

24  A    I don't know the current state of those programs.

25  Q    And, if there was such a program that would never see

 1  ARccOS and RipGuard, RealNetworks hasn't yet developed that

 2  program, have they?

 3  A     Again, I don't know the current state.

 4  Q     And if I understood your testimony at your deposition

 5  correctly, you were suggesting that these companies, like

 6  SlySoft, these ripper companies, that they don't market your

 7  hypothesized program on purpose.

 8  A     You asked me to speculate of some reasons that may

 9  motivate them, and I did some speculation, yes.

10  Q     Some reason that might motivate them not to write and sell

11  this program that you are saying could be written.  Right?

12  A     Yes, we speculated about that.

13  Q     And, your reason was that these developers, these hackers

14  are doing it for the fun, and it would take all the fun out of

15  it if they developed this magic program.  Right?

16  A     That was one reason for a certain class of hacker, sure.

17  Q     And that's the reason they haven't developed this program?

18  A     As I said, that's one reason that some hackers may not

19  have, in my wild speculation, done that.

20  Q     And so you're saying that because you believe someone

21  could write some program that would never see ARccOS or

22  RipGuard because it would perfectly mimic the way a human being

23  interacts with a DVD, because of that, the Court should ignore

24  the fact that RealNetworks is trying to market products that

25  deliberately circumvent ARccOS and RipGuard?

1            Is that what you are saying?

2   **A**    You're way out of my area here.

3   **Q**    Okay.  Now, like with Vegas, you have no opinion on

4   whether Facet circumvents ARccOS and RipGuard, right?

5   **A**    That's correct.

6   **Q**    Let's turn to CSS for a second.  You're familiar with CSS?

7   **A**    Yes.

8   **Q**    Now, you would agree that --

9            **MR. BERTA:**  Again, Your Honor, it's outside the scope

10  of his testimony.  Just to be clear, there is an

11  extraordinarily passing reference to the idea of CSS in his

12  expert report.

13           There's no opinions, there are no conclusions, and

14  there is no testimony here, today or then, about CSS.

15           **THE COURT:**  What is the basis for this?

16           **MR. SINGLA:**  Your Honor, it was discussed in his

17  deposition, and it's in his expert report.  He does talk about

18  CSS, and how it counts as copy protection under the CPSA.

19           **THE COURT:**  Well, and in a very limited area where

20  it's in his report.  But his deposition is not in evidence.

21           And so the extent that he hasn't talked about it, you

22  know, in the direct, or it's not in his report, then we're not

23  going to get into it.

24           **MR. SINGLA:**  Your Honor, what I would like to do is

25  talk about his opinions about -- he's talked about the CPSA

1  repeatedly.

2              THE COURT:  Uh-huh.

3        MR. SINGLA:  And one of the things he said in the

4  report, I can show the Court the paragraph number, is that CSS.

5              THE COURT:  The initial report or the rebuttal?

6        MR. SINGLA:  One moment, Your Honor.  Let me just

7  confirm which one.  I believe it is the rebuttal report.

8              Yes, it is the rebuttal report, Paragraph 31.

9              (The Court examines document)

10        MR. SINGLA:  And he contrasts CSS with ARccOS and

11  RipGuard with respect to the CPSA.  It goes to his whole

12  question on content protection and copy protection.

13              THE COURT:  It's going to have to be very short.

14  This doesn't say very much in this paragraph at all, about CSS.

15        MR. SINGLA:  The other thing that I would like to

16  address with the witness, Your Honor, is in Paragraph 301, you

17  will see there is a discussion of CPSA and the eleven axioms,

18  and then it talks about content management information.  It's

19  Paragraph 30.

20              I would like to discuss that with the Witness.  Ten

21  minutes, Your Honor, on those subjects.

22              THE COURT:  Make it less.

23        MR. SINGLA:  Yes, Your Honor.

24  BY MR. SINGLA:

25  Q    Sir, you agree that CSS has been a very successful speed

1  bump?

2  **A**    I would have to be careful.  What do you mean by that?

3  **Q**    Do you agree that CSS effectively prevents consumers from

4  making a usable copy of a movie on a hard disc?  Right?

5  **A**    I think the industry regards it as a useful speed bump to

6  slow down some amounts of casual copying by consumers.

7  **Q**    Okay.  Let's turn to Paragraph 30 of your expert report

8  that I was discussing with the Court.  You talk about CPSA, and

9  one of the things you mention is content management

10  information.  Right?

11  **A**    Okay.

12  **Q**    Right?

13  **A**    I don't have the report here, but I believe I understand

14  that.

15  **Q**    I think you have it there in the stack.  That's okay, we

16  can -- let's try to move this quickly.

17          Now, one of the things you were saying is that ARccOS

18  and RipGuard -- I don't know, they don't count exactly because

19  they don't have content management information.  Right?

20  **A**    They don't fit the definition of the CPSA, right.

21  **Q**    Now, you would agree that ARccOS and RipGuard are put on

22  CSS-protected DVDs.  Right?

23  **A**    In at least some cases, yes.

24  **Q**    And those DVDs then have a CSS access control on them.

25  Right?

1  **A**    Right.

2  **Q**    And then, they have some something called CGMS, right?

3          **MR. BERTA:**  Your Honor there's no CGMS -- I don't

4  want to be difficult but he's not the CSS witness --

5          **THE COURT:**  Where is this going?

6          **MR. SINGLA:**  CGMS is -- what I believe the witness

7  will say, CGMS is the content management information for these

8  DVDs.

9          **THE COURT:**  And I think -- thought you did in fact

10 mention CGMS, in his direct.  Did he not?

11         **MR. BERTA:**  He did not, Your Honor.  He did not in

12 his direct, he did not in his report --

13         **THE COURT:**  I'm sure I didn't make up that acronym.

14 So, anyway, you may proceed, right now, with the next question.

15 But let's move along.

16         **MR. SINGLA:**  Okay.

17 **BY MR. SINGLA:**

18 **Q**    Sir, on DVDs, CGMS counts as the content management

19 information, right?

20 **A**    To be precise, CGMS is a flag, which, if you read the

21 DVD-video spec, was intended for that kind of purpose.  But in

22 practice, it actually hasn't used -- worked out that way in the

23 industry.

24 **Q**    But it is part of the copy protection system for DVDs,

25 right?

```
 1   A    It's -- well, for example, it's -- it is defined in the

 2   DVD-video spec as an element or piece of data you store on a

 3   disc.

 4   Q    It's part of the content protection scheme for DVD, right,

 5   sir?

 6            MR. BERTA:  Again, Your Honor --

 7            THE COURT:  Just answer the question, yes or no.

 8            THE WITNESS:  Content protection --

 9   BY MR. SINGLA:

10   Q    Yes.

11   A    -- in the general sense of DVDs, yes, it's part of that.

12   Q    And you know that commercial CSS DVDs are marked for copy

13   never, under the CGMS.  Right?

14   A    I don't know that.

15   Q    Now, let's look at the CPSA specification you have been

16   talking about.  Can we put up Exhibit 240?

17            This is the specification you have been talking

18   about, CPSA?

19   A    Yes.

20   Q    You have been opining about this?

21   A    I have been discussing this, yes.

22   Q    Suggesting that this should guide the Court's

23   understanding of what is copy protection and what is not copy

24   protection?

25   A    I'm not sure I would state it that way, but -- this, this
```

1    is a clear understanding of how the industry thinks about copy

2    protection, yes.

3    **Q**    Okay.  And could you turn to -- and the industry includes

4    software companies like RealNetworks?

5    **A**    Yes.

6    **Q**    And it includes movie studios in your view, like my

7    clients?

8    **A**    Yes.

9    **Q**    Could we turn to Page 9.  And blow up Paragraph 9.

10            Now in your report you talk about the eleven axioms

11   of CPSA, right?

12   **A**    Yes.

13   **Q**    This is one of the axioms, right?

14   **A**    Yes.

15   **Q**    And what this axiom says is that before you copy digital

16   content like a DVD, you have to look at the content management

17   information.  Right?

18   **A**    That's one of the principles in this document, yes.

19   **Q**    And if the content management information tells you not to

20   copy a DVD, you don't copy the DVD.  Right?

21   **A**    You have to be careful here.  That's one of the principles

22   in this document.

23            As you said, this is not a specification, this is not

24   a license, this is not enforced in any way.

25   **Q**    But this is a document and a specification that you have

1  been opining to the Court about.  Right?

2  **A**    Yes.

3  **Q**    Suggesting it should guide the Court's thinking about copy

4  protection, right?

5  **A**    I have been describing how the industry, itself, thinks

6  about copy protection, yes.

7  **Q**    Now, as far as you know, both Vegas and Facet, they access

8  the CGMS information encoded on DVDs.  Right?

9  **A**    Again, you are into details of the code.  I don't know

10  that as a fact.

11  **Q**    As far as you know, that's true.

12  **A**    I don't know that as a fact.

13  **Q**    And then RealNetworks ignores them when it copies those

14  DVDs, doesn't it?

15  **A**    I have no idea.

16  **Q**    So RealNetworks doesn't follow these principles or axioms

17  at all, does it?

18  **A**    That's a very general statement.  I can't disagree with

19  that -- agree with that.

20        **MR. SINGLA:**  Your Honor, I'll pass the witness.

21        **THE COURT:**  Do you have some examination of this

22  witness?

23        **MR. MICK:**  I have no questions at all of Mr. Dixon,

24  Your Honor.

25        **THE COURT:**  Do you have any redirect?

1        MR. BERTA:  I do have a brief --

2        THE COURT:  Can we finish with his testimony, then,

3   before we take lunch?

4        MR. BERTA:  I will.

5        THE COURT:  Maybe that will provide an incentive, if

6   everyone is hungry.

7                   **REDIRECT EXAMINATION**

8   BY MR. BERTA:

9   Q    So, Mr. Dixon, the document that you were just looking at,

10  do you mind turning to Page 7 of that document.

11       Did he take it away from you?  Do you still have it?

12       (Witness examines documents)

13       THE COURT:  You are referring to CPSA?

14       THE WITNESS:  I don't have that.

15       MR. BERTA:  Yes.

16       (Off-the-Record discussion)

17  BY MR. BERTA:

18  Q    I'll give you my copy, that I quickly memorized what I was

19  going to ask.

20       So, can you look at Page 7, please.

21  A    Yes.

22  Q    At the top of Page 7, there's a paragraph that in general

23  talks about this CPI mechanism that Mr. Singla was talking to

24  you about.

25  A    Oh, yes.  Yes.

1  Q    Okay.  And so he was saying CPI, you've got to do CPI, CPI

2  means something in general?

3  A    Okay, yeah.

4  Q    Can you read the last sentence of that paragraph, and tell

5  me what it says?

6  A    It's talking about the protection from compliant devices.

7  And it says (As read):

8              "Such protection is realized only if

9          there is some means or hook to compel

10         devices to be compliant."

11 Q    Is there any means or hook or other mechanism of which you

12 are aware with respect to this CGMS flag, as you called it,

13 that compels RealNetworks or anyone else to follow that flag?

14 A    No.  It's -- it's just a flag.

15 Q    Okay.  So, a flag, just sitting there alone, does that

16 have anything to do with content protection?

17 A    Only if it's enforced in some licensing terms or other

18 specifications.

19 Q    Okay.  Let me ask you a couple of other questions.  There

20 was a lot of discussion back and forth about what ARccOS and

21 RipGuard are and are not intended to accomplish.

22          In the entire discussion that you had with

23 Mr. Singla, does that -- do you remember there was some

24 discussion about access versus copying?

25 A    Yes.

1  Q    Okay.  So, is it right that you would agree that RipGuard

2  and ARccOS in fact affect some programs' ability to make copies

3  of DVDs, depending on what those ripper programs do?

4  A    Yes, I have been saying that.

5  Q    Okay.  So if we're talking about copy protection as

6  opposed to access, does that discussion change your opinion

7  that depending on the method of access you use to get to the

8  content on the DVD, there are certain methods of access that

9  ARccOS and RipGuard simply cannot prevent copying for?

10 A    That's correct.

11 Q    And is one of those a linear copy method, if you go by

12 sector by sector?

13 A    That's correct.

14 Q    And is one of them plain save?

15 A    That's correct.

16 Q    And, how hard is, you know, writing a DVD virtual machine

17 and being able to navigate through a DVD?

18 A    There's an awful lot of detail in the DVD-video specs, so

19 there's a lot of detail to get right.

20 Q    But, are there programs that exist that every day are able

21 to successfully navigate through a DVD by using a DVD virtual

22 machine?

23 A    Yes.  Every DVD player software in effect, every set-top

24 DVD player or hardware is actually running software that

25 navigates through a DVD disc.

1  **Q**   So if you have a DVD virtual machine that's navigating

2  through the DVD, first of all, does that have anything to do

3  with the later rendering and playing back of the content?

4  **A**   Not directly, no.

5  **Q**   So you could navigate through, identify all the playable

6  content, and know what it is to make a copy of it, setting

7  aside whether you ever send a movie out to a screen?

8        Is that true or false?

9  **A**   That's true.  Playing is a separate issue.

10 **Q**   Okay.  So if you do that, by using that method of access,

11 and you, as an incident to that method of access, make a copy

12 of everything that the DVD virtual machine has accessed, is

13 there anything that RipGuard and ARccOS can do to prevent that

14 copy?

15 **A**   No.

16 **Q**   Why not?

17 **A**   Because they're not preventing the playback.  So, if you

18 play, you're reading all the sectors that have all the DVD data

19 that has to do with the playing, and therefore, you can

20 obviously copy that data.

21 **Q**   And I think Mr. Singla showed you a couple of letters from

22 a while ago with regard to certifications for ARccOS or Sony

23 DADC and for Macrovision; do you remember that?

24 **A**   Yes.

25 **Q**   So if those letters are to be credited, what do they tell

1  you about whether or not ARccOS and RipGuard do or don't

2  prevent access to the DVD contents, if you access it like a

3  player?

4  **A**    Those -- those letters say basically that ARccOS and

5  RipGuard don't interfere in any way with normal playback of the

6  disc, and therefore, you could copy while you play.

7           **MR. BERTA:**  Your Honor, I have no more questions.

8           Oh, can I take that back?  Very quickly?

9           **THE COURT:**  Boy, that was --

10          **MR. BERTA:**  Just forgot one thing.

11          **THE COURT:**  You almost lost it there.  Okay, one more

12  question?  Is that it?

13          **MR. BERTA:**  I think it will require two questions,

14  but it's very small.

15          **THE COURT:**  Okay.

16  **BY MR. BERTA:**

17  **Q**    There was a little bit of discussion in your cross about

18  ACP, which is analog content protection, put out by

19  Macrovision?

20  **A**    Yes.

21  **Q**    Okay.  Let me ask you, Mr. Singla alluded to the fact that

22  in the DMCA there's a special provision dealing particularly

23  with ACP.

24          Do you know whether that's true or not?

25  **A**    No, I don't.

1  Q    Do you know what kind of lobbying efforts went into

2  getting that special provision put into the DMCA?

3  A    I have no idea.

4  Q    Do you know whether or not, absent the lobbying efforts if

5  there were any, and absent this special exemption if it is in

6  there, ACP would qualify as a content protection mechanism

7  under the DMCA?

8  A    Oh, no.  I have no idea.

9          MR. BERTA:  Thank you, Your Honor.

10         MR. SINGLA:  Your Honor, I would like follow up on

11 the second-to-last --

12         THE COURT:  That's all you get to follow up on, is

13 what we just heard.

14         MR. SINGLA:  Not the lobbying bit.

15         THE COURT:  No, no, but I mean --

16         MR. SINGLA:  Yes, just what we heard.

17         THE COURT:  That's the limitation, as you know.

18                 <u>RECROSS EXAMINATION</u>

19 BY MR. SINGLA:

20 Q    Sir, if I understood your questioning -- your answers to

21 Mr. Berta's questions, you're saying that you will never see

22 ARccOS and RipGuard if you just navigate through the DVD like a

23 player.  Right?

24 A    Following the DVD spec, yes.

25 Q    And, and then you said that kind of program is in every

1   DVD player out there.  Right?

2   A    I said the DVD virtual machine is in every player out

3   there, yes.

4   Q    So every DVD in everybody's family room has such a program

5   in it?

6   A    It has a DVD virtual machine in it, yes.

7   Q    And you're trying to say that that program will just copy

8   ARccOS- and RipGuard-protected DVDs, and never see ARccOS and

9   RipGuard?

10  A    That's not what I said, no.

11  Q    But you're saying people can use those DVD players to copy

12  ARccOS and RipGuard DVDs without ever seeing ARccOS and

13  RipGuard?  Is that what you are saying?

14  A    No.

15  Q    But you are saying there is this kind of program that can

16  always copy an ARccOS-RipGuard-protected DVD, right?

17  A    Yes.

18  Q    And you're saying the technology to do that is in every

19  DVD player out there.

20  A    The DVD engine part of that is in every player out there,

21  yes.

22  Q    And yet, nobody has figured out how to make this program

23  that you are positing, right?

24  A    No.

25           MR. SINGLA:  No further questions.

 1              THE WITNESS:  Excuse me.  I didn't answer that

 2   question correctly.  I disagree with your statement.

 3   BY MR. SINGLA:

 4   Q    Has RealNetworks figured out how to do it?

 5   A    I don't know.

 6   Q    Has SlySoft figured out how to do it?

 7   A    I don't know.

 8   Q    Has any other ripper company figured out how to do it?

 9   A    I don't know.  For example, Microsoft -- excuse me,

10   Microsoft -- Macrovision apparently bought one of the ripper

11   companies, and so, who knows what they had figured out?

12              MR. SINGLA:  No further questions, Your Honor.

13              THE COURT:  May this witness be excused, not being

14   subject to being recalled?

15              MR. SINGLA:  Yes, Your Honor.

16              MR. MICK:  Yes, Your Honor.

17              MR. BERTA:  Yes, Your Honor.

18              THE COURT:  You may step down.  Thank you.

19              (Witness excused)

20              THE COURT:  And you have one more witness, is that

21   correct?

22              MR. BERTA:  Yes, Your Honor.

23              THE COURT:  And how long is that witness's testimony

24   going to take?

25              MR. BERTA:  A couple of hours, at the most.

1          THE COURT:  And, on cross?  Do you have some rough

2    idea how long that witness will take?

3          MR. SINGLA:  I would guess an hour, Your Honor, but

4    we have this issue with Mr. Bielman, with the documents and

5    whatnot, so we're not exactly sure what he's going to say.

6          So I have some -- I am a little hesitant to give the

7    Court a firm number.

8          THE COURT:  Mr. Bielman?

9          MR. SINGLA:  Mr. Bielman, Your Honor, is the one --

10   you will remember Mr. Williams raised the point this morning,

11   that now that we have gone back and looked at the pattern of

12   this, we only received seven e-mails he ever wrote for one week

13   in August, and we've -- out of the nine months he worked there,

14   we only have e-mails from one week.

15         THE COURT:  So Mr. Bielman was or is an employee of

16   RealNetworks.

17         MR. SINGLA:  Yes.  He is, Your Honor.

18         THE COURT:  Is.

19         MR. SINGLA:  Is.  Can I raise one other point of

20   scheduling?

21         THE COURT:  Yes.

22         MR. SINGLA:  If I understood Mr. Berta correctly that

23   Mr. Bielman will be on the stand for two hours, and then

24   Mr. Mick and I have some cross-examination, we do have a short

25   rebuttal witness we want to put on.

