1  JAMES A. DiBOISE, State Bar No. 83296
   Email:  jdiboise@wsgr.com
2  LEO CUNNINGHAM, State Bar No. 121605
   Email:  lcunningham@wsgr.com
3  COLLEEN BAL, State Bar No. 167637
   Email:  cbal@wsgr.com
4  MICHAEL A. BERTA, State Bar No. 194650
   Email:  mberta@wsgr.com
5  TRACY TOSH LANE, State Bar No. 184666
   Email: ttosh@wsgr.com
6  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
7  One Market Street
   Spear Tower, Suite 3300
8  San Francisco, CA 94105

9  Attorneys for Plaintiffs and
   Counterclaim Defendants
10 REALNETWORKS, INC. and
   REALNETWORKS HOME
11 ENTERTAINMENT, INC

12 (additional counsel listed on following page)

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15

16  REALNETWORKS, INC., a Washington          Case Nos. C08 04548 MHP;
    Corporation; and REALNETWORKS HOME                  C08 04719 MHP
    ENTERTAINMENT, INC., a Delaware
17  corporation,                              **PLAINTIFFS AND COUNTERCLAIM
                                              DEFENDANTS REALNETWORKS,
18                  Plaintiffs,               INC. AND REALNETWORKS HOME
                                              ENTERTAINMENT, INC.'S ANSWER
19         v.                                 AND COUNTERCLAIMS TO THE
                                              COUNTERCLAIMS OF THE DVD
20  DVD COPY CONTROL ASSOCIATION, INC., a     COPY CONTROL ASSOCIATION, INC.**
    Delaware nonprofit corporation, DISNEY
21  ENTERPRISES, INC., a Delaware corporation;
    PARAMOUNT PICTURES CORP., a Delaware      **Before:  Hon. Marilyn Hall Patel
22  corporation; SONY PICTURES ENTER., INC., a Dept.:  15**
    Delaware corporation; TWENTIETH CENTURY
23  FOX FILM CORP., a Delaware corporation; NBC
    UNIVERSAL, INC., a Delaware corporation;
24  WARNER BROS. ENTER. INC., a Delaware
    corporation; and VIACOM, Inc., a Delaware
25  Corporation,

26                  Defendants.

27  AND RELATED CASES

28

1    DONALD E. SCOTT, (Admitted Pro Hac Vice)
     Email:  donald.scott@bartlit-beck.com
2    MARK S. OUWELEEN, (Admitted Pro Hac Vice)
     Email: mark.ouweleen@bartlit-beck.com
3    KARMA M. GIULIANELLI, State Bar No. 184175
     Email:  karma.giulianelli@bartlit-beck.com
4    BARTLIT BECK HERMAN
     PALENCHAR & SCOTT LLP
5    1899 Wynkoop Street, 8th Floor
     Denver, CO  80202

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs and Counterclaim Defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. (collectively "RealNetworks") hereby answer the Counterclaims (the "Counterclaims") filed by Defendant and Counterclaim Plaintiff the DVD Copy Control Association, Inc. ("DVD CCA") on January 12, 2009, and assert additional counterclaims against the DVD CCA, as follows:

## ANSWER TO COUNTERCLAIMS

### NATURE OF THE ACTION

1.      RealNetworks admits that the action is for injunctive relief and damages but denies the remainder of the allegations in Paragraph 1.

### JURISDICTION AND VENUE

2.      RealNetworks admits that this Court has subject matter jurisdiction over the asserted Counterclaims, and that venue in this Court is proper.

### THE PARTIES

3.      RealNetworks admits that the DVD CCA is the licensor of the Content Scramble System ("CSS"), but denies the DVD CCA's characterization of the nature and purpose of CSS. RealNetworks does not have knowledge or information sufficient to form a belief for the remainder of the allegations in Paragraph 3 and denies those allegations on that basis.

4.      RealNetworks admits the allegations in Paragraph 4.

### THE CSS TECHNOLOGY AND LICENSE

5.      RealNetworks admits that DVDs are 5-inch discs that are capable of storing digital data, including audio and visual data such as a motion picture.  RealNetworks admits that DVDs using CSS should be playable on CSS-licensed devices, but denies DVDs are "licensed for playback."  RealNetworks does not have knowledge or information sufficient to form a belief for the remainder of the allegations in Paragraph 5, and denies those allegations on that basis.

6.      RealNetworks does not have knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 6, and denies the allegations on that basis. RealNetworks admits that CSS-encrypted DVDs should be playable on CSS-licensed devices that follow prescribed "implementation rules," including rules for decryption and descrambling,

1  but denies the remainder of the allegation in the second and fourth sentences of Paragraph 6.

2  RealNetworks does not have knowledge or information sufficient to form a belief as to the

3  allegation that CSS is a "two-part system," and denies the allegation on that basis.

4  RealNetworks admits that CSS can be licensed and used to encrypt DVD content, and that device

5  manufacturers must license CSS to manufacture devices capable of accessing that encrypted

6  content. RealNetworks denies the remainder of the allegations in Paragraph 6.

7         7. RealNetworks does not have knowledge or information sufficient to form a belief

8  as to the allegations in the first sentence of Paragraph 7, and denies the allegations on that basis.

9  RealNetworks admits that digital data can be copied on a bit-by-bit basis. RealNetworks does

10  not have knowledge or information sufficient to form a belief as to the remainder of the

11  allegations in the second sentence, and denies them on that basis. RealNetworks does not have

12  knowledge or information sufficient to form a belief as to the allegations in the third sentence,

13  and denies them on that basis. RealNetworks denies the allegations in the fourth sentence, and in

14  particular the notion that CSS "prevents" any form of digital piracy, including Internet piracy via

15  peer-to-peer networks, the manufacture and sale of illegitimate DVDs, or more localized sharing

16  and exchange of unprotected DVD content. RealNetworks does not have knowledge or

17  information sufficient to form a belief as to the allegations in the last sentence, and denies them

18  on that basis.

19         8. RealNetworks does not have knowledge or information sufficient to form a belief

20  as to the allegations in the first sentence of Paragraph 8, and denies them on that basis.

21  RealNetworks admits that there is an authentication component of the CSS technical

22  specifications, but denies the remainder of the allegations in Paragraph 8.

23         9. RealNetworks admits that it entered into a written license agreement with the

24  DVD CCA on or about August 13, 2007 (the "CSS License"), and that the CSS License

25  establishes the terms and conditions under which RealNetworks may use CSS. RealNetworks

26  further admits that after executing the CSS License, the DVD CCA transmitted to RealNetworks

27  certain technical specifications, including the "CSS General Specifications," "DVD Video

28  Descrambler," "Authenticator Module for CSS Decryption Module," and "Authenticator Module

1   for DVD Drive" (collectively, the "Technical Specifications").  RealNetworks admits that

2   Section 4.2.1 of the CSS License states that licensees "shall comply with the CSS

3   Specifications," and that the term "Agreement," as used in the CSS License, purports to refer

4   collectively to unnamed "technical specifications" and the CSS License itself.  RealNetworks

5   denies the remainder of the allegations of Paragraph 9, and in particular denies all allegations

6   suggesting that the Technical Specifications are part of the CSS License as constituting legal

7   conclusions for which an answer is neither required nor appropriate.

8          10.     RealNetworks denies the allegations in the first sentence of Paragraph 10.

9   RealNetworks admits that the CSS License imposes on it an obligation to implement certain

10  technical measures, but denies the remainder of the allegations in Paragraph 10, including the

11  allegation that either the CSS License or the Technical Specifications contains a disc-in-tray

12  requirement.

13          **REALNETWORKS' ALLEGED BREACH OF THE LICENSE AGREEMENT[1]**

14          11.     RealNetworks admits that DVD CCA has authorized it to manufacture DVD-

15  Video Descramblers ("Descramblers"), Authenticator Modules for CSS Encryption Modules,

16  and Authenticator Modules for DVD Drives ("Authenticators") in accordance with the

17  corresponding technical specifications for those modules.  RealNetworks also admits that it

18  selected membership categories prior to executing the CSS License.  RealNetworks does not

19  have knowledge or information sufficient to form a belief as to the allegations in the last

20  sentence of Paragraph 11, and denies them on that basis.  RealNetworks denies the remainder of

21  the allegations in Paragraph 11, including any suggestion that the Technical Specifications are

22  part of the CSS License and that RealNetworks is not licensed to develop and manufacture

23  certain products as constituting legal conclusions for which an answer is neither required nor

24  appropriate.

