1   GLENN D. POMERANTZ (SBN 112503)          ROBERT H. ROTSTEIN (SBN 72452)
    Glenn.Pomerantz@mto.com                   rxr@msk.com
2   BART H. WILLIAMS (SBN 134009)             ERIC J. GERMAN (SBN 224557)
    Bart.Williams@mto.com                     ejg@msk.com
3   KELLY M. KLAUS (SBN 161091)               MITCHELL SILBERBERG & KNUPP LLP
    Kelly.Klaus@mto.com                       11377 West Olympic Boulevard
4   ROHIT K. SINGLA (SBN 213057)              Los Angeles, California  90064-1683
    Rohit.Singla@mto.com                      Tel: (310) 312-2000; Fax: (310) 312-3100
5   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 35th Floor
6   Los Angeles, CA  90071-1560
    Tel: (213) 683-9100; Fax: (213) 687-3702
7
    GREGORY P. GOECKNER (SBN 103693)
8   gregory_goeckner@mpaa.org
    DANIEL E. ROBBINS (SBN 156934)
9   dan_robbins@mpaa.org
    15301 Ventura Boulevard, Building E
10  Sherman Oaks, California  91403-3102
    Tel: (818) 995-6600; Fax: (818) 285-4403
11  Attorneys for Motion Picture Studio Plaintiffs/Declaratory
    Relief Claim Defendants

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15   REALNETWORKS, INC., et al.,          CASE NO.  C 08-4548-MHP

16              Plaintiffs,               **[PROPOSED] FINDINGS OF FACT AND**
                                          **CONCLUSIONS OF LAW SUBMITTED BY**
17        vs.                             **MOTION PICTURE STUDIO PLAINTIFFS**

18   DVD COPY CONTROL ASSOCIATION,
     INC., et al.                         Date:   May 21, 2009
19                                        Time:   9:30 a.m.
                Defendants.               Ctrm:   15 (Hon. Marilyn Hall Patel)
20
                                          CASE NO.  C 08-4719-MHP
21   UNIVERSAL CITY STUDIOS
     PRODUCTIONS LLLP, ET AL.,
22              Plaintiffs,
                                          **PUBLIC - REDACTED VERSION**
23        vs.

24   REALNETWORKS, INC., et al.

25              Defendants.

26

27

28

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | | PROPOSED FINDINGS OF FACT | 1 |
| | A. | Procedural History | 1 |
| | B. | The Parties and Witnesses | 2 |
| | C. | CSS - The Content Scramble System | 6 |
| | | 1. The Development of CSS Technology and the CSS License | 6 |
| | | 2. The Intent of the CSS Technology and the CSS License Is to Prevent Copying of DVDs | 7 |
| | | 3. The Agreement and Its Requirements | 9 |
| | | 4. CSS Is An Effective Access- And Copy-Control Technology | 10 |
| | D. | RealDVD | 11 |
| | | 1. The Genesis of RealDVD | 11 |
| | | 2. The Development of Facet ▮▮▮▮▮▮▮ | 12 |
| | | 3. The Development of Vegas ▮▮▮▮▮▮▮ | 13 |
| | | 4. RealDVD Is Designed and Marketed to Enable Consumers to Copy DVDs | 14 |
| | | 5. Real Knew That Users Valued Copying Rented DVDs More Than Copying DVDs They Owned. | 14 |
| | | 6. Real's Current Restrictions on the Distribution of Copies Exist for Real's Benefit, and Real Can Easily Change Them | 14 |
| | | 7. Potential Third-Party Partners Repeatedly Raised Questions To Real About The Legality Of RealDVD | 16 |
| | E. | RealDVD Removes and Impairs CSS Protections From the Copies That It Makes | 16 |
| | F. | RealDVD Avoids, Bypasses and Impairs CSS Protections in the Process of Copying DVDs | 17 |
| | | 1. No Authorization for Copying DVDs | 17 |
| | | 2. Violations of CSS Technical Specifications | 18 |
| | | a. RealDVD Violates the CSS Specifications by ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ | 19 |
| | | b. RealDVD Violates the CSS Specifications by ▮▮▮▮▮▮ | 21 |
| | G. | Post-*Kaleidescape* Proposed CSS Amendments | 21 |
| | H. | The ARccOS and RipGuard Copy Protection Schemes | 22 |
| | I. | ARccOS And RipGuard Are Effective Copy-Control Technologies | 24 |
| | J. | RealNetworks Knew ARccOS and RipGuard Are Copy Protection Schemes and Worked to Intentionally Develop Circumvention Technologies | 27 |

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

K.   RealDVD's Use To Circumvent ARccOS and RipGuard ................................. 29

   1.   Vegas Avoids, Bypasses and/or Impairs Protections Associated with ARccOS and RipGuard ................................................................. 29

   2.   Facet Avoids, Bypasses and/or Impairs Protections Associated with ARccOS and RipGuard ................................................................. 30

   3.   Both Vegas and Facet Remove Technological Protections Associated with ARccOS and RipGuard ............................................. 33

L.   Marking Rental DVDs ................................................................................. 33

M.   Real's Use And Concealment Of Evidence Regarding Illegal Code And Hackers ................................................................................................. 33

N.   The *Real v. Streambox* Litigation .................................................................. 35

O.   The Injury To The Studios Caused By RealDVD ............................................. 35

II.   PROPOSED CONCLUSIONS OF LAW ............................................................ 39

A.   Standard For Preliminary Injunctive Relief ..................................................... 39

B.   The Studios Have Established A Likelihood Of Success On The Merits ......... 40

   1.   Sections 1201(a)(2) and 1202(b)(1) of the DMCA .............................. 40

   2.   The Studios Likely Will Succeed On Their DMCA Access- And Copy- Control Claims Regarding CSS ................................................... 41

      a.   CSS Is A "Technological Measure" That Both "Effectively Controls Access" To Copyrighted Works And "Effectively Protects A Right Of A Copyright Owner" ................................. 41

      b.   RealDVD's Design, Marketing And Use To Circumvent CSS Violates Each Of The Anti-Trafficking Provisions Of Sections 1201(a) and 1201(b)(1) ............................................... 42

   3.   The Studios Likely Will Succeed On Their Copy-Control Claim Regarding ARccOS/RipGuard ................................................................. 44

      a.   ARccOS and RipGuard Are "Technological Measures" That "Effectively Protect A Right Of A Copyright Owner" ............. 44

      b.   RealDVD's Design, Marketing And Use To Circumvent ARccOS and RipGuard Violates Each Of The Anti-Trafficking Provisions Of Section 1201(b)(1) ......................... 45

   4.   Real's Reliance On An Asserted Fair Use Defense Of RealDVD End-Users To The Studios' Copy-Control Claims Under The DMCA Is Without Merit ...................................................................... 46

      a.   An End-User's Defense Of Fair Use Does Not Provide Any Defense To Real's Liability Under The DMCA ....................... 46

      b.   Real Is Judicially Estopped From Arguing That An End-User's Defense Of Fair Use Is A Defense To A DMCA Violation ................................................................................. 47

      c.   Even If An End-User's Fair Use Defense Was A Defense To A DMCA Violation, The Defense Would Not Apply To Copying Movies And Television Programs With RealDVD .... 48

C.   The Studios Have Established The Possibility Of Irreparable Injury If Real Is Not Restrained From Trafficking In RealDVD Pending A Trial On The Merits ......................................................................................................... 49

D.   The Balance Of Hardships Favors The Studios ................................................ 50

E.   The Public Interest Would Be Served By Entry Of A Preliminary Injunction .......................................................................................................... 50

# I.

## **PROPOSED FINDINGS OF FACT**

*Except as otherwise noted, page and line citations are to the transcript of the preliminary injunction hearing, and exhibit citations are to the exhibits admitted in connection with the preliminary injunction hearing.*

### A.   **Procedural History.**

1.        On September 30, 2008, a number of major motion picture studios filed a lawsuit in the United States District Court for the Central District of California against RealNetworks, Inc., and RealNetworks Home Entertainment, Inc. (collectively, "Real").  Plaintiffs Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Warner Bros. Entertainment Inc., Disney Enterprises, Inc., Sony Pictures Television Inc. and Columbia Pictures Industries, Inc. (collectively, "Studios") alleged that Real's distribution of the RealDVD product used to circumvent the protections afforded by the Content Scramble System ("CSS") was in violation of the anti-trafficking proscriptions of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 et seq. ("DMCA").  The Studios sought a temporary restraining order, restraining Real's trafficking in RealDVD, which had commenced that day.[1]

2.        On the same day, Real commenced an action for declaratory judgment in the United States District Court for the Northern District of California against the organization that licenses the CSS technology, the DVD Copy Control Association ("DVD CCA"), as well as several of the Studios and their affiliates.  In its complaint, Real requested that the Court declare that its conduct with respect to RealDVD did not violate either the DMCA or the CSS License Agreement.  *See* Complaint for Declaratory Relief.

3.        On October 3, 2008, the District Court in the Central District of California entered an order transferring the Studios' complaint to the Northern District of California.

---

[1] In the same complaint, Plaintiffs Universal City Studios LLLP, Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Sony Pictures Entertainment Inc., Walt Disney Pictures, and Warner Bros. Entertainment Inc. asserted a third-party beneficiary claim against Real for breach of the CSS License Agreement.

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

4.      On October 3, the Studios named in Real's complaint counter-claimed and renewed their motion for a TRO based on the DMCA.  Following a hearing that day, the Court granted the Studios' motion for a temporary restraining order, enjoining Real from trafficking in RealDVD ("TRO").  *See* Docket No. 43, Minute Entry: Temporary Restraining Order Hearing (filed under seal).  The Court extended the TRO following another hearing on October 7, 2008.  The TRO has been extended several times with the consent of all parties pending the completion of a hearing on the Studios' and the DVD CCA's motions for preliminary injunction.

5.      Pursuant to Real's request, the preliminary injunction hearing has encompassed both versions of RealDVD that Real has represented it has developed.  As explained in further detail below, one version is code-named "Vegas" by Real; Real's code-name for the other version is "Facet."  Pursuant to the Studios' request, the DMCA claim and the motion for preliminary injunction encompass Real's circumvention of CSS as well as two other technological measures employed by certain Studios in connection with their distribution of content on DVDs.  As explained in further detail below, those supplemental technological protection measures are called "ARccOS" and "RipGuard."

**B.      The Parties and Witnesses.**

6.      The parties to the motions for preliminary injunction before the Court are the aforementioned Studios, the DVD CCA, and Real.

7.      Each of **the Studios** owns copyrights in many of the most successful and critically acclaimed movies and recorded television programs released in the United States and throughout the world.  The Studios have invested billions of dollars creating their content and distributing it to consumers.

8.      **DVD CCA** is a Delaware not-for-profit corporation that is responsible for licensing CSS to entertainment, consumer electronics and information technology companies that wish to implement CSS in their products.  Declaration of Jacob Pak in Support of DVD CCA's Motion for Preliminary Injunction, dated March 19, 2009 ("Pak Decl."), ¶ 2; Declaration of Andrew Parsons in Support of DVD CCA's Motion for Preliminary Injunction, dated March 19, 2009 ("Parsons Decl."), ¶ 3.

1       9.    **RealNetworks, Inc.** is a technology company that manufactures and sells several

2  popular product lines that allow streaming of audio and video content on the Internet.  47:23-

3  48:5; 440:21-442:24 (Glaser).  **RealNetworks Home Entertainment, Inc.** is a subsidiary of

4  RealNetworks, Inc.  Real's Complaint for Declaratory Relief, ¶ 11.  Both companies have their

5  principal place of business in Seattle, Washington.  *Id.*, ¶¶ 11-12.

6       10.    **Marsha King** joined Twentieth Century Fox Film Corporation in 1987, where she

7  held the positions of Counsel, and then Senior Counsel.  71:4-5 (King).  From 1990 to 2006, Ms.

8  King was at Warner Bros.  71:6-10 (King).  She began her career at Warner Bros. as General

9  Counsel of the Video Division, and ended as an Executive Vice President and General Manager

10  of the Video Division.  *Id.*  From 2006 to 2007, Ms. King was Executive Vice-President of

11  Worldwide Business Affairs at Paramount Pictures Corporation.  71:11-13 (King).  Ms. King was

12  deeply involved in the development of the Digital Versatile Disc ("DVD") and CSS copy

13  protection technology and in the drafting and negotiation of the CSS License Agreement.  71:14-

14  101:2 (King).

15       11.    **Dr. John Kelly** holds bachelor's and master's degrees in mathematics from the

16  University of Cambridge in England, and a Ph.D. in computer science from the University of

17  California at Los Angeles ("UCLA").  147:6-9 (Kelly).  Upon obtaining his Ph.D. from UCLA,

18  Dr. Kelly was a professor in the computer science department at UCLA for four years.  147:15-17

19  (Kelly).  He then transferred to the University of California at Santa Barbara to the electrical and

20  computer engineering departments, where he received tenure.  147:17-20 (Kelly).  Dr. Kelly left

21  the university in 1997 and formed the Kelly Technology Group in Santa Barbara, a high

22  technology consulting firm.  146:21-147:3 (Kelly).  As part of his work in this matter, Dr. Kelly

23  studied the CSS specifications, Real's documents and technical specifications, the depositions of

24  Real's engineers, and the source code for the Vegas and Facet products.  148:19-149:7 (Kelly);

25  Declaration of John P.J. Kelly, Ph.D., In Support of DVD Copy Control Association, Inc.'s

26  Motion for Preliminary Injunction, dated March 19, 2009 ("Kelly Decl."), ¶ 6, Ex. B.  Dr. Kelly

27  also conducted extensive testing of the Facet and Vegas products.  149:7 (Kelly); Kelly Decl., ¶ 6.

