Realnetworks, Inc. et al v. DVD Copy Control Association, Inc. et al Doc. 334

REGINALD D. STEER (SBN 056324)
rsteer@akingump.com
MARIA ELLINIKOS (SBN 235528)
mellinikos@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, 15th Floor
San Francisco, California 94104-1036
Telephone: (415) 765-9500
Facsimile: (415) 765-9501

EDWARD P. LAZARUS (SBN 212658)
elazarus@akingump.com
STEPHEN MICK (SBN 131569)
smick@akingump.com
MICHAEL SMALL (SBN 222768)
msmall@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: (310) 229-1000
Facsimile: (310) 229-1001

WILLIAM SLOAN COATS (SBN 94864)
wcoats@whitecase.com
MARK WEINSTEIN (SBN 193043)
mweinstein@whitecase.com
MARK F. LAMBERT (SBN 197410)
mlambert@whitecase.com
**WHITE & CASE LLP**
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, California 94306
Telephone: (650) 213-0300
Facsimile: (650) 213-8158

Attorneys for Defendant and Counterclaimant
DVD COPY CONTROL ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation,

Plaintiffs,

v.

DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, et al.

Defendants.

And Related Counterclaims.

AND RELATED CASES

Case No. C08 04548 MHP;
C08 04719 MHP

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT AND COUNTERCLAIMANT DVD COPY CONTROL ASSOCIATION, INC.**

Date: April 24, 2009
Time: 9:00 a.m.
Dept.: 15 (Hon. Marilyn Hall Patel)

**PUBLIC REDACTED VERSION**

Dockets.Justia.com

Defendant and Counterclaimant DVD Copy Control Association, Inc. ("DVD CCA") hereby submits the following Proposed Findings of Fact and Conclusions of Law in support of an order granting its Motion for Preliminary Injunction.

## FINDINGS OF FACT

### A. PARTIES

1. DVD CCA is a Delaware not-for-profit corporation that is responsible for licensing the Content Scramble System ("CSS") to entertainment, consumer electronics and information technology companies that wish to implement CSS in their products. Declaration of Jacob Pak in Support of DVD CCA's Motion for Preliminary Injunction, dated March 19, 2009 ("Pak Dec.") ¶ 2; Declaration of Andrew Parsons in Support of DVD CCA's Motion for Preliminary Injunction, dated March 19, 2009 ("Parsons Dec.") ¶ 3.

2. RealNetworks, Inc. ("Real") is a technology company that manufactures and sells several product lines that allow streaming of audio and video content on the Internet. Hearing Tr. 47:23-48:5; 440:21-442:24; Coppinger Dep. at 217:9-23 (Declaration of Maria Ellinikos in Support of DVD CCA's Motion for Preliminary Injunction, dated March 19, 2009 ("Ellinikos Dec."), Ex. E); Glaser Dep. 222:25-223:14, 228:21-229:11 (Ellinikos Dec., Ex. G); *see also* Ellinikos Dec., Ex. Y at 40-43.

### B. PROCEDURAL HISTORY

3. On September 30, 2008, Real brought a declaratory judgment action in the United States District Court for the Northern District of California against DVD CCA, Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc., Warner Bros. Entertainment, Inc. and Viacom, Inc., seeking, among other things, a declaration that it was not in breach of its license agreement with DVD CCA and did not violate the Digital Millennium Copyright Act, 17 U.S.C. § 1201 et seq. *See* Complaint for Declaratory Relief (Dkt. No. 1).

4. DVD CCA filed its Answer to the Complaint on October 21, 2008. *See* Answer of DVD CCA (Dkt. No. 53).

5.      On November 10, 2008, DVD CCA filed an amended answer and counterclaims against Real for breach of contract and breach of the covenant of good faith and fair dealing.  *See* Amended Answer and Counterclaims of DVD CCA (Dkt. No. 60).

6.      On November 10, 2008, DVD CCA also moved for a preliminary injunction to prevent Real from producing, selling, offering, marketing or otherwise trafficking in its RealDVD product.  *See* Notice of Motion and Motion of DVD CCA for Preliminary Injunction (Dkt. No. 61).

7.      Although Real moved to strike DVD CCA's motion for preliminary injunction on November 17, 2008, the Court did not grant the motion and permitted DVD CCA to participate in the preliminary injunction proceedings.  *See* Notice of Motion and Motion to Strike DVD CCA's Motion for Preliminary Injunction (Dkt. No. 65); Minute Entry, dated December 23, 2008 (Dkt. No. 92); Transcript of Proceedings held on December 22, 2008.

8.      On March 19, 2009, DVD CCA filed its memorandum of points and authorities in support of its motion for preliminary injunction and supporting evidence.  On the same day, Real filed its memorandum opposing DVD CCA's motion.  The parties filed responsive papers on April 10, 2009. The Court heard arguments and testimony on DVD CCA's motion on April 24, 28, 29 and May 7, 2009.  Closing arguments were held on May 21, 2009.

**C.    CSS – THE CONTENT SCRAMBLE SYSTEM**

    **1.    <u>Development and History of CSS and the Role of DVD CCA</u>**

9.      In the 1990's, a group of motion picture studios, consumer electronics companies, and companies from the computer industry formed an open, public forum called the Copy Protection Technical Working Group (the "CPTWG"), which brought together interested parties to discuss matters including copy protection technologies related to new media such as the DVD format.  Hearing Tr. 75:14-76:5; Parsons Dec. ¶ 4.

10.     The CSS technology, owned by Toshiba Corporation and Matsushita Electric Industrial Company LTD, emerged from discussions that took place in numerous meetings among members of the CPTWG as a viable technology that could be used to protect copyrighted movies and other audio visual works distributed on DVDs from being copied by casual consumers.  Hearing Tr. 81:6-82:12; Parsons Dec. ¶ 4.

