1    JAMES A. DiBOISE, State Bar No. 83296
     Email: jdiboise@wsgr.com
2    LEO P. CUNNINGHAM, State Bar No. 167637
     Email: lcunningham@wsgr.com
3    COLLEEN BAL, State Bar No. 167637
     Email: cbal@wsgr.com
4    MICHAEL A. BERTA, State Bar No. 194650
     Email: mberta@wsgr.com
5    TRACY TOSH LANE, State Bar No. 184666
     Email: ttosh@wsgr.com
6    WILSON SONSINI GOODRICH & ROSATI
     Professional Corporation
7    One Market Street
     Spear Tower, Suite 3300
8    San Francisco, CA 94105

9    Attorneys for Plaintiffs and
     Counterclaim Defendants
10   REALNETWORKS, INC. and
     REALNETWORKS HOME
11   ENTERTAINMENT, INC.

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14   REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation, | Case Nos. C08 04548 MHP; C08 04719 MHP |
| 16 | |
| 17             Plaintiffs, | **REALNETWORKS' AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 18      v. | **Date:** May 21, 2009 <br> **Time:** 9:30 am |
| 19   DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware Corporation, | **[PUBLIC REDACTED VERSION] [PART 1]** |
| 24            Defendants. | |

26
27   AND RELATED CASES

28

Dockets.Justia.com

1

**TABLE OF CONTENTS**

2
Page

3  PROPOSED FINDINGS OF FACT .................................... 1

4  I.      PARTIES AND BACKGROUND .................................. 1

5          A.      RealNetworks, Inc. ................................... 1

6          B.      The Studio Defendants ................................ 2

7          C.      The DVD Copy Control Association ...................... 2

8  II.     CONSUMERS DEMAND AND EXPECT THAT THEY CAN MAKE FAIR
           USECOPIES OF DIGITAL AUDIO AND VIDEO CONTENT .............. 3
9
           A.      Digital Audio ...................................... 3
10
           B.      Digital Video ...................................... 4
11
   III.    THE REAL DVD PRODUCTS: FACET AND VEGAS ..................... 5
12
           A.      Conception ........................................ 5
13
           B.      Purpose, Features and Intended Use of RealDVD Products ............. 6
14
           C.      RealDVD Is Intended and Marketed for Saving DVDs the Consumer Owns  7
15
           D.      Movies Saved by the RealDVD Products Are Secure ................. 8
16
           E.      The Prospect of Rent Rip and Return ........................ 10
17
           F.      RealDVD Will Enhance the Value of DVDs ..................... 12
18
           G.      The Studio Defendants Compete with RealDVD ................... 12
19
   IV.     THE CSS LICENSE AND TECHNOLOGY ........................... 13
20
           A.      The Licensing Process ............................... 13
21
           ■      ████████████████████████ █████████████████████████ ■
22
           C.      CSS Was Compromised Years Ago ........................ 16
23
   V.      ARCCOS AND RIPGUARD ................................... 17
24
25          ■      ██████████████████████████████████████ ■

26          ■    ███████████████████████████ ███████████ ■

27          ■   ██████████████████████████ ██████████ ■

28

B.    ARccOS and RipGuard Were Not Designed to Prevent, and Do Not Prevent, a "Playand Save" Copy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E.    The Studios Use ARccOS and RipGuard Sparingly  . . . . . . . . . . . . . . . . . 28

VI.    THE STUDIOS HAVE NOT SHOWN IRREPARABLE HARM  . . . . . . . . . . . . 30

A.    Any loss of sales is quantifiable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    Any studio harm was self-inflicted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VII.    THE DVD CCA HAS NOT SHOWN ANY HARM . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII.    REALDVD WILL SUFFER IRREPARABLE HARM IF ENJOINED . . . . . . . . . . 33

A.    Real Faces Imminent Competition from Rivals . . . . . . . . . . . . . . . . . . . . . 33

IX.    AN INJUNCTION WILL HARM THE PUBLIC INTEREST  . . . . . . . . . . . . . . . 34

PROPOSED CONCLUSIONS OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

I.    FAIR USE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.    BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A.    Because The CSS License Is A Contract of Adhesion, RealNetworks' . . . . . .
Reasonable Interpretation Of The CSS License Should Control . . . . . . . . . . . . . 37

B.    Under California Law, Contract Recitals Are Not Part of the Operative . . . . .
Agreement and Do Not Impose Obligations On the Parties . . . . . . . . . . . . . . . . . 39

C.    Under California Law, the CSS License Obligations
Do Not Include The General Or Technical Specifications . . . . . . . . . . . . . 40

D.    Under The Terms of The CSS License, The General Specifications Are
Not Part of The CSS License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E.    The RealDVD Products Comply With The CSS License Agreement . . . . . 42

1.    The CSS License Permits The Manufacture of the RealDVD
Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2.    The RealDVD Products Comply With The Requirements of The . . . .
Technical, Procedural and General Specifications . . . . . . . . . . . . . . . . . . . 43

3.     The RealDVD Products Comply With the Authenticator Module for CSS Decryption Module Technical Specification . . . . . . . . . . . . . . . . . . . . __43__

4.     The RealDVD Products Implement The CSS Authentication or "Drive-locking" Mechanism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __45__

5.     The RealDVD Products Implement Bus-Decryption . . . . . . . . . . . __46__

6.     The RealDVD Products Correctly Implement The Descrambler Specification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __49__

7.     The RealDVD Products Conform To The Procedural Specifications __50__

8.     The RealDVD Products Conform To The General Specifications . . __50__

F.     The RealDVD Products' Functionality of Storing CSS-Scrambled Video . . . . Content And CSS-Encrypted Key Data To Hard Drive Memory Conforms . . . . . . . . With The CSS Documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __51__

G.     The Defendants Have Not Shown That The RealDVD Functionality of Saving Encrypted CSS Keys and Scrambled CSS Video Data to A Hard Drive Violates The CSS Specifications . . . . . . . . . . . . . . . . . . . . __54__

H.     The RealDVD products appropriately handle the CGMS-D copy flags. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __56__

III.     COVENANT OF GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . __56__

IV.     THE STUDIO DEFENDANTS CANNOT SHOW A LIKELIHOOD OF SUCCESS UNDER THE DMCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __59__

A.     The RealDVD Products Are Licensed To Use and Comply With The CSS Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __59__

