1   JAMES A. DiBOISE, State Bar No. 83296
    Email: jdiboise@wsgr.com
2   LEO P. CUNNINGHAM, State Bar No. 167637
    Email: lcunningham@wsgr.com
3   COLLEEN BAL, State Bar No. 167637
    Email: cbal@wsgr.com
4   MICHAEL A. BERTA, State Bar No. 194650
    Email: mberta@wsgr.com
5   TRACY TOSH LANE, State Bar No. 184666
    Email: ttosh@wsgr.com
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
7   One Market Street
    Spear Tower, Suite 3300
8   San Francisco, CA 94105

9   Attorneys for Plaintiffs and
    Counterclaim Defendants
10   REALNETWORKS, INC. and
    REALNETWORKS HOME
11   ENTERTAINMENT, INC.

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14   REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware Corporation, <br><br> Defendants. | Case Nos. C08 04548 MHP; <br>          C08 04719 MHP <br><br> **REALNETWORKS' AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> **Date: May 21, 2009** <br> **Time: 9:30 am** <br><br><br> **[PUBLIC REDACTED VERSION] [PART 2]** |

AND RELATED CASES

AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW
C-08-4548 MHP; C08-4719 MHP

1 | Specifications to Real prior to Real's signing the CSS Agreement and paying membership fees.

2 | Nelson Ex. 6 (Pak Dep.) at 73:12-74:3.  *Chan*, 178 Cal. App. 3d at 641.

3 |     23.    The Technical Specifications are also not incorporated into the agreement

4 | between Real and the DVD CCA because it is undisputed that the Technical Specifications were

5 | not made available to Real prior to signing the CSS Agreement and paying the requisite fees.

6 | Nelson Ex. 6 (Pak Dep.) at 73:12-74:3; *Chan*, 178 Cal. App. 3d at 641; *Baker v. Osborne Dev.*

7 | *Corp.*, 159 Cal. App. 4th 884, 896 (2008)

8 |     24.    Because the Technical and General Specifications were not properly

9 | incorporated into the CSS Agreement, they impose no restrictions on Real.  *Chan*, 178 Cal.

10 | App. 3d at 645.  Even if RealNetworks were aware at the time it signed the CSS Agreement that

11 | the DVD CCA planned to provide a copy of the Technical Specifications after RealNetworks

12 | entered into the CSS License Agreement, the Technical Specifications still could not impose

13 | contractual obligations on RealNetworks because those specifications were not made available to

14 | Real prior to signing the CSS Agreement and paying the requisite fees.  *Id*. at 641 ("For the terms

15 | of another document to be incorporated into the document executed by the parties . . . the terms of

16 | the incorporated document must be known or easily available to the contracting parties.")

17 |     25.    The fact that RealNetworks worked to comply with all of the CSS

18 | documentation, including the General and Technical Specifications, after receiving them does not

19 | rectify the DVD CCA's failure to have properly incorporated those documents by reference into

20 | the CSS Agreement as executed by RealNetworks.  The cases relied upon by the DVD CCA in

21 | their P.I. briefing (*see* DVD CCA Responsive PI Br. at 15) stand only for the proposition that the

22 | meaning of disputed terms in a contract may be ascertainable from the parties' subsequent efforts

23 | to comply with those terms.  No case cited by the DVD CCA provides that a party may be bound

24 | to terms to which it had no access or knowledge prior to execution of an agreement.

25 |     **D.    Under The Terms of The CSS License, The General Specifications Are Not Part of The CSS License**

26 |

27 | ██

28 |



**E.** **The RealDVD Products Comply With The CSS License Agreement**

    **1.** **CSS License Permits The Manufacture of the RealDVD Products**

1 ██ ██████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████

5 ██████████████████████

### 2. The RealDVD Products Comply With The Requirements of The Technical, Procedural and General Specifications

37. The RealDVD Products conform to the CSS specifications. Hearing Tr. (Bishop) at 669:19-670:10, 632:17-17-633:20; Hearing Tr. (Bishop) at 757:8-15, 793:14-18; Bishop Decl. in Opp. to PI, Ex. A at ¶¶ 29-226; Felten Decl. in Opp. to PI, Ex. A ¶¶ 42-149.

38. James Bielman, the Real software engineer who implemented the CSS specifications for the Facet product, has ten years of experience in software development and software specification implementation. He made the effort to understand the specifications and their requirements, attempted to implement them correctly, and had a reasonable belief that he implemented the CSS specifications correctly. Hearing Tr. (STIPULATION) 1043:18-1044:12; Hearing Tr. (Bielman) at 1004:3-1005:6, 1005:14-19, 1044:15-1045:5. The Real software engineer who implemented the CSS Specifications for Vegas also followed the specifications rigorously. Buzzard Dep. at 138:10-139:3, 195:22-198:10, 86:22-87:1.

