Volume 5

Pages 1204 - 1390

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

REALNETWORKS, INC., a          )
Washington Corporation; et     )
al.,                           )
                               )
        Plaintiffs and         )
        Counter-Defendants,    )
                               )
    v.                         )    No. C 08-4548 MHP
                               )        C 08-4719 MHP
DVD COPY CONTROL ASSOCIATION,  )
INC., a Delaware nonprofit     )
corporation; et al.,           )
                               )
        Defendants and         )
        Counter-Complainants.  )
_____)    San Francisco, California
                                    Thursday, May 21, 2009


                TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs/**          WILSON SONSINI GOODRICH & ROSATI
**Counter-Defendants:**      650 Page Mill Road
                             Palo Alto, California  94304-1050
                      BY:  **LEO P. CUNNINGHAM, ESQUIRE**
                           **COLLEEN BAL, ESQUIRE**
                           **MICHAEL A. BERTA, ESQUIRE**




(Appearances continued on next page)

**Reported By:**             KATHERINE SULLIVAN, CSR, RPR, CRR
                             BELLE BALL, CSR, RMR, CRR
                             OFFICIAL REPORTERS

*Katherine Sullivan, CRR and Belle Ball, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

Dockets.Justia.com

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Plaintiffs/**<br>**Counter-Defendants:** | BARTLIT BECK HERMAN PALENCHAR & SCOTT<br>1899 Wynkoop Street, 8th Floor<br>Denver, Colorado  80202 |

                   BY:  **DONALD E. SCOTT, ESQUIRE**

                                BARTLIT BECK HERMAN PALENCHAR & SCOTT
                                54 West Hubbard Street
                                Chicago, Illinois  60610

                   BY:  **MARK S. OUWELEEN, ESQUIRE**

**For Studio Defendants/**   MUNGER, TOLLES & OLSON
**Counter-Complainants:**  560 Mission Street, 27th Floor
                                San Francisco, California  94105-2907

                   BY:  **BART WILLIAMS, ESQUIRE**
                        **ROHIT K. SINGLA, ESQUIRE**

                                  MUNGER, TOLLES & OLSON
                                355 South Grand Avenue, 35th Floor
                                Los Angeles, California  90071-1560

                   BY:  **KELLY M. KLAUS, ESQUIRE**

**For Defendant/**         AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
**Counter-Complainant**  580 California Street, Suite 1500
**DVD CCA:**               San Francisco, California  94104-1036

                   BY:  **REGINALD D. STEER, ESQUIRE**

                                AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
                                2029 Century Park East, Suite 2400
                                Los Angeles, California  90067-3012

                   BY:  **STEPHEN R. MICK, ESQUIRE**

                                WHITE & CASE LLP
                                3000 El Camino Real
                                Five Palo Alto Square, 9th Floor
                                Palo Alto, California  94306

                   BY:  **MARK F. LAMBERT, ESQUIRE**

```
 1                    P R O C E E D I N G S
 2  MAY 21, 2009                                    9:42 A.M.
 3
 4          THE COURT:  I guess we don't need to call this case
 5  since we all know what it is, right?  And the court reporters
 6  know what it is.
 7          So, whom are we going to hear from with respect to
 8  the Studios and DVD Copy Control, and which of you is going to
 9  go first?
10          MR. WILLIAMS:  Your Honor, Bart Williams on behalf of
11  the Studios.
12          I am going to go first on behalf of the Studios.
13  Mr. Singla and I are going to split our time.  He is going to
14  talk about some of the technical features, and then we want to
15  reserve some time for rebuttal.
16          THE COURT:  How much time do you want to reserve for
17  rebuttal?
18          MR. WILLIAMS:  Twenty minutes.
19          THE COURT:  And how much time did I give you, an hour
20  and a half?
21          MR. WILLIAMS:  You gave us an hour total.  And what
22  we wanted to ask for was an hour and 15 minutes total, based
23  upon our estimates and having run through it.
24          THE COURT:  Okay.  Okay.
25          MR. WILLIAMS:  Thank you.
```

PROCEEDINGS

1           THE COURT:  We'll see if Mr. Bowser lied to me.  He
2    told me that I gave you an hour and a half.  What was I
3    thinking of?
4           MR. WILLIAMS:  You gave Mr. Steer a half an hour.
5           THE COURT:  Yes.
6           MR. WILLIAMS:  You gave the Studios an hour.  And you
7    gave Mr. Scott an hour and a half.
8           THE COURT:  I see.  That's what it is.  Okay.
9           MR. STEER:  Good morning, Your Honor.
10          THE COURT:  Good morning.
11          MR. STEER:  On behalf of DVD CCA, I will make the
12   opening part of the closing argument, but would like to
13   reserve, hopefully, around 10 minutes.  And my partner,
14   Mr. Mick, may do the rebuttal if that's okay with the Court.
15          THE COURT:  That's fine.
16          MR. STEER:  Thank you.
17          THE COURT:  And how long do you expect to be on your
18   opening, then?
19          MR. STEER:  Approximately 20 minutes.
20          THE COURT:  Okay.
21          MR. SCOTT:  I'll speak by myself, Your Honor.
22          THE COURT:  Yes, okay.
23          MR. SCOTT:  Thank you.
24          THE COURT:  All at one time, right?
25          MR. SCOTT:  Yes.

PROCEEDINGS

1          **THE COURT:**  Okay.  Fine.  Well, we know who has the

2   burden of proof, right?  So you may proceed then.  Are you

3   ready?

4          **MR. WILLIAMS:**  Thank you, Your Honor.  There's one

5   other thing.  We simply wanted to put on the record --

6          **THE COURT:**  Yes.

7          **MR. WILLIAMS:**  -- to make a motion.

8          The Court probably received yesterday a letter and a

9   declaration filed by RealNetworks.  It's the declaration of

10  Mr. Peter Biddle in support of their opposition.

11         **THE COURT:**  Yes, I did.  But I didn't bring that out

12  with me.  I brought some other material out.  It's not a good

13  sign I brought the sentencing guidelines.

14         (Laughter.)

15         **THE COURT:**  Sorry about that.

16         **MR. WILLIAMS:**  No, hopefully, we won't need those.

17         **THE COURT:**  No.  Proposed findings and conclusions,

18  we have a lot of those documents.  And Mr. Bowser can go back

19  and he can get that.

20         **MR. WILLIAMS:**  Thank you, Your Honor.

21         We simply wanted to put on the record a motion to

22  strike that declaration.  We don't believe it's appropriately

23  filed.  We don't believe it should be part of the record for

24  purposes of this motion and the Court's decision on the motion

25  for preliminary injunction.

PROCEEDINGS

```
 1          There are a number of procedural deficiencies that we
 2  believe -- I won't list them now.  It wastes time.  We just
 3  wanted to put on the record --
 4          THE COURT:  Why don't you go ahead.  Okay.  It's
 5  noted for the record, and we can take it up later.
 6          MR. WILLIAMS:  Do you want me to note those for the
 7  record?
 8          THE COURT:  No, it's noted for the record.
 9          MR. WILLIAMS:  Oh, yes.
10          THE COURT:  I'm sorry.  My voice dropped down there.
11          But you go ahead with your argument, and then if we
12  need to take it up, we can take it up at the end of the day.
13          We'll save the period of time after argument for the
14  less interesting matters, okay.
15          MR. WILLIAMS:  Thank you, Your Honor.
16          MR. CUNNINGHAM:  Thank you.
17          MR. STEER:  Your Honor, so, if I may, so the record
18  is clear, the DVD CCA joins in the motion.
19          THE COURT:  Yes.
20          MR. SINGLA:  Your Honor, this is Mr. Singla.  If I
21  could raise one more point of procedure about the closings.
22          I believe each party expects to discuss, for some
23  portion of time, confidential DVD CCA technical specifications.
24  And so what we were going to propose to the Court is, rather
25  than close the courtroom for the entire closing arguments, was
```

1   whenever any of the lawyers need to talk about one of those

2   issues, to ask the Court at that point to close the courtroom.

3   That would interrupt things for a few minutes while people come

4   and go, but we thought that might be a way to balance, sort of,

5   the interests of the DVD CCA versus the public.

6           **THE COURT:**  Okay.  Are you going to be, essentially,

7   hitting upon those during your argument, or is it Mr. Williams

8   that's going to be do doing that?

9           **MR. SINGLA:**  I will be doing that, Your Honor, yes.

10          **THE COURT:**  Can't you make it relatively sketchy?

11          **MR. SINGLA:**  Okay.  We will try to limit our -- one

12  thing we could do is close the screens, the back screens, as

13  we've done before.

14          **THE COURT:**  Sure.

15          **MR. SINGLA:**  And we will try, if the Court would

16  like, to just refer to things and point the Court to things on

17  the documents.

18          **THE COURT:**  Fine.  Fine.  Try to do it that way.

19  Okay?  Thank you.

20          **MR. SINGLA:**  Thank you, Your Honor.

21          Your Honor, may we hand up a copy of some slides that

22  we'll be using, the Studio Defendants?

23          **THE COURT:**  Yes.

24          **MR. SINGLA:**  I have a copy for the law clerk.

25          **THE COURT:**  Yes.

PROCEEDINGS

1      **MR. WILLIAMS:**  Your Honor, may we ask Mr. Bowser to

2  turn on the screens?

3      **THE COURT:**  Oh, yes.  Before you go, Mr. Bowser.

4      Do you have what you need now?

5      **MR. WILLIAMS:**  I think so.

6      **THE COURT:**  Okay.

7                         <u>**CLOSING ARGUMENT**</u>

8      **MR. WILLIAMS:**  Thank you, Your Honor.

9      Your Honor, the Motion Picture Studios put technology

10  on DVDs that prevents people from copying them.  The DMCA makes

11  it unlawful to traffic in devices that circumvent access and

12  copy control measures.

13      If we take a step back and consider what's actually

14  going on here, RealDVD takes a DVD like this one, *Finding Nemo*,

15  and before they get their hands on it, there is just this one

16  copy of that DVD.  But once it is exposed to their device,

17  there's another copy, either on a hard drive or on a thumb

18  drive, like this, a second copy or a third or a fourth or a

19  fifth that is created.

20      That copy and any subsequent copies is completely

21  contrary to everything that we know from every available source

22  about what the Studios have said.  The Studios have clearly

23  said, "Don't copy our movies from DVDs."  Every studio has made

24  that clear.  "We don't want movies copied from DVDs."

25      And the computer electronics companies and the IT

1    companies and the Studios came together in the mid 1990s and

2    formed the DVD Copy Control Association, an association formed

3    for the purpose of controlling copies of DVDs.

4           You heard unrebutted testimony from Ms. Marsha King,

5    an ex-executive from Warner Bros. and Paramount.  She testified

6    that no studio wanted any of its movies to be copied.

7           She testified that no studio would release its movies

8    on the DVDs in the DVD format without some copy protection.

9           She testified that the electronics companies, the IT

10   companies, wanted to make clear that at least you have to be

11   able to make some sort of a fleeting copy because, otherwise,

12   you cannot show the movie on the television or on a computer.

13          She said it's important to have three legs of support

14   for the copy protection:  The technology itself, which

15   ultimately was the Content Scramble System, or CSS; a license;

16   and a law, the DMCA, that gave teeth to attempts to get around

17   the technology.

18          She testified that as far as Warner Bros. was

19   concerned, two of those three legs of the stool were in place

20   before the first DVD hit the market.  It was only the law that

21   came a few months later.

22          Ms. King's testimony on the purpose of CSS was

23   unrebutted.  After six months of discovery, opportunity to take

24   depositions, there was no one who came in here and said

25   anything other than what we would suggest is obvious, that the

```
 1   content holders did not want copies to be made from movies off

 2   of DVDs.

 3           It's on the DVD packaging itself, as we showed you in

 4   the opening statement.  It's on the back.  It's on the DVD

 5   discs themselves.  It's on the FBI warning that shows when you

 6   play the DVD.

 7           And, indeed, during Mr. Glaser's testimony on direct

 8   examination there was a demonstration.  And the first thing

 9   that showed up on the screen -- they took it down very

10   quickly -- was the warning that says there are civil and

11   criminal penalties for making a copy of the content.

12           It's not just that, though.  It's also things like

13   CGMS, which puts millions of flags that only the computer can

14   read, including RealDVD, that say, never copy, never copy,

15   never copy, a million times, millions of times on every DVD.

16           And RealDVD reads those commands and ignores them.

17           But it's not just that, because all of Real's

18   potential partners knew that the Studios did not want their

19   movies to be copied from DVDs.  I'll show you just one exhibit.

20           This is Exhibit 527.  It's in evidence.  It reflects

21   a meeting where Martin Schwarz of RealNetworks met with

22   representatives of JVC on June 26 of 2008.  And on page 2 of

23   the document, which is highlighted here, Mr. Schwarz writes:

24   "Tried to do similar product three years ago; shut down by

25   their legal; they are tracking Kaleidescape legal activity
```

 1   monthly."

 2           Admonitions like this are echoed throughout the

 3   comments of other potential partners:  TiVo, Sharp, LGE,

 4   Samsung and Pioneer.  All documents in evidence.  Those are

 5   Exhibits 602, 557, 556 and 527.

 6           The documents say that the electronics companies and

 7   the IT companies raised what the documents indicate, Real's

 8   documents indicate, were classic, in quotes, or typical legal

 9   questions.  And they were right.  Because what Real is doing is

10   not legal.

11           You heard a lot about the specifications, and you

12   will hear more.  You heard about the terms of the license and

13   Real's claims that it does not breach.  And Mr. Steer is going

14   to walk through that license with you.  Mr. Singla will do a

15   little bit of that, as well.

16           And the Studios do have a breach of contract claim,

17   but that's not the basis of our motion.  The Studios' motion is

18   based on circumvention of the DMCA, and only upon circumvention

19   of the DMCA, because Real wants to traffic in this device,

20   RealDVD, that is designed for circumventing the access control

21   measures and the copy control measures that are on the DVDs.

22           They are separate measures.  You'll hear about those,

23   ARccOS and RipGuard.  So there's a federal statute, the one

24   that Ms. King said was the third leg of the three-legged stool,

25   that says you cannot traffic in such devices.

CLOSING ARGUMENT / WILLIAMS

```
 1          And in the face of the clear policy of the Copy
 2   Control Association, to prevent consumer copying of DVDs,
 3   Real's attempts during the course of this proceeding to explain
 4   their conduct ultimately take the form of twisting some of the
 5   words of the license, twisting words of the statute, ignoring
 6   other words of the license, other words of the statute, using
 7   plays on words from their own documents and on documents from
 8   others to justify their interpretations.
 9          And we respectfully submit that when we finish our
10   rebuttal later today, we're going to ask the Court to apply
11   common sense to the law and to the statute and the license in
12   reaching your decision.
13          Mr. Singla is going to talk about the technology, and
14   then he's going to kick it back to me and I'm going to talk
15   about some of the things that we believe you can expect to hear
16   from Mr. Scott.  And I will deal with some of what I called in
17   opening statement the excuses that RealNetworks puts forth to
18   explain their conduct.  So, that's our format.
19          I'll kick it, now, to Mr. Singla.
20          THE COURT:  Thank you.
21          Mr. Singla.
22                      CLOSING ARGUMENT
23          MR. SINGLA:  Mr. Bales, could we get...
24          (Document displayed)
25          Your Honor, as Mr. Williams said, I would like to
```

```
 1   walk through the ways in which the RealNetworks products, Facet
 2   and Vegas, circumvent both ARccOS and RipGuard and CSS.
 3           And I want to start with ARccOS and RipGuard because
 4   we're going to talk about CSS.  Mr. Steer is going to talk
 5   about CSS.  There's been a lot of focus on the CSS
 6   specifications.  And I want to make sure that ARccOS and
 7   RipGuard do not get lost in the shuffle.
 8           THE COURT:  You're talking about ARccOS and RipGuard.
 9   As I understood the testimony, actually, there are very few
10   DVDs that employ ARccOS and RipGuard.
11           What is the consequence of that?  I assume that's
12   done just because no one knows whether it's the particular DVD
13   has ARccOS or RipGuard protection or not.  So it's sort of a
14   random selection matter.  But is it employed sufficiently
15   enough to be effective?  And is it, when employed, effective?
16           MR. SINGLA:  That is something that RealNetworks is
17   focused on.
18           And I want to show the Court a finding of fact that
19   they have submitted.  This is a finding of fact they
20   submitted -- sorry, a conclusion of law they have submitted,
21   168.  It's on the screen.
22           They suggest to the Court that ARccOS and RipGuard
23   are used on only 3 percent of DVD titles.  And then they say
24   that's a de minimus fraction of the approximately 10 billion
25   DVDs in the United States.  I think that's what the Court is
```

1  referring to, that allegation by RealNetworks.

2          Your Honor, that's a misstatement of the facts.

3  That's a highly misleading conclusion of law.  And I want to

4  break that down.

5          They say 3 percent of DVD titles.  Well, that is

6  true.  ARccOS and RipGuard are used on a small percentage of

7  DVD titles.  But ARccOS and RipGuard are used on the most

8  popular 3 or 4 percent, whatever this percentage is, and the

9  end result is it's used on a very large number of DVDs.

10          **THE COURT:**  Very few titles.

11          **MR. SINGLA:**  Very few titles, but the most popular

12  titles.

13          So the actual evidence in the record, Your Honor,

14  which is on the screen right now, is on slide 7 of the little

15  packet that we gave the Court.  This is Mr. Hollar's

16  declaration, unrebutted, uncontroverted evidence.  It's used on

17  1.3 billion DVDs worldwide, ARccOS or RipGuard.  1.3 billion.

18  That's out of an estimated 14 billion worldwide.  On a very

19  large number of DVDs.

20          There's testimony from Mr. Hollar's deposition that's

21  been designated.  I'm talking about Exhibit 249, which are in

22  the binders that we submitted to the Court of exhibits for the

23  hearing.

24          That documents goes to the top 300 movies used in

25  2005, 2006, 2007.  Over three years, top 300 movies.  It's

1    undisputed, uncontroverted that ARccOS and RipGuard are used on

2    a total of 62, 62 out of those 300 top movies.  That's more

3    than 20 percent of the top movies issued in those three years

4    had ARccOS or RipGuard on them.

5            So the idea that ARccOS and RipGuard are only used on

6    3 percent of DVDs is just false.  It's used on a very

7    substantial number of DVDs.

8            And it is very effective, even though it's only used

9    on a small percentage of DVDs, not on all DVDs, let me say, for

10   the reason the Court identified, that if you're a ripping

11   company, like RealNetworks, you don't know which DVDs, your

12   consumers don't know which DVDs have ARccOS on them, or

13   RipGuard.  And so the products have to be able to copy those

14   movies, especially if the movies that they're on are the most

15   popular movies.

16           There's a slide that I'd like to show the Court, a

17   document.

18           This is an e-mail from Mr. Graham.  It's Exhibit --

19   it was attached to Mr. Blavin's supplemental declaration,

20   Exhibit 9.  It was in January of 2008.

21           What did he say to the Vegas team?  "If we do not

22   start focusing on this, we will be stuck with weeks of work for

23   80 percent of ARccOS DVDs.  I think that failure on the other

24   20 percent will kill us."

25           This was a critical problem.  The Court will recall,

1  on the Facet team, they had three programmers:  Mr. Moore,

2  Mr. Watson, and Mr. Bielman, finally, who worked over 18 months

3  to try to figure out how to copy these DVDs.

4         Mr. Bielman and Ms. Hamilton both testified that the

5  team had concluded they could not issue their product if they

6  did not know how to copy and circumvent ARccOS and RipGuard,

7  copy those DVDs.  So this was a critical issue for them.

8         It is simply not true that ARccOS and RipGuard are

9  not used.

10        **THE COURT:**  And, generally, how effective are ARccOS

11  and RipGuard?

12        **MR. SINGLA:**  The question --

13        **THE COURT:**  We've heard about -- excuse me, about

14  with respect to RealNetworks in this case, but just generally

15  how effective are they?

16        **MR. SINGLA:**  Your Honor, for the definition of

17  "effective," let's turn to the DMCA.

18        **THE COURT:**  In terms of being able to rip them.

19        **MR. SINGLA:**  Certainly.

20        Just one moment, Your Honor.

21        **THE COURT:**  You should have anticipated the Court's

22  questions.  No, not necessarily.  But it doesn't matter, does

23  it?

24        (Laughter.)

25        **MR. SINGLA:**  I'm only trying to stall for time for a

 1   moment, Your Honor.

 2            So, first, let's talk about the DMCA for a moment.

 3   The definition of an effective measure under the DMCA is if in

 4   the ordinary course of its operation it prevents, restricts or

 5   otherwise limits copying; i.e. the right of a copyright holder.

 6   So that's the standard.

 7            And the cases are very clear.  That does not mean

 8   that it can't be hacked or that it can't be cracked.  It simply

 9   means that in the ordinary course, does it stop people from

10   copying?

11            And, obviously, as the Court said, we know the

12   evidence from RealNetworks.  They had a very hard time copying

13   these DVDs.

14            And we also know the testimony and the evidence in

15   the record about what ordinary people experience.  There was

16   that Exhibit 228, the Court may recall.  That was the Ninjaklec

17   (phonetic) e-mail that we talked about at the very end of the

18   hearing.

19            And that was a consumer complaining that even with

20   Vegas, they could not copy Wall-E, Prince Caspion and Disney

21   DVDs protected with RipGuard.

22            RealNetworks' response, their consumer support

23   representative said those technologies will slow down copying

24   by four to six hours.

25            The Court will recall there was testimony from

1    Mr. Brennan saying that copying would take 30 minutes to up to

2    eight hours, ARccOS and RipGuard DVDs.  That's on page 965 of

3    the transcript.

4            Ms. Hamilton testified that sometimes DVDs they tried

5    to copy with ARccOS and RipGuard could take 24 to 48 hours.

6            Mr. Hollar's report explains that although their

7    products could often copy these DVDs over an extended time,

8    there are many ripping products that can't copy ARccOS or

9    RipGuard DVDs at all.

10           Mr. Schumann testified that in January of this year,

11   when he went to test the Facet product -- this is after 18

12   months of development by their team -- it still could not copy

13   some ARccOS or RipGuard DVDs.

14           So, these technologies are profoundly effective.

15   That doesn't mean that companies like RealNetworks or SlySoft

16   figure out ways to circumvent them and get around them.  But

17   for purposes of the DMCA, they easily meet the standard of

18   effectiveness.

19           And I want to back up for a moment and just talk

20   about what ARccOS and RipGuard are, and remind the Court that

21   these are technologies that the Studios pay good money to Sony

22   DAVC and to Macrovision to add these copy protections on top of

23   CSS.  They are used in addition to CSS.

24           They don't interfere with playback.  So if you or I

25   are watching a movie on our DVD player at home or a DVD player

1    on our computer, it should not interfere with that process.  We

2    can select whatever parts of the movie and watch it as we will.

3          But it does have technologies that stop copiers,

4    things like bad sectors on the DVD, things like logical

5    errors -- Mr. Schumann and Mr. Hollar explained that, and they

6    don't dispute this -- that make the files look like they're 60

7    gigabytes or bigger than a hard drive so they are hard to copy,

8    and also things like hidden buttons.

9          Invisible buttons, that's something that people have

10   talked about throughout the trial.  Their own finding of fact

11   122 talks about this.  It's a technology used to stop programs

12   that try to pretend to be a human being, try to pretend to be

13   you or I, to copy the DVD.  They use technologies that, to

14   them, look like a real button.  They may follow it and run into

15   an ARccOS or RipGuard error.

16         Now, we've talked about whether it's effective.  One

17   of the things that we expect -- I expect Mr. Scott might say to

18   the Court in his portion of the closing is to point out that

19   there are a lot of studio executives and e-mails and

20   deposition -- from depositions, excerpts, snippets from studio

21   executives complaining, complaining that companies like

22   RealNetworks, like SlySoft and Antigua, a company in Barbados,

23   have figured out ways to circumvent and hack these

24   technologies.

25         And these executives wonder, should we be spending

1  millions of dollars to add these copy protections onto our DVDs

2  when companies like Real are just going to figure out ways,

3  they are going to devote programmers and resources to figure

4  out ways to hack them?

5          That's what they're talking about.  And that is not

6  the relevant standard of effectiveness, the fact that people

7  are concerned about whether it's worth spending more money to

8  keep doing this when companies are hacking it.  That's not the

9  standard under the DMCA for effectiveness.

10          The question of the DMCA is simply, in the ordinary

11  course, a normal person, you or I try to copy a DVD, does it

12  stop us or impair us?  Does it take four or five times longer

13  than we expect?  Would it discourage us from copying?

14          And there's no dispute, there's no dispute in the

15  record that ARccOS and RipGuard discourage consumers by

16  extending the time of copying, or preventing altogether,

17  discourage consumers from copying DVDs.

18          Now, the question of circumvention, if you look at

19  the statute, circumvention means to avoid, bypass, avoid or

20  bypass, remove or deactivate, or otherwise impair a

21  technological measure.  That's the standard for circumvention.

22          And there really is no dispute, Your Honor, no

23  reasonable dispute that they have circumvented ARccOS and

24  RipGuard.  The most obvious, the copy of the movie they make on

25  these thumb drives, there's undisputed testimony from

1   Mr. Schumann, it doesn't have the bad sectors anymore.  They

2   have removed ARccOS and RipGuard's primary source of

3   protection.  It's gone.  They have removed it.  They have

4   deactivated it.  So the copier no longer has the most important

5   parts of ARccOS and RipGuard on it.  That's circumvention right

6   there.

7          But in the process of making the copy, they also

8   circumvent ARccOS and RipGuard.  They avoid the protections

9   imposed by ARccOS and RipGuard.

10         Now, on the Vegas side, to start with the Vegas side,

11  they try to say, still, in their conclusions of law submitted

12  just last week, they try to say, oh, Vegas, the code in Vegas

13  that circumvents the copies of these DVDs, it's just for error

14  protection; it's not for ARccOS or RipGuard; it's for scratches

15  or smudges.

16         Now, they didn't bring Mr. Buzzard, the man who wrote

17  that code, to tell the Court that.  They didn't bring his boss,

18  Mr. Chasen, an engineer, to come tell the Court that.

19         They brought Mr. Dixon, someone who had never used

20  Vegas, never seen the source code, never read the depositions

21  of those engineers, never seen any of the technical

22  specifications, never read any of the RealNetworks documents,

23  they brought him here to tell the Court that Vegas is all about

24  error correction and not about ARccOS and RipGuard.

25         Well, Your Honor, that claim, that claim is simply

1    implausible, given the fact that they hired programmers in the

2    Ukraine to try to figure out how to copy ARccOS discs -- the

3    e-mails are very clear -- given the e-mail we just saw from

4    Mr. Graham, in which he complains in January 2008 about the

5    problems they are having and how the ARccOS discs will kill

6    them.

7             And, Your Honor, given Exhibit 50A, which

8    Mr. Williams put up in opening.  This is the official technical

9    specification for Vegas.  It makes very clear that they have

10   special code to address ARccOS.

11            In fact, it says that the way they had been copying

12   DVDs, when they tried it on ARccOS and RipGuard DVDs, it took

13   many hours to complete.  It wasn't going to be practical.

14            And then they implemented Logic 9.4.2.  They

15   implemented Logic, i.e. code, special code to deal with ARccOS

16   and RipGuard.

17            They even say in this document, plain English, that

18   they take steps to make sure that it's not a scratch or a dirty

19   DVD disc.  That's on the bottom of the pullout we have there.

20   They make clear that they have code that tries to distinguish

21   between a dirty -- a scratch or a dirty disc and ARccOS.

22            It's simply not plausible that Vegas is not designed

23   specifically for the purpose of circumventing ARccOS and

24   RipGuard.

25            Facet.  Now, on Facet, they've come now, after all

1    the trial testimony, to the following -- to the finding of fact

2    152, from RealNetworks, to the following assertion:  They now

3    say that DVD Walk, this is the part of the Facet program that

4    copies ARccOS and RipGuard DVDs, it was created to ensure that

5    Facet, quote, "never encountered ARccOS or RipGuard" as it made

6    copies.  "Never encountered."

