1  JAMES A. DiBOISE, State Bar No. 83296
   Email: jdiboise@wsgr.com
2  LEO P. CUNNINGHAM, State Bar No. 121605
   Email: lcunningham@wsgr.com
3  COLLEEN BAL, State Bar No. 167637
   Email: cbal@wsgr.com
4  MICHAEL A. BERTA, State Bar No. 194650
   Email: mberta@wsgr.com
5  TRACY TOSH LANE, State Bar No. 184666
   Email: ttosh@wsgr.com
6  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
7  One Market Street
   Spear Tower, Suite 3300
8  San Francisco, CA 94105

9  Attorneys for Plaintiffs and
   Counterclaim Defendants
10 REALNETWORKS, INC. and
   REALNETWORKS HOME
11 ENTERTAINMENT, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALNETWORKS, INC., a Washington Corporation; and REALNETWORKS HOME ENTERTAINMENT, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DVD COPY CONTROL ASSOCIATION, INC., a Delaware nonprofit corporation, DISNEY ENTERPRISES, INC., a Delaware corporation; PARAMOUNT PICTURES CORP., a Delaware corporation; SONY PICTURES ENTER., INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORP., a Delaware corporation; NBC UNIVERSAL, INC., a Delaware corporation; WARNER BROS. ENTER. INC., a Delaware corporation; and VIACOM, Inc., a Delaware Corporation,<br><br>Defendants.<br><br>AND RELATED CASES | Case Nos. C08 04548 MHP;<br>C08 04719 MHP<br><br>**DECLARATION OF PETER BIDDLE IN SUPPORT OF PLAINTIFFS REALNETWORKS, INC. AND REALNETWORKS HOME ENTERTAINMENT, INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   May 21, 2009<br>Time:   9:00 p.m.<br>Courtroom:   15<br><br>Before: Hon. Marilyn Hall Patel |

DECLARATION OF PETER BIDDLE
CASE NOS.: C08 04548 MHP; C08 04719 MHP

I, Peter Biddle, declare:

1. I am currently employed as the Director of the Google Program Office at Intel Corporation. I have been asked to provide this Declaration and understand that it is in support of RealNetworks' Opposition to the DVD CCA and Studios' Motions for Preliminary Injunction. I am over the age of eighteen, and I have personal knowledge of the facts set forth herein. If called as a witness, I could and would testify competently to the contents of this Declaration.

2. From approximately 1990 to 2007, I worked for Microsoft Corporation in various roles, including as a Hardware Technical Evangelist for certain Windows storage technology, which involved CDs and DVDs. In this role as a technical strategist between Microsoft and external standards bodies and companies, I worked with internal Microsoft product teams as well as with other members of the industry to introduce and promote Microsoft specific technology. Also during my time at Microsoft, I assembled and led an engineering team of approximately 75 engineers who developed security system software including BitLocker Drive Encryption, which is a security system for Windows.

3. While at Microsoft, and as discussed below, I was deeply involved in DVD video and the DVD format as a founding member of the Copy Protection Technical Working Group ("CPTWG"), which is the standards-setting group that negotiated and drafted what ultimately became the CSS License Agreement. I personally participated in the negotiation of the CSS License Agreement and its predecessor, the interim CSS license agreement.

4. In the course of the negotiations over the CSS License Agreement, I participated in and contributed specific language to the drafting of the original CSS License Agreement and accompanying technical documents.

5. While I have been generally aware of the litigation between RealNetworks, the DVD CCA and the movie studios for some time, I only recently became aware of the specific assertions made by the DVD CCA and the movie studios regarding the intent and meaning of the CSS License Agreement and accompanying documents. I have first hand knowledge

regarding the negotiation and drafting of the original CSS License Agreement and accompanying documents.

6. As one of the founders of CPTWG, I attended most of the CPTWG meetings from 1996 through 1998, the time frame in which the primary topic of those meetings was the negotiation and drafting of the original CSS License Agreement and accompanying specifications. My participation in the negotiation and drafting of these documents occurred over the course of more than 30 meetings. I represented Microsoft in those meetings as Microsoft's lead representative with respect to the negotiation and drafting of the original CSS License Agreement and specifications. During this time, I reported on the status of the CSS negotiations to senior executives at Microsoft, including Bill Gates. Microsoft's executives took an active interest in the CSS negotiations in the course of determining whether Microsoft would support DVD technology in the computer environment.

7. I recall discussions during the CPTWG meetings regarding the movie studios' position that the CSS Agreement should contain a blanket prohibition on "copying" DVD content. I recall that Marsha King and her superior, Chris Cookson, took part in these discussions. The computer industry representatives did not agree to such a prohibition. With respect to this issue, I repeatedly explained that such a prohibition would be extremely difficult to implement, impossible to rigorously enforce, and would put Microsoft's Windows operating system at a competitive disadvantage to other operating systems. From the standpoint of software architecture, copying is a fundamental and necessary part of the operation of a computer, and there were a variety of scenarios where the ability to copy CSS data and video content was both necessary and desirable. I specifically discussed the fact that the Windows operating system uses copying operations such as pre-fetching, caching and page-filing to a hard drive as part of its functionality, and that a copying prohibition would interfere with these existing Windows operations.