PROCEEDINGS

```
 1              And that witness has to leave today.  He's not
 2    available tomorrow morning.  He has his daughter's
 3    confirmation.  It's Mr. Schumann.
 4              THE COURT:  Whose testimony is he rebutting?  Oh,
 5    okay.
 6              MR. SINGLA:  He will be primarily responding to
 7    Mr. Bishop.  He would also respond very briefly to what
 8    Mr. Dixon said.
 9              We would like the opportunity to have him respond to
10    what Mr. Bielman says, but if that's not possible because of
11    scheduling, we would ask permission to take him out of order if
12    we think we're going to go late.
13              His rebuttal would be 30 minutes.
14              THE COURT:  Yes?
15              MR. SCOTT:  Your Honor, I do not have a problem with
16    accommodating schedule, whether it's taking out of order or
17    going late.
18              I do object to the calling of Mr. Schumann, rebuttal,
19    because, you know, the -- Mr. Singla has been objecting and
20    Your Honor's been enforcing very strict confinement to the
21    reports, so there is no surprise material here.
22              That certainly was true with Professor Bishop, when I
23    was putting on his direct.  So there's been no surprise
24    testimony, nothing outside of the report.
25              In fact, I asked Mr. Singla by e-mail last night what
```

```
 1   areas he would anticipate as to Bishop, who already testified,
 2   would be the subject of the request for rebuttal.  And I
 3   thought I was going to be told, and I've heard nothing as to
 4   this time as to what those subject might be.
 5            But, Your Honor will recall from last week that we
 6   went through very strict confinement, presentation to his
 7   report.
 8            MR. SINGLA:  Could I respond, Your Honor?
 9            THE COURT:  Yes.
10            MR. SINGLA:  My memory of Professor Bishop's
11   testimony differs from my opposing counsel's.
12            As the Court will recall, I objected numerous times,
13   that we believed and still believe that Mr. Bishop's testimony
14   went well outside the bounds of his expert reports.
15            THE COURT:  Well, what is -- how about answering this
16   question?
17            MR. SINGLA:  Yes, Your Honor?
18            THE COURT:  What is the extent of his rebuttal as to
19   Bishop?
20            MR. SINGLA:  Yes, Your Honor.  And there will be, I
21   think, having heard Mr. Dixon's testimony, maybe a couple of
22   points about Mister -- on Mr. Dixon.
23            THE COURT:  Yes.  But also, but as to Bishop, what is
24   the nature of --
25            MR. SINGLA:  Oh, I'm sorry, Your Honor.  What -- what
```

PROCEEDINGS

1  Mr. Schumann would explain in rebuttal is he would respond to

2  some of the slides that Professor Bishop put in front of the

3  Court in terms of explaining -- for example, there was a

4  diagram that the Court -- can I blow up the slides, Your Honor?

5          I can show the Court which slides.

6          **THE COURT:**  That's all right, just briefly --

7          **MR. SINGLA:**  The Court will recall there was a slide

8  that was put up by Professor Bishop that we pointed out as

9  nowhere in the expert report.  And then there was a discussion,

10  the Court permitted the witness to talk about that figure from

11  the descrambler spec.

12          So Mr. Schumann would respond and explain -- respond

13  to Professor Bishop's testimony about that, which we could not

14  have anticipated.

15          Also, Professor Bishop gave this theory about the

16  blobs on the buses, and why they're blobs.  And Professor --

17  Mr. Schumann would respond to that, and why that theory is

18  inconsistent with the specifications, themselves.

19          And I have to look back at my notes, but I think

20  that's the vast bulk of it.

21          **THE COURT:**  Well, it seems to me that if

22  Mr. Bishop -- you know, whether it's in the -- you know,

23  Mr. Schumann's report or not, if Mr. Bishop was allowed to

24  testify as to certain matters, it's in the record.  And

25  certainly, that's appropriate rebuttal.  But it -- obviously,

PROCEEDINGS

```
 1  nothing new, can't -- you know, not going to -- you can't go
 2  into any new areas.
 3       MR. SINGLA:  And I will say, Your Honor, I believe
 4  that much of what Mr. Schumann, maybe of all of what
 5  Mr. Schumann will say, was in his deposition, for example, was
 6  explored in his deposition.
 7       THE COURT:  That's a difference as between a report
 8  that's in evidence and the deposition, which is not.  But if
 9  it's rebuttal, we're not talking about something new; we're
10  talking about strictly confined to what Mr. Bishop testified.
11       MR. SINGLA:  Yes, Your Honor.  We will go slide by
12  slide.
13       MR. SCOTT:  So I understand, just so I can be
14  prepared, I can count on we're talking about that slide, about
15  the -- the disc, and the blobs.
16       MR. SINGLA:  If I could just pull out my outline, I
17  could be a little more authoritative.
18       He will talk about Slide 62.  Slide 31.  Excuse me --
19  Your Honor, we can do this over lunch.
20       THE COURT:  Yes, okay.
21       MR. SCOTT:  This is what I had hoped to do last night
22  or this morning.  But we don't need to take the Court's time
23  with it, so --
24       THE COURT:  Well, no such thing as taking you by
25  surprise, right?
```

PROCEEDINGS

```
 1        MR. SCOTT:  I'm used to that, Your Honor.  You are

 2   right, there used to be a lot more of that in the past.

 3        THE COURT:  A lot of surprise, right?

 4        MR. SCOTT:  At trial.

 5        THE COURT:  Yes, okay.  Can we take 45 minutes for

 6   lunch?

 7        MR. SINGLA:  Could I ask the Court how long the Court

 8   is able to go today, so we can decide whether Mr. Bielman can

 9   go first or whether we need to do this out of order?

10        THE COURT:  And then when we do all of that, do you

11   have -- what are you going to do about closing argument?  Do

12   you want to wait until you get your proposed findings and

13   conclusions in, and then have closing argument after that?

14        MR. WILLIAMS:  Your Honor, we would be prepared to do

15   the closings tomorrow, before the findings are finalized.

16        MR. SCOTT:  As would we, Your Honor.

17        THE COURT:  Well, how long?  Because I have

18   obligations tomorrow, and I'm going to take a chunk of time out

19   in the middle of the day, so come hell or high water.

20        MR. WILLIAMS:  One hour for the studios, Your Honor.

21        MR. STEER:  Half an hour for DVD CCA.

22        MR. SCOTT:  If I could just have equal time to the

23   other side, Your Honor.  They're saying an hour and a half.  If

24   I could have equal time.  I would try to go under that, but --

25        THE COURT:  Let me figure, over lunch, you know, what
```

1    time we should start.  Tonight, I'll go as long as we need to

2    go, to finish this up, to finish the witness testimony.

3              MR. SINGLA:  Then, Your Honor --

4              THE COURT:  That doesn't mean that you should be more

5    expansive, however.

6              MR. SINGLA:  Of course not, Your Honor.  Of course

7    not.  I think I heard my witness laughing at that.

8              So, if that's the case, then what I would propose, we

9    would propose is that we start with Mr. Bielman after lunch.

10   He would go, I think, two hours, they said, to about 3:45.  I

11   think Mr. Mick and I could complete our examination by 5:00,

12   certainly.  Mr. Schumann's rebuttal will be half an hour.  And,

13   then, if the Court can go until 6:00, that should be adequate

14   time for cross-examination.

15             MR. SCOTT:  Fine with us, Your Honor.

16             THE COURT:  Okay.  Fine.  Fine.

17             MR. SINGLA:  Thank you, Your Honor.

18             THE COURT:  Then, you have got the situation with

19   Mr. Bielman and the e-mails and all that straightened out, as

20   well; is that correct?

21             MR. SINGLA:  We will try over lunch, Your Honor.

22             THE COURT:  Fine.  We will see you back here at 1:30.

23             MR. SCOTT:  Thank you, Your Honor.

24             MR. WILLIAMS:  Thank you, Your Honor.

25             (Recess taken from 12:55 to 1:41 p.m.)

PROCEEDINGS
PROCEEDINGS

```
1                    P R O C E E D I N G S

2   MAY 7, 2009                                    1:41 P.M.

3

4             THE COURT:  Your next witness?

5             MR. BERTA:  Your Honor, RealNetworks would like to

6   call Mr. James Bielman.

7             THE COURT:  Yes.  Is Mr. Bielman in the house?

8             There you go.  Okay.  Thank you.  Stand right here

9   and be sworn.

10            THE WITNESS:  Yes.

11                         JAMES BIELMAN,

12  called as a witness for the Plaintiffs herein, having been

13  first duly sworn, was examined and testified as follows:

14            THE WITNESS:  I do.

15            THE CLERK:  Please, state your full name, spell your

16  last name for the record.

17            THE WITNESS:  James Jesse Bielman, B-i-e-l-m-a-n.

18            THE COURT:  You may be seated.

19            MR. BERTA:  For purposes of the examination, I want

20  to give to Mr. Bielman a copy of his deposition transcript in

21  case he needs to refer to it.  And then what is in this binder

22  is the CSS general specifications, which is -- I believe you're

23  using Pak Exhibit L.

24            THE COURT:  Yes.

25            MR. BERTA:  And then the DVD-video descrambler
```

```
 1   specification, which is Pak Exhibit M, and then Pak N, which is

 2   the authenticator module for CSS decryption module.

 3            And then Chasen 505, which is the procedural

 4   specifications, Version 2.9; although, I believe that what the

 5   Court has is a later version, 3.1, in Mr. Pak's declaration.

 6   But on the issue on which I'm going to examine him, the

 7   language is the same.

 8            THE COURT:  Yes.

 9            MR. MICK:  It would seem apparent from Mr. Berta's

10   discussion of the specification that he intends to examine

11   Mr. Bielman on the specifics of the various specifications that

12   he's identified.

13            And so I would like to raise for the Court,

14   initially, the extent to which Mr. Berta anticipates his

15   examination will involve testimony from the witness or

16   questions from him or document discussion that's going to

17   involve the details of the specifications because it raises,

18   again, the closing of the courtroom issue we discussed last

19   week.

20            THE COURT:  Yes.

21            MR. BERTA:  Your Honor, Mr. Bielman's testimony is

22   going to focus on the particulars of the specifications and

23   Real's implementation of them in Facet.

24            Since the Court has a copy of the specifications, I

25   believe that I can do this by pointing everyone to the relevant
```

```
 1   language without having it in the record.

 2              THE COURT:   Okay.   Please make an effort to do that.

 3   If there is something that seems that it's coming up that is

 4   protected, then you can raise your objection.   But would you

 5   hold on just a moment, because I'm not sure ...

 6              (The Court confers with the clerk.)

 7              THE COURT:   You may proceed.

 8              MR. BERTA:   Thank you, Your Honor.

 9                        DIRECT EXAMINATION

10   BY MR. BERTA:

11   Q.   Can you go ahead and just state your name for the record,

12   please.

13   A.   James Bielman.

14   Q.   Mr. Bielman, where are you currently employed?

15   A.   At RealNetworks.   At RealNetworks.

16   Q.   What is your position at RealNetworks?

17   A.   I'm a senior software developer.

18   Q.   How long have you been at RealNetworks?

19   A.   Since March 2008.

20   Q.   Prior to your time at RealNetworks, can you give me a

21   brief description of any previous work you've had in software

22   development?

23   A.   Sure.   Immediately prior to Real, I did some contract work

24   for a gaming company.   Prior to that, I wrote server and

25   handheld software for inventory management systems.   And before
```

1  that, I worked on an application to scale down websites for

2  portable devices.

3  **Q.**   How long professionally have you been working in software

4  development?

5  **A.**   Probably about ten years.

6  **Q.**   Did you go to college?

7  **A.**   Uhm, I did go to college for one year, as a music major.

8  **Q.**   As a music major.  Okay.

9         So, setting aside professional experience -- did you

10 leave college to work on software development?

11 **A.**   Yes.

12 **Q.**   So, setting aside ten years of professional development,

13 do you have any other experience with respect to software

14 development?

15 **A.**   I do.  My father was an engineer at Hewlett-Packard, and

16 he would build computers out of spare parts and teach us how to

17 use them.  So, I've been programming computers from a very

18 young age, probably since I was 8.

19 **Q.**   Have you had -- in all this prior experience of yours,

20 have you had experience in implementing software

21 specifications?

22 **A.**   Yes.  On most commercial projects, you'll have the

23 specification from management to implement, and then sometimes

24 you have third-party specifications.

25         One example would be on this inventory management

1  system, we had a network protocol specification that I

2  implemented that described how these handheld devices would

3  talk to the server.

4  **Q.**   Before your time at Real, would you say you had a general

5  understanding of how to implement software specifications?

6  **A.**   Yes, I would.

7  **Q.**   Now, I understand that you worked on the Facet product in

8  your time at RealNetworks; is that right?

9  **A.**   That's right.  I was hired for the Facet project.

10 **Q.**   Can you give me just a general description of what Facet's

11 functionality is?

12 **A.**   Yes.  Facet is a DVD player that also contains a hard

13 drive that allows the user to save and organize their DVDs.

14 **Q.**   Can you tell us, generally, what your responsibilities

15 were with respect to the development of the Facet product at

16 Real?

17 **A.**   I was the lead developer for the Facet application, which

18 consists of the user interface, database code, DVD saving, and

19 implementing the technical CSS specifications.

20 **Q.**   Okay.  I want to talk about two of those areas of

21 responsibility, specifically CSS and DVD saving.

22          But, let me ask you, you mentioned you were the lead

23 developer for Facet.  Is that what you said?

24 **A.**   Yes.

25 **Q.**   What does that mean?

1  **A.**    Being the lead means, in addition to writing my own code,

2  I would review the code of other engineers and assist them with

3  designing their tasks.

4  **Q.**    Okay.  Now, so does that -- could I take that to mean that

5  you, in fact, wrote source code for the Facet product?

6  **A.**    Yes, I did.

7  **Q.**    Now, I want to talk about the implementation of the CSS

8  protocols at some point during the time that we have here

9  today, but I want to talk first about this DVD saving

10  technology.

11              Does Facet contain functionality that permits saving

12  a DVD to a hard drive?

13  **A.**    Yes.

14  **Q.**    Okay.  Can you tell me, first, what are the two types of

15  information that Facet actually stores off of a DVD onto a hard

16  drive?

17  **A.**    Well, there is the actual DVD-video data, and then there

18  are the CSS keys.

19  **Q.**    Okay.  With respect to the DVD-video data itself, is that

20  stored on a hard drive by Facet?

21  **A.**    Yes.

22  **Q.**    Does Facet save that stuff to a hard drive?

23  **A.**    Yes, it does.

24  **Q.**    What's the form in which just the video data itself,

25  setting aside the CSS keys, is stored on the hard drive?

 1  **A.**   It's stored as a file which is an image of the readable

 2  sectors on the disc.

 3  **Q.**   Okay.  And is it -- sorry, go ahead.  Did you say

 4  something?

 5  **A.**   No.  That was it.

 6  **Q.**   Is it -- what's the format of that stuff that's stored on

 7  the DVD drive?  Is there encryption on it?

 8  **A.**   Yes.  Some of the sectors in the video data have CSS

 9  encryption.

10  **Q.**   Which sectors that are sorted to the hard drive have CSS

11  encryption?

12  **A.**   All the sectors that were CSS encrypted on the DVD disc.

13  **Q.**   Okay.  And is there any additional encryption on the hard

14  drive copy?

15  **A.**   There is.  We also add 128-bit AES encryption to that

16  image.

17  **Q.**   And so you also store the keys to the hard drive; is that

18  correct?

19  **A.**   Yes.

20  **Q.**   Okay.  Is that handled the same or sort of separately from

21  the content being stored to the hard drive?

22  **A.**   That's handled prior to actually storing the DVD-video

23  content on the hard drive.

24  **Q.**   Okay.  So, with respect to the video content itself,

25  setting aside the keys, that's on that DVD, what kind of stuff

1  is in a DVD that is -- specifically, what are the kind of files

2  that are in a DVD that is moved over to a hard drive by Facet?

3  **A.**    So, the video data on a DVD is stored in two types of

4  files.  They are files called VOB files, V-O-B, which contain

5  the actual movie data, and then there are information or IFO,

6  I-F-O, files, which contain information about how to play those

7  movies.

8  **Q.**    Okay.  So, just as a preliminary matter, with respect to

9  CSS, if you've -- you're on the DVD, is there anything in CSS

10  that prevents the storing of the scrambled video data over to

11  the hard drive?

12          **MR. MICK:**  Foundation, Your Honor.

13          **MR. SINGLA:**  Your Honor, I'd make a separate

14  objection.  I think this is calling for expert opinion.  He is

15  a fact witness.  These are subjects for expert testimony.

16          **MR. BERTA:**  Your Honor, he implemented this.

17          **THE COURT:**  He can testify based upon his own

18  knowledge.  If there's any question about the basis for that

19  knowledge, you can go into it on cross-examination.

20          **MR. BERTA:**  Thank you, Your Honor.

21          **THE WITNESS:**  May I have the question again?

22  **BY MR. BERTA:**

23  **Q.**    In your understanding of what CSS requires, is there

24  anything in the CSS documentation that restricts or prohibits

25  the saving of CSS scrambled video data, setting aside the keys,

1  over to the hard drive in scrambled form?

2  **A.**   No, there isn't.

3  **Q.**   Okay.  With respect to the CSS keys, is there anything in

4  ARccOS or RipGuard, as you understand those products, that has

5  anything at all to do with moving the CSS keys over to a hard

6  drive?

7  **A.**   No, not to my knowledge.

8  **Q.**   Okay.  So, does Facet have a single approach that it uses

9  for saving to -- we're going to talk about the CSS keys later.

10          With respect to the video content, does Facet have a

11  single approach it uses to save the video content from the DVD

12  over to the hard drive?

13  **A.**   No.  There are two approaches that we use in Facet.  The

14  first approach is a linear process that goes one sector at a

15  time, reading that sector, saving it to the hard drive, and

16  then moving it to the next one.

17          The second process uses a software DVD player called

18  "dvdwalk," which essentially plays and saves the DVD.

19          **THE COURT:**  Did you use the term "venire"?

20          **THE WITNESS:**  I'm sorry?

21          **THE COURT:**  Did you use the term "venire"?

22          **THE WITNESS:**  "Dvdwalk."

23          **THE COURT:**  No, the "venire process."

24          **THE WITNESS:**  "Linear process."

25          **THE COURT:**  "Linear."  Okay.  Because it came up

1   differently on the screen, and I thought I heard "venire" also.

2   So, linear.

3           THE WITNESS:  Linear, yes.

4           THE COURT:  Okay.  Excuse me.

5   BY MR. BERTA:

6   Q.   The linear process, is it -- is that a sector-by-sector

7   approach?  Is that what you said?

8   A.   Yes.

9   Q.   So, I want to talk about both of those different

10  approaches to saving the DVD-video content.  But, first, why

11  would you have two alternate approaches to saving content?

12  A.   Well, there are engineering trade-offs with either

13  approach.  The linear approach is simpler, and may be faster in

14  some cases.  But the dvdwalk approach more closely adheres to

15  the specifications and will save everything that can be watched

16  on the DVD.

17  Q.   Okay.  So, I want to talk about both of these.  First,

18  with respect to the linear copy or sector-by-sector method in

19  Facet, can you just give us a brief explanation of how that

20  would work in Facet.

21  A.   Yes.  It starts at any location in the DVD, and reads one

22  sector from that location and saves that sector to the hard

23  drive, and then moves on to the next sector, saves that sector,

24  and so on until it's saved the entire disc.

25  Q.   If that process, the linear copy process, is not

1  interrupted for some reason, will it make a successful copy of

2  the whole DVD?

3  **A.**   Yes.

4  **Q.**   Is there -- are there ways in which, in the current Facet

5  implementation, that the linear copy sometimes doesn't complete

6  a sector-by-sector copy of a DVD?

7  **A.**   Yes.  If that linear process hits a certain number of read

8  errors in a row, then we stop that automatic linear process and

9  start dvdwalk instead.

10 **Q.**   So, I want to talk about what happens when you switch to

11 dvdwalk if you hit these read errors.

12          But, first, if Facet didn't switch to dvdwalk when

13 you hit a sector error, would you be able to still make a

14 complete copy of the good sectors on that DVD by using the

15 linear copy approach?

16 **A.**   Yes, we could.  We could simply retry each one of those

17 erroneous sectors and then move on.  Eventually, we would have

18 an image of a readable sector on that disc.

19 **Q.**   So, when you say -- and I can't actually remember the word

20 you used, so I apologize, but these sector errors or bad

21 sectors or -- I think you might have actually said "read

22 errors," what are those?

23 **A.**   So, when you're trying to read from the DVD, normally you

24 would get back the data at that location.  But if there's some

25 reason that the drive can't provide you with that data, then it

1  returns an error instead.

2  **Q.**   What kind of things can cause a read error or sector area,

3  in your experience?

4  **A.**   It can be either a physical problem with the disc, such as

5  a scratch or a mark, it can also be a problem with the data on

6  the disc.

7  **Q.**   Can read errors be put on a disc intentionally?

8  **A.**   Yes.  Yeah, they could be.

9  **Q.**   Sorry?

10  **A.**   They could be, yes.