25

26  ─────────────────

27          [1] The headings in this Answer reflect the corresponding headings in the Counterclaims.  This
    has been done for purposes of clarity and organization.  None of the headings in RealNetworks'
28  Answer should be construed as admissions of any kind.

REALNETWORKS'S ANSWER TO THE DVD CCA'S          -3-
COUNTERCLAIMS
CASE NO.: C-08-CV-04548-MHP

1        12.     RealNetworks admits that it developed a software application that was released as

2 "RealDVD," and admits that this software runs on a Windows PCs and is capable of making a

3 secure, fair-use copy of the contents of a motion picture DVD to a hard drive for later playback

4 without the DVD present.  RealNetworks also admits that it is developing a product known

5 internally as Facet that has similar functionality, which runs on standalone, single-purpose

6 hardware rather than on a PC.  RealNetworks denies the remainder of the allegations in

7 Paragraph 12, including the suggestion that Facet is a personal computer.

8        13.     RealNetworks admits that it is a large public company with highly skilled

9 employees.  RealNetworks also admits that it received legal advice from its attorneys in

10 connection with RealDVD and Facet.  RealNetworks denies the remainder of the allegations in

11 Paragraph 13.

12        14.     RealNetworks admits that one of the options presented to a Facet or RealDVD

13 user upon the insertion of a DVD is to save the contents of the DVD, but denies the remainder of

14 the allegations in the first sentence of Paragraph 14, including the suggestion that only one

15 option is presented to users upon the insertion of a disc.  RealNetworks admits the allegations in

16 the second sentence.  RealNetworks admits that one of the value propositions of RealDVD and

17 Facet is that both products allow users to organize motion picture content that has been saved to

18 a hard drive, but denies the remainder of the allegations in Paragraph 14, including the

19 suggestions that the Company has not taken steps to stop improper use of its products, and that

20 movies saved by RealDVD and Facet can be "distribut[ed]" or "access[ed]" by "other users."

21        15.     Paragraph 15 contains allegations that constitute legal conclusions for which an

22 answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

23 extent the allegations in Paragraph 15 require a response, RealNetworks denies the allegations.

24        16.     Paragraph 16 contains allegations that constitute legal conclusions for which an

25 answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

26 extent the allegations in Paragraph 16 require a response, RealNetworks denies the allegations.

27        17.     RealNetworks admits that RealDVD and Facet are designed to allow, and that

28 RealDVD has been marketed as allowing, consumers to make a secure, fair-use copy of DVD

1    content that the consumer owns.  RealNetworks also admits that neither RealDVD nor Facet is

2    capable of monitoring or preventing improper user behavior because the defendant movie studios

3    have refused to implement simple technical measures necessary to do so, including serialization

4    or watermarking of DVDs.  RealNetworks denies the remainder of the allegations in Paragraph

5    17.

6          18.     Paragraph 18 contains allegations that constitute legal conclusions for which an

7    answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

8    extent the allegations in Paragraph 18 requires a response, RealNetworks denies the allegations.

9          19.     RealNetworks does not have knowledge or information sufficient to form a belief

10   as to the allegations in Paragraph 19, and denies the allegations on that basis.

11                            **FIRST CLAIM FOR RELIEF**

12                              **(Breach of Contract)**

13         20.     RealNetworks incorporates by reference its responses to Paragraphs 1 through 19,

14   inclusive, as though fully set forth herein.

15         21.     Paragraph 21 contains allegations that constitute legal conclusions for which an

16   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

17   extent the allegations in Paragraph 21 requires a response, RealNetworks denies the allegations.

18         22.     Paragraph 22 contains allegations that constitute legal conclusions for which an

19   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

20   extent the allegations in Paragraph 22 requires a response, RealNetworks denies the allegations.

21         23.     Paragraph 23 contains allegations that constitute legal conclusions for which an

22   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

23   extent the allegations in Paragraph 23 requires a response, RealNetworks denies the allegations.

24         24.     Paragraph 24 contains allegations that constitute legal conclusions for which an

25   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

26   extent the allegations in Paragraph 24 requires a response, RealNetworks denies the allegations.

27

28

1

**SECOND CLAIM FOR RELIEF**

2

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

3       25.      RealNetworks incorporates by reference its responses to Paragraphs 1 through 24,

4   inclusive, as though fully set forth herein.

5       26.      RealNetworks denies the allegations in the first two sentences of Paragraph 26.

6   RealNetworks admits that both RealDVD and Facet have been designed to allow consumers to

7   make a secure, fair-use copy of motion picture content stored on a DVD to a hard drive for later

8   playback.  RealNetworks further admits that it had no communications with the DVD CCA

9   about the functionality of RealDVD or Facet prior to entering into the CSS License, but denies

10   the remainder of the allegations in Paragraph 26.

11      27.      Paragraph 27 contains allegations that constitute legal conclusions for which an

12   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

13   extent the allegations in Paragraph 27 requires a response, RealNetworks denies the allegations.

14      28.      Paragraph 28 contains allegations that constitute legal conclusions for which an

15   answer is neither required nor appropriate, and RealNetworks denies them on that basis.  To the

16   extent the allegations in Paragraph 28 requires a response, RealNetworks denies the allegations.

17

**AFFIRMATIVE AND OTHER DEFENSES**

18      RealNetworks asserts the following affirmative and other defenses.  In asserting these

19   defenses, RealNetworks does not assume the burden of proof with respect to any issue as to

20   which applicable law places the burden of proof upon the DVD CCA.  RealNetworks alleges and

21   states the following upon information and belief except with respect to its own actions:

22

**FIRST AFFIRMATIVE DEFENSE**

23

**(Unconscionability – All Causes of Action)**

24      As and for an affirmative defense to all Causes of Action, RealNetworks alleges, without

25   admitting that the DVD CCA was injured or damaged in any manner or amount whatsoever, that

26   Counterclaim Plaintiff is barred from any and all recovery or relief regarding the CSS License

27   Agreement or regarding any claim of circumvention, because any obligation by RealNetworks

28   under the CSS License Agreement, to the extent that such obligation has not been performed or

1    excused, is unconscionable and unenforceable.  The DVD CCA seeks to bind RealNetworks to

2    hidden and secret contractual terms which were neither known nor readily available to

3    RealNetworks prior to execution of the CSS License Agreement.  For example, RealNetworks

4    was prohibited access to the Technical Specifications prior to execution of the CSS License

5    Agreement, which Technical Specifications the DVD CCA seeks to incorporate into the

6    Agreement.  Further, there was no opportunity for RealNetworks to negotiate the terms of the

7    CSS License Agreement, which was presented to RealNetworks on a take-it-or-leave-it basis,

8    and which the DVD CCA now claims contain restrictions that were expressly rejected as

9    proposed amendments to the CSS License Agreement.

10                         **SECOND AFFIRMATIVE DEFENSE**

11                    **(Contract of Adhesion – All Causes of Action)**

12           As and for an affirmative defense to all Causes of Action, RealNetworks alleges, without

13   admitting that the DVD CCA was injured or damaged in any manner or amount whatsoever, that

14   the DVD CCA is barred from any and all recovery or relief regarding the CSS License

15   Agreement, because the CSS License Agreement is a contract of adhesion.  There was no

16   opportunity for RealNetworks to negotiate the terms of the CSS License Agreement, which was

17   presented to RealNetworks on a take-it-or-leave-it basis.  Further, the DVD CCA seeks to

18   incorporate hidden and secret contractual terms which were neither known nor readily available

19   to RealNetworks prior to execution of the CSS License Agreement, and which were not subject

20   to negotiation by RealNetworks.