28

1        12.    **Robert Schumann** has a bachelor's degree in computer science from the

2  Rochester Institute of Technology.  Declaration of Robert Schumann in Support of Studio

3  Plaintiffs' Motion for a Preliminary Injunction, dated March 17, 2009 ("Schumann Decl."), Ex. A

4  at ¶ 1.  He has been working with DVD copy protection technologies since 1995 when DVDs first

5  came into being.  266:17-19 (Schumann).  Mr. Schumann has designed and developed DVD

6  players which include CSS technology.  267:2-268:7 (Schumann).  He has also designed two

7  additional content protection schemes for video content distributed on DVDs.  267:5-24

8  (Schumann).  Mr. Schumann has testified as an expert witness in two CSS-related cases,

9  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 309-311 (S.D.N.Y. 2000), *aff'd*,

10  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 436-37 (2d Cir. 2001), the original DeCSS

11  case, and *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.Supp. 2d 1085, 1089 (N.D.

12  Cal. 2004).  268:11-18 (Schumann).  Mr. Schumann holds 17 issued and pending U.S. patents,

13  including patents in the areas of copy protection and DVD processing technologies.  269:11-14

14  (Schumann).  As part of his work in this matter, Mr. Schumann studied the CSS specifications,

15  Real's documents and technical specifications, the depositions of Real's engineers, and the source

16  code for the Vegas and Facet products.  270:8-271:3; Schumann Decl., Ex. A at ¶¶ 5-6.  Mr.

17  Schumann also conducted extensive testing of the Facet and Vegas products, including testing

18  Vegas and Facet on ARccOS or RipGuard-protected DVDs.  *Id.* at Ex. A ¶¶ 5-6, 90; Ex. B.

19        13.    **Rob Glaser** is the founder, chairman, and CEO of Real.  440:5-9 (Glaser).

20        14.    **Matthew Bishop** holds a bachelor's degree in astronomy and applied mathematics

21  and a master's degree in mathematics from the University of California at Berkeley, and a

22  master's degree and Ph.D. in computer science from Purdue University.  623:16-25 (Bishop).

23  Professor Bishop has been a professor at the University of California at Davis for the last sixteen

24  years.  625:10-17 (Bishop).  Prior to this case, Professor Bishop had no experience with DVD

25  technologies or software and had never seen the CSS Specifications.  799:7-800:14 (Bishop).

26  Nor does Professor Bishop know how or why the CSS system was developed.  800:10-16

27  (Bishop).  Professor Bishop further testified that he did not consider any "policy" behind CSS in

28

1   his analysis of compliance. 800:25-801:8 (Bishop). At the time he developed his opinions in this

2   case, Professor Bishop had never seen or used the Facet system, 746:10-747:6 (Bishop).

3       15.   **Douglas Dixon** holds bachelor's and master's degrees in computer science from

4   Brown University. 858:16-21 (Dixon). Mr. Dixon is currently an independent consultant on

5   digital media. 861:8-13 (Dixon). Mr. Dixon also is editor-in-chief of the magazine *Mediaware*, a

6   trade magazine published for the content and delivery industry. 862:20-863:1 (Dixon). Mr.

7   Dixon is not an expert in either copy protection, 952:13-14, 938:9-11 (Dixon) or error-

8   management on DVDs, 923:21-23 (Dixon). He has never done any work on error-recovery

9   techniques for DVD playback before his engagement in the present case. 923: 21-23, 924:9-15

10   (Dixon). At the time he formed his opinions and submitted his expert reports, he had not even

11   used either Vegas or Facet, nor seen the source code or any documentation for either of those

12   programs. 930:9-10, 961:16-17, 927:11-19, 928:16-19, 929:4-6, 930:14-16, 961:18-24 (Dixon).

13   He conducted no experiments in support of his opinions. 925:17-23, 926:2-5 (Dixon). He did not

14   review Real's technical documentation for either product. 961:1-9 (Dixon). He had not spoken

15   to Real's engineers or reviewed the depositions of the Real engineers with primary responsibility

16   for designing and implementing Vegas and Facet. 929:9-22, 961:10-15, 964:5-13 (Dixon).

17       16.   **James Bielman** is a senior software developer at Real. 1003:14-17 (Bielman). He

18   has been at the company since March 2008. 1003:18-19 (Bielman). The only parts of the Facet

19   project for which Mr. Bielman had primary responsibility were the program that Real now calls

20   "DVD Walk" (but was formerly known at Real as "ARccOS") and Facet's video output.

21   1063:13-16, 1082:2-8 (Bielman). Mr. Bielman did not implement the entire CSS design for

22   Facet, but only coded the raw CSS descrambler and authentication algorithms, based on code

23   originally written for Vegas by Mr. Jeffrey Buzzard. 1063:25-1064:16 (Bielman).

24

25

26

27

28

C. **CSS - The Content Scramble System.**

1. **The Development of CSS Technology and the CSS License.**[2]

17.     In the early 1990s, various Studios began to consider the possibility of distributing their movies in digital form.  71:14-72:3 (King).  In or around 1995, the digital versatile disc ("DVD") emerged as the accepted medium for the possible dissemination of audio-visual content in digital form.  74:5-8 (King).

18.     No Studio, however, was prepared to release its copyrighted content on DVDs absent adequate safeguards against making any copies of that content from DVDs.  73:20:-25; 74-9-12; 91:19-92:2 (King).  *See Corley*, 273 F.3d at 436-37.

19.     In 1995, the Studios were contacted by major consumer electronic manufacturers, such as Sony, Matsushita, Toshiba, Phillips, and Thompson, to discuss the development of copy protection measures for DVDs.  74:19-75:2 (King).  Because the DVD format was going to be playable on computers as well, representatives from the computer industry, including Microsoft, Apple, and IBM, were brought into the discussions concerning potential copy protection technologies for DVDs.  75:2-13 (King).  The three industries – the motion picture, consumer electronics, and computer industries – formed the Copy Protection Technical Working Group (the "CPTWG"), an organization to discuss copy-protection technologies that was open to interested parties and the public.  75:14:76:5 (King).

20.     In 1996, the three industries through the CPTWG endorsed the Content Scramble System, or CSS, technology to create a secure system for the dissemination and playback of copyrighted content on DVDs, while preventing copying, so that consumers would be able to play all DVDs on all players.  79:22-80:3 (King).  Matsushita and Toshiba owned the underlying intellectual property for CSS.  85:19-21 (King).

---

[2] The history and development of CSS has been described in detail by a number of federal courts. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 436-37 (2d Cir. 2001); *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 309-311 (S.D.N.Y. 2000); *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.Supp.2d 1085, 1089 (N.D. Cal. 2004).

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

21.     Following the CPTWG's endorsement of CSS technology, representatives of the three industries engaged in the negotiation of a license agreement which would permit the manufacturing and distribution of devices that playback DVDs.  77:13-20, 82:4-12 (King).

22.     During the discussions and negotiations in the CPTWG and in the drafting of the license agreement, each of the Studios adamantly, repeatedly, and publicly announced that there should be no making of permanent, playable copies – whether single copies or multiple copies – of their content released on CSS-encrypted DVDs.  81:14-16, 88:5-7, 90:14-24, 111:1-10, 122:5-11 (King).

23.     Counsel for Matsushita served as the primary drafter of the agreement.  93:11-12 (King).  Under the agreement, licensees manufacturing and distributing DVD playback devices and DVD discs would be obliged to enforce the technological protections of CSS.  77:13-20, 82:4-12 (King).  Toshiba licensed its portion of CSS to Matsushita, who served as the initial licensor of the technology.  Ex. 1 at 1; 86:24-87:7, 89:16-17 (King).

24.     After nearly two years of heavy and complex negotiations, the Restated and Amended CSS Interim License Agreement was finalized in November 1997.  Ex. 1 at 20; 97:10-13, 89:19-22 (King).  Ms. King was heavily involved in those negotiations.  83:20-22 (King).

25.     The DVD Copy Control Association (the "DVD CCA") was formed in 1999. Matsushita and Toshiba granted the DVD CCA a royalty-free license in CSS technology, and it became the licensor and administrator of CSS technology and the CSS License Agreement, which in all material respects is identical to the Restated and Amended CSS Interim License Agreement. 89:13-18, 98:10-99:17 (King).

26.     The DVD CCA represents all three industries, and there are over 300 licensee members of the DVD CCA.  Deposition of Andrew Parsons, dated December 11, 2008 ("Parsons Depo."), at 21:21-22:14, 23:7-23:15 (Studios' Designations)..

**2.     The Intent of the CSS Technology and the CSS License Is to Prevent Copying of DVDs.**

27.     The intent of all three industries in developing CSS technology and negotiating and drafting the CSS License Agreement was to prevent the making of permanent, playable

- 7 -

1  copies of copyrighted DVD content without the authority of the copyright owner. 77:9-12, 80:4-

2  21, 81:6-18, 90:14-91:5, 100:14-20, 122:5-11, 122:17-20 (King); Parsons Depo. at 45:18-47:7,

3  52:5-21, 53:10-54:13 (Studios' Designations).

4        28.    The CSS License Agreement expressly confirms this intent, stating on its first page

5  under Recital A that CSS was developed to "provide reasonable security to the contents of DVD

6  discs" and to "provide protection for copyrighted content against unauthorized consumer

7  copying." Ex. 1 at 1 (Recital A); Pak Decl., Ex. J at 1 (Recital A).

8        29.    The CSS General Specifications set forth the following two objectives of CSS:

9      (1) ███████████████████████████████████████████

10  ████████████████████████

11      (2) ███████████████████████████████████████████

12  Pak Decl., Ex. L at REAL001325 (§ 1.2). Other technical specifications of the CSS License also

13  repeatedly explain that CSS's purpose is to ██████████████████████████████████

14  ████████████████ Pak Decl. at Exs. N (§ 1.1), O (§ 1.1).

15        30.    CSS General Specifications, § 1.5, provides █████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████ Pak Decl., Ex. L at REAL001328.

18        31.    The reference to "authorized" copying in "unauthorized consumer copying" in

19  Recital A of the CSS License Agreement was inserted during the drafting process.

20  Representatives of the computer industry stated that the playback of a DVD on a computer would

21  require the making of temporary copies of a few seconds of DVD content in the computer's

22  memory, and thus, a blanket prohibition on all copying would be technically unworkable. 79:10-

23  21 (King). This temporary copying, sometimes referred to as "buffering" or "caching," is a

24  necessary part of the playback process of a DVD in all DVD playback devices. 290:13-23

25  (Schumann). *See also* Schumann Decl., Ex. B at ¶¶ 6-9 (discussing, *e.g.*, Procedural

26  Specifications § 6.2.4(2)).

27

28

32.     CSS is licensed by the DVD CCA under a contract that requires all licensees to adhere to detailed restrictions intended to safeguard CSS protected content.  81:19-82:12, 89:9-90:1 (King); Parsons Decl., ¶ 3.

**3.     The Agreement and Its Requirements.**

33.     The CSS License Agreement (Pak Decl., Ex. J), along with the CSS Specifications Real received from DVD CCA (Pak Decl., Exs. L-P), make up the "Agreement" between Real and DVD CCA.  Pak Decl., ¶ 24.

34.     Section 4.2.1 of the CSS License Agreement required Real to comply with all the specifications it received:  "Licensee shall comply with the CSS Specifications as may be amended from time to time by Licensor in accordance with the By-Laws.  Each DVD Product [made by Licensee] shall comply with the version of the CSS Specifications which is in effect at the time such DVD Product is manufactured . . . ."  Pak Decl., Ex. J (§ 4.2.1).

35.     Section 5 of the CSS License Agreement bars licensees from "us[ing] Confidential Information or Highly Confidential Information or any mentally-retained recollections thereof to *circumvent* or copy the methods disclosed in Proprietary Information, Confidential Information, or Highly Confidential Information or to circumvent any obligations under this Agreement."  Pak Decl., Ex. J (§ 5.2(a)) (emphasis added).

36.     The CSS License Agreement defines "DVD Products" as DVD Players, DVD Drives, Descramblers, Authenticators, Scramblers, CSS Decryption Modules, CSS Disc Formatters, DVD Discs, Special Purpose DVD Players, Special Purpose DVD Drives, Verification Products and Integrated Products.  Pak Decl., Ex. J at REAL001413 (§ 1.15).

37.     As Real's expert testified at the preliminary injunction hearing, Vegas and Facet are not "DVD Players" within the meaning of the CSS specifications.  They are software "decryption modules," *i.e.,* within the "personal computer environment" as that term is used in the CSS specifications.  756:14-757:3 (Bishop).