11.     Input from interested parties from the motion picture studios, the consumer electronics companies, and the computer companies resulted in an interim license agreement, pursuant to which companies wishing to use the CSS technology to either distribute copyrighted content on DVDs or to manufacture and sell devices that playback DVDs could license the CSS technology.  Hearing Tr. 81:19-82:12; 85:13-86:9.

12.     Matsushita Electric Industrial Company, LTD handled the licensing of the CSS technology prior to the formation of the DVD CCA.  Hearing Tr. 86:12-87:7, 89:9-90:1.

13.     DVD CCA, which is itself comprised of members from the motion picture, consumer electronics and computer industries, administers the current uniform license for CSS that enables content providers to release their copyrighted motion picture titles on DVD knowing that the products used to play them back will protect the content from being copied.  Parsons Dec. ¶ 5.

14.     The composition of DVD CCA's Board of Directors is set forth in DVD CCA's Certificate of Incorporation.  The Certificate of Incorporation provides for a 12 seat Board of Directors composed of five "Motion Picture Company Directors," three "Consumer Electronics Manufacturer Directors," three "Computer Manufacturer Directors," and one "At Large" director.  Pak Dec. (April 10, 2009) ¶ 3.

15.     The CSS license enables consumer electronics and computer companies to sell inexpensive devices that are able to play a wide range of available DVD titles.  Parsons Dec. ¶ 5.

16.     Consumers benefit from the CSS license because it enables them to view digital quality content on DVD.  Parsons Dec. ¶ 5

17.     More than 300 companies have licensed CSS from the DVD CCA.  Parsons Dec. ¶ 5.

18.     CSS is used to protect the content on hundreds of millions of DVDs.  Parsons Dec. ¶ 5.

19.     CSS has been implemented in millions of DVD players and computers worldwide. Parsons Dec. ¶ 5.

20.     Each company that obtains a license from DVD CCA agrees to comply with the uniform set of rules set forth in the CSS license.  Parsons Dec. ¶ 6.

21.     These rules are designed to prevent consumer copying of DVD content.  Hearing Tr. 79:22-80:21; Parsons Dec. ¶ 6.

Case3:08-cv-04548-MHP Document334 Filed05/15/09 Page5 of 30

22. The DVD CCA By-Laws contain provisions addressing, among other things, the procedures involved in members proposing changes to the CSS Specifications. Pak Dec. ¶ 4.

**2. Elements of the CSS System**

23. The CSS system combines multiple layers of protection, including encryption and an authentication process designed to ensure that a DVD's copyrighted video content is not intercepted inside a playback device (including a personal computer system) so no playable copy of the DVD can be made and stored. Hearing Tr. 151:17-23; 152:20-154:2; 155:10-157:11; 159:8-160:5; Pak Dec. ¶ 3; Parsons Dec. ¶ 3; Declaration of John P.J. Kelly, dated March 19, 2009 ("Kelly Dec.") ¶¶ 16-44.

4

PROPOSED FINDINGS AND CONCLUSIONS OF LAW OF DEFENDANT AND COUNTERCLAIMANT DVD COPY CONTROL ASSOCIATION, INC.
CASE NO. C08 04548 MHP



5



Case3:08-cv-04548-MHP Document334 Filed05/15/09 Page7 of 30

6

PROPOSED FINDINGS AND CONCLUSIONS OF LAW OF DEFENDANT AND COUNTERCLAIMANT DVD COPY CONTROL ASSOCIATION, INC.
CASE NO. C08 04548 MHP



43.

### 3.   Real's CSS License

44.   CSS is licensed by the DVD CCA under a uniform agreement that requires all licensees to adhere to detailed restrictions intended to safeguard CSS protected content. Hearing Tr. 81:19-82:12, 89:9-90:1; Parsons Dec., ¶ 3.

45.   On August 23, 2007, Real submitted to DVD CCA an executed CSS License Agreement, dated August 13, 2007. Pak Dec., ¶ 19, Ex. J.

46.   Real received documentation DVD CCA delivered to it in accordance with DVD CCA's standard licensing practice, including the following CSS Specifications identified by uniquely assigned serial numbers and reflecting Real's corporate name, the classification of the document as "Confidential" or "Highly Confidential" information under the CSS License Agreement in parentheses: (1) CSS General Specifications, GEN-05316 (Confidential); (2) DVD-Video Descrambler, 609-05099 (Confidential); (3) Authenticator Module for CSS Decryption Module, 809-05083 (Confidential); and (4) Authenticator Module for DVD Drive, 709-05030 (Confidential). Pak Dec. ¶ 21, Exs. K, L, M, N, and O.

47.   It is standard practice for licensors of technologies like CSS to provide confidential technical specifications to the licensee only after the licensee has signed the licensing agreement. Hearing Tr. 289:4-19.

### 4.   The Agreement and Its Requirements

48.   The CSS License Agreement (Pak Dec., Ex. J), the CSS Procedural Specifications, which are available on the DVD CCA website (Pak Dec. Exh. P), and the CSS Specifications that Real received from DVD CCA after it executed the License Agreement (Pak Dec., Ex. L-O), make up the "Agreement" between Real and DVD CCA. Pak Dec. ¶ 24.

49. The CSS License Agreement defines "DVD Products" as DVD Players, DVD Drives, Descramblers, Authenticators, Scramblers, CSS Decryption Modules, CSS Disc Formatters, DVD Discs, Special Purpose DVD Players, Special Purpose DVD Drives, Verification Products and Integrated Products. Pak Dec., Ex. J at Real001413 (§ 1.15).

50. The definition of "DVD Products" in the CSS License Agreement does not include DVD copying systems. Pak Dec., Ex. J at Real001413 (§ 1.15).