B.     CGMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __64__

C.     ARccOS and RipGuard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __65__

1.     ARccOS and RipGuard Are Not Effective Technological Measures under §1201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __65__

2.     ARccOS and RipGuard Are Not Copy Protection Because They Lack Authentication And Encryption . . . . . . . . . . . . . . . . . . . . . . . __66__

3.     Facet Does Not "Circumvent" ARccOS or RipGuard . . . . . . . . . . __67__

4.     Vegas Does Not Circumvent ARccOS or RipGuard . . . . . . . . . . . __68__

5.     The Studios have Not Carried their Burden to Establish the Existence of any Particular ARccOS or RipGuard Error, or the . . . means that the RealDVD Products Use to Circumvent that Error . . . . . . . . __69__

6.     ARccOS and RipGuard Do Not Protect "A Right Of A Copyright Owner" With Respect to Products that Enable Fair Use . . . . . . . . __69__

7.      ARccOS and RipGuard Cannot Form the Basis of a Preliminary . . . . .
        Injunction of the RealDVD Products because they Are Rarely Used  . . . . . 72

V.      THE BALANCE OF HARDSHIPS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

1    **PROPOSED FINDINGS OF FACT**

2    **I.      PARTIES AND BACKGROUND**

3         **A.      RealNetworks, Inc.**

4         1.      RealNetworks, Inc. ("Real") is a public company headquartered in Seattle,

5    Washington.  Real was incorporated in 1994, and was a pioneer in the market for technology that

6    relates to the delivery of audio and video content over the Internet.  Hearing Tr. (Glaser) at

7    440:8-9, 440:21-441:19.

8         2.      Today, Real delivers a variety of copyrighted content in digital form over the

9    Internet, which it licenses from content owners in the film, television, music, and electronic

10   gaming industries.  Hearing Tr. (Glaser) at 442:7-14.  For example, Real offers a popular music

11   product called "Rhapsody," which is a subscription-based service offering consumers the ability

12   to stream some 5 million songs over the Internet, all of which Real has licensed from the

13   copyright holders.  Hearing Tr. (Glaser) at 442:15-24.  Rhapsody also lets consumers copy and

14   organize CDs that they own.  Hearing Tr. (Glaser) at 527:14-22.

15        3.      In its fifteen-year history, Real has never been accused of copyright

16   infringement from a major content provider.  Hearing Tr. (Glaser) at 443:17-23.

17        4.      Beginning in 2007, Real began developing a product that would allow

18   consumers to copy and organize their DVD collections, as is common practice with CD

19   collections.  Nelson Ex.[1] 3 (Glaser Dep.) at 14:25-16:4; Hearing Tr. (Glaser) at 445:3-15,

20   528:12-15.

21        5.      That idea eventually spawned the two products which are the subject of the

22   defendants' motion for a preliminary injunction.  The products, described more fully below, are

23   known as Vegas and Facet.  Where appropriate, they are referred to collectively as the

24   "RealDVD Products."

25

26   ───────────────

27   [1] All references to "Nelson Ex. ___ " refer to the exhibits to the Declarations of Christopher
     Nelson submitted in support of Real's Opposition and Response to Defendants' Motions for
28   Preliminary Injunction.

1

### B.    The Studio Defendants

2      6.    The Studio Defendants comprise six major motion picture companies: Disney

3   Enterprises, Inc. ("Disney"), Paramount Pictures Corporation and its parent corporation, Viacom,

4   Inc. (collectively, "Paramount"), Sony Pictures Entertainment, Inc. ("Sony"),  Twentieth Century

5   Fox Film Corporation ("Fox"), NBC Universal, Inc. ("Universal"), Warner Brothers

6   Entertainment, Inc. ("Warner").  Studios' Answer, ¶¶ 13-19.  The Studio Defendants are

7   headquartered in or near Los Angeles, California or New York City, New York.  Studios'

8   Answer, ¶¶ 13-19.

9      7.    The Studio Defendants are engaged in the business of, among other things,

10  making and distributing motion pictures on DVD discs.  Studios' Answer, ¶ 20.

11

### C.    The DVD Copy Control Association

12     8.    Defendant DVD Copy Control Association ("DVD CCA") is a not-for-profit

13  corporation.  DVD CCA Answer, ¶ 4.

14     9.    The DVD CCA is an organization that was collectively founded by three

15  different industry groups: movie studios, consumer electronics companies, and computer or

16  information technology companies.  Hearing Tr. (King) at 74:16-75:13, 81:6-11, 83:14-22, 85:13-

17  86:9, 89:9-15; Nelson Ex. 7 (Parsons Dep.) at 22:25-23:6.

18

19

20

21

22     11.    The technological framework that was ultimately agreed upon to provide limits

23  on copying is known as the Content Scramble System, or "CSS."  Hearing Tr. (King) at 79:22-

24  80:3.

25

26

27  _____

[2] Deposition testimony and accompanying deposition exhibits cited herein without reference to a
"Nelson Ex." can be found in the submissions of deposition designations lodged with the Court
28  by the parties.

1

2

3

4

5

6

7

8

9

10

11

12

13

14   **II.     CONSUMERS DEMAND AND EXPECT THAT THEY CAN MAKE
        FAIR USE COPIES OF DIGITAL AUDIO AND VIDEO CONTENT**

15

16        **A.     Digital Audio**

17        15.    Consumers today routinely exercise their right to make copies of analog and

18   digital music that they have purchased.  Gerbrandt Decl. in Opp. to PI, ¶ 32.  This is most

19   commonly done by copying songs from a music CD on the computer using popular applications

20   such as iTunes and Rhapsody.  Hearing Tr. (Glaser) 527:17-528:15, 532:4-533:2.

21        16.    Copyright holders, including companies that are closely related to the Studio

22   Defendants, recognize that consumers are entitled to make such copies of music.  As Sony has

23   advertised on its website: "SonyBMG wants music to be easily transferable to any device that

24   supports secure music.  Currently, music from our protected CDs may be transferred to hundreds

25   of such devices, as both Microsoft and Sony have assisted to make the user experience on our

26   discs as seamless as possible with their secure formats."  Nelson Decl., Ex. 37 at 7 (emphasis

27   added).