39. Because the CSS License is a contract of adhesion, Real's engineers' belief that they implemented correctly the CSS specifications is sufficient to conclude that the RealDVD products do, in fact, comply with the CSS specifications. *See supra*, ¶¶ 11-12.

### 3. The RealDVD Products Comply With the Authenticator Module for CSS Decryption Module Technical Specification

40. The RealDVD products conform to the CSS specifications, including correctly performing bus authentication and bus-decryption. Hearing Tr. (Bielman) at 1034:13-1035:9; Hearing Tr. (Bishop) at 652:12-15; *see also* Hearing Tr. (Bishop) at 669:19-670:10, 632:17-633:20, 757:8-15, 793:14-18; Bishop Decl. in Opp. to PI, Ex. A at ¶¶ 42-50, 62-70 and Ex. B at ¶ 28.

























1   99.   The fact that the CSS specifications do not proscribe the functionality of the

2   RealDVD products is confirmed by the *Kaleidescape* decision where the same functionality was

3   held not to violate the CSS specifications at issue.

16   **III.   COVENANT OF GOOD FAITH AND FAIR DEALING**

17   103.   The CSS Agreement was a negotiated compromise among various industry

18   participants, including the Studios, various consumer electronics companies and various

19   technology companies.   Nelson Ex. 40.   The drafting efforts of these different industries yielded a

20   very detailed and specific set of requirements and prohibitions that cannot be modified by implied

21   terms.   *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000) (implied covenant "cannot

22   impose substantive duties or limits on the contracting parties beyond those incorporated in the

23   specific terms of their agreement.").

24   104.   An implied covenant cannot be invoked to impose obligations that add to or vary

25   the parties' agreement.   *Guz*, 24 Cal. 4th at 327; *Bionghi v. Metro Water Dist.*, 70 Cal. App. 4th

26   1358, 1368-69 (1999).

27   105.   The Studios' purported desire that the CSS Agreement prohibit even a single

28   digital copy of DVD content by the DVD owner is not proof that the Agreement prohibits such a

1  copy. To the contrary, the purported adamancy of the Studios' desire, combined with the lack of

2  such a restriction in the express language of the Agreement, indicates that the Studios were

3  unsuccessful in their efforts to achieve their objective.

4        106.  That the DVD CCA's interpretation of the CSS Agreement was advocated (and

5  rejected) in the *Kaliedescape* case was publicly known prior to Real's entry into the CSS License

6  Agreement does not require that the Court adopt the DVD CCA's interpretation of that

7  Agreement. Additional obligations may not be imposed upon a licensee based on that licensee's

8  supposed knowledge at the time of entering into the CSS Agreement. That would result in a

9  contract that was not "uniform" and that discriminated against certain licensees by imposing

10  additional obligations not imposed on other licensees. By the DVD CCA's own admissions, the

11  CSS Agreement cannot properly be interpreted to impose additional, unagreed obligations on

12  Real because *every CSS licensee must enter the same agreement. See* Nelson Ex. 78 (Pak Dep.)

13  at 72:10-73:4; Nelson Ex. 80 at MPAA-DIS-0001578; Nelson Ex. 77 at 4. Thus, even if Real

14  were aware of the DVD CCA's interpretation at a specific point in time, that could not impose

15  additional obligations on Real or revise the actual language of the CSS Agreement.

16  ████ ████████████████████████████████████

17  ██████████████████████████████████████████████

18  ██████████████████████████████████████████

19  *Oritani Sav. & Loan Ass'n. v. Fid. & Deposit Co. of Maryland*, 744 F. Supp. 1311, 1315 (D.N.J.

20  1990) ("[T]he subjective intent of a person drafting a contract is not, by any means, determinative

21  as to the meaning of the contract especially where, as here, the contract is one of adhesion."). If

22  intent is to be considered at all, the CSS Agreement must be interpreted in light of the reasonable

23  expectations of Real as the *adhering* party, and not according to the expectations of the DVD

24  CCA. *State Farm Fire and Cas. Co. v. Keenan*, 171 Cal. App. 3d 1, 14 (1985) (contract of

25  adhesion interpreted in light of the reasonable expectations of the adhering party and not "from

26  the subjective intent of the people who drew up those policies of adhesion.").

27        108.  While the covenant of good faith and fair dealing is implied by law in every

28  contract, it "exists merely to prevent one contracting party from unfairly frustrating the other

1   party's right to receive the *benefits of the agreement actually made.*" *Guz v. Bechtel Nat'l, Inc.*,

2   24 Cal. 4th 317, 349 (2000) (emphasis in original) (approving denial of summary judgment on

3   implied covenant claim).  The covenant is not a vehicle for implying additional terms on which

4   the parties never agreed.  Hence, the covenant "cannot impose substantive duties or limits on the

5   contracting parties beyond those incorporated in the specific terms of their agreement." *Id. at*

6   *349-50*; *see also Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395

7   (1990).