7            What are they saying about that, Your Honor?  What

8    are they saying?  They're saying a few different things.

9            The first thing they're saying is witnesses like

10   Mr. Hollar, our expert on ARccOS and RipGuard, testified that

11   ARccOS and RipGuard don't interfere with playback.

12           That's true.  You and I are watching a movie, it

13   doesn't interfere with playback.

14           So they are saying to the Court in their conclusions

15   of law and in their arguments -- Mr. Bielman tried to say

16   this -- Oh, well, we just built a player.  We just built a

17   player.

18           But that's not true, Your Honor.  That's just not

19   credible.  It's not a player.  It's a copier.  It's a program

20   that doesn't play back the movie, it copies the movie.

21           And, as I said, ARccOS and RipGuard have techniques,

22   things that they admit, like the invisible buttons that try to

23   identify a program that's copying the movies and accessing the

24   movie versus a human being.  They have hidden menus, other

25   kinds of techniques that, to a program, will look like

 1   something it should try to copy, but a human being would never

 2   press.

 3          ARccOS and RipGuard specifically intended to separate

 4   out those programs from us human beings.

 5          Now, the second thing they are trying to say is "play

 6   and save."  The Court may recall Mr. Dixon and Mr. Bielman

 7   talked a lot about play and save.  It's all over their

 8   findings, this idea, Oh, we are just doing play and save.

 9          Now, let's talk about Mr. Dixon for a moment, Your

10   Honor.  One of the most curious things in this trial is they

11   brought this man, Mr. Dixon, to be their expert on ARccOS and

12   RipGuard, to testify to the Court and opine to the Court as an

13   expert about ARccOS and RipGuard and their products.

14          And what did they do?  They didn't show him the

15   products.  They didn't let him test the products.  They didn't

16   show him the source code.  He is a computer scientist.  He

17   could read the source code.

18          They didn't show him the technical documentation.

19   They didn't show him any documents from RealNetworks.  They

20   didn't let him talk to the engineers.  He didn't read most of

21   the depositions of the engineers.

22          Why?  Why would they bring an expert in and not tell

23   him anything about the product, keep everything about the

24   product from him?

25          Well, we submit the reason, Your Honor, is because

1    they wanted testimony from him that they could not get if

2    Mr. Dixon actually knew what Facet was and how it worked.

3            Here's what Mr. Dixon meant by play and save.  This

4    is a semantic slight of hand that RealNetworks is trying, Your

5    Honor.

6            Mr. Dixon meant by play and save -- and I asked him

7    very clearly in cross-examination, "You're saying" -- "This

8    play-and-save approach, you're saying because ARccOS and

9    RipGuard allow you to watch the movie, don't interfere with

10   watching a movie, it should be possible for someone to copy the

11   movie while it's being watched?"

12           He said, "Yes."  That's what I'm saying.  This is at

13   page 969 of the transcript.

14           And then I asked him again, just to be clear, When

15   you say that DVD Walk saves movies as a byproduct of playing,

16   that's what you're saying, right?  And he said he doesn't

17   really know if that's what DVD Walk does.

18           I said, okay, let me just make sure.  It's your

19   understanding -- this is what I asked him:  "Your understanding

20   is that DVD Walk does save the movie while it's being played?"

21           And he said, "I don't know exactly how the product

22   works.  I understand there's a

23   watch-movie-and-save-while-you're-playing mode in it."

24           So that's what Mr. Dixon was saying.  He had been

25   informed that the way Facet copied movies is it copied it while

1  you're watching it.  But that's not true, Your Honor.

2          The play-and-save mode in their product, it's called

3  play and save, but it's a totally different thing.  It's really

4  save and play.

5          What their product does, and Mr. Bielman admitted

6  this in the transcript, is DVD Walk saves the movie onto the

7  hard drive.  And the consumer, the person, watches it off the

8  hard drive behind the DVD Walk.

9          I asked Mr. Bielman:  It's not the user, with one

10  exception, it's not the user who mostly is telling the DVD Walk

11  where to go to copy the movie?  Mr. Bielman said, "Yeah, that's

12  right."

13          Their product isn't saving it while you're watching

14  it.  It's just copying the DVD with a program that tries to

15  pretend to act like a human being.

16          Your Honor, if we can step back for one moment, what

17  are they saying?  They're saying to the Court, We don't

18  encounter ARccOS and RipGuard, so we don't circumvent.

19          Well, we submit, Your Honor, a company that devotes

20  programmer after programmer, month after month of development

21  time to figure out a way to not encounter a copy protection

22  scheme, where they work really hard over a long period of time

23  to figure out how to not run into, not encounter a copy

24  protection scheme, that's avoiding.  That's bypassing.  That's

25  the definition of circumvention.

```
 1              Your Honor, I would like to turn to CSS.  Now, with

 2    respect to CSS, there are three ways, three independent and

 3    separate ways, in which the RealNetworks products, Facet and

 4    Vegas, circumvent CSS.  And they are listed on the screen.

 5              The first is that the end product here, whatever they

 6    do, whether they follow the specs or not, let's put that aside

 7    for just one moment, this copy here does not have CSS on it

 8    anymore.  CSS has been removed and deactivated under the

 9    language of the statute.

10              The facts are not disputed.  I'll walk the Court

11    through the testimony from their own expert on this.  CSS is

12    gone.  That's circumvention, plain and simple.

13              Second, in the process of making this copy, bring it

14    from the DVD to the copy, they circumvent, they bypass and

15    avoid the specific provisions of CSS.

16              These are specific violations of provisions in the

17    CSS license.  And I will walk the Court through a couple of

18    examples.

19              There are many examples.  And I think Mr. Steer will

20    have a couple of examples.

21              Thirdly, we'll look at Professor Bishop's own diagram

22    of how RealDVD works.

23              And what they are doing is not authorized.  The

24    copies that are made, the circumvention that is done, is not

25    authorized by the Studios.  And it is an impairment of CSS.
```

1          Let me start with the first one.  And, again, I go

2     back to the definition of the DMCA.  Circumvention includes

3     removing and deactivating.

4          The Court may recall this slide from Mr. Schumann,

5     the five levels of CSS on the left, and the protections that

6     have been removed from this copy by RealDVD.

7          Now, these facts are not disputed.  Mr. Bishop

8     admitted that those are the protections offered by CSS.  No one

9     has disputed that.

10         And he admitted -- this is page 787 of the

11    transcript -- on cross-examination that the other four things,

12    i.e. those first four levels there, they are not present on

13    the, he said.  They're not -- they do not occur in the

14    interaction between the hard drive, i.e. this copy that Real

15    has made, and the software, RealNetworks' playback software.

16    They're gone.

17         We went through them one by one, Your Honor, just to

18    be clear.  The DVD drive, the Court will recall, Mr. Schumann

19    explained this, Mr. Schumann demonstrated this, the DVD drive

20    will lock.  It will not allow access until authentication.

21         This here, Mr. Bishop admitted, it does not lock in

22    that sense.  There is no drive locking with a thumb drive or a

23    hard drive.  This is on page 786 of the transcript.

24         On page 770 of the transcript, and 786, he admitted

25    there is no bus authentication on this copy the way there is on

 1   a DVD drive and the way DVDs -- physical DVDs are protected.

 2           Bus encryption.  On page 788 of the transcript he

 3   admitted there is not CSS bus encryption on this copy.  It's

 4   gone.

 5           Lead-in area.  The Court will recall that part of the

 6   CSS system is the physical DVD itself, has a physical attribute

 7   that the keys are hidden in a lead-in area, a hidden lead-in

 8   area, and in hidden sector headers.  That's gone.  He admitted

 9   it just doesn't exist in this format.  And he said, right, it's

10   not there.

11           So these protections are gone.  They have been

12   removed and deactivated.

13           What is RealNetworks' response?  They have two.  The

14   first response they make is:  Yes, yes, who cares if we have

15   removed and deactivated all these protections?  We put on our

16   own AES system that we control.

17           Well, Your Honor, however good AES is or strong it is

18   or isn't, there is nothing in the DMCA, there is nothing in any

19   case that we know of or they have cited that says that's a

20   defense to the DMCA, that you can circumvent and remove the

21   locks and protections content holders have put on, chosen to

22   put on, and put on your own locks, to which you have your own

23   keys, and say that's a defense to the DMCA.  It's not a

24   defense.

25           And with respect to AES, Your Honor, the Court may

1  recall the testimony of Mr. Basche that we submitted in

2  designations, or Exhibit 3 that Mr. Williams went through with

3  Mr. Glaser.  They put AES on for their own purposes, Your

4  Honor.  They put it on to lock consumers into the RealDVD

5  product once they made these copies, so that the copies only

6  work on Real's own software.  They didn't do it to do us any

7  favors.

8          Now, the second response that they have is, well, we

9  did all this to begin with.  We unlocked the drive when we made

10 the copy, and we did bus encryption with the DVD drive when we

11 made the copy.

12         But that's not the argument that we raise, Your

13 Honor.  I'll talk about that in a minute.

14         What we're saying is, under the statute they have

15 removed the protections.  We had a DVD that had all these

16 protections on it, and at the end of RealNetworks' process we

17 have a copy without any protections on it.

18         I want to turn to the second form of circumvention.

19         Separate and independently, they don't follow the

20 specifications, Your Honor.  They do bypass and avoid CSS while

21 they make the copy.

22         Now, there are many examples in Mr. Schumann's and

23 Dr. Kelly's expert reports.  And I want to just take two

24 examples.  We could go through many, many examples.

25         I'm sorry, could we turn the screens off in the back,

1    Mr. Bowser.

2             The Court may recall Authenticator Section 2 in the

3    specification, the language in red there, right.  It begins

4    with, "Connection to Descrambler."

5             **THE COURT:**  Uh-huh.

6             **MR. SINGLA:**  It ends with "user-accessible bus."

7             Now, this is the connection between the

8    authentication module and the descrambler module and how the

9    keys are to be sent.  Those are encrypted keys being sent.

10            Now, let's look at their own -- this is their

11   illustration of how RealNetworks works.  We have not touched

12   this.

13            And the blue box there, Your Honor, is the encrypted

14   disc keys.  It's not a key, right?  It's a box because it has

15   got encryption on it.  And it's going from the authenticator

16   module over to the descrambler module on the right there.

17   Those are red lines, user-accessible buses.

18            And what happens?  In their animation of their

19   product, there it goes right across a bus.

20            And now months later, I've taken the DVD, sent it

21   back to my friend, or loaned it to somebody else, or put it

22   away, and I play back.  There it goes again, Your Honor, right

23   across a user-accessible bus on playback.  Twice.  Twice it

24   goes across a bus.

25            That directly violates the language we were just

 1    looking at.

 2            Now, what is their response?  They have two

 3    responses.  The first is, they say -- Mr. Bishop came in,

 4    Professor Bishop came in and said, Oh, well, it's all right.

 5    It's not actually a key going across; it's a blob.

 6            This is a professor of computer science in computer

 7    security, and the best argument he could give the Court, the

 8    most pentacle language he could give the Court is that it's a

 9    blob.

10            Your Honor, that argument doesn't make any sense.

11    First, it doesn't make sense because in the normal course what

12    is being sent is an encrypted key.

13            The specifications are telling, don't send this

14    encrypted key over a bus.  It's already a, quote, blob, if

15    that's what you want to call it.  The specs are saying, don't

16    send that thing, an encrypted key, over a bus.  That's what

17    they're doing.

18            Secondly, Your Honor, this idea that when you encrypt

19    something it's no longer a copy of what it was, it's something

20    different now, this is something we've heard throughout the

21    case, but they have abandoned this.

22            Even Mr. Bielman admitted, on page 1106 of the

23    transcript, that -- I asked him, "... the copy on the DVD and

24    the copy on the Facet hard disk are different in the sense that

25    you have additional encryption ... right?"  I'm talking here

1    about the movie, but it's the same issue with the keys.

2              And he said, "Yes."

3              And I said, "But it's the same thing, right?"

4              And he finally admitted here at trial -- he said,

5    "Yes."

6              I said, "It's a copy."

7              And he said, "Yes."

8              It's the same thing.  If you add encryption on

9    something, it doesn't change it.  It's still a key.  It's still

10   a movie.

11             I want to go through one more example.  And this is

12   Descrambler Specification 3.2.  As the Court may recall, we

13   went through with Mr. Schumann and Mr. Bielman.

14             And what it says is that the DecDKv algorithm should

15   be done upon the insertion of a disc.  And if there was any

16   doubt, the engineers at the bottom have said, note -- just to

17   be really clear about this, "Note, this process occurs upon the

18   insertion of a disc."

19             Now, let's look at their own diagram.  This is

20   Professor Bishop's illustration of playback.

21             Now, the one thing we have done to this diagram, Your

22   Honor -- this is slide 28 in our little pack there -- is we've

23   grayed out the left part.  And that's because at this point on

24   playback -- the DVD, again, has been returned, right -- the

25   idea is to play back from the hard drive.

1        You know, RealNetworks says, oh, it's just a backup.

2   But, of course, it's not a backup.  This is the copy we're

3   playing on the Facet box or on the Vegas system.  The original

4   DVDs, we don't need that anymore, right?  This isn't a backup.

5        But let's look at how it works.  There's that purple

6   box with the key data in it.  And it's about to go into the box

7   labeled "DecDKv."  And there's no disc inserted in the drive.

8   It goes in, and in their own animation, they show that they run

9   the algorithm, and there it is.  It was a key all along.

10  There's the key.  And they just did it.  There's no disc in the

11  drive.

12       Now, they will have, perhaps, some argument for why

13  they do do it on insertion of a disc before and so they can do

14  it whenever they want later.

15       Well, Your Honor, that's not an appropriate way to

16  read specifications.  One of the things they have said is, you

17  know, the specs don't say no copying keys to a hard drive.  It

18  doesn't say no copying to a hard drive.

19       Well, Your Honor, we submit even if the specs had

20  said that, we would still be here, because they would say, Oh,

21  we don't copy; we save.  They would say, Oh, it's not a hard

22  drive; it's a thumb drive.  They'd say, Oh, we haven't copied

23  the keys; we copied a blob.

24       Now I want to turn to the last form of circumvention,

25  Your Honor.

 1          Now, again, this is Figure 4 from the general

 2   specifications.  It's also in other specifications.  Everybody

 3   at court, Mr. Bielman, Professor Bishop, Dr. Kelly,

 4   Mr. Schumann, they have used this to illustrate CSS

 5   specifications.  This is slide 30 in our pack.  It's used by

 6   many of the witnesses, Figure 4.

 7          **THE COURT:**  The booklet, however, is numbered

 8   differently.

 9          **MR. SINGLA:**  Oh, is it, Your Honor?  I apologize.

10          **THE COURT:**  I don't know where in -- I haven't gone

11   back through.  I've been listening to you, and as I've been

12   going back through it, I'm trying to figure out --

13          **MR. SINGLA:**  Let me find it, Your Honor.

14          **THE COURT:**  -- wherein one is missing or adding.

15          **MR. SINGLA:**  It's 29.  It's all off by one.

16          **THE COURT:**  It's 29 in the book; it's 30 on the

17   screen.

18          **MR. SINGLA:**  Thank you, Your Honor.  I appreciate the

19   clarification.

20          **THE COURT:**  For the record, it's probably important,

21   too.

22          **MR. SINGLA:**  I appreciate that, Your Honor.

23          **THE COURT:**  I don't know, there must be an additional

24   slide in here that --

25          **MR. SINGLA:**  You know, I think we put a cover page in

 1  or something.

 2          **THE COURT:**  Somebody didn't repaginate.

 3          **MR. SINGLA:**  I apologize, Your Honor.

 4          **THE COURT:**  That's all right.

 5          **MR. SINGLA:**  But this is the diagram everyone has

 6  been using.

 7          **THE COURT:**  Uh-huh.

 8          **MR. SINGLA:**  This is what the CSS specifications

 9  provide.  If you do all this, what happens?  You play back the

10  movie.  You don't get a copy.  You see the movie.

11          Now, this is how they -- Professor Bishop, in his

12  animation, this is how he illustrates their system.  They have

13  taken this copy protection access control system of CSS and

14  they break it open.  They break it open in the middle.  And

15  they insert copying.

16          It's a system, an access control and a copy

17  protection system designed to stop copying.  They break it open

18  and insert a copying process in the middle.  Under the statute,

19  we would submit, that is otherwise impairing a system.

20          Even if they did follow all of the specifications,

21  which as I illustrate they don't, but even if they did, the

22  fundamental thing they're doing is inserting something that is

23  directly contrary to the whole point of the system.

24          I'm trying to use the printout here, so I can give

25  the right slide numbers.  I want to return back to slide 31,

CLOSING ARGUMENT / SINGLA

1    turn back to the statute.

2         The statute says that it makes the authority of the

3    copyright owner -- this is in 17 1201(a), I think, (3)(b), if I

4    have the right numbering -- make the authority of the copyright

5    owner important, critical to whether you can circumvent,

6    whether you can do something like this.

7         Now, the copyright owner, Your Honor, are my clients,

8    the Studios.  They have never given, as Mr. Williams said,

9    anyone permission, not RealNetworks, not end users, not

10   SlySoft, permission to do this, to break open CSS and stick

11   copying in the middle.

12        Indeed, as Mr. Williams said, every DVD has marked on

13   it millions of CGMS signals saying, "Don't copy this, copy

14   never," which they process and ignore.

15        Now, what their excuse is, they say, Well, we have a

16   license from the DVD CCA.  This is their defense.  We have a

17   license from the DVD CCA that says we can do this, that

18   authorizes us to do this.

19        That's not true.

20        First, we're not the license source.  The studio is.

21   But, more importantly, that's not what the license says, and

22   they admit this, Your Honor.  This is Mr. Scott's opening

23   statement.  This is slide 33.  It's page 58 and 60 of the

24   transcript.

25        He said the CSS specifications say nothing pro or con

 1   about whether a copy can be made by a licensed device to a hard

 2   drive.   That's what he said.

 3          Now, I've just shown the Court, there's lots of

 4   things con.  But even if you take their interpretation, there's

 5   nothing in there saying they can do this.  As he said, they

 6   don't say you can, they don't say you can't.

 7          We asked them in discovery -- this is slide 34.  It's

 8   missing a citation, unfortunately, but this was attached to

 9   Mr. Blavin's declaration in support of the preliminary

10   injunction motion, the interrogatory we served on RealNetworks,

11   asking them to identify the provision supposedly authorizing

12   them to make copies.  They couldn't identify anything.  All

13   they said is nothing prohibits it.

14          But, Your Honor, just look at the language of the

15   license.  It says, Section 2.5 of the license they signed,

16   slide 35 here, Pak Exhibit J, it says:

17          "The licenses granted herein are the only licenses

18   granted to RealNetworks.  All rights not expressly granted

19   under this agreement are reserved to the DVD CCA."

20          So there's no dispute here that they agree there's

21   nothing authorizing them to make these copies, even in the

22   license.  The license says, We're only granting exactly what we

23   put in the license.

24          So they don't have authorization to break the system

25   open and insert copying in the middle of a system designed to

CLOSING ARGUMENT / SINGLA

1    stop copying.

2            Now, this is a separate and independent

3    circumvention.  Even if they followed all the specifications,

4    they still couldn't do this.

5            I want to turn it back to Mr. Williams.

6            **THE COURT:**  Thank you.

7            **MR. SINGLA:**  Thank you, Your Honor.

8            **THE COURT:**  Mr. Williams.

9            **MR. WILLIAMS:**  Thank you, Your Honor.

10                   **CLOSING ARGUMENT**

11           **MR. WILLIAMS:**  Your Honor, as I've said, the

12   copyright owners' clear message to everyone was and is, Don't

13   copy movies from DVDs.  And our clients and other copyright

14   owners have released literally billions of copies of content on

15   CSS-protected DVDs.

16           But what's the purpose behind that CSS license?  I'm

17   not going to go through the recitals now, or the specific

18   provisions now.  You know them.

19           The DVD Copy Control Association in that license has

20   recital A, that speaks about preventing unauthorized consumer

21   copying.  The general specification, paragraph 1.5, says that

22   it is to prevent unauthorized consumer copying.  It is intended

23   to prevent casual users from unauthorized copying of

24   copyrighted materials.

25           The technical specifications say that the whole

 1  purpose is to prevent digital-to-digital copying in the

 2  personal computer environment.

 3          So what does Real and Professor Bishop, their expert

 4  witness, do with this purpose evidence, all of this evidence

 5  reflected many places in the record?

 6          What they do, Your Honor, is they ignore it.

 7          Professor Bishop did not consider the purpose of the

 8  CSS license.  This is quoting from page 800 through page 801 of

 9  the transcript.

10          Mr. Singla asked him:

11          "Now, in your view, the specifications do not

12          state an underlying policy, right?"

13          And he answers:

14          "The specifications state, here are the steps

15          you have to do.  That's what I checked for.

16          "QUESTION:  And you did not think that there

17          was any explicit, overarching policy stated

18          in the specifications, right?

19          "ANSWER:  I did not examine the

20          specifications for any overarching policy.  I

21          simply looked at, does this comply with the

22          steps?  That was my job.

23          "QUESTION:  When you interpreted these

24          specifications, you did not consider any

25          overarching policy underlying the

1          specifications, right?

2          **"ANSWER:**  I simply looked at what each step

3          of the specification said and whether or not

4          Real's products followed them.  That's it."

5          What's so strange about this, Your Honor, is that

6    applying that kind of a narrow-minded tunnel-vision view or

7    construction to specifications without regard to the

8    overarching policy that is stated is not what Professor Bishop

9    teaches his students to do.

10         You may recall on cross-examination, again, we put in

11   front of Professor Bishop a hypothetical that's in his book,

12   and it's in his teaching aid for teachers, in a book called,

13   *Instruction to Computer Security.*

14         And in that, here's the conclusion.  This is an

15   unadulterated copy of what appears in his book.  Only the red

16   part is bolded.

17         "Professor Bishop came to the conclusion that in that

18   illustration, Bill, a student at the university, cheated

19   because the university had a policy of forbidding copying of

20   homework assignments.  And in that particular case, the other

21   student had not protected her homework when she posted it on

22   the system, which she could have done.  He concluded if not

23   explicit in computer security policy, it is certainly

24   implicit."  And he said, "It simply is not credible that a unit

25   of the university allows something that the university as a

1  whole forbids, unless the unit explicitly says so."

2          So Real ignores the purpose of the license.  Indeed,

3  they ignore the purpose of the Copy Control Association.  And

4  Real says it is reasonable to construe the agreement to permit

5  not just a copy, but unlimited copies.

6          We asked Professor Bishop whether or not, under his

7  interpretation of Real's interpretation of the license, there

8  would be any limit on copying of movies.  And on line 20 here,

9  this is page 811 through 12, he was asked:

10         **"QUESTION:**  The way you are interpreting

11             these specifications, isn't it true that

12             there would be no limitation then on copying

13             of movies onto various hard disks and playing

14             them back on any computer?"

15         He answered:

16             "I can't say.  I would need to evaluate the

17             specifics of what you are suggesting, and

18             then determine whether or not the codes you

19             are proposing meets the standard.  I have not

20             done so."

21         Now, although Professor Bishop, the expert that they

22  had testify, wouldn't say, their original expert, Dr. Felton,

23  who's from Princeton, did.  He did consider that.  And he

24  admitted -- I won't show you the slide, but it's page 136 of

25  his deposition testimony.  He testified that the license places

 1   no restriction, whatsoever, on the number of copies.

 2          And, in fact, Your Honor, just recently, in their

 3   conclusions of law, conclusion of law 121, which appears on

 4   page 60 of Real's conclusions of law, very subtly but

 5   ultimately concedes that point, that there is no limitation.

 6   Again, it's paragraph 121, conclusion of law 121, page 60.

 7          They write:  "The fact that under Real's

 8   interpretation of the CSS license there is no set limit on the

 9   number of registered devices on which the single copy can be

10   played does not call into question Real's interpretation of the

11   CSS license."

12          Well, sure it does.  Of course it does, Your Honor.

13   It does because the overarching policy is that you cannot make

14   even a single copy, much less unlimited copies, which is now

15   how they admittedly are construing the license.

16          The question is:  Does it make any sense?

17          By ignoring the policy, they claim that it is

18   reasonable to read a license whose purpose was to prevent

19   copying, to permit unlimited copies and copies of copies under

20   their interpretation of the license.

21          **THE COURT:**  That sort of gets, also, into -- or close

22   to a question about fair use, which I know they have asserted

23   in their conclusions of law, as well.

24          Is there such thing as a fair use copy?

25          **MR. WILLIAMS:**  For purposes of the DMCA, no, there is

 1   not, Your Honor.  And, indeed, I am going to get to that and

 2   describe precisely why that is, if I may.  Or I will do it now,

 3   if you'd like me to do it now.

 4          **THE COURT:**  You can do that now.  And I will take it

 5   up with you then.

 6          **MR. WILLIAMS:**  Okay.  Thank you, Your Honor.

 7          **THE COURT:**  Then I have a couple of other questions

 8   in that respect.

 9          **MR. WILLIAMS:**  Okay.  Sure.

10          So let me turn, then, to what Real does, their

11   excuses, as we've called them.

12          Their first one is, look, we're just making one copy.

13   That's all it is.  We're just making one copy.

14          Number one, one copy is a violation of the DMCA.

15   Nothing in the DMCA says you get to circumvent so long as

16   you're only making one copy.

17          Number two, just one copy, perfect, playable,

18   permanent copy adds up pretty quickly, if you think about it.

19          Their testimony was that -- Ms. Coppinger, in her

20   declaration, she said that they would estimate they would sell

21   100,000 copies of their product in the last quarter of 2008

22   alone.

23          Now, if each person copied only ten movies, you'd get

24   to a million very quickly.  And so on and so on.  Because the

25   individual disc, the DVD disc, can be proliferated, can be

1  given to someone else because, of course, once you use their

2  product, you don't need your original disc anymore.

3          Indeed, the whole purpose of their product is you

4  don't need the disc.  You use their product to play the movie

5  without this any longer, and this can be passed on to friends,

6  to family, to someone else, so that they can copy it on their

7  Facet box or their RealDVD product.

8          But the evidence before Your Honor is it won't just

9  be one copy, Your Honor.  Because, indeed, Real's own product

10  roadmap shows that it is in their future.

11          I'll just point you to two exhibits.  Exhibit 232,

12  slide 51.  It's a document, you may recall, that showed a plan

13  to network.  That network could be a building, it could be a

14  dorm, it could be anywhere where the computers could talk to

15  one another.

16          Exhibit 599, slide 3.  This was a document that on

17  its first page says it is a final PowerPoint for a meeting with

18  Rob Glaser, dated November 1, 2007.  And on it, it showed a box

19  that had DVD Rip, with a line connected to peer-to-peer

20  networks.

21          Now, Mr. Bielman, when he testified here, testified

22  that networking is, in fact, on RealNetworks' roadmap for

23  RealDVD.  He said that shared content over a local area network

24  is part of the plan.  That's in the transcript, page 1099.

25          Now, why is that important?  It's important because

 1   Real's reading of the CSS license, under that reading, the only

 2   thing preventing peer-to-peer transference, the only thing

 3   preventing networking is Real's goodwill.  It's not the

 4   license.  It's because they say they will not do it.

 5        Real does not get to make a decision, Your Honor,

 6   about when a copy of the protected content can be made.  Which

 7   brings me to their second excuse, fair use.

 8        Now, fair use, under the statute, is a phrase with

 9   meaning.  Yet Real, up until their findings of fact came out

10   just a couple of days ago, never actually described fair use or

11   went through factors.

12        What they said up until that point was, We, Real,

13   intend for people to make a, quote, convenience copy; and

14   that's fair.  It's a convenience copy.  That's a fair use.