8. Microsoft's position during these negotiations was that if the Studios wished to allow computers the ability to play DVDs, the CSS License had to be drafted to allow computer
DECLARATION OF PETER BIDDLE      2
CASE NOS.: C08 04548 MHP; C08 04719 MHP

and software manufacturers the flexibility to implement their products to account for different computer architectures, including architectures that did not exist at the time. Because computer and software products rapidly evolve, the CSS License was designed to enable computer manufacturers to have significant freedom in the internal implementation of CSS technology. In exchange, rigorous controls were put in place to prevent the leakage of CSS algorithms, unencrypted CSS keys or unscrambled compressed CSS video content from a computer system. In my view, consistent with these goals, the final agreement enabled copying of CSS data within the computer system, as long as the output controls were drafted and implemented to protect unencrypted keys or video data from being available outside of the CSS software.

9.  I recall explaining the concept of buffering (or caching) as just one example of how computers regularly engage in copying DVD content. The example of "buffering" is one reason why a blanket ban on "copying" was untenable from the standpoint of the computer industry. "Buffering" was offered as an example. It was never agreed or written into the CSS agreement that "buffering" would be the only type of copying allowed. Instead, it was one reason that a prohibition on copying was not feasible or acceptable to the computer industry.

10. While there was much discussion around the concept of "copying," there was no agreement reached – either explicitly or implicitly – during the negotiations or drafting of the CSS License Agreement (and accompanying documents) that there would be a prohibition on copying. As I was drafting the documents, I considered it to be my primary job to ensure that there was no prohibition on copying in the CSS documents. As Microsoft's representative, I could not have agreed to such a prohibition and I verified that no such prohibition appeared in the final CSS documents. I also discussed the movie studios' position with other members of the computer industry who also refused to agree to such a prohibition. Despite not having any agreement or language in the agreement regarding an anti-copying provision, the parties concluded the license and moved on.

11. I personally drafted language for inclusion in the technical documentation. For example, I drafted the language around the term "user-accessible bus" as a way to address the

types of restrictions to protect CSS keys and content in a computer system. This language was intended to disallow carrying unencrypted CSS keys and unscrambled compressed CSS video data over certain types of computer connections, and require that if such connections were used, the CSS data had to be adequately protected. The idea behind the bus-authentication and bus-encryption/decryption scheme was to provide a way to protect the CSS keys on their way to the computer system. With respect to bus-authentication and encryption/decryption, I sought flexibility in the implementation of the CSS system to allow for the possibility that, as long as the DVD content was obtained from a DVD in an authorized manner, the computer system would have the ability to use that DVD content without needing to interact with the DVD Drive any further. Once the CSS data was securely brought into the computer system, the software developer was left free to use whatever memory they chose and to store the CSS keys and video content for an indeterminate length of time, as long as the unscrambled video content, unencrypted CSS keys and the CSS algorithms were reasonably protected from discovery from outside of the computer software.

12. During the drafting of the CSS documentation, I was aware that the CSS requirements would allow copies of CSS video data and encrypted CSS keys to be made. For example, I was aware that the CSS documentation would allow encrypted CSS video content and encrypted keys to be stored to flash memory in a computer processor. I was also aware that copies of this data could be made to other memory devices, such as hard drives, as long as the data was protected. At the time, it was important to Microsoft and the computer industry that the CSS License preserve this flexibility to allow future innovation in software and computer products.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Seattle, Washington on May 20, 2009.

/s/
Peter Biddle

types of restrictions to protect CSS keys and content in a computer system. This language was intended to disallow carrying unencrypted CSS keys and unscrambled compressed CSS video data over certain types of computer connections, and require that if such connections were used, the CSS data had to be adequately protected. The idea behind the bus-authentication and bus-encryption/decryption scheme was to provide a way to protect the CSS keys on their way to the computer system. With respect to bus-authentication and encryption/decryption, I sought flexibility in the implementation of the CSS system to allow for the possibility that, as long as the DVD content was obtained from a DVD in an authorized manner, the computer system would have the ability to use that DVD content without needing to interact with the DVD Drive any further. Once the CSS data was securely brought into the computer system, the software developer was left free to use whatever memory they chose and to store the CSS keys and video content for an indeterminate length of time, as long as the unscrambled video content, unencrypted CSS keys and the CSS algorithms were reasonably protected from discovery from outside of the computer software.

    12.    During the drafting of the CSS documentation, I was aware that the CSS requirements would allow copies of CSS video data and encrypted CSS keys to be made. For example, I was aware that the CSS documentation would allow encrypted CSS video content and encrypted keys to be stored to flash memory in a computer processor. I was also aware that copies of this data could be made to other memory devices, such as hard drives, as long as the data was protected. At the time, it was important to Microsoft and the computer industry that the CSS License preserve this flexibility to allow future innovation in software and computer products.

    I declare under penalty of perjury that the foregoing is true and correct. Executed at Seattle, Washington on May 20, 2009.

*[signature]*

Peter Biddle

DECLARATION OF PETER BIDDLE     4
CASE NOS.: C08 04548 MHP: C08 04719 MHP