11  **Q.**   They could be.  Okay.

12        Is there any way that Facet can tell one way or the

13  other, when it gets a read error back from a DVD, whether that

14  error was put there intentionally or unintentionally?

15  **A.**   No.  The errors don't have any intent information.  They

16  just signify failure to read that location.

17  **Q.**   Is there a different thing that's reported if it's a

18  purposeful error than if it's an unintentional error?

19  **A.**   No.

20  **Q.**   So, if you can just fight through the errors and make a

21  complete copy of the disc using the sector-by-sector linear

22  copy approach, why don't you always use that in Facet?

23  **A.**   We could, but if there -- but if a particular disc has a

24  lot of errors, then that may take a lot of time to retrack

25  through all of them.

1  Q.   So, when you hit some unidentified sector error, you then

2  switch to dvdwalk; is that right?

3  A.   That's right.

4  Q.   All right.  So, who wrote the dvdwalk program?

5  A.   I did.

6  Q.   Can you tell us what dvdwalk is?

7  A.   Yes.  Dvdwalk is a software DVD player that essentially

8  starts at the beginning of the DVD, as the user would watch it,

9  and watches the movie content.  And when it reaches a menu that

10  has buttons, it tries to follow all of those buttons that the

11  user would select.  And by doing this process, it will watch

12  all of the watchable movie content on the disc.

13  Q.   So, a couple of things.  How does dvdwalk know where to

14  start on that DVD?

15  A.   In one of the IFO files, there is a -- what's called the

16  first play chain, which tells all DVD players where to begin

17  playback.

18  Q.   How is it that dvdwalk is able to identify that first play

19  chain and open it up and start playing the DVD?

20  A.   Because it contains a DVD player which has a DVD virtual

21  machine which knows how to read and interpret that data.

22  Q.   So, when you say dvdwalk contains a DVD player and a DVD

23  virtual machine, what DVD virtual machine is dvdwalk using to

24  do this playing through the DVD?

25  A.   It uses the same virtual machine that is used for playback

1    in Facet.

2    Q.    So, if you're just playing it back for a user to choose to

3    play it back, is it the same virtual machine that's used in

4    this dvdwalk approach?

5    A.    That's right.

6    Q.    Does dvdwalk require -- in order to interact with the

7    contents on the DVD and open up the first file and play through

8    all the contents, does it require human intervention?

9    A.    No, it doesn't.

10   Q.    Why not?

11   A.    The dvdwalk software is presented with all of the same

12   choices that a user watching the movie would be presented with

13   in terms of the -- say, the buttons on a remote control.  So,

14   it can make all the same decisions that a user would make.

15   Q.    And how -- can you just tell me a little bit about -- how

16   does that work?  Like, how does the DVD player follow all the

17   different -- and make those different decisions?  Like, how is

18   it that -- how is it that it doesn't require a human?  What's

19   the process that it goes through, dvdwalk?

20   A.    There's a software interface between the virtual machine

21   and dvdwalk which gives you access to functionality, like

22   moving the cursor up and down or selecting a particular menu

23   button.

24   Q.    Does dvdwalk actually render an output video content while

25   it's doing this play through the DVD contents?

1  A.    No.  It receives the video data, but it doesn't display it

2  on a screen.

3  Q.    In your view, when you were writing it, does that make it

4  not a DVD player?

5  A.    No.

6  Q.    Why not?

7  A.    Because it's accessing the DVD in the exact same manner as

8  a DVD player.

9  Q.    Let me ask you a one-level-down technical question.  Does

10  the dvdwalk player software itself actually make a copy of the

11  DVD content?

12  A.    No, it doesn't.

13  Q.    So, how is the copy made if you're using the dvdwalk

14  approach?

15  A.    We have a device driver in Facet which presents the same

16  interface as a DVD drive, except that when we read from that

17  device, that sector that's read is also saved to the hard

18  drive.  And, so, dvdwalk plays from this device and, as a

19  consequence, it saves an image to the hard drive.

20  Q.    So, if you didn't have this extra process sitting over

21  here watching what dvdwalk was doing and making a copy of those

22  things, would DVD -- say you turned off the copy part of this.

23  Would dvdwalk behave any differently?

24  A.    No, it wouldn't.

25  Q.    So, it still would -- it just plays through the DVD?

1  A.    That's right.

2  Q.    So, is it correct that the actual copying function itself

3  is sort of incident to dvdwalk?

4  A.    Yes.

5  Q.    Okay.  So, if dvdwalk is not actually the copier, and just

6  a player, and someone else is watching where it goes and

7  copies, if there's an error on a disc that's intended to

8  prevent copying, would you expect that to affect dvdwalk?

9  A.    If those errors are intended to not be seen by a player,

10  then I would not expect them to be seen by dvdwalk either.

11  Q.    So, does saving the DVD content -- does that change the

12  behavior of dvdwalk in any way?

13  A.    No.

14  Q.    So, how did you go about putting together the dvdwalk

15  software?

16  A.    I started with the idea to write a program that would do

17  this traversal that we talked about.  And that was where we

18  started.

19  Q.    Did you use any references or other materials to try to

20  figure out how to make a DVD player work for dvdwalk?

21  A.    Yeah.  I had a book called *DVD Demystified*, and a pdf

22  still from the specification.  But we also had an existing DVD

23  virtual machine already, so I didn't need to implement that

24  from the ground up.

25  Q.    So, that existing DVD virtual machine is the same machine

1  that's used for playback?  Is that the right machine?

2  **A.**  Yes.

3  **Q.**  So, how good is the dvdwalk system using this existing

4  virtual machine, how good is it at following the DVD-video

5  specifications and being a player?

6  **A.**  I would say that it's good at being a player, because we

7  use it for playback of lots of DVDs.

8  **Q.**  Okay.  In your work developing this DVD player, did you

9  have some understanding as to what ARccOS and RipGuard was --

10  or were or are?

11  **A.**  Yeah.  We didn't have any official specifications, but

12  there was a general understanding that ARccOS and RipGuard

13  involved errors on unused portions of the disc.

14  **Q.**  And did you have any understanding as to whether or not

15  ARccOS or RipGuard errors, if you're being a player, would

16  interrupt that process?

17  **A.**  My understanding is that those errors would not affect a

18  player.

19  **Q.**  Why would you have that understanding?

20  **A.**  Because these DVDs work in DVD players.  And if they

21  didn't, they would crash the player.

22  **Q.**  So, when you were working on dvdwalk, if you implement it

23  successfully, did you have any understanding as to whether

24  dvdwalk would see any of these ARccOS or RipGuard errors,

25  whatever they are?

1  **A.**   My understanding was that it would not.

2  **Q.**   To your knowledge, have you ever had to make a change to

3  the dvdwalk software because of a DVD that had an ARccOS error

4  on it?

5  **A.**   No, not to my knowledge.

6  **Q.**   What about with respect to RipGuard, have you ever had to

7  make a change to dvdwalk because of a disc you understood to

8  have a RipGuard error on it?

9  **A.**   Same thing.  Not to my knowledge, no.

10 **Q.**   Would you ever expect to have to make a change to dvdwalk

11 because of an ARccOS or RipGuard error?

12 **A.**   I wouldn't, because dvdwalk is a player.  And, so, if

13 those errors are not intended to be seen by players, then they

14 would also not be seen by dvdwalk.

15 **Q.**   Okay.  And if you're doing the copying as a sort of other

16 guy over here watching what dvdwalk is doing, would you expect

17 ARccOS and RipGuard to be able to interfere with that separate

18 copying process?

19 **A.**   No, I wouldn't.

20 **Q.**   So, let me ask you, does dvdwalk have within it, to your

21 knowledge, any -- within dvdwalk, is there any mechanism that

22 recognizes an ARccOS or a RipGuard disc?

23 **A.**   No, there isn't.

24 **Q.**   Is there any mechanism within dvdwalk that deals with an

25 ARccOS or RipGuard error?

 1   **A.**    No.

 2   **Q.**    If you did a complete linear copy of a DVD, so if the

 3   first approach worked and you did a linear copy of a DVD using

 4   Facet, would that linear copy have ever seen any ARccOS or

 5   RipGuard errors?

 6   **A.**    No, I don't believe it would.

 7   **Q.**    Is there any special mechanism within the linear copy

 8   system that recognizes an ARccOS or RipGuard disc?

 9   **A.**    No.

10   **Q.**    Okay.  Because -- but what it does do is it recognizes

11   sector errors, right?

12   **A.**    That's right.

13   **Q.**    And does the linear copy method switch to dvdwalk for

14   errors that you think probably aren't ARccOS or RipGuard

15   errors?

16   **A.**    Yes.  If there are big scratches on the disc, then it will

17   definitely start dvdwalk.

18   **Q.**    Does Facet, as it currently exists, does it work on all

19   DVDs to make a copy of the DVD?

20   **A.**    I'm sorry.  Can you repeat --

21   **Q.**    If you have Facet in its current form -- although, it's no

22   longer in the courtroom -- does it actually work?  Will it

23   successfully make a copy of every DVD out there; do you know?

24   **A.**    No, I think there may be some discs that it might not

25   successfully copy.

1  Q.    Have you had problems with just some discs and being able

2  to make a copy of those discs using Facet?

3  A.    Yes.

4  Q.    Okay.  To your knowledge, why would you run into problems

5  making a copy of a DVD?

6  A.    We would run into problems if the disc was physically

7  damaged in some way, or if there were bugs in the Facet

8  software that prevented it from saving that disc correctly.

9  Q.    And have you found some bugs in the Facet software on

10 saving issues?

11 A.    Yes.

12 Q.    To your knowledge, have you been able to correct those

13 bugs?

14 A.    Yes.

15 Q.    To your knowledge, do any of those bugs have anything to

16 do with ARccOS or RipGuard or ARccOS or RipGuard DVDs, to your

17 knowledge?

18 A.    No, not to my knowledge.

19 Q.    Okay.  So, there could just be some random bug that makes

20 dvdwalk or Facet fail?

21 A.    That's right.

22 Q.    Can you give me an example of something like that?

23 A.    Yes.  One bug that we had in dvdwalk was that we would

24 reach what's called an infinite still frame -- which is

25 basically a menu that stays up on the screen forever, until you

1  select a button -- and dvdwalk would incorrectly try to move

2  past that still frame instead of realizing that it's reached

3  the end of its walk and try to go back.

4         And so by -- when we had this bug, it would result in

5  us going through the DVD in the wrong order, and we could miss

6  parts of the disc.

7  **Q.**   Is there -- let me ask you, was there a DVD that you had

8  to make specific -- a particular DVD that you did have to make

9  specific changes to dvdwalk for, in your recollection?

10 **A.**   Yes.

11 **Q.**   What disc was that?

12 **A.**   We had to make a change for a disc called "Shoot 'Em Up."

13 **Q.**   Shoot 'Em Up.  And, to your knowledge, what was the

14 problem with Shoot 'Em Up?

15 **A.**   The problem we ran into with that DVD is that it would --

16 it contained buttons that were --

17        **MR. SINGLA:**  Your Honor, if I could interrupt for a

18 moment.

19        **THE COURT:**  Yes.

20        **MR. SINGLA:**  I have no objection.  I'm happy to have

21 Mr. Bielman testify about this, but I am concerned about

22 confidentiality issues.  I don't know how deep you plan to have

23 the witness talk about this.  I think the subject has already

24 come up in open court.

25        **MR. BERTA:**  I don't know whose confidentiality we are

1    talking about.

2            MR. SINGLA:  This is Macrovision's confidentiality.

3            MR. SCOTT:  As it turns out, Shoot 'Em Up is not a

4    Macrovision or a Sony DADC disc, so there is no issues.

5            MR. SINGLA:  Okay.  That's fine.

6            THE COURT:  Okay.

7    BY MR. BERTA:

8    Q.   Let me ask you -- you've already testified -- do you have

9    any understanding as to whether Shoot 'Em Up uses ARccOS or

10   RipGuard at all?

11   A.   I don't have the specific understanding, but I don't

12   believe it does.

13   Q.   Why do you think that it doesn't?

14   A.   Because when I did a search for it, it was associated with

15   some other system that was not ARccOS or RipGuard.

16   Q.   So, what was the problem with Shoot 'Em Up?

17   A.   Shoot 'Em Up had these, essentially, invisible menu

18   buttons that when we would select them the disc would end up

19   giving us read errors.

20   Q.   And what did you do with respect to dvdwalk to address

21   this issue on this disc?

22   A.   I made a modification to dvdwalk to try to only select the

23   buttons that we thought the user would actually select when

24   they were watching that disc.

25   Q.   So, if you are selecting the buttons that the user would

```
 1   watch, is that consistent with dvdwalk being a DVD player?

 2              (Reporter interrupts)

 3              THE COURT:  Start that one again.

 4   BY MR. BERTA:

 5   Q.   If you are selecting only the buttons that a user would

 6   select in dvdwalk, is that consistent with dvdwalk being a DVD

 7   player?

 8   A.   Yes, I believe so, because those are the buttons the user

 9   would select on any other DVD player.

10   Q.   Okay.  Incidentally, do you have a general understanding

11   as to, in Facet, what percentage of discs are copied

12   successfully using the linear copy method without ever

13   triggering dvdwalk?

14   A.   Yes.  My understanding is that almost all of them save

15   with the linear process.

16   Q.   Okay.  And so if almost all of them save with the linear

17   process, does that mean that almost all discs out there don't

18   have any sector errors one way or the other?

19   A.   Yeah, I think it would mean that.

20   Q.   So, whether purposeful or not, there's -- most discs out

21   there have no sector errors, and, so, then, they are copied by

22   linear copy; is that right?

23              MR. SINGLA:  Objection.  Foundation, Your Honor.

24              THE COURT:  Objection sustained.

25              MR. BERTA:  I don't know what I asked.
```

1  BY MR. BERTA:

2  Q.   So, it's correct that linear copy will -- in the current

3  implementation of Facet, will only complete if there's not this

4  issue of sector errors, right?

5  A.   That's right.

6  Q.   So, if most DVDs or almost all DVDs copy with linear copy

7  in Facet, do you have any understanding whether that means most

8  DVDs don't have sector errors?

9          MR. SINGLA:  Objection, Your Honor.  Foundation.  And

10  the witness --

11         THE COURT:  I think that's taking it beyond his area

12  of expertise.  And he's not supposed to be testifying as an

13  expert, anyway.

14         MR. BERTA:  I apologize.  I don't want him to testify

15  as an expert.  I'm just talking about in his experience with

16  how Facet has actually worked.

17         THE COURT:  But I don't think he can actually render

18  that conclusion without some further foundation, and then I

19  think you're getting into expert testimony.

20         MR. BERTA:  Okay.  Thank you, Your Honor.

21  BY MR. BERTA:

22  Q.   So, is it correct that you wrote the code for dvdwalk?

23  A.   Yes, I did.

24  Q.   And you wrote what part of the implementation for CSS?

25  A.   I implemented the technical specifications for the

1  authenticator module and the descrambler module.

2  **Q.**   Have you ever received or seen any source code or

3  documentation from anyone that you knew or suspected to be a

4  Ukrainian?

5  **A.**   No.

6  **Q.**   And so you have never used anyone else's code but your own

7  code, to do the things that you've done with respect to Facet?

8  **A.**   Our code as in RealNetworks' code?

9  **Q.**   Yeah.

10 **A.**   That's right.

11 **Q.**   Well, your own code, right?

12 **A.**   Yes.

13 **Q.**   Okay.  And that sets aside the virtual machine itself,

14 which you used as the player virtual machine; is that right?

15 **A.**   That's right.  It's from a third party.

16 **Q.**   The virtual machine, where is that from?

17 **A.**   It's an open source project called DVD Nav, N-a-v.

18 **Q.**   And there was some -- there was some testimony earlier

19 about the word "ARccOS" being in the Facet source code.  Are

20 you generally aware of that issue?

21 **A.**   Yes.

22 **Q.**   Okay.  Do you know what that's referring to?

23 **A.**   Yes.  I believe that's referring to some really old code

24 that was actually in place before I even started, that was used

25 to disable some code that was being tested at the time.

1  **Q.**    Okay.   The code that was being disabled, is that in Facet

2  anymore?

3  **A.**    No.

4  **Q.**    So, this code that has the word "ARccOS" in it, that is

5  used to do the disabling, is that used in the -- in the just

6  regular use of Facet anymore?

7  **A.**    Well, it runs that code, but it doesn't serve any purpose

8  for linear operation of Facet now.

9  **Q.**    Is there any reason for that code to be in Facet?

10  **A.**    No.

11  **Q.**    Would you take it out?

12  **A.**    I would.

13  **Q.**    Why haven't you taken it out?

14  **A.**    I haven't taken it out because of the litigation.   I

15  wasn't sure what to do.

16  **Q.**    I do also want to talk about your implementation of the

17  CSS specifications.   And, actually, in the interest of time, I

18  just want to get right to it.

19          Your binder has a copy of, first, the authenticator

20  module for CSS decryption module.   Have you seen this document

21  before?

22  **A.**    Yes.

23  **Q.**    Okay.

24          **MR. BERTA:**   For the record, this is the document that

25  has been identified as Pak Exhibit N.

 1              THE COURT:  N?

 2              MR. BERTA:  N.

 3              THE COURT:  The decryption module?

 4              MR. BERTA:  Yeah, the authenticator module for CSS

 5    decryption.

 6    BY MR. BERTA:

 7    Q.   Have you seen this document before?

 8    A.   Yes.

 9    Q.   Did you review this document when you were implementing

10    the CSS algorithms for Facet?

11    A.   Yes, I did.

12    Q.   To your knowledge, does Facet implement this specification

13    correctly?

14    A.   Yes.

15    Q.   Okay.

16              MR. BERTA:  I actually have a blowup of just the

17    table of contents, and I want to walk through those.

18              MR. MICK:  The table of contents, I believe, has the

19    internal process names.

20              THE COURT:  Well, just put it on that -- see the one

21    behind you there?  Put it on that, and put it in this

22    direction.  Although, is there anyone in the courtroom now that

23    has any --

24              MR. MICK:  Like lawyers sometimes do, we may have

25    worn them down.

1          THE COURT:  Well, yes, I mean, I think they lose

2    interest, sometimes quickly, also, when you get into the

3    minutia.  I think we are all right, right now.

4          Somebody back there, who's your designated policeman

5    today?  The court security officer back there.

6          MR. LAMBERT:  He's not here today.

7          MR. MICK:  Mr. Lambert will have to serve in his

8    stead.

9          THE COURT:  You're it, Mr. Lambert.

10         MR. LAMBERT:  I think so.

11         While I think the company in the courtroom is fine,

12   the transcript, though, will not be under seal.  So to the

13   extent the visual aid is going to be getting into the

14   transcript, I still think we may have a potential issue.

15   But --

16         THE COURT:  Well, we'll just indicate that from this

17   point forward, until you indicate otherwise, it will be under

18   seal.  I know that's a little difficult for the court

19   reporters.  But they are quite talented, so no concerns about

20   that.  Okay?  But you better tell us when to stop.

21         MR. LAMBERT:  I do have one question.  I don't

22   believe I know the gentleman in the blue shirt with the yellow

23   tie.  But he may be --

24         THE COURT:  He's a spy.

25         MR. BERTA:  He is from RealNetworks, Your Honor.

```
 1              THE COURT:  From RealNetworks?

 2              MR. BERTA:  Yes, Your Honor.

 3              THE COURT:  So, he is a spy.

 4              MR. BERTA:  He is.

 5              THE COURT:  Okay.  Is that all right?

 6              MR. LAMBERT:  If he's signed an undertaking and

 7  subject to the protective order, then there's no issue.

 8              MR. BERTA:  Like I said, I don't know if we need to

 9  seal or not.  I'm going to try not to go through the specifics

10  anyway.

11              THE COURT:  Okay.  But is there any reason why -- has

12  he signed off on whatever needs to be signed off on, you know?

13              MR. BERTA:  I actually don't know.

14              MR. KIMBALL:  He has signed onto an NDA with

15  Realnetworks --

16              (Reporter interrupts)

17              THE COURT:  This doesn't need to be on the record,

18  anyway.

19              (Discussion held off the record.)

20              (Pages 1030 through 1059 under seal in Volume 4

21              Excerpt.  Unsealed transcript resumes on page 1060.

22              Nothing ommited.  Nothing deleted.)

23              //

24              //

25              //
```

1          THE COURT:  Okay.

2          MR. SINGLA:  Your Honor, could we ask for just a

3   couple of minutes?  We got some documents, regarding

4   Mr. Bielman, from RealNetworks at the lunch hour.  I think

5   there are some copies that I --

6          THE COURT:  The lunch half hour?

7          MR. SINGLA:  Forty-five minutes.

8          THE COURT:  Ten minutes?

9          MR. SINGLA:  That would be terrific.

10         THE COURT:  Okay.

11         MR. SINGLA:  I appreciate that.

12         THE COURT:  Thank you.

13         In fact, how long are you going to be now?

14         MR. SINGLA:  I expect, Your Honor, I will be over an

15  hour, maybe closer to an hour, because, suddenly, there's an

16  entire world of CSS specifications to discuss.