21                          **THIRD AFFIRMATIVE DEFENSE**

22                       **(Estoppel – All Causes of Action)**

23           As and for an affirmative defense to all Causes of Action, RealNetworks alleges, without

24   admitting that the DVD CCA was injured or damaged in any manner or amount whatsoever, that

25   the DVD CCA's claims are barred in whole or in part by the doctrine of estoppel.  The DVD

26   CCA seeks to impair the fair-use rights of consumers to make a back-up copy of DVDs that they

27   own.  The DVD CCA's filing and maintenance of the present lawsuit seeks to improperly

28   restrain the fair-use rights of consumers, whose fair-use rights extend to technologies that aid in

REALNETWORKS'S ANSWER TO THE DVD CCA'S                    -7-
COUNTERCLAIMS
CASE NO.: C-08-CV-04548-MHP

1   the exercise of fair use.  In addition, the DVD CCA is estopped from pursuing all Causes of

2   Action or any equitable relief against RealNetworks because of the DVD CCA's actions and

3   omissions with respect to Kaleidescape and with respect to proposed amendments to the CSS

4   License Agreement, upon which RealNetworks reasonably relied to its detriment.  The DVD

5   CCA is also estopped from pursuing all Causes of Action against RealNetworks because of the

6   ruling in *DVD Copy Control Association, Inc. v. Kaleidescape, Inc*., Santa Clara Court Case No.

7   1-04-CV031829 and because the DVD CCA had the opportunity but failed to amend the CSS

8   License Agreement with restrictions relevant to the DVD CCA's claims here.  Further, the DVD

9   CCA is estopped from pursuing all Causes of Action because it has not pursued claims against

10  AMX Corporation or Telestream, Inc., each of which, upon information and belief, is a CSS

11  licensee that sells and markets products that save CSS-encrypted DVD content to hard drives.

12  **FOURTH AFFIRMATIVE DEFENSE**

13  **(Unclean Hands – All Causes of Action)**

14          As and for an affirmative defense to all Causes of Action, RealNetworks alleges, without

15  admitting that the DVD CCA was injured or damaged in any manner or amount whatsoever, that

16  the DVD CCA's claims are barred in whole or in part by the doctrine of unclean hands.  The

17  DVD CCA seeks to impair the fair-use rights of consumers to make a back-up copy of DVDs

18  that they own.

19  **FIFTH AFFIRMATIVE DEFENSE**

20  **(Laches – All Causes of Action)**

21          As and for an affirmative defense to all Causes of Action, RealNetworks alleges, without

22  admitting that the DVD CCA was injured or damaged in any manner or amount whatsoever, that

23  The DVD CCA's claims are barred in whole or in part by the doctrine of laches.  The DVD CCA

24  is barred from pursuing all Causes of Action because it has not pursued similar claims against

25  AMX Corporation or Telestream, Inc., each of which, upon information and belief, is a CSS

26  licensee that sells and markets products that save CSS-encrypted DVD content to hard drives.

27

28

**ADDITIONAL DEFENSES**

RealNetworks reserves the right to assert additional affirmative defenses once the precise nature of the relevant circumstances or events is determined through subsequent discovery.

**<u>COUNTERCLAIMS</u>**

Declaratory judgment plaintiffs/counterclaim defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. (together, "RealNetworks") bring these counterclaims against the DVD Copy Control Association ("DVD CCA") as follows:

**INTRODUCTION**

1.      The DVD CCA and its co-conspiring members, Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc., Warner Brothers Entertainment, Inc. and Viacom, Inc. (together, the "Studios"),[2] have sought to enjoin RealNetworks from distributing a product that provides the technology to add features to DVD content by saving the content to a personal hard drive. RealNetworks' technology products compete with products offered by the Studios.  The position of the DVD CCA and Studios about the CSS License Agreement was confirmed during the hearing on the preliminary injunction motion.  They acknowledge that the CSS License Agreement results from collective action by the Studios through the DVD CCA to prohibit all copying to a hard drive unless the Studios jointly authorize the making of such a copy.  Pursuant to their interpretation of the CSS License Agreement, each Studio has ceded its individual authority to authorize the use of its movie content through *individual* copyright licenses in favor of a *joint agreement* to grant or withhold the use of such content– the CSS License Agreement.

2.      If true, this is an antitrust violation for two reasons:    (1) As described below, because of their interpretation of the CSS License Agreement, no individual Studio can authorize

---

[2] As a result of the procedural posture of this case, the claims that Real alleges in this Answer and Counterclaim are against the DVD CCA only.  Since the factual allegations of these claims involve the activity of the DVD CCA's member Studios, Real identifies the Studios as co-conspirators here and maintains all of the factual allegations that it has relating to the Studios in this counterclaim.  Real has simultaneously filed a motion for leave to amend its First Amended Complaint against the Studios and DVD CCA.

1   the use of its own content consistent with the claimed provisions of the CSS Agreement; (2) the

2   CSS Agreement is being used to extend a legally granted monopoly over content into separate

3   markets – to prevent competition from technologies that would allow a copy of content for fair

4   use purposes.  But the making of a copy of a Studio DVD is authorized fair use under the

5   Copyright Act, so the Studios have no "authority" to grant or withhold with respect to that

6   content.  Nevertheless, the DVD CCA and Studios claim that the CSS Agreement grants the

7   Studios such authority, and that anyone seeking to compete with them in that separate market

8   violates not only the CSS Agreement, but is also subject to criminal penalties under the Digital

9   Millennium Copyright Act ("DMCA").

10          3.      The average consumer owns over 75 DVDs.   DVDs cost approximately $10 -

11   $15.  Thus the average household may have an investment of well over $1,000 in its DVD

12   collection.

13          4.      Market research shows that consumers' main complaints about DVDs are

14   twofold:  (1) they get damaged; and (2) they get lost.  It is common to open the DVD case of a

15   favorite video only to find an empty slot; the wrong DVD in the case; or a DVD covered with

16   scratches or gunk.

17          5.      In 2007, RealNetworks sought to meet strong consumer demand among DVD

18   owners for technology that would enable them to save a secure copy of their DVDs to a hard

19   drive for safekeeping, portability, easy retrieval, and later playback.   It developed two

20   innovative products – a software product code-named "Vegas" and a device code-named

21   "Facet."  Both products will be referred to herein as "RealDVD."  RealDVD allows users to save

22   and play a secure backup copy of the DVDs they own and to organize their favorite movies, TV

23   shows, scenes and actors so that they are all just a click away.

24          6.      There were good reasons the Studios should have been excited about RealDVD:

25   products that make DVDs easier for consumers to use make DVDs more valuable to their

26   owners, and so are likely to increase the number of DVDs that consumers want to buy.

27   RealNetworks' innovative products thus stood to benefit everyone:  consumers, who would get

28

1   more value out of the DVDs they own; the Studios, who would sell more DVDs; and

2   RealNetworks, from the sale of its new products.

3       7.      Before RealNetworks released Vegas, RealNetworks approached the Studios to

4   notify them of the product, and to explore mutual marketing opportunities.  RealNetworks

5   answered detailed questions about its product and the extensive safeguards it provided against

6   piracy.  Negotiations ensued with two of the Studios, Fox and Paramount.

7       8.      Underlying the negotiations between RealNetworks and the Studios was the

8   question of whether a consumer who had purchased a DVD had a fair-use right to make a secure

9   copy of the DVD on his computer hard drive.  RealNetworks believed then, as it does now, that a

10  consumer who has purchased, for example, an *Iron Man* DVD, does not need further permission

11  from Paramount to copy that DVD onto her hard drive so as to get the benefit of additional

12  features that can only be provided by the saving to a hard drive.  Those features include the

13  protection of DVD content, the ability to automatically organize and search DVD content,

14  bookmarking and parental control features, and the benefits of efficient portability for an

15  individual's DVD collection.  Nonetheless, RealNetworks was eager to negotiate these issues

16  with the Studios, in the expectation it would be possible to reach marketing agreements that

17  would benefit all of the parties.

18      9.      Ultimately RealNetworks was unable to conclude a deal with any of the Studios.

19  The Studios recognized that consumers would value the DVD playback and storage capability.

20  The Studios, however, wanted their customers to pay substantial sums to the Studios themselves

21  for this functionality.  In essence, the Studios wanted to charge consumers who have already

22  purchased the DVDs for their exercise of their fair-use rights to make a backup copy.

23      10.     Any individual Studio could have decided not to enter into an agreement with

24  RealNetworks and to sue to prevent its customers from using RealDVD to make copies of that

25  Studio's titles.  Doing so individually, however, risked the possibility that another Studio might

26  reach an agreement with RealNetworks to promote its titles in connection with the release of a

27  popular new product.  The litigating Studio then would face what could be a legal and public

28  relations nightmare.