38.     The definition of "DVD Products" in the CSS License Agreement does not include DVD copying devices.  Pak Decl., Ex. J at REAL001413 (§ 1.15).

1          **4.     CSS Is An Effective Access- And Copy-Control Technology.**

2          39.     The CSS system comprises several layers of access and copy protections including

3    DVD drive-locking, secure storage of keys on a DVD, CSS authentication, CSS bus encryption,

4    and CSS content encryption.  Schumann Decl., Ex. A at ¶¶ 22-33; 755:16-756:8 (Bishop).  These

5    measures create an environment in which DVD video content cannot be played back or accessed

6    from any medium other than the original, physical disc, and in which copies of that video content

7    cannot be made.  *Id*. at ¶ 22.

8          40.     CSS technology requires that DVD drives "lock" on insertion of a CSS-protected

9    DVD and prevent any access to its contents until a legitimate player engages in an authentication

10   procedure, akin to a secret handshake, to establish mutual "trust."  272:17-25 (Schumann);

11   Schumann Decl., Ex. A at ¶¶ 25, 28-30; *see* 786:21-24 (Bishop).  The two components of drive

12   locking are the DVD disc itself, and the DVD drive, which has extensive intelligence about CSS.

13   274:2-15 (Schumann).  Upon the insertion of a CSS-protected DVD disc the DVD drive

14   recognizes that it is a DVD disc, that it has CSS protection technology on it, and that it cannot

15   release the data on the disc until it has gone through the authentication process.  274:2-15

16   (Schumann).

17         41.     DVD content protected by CSS can be decrypted only with the CSS "keys" for

18   that DVD, which themselves are both further encrypted and saved in physically secure parts of

19   the DVD, called the "lead-in" and "sector header" areas, which are not ordinarily accessible even

20   after a drive has been "unlocked."  278:4-11, 281:4-13 (Schumann); Schumann Decl., Ex. A at

21   ¶ 27; 755:25-756:5 (Bishop).

22         42.     CSS technology requires that players authenticate themselves to DVD drives to

23   establish mutual trust, both to "unlock" the DVD and gain access to the encrypted video data and

24   also separately to gain access to the decryption keys stored in the lead-in and sector header areas.

25   276:17-23, 277:9-11, 278:16-3 (Schumann); Schumann Decl., Ex. A at ¶¶ 28-30; *see* 755:19-20

26   (Bishop).  Authentication cannot occur without a disc in the DVD drive.  277:9-11 (Schumann).

27   The drive-locking and authentication protections are thus integral, key techniques of CSS tying

28

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1    the playback of the DVD to the disc and to the DVD drive, ensuring that the DVD content always

2    is played back from the disc and not any other source, such as a computer hard drive.  Schumann

3    Decl., Exh. A at ¶¶ 28-30.

4          43.     CSS further protects the decryption keys ████████████████████

5    ████████████████████████████████████████████████████████████

6    █████████████ 173:2-14; 283:8-285:12 (Schumann); *see* 755:21-22 (Bishop).  Unlike

7    the other CSS encryption schemes, █████████████████████████████████████████

8    ██████████████████████████████ 173:2-14, 283:8-285:12

9    (Schumann); Schumann Decl., Ex. A at ¶¶ 31-33.  CSS bus encryption cannot work without the

10   physical DVD disc as part of the process.  284:11-24 (Schumann).

11         44.     CSS encrypts the content on DVDs, scrambling the video images rendering them

12   unplayable unless and until they are decrypted with CSS decryption "keys."  285:22-286:5

13   (Schumann); Schumann Decl., Ex. A at ¶ 26.

14         45.     Although certain CSS keys and algorithms have been compromised by hackers,

15   CSS technology was intended to and continues to effectively prevent copying by the average

16   consumer.  90:14-21, 228:4-6 (Schumann).  Real's own expert and employees have admitted this.

17   944:8-12 (Dixon); Deposition of Todd Basche, dated February 16, 2009 ("Basche Depo.") at

18   257:6-16 (Studios' Designations).

19         46.     Numerous courts have held that CSS is an effective technological access- and

20   copy-control measure.  *See, e.g., 321 Studios*, 307 F. Supp. 2d at 1095; *Reimerdes,* 111 F. Supp.

21   2d at 317-18.

22   **D.**     **RealDVD.**

23        **1.**     **The Genesis of RealDVD.**

24         47.     In early 2007, Real's CEO, Rob Glaser, in conjunction with other Real executives,

25   began planning for RealDVD.  Declaration of Jonathan H. Blavin In Support of Studio Plaintiffs'

26   Motion for Preliminary Injunction, dated March 19, 2009, Ex. 17; *id.*, Ex. 1 (Barrett Depo.) at

27   56:11-13; 447:16-24 (Glaser).  Real viewed RealDVD as a way to enter the digital video market.

28   444:14-445:2 (Glaser).

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1    48. ███████████████████████████████████████████

2    ███████████████████████████████████████████████████

3    ███████████████████████████████████████████ Blavin

4    Decl., Ex. 12 (Wolpert Depo.) at 41:15-42:8.  The entire basis of the trial court's decision in the

5    *Kaleidescape* case was that the CSS General Specifications were not "CSS Specifications" with

6    which licensees must comply under Section 4.2 of the CSS License Agreement.  *DVD CCA v.*

7    *Kaleidescape, Inc.*, No.1:04 CV 031829 (Cal. Superior Ct., March 29, 2007).  The Studios were

8    not parties to the *Kaleidescape* case, and it did not involve any claims brought under the DMCA.

9    *Id.*  The trial court emphasized that it was not "tiptoeing" into federal intellectual property law

10   and that its judgment was "framed" solely by "classic state law issues," *i.e.* on the DVD CCA

11   breach of contract claim.  Blavin Decl., Ex. 70 at 72:18-73:13.  Real, however, treated the

12   Kaleidescape product as a "blueprint" for the continued development of RealDVD.  444:14-445:2

13   (Glaser).

14          **2.    The Development of Facet** ███████████████████

15   49.    In the Spring of 2007, Real began developing the RealDVD "Facet" product.

16   Facet is software that runs under the Linux operating system on a personal computer contained in

17   a hardware box.  178:1-4 (Kelly); 424:8-9 (Schumann); 747:19-21 (Bishop).  Facet allows users

18   to save DVDs to an internal hard drive, and to an external drive, such as a thumb drive, which can

19   be played back on the Facet box.  451:1-20 (Glaser).

20   50. ████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ███████████████████ *Id.*, Ex. 8 (Hamilton Depo.) at 43:4-44:16. ████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   Deposition of Martin Schwarz, dated January 30, 2009 ("Schwarz Depo.") at 145:3-7, 145:15-19,

26   146:14-19, 147:19-148:6 (Studios' Designations).

27   51.    In June 2007, Real took steps to become a member of the DVD CCA and a CSS

28   licensee.  At that time, ████████████████████████████████████

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1   ████████████████████████████████████████████████

2   Blavin Decl., Ex. 20. ████████████████████████████

3   ████████████████████████████████████████████████

4   ██████████ Deposition of Nicole Hamilton, dated February 13, 2009 ("Hamilton Depo.") at

5   235:21-236:4 (Studios' Designations).

6       52.    Facet has yet to be released to the public.  A future direction for Facet is to be a

7   networkable device in which DVD content can be shared between Facet boxes and between Facet

8   and Vegas installations.  454:1-9; 580:24-581:4 (Glaser).  Real technical documentation details

9   future networking plans for Facet and the Facet source code includes the basis for building

10  networking systems for sharing copied DVDs.  299:21-23, 413:14-23 (Schumann).

    **3.**    **The Development of Vegas** ████████████████████

11

12      53.    In the fall of 2007, Real began developing "Vegas," a software application that

13  runs on a Windows-based computer and allows users to copy DVDs to a computer hard drive and

14  to external drives, such as thumb drives.  Blavin Decl., Ex. 23; 178:1-4 (Kelly); 371:2-5

15  (Schumann).

16      54.    The code-name "Vegas" was chosen because, ████████████████

17  ██████████████████████████████████████ Blavin Decl., Ex. 1 (Barrett

18  Depo.) at 64:25. ███████████████████████████████████

19  ████████████████████████████ *Id.*, Ex. 1 (Barrett Depo.) at 112:7-10.

20      55. ████████████████████████████████████████████

21  ██████████████████████████████████████. *See* Blavin Decl., Ex. 5 (Buzzard

22  Depo.) at 57:15-59:5, 60:11-61:17; *id.*, Ex. 6 (Chasen Depo.) at 141:12-14, 142:14-22; *id.*, Ex. 12

23  (Wolpert Depo.) at 113:25-114:9. ████████████████████████

24  ████████████████████ Schumann Decl., Ex. A at ¶¶ 45-46 (referencing REAL075625).

25      56.    The CSS authentication and decryption algorithms for Facet were then based on

26  the versions developed for Vegas.  1064:3-16 (Bielman).

27      57.    Vegas was on the market from September 30, 2008 until the Court issued its TRO

28  on October 3, 2008.  Real sold Vegas for $29.99, and charged $19.99 for each software license

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1   for the additional four computers that can play back DVDs copied with Vegas.  Supplemental

2   Declaration of Jonathan H. Blavin In Support of Studio Plaintiffs' Motion for Preliminary

3   Injunction, dated April 10, 2009 ("Supp. Blavin Decl."), Ex. 12.

4       **4.   RealDVD Is Designed and Marketed to Enable Consumers to Copy DVDs.**

5       58.   RealDVD is primarily designed or produced for the purpose of circumventing, has

6   only limited commercially significant purpose or use other than to circumvent, and is marketed

7   with knowledge of its use in circumventing CSS and the ARccOS and Ripguard copy protection

8   technologies. *See* Blavin Decl., Exs. 65, 66.

9       59.   A physical DVD disc can be copied an unlimited number of times on an unlimited

10   number of hard drives using Vegas or Facet, such that a DVD disc could be passed around a

11   dormitory, office, or neighborhood and copied on any Facet box or any computer using Vegas.

12   344:17-346:2 (Schumann); 776:24-777:23 (Bishop).  Once a copy is made with RealDVD, the

13   consumer no longer needs the physical DVD to watch the content.

14       60.   Vegas and Facet can copy DVDs that are borrowed and rented from stores.  505:6-

15   13 (Glaser).

16       **5.   Real Knew That Users Valued Copying Rented DVDs More Than Copying DVDs They Owned.**

17

18       61.   Real commissioned focus group studies of potential markets for the RealDVD

19   products in their development stages.  519:19-21 (Glaser).  In a study dated May 29-30, 2008 for

20   the Vegas product, Real noted "[c]oncerns" about the product arising from comments of focus

21   group respondents.  One such concern was that the "[v]alue of 'saving' owned DVDs is less

22   interesting because this content has often been viewed (conversely doing it with rented DVDs

23   raises legality for some respondents)."  Ex. 146 at 10.

24       **6.   Real's Current Restrictions on the Distribution of Copies Exist for Real's Benefit, and Real Can Easily Change Them.**

25

26       62.   A single copy of Vegas or Facet can make unlimited copies of DVDs from a

27   physical DVD disc to one or more computer hard drives or other forms of external storage.

28   300:8-10 (Schumann).  Currently, Real limits the playback of copies of DVDs made with one

1    registered Vegas program to five computers registered under that single user account. 300:3-7

2    (Schumann); 774:3-6 (Bishop).  Real also limits the playback of copies made with a Facet box to

3    the original box with which the copy was made. 451:9-12 (Glaser).

4         63.    A copy of a DVD made with RealDVD can be itself copied an unlimited number

5    of times to an unlimited number of other hard drives. 300:8-10 (Schumann).  Currently, Real has

6    programmed Vegas and Facet so that they decline to play those "copies of copies." 302:5-16

7    (Schumann).  Real's expert, Dr. Felten,

8    

9    

10        Deposition of Edward Felten, dated March 13, 2009 ("Felten Depo."), at 135:13-136:3,

11   136:11-16, 136:18-20, 136:22-25 (Studios' Designations).

12        64.    Real could easily change the number of computers that permit playback of DVDs

13   copied with RealDVD simply by changing a few lines of code, and could remove such a

14   limitation altogether by releasing over the Internet an update of the software. 300:25-302:4

15   (Schumann).  Real could similarly change Vegas or Facet, through an update sent over the

16   Internet, to permit "copies of copies" to be freely played. 303:18-304:24 (Schumann).

17        65.    RealDVD encrypts the copies of DVD data it makes with AES encryption. 201:3-

18   12 (Kelly); 280:3-14 (Schumann).  The master keys to that AES encryption are held by

19   RealNetworks. 391:8-19 (Schumann).  Copies of DVDs made by the RealDVD products can,

20   thus, only be played back by RealNetworks software. 588:13-18, 589:6-11 (Glaser); 282:15-22

21   (Bishop).  Real views the AES encryption used by RealDVD as a format "protected by and

22   owned by Real," and as a "way to leverage" the value of DVDs and "turn that into a portal" for

23   delivering, selling, and renting content "over both the PC" and "IP enabled" video devices. Ex. 3

24   at 25.