51. Recital A of the CSS License Agreement explicitly states that its purpose is "to provide protection for [ ] copyrighted content against unauthorized consumer copying." Pak Dec., Ex. J at Real001411 (Recital A).

52. The term "unauthorized copy" (and similar usages such as "unauthorized copying" and "unauthorized consumer copying") as used in the CSS License Agreement means a copy of a copyrighted work that is made without the authority of the copyright owner, or in any event a copy of a CSS protected copyrighted work that is made or facilitated through a use or an implementation of CSS that is not permitted under the Agreement. Pak Dec., Ex. J at Recital A, Section 9.2 and Section 9.5.

53. Section 4.2.1 of the CSS License Agreement provides in pertinent part: "Licensee shall comply with the CSS Specifications as may be amended from time to time by Licensor in accordance with the By-Laws. Each DVD Product [made by Licensee] shall comply with the version of the CSS Specifications which is in effect at the time such DVD Product is manufactured . . . ." Pak Dec., Ex. J.

54. Section 5 of the CSS License Agreement bars licensees from "us[ing] Confidential Information or Highly Confidential Information or any mentally retained recollections thereof to circumvent or copy the methods disclosed in Proprietary Information, Confidential Information, or Highly Confidential Information or to circumvent any obligations under this Agreement." Pak Dec., Ex. J (§ 5.2(a)).

55. Following the trial court ruling in *DVD CCA v. Kaleidescape, Inc.*, No.1:04 CV 031829 (Cal. Superior Ct., March 29, 2007), some DVD CCA members prepared a proposed amendment to the Procedural Specifications that would have summarized existing requirements expressed in other CSS Specifications that require the DVD Disc to be in the DVD Drive during playback, but the proposed amendment was never voted upon for adoption by the DVD CCA Board. Parsons Dep. 91:13-92:12

Case3:08-cv-04548-MHP Document334 Filed05/15/09 Page10 of 30

(Declaration of Maria Ellinikos in Support of DVD CCA's Response, dated April 10, 2009 ("Ellinikos Response Dec."), Ex. 8).

**a) The Authenticator Module for CSS Decryption Module Specifications**

9

PROPOSED FINDINGS AND CONCLUSIONS OF LAW OF DEFENDANT AND COUNTERCLAIMANT DVD COPY CONTROL ASSOCIATION, INC.
CASE NO. C08 04548 MHP

62.

c) **The Procedural Specifications**

63. Section 6.2 of the CSS Procedural Specifications sets forth the "conditions that must be observed by CSS licensees with respect to access to, playback of and transmission of CSS Data" to promote "Copy Protection." Pak Dec., Ex. P at A-9 (DVD 016768).

64. There is no provision in the Procedural Specifications, or elsewhere in the Agreement that sets forth any conditions in which a CSS Licensee may use CSS to make copies of CSS protected DVDs on a computer hard disk drive or other storage medium. Pak Dec., Exs. J, L-P.

65. Section 6.2.3 of the Procedural Specifications provides that the authentication software module "shall correctly engage in and complete the authentication process with the DVD Drive and ensure that the CSS Keys are received by the Descrambler only if the authentication process is successful." Hearing Tr. 156:21-157:11; Pak Dec., Ex. P at A-25 (DVD016784).

66. Section 6.2.12 of the Procedural Specifications bars licensees from "produc[ing] or sell[ing] devices or software (a) under color of this Agreement, or (b) using CSS Confidential or Highly Confidential Information, where such devices or software are designed to circumvent the requirements of Section 6.2 of the Procedural Specifications." Pak Dec., Ex. P at A-63 (DVD016822).

d) **The CSS General Specifications**

72.

5. Real's Plan to Evade the Requirements of the Agreement

73. [redacted] Barrett Dep. 265:13-267:6 (Ellinikos Dec., Ex. A); Ex. S at Real112719; Barrett Dep. 260:13-261:23 (Ellinikos Dec., Ex. A); Ellinikos Dec., Ex. W at Real051341-43; *see also* Hamilton Dep. 235:12-20 (Ellinikos Dec, Ex. H); Hamilton Dep. 267:16-268:11 (Second Amended Dep. Designations, Dkt. No. 327); Ellinikos Dec., Ex. R.

74. There is no evidence that Real ever conveyed a contrary interpretation of the Agreement to DVD CCA.

75. [redacted] Chasen Dep. 296:19-297:11 (Ellinikos Dec., Ex. D); Brennan Dep. 291:2-292:24 (Ellinikos Dec., Ex. C).

76. In devising its software product, Real relied on the supposition that the trial court's *Kaleidescape* decision would provide a legal "loophole," regardless of the language of the CSS Specifications, the explicitly stated intent of the Agreement, and the DVD CCA's stated and known position that the contract barred devices of the very sort that Real was building. Hearing Tr. 444:12-445:2; 598:10-13; Wolpert Dep. 41:12:42-8 (Ellinikos Dec., Ex. L); *see also* Glaser Dep. 11:2-14:6 (Ellinikos Dec. Ex. G); Chasen Dep. 44:17-45:9, 291:3-19 (Ellinikos Dec., Ex. D).

77. As it was working on its software product, Real did not ever communicate to DVD CCA that it intended to construe the trial court's *Kaleidescape* decision as authorizing it to manufacture RealDVD.

6. The RealDVD Products

78. Real has produced two versions of the RealDVD software, internally referred to as "Vegas" and "Facet." Hearing Tr. 148:14-18.

79. Vegas is designed to run on the Microsoft Windows computer operating system. Hearing Tr. 148:14-149:7; Ellinikos Dec., Ex. P at Real000550; Glaser Dep.15:14-17 (Ellinikos Dec., Ex. G).

80. Facet is designed to run on the Linux computer operating system. Hearing Tr. 177:18-178:4, 420:2-424:9; Hamilton Dep. 139:4-15 (Ellinikos Dec., Ex. H).