28

AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
C-08-4548 MHP; C08-4719 MHP                          -3-

1    17.    Counsel on behalf of the Studio Defendants argued to the Supreme Court of the

2    United States that this activity is both legitimate and lawful with respect to music.  In *MGM v.*

3    *Grokster*, counsel for Disney Enterprises, Inc., Warner Bros. Entertainment Inc., Paramount

4    Pictures Corporation, and Twentieth Century Fox Film Corporation represented to the Supreme

5    Court that: "The record companies, my clients, have said, for some time now, and it's been on

6    their Website for some time now, that it's perfectly lawful to take a CD that you've purchased,

7    upload it onto your computer, put it onto your iPod.  There is a very, very significant lawful

8    commercial use for that device, going forward."

9    (http://www.supremecourtus.gov/oral_arguments/argument_transcripts/04-480.pdf).

10    **B.    Digital Video**

11    18.    Consumers have long been accustomed to exercising their fair use rights to copy

12    digital video to a hard drive.  For over a decade, a company called TiVo has made a device that

13    allows consumers to save digital video to hard drive for later playback on a TV.  Barrett Decl. in

14    Opp. to PI, ¶ 7.  Consumers who subscribe to a cable service regularly copy movie and television

15    content at no charge for later viewing using digital video recorders (DVRs).  Gerbrandt Decl. in

16    Opp. to PI, ¶ 32.

17    19.    Within the last five years, a number of companies have begun offering products

18    that allow consumers the ability to make a fair use copy of DVDs that they already own.  A

19    company called AMX offers a product that allows consumers to record DVDs onto a hard drive

20    for later playback.  Nelson Ex. 17; Nelson Ex. 41 at 154-55; Hearing Tr. (Glaser) at 448:9-21.

21    The DVD CCA has been aware of the AMX product since at least 2004.  Nelson Ex. 14.

22    20.    A company known as Telestream, Inc. offers a software product, "Drive-in," that

23    allows consumers to make a secure copy of a DVD to the hard drive of a Macintosh computer.

24    Hearing Tr. (Glaser) Direct at 448:9-21; Nelson Exs. 18, 19.

25    21.    A company known as Kaleidescape has sold a product that is capable of making

26    secure copes of CSS-encrypted DVDs to a proprietary collection of hard drives since at least

27    2003.  Nelson Ex. 20 at REAL004543; Nelson Ex. 4 at 19; Hearing Tr. (Glaser) at 445:16-

28    446:16.

1    22.    Each of these companies—AMX, Telestream, and Kaleidescape—holds a CSS

2 license issued by the DVD CCA. Nelson Ex. 20 at REAL004535, REAL004543; Nelson Ex. 18;

3 Nelson Ex. 4 at 4, 14.

4    23.    In 2005, the DVD CCA sued Kaleidescape in an effort to enjoin distribution of

5 its DVD hardware. In early 2007, Judge Nichols of the Superior Court of California, Santa Clara

6 County, refused to enter an injunction against Kaleidescape after finding that the DVD CCA

7 failed to establish that Kaleidescape had violated the CSS License. Nelson Ex. 43 at 2;

8 Nelson Ex. 5 at 875, 880.

**III.    THE REAL DVD PRODUCTS: FACET AND VEGAS**

**A.    Conception**

11    24.    The products that eventually became Facet and Vegas resulted from Real's

12 effort—led by its CEO, Robert Glaser—to move its product line from the personal computer to

13 the living room -- the household's television-based entertainment center. Hearing Tr. (Glaser)

14 Direct at 444:12-445:2; Barrett Decl. in Opp. to PI, ¶ 6.

15    25.    The initial project, which was given the internal code name "Facet," was to

16 develop an improved standalone DVD player; Facet was to be a "next generation" DVD player

17 that would add value to consumers' existing DVD collections by allowing them to archive,

18 organize, and playback their movies without the need to keep track of cumbersome DVDs.

19 Hearing Tr. (Glaser) at 445:3-15.

20    26.    Based on research, Real believed that the average consumer had a large DVD

21 collection, consisting of between 70-80 DVDs. Hearing Tr. (Glaser) at 445:3-15.

22    27.    Real was aware that there was already a product on the market that allowed

23 consumers to backup and organize their DVDs, but knew the product to be expensive. Glaser had

24 personal experience with that system, Kaleidescape, and recognized the value that the system

25 brought to his personal DVD collection. Hearing Tr. (Glaser) at 445:16-446:15; Nelson Ex. 3

26 (Glaser Dep.) at 28:12-16, 258:4-8, 259:16-24, 260:3-11.

27    28.    Glaser also knew that the DVD CCA had challenged the Kaleidescape system in

28 California State Court. Nelson Ex. 3 (Glaser Dep.) at 261:6-12. After the court rejected the DVD

1  CCA's efforts to enjoin the distribution of Kaleidescape in early 2007, Real launched an effort to

2  build a product with similar functionality at a much more affordable price point.  Hearing Tr.

3  (Glaser) at 447:15-448:8.

4       29.     Facet is to be a standalone hardware device manufactured by Real's partner(s)

5  that is capable of, among other things, playing DVDs, saving DVDs to an internal hard drive, and

6  organizing and presenting saved content by means of an intuitive user interface as commonly

7  found on a DVD player.  Brennan Decl. in Opp. to PI, ¶¶ 3, 4; Hearing Tr. (Glaser) at 445:6-

8  446:16, 448:3-8.

9  [redacted]

10 [redacted]

11 [redacted]

12 [redacted]

13 [redacted]

14 **B.     Purpose, Features and Intended Use of RealDVD Products**

15      31.     There are three target market segments for RealDVD: (1) families with small

16 children, who typically watch DVDs over and over again and easily misplace or damage their

17 physical copies; (2) consumers with large libraries of DVDs, who would appreciate the

18 organization the product provides; and (3) for Vegas, business travelers, who travel with laptops

19 that can be loaded with their movie collections.  Hearing Tr. (Glaser) at 446:19-447:12.

20      32.     The RealDVD products store DVD content so that the user does not have to find

21 the physical DVD to watch the content.  Brennan Decl. in Opp. to PI, ¶ 4.  The storage of DVD

22 content also provides protection from scratches or other damage.  Hearing Tr. (Glaser) at 592:23-

23 593:10.

24      33.     RealDVD organizes collections of movies and provides for easy browsing to

25 locate the desired movie or particular episode.  Hearing Tr. (Glaser) at 464:2-6, 464:18-25;

26 Brennan Decl. in Opp. to PI, ¶ 4 (Facet); Chasen Decl. in Opp. to PI, ¶ 4-6 (Vegas).

27

28

34.     RealDVD adds a marker to identify where a user left off in viewing a particular movie so that it can resume to that particular location later at the viewer's convenience.  Hearing Tr. (Glaser) at 465:5-13; Chasen, Decl. in Opp. to PI, ¶ 6.