8   ████ ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████

14          110.    The DVD CCA is not entitled to an injunction based on alleged implied terms in

15  the CSS Agreement.  To enjoin an alleged breach of contract, the moving party must show that it

16  is entitled to specific performance of the obligation(s) to be enforced.  Cal. Civ. Code § 3423(e).

17  An injunction must be denied if it goes beyond the parties' agreement or if the terms of the

18  obligation sought to be enforced cannot be ascertained with certainty.  *Berry v. Moulie*, 180 Cal.

19  137, 140-41 (1919) (affirming vacatur of judgment granting specific performance where

20  agreement to transfer undefined secret formulas failed to identify precise act to be done); *see also*

21  *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 577-78 (1983) (specific

22  performance available "to permit enforcement of the respondent's performance as promised");

23  *Hernandez v. Bd. of Educ.*, 126 Cal. App. 4th 1161, 1176 (2004) ("The court is powerless to

24  impose on the parties more restrictive or less restrictive or different terms than those contained in

25  their settlement agreement;" discussing enforcement of settlement under California Code of Civil

26  Procedure § 664.6).

27          111.    Real did not obtain its CSS License under "false pretenses" by failing to inform

28  the DVD CCA of the intended functionality of the RealDVD Products.  The DVD CCA offered

1   no evidence that it asked, received or relied upon any statement about Real's intent when Real

2   applied for a CSS License. Real chose between a finite number of pre-defined "membership

3   categories" and selected the categories it believed were necessary for building RealDVD. *See*

4   Nelson Ex. 77 at 4. Further, according to the DVD CCA's statements to the FTC, the DVD CCA

5   would have been obligated to offer Real the opportunity to become a CSS licensee even if Real

6   had disclosed the details of the products that it intended to make. Nelson Ex. 80 at MPAA-DIS-

7   0001578.

8   **IV.     THE STUDIO DEFENDANTS CANNOT SHOW A LIKELIHOOD OF
            SUCCESS UNDER THE DMCA**

9

10          **A.      The RealDVD Products Are Licensed To Use and Comply With The CSS
                    Requirements**

11

12          112.    The RealDVD Products do not circumvent CSS because they implement and

13  comply with the requirements and prohibitions set forth in the CSS documentation. 17 U.S.C.

14  § 1201.

15          113.    A DMCA claim is unavailable to the Studio Defendants against a co-licensee to

16  CSS technology. The CSS Agreement granted to Real a license to use all intellectual property

17  held by the DVD CCA, including all patent rights, copyrights and trade secret rights, to "use and

18  implement CSS to develop, design, manufacture and use DVD Products that are in the

19  Membership Categories selected by Licensee . . ." and "to distribute, offer to sell, sell, import and

20  otherwise transfer DVD Products made in accordance with this Agreement . . . ." Nelson Ex. 8

21  (CSS License Agreement) at § 2.1 (a)-(b). Thus, even if Real did not strictly comply with each of

22  the requirements of the CSS Specifications, it would at most be subject to a claim for breach of

23  contract, and not a claim for circumvention of the DMCA, as a licensee acting within the scope of

24  its license. *See, e.g., Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir.

25  1999) ("Generally, a 'copyright owner who grants a nonexclusive license to use his copyright

26  material waives his right to sue the licensee for copyright infringement' and can sue only for

27  breach of contract."); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026,

28  1032 (N.D. Cal. 2000) (license compatibility requirements constitute separate covenants and not

conditions of, or restrictions on, the license grant); *Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008) (where terms of license are "merely covenants," they are "governed by contract law.").

114.    No case has ever held that a licensee to technology may be held liable for circumventing the same technology, as opposed to merely breaching its license agreement, under any circumstances, much less in a case like the present where RealNetworks plainly sought to comply with the hundreds of pages of documents comprising the CSS documentation.

115.    Section 1201(a) of the DMCA provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." As defined in § 1201(a), "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).

116.    Section 1201(a) is analogous to a prohibition against breaking and entering. H.R. Rep. No. 105-551, pt. 1, at 17 (1998).  It does not apply to situations where even unauthorized persons use a technology, so long as they do not break or impair the technology. *See, e.g., Egilman v. Keller & Heckman*, LLP, 401 F. Supp. 2d 105, 113-14 (D.D.C. 2005) ("using a username/password combination as intended-by entering a valid username and password, albeit without authorization-does not constitute circumvention under the DMCA."); *I.M.S. Inquiry Mgmt. Sys. Ltd. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521 (S.D. N.Y. 2004) (same); *see also Healthcare Advocates, Inc. v. Harding, Early, Follmer & Frailey*, 497 F. Supp. 2d 627, 646 (E.D. Pa. 2007) ("lack of permission is not a circumvention under the DMCA").