15   That's what they say.

16        A few points.  Number one, fair use is not a defense

17   to a DMCA claim.  And Mr. Cunningham admitted that in opening

18   statement.  He did it at page 53 of the transcript, line 13

19   through page 54.  He said, quote, Fair use is not a defense, if

20   you will, to the DMCA, but it matters here.  That's what he

21   said.

22        Well, he's partly right.  Fair use under the DMCA is

23   not a defense.  But he's wrong when he says that it does matter

24   for purposes of Your Honor's analysis.  Because the statute

25   makes clear that it doesn't matter to a DMCA claim.

1           And a decade's worth of cases:  321 Studios by Judge

2    Illston, the Reimerdes and Corley decision from the Southern

3    District of New York and the Second Circuit from the year 2000,

4    the Elcom decision from Judge White here in the Northern

5    District, all of those cases say that fair use is not a defense

6    under the DMCA.

7           And Real itself, ironically, helped to make that law

8    back in the year 2000, in the Streambox case.

9           You'll recall from opening statement I showed you the

10   reply brief in support of their preliminary injunction, Real's,

11   against Streambox, and this argument:  "There is no fair use

12   defense for the VCR," which is the product in that case.  It's

13   not VCRs as you and I know it.  It was a product, another

14   product.

15          It says, "Streambox claims that it should be

16   permitted to resume the manufacture and distribution of the VCR

17   and ripper products because the use to which those products are

18   put is somehow fair.  However, the DMCA does not have a fair

19   use exception allowing individuals to circumvent access and

20   copy protection measures."

21          Real should be judicially estopped in this proceeding

22   from making that argument.  In the Streambox case, Your Honor,

23   Real argued that fair use is not a defense to the access and

24   the copy control measures.  That's what's before Your Honor on

25   the screen.

```
 1            Judge Pechman, from the Western District of
 2   Washington, in 2000, agreed on both counts.  And she did so in
 3   paragraphs 13 through 17.  And we have copies of that decision
 4   to show you, if you wish.  That's point one.  It's not a
 5   defense.
 6            But, number two, even if it were relevant, and it is
 7   not, Real can't just say it's a fair use in order to make it
 8   so.  They have to go through the four factors.  And let me do
 9   it very quickly.
10            Factor number one:  The nature and purpose of the
11   use.  That asks, is it transformative?  And, of course, it
12   isn't transformative here because it's just another copy of the
13   movie.
14            So Real says, well, it's a personal use.  It's a
15   noncommercial use.  Well, no, that's not true.
16            Because Mr. Glaser admitted at page 450, lines 4
17   through 22 of the transcript, that their product is a
18   substitute for a digital copy.
19            He says that Real is competing with the Studios on
20   this product and that a consumer would otherwise have to
21   purchase the product from the Studios in order to -- purchase
22   the movie from the Studios in order to have it.  So that's
23   factor one.
24            Factor two:  The nature of the copyrighted work, is
25   it creative?  Well, they concede this one.  Movies are the
```

 1  epitome of creative works.  They don't even delay you on that

 2  one.

 3          Factor three:  The amount of the work used.  Well,

 4  they don't deny that one either.  They admit it.  Because it's

 5  100 percent of the work.  Everything is copied.

 6          Which brings us to the final factor, factor 4:  The

 7  effect of the use on actual or potential markets.

 8          Again, the excerpt I just referred the Court to, page

 9  450 of the transcript, Mr. Glaser's testimony, Mr. Glaser

10  admitted that they compete with digital copies that the Studios

11  sell right now, that the users can put onto their hard drive.

12  You can buy the DVD from the store.  And, in some instances,

13  you can also by a digital copy that is not CSS protected.  Or

14  you can download a copy to your computer, again, not CSS

15  protected by the Studios.  And the consumer has to pay them.

16          Under Real's product, you can buy this one -- only

17  buy this one for $18, if you buy it new, or you can borrow it

18  from a friend for nothing, or you can rent it for $4, and you

19  can make a perfect permanent playable copy.

20          That's competition.  That is an actual or potential

21  market.

22          Of course, we also know -- and this is a point that

23  came out on Mr. Glaser's cross-examination -- that Real doesn't

24  believe in convenience copies when it comes to their own

25  intellectual property.

1        Because if the consumer wants to buy the Real

2   product, this is the Vegas product, if they buy that product,

3   they pay $40; they put it on their computer.  But if they want

4   to put it on another computer or another or another, they pay

5   $20 each time.

6        You don't get a convenience copy of RealDVD from

7   them.  They understand how this works if it's intellectual

8   property that they want to protect.

9        Let me go to excuse number three.

10       **THE COURT:**  Well, before you leave that --

11       **MR. WILLIAMS:**  Sure.

12       **THE COURT:**  -- if the RealNetworks' device allowed

13   for making a single copy only to a hard drive that is on the

14   machine, the player, whatever you want to call it, or the

15   computer, whatever you want to call that piece of equipment, in

16   other words, not to a flash drive or a thumb drive or to some

17   external hard drive, but just to the particular player that --

18   that they're selling, and you could not make a copy from that,

19   I mean, if all of that is possible, would that be circumvention

20   within the meaning of the DMCA?  Would it, in fact, then mean,

21   also, that it really was sufficient to constitute fair use

22   under the DMCA?

23       **MR. WILLIAMS:**  I think the answers to your questions

24   are:  Yes, it would be circumvention; no, it would not be a

25   fair use.

1           Yes, it would be circumvention because once you make

2    the copy and put that single copy on the hard drive, this DVD,

3    you don't need that anymore.  You could give it away.  You can

4    give it to anybody.  And you have actually made the copy.

5           There is nothing in the license that allows you to

6    make that single copy.  The only type of copy that is made, the

7    only one that necessarily follows from following the steps in

8    the CSS license, Your Honor, is this buffer copy, which you've

9    heard something about, the cache copy.  Which is the fleeting

10   copy; not playable.  It goes away.

11           **THE COURT:**  Oh, yes.

12           **MR. WILLIAMS:**  In other words, if you follow the

13   steps, say, 1 through 9 of the CSS license, you end up with the

14   ability to play a DVD, but not the ability -- that is on a DVD

15   player, but not with a copy of the DVD.

16           If you follow the steps that they follow, the ones

17   they've grafted on top of the CSS license, you end up with the

18   copy.

19           What they're making is not a fair copy, period.  It's

20   just not a fair copy.

21           If you go through each of the factors that I just

22   went through, whether it's one copy or more than one, that is

23   not a fair use.  You don't ever reach that question.  You

24   should not ever reach that question because there is no fair

25   use defense under the DMCA.

 1          **THE COURT:**  Well, let me put it another way.

 2          **MR. WILLIAMS:**  Sure.

 3          **THE COURT:**  Is there any kind of a player that could

 4  be manufactured that would allow you -- if it allowed you to

 5  save, as I described, only to this hard drive, without being

 6  able to save it to any flash drive or external drive, or

 7  whatever, and not be able to copy it off the hard drive,

 8  essentially, just the person who's buying the DVD can save a

 9  copy to that hard drive, is that a device that enables fair

10  use?

11          **MR. WILLIAMS:**  No.  We would say that that's a device

12  that allows one to circumvent the DMCA.  It's a device that

13  exists for the purpose of making that copy.

14          The only backup copy that Congress actually

15  envisioned was a so-called archival copy, the kind of copy that

16  if you have your computer at work and you want to keep that

17  data on the computer, you can have an archival copy that you

18  would never use until such time as your main computer goes

19  down.

20          That's not what this is.  The whole purpose of this

21  device is so that you can make a copy and use, in the first

22  instance, the copy that you've made onto your hard drive.

23          The DMCA has specific language in it, Your Honor,

24  that talks about certain exceptions.  There's a whole process.

25  And you remember, there's that -- the document that was Exhibit

1    239.  That's the document that was written by the former

2    general counsel of Real, submitted to the Library of Congress

3    saying, Don't permit an exemption for researchers from MIT to

4    make a copy.

5           And there is a whole process that is designed every

6    three years, triennially, for people to make arguments about

7    why there should be an exemption.

8           You wouldn't go through that -- Congress would not

9    have gone through that whole process of identifying all of

10   these different exemptions, some exemptions for libraries or

11   educational institutions, or have this triennial process if you

12   were just going to say that there is some fair use right to

13   make that one copy.

14          The whole idea of the DMCA is that you cannot traffic

15   in a device that circumvents.  You cannot traffic in a device

16   that circumvents the access control and the copy control

17   measures.

18          I hope that answers the question.

19          Let me go to their final excuse, that I'll deal with

20   now, which is that, "No one is going to use our product to

21   steal."

22          Mr. Glaser testified at page 458 of the transcript

23   that, "Customers who don't follow their limitations that are

24   put onto the device by RealDVD aren't our target market and we

25   don't have the best product for them.  We're not after those

1  folks."

2         Well, that's not who they tested in focus groups.

3  And you'll recall this from his cross --

4         **THE COURT:**  That argument doesn't make much sense

5  anyway.

6         **MR. WILLIAMS:**  Right.

7         **THE COURT:**  I'll hear what Mr. Scott has to say about

8  it.  It just doesn't make any sense.  As I understood that

9  argument is, "We're selling -- or our target market is people

10 who obey the law."

11        **MR. WILLIAMS:**  Right.

12        **THE COURT:**  Right?

13        **MR. WILLIAMS:**  That's right.  That's right.  And so I

14 won't belabor it, Your Honor.

15        I mean, look, this is who they tested, they tested

16 students.  This is Exhibit Number 146, the second slide.

17        They recruited students.  The students told them what

18 we think someone knew before they ever came into the court.

19 They told them the value of saving owned DVDs is less

20 interesting because this content has often been viewed.

21        Well, that makes sense.  That's not as interesting as

22 getting something for free.

23        And there are other documents that are in evidence

24 that talk about how people want to get things for free, and

25 that Real recognized that and appreciates that.  So --

 1        **THE COURT:**  All those license agreements that come

 2   up, you know, when you download software, right --

 3        **MR. WILLIAMS:**  Right.

 4        **THE COURT:**  -- and you sign off on it and so forth, I

 5   mean, obviously they know very well if you were trying to make

 6   a copy, I assume, if you were trying to subvert the license in

 7   some way.  But do you think that people, if there wasn't some

 8   way of controlling that, that they would just accept the fact

 9   that somebody signs one of those agreements?  It's meaningless.

10        **MR. WILLIAMS:**  Precisely, Your Honor.  And, if I

11   may --

12        **THE COURT:**  Even if you had everybody sign when they

13   bought the piece of equipment, and sent it in like with their

14   warranty registration, or whatever, I don't think it's worth

15   much.

16        **MR. WILLIAMS:**  That's right, Your Honor.  And that's

17   why I cross-examined Mr. Glaser and asked him.  You know, so

18   people have their reasons.  You know, people are going to have

19   a reason for making a copy.

20           But here's the real vice here.  Here's the equation.

21   You have a large, supposedly reputable company, RealNetworks,

22   that has 30 million customers for their other products existing

23   right now; plus, you have a product that permits the consumer

24   to make a perfect playable permanent copy of owned DVDs or

25   borrowed DVDs or rented DVDs; plus, you have a campaign that's

1    designed to tell consumers that they can save DVDs legally,

2    100 percent legally, here's how they market it -- this is

3    Exhibit -- I think it is 231.  No, excuse me.  I'm not sure of

4    the number.  I think it's 232, 231.  But here's how they market

5    it.  It says at the bottom, "Save your movies legally and with

6    confidence."

7            The whole point -- there's another document that says

8    it's 100 percent legal.  So when you put that equation

9    together, that's the problem, because people will start to have

10   the view:  Oh, this is okay.  I'm just using RealDVD.  It's a

11   nice, pretty machine, and it allows me to make copies of my

12   DVDs.

13           So let me turn briefly to irreparable harm.

14   Irreparable harm is presumed under the statute based upon the

15   DMCA violation, if you find one.  We have proven the harm.

16           I just want to refer the Court to Mr. Michael Dunn's

17   declaration.  He's the professor -- excuse me, he's the

18   president of 20th Century Fox Home Entertainment.  "Real

19   reduces the price of a DVD that will cost 18 bucks or more to

20   zero, if you borrow it, or $3.99 if you rent it.  That

21   undermines existing developing nascent markets."  Which

22   Mr. Dunn's declaration refers to.  You can do all of this

23   downloading a movie from iTunes or from Amazon.com.  You can do

24   that right now for a price.

25           Mr. Glaser testified at page 476 of the transcript

1    that, quote, "Once consumer behavior patterns get established,

2    they get harder and harder and very expensive to change."

3          Now, of course, that was when he was suggesting that

4    once the consumers get used to using the Studios' ways of

5    downloading the movies and paying for them, they will get used

6    to that.

7          Well, you bet they will.  But the Studios, the

8    content holders, get paid in that equation.  They don't get

9    paid with RealDVD.

10          The balance of the hardships are not hard at all

11   here.  The Studios have released billions of CSS-protected DVDs

12   with the expectation, confirmed by a decade of practice, that

13   the system did not allow permanent playable copies.

14          And, on the other hand, you have Real that says they

15   will have to lay off engineers.  But they're going to have to

16   lay off engineers that they hired knowing, Your Honor, taking

17   the gamble that they were going to have to figure out these

18   legal issues that they knew were coming based upon the

19   documents you have seen.  They knew that it was coming.

20          The fact that they're still hiring engineers in the

21   last two weeks -- indeed they posted on Craig's List for

22   engineers for this specific product on the last day of

23   testimony in this case -- the fact that those folks may not be

24   able to stay with RealDVD is on them, Your Honor, because they

25   took on that risk.

 1          You do not have a right to be the first mover in an

 2   illegal market.

 3          So to close, I'll say this:  Real's defense is based

 4   upon word games and semantics and denials and slights of hand.

 5   They say, "We don't copy.  We save DVDs."  Or at least they did

 6   say that.  They dropped it at trial.  "We don't plan to connect

 7   machines to network or do peer to peer," ignoring the

 8   engineering documents that say that is exactly what the plan

 9   is.

10          They say, "AES protects DVDs."  They say a DVD's

11   safest moment -- this was the quote.  "The safest time in its

12   life is when RealDVD gets it."  When, in reality, the AES

13   encryption that they put onto the DVDs is there so that they

14   can leverage -- and this is from their document, Exhibit 3 --

15   leverage the existing customers' DVD collection and the value

16   they have in it.

17          They say, "We don't know what ARccOS and RipGuard

18   are," even though their own specifications, as Mr. Singla

19   showed you, describe them perfectly.

20          They say, "We don't circumvent ARccOS and RipGuard.

21   We simply don't encounter them."  When the whole idea of their

22   design is to not encounter them.

23          It took them a year and a half to avoid or to bypass

24   ARccOS and RipGuard.  So they use the semantic word, "We don't

25   encounter them," when that's the whole idea.

CLOSING ARGUMENT / WILLIAMS

1          They say, "What's going across the user-accessible
2   bus is a blob.  It was a key before.  It's a key after.  But
3   when it goes over that user-accessible bus we're going to call
4   it a blob, to get around the clear language of the statute."

5          It's like me coming in with a hat and a mask and
6   saying it's not Bart Williams.  Well, yeah, it's still me.  I
7   just have a hat and a mask on.

8          That's what they're doing with this whole slight of
9   hand on when it goes across the user-accessible bus, when they
10  have their expert call it a blob.

11         Eventually the word games, we believe, should fall
12  away.  They should give way to the plain language of the
13  statute, the plain language of the license, to logic and to
14  common sense.

15         We urge the Court to enter a preliminary injunction.

16         We look forward to having a brief time to rebut
17  Mr. Scott's arguments.

18         **THE COURT:**  You mentioned judicial estoppel.

19         **MR. WILLIAMS:**  Yes.

20         **THE COURT:**  Do you really have the elements here to
21  establish judicial estoppel?  And if you believe you do, what
22  argument is estopped?

23         **MR. WILLIAMS:**  Well, we believe we met the elements.
24  They made the argument they were successful.

25         **THE COURT:**  Why do you believe you met the elements?

1          **MR. WILLIAMS:**  We believe -- okay.  I believe here

2   are the elements of judicial estoppel:

3          That Real made the argument -- they did, and we

4   showed you the briefs in which they said fair use is not a

5   defense.  They prevailed on that argument.

6          The Western District of Washington on both counts

7   said that it is not a defense to a 1201(a)(2) claim or a

8   1201(b)(1) claim.  Fair use is not a defense.

9          It would be prejudicial to permit them to come into

10  this court and argue that fair use is a defense under a DMCA

11  claim, when they claim clearly that it was not.  In other

12  words, it was not a collateral issue.

13         **THE COURT:**  Was that the scope of their claim?  What

14  was the scope of their claim?  This was in the Streambox case.

15         **MR. WILLIAMS:**  Streambox case, and --

16         **THE COURT:**  What was the scope of that claim?

17         **MR. WILLIAMS:**  The scope of their claim that the fair

18  use was not a defense?

19         **THE COURT:**  Uh-huh.

20         **MR. WILLIAMS:**  The scope of the claim there was a

21  blanket argument, fair use is not a defense to a DMCA claim to

22  either a 1201(a)(2) or 1201(b)(1) claim.

23         That's what Real claimed.  And we actually showed

24  you, in our presentation today, the portion of the -- right

25  here.  It's on your screen now.  That's from their brief, from

 1   their reply brief.  This is the argument that Real made.  So

 2   that establishes element one.

 3            Element two was, what was the Court's holding?  And

 4   we have copies of the -- copies of the holding.  It's on page

 5   8, star 8 of the holding.  It wasn't a reported decision.

 6            May we hand this up to the Court, Your Honor?

 7            **THE COURT:**  Yes.

 8            **MR. WILLIAMS:**  The Court's holding was not some

 9   narrow ruling.  The Court's holding, at paragraphs 13 through

10   17 of that decision, you'll see the entire analysis of fair

11   use, what was argued by Real, what was accepted by the Court.

12   And you see -- I think it's Judge Littmann -- you see her

13   analysis of why fair use under the statute -- you see the

14   analysis of why fair use is not a defense.  And this is

15   paragraph 16.

16            She says, "Moreover, the Sony decision did not

17   involve interpretation of the DMCA.  Under the DMCA, product

18   developers do not have the right to distribute products that

19   circumvent technological measures that prevent consumers from

20   gaining unauthorized access to or making unauthorized copies of

21   works protected by the Copyright Act.  Indeed, Congress

22   specifically prohibited the distribution of the tools by which

23   such circumvention could be accomplished.

24            "The portion of the Streambox VCR that circumvents

25   the technological measures that prevent unauthorized access to

 1  and duplication of audio and video content, therefore, runs

 2  afoul of the DMCA."

 3          And then down in the next paragraph, paragraph 7, she

 4  cites Section 1201.

 5          Could I have the earlier page?

 6          In the earlier page, on page 13 --

 7          **MR. SINGLA:**  Paragraph.

 8          **MR. WILLIAMS:**  -- paragraph 13, pardon me, it sets up

 9  Streambox's primary defense.

10          "Streambox's defense to plaintiff's claim is that the

11  VCR" -- that's the product there -- "has legitimate uses.

12          "In particular, Streambox claims that the VCR allows

13  consumers to make a fair use copy of Real media files,

14  notwithstanding, notwithstanding the access control and copy

15  protection measures that the copyright owner may have placed on

16  the files."

17          And so she goes from that analysis to the analysis

18  that I just read describing the Sony case.

19          In other words, what she is saying is:  We don't buy

20  it.  Under the copy control and access control provisions of

21  the DMCA, fair use is not a defense.

22          So that's why we believe they should be judicially

23  estopped, Your Honor.

24          **THE COURT:**  Anything further?

25          **MR. WILLIAMS:**  No, Your Honor.  Thank you very much.

1          **THE COURT:**  Thank you.

2          Mr. Steer.

3          **MR. STEER:**  Thank you, Your Honor.

4                          **CLOSING ARGUMENT**

5          **MR. STEER:**  Before I get started, we have a stack,

6     Your Honor, of slides which I'll distribute.  There is nothing

7     new in it.  And if I may hand a copy up to the Court.

8          Your Honor, I think it was Mr. Williams who said in

9     his remarks that at some point we have to get back to the clear

10    provisions of the contract.  And that's how I want to start

11    out.

12         CSS, it's been said many times, is a copy protection

13    system.  Everyone agrees on that.  It's designed to prevent

14    consumers from copying movies on DVDs.  That's its entire

15    purpose.

16         The license agreement and the specifications with

17    which the Court is now very familiar all state clearly and

18    repeatedly that the purpose of the system is to protect against

19    consumer copying of DVDs.

20         RealNetworks has built a DVD copier.  It's targeted

21    at a mass market of consumers.  So this issue should be simple,

22    viewed in that light.  No person could reasonably understand

23    that the CSS license agreement was intended to allow licensees

24    to build DVD copiers that allow people to copy movies off of

25    DVD discs and play them back without ever having to go back to

CLOSING ARGUMENT / STEER

1   use the DVD disc.  It violates the fundamental purpose of the

2   entire system.

3           What does the agreement say?  Section 2.1 tells

4   exactly what license is granted.  It says -- and this is

5   Section 2.1 of the license agreement itself, Your Honor, it

6   says, starting with "Nonexclusive License," "Subject to the

7   terms and conditions of this agreement, Licensor grants to

8   Licensee a worldwide, royalty-free, non-exclusive,

9   non-transferable right, under the licensed rights,"

10  subparagraph (a), "to use and implement CSS, to develop,

11  design, manufacture and use DVD Products" -- and you will see

12  that "DVD Products" is capitalized because it's a defined

13  term -- "that are in the Membership Categories," also

14  capitalized, "selected by Licensee, and practice any methods

15  necessary for the manufacture or use of such DVD products."

16          It goes on.  There's more to it.  But this is the

17  essential part, as far as the dispute of this case is

18  concerned.

19          Bear with me, please.  I'm fighting some kind of bug,

20  and I have taken all kinds of medicines that make me more

21  thirsty than usual.

22          So, as I said, "DVD Products" is a defined term.  And

23  in Section 1.15 of the license agreement -- again, the license

24  agreement is the public document, one of the public documents,

25  available off of the DVD Web site.  And we know that, of

1    course, Real obtained this and the procedural specifications,

2    which are also publicly available off the Web site, months

3    before it signed on to the agreement.

4            So DVD products are listed here.  And, again, each of

5    these are capitalized.  They're defined terms.  It says, "DVD

6    Products shall mean the following products if they incorporate

7    any portion of CSS:  DVD players," obviously consistent, "DVD

8    drives, descramblers, authenticators, scramblers, CSS

9    decryption modules," and it talks about software and hardware,

10   "disc formatters, DVD discs, special purpose DVD players,

11   special purpose DVD drives, verification products, and

12   integrated products."

13           The list of DVD products does not mention a copier.

14   It could not, because the whole purpose of the system is to

15   prevent copies from being made.

16           And our position, as we've stated clearly throughout,

17   is that RealNetworks is in breach of the contract.

18           The contract says that Real is obligated to comply

19   with the CSS specifications that have been discussed in the

20   briefs and in the testimony at great lengths.

21           Referring to Section 4.2 -- and, again, this is

22   directly from the license agreement, the public document.  It

23   says, at the very start, "Licensee shall comply with the CSS

24   specifications."

25           It goes on and says, "Each DVD product shall comply

```
 1   with the version of the CSS specifications which is in effect

 2   at the time such DVD product is manufactured," et cetera.

 3          It could not be clearer.

 4          THE COURT:  The parties who are -- or companies,

 5   whomever, licensees are, I assume, companies that manufacture

 6   players, manufacture discs, disc drives, things of that nature.

 7          MR. STEER:  Your Honor --

 8          THE COURT:  What's the gamut of --

 9          MR. STEER:  The gamut is extremely broad in the

10   electronics and production industries.

11          You've got companies like Intel, Microsoft,

12   Hewlett-Packard, computer companies, software companies.  You

13   have the consumer electronics manufacturers.

14          Remember, it was Matsushita and Toshiba who did the

15   initial work to create the software on which the system is

16   based.  And they essentially donated their intellectual

17   property to set up the CSS system.

18          Pioneer Electronics is a member, but there are many,

19   many more.  Apple Computer is a member.  I couldn't begin to

20   list all of them, but if you --

21          THE COURT:  No, no.  That sort of runs the gamut

22   then?

23          MR. STEER:  Right, it runs the gamut.  Of course, the

24   movie Studios who are here are members as well.

25          So, going on, I'm talking about the specifications
```

CLOSING ARGUMENT / STEER

1   with which Real is obligated to comply.  And, again, that's a

2   defined term, as well.

3            And it says, in Section 1.13 of the license

4   agreement, "CSS specifications shall mean the documentation

5   relating to CSS, entitled 'CSS Specifications'" -- going on and

6   on -- "that licensor makes available to licensee."

7            Well, there is no doubt here, no dispute about what

8   specs were made available to RealNetworks.

9            RealNetworks admits, its people admit that they

10  signed the license, that they received the exact specifications

11  we have been discussing, which they requested.  They chose

12  which categories to join.  And they got the right

13  specifications.

14           Remember, I showed you in opening statement what is

15  now slide number 6.  It was the signed receipt for the

16  confidential and highly confidential information that Nichole

17  Hamilton of RealNetworks received and signed for in

18  September -- I'm sorry, in August -- yeah, August.  Sorry, my

19  eyes are failing.  This is September of 2007.  I apologize.

20           So, again, there's no dispute about what

21  specifications apply here.  They made arguments about, you

22  know, are these specifications part of the contract or not, so

23  on and so forth.

24           **THE COURT:**  Well, excuse me.

25           Technical specifications include the authenticator

1   specifications, descrambler specifications, things like that as
2   well, correct?

3          MR. STEER:  The term "technical specifications" has
4   been used in a variety of ways.

5          We start off here with the license agreement itself,
6   which is the umbrella.

7          THE COURT:  That's not very good for contract
8   interpretation though.  The technical specifications mean what?

9          MR. STEER:  The specifications are the confidential
10  specifications.  That's really what contains the technology
11  here.

12         THE COURT:  But we've seen sets of different
13  specifications.  For example, the descrambler and the
14  authenticator, et cetera.

15         MR. STEER:  Those are technical specifications.

16         THE COURT:  Those are technical specifications,
17  right?

18         MR. STEER:  Absolutely right.

19         THE COURT:  And they come within the rubric of
20  technical specifications?

21         MR. STEER:  Right.  And so are the -- and I believe
22  the general specifications are, as well.  It only takes a look
23  through them to see that they are, in fact, technical.

24         And the exception and what's outside of that scope is
25  the procedural specifications.  And that's, as I said, on the

1   Internet and available for everyone.  So you know what

2   procedures you need to follow.

3          The bottom line is, Real was obligated to comply with

4   these specifications, with all the specifications under the --

5   under Section 4.2.  They're in breach if they don't comply with

6   all of the specifications.  And their own people testified that

7   they understood that.

8          So let's talk, now, more about the specifications.

9   Most of this case has been a series of efforts by Real to

10  confuse the meaning of the specifications by carving up the

11  language into little isolated bits and parsing it with lawyers'

12  arguments about what it might mean or doesn't mean.

13         It's no surprise, given the fact that this whole

14  approach by Real was crafted, essentially, by its lawyers.  I

15  would say that the products were designed from the lawyers up.

16  And that's essentially what Mr. Glaser testified to.

17         So how are we supposed to interpret contracts?  I

18  think this is very important here.  In California law, we

19  interpret contracts to give effect to the intent of the

20  parties.  We look at the entire contract as a whole.

21         But under Section 1650 of our Civil Code, we know

22  that particular clauses of a contract are subordinate to its

23  general intent.

24         So the general intent is very important.  And that

25  general intent is, again, as I've said, stated on slide 8 here,

1  Recital A of the CSS license agreement.  This is one of the

2  places where it's stated.