17         THE COURT:  Well, that doesn't mean you have to

18  discuss the whole world of them.

19         MR. SINGLA:  I'm not going to.  I am going to pick

20  one or two.

21         THE COURT:  Be selective.

22         MR. SINGLA:  I will, Your Honor.

23         THE COURT:  Then you still have this other witness

24  that you want to call, Mr. Schumann?

25         MR. SINGLA:  Yes.  And I believe Mr. Mick will have

1    questions for Mr. Bielman, also.

2           **MR. MICK:**  I think Mr. Singla won the coin toss.  He

3    will go first.

4           **THE COURT:**  We will take ten minutes, then.

5           **MR. SINGLA:**  Thank you, Your Honor.

6           (Proceedings in recess from 3:00 to 3:32 p.m.)

7           **THE COURT:**  Yes, Mr. Singla.

8           **MR. SINGLA:**  Your Honor, I believe -- we believe the

9    Court can be unsealed, at this point.  And if there comes a

10   point during the examination where it needs to be resealed, we

11   can -- we'll make a request.

12          **THE COURT:**  Then there are people in the courtroom

13   who I think I've seen from prior occasions, who may be with the

14   media.  I don't know.  There may be some other people that some

15   of us know.

16          **MR. SINGLA:**  There could be, Your Honor.

17          **THE COURT:**  Could be?

18          **MR. SINGLA:**  Could be, Your Honor, yes.

19          **THE COURT:**  Okay.  Fine.

20          **MR. SINGLA:**  I'm having performance anxiety, Your

21   Honor.

22          (Laughter)

23                        **CROSS EXAMINATION**

24   BY MR. SINGLA:

25   **Q.**   Good afternoon, Mr. Bielman.

1  **A.**    Good afternoon.

2  **Q.**    Now, let's start with CSS, what you were discussing with

3  Mr. Berta there at the end.

4           Now, I believe you talked to the Court or answered

5  the Court's question and explained that you had no role in the

6  development of Vegas, correct?

7  **A.**    That's right.

8  **Q.**    That was Mr. Buzzard?

9  **A.**    Yes.

10 **Q.**    And with respect to Facet, it was Mr. Barrett who came up

11 with the overall technical design, right?

12 **A.**    For Facet?

13 **Q.**    Yes.

14 **A.**    Uhm, yeah.

15 **Q.**    And, Mr. Barrett is a very skilled engineer?

16 **A.**    He -- he's a manager on the project.  He doesn't actually

17 work as an engineer.  But he seems to know/understand

18 engineering concepts.

19 **Q.**    And Mr. Brennan was your boss, right?

20 **A.**    Uhm, he was the -- my technical boss for technical issues,

21 not necessarily my administrative report.

22 **Q.**    Fair enough.  But he was in charge, he was your boss for

23 technical matters?

24 **A.**    Yes.

25 **Q.**    He had a higher level of responsibility for the code than

1  you?

2  **A.**    Yes.

3  **Q.**    And Mr. Brennan was here in court last week, right?

4  **A.**    I'm not sure if he was here or not.

5  **Q.**    Do you know that he came to help Mr. Blazer with his Facet

6  demonstration last week?

7  **A.**    Yes.

8  **Q.**    Now, the only parts of Facet you were in charge of were

9  the dvdwalk and the video output, right?

10  **A.**    No, I wouldn't necessarily say that.  I was reviewing the

11  code from the other engineers for the user interface and the

12  database code as well.

13  **Q.**    Well, you would agree that the only parts you had primary

14  responsibility for were the dvdwalk program and the video

15  output, right?

16  **A.**    Yes.

17  **Q.**    And with respect to CSS, you just implemented the raw

18  descrambler and authentication algorithms, right?

19  **A.**    Yes, that's right.

20  **Q.**    You implemented the pieces that decrypt keys and

21  authenticate between the drives?

22  **A.**    And also descramble the A/V content.

23  **Q.**    And descramble the video content?

24  **A.**    Yes.

25  **Q.**    So, what we've been looking at, the entire design of the

1  CSS implementation, you didn't write that entire design, right?

2  **A.**   No.

3  **Q.**   You just did the descrambler and authentication

4  algorithms, right?

5  **A.**   That's right.

6  **Q.**   And even as to those algorithms that you worked on, you

7  worked off Mr. Buzzard's implementation, right?

8  **A.**   I had his code as a reference, but I actually started over

9  and wrote my own code.

10  **Q.**   Sir, Mr. Buzzard implemented those features, those parts

11  of CSS, before you, right?

12  **A.**   Yes.

13  **Q.**   And then when you were working on those features, you

14  worked off his code, correct?

15  **A.**   Well, like I said, I didn't actually use his code.  I had

16  it as a reference, but I wrote my own code.

17  **Q.**   But you were essentially just porting it to Linux, right?

18  **A.**   No, I actually changed the design substantially when I

19  wrote my own code.

20  **Q.**   You had his implementation in front of you?

21  **A.**   I had access to it, yes.

22  **Q.**   And you were essentially just porting that to the Linux

23  platform, right?

24  **A.**   Well, I mean, as I said, I had changed the design

25  substantially.  So, there was more work that I did than just

1  strictly porting.

2  **Q.**   He had already done all the kinds of hard work of trying

3  to figure out exactly what the specifications required, right?

4  **A.**   Uhm, yes, except for the A/V descrambler.

5  **Q.**   And then you were just porting that to Linux, right?

6  **A.**   I mean, I think I've answered this several times.  In a

7  sense, you could say I was porting it, but I actually changed

8  the design.  I didn't take his code as is and just tweak it

9  here and there to run on Linux.

10         **MR. SINGLA:**  Your Honor, we would like to play from

11  Mr. Bielman's deposition.  Could I give the Court a copy of his

12  deposition?

13         **THE COURT:**  Yes, if you would, please.

14         **MR. SINGLA:**  We would like to play page 236, lines 6

15  through 23.

16         **THE COURT:**  Go ahead.

17         **MR. BERTA:**  What lines?

18         **THE COURT:**  Line 6 through 23.

19         **MR. BERTA:**  Thank you.

20         (Video played as follows:)

21         **"QUESTION:**  And did you speak with anyone

22         about how to implement the CSS specifications

23         for those modules?

24         **"ANSWER:**  I'm -- I guess I'm not sure which

25         specifications you're talking about.

1          "QUESTION:  The specifications for the

2          authentication and descrambler modules.

3          "ANSWER:  Did I speak with anyone about

4          those?

5          "QUESTION:  Yeah.

6          "ANSWER:  I don't think that I did.  They

7          were fairly self-explanatory.  I did have

8          Jeff Buzzard's implementation.

9          "QUESTION:  Oh, you had his implementation in

10          front of you?

11          "ANSWER:  Yes.

12          "QUESTION:  So, were you essentially just

13          porting that to the Linux platform?

14          "ANSWER:  Essentially.

15          "QUESTION:  He had already done all the kind

16          of hard work of trying to figure out exactly

17          what the specifications require?

18          "ANSWER:  He had done most of it.  Not all."

19  BY MR. SINGLA:

20  Q.   Now, sir, you -- you talked to Mr. Berta today and you

21  said you hadn't seen this Ukrainian ripper code.

22  A.   I haven't seen any code, as far as I know, that's from any

23  Ukrainians.

24  Q.   But you said you did see some of Mr. Buzzard's code for

25  CSS, right?

1  **A.**    That's right.

2  **Q.**    Did you see the code he had taken from the DeCSS ripper?

3          **MR. BERTA:**  Foundation, Your Honor.

4          **THE COURT:**  Do you want to rephrase the question?

5          **MR. SINGLA:**  Certainly.

6  **BY MR. SINGLA:**

7  **Q.**    Did you see code -- among the code that Mr. Buzzard gave

8  you, did you see code that had come from the DeCSS ripper?

9  **A.**    No, I don't believe so.

10  **Q.**    Did you -- now, your Facet project was originally designed

11  with ripper code, right?

12  **A.**    I'm not sure I understand what you mean.

13          **MR. SINGLA:**  Well, Your Honor, could we play

14  Hamilton, page 43, 4 through 16, and 45, 4 through 7?

15          **MR. BERTA:**  If it was up to me, Your Honor, I'd

16  say -- I don't know whether they're trying to impeach that

17  question and answer with someone else's testimony, but I don't

18  think that's proper because he just said, I don't think so.

19          **THE COURT:**  Well, it's in evidence.

20          **MR. SINGLA:**  Yes, Your Honor.

21          **THE COURT:**  So, I mean, he can read it if it's in

22  evidence.

23          **MR. SINGLA:**  43, 4 through 16.

24          **THE COURT:**  Is this one of the portions that is in

25  evidence?

 1              MR. SINGLA:  Yes, Your Honor.

 2              THE COURT:  Because I've seen the video, but --

 3              MR. SINGLA:  Your Honor, for Ms. Hamilton there, we

 4    provided a short video excerpt, but we also provided in a

 5    binder a longer set of designations.  The video was not the

 6    full designations.

 7              THE COURT:  Oh, I see.  Okay.  Well, there's more,

 8    right --

 9              MR. SINGLA:  There's more.

10              THE COURT:  -- that I haven't watched?

11              MR. SINGLA:  Yes, Your Honor.

12              THE COURT:  Oh, dear.

13              MR. SINGLA:  I believe this one you may not have

14    watched.  We were trying to cut it down to fit into the time

15    the Court might make available to us in the courtroom, so

16    that's what we gave the Court.

17              THE COURT:  Yes.

18              MR. BERTA:  Obviously, Your Honor, we had the

19    opportunity to counter-designate Ms. Hamilton.  As you know, we

20    have other evidence in the record on the Ms. Hamilton issue,

21    but I just --

22              THE COURT:  Well, I mean, the only thing he's going

23    to do is read it into the record.  I mean, if it's in the

24    record, he can read it into the record or have it played into

25    the record.  So, which is it going to be?

```
1          MR. SINGLA:  We're going to play it, Your Honor.

2          THE COURT:  Play it.  Okay.

3          MR. SINGLA:  43, 4 through 16.

4          (Video played as follows:)

5          "QUESTION:  Now, you mentioned that at one

6          point you were using source code that had

7          been downloaded off the Internet from some

8          source in eastern Europe.

9          "ANSWER:  Yes.

10          "QUESTION:  What do you mean?

11          "ANSWER:  Well, the player itself was an open

12          source XINE, however you pronounce it, or

13          X-I-N-E player, and you can get some kind of

14          a plug-in.  Again, I didn't look at the code

15          myself, but you can get a plug-in that --

16          it's my understanding it's not legal here in

17          this country but it's on FTP sites over in

18          Eastern Europe that will crack CSS

19          encryption.  And we were using that to

20          decrypt the DVDs."

21          MR. SINGLA:  And could we also play Hamilton 45, 4

22 through 7.

23          (Video played as follows:)

24          "QUESTION:  And when you say that there was

25          'cracking code' that was downloaded from
```

```
1              Eastern Europe, was that used in Vegas or on
2              Facet?
3                   "ANSWER:  Facet.  To my knowledge, only on
4              Facet."
5  BY MR. SINGLA:
6  Q.   Now, sir, you also told Mr. Berta that Facet is not a
7  personal computer.
8  A.   That's right.
9              MR. SINGLA:  If we could play Barrett 88, 2 through
10 5.
11 BY MR. SINGLA:
12 Q.   Mr. Barrett was your boss, right?
13 A.   Yes.
14 Q.   Your boss's boss?
15 A.   Right.
16 Q.   And we established earlier that he is the one who designed
17 the overall architecture for Facet, right?
18 A.   Yes, you could say that.
19              MR. SINGLA:  Could we see Barrett 88, 2 through 5.
20              MR. BERTA:  The only objection I would make, Your
21 Honor, is we're trying to get to closing.  This seems like
22 argument for closing.  If they want to make an argument about
23 it, they --
24              THE COURT:  Well, since the snippets are short, we'll
25 get through it if we don't have too many objections, right?
```

1           (Laughter)

2           MR. SINGLA:  Something is wrong with the audio.  Give

3  us one moment.

4           (Video played as follows:)

5           "QUESTION:  Is it fair to say that this Facet

6           box -- you said it looks like a DVD player --

7           it's really a Linux-based computer?

8           "ANSWER:  Yes."

9           MR. SINGLA:  Could we play 88, 15 through 17.

10          (Video played as follows:)

11          "QUESTION:  So, it's a nicely packaged Linux

12          computer with custom software on it?

13          "ANSWER:  Yes."

14  BY MR. SINGLA:

15  Q.   Now, sir, you also testified about all the CSS

16  specifications with Mr. Berta, right?

17  A.   Yes.

18  Q.   And how you thought that you had implemented them

19  correctly, right?

20  A.   Yes.

21  Q.   Now, is it fair to say that you were trying to make a good

22  faith effort to implement -- to have your Facet product meet

23  those specifications?

24  A.   Yes.

25  Q.   You were trying to read them fairly, right?

1  A.    Well, I was trying to understand the steps that were

2  required, and implement them.

3  Q.    You were trying to read them the way a computer scientist

4  who was generally interested in meeting the specifications

5  would read them, right?

6  A.    Yes.

7  Q.    Right, in good faith?

8  A.    Yes.

9          MR. SINGLA:  Your Honor, could we turn those screens

10 off?

11         THE COURT:  Yes.  And do we need to seal the

12 courtroom again?

13         MR. SINGLA:  I don't think so, Your Honor.  I'm

14 hoping to do this without sealing the courtroom.

15         THE COURT:  Okay.

16         MR. SINGLA:  I'm going to put up on the Elmo -- could

17 we get the Elmo?

18         This is slide 44 from Mr. Bishop.

19         (Document displayed.)

20 BY MR. SINGLA:

21 Q.    Now, sir, what I'm showing you is a slide from one of

22 RealNetworks' experts, okay?

23 A.    Okay.

24 Q.    Okay.  Now, we looked at, earlier, a Figure 4 from the

25 specifications.

1  A.   Yes.

2  Q.   Okay.  And so -- just so you know, the three kind of items

3  on the left, columns on the left, and the right-most column are

4  from that figure.  Do you recognize them?

5  A.   Yes.

6  Q.   And in the middle, Professor Bishop, RealNetworks' expert,

7  has inserted what RealDVD does.

8  A.   Okay.

9  Q.   Makes sense to you, right?

10 A.   Yeah, it makes sense.

11 Q.   Okay.  Now, there's this box over here, "DecDKv,"

12 (indicating).  Do you see that?

13 A.   Yes.

14 Q.   And that's a box far on the right here, right

15 (indicating)?

16 A.   Yes.

17 Q.   Okay.  Now, the way RealDVD functions, once you copy the

18 DVD to the hard drive, you no longer need the DVD, right?

19 A.   That's right.

20 Q.   Okay.  And then -- so, this DecDKv step happens without

21 the DVD around, right?

22 A.   That's not necessarily true in every case.  There is an

23 additional path that's not shown on this diagram, where, when

24 the disc is inserted, the disc key block, which -- I don't know

25 if I can indicate it on this diagram, but the disc key block in

1    the --

2    **Q.**    You can.  You can touch the screen.  It's a touch screen.

3    **A.**    So, the disc key block that's obtained here can also flow

4    straight to the decrypter right here (indicating).

5    **Q.**    How does it flow right to the decrypter, sir?

6    **A.**    Because the disc key recovery logic is performed as one of

7    the very first steps when the disc is inserted.

8    **Q.**    Right.  But what you store on the hard drive is the entire

9    secured disc key block, right?

10   **A.**    Yes, I believe so.

11   **Q.**    And, then, on playback what you read back is the entire

12   block, right?

13   **A.**    Yes.

14   **Q.**    Okay.  So, I believe what you're telling the Court is that

15   what you all did in Facet is you made another one of these

16   DecDKv and you inserted it right here, where I'm drawing with

17   my pen (indicating).  Something like that, right?

18   **A.**    I don't think that I would characterize that.  I think by

19   saying that you're implying there's a notion of time in this

20   diagram, and I don't see that at all on this diagram.

21   **Q.**    Oh, okay.  Well, let's not argue about whether there's a

22   notion of time.

23           What you're saying is, before you save the entire

24   secured disc key block to the hard drive you guys run this

25   DecDKv over here in the authenticator, right (indicating)?

1  **A.**    Well, the authenticator and the descrambler are not

2  separate pieces of code.  This is really demonstrating the way

3  that the content is transferred over the bus.  But it doesn't

4  really describe the actual structure of the code.

5  **Q.**    Okay.  It does describe the operation, right?  I mean,

6  first, you do the authenticator step, then you save it to a

7  hard drive, and then you read it back?  It does describe the

8  flow of data through time, doesn't it?

9  **A.**    No.  Actually, it doesn't.  The AES encrypted keys are

10  written to the hard drive after we have done the disc key

11  recovery logic.

12  **Q.**    Okay.  That's what I was trying to get at.

13          Okay.  So, what you're saying here is after this

14  b-u-s d-e-c, bus dec box, you guys do run the DecDKv algorithm,

15  right?

16  **A.**    Yes, we do.

17  **Q.**    And then you take the results of that and throw it away?

18  **A.**    No, we don't throw it away.

19  **Q.**    Well, you don't save it to the hard disc, right?

20  **A.**    Well, it's retained in memory for playback.

21  **Q.**    Okay.  It's retained in memory.  So, let's just work this

22  out, what you're telling the Court.  So, you have a RealDVD

23  computer, right, a Facet box?  Sorry.  You have a Facet box,

24  right?

25  **A.**    Okay.

1    Q.   You put a DVD in, right?

2    A.   Yes.

3    Q.   The person hits "save," okay?

4    A.   Just save?

5    Q.   Just save.

6    A.   Okay.

7    Q.   And then the data, the secured disc key data, comes off

8    the Facet box into your authenticator, right?

9    A.   Yes.

10   Q.   Then you run -- right at that moment, you run the DecDKv

11   algorithm, right?

12   A.   Yes, we do.

13   Q.   But then what you write to the hard disk is the entire

14   secured disc key block, right?

15   A.   With AES encryption, yes.

16   Q.   With AES encryption, right?

17   A.   Yes.

18   Q.   Okay.  Now, the person turns the Facet box off.  Are you

19   with me?

20   A.   Okay.

21   Q.   Three months later they come back and they want to play

22   the saved movie.  Okay?

23   A.   Okay.

24   Q.   Now, then you run this DecDKv algorithm again, right?

25   A.   Yes.

1  Q.   You have to, right?

2  A.   Yes, we do.

3  Q.   Because all you've saved here is the secured disc key

4  data?

5  A.   That's right.

6  Q.   So, the DecDKv that you executed before you saved the

7  movie, the results of that are just thrown away, right?

8  A.   Well, they may be thrown away in that particular instance,

9  but if the user hadn't played it before they shut the box off,

10 then they would have been used.

11 Q.   Okay.  So, the user plays the movie, the user saves the

12 movie and immediately plays it, and then it's used?

13 A.   Yes.

14 Q.   But if the user saves the movie and turns the box off,

15 it's not used, right, the results of that?

16 A.   Well, they're actually used to -- the disc key block is

17 used, at that time, to fetch the title keys, as well.

18 Q.   Okay.  But then you'd need to run this again over here,

19 right?  This DecDKv, you need to run it when the person turns

20 the computer back on, right?

21 A.   If they play that particular DVD, yes.

22 Q.   Right.  Now, at that point, there's no DVD in the drive,

23 right?

24 A.   That's right.

25 Q.   So, this is not happening -- this DecDKv over here on the

1  right-most column is not happening with a disc in the drive, is

2  it?