1    11.    The Studios agreed that they would claim that they cannot enter into individual

2    agreements with RealNetworks – in other words, they agreed collectively not to deal with

3    RealNetworks.  So, for example, they claim that, because of the CSS Agreement, Paramount

4    cannot grant a license to make an archival copy of its own *Iron Man* DVD without the

5    permission of Fox, Disney, and the rest.  This is a horizontal group boycott, and it is a horizontal

6    group boycott even though the Studios in fact have no right to grant or withhold authority to

7    make fair use copies and RealNetworks does not need their consent.

8    12.    According to the Studios, this boycott is required by the terms of a license issued

9    through an entity that they dominate called the DVD CCA.  The DVD CCA was purportedly

10    created to license the encryption technology (CSS) that any company needs in order to make

11    products to play a DVD.  According to the Studios, under the CSS license, unless amended

12    (which requires their collective approval through DVD CCA), they are prevented from

13    individually granting RealNetworks a license that would make clear that customers of any

14    particular Studio can make an archival copy of that Studio's DVDs (as long as the customer

15    owns the DVD).

16    13.    Testimony at the preliminary injunction hearing confirmed that the Studios

17    entered into this collective agreement that, according to their interpretation, prohibits any

18    individual studio, without the action of the group, from authorizing any copies of their content

19    (for fair use or otherwise).  Ms. King, a former Studio lawyer characterized by the Studios'

20    outside counsel as "a framer" of the CSS license (Tr. 19:9-17), unequivocally testified that the

21    motion picture studios got together as a group to determine the terms of the CSS license.   (Tr.

22    74:1-12; 76:14-19; 83:14-84:6; 110:19-111:10).  Their concerted action is illegal because they

23    agreed that there would be "no copies at all" of each individual Studio's content made without

24    the authority of the group acting in concert.  According to Ms. King, this agreement is

25    memorialized in the CSS License Agreement.  (Tr. 74:1-12; 79:22-80:3).  According to Ms.

26    King, the right of the Studios to authorize the use of their content flows through the CSS License

27    Agreement, which allows only what the Studios "authorized could be done."  (Tr. 87:16-88:4;

28    98:10-23; 111:22-112:5).

14.     Testimony from the expert from the DVD CCA, Dr. Kelly, further confirmed that the Studios and the DVD CCA intend the CSS agreement to prohibit any copies of DVD content to a hard drive without the authority of the Studios. (Tr. 152:20-153:8). Dr. Kelly's theory is that the CSS agreement, by its terms, requires that a physical DVD disc be in a drive during playback. (Tr. 149:10-23). According to this interpretation, no individual studio could possibly give authority to create a product allowing for the copying of the individual studios' content without having that product run afoul of the group CSS Agreement. In other words, in order for an individual studio to grant such authority, the group acting as a whole through the DVD CCA would need to amend their agreement. The CSS Agreement, which is a product of the joint conduct of the DVD CCA and the Studios, therefore memorializes the illegal horizontal agreement to boycott any potential competitor.

15.     Consistent with their agreement, the Studios have never authorized anyone to make a playable copy of their content. (Tr. 100:14-20). Mr. Dunn, speaking for 20th Century Fox Entertainment, confirmed the same thing: "The Studios have never licensed any third party to offer a lawful product that would allow the copying of DVDs onto hard drives (and to my understanding, the encryption technology we use on our DVDs does not even permit for such a license)." (Dunn Decl., ¶ 28.)

16.     Consumers are directly harmed by the Studios' and the DVD CCA's conduct. The risk the Studios faced – that some one of them would do a deal with RealNetworks or any other of their potential competitors – is the risk created by a competitive marketplace. Consumers would have obtained a new technology to gain more value from their DVDs, without having to pay again for a backup copy of the DVDs they had already purchased. The Studios decided to short-circuit this outcome so that they could appropriate all of the extra value themselves, through the means of a group boycott. The DVD CCA was the instrumentality that they used to effectuate the boycott. A group boycott is, indeed, a very effective means of achieving this objective. Not coincidentally, that is also why it is per se illegal under the antitrust laws.

1

**NATURE OF THE CASE**

2

    A.      **The RealDVD Products**

3

    17.      The RealDVD products give consumers the ability to save DVDs they own to

4

their computers or, in the case of Facet, a separate hardware box, where the DVDs are

5

catalogued in a library that displays covers of the DVDs so that they are easily retrievable for

6

playback.   A user's screen in the Vegas product will look like this:

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

    18.      Once the DVDs are stored in RealDVD, they can be retrieved for playback at the

22

user's convenience, without having to search for the physical copy of the DVD.

23

    19.      RealDVD offers many features that consumers want, including:

24

- The ability to keep consumers' DVDs safe, without scratches, gunk, skips, blips, or lost titles.

25

26

- Through the Vegas product, the ability to take an owner's DVD collection on the road to view from a hard drive.  Many consumers watch the DVDs they own from their personal computer on airplanes and during vacations, but do not want to carry along multiple DVDs from their collection.

27

28

- RealDVD remembers where the consumer is in the movie, so he can stop, shut down and come back later without losing his spot.

- RealDVD provides additional features, such as detailed plot synopses and cast lists for the movies; parental controls; and the ability to browse the collection by cover art, genre, title, rating, or actor.

20.     The product designers at RealNetworks saw the potential demand for products like RealDVD based partly on the popularity of a product from a company named Kaleidescape. As described on the Kaleidescape website, "The Kaleidescape System simplifies the way you collect, manage and enjoy movies and music. Once your personal entertainment collection is stored on the Kaleidescape System's fault-tolerant Servers, you can say goodbye to DVD and CD clutter and the frustration of storing and organizing your movies and music."

21.     With a price tag that can reach over $10,000, however, Kaleidescape is not accessible to the general public. Kaleidescape makes the point quite well: "the Kaleidescape System, is an entertainment server that has changed the way movies and music are collected and enjoyed in a home, yacht or private jet." *See* http://www.kaleidescape.com/news/.

22.     The DVD CCA sued Kaleidescape on the ground that Kaleidescape was barred by the terms of its license agreement to DVD encryption technology (the CSS license) to provide consumers with technology that would allow them to make personal copies of the DVDs they own.

23.     The DVD CCA lost that case.  Thereafter, RealNetworks determined that it could make products that provided this capability while complying with the CSS agreement and the law.

24.     RealNetworks wanted to make a product with similar functionality that could be used by the average DVD customer.  The price tag for the Vegas software, for example, is $50.00 (and was offered at an introductory price of $29.99).

**B.      The Studios Seek to Maintain the Profits from the Fair Use Copy**

25.     The Studios themselves have been attempting to develop a product that would allow consumers to make a copy of the DVDs they purchase for use on a personal computer or portable video player like an iPod.  The Studios call this "digital copy", "managed copy," and

1    "second session copy."  "Digital copy" is a separate disc that allows for the making of a copy of

2    the content on a DVD onto a consumer's computer hard drive.  The copy may be made directly

3    from a DVD or could be delivered over the Internet as a download.  Upon information and

4    belief, one or more of the Studios have approached a company called Sonic to help them build a

5    product with functionality similar to RealDVD.

6         26.    The critical difference between RealDVD and the Studios' plan for "digital" and

7    "managed copy" is that the Studios intend to charge DVD purchasers an additional sum for the

8    "managed copy" of each and every DVD they have purchased.  Having already purchased the

9    digital content on their DVDs, however, DVD owners have the fair-use right to make a backup

10   copy for these purposes without buying the content a second time.  In fact, average consumers

11   have over 75 DVDs that they have already purchased and for which they already own the rights

12   to make a fair use copy without making an additional payment to the Studios.  The Studios are

13   motivated by their own financial gain.  Indeed, the longer that they are able to hinder the

14   development and release of products that provide consumers with the ability to make fair-use

15   copies of DVDs that they own, the Studios' own ability to market a competing product is aided.

16   The illegal scheme thus delays competitors while leaving the Studios free to market their own

17   products and to charge consumers for the fair-use copy that the law already gives consumers the

18   right to make.