25        Basche Depo. at 181:4 - 183:6 (Studios'

26   Designations).

27

28

7. **Potential Third-Party Partners Repeatedly Raised Questions To Real About The Legality Of RealDVD.**

66.     Real met with third parties it wanted to partner with in the release of RealDVD nearly a year before launching RealDVD.  563:17-564:1.  Many of these potential third-party partners expressed concerns to Real about the legality of the RealDVD product.  In December 2007, Rob Glaser, Phil Barrett, and other Real executives met with TiVo.  Ex. 602; 564:22-565:4 (Glaser).  Mr. Barrett reported in a subsequent email that "[m]any, if not most" of TiVo's "questions centered around legal issues."  Ex. 602.  In May 2008, Real employee Martin Schwarz traveled to Asia and met with several potential manufacturers of the Facet box.  566:16-567:3 (Glaser); Ex. 557.  Mr. Schwarz noted in an email describing his meeting with Sharp that its employees told him that Sharp has a "'social responsibility' at least in Japan, to protect copyright laws and not to create tension/friction with the studios," and that they wanted to know if Real "had talked with Hollywood Studios yet and have they accepted the product."  Ex. 557.  *See also* Ex. 556 (Martin Schwartz email summarizing Samsung meeting and questions).

67.     Real did not approach any Studio concerning RealDVD until mid-August 2008, which was three weeks before Real's planned date to launch RealDVD.  570:3-571:15 (Glaser).

E. **RealDVD Removes and Impairs CSS Protections From the Copies That It Makes.**

68.     The copies of DVD content made by RealDVD, in both its Vegas and Facet incarnations, do not include most of the protection provided by CSS, namely, drive-locking, hidden lead-in and sector header areas, authentication, and bus encryption.  Schumann Decl., Ex. A at ¶¶ 55-82.

69.     **Drive Locking.**  Copies of CSS-protected DVD content made to an internal or external hard drive by RealDVD are not protected by CSS drive-locking technology.  The hard drive on which movies are stored is incapable of similarly "locking," and thus encrypted data on such a drive can be immediately accessed.  275:9-21 (Schumann); *see* 786:25-787:4 (Bishop)

70.     **Hidden Lead-in Areas and Sector Headers.**  The keys copied from CSS-protected DVDs to an internal or external hard drive by RealDVD are not protected by CSS

1   hidden lead-in area and sector header technology. RealDVD copies the CSS decryption to a file

2   on the hard drive visible to all users. 769:18-19 (Bishop); 279:4-20 (Schumann); Schumann

3   Decl., Ex. A at ¶¶ 60-65, 71-72. Although RealDVD further encrypts the copied CSS decryption

4   keys, the area in which those encrypted keys are stored is not, itself, hidden or physically

5   inaccessible. 769:17 (Bishop); 281:2-20 (Schumann). This was conceded by Real's expert.

6   769:9-17, 769:20-24 (Bishop). Thus, unlike on a DVD, the encrypted keys are in a file that can

7   be copied and accessed. 280:15-281:20 (Schumann).

8       71.    **Authentication.** Copies of CSS-protected DVD content made to an internal or

9   external hard drive by RealDVD bypass authentication with the DVD drive on playback from the

10  hard drive. Schumann Decl., Ex. A at ¶¶ 72-75. Real's expert admitted this. 769:25-770:7

11  (Bishop). The hard drive to which RealDVD stores movies does not perform any CSS

12  authentication of RealDVD. 784:22-24 (Bishop).

13      72.    **Bus Encryption.** RealDVD removes the protections of CSS bus encryption from

14  the copy made onto the hard drive. On playback, RealDVD does not use CSS bus encryption to

15  obscure the title keys as they are passed from the hard drive to the descrambler. 283:12-285:20

16  (Schumann); 770:13-16 (Bishop); Schumann Decl., Ex. A at ¶¶ 77-82. By removing the

17  protections of bus encryption, ███████████████████████████ and

18  thereby violates the technological requirement that a DVD disc be present during playback of the

19  content. Schumann Decl., Ex. A at ¶¶ 66-68. Real's expert admitted this. 768:9-19, 770:13-15,

20  786:16-17 (Bishop).

21      F.    **RealDVD Avoids, Bypasses and Impairs CSS Protections in the Process of
            Copying DVDs.**

22
23      73.    Not only does RealDVD produce copies of DVD content that has various layers of

24  CSS protections removed, but RealDVD also avoids and bypasses the CSS system in the process

    of making the copy.

25      1.    **No Authorization for Copying DVDs.**

26      74.    Real admits that ██████████████████████████████

27  ██████████████████████████████. Blavin Decl., Ex. 64 at

28

1   9-10 (Response to Interr. No. 6); *id*. at Ex. 25 (at REAL078281); 61:13-14.  Nor has any fact

2   witness or expert identified any such provision.  759:22-760:3 (Bishop).

3       75.     The CSS License expressly disclaims that any implied licenses are granted

4   thereby.  It provides that the "licenses granted herein are the only licenses granted to Licensee,

5   and that no other licenses are granted, expressly, by implication or by estoppel, now or in the

6   future" and "all rights not expressly granted to Licensee under this Agreement in and to CSS and

7   the Proprietary Information are reserved and retained by Licensor."  Pak Decl., Ex. J at § 2.5.

8       76.     Each Studio has consistently and explicitly prohibited the making of permanent,

9   playable copies of CSS-protected DVDs.  Copyrighted DVDs have FBI warnings saying that it is

10  illegal to copy a DVD.  20:6-21.  The packaging of each of the Studios' DVDs likewise states that

11  copying is strictly prohibited.  *Id*.; Blavin Decl., Ex. 69.

12      77.     Commercial movie DVDs have millions of CGMS-D encodings marking the

13  movie as "Copy Never."  Schumann Decl., Ex. A at ¶¶ 109-115.  CGMS-D encodings are part of

14  the fundamental DVD specification and part of the DVD content protection system.  417:5-21

15  (Schumann); 982:18-983:3 (Dixon).  The purpose of CGMS-D encodings is to indicate to DVD

16  devices whether copies are permitted of the content stored on the DVD.  417:25-418:1

17  (Schumann).  RealDVD ignores these encodings, and in fact makes copies of them when it copies

18  the DVD.  418:2-12 (Schumann).

19

20  Blavin Decl., Ex. 5 (Buzzard Depo.) at 178:2-180:14; *id*., Ex. 8 (Hamilton Depo.) at 178:24-

21  180:19.

22      **2.      Violations of CSS Technical Specifications.**

23      78.     In the process of copying DVD content, RealDVD violates numerous specific

24  requirements of CSS set out in the technical specifications.  For example, when RealDVD plays

25  back video content:

26          a)

27                                                              and 3.2 and Procedural

28  Specification, §§ 1.13, 1.23-1.25, 1.44, and 1.45;

1    b) ██████████████████████████████████████

2    ████████████████████████████████████

3    ██████████;

4    c) the authentication software module does not ensure that the Descrambler

5    receives the Disc Key and Title Key data from the DVD Drive only if the authentication process

6    is performed correctly and successfully as required by Procedural Specification, § 6.2.3; and

7    d) ████████████████████████████████

8    ████████████████████████████████████

9    ████████████████████████████████████

10   ████████████████████████████████████

11   ██████████.

12   79.    Several of these violations were discussed in detail during the preliminary

13   injunction hearing.  These include the following two violations:

14   **a.    RealDVD Violates the CSS Specifications by** ████████

15   ████████████████████████████████████

16   80.    ████████████████████████████████

17   ████████████████████████████████████

18   ████████████████████████████████. 177:5-9
     (Kelly).

19   81.    ████████████████████████████████

20   ████████████████████████████████████. 184:5-16 (Kelly).

21   ████████████████████████████████████

22   ████████████████████████████████████.":

23   ████████████████████████████████████

24   ████████████████████████████████

25   ████████████████████████████

26   ████████████████████████████

27   Pak Decl., Ex. N (§ 2) (emphases added).

28

82.     The RealDVD products violate these provisions.  As both Professor Bishop and

Mr. Bielman testified, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ 1048:19-

23 (Bielman); 1146: 6-10, 1147:19-22 (Schumann). ███████████████████████████

████████████████████████████████████████████

*See* Ex. D; 1145:23-1146:3 (Schumann).

83.     Professor Bishop's only response is that ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

. 1134:15-123 (Bielman); 220:2-9 (Kelly); 1149:15-17 (Schumann).

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

.

84. ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

.

85.    Real's addition of an extra layer of AES encryption does not obviate the need to follow the specifications. ████████████████████████

████████████████████████████████████████████.

**b.    RealDVD Violates the CSS Specifications by** ████████████.

86.    ████████████████████████████████████████████

████████████████████████████████████████████

87.    ████████████████████████████████████████████

████████████████████████████████████████████

88.    ████████████████████████████████████████████

████████████████████████████████████████████

**G.    Post-*Kaleidescape* Proposed CSS Amendments.**

89.    DVD CCA members proposed amendments to the CSS License agreement following the *Kaleidescape* decision because, ████████████████████

1

2

3                           . Parsons Depo. at 56:11-57:1, 78:20-79:2, 79:19-

4    80:11 (Studios' Designations).

5         90.    DVD CCA members withdrew proposed amendments to the CSS License

6    following the *Kaleidescape* decision because

7

8                           *Id*. at 91:13-21, 92:4-12, 95:9-14, 95:18-96:7.  As Mr. Parsons, a

9    Senior Vice President of Advanced Product Development at Pioneer and a board member of the

10   DVD CCA, *id*. at 10:1-10:23, testified,

11

12

13

14                           *Id*. at 95:18-96:7.

15   **H.    The ARccOS and RipGuard Copy Protection Schemes.**

16        91.    The Studios employ supplementary technologies that provide a level of copy

17   protection in addition to that provided by CSS for commercially-released DVDs.  306:23-307:3,

18   307:14-17 (Schumann); Schumann Decl. Ex. A ¶ 84; Hollar Decl., Ex. A at ¶ 11; Declaration of

19   Jeffrey S. Miller in Support of Studio Plaintiffs' Motion for a Preliminary Injunction, dated

20   March 19, 2009 ("Miller Decl."), ¶¶ 4-5.  These technologies include ARccOS, a copy-protection

21   system developed and marketed by Sony DADC, and RipGuard, a similar copy-protection system

22   developed and marketed by Macrovision, Inc.  Schumann Decl., Ex. A at ¶ 85; Hollar Decl., Ex.

23   A at ¶ 11.

24        92.    ARccOS and RipGuard are used and marketed solely for copy-protection.  311:2-3

25   (Schumann).

26        93.

27

28

94.     In the normal course of their operation, both ARccOS and RipGuard prevent, restrict or otherwise limit the copying of protected DVDs.  307:24-308:4 (Schumann); Schumann Decl., Ex. A ¶¶ 89; Hollar Decl., Ex. A at ¶¶ 21-23.  These copy-protection systems make the copying of a protected DVD either an impossible or an extremely burdensome process — resulting in the computer freezing or stalling; the failure of the illegal copy program; or the extension of the length of the time it takes to copy a movie for numerous hours.  307:24-308:4 (Schumann); Hollar Decl., Ex. A at ¶ 22.

95.     Unlike with CSS, manufacturers of both software and consumer-electronic DVD players do not need a license or to have any special knowledge of ARccOS or RipGuard in order to play DVDs protected with those technologies.  309:14-310:1 (Schumann).  Rather, the technologies are designed to be transparent to a human being watching a movie with any standard DVD player.  They instead take advantage of the differences between how a human watches a DVD and the behavior of DVD copying programs to prohibit or impede the functionality only of the latter.  309:18-310:17 (Schumann); 866:3, 880:18-22, 883:3-11, 972:19-21 (Dixon); Hollar Decl., Ex. B at ¶¶ 14-16.

96.     One of the primary techniques employed by these copy-protection schemes is to insert "bad sectors" on the DVD disc: intentional obstacles placed in DVD data that cause read errors when the sectors are read by a DVD drive, and thus severely impede or prohibit copying of the disc.  307:7-13 (Schumann); 882:5-10 (Dixon); Schumann Decl., Ex. A at ¶ 85; Hollar Decl., Ex. A at ¶ 16.

Schumann Decl. Ex. A ¶ 86; Hollar Decl., Ex. A at ¶¶ 14, 17.

97.     ARccOS and RipGuard also rely on secondary techniques, which interfere with attempts to avoid bad sectors by "traversing" or intelligently navigating the program chain information on a DVD.  308:17-309:13 (Schumann); Schumann Decl. Ex. A ¶ 87; Hollar Decl., Ex. A at ¶ 18.

[redacted]

.  358:22-359:1, 366:18-22 (Schumann); Schumann Decl., Ex. A at ¶ 87; Hollar Decl., Ex. A at ¶ 18.  They are sometimes referred to as "logical" errors.  882:25 (Dixon).

[redacted]

1176:24-1177: 6, 1168:2-1169:16 (Schumann); Schumann Decl. Ex. B ¶ 45.

99.

[redacted]

.  1168:20-1169:16 (Schumann).

100.    Both ARccOS and RipGuard-protected discs are certified compliant with the DVD Forum Logo License.  Hollar Decl., Ex. A at ¶ 37 (and Ex. F thereto); Ex. B ¶ 4 (and Ex. G thereto).