81. While the Facet and Vegas versions of RealDVD are designed to run on different computer operating systems, as far as users are concerned, the software functions essentially the same way on both systems, and thus the Court refers to both Facet and Vegas interchangeably as "RealDVD." Hearing Tr. 177:18-178:4, 193:14-21, 745:6-748:8; Kelly Dec. ¶¶ 7, 67.

82. Both versions of RealDVD copy DVDs to computer hard disk drives or other portable storage media for subsequent playback. Hearing Tr. 190:22-192:14, 193:22-194:5, 197:17-21, 272:11-18, 773:5-10, 773:20-774:6, 1006:7-23; Schwarz Dep. 42:25- 44:4, 77:1-11 (Ellinikos Dec., Ex. J); Hamilton Dep. 139:4-6 (Ellinikos Dec., Ex. H); Glaser Dep. 15:14-17 (Ellinikos Dec., Ex. G).

83. When a user inserts a CSS protected DVD into the DVD Drive of a device running the RealDVD software, the user is presented with options to (1) "play" the DVD without copying it onto the device's hard disk drive, (2) "play and save" the DVD, which allows the user to view the content while RealDVD makes a copy of the content on the device's hard disk drive, or (3) "save" the DVD, which commands RealDVD to simply copy the content from the DVD onto the device's hard disk drive so that it can be played later, without the DVD Disc. Hearing Tr. 191:6-192:14, 1103:14-1104:12; Kelly Dec. ¶¶ 45-48, 51; 67-74.

84.



92. The CSS Specifications nowhere describe the acts of saving key data or content data on to a hard disk drive or other storage device. Hearing Tr. 759:22-760:3; 1133:17-20.

93. Real's expert admitted that the CSS Specifications nowhere describe the acts of saving key data or content data on to a hard disk drive or other storage device. Hearing Tr. 759:22-760:3.

94. Real's expert further admitted that the phrase "save to the hard drive" does not appear anywhere in the CSS Specifications. Hearing Tr. 760:4-7.

95. Although Real claims that it followed the CSS Specifications in creating RealDVD, the evidence demonstrates that the company employees involved in the creation of RealDVD were unfamiliar with the requirements of the CSS Specifications and lacked interest in whether RealDVD met the CSS strictures. Hearing Tr. 1063:8 - 1066:18; Buzzard Dep. 226:2-22, 222:7-13; 223:20-25; 224:5-225:10; 228:3-229:1 (Ellinikos Response Dec., Ex. 4); Brennan Dep. 205:3-20, 210:16-212:13 (Ellinikos Response Dec., Ex. 3); Bielman Dep. 234:1-235:25 (Ellinikos Response Dec., Ex. 1); Chasen Dep. 63:23-68:25, 106:15-107:17 (Ellinikos Response Dec., Ex. 5).

96. Pursuant to Section 4.2.1 of the Agreement, requiring licensees to comply with the CSS Specifications, application of a different or additional layer of encryption cannot excuse non compliance with the CSS Specifications. Pak Dec., Ex. J; Bishop Dep. 151:2-152:16 (Ellinikos Response Dec., Ex. 2).

97. By the time RealDVD applies AES encryption, RealDVD has already misused CSS to make a playable hard disk drive copy of protected content. Hearing Tr. 202:19-25, 762:21-765:16; 766:5-768:8; 784:8-785:9.

100.

7. **Injury to the DVD CCA**

101. Pursuant to the CSS License Agreement, Real and DVD CCA expressly stipulated that DVD CCA would suffer "lasting effect . . . and harm [arising] from a breach" of certain specified contract terms safeguarding CSS-encrypted content, including Sections 2.1, 4.2 (which, as indicated above, requires compliance with the CSS Specifications), and 5 of the CSS License Agreement, because such breaches would "mak[e] available the means for widespread unauthorized copying of copyrighted content intended to be protected." Hearing Tr. 92:16-94:25; 98:1-99:7, 152:19-153:10; Pak. Dec., Ex. J.

102. The parties further stipulated in Section 9.2 of the CSS License Agreement that the harm flowing from a breach of these contract terms "[would] be irreparable," and that "monetary damages [would] not [be] sufficient to remedy the injury." Hearing Tr. 92:16-94:25; 98:1-99:7; Pak. Dec., Ex. J.

103. Section 9.2 of the CSS License Agreement entitles DVD CCA to "specific performance or other temporary, preliminary, or permanent injunctive relief . . . (whether or not there have been commercial sales of products subject to the requested relief)." Pak. Dec., Ex. J.

104. Real has marketed RealDVD as a legal product that provides a cheap and easy way to watch and store copies of DVDs, including DVDs that a consumer has rented or borrowed. Ellinikos Dec., Ex. V at Real135594; Hamilton Dep. 262:9-23 (Ellinikos Dec., Ex. H).

105. Real proclaimed that, for less than $30, consumers can permanently download RealDVD on to their personal computers, store copies of DVDs on their computers, and watch them later at their convenience. Ellinikos Dec., Ex. V at Real135594; Hamilton Dep. 262:9-23 (Ellinikos Dec., Ex. H).

106. Consumers using RealDVD who rent or borrow DVDs thus can play back a DVD on their computers after returning the disc to the video rental business from which they rented it or to the

friend from whom they borrowed it. Hearing Tr. 455:19-22, 773:20-23; Chasen Dep. 92:21- 93:8; 95:18-96:5 (Ellinikos Dec., Ex. D); *see also* Coppinger Dep. 62:3-65:11 (Ellinikos Dec., Ex. E).

107. RealDVD undermines the integrity of the CSS system, the administration of which is the sole purpose and mission of DVD CCA. Parsons Dec. ¶ 7; Dunn Dep. 93:20-96:9; 100:25-102:19; 117:1-118:3 (Ellinikos Dec., Ex. F).