35.     RealDVD adds a written synopsis to each DVD on its system.  Hearing Tr. (Glaser) at 464:22-25.

36.     RealDVD includes parental controls that allow restricted access to particular movies or categories of movies.  Hearing Tr. (Glaser) at 464:7-17; Brennan Decl. in Opp. to PI, ¶ 5 (Facet); Chasen Decl. in Opp. to PI, ¶ 5 (Vegas).

37.     None of the functionality discussed above is offered by typical DVD players that do not save DVD content to a hard drive.  Chasen Decl. in Opp. to PI, ¶ 6.

**C.      RealDVD Is Intended and Marketed for Saving DVDs the Consumer Owns**

38.     Real created the RealDVD products to allow for the storage and management of *personal* DVD collections and has always intended that customers use the RealDVD Products to save only those DVDs that are owned by the customer.  Hearing Tr. (Glaser) at 445:19-446:16, 518:5-15; Gerbrandt Decl. in Opp. to PI, ¶¶ 8, 14.

39.     The RealDVD Products are marketed exclusively for use with DVDs that a consumer owns.  Hearing Ex. B.  For example, Real tells its potential users that the product is legal only if "'you are the owner of the original DVD and you use your saved copy solely for your personal use[.]'"  Hearing Tr. (Glaser) at 458:5-10; Hearing Ex. A.

40.     RealDVD warns its users before allowing them to save any movies, that "'RealDVD should only be used to save discs you own.  If you don't own the disc, please select Play.'"  Hearing Tr. (Glaser) at 462:9-11.

41.     Real also contractually requires uses of Vegas to only save for fair use: "You may use the saving functionality of the Software only with DVDs that you own.  You may not use the Software to save DVDs that you do not own, such as rental or borrowed DVDs."  Nelson Ex. 22, at § 2b.

42.     Vegas was marketed to law-abiding users who wished to make backup copies of DVDs that they own. Gerbrandt Decl. in Opp. to PI, ¶ 14. None of Vegas's marketing materials suggest that Vegas should be used to create libraries of rented or borrowed DVDs. Gerbrandt Decl. in Opp. to PI, ¶ 14; *see also* Hearing Exs. A, B; Nelson Ex. 22; Hearing Tr. (Glaser) at 445:19-446:16, 518:5-15.

**D.     Movies Saved by the RealDVD Products Are Secure**

43.     The DVDs saved by Vegas and Facet are secured and locked down in several respects. Movie content saved by the RealDVD Products is unplayable if it is removed or copied from the hard drive to which it was originally saved. Hearing Tr. (Glaser) at 455:13-18, 428:20-429:1; Hearing Tr. (Schumann) at 428:20-429:1; Nelson Ex. 3 (Glaser Dep.) at 67:5-9; Brennan Decl. in Opp. to PI, ¶ 6; Buzzard Decl. in Opp. to PI, ¶¶ 4, 10; Chasen Decl. in Opp. to PI, ¶ 12.

44.     Movie content saved by the RealDVD Products cannot be transcoded into different audio or video formats, and cannot be compressed. Hearing Tr. (Glaser) at 468:18-469:6, 470:5-12, 596:18-597:13.

45.     Movie content saved by the RealDVD Products cannot be uploaded to the Internet in playable form or played on a network. Hearing Tr. (Glaser) at 449:14-24; Brennan Decl. in Opp. to PI, ¶ 6; Buzzard Decl. in Opp. to PI, ¶ 10; Chasen Decl. in Opp. to PI, ¶ 12.

46.     A movie saved by Facet can only be played back by the Facet box that made the copy—that is to say, the hard drive cannot be removed and used in a different Facet system. It is not portable. Hearing Tr. (Glaser) at 451:9-12; Brennan Decl. in Opp. to PI, ¶ 6.

47.     A movie saved by Vegas to a hard drive can be played back by up to five different PCs that are registered to the same user account, but cannot be removed from the hard drive in playable form. Hearing Tr. (Bishop) at 773:24-774:3-6; Hearing Tr. (Schumann) at 299:25-300:7, 344:8-12, 374:24-375:3, 428:20-429:1.

48.     No changes to the restrictions on the copy made with RealDVD will be made that would enlarge the product's intended use beyond legal fair use. Hearing Tr. (Glaser) at 596:23-597:13.

49.     All movies saved by the RealDVD Products remain CSS encrypted, just as they were on the original DVD.  Hearing Tr. (Glaser) at 449:14-18; Hearing Tr. (Schumann) at 376:13-377:16; Nelson Ex. 3 (Glaser Dep.) at 54:7-10; Brennan Decl. in Opp. to PI, ¶ 7; Buzzard Decl. in Opp. to PI, ¶¶ 4, 10.

50.     In addition to preserving CSS encryption, the RealDVD Products place an additional layer of encryption on each saved movie.  This second layer of encryption is known as AES-128.  Hearing Tr. (Glaser) at 449:14-24; Hearing Tr. (Bielman) at 1106:8-11, 1134:24-1135:2; Hearing Tr. (Schumann) at 376:13-377:16; Nelson Ex. 3 (Glaser Dep.) at 54:7-10; Brennan Decl. in Opp. to PI, ¶ 7-8; Buzzard Decl. in Opp. to PI, ¶¶ 7-8; Chasen Decl. in Opp. to PI, ¶ 11.

51.     "AES" stands for "Advanced Encryption Standard," and the number 128 represents the number of bits in the encryption keys used by this encryption standard.  Hearing Tr. (Bishop) at 711:8-712:2, 720:6-13.

52.     AES-128 was developed by the computer industry and the government, and it is used for protecting, among other things, classified and financial data.  Hearing Tr. (Bishop) at 711:11-712:2, 720:4-13.  It is widely considered to be the safest and best-available form of encryption, and it is far more secure than CSS.  Hearing Tr. (Bishop) at 720:4-13, 733:15-16.

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮

3 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮

### E.    The Prospect of Rent Rip and Return

58.    It is possible for someone to use RealDVD to rent a movie, make a copy of it, and then return the movie (Hearing Tr. (Glaser) at 455:19-22), but RealNetworks discourages such conduct and warns consumers that the product is not to be used to copy DVDs that the user does not own.  Hearing Tr. (Glaser) at 462:9-11; Nelson Ex. 22, at § 2b.  *See* § III(C) ¶¶ 38-42, above.