118.    As defined in § 1201(a), one can only circumvent a technological measure if it does so "without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).  As a CSS licensee, Real has the authority to "use and implement" CSS on DVD Products, which expressly includes the DVDs with Studio content.  Nelson Ex. 8 (CSS License Agreement) at §§ 2.1(a), 1.15.  Accordingly, Real also does not circumvent CSS under § 1201(a) because it has "the authority of the copyright owner."  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004) ("[O]ne would not say that a lock on any door of a house 'controls access' to the house after its purchaser receives the key to the lock."); *compare 321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1096 (N.D. Cal. 2004) ("321's software does not have [a CSS] license, and therefore does not have the authority of the copyright owner.").

119.    Real does not need permission from the Studios to implement CSS technology in a way that allows consumers to make a backup copy of the DVDs that they own in order to avoid liability under § 1201(a).  Real already has the authority to use and implement CSS from the DVD CCA pursuant to its CSS license.  Nelson Ex. 8 (CSS License Agreement) at §§ 2.1(a), 1.15.

120.    The Studios' reliance on federal copyright cases such as *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (N.D. Cal. 1999) and *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006) – to argue that the CSS Agreement must expressly authorize copying of the Studios' movie content – is misplaced.  The fact that the CSS Agreement neither authorizes nor prohibits copying of the Studios' movie content is irrelevant to the issue of whether the RealDVD Products circumvent CSS.  The separate copyright question of whether users can make a backup copy of their DVDs is answered by the doctrine of fair use.

██████████████████████████████ That Agreement is intended to govern CSS use and implementation, and **not** to provide comprehensive protection for all rights of copyright holders. The entire body of copyright law addresses such protection.

122. Section 1201(b) of the DMCA prohibits persons from making products that are "primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner." "To 'circumvent protection afforded by a technological measure' means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(b)(2)(A).

123. Real does not violate § 1201(b) because the RealDVD Products implement CSS technology as required and do not avoid, bypass, remove, deactivate, or impair CSS. 17 U.S.C. § 1201(b)(2)(A).

124. Section 1201(b) only addresses the circumvention of "a technological measure that effectively protects a right of a copyright owner." 17 U.S.C. § 1201(b)(1)(A-C). The RealDVD Products do not circumvent any "right of a copyright holder. ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████
██████     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



1    129.    *Studios v. Metro-Goldwyn-Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal.

2    2004) is distinguishable from the current case and does not provide a basis for liability here.  321

3    Studios was not licensed to use CSS and its software product therefore circumvented CSS under

4    §1201(a) when it provided unlicensed access to DVD content.  *Id.* at 1096 ("321's

5    software does not have such a [CSS] license, and therefore does not have the authority of the

6    copyright owner.").  For the same reason, 321 Studios was also found to circumvent §1201(b).

7    *Id.* at 1098 ("[W]hile 321's software does use the authorized key to access the DVD, it does not

8    have the authority to use this key, as licensed DVD players do, and it therefore avoids and

9    bypasses CSS.  For these reasons, §1201(b)(1) does apply to 321's DVD copying software.").  In

10   contrast, because RealNetworks is licensed to implement and does in fact implement CSS, under

11   the reasoning of *321 Studios*, RealNetworks cannot be found liable under either circumvention

12   provision.

13   130.    For similar reasons, *Universal City Studios, Inc. v.* Reimerdes, 82 F. Supp. 211

14   (S.D.N.Y. 2000) (appealed as *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2nd Cir.

15   2001)) also does not support a finding of liability here.  In *Reimerdes*, the defendants were

16   enjoined pursuant to §1201(a) from posting DeCSS – an unlicensed ripper program used to defeat

17   CSS and decrypt copyrighted works without the authority of the copyright owner.  *Id.* at 217.

18   Once again, that case has no application here, since RealNetworks is licensed to and implements

19   CSS technology.  *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002).

20   **B.    CGMS**

21   ████  ███████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████████████

26   █

27   ████  ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ███████████████████████████

3      133.    Copy flags do not control access to DVDs or protect copying or any other rights

4 held by copyright owners.  Standing alone, copy flags therefore cannot form the basis of a

5 circumvention claim.  *Agfa Monotype Corp. v. Adobe Sys., Inc.*, 404 F. Supp. 2d 1030, 1036

6 (N.D. Ill. 2005) (rejecting claim that 2-bit embedding bit "similar to a Copy Switch" constituted

7 technological measure under 1201(a)(2)(A) because imbedding bits were a "passive entity" that

8 did nothing by themselves); *see also RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070,

9 2000 WL 127311, at *7 (W.D. Wash. Jan. 18, 2000) (finding that "[i]n conjunction with the

10 Secret Handshake, the Copy Switch is a 'technological measure' that effectively protects the right

11 of a copyright owner to control the unauthorized copying of its work.") (emphasis added).