3         And it is "To provide reasonable security for content

4  on DVD discs and, thereby, together with the terms and

5  conditions of the agreement, to provide protection for such

6  copyrighted content against unauthorized consumer copying."

7         This is said again in the specifications.  In general

8  specification Section 1.5, the contract says, "The general

9  security requirements for the DVD-video content scramble system

10  are as follows:  1, the DVD-video content scramble system is

11  intended to prevent casual users from the unauthorized copying

12  of copyrighted materials recorded on DVD-video/audio discs."

13         And, again, in Section 1.2 of the general

14  specifications it states two objectives of the DVD-video

15  content scramble system:  One, "To make playback" -- and again,

16  this is about playback, Your Honor, not copying -- "of

17  copyrighted materials on a DVD-ROM disc possible only on

18  devices subject to license terms that protect certain rights of

19  the copyright owner of that material."  And, number two, "To

20  prevent digital-to-digital copying in a personal computer

21  environment."

22         There's been a lot of discussion about that.  There

23  is no doubt that what is done here is digital-to-digital

24  copying.  Professor Bishop admitted that, although grudgingly.

25  So it's not really an issue.

CLOSING ARGUMENT / STEER

```
 1              So the goal here was -- is a system that allows
 2  companies to manufacture devices that will play back DVDs,
 3  movie DVDs, but at the same time prevent copying.
 4              And if we look at what has been numbered slide 11,
 5  it's an excerpt from the authenticator specification, and it's
 6  Section 1.1.  And it talks about the objectives of bus
 7  authentication and bus decryption.
 8              And Mr. Singla has already talked about that a bit.
 9  But it says bus authentication's objective is to prevent
10  digital-to-digital copying in a personal computer environment.
11  And bus encryption is intended to prevent the unauthorized
12  interception of data after mutual authentication.
13              Real, of course, does both of those things.
14              These statements of purpose and intent, Your Honor,
15  provide guidance to interpret the specific provisions of the
16  license and the specifications.
17              So if a possible interpretation of this contractual
18  setup would contradict the stated intent, we know that that
19  interpretation is wrong.
20              And, so, to try to get around the clearly stated
21  intent of the contract, which is repeated multiple times, Real
22  first argues that these provisions don't count because they're
23  mere recitals.  That's kind of their latest assertion.
24              And, first, they're not all just recitals.  The
25  intent is stated again and again in the specifications.
```

1            And, second, it doesn't matter whether these are

2    separate covenants or not.  They're explicit statements of

3    contractual intent that govern how the agreement should be

4    interpreted.

5            Again, under California law, it's got to be read as a

6    whole, with each provision supporting the whole and the others.

7            Next, Real resorts to all kinds of alternative

8    intents when it describes this system, which it's crafting to

9    suit its purposes.  They're distortions.

10           They're claiming that in one place or some places

11   that the intent of this system is to keep the keys from

12   unlicensed people, or prevent viral copying on the Internet, as

13   though it would be perfectly free and okay if every consumer in

14   America copied all their Blockbuster movies for free, so long

15   as they don't post them on the Internet.

16           Well, we know what the actual intent is, to prevent

17   consumers from copying DVDs, because that's very clearly stated

18   and stated repeatedly in the agreement.

19           And, contrary to Real's legal argument, these

20   so-called mere recitals do have a legal function.

21           And I'm going to cite the Court to California

22   Evidence Code, Section 622, which is slide 12 here, not because

23   I contend that it's binding, but it's an expression of

24   legislative policy in California.

25           And what it says is, "The facts recited in a written

1   instrument are conclusively presumed to be true as between the

2   parties thereto or their successors in interest, but this rule

3   does not apply to the recital of a consideration."

4          So not only do we know what the intent is but,

5   certainly, California has spoken to this kind of contract, and

6   said it's conclusively established.

7          Can we turn off the large -- the large ones are off.

8   Thank you.

9          Your Honor, I brought up the slide which is Figure 4

10  in the general specifications and with which the Court is

11  familiar because, of course, Dr. Kelly testified at length

12  about this particular figure.  And, of course, Dr. Bishop

13  changed it and testified at length about his version.

14         The specifications are a blueprint for building

15  particular devices.  They have to be CSS-compliant devices.

16  And, as I said, there's no specification for a copier.

17         This diagram is entitled "Architecture of the DVD

18  Playback System," not "architecture of the DVD copying system."

19         So if a licensee builds the device that is described

20  in these specifications to which Real subscribed, that licensee

21  will get a device that plays DVDs, but not one that copies

22  DVDs.

23         The specs -- and your question was a good one.  The

24  specs overlap, and they describe a coherent system that

25  accomplishes that result, the result being a device that plays

CLOSING ARGUMENT / STERR

1   DVDs without the keys or data being intercepted, so that

2   someone can make a copy.

3            Slide 14 shows a diagram that's from the

4   authenticator module specification, and it's Figure 1.  And the

5   reason that I'm showing this is that you'll find the same

6   diagram of the playback system throughout these specifications.

7   The structure is fundamentally the same, but, of course, each

8   specification addresses a different set of functions, a

9   different set of processes within the system.

10           So here we're looking at the DVD-video decoder which

11  is boxed in on the right, and it contains, first, the

12  authenticator -- and that's been explained a number of times --

13  and then the descrambler.

14           These are the two software machines, if you will, or

15  devices that must work directly together.  And this is where

16  Real divides the diagram, essentially, and inserts the hard

17  drive in the middle.  We'll get to that shortly.

18           What you won't find, as I say, is a description of

19  any copier, either textural or diagrammatical.

20           My point here is that these diagrams that I've just

21  shown you are essentially summary descriptions of what's

22  contained in the text of the specifications.  And the reason

23  that there is no diagrammatical summary description of text

24  defining or describing a copier is there isn't such text.

25           And, of course, again, there can't be, because the

 1  purpose of the system is directly opposite.  There's not going

 2  to be a hard drive defined -- described in any of these

 3  specifications.  One can read through the entire set, and one

 4  will find it never says anything about, you know, a hard drive

 5  being part of the system.

 6          Now, Dr. Kelly, I'm sure you'll recall, testified in

 7  great detail about the operation of the CSS system, according

 8  to all the applicable specifications.

 9          He explained that RealDVD's products failed to comply

10  with the specifications in at least four different ways.  And

11  I'm going to go back to them, if I may.

12          This was Dr. Kelly's thirty-sixth slide.  It was a --

13  it is a summary of important ways in which Vegas and Facet do

14  not comply with the CSS specifications.  I've modified his

15  slide to add into it, for the Court's ease of reference here,

16  the various applicable provisions relating to each of these

17  failings or violations.

18          First, Vegas and Facet intercept and copy the secret

19  keys to a hard drive.  Second, they don't obtain the keys and

20  data from the physical DVD disc played back from the hard

21  drive.

22          As you remember, we talked about the hidden areas on

23  the DVD disc that contain various keys.

24          Once Real's products save the movie to a hard drive,

25  the DVD is taken out of the process entirely.  And so the

1  provisions that required getting the keys from the actual

2  physical DVD, they cannot be complied with.  They are violated

3  as a matter of definition.  And it's this definition of the

4  steps that must take place in order to be in compliance with

5  the specifications that is the heart of our case.

6           Going on.  Third, they don't perform CSS

7  authentication during playback from the hard drive.

8           And, fourth, they don't use bus encryption or

9  decryption during playback from the hard drive.

10          And Mr. Singla has talked a bit about these things.

11  I won't repeat what he's done.

12          There's no dispute that RealDVD's product -- that

13  RealDVD acts this way.  Both Professor Bishop and Mr. Bielman

14  freely conceded that each of these facts is true.  And in each

15  case, Real has a contorted explanation as to why it should be

16  okay to do what it does.

17          In each case, Real's explanation bends the language

18  of the specification in a way that contradicts the explicit

19  intent of the contract.  And we know that it can't be right

20  based on the California interpretation rules.

21          The proper interpretation of the contract cannot be

22  the one that allows users to make copies of DVDs that let them

23  play movies without ever having to go back to the DVD disc.

24          I want to examine these breaches in greater depth one

25  at a time.

```
 1          The first one is intercepting and copying the secret

 2   keys to the hard drive.  As Dr. Kelly explained and Mr. Singla

 3   has already covered, the specifications require that the CSS

 4   encrypted keys go directly from the authentication and bus

 5   decryption process to the descrambler, without appearing on a

 6   user-accessible bus.

 7          Mr. Singla showed you the user-accessible bus between

 8   the hard drive and the other components in the Real system.

 9          Real's witnesses admitted that the keys go out to the

10   hard drive on a user-accessible bus.  The keys are, therefore,

11   intercepted and copied.

12          Let me see if I can go forward.  I do have -- Your

13   Honor, I have as slide 18, once again, Professor Bishop's

14   version of this, showing the -- or illustrating the way the

15   keys move.  And, again, I don't want to go through it entirely

16   because you've already seen it once today and probably three or

17   four times in the past.

18          But Real's excuse, as Mr. Singla said, is that this

19   breach is okay because they put extra encryption on the keys.

20   The specifications don't say you can put the keys out on a

21   user-accessible bus if you're really careful.  They say simply

22   don't do it.

23          So what they do here simply doesn't comply with the

24   specification, and it's a clear breach.

25          The second breach that Dr. Kelly talked about was
```

1  failing to obtain the keys and data from the physical DVD disc

2  during playback from the hard drive.

3          Again, as Dr. Kelly explained and Mr. Singla has

4  already covered, the descrambler process which decodes the

5  audio/video data for playback on a screen is supposed to obtain

6  the disc data from the physical DVD.

7          That doesn't happen here.  In RealNetworks' products,

8  they get that data from the hard drive, not the physical DVD.

9  The consumer is able to sell, give, throw away, do whatever

10 they want with that physical DVD, and forever just use the copy

11 on the hard drive.

12         And the specifications clearly state that the input

13 to the descrambler is triggered by the insertion of a physical

14 disc using the "on insertion" language that we've talked about

15 any number of times.

16         As Mr. Singla said, Real's answer to this is, this

17 actually isn't -- you know, once upon a time, there was a disc

18 inserted into the system and so we complied.

19         As Mr. Singla pointed out and Professor Bishop

20 admitted, that isn't necessarily true, because a person can

21 play a stored copy of a movie on a second or third or fourth

22 version of RealDVD, and those extra copies may never have seen

23 the physical DVD.

24         So there is a certain amount of inconsistency here,

25 to say the least.

1           But more to the point, what they do turns this system

2    on its head.   Interpreting the phrase "on insertion of disc" to

3    mean someone somewhere put a disc into a drive frustrates the

4    entire authentication scheme and allows people to make and use

5    extra copies of the movie.   And we know that cannot be the

6    correct interpretation because it contradicts the stated

7    intent.

8           The third failing that Dr. Kelly identified was that

9    Vegas and Facet do not authenticate with the DVD drive during

10   playback of a movie copied to the hard drive.

11          As Dr. Kelly explained, the procedural

12   specification -- and here we go into the procedural spec -- it

13   requires that CSS keys are received by the descrambler only if

14   the authentication process is successful.

15          So Real's witnesses admit that CSS authentication is

16   not performed when RealDVD plays back movies from the hard

17   drive.   And, again, their excuse for this is that once upon a

18   time authentication was performed before the keys were sent to

19   the hard drive.

20          But the purpose of authentication is to prevent

21   digital-to-digital copying.   And by interpreting the procedural

22   specification like this, the way they do, Real is explicitly

23   enabling digital copies to be made and then used freely,

24   without regard to whether the DVD has since been returned to

25   Blockbuster or given to someone else, or whatever.   Again, that

1  interpretation just cannot be right.

2          And turning to -- let's see if I have the right

3  screen.  Yes.  Turning to our slide 23, Dr. Kelly testified

4  that Vegas and Facet do not use the bus encryption and bus

5  decryption processes for playback of a movie copied to the hard

6  drive.

7          Again, we've been through this.  It's

8  straightforward.  There is specific language on our slide 24,

9  referring to authenticator specification section 5.4.  Again,

10 this is highly confidential so, Your Honor, I am not going to

11 read it aloud.

12          And, by the way, in the stack of the slides that I

13 provided to you, there may be some errors in that some of the

14 outtakes, the blowups, are grayed out.  And what I propose to

15 do is provide the Court an amended stack.  And I apologize for

16 that mistake.  We were a little pressed for time on some of

17 these revisions.

18          In any event, Real's witnesses admit that RealDVD

19 does not perform bus decryption on the keys when it plays back

20 from the hard drive.  The keys aren't bus encrypted at all when

21 they come from the hard drive.

22          Dr. Bishop argued about that.  He said, well, they're

23 encrypted because they have AES.  But, in fact, they were not

24 bus encrypted as the specification requires.

25          Again, Real's excuse for this breach is that "before

```
 1   playback," as is referenced here, might be interpreted to mean
 2   anytime in history before playback.  But that's not a fair
 3   interpretation of the language.
 4          In this context, "before" means immediately prior to
 5   playback.  How do we know?  First, because there are two parts
 6   to this section of the specification.  One, the top one,
 7   happens on insertion of the disc.  I'm sorry, on an inserted
 8   disc.  And the other happens before playback of a VTS.  VTS
 9   being the video.
10          Real's interpretation would compress these two parts
11   together to mean the same thing so that "before playback" would
12   only occur when a disc is initially inserted.  It would make
13   the second part superfluous.
14          Second, because Real's interpretation would frustrate
15   the entire bus encryption process, which is designed to require
16   the keys to be bus encrypted with a special time variable key
17   when they are put on a user-accessible bus or interface.
18          And you remember, Your Honor, there was a lot of
19   testimony about why a time variable key was important in bus
20   encryption, so that a new key is generated with each
21   transaction, each exchange.
22          Under Real's interpretation, if you've done that
23   once, you get a free pass.  You can ignore the requirement
24   forever in the future, and you put these keys out on any bus
25   you want because you've done bus encryption once in the past.
```

1   That's a nonsensical interpretation of the specifications.

2            And, third, Real's interpretation allows the keys and

3   thus the movie to be copied.  And we know that that cannot be

4   right.

5            So, in summary, with respect to the specifications,

6   Real's interpretation of the license and specifications is not

7   reasonable and it is not credible.

8            Real and its witnesses ignore the stated intent of

9   the agreement.  They purposefully choose to destroy the

10  interpretations of words and clauses in order to allow

11  themselves to copy movies, which the agreement plainly says it

12  is designed to prevent.  And they fail to consider the overall

13  design of the system, which shows a method for playing DVDs,

14  not copying DVDs.

15           So going back to our last slide here, again, this is

16  highly confidential, it says, "Architecture of the DVD Playback

17  System."  Their interpretation cannot be right.

18           Now, that said, I'd like to turn to the issues

19  relating to the implied covenant of good faith and fair

20  dealing, very briefly.

21           Much of Real's argument is --

22       **THE COURT:**  How much time did you have?  And I

23  think --

24       **MR. STEER:**  Twenty minutes, and I probably shattered

25  it.

```
 1            THE COURT:  Yes, you did.  Quite a bit, I think.

 2            The breach of covenant of good faith and fair dealing

 3    is included in the conclusions, right, of law in your

 4    submission?

 5            MR. STEER:  It is, Your Honor.  The key point here is

 6    that the restatement of contracts contains a wonderful

 7    description of the obligation of the covenant.  And I want to

 8    say it says.  It says, "Subterfuges" --

 9            THE COURT:  Say it, and then that's it.

10            MR. STEER:  Okay.  "Subterfuges and evasions violate

11    the obligation of good faith performance even though the actor

12    may believe his conduct to be justified."

13            THE COURT:  Okay.

14            MR. STEER:  Thank you.

15            THE COURT:  Thank you.

16            We are going to take a break before we proceed with

17    the next argument, Mr. Scott.

18            MR. SCOTT:  Thank you.

19            THE COURT:  You are up next.  So we will take ten

20    minutes.

21            (Recess taken from 11:37 a.m. to 12:00 p.m.)

22            THE COURT:  Mr. Scott.

23                         CLOSING ARGUMENT

24            MR. SCOTT:  Thank you very much, Your Honor.

25            First, I want to thank the Court for your many
```

 1   courtesies on behalf of myself and my client, and the entire

 2   RealNetworks legal team here at the table.  It's been a long

 3   proceeding, and you have been very gracious to us all.

 4         This case is about primarily RealNetworks' compliance

 5   with the CSS license and specifications, and to a lesser degree

 6   about the issues of ARccOS and RipGuard, but they're there, to

 7   be addressed.

 8         I will principally in my time review the evidence

 9   showing that Defendants are wrong in their interpretation of

10   the license as to the making of a copy, they're wrong in their

11   interpretation of the CSS specs as to our company's compliance,

12   and they're wrong in their effort to try to enjoin an entire

13   product launch based on ARccOS and RipGuard.  And wrong in

14   other respects, too, but I want to highlight those points.

15   I'll talk about those.

16         But I think it will be helpful just to spend a few

17   minutes before I get there on the question of what the case is

18   not really about.  It is not really about security, and it's

19   not really about piracy.  Even though those things have been

20   talked about.

21         The concept behind CSS has always been one of

22   achieving security for DVDs.  But CSS, as we know, was

23   compromised long ago.

24         Professor Bishop talked about this, and the

25   Defendants' witnesses talked about it as well, that the master

1  keys for CSS have been on the Internet, some of them, for the

2  last ten years.  And that with etch one of those master keys,

3  that a hacker can get into the CSS DVDs and make copies in the

4  free and clear.

5          Now, RealDVD does not take off CSS protection.  It

6  leaves the protection on, and adds AES on top of that.

7  Mr. Singla, in his argument, misspoke when he told the Court

8  that -- I'm quoting -- "CSS is gone," that the copy on the

9  thumb drive does not have CSS on it any more, and saying later

10 on, I'm quoting, "At the end of RealNetworks' process, we have

11 a copy without any protection on it."

12         Now, I'll come to the issues about the locking of a

13 drive that Mr. Schumann's exhibit was about, but it's just

14 mistaken to tell the Court that we take off the CSS protection.

15 No witness has claimed that.

16         Indeed, we leave on the CSS protection, and add the

17 AES protection, until the time that the movie is descrambled

18 for playback.

19         AES encryption, continuing about -- this case is not

20 about security.  AES, as Your Honor knows, is the same

21 encryption that the Studios are now using for their new series

22 of Blu-ray DVDs.

23         Now, Mr. Schumann, testifying as the Studios' expert,

24 did not want to give up the fact that Real makes the movies

25 more secure.  Now, Your Honor, I've given you a notebook.  I

 1   don't know if you have that there?  Yeah.

 2          **THE COURT:**  Yes.

 3          **MR. SCOTT:**  I'm now on Page 3, and I hope my

 4   numbering is right in my booklet.

 5          **THE COURT:**  We figure it out somehow.

 6          **MR. SCOTT:**  Well, I know, I know, but -- we can get

 7   there, but it makes it easier.

 8          I'm just looking at the screen, here, so I keep my

 9   place.

10          **THE COURT:**  Uh-huh.

11          **MR. SCOTT:**  When I was asking Mr. Schumann about CSS,

12   he didn't want to just give up the fact that CSS really has

13   been compromised long ago.  And he actually spent two pages

14   talking to us about the concept of revocation of those stolen

15   master keys.

16          And after two pages of uninterrupted talking about

17   revocation, he acknowledged they've never been revoked.  They

18   have never been revoked in those ten years.  As if somebody

19   just doesn't care any more.

20          And then he attacked AES security.  When I was asking

21   him questions, he said that AES keys could be stolen, and it

22   was the same problem as CSS.  But then when the Court asked him

23   a question, he admitted it quite readily -- you were asking him

24   about Blu-ray.  And he acknowledged the Studios are using

25   Blu-ray, the newest technology.  And even though some keys have

 1   been stolen, it has a robust key revocation mechanism that's in

 2   place.  And that's the same system that RealNetworks has in

 3   place and plans to use with RealDVD if it launches.

 4          So, security in our implementation is not a real

 5   issue in this case.  And in fact, the Studios, themselves, have

 6   been voting with their feet in moving from CSS which we

 7   preserve, over to AES, which we add.

 8          Piracy is also not what this case is about.  And I'm

 9   using that term to refer to the propagation of many copies, a

10   so-called viral distribution, because the digital copies are

11   perfect from one copy to the next.

12          RealDVD actually locks down the movie on a single

13   hard drive.  From that hard drive, it can be played on the one

14   device in Facet, and up to five registered devices in Vegas.

15   In neither Vegas or Facet can a playable copy be made from that

16   copy on the hard drive.  There cannot be viral distribution.

17          We need cooperation from the Studios to be able to

18   implement protections against rent, rip and return by

19   identifying rental discs.  We need cooperation from the Studios

20   to implement protections against borrow, rip and return, by

21   having unique serial numbers.  They do both of those things in

22   other discs.  But, they've not been willing to do it so that we

23   can implement protections there.

24          One question Your Honor was discussing with

25   Mr. Williams is about the targeting of our product, and the

1  fact that Mr. Glaser testified that we target people who will

2  obey the law.  And RealNetworks knows that there's not perfect

3  compliance.  Your Honor correctly pointed that out.

4          But, the difference here is that we are selling a

5  product with all kinds of restrictions to lock down further

6  copying.  And the market for the people who want to copy free

7  rein and not pay is already well-served out there.

8          Ours is a product with many features.  And to provide

9  those features to the consumer, we have to make that one copy

10  to hard drive.  The features of parental controls, the features

11  of searching and organizing, the features of metadata from the

12  Internet, placekeepers; we have to have the copy from hard

13  drive to be able to do that.

14          This case is about making.  It's not about security,

15  it's not about piracy.  It's about a making of a secure single

16  copy to a hard drive through our device, so that we are able to

17  work off of that copy to provide these other functionalities

18  and features to the consumer.  We can't even offer those

19  without having a copy on the hard drive, and the Studios know

20  that.

21          By preventing Real from making a copy to the hard

22  drive, what they are doing is blocking us from providing those

23  features which they are offering, themselves, in their own

24  products.  They want to occupy that field, and do it by

25  themselves.

1        Now, one way to view the question here is whether

2   Real is permitted to sell a product that lets consumers use the

3   same features and functionalities that the Studios, themselves,

4   many of them, are already selling, for example, as Digital

5   Copy.

6        And, I'm showing Hearing Exhibit C, which is Disney's

7   advertisement of Digital Copy.  The concept of RealDVD and

8   Digital Copy is very similar.  Enabling the consumer to make a

9   copy of the movie to hard drive, and then have features that

10  enhance the use of the movie.

11       But, they do have differences.  The Studios' Digital

12  Copy actually allows more copies.  On the screen, you can see

13  from their extra copy of the DVD, they actually have compressed

14  data, which we don't do, copy to the computer, and copy it to

15  the iPod.

16       Now, the difference here is the Studios want to be

17  able to sell, to monotize that second copy.  And when they do

18  so, then they allow copies on iPods, up to five copies.

19  RealDVD wants to make one copy without charging the consumer,

20  so that we can offer the other functionalities.

21       Now, it is true --

22       **THE COURT:**  But the difference is, what I've raised,

23  I think, many weeks ago.  And that is, they are the owner of

24  the copyright.

25       **MR. SCOTT:**  Yes, Your Honor.

```
 1              THE COURT:  I mean, they can do with it as they will.

 2              MR. SCOTT:  That is -- that is -- that is true.  I

 3     was going to address that next.  They do own the copyrights.

 4     But it's also true that the buyer has certain rights.  There is

 5     a fair-use issue here.

 6              The buyer has the right, we know, to play and replay

 7     that movie, once he buys it, as many times as he wishes.  And

 8     we think he also has the fair-use right to be able to have a

 9     copy on a hard drive, not just for security, but to be able to

10     have these features that we're trying to enable.

11              This fair-use copy and adding these features is the

12     whole premise of Real's product development for RealDVD.  Other

13     companies are offering that.  Not just the Studios, but

14     Kaleidescape, under legal challenge in the courts, but also

15     companies like Drive-In and AMX have these kinds of products

16     out there, without legal challenge.  And they're doing it, too.

17              Now --

18              THE COURT:  Well, if -- if -- you say -- if you have

19     a copy, and you -- if you have the DVD, you've bought the DVD.

20              MR. SCOTT:  Yes.

21              THE COURT:  And, then you can save it to your hard

22     drive and whatever, five other copies, whatever, with Vegas.

23              There's nothing preventing you from giving your DVD

24     to somebody else who has, you know, the same system, a

25     RealNetworks system, Vegas, for example, and they can do the
```

1  same thing, and essentially you can just pass it down the

2  block, or around the dorm, or wherever.  Right?

3          That DVD -- the purchased DVD can be saved as long as

4  you're talking about saving it or -- the copies that you have

5  can be saved and passed around to other people who have the

6  advantage of copying it.

7          I'm just looking at the multiplicity issue here.

8  Because we're not talking about one copy for personal use or

9  something like that.  We're talking about spreading it around.

10 Anybody who has a RealNetworks player of the Vegas sort, you

11 know, sort of endless, right?

12        **MR. SCOTT:**  It is -- it is -- it is possible at this

13 time that that will happen.  The copying of a borrowed DVD or a

14 rented DVD.

15        **THE COURT:**  Uh-huh.

16        **MR. SCOTT:**  This is where we need the Studios'

17 cooperation to prevent that, which was discussed in the

18 negotiations in the late summer of 2008.  Seemed perfectly

19 capable of doing it, but are not doing it.

20        To prevent the borrowing and copying that Your Honor

21 has described, that requires some unique serial number on the

22 DVD.  Which the Studios are doing, in Digital Copy.  But they

23 won't do it, to enable our device to be used without that kind

24 of -- of compromise.

25        The rental copies need to be marked as rentals so we

1    can recognize them and not copy, which they do, in Europe.  But

2    they won't do here to enable our -- our device, to go without

3    this challenge.

4            Yes, those things can happen.  It does require the

5    physical disc to be copied over and over.  This is not the

6    viral, easy copying that we've seen in the past or with rippers

7    out there who have compressed copies they can send over the

8    Internet, and just copy and distribute.  But it is possible

9    until those protections are in place.

10           And those are things the Studios do already when it

11   suits them.  And they're not doing it for us, and they're

12   arguing about it here, instead.  But those are cumbersome ways

13   to make copies, and those are not the markets that we are

14   targeting.  But yes, that can happen.

15           I do want to correct one thing, Your Honor.  Just as

16   you were describing our Vegas system, it is not five copies

17   that are made.  Only one playable copy can be made in the Vegas

18   system, on that hard drive.  And then up to five different

19   devices, like my son's computer or my second son's computer.

20           **THE COURT:**  Uh-huh.

21           **MR. SCOTT:**  I was about to say "daughter," I wish I

22   had one, but I don't.  But I -- they can -- up to five people

23   can play on that one, one hard drive, if they've accessed that

24   single hard drive in Vegas.

25           **THE COURT:**  Uh-huh.

1          **MR. SCOTT:**  Just so we're clear on what that is.

2          **THE COURT:**  Okay.

3          **MR. SCOTT:**  I think Your Honor understands that

4    already, but I just needed to make that point.

5          Now, you asked a number of questions about fair use

6    when Mr. Williams was up, and I'm going to come to that at the

7    end.  But, we are trying to offer a capability here that

8    requires the making of one copy.

9          And this, in fact, this, in fact, is the kind of

10   consumer experience that is recognized, and has been, as lawful

11   fair use for years in the world -- in the world of music CDs.

12   Now, these same Studios, wearing their record-label hats, have

13   talked about CDs.

14         Now, CDs, a purchased CD, can be copied to the

15   computer and then copied over to the iPod without any extra

16   charge, without any express authorization by the copyright

17   owner, or the studio.

18         Addressing that in oral argument to the U.S. Supreme

19   Court in *Grokster*, four of the Studios here, through

20   Mr. Verrilli, not just speaking for them, but actually quoting

21   them from their website, said that, speaking about the iPod and

22   the CDs, it's obvious that there were very significant lawful

23   commercial for that, for the iPod.