3  **A.**   No.  But, again, there aren't two DecDKvs.  There's only

4  one place in the source code that does that function.

5  **Q.**   Okay.  So, if the specifications say --

6              **MR. SINGLA:**  Your Honor, may I consult for one

7  moment?

8              **THE COURT:**  Yes.

9  **BY MR. SINGLA:**

10  **Q.**   Sir, you agree the specification says that DecDKv should

11  be run on insertion of disc?  It says that, right?

12  **A.**   Can you tell me where it says that?

13  **Q.**   In the descrambler specification that Mr. Berta took you

14  through.  Do you remember?  On page 6 of the descrambler

15  specification, which I believe is Pak Exhibit M --

16  **A.**   Okay.

17  **Q.**   -- it says that DecDKv is run upon insertion of the disc,

18  right?

19  **A.**   Yes.

20  **Q.**   It says that at the top of the page?

21  **A.**   Yes.

22  **Q.**   It says it at the bottom of the page?

23  **A.**   Yes.

24  **Q.**   Okay.  But this DecDKv, we just established, this is not

25  run with the disc in the drive, is it?

1  **A.**   Well, what this -- what this specification is talking

2  about is a particular algorithm.  And we always run this

3  algorithm when a disc is inserted, so I would not agree.

4  **Q.**   But you also run it without a disc in the drive, right?

5  **A.**   Yes.

6  **Q.**   Okay.  And the reason you run it with a disc in the drive

7  the first time is just so you can tell people that you comply

8  with this, right?

9  **A.**   No, that's not true.

10 **Q.**   Well, when you save a movie and you turn the box off, the

11 results aren't used, are they?

12 **A.**   There's no distinction, when we set up the system, to

13 either play or save a DVD, whether it's going to be played or

14 not.  We simply load in all the keys in case it's going to be

15 played.  So, it's the same process either way.

16 **Q.**   Well, sir, there would be, otherwise, no reason to run it

17 right then.  You could just wait and run it here when the

18 person hits "play," right?  You don't need that for the saving

19 process?

20 **A.**   I think what I'm trying to explain is that the way the

21 saving process begins in Facet is the same as the way the

22 playback process begins.  And, so, in both instances we fetch

23 all the keys.  So, it's the same code.

24 **Q.**   So, in your view, you think it's a fair reading of this

25 that when it says that this algorithm is to be run on insertion

1  of a disc, it's all right if you run it without the DVD in the

2  drive, as long as, once upon a time, you ran it with the DVD in

3  the drive, right?

4  A.   Yes.  I mean, that's what it says, is to run it upon

5  insertion of the disc, which we do.

6  Q.   Now, sir, I'd like to turn to ARccOS, if we could.

7  A.   Okay.

8  Q.   Now, at the time you were developing dvdwalk, right, you

9  knew ARccOS was copy protection, didn't you?

10  A.   Well, I wouldn't personally characterize it as copy

11  protection.

12  Q.   You're saying ARccOS is not copy protection?

13  A.   In my personal view, I wouldn't classify it as copy

14  protection.

15  Q.   But you would agree that dvdwalk was written specifically

16  to copy ARccOS and RipGuard protected discs, right?

17  A.   Well, DVDwalk was written to copy discs that couldn't

18  otherwise be copied by the linear process.  And that may

19  include those discs, but --

20  Q.   Well, it was written specifically -- the intention was to

21  write DVDwalk as a way to copy ARccOS- and RipGuard-protected

22  discs.  That's why you wrote DVDwalk, right?

23  A.   Well, I mean, it -- it makes sense, to play and save the

24  DVD, to save those discs.  But those errors aren't encountered

25  by a DVD player and they also are not encountered by dvdwalk.

1   Q.   The ARccOS errors aren't encountered by dvdwalk?

2   A.   That's right.

3   Q.   Okay.  Well, my question, sir, is -- let's be clear.  The

4   reason you wrote dvdwalk, yes or no, was to copy ARccOS- and

5   RipGuard-protected discs?  That's the reason you wrote it?

6   A.   It would be one of the reasons we wrote it, yes.

7   Q.   Is there any other reason you wrote it?

8   A.   Uhm, we had also wanted to do better recovery for

9   scratches.  And dvdwalk would have been one way we could do

10  that.

11  Q.   Okay.  So, now you're saying you wrote dvdwalk for ARccOS

12  and RipGuard discs and also for scratches?

13  A.   It was an idea that it might help us do that, yes.

14  Q.   Did it help with scratches?

15  A.   We ended up not pursuing that, but it still may be

16  something that we would want to look at in the future.

17  Q.   So, dvdwalk doesn't help with scratches?

18  A.   Currently, it doesn't.

19  Q.   It only helps with ARccOS- and RipGuard-protected discs,

20  right?

21  A.   Well, it also helps with discs that have any read errors

22  anywhere that lie outside the DVD-video content.

23          (Reporter interrupts)

24          **THE WITNESS:**  It also helps with any discs that have

25  errors that lie outside the DVD-video content.

1  BY MR. SINGLA:

2  Q.   So, the original name of dvdwalk was "ARccOS," right?

3  A.   That wasn't the name for the code, but the team had this

4  name "ARccOS" established for a project that eventually turned

5  into dvdwalk.

6  Q.   Right.  And you were using the name ARccOS for this as

7  late as August of 2008?

8  A.   Yes.

9  Q.   In fact, you didn't change the name from "ARccOS" to

10 "dvdwalk" until this litigation was filed; isn't that true?

11 A.   No, that's not true.

12 Q.   Now, I noticed that you said that the code no longer uses

13 the term "ARccOS" inside it, right?

14 A.   I'm sorry.  Which code are you referring to?

15 Q.   When you were talking to Mr. Berta, you said the source

16 code no longer uses the term "ARccOS" inside it.

17 A.   What I said was that code doesn't have any effect on the

18 operation of Facet.

19 Q.   But it used to?

20 A.   It used to, yes.

21 Q.   Now, when you got involved, did you ever wonder why

22 everyone was calling this ARccOS?

23 A.   Uhm, no.  I mean, I think we had discussed sort of the

24 general notion that there were these read errors.

25 Q.   And you knew that ARccOS was a system for putting

 1  intentional read errors on a disc as copy protection, right?

 2  **A.**    I knew that it was a system for putting intentional errors

 3  in the disc, yes.

 4  **Q.**    You were told the general definition of what ARccOS was,

 5  right?

 6  **A.**    Yes.

 7  **Q.**    And you all understood that it was copy protection?

 8  **A.**    Uhm, well, as I said, I don't personally classify it as

 9  copy protection.  What other people think is what they think.

10  I don't know.

11  **Q.**    Well, you all wondered and tried to figure out whether it

12  should be called copy protection, right?

13           **MR. SCOTT:**  My objection is vague as to "you all,"

14  but go ahead.

15  **BY MR. SINGLA:**

16  **Q.**    Your team, the Facet team, you wondered whether to call it

17  copy protection?

18  **A.**    I don't think we had any discussions about whether it was

19  copy protection or not.

20           **MR. SINGLA:**  Could we put up Exhibit 233.

21           (Document displayed.)

22           **MR. SINGLA:**  Could you zoom that in?

23  **BY MR. SINGLA:**

24  **Q.**    So, now, Mr. Barrett was your boss, right?

25  **A.**    Yes.

1          **MR. SINGLA:**  Shannon, could you zoom up into the

2    e-mail so we can read it?

3          (Document displayed.)

4          **THE CLERK:**  Mr. Singla, is this public?

5          **MR. SINGLA:**  Yes.

6    **BY MR. SINGLA:**

7    **Q.**   So, now, Mr. Barrett has a note to himself here.  He says,

8    "Is this ARccOS?  Is this an effective copy protection scheme?

9    I believe the answer is no."

10         Now, did you remember talking to Mr. Barrett about

11   his theories for why ARccOS wouldn't be copy protection?

12   **A.**   No, I don't recall us ever talking about that.

13   **Q.**   And do you see the next paragraph, it says, "Rented disc

14   issue"?

15   **A.**   Yes.

16   **Q.**   It says, "If a Facet owner rips a rented DVD, when does it

17   become legal?"  [sic]

18         Do you see that?

19   **A.**   Yes.

20   **Q.**   Did you remember talking to your team or Mr. Barrett about

21   this idea of trying to figure out what to do with rented discs?

22   **A.**   No, I don't recall ever talking about that.

23   **Q.**   Do you remember discussing that there was a concern that

24   people would rip rented discs?

25   **A.**   Uhm, I don't recall there being any discussions about

1  that, but, typically, as an engineer, I wouldn't necessarily be

2  involved in that.

3          THE COURT:  I think, also, for the record, that's,

4  "When does it become illegal?" not "legal."

5          MR. SINGLA:  Yes, Your Honor.  If I misread that, my

6  apologies.

7          THE COURT:  No.  I heard "illegal."  And I see

8  "illegal" also.

9  BY MR. SINGLA:

10 Q.  Now, you said you all originally intended the dvdwalk

11 system to deal, at least in part, with scratches.  Is that what

12 you said?

13 A.  Well, that was a future goal that DVDwalk might help with.

14 Q.  Okay.  So, I guess I'm confused now.  When you all wrote

15 dvdwalk, was the idea of dealing with scratches a future goal,

16 or was that one reason you wrote dvdwalk?

17 A.  Well, one reason that we wrote it is because it might help

18 implementing that goal in the future.

19 Q.  So, when you were writing it, you were concerned about

20 scratches, right?

21 A.  Well, yes.

22 Q.  Right?

23 A.  Yes.

24 Q.  But, sir, when you got a copy of a DVD and it didn't work,

25 you never got a brand-new copy of that DVD to see if it would

1   have made a difference whether you had the old copy of the DVD

2   or a new one, right?

3   A.   I don't recall doing that myself.

4   Q.   But that would have made sense, right?

5   A.   In some cases it might make sense, yeah.

6   Q.   Well, I mean, as a computer scientist, if you have a

7   scratched DVD or a DVD that might be scratched, it's not

8   copying, and you think it could be because of scratches, just

9   as a basic sort of debugging thing, you would go get a

10  brand-new one to see, is it really the scratches or not, right?

11  A.   Yes.  And when that tended to happen, I would give it to

12  the QA folks and say:  This disc has a giant scratch on it.  I

13  don't -- you know, I think that's probably the cause.

14          So, that would really, I think, be their job to go

15  and get another disc and test it out.

16  Q.   So, do you recall doing that, sending them a disc and

17  saying, I think there's a big scratch, that's why it's not

18  being copied?

19  A.   Yeah, that happened a lot, that they would give me a disc

20  and say, "This disc doesn't save," and I would look at it and

21  it would have all kinds of scratches on it.

22  Q.   But you don't recall ever going and trying to get a clean

23  copy of that disc, right?

24  A.   Not myself, no.

25  Q.   Now, you mentioned this QA team.  Now, they were testing

1  every DVD they could find, right, in Facet?

2  **A.**  I don't know exactly how their process works, but I know

3  they test a lot of DVDs.

4  **Q.**  And sometimes you're saying that there would be discs that

5  were supposedly scratched, and that's why they weren't copying,

6  right?

7  **A.**  Well, when I would look at them, they were scratched.  So,

8  that was my -- what I would conclude.

9  **Q.**  But, sir, you don't recall the QA team ever telling you

10  that they had ever tested these supposed scratched DVDs against

11  a brand-new one?  You don't recall them ever doing that, do

12  you?

13  **A.**  No, I don't think I do.

14  **Q.**  But that would have made sense if you were really

15  concerned about scratches, right?

16  **A.**  I'm not sure I follow.

17  **Q.**  If you were really concerned about scratches, it would

18  have made sense to test these supposedly scratched DVDs against

19  a new one?

20  **A.**  I guess what I don't understand is, what do you mean by

21  "concerned about scratches"?

22  **Q.**  If you thought that's why they weren't being copied, you

23  thought it was the scratches, you would have gotten a clean

24  one?

25  **A.**  Well, I mean, again, that would be something that I would

1  hope that maybe they would test.  I looked at the disc and saw

2  it was obviously very scratched, and so I would give it back to

3  them as the likely cause.

4  **Q.**   Now, sir, when you did your original development for Facet

5  for dvdwalk, you worked with Casino Royale and Sopranos.  Those

6  were the two test DVDs you used, right?

7  **A.**   Primarily, Sopranos.  I think I tried Casino Royale at one

8  point, and it worked.

9  **Q.**   Sir, you said you picked Casino Royale as one of the DVDs

10  you tested with because you knew people were having a hard time

11  copying it, right?

12  **A.**   Right.  I tested it, and it worked.

13  **Q.**   And the copies that you used of Casino Royale and

14  Sopranos, they weren't scratched, were they?

15  **A.**   I don't remember.  I don't believe so.

16  **Q.**   Now --

17          **MR. SINGLA:**  Can we put up Exhibit 539.

18          (Document displayed.)

19          **MR. SINGLA:**  Can you zoom in on the e-mail.

20  **BY MR. SINGLA:**

21  **Q.**   Sir, this is an e-mail you sent, late August, to your

22  team, right?

23  **A.**   Yes.

24  **Q.**   And you're mentioning, "The ARccOS changes are in."  Do

25  you see that language, sir?

1  A.   Yes, I do.

2  Q.   Now, these ARccOS changes are what you all are now calling

3  "dvdwalk"?

4  A.   Yeah, that's what people on the team referred to that

5  project as.

6  Q.   Everyone, including yourself, called it "ARccOS"?

7  A.   Yes.

8  Q.   And you're asking for discs that still have read errors?

9  A.   That's right.  I was looking for discs that were scratched

10  enough that they wouldn't save.

11  Q.   But you don't use the word "scratches," do you?

12  A.   No, because I didn't want to get every disc that had a

13  little, tiny scratch on it but it would end up saving okay

14  because it could retry through the scratches.  So, I wanted

15  discs specifically that failed to save.

16  Q.   But nowhere in here do you say, Oh, I'd like discs with

17  big scratches on them, that don't save because of the

18  scratches.  You don't say that, right?

19  A.   I don't say that, but that was my intent in writing this

20  e-mail.

21  Q.   Your intent was to get discs with scratches?

22  A.   Yes.

23  Q.   Even though dvdwalk today doesn't help you with scratches

24  at all, right?

25  A.   No.  At one point, I thought about starting to work on

1  that project.  And, so, this e-mail was me sort of trying to

2  assemble a library of discs that had big scratches on them.

3  **Q.**   And, sir, in response to this e-mail, though, you didn't

4  get any discs with scratches, did you?

5  **A.**   No, I don't think that I did.  I don't recall, actually.

6  **Q.**   And you never did have a big collection of discs with

7  scratches, did you?

8  **A.**   No, I don't think I actually got any discs in response to

9  this e-mail, scratched or otherwise.

10 **Q.**   Now, sir, you would agree that it wasn't viable for you to

11 market Facet without a way to copy ARccOS- and

12 RipGuard-protected discs, right?

13 **A.**   That's not really a decision that I would make as an

14 engineer.

15 **Q.**   But, to your understanding, that was the -- that was the

16 decision that had been made, that you could not viably market a

17 product that wouldn't copy ARccOS- and RipGuard-protected

18 discs, right?

19 **A.**   Well, I mean, I would understand that we would want to

20 market a product that works with as many discs as possible.

21 **Q.**   Now, DVDwalk, when it hits a scratch, it just fails and

22 gives up, right?

23 **A.**   If it -- if it hits an error that it can't recover from,

24 it gives up, yes.

25 **Q.**   If it hits a scratch, it just gives up?

1   **A.**   If it hits a scratch that's bad enough that it can't retry

2   it, then, yes.

3   **Q.**   Now, the Facet team maintains a wiki, w-i-k-i, right?

4   **A.**   Yes.

5   **Q.**   I would like to talk about the wiki.  This is like a

6   free-form document database you maintain?

7   **A.**   That's right.

8   **Q.**   It's specific to Facet?

9   **A.**   Yes.

10  **Q.**   Now, it's the best technical documentation that exists for

11  Facet, right?

12  **A.**   Yes.  I think that's true.

13          **MR. SINGLA:**  I'd like to hand up Exhibit 530, Your

14  Honor, which is the wiki.  It's a rather large document.

15          Could we put up Exhibit 530.

16          (Document displayed.)

17  **BY MR. SINGLA:**

18  **Q.**   That's the wiki, right?

19  **A.**   Yes, that's the start page.

20  **Q.**   All right.  Now, let's turn 15 pages in, to page 137327.

21          (Document displayed.)

22          **MR. SINGLA:**  Actually, let's turn to 137335.  My

23  mistake.

24          (Document displayed.)

25  **BY MR. SINGLA:**

 1  Q.   This is the beginning of the Facet specifications.  Do you

 2  see that?

 3  A.   Yes.

 4  Q.   Let me give you a copy, sir.

 5          MR. SINGLA:  May I approach the witness, Your Honor?

 6          THE COURT:  Yes.

 7          THE WITNESS:  Thank you.

 8  BY MR. SINGLA:

 9  Q.   Looking at 137335.

10  A.   Okay.

11  Q.   And after this starts, the specification, there's page

12  after page of detail about Facet, right?

13  A.   Yes.

14  Q.   You're familiar with this document?

15  A.   Yes.

16  Q.   Now, if we turn to the second page, 137336, we can see the

17  date of this document is November 17, right?

18  A.   Yeah, that's what it says, but I am not certain that this

19  revision history is always updated.

20  Q.   So, it might be more recent than November 17?

21  A.   It may be.

22  Q.   So, it's November 17 or after.

23          Now, if we turn to 137359 --

24          MR. SINGLA:  If we could zoom in on the DVD save

25  part, 6.4.

```
 1              (Document displayed.)

 2   BY MR. SINGLA:

 3   Q.    Do you see that, sir?

 4   A.    Yes.

 5   Q.    It says, "Copy Protection Schemes."  Do you see that, sir?

 6   A.    Yes.

 7   Q.    And it says, "RealDVD will properly support playing and

 8   saving of DVDs authored with the following copy protection

 9   schemes."

10              Do you see that?

11   A.    Yes.

12   Q.    "ARccOS, RipGuard and ProtectDISC," right?

13   A.    Yes.

14   Q.    Now, ProtectDISC is something you understood to be similar

15   to ARccOS and RipGuard, right?

16   A.    I'm not familiar with that exact language, but something

17   similar perhaps, yeah.

18   Q.    So, another competitor to ARccOS and RipGuard?

19   A.    I don't know exactly what it would be.

20   Q.    Now, this section is talking about dvdwalk, right?

21   A.    Uhm, I'm not sure.  I don't think I've ever actually read

22   this section before.  I don't know.

23   Q.    Well, sir, DVD save is something you worked on, right?

24   A.    Right.  And then what I would say is that this section is

25   talking about DVD saving as a whole, as a feature.
```

 1  Q.   As a feature.   Okay.

 2           Now, the part of the DVD save as a whole that copies

 3  ARccOS/RipGuard discs is dvdwalk, right?

 4  A.   Well, yes.

 5  Q.   Right?

 6  A.   It -- it is capable of copying those discs, yes.

 7  Q.   The way you all got around ARccOS and RipGuard is through

 8  this dvdwalk?

 9  A.   Well, I mean, we don't really get around anything.   The

10  DVD-video is played and saved just like with any DVD player.

11  Q.   Now, you worked with Mr. Buzzard on the ARccOS issues,

12  right?

13  A.   No, we didn't actually really work together.

14  Q.   You talked to Mr. Buzzard?

15  A.   We spoke every now and then.

16  Q.   About ARccOS issues?

17  A.   About discs, primarily.

18  Q.   You compared notes?

19  A.   Yeah, I would tell him that we had a problem with this

20  disc and, you know, recommend that, perhaps, he test it.

21           MR. SINGLA:   Could we put up Exhibit 82.

22  BY MR. SINGLA:

23  Q.   This is an e-mail from Mr. Chasen to Mr. Buzzard and the

24  others on the Vegas team.