19        27.    Consumers are harmed by this conduct.  To start, charging consumers to exercise

20   their fair-use rights, as the Studios would like to do, reduces the value of the DVDs consumers

21   already own or would buy and improperly extends the narrow exclusivity that the copyright laws

22   provide to a content owner (here, the Studios).  The effect is the same as if the Studios had

23   agreed to increase the prices of the DVDs themselves.  RealNetworks' products threaten the

24   Studios' attempts to monetize the non-infringing digital copies consumers already are entitled to

25   create.

26        28.    But whether or not a consumer has a fair-use right to make backup copies of the

27   DVDs they already have purchased, the Studios' collective agreement not to negotiate individual

28   licenses for their content with RealNetworks or any other potential competitor is nothing more

1  than an illegal scheme between horizontal competitors to eliminate a competitive threat and to

2  charge higher prices. The harm to consumers from such a scheme is obvious—they will pay

3  higher prices for the privilege of making digital copies of their DVDs.

4        29.     The Studios' and the DVD CCA's unlawful conduct ensures that – until they are

5  stopped by a court – the Studios will be free from competition in the market for technology that

6  enables a consumer to make a secure backup copy of a DVD that she already owns. Competition

7  and consumers alike will suffer as a result of this unlawful conduct.

8        **C.     RealDVD's Protection Against Unauthorized Copying**

9        30.     RealNetworks has put into place significant protections against unauthorized

10  copying, including:

11       • RealDVD stores DVD content securely on a hard drive in the original CSS
             encrypted form.
12

13       • RealDVD adds a layer of security to the CSS protection by further encrypting
             the CSS encrypted content and the keys to unlock the content with AES
14           encryption. AES encryption is a quintillion times more secure than the CSS
             encryption. It is the encryption system used by the U.S. Government for
15           classified information.

16       • RealDVD is a "closed system" that does not allow DVD content to be sent
             through a network or uploaded to an Internet site and viewed by any other
17           person. The backup copy made by RealDVD cannot be copied in playable
             form to any other hard drive or other device as a result of the AES encryption.
18

19       • The backup copy made by RealDVD cannot be played from any storage
             device other than the storage device onto which it was originally copied. It is
20           impossible to transfer playable DVD content onto a device like an iPod or to
             "burn" a new playable DVD disc using RealDVD. RealDVD cannot be used
21           to create pirate or counterfeit DVDs.
22

23       • When Facet saves a DVD to its hard drive, that DVD is locked to that hard
             drive and may only be played on the Facet machine that saved the copy.
24       • Facet does not allow a user to do anything with the saved DVD other than
             play it. It cannot be sent over the Internet or even over a home network.
25

26       • Vegas prevents making a copy of the DVDs that are on the computer hard
             drive. A user can make a copy only from the physical DVD. The user cannot
27           then make a playable copy of the copy.

28       • Vegas allows the playback of the saved DVD on only five registered playback
             devices. The intended and probable use is for sharing of a single archival

hard drive among a family's multiple computers.  The playback is accomplished by taking the single physical hard drive on which the DVDs are saved and plugging it in one at a time into one of five registered devices.    In order to play the DVDs, the hard drive needs to be present.  Thus with the removable hard drive, a family can view their saved DVDs on television (so long as it is attached to hard drive on which the saved DVDs are located); a laptop in the bedroom if the television is being used by other members of the family; a laptop during travel; or a personal computer located, for example, in the kitchen.

### D.    The Studios' and the DVD CCA's Use of the CSS License Agreement to Prevent Competition

31.    Defendant DVD CCA is a joint venture trade association.  Its member movie Studios compete against one another and others in the industry to provide content to users in various formats.  As a joint venture of horizontal competitors, the DVD CCA must have circumscribed powers necessary to achieving a lawful purpose.

32.    The stated purpose of the DVD CCA is to license the Content Scramble System (CSS) to manufacturers of DVD hardware, discs and related products.  As described by Defendant DVD CCA, "CSS prevents movies from being *illegally* duplicated, protecting the intellectual property of the manufacturers, producers and writers from *theft*."  (Emphasis added).  Indeed, the DVD CCA has represented to the United States government in connection with its application under the National Cooperative Research and Production Act (NCRPA) that "[t]he nature and objectives of the venture are to provide an encryption technology designed to prevent unlawful or unauthorized copying by encrypting digital files that can be decrypted only on licensed equipment.  DVD CCA also intends to research, evaluate, adopt and license related technologies designed to protect CSS against unauthorized or unlawful copying and to prevent the unauthorized or unlawful copying and playback of DVD discs."  (Fed. Reg. Vol. 66, No. 150, at 40729 (8/3/2001).)

33.    The DVD owner's ability to save his/her *own* DVDs for storage and later playback, however, is neither illegal duplication nor theft, but the exercise of his/her legitimate fair-use rights with respect to a product already purchased.

34. Whether or not the DVD owner already has this fair-use right, a Studio Defendant could license the ability to make such copies. Achieving any limited legitimate purpose of the DVD CCA does not require a licensing agreement that prohibits individual Studios from granting licenses to copy their content from DVDs. Yet this is exactly what the DVD CCA and the Studios claim that the CSS License prohibits. As such, the legitimate purpose of the DVD CCA has been subverted to serve as a means through which the Studios act as, and enforce, a cartel with respect to the licensing of their content by different, lawful copying technologies.

35. Indeed, the CSS License specifically contemplates with respect to "secure managed recording" (essentially, burn-to-DVD), another type of copying technology, that collective action is not required for a license to a given Studio's content (assuming such a license is necessary at all). The Studios' approach to "secure managed recording" illustrates that the terms under which a particular movie or television program can be licensed for the creation of a digital copy is (at most) a matter for negotiation with the individual Studio.

36. Nonetheless, the DVD CCA and the Studios claim that the CSS Agreement prevents the Studios from entering into individual licenses granting the right to make digital copies of DVDs previously purchased by customers. To try to enforce the illegal and unjustified terms in the CSS License Agreement, they demand that in order to license the CSS technology, RealNetworks and other potential competitors to the Studios must agree not to compete in the provision of technology that would enable DVD owners to create and store a secure digital copy of DVDs that they own.

37. If the DVD CCA and the Studios are right in their collective interpretation of the CSS License Agreement — that the agreement conditions access to the CSS technology on a promise not to enable DVD owners to create and store a secure copy of DVDs that they own, except upon terms collectively dictated by the Studios and the DVD CCA — then the agreement itself is illegal and would have been illegal since its inception. It would simply function as the vehicle by which the Studios unlawfully extend the narrow monopoly afforded to them by the copyright laws.

38.     If the Studios and the DVD CCA are wrong in their interpretation of the CSS License, then their attempt to use the License to impose post-hoc terms that were not included in the License amounts to an illegal group boycott.

39.     The Noerr Pennington doctrine does not insulate their collective agreement to interpret the CSS License in this manner.  It is not the litigation through which the Studios and the DVD CCA seek to persuade a court to adopt their interpretation of the CSS License Agreement that has the anti-competitive effect.  Rather, it is the interpretation of the Agreement in the manner advocated by the Studios and the DVD CCA that causes the harm, by turning the CSS Agreement into an exclusionary agreement that requires anyone who executes it to give up the right to compete with the Studios. It is thus the CSS License Agreement itself, or the Studios' and the DVD CCA's collective interpretation of it, that violates Section 1.  Litigation is merely a manifestation of their illegal agreement.

**E.      Harm to Consumers from the Illegal Cartel**

40.     In making these agreements, the Studios are motivated by their own financial gain.  There are two distinct ways, both illegal, in which the Studios hope to profit from their illegal scheme.  Consumers will be harmed in either event.

41.     To begin with, despite the fact that their customers have a fair-use right to make backup copies of the DVDs they already have purchased, the Studios would like to force DVD owners to pay a second time to obtain that copy.  In other words, the Studios want to charge consumers to exercise their fair-use rights.  If the co-conspiring Studios and the DVD CCA succeed in imposing this illegal surcharge, they will have reduced the value of the DVDs consumers already own or would buy.  Consumers will get less value for the same price.

42.     The Studios perceive the new products developed by RealNetworks as a significant threat to their ability to monetize the non-infringing digital copies consumers already are entitled to create, a stream of revenue to which the Studios purport they are entitled but as to which the copyright laws, in fact, give them no right.