**I.      ARccOS And RipGuard Are Effective Copy-Control Technologies.**

101.    Douglas Dixon, Real's expert witness, contested the significance of the additional time required to copy DVDs protected by ARccOS and RipGuard.  But his testimony was contradicted by Real's own documents, as well as by the credible testimony of the Studios' experts.  895:21 (Dixon); 319:13-15 (Schumann); Hollar Decl., Ex. A at ¶ 22.  [redacted]

1

2

3

4

5 . Ex. 652.

6 Furthermore, Mr. Dixon had no adequate basis for his opinion: he never tested any protected

7 DVDs, 925:21-23 (Dixon), never tested such (or any other) DVDs on the Facet or Vegas

8 products, 925:17-23, 926:2-5, 930:14-16, 961:18-24 (Dixon), and did not include any basis for his

9 time-estimate in his expert reports, 891:8-893:16 (Dixon).  He also admitted he is not an expert in

10 copy protection, and conducted no tests to develop his opinions.  952:13-14, 925:17-23, 926:2-5,

11 925:21-23 (Dixon).

12      102.

13

14

15 . Schumann Decl., Ex. A at ¶ 90; Hollar Decl., Ex. A at ¶¶ 21-23, 28-31.

16

17

18 . 976:19-25 (Dixon); Hollar Decl.,

19 Ex. A at ¶ 30.

20      103.    The experience of RealNetworks' engineers demonstrates the effectiveness of the

21 technologies.  313:2-5, 332:10-17 (Schumann); Schumann Decl., Ex. A at ¶ 90.  Documents and

22 deposition testimony indicate that engineers for both Facet and Vegas struggled — even during

23 the pendency of the Temporary Restraining Order — to find ways to effectively and efficiently

24 copy DVDs despite these protection systems — each spending numerous months working to find

25 solutions.  332:18-333:1, 333:24-340:1 (Schumann).

26      104.    The Program Manager for the Facet project, Nicole Hamilton, testified that

27

28

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1  ██████████████████████████████████" Blavin Decl., Ex. 8 (Hamilton Depo.) at

2  67:5-68:2.

3      105.  The Facet team spent over a year developing the functionality, beginning in or

4  before October 2007 and using three different engineers after the first engineers' efforts failed.

5  1108:10-15, 1109:16-1110:7, 1121:21-1122:24 (Bielman).  Changes were being made to the

6  functionality as late as February 2009.  1113:19-24 (Bielman).  Mr. Bielman recognized that the

7  development of such code was a "non-trivial" problem, which required the staffing of the team's

8  most skilled engineer.  1111:6-14 (Bielman).

9      106.  Jeffrey Buzzard, the Vegas engineer ████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ██  Blavin Decl., Ex. 5 (Buzzard Depo.) at 160:20-161:1, 175:20-176:10.

13      107.  The Vegas team ultimately turned to Ukrainian developers of "DeCSS cracker"

14  programs to seek assistance in the development of their functionality relating to circumventing

15  ARccOS.  333:24-340:1.  The developers the Vegas team turned to also were unable to

16  circumvent the ARccOS and RipGuard technologies.  Ex. 76; 335:1-11.

17      108.  ████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████  Schumann Decl., Ex. A at ¶ 90; Hollar Decl., Ex. A

20  at ¶ 46; *see also* Declaration of Anthony J. DeNatale in Support of Response to Motions for

21  Preliminary Injunction ("Natale Decl.") ¶ 7 (████████████████████████).

22      109.  Real's own online message boards indicate that Vegas engineers have continued to

23  research new versions of RipGuard, and were planning on releasing software updates designed to

24  circumvent newly-released versions upon the lifting of the TRO. 1174:10-13 (Schumann); Ex.

25  228 (1169:21).

26      110.  Facet, likewise, as of the Studio experts' testing of the product in February 2009,

27  remained incapable of copying several discs protected by these systems.  311:7-17, 316:6-317:2

28  (Schumann); Schumann Decl., Ex. A at ¶ 90.

111. The same DVDs that impeded or prohibited copying in the Vegas and Facet systems could be played normally on those and other DVD player systems. 311:20-22 (Schumann). *See also* DeNatale Decl. ¶¶ 6, 8.

**J.  RealNetworks Knew ARccOS and RipGuard Are Copy Protection Schemes and Worked to Intentionally Develop Circumvention Technologies.**

112. RealNetworks maintained, both in discovery and in its Preliminary Injunction briefing, that ████████████████████████████████████. Opp. at 16:14-15. ████████████████████████████████████████████████; Blavin Decl. Ex. 1 (Barrett Depo.) at 124:15-17, 125:13-14.

113. Under the Court's March 5, 2009 Order regarding the Studios' Motion for Sanctions for Spoliation of Evidence, the Court will "infer from communications between Real's Jeff Chasen and the CEO of Rocket Division Software that Real was aware of the non-CSS technologies, ARccOS and Ripguard." Dkt. No. 316 at 19:10-12. The Court's inference is fully borne out by the evidence and in fact supported by Real's own witnesses during the preliminary injunction hearing. 1017:8-11 (Bielman).

114. ████████████████████████████████████████████████ ████████████████████████████████████████████

115. RealNetworks engineers had an understanding of ARccOS and RipGuard during the development of the RealDVD products. 1017:8-11 (Bielman). ████████████████████████████████████████████████ ██████████████████ 315:10-16 (Schumann); Blavin Decl., Ex. 5 (Buzzard Depo.) at 158:14-159:4, *id.*, Ex. 11 (Schwarz Depo.) at 78:8-14; *id.*, Ex. 8 (Hamilton Depo.) at 64:14-19. ██████████████████████████████████████ ██████ 316:6-317:2, 317:19-318:22 (Schumann); Ex. 5 (315:17); *see also* Ex. 233 (317:7).

116. ████████████████████████████████████████████████ ████████████ 313:14-21, 314:1-6 (Schumann); Schumann Decl. Ex. A ¶ 85; Blavin Decl.,

1   Ex. 5 (Buzzard Depo.) at 126:17-127:9, *id.*, Ex. 3 (Bielman Depo.) at 29:18-30:6; *id.*, Ex. 2

2   (Basche Depo.) at 106:8-11.

3       117.   Real's official specification for Vegas explains: "ARccOS is a system used on

4   some DVDs that creates corrupted sectors on the DVD, which cause the copying of these sectors

5   to produce errors.  Normal DVD players never read these sectors since their DVD navigators

6   follow a set of instructions know[n] as the program chain, which is encoded on the disc and does

7   not reference the corrupted sectors."  Ex. 50A (at REAL000620).

8       118.   "ARccOS" also was used by the Facet team to refer to the code responsible for

9   dealing with discs which were protected by these technologies, and that term accordingly appears

10  in comments to their source-code. 1082:6-8, 1025:18-21 (Schumann).

11      119.   A specification for Facet from the official Facet Wiki has a dedicated section for

12  "Copy Protection Schemes," and indicates that "RealDVD will properly support playing and

13  saving of DVDs authored with the following copy protection schemes," listing "ARccOS,"

14  "RipGuard," and "ProtectDISC DVD."  Ex. 530 (1091:10-16) (at REAL137359); 1093:7-11

15  (Bielman).

16      120.   Nicole Hamilton, the Project Manager for Facet,



18                              Blavin Decl., Ex. 8 (Hamilton Depo.) at 75:2-77:7.  She

19  likewise testified

20                              .  *Id.* at 78:19-22.

21      121.

22                              .  *See* Blavin Decl., Ex. 23 (at

23  REAL078804, ¶ 15) ("                              ); Blavin Supp. Decl., Ex. 9

24  (at REAL074747) ("

25                              "); Blavin Decl.,

26  Ex. 29 (at REAL065558) (

27        ).

28

**K.     RealDVD's Use To Circumvent ARccOS and RipGuard.**

122.    Both versions of the RealDVD product (Vegas and Facet) are used to remove, bypass, avoid, and/or remove technological protection measures associated with ARccOS and RipGuard.  341:10-17, 341:18-342:13 (Schumann).

123.    RealNetworks offered no expert opinion on whether Vegas or Facet circumvent ARccOS and RipGuard.  Mr. Dixon disclaimed any opinion on circumvention, 935:2-4, 979:3-5 (Dixon), and furthermore had no basis for such testimony: he did not use or test the Vegas or Facet products, 930:14-16, 961:18-24 (Dixon), he had never seen the Facet product, 961:23-24 (Dixon), he did not review either product's source code, 930:9-10, 961:16-17 (Dixon), he was not given any documents or technical specifications by RealNetworks, 927:11-19, 928:16-19, 929:4-6 (Dixon), and he never spoke with RealNetworks' engineers before forming his opinions, 929:16-18 (Dixon).  He disclaimed any knowledge of specifics of how either the Vegas or Facet product dealt with ARccOS, RipGuard, or errors, 926:18-21, 934:7, 960:23-25, 961:16-962:8 (Dixon), and he could not correctly identify the method that Vegas uses to copy DVDs, 932:25-933:2 (Dixon).  Dr. Bishop provided no opinion about ARccOS and RipGuard.

**1.     Vegas Avoids, Bypasses and/or Impairs Protections Associated with ARccOS and RipGuard.**

124.    ██████████████████████████████████████████████████████████████████████████████ ████████████████.  Schumann Decl., Ex. A at ¶ 92; Hollar Decl., Ex. A at ¶ 40.  Vegas alters its copying behavior on detection of read errors to detect and then intelligently skip over ARccOS and RipGuard protections.  Schumann Decl., Ex. A at ¶ 92; Hollar Decl., Ex. A at ¶ 43. ████████████████████████████████████████████████████████.  Ex. 50A (at REAL000620).

125.    In particular, in "Save" mode, if Vegas encounters an area of read errors it will probe the cell it is copying to determine if the cell has further read errors — indicating an ARccOS/RipGuard cell.  If not, it will continue copying in a linear fashion.  320:6-12 (Schumann).  However, if Vegas determines that it is dealing with an ARccOS/RipGuard cell, Vegas will skip the rest of the cell, which could otherwise result in the loss of minutes of video.  320:13-321:3 (Schumann); Schumann Decl., Ex. A at ¶ 95; Hollar Decl., Ex. A at ¶ 43.

126. Vegas's behavior is inconsistent with the handling of accidental scratches or other unintentional read errors. 315:5-13; 319:7-11 (Schumann); Schumann Decl., Ex. A at ¶ 93, Ex. B at ¶ 39; Hollar Decl., Ex. A at ¶ 45.

Schumann Decl., Ex. A at ¶ 94; Hollar Decl., Ex. A at ¶¶41-42.

Schumann Decl., Ex. A at ¶ 94; Hollar Decl., Ex. A at ¶ 42.

319:2-4, 320:23-321:2 (Schumann); Schumann Decl., Ex. B at ¶¶ 34-36, 38; Hollar Decl., Ex. A at ¶ 42.

127. Additionally, if the code in "Save" mode designed for ARccOS and RipGuard is accidentally triggered by an unlikely series of scratches, it will result in the loss of significant video data from the copied movie — up to several minutes. 321:7-13 (Schumann); Schumann Decl., Ex. A at ¶ 98; Hollar Decl., Ex. A at ¶ 43.

128. Vegas code and documents from Vegas engineers further indicate Vegas's deliberate attempt to circumvent ARccOS and RipGuard. 322:17-21 (Schumann); Schumann Decl., Ex. A at ¶ 99. Comments in Vegas's source-code specifically reference "ARccOS." 319:12-17 (Schumann). Additionally, the formal specification document for Vegas itself — "Specification: RealDVD" identifies ARccOS as copy-protection, notes that Vegas's "normal method of copying" a disc will *not work* on ARccOS-protected discs, and indicates that the code attempts to distinguish such discs from scratched discs. Ex. 50; 323:3-325:5 (Schumann).

### 2. Facet Avoids, Bypasses and/or Impairs Protections Associated with ARccOS and RipGuard.

129. The Facet product is also specifically designed to avoid, bypass and/or impair ARccOS and RipGuard. Schumann Decl., Ex. A at ¶ 102.

1  ███████████████████████████████.  Schumann Decl. Ex. A, at ¶¶ 102-106, Ex. B,

2  at ¶¶ 40-42.

3      130.    Facet uses two approaches to copying. 1009:13-16 (Bielman).  Facet begins

4  copying a disc linearly, sector-by-sector. 326:1-3 (Schumann); 1009:13-16 (Bielman).  However,

5  if it encounters a minimum threshold of read errors (currently set at 10), it will throw out the copy

6  it had begun to make and restart from the beginning of the disc using a dramatically different

7  copying mechanism, which spiders through the DVD menu and playback structures to avoid

8  copy-protected sectors. 326:8-13 (Schumann); 1104:2-4 (Bielman); Schumann Decl., Ex. A at

9  ¶ 104.  RealDVD called this project "ARccOS" until shortly before this litigation was filed.

10  1082:2-8 (Bielman).  It is now called "DVD Walk."

11      131.    Mr. James Bielman had primary responsibility for the development of DVD Walk.