108. Allowing Real to market a product capable of copying CSS-protected DVD content to a hard disk drive compromises the environment of trust essential to the DVD CCA's mission. Parsons Dec. ¶¶ 4, 6, 7.

109. RealDVD would destroy the balance struck by the content providers, on the one hand, who would not distribute copyrighted content on DVDs unless and until there was a workable technology that would render it difficult for consumers to make unauthorized copies of the provider's copyrighted materials, and consumer electronics and information technology companies, on the other hand, who needed a content protection system that would make content available to be played back on their products and not add unduly to the price of those products. Hearing Tr. 73:20-25; 79:22-80:21, 81:6-18; Parsons Dec., ¶¶ 4, 7.

## CONCLUSIONS OF LAW

### A. DVD CCA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS THAT REAL HAS BREACHED THE AGREEMENT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING

1. A plaintiff is entitled to a preliminary injunction when it demonstrates that it will likely succeed on the merits of its claims; will suffer irreparable harm in the absence of interim relief; and equitable and public interest considerations weigh in its favor. *Winter v. National Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008).

### B. DVD CCA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS THAT REAL HAS BREACHED THE AGREEMENT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING

#### 1. Real Has Breached The Agreement

2. The contract between DVD CCA and Real is comprised of the CSS License Agreement and the CSS Specifications (defined collectively as the "Agreement"), which, in turn, and as relevant to this litigation, include the CSS Procedural Specifications; the CSS Technical Specifications

corresponding to the membership categories that Real selected (Authenticator Module for CSS Decryption Module, DVD-Video Descrambler and Authenticator Module for DVD Drive); and the CSS General Specifications.

3. Under California law, contracts are interpreted to reflect the mutual intent of the parties at the time of contracting. Cal. Civ. Code § 1636; *Cedars-Sinai Medical Ctr. v. Shewry*, 137 Cal. App. 4th 964, 979 (2006). The starting point for ascertaining the parties' intent is the language of the agreement. Cal. Civ. Code § 1638; *Crawford v. Weather Shield Mfg. Inc.*, 44 Cal. 4th 541, 552 (2008). The language of the contract must be interpreted as a whole to give effect to each provision. Cal. Civ. Code § 1641. Where the language of a contract "can reasonably be understood in more than one way, the court must admit and consider extrinsic evidence to determine what the parties actually intended the word or phrase to mean." *Rainer Credit Co. v. Western Alliance Corp.*, 171 Cal.App.3d 255, 261 (1985) (citing *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal.2d 33, 40 (1968)). If there is extrinsic evidence that one party understood that the other party interpreted the contract in a particular way, and that party did not communicate a contrary interpretation to the other party, then the other party's interpretation shall control. Cal. Civ. Code § 1649; *see United Teachers of Oakland, Local 771 v. Oakland Unified School Dist.*, 75 Cal. App. 3d 322, 330 (1977); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 n.3 (1992); *see also Restatement (Second) of Contracts* § 201(2)(a) (1981) ("Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party."); *Merced County Sheriff's Employee's Assn. v. County of Merced*, 188 Cal. App. 3d 662, 673 (1987) (applying *Restatement* § 201(2)(a) and holding that parties were bound by contractual understanding of plaintiff when defendant had reason to know of plaintiff's understanding and never communicated its understanding to the plaintiff); *Johnston v. Comm'r*, 461 F.3d 1162, 1165 (9th Cir. 2006) (same).

Case3:08-cv-04548-MHP Document334 Filed05/15/09 Page20 of 30

**a) When The Language Of The Agreement Is Viewed As A Whole, RealDVD Does Not Comply With The Text Of The CSS Specifications And The Agreement's Anti-Circumvention Clauses**

4. Real's interpretation that the Agreement allows the copying performed by RealDVD is unreasonable, in view of the Agreement's clearly stated anti-copying objectives and the text of the contractual provisions explicitly prescribing the sequence of operations for the playback of DVDs that can only be implemented if the physical DVD Disc is in the DVD Drive.

5. RealDVD saves and copies DVDs to computer hard disk drives and plays them back in the absence of the DVD Disc itself, bypassing multiple layers of the CSS protection system. By manufacturing and selling Real DVD, Real has violated the following critical provisions of the Agreement:

19

PROPOSED FINDINGS AND CONCLUSIONS OF LAW OF DEFENDANT AND COUNTERCLAIMANT DVD COPY CONTROL ASSOCIATION, INC.
CASE NO. C08 04548 MHP

[redacted]

e. Section 6.2.12 of the Procedural Specification bars licensees from "produc[ing] or sell[ing] devices or software (a) under color of this Agreement, or (b) using CSS Confidential or Highly Confidential Information, where such devices or software are designed to circumvent the requirements of Section 6.2 of the Procedural Specifications." This is precisely what RealDVD does.

f. Section 5 of the CSS License Agreement bars licensees from "us[ing] Confidential Information or Highly Confidential Information or any mentally retained recollections thereof to circumvent or copy the methods disclosed in Proprietary Information, Confidential Information, or Highly Confidential Information or to circumvent any obligations under this Agreement." Again, this is precisely what RealDVD does.

6. In sum, because RealDVD does not comply with multiple provisions of the CSS Specifications, Real has breached Section 4.2.1 of the CSS License Agreement, which requires licensees to comply with the CSS Specifications. Additionally, RealDVD violates the anti-circumvention requirements of Section 6.2.12 of the Procedural Specifications and Section 5 of the CSS License Agreement.

7. There is no evidence in the record to support an inference that the Agreement allows Real to manufacture and sell RealDVD.