59.    The Studios could mark discs sold to the rental channel to indicate that they were rentals.  Hearing Tr. (Glaser) at 455:23-456:8, 573:23-574:13; Gewecke Dep., 205:5-20.

15 ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮

61.    In the absence of Studio cooperation, there is no way for RealDVD to detect whether a disc is a rental disc.  Hearing Tr. (Glaser) at 455:23-25.

62.    RealDVD's target market values legality.  Gerbrandt Decl. in Opp. to PI, ¶ 12; *see also id.* at Ex. 5 (Smith Geiger Research) at REAL021004.  Its customers are unlikely to use RealDVD to make copies of DVDs they do not own.  Hearing Tr. (Glaser) at 455:11-24, 504:14-505:5, 509:19-510:14; *see also* Bresnahan Decl. in Opp. to PI, ¶¶ 6-7, 12-19; Gerbrandt Decl. in Opp. to PI, ¶¶ 4-18.

63.    A physical DVD is not interchangeable with the content on a hard drive.  People purchase movies (as opposed to renting them) because they want to own the physical copy of the disc in the case with the packaging to keep in their collection.  That is a reason why the electronic

1  sell through market for movie content has historically been relatively small.  Gerbrandt Decl. in

2  Opp. to PI, ¶ 16.

3          64.     The Studio Defendants acknowledge a lack of evidence that a meaningful

4  number of users will use RealDVD to make copies of DVDs they do not own.  Ms. King, a

5  consultant for the Studios in this case, is not aware of any analysis done by the Studios on the

6  harm they expect to face if RealDVD is released.  Hearing Tr. (King) at 117:9-118:2.

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████

11          65.     Consumers who want to make copies of DVDs they do not own have available

12  to them other products, known as "rippers," that are better than RealDVD for that purpose.

13  Hearing Tr. (Glaser) at 509:19-510:14, 596:18-597:13.

14          66.     There are hundreds of software products that allow DVD content to be "ripped"

15  from DVDs so as to be saved to a hard drive without any encryption.  *See* Gerbrandt Decl. in

16  Opp. to PI, ¶ 7 and Ex. 2; Bresnahan Decl. in Opp. to PI, ¶ 7.  Such products are neither hard to

17  find nor difficult to use.  They may be purchased in mainstream retail outlets such as Best Buy or

18  Costco, downloaded (often for free) from the Internet, and are commonly reviewed in mainstream

19  magazines.  Bresnahan Decl. in Opp. to PI, ¶ 19; Gerbrandt Decl. in Opp. to PI, ¶ 7.

20          67.     Unlike copies made using RealDVD, movies downloaded from the Internet or

21  copied using DVD rippers are generally free from CSS encryption and other forms of digital

22  rights management.  They can thus be freely re-copied and shared (including over the Internet),

23  burned onto DVDs, and transcoded and compressed to be played on a variety of mobile devices,

24  including iPods, PDAs, laptop computers and cell phones.  Hearing Tr. (Glaser) at 449:14-12,

25  455:13-18; Gerbrandt Decl. in Opp. to PI, ¶ 7.

26  ██     ████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████



**F.      RealDVD Will Enhance the Value of DVDs**

70.    RealDVD adds value to the content on a DVD, and because such value is added,

people may be more inclined to purchase more DVDs.  Hearing Tr. (Glaser) at 470:18-471:12;

Gerbrandt Decl. in Opp. to PI, ¶ 19; Bresnahan Decl. in Opp to PI, ¶ 16.

72.    These features would not be available without the ability to make a copy of the

movie content to a hard drive.  The reason to use RealDVD is not merely to get an extra copy of a

movie, but to get the extra features (such as protection, organization, and portability) that are

available only with a hard drive copy.  Hearing Tr. (Glaser) at 536:2-537:24; Chasen Decl. in

Opp. to PI ¶ 6.

**G.      The Studio Defendants Compete with RealDVD**

74.    The Studio Defendants have entered the market for fee-based digital video with

a product called "Digital Copy."  Nelson Ex. 63.  The Digital Copy product is essentially an

1  unencrypted second copy of a movie sold alongside the DVD.  *Id.*  The copy can be transferred

2  between portable devices, or saved to one or more hard drives, and is playable without the DVD.

3  *Id.*



14  **IV.    THE CSS LICENSE AND TECHNOLOGY**

15  **A.    The Licensing Process**





1

2

3

4

5

6          87.    After the California State Court ruled that the DVD CCA had failed to prove

7    that the Kaleidescape system, which offers nearly identical functionality to Real's Facet product

8    (Hearing Tr. (Glaser) at 447:15-448:8),

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**C.    CSS Was Compromised Years Ago**

94.    One or more keys needed to access CSS-encrypted DVD content have been publicly available on the Internet, and elsewhere, since at least 1999. Hearing Tr. (Kelly) 228:18-229:6; Hearing Tr. (Schumann) at 385:1-388:25; Nelson Ex. 6 (Pak Dep.) at 206:22-210:12. These compromised CSS keys can be located on the Internet in a matter of minutes, and it only takes one to access all DVDs encrypted with CSS. Hearing Tr. (Bishop) 717:2-16, 719:8-720:3.

96.    As result of CSS being compromised, there are many software applications available on the Internet that are capable of stripping the CSS encryption from a DVD and making copies that can then be freely distributed, compressed, transcoded into other formats, and

1  otherwise pirated.  Hearing Tr. (Glaser) at 448:22-449:1, 470:5-12; Gewecke Dep. at 122:6-12;

2  Bresnahan Decl. in Opp. to TRO, ¶¶ 19-20; Felten Decl. in Opp. to TRO, ¶¶ 17-29.

3  ■ ████████████████████████████████

4  ████████████████████████████████

5  ███████████████

6  **V.    ARCCOS AND RIPGUARD**

7  ■ ████████████████████████████████

8  ■ ████████████████████████████████

9  ██████████████████████████████

10 ████████████████████████████████████

11 ███████████████████████████████████

12 ████████████████████████████████████

13 ██████████████████████████████████

14 ██████████

15 ■ ████████████████████████████████

16 ███████████████████████████████████

17 ███████████████████████████████████

18 ██████████████████████████████████

19 ███████████████████████████████████

20 ████████████████████

21 ■ █████████████████████████████

22 ███████████████████████████████████

23 █████████████████████████████████

24 █████████████████████████████████

25 ██████████████████████████████████

26 ■ ███████████████████████████

27 ████████████████████████████████████

28 ████████████████████████████████████











**B.   ARccOS and RipGuard Were Not Designed to Prevent, and Do Not Prevent, a "Play and Save" Copy**











160.    There are hundreds of other licensed DVD player manufacturers in the world.

These manufacturers all have standard recovery mechanisms to deal with errors on DVDs.  Dixon