**C.    ARccOS and RipGuard**

13      134.    Sections 1201(a) and (b) of the DMCA prohibit the "circumven[tion]" of any

14 technological measure that "effectively controls access" to a copyrighted work or "effectively

15 protects a right of a copyright owner" in a copyrighted work, respectively.  17 U.S.C.

16 § 1201(a)(2)(A-C) and § 1201(b)(1)(A-C).

17 ██   ███████████████████████████████████████████████████

18 █████████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████

22 █████████████████████████████████████

**1.    ARccOS and RipGuard Are Not Effective Technological Measures under §1201(b)**

25      136.    A technology that "restricts one form of access, but leaves another route wide

26 open" cannot and does not "effectively" control access to a work.  *Lexmark Int'l., Inc. v. Status

27 Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004) (vacating the grant of preliminary

28 injunction, stating "[j]ust as one would not say that a lock on the back door of a house 'controls

1   access' to a house whose front door does not contain a lock and just as one would not say that a

2   lock on any door of a house 'controls access' to the house after its purchaser receives the key to

3   the lock, it does not make sense to say that this provision of the DMCA applies to otherwise-

4   readily-accessible copyrighted works.").

5        137.   A technology that permits the "'ability to [] obtain' a copy of the work" does not

6   support a circumvention claim under § 1201(b). *Id.* No material difference between the

7   "effectively controls" requirements of § 1201(a)(2) and § 1201(b) can distinguish *Lexmark* from

8   the present case.

1 ██ ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ██████████████████████████████ The legislative history confirms:

5 "[T]hose measures that cause noticeable and recurring adverse effects on the authorized display

6 or performance ***should not be deemed to be effective*** … [because] such measures may cause

7 severe 'playability' problems . . . .  The Committee has a strong, long-standing interest in

8 encouraging the introduction in the market of exciting new products."  Nimmer, Melville B.,

9 *Nimmer on Copyright*, CR1:6-55 (Vol. CR1 2000).

10 ██ ██████████████████████████████████

11 ██ ████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ██████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████

20 █████████

21 ██ ████████████████████████████████████████

22 ████████████████████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ██████████████████████████████████████████

27 ████████████████████████████████████████████████

28



144.    It is standard practice to include error-correction mechanisms in computer software, and it is a best-practice to address all errors in the same fashion, with the same code. *See Supra* Proposed Findings of Fact at ¶ 159.  To hold that error correction software is a "circumvention" device under the DMCA would extend the statute far beyond its intended purpose, and would introduce an intolerable and unwarranted measure of uncertainty into the field of software design and programming.

1

### 5. The Studios Have Not Carried Their Burden to Establish the Existence of Any Particular ARccOS or RipGuard Error, or the Means That the RealDVD Products Use to Circumvent That Error

2

3    146.    There is insufficient evidence to support the Studios' ARccOS and RipGuard

4    DMCA claims.

5

6

7

8

9

10

11

12

13

14

15

16

### 6. ARccOS and RipGuard Do Not Protect "A Right Of A Copyright Owner" With Respect To Products That Enable Fair Use

17

18

19    149.    Neither ARccOS nor RipGuard "effectively protects a right of a copyright

20    owner" under § 1201(b)(1).  A technological measure "effectively protects a right of a copyright

21    owner" if "the measure, in the ordinary course of its operation, prevents, restricts, or otherwise

22    limits the exercise of *a right of a copyright owner under this title.*"  17 U.S.C. § 1201(b)(1)

23    (emphasis added).

24    The rights of copyright

25    owners are expressly defined to exclude rights preserved to others under the doctrine of fair use.

26    17 U.S.C. § 106, § 107.

27    150.    While fair use is an affirmative defense to copyright infringement, which must

28    be proven by the party accused of infringement, it is the moving party which must prove each of

1   the elements of a DMCA claim. *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381

2   F.3d 1178, 1203 (Fed. Cir. 2004). The Studios therefore have the burden of demonstrating that

3   ARccOS and RipGuard "effectively protect[] *a right of a copyright owner*" under §1201(b)(2)(B)

4   in order to prevail on their DMCA claim.

5         151.    Section 1201(b) does not ban devices whose primary purpose is to enable "fair

6   use." Nelson Ex. 82 (S. Rep. No. 105-190 (1998)); *Sony Corp.*, 464 U.S. at 442; 17 U.S.C.

7   1201(c) To the extent *United States v. Elcom, Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) rules

8   to the contrary, it is based on a misreading of the legislative history. *Id.* at 1124-25; Nelson Ex.