24         And then he talks about the CDs.  "...it's perfectly

25   lawful" -- he's quoting his clients -- "to take a CD that

1 you've purchased, upload it onto your computer, put it onto

2 your iPod."

3       Now, they can argue until they're blue in their face

4 there's a difference between the CDs and DVDs because these are

5 not CSS-encrypted. That has nothing do with the fair-use

6 analysis.

7       This answer to the U.S. Supreme Court responding to

8 justices who were very concerned -- read the oral argument,

9 it's obviously it's published -- very concerned about a rule --

10 it's a copyright case, contributory copyright infringement, but

11 a rule that would unduly squelch innovative developments in

12 this field. And -- and how much use was permitted.

13       This answer is not about with the permission of the

14 Studios, and it's not about if a studio had given authorization

15 to copy a CD. It's a general statement about accepted practice

16 and lawful practice in the parallel field of CD music, doing

17 more copies than we're even proposing, for consumer

18 convenience.

19       So should Real be enjoined? I say not. Not enjoined

20 from offering a consumer-friendly product that meets a demand

21 that others are permitted to serve. Other companies, and the

22 Studios, themselves. We're offering a product that is even

23 more judicious than the other ones out there, in terms of the

24 restrictions on its use, and the number of copies that can be

25 made.

 1          But to lock down against borrowing and ripping and

 2   renting, we do need the Studios' cooperation.  Tried to get it

 3   last summer, in September.  And there was no practical problem,

 4   just a turn, instead, to the courtroom.

 5          I want to turn to the alleged breach of the CSS on

 6   the question, broadly, of copying.  Not the details yet about

 7   user-accessible bus and the like, but the question overall of

 8   copying.

 9          Does CSS compliance depend upon somebody, whether

10   it's Real or the consumer, getting the studio authorization to

11   make a copy?  That, I believe, is what the Defendants urge.

12          We have here the CSS license agreement recital that

13   was shown to you.  It talks about providing reasonable security

14   for content, and thereby, providing protection for copyrighted

15   content against unauthorized consumer copying.

16          Now, we all know that term is not defined or

17   explained in the CSS documentation.  The "unauthorized consumer

18   copying."  And the reason it is not defined is because

19   authority to make a copy of a DVD would not flow through the

20   CSS agreements.  This is not where it would happen.  To grant

21   or withhold the authority to copy is not what CSS is about.

22          We have to bear in mind, this is a -- an

23   industry-collective agreement.  An industry standard, a

24   technical standard, meant to provide protection.  And there are

25   proper ways of doing that.  But this kind of agreement,

1  collective agreement, is not where authority to make a copy are

2  or withhold it would flow through, as a collective commercial

3  decision by the Studios.

4       What CSS does instead is to spell out how licensees

5  like Real shall make their products.  It does have the general

6  goal to prevent unauthorized consumer copying.  And CSS

7  licensing, Your Honor, plays a role in that.

8       It plays a role because by implementing the specs,

9  the licensees help to prevent interception of content and the

10 unauthorized propagation of copies.  The digital-to-digital

11 copying that we've heard about.

12      Now, the Defendants argue that authority to make a

13 copy must be found in these CSS documents.  I want to take a

14 look here in my graphics at two entirely different kind of

15 legal relationships.

16      On the right-hand side we have CSS, which is a

17 collective industry-wide process of granting authority to use a

18 CSS technology, done so as to build devices that will protect

19 the content from interception and distribution.

20      This is a licensing of technology which goes from the

21 DVD CCA on behalf of the Studios down to RealNetworks and other

22 manufacturers.  This is where the DVD CCA speaks to us, as a

23 manufacturer, about how to build our devices.

24      And it does not contain basic contract terms like

25 "Thou shalt not copy" or "Thou shall copy" or "Thy -- to make

```
 1   one copy and no more," because that would be a collective

 2   agreement.  It doesn't contain that.  And you wouldn't expect

 3   it to.

 4            In fact, in Mr. Steer's comments, he showed you the

 5   portion in the license agreement that said the license

 6   concerned license rights to -- to be used to implement CSS.

 7   There was nothing there about how to use a DVD.  It was about

 8   using CSS.  The license within this license agreement is about

 9   using CSS, not how to use the DVDs.

10            On the left-hand side is a copyright license, which

11   in the case of the DVDs, actually goes from the Studios to

12   their business partners who manufacture those DVDs.  And then a

13   copyright right goes to the consumer via the sale of the disc,

14   itself.

15            Now, the Studios have argued from *S.O.S.-Payday* --

16            MR. LAMBERT:  Excuse me.  Your Honor, can we have

17   this particular slide off the public screens?

18            MR. SCOTT:  Why?

19            THE COURT:  This -- the one with the two legal

20   relationships?

21            MR. LAMBERT:  I don't know how it can be blown up or

22   how visible it is on the big screens, but it has the CSS

23   license and the diagrams represented.

24            MR. SCOTT:  I accede, Your Honor.  I don't think --

25            MR. LAMBERT:  Just off the public ones.
```

```
 1              THE COURT:  I think it's off now.

 2              Is that correct?

 3              THE CLERK:  Yes.

 4              MR. STEER:  Yes.

 5              THE COURT:  Maybe it's more readable on the larger

 6   screens.  I don't know.  Mine is so small, you couldn't

 7   possibly read it.

 8              MR. SCOTT:  It's meant to be a demonstrative, Your

 9   Honor, obviously.

10              THE COURT:  Uh-huh.

11              MR. SCOTT:  May I proceed?

12              THE COURT:  Yes.

13              MR. SCOTT:  Thank you.

14              THE COURT:  But, it's off the public screen.

15              MR. LAMBERT:  I apologize, Your Honor.

16              THE COURT:  Okay.

17              MR. SCOTT:  Thank you.

18              The Studios have cited the case of S.O.S.-Payday to

19   Your Honor, which is a case that says in a copyright license,

20   where authority is given how to use the copyrighted work, that

21   whats not granted is -- is withheld.  And, that is in apposite

22   to our kind of case.  That is, over on the left-hand side of

23   this screen in my illustration, that would be the copyright

24   license between the Studios and their business partners on how

25   they may use DVDs.
```

1            But, in the CSS documentation, we are not taking

2    licenses from the Studios on anything having to do with the

3    DVDs.  We are licensing the CSS specifications, as Mr. Steer

4    showed you on the screen during his remarks.

5            Now, CSS compliance cannot depend, on the right-hand

6    side, on Studio granting authorization on how to use or whether

7    a copy can be made of the DVD.

8            For example, if a studio or all of them said no,

9    would that mean that even our perfect technical compliance with

10   CSS nonetheless breaches the contract?  It can't really mean

11   that.  We're supposed to technically comply with the CSS specs.

12           And, if the Studios, one of them, all of them, said

13   yes to making a copy to us, does that mean that we comply with

14   the specifications, even though, according to the Defendants'

15   argument, we breach it because we have playback without a --

16   without a DVD in the hard drive?  So, does all that not matter

17   on how the specs are interpreted?

18           And the problem here in their argument is that

19   authority to make a copy or no copies or one copy does not flow

20   through the CSS, and that's why we do not see these terms

21   defined there about what is unauthorized consumer copying.

22   Because that's not what it is about.

23           Now, there are a number of factors that support our

24   interpretation directly of the CSS license on this question.

25   They show that Real has a reasonable interpretation, and more

 1   than that, that ours is right.

 2           And, I want to talk to you first about what the CSS

 3   documents say about copies, what's there, what's not there, and

 4   what the Studios then tried to add by amendment to fill the

 5   gap.

 6           I want to talk to you secondly about what the CSS

 7   specs would and do mean to a normal software engineer trying to

 8   implement them.  Engineers like James Bielman and Professor

 9   Bishop.

10           And third, I guess, really on the question of the

11   reasonableness of our interpretation, the fact that other

12   companies are already doing what Real seeks to do here.  Either

13   with court approval in Kaleidescape, subject to appeal, or

14   without opposition, in the case of AMX and Drive-In.

15           Both -- actually all three, I think, of the

16   presenters for the Defendants talked about Marsha King's

17   testimony.  And I want to focus on what she said the DVD CCA's

18   membership was trying to accomplish with CSS.

19           This slide -- which I skipped, I didn't mean to -- is

20   about the impossibility of complying with the specs if the

21   Studios take different positions on whether or not Real can

22   make a copy.  Just can't comply.

23           Okay.  Ms. King.  She was asked what copy protection

24   from the Studios' standpoint meant for Warner.  And she

25   explained that "digital copies are perfect."  I'm not going to

 1  read it all because you've heard it, and you understand the

 2  concept, I know, Your Honor.  That the digital world, unlike

 3  the analog world, the copies do not deteriorate.  You're just

 4  copying zeroes and ones.  And so, you can have perfect

 5  generational copies, viral copies.

 6          And, I was struck by her colorful phrase:  "Whereas,

 7  a copy in digital media is perfect, all through the 342nd

 8  generation."  Now, that was a goal that she described of the

 9  people working on CSS.

10          On the next page, she really describes a second goal.

11  At the end of this, and what's highlighted, she begins this

12  quote talking about the problem of digital-to-digital copying,

13  propagation.

14          But then she shifts into the subject of: "And so, no

15  copy was allowed to be made to the hard drive.  I mean, that

16  was the whole purpose of the license agreement."  And she

17  continues.

18          So, she blends these two goals as if they are one,

19  but really, they are two very different things.  First,

20  addressing the problem of propagation of perfect

21  digital-to-digital copies.  That's unique to the digital world.

22          The problem whether or not to make one copy to hard

23  drive is no different in the digital era than it was in the

24  analog era.  That problem is no different than it was in Sony

25  Betamax.  Whether or not to make one copy to hard drive.

1    That's not a technological problem.  That's a licensing and a

2    commercial question.

3           So, we're going to look in the specifications in a

4    moment, to see whether either or both of these goals are

5    reflected in the actual specs.

6           Now, Dr. Kelly recognized, in response to the Court,

7    exactly what was meant by this phrase "digital-to-digital

8    copying," the first of the two goals.  You asked him what it

9    meant to an engineer.

10          And he thought it was straightforward, that it meant

11   the copy you produce is 100 percent exactly like the original.

12   In that sense, it's digital-to-digital copying.  Hence, the

13   problem with the copying to the 342nd generation.  It doesn't

14   deteriorate.  Unique in the digital world; didn't happen in the

15   analog worked.  He knew exactly what that meant.

16          Professor Bishop agreed with that.  That would be a

17   very odd word to use, "digital-to-digital copying," if the idea

18   was to prohibit, no digital copies.  It would be a strange word

19   to use, and not the way the experts took it on either side of

20   the case.

21          So, was Ms. King right, that the Studios got both of

22   those goals in the final CSS agreement?  She definitely had a

23   point of view, Your Honor.  She was closely aligned with the

24   Studios.  She had worked for three of them.  And she was now

25   working for them still as a paid fact witness.  So, she was

1  closely aligned with their view.  And, it's important to

2  recognize it was no given that the Studios would get whatever

3  they wanted in these negotiations.

4         The Studios' findings of fact No. 27, Paragraph 27,

5  suggest that all the three industry groups -- the IT, the

6  consumer electronics and the Studios -- agreed on no copies

7  whatsoever, and they have citations that do not say that.

8         There were other industry groups involved.  Notably,

9  the consumer electronics industry making these devices.  And

10 for example, there was going to be no agreement without

11 Microsoft.  Microsoft makes 95 percent of the operating systems

12 on personal computers in this country.  There's no agreement

13 without them.

14        And, we have now been able to get the testimony, by

15 declaration, from Microsoft's lead negotiator, Peter Biddle,

16 which was not available to us before.  And I understand it's

17 subject to a motion to strike.

18        **MR. WILLIAMS:**  Objection, Your Honor.  Motion to

19 strike --

20        **MR. SCOTT:**  Did I say -- subject to the motion, Your

21 Honor.

22        **THE COURT:**  That's correct.

23        **MR. STEER:**  It was unsigned as far as what was

24 severed on us as well, Your Honor, so this is Counsel's

25 representation of what the witness were to say.

1          **MR. SCOTT:**  Mr. Cunningham, yes?

2          **THE COURT:**  Uh-huh.

3          **MR. CUNNINGHAM:**  It is a signed version.

4          **MR. SINGLA:**  The version that we received was --

5          **THE COURT:**  Are you planning to go into this?  Now?

6    Mr. Scott?

7          **MR. SCOTT:**  I have some excerpts, not right now, but

8    I do have excerpts from him in here, in the book.

9          And I can provided by either doing as I planned, and

10   briefly discussing them, subject to the motion, or I can just

11   tell you that they're there, and what they bear upon, subject

12   to our ultimate decision.

13         **THE COURT:**  I think you should move on.

14         **MR. SCOTT:**  The latter?

15         **THE COURT:**  Yes.

16         **MR. SCOTT:**  All right.  I would say that the Studios'

17   Proposed Finding of Fact 27 makes it very clear that they are

18   taking the position that all the industry groups agreed on

19   Ms. King's claimed -- the studio goal of no copies whatsoever

20   was embodied in this agreement.

21         And that would be a very odd outcome, anyway, that

22   the consumer electronics industry would want to have its

23   devices limited in their future capabilities.

24         And now, and now, we have the testimony from

25   Microsoft's lead negotiator and drafter of conditions on what

1  actually was intended here, and the position of Microsoft and

2  the other electronics companies on that precise matter.

3         The ultimate test, I think, on whether Ms. King or Mr

4  Biddle is right on this question is going to be what the

5  documentation actually says as a contract.

6         Now, with respect, I say Ms. King is not really

7  competent in the legal sense to say that, because she was not

8  in the negotiations of the final agreement, nor of the

9  specifications, not involved in the drafting of the final

10  documents.

11         She did not read the final agreement until portions

12  were shown to her by her counsel the night before she

13  testified, and she never read the specifications, as she

14  acknowledged to me.

15         Here we have from the specifications my organization

16  of what they say on these two different goals she describes.

17  And I readily concede the first one got into these agreements.

18  The generational or viral copying, protections against

19  interception.

20         Just as Dr. Kelly described the concern from General

21  Spec 1.2, indeed, it says:  "To prevent digital-to-digital

22  copying in a personal computer environment," referring, as he

23  defined the term, to the problem of generational perfect

24  copies.

25         That same page goes on to express the problem that

```
 1   data in a PC environment, on a PC bus -- which is a
 2   user-accessible bus -- can be easily copied, as it states
 3   there.  And so to prevent that kind of interception and
 4   copying, the person making the machine in accordance with the
 5   specs was to have authentication to check the validity of the
 6   recipient, so you don't send it to unauthorized people, and bus
 7   decryption to prevent unauthorized interception.  This is about
 8   preventing interception and viral distribution.
 9           What about the idea of not making a single copy to
10   hard drive?  Ms. King pounded this, that the Studios were
11   adamant about this goal.  Well, in the documentation, for
12   example, there is no provision parallel to the one I quoted to
13   prevent digital-to-digital copying in a DVD player environment.
14           There are the two classes of devices.  There are the
15   PC-environment devices which have user-accessible buses, then
16   there's the residual.  Those that don't are DVD players.
17           Now, not to have any confusion, both of our devices
18   are currently configured as the PC environment.  Facet could be
19   easily reconfigured as a DVD player within the definition, with
20   no user-accessible buses, no standardized interfaces.  Could
21   easily be done, but that's not -- what my point is here is that
22   for contract interpretation, how does the documentation express
23   the concern about copying?
24           Well, the Defendants have beaten the drum about
25   digital-to-digital, and ignored the fact it only applies to
```

1    half the devices, under CSS, the PCs.  Doesn't apply to DVD

2    players that lack the user-accessible buses.

3              Why?  Why?  What's different between those two

4    devices?  What is different, by definition, is that the one,

5    the DVD player, does not have user-accessible buses.  It cannot

6    be intercepted.

7              Both of them have or can have hard drives is for

8    storage.  That's not the reason that there's a

9    digital-to-digital copying concern for one type, but not the

10   other.  It's not about copies to hard drive.  Or they would say

11   something about that.

12             It's solely about interception, because one class has

13   the user-accessible bus and the other does not.

14             What about copy protection?  The procedural

15   specification Section 6.2 go on in some detail -- and I'm just

16   going to do top-line.  It's not what they provide, it's what

17   they're -- the fact that it's covered.

18             Regional playback control and recordable media

19   playback control.  This is about players not accepting DVDs for

20   playback.  Either because of a regional code, or because

21   they're burned DVDs.  They're unauthorized copies of DVDs.

22             Analog inputs and digital outputs.  The players are

23   protecting the unscrambled output to the TV.  These are all

24   about viral distribution.

25             The CGMS no-copy flag has gotten some attention here.

1    A flag that identifies whether the copyright owner wants it to

2    be copied or not.  And they always say no.  This was something

3    that never really got implemented in the industry.  But what it

4    is is a signal that goes out to the TV receiver, so that

5    unscrambled video data is not copied.

6           It's all about interception, Judge.  It's all about

7    interception and viral copying.  Internal data and signal

8    restrictions.  This is a section we'll come to, but it's one

9    about user-accessible bus; and what shall and shall not be

10   carried; are the keys encrypted or not.  That's the subject

11   matter there.  It's all about interception.

12          In contrast, on whether there is going to be any copy

13   to hard drive, Marsha King being adamant.  This was discussed,

14   it was heavily negotiated, there is no provision in the specs

15   anywhere to be found, in words or similar to "Make no digital

16   copies."  Because as soon as they said that, they would have to

17   write an exception for cached copies or buffered copies, like

18   everybody acknowledges.

19          Well, Ms. King said that was in there.  And you can

20   look all day, and it's not.  Professor Bishop so testified.

21   But it's not in there.  It's just not.  Because there's no

22   general prohibition, no exception is needed.

23          "Do not copy to hard drive" is not there.  "Have the

24   disc in the tray for playback" is nowhere to be seen.  These

25   words would be so easy to include, if that were the intent of

1   the contract.

2          And beyond being easy to conclude (sic) -- easy to

3   put in there, and for us not to have a debate about it, this is

4   the kind of language that software developers need to see, to

5   be able to know that that's what they're supposed to do.

6          Are they supposed to figure that there are -- copies

7   hard drive are prohibited because somebody used a dark arrow in

8   a diagram, which I'll come to?  That's the argument you're

9   hearing here.

10         No, it was -- the language never said "No digital

11  copies."  It's all implied by a black arrow someplace in an

12  architectural diagram.

13         Now, Ms. King said the Studios were adamant.  I

14  didn't copy that word because we -- she used it over and over

15  again.  She stressed it was heavily, heavily, heavily

16  negotiated.  Lots of meetings.  There were multiple industries,

17  the interests were different, and there were compromises.

18         Now, I suggest to the Court, this does not mean the

19  Studios necessarily got what they wanted.  What I suggest to

20  the Court this plainly means is that language to do these

21  things would not be inadvertently omitted.  I the Studios were

22  being adamant, if it was heavily negotiated, if compromises

23  were made, why are none of those words in there, if the Studios

24  got what they wanted?

25         I suggest that if agreed, that language would be

1    there.  And if not there, it means it was not agreed.  How else

2    can we take the fact the Studios were adamant in demanding

3    something, it was heavily negotiated, and we can't find words

4    even remotely like they claimed they were demanding?

5         Here, I'm going to go past Mr. Biddle's declaration

6    on that precise point on Page 22, I just won't address that for

7    now.  He does address precisely that question.  On behalf of

8    Microsoft.  He is now with Intel.

9         Now, somewhere -- before I come to this next slide,

10   somewhere in this process, I know Your Honor will be

11   considering in some way whether one party's interpretation of

12   CSS is reasonable, or the others'.

13        Now, we welcome that consideration.  I want to remind

14   the Court, as we say in our briefs, legally, that we are the ad

15   hearing party in a contract of adhesion, and our interpretation

16   should prevail if it's a reasonable interpretation.  Even if

17   they've got one, too.  But having said that, I want to talk

18   about what's more reasonable.

19        In -- I believe Mr. Williams' argument this morning,

20   he reminded us of Mr. Singla's questioning of Professor Bishop

21   in cross-examination.  Near the end of the cross, where the

22   topic really was whether or not Professor Bishop was making a

23   reasonable interpretation of CSS.

24        And the question was to the effect of whether

25   Bishop's reading of the specs meant -- and now I'm quoting (As

1   read):

2                  "There would be no limitations

3              whatsoever in CSS on making endless copies

4              of movies on hard disc."

5          Now, Professor Bishop had not studied that question,

6   and he declined to answer a question he had not studied.  He's

7   a very careful man.

8          But I think the point was, and I think this is what

9   Mr. Williams argued this morning, that Real's interpretation of

10  CSS must somehow be unreasonable because it leaves our

11  restrictions on copies, the many restrictions we have on our

12  device, as being purely voluntarily, suggesting that that was

13  not reasonable.  CSS had to provide more protection than we

14  were allowing for it.

15         I'm going to answer it this way, Your Honor.  We,

16  collectively, do not need to force an interpretation on CSS

17  that tries to make it into a comprehensive copyright

18  protection.  We have copyright to do that.  And the courts stay

19  open.

20         CSS, as the preamble makes clear, serves a purpose

21  along the way of protecting the copyright owner.  It serves the

22  purpose of having devices that prevent interception and

23  generational viral copying.  That's what it does.

24         And, RealDVD has been designed rigorously to

25  accomplish that, to accomplish that goal of locking down, not

1    allowing viral distribution, as best we can.

2            They challenged the reasonableness of our

3    interpretation.  I want to turn the spotlight on the

4    reasonableness of their interpretation.

5            As I understand the Defendants, the CSS agreement, at

6    the insistence of the Studios, prohibits any copies, including

7    any first-generational copies to hard drive.

8            Here I have Ms. King's testimony on the screen, Slide

9    23, where she's saying the studios, collectively, became very

10   involved; "absolute fundamental rule...they wanted no perfect

11   copies, no copies at all of their product..."

12           The next quote, "...forward thinking...We might at

13   one point want to authorize the making of a copy."

14           Under that view, Your Honor, CSS is no longer just an

15   industry-wide technical standard.  That's not what it is any

16   more.  It's a ban on any devices that enable the consumer to

17   make a copy, including a fair-use copy.

18           That's not a technical standard.  That's a commercial

19   agreement, carried out through the DVD CCA, it's commercial and

20   it's collective, where the Studios ban all copies.

21           If the Studios believe that CSS bans all copies, that

22   they've agreed collectively to ban all copies, they can't

23   individually authorize copies.  That would take an amendment to

24   the agreement.

25           Remember, we're now away from a technical standard

 1    like CSS and the design of the equipment.  We're talking about

 2    the generalized purpose.  Mr. Williams said, to ban all copies.

 3    Ms. King say "We banned all copies, and we might eventually

 4    some day agree to allow some."

 5              What she is describing is a group boycott.  And that

 6    that has been a per se antitrust violation since 1941.

 7              We don't really think, that's what CSS means.  We

 8    don't see the language in that agreement carrying out this

 9    purpose to ban that first copy.

10              There is certainly a technological standard to

11    prevent viral copying and distribution, but nothing like a

12    commercial agreement to collectively ban making of that first

13    copy, or to say the Studios act collectively in licensing the

14    right to make a copy or not.  That's nowhere in there.  She

15    said it is.

16              Now, if this is true, that's deep trouble.  We just

17    don't think that part of it is true, that it got into the

18    agreement.  We believe it was their intent, but didn't get to

19    the agreement.

20              This was precisely the objection that Kaleidescape

21    made to the amendment proposed by the Studios to amend CSS in

22    2007.  It was to be a collective amendment, requiring that the

23    DVD disc be physically present for playback, and prohibiting

24    the making of a persistent copy.  That was the proposal.

25              Kaleidescape wrote a letter in the record, objecting

1   on antitrust grounds, and this (Indicating) was withdrawn by

2   the Studios.  They proposed it a second time, and nothing has

3   happened so far.

4           Who has a more reasonable interpretation of the

5   agreement?  That's how I began this, and that's how I want to

6   end it, on the topic of copying.

7           We've shown Your Honor, yes, there were two goals,

8   they were debated.  Mr. Biddle agrees they were debated.  One

9   made it into the agreements.  The protection against

10  interception and viral copying.

11          The second, the ban on any copy at all, is nowhere

12  reflected there, and didn't make it in.  Who's more reasonable?

13  CSS accomplished its purpose of preventing interception.  The

14  Studios' interpretation of that agreement would be a serious

15  problem under other laws.

16          I want to turn to the alleged breach in terms of the

17  implementation.  Our implementation of CSS.  Professor Bishop

18  and James Bielman walked through how a software engineer would

19  implement the CSS specs.  What the words meant to them.

20          And Professor Bishop opined that he gave us an

21  A-minus because our engineers had neglected to link up some

22  code.  And, you probably remember that testimony.  He pointed

23  that out, and it's been fixed.

24          The Defendants say otherwise.  They say there are

25  certain detailed provisions that make it impossible to comply,

1   impossible for Real to comply, if it saves a copy to the hard

2   drive.

3          They find pieces of language -- and I'll talk about

4   those -- that they embellish as meaning that there can be no

5   copy to hard drive, even though such words are never used in

6   the specs.

7          And, this is just an indirect, cute way of

8   interpreting the specs to say "There could be no copy to hard

9   drive, we, the Studios, have collectively agreed so."  And they

10   are right back in the antitrust pit.

11          Because that kind of interpretation serves no

12   technical purpose.  It is simply an embellishment of the

13   standards.  An embellishment to say it's, quote, technically

14   impossible to make your kind of device, RealNetworks, and

15   comply with the specs.

16          Now, one of the first examples we saw was Dr. Kelly

17   for the DVD CCA, both in his declaration -- and I was struck

18   that Figure 4 was -- was the centerpiece of his argument of why

19   we breach.  And again his testimony, talking about the arrows.

20   I made the black arrows red so you can see what we are talking

21   about more clearly.

22          He said -- although Counsel did not argue it today --

23   the drum that he beat all along before this hearing was the

24   diagrams show a direct path from the disc over to playback.

25   And that means it must all happen at once.

1        The only problem is that architectural diagrams don't

2  mean that.  They don't show all the steps.  They're not maps of

3  time, that things are happening at the same time.  They're not

4  maps of space, that things are actually in different locations.

5  What they are is maps of the relationship of inputs and

6  outputs.  Period.  Inputs and outputs.

7        James Bielman, who designed the Facet implementation,

8  gave the example of the authenticator module.  And here, we're

9  in the big box on the right side of this diagram, Your Honor.

10  The authenticator module and descrambler are shown as separate

11  modules here.  But actually, they're not even in different

12  places in the device.  They are located together.  This is not

13  about space.  Just inputs and outputs.

14        And Professor Bishop gave the example, he had found

15  in the diagrams in the specs, from the descrambler spec, one

16  where you have a black arrow dividing what we have colored as

17  the blue box from the red box, and a straight, solid black

18  arrow between them.

19        And to believe Dr. Kelly, who ought to know better,

20  he says that means there's direct flow.  In other diagrams, he

21  says, that black arrow means it's a direct flow.  It's all

22  happening directly.  Can't go anywhere, can't store it,

23  nothing.

24        Well, as a matter of fact, the black arrow is not

25  trying to show all the steps, because in that case, the black

1    arrow is not showing the storage to the hard drive, itself --

2    the storage to the DVD disc, itself.  There is storage.

3    Storage is not mandated or proscribed by a black arrow.  That's

4    not what it means.

5         It's really a strange interpretation of these specs

6    to say that the spec writers meant to say there may be no

7    copies to hard drive, and the way they did it was to use a

8    black arrow in some architectural diagram.  Why not just use

9    the words, if that was the agreement?

10        The Studios' expert, Mr. Schumann, focused on his

11   first day of testimony, on DMCA.  His Exhibit 1.  And I'll come

12   to that when I talk about DMCA.