25           MR. SINGLA:   Oh, you don't have it on the screen.

```
 1                (Document displayed.)

 2                MR. SINGLA:   Could you zoom in to the top e-mail

 3   there.

 4   BY MR. SINGLA:

 5   Q.    Now, do you remember talking -- well, first, Mr. -- do you

 6   see that there's an e-mail that starts like three lines down,

 7   January 15, 2008, from Mr. Graham?  Do you see that, sir?

 8                MR. BERTA:   Objection.  Foundation.  Go ahead.

 9                MR. SINGLA:   I haven't gotten to my question yet.

10                THE COURT:   The question is does he see that.

11                MR. BERTA:   I understand.

12                THE COURT:   Let's see where he's going.

13                THE WITNESS:   Yes, I see it.

14   BY MR. SINGLA:

15   Q.    And he's saying that they need a guaranteed way to do

16   this, which is to parse the IFOs.  Do you see that, sir?

17   A.    Yes.

18   Q     And then, at the bottom he says that they are thinking

19   about switching gears and going for a guaranteed 100 percent

20   solution.  Right?

21   A     Yes, I see that.

22   Q     Now, this is about copying ARccOS discs or RipGuard discs,

23   right?

24                MR. BERTA:   So, objection, foundation.

25                THE COURT:   Is that self-evident from reading this?
```

1   BY MR. SINGLA:

2   Q    Sir, is that self-evident to you, from reading this?

3   A    I'm not sure --

4            THE COURT:  That was my question to you, not to him.

5            MR. SINGLA:  Fair enough, Your Honor.

6   BY MR. SINGLA:

7   Q    Let's look at the second paragraph of Mr. Graham's e-mail.

8   Says, "If we do not start focusing on this, we will be stuck

9   with weeks of work for 80 percent -- about 80 percent of ARccOS

10  DVDs."

11           Do you see that?

12  A    Yes.

13  Q    This is talking about ARccOS DVDs?

14  A    Yes.

15  Q    Copying of them.

16           (Witness examines document)

17  Q    Right?

18  A    I'm reading the e-mail, see anything in that paragraph

19  that talks about copying them.

20  Q    Do you think they're talking about something else?

21  A    They could be talking about playing them.  I'm not sure.

22  Q    Do you think when they're saying that they want to save

23  only the VOB data referenced, they're talking about playing the

24  DVD?  In the first sentence, sir.

25           They're talking about copying, right, sir?

1   **A**    That could be.

2   **Q**    Do you remember talking to Buzzard about this method of

3   copying ARccOS and RipGuard discs, parsing the IFOs?

4   **A**    No, I don't believe so.

5   **Q**    You don't remember talking to Mr. Buzzard about that.

6   **A**    I don't -- I don't think so.  I didn't have a conversation

7   about parsing IFOs, as far as I know.

8   **Q**    If you look at the top e-mail from Mr. Chasen, he says (As

9   read): "Not yet - number of issues, I need one more legal

10  meeting first before we decide."

11             Do you see that?

12  **A**    Yes.

13  **Q**    Do you remember talking to Mr. Buzzard about legal issues

14  that were raised through the method through which you copy

15  ARccOS and RipGuard discs?

16  **A**    No, I don't think so.

17  **Q**    Let's turn back to Facet.  There's been some confusion

18  here I think in the courtroom, that maybe you can clear up.

19  The Facet devices allow people to save movies on USB thumb

20  drives, right?

21  **A**    On USB hard drives, yes.

22  **Q**    Including thumb drives?

23  **A**    I think most thumb drives are probably too small.

24  **Q**    Well, if you had a thumb drive that was big enough, you

25  could save movies on it with Facet.  Right?

1  A    Yes, I don't think it's any different to the system than a

2  hard drive.

3  Q    So all the different implementations of Facet right now

4  will allow you to save movies to thumb drives?

5  A    Yes, to any USB drive.

6  Q    If we could go back to Exhibit 530, that's the big wiki

7  that you have in front of you.  And would you turn to Page

8  137460.

9  A    Okay.

10  Q    Now, this is a document labeled "DRM for Facet/Vegas."

11  Sorry.  "Transparent DRM for Facet/Vegas."  Right?

12  A    Yes.

13  Q    Now, this, if you look at it, sir, is a specification for

14  how to share movies between Facet and Vegas.  Right?

15  A    I'm not actually familiar with this document.  I need to

16  read it.

17          (Witness examines document)

18  A    That seems to be what it is, yeah.

19  Q    Do you see the system requirements on the first page

20  there?

21  A    Yes.

22  Q    Says, "One, to interoperate between Vegas and Facet"?

23  A    Yes.

24  Q    That means sharing movies copied to thumb drives or hard

25  drives, copying them on Vegas and using them on Facet, copying

1   on Facet and using them on Vegas.  Right?

2   A    That could be what it means.  As I said, I'm not familiar

3   with this document.  I don't know for certain.

4   Q    And, it also talks -- let's turn to Page -- if you turn to

5   Page 137466.  Okay?

6   A    Right.

7   Q    It also talks about multiple Facet boxes sharing content

8   over a network, attached storage on a LAN.  Do you see that?

9   A    Yes.

10  Q    Now, what that's talking about is an approach to having

11  Facet boxes share movies over an ethernet network.  Right?

12  A    Share content, yes.

13  Q    Content, you mean movies?

14  A    Including movies, yes.

15  Q    DVDs.

16  A    Right.

17  Q    That could be a RAN ethernet network, right?

18  A    I don't think so.  This says a local area network.

19  Q    Fair enough.  Any local area network.

20  A    Yes.

21  Q    Now, this is on the roadmap for Facet, right?

22  A    I don't know.  I don't actually make those decisions as an

23  engineer.

24  Q.   Well, let me show you Mr. Schwarz' deposition, Page 126,

25  Lines 2 through 17.  One second.  Mr. Schwarz is the business

 1  development manager for Facet?

 2  **A**    That's right.

 3  **Q**    Okay.  And he was a -- do you remember a Rule 30(b)(6) --

 4  no, you wouldn't know that.

 5           **MR. SINGLA:**  He was a Rule 30(b)(6) witness, Your

 6  Honor.  Page 136, Lines 2 through 17.

 7           (Portion of videotaped deposition played:)

 8           **"QUESTION:**  What about supporting network

 9           storage?  Is that a feature that you --

10           **"ANSWER:**  Oh, sorry.  Yes.  Yes, of course,

11           yes.  We have discussed supporting network

12           storage.  We've discussed having multiple

13           Facet box within the home to potentially

14           share, share communication and share content.

15           **"QUESTION:**  Right.  So you could --

16           **"ANSWER:**  But these are just simply roadmap

17           discussions that we've had.

18           **"QUESTION:**  So part of the roadmap you

19           discussed is being able to have movies copied

20           from a Facet box onto a network storage, and

21           then be able to watch them on TVs around the

22           house."

23           **MR. SINGLA:**  Missed the answer there.

24           Why don't I just -- let me just read it.

25           **THE COURT:**  It's not possible to pull it up quickly?

1      **MR. SINGLA:**  Mr. Bales, can we pull that back up?

2      **MR. WILLIAMS:**  Yeah.

3      **THE COURT:**  Uh-huh.

4      (Portion of videotaped deposition played:)

5      **"QUESTION:**  Watch them on TVs around the

6      house?

7      **"ANSWER:**  That's correct.  That characterizes

8      a good application scenario."

9    BY MR. SINGLA:

10   **Q**   Now, sir, in the Facet system, you all used a player that

11   you got from somewhere else.  The Xine player, right?

12   **A**   Yes, that's right.

13   **Q**   That's not something you wrote?

14   **A**   No.

15   **Q**   You downloaded that off the Internet.

16   **A**   Yes.

17   **Q**   It's a standard open-source player.  Right?

18   **A**   Yes.

19   **Q**   And that Xine player expects to play a movie off a

20   physical DVD, right?

21   **A**   No, I don't think it makes that distinction.  It can

22   either -- well, it plays from a device that has a UDF file

23   system on it, with the appropriate DVD-video files on it.

24   **Q**   Sir, the Xine typically expects to play a movie off of a

25   DVD physical disc, right?

```
 1   A    Yeah.  It -- it attempts to play a movie off something

 2   that looks like a DVD device.

 3   Q    It expects to play a movie off of a DVD physical disc,

 4   right?

 5   A    I just answered the question.  It attempts to play off

 6   something that looks like a physical DVD device.

 7             MR. SINGLA:  Your Honor, we would like to play

 8   Page 23, Lines 1 through 5 of Mr. Bielman's deposition.

 9             THE COURT:  All right.

10             (Portion of videotaped deposition played:)

11             "QUESTION:   The DVD player that's used, what

12             is it called?

13             "ANSWER:  Xine.

14             "QUESTION:  Xine.  Xine typically expects to

15             play a movie off of a DVD physical disc,

16             correct?

17             "ANSWER:  Yes."

18   BY MR. SINGLA:

19   Q    But you all tricked it into playing a movie copied from a

20   DVD onto the hard drive, right?

21   A    No.  I -- I think I was being a little bit imprecise there

22   with what I was really -- what I really mean is that it will

23   play off any device that has the proper file system and files

24   on it.  So, there's no tricking involved.  You simply point at

25   a different location.
```

1  Q    Well, you all wrote a virtual DVD device, right?

2  A    Yes.

3  Q    That -- that stores the movie on the hard drive, right?

4  A    Yes.

5  Q    And to Xine, the way you designed your system, that to

6  Xine looks like an actual DVD drive.  Right?

7  A    It doesn't necessarily look like a -- it looks like a

8  device that has the right file system and files on it.

9  Q    It looks like an actual DVD drive, right?

10 A    In a sense, yes, it does.

11 Q    And Xine does not know that it's playing back a movie from

12 a hard drive, does it?

13 A    No, I don't believe it does.

14 Q    And the Xine player -- strike that.

15       Now, I want to talk about DVD Walk for a second.  In

16 the Facet system, you have Play as an option, right?  Play a

17 DVD?

18 A    Yes.

19 Q    And then you have Save, right?

20 A    Yes.

21 Q    And then you hit Save, it just starts copying the DVD.

22 Right?

23 A    Yes, it using the linear approach.

24 Q    And then if you hit an error, it turns into -- if you hit

25 a bad sector, it goes to DVD Walk.

1   **A**    If you hit a certain number of bad sectors, yes.

2   **Q**    How many bad sectors?

3   **A**    I think it's ten.

4   **Q**    Now, there's also this play-and-save mode?

5   **A**    Yes.

6   **Q**    Now, in the play-and-save mode, what happens is the

7   copying system goes off and starts copying the disc, the DVD,

8   right?

9   **A**    Yes.

10  **Q**    And then, it starts playing the movie off of the hard

11  drive.

12  **A**    Yes.

13  **Q**    So the Facet system in that approach copies the DVD with

14  its either linear copier or DVD Walk, right?

15  **A**    Yes.

16  **Q**    And then, plays the movie back to the user on the screen

17  off the hard drive.

18  **A**    Yes.

19  **Q**    And then, if the user says, "Look, I want to go to some

20  other chapter" or "I want to use a different audio content,"

21  sometimes the -- the copying system is told, "You know what?

22  You need to go copy this part over here."  Right?

23  **A**    Yes, that's right.

24  **Q**    But otherwise, the copying system, DVD Walk, kind of

25  operates on its own, ahead of where the person's watching the

 1  movie.

 2  **A**    Yes.

 3  **Q**    So in that scenario, it's not the user who's mostly,

 4  except for this one exception, telling DVD Walk where to go

 5  copy the movie.

 6  **A**    Yeah, that's right.

 7  **Q**    Now, one thing I noticed today, you kept saying to

 8  Mr. Berta that it saves, Facet saves the DVD.  Right?

 9  **A**    Yes.

10  **Q**    Now, it copies the movie or the DVD, right?

11  **A**    I -- I suppose you could say they're equivalent.

12  **Q**    Are they equivalent, sir?

13  **A**    I -- I think for the purpose of this discussion, they're

14  probably equivalent.

15  **Q**    But, sir, in -- do you remember when I took your

16  deposition?

17  **A**    Yes.

18  **Q**    And do you remember, in your deposition, you insisted that

19  it did not copy movies?

20  **A**    Yes.

21  **Q**    And you said it only saves DVDs?

22  **A**    Yes.

23  **Q**    But now you agree that it actually does copy the DVD.

24  Right?

25  **A**    Well, yeah, I mean, it's -- it's a fine distinction.  I --

 1   I don't think it matters for this -- this purpose.

 2   Q    Right.  Because, it's the same thing.  What you had on the

 3   DVD and what you have on the Facet hard disc, basically it's

 4   the same thing.  It's the movie.  Right?

 5   A    Yeah, it's not a bit-for-bit copy because there's also

 6   additional encryption, but in sort of a layman's terms you

 7   could say they're the same thing.

 8   Q    Right.  So, the copy on the DVD and the copy on the Facet

 9   hard disc are different in the sense that you have additional

10   encryption, your AES encryption on the hard drive, right?

11   A    Yes.

12   Q    But it's the same thing.  Right?

13   A    Yes.

14   Q    It's a copy.

15   A    Yes.

16   Q    So, in your deposition, you were telling me, right, that

17   because it's encrypted, it's not a copy any more.  That's what

18   you were saying in your deposition, right?

19   A    Yes.

20   Q    And you're saying it's a whole different thing now,

21   because it had encryption on it.  Right?

22   A    That may have been what I said.  I don't recall

23   specifically.

24   Q    But you're not saying that any more.

25   A    No, I suppose not.

1  Q    Something that's encrypted remains -- it remains, you can

2  say, a copy of what the original thing was.  Right?

3  A    As I said, in layman's terms, yeah.

4  Q    And this whole issue of whether it should be called

5  copying or saving, you discussed this with Mr. Barrett, right?

6  A    Yes.

7  Q    You all had conversations with Mr. Barrett about whether

8  to call this copying or saving, right?

9  A    Well, I -- I believe that that was something that he had

10 spoken with our attorneys about.  I don't understand the exact

11 nature of that.

12 Q    Well, I don't want to understand -- I don't want to know

13 what he spoke to the lawyers about.  I just want to know, that

14 you did discuss with Mr. Barrett -- the team discussed with

15 Mr. Barrett whether to call it copying or whether to call it

16 saving.

17 A    Well, he mentioned it in a meeting.  And I don't know if

18 that came from attorneys or not.

19 Q    Now, ARccOS and RipGuard are very effective, aren't they?

20 A    Effective at what?

21 Q    Effective at stopping people from copying DVDs.

22 A    No, I wouldn't agree that they are.

23 Q    They're very hard to circumvent, aren't they?

24 A    No.  I mean, as I discussed earlier, you could simply

25 retry your way through every error on the disc and obtain a

 1  copy.

 2  **Q**    Now, sir, when did you start on the Facet team?

 3  **A**    March of 2008.

 4  **Q**    And, even before you started, the team had had this idea

 5  of using this spider approach, traversal approach to copy

 6  ARccOS discs, right?

 7  **A**    Yes.

 8  **Q**    And, Dave Watson, he's a developer on your team?

 9  **A**    Yes.

10  **Q**    And before you, he tried to develop a way to copy these

11  ARccOS discs.  Right?

12  **A**    Yes.

13  **Q**    And he couldn't get his solution to work, company?

14  **A**    There was some specific problems when trying to play the

15  disc that was being saved.

16  **Q**    He spent several months on it, right?

17  **A**    I am not sure exactly how long he spent on it, but it

18  was -- he was working on it for a while.

19  **Q**    And he couldn't figure out a way to get around ARccOS and

20  RipGuard.

21          (Recorded voice is heard)

22          **MR. SINGLA:**  Apologies, Your Honor.

23          **THE COURT:**  Is that an echo there?

24          **MR. SINGLA:**  That's my next question.  Somehow it's

25  already recorded.

```
 1              THE WITNESS:  Can I have the question again?

 2              THE COURT:  It really is inventive equipment.  Right?

 3  BY MR. SINGLA:

 4  Q     Sir, he could not get working his effort at trying to copy

 5  ARccOS and RipGuard-protected discs, right?

 6  A     Well, my recollection was that his solution was actually

 7  working as far as the copying was going, but it was this

 8  play-and-save issue that he hadn't really handled.

 9  Q     And before Mr. Moore, there was someone else -- I'm sorry.

10  Before Mr. Watson, there was someone else working on it, right?

11  A     Only based on what you have told me.  I -- I don't know.

12  Q     Mr. Moore, right?

13  A     That's -- I -- I don't recall him ever working on that.

14  Q     Well, he's a programmer on your team.

15  A     Yes.

16              MR. SINGLA:  Can we look at Exhibit 90.

17  BY MR. SINGLA:

18  Q     Now, this is an e-mail from Mr. Wolpert in October of

19  2007, right.

20  A     Yes.

21  Q     If we turn to the next page, there's a Gantt chart.

22  Right?

23  A     Yes.

24  Q     It's a chart assigning people tasks.

25  A     Okay.
```

1  Q     And you see the first line says ARccOS?

2  A     Yes.

3  Q     Says J. Moore?

4  A     Yes.

5  Q     And this is back in October of 2007.

6  A     That's right.

7  Q     So, your efforts to get around ARccOS and RipGuard on the

8  Facet team started with Mr. Moore, it looks like, in October of

9  2007, right?

10            MR. BERTA:  Vague as to "your."

11            THE COURT:  What do you mean by "your efforts"?

12            MR. SINGLA:  The Facet team.  Let me be more precise.

13  Thank you, Your Honor.

14  BY MR. SINGLA:

15  Q     The Facet team's efforts to get around ARccOS and RipGuard

16  looked like they started with Mr. Moore back in October of

17  2007, right?

18  A     That was actually before I was working, but this -- this

19  document would seem to suggest that.

20  Q     And then, Mr. Watson spent a few months on it, right?

21  A     Yes.

22  Q     And then finally it got handed over to you, right?

23  A     Yes.

24  Q     Because this was a very hard problem.

25  A     What was a hard problem?

1  Q    Copying ARccOS- and RipGuard-protected DVDs.

2  A    Well, I mean, writing a DVD player is a very complicated

3  problem.  So writing this traversal algorithm requires

4  implementing the virtual machine, and it's, you know, a

5  complicated specification.

6  Q    It's a non-trivial problem.

7  A    Yes.

8  Q    That's what a computer scientist would say, right?

9  A    That's right.

10 Q    They need one of the best programmers, the Facet team

11 needed one of the best programmers they had, right?

12 A    Well, to implement this DVD player, yes.

13 Q    That was you.

14 A    I like to think so.

15 Q    In fact, when you got assigned to this product, you even

16 got a corner office, didn't you?

17 A    It's an inside corner.

18        THE COURT:  Now we see what's really important, don't

19 we?

20        (Laughter)

21 BY MR. SINGLA:

22 Q    That's still better than what everybody else had, right?

23 A    It's -- it's not an open desk, so, yes.

24 Q    This was a really important project.

25 A    I -- I don't know.  I would assume so.

1  Q    And, let's put up Exhibit 109.  Before we do that, what is

2  HandBrake, sir?

3  A    I think it's an open-source program that can, like, rip

4  DVDs.

5  Q    It's an illegal ripper, right?

6  A    I don't know if it's illegal or not.

7  Q    It's a ripper.

8  A    I think so, yes.

9  Q    It breaks CSS?

10  A    I don't know if it breaks CSS or not.

11              MR. SINGLA:  Can we put up Exhibit 109.

12              (Witness examines document)

13  BY MR. SINGLA:

14  Q    Sir, you have the e-mail in front of you?

15  A    Yes.

16  Q    It's from Mr. Barrett to you, is that right?

17  A    That's right.

18  Q    From the end of August, 2008, right?

19  A    Right.

20  Q    This is like two months after or a month -- two months

21  after you started working on the ARccOS solution.

22  A    Something like that.  Maybe one month.  I think I worked

23  on DVD Walk in August.

24  Q    Now, at this time it wasn't called DVD Walk, it was called

25  ARccOS, right, sir?

1  **A**    I don't remember.  I mean, I had to give it a name.  I'm

2  pretty sure I gave it either DVD Traverse or DVD Walk when I

3  first wrote it.

4  **Q**    Now, what Mr. Barrett is suggesting is that you go look at

5  the source code for HandBrake.  Right?

6  **A**    Yeah.  He says it might be worth looking at their source.

7  **Q**    To figure out how they're copying ARccOS- and

8  RipGuard-protected discs, right?

9  **A**    Well, this just says "better handling of DVD reader," so I

10  don't know that it necessarily implies the ARccOS or RipGuard

11  discs.

12  **Q**    Well, what else could it be saying, sir?  Scratched discs?