43.     Moreover, whether or not customers have a fair-use right to make backup copies of the DVDs they already have purchased, the Studios' collective agreement not to negotiate

1   individual licenses for their content with RealNetworks, under the guise that the CSS Agreement

2   would preclude such deals anyway, is nothing more than an illegal price fixing scheme between

3   horizontal competitors. The harm to consumers from such a scheme is obvious—they will pay

4   higher prices for the privilege of making digital copies of their DVDs.

5        44.    By their illegal agreement, the co-conspiring Studios have ensured that – unless a

6   court intervenes – they will face *no* competition in the market for technology that enables a

7   consumer to make a secure backup copy of a DVD that she already owns. With no competitors

8   to challenge them, the Studios will face less pressure to make the technology available to

9   consumers sooner rather than later, or to develop consumer-friendly features. Competition and

10   consumers alike will suffer as a result of this unlawful conduct.

11                        **PARTIES**

12        45.    RealNetworks, Inc. is a Washington corporation with its principal place of

13   business in Seattle, Washington. It is engaged in the business of, among other things,

14   developing, manufacturing, and selling technology for the creation, delivery, playback and

15   management of digital media. Consumers use RealNetworks' services and software to find, play,

16   purchase and manage free and premium digital content, including music, games and video.

17   Broadcasters, network operators, media companies and enterprises use RealNetworks' products

18   and services to create and deliver digital media to PCs, mobile phones and other consumer

19   electronics devices. RealNetworks' RealPlayer product is an innovative award-winning

20   technology that was one of the first media players capable of streaming media over the Internet.

21        46.    RealNetworks Home Entertainment, Inc. is a Delaware corporation with its

22   principal place of business in Seattle, Washington. It is a subsidiary of RealNetworks, and it is

23   the entity that distributes the RealDVD product and that will distribute the Facet product.

24        47.    The DVD CCA is a Delaware nonprofit corporation, having offices located in

25   Morgan Hill, California. According to the allegations of its Amended Answer and

26   Counterclaims, the DVD CCA is responsible for developing, evaluating and licensing copy

27   control and related technologies to participants at various levels in the DVD industry. DVD

28   CCA is the licensor of the Content Scramble System. DVD CCA licenses the Content Scramble

1   System technologies to companies that manufacture hardware and software products that play

2   back to viewers CSS-protected DVDs, recordable discs and related products, and to motion

3   picture studios and other companies whose audio-visual works are encrypted using the Content

4   Scramble System.  The Studios are members of the DVD CCA.  Upon information and belief,

5   the other members of the DVD CCA are consumer electronics companies and computer

6   manufacturers.  Upon information and belief, there are twelve seats on the DVD CCA's board of

7   directors and the Studios hold six of them.  The remaining seats are held by representatives of the

8   computer electronics industries and computer companies.

9                          **CO-CONSPIRING STUDIOS**

10         48.     Disney Enterprises, Inc. is a Delaware corporation with its principal place of

11  business in Los Angeles, California.  It is engaged in the business of, among other things,

12  making motion pictures.  It is a member of the DVD CCA.

13         49.     Paramount Pictures Corp. is a Delaware corporation with its principal place of

14  business in Los Angeles, California.  It is engaged in the business of, among other things,

15  making motion pictures.  It is a member of the DVD CCA.

16         50.     Sony Pictures Entertainment, Inc. is a Delaware corporation with its principal

17  place of business in Culver City, California.  It is engaged in the business of, among other things,

18  making motion pictures.  It is a member of the DVD CCA.

19         51.     Twentieth Century Fox Film Corp. ("Fox") is a Delaware corporation with its

20  principal place of business in Los Angeles, California.  It is engaged in the business of, among

21  other things, making motion pictures.  It is a member of the DVD CCA.

22         52.     NBC Universal, Inc., is a Delaware corporation with its principal place of

23  business in Universal City, California.  It is engaged in the business of, among other things,

24  making motion pictures.  It is a member of the DVD CCA.

25         53.     Warner Bros. Entertainment, Inc. is a Delaware corporation with its principal

26  place of business in Los Angeles, California.  It is engaged in the business of, among other

27  things, making motion pictures.  It is a member of the DVD CCA.

28

1   54.   Viacom, Inc. is a Delaware corporation with its principal place of business in

2   New York, New York.  It is engaged in the business of, among other things, making motion

3   pictures.  It is a member of the DVD CCA.

4   **JURISDICTION, VENUE AND INTERSTATE COMMERCE**

5   55.   These counterclaims arise under the antitrust laws of the United States, including

6   Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15

7   U.S.C. §§ 16 and 26, and under the California Cartwright Act, Bus. & Prof. Code § 16700 *et*

8   *seq*., and the California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*

9   56.   The actions complained of have occurred in and substantially affected interstate

10   commerce.

11   57.   Subject matter jurisdiction is founded on 28 U.S.C. §§ 1331 and 1337(a).  This

12   Court has jurisdiction over RealNetworks' state law claims pursuant to 28 U.S.C. § 1367.

13   58.   Venue for these counterclaims is appropriate in this district pursuant to 28 U.S.C.

14   §§ 1391 and 1400(b).

15   **FACTUAL ALLEGATIONS**

16   ***RealNetworks' CSS License and the Introduction of the RealDVD Product***

17   59.   RealNetworks entered into a CSS License Agreement with the DVD CCA on or

18   about August 13, 2007, for the purpose of obtaining the technology needed for its RealDVD

19   product to play back encrypted DVD content on personal computers.  RealNetworks is therefore

20   entitled to use the CSS technology under the terms of that Agreement.

21   60.   In September, 2008, RealNetworks informed the DVD CCA and the Studios that

22   its RealDVD technology would be released to the public on September 30, 2008.  After

23   unsuccessful attempts to resolve the ensuing dispute between RealNetworks and the DVD CCA

24   and the Studios, described above, RealNetworks sued both the DVD CCA and the Studios in this

25   Court on September 30, 2008.  RealNetworks' complaint seeks a declaration that RealNetworks

26   has neither breached the terms of its CSS License nor engaged in conduct in violation of the

27   DMCA.  At the same time, in the Central District of California, the Studios filed their own

28   Complaint, together with an *ex parte* application for a temporary restraining order and an order

1   to show cause why a preliminary injunction should not issue to prevent RealNetworks from

2   marketing or selling its RealDVD product.

3        61.    Following transfer of the Studios' Complaint and pending TRO motion to the

4   Northern District of California, this Court granted the Studios' renewed request for a temporary

5   restraining order barring the sale of RealDVD on October 7, 2008.  On November 10, 2008, the

6   DVD CCA filed Counterclaims against RealNetworks, including a claim that RealNetworks has

7   breached the CSS License Agreement by developing and distributing RealDVD, accompanied by

8   DVD CCA's own motion for preliminary injunction.  RealNetworks moved for and was granted

9   leave to amend its Complaint to include Facet on December 23, 2008.  The DVD CCA has

10   subsequently amended its Counterclaims to allege that RealNetworks' development of Facet also

11   constitutes a breach of the CSS License Agreement.

12   ***The Relevant Market***

13        62.    The relevant product market is the provision of technology that enables

14   consumers to (a) create or otherwise obtain digital copies of movies and TV shows that they own

15   on DVDs and (b) store and manage those copies electronically (e.g., on a hard drive) for

16   subsequent playback.  Only firms that enable consumers to obtain digital copies of movies and

17   TV shows that they own and to store them electronically for subsequent playback have the

18   ability to take significant amounts of business away from each other.   A hypothetical monopolist

19   of such technology would be able profitably to impose a small but significant and nontransitory

20   increase in price.  Manufacturers of conventional DVD players do not compete in this market, in

21   that they do not constrain pricing by firms in the relevant market, but they do lose sales and

22   income to firms that succeed in the relevant market.

23        63.    The relevant geographic market is the United States.

24        64.    The principal competitors in the relevant market are RealNetworks, AMX,

25   Telestream, Kaleidescape, and the Studios.

26        65.    As elaborated in the declaration of Fox's Michael Dunn, the Studios are actively

27   working on a number of products designed to provide consumers with the ability to obtain a

28   second digital copy of DVDs that they purchase. The Studios acknowledge that RealNetworks is

1  a competitor to at least two of these products: "digital copy," which is already available for many

2  movie titles, and so-called "managed copy" — which the Studios are working to define in the

3  context of a multi-industry agreement.