12  1063:13-16 (Bielman).  He testified that DVD Walk was specifically developed to copy ARccOS

13  and RipGuard-protected discs. 1071:3-18 (Bielman).

14      132.    Mr. Dixon testified that he believed ARccOS and RipGuard were not effective

15  against rippers that copied as a byproduct of playing a movie, because access to the movie must

16  be left available to players. 969:23-24 (Dixon).  However, he did not know whether DVD Walk

17  actually copied movies during and as a byproduct of playback. 971:15-18 (Dixon).  Similarly,

18  Real has argued that DVD Walk is simply following the "DVD playback protocols," in such a

19  way that Facet "never . . . encounter[s] ARccOS and RipGuard." 64:7-8 (Mr. Scott).  However,

20  by "never encountering" ARccOS and RipGuard, which would otherwise be encountered during a

21  standard copying process, DVD Walk thereby "avoids" or "bypasses" these copy protection

22  schemes.  Moreover, as indicated by the testimony of Mr. Bielman and the Studios' expert Mr.

23  Schumann, DVD Walk's behavior is not consistent with simply "playing" the movie. 329:15

24  (Schumann); 1104:6-1105:6 (Bielman); Schumann Decl., Ex. B at ¶ 44.  As Mr. Bielman

25  testified, DVD Walk does not play the movie at all. 1015:1-2 (Bielman).  Additionally, DVD

26  Walk does not simply follow the video output as it is shown to a user; a user does not tell DVD

27  Walk where to go. 1105:3-6 (Bielman).

28

133.    Numerous techniques employed by ARccOS and RipGuard are designed to prohibit exactly this kind of attempt to avoid "bad sectors" by traversing or spidering the disc like DVD Walk. 358:22-359:1, 360:18-22, 362:3-363:7, 366:18-22 (Schumann); Schumann Decl. Ex. B ¶ 45; Hollar Decl. Ex. B ¶ 14-16. These techniques take advantage of the differences between how a person accesses a DVD while watching it and how ripping software accesses a DVD. 309:18-310:17, 358:22-359:1, 366:18-22 (Schumann); Hollar Decl., Ex. B at ¶¶ 14, 16.

134.    Documents and testimony indicate that RealNetworks' engineers struggled with exactly these techniques, and implemented changes to attempt to overcome them. 330:2-20 (Schumann); 1117:20-21, 1119:20-25, 1020:23-1021:6, 1022:17-24 (Bielman); Schumann Decl., Ex. B at ¶ 45. Thus, although Real acquired a complete DVD navigation engine from a third party, 1025:13-17 (Bielman), it spent well over a year designing its "ARccOS" or "DVD Walk" implementation, for the express purpose of handling the copying of ARccOS and RipGuard-protected discs. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████ 326:18-22 (Schumann); Schumann Decl., Ex. A at ¶ 105. Mr. Bielman testified that he specifically changed DVD Walk to be able to deal █████████████ encountered during copying. 1117:20-21, 1119:20-25, 1022:17-24 (Bielman).

135.    The behavior of DVD Walk is likewise inconsistent with the handling of accidental scratches or other unintentional read errors. 327:14-328:10 (Schumann); Schumann Decl., Ex. B at ¶¶ 40-43. Mr. Bielman, who was primarily responsible for the development of DVD Walk, testified (in direct contradiction of Real's expert Mr. Dixon) that DVD Walk does not help with scratches. 1081:14-18 (Bielman). This is consistent with the code as a whole: ████████ █████████████████████████████████████████ Schumann Decl., Ex. B at ¶ 40. Thus, Facet's engineers apparently ignored accidental errors altogether, while spending months developing code designed for circumventing and bypassing ARccOS and RipGuard. 332:18-333:1 (Schumann); Schumann Decl., Ex. B at ¶ 42.

136.   Additionally, if the code in "Save" mode designed for ARccOS and RipGuard is triggered by a scratch, it will *not* work to avoid the scratch.  To the contrary, on a disc not protected by ARccOS and RipGuard, the same area of data will be covered by both the default and the DVD-Walk methods of copying — and thus any scratch will be ultimately encountered by both, albeit perhaps at a different time.  327:14-328:10 (Schumann); 1081:14-18 (Bielman).

### 3.   Both Vegas and Facet Remove Technological Protections Associated with ARccOS and RipGuard.

137.   Both Vegas and Facet remove the protections of ARccOS and RipGuard, producing copies of DVDs that no longer have the "bad sectors" that protected them in DVD form.  341:18-342:13 (Schumann).  Thus, subsequent copying of previously-protected DVD Movies will not be impeded by ARccOS or RipGuard.  *Id.*

### L.   Marking Rental DVDs.

138.   Aodan Coburn, Executive Vice President of Worldwide Operations at Sony Pictures, testified that



Deposition of Aodan Coburn, dated February 17, 2009 ("Coburn Depo."), at 20:20-6, 214:8-24, 217:8-218:21 (Studios' Counter-designations).

139.   Marking DVDs prospectively as "rented" would do nothing to address the copying of billions of existing legacy DVDs, such as owned DVDs passed between individuals, 580:12-23 (Glaser).

### M.   Real's Use And Concealment Of Evidence Regarding Illegal Code And Hackers.

140.   Beginning in November 2007, Jeffrey Chasen, the Program Manager of the Vegas team, engaged a firm in Ukraine that was offering illegal ripping products to assist in the Vegas team's efforts to circumvent ARccOS and RipGuard.  333:6-340:13 (Schumann).  These developers of illicit software worked for several months, through January 2008, searching for methods for circumventing "ARccOS." .

141. Numerous times during his correspondence with these programmers, Mr. Chasen was offered "deCSS Cracker" and "CSS grabber" products. Ex. 76 (at REAL077776, 77). The Ukrainian engineers likewise insisted that their approach was "not gonna work" without a "CSS decoder." *Id.* (at REAL077777) Mr. Chasen responded only by insisting: "Trust me, we know what we are doing. We jave [sic] all the CSS stuff handled . . . can't say more in the email." *Id.* (at REAL077776).

142. On December 24, 2007, Anton Kolomyeytsev forwarded Mr. Chasen a file, "ARccOS.zip," which contained numerous compressed files, including source-code for a program (the PSL2 plugin) designed for circumventing and studying ARccOS and RipGuard-protected DVDs. Ex. 76; 335:12-23 (Schumann). Mr. Chasen subsequently circulated those files internally. 338:18-20 (Schumann).

143. Real prevented the production of the ARccOS.zip file to Defendants, falsely alleging that the file was corrupted by a virus. After the Studios filed a motion for sanctions for spoliation of evidence, on March 4, 2009, RealNetworks finally produced the ARccOS.zip file. *See* Memorandum and Order Re: Defendants' Motion for Sanctions for Spoliation of Evidence, Dkt. No. 316, at 17:25-18:6.

144. The ARccOS.zip file contained numerous files, including open source software that integrates with a particular ripper to analyze discs with ARccOS and RipGuard, attack and try to overcome those protections. 337:17-23, 338: 21-339:1 (Schumann). In addition,

[REDACTED]

. Ex. 230; 337:24-338:8; 339:4-340:13 (Schumann).

145. [REDACTED]

1    **N.    The _Real v. Streambox_ Litigation.**

2        146.    This lawsuit is not Real's first experience with the DMCA.  On December 21,

3    1999, Real filed an action in the Western District of Washington alleging that a company called

4    Streambox violated the DMCA by distributing and marketing products known as the Streambox

5    VCR and the Ripper.  _RealNetworks, Inc. v. Streambox, Inc._, 2000 WL 127311 at *1 (W.D.Wash.

6    Jan. 18, 2000).  Real brought DMCA claims under section 1201(a)(2) and 1201(b)(1) and sought

7    a TRO and preliminary injunction.  _Id._

8        147.    Real provided Internet streaming of copyrighted audio and video files in a format

9    called "RealMedia."  _Id._ at *2-3.  The RealMedia files were protected through various Real

10   proprietary measures, including a "Copy Switch."  _Id._  If the "Copy Switch" was turned "on" by

11   the content owner, the content could be downloaded (_i.e._, copied) as well as streamed.  If the

12   "Copy Switch" was turned "off," then the content could only be streamed.  _Id._

13       148.    Streambox distributed a product called the "Streambox VCR," which enabled end-

14   users to circumvent Real's protection and make copies of the RealMedia content files.  _Id._ at *4.

15       149.    Streambox's "primary defense" to Real's DMCA claims was that under _Sony_

16   _Corp. of Am. v. Universal City Studios,_ 464 U.S. 417 (1984)**,** the Streambox VCR allowed

17   consumers to make "fair use" copies of RealMedia files.  _Streambox_, 2000 WL 127311 at *8.

18       150.    Real repeatedly argued to the district court in the _Streambox_ that any end-user's

19   fair use defense was no defense for Streambox under the DMCA.  Blavin Decl., Ex. 68 at 3-5;

20   Supp. Blavin Decl., Ex. 11 (at 9:5-12; 19:12-15; 61:15-20; 64:12-14).

21       151.    The district court agreed with and adopted Real's position, and it rejected

22   Streambox's reliance on the fair use defense as a defense to DMCA liability.  2000 WL 127311 at

23   *8.

24   **O.    The Injury To The Studios Caused By RealDVD.**

25       152.    Currently, consumers can purchase newly-released Studio movies on DVD at an

26   average cost of approximately $18.50.  Declaration of Michael Dunn in Support of _Ex Parte_

27

28

1    Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re:

2    Preliminary Injunction Thereof, dated September 29, 2008 ("Dunn Decl."), ¶ 4.

3            153.    Alternatively, consumers can rent a movie for a limited time for approximately

4    $3.25.  *Id.*

5            154.    In the aggregate, the Studios received revenues of approximately $12.5 billion

6    from the sale of DVDs (net of returns) in 2007.  By 2012, that figure is projected by the studios to

7    grow to approximately $14.5 billion.  *Id.*, ¶ 11.

8            155.    In 2007, the Studios, in the aggregate, received revenues of approximately $2

9    billion from outlets that rent DVDs.  By 2012, that figure is projected by the studios to grow to

10   approximately $2.5 billion.  *Id.*, ¶ 12.

11           156.    All of the Studios currently offer movies through one or more internet download

12   services.  The typical price paid by consumers to purchase a newly-released movie from one such

13   service (iTunes) is $14.99, or they can rent such a movie (*i.e.,* download it and watch it for a

14   limited period of time) for $3.99.  *Id.*, ¶ 13.

15           157.    In the aggregate, the Studios received revenues of more than $200 million from

16   internet download services in 2007.  By 2012, that figure is projected by the studios to grow to

17   approximately $1 billion.  *Id.*, ¶ 14.

18           158.    All of the Studios currently distribute movies through video-on-demand and pay-

19   per-view services, which are offered by cable-TV operators and others.  The average price that

20   consumers pay to watch a movie through such services is approximately $4.  *Id.*, ¶ 15.

21           159.    In the aggregate, the Studios received revenues of approximately $600 million

22   from video-on-demand and pay-per-view services in 2007.  By 2012, that figure is projected by

23   the studios to grow to approximately $1 billion.  *Id.*, ¶ 16.

24           160.    The Studios offer consumers a relatively new product called "Digital Copy."

25   "Digital Copy" versions of DVD movies are sold, at a higher cost than the regular version of the

26   same movie, with an extra disc containing additional features.  One of the features of the extra

27   disc is the ability to place it in a computer's DVD drive and copy the movie to a computer's hard

28   drive.  *Id.*, ¶ 17.

161.    Both Facet and Vegas compete directly with the studios' "Digital Copy" product, in that they allow consumers to download the contents of a DVD to their hard drive. 450:6-10 (Glaser); Dunn Decl., ¶ 17; 450:6-22; Declaration of Timothy F. Bresnahan, dated March 18, 2009 ("Bresnahan Decl."), ¶ 9.

162.    The presence in the market of either Facet or Vegas would provide consumers with a strong financial incentive to download the contents of DVDs to their hard drive for free rather than purchasing the Studios' "Digital Copy" product, causing the Studios to lose revenues and profit. Dunn Decl., ¶ 24.

163.    The presence in the market of either Facet or Vegas would cause a significant number of consumers to download the contents of DVDs to their hard drive using those products rather than purchasing the studios' "Digital Copy" product, thus causing the Studios to lose revenues and profit. *Id.* at ¶ 24.

164.    The presence in the market of either Facet or Vegas would provide consumers with a strong financial incentive to rent a DVD movie for $3.25 and make a perfect permanent copy, or to borrow the DVD for free and make a perfect permanent copy. In either case, the Studios will be harmed by a loss of revenue and profit. *Id.*, ¶ 22.

165.    The presence in the market of either Facet or Vegas would provide consumers with a strong financial incentive to copy a DVD for free (or, in the case of a rental, for $3.25), rather than purchase or rent its content through online download services, through video-on-demand or pay-per-view services, causing the Studios to lose revenues and profit. *Id.*, ¶ 23.

166.    Both Facet and Vegas are likely to be used by a number of consumers to copy the content of DVDs they own. 447:7-10, 458:1-4, 518:8-12 (Glaser); Exs. 234, A.