**b) The Extrinsic Evidence Shows That Real Was Aware That DVD CCA Understood The Agreement To Prohibit Applications That Copy Protected DVD Content To Computer Hard Disk Drives For Playback Without Any Further Need For The Physical DVD Disc, And Real never Communicated A Contrary Understanding To DVD CCA.**

8. Even if, when viewed as a whole, the language of the Agreement reasonably could be understood in more than one way, Real's interpretation would still fail in light of the undisputed extrinsic evidence of the parties' understandings of the meaning of the Agreement.

9. The extrinsic evidence conclusively shows that DVD CCA interpreted the Agreement as memorializing the central anti-copying objective of the CSS system, and that DVD CCA considered

the requirement of the physical presence of the DVD Disc to be a primary tool for achieving that objective.

10. The extrinsic evidence also conclusively shows that, at the time it executed the CSS License Agreement, Real was fully aware that DVD CCA interpreted the Agreement in this way. There is no evidence whatsoever that Real ever conveyed a contrary interpretation to DVD CCA, nor is there any evidence that DVD CCA was aware that Real had a contrary understanding of the Agreement. Real's claim that its interpretation of the contract is reasonable is undercut by its engineers' lack of familiarity with the requirements of the CSS Specifications and lack of interest in whether RealDVD met the CSS strictures.

11. Under the extrinsic evidence principles of Section 1649 of the California Civil Code and Section 201(2) of the *Restatement* and the case law applying those principle, *see, e.g.*, *United Teachers of Oakland, Local 771 v. Oakland Unified School Dist.*, 75 Cal. App. 3d 322, 330 (1977) and *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 n.3 (1992), Real is bound to its understanding of DVD CCA's understanding, *i.e.*, that the Agreement requires that devices play back CSS protected content from a DVD that is in the DVD Drive of the playback system.

**c) Real's Adhesive Contract Theory Would Undermine The Societal Benefits Achieved Through Uniform Arrangements For the Licensing Of Intellectual Property And, In Any Event, Misapprehends The Rules Governing The Interpretation Of Standardized Agreements**

12. By their very nature, uniform intellectual property licenses can rarely, if ever, be subject to separate negotiation with each prospective licensee. It is instead essential that licensors of intellectual property have the latitude to set uniform rules governing use of that property. This approach is fair to the licensor because what the licensee buys is not the intellectual property per se (unlike in a sale of goods where a consumer actually acquires the good), but permission to use the property within the limits of the license terms. *See* Nimmer, *Licensing in the Contemporary Information Economy*, 8 Wash. U. J.L. & Pol'y 99, 123, 136-37, 162-65 (2002). It is also fair to licensees because the uniformity ensures a level playing field on equal terms for all licensees -- large companies and start-ups alike, and across multiple industries. Furthermore, it is widely acknowledged that the setting of standards for the use of intellectual property pursuant to uniform licensing

arrangements can lead to profound societal benefits by producing efficiencies, increasing innovation, and fostering increased access to new technology. *See* Nimmer, 8 Wash. U. J.L. & Pol'y at 104 (uniform licensing of intellectual property "contributes to the efficient tailoring of an information product and its cost to meet diverse market demands").

13. The CSS License administered by the DVD CCA is a classic example of a uniform agreement that provides equal access to technology by parties from multiple industries that has created enormous societal benefits -- namely, the advent of the market for DVDs and devices that play them. The notion that Real's interpretation controls because the Agreement is not negotiated, and hence is "adhesive," if accepted, would seriously impair the ability of DVD CCA to safeguard the dissemination of CSS. More fundamentally, Real's position would have pernicious consequences beyond this litigation, and serve to unravel the societal benefits that may be achieved through standard licensing arrangements. Under Real's theory, individual licensees would be empowered to impose their own self-serving, idiosyncratic terms of use of the licensed technology, which is supposed to be made available to all comers under uniform and nondiscriminatory terms, and would thereby diminish the likelihood that owners of intellectual property will agree to license its use.

14. This Court need not resolve whether the Agreement is adhesive, however, because Real is wrong on the implications of calling a contract "adhesive." Contrary to Real's supposition, adhesive contracts are not automatically construed according to the adhering party's interpretation, and none of the cases that Real cites holds otherwise. Indeed, as the California Supreme Court stated in one of the cases on which Real relies,"[t]o describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, the beginning and not the end of the analysis . . . ." *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 819 (1981) (internal quotations omitted). That same case states unequivocally that, in analyzing an adhesive contract, courts generally should enforce the agreement "according to its terms," *id.*, and that the terms of the agreement are to be construed "under established principles" of contract interpretation, just like any other agreement. *Id.* at 819 n.16; *see Badie v. Bank of America*, 67 Cal. App. 4th 779, 798 (1998) (applying "standard rules of contract of interpretation" in construing an adhesive consumer banking agreement); *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal. App. 4th

1199, 1214 (1998) (applying "standard rules of contract interpretation" in construing an adhesive health club membership agreement).

15. The interpretive rule of last resort known as the doctrine of contra proferentem states that ambiguities in an agreement are to be construed against the drafter, including the drafter of an adhesive contract. Cal. Civ. Code § 1654; *Badie*, 67 Cal. App. 4th at 800; *Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan*, 329 F. Supp. 2d 1198, 1216 (C.D. Cal. 2004). This doctrine, however, comes into play *only* when the meaning of an adhesive contract cannot be ascertained through the agreement's text and the extrinsic evidence of the parties' understanding. *Chow v. Levi Strauss & Co.*, 49 Cal. App. 3d 315, 325 (1975); *Rainier Credit Co. v. W. Alliance Corp.*, 171 Cal. App. 3d 255, 263 (1985). That is not the case here.