Decl. in Opp. to PI, Ex. B at ¶19.  Many of these manufacturers have had problems playing DVDs

1   that have been infected with ARccOS and RipGuard errors.  Nelson Ex. 53. 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17   **E.   The Studios Use ARccOS and RipGuard Sparingly**

18   164.   The Studios' use of ARccOS and RipGuard errors is sparing.

19

20

21

22

23

24

25

26

27

28



**VI.    THE STUDIOS HAVE NOT SHOWN IRREPARABLE HARM**

177.   Consumers already believe they have the right to make a backup copy of a purchased DVD,

178.   DVDs typically do not state that making a backup copy is prohibited.  They instead state that "unauthorized copying" or "unauthorized reproduction" is prohibited, or that the DVD is intended "for private home use only."  Nelson Ex. 103.  Similar language appears on the FBI warning at the beginning of most DVDs, and does not purport to prohibit backup copies. Nelson Ex. 104.  Further, some DVDs do not even contain the FBI warning.  DeNatale Decl. in Response to PI, ¶ 8.

1

2

3

4

5

6

7

8

9

10   181.   Persons interested in stealing DVD content have available to them high-quality

11   copies of movies on free peer-to-peer networks that are available on the Internet before the DVDs

12   are even made available for sale.  Gerbrandt Decl. in Opp. to PI, ¶¶ 9-11.

13   182.   Vegas and Facet both forbid "rent-rip-and-return" and Real's own studies have

14   shown that its customers are unlikely to engage in such behavior.  *See supra*, ¶¶ 38-42; Gerbrandt

15   Decl. in Opp. to PI, ¶ 14 and Ex. 5.

16   183.   The likely consumers of Vegas and Facet are those who care about legality,

17   actively avoid stealing movie and television content, and are looking to make a backup or

18   convenience copy of media that is notoriously fragile, cumbersome and inconvenient to use in

19   today's digital world – a DVD disc.  Bresnahan Decl. in Opp. to PI, ¶ 13; Gerbrandt Decl. in Opp.

20   to PI, ¶ 8.  As explained above, people interested in stealing movies have available to them

21   alternative technologies that are superior to RealDVD for that purpose.  *See supra* ¶¶ 66-69.

22   184.   The presence of RealDVD and Facet increases the value of purchased DVDs to

23   these law abiding consumers (by adding numerous convenience and other benefits to purchased

24   DVDs), and will tend to increase the demand for purchased DVDs.  Bresnahan Decl. in Opp. to

25   PI, ¶ 16; Gerbrandt Decl. in Opp. to PI, ¶ 19.

26

27

28

AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
C-08-4548 MHP; C08-4719 MHP                                    -31-

1    **A.    Any Loss of Sales Is Quantifiable**

2        185.    Damages, if any, from the sale of RealDVD between the lifting of the temporary

3    restraining order and a final judgment (if adverse to Real) could be readily calculated.  Klein

4    Decl. in Opp. to PI, ¶¶ 7, 12.

5        186.    The method to calculate such damages would involve the following factors:

6    (1) the differential in price received between the lost product sales attributable to RealDVD and

7    the actual product sales; (2) costs associated with lost product sales and actual product sales to

8    compute lost profits; (3) the size of the population subset that engages in behavior leading to

9    diverted sales; and (4) the quantity of sales diverted by this population subset.  Klein Decl. in

10   Opp. to PI, ¶¶ 8-11, 13-16.

11       187.    The data to determine the above factors are readily available; the Studios track

12   and forecast price and cost data.  Klein Decl. in Opp. to PI, ¶¶ 8-11, 13-16; *see also* Gerbrandt

13   Decl. in Opp. to PI, ¶¶ 20-22.  If the data did not already exist, consumer surveys could be used.

14   *Id.*, ¶ 21.  If harm from competition were a cognizable injury, that, too, would be compensable in

15   damages.  *Id.*, ¶ 28; Klein Dec. in Opp. to PI, ¶¶ 7, 11.

16   ████ ██████████████████████████████

17   ████████████████████████████████████████

18   ███ ████████████████████████████████

19   ██████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████

22   ████████████████

23   **B.    Any Studio Harm Was Self-Inflicted**

24       190.    Any harm that the Studios would have suffered from the threat of the users of the

25   RealDVD Products from "rent-rip-and-return" is self inflicted because the Studios alone possess

26   the ability to prevent such harm.  ████████████████████

27

28

███████████████████████████

██████████████████████████████

████

████  █████████████████████████

███████████████████████████

████  █████████████████████████

██████████████████████████████

█████████████████████████

## VII.    THE DVD CCA HAS NOT SHOWN ANY HARM

193.    The CSS licensing structure has remained in place notwithstanding the continued presence of CSS-licensed products similar to the RealDVD products, such as AMX, Kaleidescape, and Drive-in advertised on Apple's website.  There is no evidence that such products have changed DVD CCA in any way. Nelson Ex. 20 at REAL004535; Nelson Ex. 14 at DVD001504; *see also* Nelson Ex. 15 at DVD009096; Nelson Ex. 16 at DVD009098-99; Nelson Exs. 17, 18, 19; Nelson Ex. 20 at REAL004543; Nelson Ex. 4; Nelson Ex. 6 (Pak Dep.) at 196:12-20, 200:12-22.

## VIII.   REALDVD WILL SUFFER IRREPARABLE HARM IF ENJOINED

### A.    Real Faces Imminent Competition from Rivals

194.    Real is a much smaller company than the Studios and other potential rivals which are, or are preparing products to compete with RealDVD.  Once consumers adopt a product to save their DVDs, they are unlikely to switch to a different product.  Gaining early market share is therefore critical for Real.  Nelson Ex. 21 (Coppinger Dep.) at 216:2-6; Hearing Tr. (Glaser) at 475:15-476:14.