9   82 at 89 (S. Rep. No. 105-190 (1998)). Because *321 Studios* relies largely on *Elcom* for the same

10   point, *see* 307 F. Supp. 2d at 1097, it suffers from the same problem. *Universal City Studios, Inc.*

11   *v. Corley*, 273 F.3d 429 (2nd Cir. 2001) (and the district court *Reimerdes* decision) do not directly

12   address this issue because that *Corley/Reimerdes* was limited to claimed violation of §1201(a)

13   and not §1201(b).

14         152.    *Elcom* states that "Congress sought to ban all circumvention tools because most

15   of the time those tools would be used to infringe a copyright." *Id.* at 1124-25. That statement

16   reflects confusion between the Senate report's discussion of sellers' liability for *devices* of

17   circumvention and its separate discussion of users' potential liability for *acts* of circumvention.

18   The court's quoted sentence from the Senate report is the one appearing below between the two

19   italicized sentences:

20   > Unlike subsection (a), which prohibits the circumvention of access control
   > technologies, *subsection (b) does not, by itself, prohibit the circumvention of*

21   > *effective technological copyright protection measures.* It is anticipated that most acts
   > of circumventing a technological copyright protection measure will occur in the

22   > course of conduct which itself implicates the copyright owners [sic] rights under
   > Title 17. *This subsection is not intended in any way to enlarge or diminish those*

23   > *rights.* Nelson Ex. 82 at 29 (S. Rep. No. 105-190 (1998)).

24   The Senate report was not speaking of devices or tools of circumvention. Instead, it was

25   explaining that §1201(b) did not create standalone liability for *users* who commit acts of

26   circumvention with such devices, since their liability was controlled by the existing law of

27   copyright infringement and fair use.

28

153.   Interpreting §1201(b) to ban devices whose primary purpose it to enable "fair use" cannot be reconciled with *Sony*. Such an interpretation would deliver a new property right and power to copyright owners to use the DMCA to limit fair use, which belongs to the public. Section 1201 did not expand the copyright owner's rights, or take away consumers' rights. *See Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202 (Fed. Cir. 2004) ("The DMCA does not create a new property right") (emphasis omitted).

154.   Nor does the DMCA impose liability on entities, like Real, whose products do not facilitate infringement but are rather designed to facilitate fair use rights. *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1195 (Fed. Cir. 2004) ("defendants whose circumvention devices do not facilitate infringement are not subject to § 1201 liability"); *see also Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005) (explaining that the DMCA does not create a new source of liability where underlying copyright law is not at risk; "[C]ourts generally have found a violation of the DMCA only when the alleged access was intertwined with a right protected by the Copyright Act."); *Lexmark*, 387 F.3d at 562 (concurring opinion) ("[I]f the district court on remand were to find that the merger, scenes a faire, or fair use doctrine supplied an adequate defense to infringement, given the copying that went on in this case, I do not believe Plaintiff could meet its burden to show likelihood of success under 17 U.S.C. § 1201(b), because there would be no "right of a copyright owner" to prevent the [toner loading program's] use in this fashion.").

155.   To the extent ARccOS or RipGuard interfere with a consumer's exercise of a fair use right, they are not "effectively protect[ing] a right of a copyright owner under this title" and therefore cannot be circumvented under § 1201(b)(1).

156.   Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8 (2000). It is designed to maintain the integrity of the judicial process, and to prevent the party who prevails on a prior inconsistent argument from obtaining a later unfair advantage. It applies where a party assumes a position and *succeeds in maintaining that position. New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001).

1      157.   RealNetworks is not judicially estopped from arguing that §1201(b) does not ban

2  devices whose primary purpose is to enable "fair use." The Studios argue that judicial estoppel

3  should apply here based on the decision in *RealNetworks, Inc. v. Streambox, Inc.* The *Streambox*

4  court found that the particular product at issue in that case, which circumvented a secret handshake

5  (unauthorized access) to allow for the stealing of content, was not entitled to fair use protections in

6  the first instance. *See RealNetworks v. Streambox, Inc.*, 2000 WL 127311, at \*8. The *Streambox*

7  court then turned to the separate question of whether there was a substantial non-infringing use for

8  the product. In that context, and coupled with the finding that Streambox had no authorized

9  access, the court found that the *Sony* decision recognizing a defense of *substantial non-infringing*

10  *use* did not apply to the DMCA. *Id.* The *Streambox* court did not adopt the broad legal

11  proposition that fair use is never a defense to a §1201 violation, as the Studios apparently contend.