13        But in his rebuttal, he focused in on the argument

14   about the user-accessible bus.  It had been mentioned before,

15   but it became the focus of his rebuttal testimony.

16        Here, this is the claimed violation about encrypted

17   keys appearing on a user-accessible bus, citing the

18   Authenticator Module Section 2.

19        His position was -- Mr. Schumann -- that Real could

20   not implement RealDVD in order to save the content and still

21   comply with this section.

22        Well, the first thing about that I want to mention is

23   that Mr. Schumann does not claim that his interpretation serves

24   any technical purpose at all.  He had already told us in

25   response to a question from this Court, he already told us what

 1  could be seen on one of those buses if you had a CSS and

 2  AES-encrypted key.  That's the context he's talking about.

 3  Keys as we encrypt them in RealDVD.

 4          And you asked:  "If you were to open that file, what

 5  would we see in the display?"

 6          And his answer was:  "Essentially, gibberish."  And

 7  he goes on to make clear he's talking about it's CSS and the

 8  AES we add on top.

 9          His position on the user-accessible bus is a

10  technicality without a purpose that he claims as a gotcha, that

11  we therefore cannot make a device that complies with CSS and

12  stores a copy to the hard drive.  Now, I say it doesn't mean

13  that.  But, there's no claim it serves a technical purpose.

14          I think the Court invited the right inquiry when you

15  asked what could be seen there.  Because back in the spec,

16  itself, it talked about whether something appeared on a

17  user-accessible bus.

18          Mr. Schumann denied that "appear" in that spec means

19  anything that has to do with what a hacker might actually see

20  if he intercepted the data.  He says, Mr. Schumann does, that

21  "appear" simply means to be carried, or to cross the bus.

22  Nothing more.  So he doesn't give the meaning the English

23  language might ascribe to different words, he just says he

24  chooses to treat them as being synonyms.

25          Professor Bishop, as an engineer who might implement

1  these, found the compliance with -- in terms of our encryption

2  of the keys as CSS and AES.  "Blob" was his word, not the

3  lawyer.  He called -- it's a blob.  It can't be recognized.

4  It's a blob.  And it does not appear when it crosses a

5  user-accessible bus.

6          Now, the spec writers knew how to say "merely carried

7  on a user bus" if that's what they meant.  There's another part

8  of the same specification that uses those words instead, in

9  complete sentences.  Authenticator Module, Section 6.1.2(2).

10 And we spent some time going around and around on this.

11         The second says "This provision requires that

12 unscrambled" -- let me back up and say, as we read this, that

13 our position and Professor Bishop's testimony is that this

14 means you don't send decrypted content or keys across a

15 user-accessible bus.  You protect them.

16         The previous paragraph is the one, Your Honor will

17 recall, that talks about using any method that accomplishes

18 that.  That's the paragraph above this.

19         So here (As read), "This requires that unscrambled

20 compressed data representing video content or keys initially

21 encrypted with CSS not be carried on a user-accessible bus."

22         Now, the debate here is whether that means no longer

23 encrypted, or maybe still encrypted.  Because Mr. Schumann

24 wants to argue that keys still encrypted may not cross that

25 bus.

1          Well, we can look at other specs that cast some light

2     on this.  This is criteria to the whole argument he made in the

3     rebuttal about what that provision meant.  And I showed him

4     procedural spec 6.2.5.2.

5          Now, this one, Your Honor, overlaps and relates in

6     subject matter to the one we were just looking at.  This is

7     about hardware devices, and the previous one was hardware and

8     software devices.  My only point is they are related subject

9     matter.

10          And here, it's interesting, they say currently,

11     unscrambled compressed data should not be carried in a

12     user-accessible bus.  No surprise there.  They're talking about

13     video data.  And in (iv), in the future, when it becomes

14     reasonable to do so, that requirement of not crossing a

15     user-accessible bus shall apply to decompressed data

16     representing video content initially encrypted using CSS.

17          Well, I guess they could just have written

18     "unscrambled decompressed data" to be parallel to the previous

19     provision "unscrambled compressed data," except that they were

20     using the term "unscrambled" to mean the same thing as

21     "initially encrypted, but no longer."

22          It's also interesting that they use the term

23     "encrypted" and "unscrambled" interchangeably, which

24     Mr. Schumann denied.  "Unscrambled data" in (ii), "Encrypted"

25     in (iv).  Because you go back to the one we looked at earlier

1  from the authenticator module, and the previous sentence that

2  is the context, designing those three modules and associating

3  them to protect the flow of unscrambled content between them

4  against being intercepted and copied.

5          Mr. Schumann denied that "unscrambled content" meant

6  anything except video data.  He said he did not mean to include

7  keys.  Which would be odd, since the video data never goes to

8  the authenticator.

9          This is about the association between the modules.

10 The descrambler and the decryption module are together.  He's

11 talking about associating them.  "Unscrambled content" does

12 mean both keys and video content, because it's keys that go

13 between the authenticator and the descrambler.  The video data

14 never goes from the disc to the authenticator.  It goes

15 straight over to the descrambler.  This (Indicating) would make

16 no sense, read as Mr. Schumann does.

17         It also would make no sense in the overall structure

18 of CSS.  To prohibit keys that are encrypted from going across

19 a user-accessible bus, if it's good encryption.  That'd make no

20 sense.

21         My Slide 33 is one that Professor Bishop used.  Now,

22 I want to be clear, Your Honor, this is a slide about keys

23 coming off the disc.  This is not about keys going between the

24 authenticator and the descrambler, which the previous section

25 was about.

```
 1            I'm making a point by analogy.  I don't want any
 2   confusion that I'm saying this it is the same thing as the
 3   previous section.  It's a point about user-accessible buses and
 4   what makes sense.
 5            Encrypted keys in CSS must cross a user-accessible
 6   bus to get from the DVD into the authenticator.  They must.
 7   There's no other way.  They can't operate without crossing a
 8   user-accessible bus.  When we get it in our device, then we add
 9   AES and make it more secure.
10            So, if it later crosses a different user-accessible
11   bus, it's more secure than that guy, that yellow box in this
12   slide (Indicating) coming over from the disc.  It wouldn't make
13   sense to say that well, they can cross a user-accessible bus
14   from the disc, but never, ever again.  Even when they're better
15   encrypted in our implementation.
16            So, we can have an interpretation of the
17   authenticator section like Mr. Schumann's that serves no
18   meaningful technical purpose except to block us, as a gotcha,
19   from having it copy to hard drive, to serve a commercial
20   agreement collectively by the Studios, or, or, we can have the
21   interpretation that this provision -- as you will see, when you
22   examine Mr. Biddle's declaration -- he wrote it.  He not just
23   was there.  He wrote it, as to what the user-accessible bus
24   provision means.  We can have his, or we can have
25   Mr. Schumann's.
```

```
 1              There's a final point about the implementation I want
 2    to make.  Not going to touch on everything, but just a final
 3    point.  And that's about whether the spec language, whether
 4    something will occur before playback of a VTS, which you've
 5    seen in several contexts.  Whether that means it must be
 6    simultaneous with playback, which is the suggestion made by the
 7    Defendants.  Okay?
 8              The specs never say that.  They just say before VTS.
 9    And it led to the interesting analogy used by Mr. Mick about
10    washing hands, which I'll -- that was the context in which that
11    arose.  Whether "before" meant right before or any time before.
12              But, it's a broader point here.  Did the spec writers
13    mean to imply some requirement of simultaneity in these
14    specifications?  And on that subject, the Defendants ignore the
15    one spec that actually makes an explicit statement about
16    simultaneity.
17              I'm passing by Mr. Biddle's page there.  On our Slide
18    35 -- Are we off the public screen, as we should be?  I guess I
19    never went back on.  I'm sorry, Your Honor.
20         THE CLERK:  (Nods head)
21         THE COURT:  (Nods head)
22         MR. SCOTT:  The subject is, do the spec writers know
23    how to talk about simultaneity when they mean to?  On this
24    particular specification, General Spec 2.1.2, they talk about
25    playback on a player.
```

1          Now, that's the classic device that's called a DVD

2   player.  And they go down and talk in the next paragraph about

3   the PC environments.  They're covering both.

4          And, that difference is not material to the point I'm

5   making here.  When they talk about the PC environment in the

6   language that's cut off below, they're just talking about the

7   added step of authentication.

8          Here, in terms of contract interpretation, they talk

9   about the process, "Disc Key Recovery logic," blah, blah, blah.

10  "The DVD-Video Descrambler then reads," blah, blah, blah.

11         "(3) The DVD-Video Descrambler then descrambles the

12  A/V data in real time for playback."

13         The one statement about simultaneity, I believe you

14  will find -- I found in the entire specifications.  Professor

15  Bishop's testimony on this is on the right-hand side.

16         It's pretty clear to him, you do not descramble the

17  video data and leave it lying around.  You descramble it as you

18  need it for playback.  And therefore, it happens in real time

19  of playback, and the spec writers knew how to say it when they

20  meant it.  They knew real English if they meant that.

21         If recovery from the disc and authentication ought to

22  be in real time, in real time with descrambling, no stops in

23  between, right over to playback, these fellows writing the

24  specs knew how to say it.  And it appears nowhere, except by

25  embellishment by Defendants of other language from which they

1    imply it.

2         Turning to the DMCA, away from the contract to the

3    DMCA, I acknowledge I find that to be a complicated statute.

4    Maybe others don't, but I do.  It has prohibitory language

5    intertwined with definitions.  And for us today, it has

6    different issues from CSS than it does for ARccOS and RipGuard.

7         But, one thing is clear.  Real is a lawful licensee

8    of CSS.  It's unlike the prior cases decided under the DMCA.

9    We -- and I mean I and the Real team, collectively -- we are

10   aware of no case where 1201(a)(2) has been applied against a

11   licensee of the very technology it's being accused of accessing

12   wrongly; we know of no case where in fact the DMCA had been

13   applied, 1201(a) or (b), to the lawful licensee who's gained

14   access properly under his license, as we have, to the CSS

15   technology, and implemented it.

16        Now, the Studios try to invoke both sections against

17   us on CSS.  I have done this illustration.  I don't -- I don't

18   always use this kind of coloring, Your Honor.  But I'm just

19   trying to link up the language with the definitions.  That's

20   the only reason for the coloring.  I think it's helpful

21   sometimes to the definitions handy when you look at the

22   language.  1201(a)(2) is the access provision, as we call it.

23        And, the paradigm for the cases that have found

24   violations of 1201(a)(2) are ones like *Remeirdes Corley* and *321*

25   *Studios* and *Streambox*.  They are cases where the Defendant has

1  made a device that actually gains unauthorized access to the

2  copyrighted material, grabs it and distributes it.  It's

3  unauthorized access, and then viral distribution.  That's the

4  paradigm.  That happened in terms of breaking CSS, in fact, in

5  the *Corley* case.

6       But to read these elements of the statute is to

7  really know the answer why it cannot apply to RealNetworks.

8  Down there in the first definition, the blue definition,

9  "circumventing" is to descramble or decrypt or

10  otherwise...et cetera, without the authority of the copyright

11  owner.

12       Here, that is precisely what the license gives CSS --

13  gives RealNetworks authority to do.  Real, being a licensee,

14  does not circumvent when it gains access with the authority of

15  the copyright owner via the CSS license.  And, it's licensed to

16  make devices that do gain access and play back.

17       I want to note, while I'm on this, that I believe

18  when Mr. Singla was talking about copying, he was -- he was

19  pointing to the definition here of "without the authority of

20  the copyright owner."  And it was a mistake, I think, because

21  actually, this language appears in Subsection A, which is about

22  gaining access, which we clearly have authority -- express

23  authority to do under our CSS license.

24       In contrast, this language about "without authority

25  of the copyright owner" that's for access.  That parallel

1    language did not appear in Section(b)(1) on the next page.  So,

2    I think he just showed you mistakenly, I think by accident, you

3    know, the wrong section when he argued about "without authority

4    of the copyright owner."

5            Section 1201(b) is the one about protecting the right

6    of the copyright owner.  And focusing first on CSS, "primarily

7    designed."  Well, RealDVD was primarily designed to provide

8    features to a consumer by implementing CSS, and adding more

9    protection than we found there originally.

10           Now, we understand there's a dispute, a big one here,

11   about whether or not CSS prohibits any copy.  I'm not talking

12   about that.  You know, whether it prohibits any copy, that's an

13   issue we've already -- already addressed here.  But they say we

14   violate this because somehow we primarily designed RealDVD to

15   circumvent protection.  Circumvent protection.

16           You know, the irony of that is that RealNetworks

17   tries to implement CSS, and as soon as our device gets its

18   hands on the video keys and content, we reencrypt it on top of

19   CSS with the AES as well.  The new state-of-the-art encryption

20   used in Blu-ray.

21           And this brings us to Mr. Schumann's Exhibit No. 1,

22   discussed in his first day of testimony about the -- what he

23   called removing -- I've circled the top, removing CSS

24   protections.

25           Mr. Schumann put on, you know, language of the

1  statute, I guess, to argue his point that -- his point is that

2  we remove protections.  And I want to talk about this slide.

3  There's a similar cellar one used by Dr. Kelly, makes some of

4  the same points.  And I won't do both, because they're making

5  the same points.

6          Schumann testified that these five -- these five

7  items on his Exhibit No. 1 he calls the five primary protection

8  mechanisms that comprise the CSS protection envelope of

9  architecture.  Page 271 of the record.

10          And here's what I want to tell you first, Your Honor.

11  Per Slide No. 5, he agrees we do that.  In fact, that's when we

12  add in AES.  The other four, those are four different ways of

13  saying that we do not authenticate a second time when we play

14  from the hard drive.  It's all redundant.  That's what I'll

15  show you.  It's four ways of saying we do not authenticate a

16  second time when we play back from hard drive.

17  Authentication's Line No. 2.  The other three, 1, 3 and 4,

18  occur automatically when you authenticate.

19          Now, I'll come to the issue of whether we do it a

20  second time later.  But let's just look at what he calls the

21  protections.  His title.  We remove the CSS protections.

22  That's his big deal.  And so, we should be liable under the

23  DMCA.

24          Locking has been talked about a lot.  Locking of the

25  DVD drives means the disc does not spin until authentication

1    happens.  When authentication happens with a CSS device, then

2    it unlocks and releases the data.

3         Interesting fact:  When a disc authenticates to any

4    CSS device -- for example, on a Windows PC -- the data on that

5    disc -- this big deal about unlocking, primary protection.

6    When it unlocks in response to a single CSS device, it's then

7    available to any other player, any other program, that's on

8    that computer.

9         For example, when it's -- unlocks, authenticates,

10   unlocks automatically, it's not RealDVD.  Windows unlocks --

11   Windows player, you can drag it and drop it and make a copy to

12   your hard drive.  It's not playable.  But neither was the --

13   the thumb drive that Mr. Schumann demonstrated when he copied,

14   dragged and dropped on RealDVD from the Vegas screen to a thumb

15   drive.  Exactly the same.  Neither one was playable.  Big-deal

16   demonstration, dragging and dropping on RealDVD.  Unplayable,

17   he admitted on cross-examination.

18        Exactly the same thing happens in Windows without

19   RealDVD, as soon as the drive unlocks that disc.  We don't

20   change the security one bit.

21        Authentication; drive unlocks; down to 3, that's the

22   bus key encryption.  That happens automatically when somebody

23   authenticates, which of course, can be a CSS device or a

24   hacker.  Then bus key encryption, that happens right away.

25        And what about those hidden areas?  Well, that's

1   where the CSS specs say -- I'm sorry, the DVD specs, not CSS --

2   tell the DVD maker where to put those keys on the disc.

3   They're retrieved automatically, right where the specs say to

4   find them.  It all happens automatically with authentication.

5   Mr. Schumann acknowledged that, Page 278.  Four different ways

6   of saying authentication.

7           And the specs then don't even say where to put those

8   keys, even during normal simultaneous playback.  Are they

9   supposed to be put someplace back in a hidden area?  Is that

10  what Mr. Schumann was implying?

11          The specs don't even say during regular playback that

12  they go in anywhere except into memory, cache, page files in

13  the hard drive; doesn't say.  Four different ways of saying

14  authentication, to say there are four violations, to make a

15  point.  It's all authentication.

16          Professor Bishop -- let me just -- before I get to

17  Bishop, Mr. Schumann talked a lot about the drive locking.  And

18  I want to point out something to Your Honor.  Just judge it as

19  you will, as I know you will.  He tells you, in the spec (As

20  read), "It's one of the key techniques by which they tie

21  playback to the disc, into the drive."

22          "Key techniques."  I don't think you'll find "Drive

23  locking" anywhere in the specifications.  Drive is unlocked

24  through the authentication process.  Drive locking is only as

25  good as the authentication itself.

1          So Schumann, number one, was making one point over

2   and over and over again:  Authentication, authentication, which

3   takes us right back to the stolen master keys on the Internet

4   which have not been revoked in ten years, as if somebody no

5   longer even cares.

6          Professor Bishop is the blue column in the middle.

7   He went through and described how we actually comply.  We do

8   these things when the specs say to do them.  We do them upon

9   retrieval.  We do them when the specs say to do them.  Specs

10  say nothing about doing them a second time.

11         Mr. Schumann just assumes his own conclusion that we

12  are required to reauthenticate, do it a second time, when it

13  comes off the hard drive for playback.  Professor Bishop read

14  the specs, and we do it as prescribed, and when prescribed.

15         ARccOS and RipGuard.  From what we know, ARccOS and

16  RipGuard -- I think I'll just say "ARccOS" and mean both,

17  unless it makes a difference, Your Honor -- are techniques to

18  author DVDs that have purposeful errors to interfere with

19  copying.  That much we know.  They do not encrypt the DVD like

20  CSS does or AES, to protect the content.  The content is there,

21  and viewable.

22         And you might remember, Mr. Dixon testified that what

23  you can see and what you can play as a user -- what you can

24  play, the computer can see.  And what you can see, you can

25  copy.  Fundamental.

```
 1              And these techniques cannot interfere with playback,

 2      or else they cannot be in compliance with the DVD specs and

 3      carry the logo DVDs.  So what you can play, you can see, as a

 4      computer.  And what you can see, you can copy.

 5              Now, these are not used by some of the Studios at

 6      all.  Fox doesn't use them at all.  We have evidentiary

 7      citations.  Paramount tried them out on three DVDs, and

 8      apparently uses them no more.

 9              Universal did it on five DVDs back in '06.  We're not

10      aware, on the record, of any more.  Sony has some future plans.

11      Warner tried it for a year, and stopped.  Disney does use them.

12              And here, we do not have any kind of record from the

13      Defendants as to what -- and you asked one of my colleagues, I

14      can't remember who, what it was that made them effective.  I

15      mean, are they effective protection.

16              If you look at the disparity of use here, Your Honor,

17      on this slide, and you wonder, you know, why is it -- and this

18      is an unanswered question, because we have been told precious

19      little about ARccOS and RipGuard -- why is it that some use

20      them, some don't use them at all, some tried them out and

21      stopped.  And all told, they're on about 3 percent of the

22      titles as we said in our findings.  And one of my colleagues

23      said -- Mr. Singla said, well, they're put on some of the most

24      popular titles.

25              And he gave a number, I'm not sure if it's in the
```

1   record, but some -- you know, 1.1 million or billion.  It was

2   about -- about 10 percent of the DVDs sold -- not titles, sold

3   in the world.  Something less than that.

4          So, does this record tell us why some studios are

5   using them, and some are just not even bothering?  We don't

6   know that.  We do know Warner's view.  This (Indicating) is

7   Exhibit E.

8          If you go back to the previous one, you will see that

9   Warner was doing a one-year trial period in 2008, and this is

10  their report on it, that they just found them to be not

11  effective.  We have no record here as to why.

12         Why?  What's going on here?  Why is it useful to some

13  people?  Most of them, in fact, tried and abandoned it.  And

14  Warner tells us, because it's not effective.

15         Well, I want to discuss the DMCA as it applies here.

16  And I want to begin -- I don't put the statute up again.  Your

17  Honor knows the statute, I believe.

18         We believe the most important authority here is the

19  Sixth Circuit's *Lexmark* decision on the question of what

20  "effectively protects" means.  I want to point out myself, Your

21  Honor, that this is -- this is a -- this was a case involving

22  (a)(2), was involving access.  Access to a computer program on

23  a printer.  And, we have discussed and outlined it in the reply

24  brief.  Primarily the reply portion, which I wrote.

25         The -- the sections are very similar in their

1   structure on what "effectively prevents" -- "protects" means.

2   This one is dealing with (a), "effectively controls access."

3   And the Section (b) of the statute is "effectively protects a

4   right of the copyright owner."  It's about what is effective as

5   a protection, the *Lexmark* decision is.  And we believe -- I

6   won't argue as to -- I believe it's directly apposite here.

7           The holding is although the Defendant in that case

8   kind of broke into the technology that underlay the suit, that

9   the Court held that there was another way in that was

10  completely unprotected.

11              "Just as one would not say that a lock

12              on the back door of a house controls access

13              to a house whose front door does not

14              contain a lock, and just as one would not

15              say that a lock on any door of a house

16              controls access to the house after its

17              purchaser receives the lock -- the key to

18              the lock, it does not make sense to say

19              that this provision of the DMCA applies to

20              otherwise readily-accessible copyrighted

21              works."

22          As applied to the (b) section, if the Court -- if the

23  Court believes, as I do, that it's directly applicable, it is

24  saying it doesn't make sense that the provision applies where

25  there's otherwise readily-copyable copyrighted work.

1          Under *Lexmark*, it is not enough that ARccOS might

2    slow down the making of a copy by one technique.  It is not

3    enough that it might prevent making a copy by some other

4    technique.  ARccOS does not effectively protect the DVD, under

5    *Lexmark*, if it leads one route open and free and clear.  That's

6    the purport of the holding.

7          Facet.  This was the hardware implementation designed

8    by the team that James Bielman participated in.  They wrote --

9    this is going to be a summary, as you can see on the printed

10   slides, Your Honor, of four different approaches.  I'm talking

11   about Facet now, in the first two columns.

12         Their copy function for Facet incorporated two

13   methods.  Because they were working independently, the two

14   teams were.  Linear copy copies straight through.  It could

15   just keep on going.

16         But in the Facet implementation, if it hits -- if it

17   hits a bad sector, it stops cold, it discards what it's copied

18   so far, and quits, and then the copy function is turned over to

19   DVD Walk.

20         Now, as far as I know, there's been no challenge that

21   linear copying, if it were the only thing we implemented, would

22   be compliant.  It's not going around anything.  It either gets

23   through or it doesn't.

24         Mr. Schumann testified, at Page 356, that this

25   method, spiraling or linear copying, is logical, it's

1  efficient, it's exactly what the Windows program does.  That's

2  how Windows makes a copy, by linear copy.

3          So, would it violate or circumvent if RealDVD simply

4  did the linear copying and left it alone to succeed or fail?

5  And, we say, no, that's not even been challenged.  It would be

6  eventually succeeding on 100 percent of the DVDs.  It would do

7  97 percent of them without having a problem, and the other 3

8  percent would slow down to some degree.  But it would

9  eventually succeed in copying them all.

10         The alternative they switched to on Facet is

11 following DVD Walk.  Would it violate or circumvent if we just

12 used DVD Walk as the only method in Facet?

13         This is designed to be working through a DVD virtual

14 machine.  That's what took so long -- one of the things that

15 took so long in the design of this, was not just ARccOS, but

16 simply designing this virtual machine.

17         What it does, it saves sectors needed for playback.

18 But the computer selects which ones to copy in what order.  And

19 it never encounters intentionally-damaged sectors.

20         And the only difference between this and actually

21 saving during playback -- and I was writing down what

22 Mr. Singla was saying.  He said, well, DVD Walk is save and

23 play, as opposed to play and save.  Well, "Play and Save" will

24 be my fourth column.

25         The only difference here is whether it's the computer

1  that selects which channels to play back, or the user.  What

2  happens here is, if you imagine a remote control where the user

3  has menu options and can select play the movie, play the

4  trailer, and selects which one, DVD Walk will select each one

5  of them in turn, and copy the available options.

6          So, it does the same thing except it copies, it

7  decides -- the machine decides which ones to copy, and what

8  sequence, and takes all the options.

9          Well, Mr. Schumann's objection to DVD Walk, as I

10  understood it, to quote him from 329, was that DVD Walk

11  pretends to be a person.  That's his objection.  It pretends to

12  be a person, like a person holding a remote control and

13  pressing the buttons to follow the options available.

14          Nothing's wrong with that, unless Schumann really

15  means that once you know that ARccOS is out there, you can't

16  act like a human to avoid encountering ARccOS.

17          I ask the Court to think about this.  Under that

18  argument, do we have two classes of people out there making

19  devices?

20          We have one class like RealNetworks, who knows about

21  ARccOS and, therefore, according to Schumann, can't follow the

22  DVD spec to make copies.  But it makes some darn good software

23  for doing that, some really robust error recovery.

24          A second class of people who never heard of ARccOS,

25  but they like our software for error recovery, whatever it may

1  be, intentional or not, and they implement it.  And they get to

2  use it because they don't know about ARccOS, but we can't

3  because we do know about ARccOS, under a statute where

4  subjective intent is supposed to be considered irrelevant, as

5  the Studios wrote in their brief at Page 18.

6          Does it circumvent because Facet switches from one to

7  the other?  Well, Facet, on linear copying, never deactivates

8  ARccOS.  It never removes it.

9          The suggestion was made that it removes something

10  because it only copies the playable sectors.  That's not

11  removing.  Linear copying just stops cold, discards, and starts

12  over.

13          But, if there's something wrong with switching from

14  one to the other, and Facet can be reimplemented, if it was

15  just one or just the other, whatever the Court has concluded is

16  appropriate.

17          I talked at the beginning about the ARccOS and

18  RipGuard arguments do not -- Defendants are wrong that those

19  arguments support an injunction against the launch of a

20  product.

21          We're dealing here with lines of code that implement

22  different kinds of methods.  And if there's something wrong

23  with one line of code, RealNetworks can or can attempt to do

24  something else that the Court has not found objectionable.

25          Vegas.  The method of optimized linear copying is

1  skipping a sector where there are found to be errors.  I'll put

2  the other one up, as well, "Save While Playing."

3         The team doing Vegas was aware of ARccOS when they

4  did this.  They also were aware that they believed the front

5  door was open, using the *Lexmark* analogy, the metaphor, that

6  they could save while playing.

7         That's actually written about by Mr. Chasen, from the

8  Vegas team, in -- I thought I had it written down here.  Chasen

9  Exhibit 104, that they considered just doing save while

10 playing.  And they chose the optimized linear copying instead.

11 They could do either one.  And they still could.

12        And this is the one that the Studios spend most of

13 their time attacking.  This is the one where they like to talk

14 about the Ukrainian military contractors, and all of that

15 stuff, and the Customs, and has to do with the Vegas column

16 there.

17        Real does not dispute that its engineers knew about

18 ARccOS and had in mind not being stopped by ARccOS when they

19 designed their error recovery.  And the Court has made a ruling

20 on adverse inference on that point.

21        But subjective intent, as I said, is supposed to be

22 irrelevant to the statute.  The question is, I mean, by

23 designing some robust software to deal with this, are we

24 illegal because we knew about ARccOS, and somebody else who

25 wants to use our software, who never heard of ARccOS, can do

 1  it?  Is that really the world we are in under the DMCA?

 2          I think the fate of the Vegas implementation probably

 3  depends more on a question of law than one of fact.

 4          I think if the Court follows *Lexmark*, the front door

 5  is unlocked, save while playing -- and, in fact, I think there

 6  are two doors unlocked, save while playing and DVD Walk.

 7          Now, linear copying is not really a locked door.

 8  And, if that is true, and we are following *Lexmark*, then the

 9  method chosen by the engineers should be okay because the front

10  door is open.  Maybe the side doors, as well.