13  **A**    He could be.  I don't really know the intent of this

14  e-mail.  I don't think I asked him to send me this e-mail.

15  **Q**    So you think that what Mr. Barrett was saying to you is

16  that HandBrake has some additional features to handle

17  scratches?

18  **A**    I really don't know, one way or the other.

19  **Q**    Now, even as of February when you were deposed, you were

20  still working on the solution, this DVD Walk.  Right?

21  **A**    Well, I mean, I was making fixes as necessary.  It was

22  basically done.

23  **Q**    Your QA team was reporting DVDs that could not be copied.

24  **A**    That's right.

25  **Q**    Now, Mr. Barrett, we talk about Mr. Barrett.  He's your, I

```
 1   guess, boss's boss?

 2   A    Yes.

 3   Q    And, you know he was deposed in this case.

 4   A    Yes.

 5   Q    In December.

 6   A    Okay.

 7   Q    And, did you review his deposition transcript?

 8   A    No.

 9   Q    I'll represent to you that ARccOS and RipGuard came up

10   quite a bit in his deposition.

11             Now, in January, after he was deposed, Mr. Barrett

12   asked you to consider changing the way Facet copies DVDs.

13   Right?

14   A    He asked me to do a build to -- to evaluate it.  It wasn't

15   necessarily to make that change.

16   Q    Right.  He asked you to consider it.  Right?

17   A    Yes.

18   Q    And what he asked you to consider is to use DVD Walk for

19   all DVDs.

20   A    That's right.

21   Q    And, you asked him why he wanted to make that change,

22   right?

23   A    I -- I may have.  I don't -- I don't remember.

24   Q    Because to you it didn't make any sense, did it?

25   A    I don't know that it wouldn't make sense.  But, it -- it
```

1  makes sense to have more approaches available.

2  Q    Well, DVD Walk is a much more inefficient and difficult

3  and time-consuming way to copy a DVD, right?

4  A    Well, it's -- it is slower.

5  Q    I mean, you could not think of any technical advantages

6  for using DVD Walk for movies not protected by ARccOS or

7  RipGuard.  Isn't that right?

8  A    I don't know that I would say that there are no technical

9  advantages.  Given the state of Facet at that time, it may not

10 have had any technical advantages.

11 Q    Well, sir, from your perspective, you're not sure there

12 could be any specific technical advantages for using DVD Walk

13 for all DVDs.  Right?

14 A    Right.  At that -- at that time, at the current state of

15 Facet, that may have been true.

16 Q    That was true.

17 A    Yes.

18 Q    Indeed, doing that would make everything slower.  Right?

19 A    Well, I think -- it probably would, yes.

20 Q    Now, Mr. Barrett wouldn't tell you why he wanted you to

21 switch to using this DVD Walk for all DVDs.  At least he

22 wouldn't tell you without the -- without the lawyers present.

23 Right?

24 A    Well, we had a meeting with Bill Way and discussed it.

25 Q    Right.  And Mr. Barrett wouldn't talk to you about it

1 without the lawyers present, would he?

2 **A**    I don't remember if he said that, but he'd scheduled a

3 meeting to discuss it.

4 **Q**    And so, you ultimately concluded, though, that it didn't

5 make sense to use this DVD Walk for all DVDs, right?

6 **A**    I don't actually remember if we ever -- if there was ever

7 a formal conclusion.  But, I mean, we -- the issue didn't

8 really come up again.

9 **Q**    Well, sir, weren't there a fair number of movies that you

10 couldn't copy using DVD Walk?

11 **A**    I think at the time there may have been several.

12 **Q**    Right.  When he asked you to switch all movies to DVD

13 Walk, there were lot of movies you couldn't copy with DVD Walk,

14 right?

15 **A**    Yeah.  And again, I don't know the details of how that

16 actually worked out.  The QA team may know that.

17 **Q**    Okay.  So, now, DVD Walk, you're saying it doesn't

18 encounter (Indicating quotation marks) ARccOS and RipGuard.

19 Right?

20 **A**    Right.  If a player wouldn't encounter that error, then

21 neither would DVD Walk.

22 **Q**    Now, DVD Walk has to do more than just traverse the entire

23 path of the DVD, though.  Right?

24 **A**    I'm not sure what you mean.

25 **Q**    DVD Walk has to do more than just -- DVD Walk has to deal

 1  with other tricks and things put in by ARccOS and RipGuard,

 2  doesn't it?

 3  A     This -- not as far as I'm aware of.

 4  Q     Well, it has to deal, for example, with hidden buttons.

 5           MR. BERTA:  Objection, Your Honor.  No foundation.

 6  BY MR. SIGLA:

 7  Q     Doesn't it?

 8           THE COURT:  You can testify, if you know of your own

 9  knowledge.

10           THE WITNESS:  I don't have any knowledge that hidden

11  buttons are part of ARccOS or RipGuard.

12  BY MR. SINGLA:

13  Q     Okay.  But you do know that hidden buttons were used by

14  Protect DVD.  Right?

15  A     Again, I don't know that for certain, but I may have had

16  an idea, based on some random, you know, web searching.

17  Q     Right.  You found DVD that had these hidden buttons on it,

18  right?

19  A     Yes.

20  Q     And you had to write code to deal with that.  Right?

21  A     Yes.

22  Q     You had to write something so that the program would

23  realize that these were buttons that a human being wouldn't

24  see.  Right?

25           MR. BERTA:  I just want to make an objection on this,

 1  Your Honor.  I believe Mr. Singla will agree that that DVD is

 2  not ARccOS and RipGuard.  We have had -- they have not put

 3  those in the case.

 4          I can't tell you what that stuff is.  We have had no

 5  discovery on it.  I don't even know where it's made from.  So

 6  it's not part of this proceeding.

 7          **THE COURT:**  Yes.  Is it part of this proceeding?  Or

 8  are we going far afield now, or somewhat afield?

 9          **MR. SINGLA:**  We're not going far afield, Your Honor.

10  If I could explain, the one DVD that they encountered, the

11  first one with these hidden buttons, was by another technology,

12  Protect DVD.  Very similar.

13          **THE COURT:**  Uh-huh.

14          **MR. SINGLA:**  Mr. Schumann has testified that similar

15  technologies are used in ARccOS and RipGuard.  It's the same

16  issue, just happens to come up in their situation on a DVD with

17  some other company's technology on it.

18          **THE COURT:**  But what is he supposed to testify to

19  with respect to that, that he would have personal knowledge of?

20          **MR. SINGLA:**  They made an effort -- that's what I'm

21  trying to get Mr. Bielman to explain -- to deal with these

22  hidden buttons on this DVD.  Now, that happened to be for

23  this -- you know, used by some other technology, but there's

24  testimony that -- uncontroverted testimony that the same

25  techniques are used in ARccOS and RipGuard.

1              THE COURT:  Yes.

2              MR. BERTA:  If I can just address this, the problem

3    is that that's not exactly accurate.  The only things that we

4    have had since December in this case are ARccOS and RipGuard.

5    Whatever this is, which, there's different things in the record

6    about what it is, we have had no discovery on.

7              This witness has no idea, but there are very many

8    very good reasons why whatever it is may be fundamentally

9    different from ARccOS and RipGuard.  And it's in the documents.

10   But, like, we haven't addressed this issue, because it's not

11   here.

12             THE COURT:  Is it worth spending time with this

13   witness on?

14             MR. SINGLA:  Just a couple of questions, Your Honor,

15   and then we'll -- I'll move on.

16             THE COURT:  Well, let's see what they are.  Ask your

17   next one, and I'll see.

18             MR. SINGLA:  Thank you, Your Honor.

19   BY MR. SINGLA:

20   Q    So, you did have to write code to deal with these hidden

21   buttons.  Right?

22   A    Yes.

23   Q    And to change DVD Walk so it would realize that human

24   beings would never press these buttons.  Right?

25   A    That's right.

1  Q    And you knew that Protect DVD is generally similar to

2  ARccOS, right?

3          MR. BERTA:  There's no foundation.

4          MR. SINGLA:  I'm asking if he knew.

5          THE COURT:  Do you know?

6          THE WITNESS:  No, I don't really know.

7          THE COURT:  Okay, so I guess you'll be moving on

8  then.  Right?

9          MR. SINGLA:  Hmm.

10          THE COURT:  Also, do you have another witness that

11  you need to get on and off?

12          MR. SINGLA:  Yes, Your Honor.

13          THE COURT:  Do you see the clock yet?

14          MR. SINGLA:  I do, Your Honor.  I'm just wrapping up

15  now.

16          THE COURT:  It's ten to 5:00, I believe.

17          MR. SINGLA:  I'll just finish one line of questions,

18  Your Honor, and be done.

19          THE COURT:  I mean, there may be some redirect, too.

20          MR. SINGLA:  Yes, Your Honor.  And I believe Mr. Mick

21  has some questions, too.

22          THE COURT:  Okay.

23  BY MR. SINGLA:

24  Q    Do you understand that the goal of ARccOS and RipGuard is

25  to signed the differences between how people actually watch a

1  movie and how these kind of programs like DVD Walk work?

2          That's one of the goals of ARccOS and RipGuard?

3  **A**    No, I didn't know that.

4  **Q**    Now, you're saying that your product doesn't, quote,

5  encounter (Indicating quotation marks) ARccOS and RipGuard.

6  **A**    Well, DVD Walk is a DVD player.  And it -- if ARccOS and

7  RipGuard are meant to not be encountered by DVD players, then

8  it would not.

9  **Q**    Now, you said it's a DVD player.  No video is actually

10 shown on the screen, right?

11 **A**    Well, that's true, but I mean, it -- that's just, like,

12 one sort of output step.  But as far as implementing the

13 DVD-video specifications, it is a DVD player.

14 **Q**    Okay.  And you all spent a year trying to figure out how

15 not encounter ARccOS and RipGuard.  Right?

16 **A**    Talking about the team.  I mean, I --

17 **Q**    Yes.  The team.

18 **A**    I don't really understand -- I don't really know the

19 specifics of how long those other guys spent working on this

20 stuff.

21 **Q**    But Mr. Moore tried to figure out how to not encounter

22 ARccOS and RipGuard, right?

23 **A**    He may have.  That was before I joined.

24 **Q**    And Mr. Watson tried to figure out how to not encounter

25 ARccOS and RipGuard, right?

1   **A**     Yes.

2   **Q**     And then you have been working on how to not encounter

3   ARccOS and RipGuard, right?

4   **A**     Yes.

5   **Q**     And sometimes you do accidentally encounter ARccOS and

6   RipGuard, right?

7   **A**     No, I don't think that's true.

8   **Q**     Well, there are DVDs that your QA people sent back as not

9   being able to be copied.  Right?

10  **A**     Yes.  And I think in most cases those had been bugs that

11  were unrelated to ARccOS, RipGuard and DVD Walk.

12  **Q**     So sometimes there are bugs in your system that actually

13  end up encountering ARccOS and RipGuard.

14  **A**     No.  Actually, most of those discs, the nature of the bug

15  would be that it would not -- there would be content that it

16  would miss.  And then there would be errors on playback.

17  **Q**     And you know that we tested the Facet box, are you

18  familiar with that, back in January?

19  **A**     Yes, I think so.

20  **Q**     And, we found that it couldn't copy; it actually did

21  encounter ARccOS and RipGuard sometimes?

22          **MR. BERTA:**  Objection.  No foundation.

23  **BY MR. SINGLA:**

24  **Q**     I'm asking, do you know that?

25          **THE WITNESS:**  No, I don't know that.

 1          THE COURT:  How would he know that other than by

 2   hearsay?  Okay?

 3          MR. SINGLA:  Okay.

 4   BY MR. SINGLA:

 5   Q    And am I right, you all are still testing the system to

 6   make sure you never encounter, quote-unquote, ARccOS and

 7   RipGuard.

 8   A    Well, I mean, we test the system as a whole we don't test

 9   that specific piece of it.

10   Q    And it took you to step in, one of the best programmers on

11   the team, to figure out how to, quote, not encounter

12   ARccOS-RipGuard, right?

13   A    Well, I think as I stated earlier, Dave's program was

14   actually fairly successful at copying his discs, but it was the

15   play-and-save portion that really wasn't working.  We needed a

16   new design for that.

17          MR. SINGLA:  I'll pass the witness, Your Honor.

18          THE COURT:  Mr. Mick?

19          MR. MICK:  Thank you, Your Honor.

20                    <u>CROSS EXAMINATION</u>

21   BY MR. MICK:

22   Q    Good afternoon, Mr. Bielman.

23   A    Good afternoon.

24   Q    I think we established in Mr. Singla's questioning that

25   Facet makes copies of DVDs.  Right?

1   **A**    Yes.

2   **Q**    I mean, after all, there are lots of DVD players on the

3   market, right?

4   **A**    Yes.

5   **Q**    And you can buy a DVD player for 70 bucks or so, right?

6   **A**    Yes.

7   **Q**    So, it's fair to say Facet isn't going to be marketed as

8   another DVD player.  Right?

9   **A**    Well, it's a DVD player with additional features on top of

10  a standard player.

11  **Q**    Okay.  But if you can buy a standard DVD player for 70

12  bucks, nobody's going to buy the Facet player as a substitute

13  for a standard DVD player; they're going to buy it because they

14  want those extra features.  Right?

15  **A**    I would imagine so, yes.

16  **Q**    And the principle extra feature we're talking about is it

17  copies DVDs, right?

18  **A**    Yeah.  And it allows you to organize them and get meta

19  data for them, and so forth.

20  **Q**    So the ordinary consumer, the ordinary consumer who buys a

21  Facet box, can use his Facet box to make copies of DVDs.

22  That's the whole point.  Right?

23  **A**    Yes.

24  **Q**    They can make copies of DVDs that they've purchased,

25  themselves, right?

1    **A**    Yes.

2    **Q**    And copies of DVDs that they've borrowed or rented.

3    Right?

4    **A**    I think they may be able to.  I don't think there's any

5    technological way to tell the difference.

6    **Q**    They can do it with the Facet box.  Right?

7    **A**    They could.  I believe our software tells them not to.

8    **Q**    My client is the DVD Copy Control Association.  Do you

9    know what that is?

10   **A**    Yeah, I think so.

11   **Q**    You would agree with me that the purpose of CSS is to

12   prevent unauthorized duplication of DVDs.  Right?

13   **A**    Yes.

14   **Q**    And CSS is a copy protection system, correct?

15   **A**    Yes.

16   **Q**    In fact, there's a license that you have to take in order

17   to lawfully implement CSS, correct?

18   **A**    Yes, I believe so.

19   **Q**    And RealNetworks took that license, right?

20   **A**    Yes.

21   **Q**    And, and you, in fact, signed some paperwork to allow you

22   to get access to some of the stuff that comes with the license,

23   right?

24   **A**    That's right.

25   **Q**    You testified earlier about some of the specifications

 1   that you reviewed in the course of doing your work on Facet.

 2            Do you recall that?

 3   **A**    Yes.

 4   **Q**    And, some of your testimony involved your understanding of

 5   the specifications.  Do you recall that?

 6   **A**    Yes.

 7   **Q**    Now, I know you've read the specifications, correct?

 8   **A**    Yes, I have.

 9   **Q**    Now, before you testified here today, about your

10   understanding of the specifications, had you discussed what the

11   specifications mean with other people?

12   **A**    I -- I discussed them with our attorneys, preparing for

13   the case.  I don't remember any discussions about that on the

14   team, necessarily.

15   **Q**    So, no discussions about what the specifications mean with

16   the other members of the Facet engineering team, but you did in

17   fact discuss what the specifications mean with RealNetworks'

18   attorneys.  That's your testimony, right?

19            **MR. BERTA:**  So, I don't -- I'm sure that Mr. Mick is

20   not actually trying to ask about those conversations.

21            **THE COURT:**  You can answer that yes or no, but not

22   about the substance of any conversations you may have had with

23   the attorneys.

24            **MR. MICK:**  For the Record, Your Honor, it is my

25   contention that the privilege has been waived.  And I won't

 1  make that motion here, I'll make it at a later time.  But, I'll

 2  move on.

 3  **BY MR. MICK:**

 4  **Q**    Let's take a look at some of the specifications you

 5  testified about.

 6         Would you turn to the general specification, which is

 7  Exhibit L to the Pak declaration.

 8  **A**    Okay.

 9  **Q**    And, Pages GN19 and GN20.

10         (Request complied with by the Witness)

11  **A**    Okay.

12  **Q**    Now, you testified earlier today in response to questions

13  from Mr. Berta about Sections 2.4 and 2.5.  Do you recall that?

14  **A**    Yes.

15  **Q**    2.4 says "The Architecture of a DVD-video Player," in

16  quotations.  Do you see that?

17  **A**    Yes.

18  **Q**    And 2.5 is The Architecture of a DVD-video Playback System

19  on PC.  Do you see that one?  Right?

20  **A**    Yes.

21  **Q**    Now, you have read the general specification, correct?

22  **A**    Yes.

23  **Q**    And the general specification includes definitions, right?

24  **A**    Yes.

25  **Q**    You have read the definition of a DVD-video player, right?

1   **A**    Yes, I believe so.

2   **Q**    And Facet is in fact not a DVD-video player, correct?

3   **A**    My understanding is that a DVD-video player does not do

4   drive authentication.  So based on that understanding, no, I

5   don't think so.

6   **Q**    Facet isn't a DVD-video player.  You, in fact, in your

7   testimony, described it -- I think correctly -- as a

8   combination of a DVD drive and a decryption module.  Right?

9   **A**    That's right.

10  **Q**    So you would agree with me that Section 2.4 doesn't apply

11  to Facet, right?

12  **A**    Yes.

13  **Q**    2.5 in fact applies to Facet.  Correct?

14  **A**    That's my understanding.

15  **Q**    And 2.5 is the one that reads, "Architecture of a

16  DVD-video playback system on PC."  Correct?

17  **A**    Yes.

18  **Q**    Now, Facet has inside the box a DVD-ROM drive, right?

19  **A**    Yes, it does.

20  **Q**    It's a standard PC-component DVD-ROM drive.  Correct?

21  **A**    It's a standard DVD-ROM drive.  My understanding is that

22  many set-top DVD players that are not PCs use similar drives.

23  **Q**    Let's talk about the hard drive.  The hard drive in the

24  Facet box is a standard hard drive.  Right?

25  **A**    Yes.

1  Q    And there's a bus connection between the board inside the

2  Facet box and the hard drive, right?

3  A    Yes.

4  Q    And what kind of bus connection was it?

5  A    I believe it's a serial ATA.

6  Q    And you would agree with me that the serial ATA bus is a

7  user-accessible bus, right?

8  A    Yes, I think so.

9  Q    And the board on which the Facet software runs in the

10 Facet box in your development prototypes you describe as an x86

11 model, right?

12 A    I'm sorry, you're talking about the UBUNTU prototypes.

13 Q    Yes.  The Facet development team had access to a number of

14 prototypes.  Right?

15 A    Yes.

16 Q    And in fact, the prototypes generally fall into three

17 categories.  Right?

18 A    That's right.

19 Q    Okay.  And the three categories are what?

20 A    We have an Ubuntu system, a BroadCom-based system, and an

21 Intel Kenmore-based system.

22 Q    What is the processor in the Ubuntu system?

23 A    It's the standard x86 CPU.

24 Q    When you say the standard x86 CPU that's the standard

25 Intel chip that you find on PCs everywhere, right?

1   **A**    It's not a system-on chip like in the other two.

2   **Q**    But it is an x86-type Intel processor, right?

3   **A**    Yes.

4   **Q**    Okay.  You started work at RealNetworks in March of 2008,

5   correct?

6   **A**    That's right.

7   **Q**    And when you started at RealNetworks, there was already a

8   prototype version of Facet that had been built around a bunch

9   of unlicensed code that had been taken off the Internet.

10  Right?

11  **A**    I believe so, yes.

12  **Q**    Okay.  And, you understood that that unlicensed code was

13  not something that you could ship the product with, right?

14  **A**    I think that was management's understanding, as I -- as I

15  know.

16  **Q**    And you eventually rewrote the code because understood you

17  couldn't ship it.  Right?

18  **A**    Yes.  We have -- I wrote a new CSS code because we wanted

19  to comply.

20  **Q**    Even though RealNetworks had no qualms at all about using

21  the illegal code to build the product in the first place,

22  right?