4        66.     Digital copy is a product that the Studios are marketing where a DVD is sold with

5  an additional "digital copy" version of the content (a second disc), where the second disc can be

6  copied onto the consumer's computer hard drive (without CSS encryption).  As Mr. Dunn

7  declares:  "'Digital Copy' versions of DVD movies are sold – at a higher cost than the regular

8  version of the same movie – with an extra disc containing additional features.  One of the

9  features of the second disc is the ability to place it in a computer's DVD drive and copy the

10  movie to a computer's hard drive."  Mr. Dunn continues:  "*Digital Copy is particularly relevant*

11  *because it allows consumers to purchase from the Studios that which RealDVD is trying to sell*

12  *for its own benefit*."  (Dunn Decl., para 17.)  The cost for this "second disc"?  Roughly $4.00 for

13  each individual disc.

14        67.     Managed copy is simply the ability to make a copy of the content on a standard

15  definition DVD (as opposed to high-definition Blu-ray discs) onto a consumer's computer hard

16  drive.  As Mr. Dunn again declares:  "This capability, referred to (sic) 'Managed Copy' is, once

17  again, similar to RealDVD's functionality, in that it allows consumers to have content both on a

18  DVD and on their computer's hard drive.  The critical difference is that (a) Managed Copy will

19  be authorized by the content owners and (b) *it will allow the content owners to capture the extra*

20  *value that it brings to the consumer*."  (Dunn Decl., para 19.)

21        68.     Mr. Dunn also mentions "Burn-to-DVD," which is another technology that will

22  allow a consumer to create a DVD after purchasing a download of a movie or television show.

23  (Dunn Decl., para. 18.)  The DVD CCA recently approved an amendment to the CSS

24  Specifications that permits each Studio to decide independently whether and whom it will

25  authorize to enable the creation of such DVDs.

26                         ***The Co-Conspiring Studios' Market Power***

27        69.     The Studios comprise the largest and most powerful collection of motion picture

28  companies in the United States and compete with each other in the market for motion picture

1   content.  The audio-visual works that the Studios create and own make up a predominate

2   percentage of the content suitable for family viewing available to consumers on DVD.  These

3   competing Studios dominate the market for copyrighted motion picture content, which is an

4   essential input into not only the RealDVD and the Facet products, but also other products that

5   have similar functionality to RealNetworks' products.  The Studios thus not only compete in the

6   relevant market but also collectively control an element essential to effective competition in the

7   relevant market.

8                   *The Group Boycott:  Refusing to Deal with RealNetworks*

9           70.     The Studios have entered into a "contract, combination, or conspiracy," within the

10   meaning of Section 1, among the Studios.  This is so in two respects.

11          71.     Should the DVD CCA and Studios' interpretation of the CSS License Agreement

12   prevail, then the contract stands as a binding (until declared unlawful) agreement among them to

13   boycott RealNetworks until RealNetworks assents to their collectively-imposed terms.  If the

14   DVD CCA and the Studios are incorrect in their interpretation, as RealNetworks submits, their

15   joint attempt to block competition in the market for these "new digital products" by collectively

16   refusing to deal with RealNetworks similarly violates Section 1.

17                   *The Group Boycott Has Harmed RealNetworks*

18          72.     RealNetworks initially planned to launch Vegas upon the announcement of the

19   product at a technology conference on September 8, 2008.  RealNetworks made an ambitious

20   and expensive public relations and advertising effort to prepare for the initial launch.  When

21   RealNetworks delayed the launch of Vegas to September 30, 2008 while it attempted to address

22   the Studios' concerns regarding the product, RealNetworks attempted to recreate as much as

23   possible the initial public interest that surrounded the product at the time of the planned initial

24   September 8 launch.  However, despite RealNetworks' efforts, many of the publications that had

25   already generated press regarding Vegas were not willing to run second articles on the product.

26          73.     In the event that DVD CCA's and the Studios' efforts to keep its products from

27   the market are unsuccessful, RealNetworks will most certainly not be able to successfully

28

1    execute a "third" publicly acclaimed launch of RealDVD after having been tainted with the

2    mislabel of an illegal product following two aborted launches.

3        74.    The collective conduct of the Studios and the DVD CCA will foreclose

4    RealNetworks from competing in the market for technology that enables consumers to (a) create

5    or otherwise obtain digital copies of movies and TV shows that they own on DVDs and (b) store

6    and manage those copies electronically (*e.g.,* on a hard drive) for subsequent playback.  As a

7    result of the conduct, RealNetworks' entry into the relevant market has been delayed while the

8    Studios have remained free to distribute and sell their own "Digital Copy" products and capture

9    the market for themselves.

10                          ***The Group Boycott Harms Competition***

11        75.    The DVD CCA's and the co-conspiring Studios' group boycott against

12    RealNetworks harms competition in the relevant market in at least two ways—by increasing

13    prices and by retarding innovation competition.

14        76.    First, consumer welfare is harmed.  Curtailing the ability of consumers to enjoy

15    the capability to make non-infringing uses of the DVDs that they own or would buy—*i.e.*,

16    denying their fair-use right to make a backup copy of those DVDS--reduces the value of these

17    DVDs, functioning in precisely the same manner as a collectively-imposed price increase.  If the

18    DVD CCA and the Studios succeed in their efforts to eliminate competition in the relevant

19    market, a consumer with a DVD will be forced to pay a second time to obtain a "downloadable"

20    digital file of DVD content that he or she already owns.  This price increase is a naked exercise

21    of market power, possible only because of the elimination of RealNetworks, a lower-priced

22    competitor.

23        77.    Without this restriction, consumers could lawfully store a movie from a DVD

24    onto a hard drive without additional charges (or, if a license were necessary, at much lower,

25    individually-negotiated charges).  CSS-licensed products like RealDVD facilitate this lawful

26    activity while preserving and enhancing the protections provided by CSS.  Thus, by imposing

27    their interpretation of the CSS License Agreement on RealNetworks (and every other firm), the

28

1   Studios extract extra dollars from consumers to which they are not entitled while actually

2   reducing the value of the product that they are selling.

3        78.     Moreover, whether or not consumers have a fair-use right to make back up copies

4   of DVDs they already have purchased, by agreeing not to negotiate in good faith individually

5   with RealNetworks (while claiming that they are prohibited from doing so by the CSS

6   Agreement), the Studios have effectively agreed to fix the price at which they will license their

7   content.  As a consequence, consumers will pay more than they otherwise would have to make

8   digital copies of their DVDs.

9        79.     Second, by using the DVD CCA to impede or thwart the efforts of firms like

10  RealNetworks to develop and distribute products that would permit them to compete in the

11  relevant market, the Studios have been and will continue to be able to retard the pace at which

12  such products become available to consumers, as well as the features that they offer to

13  consumers.  The concerted actions of the Studios and the DVD CCA alleged herein directly and

14  intentionally impede the introduction of viable, lawful new technologies.  Indeed, the Studios'

15  assertions about how quickly consumers would adopt RealDVD illustrates the adverse effect that

16  DVD CCA's and the Studios' conduct has had and will continue to have in slowing the

17  introduction of technology for which there is substantial consumer demand.

18                          **FIRST CAUSE OF ACTION**

19              ***Group Boycott in Violation of Section 1 of the Sherman Act***

20                   ***(Construction of CSS License Agreement)***

21       80.     RealNetworks incorporates the allegations of paragraphs 1 through 79 as if fully

22  set forth herein.

23       81.     Under the DVD CCA's and the co-conspiring Studios' interpretation of the CSS

24  License Agreement, any hardware or software manufacturer wishing to provide technology

25  capable of playing back copyrighted audio-visual works owned by the Studios is required at the

26  same time to agree to forebear from competing in the relevant market for technology that enables

27  consumers to (a) create or otherwise obtain digital copies of movies and TV shows that they own

28  on DVDs and (b) store and manage those copies electronically (e.g., on a hard drive) for

1   subsequent playback.  The technology that makes up the relevant market permits consumers to

2   engage in non-infringing conduct relating to the Studios' copyrighted audio-visual works.  As

3   such, the DVD CCA and the Studios have no basis in copyright law to exclude competition in

4   this market.  Moreover, even if licenses for digital copying were necessary, the relevant

5   copyrights relating to the underlying content are held by the individual Studios, and there is no

6   lawful basis for the Studios to negotiate for such licenses only on collective terms.