167.    Both Facet and Vegas are likely to be used by a large number of consumers to copy the content of DVDs that they rent or borrow. Dunn Decl., ¶ 22. Real's own focus group studies show that consumers place great value on copying rental DVDs. Ex. 146 at 10. Neither product can differentiate between owned DVDs, on the one hand, and rented or borrowed DVDs, on the other. 455:19-25, 504:6-11 (Glaser).

168.   The purported "warnings" against copying rented or borrowed DVDS conveyed by RealNetworks on its RealDVD website, and by the Facet and Vegas software, are likely to be ineffective with respect to a significant number of consumers.  Ex. 146 at 10; Blavin Decl., Ex. 40.

169.   Based on the foregoing, the presence in the market of either Facet and Vegas would likely cause great injury to the Studios in terms of lost revenues and profits.  Dunn Decl., ¶¶ 21-25.

170.   Based on the nature of the entertainment business, it would be difficult to measure in dollar terms what portion of a decline in DVD purchases is a result of copying by RealDVD users as opposed, for example, to fluctuations in the economy, competing entertainment options, consumer tastes and desires, or of any of a number of other factors.  *Id.*, ¶ 25.

171.   Such quantification of harm would be even more difficult in connection with newer products and distribution channels such as "Digital Copy" purchases, video-on-demand purchases or digital download purchases, as they are nascent markets.  *Id.*, ¶ 26.

172.   Both Facet and Vegas pose yet another type of significant harm to the Studios' business, in that they are likely to change consumers' perceptions about what is lawful, and thus their behaviors.  *Id.* at ¶ 27.

173.   RealNetworks is a well-known and seemingly-legitimate company, whose existing products have broad penetration among computer users.  440:21-444:11 (Glaser).

174.   The "ripper" products currently available on the Internet are offered by companies that do not bear the same indicia of legitimacy as RealNetworks.  Blavin Decl., Ex. 45 (at REAL082718); *id.*, Ex. 7 (Coppinger Depo.) at 56:4-57:20; *id.*, Ex. 47 (at REAL064087).

175.   Many of the "ripper" products currently available on the internet are difficult to use, and pose security threats to consumers' computers.  Blavin Decl., Ex. 23 (at REAL078801); *id.*, Ex. 60 (at REAL106519, REAL106525); *id.*, Ex. 59 (at REAL106084); *id.*, Ex. 7 (Coppinger Depo.) at 56:4-57:20.

176.    RealDVD is simple to use, and its interface is designed to be very appealing to consumers -- particularly to consumers who want to build "virtual libraries" of movies and TV shows.  445:6-15; 461:19-465:19; 518:8-12 (Glaser).

177.    Real holds its Facet and Vegas products out as being "legal."  Exs. 234, A.

178.    As testified to by Real's own CEO, consumer attitudes with respect to digital entertainment products change quickly, based on the presence of products in the market.  450:16-22 (Glaser).

179.    Thus, the presence in the market of Facet and Vegas is likely to cause a significant number of consumers to believe that making permanent copies of DVDs onto their hard drives is "legal."  Dunn Decl., ¶ 27.  Real's "legal copying meme" had already "taken hold" in just the few weeks leading up to the TRO.  Blavin Decl., Ex. 50.

180.    If, following a trial, the Court concludes that Facet and Vegas are not lawful products -- as it concludes below is likely -- consumers will have been exposed in the interim to an inaccurate message that threatens to change their perception of what can be done legally with DVDs.  Such damage is likely to be impossible to measure.  *Id.*

## II.

## PROPOSED CONCLUSIONS OF LAW

### A.    Standard For Preliminary Injunctive Relief.

181.    The Court may issue a preliminary injunction on a showing of "(1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the moving party's] favor."  *Nike, Inc. v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004) (quotations omitted).

182.    "[T]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Dep't of Parks & Rec. of Calif. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1123 (9th Cir. 2006) (citations omitted).

**B.     The Studios Have Established A Likelihood Of Success On The Merits.**

  **1.  Sections 1201(a)(2) and 1202(b)(1) of the DMCA.**

  183. Section 1201(a)(2) of the DMCA (the "access-control provision") provides:

No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that --

  (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

  (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

  (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2).  Section 1201(a) of the DMCA is referred to herein as the "access-control provision."

  184. 1201(b)(1) of the DMCA (the "copy-control provision") provides:

No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that --

  (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

  (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

  (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

17 U.S.C. § 1201(b)(1).  Section 1201(b) of the DMCA is referred to herein as the "copy-control provision."

  185. The Studios contend that Real's plan to manufacture, offer to the public, provide or otherwise traffic in RealDVD violates both the prohibitions of the access- and copy-control

provisions of the DMCA.  Specifically, the Studios contend that RealDVD is a device for circumventing CSS in violation of the anti-trafficking prohibitions of both the access- and copy-control provisions of the DMCA.  And the Studios contend that RealDVD is also a device for circumventing ARccOS and RipGuard in independent violation of the anti-trafficking prohibition of the copy-control provisions of the DMCA.

> **2.   The Studios Likely Will Succeed On Their DMCA Access- And Copy-Control Claims Regarding CSS.**
>
> **a.   CSS Is A "Technological Measure" That Both "Effectively Controls Access" To Copyrighted Works And "Effectively Protects A Right Of A Copyright Owner."**

186.   CSS is a "technological measure" that "effectively controls access" to copyrighted works, 17 U.S.C. § 1201(a)(2), and that "effectively protects a right of a copyright owner under" Title 17, *id.* § 1201(b)(1).  *See, e.g., 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D. Cal. 2004) ("It is evident to this Court, as it has been to previous courts, that CSS is a technological measure that both effectively controls access to DVDs and effectively protects the right of a copyright holder."); *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 317-18 (S.D.N.Y. 2000) (same), *aff'd, Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

187.   Real's contention that CSS is not an effective technological measure subject to the protections of the DMCA because of the widespread availability of illegal products that make unauthorized use of CSS "master keys" is without merit.  The DMCA itself defines an "effective[]" technological measure to be one that, "*in the ordinary course of its operation,*" either, in the case of an access-control measure, "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work[,]" or, in the case of a copy-control measure, "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title."  17 U.S.C. § 1201(a)(3)(B), (b)(2)(B).  Because the availability of illegal devices does not affect the operation of a technological measure like CSS in its ordinary course, it does not alter the "effectiveness" of CSS for purposes of the DMCA. *See*

1   *321 Studios*, 307 F. Supp. 2d at 1095 ("[T]his is equivalent to a claim that, since it is easy to find

2   skeleton keys on the black market, a deadbolt is not an effective lock to a door.").

3           **b.    RealDVD's Design, Marketing And Use To Circumvent CSS
                     Violates Each Of The Anti-Trafficking Provisions Of Sections
4                    1201(a) and 1201(b)(1).**

5           188.    The DMCA provides that, to "circumvent a technological measure" means, in the

6   case of an access-control measure, "to descramble a scrambled work, to decrypt an encrypted

7   work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure,

8   without the authority of a copyright owner," and, in the case of a copy-control measure,

9   "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure[.]"

10  17 U.S.C. § 1201(a)(3)(A), (b)(2)(A).

11          189.    Under the statutory definition of "circumvention," RealDVD circumvents the

12  access- and copy-control protections of CSS in numerous respects, including:

13                  a.      By making copies of protected content from a DVD to a hard drive or

14  portable drive, RealDVD removes multiple layers of CSS protections, including drive-locking,

15  hidden lead-in and sector header areas, authentication and bus encryption.

16                  b.      RealDVD utilizes the CSS authentication codes and algorithms for an

17  unauthorized purpose, namely, to copy the content from a CSS-protected DVD to a hard drive,

18  thus impairing the technological protection provided by CSS.

19                  c.      RealDVD avoids, bypasses, and/or impairs the CSS protection measures

20  proscribing █████████████████████████████████████████████████████████████████

21  ████████████████.

22                  d.      Real DVD avoids and/or bypasses the CSS protection measure requiring

23  ██████████████████████████████████████████

24          190.    There is no "authority of the copyright owner" for any of the foregoing actions

25  enabled through RealDVD "to avoid, bypass, remove, deactivate, or impair" the access-control

26  measures of CSS.  17 U.S.C. § 1201(a)(3)(A).  In fact, each Studio has consistently and explicitly

27  made it clear that it does not authorize anyone to make permanent, playable copies from DVDs

28  that the Studio protects with CSS.  This is clear, for example, from the packaging in which each

1   Studio's DVDs are enclosed, as well as the FBI warning that each Studio includes at the

2   beginning or end of their copyrighted content on a DVD.  Moreover, commercial DVDs also are

3   encoded with CGMS-D encodings, which use "flags" to signal that the content should not be

4   copied, a system that the engineers who designed RealDVD decided to ignore.  The presence of

5   the CGMS-D flags is an additional clear expression by each Studio that copying CSS-protected

6   DVDs is not authorized.

7        191.    Real's contention that the CSS License provides the "authority of the copyright

8   owner" for the foregoing actions enabled through RealDVD is without merit.  In the first place,

9   the actions that Real takes to enable the making of permanent, playable copies of CSS-protected

10  content onto hard drives are in violation of multiple provisions of the CSS License that are

11  designed to prevent exactly that type of copying.  Real cannot purport to find authorization from

12  anyone, including "the copyright owner," in a license that it has materially breached.

13       192.    Even if Real were right that its actions do not breach a prohibition in the CSS

14  License, that fact still would not provide Real with "the authority of the copyright owner" to

15  "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass,

16  remove, deactivate, or impair a technological measure," which is the standard under

17  § 1201(a)(3)(A).  Real admits ███████████████████████████

18  Blavin Decl., Ex. 64 at 9-10 (Response to Interr. No. 6); *id.* at Ex. 25 (at REAL078281); 759:22-

19  760:3 (Bishop).  Real's contention instead is that the "the authority of the copyright owner" may

20  be inferred from the *absence* of a prohibition in the CSS License.  This position is without merit.

21  First, the alleged silence of the CSS License, which is between the DVD CCA and Real – and not

22  between any Studio and Real – cannot overcome each Studio's clear prohibition on end users'

23  making of permanent, playable copies of DVD content.  Second, under federal law, a copyright

24  owner's authorization must be affirmatively granted; such authorization cannot be inferred from

25  the absence of a proscription.  *S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081, 1089 (9th Cir. 1989).

26  Third, Real's argument that authorization can be inferred by implication is not even consistent

27  under the terms of the CSS License itself.  Section 2.5 of the CSS License expressly *disclaims*

28  any implied licenses.  Pak Decl., Ex. J at § 2.5.

193.    Real's contention that the foregoing actions cannot constitute "circumvention" because they are effected through the use of DVD CCA-issued algorithms and keys, and do not involve "breaking" CSS code, is without merit.  Real utilizes CSS-issued authorized algorithms and keys in copying DVDs, but Real uses them for an unauthorized purpose.  That is circumvention, even if Real does not "break" or "crack" any code in the process.  *See 321 Studios*, 307 F. Supp. 2d at 1098; *Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008).

194.    Real's trafficking in RealDVD as a device for circumventing CSS violates all three sub-clauses of Section 1201(a)(2) and Section 1201(b)(1)'s restrictions:  (A) RealDVD is primarily designed or produced for the purpose of circumventing any access- and copy-control protections that may prevent or limit the copying of content on DVDs; (B) RealDVD's only commercially significant purpose is to circumvent access- and copy-control protections found on commercially available DVDs; and (C) Real explicitly markets CSS for use in avoiding and bypassing the access- and copy-control protections found on DVDs.

### 3.    The Studios Likely Will Succeed On Their Copy-Control Claim Regarding ARccOS/RipGuard.

#### a.    ARccOS and RipGuard Are "Technological Measures" That "Effectively Protect A Right Of A Copyright Owner."

195.    ARccOS and RipGuard are "technological measures" that "effectively protect[] a right of a copyright owner under" Title 17.  17 U.S.C. § 1201(b)(1).  In "the ordinary course of [their] operation, ARccOS and RipGuard "prevent[], restrict[], or otherwise limit[] the exercise of a right of a copyright owner under [Title 17]," *id.* § 1201(b)(2)(B), including the copyright owner's exclusive right to reproduce its copyrighted work.  *Id.* § 106(1).  ARccOS and RipGuard, in the ordinary course of their operations, either prevent altogether, or severely limit, the process of copying protected DVD content.

196.    Real's contention that ARccOS and RipGuard are not effective copy-control measures because they do not interfere with the playback of DVD content is without merit.  Real's argument confuses the standard for an access-control measure, which is the subject of 17 U.S.C. § 1201(a), with the standard for a *copy*-control measure.  The latter is the subject of 17

1   U.S.C. § 1201(b), and is the basis for the Studios' DMCA claim regarding ARccOS and

2   RipGuard.  It is clear that ARccOS and RipGuard prevent, restrict or otherwise limit the copying

3   of protected content on DVDs, and that is all that is required.

                   **b.**    **RealDVD's Design, Marketing And Use To Circumvent**

4                               **ARccOS and RipGuard Violates Each Of The Anti-Trafficking**

5                               **Provisions Of Section 1201(b)(1).**

6        197.    The facts set forth above establish that both versions of RealDVD (Facet and

7   Vegas) are used to remove, bypass, avoid, and/or impair technological protection measures

8   associated with ARccOS and RipGuard.