**2. <u>The Trial Court Decision in *Kaleidescape* Does Not Rescue RealDVD</u>**

16. The trial court's decision in *Kaleidescape* does not create a "loophole" in the Agreement that excuses the presence of the physical disc in the DVD Drive for playback. First, the trial court in *Kaleidescape* held only that the General Specifications were not part of the contract between Kaleidescape and DVD CCA. Declaration of Jonathan Blavin in Support of Studios' Motion for Preliminary Injunction, Ex. 70 at 2. That limited holding (which DVD CCA is contesting on appeal and thus is not final for purposes of California law, *Franklin & Franklin v. 7-11 Owners For Fair Franchising*, 85 Cal. App. 4th 1168, 1174 (2000)) did not address the applicability and requirements of the CSS Procedural Specifications, the CSS License Agreement, and the category-specific CSS Specifications that Real selected -- each of which is part of the Agreement between DVD CCA and Real and each of which contains provisions that RealDVD breaches. Second, even as to the CSS General Specifications themselves, the trial court decision in *Kaleidescape* does not shelter RealDVD.

Hamilton Dep. 235:21-236:4 (Ellinikos Dec.,

Ex. H); Ellinikos Dec., Ex. R; Hamilton Dep. 267:16-268:11 (Second Amended Dep. Designations, Dkt. No. 327). By contrast, there is no evidence that DVD CCA was aware that Real had a contrary understanding of the Agreement. Thus, Real is bound to its understanding of DVD CCA's understanding, i.e. that the Agreement requires that devices play back CSS protected content from a DVD that is in the DVD Drive of the playback system.

17. Moreover, the draft amendment to the Procedural Specifications proposed by some members of the DVD CCA following the trial court's *Kaleidescape* decision adds nothing to the contractual analysis. The proposed amendment was never voted upon for adoption by the DVD CCA, and thus carries no weight in the interpretation of the Agreement. *See United States v. Craft*, 535 U.S. 274, 287 (2002) ("failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute"); *United States v. Meek*, 366 F.3d 705, 720 (9th Cir. 2004) ("Sorting through the dustbin of discarded legislative proposals is a notoriously dubious proposition").

**3. Real Has Breached The Covenant Of Good Faith And Fair Dealing**

18. An implied duty of good faith and fair dealing is part of every contract. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979). The obligations imposed by this covenant preclude one party from taking action that frustrates the other party's contractual expectations. *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000). Put another way, "[t]he implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Schoolcraft v. Ross*, 81 Cal. App. 3d 75, 80 (1978).

19. DVD CCA expected that, to accomplish the Agreement's purpose of preventing copying of protected content, Real would use the CSS technology it obtained from DVD CCA under the license to produce a device that plays back protected content from the physical DVD Disc, and that precludes consumers from making lasting digital copies of DVDs. By producing a device that does exactly the opposite, Real has frustrated DVD CCA's contractual expectation.

20. Real knew full well that the manner in which RealDVD operates is directly contrary to DVD CCA's contractual expectation that CSS protected content would not be copied by playback devices onto a hard disk drive in a manner that would allow playback without the presence of the physical disc in the device's DVD Drive. But Real went ahead anyway with its plans to manufacture

and sell RealDVD, and thus committed a paradigmatic breach of the covenant of good faith and fair dealing. *See Lippman v. Sears, Roebuck & Co.*, 44 Cal. 2d 136, 142-43 (1955) (retailer breached covenant of good faith and fair dealing by failing to maintain retail store on shopping center premises; retailer's payment of rent for the space failed to make up for frustration of lessor's expectation that retailer had leased space to serve as the center's anchor tenant); *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 771 (1942) (seller of machine breached covenant of good faith and fair dealing by failing to share information regarding an improved machine and thus frustrating expectation of partner in joint venture to develop and market the machine); *see also Liberty Mutual Ins. Co. v. Altfillisch Constr. Co.*, 70 Cal.App.3d 789, 797 (1977); *American Medical Int'l, Inc. v. National Union Fire Ins.Co.*, 244 F.3d 715, 720 (9th Cir. 2001).

### C. ENTRY OF A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE INJURY TO DVD CCA, AND PUBLIC INTEREST CONSIDERATIONS AND THE BALANCE OF EQUITIES WEIGH IN FAVOR OF INTERIM RELIEF.

#### 1. The Agreement Stipulates That A Breach Of Key Provisions Safeguarding CSS-Encrypted Content, Which Real Has Violated, Will Cause Irreparable Injury To DVD CCA.

21. Real's multiple breaches of the Agreement entitle DVD CCA to a preliminary injunction pursuant to the stipulated remedy of Section 9.2 of the CSS License Agreement.

22. Most of the courts nationwide that have addressed the enforceability of stipulated irreparable injury provisions like Section 9.2 of the CSS License Agreement have held that such provisions are dispositive and should be honored, without any need to evaluate the evidentiary basis for the irreparable injury claim. *See Cirrus Holding Co. Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001); *Concept, Inc. v. Thermotemp, Inc.*, 553 So. 2d 1325, 1326-28 (Fla. Dist. Ct. App. 1989); *Mann v. Johnson Mem. Hosp.*, 611 N.E.2d 676, 679 (Ind. Ct. App. 1993); *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 158 (Iowa 1993); *Stanley Works v. Newell Co.*, No. 2:91CV00488, 1992 WL 345622, *1-2 (D. Conn. Oct. 2, 1992). Other courts have held that, while not dispositive, stipulated irreparable injury provisions must be given significant weight in crafting relief; these courts honor the provisions, except when there is absolutely no evidence of potential harm to the party seeking to enforce the stipulation. *See, e.g., Dominion Video Satellite, Inc.*

*v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1265 (10th Cir. 2004); *Traders Int'l, Ltd. v. Scheuermann*, No. H-06-1632, 2006 WL 2521336, *9 (S.D. Tex. Aug. 30, 2006). The stipulated irreparable injury provision in the CSS License Agreement is akin to liquidated damages provisions in contracts, which California courts regularly honor because "they remove the uncertainty factor from determining damages from a breach of contract and reduce litigation." *Utility Consumers' Action Network, Inc. v. AT&T Broadband of Southern California, Inc.*, 135 Cal. App. 4th 1023, 1038 (2006).