195.    If the injunction continues, Real's competitors, including the Studios themselves, could be expected to gain market share and irreparably diminish the chance of success for RealDVD.  Barrett Decl. in Opp. to PI, ¶ 10; Nelson Exs. 2, 4, 17, 18, ; Hearing Tr. (Glaser) at 475:15-476:2.

196.    Real's OEM partner for Facet will also not deliver a final pre-production product while an injunction is pending.  Barrett Decl. in Opp. to PI, ¶ 12.  Because hardware production and testing requires long lead times, it is important to the success of Facet that Real find a hardware manufacturer that will work with it now.  *Id.*  An injunction will further deter such partners.  *Id.*

**B.    An Injunction Will Likely Cause Job Loss and Irreparably Damage Real's Ability to Launch RealDVD**

██  ████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
███████████████████

## IX.    AN INJUNCTION WILL HARM THE PUBLIC INTEREST

198.    The Studios' attempt to keep RealDVD and Facet out of the marketplace harms consumers by withholding innovative and relatively inexpensive products.  Bresnahan Decl. in Opp. to PI, ¶ 23.  An injunction would harm, not further, the public interest.

199.    Continuing the injunction effectively eliminates consumers' fair use right under the Copyright Act to make a copy of DVDs they have purchased.  Consumers would then be forced to pay the Studios a second time for the right to make a fair use copy of such DVDs.  ███
████████████████████████████████████████████
███████████████████████████████████

### PROPOSED CONCLUSIONS OF LAW

From the foregoing facts, the Court concludes:

1.    If any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby incorporated by this reference into these conclusions of law.

**APPLICABLE LEGAL STANDARDS**

2.     Two tests determine whether to grant or deny a preliminary injunction.  Under the first test, the moving party must demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)."  *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).  "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor."  *Id.*  (citations and quotations omitted).

3.     The court "must consider the public interest as a factor in balancing the hardships when the public interest may be affected."  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

**LIKELIHOOD OF SUCCESS ON THE MERITS**

**I.     FAIR USE**

4.     Creating a personal backup copy of a purchased DVD is a fair use.  17 U.S.C. § 107; *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984).

5.     The policy of permitting a back up copy of digital content is explicitly endorsed in the Copyright Act itself.  Pursuant to Section 117, the owner of a copy of a computer program – and the contents of a DVD are a computer program – is authorized to make an additional copy. 17 U.S.C. § 117.

6.     A DVD qualifies as a "computer program" under § 117.  17 U.S.C. § 101 defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  Any DVD that can be played on a software DVD player (*i.e.*, all DVDs) satisfies that definition.

7.     Making a backup copy of a purchased DVD is a fair use under 17 U.S.C. §107.

a.     Under the first factor (the purpose and character of the work), courts looks to whether the secondary use "is of a commercial nature or is for nonprofit educational

1 | purposes."  17 U.S.C. § 107.  The Copyright Act sets out a spectrum of purposes, and personal

2 | private copying falls at the favored end of the spectrum because non-commercial uses are more

3 | likely to be fair.  *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984).

4 | Here, the RealDVD Products are intended to be used by consumers to make backup copies of

5 | purchased DVDS, a use that is purely non-commercial and private in nature.  *See Sony,* 464 U.S.

6 | at 449 (holding that "time-shifting [by taping broadcast television shows] for private home use

7 | must be characterized as a noncommercial, nonprofit activity.").    Further, since such consumers

8 | have already paid once for the work, they should not have to pay a second fee to make the initial

9 | purchase more secure or convenient, since the Studios have already been justly compensated.

10 | This factor weighs in favor of fair use.

11 |         b.    The second factor requires consideration of the nature of the copyrighted

12 | work.  The Studios' movies are creative works entitled to the full extent of copyright protection.

13 |         c.    The third factor is the amount and substantiality of the portion of the

14 | work used.  Although a consumer could be expected to make a copy of the entire movie or

15 | television show on a DVD, this factor does not weigh against fair use since the consumer is

16 | taking only as much as is necessary for the intended use.  *Kelly v. Arriba Soft,* 336 F.3d 811, 820-

17 | 21 (9th Cir. 2003) ("This factor neither weighs for nor against either party because, although

18 | Arriba did copy each of Kelly's images as a whole, it was reasonable to do so in light of Arribas

19 | use of the images.").

20 |         d.    The fourth factor under §107, the effect on the market, is "undoubtedly

21 | the single most important element of fair use." *Harper & Row v. Nation Enters.*  Because the use

22 | by RealDVD consumers is noncommercial, the Studio must prove that the use is harmful or

23 | would adversely affect the market for the copyrighted work if it became widespread, which they

24 | have not done.  *Sony,* 464 U.S. at 451.  Here, as in *Sony,* the copy made by RealDVD will not

25 | harm the market for or the value of the copyrighted work. 471 U.S. 539, 566 (1985).   To the

26 | contrary, the ability to make a copy with RealDVD will enhance the value of DVDs.  In addition,

27 | the user of RealDVD has already purchased the DVD, and has the right to watch it repeatedly.

28 | The single copy created by RealDVD just permits the consumer to "shift" viewing to a different

1   time and place.  This most important factor weighs in favor of fair use, and combined with the

2   other factors, demonstrates that the intended use of the RealDVD Products is to enable fair use.

3   **II      BREACH OF CONTRACT**

4       **A.      Because The CSS License Is a Contract of Adhesion, RealNetworks'
                Reasonable Interpretation of the CSS License Should Control**

5

6       8.      Contracts of adhesion are agreements offered by a party of superior bargaining

7   strength on a "take it or leave it basis." *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003);

8   *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1069-70 (N.D. Cal. 2007).

9       9.      The CSS Agreement is a standardized contract, imposed upon the subscribing

10  party without an opportunity to negotiate the terms.  It is therefore a contract of adhesion.

11  *Armendariz v. Found. Health PsychCare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000).

12      10.     The fact that Real was represented by counsel does not change the adhesive

13  nature of the CSS Agreement since Real had no choice but to accept the CSS Agreement in order

14  to make a viable DVD product.  That requirement, and the absence of any alternatives, eliminated

15  Real's bargaining power.  *Madden v. Kaiser Found. Hosps.*, 17 Cal. 3d 699, 711 (1979) ("In

16  many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but

17  also any realistic opportunity to look elsewhere for a more favorable contract."); *Graham v.*

18  *Scissor-Tail, Inc.*, 28 Cal. 3d 807, 818 (1981).