12  Hence, RealNetworks did not argue for and prevail upon that broad legal proposition, as is

13  required for judicial estoppel to apply, and is therefore not estopped from arguing that the intended

14  fair uses of its products preclude a finding of circumvention. *See New Hampshire v. Maine*, 532

15  U.S. at 749-51.

        **7.    ARccOS and RipGuard Cannot Form the Basis of a Preliminary Injunction of the RealDVD Products Because they Are Rarely Used**

159.    It is, likewise, impossible to enjoin the RealDVD products as a whole when they can be used to (and will almost certainly be used to) backup the thousands of DVDs that were released prior to the advent of ARccOS and RipGuard in 2004 and 2005.  Nelson Ex. 27.

███ ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████      *See Supra* Proposed Findings of Fact at ¶ 173.  Under these real-world conditions, an injunction would be unduly burdensome to craft, and almost certainly mooted (or at least rendered ambiguous and confusing) soon after it was entered.  It would also, one might fairly surmise, serve as a windfall to Sony DADC and Macrovision (as the studios rushed to employ ARccOS and RipGuard to qualify their products for injunctive protection)—and the courts are not in the business of creating windfalls.

## V.    THE BALANCE OF HARDSHIPS

161.    No presumption of irreparable harm is applicable in this case.  The presumption of irreparable harm formerly applied by some courts in copyright infringement cases has never applied in circumvention cases.  *See, e.g., RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070, 2000 WL 127311, at *6 (W.D. Wash. Jan. 18, 2000).  Even with respect to copyright cases, the presumption is no longer valid after the Supreme Court decision in *eBay Inc. v. MercExchange*, 547 U.S. 388, 392-93 (2006).  *eBay* rejected the notion that a presumption could substitute for a careful analysis of the four equitable factors relevant to entry of an injunction in copyright cases.  *Id.* at 392-93 (noting that the Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.") (citing cases).

162.    Although *eBay* concerned a permanent injunction, its rationale applies in the context of preliminary injunctions too.  The *eBay* Court relied on the *Amoco* case, which held that presumption of irreparable harm for a preliminary injunction is "contrary to traditional equitable principles."  *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987).  In *MGM v.*

*Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214 (C.D. Cal. 2007) the court applied *eBay* and *Amoco* to conclude "there is no language in the text of the Copyright Act that would permit a departure from traditional equitable principles such that a presumption of irreparable harm would be allowed in *any* injunctive context." 518 F. Supp. 2d at 1214 (*emphasis added*).

163.    There is no presumption of harm to prevent the "violation of a federal statute" that "specifically authorizes a district court to grant injunctive relief . . ." as the Studios' contend. *eBay* itself involved the violation of a federal statute that authorizes injunctive relief (the Patent Act. 35 U.S.C. § 283) and rejected the very presumption the Studios' advocate. *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.").

164.    To be entitled to the extraordinary relief of a preliminary injunction, the Studios and DVD CCA must establish "a significant threat of irreparable injury." *Oakland Tribune, Inc. v. The Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Los Angeles Mem'l Coliseum*, 634 F.2d 1197 at 1201. Speculation that harm may occur does not satisfy the standard. *Carribbean*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

165.    The Studios have not provided evidence of imminent irreparable harm caused by the RealDVD Products.

166.    The Studios cannot claim harm resulting from the use of RealDVD to make a backup copy of a user's purchased DVDs. Any such harm is "fair use" and is not cognizable. *See Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984).

167.    The fact that the Studios have refused to take steps to prevent "rent-rip-and-return" supports the conclusion that it is not a significant concern.

1   ████████████████████████████████████████████

2   ████████████   *See supra* Proposed Findings of Fact at ¶ 164-174; *Belushi v. Woodward*, 598

3   F. Supp. 36, 37 (D.C.D.C. 1984) (denying TRO for lack of irreparable injury where one photo in

4   defendant's book infringed copyright); *Miller Harness Co. v. Arcaro & Dan's Saddlery, Inc.*, 142

5   F. Supp. 634, 635 (E.D.N.Y. 1956) (denying injunction where only 25 of over 2000 items in a

6   catalog possibly infringed plaintiff's copyright); *see also z4 Techs., Inc. v. Microsoft Corp.*, 434

7   F. Supp. 2d 437 (E.D. Tex. 2006) (money damages suffice where infringing component only small

8   portion of product).

9            169.    The ability to quantify damages precludes a preliminary injunction. *See, e.g.*,

10  *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989) ("Injuries compensable in

11  monetary damages are not normally considered irreparable") (internal quotation markets and

12  citation omitted); *Reilly v. Medianews Group, Inc.*, No. C 06-04332, 2006 WL 2419100, at *5

13  (N.D. Cal. July 28, 2006) ("It is well established, however, that an injury that is solely financial

14  and that is compensable by monetary damages cannot constitute irreparable injury.").