11          If the Court does not follow *Lexmark* on that point,

12  then at least the Real engineering team should have been given

13  the opportunity to implement one of the front-door approaches

14  and not be blocked from issuing the product.  Because they

15  considered doing it either way.  It's lines of code and they

16  can implement it in different ways.

17          The Studios are really asking this Court to do

18  something never done before.  We have a series, in ARccOS and

19  RipGuard, a series of unspecified file errors, a very slim

20  record describing what it is, when it works, when it doesn't,

21  why some Studios find it useless while others embrace it in

22  some degree, where it's used in a tiny percent of DVDs, even by

23  the Studios who do use it.  Why?  Why?  Why?

24          Is it really effective?  Do we have the record for

25  that?  Is there errors that can't be distinguished from any

1    other errors, even natural errors?  And software has to have

2    some method to recover from errors.

3           So, do they become illegal, any method, simply

4    because the engineers knew about ARccOS?

5           The Defendants ask the Court to anoint these as some

6    kind of defective technological method, mainly because our

7    engineers knew about them and wanted to avoid them.

8           And that, again, would set up two classes of people,

9    those that can use technology because they do not know about

10   ARccOS, and those who can't because they do.  And does that

11   really make any sense as an implementation of the DMCA?

12          Do we have the record to know why some Studios don't

13   even find it to be worth doing?  What's really going on here?

14          On the subject of possible redesigns, I just want to

15   note, you know, we believe the Court should deny the injunction

16   for many, many reasons, but I want to note, as the Court

17   considers these issues, that if there is objection to something

18   done of a detailed nature, like the ARccOS techniques on the

19   screen, that there are redesign implementation possibilities.

20          And the same is true in terms of the CSS compliance.

21   Our devices can be done -- Facet can be redone as a DVD player.

22   No user-accessible buses.  No standardized interfaces.  Bielman

23   talked about that at 1058, Schumann at 406.  We can do those.

24   Keys are never saved across user-accessible buses, if that's

25   the objection.

1            The only thing the Studios have going here, that can

2    justify enjoining the product, the launch entirely, is their

3    argument that they have made an agreement to the CSS specs, as

4    Ms. King testified, to ban all copies and they've implemented

5    that through the CSS specs.

6            I believe, I submit, that's the only argument they

7    have in this case that can properly support an injunction

8    against the product.  And then there are real problems under

9    other laws, if that's the agreement they have made.

10           Finally, on fair use, Defendants say the Court should

11   never reach this question.  Certainly, I agree the Court does

12   not need to reach fair use to deny the injunction, but I

13   believe it does need to reach it to grant the injunction.

14           We are not urging fair use as some kind of broad

15   defense to the DMCA.  I think it's very important to

16   distinguish between "affirmative defense" and "element of a

17   claim," which is what Mr. Cunningham was getting at when he

18   made a comment during the opening.

19           The fair use doctrine is not a defense in some kinds

20   of cases.  But we are urging that it has a specific place in

21   the analysis of the elements of 1201(b).

22           Begin with where it doesn't work.  This case is not

23   like the hacker cases under 1201(a), Corley, 321, cases like

24   that, where the defendants' device broke into technology like

25   CSS, without authority, and then distributed copies.

1    The courts there have held that when you break in and

2  distribute, you've already violated 1201(a) by getting

3  unauthorized access.

4    The fact that your customers might have a fair use of

5  that copyrighted material does not expunge the wrong of

6  breaking into the technology.  That's what Corley's about, and

7  321, and Reimerdes and Streambox.

8    Under 1201(b), though, fair use arises in the

9  elements of the claim itself.  The statute incorporates the

10  notion of protecting a right of the copyright owner.

11    The right of the copyright owner under that title of

12  the copyright statute, does not include prohibiting the fair

13  use by a consumer, however that might be decided by a court.

14    We know that from the Supreme Court *Sony* decision

15  holding that the authority of the copyright owner is not

16  required to make a fair use.  Their authority does not matter.

17    And, the Court in the *Campbell* decision, the Supreme

18  Court, which was the one about the parity of Pretty Woman, in

19  that decision saying that the withholding of permission for a

20  use has no bearing on whether or not it is a fair use.

21    Now, here (indicating) the question is whether or not

22  our device is primarily designed to impair a right of the

23  copyright owner.

24    We are trying to enable a fair use.  We have briefed

25  these issues.  I'm not going spend time, considering the hour

 1  of the day, on what is already in our briefs, Your Honor.

 2              **THE COURT:**  And you have about five minutes.

 3              **MR. SCOTT:**  I'm going to wrap up.

 4              **THE COURT:**  In fact, I think you may be over that,

 5  but I'm giving you five minutes to wrap it up.

 6              **MR. SCOTT:**  Okay.  Okay.

 7              In that event, I want the Court, in terms of

 8  interpreting this statute, to focus on one thing here in

 9  particular.

10              The use of circumventing primarily designed to

11  circumvent protection as the purpose of the device addressed by

12  the statute, and what effectively protects the right of the

13  copyright owner.  Those, I submit, are used in parallel.

14              The primary purpose needs to be something to

15  circumvent the protection of the right of the copyright owner.

16  Not something that has a good primary purpose but then can be

17  used by somebody else for some infringing use.  That's not what

18  this statute is about.

19              I am going to get to the end.  Interesting

20  legislative history is in our brief.  It is in the slides.  I

21  won't read it in light of the time.

22              Let me go, instead, to the question of the Section

23  107 factors, because I think it is important.

24              Just running through them, on my Slide 50, note the

25  first factor, about the character of the use is not about

1   whether RealNetworks sells a product commercially, but, rather,

2   how the consumer uses it.  I think Mr. Williams is just wrong

3   on that point.

4          It's about how the consumer uses it.  And, the U.S.

5   Supreme Court says that in *Sony* itself.  It is a copyrighted

6   work.  RealNetworks does make a copy of all of it because

7   that's the way it must be used.

8          The third factor is about whether a teacher who only

9   needs one chapter copies the whole book.  And that is regarded

10  by the case law as neutral in a case like this where we need to

11  use the whole work.

12         And the most important impact, by far, is the impact

13  upon the market.  And the market here is the value of the

14  copyrighted work represented by the first sale, the original

15  sale of that DVD.  Features like ours enhance that value.  They

16  enhance that value.

17         Mr. Glaser talked about, you know, in fact, if people

18  commonly had jukeboxes, no copy of the DVD was needed, if they

19  kept jukeboxes, and we just offer a functionality on top of the

20  jukebox to parental controls, search, et cetera, that would

21  work.

22         But we don't live in that world.  We live in a world

23  where you must do these features on top of the saved copy.  And

24  that adds value to the DVD.

25         We have unrebutted testimony in our declarations from

 1  Dr. Bresnahan on this point, unrebutted as to what the effect

 2  is.

 3          In fact, the Studios themselves simply want to

 4  monotize, want to monotize the sale of that copy.  And that is

 5  the issue.  But we shouldn't assume the conclusion that because

 6  they want to monotize it, therefore, we are undercutting their

 7  market.

 8          That's the question.  Do they own the right to that

 9  copy, exclusively?

10          On irreparable harm, simply to say the harm to us is

11  obvious, the claimed irreparable harm to the Studios is very

12  vague.  The record is very deficient.  And we briefed this.

13  They have shown no irreparable harm.

14          Mainly, what they talk about is that we can make --

15  if we can make a copy, that enables us, RealDVD, to be able to

16  sell our other features, the management features.  It enables

17  us to enter the market in competition with them based upon that

18  first copy to hard drive.  And they don't want that

19  competition.

20          And we are talking about competition.  We are talking

21  about something quantifiable in damages.  Experts do it all the

22  time.  And the quantifiability of this is unrebutted in the

23  record.  That is not irreparable harm as a matter of law.

24          With that, Your Honor, and the concluding comment,

25  the public interest does respect copyrights, as do we.  But it

 1  also under our law requires respect for the right of fair use

 2  under the precedent, including Sony Betamax.  And that is the

 3  issue we are putting forward.  And that does severely implicate

 4  the public interest.

 5          We ask, respectfully, the Court deny the injunction.

 6          And I thank you for your time throughout the hearing

 7  and today.

 8          **THE COURT:**  Thank you.

 9          **MR. WILLIAMS:**  Your Honor, we would request a short

10  break, if not a short lunch break.

11          **THE COURT:**  Well, I think probably a lunch break at

12  this point.  Otherwise, it's going to be a tea break or

13  something, I'm afraid.

14          **MR. WILLIAMS:**  Thank you, Your Honor.

15          **THE COURT:**  And the question of this Mr. Biddle, I am

16  sort of mystified.

17          Is it that no one was aware there was a Mr. Biddle

18  who might have some information?  Or was it that Mr. Biddle

19  couldn't be found?

20          **MR. CUNNINGHAM:**  Mr. Biddle couldn't be found, Your

21  Honor.  We tried to contact him in October.  We were unable to

22  locate him.  It turns out he was out of the county.  We've

23  tried to contact him again more recently, and we did locate

24  him.

25          We had no interest in delaying the evidence from Mr.

 1  Biddle.  He's one of the few detached people here who can

 2  describe what really went on in those negotiations.

 3          He was working for Microsoft at the time.  He works

 4  for Intel now.  Never worked for the Studios, like Marsha King.

 5  He's never worked for us.

 6          And he does describe -- he completes the picture

 7  about the negotiations that led to the DVD CCA license.  And he

 8  makes the critical point that the Studios may have wanted a

 9  no-copy prohibition --

10          **MR. SINGLA:**  Now we are into substance.

11          **MR. CUNNINGHAM:**  Yes, we are.

12          On behalf of Microsoft, he wasn't going to let that

13  happen.

14          So his testimony is critical, I think.  There's no

15  reason for Your Honor not to hear it in connection with this

16  motion, because there's no question you will be able to hear it

17  at the ultimate trial on the merits.  And given that the

18  question before --

19          **THE COURT:**  It's a bit late now.

20          **MR. CUNNINGHAM:**  Well, it isn't, really, Your Honor.

21          Both sides have recognized that we're not done with

22  discovery.

23          **THE COURT:**  Well, but you have -- I mean, this motion

24  has been pending for a long time.  And, your inability to find

25  Mr. Biddle, who is quite well-known, actually, right, I find

1   inexplicable, since I found him in three minutes during the

2   break.  Linked-in.  It's the second entry in Google.

3           **MR. CUNNINGHAM:**  Well, Your Honor, we did try to find

4   him.  We had numbers.  Our inquiries to him went unreturned.

5           **THE COURT:**  How hard is it to find somebody like

6   that?  The number of entries for Mr. Biddle on Google is

7   incredible.

8           The second one that comes up -- as the first one has

9   something to do with Microsoft.  The second one that comes up

10  is linked in, tells you exactly where he is and what he's

11  doing.

12          I just find that, you know, if you said -- you know,

13  earlier, you answered my question about whether you were aware

14  of the fact that he may have information, yes, it was just you

15  couldn't find him.  I don't -- I don't buy that.

16          And being out of the country, I think this man is in

17  and out of the country all the time, so I'm not persuaded.  You

18  will have to save it until another time.

19          **MR. CUNNINGHAM:**  Your Honor, may I be more precise?

20  We did find him.  We reached out to him.  He would not return

21  our communications.  So we couldn't get any information from

22  him.

23          **THE COURT:**  There you are.  I guess you didn't try

24  hard enough, then.

25          Okay.  We will take, well, let's say, 45 minutes.

```
1              MR. WILLIAMS:   Thank you, Your Honor.

2              THE COURT:   Which brings us to where?   Something like

3   2:30, 2:35, yeah.   Okay.   Thank you.

4              MR. WILLIAMS:   Thank you, Your Honor.

5              (Recess taken from 1:53 to 2:45 p.m.)

6              THE COURT:   Now, Mr. Williams, how many minutes do

7   you think you would have?

8              MR. WILLIAMS:   Between Mr. Singla and I, I would

9   think 20 minutes.

10             THE COURT:   Okay.   You may proceed.

11                          REBUTTAL ARGUMENT

12             MR. WILLIAMS:   Thank you, Your Honor.

13             I would like to start, Your Honor, with the

14  suggestion that was made by Counsel that the only witness who

15  does have information in the record about what the parties, the

16  various stakeholders had in mind back at the inception of the

17  Copy Control Association was the testimony of Ms. King, because

18  that's not so.   There is other testimony.

19             And the testimony that's on the screen -- the

20  testimony that's on the screen is from Mr. Andrew Parsons,

21  who's a representative of Pioneer Electronics.   His deposition

22  was taken by Real in this case.

23             And, here's what he said.   He has no connection to

24  the Studios whatsoever.   The question (As read):

25             "QUESTION:   And is it your understanding
```

```
 1              that across all industries it was a unanimous
 2              intent to prohibit DVD content from being
 3              copied to a hard drive?
 4         "ANSWER:  I will say that I believe it was
 5              everyone's intent to avoid copying to any
 6              other kind of medium.  CSS is a relatively
 7              straightforward technology in that you are
 8              not supposed to make copies of content with
 9              it, it prevents you from doing that.
10              Wherever the destination medium is beside the
11              point."
12         And then down at the bottom we also have in bold, his
13  testimony that:
14              "The point is to not allow copies to be
15               made, whether it be recordable DVD to a
16               hard drive, to a memory card or whatever."
17         I'm sorry, Your Honor.  Mine was cut off.  The
18  left-hand side is cut off I think.
19         THE COURT:  I think maybe you have to move the screen
20  over.  No, not the whole picture, not the whole --
21         MR. WILLIAMS:  That's okay.  That's the only time I'm
22  using it, Your Honor.
23         THE COURT:  Mr. Singla is laughing at you.  I don't
24  mean that.  I mean the cursor you take, and you move the arrows
25  at the bottom from left to right.
```

1        **MR. WILLIAMS:**  I understand.  Fortunately I don't

2   need to do that, because I'm done.

3        **THE COURT:**  Now that we have taught you the

4   technique.

5        **MR. WILLIAMS:**  The point is done.  The point is that

6   it was in fact the understanding of the other people who were

7   around at the time, that there would not be copies.

8        Let me next turn, though, to the issue of

9   cooperation.  Mr. Scott says that all we need, all we,

10  RealNetworks, need is some cooperation from the Studios to get

11  around this rip, rent, return -- borrow, rip, return problem.

12       A couple of point about that.  Number one, the harm

13  to the Studios is not just with copying rental discs, Your

14  Honor; it's with copying borrowed discs.  It's with copying the

15  discs that are already in the marketplace.

16       Number two, there's a cost associated with marketing

17  them, which Real wants the Studios to pick up, to facilitate

18  Real's product.  There's no obligation on the part of the

19  Studios to have to do that, nor should there be.

20       Three, a simple rental flag marking it, saying "This

21  is a rental DVD" will not work because of the first-sale

22  doctrine which allows DVDs to be passed on, and to move from

23  the rental market to the sale market after that.

24       Number four, significantly, there's a cost of

25  maintaining and enforcing the marking system, and that would be

1  prohibitively expensive.

2          Number five, marking the DVDs does nothing whatsoever

3  for the billions of DVDs that are already out into the

4  marketplace.

5          And finally, all they're saying is "Why won't the

6  Studios change their practices to lessen the harm that's caused

7  by my illegal product?"  It is not the duty of the Studios to

8  do that.

9          The next issue, though, very important, fair use.

10  First of all, this is not a new argument.  The argument that's

11  being made by RealNetworks here, because every defendant, every

12  time that an action is brought under the DMCA, every time, the

13  defendant says, "Look at the uses that we want our users to

14  make.  Those are fair uses."  And each and every time, it's

15  rejected by the courts that have considered it.

16          This bullet point, Your Honor, is Page 15 of our

17  brief.  And it lists case after case that consider the question

18  and rejected that idea, and found that fair use is not a

19  defense.  *Corley, Remeirdes, Elcom, 321 Studios, Macrovision.*

20          A number of those cases, contrary to what Mr. Scott

21  indicated, are both 1201(a) and 1201(b) cases.  That would be

22  *Remeirdes, Elcom, 321 Studios.*

23          Importantly, second -- so, that's Point Number One.

24  It's been offered and rejected again and again.

25          Point number two.  The reason that fair use is not a

1    defense to a DMCA claim is that Congress said that it is going

2    to presume that most of the uses, most of the times that this

3    is going to be raised under the statute, the uses will be

4    unfair uses.

5            That was the *Elcom* case.  Let me just read a portion

6    of it, at Page 1125 (As read):

7                "The inescapable conclusion from the

8                statutory language adopted by Congress in

9                the legislative history discussed above is

10               that Congress sought to ban all

11               circumvention tools, because most of the

12               time, those tools would be used to infringe

13               a copyright."

14           That's the point.

15           Furthermore, free use, a free copy is just simply too

16   enticing.  It's too easy.  And that's what Congress recognized

17   in passing this act prohibiting trafficking in a device that

18   allows you to circumvent the access and the copy control

19   measures.

20           As the Court pointed out, the warnings here are

21   essentially meaningless because people will have their reasons,

22   and they will go past them.

23           But importantly, the *Corley* case said, "We are going

24   to leave it to the exceptions" -- "the exemptions," excuse me

25   -- "that are carved out in the statute.  We're not going to

 1   have fair use as a defense."

 2           I would refer to court to the *Corley* decision,

 3   Footnote 13.  It appears on Page 444.  There, the Court wrote

 4   (As read):

 5               "Congress also sought to implement a

 6               balanced approach through statutory

 7               provisions that leave limited areas of

 8               breathing space for fair use.  A good

 9               example is Subsection 1201(d), which allows

10               a library or educational institution" --

11               things that I mentioned earlier, Your Honor

12               -- "to circumvent a digital wall in order

13               to determine whether it wishes legitimately

14               to obtain the materials behind the wall.

15               It would be strange for Congress to open a

16               small, carefully limited window for

17               circumvention to prevent fair use in

18               Subsection 1201(d)(F) if it then meant to

19               exempt in 1201(c)(1) any invention

20               necessary for fair use."

21           Thus, they carved it out.  And I also mention the

22   carve-out, Your Honor, for the entire triennial process, which

23   I mentioned in my earlier argument.

24           Congress has rejected the whole notion of time

25   shifting.  And ironically, that was an argument that was made

1   by Real in the *Streambox* case.

2         I have up on the screen right now, a portion from our

3   brief, Page 17.  All of these, arguments made by RealNetworks

4   in its *Streambox* briefing.

5         The final bullet point there (As read):

6           "Time shifting doesn't apply to the

7           DMCA because in order to time shift, you

8           have to make a copy, and the whole Act was

9           designed to make certain that products

10          could not be made, distributed, that permit

11          you to defeat the access controls and the

12          rights of the copyright holder to say

13          whether or not you can copy."

14        Actually that wasn't from the briefing; that was from

15  oral argument by Mr. DiBoise.

16        Importantly, on the issue of fair use, the Studios

17  are already in the market.  It is not as though the Studios are

18  trying to prevent consumers from having the ability to get

19  access to a downloadable copy of these movies.  iTunes,

20  Amazon.com, the Digital Copy all already permit consumers to

21  enter into it.

22        The point is that in return for getting that

23  downloadable copy, the consumer ask has to pay for it.  And the

24  Studios, the owners of the content, have to get some

25  remuneration.  That's the point.  And, it's already available

1    in the market.

2            Next, Mr. Scott mentioned that I had apparently

3    misrepresented, he says, the first factor of the fair use.  No,

4    I did not.  I was talking about the consumer when I was

5    discussing the first factor.

6            I was simply making the point that the fact that the

7    consumer, under their rationale, gets these items for free

8    versus having to pay for it has some benefit to the consumer.

9            Same kind of analysis that this Court went through in

10   the *Napster* decision.  Different set of facts, different kind

11   of setting.  But for purposes of this point, Your Honor, the

12   analysis is the same.

13           At Page 912 of Your Honor's opinion in 114 F Sup, you

14   made the point (As read):

15               "Moreover, the fact that Napster users

16            get for free something they would

17            ordinarily have to buy suggests that they

18            wreak economic advantages from Napster

19            use."

20           That's having to do with Factor 1.  Having to do with

21   Factor No. 4, the commercial use, the Court found, and this is

22   at Page 914:

23               "Any potential enhancement of

24            Plaintiff's sales due to sampling would not

25            tip the fair use analysis conclusively in

 1              favor of Defendant.  Indeed, courts have

 2              rejected the suggestion that a positive

 3              impact on sales negates the copyright

 4              holder's entitlement to licensing fees for

 5              access."

 6         In other words, courts including this one have

 7   rejected the notion that "Don't worry about it, I'm going to be

 8   good for you, I'll be good for your sales," that argument has

 9   already been rejected.

10         Let me move from the fair use issue to a couple more

11   points.  Mr. Scott said at one point, with respect to CGMS, he

12   said well, that's -- that's just something that's not really

13   accepted in the industry.

14         Well, this is very important, because Your Honor,

15   CGMS is on every single disc.  It has to be read by the

16   computer in order for the computer to play back the movie.  And

17   when it -- further, Real's purposes, in the *Streambox* case,

18   they argued that precisely the same type of copy control was in

19   fact a copy control, and was ignored by *Streambox* in that case.

20         I refer the Court to the *Streambox* decision, and this

21   is at Page 117318 of the decision.  It said (As read):

22              "Here, by contrast, copyright owners

23              have specifically chosen to prevent the

24              copying enabled by the *Streambox* VCR by

25              putting their content on Real servers and

1              leaving the copy switch off."

2              The copy switch is very similar to the CGMS

3    never-copy protection that is on the DVDs.

4              Mr. Scott suggested that the amendments, the

5    potential amendments that were rejected, somehow suggest that

6    the original intent of the CSS license was not to prevent

7    copies.

8              A couple of points.  First of all, that's not true at

9    all.  That's what the -- the evidence, we think, is

10   overwhelming that -- overwhelmingly suggests that precisely the

11   goal was to limit copying or to prohibit consumer copying of

12   DVDs.

13             It would be speculative to construe that the existing

14   agreement, the one that's already been agreed to, means that a

15   later proposal to change it was never -- let me say it again.

16             Real's argument that the proposed amendments are the

17   linchpin for construing the CSS license causes you to have to

18   speculate.  And you can't look at the possibility that there

19   would be a change later to say well, that means you go back in

20   time, and it was not the intent of the original designers.  In

21   fact, it could simply mean, and probably does here, that they

22   wanted to make it clearer.  To refine it.

23             That is not what Real was saying at the time,

24   moreover.  And this is an important point.  At the time, in

25   November, 2007, when the amendment was being considered, Real

```
 1   didn't suggest that the -- the reason that the amendment was
 2   being offered -- was being rejected, excuse me -- was for the
 3   reasons that they now claim.
 4           At the time, and this is in their Finding of Fact
 5   No. 90, Real's executives said to one another that the
 6   amendment was not going pass because Kaleidescape had
 7   threatened the DVD CCA with antitrust lawsuits, and that that
 8   threat of a lawsuit was the reason why it was not passed at
 9   that time.
10           The broader point is, the fact that there was an
11   amendment that was rejected does not mean that at the time of
12   the DVD CCA's inception, that the intention here was to permit
13   somehow the copying of DVDs.
14           Finally, before I turn to Mr. Singla, at the end,
15   Mr. Scott talked about possible redesigns.  We would simply say
16   to Your Honor that this Court is duty-bound to consider the
17   product that's before the Court today.  If there's a different
18   product that's before the Court tomorrow, the Court needs to
19   consider that.
20           And to the extent that what he's asking for is some
21   sort of an advisory type of opinion from the Court, of course
22   we say that that wouldn't be appropriate.  The device that is
23   before the Court today violates both the access control and the
24   copy control rules.
25           I'll leave you with this.  This case is about how
```

1   Real is trying to take money that isn't theirs by asking

2   consumers to pay Real for the content that is owned by the

3   Studios.  That's not appropriate.

4         All the Studios are saying is that it would be

5   appropriate for consumers to have to pay for the copy that they

6   have.  When you buy a DVD, you do not buy the movie.  You buy a

7   copy of the movie.  In the same way that when you buy a

8   hardback book, you buy the hardback book.  You don't buy the

9   book in every form.  So if you want to have a paperback so you

10  can travel with it more easily, fine.  If you want to put it in

11  your Kindle, fine.  But you have to pay the content owner in

12  order to have that copy.  It's as simple as that.  And that is

13  exactly the type of protection that the DMCA is meant to

14  protect.

15        I'll turn it over for the technical issues to

16  Mr. Singla.  Thank you, Your Honor.

17        **THE COURT:**  Thank you.

18        **MR. SINGLA:**  Thank you, Your Honor.

19        Your Honor, if we can have one moment, because there

20  seems to be a little problem with the ELMO.

21        **THE COURT:**  Yes.

22                  **REBUTTAL ARGUMENT**

23        **MR. SINGLA:**  Your Honor, while we try to figure out

24  the ELMO, let me begin.

25        First, just to clarify something that Mr. Williams

```
 1   said, I think he meant to say that the proposed amendments that
 2   were made to the DVD CCA in the wake of Kaleidescape.
 3          To clarify, perfectly clear, the requirements of the
 4   CSS license, they were withdrawn, not rejected, because of
 5   these antitrust threats.
 6          Now, turning to the technical issues that Mr. Scott
 7   addressed during his presentation, first, in terms of fair use.
 8   Mr. Scott repeatedly said that their product only copies DVDs
 9   so that it can provide some enhanced features.  And for that
10   reason, it should be -- that factor should weigh in terms of
11   fair use.  Towards fair use.
12          But the reality, Your Honor, is every feature they
13   provide -- meta data, cover art, parental controls, knowing
14   where you paused the show, knowing which episode you were on --
15   you can provide all that without copying the DVDs.  There's no
16   reason you have to copy the DVDs to do that.  The only reason
17   to copy the DVDs is so you don't need the DVD any more.
18          Secondly, Mr. Scott suggested in closing, for the
19   first time -- this is not in their findings of fact or
20   conclusions of law -- that the only purpose of CSS is to
21   prevent generational copying.  He said that repeatedly.
22          And yet, he did not identify, nor did any of their
23   witnesses, any supposed provision in the CSS license, the way
24   they're interpreting it -- the way they're interpreting it --
25   that would stop generational copying.
```

```
 1            So in other words, they're proposing that the Court

 2   should interpret the purpose of CSS not to be what it says, but

 3   to be something else, preventing generational copying, and then

 4   yet then very conveniently, there would be nothing in the

 5   license that stops generational copying.  Doesn't make any

 6   sense.

 7            I just want to put before the Court Mr. Felten's

 8   testimony.  This is their expert.

 9            We are having further ELMO difficulties.  Can the

10   Court read that?

11            THE COURT:  Somewhat.  Somewhat, yes.

12            MR. SINGLA:  Let me just read it.  I'm sorry, Your

13   Honor.  I don't know what the problem is here.

14            This is from Page 141 of Mr. Felten's deposition,

15   which is in evidence.  I asked him (As read):

16            "QUESTION:   Is it consistent with your

17            reading" -- same reading that Professor

18            Bishop was given -- "of the specifications if

19            Vegas were to permit people, keeping the AES

20            encryption and the CSS encryption, to copy

21            movies to a hard disc, allow those copies

22            then to be copied to other hard discs, and

23            allow them to be played back by any copy of

24            Vegas anywhere?"

25            In other words, no limits on copying whatsoever.
```

1          **"QUESTION:**    That would be consistent with

2          your reading of the specification, right?"

3          And he said:

4          **"ANSWER:**  I think it would be."

5          In other words, what Mr. Scott wants the Court to

6    accept is that CSS has no meaning, and no purpose, and no

7    effect, whatsoever.

8          When we talked specifically about the -- can we turn

9    those screens off, Mr. Bowser?