23  **A**    That wasn't a decision that I made.  I don't know if there

24  were any qualms.

25  **Q**    It happened before you arrived.  Right?

1   **A**    Yes.

2   **Q**    But in fact that open-source system was in use when you

3   arrived, right?

4   **A**    Yeah.  But I'm pretty sure the intent was always to

5   replace that as soon as possible.

6   **Q**    In your earlier testimony, I think you referenced Figure 4

7   from the general specification.  Do you recall that?

8   **A**    Yes.

9   **Q**    Professor Bishop testified last week, and he had a

10  slightly different drawing.

11          **MR. MICK:**  Can we have Bishop Slide 61 brought up,

12  Mr. Bowser?  We -- not on the public monitors?

13          (Document displayed)

14  **BY MR. MICK:**

15  **Q**    All right, sir.

16          **MR. MICK:**  Let's go with 60.  Can we have 60 brought

17  up?

18          (Document displayed)

19          **MR. MICK:**  Thank you.

20  **BY MR. MICK:**

21  **Q**    Do you have Slide No. 60 in front of you, Mr. Bielman?

22  **A**    Yes, I have it right here.

23  **Q**    Have you ever seen this before today?

24  **A**    Yes, I believe Mr. Singla showed this to me earlier.

25  **Q**    No, my question was, have you ever seen this before today.

```
 1  A    I may have seen this in preparation for testifying.

 2  Q    Did Professor Bishop talk to you about the Facet system

 3  before he put together this slide?

 4  A    No, I don't recall doing that.

 5  Q    Have you ever talked to Professor Bishop?

 6  A    Yes.

 7  Q    Is Professor Bishop's description of the Facet system

 8  accurate?

 9  A    As -- as, with respect to this diagram?

10  Q    In general.

11           MR. BERTA:  So, I mean, foundation, here --

12  BY MR. MICK:

13  Q    What did you talk to Professor Bishop about, sir?

14           THE COURT:  Okay.  That's probably a good idea.

15           THE WITNESS:  He had questions about where some

16  things were in the source code, and I pointed them to the

17  relevant areas.

18  BY MR. MICK:

19  Q    Did you see his testimony?

20  A    No.

21  Q    Did you see his diagrams?

22  A    No, apart from the one that I saw when preparing.

23  Q    Do you in fact have a different architectural diagram for

24  the Facet system, yourself?

25  A    For Facet as a whole?
```

1  Q    Yeah.

2  A    I am not aware of anything, off the top of my head.

3  Q    You built the Facet system without an architectural

4  diagram or data flow, flow chart, any of that stuff.

5  A    I -- I think so.  I mean, there may be some old

6  architecture diagram on the wiki but I -- that's not something

7  that I would refer to.

8  Q    Would you take a look at Professor Bishop's slide for me,

9  sir.

10         Now, you see the hard drive that he has there in the

11 sort of the middle right section of it?

12         (Witness examines document)

13 A    Yes.

14 Q    You agree with me that that hard drive is not pictured in

15 any of the figures in the CSS specifications, right?

16 A    Yes, it's not there.

17 Q    In fact, there's no description of saving audio/visual

18 data to the hard drive anywhere in the CSS specifications,

19 right?

20 A    Right.

21 Q    Let's talk a little bit about how Facet operates.  When

22 you put a DVD disc in the drive of the Facet machine, the first

23 thing it does is drive authentication, right?

24 A    Yes, I believe so.

25 Q    The next thing it does is it fetches the keys from the DVD

1   disc, right?

2   A    That's right.

3   Q    And, the keys are then bus decrypted, right?

4   A    Yes, that would be part of the process of fetching them.

5   Q    You implement the bus encrypt process from the CSS

6   specifications, right?

7   A    Yes.

8   Q    And you use that to take the bus encryption off of the

9   keys, right?

10  A    Yes.

11  Q    The output of the bus decrypt algorithm in the CSS

12  specifications is the secure disc key data and the title keys.

13  Right?

14  A    Yes.

15  Q    Now, when I say the output is the secure disc key data and

16  the title keys, they're still CSS encrypted, correct?

17  A    That's right.

18  Q    The bus encryption has been taken off, but the CSS

19  encryption is still on.  Right?

20  A    Yes.

21  Q    So the output of the bus decrypt process is the encrypted

22  secure disc key data and the encrypted title keys.  Correct?

23  A    Yes, I believe so.

24  Q    Okay.  Now, Facet then puts on an AES encryption on top of

25  that, correct?

 1   A    That's a step that's performed later.  But when it is

 2   saved to the hard drive, yes, there's additional AES encrypts.

 3   Q    When it saves them to the hard drive, it saves them in an

 4   EDF file, right?

 5   A    Yes.

 6   Q    Doesn't put them in a hidden sector or lead-in area

 7   because that's the stuff that's on the DVD disc.  Right?

 8   A    That's right.

 9   Q    And when the encrypted keys get put out to the hard drive

10   by Facet, they go over a user-accessible bus.  Right?

11   A    I'm sorry.  Can you repeat it?

12   Q    When the encrypted disc key data and encrypted title keys

13   get put out to the hard drive by Facet, they go over a

14   user-accessible bus.  Right?

15   A    They do, but they're encrypted prior to -- they're

16   encrypted again with AES prior to being sent over the bus.

17   Q    At some point in the operation of Facet, a menu screen

18   comes up that gives you the Play, Save, Play-and-save options,

19   right?

20   A    Yes.

21   Q    At the point in time that that menu screen comes up, has

22   the key information already been stored to the hard drive?

23   A    No.  I believe it's in memory, but not in the hard drive.

24   Q    Let's say that the user selects Save.  The first thing

25   Facet does, it tries to do a linear sector-by-sector save,

 1  right?

 2  **A**    Yes.

 3  **Q**    Now, if we assume that there's no ARccOS or other stuff on

 4  the disc, as you probably heard way too much of that already,

 5  it's going to use this linear sector-by-sector save to copy the

 6  whole disc.  Right?

 7  **A**    Right.

 8  **Q**    Now, when it's done, all of the audio/visual data is out

 9  on the hard drive.  Correct?

10  **A**    Correct.

11  **Q**    And at that point the disc can be ejected, right?

12  **A**    Yes.

13  **Q**    None of the audio/visual data has been descrambled at that

14  point, right?

15  **A**    None of the A/V data, that's correct.

16  **Q**    All right.  Let talk a little bit about playback from the

17  hard drive.  Okay?

18  **A**    Okay.

19  **Q**    On playback from the hard drive, Facet doesn't try to do

20  the CSS drive authentication on the DVD drive, does it?

21  **A**    No.

22  **Q**    On playback from the hard drive, the hard drive doesn't

23  try to authenticate the Facet software, does it?

24  **A**    No.  Hard drives don't implement the function.

25  **Q**    And on playback from the hard drive, Facet gets the title

```
 1  keys and the secure disc key data from the hard drive, and not
 2  the DVD disc.  Right?
 3  A    That's right.
 4  Q    In fact, the DVD disc doesn't even have to be in the
 5  machine at that point, right?
 6  A    That's right.
 7  Q    And on playback from the hard drive, the keys are sent
 8  from the hard drive with no CSS bus encryption on them.  Right?
 9  A    No.  Hard drives don't implement that bus encryption --
10  Q    So you agree with my statement, none of that's on there,
11  right?
12  A    Yes, I agree.
13  Q    And on playback from the hard drive, Facet does not call
14  the CSS bus decryption algorithm, does it?
15  A    No.
16  Q    All right.  Let me ask you to turn to Page ADC7 in the
17  authenticator specification, which is Exhibit N to the Pak
18  declaration.
19          (Request complied with by the Witness)
20  Q    Now, this is one of the sections that you testified about
21  earlier in response to questions from Mr. Berta, right?
22  A    Yes.
23  Q    And in fact, Mr. Berta asked you specifically about
24  Section 3.7 of the authenticator spec.  Correct?
25  A    Yes.
```

1  Q    The second sentence of 3.7 begins "Before playback of a

2  VTS."  Do you see that?

3  A    Yes.

4  Q    VTS is the audio/visual data, right?  It's the video

5  title.

6  A    That's right.

7  Q    And you testified that Facet complies with this section,

8  right?

9  A    Yes.

10 Q    Because, you interpreted "before" to mean it can happen

11 any time prior.  Right?

12 A    That's right.

13 Q    Even weeks or months prior.  Right?

14 A    Yes.

15 Q    Do you think that's a fair reading of what "before" means

16 here, in this specification?

17 A    Yes, I do.

18 Q    Do you think it might in fact imply immediately before, or

19 at least some time contemporaneously to playback?

20 A    I -- I think that if it meant that, it could say "on

21 playback of a VTS," just like it says "on an inserted disc."

22 Q    Are there other contexts that you're aware, in which the

23 word "before" (Indicating quotation marks) implies immediately

24 before, or at least some time contemporaneously with?

25 A    I'm sorry, I'm not sure I follow.

1  Q    Have you ever been to a restaurant, sir?

2  A    Yes.

3  Q    Have you ever seen a sign in a restaurant bathroom that

4  says, "Employees must wash hands before returning to work"?

5  Have you ever seen that sign?

6        MR. BERTA:  For the Record, I'm happy to have him

7  answer these questions -- I mean, not really, but --

8        THE COURT:  I'm not sure what the relevancy of what

9  that sign is to what -- maybe you can enlighten us -- to the

10 CSS specifications.

11 BY MR. MICK:

12 Q    Do you think, when they say "before," they mean "Hey, any

13 time before," two weeks before, a month before?  Or do you

14 think sometimes people use the word "before" to imply

15 immediately before?

16 A    Well, I mean, to me what that's saying is in between --

17 whatever you said, using the reference room and returning to

18 work, you need to wash your hands.  So, in the middle.  Between

19 those two things.

20 Q    Sometimes it would defeat the whole purpose of the policy

21 in question if "before" meant two months before, right?

22 A    Well, I mean, I think that would be implying that you

23 haven't used the bathroom again in two months since then, so I

24 don't know that I would necessarily agree.

25        THE COURT:  Called bad analogy, I think.

1  BY MR. MICK:

2  Q    The purpose of CSS is to prevent users from copying DVDs.

3  Right, sir?

4  A    I believe it says the purpose is to prevent unauthorized

5  duplication.

6  Q    Unauthorized duplication of what?  DVD movies, right?

7  A    Yes.

8  Q    Purpose is to prevent copies of DVDs, isn't it?

9  A    To prevent unauthorized copies, yes.

10 Q    At the end of the day, the user of your Facet box has the

11 ability to make copies of all their DVDs on to the hard drive,

12 right?

13 A    Yes.

14 Q    And then they don't need the DVDs in the drive any more,

15 right?

16 A    Yes.

17 Q    In fact, they don't even need the DVDs at all, right?

18 A    Well, yeah, if they're not in the drive then they're not

19 in the drive.

20          MR. MICK:  Nothing further, Your Honor.

21          THE COURT:  Mr. Berta, do you have any redirect?

22          MR. BERTA:  Very briefly, Your Honor.

23          THE COURT:  Yes.

24

25

1          **REDIRECT EXAMINATION**

2     BY MR. BERTA:

3     Q     Just a couple of questions that I have for you, based on

4     some of the stuff that was in the cross.  At one point, there

5     was some discussion about DVD Walk and -- DVD Walk.

6               Mister, I think, Singla had suggested to you that DVD

7     Walk was written to copy discs that could not be copied by the

8     linear process.  I don't know if you remember that line of

9     questioning.

10              Is it your testimony that linear copying cannot copy

11    DVDs?

12    A     No.  It -- it could copy them by retrying the errors.  It

13    may just take a long time.

14    Q     Okay.  The other question I had for you is, it went by

15    pretty quickly, but what Mr. Phil Barrett actually said in his

16    testimony which was played here, was that Facet was a

17    Linux-based computer.

18              My question to you is do you agree that Facet is a

19    Linux-based computer?

20    A     Yes.  There are a lot of Linux-based computers that aren't

21    PCs, such as TiVos and Google and red phone (Phonetic).

22    Q     Okay.  So, you anticipated my question.  Just because

23    something is a computer, does that make it a personal computer?

24    A     No.

25    Q     And why is Facet not a personal computer?

1   **A**     Because it's an embedded system with a single purpose,

2   which is to run the Facet application.

3   **Q**     There was a lot of discussion about authorized copying.

4   When you were going through the CSS implementation, did you

5   have an understanding as to whether or not the way that Facet

6   handles content and CSS keys is or is not authorized by the

7   specifications?

8   **A**     Well, I would think that by following the specifications

9   we would be authorized.

10              **MR. BERTA:**  That's it, Your Honor.

11              **THE COURT:**  Anything further?

12              **MR. SINGLA:**  No, Your Honor.

13              **THE COURT:**  Anything further, Mr. Mick?

14              **MR. MICK:**  Nothing, Your Honor.

15              **THE COURT:**  May this witness be excused without being

16  subject to being recalled?

17              **MR. BERTA:**  Yes, Your Honor.

18              **THE COURT:**  You are excused, but do not discuss your

19  testimony with any other persons who may be witnesses until the

20  proceedings are over.  Thank you.

21              (Witness excused)

22              **THE COURT:**  And, does that conclude for your

23  witnesses?

24              **MR. CUNNINGHAM:**  Yes, it does.  The only issue --

25              **THE COURT:**  If we need to do cleanup on exhibits, we

 1  can arrange some other time for that to be done, so we can move

 2  to the --

 3          **MR. CUNNINGHAM:**  That would be the issue.

 4          **THE COURT:**  Okay.  So are you going to be able to get

 5  your witness on in --

 6          **MR. SINGLA:**  Yes, Your Honor, I think so.

 7          **THE COURT:**  Okay.

 8          **MR. SINGLA:**  We call Robert Schumann to the stand.

 9          **THE COURT:**  Have a seat.  You are still under oath,

10  and the oath will not be re-administered.

11                      <u>**ROBERT SCHUMANN**</u>,

12  called as a rebuttal witness for the Defendant herein, having

13  been previously sworn, resumed the stand and testified further

14  as follows:

15                  <u>**DIRECT EXAMINATION**</u>

16  **BY MR. SINGLA:**

17  **Q**    Good evening, Mr. Schumann.

18  **A**    Good evening.

19  **Q**    Do you need some water?

20  **A**    I think the Court was kind enough to provide water.

21  **Q**    Oh, good.  So, let's get right to it.  Were you here for

22  Mr. Bishop's testimony?

23  **A**    Yes, I was.

24  **Q**    And were you here for Mr. Bielman's testimony about CSS?

25  **A**    Yes.  Yes, I was.

 1  **Q**     Okay.  I want to show you a couple of the slides that

 2  Mr. Bishop used.

 3          **MR. SINGLA:**  Your Honor, may I request the courtroom

 4  be sealed?  I think this will go much quicker if we can get

 5  right to the point.  And we are going to talk about some of the

 6  specs in detail.

 7          **THE COURT:**  Okay.

 8          **MR. SINGLA:**  We have tried to keep the courtroom open

 9  as much as possible.  At this point, I would request sealing.

10          **THE COURT:**  Fine.  Fine.  So, those who do not have

11  the privilege of being here are excused.  Okay, the courtroom

12  is closed.  Goodbye.  You can make the morning papers this way.

13          **MR. SINGLA:**  Or not, Your Honor.

14          **THE COURT:**  Or not.  Yes.

15          (Courtroom closed to the public)

16          (Pages 1145 through 1199 under seal in Volume 4

17          Excerpt.  Unsealed transcript resumes on pages 1200.

18          Nothing omitted.  Nothing deleted.)

19

20

21

22

23

24

25

```
1            MR. SCOTT:  That's all.  Thank you, Your Honor.

2            THE COURT:  May the witness be excused, without being

3  subject to being recalled?

4            MR. SCOTT:  Yes, Your Honor.

5            MR. SINGLA:  Yes, Your Honor.

6            THE COURT:  You are excused.  Aren't you happy about

7  that?  You don't have to come back.  Thank you.

8            But, do not discuss your testimony with any other

9  persons until the proceedings are over.

10            THE WITNESS:  Yes.  Thank you.

11            (Witness excused)

12            THE COURT:  You see, they turn the air off here at

13  5:00.  Do you see what it's like?

14            MR. SCOTT:  I think it happened during my tour of

15  duty, Your Honor.  See my face?

16            THE COURT:  Well, in any event, is there any way of

17  your just coming back next week?  Give you Tuesday, Wednesday,

18  Thursday, for closing arguments and so forth?

19            MR. SCOTT:  Your Honor, I'll be --

20            THE COURT:  And I'll tell you why.  Because if you

21  come back tomorrow, there's going to be a chunk of time in the

22  middle of the day when I'm not going to be available.  And so,

23  I will say goodbye to you around 11:00, and won't see you again

24  until about 3:00, probably.

25            MR. SCOTT:  Your Honor, speaking for myself, I'm
```

1   pleased to come back.  Next week, next week I'm booked from

2   beginning to end.

3          The week right after that, the first of the week,

4   whatever you wanted.  Just next week I'm scheduled, catching up

5   on things.

6          **THE COURT:**  How about everybody else?

7          **MR. SINGLA:**  Just one moment, as we consult our

8   calendars, Your Honor.

9          **MR. SCOTT:**  Beyond next week, I can give you

10  anything, anything --

11         **THE COURT:**  Yeah.  The following week, we begin to

12  get into other things, although I guess, if you're going to get

13  your proposed findings and conclusions in by Friday, then I

14  would have those for the following week.

15         What does that following week look like?

16         (Off-the-Record discussion)

17         (At 6:34 p.m. the proceedings were adjourned, to

18         resume with closing arguments on May 21, 2009, at

19         9:30 a.m.)

20

21

22

23

24

25

**I N D E X**

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **DIXON, DOUGLAS FREMONT** | | |
| (SWORN) | 857 | 4 |
| Direct Examination by Mr. Berta | 858 | 4 |
| Cross Examination by Mr. Singla | 922 | 4 |
| Redirect Examination by Mr. Berta | 986 | 4 |
| Recross Examination by Mr. Singla | 991 | 4 |
| | | |
| **BIELMAN, JAMES** | | |
| (SWORN) | 1001 | 4 |
| Direct Examination by Mr. Berta | 1003 | 4 |
| Direct Examination (under seal) by Mr. Berta | 1030 | 4 |
| Cross Examination by Mr. Singla | 1061 | 4 |
| Cross Examination by Mr. Mick | 1123 | 4 |
| Redirect Examination by Mr. Berta | 1141 | 4 |

**DEFENDANT'S REBUTTAL WITNESS**

| | PAGE | VOL. |
|---|---|---|
| **SCHUMANN, ROBERT** | | |
| (PREVIOUSLY SWORN) | 1143 | 4 |
| Direct Examination by Mr. Singla | 1143 | 4 |
| Direct Examination (under seal) by Mr. Singla | 1145 | 4 |
| Cross Examination (under seal) by Mr. Scott | 1175 | 4 |
| Redirect Examination (under seal) by Mr. Singla | 1196 | 4 |
| Recross Examination (under seal) by Mr. Scott | 1198 | 4 |

# E X H I B I T S

| EXHIBITS | IDEN | VOL. | EVID | VOL. |
|----------|------|------|------|------|
| E        |      |      | 920  | 4    |
| F        | 921  | 4    |      |      |
| 225      |      |      | 947  | 4    |
| 235      |      |      | 947  | 4    |
| 623      |      |      | 947  | 4    |

1

2                    **CERTIFICATE OF REPORTERS**

3          We, KATHERINE POWELL SULLIVAN and BELLE BALL, Official

4    Reporters for the United States Court, Northern District of

5    California, hereby certify that the foregoing proceedings in

6    08-4548 and 08-4719, RealNetworks, Inc., et al. vs. DVD Company

7    Control Association, Inc., et al. were reported by us,

8    certified shorthand reporters, and were thereafter transcribed

9    under our direction into typewriting; that the foregoing is a

10   full, complete and true record of said proceedings as bound by

11   us at the time of filing.

12

13                    s/b Katherine Powell Sullivan
                       _____
14
              Katherine Powell Sullivan, CSR #5812, RPR, CRR
15                         U.S. Court Reporter

16

17                          s/b Belle Ball
                       _____
18
                   Belle Ball, CSR #8785, RPR, CRR
19                         U.S. Court Reporter

20

21                      Friday, May 8, 2009

22

23

24

25