7        82.    The Defendants do not further any legitimate pro-competitive purpose by

8   adhering to their agreement.  In fact, the DVD CCA and the co-conspiring Studios entered into

9   the collective boycott, and acted in furtherance of their conspiracy, with the intent to harm

10  competition for the provision of technology in the relevant market.

11       83.    The DVD CCA's and the co-conspiring Studios' collective boycott and conduct

12  in furtherance of their conspiracy has had a direct and substantial effect on interstate trade and

13  commerce.

14       84.    RealDVD competes with products currently offered by the co-conspiring Studios,

15  as well as with products that the co-conspiring Studios have stated they intend to offer in the near

16  future.  Absent their unlawful agreement, the co-conspiring Studios would otherwise have

17  competed directly with one another, and with other studios and technology providers like

18  RealNetworks, to develop technology in the relevant market.

19       85.    The DVD CCA and its co-conspirators' unlawful contract, combination,

20  conspiracy and agreement in unreasonable restraint of interstate trade and commerce constitutes

21  a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22       86.    The DVD CCA and its co-conspirators' unlawful contract, combination,

23  conspiracy and agreement is an unreasonable restraint of interstate trade and commerce and

24  therefore also violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason.

25  The market for technology that enables consumers to (a) create or otherwise obtain digital copies

26  of movies and TV shows that they own on DVDs and (b) store and manage those copies

27  electronically (e.g., on a hard drive) for subsequent playback, is a relevant product market within

28  the meaning of the antitrust laws.  The relevant geographic market is the United States.  The co-

conspiring Studios control an element essential to effective competition in the relevant market and are using the control that they exert over that element to inhibit RealNetworks' competition with them in the relevant market.

87.      The anticompetitive and exclusionary effects of the DVD CCA and the co-conspiring Studios' unlawful collective boycott have caused:

(a)      A significant reduction in consumer welfare, by curtailing the ability of consumers to play back and enjoy DVDs containing movies or TV shows those consumers own or would buy.  The value of those DVDs is thereby reduced, amounting to an increase in price, and a reduction of competition in the relevant market.

(b)      The retardation of innovation in the relevant market.  As construed by the Studios and the DVD CCA, and if that construction is adopted by this Court, the CSS License Agreement allows the Studios collectively to retard innovation by controlling and dictating the pace at which new products become available in the relevant market and the features that they offer, rather than permitting the evolution of technology in the relevant market to be driven by competition.

(c)      The potential elimination of RealNetworks as a competitor in the relevant market.

88.      These anticompetitive and exclusionary effects are not offset by sufficient pro-competitive effects or purposes.  To obtain the efficiencies associated with an encryption system it is not necessary or helpful to end competition in the market for providing consumers the technology to make legal persistent copies of DVDs.  Even if such a restriction furthers the efficiency goals of the DVD CCA to some extent, which it does not, such benefits would be outweighed by the competitive harms inflicted by this naked group boycott.

89.      Moreover, as the "Managed Recording" sections of the Procedural Specifications to the CSS License Agreement demonstrate, collective action relating to the licensing of a given Studio's content was not required.

1    90.    Consequently, the Studios' and DVD CCA's interpretation of the CSS License

2    Agreement, by which they have denied RealNetworks the right to use the encryption technology

3    that it has licensed from the DVD CCA unless and until RealNetworks assents to the DVD

4    CCA's and the co-conspiring Studios' demands that it exit the relevant market, have rendered the

5    CSS License Agreement void under Section 1 (if their interpretation is held to be correct), or

6    amounted to a *de facto* agreement in violation of Section 1 (if their interpretation is held not to be

7    correct).

8    91.    The DVD CCA is liable under Section 1 of the Sherman Act to RealNetworks for

9    damages in an amount to be proven at trial, including, without limitation, the lost business and

10   reduction in company value RealNetworks has suffered as a direct result of the conspiracy,

11   which damages should be trebled pursuant to 15 U.S.C. § 15(a), plus interest, costs and

12   expenses, including attorneys' fees.

13   **SECOND CAUSE OF ACTION**

14   ***Violation of the Cartwright Act (Bus. & Prof. Code § 16700 et seq.)***

15   92.    RealNetworks incorporates the allegations of paragraphs 1 through 91 as if fully

16   set forth herein.

17   93.    The DVD CCA's and co-conspiring Studios' collective boycotts and conduct in

18   furtherance of their conspiracy violates section 16720 of the Cartwright Act, Cal. Bus. & Prof.

19   Code § 16720.

20   94.    The DVD CCA's and co-conspiring Studios' collective boycotts and conduct in

21   furtherance of their conspiracy have no legitimate business objective and unreasonably harm

22   competition in the state of California.

23   95.    The DVD CCA and the Studios should be enjoined from engaging in further

24   unlawful conduct and are liable under Section 16720 of the California Cartwright Act to

25   RealNetworks for damages in an amount to be proven at trial, including, without limitation, the

26   lost business and reduction in company value RealNetworks has suffered as a direct result of the

27   conspiracy, which damages should be trebled pursuant to §.16750 of the Cartwright Act, plus

28   interest, costs and expenses, including attorneys' fees.

1

**THIRD CAUSE OF ACTION**

2

***Violation of California Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.***

3        96.        RealNetworks incorporates the allegations of paragraphs 1 through 95 as if fully

4    set forth herein.

5        97.        In engaging in their collective boycotts and conduct in furtherance of their

6    conspiracy, the DVD CCA and the co-conspiring Studios have individually and collectively

7    engaged in fraudulent, misleading, unfair and illegal business practices in violation of Section

8    17200 of the California Business and Professions Code.  Due to the DVD CCA's and the co-

9    conspiring Studios' unfair business practices, RealNetworks has been injured in its ability to

10   compete in the relevant market and has suffered and continues to suffer direct and substantial

11   injuries.

12       98.        The DVD CCA and the Studios should be enjoined from engaging in further

13   unfair business conduct, and are liable to RealNetworks for costs and expenses, including

14   attorneys' fees.

15

**PRAYER FOR RELIEF**

16       WHEREFORE, RealNetworks prays that the Court enter judgment as follows:

17       1.        That judgment be entered in favor of RealNetworks, Inc. and RealNetworks

18   Home Entertainment, Inc.;

19       2.        That an injunction barring the DVD CCA and the Studio Defendants from

20   continuing or maintaining the boycotts alleged herein and committing other violations of the

21   Sherman Act, the Cartwright Act, the California Unfair Competition Law, or any other antitrust

22   laws be entered;

23       3.        That the Court award damages sustained by RealNetworks in an amount to be

24   proved at trial, to be trebled according to law, plus interest, including prejudgment and post-

25   judgment interest, attorneys' fees and costs of suit, and such other and further relief as this Court

26   may deem just and proper.

27       4.        That the DVD CCA take nothing from RealNetworks, Inc. and RealNetworks

28   Home Entertainment, Inc. by its Counterclaims, and that the same be dismissed with prejudice;

1          5.      For costs, attorneys' fees, expert witness fees, and court hearing costs incurred

2 herein; and

3          6.      For such other relief as the Court deems just and proper.

4

5

6 Dated:  May 13, 2009                WILSON, SONSINI, GOODRICH & ROSATI

7

8                       By: /s/ Leo P. Cunningham

9                            Leo P. Cunningham

10                     Attorneys for Defendants
REALNETWORKS, INC. and REALNETWORKS

11                     HOME ENTERTAINMENT, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2          RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. hereby demand a jury

3    trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

4

5

6    Dated:  May 13, 2008                          WILSON, SONSINI, GOODRICH & ROSATI

7

8                                                 By: /s/ Leo P. Cunningham_____
                                                      Leo P. Cunningham
9
                                                  Attorneys for Defendants
10                                                REALNETWORKS, INC. and REALNETWORKS
                                                  HOME ENTERTAINMENT, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28