9        198.    Real does not dispute that the Vegas version of RealDVD circumvents ARccOS

10  and RipGuard.

11       199.    With respect to Facet, Real contends that Facet's use of the "DVD Walk" program

12  does not enable circumvention of ARccOS or RipGuard, on the ground that DVD Walk

13  purportedly does not encounter those technological measures.  This contention is without merit.

14  The only reason that someone utilizing Facet to copy content would not encounter ARccOS or

15  RipGuard measures on a DVD protected by one of those technologies is that Real has primarily

16  designed and/or produced Facet in order to avoid, bypass and impair those technological

17  measures.  The DMCA prohibits Real from trafficking in a device designed or produced for such

18  ends. 17 U.S.C. § 1201(b)(1)(A).

19       200.    Real's trafficking in RealDVD as a device for circumventing ARccOS and

20  RipGuard violates all three sub-clauses of Section 1201(b)(1)'s restrictions:  (A) RealDVD is

21  primarily designed or produced for the purpose of circumventing any copy-control protections

22  that may prevent or limit the copying of content on DVDs, including ARccOS and RipGuard;

23  (B) RealDVD's only commercially significant purpose is to circumvent access- or copy-control

24  protections found on DVDs; and (C) Real explicitly markets CSS for use in avoiding and

25  bypassing copy-control protections found on DVDs.

26

27

28

1
        **4.**      **Real's Reliance On An Asserted Fair Use Defense Of RealDVD End-Users To The Studios' Copy-Control Claims Under The DMCA Is**

2
             **Without Merit.**

3
      201.    Notably, Real does not contend that fair use is relevant to its liability under 17

4
U.S.C. § 1201(a)(2) for trafficking in a device used to circumvent CSS's access-control

5
protections.  Even as to the claim against Real for violation of § 1201(b)(1), Real has stated that

6
fair use "is not a defense, if you will, to the DMCA, but it matters here."  53:25-54:1 (Opening

7
Statement: Cunningham).

8
      202.    The end-user's defense of fair use is not a defense, and alleged fair use does not

9
"matter" when it comes to Real's liability under the DMCA.

10
        **a.**      **An End-User's Defense Of Fair Use Does Not Provide Any Defense To Real's Liability Under The DMCA.**

11

12
      203.    Case law construing the DMCA going back more than a decade is clear:  an end-

13
user's alleged defense of fair use does not provide any defense to a defendant's liability for

14
violating the DMCA. *Corley*, 273 F.3d at 443 (holding that § 1201(c), which states that nothing in

15
section 1201 "shall affect rights, remedies, limitations or defenses to copyright infringement,

16
including fair use," "simply clarifies that the DMCA targets the *circumvention* of digital walls

17
guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself

18
with the *use* of those materials after circumvention has occurred"); *Streambox,* 2000 WL 127311,

19
at *8 (ruling for RealNetworks that, "[u]nder the DMCA, product developers do not have the

20
right to distribute products that circumvent technological measures that prevent consumer from

21
gaining unauthorized access to or making unauthorized copies of works protected by the

22
Copyright Act[,]" and that "'those who manufacture equipment and products generally can no

23
longer gauge their conduct as permitted or forbidden by the *Sony* doctrine.  For a given piece of

24
machinery might qualify as a sta[p]le item of commerce, with a substantial noninfringing use, and

25
hence be immune from attack under *Sony*'s construction of the Copyright Act, but nonetheless

26
still be subject to suppression under Section 1201.'") (quoting 1 *Nimmer on Copyright*,

27
§ 12A.18[B] (1999 Supp.)).  *Accord Sony Computer Entm't. Am., Inc. v. Divineo, Inc.*, 457 F.

28
Supp. 2d 957, 965 (N.D. Cal. 2006); *Macrovision v. Sima Prods. Corp.*, 2006 WL 1063284, at *2

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1  (S.D.N.Y. Apr. 20, 2006); *Paramount Pictures Corp. v. 321 Studios*, 2004 WL 402756, at *1

2  (S.D.N.Y. Mar. 3, 2004); *321 Studios*, 307 F. Supp. 2d at 1097; *United States v. Elcom, Ltd.*, 203

3  F. Supp. 2d 1111, 1125 (N.D. Cal. 2002); *Reimerdes*, 111 F. Supp. 2d at 323-24.

4      204.   As the *Streambox* case (brought and won by Real), as well as other cases, make

5  clear, an end-user's defense of fair use is not a defense to liability under either 17 U.S.C.

6  § 1201(a)(2) or § 1201(b)(1).  *See 321 Studios*, 307 F. Supp. 2d at 1097; *Elcom*, 203 F. Supp. 2d

7  at 1125; *Streambox,* 2000 WL 127311, at *8.

8      205.   Based on this clear law, there is no basis for Real's contention that an end-user's

9  alleged defense of fair use in making copies of copyrighted content with RealDVD has any

10  relevance to Real's liability under the DMCA.

11              **b.    Real Is Judicially Estopped From Arguing That An End-User's
                        Defense Of Fair Use Is A Defense To A DMCA Violation.**

12
13      206.   Even if the law were not clear (and it is) that an end-user's defense is irrelevant to

14  a DMCA violation, Real is judicially estopped from arguing for such a result based on the

15  positions that Real took, and that it persuaded the district court to adopt, in the *Real v. Streambox*

16  litigation.

17      207.   Judicial estoppel "precludes a party from gaining an advantage by taking one

18  position, and then seeking a second advantage by taking an incompatible position."  *Wagner v.

19  Prof'l Eng'rs*, 354 F.3d 1036, 1044 (9th Cir. 2004).  The doctrine "applies to a party's stated

20  position whether it is an expression of intention, a statement of fact, or a legal assertion."  *Id*.

21      208.   Here, all three requirements for judicial estoppel are satisfied:  (1) Real's current

22  position that an end-user's purported defense of fair use is a defense to or is in any way relevant

23  to a charge of violating the DMCA is "clearly inconsistent" with Real's position in *Real v.

24  Streambox*; (2) Real succeeded in persuading the district court to accept the earlier position; and

25  (3) Real would derive an unfair advantage if not estopped.  *See United Nat'l. Ins. Co. v. Spectrum

26  Worldwide, Inc*., 555 F.3d 772, 778-79 (9th Cir. 2009).  Real therefore is estopped from arguing

27  that an end-user's fair use defense has any relevance to Real's defense to the DMCA claim in this

28  case.

1
         **c.**     **Even If An End-User's Fair Use Defense Was A Defense To A DMCA Violation, The Defense Would Not Apply To Copying Movies And Television Programs With RealDVD.**

2

3        209.    Fair use is an affirmative defense to copyright infringement, but it is not an

4 available defense to circumvention in violation of the DMCA.  However, even if (contrary to the

5 foregoing conclusions), fair use were somehow relevant to Real's DMCA liability, Real, as the

6 party relying on fair use, has the burden of proving fair use.  *Campbell v. Acuff-Rose Music, Inc.*,

7 510 U.S. 569, 590 (1994).  *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158

8 (9th Cir. 2007).  Real does not discuss the fair use factors under § 107 or demonstrate that those

9 factors would weigh in favor of finding an end-user's making one or more permanent, playable

10 copies of copyrighted content using RealDVD to be fair use.  Real's failure to satisfy its burden

11 as the party invoking fair use is another reason that fair use has no relevance here.

12        210.    Even if the fair use factors were considered, none of them would weigh in favor of

13 copies of copyrighted movies and television shows made with RealDVD being subject to the fair

14 use defense.

15        211.    The first fair use factor is "the purpose and character of the use."  17 U.S.C.

16 § 107(1).  The Supreme Court has held that the key issue on this factor is "whether and to what

17 extent the new work is transformative[,]" *i.e.*, whether it "adds something new, with a further

18 purpose or different character, altering the first with new expression, meaning, or message[.]"

19 *Campbell*, 510 U.S. at 579 (quotations omitted).  A second (or additional) copy of DVD content

20 is not transformative.  It is a verbatim copy of the entirety of the original work used for the same

21 purpose as the original, namely, to have a playable copy.  RealDVD copies also are commercial,

22 since, as admitted by Real's CEO, a copy made with RealDVD is a complete substitute for copies

23 of copyrighted content that the Studios offer commercially.  450:6-10 (Glaser).  This factor

24 weighs against fair use.

25        212.    The second fair use factor is "the nature of the copyrighted work."  17 U.S.C.

26 § 107(2).  This factor weighs against fair use.  Movies and television programs are at the heart of

27

28

1    copyright protection. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563

2    (1985).

3         213.    The third fair use factor is "the amount and substantiality of the portion used in

4    relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor also weighs against

5    fair use, because RealDVD copies 100% of the underlying work. *See A&M Records, Inc. v.*

6    *Napster, Inc.*, 239 F.3d 1004, 1015-16 (9th Cir. 2001).

7         214.    The fourth fair use factor is "the effect of the use upon the potential market for or

8    value of the copyrighted work." 17 U.S.C. § 107(4). This factor also weighs against fair use.

9    Copies of copyrighted content made with RealDVD are indisputably substitutes for copies of

10   those works that the Studios sell, both on CSS-protected DVDs as well as in other, non-CSS

11   protected formats, including, for example, copies sold in the digital copy format. 450:6-10

12   (Glaser). Copies of copyrighted content made with RealDVD also substitute for copies that the

13   Studios are starting to sell through nascent markets, such as download-to-burn and managed copy.

14   Dunn Decl. ¶¶ 21-28. Such harm to developing or "likely to be developed" markets also is

15   relevant under the fourth fair use factor. *See, e.g., American Geophysical Union v. Texaco, Inc.*,

16   60 F.3d 913, 918, 927, 930-31 (2d Cir. 1994).

17        215.    Hence, even if the defense of fair use were relevant to Real's liability under the

18   DMCA, all four of the fair use factors would weigh against a finding that copies of copyrighted

19   content made with RealDVD are subject to the fair use defense.

20   **C.    The Studios Have Established The Possibility Of Irreparable Injury If Real Is
         Not Restrained From Trafficking In RealDVD Pending A Trial On The
21       Merits.**

22        216.    The Studios' showing that Real likely violates the DMCA creates a presumption of

23   irreparable injury for two reasons. First, a presumption of irreparable injury upon a showing of

24   likely success is appropriate under the DMCA, as in copyright cases generally. *See, e.g.,*

25   *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522, 532-33 (6th Cir. 2004);

26   *Reimerdes*, 82 F. Supp. 2d at 215. Second, irreparable harm is presumed for statutes that, like the

27   DMCA, expressly authorize injunctive relief to prevent a violation. 17 U.S.C. § 1203(b)(1)

28   (authorizing injunctive relief to "prevent or restrain a violation" of the DMCA). *See Burlington*

1   *Northern R.R. Co. v. Department of Revenue of State of Wash.*, 934 F.2d 1064, 1074 (9th Cir.

2   1991); *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983).

3       217.    Even if irreparable injury needed to be shown and were not presumed, the Studios

4   have shown it.  RealDVD threatens irreparable harm in several ways.  First, through rent/borrow-

5   rip-return, RealDVD materially changes the value of the Studios' product offerings to consumers,

6   effectively reducing the price of DVDs to $3.25 (for consumers who copy rented DVDs) or zero

7   (for those who copy borrowed DVDs).  Second, RealDVD threatens to undermine existing and

8   developing offerings for copies of copyrighted content, including Internet download services, the

9   digital copy product, and DVDs.  Third, RealDVD threatens to undermine consumers' attitudes

10   about the unlawfulness of making copies of copyrighted content.

11       **D.**    **The Balance Of Hardships Favors The Studios.**

12       218.    The harm to the Studios from denying injunctive relief is real and substantial.  The

13   harm to Real from continuing the current injunction pending a trial on the merits is minimal to

14   non-existent.  Real's contention that the entry of a preliminary injunction will force layoffs are

15   not well-founded and in any event are legally irrelevant.  Real is a large corporation with many

16   ongoing projects.  Real's staffing flexibility is evidenced by its reassignment of some of its top

17   people from other projects to the RealDVD project.  Real has not introduced any credible

18   evidence that it will not find other roles for its currently employed engineers assigned to

19   RealDVD on other Real protects.  And, in any event, no company has a legitimate interest in

20   having employees work on products that are likely illegal.

21       **E.**    **The Public Interest Would Be Served By Entry Of A Preliminary Injunction.**

22       219.    The public interest is served by the continued restraining of Real from violating

23   the DMCA.  Real's contention that a continuation of the injunction that has been in place since

24   October will harm the public by depriving the public of innovative products is without merit.  The

25   public interest is not served by allowing parties to traffic in illegal devices or technology, no

26   matter how innovative some may believe such products to be.

27

28

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP

1   DATED: May 15, 2009            MUNGER, TOLLES & OLSON LLP

2

3                               By:_____ /s/ *Rohit K. Singla*_____

                                    ROHIT K. SINGLA

4

5                      Attorneys for Motion Picture Studio
                      Plaintiffs/Declaratory Relief Claim Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STUDIOS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
CASE NOS. C 08-4548-MHP/08-4719-MHP