23. This Court follows suit and enforces the stipulated irreparable injury provision in the CSS License Agreement. The stipulated remedy to which the parties agreed comprehensively assesses the injury that DVD CCA will suffer from the degradation of its system for protecting intellectual property, from the attendant risk that other licensees will forsake their obligations and follow the violator's lead, and from the destruction of critical trust relationships with other businesses.

**2. The Release of RealDVD Will Cause Irreparable Injury To DVD CCA**

24. Even without the stipulated irreparable injury provision in the CSS License Agreement, DVD CCA is entitled to injunctive relief because Real's release of RealDVD will cause irreparable injury to DVD CCA. The threat posed to DVD CCA by the specter of the unauthorized copying of DVDs by RealDVD is manifest in the record. Real has touted RealDVD as a legal product that provides a cheap and easy way to watch and store DVDs, including DVDs that a consumer has rented or borrowed.

25. Consumer perception that it is "legal" to copy DVDs on computers through RealDVD is likely to take hold in the marketplace because of Real's well-known brand name and mainstream distribution networks. Declaration of Michael Dunn in Support of *Ex Parte* Application of Plaintiffs For Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction Thereof, dated September 29, 2008, ¶ 27.

26. If Real is permitted to launch its product and test its prediction of a strong consumer response to a device that can make playable copies of DVDs, the integrity of the CSS system will be fatally undermined, thus vitiating the purpose and mission of DVD CCA. This injury to DVD CCA's reputation and goodwill alone warrants injunctive relief. *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.

Supp. 2d 1058, 1066 (N.D. Cal. 2000) (loss of customer goodwill is irreparable "because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief").

3. **Public Interest And Equitable Considerations Support Injunctive Relief**

27. Public interest considerations strongly support the entry of the interim relief that DVD CCA is requesting. The effects of the demise of efforts to prevent copying of CSS-encrypted content through the proliferation of products like RealDVD will ultimately be felt by consumers. The motion picture, consumer electronics and information technology industries formed DVD CCA to create an environment in which content providers could release their intellectual property on the DVD format without fear of copying, and in which the consumer electronics and information technology companies would be assured that there would be content available to be played back on their products and that their products would be affordable. As content providers lose confidence in DVD CCA's ability to control unauthorized copying, they could be forced to switch to other media or adopt other more costly means of protection that would, in turn, make content unavailable for playback on the products manufactured and sold by consumer electronics and information technology companies or increase the cost of these products -- all of which will curtail the vitality or increase the cost of one of the most successful consumer products in history. The millions upon millions of members of the public who rent or purchase DVDs for their personal home viewing thus will lose out. Dunn Dep. 177:23-180:1 (Ellinikos Dec., Ex. F).

28. The balance of equities tips sharply in DVD CCA's favor as well. In essence, Real seeks to rewrite the Agreement to generate a whole new contract -- one that allows it to reap the benefits of CSS encryption technology, but without abiding by the legal framework governing use of that technology. The equities cannot be balanced through an order requiring Real to pay damages for its ongoing breaches of the Agreement, but permitting Real to sell RealDVD. Even assuming (contrary to the premise of the contract's stipulated irreparable injury provision) that damages could be calculated, the notion that damages payments would strike a happy medium flies in the face of the time-honored principle that "[no] man should be required to contract a second time with one who has without cause breached a prior contract with him." *Zanker Dev. Co. v. Cogito Sys. Corp.*, 215 Cal. App. 3d 1377, 1382 (1989) (internal quotation and citation omitted.)

29. From DVD CCA's side of the equities equation, Real's influence in the marketplace makes the continuance of injunctive relief all the more imperative. Consumer perception that it is "legal" to copy DVDs on computers using RealDVD is likely to take hold precisely because Real's products are so widely-known and used.

30. By comparison, Real will incur relatively modest burdens if it is preliminarily enjoined from selling RealDVD. Real's assertion that economic doom and gloom will beset the company if injunctive relief continues is at odds with Real's glowing portrait of its strength. A continued injunction on the sale of RealDVD will not constrain Real's ability to profit from the provision of its other popular products. Coppinger Dep. 217:9-23 (Ellinikos Dec., Ex. E); Glaser Dep. 222:25-223:14, 228:21-229:11 (Ellinikos Dec., Ex. G); Ellinikos Dec., Ex. Y.

31. There is no support for Real's claim that an injunction on the sale of RealDVD would have a "chilling effect" on the consumers that Real is targeting.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

32. Moreover, the balance of the equities weighs against the party seeking to avoid an injunction when the harm of which that party complains is self-inflicted. *See, e.g., Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (party resisting injunction "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities"). Real has brought any economic harm it claims upon itself. When it set out to hatch RealDVD, Real knew full well that DVD CCA understood the Agreement to require compliant products to play back DVD content directly from the DVD Disc. Nonetheless, Real forged ahead with RealDVD. Real's decision was a calculated gamble. Having lost that bet, it now has to endure the consequences -- including what it says will be the loss of returns on its investment in RealDVD. *See Triad*, 64 F.3d at 1338 (party's claim that it will suffer lost profits as a result of injunction barring "an activity which has been shown likely to be infringing . . . merits little equitable consideration") (internal quotations omitted).

Dated: May 15, 2009

AKIN GUMP STRAUSS HAUER & FELD LLP
WHITE & CASE LLP

By /s/
Reginald D. Steer
Attorneys for Defendant and Counterclaimant
DVD Copy Control Association, Inc.