19      11.     Because it is a contract of adhesion, the CSS Agreement must be interpreted

20  consistent with the adhering party's, Real's, reasonable interpretation of its terms.  *Acorn v.*

21  *Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1173 (N.D. Cal. 2002) (adhesive agreement will be

22  interpreted according to the reasonable interpretation of the adhering party); *State Farm Fire &*

23  *Cas. Co. v. Keenan*, 171 Cal. App. 3d 1, 14 (1985) (contract of adhesion interpreted in light of the

24  reasonable expectations of the adhering parties, and not "from the subjective intent of the people

25  who drew up those policies of adhesion").

26      12.     The CSS implementation in the RealDVD Products is a result of the

27  interpretation of the CSS documentation by persons with the appropriate engineering skill.

28

1    Because it is a contract of adhesion, the Real engineers' reasonable interpretation of the CSS

2    License is the interpretation the Court must apply. *Id.*

3          13.    Because the CSS Agreement is a contract of adhesion, any ambiguities must be

4    interpreted against the DVD CCA. *Acorn*, 211 F. Supp. 2d at 1173; Cal. Civ. Code §1654. This

5    is a rule of law applicable to adhesion contracts and is not merely a rule "of last resort" with

6    respect to such contracts as the DVD CCA contends. *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d

7    807, 820 n.16 (1990) ("Such terms, of course, are subject to interpretation under established

8    principles. The rule requiring the resolution of ambiguities against the drafting party applies with

9    peculiar force in the case of a contract of adhesion"); *Meyers v. Guarantee Sav. & Loan Assn.*, 79

10   Cal.App.3d 307, 312 n.1 (Cal.App. 5 Dist. 1978).

11         14.    The subjective intent of the DVD CCA and Studios is irrelevant. *Founding*

12   *Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.

13   App. 4th 944, 956 (2003); *Oritani Sav. & Loan Ass'n. v. Fidelity & Deposit Co. of Md.*, 744

14   F. Supp. 1311, 1315 (D. N.J. 1990) ("[T]he subjective intent of a person drafting a contract is not,

15   by any means, determinative as to the meaning of the contract especially where, as here, the

16   contract is one of adhesion.").

17         15.    Real's interpretation of the CSS Agreement and related documentation as

18   permitting copying DVD content and keys to a hard drive is reasonable. The same conclusion has

19   also been reached by persons unaffiliated with this litigation, including at least three CSS-

20   licensed manufacturers which offer products designed to make a back-up copy of DVD video

21   content on a hard drive for playback: Kaleidescape, Inc., Telestream, Inc. and AMX.

22         16.    Similarly, after a full trial on the merits, Judge Nichols of the California Superior

23   Court, Santa Clara County, noted that the DVD CCA and Studios had hundreds of meetings with

24   the best legal minds – if they wanted to prohibit copying to a hard drive, they surely could have

25   said it but did not. *DVD CCA v. Kaledidescape, Inc.*, No. 1:04 CV 031829 (Cal. Sup. Ct,

26   March 29, 2007) at 878-889 ("But the plaintiff [DVD CCA] had every advantage, the resources

27   of the whole industry . . . . I'm not criticizing anybody. They came together on over a hundred

28

1  occasions . . . . It seemed to me in reading these documents kind of like hedging the bets, that

2  clear, unequivocal, decisive decision was not made.").

3      17.    Because the CSS Agreement is a contract of adhesion, the opinions from the

4  experts retained by the Studio and DVD CCA on how the CSS Agreement and related technical

5  documentation should be interpreted opinions are irrelevant. The question is not whether one can

6  develop an interpretation of the CSS documentation that supports the Defendants' interpretation.

7  The question instead is whether the interpretation of Real's engineers is reasonable. *Acorn*, 211

8  F. Supp. 2d at 1173. And it is.

9  **B.  Under California Law, Contract Recitals Are Not Part of the Operative Agreement and Do Not Impose Obligations On the Parties**

11     18.    Contract recitals generally are not part of the operative language in an agreement

12  and therefore do not impose obligations on the parties.  Recourse to recitals to interpret the

13  language of a contract is permitted only when the operative words of the contract are ambiguous

14  and the language in the recitals is clear and unambiguous. Cal. Civ. Code § 1068; *Golden West*

15  *Baseball Co. v. City of* Anaheim, 25 Cal. App. 4th 11, 37-38 (1994) (recourse to recital necessary

16  to interpret indefinite antecedent in operative language); 17A C.J.S. (1999) Contracts, § 317, p.

17  340 ("Since recitals indicate only the background of a contract, that is, the purposes and motives

18  of the parties, they do not ordinarily form any part of the real agreement. Generally, they do not

19  have the force of contractual stipulations."). If the recitals are ambiguous and the operative text

20  of the agreement is clear, the operative text controls. Where the language of a recital is clear but

21  inconsistent with the operative text, the operative text also controls. *Id.*

1

2

3

4

5

6

7

8

9

10

11   **C.     Under California Law, the CSS License Obligations Do Not Include The General Or Technical Specifications**

12

13         21.     To incorporate a document into another agreement by reference, four

14   requirements must be met: (1) the reference to incorporation must be clear and unequivocal,

15   (2) the reference must be called to the attention of the other party, (3) the other party must consent

16   to the incorporation, and (4) the terms of the incorporated document must be known or easily

17   available to the contracting parties.  *Chan v. Drexel Burnham Lambert Inc.*, 178 Cal. App. 3d

18   632, 641 (1986) *quoting Williams Constr. Co. v. Standard Pac. Corp.*, 254 Cal. App. 2d 442

19   (1967); *Cariaga v. Local No. 1184 Laborers Int'l. Union of N. Am.*, 154 F.3d 1072, 1074 (9th

20   Cir. 1998).

21         22.     The General Specifications are not properly incorporated by reference into the

22   CSS Agreement.  The General Specifications do not meet any of the four *Chan* requirements:  (1)

23   no other CSS documents cite the General Specifications, and even the General Specifications do

24   not explicitly purport to be a part of a larger agreement (*see* CSS documentation); (2) since there

25   was no clear reference to the General Specifications in any of the available documents, Real did

26   not have notice of the document (*id.*); (3) Real consequently could not and did not consent to their

27   incorporation; and (4) as the DVD CCA admits, it did not and would not disclose the General

28