15           170.    In this case, damages – if any – could be calculated. This would involve

16  considering the following factors: (1) the differential in price received between the lost product

17  sales attributable to RealDVD and the actual product sales; (2) costs associated with lost product

18  sales and actual product sales to compute lost profits; (3) the size of the population subset that

19  engages in behavior leading to diverted sales; and (4) the quantity of sales diverted by this

20  population subset. Klein Decl. in Opp. to PI, ¶¶ 8-11, 13-16.

21           171.    Even if not precisely quantifiable, the availability of money damages precludes

22  preliminary equitable relief. *See, e.g.*, *ICU Med. Inc. v. Alaris Med. Sys., Inc.*, No. SA CV 04-689,

23  2004 WL 1874992, at *25 (C.D. Cal. July 30, 2004) ("[N]either the difficulty of calculating losses

24  in market share, nor speculation that such losses might occur, amount to proof of special

25  circumstances justifying the extraordinary relief of an injunction prior to trial."). *Thayer Plymouth*

26  *Ctr. Inc. v. Chrysler Motors Corp.*, 255 Cal. App. 2d 300, 307 (1967) (reversing preliminary

27  injunction where future damages were calculable).

28

172.     The Studios claim harm from alleged displacement of Studio products, such as digital copies and digital downloads of their movies, that directly compete with the digital copy of DVDs made using the RealDVD Products.  Nelson Ex. 63; Nelson Ex. 45 (Dunn Decl. in Support of TRO.) at 183:21-22; Nelson Ex. 62 (Dunn Decl.) ¶ 17.  The fact that the Studios themselves can and do place a monetary value on their own digital copies proves that any injury suffered by the Studios would be compensable in damages at the time of trial, and precludes the entry of a preliminary injunction.  *High Tech Med. Instruments, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (where plaintiff routinely licensed and appraised the technology at issue, "any injury suffered by [plaintiff] would be compensable in damages as part of a final judgment in this case."); *T. J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (affirming denial of preliminary injunction motion where, *inter alia*, patent holder failed to show likelihood of irreparable harm based on its grants of licenses.).

173.     The DVD CCA is not entitled to a presumption of irreparable harm based on Section 9.2 of the CSS Agreement.  A contract provision addressing irreparable harm does not suffice to establish such harm; it is just one factor in the analysis.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("[w]hile courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief."); *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001); *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminary enjoined, this by itself is an insufficient prop."); *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("It is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate.").

1     174.   It would be particularly inequitable to presume irreparable harm based on a

2  contractual provision in the CSS Agreement since the Agreement was presented to RealNetworks

3  on a take-it-or-leave-it basis and does not represent a negotiated agreement between the parties.

4     175.   Real is not threatening to disclose any of the DVD CCA's confidential

5  information or doing anything else that would hurt the licensing entity, so the DVD CCA will not

6  be irreparably harmed. The DVD CCA has not provided evidence of imminent irreparable harm.

7  ████ ██████████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10  ██████████████████████████████████████████████████

11  ██████████████████████████████████████████████████

12  ██████████████████████████████████████████████████

13  ████████████████████████████ The California Superior Court's decision in

14  the *Kaleidescape* case at least calls into question the DVD CCA's interpretation of the CSS

15  Agreement – and with much greater authority than Real.  So, too, do the other CSS-licensed

16  products, currently on the market, which allow users to copy DVD content onto a hard drive,

17  including products from Kaleidescape, AMX and Drive-in.  That the DVD CCA has acquiesced to

18  the continued presence of these products – without any apparent ill effects to its reputation or

19  viability – supports the finding that Real does not threaten imminent irreparable harm to the DVD

20  CCA.  Nelson Ex. 6 (Pak Dep.) at 196:12-20, 200:12-22.

21     177.   A preliminary injunction will cause Real imminent irreparable harm.  It will delay

22  the RealDVD products resulting in their likely termination and the termination of the employment

23  of the engineers working on the RealDVD products.

24     178.   A preliminary injunction will harm consumers by withdrawing innovative and

25  relatively inexpensive products that enable consumers to exercise their fair use right to make a

26  backup of a DVD without having to pay the Studios twice for the same content.  A preliminary

27  injunction would also eliminate competition to the Studio Defendants' digital copy and similar

28  products to the detriment of consumers.

179.    Permitting the Studios to appropriate fair use and sell it back to customers would be an improper extension of the copyright rights. *See, e.g., Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 976 (4th Cir. 1990).

180.    The balance of hardships tips strongly against a preliminary injunction.

Dated:  May 15, 2009                           WILSON SONSINI GOODRICH & ROSATI
                                               Professional Corporation


                                               By:    /s/ Leo P. Cunningham
                                                      Leo. P. Cunningham


                                               Attorneys for Plaintiffs
                                               REALNETWORKS, INC. and
                                               REALNETWORKS HOME ENTERTAINMENT