10         **THE CLERK:**  (Nods head)

11         **MR. SINGLA:**  Thank you.  Mr. Bales, could you fix the

12   ELMO?

13         Your Honor, when we -- I'll wait for the -- oh.  That

14   was upside-down.  Your Honor, when we spoke about the

15   Authenticator Section 2, and the DecDKv, and specific

16   provisions of CSS license that were violated, Mr. Scott didn't

17   even respond to the issue on DecDKv, the descrambler spec.  And

18   he called the authenticator spec a technicality.  So now if

19   they violate specific provisions, it's just a technicality.

20         Now, I know Mr. Mick is going to address the

21   Authenticator Section 2 specification in a little more detail,

22   but the Court will remember that in the authenticator

23   specification, the information sent to the descrambler is

24   already encrypted.  It's always encrypted.

25         The thing that the spec is saying should not be sent

 1  over a bus is encrypted keys.  And that's exactly what they're

 2  sending.  The fact that they add AES encryption on top doesn't

 3  change that.

 4          Now, now, Mr. Scott also addressed the argument that

 5  we made on circumvention, relating to the five layers of

 6  protection.  And he suggested that it's all one protection,

 7  it's not five different layers of protection, it's all just

 8  authentication.

 9          But, Professor Bishop, their witness, testified

10  clearly on cross-examination by Mr. Mick that that's not true.

11  He admitted -- this is a question on Page 755 of the trial

12  transcript, hearing transcript, from Mr. Mick (As read):

13          **"QUESTION:**   CSS has a number of components

14          that it uses to obtain, achieve its

15          objectives, correct?"

16          Professor Bishop said:

17          **"ANSWER:**  It consists of a number of

18          components.  Yes, sir."

19          And then Mr. Mick went through each of the

20  components.  It was on Page 755 through 756.  Mr. Bishop agreed

21  that each of those components are part of CSS.  There's no

22  dispute, that's part of CSS.

23          And there's no dispute that the copy on the hard

24  drive, whether it's a single hard drive inside Facet or a thumb

25  drive, doesn't have those protections.

```
 1          It does have the base CSS encryption of the video,
 2   but everything about the keys and the bus encryption and the
 3   locking and the lead-in areas, it's all gone.
 4          Now, the other response Mr. Scott gave is "Well, we
 5   did it before."  In other words, "In the process of copying the
 6   DVD we did engage with the DVD drive and authenticate and
 7   encrypt."
 8          But that's not our point.  That's a separate issue,
 9   whether they follow those specs when they make the copy.  The
10   point under the DMCA is the copy, itself, that they have made
11   now, they've taken the movie, they've transformed it into one
12   in which the protections have been deactivated and removed.
13          I very quickly want to turn to ARccOS and RipGuard.
14   First argument that Mr. Scott made is that ARccOS and RipGuard
15   are not effective.  The Court should ignore the fact that they
16   circumvent ARccOS and RipGuard because some studios don't use
17   it.
18          Well, first, Your Honor, we showed the Court in
19   the -- earlier this morning, the actual evidence in the record
20   about the fact that there were a more than a billion DVDs out
21   there with ARccOS and RipGuard, and the fact that 20 percent of
22   the top 300 DVDs used over the three-year period, 2005 through
23   2007, had ARccOS and RipGuard on them.
24          But there's also the indisputable evidence that they
25   went to great lengths and were very concerned about making sure
```

 1  they could copy these DVDs, which were among the most popular

 2  DVDs.  The ones that their potential customers would want to

 3  copy.  Popular movies.

 4          They hired people overseas, they brought in

 5  programmer after programmer, they looked at ripper code.  The

 6  Court will recall all the evidence at trial on that point.

 7          Now, I am hoping I can put up this slide on the ELMO,

 8  and it will be visible.  It is Mr. Scott's slide.  This is his

 9  Slide 45.  Perhaps the Court can look in the copy it has.  But

10  -- oh.  It's working.

11          What Mr. Scott suggested with this slide, Your Honor,

12  as I understood, is that -- thank you -- is that there is this

13  fourth column here, this fourth way of copying, which he's now

14  calling saving while playing.  This is not used by Vegas or by

15  Facet.  And he's callings it an open door.  That's what I

16  understand the argument to mean.

17          And what he's saying is because there's supposedly

18  this way to copy a movie, saving while playing, that the Court

19  should ignore the fact that they circumvent, and that they copy

20  using other methods.

21          Now, first of all, there is no evidence in the record

22  that this sort of magic-bullet way of copying exists.  If it

23  did, Your Honor, why wouldn't they do that?  Why wouldn't

24  SlySoft do this if there is such a way of copying a DVD?

25          But secondly, the fact that there may be ways of

```
 1  copying DVDs, movies, that ARccOS and RipGuard don't stop, even
 2  if that were true, that doesn't mean that ARccOS and RipGuard
 3  aren't entitled to protection under the DMCA.
 4         And if they circumvented, as Mr. Scott all but
 5  admitted, then they should be enjoined.  Then they violate the
 6  DMCA.  Copy protection technology doesn't have to stop every
 7  single way of copying content to be entitled to protection.
 8         And Mr. Scott cited the Lexmark case.  And he said
 9  that the Lexmark case actually establishes that proposition.
10  That if there's some other way to copy content, that
11  therefore -- then the copy protection scheme becomes -- it
12  don't count, under the DMCA.
13         Now, if the Court looks at that case, that is not
14  what that case stands for.  First and foremost, it is an access
15  control case, as Mr. Scott had to admit.  It's not a copy
16  control case.
17         So the access situation, obviously, if there is an
18  open door and a way to access the data, it's kind of hard to
19  argue that you circumvented an access control.
20         In the Lexmark case, itself, the issue was there was
21  software that was being copied that wasn't protected in any
22  way.  That was the copyrighted material.  So the Court said,
23  you didn't protect that software, you can't really complain
24  about it being accessed.
25         That's not our facts.  We are talking about a copy
```

```
 1   control provision.  And it's undisputed that ARccOS and

 2   RipGuard stop copying -- stops copying the way they copy it,

 3   frankly.

 4            Finally, on ARccOS and RipGuard, the question of

 5   intent.  I want to put the statute up.

 6            Now, we, in our brief, one of our briefs, did say

 7   that intent doesn't count under the DMCA.  And what we meant by

 8   that is that intent is not a defense, because the argument the

 9   Court may recall that RealNetworks was making at that time,

10   that argument was that they didn't know about ARccOS and

11   RipGuard.

12            And our point was that not knowing about it is not a

13   defense.  You don't have to know that you're circumventing

14   technology in order to violate the DMCA.  Because, for example,

15   it's a violation of the DMCA to traffic in a technology that is

16   marketed by that person, or another, for use in circumventing.

17   So the person who develops it doesn't necessarily have to know.

18   It's not a defense.  Ignorance is not a defense.

19            But that doesn't mean intent is irrelevant.  The

20   intent of the RealNetworks engineers, that they knew what they

21   were doing and intentionally were trying to get around ARccOS

22   and RipGuard, is directly relevant to the statute, Your Honor.

23            1201(b)(1)(A).  It is a violation to manufacture or

24   traffic -- to traffic in a device that is primarily designed to

25   circumvent.  A design.
```

 1              In other words, if their intent was to design this
 2      product, was designed with the intention of circumventing,
 3      that's a violation of the DMCA.  And that's why the intent of
 4      their witnesses is relevant, of their engineers is relevant.
 5              Finally, on the question of intent, I just want to
 6      put up testimony from Mr. Bielman, just to be absolutely clear
 7      what their intent was in all of this.  This is the example of
 8      hidden buttons.  This was his testimony at this Page 1117 and
 9      1119 of the transcript.  He found DVDs had these hidden buttons
10      on it.  And then, you, the team -- or actually him,
11      Mr. Bielman -- had to write code to deal with that.
12              He says yes.
13                  "They had to change DVD Walk so it
14                   would realize that human beings would never
15                   press those buttons, right?
16              **"ANSWER:**  That's right."
17              They had to make specific changes to deal with ARccOS
18      and RipGuard.  That is just one example.
19              Thank you.
20              **THE COURT:**  Thank you.  Mr. Mick?
21              **MR. MICK:**  Thank you, Your Honor.
22                              **REBUTTAL ARGUMENT**
23              **MR. MICK:**  Let me say thank you for your patience.
24      I'm used to going last, but this is one time where going last
25      is good.

1          Most of Mr. Scott's argument today was not directed

2   at my client, the Copy Control Association.  Most of

3   Mr. Scott's argument was directed at the Studios.  He talked at

4   great length with respect to ARccOS and the DMCA.  I'm not

5   concerned with that at all.

6          A fair portion of Mr. Scott's argument was

7   essentially irrelevant to the breach-of-contract arguments that

8   my client is putting forth here today.  The question of whether

9   there are stolen keys on the Internet or rippers out there for

10  people to use is -- is not significant to a breach-of-contract

11  argument.  Other people's bad behavior is not a new defense to

12  breach of contract.

13         What he did say about the breach-of-contract issues

14  associated with the specifications doesn't rebut the key

15  aspects of breach that we've put before you.

16         Now, Mr. Singla has explained two of those arguments;

17  one of them having to do with the fact that the keys are put

18  out on a user-accessible bus after the bus encryption has been

19  removed, another having to do with the dec descrambler

20  algorithm which occurs at the end of the process.  I would like

21  to address two more.

22         One thing that Mr. Scott told you, and this is at his

23  Slide 33, was that the whole notion of bus encryption and our

24  argument with respect to putting things out over

25  user-accessible buses really was, as Mr. Singla said, just a

```
 1   technicality.  And, he explained in Slide 33 that in fact, the

 2   keys go across a user-accessible bus when they go between the

 3   DVD drive and the authenticator module.

 4           Yes, they go across a user-accessible bus, but they

 5   go across with bus encryption.  That is the entire point of the

 6   process.  Bus encryption is a special form of encryption that

 7   uses a time-variable key.  And, as Dr. Kelly and Mr. Schumann

 8   explained, a time-variable key is a special key that you can

 9   only use once.

10           What's the significance of a key that can only be

11   used once?  Well, the significance is that when the information

12   passes across to the authenticator, you've used your one shot.

13   The key is now expired.  So if you put that information out on

14   the hard drive, you can't move it back and forth again with bus

15   encryption, because your key has been used up.

16           Well, Mr. Scott explains that he thinks that's just a

17   technicality, something that this Court should ignore.  That's

18   not a technicality.  It's a fundamental point of the CSS

19   system, which his own witnesses admit.  He states instead that

20   it doesn't have a real technical purpose.

21           But in his next sentence, he gives up the ghost,

22   because he explains to the Court that the only purpose he can

23   see for bus encryption is to prevent us from making a copy to

24   the hard drive.

25           Well, thank you.  That's exactly right.  The purpose
```

 1   of bus encryption is to prevent people from making copies.

 2          And as his witnesses have conceded before this Court,

 3   they don't use bus encryption when they send the information

 4   out to the hard drive over a user-accessible bus, it's a clear

 5   violation.  And they do it in order to violate the express

 6   purpose of bus encryption, to make a copy.

 7          The second point that I would like to cover is the

 8   point he made with respect to realtime playback.  And he

 9   brought up -- Shannon, can you move the slide?

10          **MR. WILLIAMS:**  It's okay on the other screen.

11          **MR. MICK:**  This is the only one that's bad?  Okay,

12   don't worry about it, then.  I know what it says.  We're good.

13          He brought up a section of the general specification,

14   Page GEN-7, where there is a reference to DVD-video descrambler

15   descrambling the A/V data in realtime for playback.

16          And the argument he made to Your Honor is that when

17   the authors of the specification wanted to say something about

18   simultaneity, things that happen at the same time, they know

19   how to use that phrase.  They can say things like "It happens

20   in real time."

21          The problem with that argument is that it proves too

22   much.  Because if we take a look at this section of the general

23   specification, what we see is that the specification lays out

24   exactly what's supposed to happen at the same time.

25          In the first bullet point on GEN-7, it lays out the

1    first step of this process.  The first thing that happens is

2    you read the secure disc key data from the lead-in area.

3            The second thing that happens, in Bullet Point 2, is

4    then you read the encrypted video title key from the hidden

5    sector header.

6            Now, we know that the lead-in area and the hidden

7    sector area are both areas that only exist on the physical DVD.

8    Everybody admitted that.  There are no lead-in areas, there are

9    no hidden sector areas on the hard drive.  Okay.  So, the

10   reading of the video disc key and the video title key are done

11   from the physical drive.

12           And what happens next?  Then, the descrambler takes

13   the A/V data in real time for playback.

14           Mr. Scott's argument is, well, gee, when they want to

15   say that all of this happens at the same time, taking the

16   information from the physical DVD and descrambling it for

17   playback at the same time, they know how to say it here, for

18   playback by a DVD player.  And that's exactly what it says at

19   the top, for playback by a DVD player.  A standalone device.

20           The reason this argument proves too much, however, is

21   that if you read down below the three bullet points, it tells

22   you exactly what the system requires for playback by a

23   DVD-video decryption module, which all of Real's witnesses

24   admit is what Facet and Vegas are.

25           For playback by a decryption module, the decryption

1  descrambling process is the same as a standalone player, except

2  for the additional step.  And the additional step is

3  authentication.  So, playback by a decryption module also has

4  to have these three steps appearing, by Mr. Scott's own

5  concession, simultaneously.

6         You have to take the information off of the physical

7  DVD, and you have to descramble it for playback in real time.

8  Or as he has said, simultaneously.

9         And Your Honor, if you take a physical DVD and you

10  put it in a DVD drive to play, that's exactly what happens.

11  The machine takes the information and simultaneously broadcasts

12  it on the screen.  It doesn't read all the information off the

13  DVD, and then start playing the movie ten minutes later.  It

14  takes the information, displays it.  Takes the information,

15  displays it.  It's a process that happens simultaneously.

16         Except if you're using RealDVD.  Then it doesn't

17  happen simultaneously any more, because playback occurs at some

18  indefinite time in the future, off the hard drive.  None of

19  this --

20         **THE COURT:**  Now, in the context of this particular --

21  GEN-7, this particular section you're reading, it refers in a

22  couple of places to "playback on a DVD-video player," and then

23  it says, paren, "standalone device."

24         **MR. MICK:**  Correct.

25         **THE COURT:**  What is the significance of that?

1           **MR. MICK:**  That section applies only to an integrated

2   player, as defined in the specifications, which everyone has

3   agreed does not apply to Vegas and Facet.

4           It's the portion at the bottom that talks about what

5   the requirement is for playback on a decryption module that's

6   relevant here.  And that portion says it's the same stuff.

7   Same process.  Three steps, plus the extra authentication step.

8   And they all occur in real time for playback.

9           So the part at the top, concededly, not permanent to

10  us.  The part at the bottom is really where whether the meat is

11  for this section.

12          None of this, Your Honor, is very hard at all.  The

13  CSS specifications in several places -- I have here on the

14  screen Section 1.2 -- tell you exactly what they're supposed to

15  achieve.  You are supposed to allow playback if you're

16  following the rules, but to prevent copying.

17          Even Figure 4, our favorite diagram which you have

18  seen now probably two dozen times, says clearly right on it,

19  you can look at it in the specification, it's the architecture

20  for a playback system.  Not a copier, a playback system.

21          Real didn't make a player.  They built a ripper.

22  Their own employees conceded -- Nicole Hamilton's testimony is

23  before the Court.  They told her she was building a ripper.

24  It's a ripper in a pretty box, to be sure, but it's a ripper,

25  all the same.

```
 1              Let me talk for a moment about following the rules.

 2    Every major electronics company in the world is a signatory to

 3    the CSS license.   Toshiba, Panasonic, Sony, they are all CSS

 4    licensees.

 5              These companies make every type of electronics device

 6    that you can imagine.   They make devices that I didn't even

 7    know I needed.

 8              But there's one kind of device they don't make.   They

 9    don't make a DVD copier.   You can search Best Buy from top to

10    bottom, you will not find a Toshiba DVD copier.   Why is that?

11    It's because all of those companies know that it's against the

12    license agreement to do that.   They follow the rules.

13              If Real is not enjoined here from making a DVD

14    copier, those companies are going to jump into the game and

15    build their copiers.   And then where are we?

16              The CSS system, Your Honor, is designed to prevent

17    consumers from copying DVDs.   It's very simple, it says it

18    repeatedly, it says it right up at the top.   If you want a copy

19    of the movie, you have to pay the owner of the movie.   That's

20    what copyright is all about.

21              Real DVD lets people make copies of DVDs.   There's

22    absolutely no question about that.   That's the whole purpose of

23    the product.   With RealDVD, if you want a copy of the movie,

24    you don't have to pay for it.   You can pass it around -- as I

25    demonstrated in talking to all of the witnesses, you can pass
```

1  it to your friends, it can circulate throughout the dorm room,

2  and everybody can make a copy on RealDVD before it comes back

3  to me, or goes back to the Blockbuster.  And the copyright

4  holder gets no money for any of those copies.

5          Real's response to that is to shrug their shoulders

6  and say, "Gee, we trust people to do the right thing."

7          Well, where have we heard that before?  First Napster

8  and then Grokster appeared before the courts, and said, "Well,

9  gee, consumers could put their own music up on those systems or

10  use them to circulate public-domain stuff, and what have you."

11  It turns out that consumers have a strong desire for

12  copyrighted material that they get for free.

13          So, are consumers going pay $16 to go down the Yellow

14  Brick Road with Dorothy (Indicating), or are they going to pay

15  $4 to Blockbuster to rent it, or are they going to borrow it

16  from their friends for free?

17          The lesson that we have learned over the last 15

18  years is that consumers are very enthusiastic about free.  You

19  know that, they know that.

20          Real's president, Mr. Glaser, admitted in his

21  testimony here in court, that the Studios are his competitors

22  for RealDVD.  They want to sell digital copies; he wants to

23  take those sales away.  But the right to make money from those

24  copies belongs to the copyright holder.  Not to Mr. Glaser, not

25  to Real.

```
 1              The CSS system and the CSS license is designed to

 2    protect that very right.  Not to let people take it away.  That

 3    is the entire purpose of the system.  It is stated on Page 1 in

 4    Paragraph 1 of the license.

 5              We are here asking the Court to enforce the contract

 6    as it is intended.  We're asking you to stop RealNetworks from

 7    selling a ripper in a pretty box.

 8              Thank you.

 9              THE COURT:  Thank you.

10              Subject to your reviewing -- if you have not already

11    done so -- the exhibit admission list and so forth, and making

12    sure that everything is in the record that you think is in the

13    record, then the matter is deemed submitted.

14              Yes?

15              MR. SINGLA:  I have one issue on the Record, Your

16    Honor.

17              THE COURT:  Uh-huh.

18              MR. SINGLA:  Which is that the deposition

19    designations that matters parties have submitted, both sides --

20              THE COURT:  Yes.

21              MR. SINGLA:  They have been lodged.  And we would

22    like the Court's guidance on how they should get into the file.

23              Will the Court file them?  Should we provide copies

24    to the clerk?  It's not a trial, so I'm not exactly sure what

25    the right process is.
```

```
 1              I want to make sure before the evidence closes --

 2          THE COURT:  Well, I use the same process we use for

 3   trial.

 4          MR. SINGLA:  Okay.

 5          THE COURT:  I must say, and we may contact you, there

 6   are -- but I'll try to do something a little bit differently

 7   before we do that.  Some of them, with that heavy blue

 8   highlighting and the font size -- my eyes are not that good.

 9          MR. SINGLA:  We can reprint.

10          THE COURT:  I don't think even your eyes are that

11   good.

12          MR. SINGLA:  They're not, Your Honor.

13          THE COURT:  They're a little hard to read.  It may be

14   that it's sufficient, you know, to use the DVD.  But, but I

15   don't know.  Sometimes, you know, it's helpful to be able to

16   read it as well.

17              So, we may, for some of them we may want to -- we may

18   ask for some copy where the font is a little bit larger.

19          MR. SINGLA:  Your Honor, should we just submit that?

20   We can certainly prepare that and submit it.

21          THE COURT:  Let's wait and see which ones we still

22   need to have that done, then.  Okay?

23          MR. SINGLA:  Okay.

24          THE COURT:  But, other than that, I think that -- I

25   mean, this has been an open proceeding.  And if there's any --
```

PROCEEDINGS                                                        1384

```
 1   any -- if there are any exhibits that are not supposed to be a
 2   part of the -- the unsealed record, then you should make sure
 3   that you let us know.
 4          But, you should make sure that whatever transcripts
 5   and so forth that you want in the record are in the record --
 6   by "transcripts," I mean transcripts of depositions -- are in
 7   the record, just as if it were a trial.
 8          MR. SINGLA:  Thank you, Your Honor.  With respect to
 9   the sealing issue, we did submit on Tuesday, I believe, binders
10   to the Court with copies of all the exhibits that have been
11   admitted in the hearing.
12          THE COURT:  Uh-huh.
13          MR. SINGLA:  And I believe the exhibit list indicates
14   what is under seal and what's not under seal.
15          THE COURT:  Okay.  I did not go through that.
16          MR. SINGLA:  We will try and just put together a
17   joint motion to seal the appropriate exhibits.
18          THE COURT:  Okay, fine.  Because I -- I haven't
19   looked at that.  I was looking at the deposition transcripts
20   and so forth.
21          MR. SINGLA:  Certainly.  Thank you, Your Honor.
22          THE COURT:  Yes.  Is there anything else?
23          MR. CUNNINGHAM:  Yes, two, two issues.  One, I think
24   that there was a lack of agreement regarding a set of
25   declarations that we contend the Court should consider.  And
```

1   those -- pardon me -- were the declarations submitted in

2   connection with the spoliation motion.

3        We contend that they are relevant to considering the

4   credibility of Nicole Hamilton, and that's the reason we are

5   offering them.  And then --

6        **THE COURT:**  Because there was already a ruling, you

7   got that, on the spoliation motion.

8        **MR. CUNNINGHAM:**  Yes, Your Honor.  So, to be clear,

9   then, because Nicole Hamilton's deposition testimony has been

10  submitted, we believe that in assessing her credibility in

11  connection with the subject matters in that deposition

12  testimony, the Court should consider the fact that she's been

13  contradicted on certain points, and that contradiction

14  testimony comes in the spoliation declarations.

15       And that she has a bias against the company, and a

16  certain aspect of that bias is established by the declarations

17  of Bill Way and Tracy Tosh Lane concerning the incident, and

18  you guys -- you -- the Court has heard about before, where

19  there was a contention regarding her demand for a payment for

20  her testimony, that the company would not make.

21       **MR. WILLIAMS:**  Our only objection, Your Honor, we

22  would make it for the record, but our only objection really is

23  the inability to cross-examine those witnesses.

24       With respect to the deposition testimony that the

25  Court is relying upon as part of the record on the preliminary

PROCEEDINGS 1386

1   injunction motion, the parties have had an opportunity to

2   cross-examine those witnesses.

3        We did not get an opportunity with respect to the

4   spoliation motion, because we didn't know that Real was going

5   to be offering those in support of the motion.  That's the

6   basis of our objection to those materials.

7        **THE COURT:**  Were any -- which of those witnesses were

8   not deposed?

9        **MR. WILLIAMS:**  Mr. Way, Ms. Tosh Lane --

10       **MR. SINGLA:**  Mr. DeWitt (Phonetic).

11       **MR. WILLIAMS:**  Mr. DeWitt.

12       **MR. SINGLA:**  There was another engineer -- there was

13  four or five of them, Your Honor, that we did not depose.

14       The other point I would make, Your Honor, is that we

15  did not know until after the close of the hearing evidence that

16  they were going to try to offer these spoliation declarations

17  and I don't know what else in support of a preliminary

18  injunction motion, or with respect to the preliminary

19  injunction motion.  They didn't attach it to their preliminary

20  injunction papers.  We had no notice, no opportunity to respond

21  to those declarations.

22       So, for that reason, we think it's unfair to have

23  that evidence come in and be considered with respect to the --

24  with respect to the preliminary injunction.  There was a number

25  of witnesses we didn't have deposed.

```
 1              THE COURT:  Well, if -- they were declarations for a
 2   different purpose, essentially.
 3              MR. SINGLA:  Yes, Your Honor.
 4              THE COURT:  And no deposition, so I think it's
 5   awfully hard to consider them fairly.
 6              MR. CUNNINGHAM:  Your Honor, a number of the
 7   witnesses for whom we submit the declarations who are primarily
 8   contradicting Ms. Hamilton on a point regarding spoliation,
 9   they were deposed.  They weren't deposed about those
10   declarations, they were deposed prior to those declarations.
11   But, we are prepared to submit the matter.
12              The second issue I wanted to raise is just -- not to
13   be perseverating on this point, but we would like to formally
14   proffer the Biddle declaration.  We will make sure that the
15   version on file is signed, since that was --
16              THE COURT:  I think the one that I got -- excuse me.
17   I think the one that I got, there was an appended page.  Looked
18   like some old-fashioned kind of copying device that was used.
19   And it was signed.
20              MR. CUNNINGHAM:  It was.  I think that just --
21              THE COURT:  Uh-huh.
22              MR. CUNNINGHAM:  I believe Mr. Biddle took a picture
23   with his cell phone, because that was all that was available.
24              We will submit a more traditional signed declaration.
25              THE COURT:  That's fine.  I can consider that as a
```

1   proffer.  But, the ruling stands.

2              MR. CUNNINGHAM:  And that's why we would submit it,

3   Your Honor.  Thank you.

4              THE COURT:  Okay.

5              MR. STEER:  And Your Honor, I have the corrected

6   slide deck that I mentioned earlier.

7              THE COURT:  Oh, yes.  Okay.

8              MR. STEER:  And, if I may hand it up?

9              THE COURT:  Yes.

10             MR. STEER:  Thank you.

11             THE COURT:  And what was -- the pagination, is that

12  it?  Or --

13             MR. STEER:  No, there was graying out of a couple of

14  the --

15             THE COURT:  Oh, the part that was grayed out.  Yes.

16  Okay.  That's fine.  Thank you.

17             MR. STEER:  And of course, it does contain highly

18  confidential information, so should be maintained under seal.

19             THE COURT:  Yes.

20             MR. STEER:  Thank you.

21             THE COURT:  Okay.

22             MR. SCOTT:  Thank you, Your Honor.

23             THE COURT:  Okay.

24             MR. CUNNINGHAM:  Thank you.

25             THE COURT:  Okay, the matter is submitted.  If you

1  need to clarify anything as far as what is in the record --

2  exhibits, whatever -- you can do that with Mr. Bowser.

3          Thank you very much.

4          **MR. WILLIAMS:**  Thank you very much, Your Honor.

5          **THE COURT:**  Thank you all.

6          (Proceedings concluded at 3:37 p.m.)

7                          - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                    1390

1                          **I N D E X**

2                                              **PAGE**   **VOL.**

3   Closing Argument by Mr. Williams          1211      5
    Closing Argument by Mr. Singla            1215      5
4   Closing Argument by Mr. Williams          1242      5
    Closing Argument by Mr. Steer             1266      5
5   Closing Argument by Mr. Scott             1286      5
    Rebuttal Argument by Mr. Williams         1353      5
6   Rebuttal Argument by Mr. Singla           1364      5
    Rebuttal Argument by Mr. Mick             1373      5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTERS**</u>

3          We, KATHERINE POWELL SULLIVAN and BELLE BALL, Official

4   Reporters for the United States Court, Northern District of

5   California, hereby certify that the foregoing proceedings in

6   08-4548 and 08-4719, RealNetworks, Inc., et al. vs. DVD Company

7   Control Association, Inc., et al. were reported by us,

8   certified shorthand reporters, and were thereafter transcribed

9   under our direction into typewriting; that the foregoing is a

10  full, complete and true record of said proceedings as bound by

11  us at the time of filing.

12

13                    s/b Katherine Powell Sullivan
                   _____
14
            Katherine Powell Sullivan, CSR #5812, RPR, CRR
15                      U.S. Court Reporter

16

17                         s/b Belle Ball
                   _____
18
               Belle Ball, CSR #8785, RPR, CRR
19                      U.S. Court Reporter

20

21                        May 22, 2009

22

23

24

25