**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

REALNETWORKS, INC., a Washington
Corporation; and REALNETWORKS HOME
ENTERTAINMENT, INC., a Delaware
Corporation

            Plaintiffs and Counter-
            defendants,

  v.

DVD COPY CONTROL ASSOCIATION,
INC., a Delaware nonprofit corporation,
DISNEY ENTERPRISES, INC., a Delaware
corporation; PARAMOUNT PICTURES
CORP., a Delaware corporation; SONY
PICTURES ENTER., INC., a Delaware
corporation; TWENTIETH CENTURY FOX
FILM CORP., a Delaware corporation; NBC
UNIVERSAL, INC., a Delaware corporation;
WARNER BROS. ENTER. INC., a Delaware
corporation; and VIACOM, Inc., a Delaware
Corporation,

            Defendants and Counter-
            complainants.

_____/

UNIVERSAL CITY STUDIOS
PRODUCTIONS L.L.L.P., UNIVERSAL
CITY STUDIOS L.L.L.P., PARAMOUNT
PICTURES CORPORATION, TWENTIETH
CENTURY FOX FILM CORP., SONY
PICTURES TELEVISION INC., COLUMBIA
PICTURES INDUSTRIES, INC., SONY
PICTURES ENTERTAINMENT INC.,
DISNEY ENTERPRISES, INC., WALT
DISNEY PICTURES and WARNER BROS.
ENTER. INC.,

            Plaintiffs,

  v.

REALNETWORKS, INC., a Washington
Corporation; and REALNETWORKS HOME
ENTERTAINMENT, INC., a Delaware
Corporation

            Defendants.

_____/

No. C 08-04548 MHP


**MEMORANDUM & ORDER**

**Re: Studio Plaintiffs' and DVD Copy
Control Association's Motion for
Preliminary Injunction**


No. C 08-04719 MHP

BACKGROUND

On September 30, 2008, RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. (together, "Real")  brought action in this court against the DVD Copy Control Association, Inc. ("DVD CCA") and several major motion picture studios, seeking a declaratory judgment that Real has neither breached its license agreement with DVD CCA nor violated the Digital Millennium Copyright Act, 17 U.S.C. sections 1201 et seq. ("DMCA") by manufacturing and distributing its "RealDVD" product.  That same day, several major motion picture studios brought action in the United States District Court for the Central District of California to enjoin Real from manufacturing, distributing or otherwise trafficking in RealDVD, in alleged violation of the DMCA and as a breach of contract.  The Central District case was transferred to this court, where the cases were related and consolidated.

Following an October 3, 2008 hearing, the court granted the motion picture studios' requested Temporary Restraining Order ("TRO") to restrain and enjoin Real from manufacturing, distributing or otherwise trafficking in RealDVD or any products substantially similar.  The TRO has been extended several times at the consent of all parties pending the completion of the motion picture studios' and the DVD CCA's motions for a preliminary injunction, which is now before the court.  The hearing on this matter was held over five days in April and May 2009.

Having considered the parties' submissions, arguments of counsel, and the case file, the court rules as follows on the preliminary injunction motion.  The court makes the following Findings of Fact and Conclusions of Law to support its ruling.  To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

/////
/////
/////
/////
/////

FINDINGS OF FACT

I.      Parties

        A.      RealNetworks, Inc.

        1.  RealNetworks, Inc. is a company incorporated and based in Seattle, Washington, that develops, manufactures and sells platforms for the delivery of digital media.  See Amended Complaint for Declaratory Relief, Docket No. 62, ¶ 10, Exh. A ("Compl.").[1]  RealNetworks Home Entertainment, Inc. is a subsidiary of RealNetworks, Inc. and is incorporated in Delaware, with its principal place of business in Seattle, Washington.  Id. ¶ 11.

        2.  Real started fifteen years ago as a pioneer in the market for technology that relates to the delivery of audio and video content over the Internet.  See Hearing Tr. (Glaser) at 440:8-9, 440:21-441:19.  Today, Real sells several popular product lines that deliver streaming audio and video of copyrighted content online, which Real licenses from content owners in the film, television, music and electronic gaming industry.  Id. at 442:7-14.

        3.  Real has never been accused of copyright infringement from a major content provider.  Id. at 443:17-23.  Real has brought and prevailed on DMCA claims for circumvention of Real's access control and copy protection measures it affords to content owners.  See RealNetworks, Inc. v. Streambox, Inc., 2000 WL 127311, *8 (W.D. Wash. Jan. 18, 2000).

        B.      Motion Picture Studios

        4.  The motion picture studios involved in this consolidated action, as either plaintiffs and counter-defendants or declaratory relief claim defendants, are: Disney Enterprises, Inc., Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc., Warner Bros. Entertainment, Inc., Viacom, Inc., Universal City Studios Productions L.L.L.P., Universal City Studios L.L.L.P., Sony Pictures Television, Inc., Columbia Pictures Industries, Inc., and Walt Disney Pictures (collectively, "Studios").

        5.  The Studios are content owners of copyrighted works, including movies and recorded television programs.  The Studios or their subsidiaries distribute their movies on Digital Versatile Disks ("DVDs").  See Studios' Answer, Docket No. 59, ¶ 20.

United States District Court
For the Northern District of California

C.    DVD CCA

6.  DVD CCA is a not-for-profit corporation that consists of companies in the motion picture, consumer electronics and computer (hardware and software) industries.  Compl. ¶ 4.  These three industry groups represent the content providers, the consumer electronics manufacturers and the information technology companies.  See Nelson Dec., Docket No. 217, Exh. 7 (Parsons Dep.) at 23:2-6.  Certain of the Studios in this action, namely, Walt Disney Pictures, Paramount Pictures Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., Universal City Studios L.L.L.P. and Warner Bros. Entertainment, Inc., are members of the DVD CCA.  See Studios' Answer ¶ 4.

7.  DVD CCA is governed by a twelve-member Board of Directors.  DVD CCA's Certificate of Incorporation provides for five "Motion Picture Company Directors," three "Consumer Electronics Manufacturer Directors," three "Computer Manufacturer Directors," and one "At Large" director.  Suppl. Pak Dec., Docket No. 249, ¶ 2 & Exh. A.

8.  The purpose of DVD CCA is to license technology relating to content protection for DVDs.  Nelson Dec., Exh. 7 (Parsons Dep.) at 22:1-3.  Specifically, DVD CCA licenses Content Scramble System ("CSS") technology to manufacturers of DVD devices and software pursuant to a standard license agreement ("CSS License Agreement").  Compl. ¶ 4; Pak Dec., Docket No. 199, ¶ 2.

9.  The CSS License Agreement confers third-party beneficiary rights on any "Eligible Content Provider," as defined in Section 9.5 of that agreement.  Id.  As such, these Studios are Eligible Content Providers and third-party beneficiaries with standing to assert claims for breach of contract of the CSS License Agreement.  See Counter-Complaint,  Docket No. 15, ¶¶ 34-50, Studios' Answer ¶ 4.

II.    CSS Technology

10.  The CSS technology grew out of a series of meetings of a group known as the Copy Protection Technical Working Group ("CPTWG").  Parsons Dec., Docket No. 199, ¶ 4; Hearing Tr. (King) at 75:14-76:5.  During a series of CPTWG meetings that began in approximately the mid-1990s, representatives from the motion picture, consumer electronics and computer industries

all recognized the common benefit to be gained in adopting a single and standard format, the DVD, for delivering digital content to the public.  Id.  However, the motion picture companies were concerned about the possible distribution of their copyrighted content on DVDs without a system to prevent the high-quality digital format from being copied by consumers.  Hearing Tr. (King) at 73:20-74:12; 91:19-92:2.  The consumer electronics and information technology companies, for their part, wanted a content protection system that could be implemented without adding significantly to the cost of their products.  Parsons Dec. ¶ 4.

11.  Following many meetings, the DVD video format was adopted as the standard digital medium for home distribution of movies and the three industries, through the CPTWG, endorsed CSS as an encryption scheme to protect movies on DVDs from being copied.  The CSS technology was specifically developed to create a secure system for the dissemination and playback of copyrighted content on DVDs, while preventing copying, so that consumers would be able to play all DVDs on all players.  Hearing Tr. (King) at 79:22-82:12; see also, Universal City Studios, Inc. v. Reimerdes, 111 F. Supp.2d 294, 309-311 (S.D.N.Y. 2000)(describing history and development of CSS), aff'd, Universal City Studios, Inc. v. Corley, 273 F.3d 429, 436-37 (2d Cir. 2001)(same).

12.  The CSS technology is, at its core, an encryption-based system that employs an algorithm configured by a set of security "keys" to encrypt a DVD's contents.  CSS encrypts the content on DVDs, scrambles the video content and renders it unusable and unplayable to the user, unless and until the content is decrypted with CSS keys.  Kelly Dec., Docket No. 365, ¶ 19; Hearing Tr. (Schumann) at 285:22-286:5.  A DVD that has been CSS-protected requires the algorithm configured by a set of CSS keys to perform a series of steps, which results in unlocking the protected content and unscrambling and playing back a motion picture or other content that has been CSS-protected on a DVD.  Kelly Dec. ¶¶ 16-17.

13.  The CSS system combines multiple layers of encryption with an authentication process to protect a DVD's (typically-copyrighted) video content from unauthorized access or unauthorized consumer copying.  Pak Dec. ¶ 3; Parsons Dec. ¶ 3; Hearing Tr. (Kelly) at 151:21-23; Hearing Tr. (Bishop) at 755:3-5; see also, Pak Dec., Exh. J (Recital A).  The CSS system's set of protections includes DVD drive-locking, secure storage of keys on a DVD, CSS authentication, CSS bus

**United States District Court**
For the Northern District of California

1   encryption, and CSS content encryption.  Schumann Dec., Docket No. 204, Exh. A, ¶¶ 22-33;

2   Hearing Tr. (Bishop) at 755:16-756:8.

3        14.  CSS technology requires that a DVD drive "lock" upon insertion of a CSS-protected

4   DVD and prevent access to its contents until an CSS-authorized player engages in an authentication

5   procedure, akin to a secret handshake, to establish mutual "trust."  Hearing Tr. (Schumann) at

6   272:17-25; Schumann Dec., Exh. A, ¶¶ 25, 28-30; Hearing Tr. (Bishop) 786:21-24.  Upon the

7   insertion of a CSS-protected DVD, a DVD drive recognizes that a disc is present, that the DVD has

8   CSS protection technology on it, and that the DVD content cannot be released before an

9   authentication process occurs.  Hearing Tr. (Schumann) at 274:2-15.

10        15.  CSS technology requires that players authenticate themselves to DVD drives to establish

11   mutual trust, both to "unlock" the DVD and gain access to its protected video contents and also

12   separately to gain access to keys stored in secure areas of the DVD, which then decrypt and

13   descramble the DVD content.  Hearing Tr. (Schumann) at 276:17-23; 277:9-11; 278:4-11; 281:4-13;

14   Hearing Tr. (Bishop) at 755:25-756:5; Schumann Dec., Exh. A, ¶¶ 25-30.  The drive-locking and

15   authentication steps of the CSS technology thus tie the playback of the DVD content to the DVD

16   itself in an authorized DVD drive.  Id.  The process of authentication with the DVD drive, and

17   subsequent content decryption, will fail if a DVD is not in the DVD drive.  Hearing Tr. (Schumann)

18   at 277:9-11; Schumann Dec., Exh. A., ¶ 28.

19        16.  The CSS technology creates a system whereby a movie or other video content on a DVD

20   may only be played back in decrypted and unscrambled form from the physical DVD and not any

21   other source, such as a computer hard drive.  Schumann Dec., Exh. A, ¶¶ 28-30.  This same system

22   ensures that "playable," i.e., decrypted and descrambled, copies of the DVD's video content cannot

23   be made.  Id. ¶ 22.

24        17.  As DVD content owners and DVD distributors, the Studios rely on CSS protection to

25   garner profits from their copyrighted works.  In the aggregate, the Studios received revenues of

26   approximately $12.5 billion from the sale of DVDs (net of returns) in 2007.  Dunn Dec. ISO Pl.'s

27   Application for TRO, Sept. 29, 2008, ¶ 4.  In addition, the Studios received aggregate revenues of

28   approximately $2 billion from outlets that rent DVDs in 2007, id. ¶ 12; over $200 million from

1    Internet downloads of DVD content in 2007, id. ¶ 14; and approximately $600 million from

2    video-on-demand and pay-per-view services in 2007, id. ¶ 16.

3    III.    CSS License Agreement

4            18.  Following the development and the CPTWG's endorsement of CSS technology, an

5    interim license agreement was developed so that companies wishing to use the CSS technology to

6    distribute copyrighted content on DVDs or to manufacture and sell devices that playback DVDs

7    could license CSS technology.  Hearing Tr. (King) at 81:19-82:12; 85:13-86:9.  Representatives of

8    the three main industries that comprised the CPTWG, i.e., the motion picture, consumer electronics

9    and computer industries, engaged in the negotiation of the interim license agreement.  Id. at

10   77:13-20; 82:4-12.

11           19.  Matsushita Electric Industrial Company Ltd. ("Matsushita") and Toshiba Corporation

12   ("Toshiba") owned the underlying intellectual property for CSS.  Id. at 86:12-87:7; 89-9-90-1; Pak

13   Dec., Exh. J (Recital A).  Counsel for Matsushita served as the primary drafter of the agreement, and

14   Matsushita handled the initial licensing of CSS prior to the formation of the DVD CCA.  Id. at

15   86:24-87:7; 89:16-17; 93:11-12.

16           20.  When the DVD CCA was formed in 1999, Matsushita and Toshiba granted the DVD

17   CCA a royalty-free license in CSS technology and the DVD CCA became the sole licensor and

18   administrator of CSS technology under the CSS License Agreement.  Hearing Tr. (King) at

19   89:13-18; 98:10-99:17; Pak Dec. ¶ 2.

20           21.  Manufacturers of authorized DVD players utilize CSS technology obtained pursuant to

21   the CSS License Agreement to build licensed player devices.  Still today, DVD CCA remains the

22   sole entity responsible for licensing CSS to manufacturers of DVD hardware, discs, and related

23   products.  Pak Dec. ¶ 2.

24           22.  More than 300 companies have licensed CSS from DVD CCA.  Parsons Dec. ¶ 5.  CSS

25   licensees include the owners and manufacturers of the content distributed on CSS-protected DVDs,

26   creators of encryption engines, hardware and software decrypters, and manufacturers of DVD

27   players and DVD-ROM drives.  Pak Dec. ¶ 2.  CSS has been implemented in millions of DVD

28

7

1    players and computers worldwide and is used to protect the content on hundreds of millions of

2    DVDs.  Parsons Dec. ¶ 5.

3        23.  Each company that obtains a license from DVD CCA agrees to comply with the uniform

4    set of rules set forth in the CSS license that are intended to safeguard CSS-protected content and to

5    prevent copying of DVD content.  Id. ¶ 6; see also Pak Dec., Exh. J, § 4.2.1 ("Licensee shall comply

6    with the CSS Specifications as may be amended from time to time by Licensor in accordance with

7    the By-Laws.  Each DVD Product [made by Licensee] shall comply with the version of the CSS

8    Specifications which is in effect at the time such DVD Product is manufactured . . . .").

9        24.  DVD CCA retains the ability to enforce the CSS License Agreement and  to force

10   licensees to remove non-compliant products from the market.  The CSS License Agreement

11   specifically authorizes DVD CCA to obtain preliminary or permanent injunctive relief for a breach

12   of the agreement for the sale of non-compliant products or for otherwise "making available the

13   means for widespread unauthorized copying of copyrighted content intended to be protected using

14   CSS,".  Pak Dec., Exh. J (§ 9.2); Parsons Dec. ¶ 5.  The Agreement also states the injury to a party

15   arising from a breach of the agreement "will be irreparable."  Id.

16       A.    The Licensing Process and the CSS License Agreement with Real

17       25.  Any company, including Real, is required to obtain a CSS license in order to build a

18   product that implements CSS technology, and a CSS license is required to interact with

19   CSS-protected DVDs.  Nelson Dec., Exh. 6 (Pak Dep.) at 49:11-20.

20       26.  The CSS License Agreement is a standard form agreement.  Nelson Dec., Exh. 6 (Pak

21   Dep.) at 14:2-15:3; Pak Dec., Exh. J.  It is accompanied by a set of specifications called the

22   Procedural Specifications, which are freely available on the DVD CCA website, to provide

23   prospective licensees additional detail about the terms and conditions of use of the CSS technology.

24   Nelson Dec., Exh. 6 (Pak Dep.) at 73:12-20; Pak Dec., Exh. P.

25       27.  To become a CSS licensee, an interested party must submit a properly executed license

26   application, select a category of membership (the available categories are listed in Exhibit C to the

27   License Agreement), and pay the requisite fee.  Nelson Dec., Exh. 6 (Pak Dep.) at 62:5-14; Pak

28   Dec., Exh. J.  These procedures are set forth step by step on the DVD CCA website, along with links

to explain the licensing process, CSS technology, and its purpose, along with downloadable documents, a "Frequently Asked Questions" page, and other information on CSS membership categories.  Pak Dec. ¶¶ 7-8.

28.  The CSS webpage of the DVD CCA website provides an overview of the licensing process and specifically directs prospective licensees how to proceed, depending on what type of implementation the prospective licensee has in its plans.  Prospective licensees are guided through the application process step by step and a flowchart of the process is provided, which includes a step whereby DVD CCA verifies the completeness and validity of the information provided and gives the prospective licensee feedback on its status.  Id. ¶¶ 9-16.

29.  Prospective licensees are not permitted to negotiate any aspect of the CSS License or Procedural Specifications.  Id. at 72:10-15.  Nor does DVD CCA offer prospective licensees any legal advice about the License Agreement or the Procedural Specifications at any time—whether the advice concerns specific terms, membership categories, or more general questions about compliance.  Nelson Dec., Exh. 6 (Pak Dep.) at 68:1-6; 70:1-73:20; 77:10-78:11; 83:11-84:4; Nelson Dec., Exh. 7 (Parsons Dep.) at 204:2-22; 205:2-4.

30. In or about August 2007, Real executed Version 1.2 of the CSS License Agreement and became one of approximately 300 CSS licensees.  Nelson Dec., Exh. 6 (Pak Dep.) at 39:20-23; 47:2-5; Pak Dec., Exh. J.  Real paid approximately $30,000 to become a CSS Licensee.  Pak Dec., Exh. J at C-1.

31.  The process whereby Real became a CSS licensee was by following the standard operating procedure and licensing procedure set forth on the DVD CCA website and as described above.  DVD CCA licensing administrators assisted with the process and provided documentation and feedback in accordance with DVD CCA's standard licensing practice.  Pak Dec. ¶¶ 18-21.  Real selected its membership category by identifying the types of technology for which it sought a license, e.g., DVD Player, DVD Drive, Descrambler, Authenticator, etc.  Id. ¶ 14.

32.  The CSS specifications that Real received after it executed the CSS License Agreement were the following technical specifications: CSS General Specifications (Pak Dec., Exh. L), Authenticator Module for CSS Decryption Module (Pak Dec., Exh. N); DVD-Video Descrambler

9

United States District Court

For the Northern District of California

1   (Pak Dec., Exh. M); and Authenticator Module for DVD Drive (Pak. Dec., Exh. O).  Hearing Tr.

2   (Bielman) at 1044:15-21; 1052:7-20.  These specifications are never provided to prospective

3   licensees prior to execution of the CSS License, and thus were not provided to Real prior to August

4   2007.  Nelson Dec., Exh. 6 (Pak Dep.) at 73:25-74:3.

5         33.  Together, the CSS License Agreement (Pak Dec., Exh. J), along with the CSS

6   Procedural Specifications (Pak Dec., Exh. P), and the above-enumerated technical specifications that

7   Real received from DVD CCA after it executed the License Agreement (Pak Dec., Exhs. L-O), make

8   up the "Agreement" between Real and DVD CCA.  Pak Dec. ¶ 24.  The CSS License Agreement

9   requires CSS licensees and "each DVD product" to "comply with the CSS Specifications" relevant

10  to the appropriate membership category for each licensee, wherein the confidential CSS

11  Specifications are delivered upon selection of the appropriate category and are "in effect at the time

12  such DVD product is manufactured."  Pak Dec., Exh J, §§ 4.1 &  4.2.1.

13        B.      Language of the Agreement

14        34.  The CSS License Agreement states on its first page that CSS was developed to "provide

15  reasonable security to the contents of DVD discs" and to "provide protection for copyrighted content

16  against unauthorized consumer copying."  Pak Dec., Exh. J (Recital A).

17        35.  The term "unauthorized copy" (and similar usages such as "unauthorized copying" and

18  "unauthorized consumer copying") as used in the CSS License Agreement means a copy of a

19  copyrighted work made without the authority of the copyright owner, or in any event a copy of a

20  CSS-protected copyrighted work made or facilitated through a use or an implementation of CSS not

21  permitted under the Agreement.  Pak Dec., Exh. J (Recital A; §§ 9.2 & 9.5).

22        36.  The reference to the word "unauthorized" prior to copying was inserted during the

23  drafting process to address concerns from representatives of the computer industry that a blanket

24  prohibition on all copying would be technically unworkable, because the playback of a DVD on a

25  computer requires making a temporary copy of a few seconds of DVD content in the computer's

26  memory.  Hearing Tr. (King) at 79:10-21.  This temporary copying, sometimes referred to as

27  "buffering" or "caching," is authorized because it is a necessary part of the playback process of a

28

1    DVD in all DVD playback devices.  Hearing Tr. (Schumann) at 290:13-23; Schumann Dec., Exh. B,

2    ¶¶ 6-9.

3          37.  The CSS Procedural Specifications bar circumvention of CSS technology, stating: "No

4    Circumvention.  Licensee shall not produce or sell devices or software (a) under color of this

5    Agreement, or (b) using CSS Confidential or Highly Confidential Information, where such devices

6    or software are designed to circumvent the requirements of this Section 6.2 [section entitled "Copy

7    Protection"]."  Pak Dec., Exh. P (§ 6.2.12).  That section sets forth the "conditions that must be

8    observed by CSS licensees with respect to access to, playback of and transmission of CSS Data . . ."

9    to promote "Copy Protection."  Id. (§ 6.2).

10          38.  The CSS Procedural Specifications define "Copy Protection Functions" as "(1) the

11    regional playback control, recordable media playback control, and digital and analog output

12    restrictions and protections required by Section 6.2 of the CSS Procedural Specifications to be

13    performed by and/or contained in the CSS Compliant Products and (2) the internal data and signal

14    restrictions and protections required by [other sections]."  Id. (§ 1.8)

15          39.  The CSS General Specifications set forth the following two objectives of CSS: "(1) To

16    make playback of copyrighted material on a DVD-ROM disc possible only on devices subject to

17    license terms that protect certain rights of the copyright owner of that material; and (2) To prevent

18    digital-to-digital copying in a personal computer environment."  Pak Dec., Exh. L (§ 1.2).

19          40.  The CSS General Specifications set forth the general security requirements of CSS:  "(1)

20    [CSS] is intended to prevent casual users from the unauthorized copying of copyrighted materials

21    recorded on DVD-Video/Audio Discs" and "(2) The security of the [CSS system] depends on the

22    secrecy of its Keys and Algorithms."  Pak Dec., Exh. L (§ 1.5).

23          41.  The CSS General Specifications logically require that the keys and the DVD's video

24    content be obtained directly from the physical DVD, at which time the keys are decrypted and the

25    video data is descrambled and sent to the display device, without any opportunity for interception of

26    the data and creation of a digital copy of the content.  Pak Dec., Exh. L (§ 2.1.2); Kelly Dec. ¶¶ 41-

27    42.

28

United States District Court
For the Northern District of California

11

42.   The purpose of this mandated process is to require a direct path whereby the video content is transmitted, thus preventing unauthorized interception and the creation of a copy of the keys and DVD video content on a storage device for future playback without the DVD, such as a computer hard drive.  Hearing Tr. (Kelly) at 175:18-176:17; Kelly Dec. ¶ 41.

43.   The Authenticator Module for CSS Decryption Module sets forth the objectives of the authentication and decryption processes so as to "prevent digital-to-digital copying in a personal computer environment" and "to prevent the unauthorized interception of data after mutual authentication," respectively.  Pak Dec., Exh. N (§ 1.1).

44.   The CSS License Agreement bars licensees from "us[ing] Confidential Information or Highly Confidential Information or any mentally retained recollections thereof to circumvent or copy the methods disclosed in Proprietary Information, Confidential Information, or Highly Confidential Information or to circumvent any obligations under this Agreement."  Pak Dec., Exh. J (§ 5.2(a)).

45.   The CSS License agreement expressly disclaims the grant of implied licenses, by stating: "licenses granted herein are the only licenses granted to Licensee, and that no other licenses are granted, expressly, by implication or by estoppel, now or in the future" and "all rights not expressly granted to Licensee under this Agreement in and to CSS and the Proprietary Information are reserved and retained by Licensor."  Pak Dec., Exh. J (§ 2.5).

IV.   RealDVD Products

46.   Prior to the TRO in this action, Real sold and distributed a software product known as RealDVD.  Compl. ¶ 2.  Real viewed RealDVD as a way to enter the digital video market.  Hearing Tr. (Glaser) at 444:14-445:2.  The RealDVD software that was briefly available on the market was referred to internally as "Vegas."  It was designed to be downloaded onto a personal computer with a Microsoft Windows operating system.  Hearing Tr. (Kelly) at 149:5-7; Hearing Tr. (Bishop) at 745:6-7.  The name Vegas was chosen for the software product because, according to Real's Senior Vice President, Phillip Barrett, "What happens in Vegas stays in Vegas." Blavin Dec., Docket No. 206, Exh. 1 (Barrett Dep.) at 64:25.

United States District Court

For the Northern District of California

47. RealDVD or Vegas has a variety of different functions, such as playing back DVDs placed into the computer's DVD drive, looking up information about the DVD from Internet databases, providing links to various information websites relevant to the chosen DVD and storing an image of the copy-protected DVD to a computer hard drive for safekeeping and later playback purposes. Compl. ¶ 2.

48. When a user inserts a CSS-protected DVD into the DVD Drive of a device running RealDVD software, the user is presented with options to (1) "play" the DVD without copying it onto the device's hard drive, (2) "play and save" the DVD, which allows the user to view the content while RealDVD makes a copy of the content on the device's hard drive, or (3) "save" the DVD, which commands RealDVD to simply copy the content from the DVD onto the device's hard drive so that it can be played later, without the DVD. Hearing Tr. (Kelly) at 191:6-192:14; Hearing Tr. (Bielman) at 1103:14-1104:12; Kelly Dec. ¶¶ 48, 51, 67-74.

49. According to Real's Chief Executive Officer, Robert Glaser, Real was aware of a number of products on the market that allow consumers to make personal copies of DVDs, including: (1) a product by AMX that allows consumers to record DVDs onto a hard drive; (2) a product by Telestream, Inc., that allows consumers to make a secure copy of a DVD to the hard drive of a Macintosh computer; and (3) a product by Kaleidescape, Inc. ("Kaleidescape"), that allows consumers to make secure copies of CSS-encrypted DVDs to a proprietary collection of hard drives. Hearing Tr. (Glaser) at 445:16-446:16; 448:9-21; Nelson Dec., Exhs.18, 19, 20.

50. Real began its own effort to build a similar, competing product that allowed consumers to backup DVDs, after a California state trial court refused to enjoin distribution of Kaleidescape's product, ruling that the declaratory judgment plaintiff DVD CCA failed to establish that Kaleidescape had violated its CSS License Agreement with the DVD CCA. See DVD CCA v. Kaleidescape, Inc., No. 1:04 CV 031829 (Cal. Sup. Ct., March 29, 2007); Nelson Dec., Exh. 5 (Transcript of Statement of Decision); Exh. 43 (copy of Addendum to Statement of Decision).

In addressing the breach of contract claim only, the court held that a portion of the Agreement distributed to Kaleidescape as a licensee after the CSS License Agreement was executed, namely, the CSS General Specifications, were not binding as part of the contract between the DVD

CCA and Kaleidescape as a matter of state contract law. Id. at 2. This decision led Real's CEO to believe the Kaleidescape product was legal, and Real treated that device as a "blueprint" for the design and development of RealDVD products. Hearing Tr. (Glaser) at 598:12-13; 444:12-445:2. At no time during the design and development of RealDVD, however, did Real communicate to DVD CCA that it intended to construe the Kaleidescape decision as authorizing it to manufacture RealDVD.

51. Real's Senior Vice President, Phillip Barrett, said the following in an internal November 7, 2007 email to Real colleagues: "the statement 'Kaleidescape is the only company to have obtained a license from the [DVD CCA] to remove the [CSS] from the DVD to rip and play back from the hard drive' is a complete lie. There is no license for that. It's just the CSS license that failed to state that the disk must be present in the drive." Blavin Dec., Exh. 25.

52. Real's Vegas software, in addition to permitting storage of DVD content on a hard drive, also allows for portability of the DVD content by allowing users to create and save personal copies of DVDs onto a laptop computer or portable hard drive. Id. ¶ 24; Nelson Exh. 3 (Glaser Dep.) at 14:25-16:4; Chasen Dec., Docket No. 211, ¶ 7. The Vegas software provides a limit of five software licenses per user, so as to allow an individual licensee of the Vegas software to store and play back copies of DVDs on up to five computers that contain Vegas and are registered to the same user's account/unique license key. Chasen Dec. ¶¶ 12-13; Hearing Tr. (Bishop) at 773:24-774:3-6; Hearing Tr. (Schumann) at 299:25-300:7; 344:8-12.

53. Vegas was on the market from September 30, 2008, until the court issued its TRO on October 3, 2008. Real sold Vegas for $29.99, and charged $19.99 for each software license for the additional four (4) computers that can play back DVDs copied with Vegas. Suppl. Blavin Dec., Docket No. 246, Exh. 12.

54. Real also has a new product which it refers to as "New Platform" or "Facet." Id. ¶ 2. Facet was designed to be an improved stand-alone DVD player; a "next generation" DVD player that would add value to consumers' existing DVD collections by allowing them to archive, organize, and playback their movies without the need to keep track of physical DVDs. Hearing Tr. (Glaser) at 445:3-15.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

55.  Facet has not been finalized as a product, but is intended to be a stand-alone hardware device that is capable of, among other things, playing DVDs, saving DVDs to its internal hard drive, and organizing and presenting saved content by means of an intuitive user interface, as commonly found on a DVD player.  Brennan Dec., Docket No. 210, ¶¶ 3 & 4; Hearing Tr. (Glaser) at 445:6-446:16, 448:3-8.  Facet is designed to run on the Linux computer operating system.  Ellinikos Dec., Docket No. 199, Exh. H (Hamilton Dep.) at 139:4-15; Hearing Tr. (Kelly) at 178:1-4.

56. The Facet software, including the CSS authentication and decryption algorithms, was based on the versions developed for Vegas.  Hearing Tr. (Bielman) at 1064:3-16.  While the Facet and Vegas versions of RealDVD are designed to run on different computer operating systems, the software functions essentially the same way on both systems, and the parties refer to both Facet and Vegas interchangeably as RealDVD.  Hearing Tr. (Kelly) at 177:18-178:4; 193:14-21; Hearing Tr. (Bishop) at 745:6-748:8; Kelly Dec. ¶¶ 7, 67.

57.  Unlike with Vegas, Real limits the playback of copies of DVD content made with a Facet box to that stand-alone box to which the DVD was originally saved.  The Facet hard drive is not portable, in that it cannot be removed and used in a different Facet system, and the stored DVDs cannot be shared between Facet devices or any other devices.  Hearing Tr. (Glaser) at 451:9-12; Suppl. Brennan Dec. ¶ 6.

58.  There is nothing that limits the number of times a physical DVD can be copied using either Vegas or Facet, however.  A DVD could be passed around a dormitory, office, or neighborhood and copied on any Facet box or any computer using Vegas.  Hearing Tr. (Schumann) at 344:17-346:2; Hearing Tr. (Bishop) at 776:24-777:23.

59.  The RealDVD products are marketed exclusively for use with DVDs that a consumer owns, and Real marketed Vegas to law-abiding users who wish to make backup copies of DVDs that they own.  Hearing Tr. (Glaser) at 445:19-446:16; 518:5-15.  For example, Real tells its potential users that the product is legal only if "you are the owner of the original DVD and you use your saved copy solely for your personal use[.]"  Hearing Tr. (Glaser) at 458:5-10.

60.  The RealDVD End User License Agreement provides the following restriction: "You may use the saving functionality of the Software only with DVDs that you own.  You may not use

United States District Court

For the Northern District of California

1  the Software to save DVDs that you do not own, such as rental or borrowed DVDs."  Nelson Dec.,

2  Exh. 22 (§ 2b).

3        61.  Both Vegas and Facet are able to copy DVDs that are not owned by the licensed user of

4  RealDVD; the DVDs can be borrowed or rented from stores, copied and returned.  Hearing Tr.

5  (Glaser) at 455:19-22, 505:6-13.  There is simply no way for RealDVD to detect whether a DVD is a

6  rental DVD, in the absence of having the DVDs sold to the rental channel manufactured with

7  markings to indicate they are rentals.  Hearing Tr. (Glaser) at 455:23-25.

8        62.  Once a copy is made with RealDVD, the consumer no longer needs the physical DVD to

9  watch the content.  This was Real's intent upon initial development—to create a software product

10 that copies DVDs to hard drives so that the user does not have to find the physical DVD to watch the

11 content.  Suppl. Brennan Dec. ¶ 4; Ellinikos Dec., Exh. C (Brennan Dep.) at 291:2-292:24; Exh. D

12 (Chasen Dep.) at 296:19-297:11.  Accordingly, RealDVD's DVD drive also plays no role in the

13 playback of copied DVD content.  Hearing Tr. (Bishop) at 769:25-770:7, 786:11-17; Hearing Tr.

14 (Bielman) at 1136:19-21; Kelly Dec. ¶¶ 61-66, 80-84, 88-90.

15       63.  The storage of DVD content on RealDVD also provides protection from scratches or

16 other damage.  Hearing Tr. (Glaser) at 592:23-593:10.

17       64.  The copies of DVD content made by RealDVD, using Vegas or Facet, do not include

18 most of the protection provided by CSS, namely, DVD drive-locking, secure storage of keys on a

19 DVD, CSS authentication or CSS bus encryption.  Schumann Dec., Exh. A, ¶¶ 55-82.  Once a DVD

20 has been saved to a hard drive, RealDVD plays the movie from the hard drive and thus does not

21 authenticate the DVD drive or receive encrypted keys at that time.  Suppl. Brennan Dec. ¶ 12.

22 Real's own expert, Dr. Bishop, agreed that these layers of CSS protection—drive-locking,

23 authentication, bus encryption, secure storage of content keys—are not present and do not occur

24 when RealDVD is playing back copied DVD content from its hard drive.  Hearing Tr. (Bishop) at

25 770:4-6; 786:16-788:1; 788:18-789:8.

26       65.  The copies of DVD content made by RealDVD contain content encryption.  RealDVD

27 preserves CSS content encryption and it additionally encrypts the saved copies of DVDs it makes

28 with Advanced Encryption System 128 ("AES") encryption.  Hearing Tr. (Glaser) at 449:14-24;

Hearing Tr. (Kelly) at 201:3-12; Hearing Tr. (Schumann) at 280:3-14; Hearing Tr. (Bishop) at 711:8-712:2, 720:6-13.  AES encryption is far more secure and difficult to crack than CSS.  Suppl. Brennan Dec. ¶ 7; Hearing Tr. (Bishop) at 720:4-13, 733:15-16.  The master keys to that AES encryption are held by Real.  Hearing Tr. (Schumann) at 391:8-19.  Copies of DVDs made by the RealDVD products can, thus, only be played back by Real software.  Hearing Tr. (Glaser) at 588:13-18; 589:6-11; Hearing Tr. (Bishop) at 282:15-22.

V.      ARccOS and RipGuard Technologies

66.   The Studios employ supplementary technologies that provide a level of copy protection in addition to that provided by CSS for their commercially-released DVDs.  Hearing Tr. (Schumann) at 306:23-307:3; 307:14-17; Schumann Dec., Exh. A, ¶ 84; Hollar Dec., Docket No. 203, Exh. A, ¶ 11; Miller Dec., Docket No. 205, ¶¶ 4-5.  These technologies include ARccOS, a copy-protection system developed and marketed by Sony DADC, and RipGuard, a similar copy-protection system developed and marketed by Macrovision, Inc.  Schumann Dec., Exh. A, ¶ 85; Hollar Dec. ¶ 11.

67.   ARccOS and RipGuard are marketed as copy protection systems that are intended to interfere with the ability of certain DVD "ripping" software to make a copy of a DVD, while at the same time not affecting the ability of DVD players to access and playback DVD content.  Hearing Tr. (Dixon) at 871:14-17; 880:8-22; 900:21-903:3; Hearing Tr. (Schumann) at 307:21-308:13; 311:2-3; 360:9-23; Hollar Dec. ¶¶ 32-34.  Accordingly, manufacturers of both software and standard DVD players do not need a license or any special knowledge of ARccOS or RipGuard in order to play DVDs protected with those technologies.  Hearing Tr. (Schumann) at 309:14-310:1.

68.   ARccOS and RipGuard are designed to be transparent to a human being watching a movie with a standard DVD player.  They instead take advantage of the differences between how a person watches a DVD and the behavior of DVD copying programs, to impede the functionality only of the latter.  Hearing Tr. (Schumann) at 309:18-310:17; Hearing Tr. (Dixon) at 866:3; 880:18-22; 883:3-11; 972:19-21; Hollar Dec., Exh. B, ¶¶ 14-16.

69.   ARccOS and RipGuard function primarily by inserting corrupted or "bad" sectors on DVDs: intentional obstacles placed subversively in DVD data that cause "read" errors when the sectors are read by a DVD drive so as to severely impede copying of the DVD.  Hearing Tr.

17

(Schumann) at 307:7-13; Hearing Tr. (Dixon) at 882:5-10; Schumann Dec., Exh. A, ¶ 85; Hollar Dec., Exh. A, ¶ 16.  These bad sectors are placed onto portions of a DVD that are commonly accessed by ripping software but not by standard DVD players because they are outside of the data path that contains the actual playable DVD content.  Schumann Dec., Exh. A, ¶ 86; Hollar Dec. ¶¶ 14, 17; Hearing Tr. (Dixon) at 871:14-17; 880:8-22.

70.  These bad sectors are physical errors that slow down software that copies DVD content in a "linear" fashion, i.e., bit-by-bit from start to finish.  Hearing Tr. (Dixon) at 884:18-885:1.  While it is possible to slow a linear copy by using these physical errors, it is not possible to stop the copying entirely, as DVD drives can be directed to ignore or "time out" any errors encountered.  Dixon Dec., Docket No. 212, Exh. A, ¶ 13; Nelson Dec., Exh. 24 (Hollar Dep.) at 46:18-47:2; Hearing Tr. (Dixon) at 876:3-22; 886:16-887:23; 890:11-22.  The attendant time penalty associated with these errors will vary depending on the number of bad sectors in the particular disk, but can range from estimates of "the time it takes to playback a movie" to an additional eight hours or more and copying at some delays "may not be viable."  Hearing Tr. (Dixon) at 890:23-891:3; Ellinikos Dec., Exh. C (Brennan Dep.) at 965:23-24; 966:13-15.

71.  ARccOS and RipGuard also use secondary techniques to interfere with attempts to avoid bad sectors by intelligently navigating the data path on a DVD and making intentional, calculated modifications to various aspects of the DVD file structure.  Hearing Tr. (Schumann) at 308:17-309:13; Schumann Dec., Exh. A, ¶ 87; Hollar Dec. ¶ 18.  These modifications can obfuscate menu structures and data files or even create false menus, either of which will impede copying of the DVD content but will not affect the normal viewing of a DVD.  These techniques take advantage of the differences between the way a human interacts with a DVD player and the way an automated DVD copier attempts to gather data from a DVD.  Hearing Tr. (Schumann) at 358:22-359:1; 366:18-22; Schumann Dec., Exh. A, ¶ 87; Hollar Dec. ¶ 18.

72.  ARccOS and RipGuard secondary techniques may also implant errors such as "hidden" buttons or menus, which do not affect playback but which serve to mislead DVD rippers that attempt to intelligently follow all the streams of the DVD content when copying a DVD.  Hearing Tr.

1    (Schumann) at 308:25-309:13; Nelson Dec., Exh. 24 (Hollar Dep.) at 303:3-17.  They are sometimes

2    referred to as "logical" errors.  Hearing Tr. (Dixon) at 882:25.

3        73.  Of the top 300 DVD titles commercially released in 2005-2007, thirty were protected by

4    RipGuard, and an additional twenty five by ARccOS.  Hollar Dec., Exh. A, ¶ 38; Nelson Dec.,

5    Exh. 24 (Hollar Dep.) at 117:7-113:1; 113:11-114:9.  One Studio (Disney) uses RipGuard to protect

6    nearly all of its DVD titles distributed throughout the United States.  Miller Dec. ¶ 4.  The Studios

7    have paid tens of millions of dollars over the last four years to protect their content using these

8    systems.  Id.; Nelson Dec., Exh. 24 (Hollar Dep.) at 117:7-113:1; 113:11-114:9; Hollar Dec. ¶ 38.

9        74.  Standard error-handling software is used by DVD players when data is being read from a

10    storage device, e.g., a DVD drive, to assist with playback.  Dixon Dec., Exh. A., ¶ 14.  According to

11    Real's expert Mr. Dixon, such software is designed to work with physical errors on disks that arise

12    as a result of accidental damage to a DVD, such as scratches or smudges, but it can also check for

13    the types of errors caused by ARccOS and RipGuard, i.e., intentionally corrupted bad sectors, as

14    well as logical errors.  Id. ¶¶ 14-15.  Mr. Dixon also opines that this standard DVD player software

15    is, technically, copying the content from the DVD as part of the playback process.  Id. ¶ 19.

16        The court accepts that this, perfectly legal, error-handling software does not run into a

17    problem with such "copying" because standard DVD players should not encounter purposefully

18    placed sector errors.  See id.  However, this finding obviously cannot compel the conclusion that all

19    DVD copying software that avoids such errors is itself legal.  The court finds that Mr. Dixon's

20    expert reports fail to provide credible evidence to support such a leap in logic.  If this were true, then

21    many DVD rippers would be legal.  Other findings of fact indicate the world is not so black and

22    white; namely, there are distinctions between temporary and permanent "copying" of copyrighted

23    content.   As noted previously, temporary copying is nothing more than  "buffering" or "caching," a

24    requisite part DVD playback with DVD players.  The fact that error-handling software legally

25    avoids copy-protection errors when it buffers or caches content does not mean that copying

26    software, as RealDVD does, thereby also legally avoids copy-protection measures when it makes

27    permanent copies of DVD content on a hard drive.

28        A.    RealDVD's Attempts to Avoid ARccOS and RipGuard Errors

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

75. Real was aware of ARccOS and RipGuard during the development of the RealDVD products. Hearing Tr. (Bielman) at 1017:8-11. Real software engineers identified ARccOS and RipGuard as both copy protection systems and barriers to their development of a DVD copying device from the outset of the RealDVD project. Hearing Tr. (Schumann) at 315:10-16; Blavin Dec., Exh. 5 (Buzzard Dep.) at 158:14-159:4; Exh. 11 (Schwarz Depo.) at 78:8-14; Exh. 8 (Hamilton Depo.) at 64:14-19.

76. RealDVD software is intended never to encounter ARccOS or RipGuard physical errors (bad sectors) or logical errors (false information or hidden buttons) when copying a DVD. The result of a correctly executed "play and save" process in RealDVD is a complete copy of all playable content on a DVD that is made without ever encountering ARccOS or RipGuard errors. Hearing Tr. (Dixon) at 931:22-932:2; 973:17-974:20; Nelson Dec., Exh. 24 (Hollar Dep.) at 146:3-9; 152:2-154:9.

77. The Real software engineering team that designed Vegas understood that errors encountered during the "save" process could be intentional errors placed on certain DVDs. The Vegas team referred to these errors generically as "ARccOS." Buzzard Dec., Docket No. 213, ¶¶ 12-13. The Vegas team of engineers sought to write software code that addressed and overcame these errors. Id.

78. The Real software engineering team that designed Facet understood that ARccOS and RipGuard place errors on unused or unplayable portions of certain DVDs. Hearing Tr. (Bielman) at 1017:8-13. The team spent over a year creating software that would ensure that Facet never encountered ARccOS or RipGuard errors as it made a copy. Id. at 1081:3-6; 1109:16-1110:7; 1121:21-1122:24.

79. Facet begins by copying DVD content in a linear fashion, but if it encounters a number of consecutive bad sectors, it switches to a second method of copying (a software program called "DVD Walk") which uses a virtual machine method that seeks to avoid copy protection sectors by mimicking a human watching a DVD. Hearing Tr. (Schumann) at 357:3-6. Hearing Tr. (Bielman) at 1009:10-18, 1010:17-1111:3, 1011:5-9. As it "watches" the DVD, separate software within Facet makes a copy of the content that DVD Walk plays. Hearing Tr. (Bielman) at 1015:9-1016:4; Bishop

Dec., Exh. A, ¶ 25.  Collectively, this code and DVD Walk are equivalent to a "play and save" method of copying DVD content.  Hearing Tr. (Bielman) at 1015:13-19.

80. Facet switches to DVD Walk regardless of the cause of the errors it encounters.  There is no explicit mechanism or code in Facet to identify ARccOS or RipGuard errors with certainty; Facet only recognizes sector errors, whether intentional or inadvertent, such as from a scratch.  Hearing Tr. (Bielman) at 1018:24-1019:17; Dixon Dec., Exh. A, ¶ 14; Exh. B, ¶ 19; Buzzard Dec. ¶ 13; Suppl. Brennan Dec. ¶¶ 14-16.

81.  Facet treats read errors differently in "play" mode from the "save" or "play and save" modes, however, and alters its copying behavior on detection of read errors when saving a DVD to specifically avoid ARccOS or RipGuard errors.  Schumann Dec., Exh. A, ¶¶ 102-106; Exh. B, ¶¶ 40-42.  Facet has no read-error-handling code in "play" mode, instead relying upon the built-in error-handling functionalities of the DVD Drive.  Schumann Dec., Exh. B, ¶ 40.  Real's own DVD Walk is not used when playing a DVD, as it was designed to avoid logical errors such as hidden menu buttons encountered during copying.  Hearing Tr. (Bielman) at 1117:20-21; 1119:20-25; 1022:17-24; Hearing Tr. (Schumann) at 326:18-22; Schumann Dec., Exh. A, ¶ 105.

82.  Vegas copies DVD content to a hard drive differently than does Facet.  When Vegas encounters an error on a DVD, it implements a standard solution to avoid such read errors: it will attempt to determine the extent of the damage and skip over it to the next logical section of the DVD.  Buzzard Dec. ¶¶ 14-15.  When Vegas is in "save" mode, it attempts to identify and parse out the error to determine if it is extensive: if so, it will jump over the rest of the unreadable data precisely to the end of the navigable error; if not, it will continue copying in a linear fashion. Hearing Tr. (Schumann) at 320:6-321:3; Schumann Dec., Exh. A, ¶ 95; Hollar Dec., Exh. A, ¶ 43. Vegas implements these same error-recovery steps every time it reaches a defective sector on a DVD, regardless of the cause of the error per se.  Buzzard Dec. ¶¶ 14-15.

83. The intentional, calculated sector and file-structure errors that are created by ARccOS and RipGuard as part of their copy protection systems present different characteristics from physical scratches.  A typical scratch or smudge would not have the numbers of bad read errors in a row, i.e., sequentially from when reading a disk, that an ARccOS or RipGuard error does, because scratches

21

1   are typically perpendicular to the path of data that spirals radially around the DVD (much like the

2   grooves on a vinyl record).  These differences would be distinguishable by a software program that

3   copies DVD content.  Schumann Dec., Exh. A, ¶ 88; Hollar Dec. ¶ 13.

4

5   CONCLUSIONS OF LAW

6   I.      Preliminary Injunction Standard

7           84.  A preliminary injunction is a provisional remedy, the purpose of which is to preserve

8   status quo and to prevent irreparable loss of rights prior to final disposition of the litigation.  Sierra

9   On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984).  The Ninth Circuit

10  authorizes preliminary injunctive relief for "a party who demonstrates either (1) a combination of

11  probable success on the merits and the possibility of irreparable harm, or (2) that serious questions

12  are raised and the balance of hardships tips in its favor."  Prudential Real Estate Affiliates, Inc. v.

13  PPR Realty, Inc., 204 F.3d 867, 874 (9th Cir. 2000).  These are not separate tests, but rather

14  "opposite ends of a single 'continuum in which the required showing of harm varies inversely with

15  the required showing of meritoriousness.'"  Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d

16  824, 826 (9th Cir. 1997).

17  II.     DMCA

18          85.  The DMCA introduced epochal amendments to U.S. copyright law when it implemented

19  the World Intellectual Property Organization Copyright Treaty and the Performances and

20  Phonograms Treaty.  See DMCA, Pub. L. No. 105-304, 112 Stat. 2860, § 1 et al.  Importantly, the

21  DMCA instituted anti-circumvention and anti-trafficking provisions into Title 17, the U.S.

22  Copyright Act.  17 U.S.C. §§ 1201(a), (b).

23          86.  Section 1201(a) of the DMCA is herein referred to as the "access-control" provision.

24  That provision reads in relevant part:

25          No person shall manufacture, import, offer to the public, provide, or otherwise traffic
            in any technology, product, service, device, component, or part thereof, that–
26
            (A) is primarily designed or produced for the purpose of circumventing a
27          technological measure that effectively controls access to a work protected under this
            title;
28

United States District Court
For the Northern District of California

22

1    (B) has only limited commercially significant purpose or use other than to circumvent
2    a technological measure that effectively controls access to a work protected under this
     title; or

3    (c) is marketed by that person or another acting in concert with that person with that
     person's knowledge for use in circumventing a technological measure that effectively
4    controls access to a work protected under this title.

5    17 U.S.C. § 1201(a)(2).

6        87. Section 1201(b) of the DMCA is herein referred to as the "copy-control" provision.

7    That provision reads in relevant part:

8    No person shall manufacture, import, offer to the public, provide, or otherwise traffic
     in any technology, product, service, device, component, or part thereof, that–
9
     (A) is primarily designed or produced for the purpose of circumventing protection
10   afforded by a technological measure that effectively protects a right of a copyright
     owner under this title in a work or a portion thereof;
11
     (B) has only limited commercially significant purpose or use other than to circumvent
12   protection afforded by a technological measure that effectively protects a right of a
     copyright owner under this title in a work or a portion thereof; or
13
     (c) is marketed by that person or another acting in concert with that person with that
14   person's knowledge for use in circumventing protection afforded by a technological
     measure that effectively protects a right of a copyright owner under this title in a
15   work or a portion thereof.

16   17 U.S.C. § 1201(b)(1).

17       88. DMCA's anti-circumvention and anti-trafficking provisions establish "new grounds for

18   liability in the context of the unauthorized access of copyrighted material." Chamberlain Group,

19   Inc. v. Skylink Tech.'s Inc., 381 F.3d 1178, 1194 (Fed. Cir. 2004). The DMCA created new causes

20   of action both for circumvention of access controls in ways that facilitate copyright infringement and

21   for trafficking in circumvention devices that facilitate copyright infringement. Id. at 1195.

22       89. The DMCA provides for the following remedies: "[a]ny person injured by a violation of

23   section 1201 . . . may bring a civil action in an appropriate United States district court for such

24   violation" [and] "the court . . . may grant temporary and permanent injunctions on such terms as it

25   deems reasonable to prevent or restrain a violation [of DMCA]." 17 U.S.C. § 1203(b)(1). See

26   Reimerdes, 111 F. Supp.2d at 343 (under the DMCA, "injunctive relief is appropriate if there is a

27   reasonable likelihood of future violations absent such relief and, in cases brought by private

28   plaintiffs, if the plaintiff lacks an adequate remedy at law.").

United States District Court
For the Northern District of California

A.     CSS Technology and Access-Control Provision

90.  To prevail on a DMCA claim for violation of the access-control provision based on circumvention of CSS technology, plaintiff must first show that CSS is a "technological measure" that "effectively controls access" to copyrighted works.  17 U.S.C. § 1201(a)(2).  As defined in section 1201(a), "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."  17 U.S.C. § 1201(a)(3)(A).

91.  The Studios have established that CSS is a technological measure that effectively controls access to copyrighted works, namely, copyrighted DVD content.  Real's argument to the contrary, based on its allegation that CSS is no longer an effective technological measure because it has already been cracked or hacked, is of no moment.  The DMCA is predicated on "the authority of the copyright owner" not "whether or not [the technological measure] is a strong means of protection."  Reimerdes, 111 F. Supp.2d at 318.  Thus, to whatever extent CSS may have been cracked and certain CSS keys and algorithms have been compromised by hackers and made available on the Internet, this "availability" is not sufficient, under the DMCA's language that the measure gives access "in the ordinary course of its operation" and "with the authority of the copyright owner."

A plain reading of this statutory language means that access-control is at the level of the ordinary consumer, to prevent the easy creation of widely available and usable copyrighted works. See Pearl Investments, LLC v. Standard I/O, Inc., 257 F.Supp.2d 326, 350 (D. Me. 2003) (The question of whether a technological measure "effectively controls access" is analyzed solely with reference to how that measure works "in the ordinary course of its operation" and whether someone had "alternative means of access to the works is irrelevant to whether the [technological measure] effectively controlled access to them").  Here, the court finds that CSS technology still effectively controls access to DVD content for the average consumer.  See, e.g., 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F. Supp.2d 1085, 1095 (N.D. Cal. 2004) (Illston, J.) (rejecting similar contentions about CSS being ineffective access control, stating "this is equivalent to a claim that,

United States District Court

For the Northern District of California

1   since it is easy to find skeleton keys on the black market, a deadbolt is not an effective lock to a

2   door.").

3          92.   Plaintiff must then show that Real's RealDVD products are either: (a) primarily

4   designed or produced for the purpose of circumventing technological measures that effectively

5   controls access to a copyrighted work; (b) have only a limited commercially significant purpose or

6   use other than to circumvent such technological measures; or (c) marketed for use in circumventing

7   such technological measures. 17 U.S.C. § 1201(a)(2).  These are disjunctive clauses.  The court need

8   look no further than the first enumerated condition to find that the Studios are likely to prevail on the

9   section 1201(a)(2) claim.  As defined in section 1201(a), "to 'circumvent a technological measure'

10  means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass,

11  remove, deactivate, or impair a technological measure, without the authority of the copyright

12  owner."  17 U.S.C. § 1201(a)(3)(A).  CSS is a "technological measure" that effectively controls

13  access to copyrighted DVD content and RealDVD permits the access of that content without the

14  authority of the copyright owner.  RealDVD products are designed primarily for circumvention of

15  that technology, as Real has admitted its intent upon initial development was to create a software

16  product that copies DVDs to computer hard drives so that the user does not need the physical DVD

17  to watch the content.  This unauthorized access infringes the Studios' rights because it entails

18  accessing content without the authority of the copyright owner, as discussed *infra*.

19         93.   Real has violated section 1201(a) of the DMCA by trafficking in RealDVD products for

20  the purpose of circumventing CSS technology.  Specifically, RealDVD's "play and save" feature,

21  which allows the user to view the DVD content while RealDVD makes a copy of the content on the

22  device's hard drive, or its "save" feature, which commands RealDVD to simply copy the content

23  from the DVD onto the device's hard drive so that it can be played later, both circumvent CSS

24  technology by permitting RealDVD to access DVD content from the hard drive without going

25  through most of the CSS protection steps, such as DVD drive-locking, CSS authentication and CSS

26  bus encryption.  Once RealDVD has copied a DVD, it does not authenticate the DVD drive or

27  receive encrypted keys at that time.  The record shows that CSS technology requires that a DVD

28  drive "lock" upon insertion of a CSS-protected DVD and prevent access to its contents until an CSS-

United States District Court

For the Northern District of California

1   authorized player engages in an authentication procedure, none of which RealDVD does when it

2   reads back DVD content from its hard drive.  The process of authentication with the DVD drive, and

3   subsequent content decryption, is thereby circumvented by the RealDVD products.

4          94.  As a threshold matter, Real contends that a DMCA claim is unavailable to the Studios

5   against a co-licensee to CSS technology.  Real cites such cases as Sun Microsystems, Inc. v.

6   Microsoft Corp., 188 F.3d 1115, 1121 (9th Cir. 1999) and  Jacobsen v. Katzer, 535 F.3d 1373, 1380

7   (Fed. Cir. 2008) to contend that copyright licenses are governed by contract law and copyright

8   owners who enter into such licenses waive their rights to sue the licensee for copyright infringement

9   and are limited to breach of contract claims.  These cases are unavailing on these facts, because the

10  Studios are not bringing copyright infringement claims against Real, nor are they the direct licensors

11  of CSS technology.  Moreover, the cases cited by Real only limit licensees to breach of contract

12  claims when the licensee is acting "within the scope of its license."  Sun Microsystems, 188 F.3d at

13  1121-22.  As discussed herein, the court finds that Real has acted outside the scope of its license

14  with the DVD CCA.  Accordingly, the Studios are not limited to breach of contract claims against

15  Real.  For all of these reasons, the Studios are well within their rights to bring circumvention claims

16  under the DMCA.

17         95.  While it is true that no case has ever held that a licensee to the CSS License Agreement

18  with the DVD CCA can be held liable for circumventing that same technology under the DMCA,

19  that is simply because no court has ever adjudicated the issue.  And, it may be that no licensee has

20  been so bold as Real.  This court holds that the Studios are permitted to bring both DMCA claims for

21  circumvention of CSS technology and breach of contract claims under the CSS License Agreement,

22  noting that other courts have permitted such types of claims to co-exist.  See, e.g., Ticketmaster

23  L.L.C. v. RMG Tech.'s, Inc.,  507 F. Supp.2d 1096, 1111-13 (C.D. Cal. 2007) (granting preliminary

24  injunction on DMCA and breach of contract claims); Davidson & Associates v. Jung, 422 F.3d 630,

25  642 (8th Cir. 2005) (affirming breach of software license and circumvention under DMCA).

26         96.  Real's argument that section 1201(a) does not apply to situations where even

27  unauthorized persons use a technology, so long as they do not break or impair the technology, is

28  misguided.  See, e.g., Egilman v. Keller & Heckman, LLP, 401 F. Supp. 2d 105, 113-14 (D.D.C.

United States District Court

For the Northern District of California

1   2005) ("using a username/password combination as intended—by entering a valid username and

2   password, albeit without authorization—does not constitute circumvention under the DMCA.").  The

3   DMCA, in general, is aimed at entities seeking to traffic in circumvention tools, while section

4   1201(a), in particular, is aimed at circumvention tools that control access to protected works.  The

5   statute is not, as Real asserts, solely intended to thwart hackers.  Rather, it provides broad statutory

6   protection against circumvention of technological measures that protect the interests of copyright

7   owners.  This includes any form of unauthorized use—not just "breaking"—of a technology such as

8   CSS, which requires the application of information or a process with the authority of the copyright

9   owner, to gain access to copyrighted works.  See 17 U.S.C. § 1201(a)(3)(A); Universal City Studios,

10  Inc. v. Reimerdes, 82 F.Supp.2d 211, 216 (S.D.N.Y. 2000); Reimerdes, 111 F. Supp.2d at 318 ("As

11  CSS, in the ordinary course of its operation  . . . 'actually works' to prevent access to the protected

12  work, it 'effectively controls access' within the contemplation of the statute.").

13          97.  That Real may have initially gained lawful access to the CSS keys by entering into a

14  CSS License Agreement does not mean that Real is thereby exculpated from DMCA liability forever

15  more.  RealDVD uses the CSS keys and algorithms to access DVD content without deactivating,

16  impairing or otherwise circumventing CSS to access the DVD content only in limited circumstance.

17  The only time RealDVD accesses the CSS keys with authorization is the first time RealDVD reads a

18  physical DVD that is inserted in the DVD Drive.  Thereafter, RealDVD circumvents CSS when it

19  accesses the DVD content from its hard drive, after having performed the "save" or "play and save"

20  function.  Every time the RealDVD product, be it Vegas or Facet, accesses DVD content from the

21  hard drive, it does so by circumventing CSS technology and violating the access-control provision of

22  the DMCA.

23          As the court in 321 Studios found, "only licensed DVD players can legally access the CSS

24  keys in order to play DVDs."  307 F. Supp.2d at 1095 (emphasis added).  Licensed DVD players are

25  not shielded from the DMCA for accessing the CSS keys in order to perform non-licensed functions,

26  such as copying DVD content and later accessing that DVD content from the hard drive.  Real's own

27  Senior Vice President, Phillip Barrett, admitted as much in his email to Real colleagues about the

28  Kaleidescape system's accessing of CSS keys for a non-licensed function: "the statement

27

1   'Kaleidescape is the only company to have obtained a license from the [DVD CCA] to remove the

2   [CSS] from the DVD to rip and play back from the hard drive' is a complete lie. *There is no license*

3   *for that.*" (emphasis added).

4       By designing and producing its RealDVD products for the purpose of removing various CSS

5   protections, which effectively control access to a copyrighted work by scrambling DVD content and

6   rendering it unusable and unplayable to the user, Real violates section 1201(a)(2) of the DMCA.

7   Real cannot escape this liability merely because it is a CSS licensee and because RealDVD leaves

8   CSS content encryption on the copied disks.  RealDVD's removal of other CSS protections required

9   for authentication and bus encryption unequivocally circumvents this technology under the DMCA.

10              **B.**      CSS Technology and Copy-Control Provision

11      98.  To prevail on a DMCA claim for violation of the copy-control provision, plaintiff must

12  show that CSS "effectively protects a right of a copyright owner under" the DMCA.  17 U.S.C. §

13  1201(b)(1).  Under that section, a technological measure "effectively protects a right of a copyright

14  owner . . . if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise

15  limits the exercise of a right of a copyright owner under this title."  17 U.S.C. § 1201(b)(2)(B).  For

16  the reasons articulated above, the court finds that CSS technology is an effective technological

17  measure to prevent copying of copyrighted DVD content by the average consumer.  That CSS

18  technology has been hacked does not disturb this conclusion.

19      99.  Circumvention in the case of a copy-control measure means "avoiding, bypassing,

20  removing, deactivating, or otherwise impairing a technological measure[.]"  17 U.S.C. § (b)(2)(A).

21  The Studios are likely to prevail on the section 1201(b)(1) claim, based on RealDVD's

22  circumvention of the copy-protections of CSS.  The court has found that CSS technology was

23  developed to create a secure system for the dissemination and playback of copyrighted content on

24  DVDs, and that the CSS system accomplishes this by combining multiple layers of encryption with

25  an authentication process to protect a DVD's content from unauthorized access as well as from

26  unauthorized consumer copying.

27      RealDVD circumvents the copy-control provision of the DMCA through RealDVD's

28  utilization of the CSS authentication codes and algorithms for an unauthorized purpose, namely, to

*United States District Court*
For the Northern District of California

28

copy the content from a CSS-protected DVD to a hard drive.  By making copies of protected content from a DVD to a hard drive or portable drive, RealDVD removes or deactivates multiple layers of CSS protections, including drive-locking, authentication and bus encryption.  This is consistent with other courts' findings.  See e.g., 321 Studios, 307 F. Supp. 2d at 1095 ("It is evident to this Court, as it has been to previous courts, that CSS is a technological measure that both effectively controls access to DVDs and effectively protects the right of a copyright holder."); Reimerdes, 111 F. Supp.2d at 317-18 (same).

100.  Real's argument that RealDVD does not "remove" the layers of CSS protection, including drive-locking, authentication or bus decryption, because those CSS requirements have been fulfilled by RealDVD when it first obtains DVD content from a DVD and are not needed thereafter from a DVD amounts to legal legerdemain.  The reason the CSS protections are "no longer required" is because the RealDVD products store the CSS algorithms and keys on a hard drive, thereby evading or bypassing the need for the CSS protection steps to engage between a DVD Drive and a CSS-authorized player.  Real admits that its RealDVD products do not perform these unlocking, authentication and decryption steps because there is no need for them once RealDVD has copied the DVD content onto the hard drive.  This is circumvention by its statutory definition in the DMCA's copy-control provision.  RealDVD does not escape liability because it abides by CSS technological measures only upon the initial insertion of a DVD.  In this case, once is not enough.

101.  That Real is a licensee to the CSS License Agreement is irrelevant to this analysis because the CSS License Agreement does not give license to copy DVD content to a hard drive permanently.  The court has found the only copying the copyright owners have "authorized" is temporary copying, i.e., buffering or caching, because it is a necessary part of the playback process in all DVD players.  Notably, this temporary versus permanent distinction is reflected elsewhere in the DMCA, which provides a safe harbor for certain system caching activities.  See 17 U.S.C. § 512(b) (limiting the copyright infringement liability of service providers who make "intermediate and temporary storage" of copyrighted material stored in a cache); see, e.g., Parker v. Google, Inc., 422 F. Supp.2d 492, 498 (E.D. Pa. 2006) (exempting from liability Google's automatic system caching).

1    102.  Real cannot use the CSS License Agreement as a sword to unlock, decrypt and

2    descramble CSS content and then assert this right as a shield against a DMCA violation.  CSS

3    provides technological measures to safeguard against access to and reproduction of copyrighted

4    video content, such as the Studios' motion pictures, released on DVDs.  Real does not implement

5    and comply with the requirements and prohibitions set forth in the CSS License Agreement

6    regarding copying.  Accordingly, the RealDVD products circumvent CSS in violation of the copy-

7    control provision of the DMCA.

8         This conclusion is supported by the legislative history of the DMCA, which emphasized that

9    "[s]ection [1201](b)(1) is aimed fundamentally at outlawing so-called 'black boxes' that are

10   expressly intended to facilitate circumvention of technological protection measures for purposes of

11   gaining access to a work."  <u>See</u> Report of the House Comm. on Commerce, H.R. Rep. No. 105-551

12   (II), 1998 WL 414916, at 39.  The DMCA was intended for products like RealDVD; products that

13   are expressly designed to circumvent technological measures for purposes of thwarting the rights of

14   copyright owners' to decide who may gain access to their copyrighted works in digital format.

15        Real argues that because this legislative history shows the statute is meant to stop classic

16   hackers, it does not apply to the RealDVD products.  This reasoning is flawed.  The court

17   understands that Real is not a classic "hacker."  But such aspersions, in and of themselves, are

18   meaningless when unfettered from the statutory language.  Real has failed to show that the

19   RealDVD products are to be used by consumers primarily for legitimate purposes.  <u>See id.</u> ("This

20   provision is not aimed at products that are . . . used by businesses and consumers for perfectly

21   legitimate purposes.").  Real has also failed to show that RealDVD products are not primarily

22   designed or produced for the purpose of circumventing protection afforded by an effective

23   technological measure that protects a right of a copyright owner.  Accordingly, the court finds that

24   Real has violated section 1201(b) of the DMCA by trafficking in RealDVD products for the purpose

25   of circumventing CSS technology.

26        C.    <u>ARccOS and RipGuard Technologies and Copy-Control Provision</u>

27        103.  The Studios have established that ARccOS and RipGuard are technological measures

28   that "effectively protect[] a right of a copyright owner under" the DMCA.  17 U.S.C. § 1201(b)(1).

United States District Court

For the Northern District of California

ARccOS and RipGuard, in the ordinary course of their operations, either severely restrict or otherwise limit, the process of copying protected DVD content by inserting intentional errors which do not affect playback but which affect copying of a DVD. See id. § 1201(b)(2)(B). The court has found these errors can come in two general forms: (1) intentional errors, i.e., corrupted or "bad" sectors outside of the data path that contains the actual playable DVD content, which cause read errors when the sectors are read by a DVD drive so as to impair copying of the DVD, or (2) logical errors, i.e., secondary errors such as "hidden" buttons or false menus, which serve to mislead DVD rippers that attempt to intelligently follow all the streams of the DVD content when copying a DVD. The Studios have established that either type of error will impede copying of DVD content.

104. Real's claim that Vegas and Facet do not distinguish between errors that are accidental scratches or other unintentional read errors versus errors that may be intentionally inserted by copy protection schemes like ARccOS or RipGuard does not hold water from a credibility standpoint. Real's experts have opined as such without documented evidence or even any reasoning or rationale as to how the differences are not distinguishable. By contrast, the Studios' experts Mr. Schumann and Mr. Hollar have presented reasoned testimony controverting such assertions. Mr. Schumann said it would be almost impossible for a physical scratch to be made in such a way that would generate a linear sequence of errors, i.e., along the "groove" of a DVD, as occurs with intentional ARccOS or RipGuard errors. Moreover, physical defects on a DVD are simply skipped over by standard DVD players, whereas testimony by Real's engineer Mr. Bielman, as well as by Mr. Schumann, indicates that DVD Walk's behavior is not consistent with simply playing the movie.

The court accepts that it is not inconceivable that unintentional errors, such as manufacturing defects, could result in sequential sector errors similar to—and indeed perhaps indistinguishable in some cases from—ARccOS or RipGuard errors. However, that Real would spend the amount of time and resources that it did to address the potential for those rare manufacturing defects which might possibly exhibit error characteristics that would duplicate the errors that are intentionally placed on ARccOS or RipGuard DVDs is not conceivable. Previously in this litigation, the court has taken notice of the fact that Real was aware of the ARccOS and RipGuard technologies. Based on the record now before the court, it is apparent that Real's team of developers working on RealDVD

31

spent significant time dissecting those copy protection schemes and made conscious design decisions to circumvent ARccOS and RipGuard so that RealDVD could successfully copy DVDs containing such protections. The substantial time and manpower spent on studying and constantly updating and integrating new techniques to best handle errors that arise in copying DVDs would be nonsensical otherwise. The only means by which RealDVD could properly support playing and saving of DVDs authored with ARccOS and RipGuard errors was through active, intentional circumvention of those technological measures.

105. Real argues that neither ARccOS nor RipGuard constitutes effective technological measures under the copy-control provision for two main reasons. Real's first reason is a temporal one. Real argues that because ARccOS and RipGuard errors do not completely prevent copying by DVD rippers or other software programs, they merely slow down that copying process. The court does not agree that a time penalty is necessarily an ineffective means of protecting the right of a copyright owner under section 1201(b). As Real's own engineer explained, the time penalty associated with ARccOS or RipGuard errors can range from a matter of hours to a time frame that "may not be viable." In other words, the opportunity cost of copying may be too great in some instances to even attempt copying. This means that ARccOS and RipGuard are effective at preventing copying.

Real's second reason for why neither ARccOS nor RipGuard is an effective measure is because software can be written to automatically navigate and copy the portions of a DVD that can be accessed so as to result in a complete copy of all playable content on a DVD without ever encountering ARccOS or RipGuard errors. Indeed, Real admits that RealDVD is meant never to encounter ARccOS or RipGuard errors, be they physical bad sectors or else logical errors that contain false information or hidden buttons. Real cites the Sixth Circuit's holding in <u>Lexmark Int'l., Inc. v. Static Control Components, Inc.</u>, 387 F.3d 522, 547 (6th Cir. 2004) that "a technological measure that only restricts one form of access but leaves another route wide open" does not effectively control access under section 1201(a).

Real attempts to parlay this holding into having broader application, i.e., to section 1201(b), to argue that ARccOS and RipGuard are not effective copy control measures because they leave

United States District Court

For the Northern District of California

other means of copying "wide open" such as sector-by-sector copying or through software re-writing, as RealDVD has done. This argument is audacious in its assertion and to countenance it would virtually jettison the law of section 1201(b). If this were the law, a copy protection measure would have to protect against every possible current and future means of copying copyrighted content. There could be no liability under this section, for once the copy protection measure had been circumvented, it would purportedly be rendered ineffective. This is circular nonsense. The court has found that ARccOS and RipGuard errors impair copying of copyrighted DVD content. ARccOS and RipGuard are therefore effective technological measures under the copy-control provision of the DMCA.

106. Real conflates the standards for technological measures (and the circumvention thereof) under subsections 1201(a) and (b). The legislative history of the DMCA has made clear that violations under 1201(a) and (b) are not interchangeable and many devices will be subject to challenge only under one of the subsections:

> [I]f an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(b), but not under subsection 1201(a)(2). Conversely, if an effective technological protection measure limits access to the plain text of a work only to those with authorized access, but provides no additional protection against copying, displaying, performing or distributing the work, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(a)(2), but not under subsection 1201(b).

Report on the Senate Committee on the Judiciary, S. Rep. No. 105-190 (II), 1998 WL 239623, at 12.

107. ARccOS and RipGuard are copy-control measures under section 1201(b), not access-control measures under section 1201(a). As such, ARccOS and RipGuard need not possess authentication and encryption mechanisms to be effective at protecting DVD content. As stated above, the standard for copy-control effectiveness under the DMCA is not to prohibit copying of DVD content entirely, nor is it to prohibit access to that content. Under the statute, a copy-control measure is "effective" if in the ordinary course of its operation," the measure "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." 17 U.S.C. § 1201(b)(2)(B). The court finds that ARccOS and RipGuard technologies do just that. It does not

matter how often they are used, just how much they impede copying, or whether they contribute to enforcing access control.

108.  By taking the position it has with regard to the effectiveness of ARccOS and RipGuard as technological measures, i.e., that software (like DVD Walk) can be created to avoid ARccOS and RipGuard errors, Real has walked right into admitting its own liability under section 1201(b).  Real admits that RealDVD, specifically Facet, uses the software program DVD Walk only when it encounters a read error during copying.  It is undisputed that DVD Walk avoids copy protection sectors by following the DVD Video Specifications as a player does, to mimic a human watching a DVD.  Real admits that its Facet team of engineers spent over a year creating this software that would ensure that RealDVD never encountered ARccOS or RipGuard errors as it made a copy.  By "never encountering" ARccOS and RipGuard, which would otherwise be encountered during a standard copying process, the Facet software, DVD Walk, thereby "avoids" or "bypasses" these copy protection schemes.  This is circumvention under the DMCA.

Facet circumvents ARccOS or RipGuard when it begins copying DVD content in a linear fashion and then switches to DVD Walk when it counters a number of consecutive bad sectors.  That there is no explicit mechanism or code in Facet to identify ARccOS or RipGuard errors with certainty is not dispositive.  The court has found that ARccOS or RipGuard errors will trigger this circumvention technique when RealDVD is copying DVD content, i.e., in the "play and save" or "save" mode.  It does not matter, for DMCA liability purposes, if other errors trigger it as well.  As the Studios properly point out, there is no intent element to the element of "circumvent[ing] protection afforded by a technological measure" under the copy-control provision.  17 U.S.C. § 1201(b)(2)(A).  The statutory definition relies on the functionality, i.e., "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure[.]"  Id.

109.  Real's next argument that ARccOS and RipGuard are not "effective copy protection measures" under the DMCA rests on the contention that standard DVD player software "technically" copies DVD content from the DVD and has no problem in playing back a DVD after so doing.  Presumably, this evinces that ARccOS and RipGuard are not effective in protecting the

34

copying of DVDs because standard DVD players do not encounter the purposefully placed ARccOS and RipGuard errors. This argument is fatally flawed. As Real's expert Mr. Dixon himself acknowledges, ARccOS and RipGuard do not inhibit the copying of DVDs "if the copying is done as a byproduct of playing through the disks." <u>See</u> Dixon Dec. ¶ 19.

Real cannot stretch this argument far enough to then credibly assert that RealDVD's form of copying also is not inhibited by ARccOS and RipGuard because RealDVD copies during the normal playback process as ascribed to standard DVD players. As the evidence has shown, RealDVD's form of copying is not the same form done during the normal playback process on a standard DVD player. To suggest otherwise is nothing short of disingenuous. Standard DVD players must make that temporary copy in order to play the DVD at all; it is a "cached" or "buffered" copy that is needed for playback in all DVD players. Thus, its functionality has a significant and important purpose other than circumventing ARccOS and RipGuard. Plainly, standard DVD players do not make permanent, playable copies of DVDs, whereas RealDVD does. The court finds that the main purpose of RealDVD's software is to make permanent copies of DVDs, not to make cached copies or to provide other supplemental information regarding the contents of a DVD, such as the audio and subtitle tracks. On this basis, both Vegas and Facet violate the DMCA for circumventing ARccOS and RipGuard copy protection technologies.

110. Real similarly argues that liability cannot exist for software that operates in the same manner as standard error-correction software. The court does not find it credible that standard error-handling software used to assist with playback would avoid ARccOS and RipGuard errors by following the "watched" content in the same manner as does DVD Walk. Thus, it is incorrect to allege the DMCA is being improperly extended far beyond its intended purpose to encompass "legitimate" software.

The manner in which Vegas handles errors is less clear. The court has found that Vegas assesses read errors differently based on the length and other navigational aspects of the error. It may be that Vegas circumvents ARccOS or RipGuard errors when it determines the extent of the damage in a read error and parses out the error during copying in "save" mode. However, the

United States District Court

For the Northern District of California

Studios' have failed to establish that Vegas operates any differently when it is in "play" mode. Real has admitted that its Vegas team of engineers understood that errors encountered during the "save" process could be intentional errors (which they referred to as "ARccOS") placed on certain DVDs and that they sought to write software code that addressed and overcame these errors. Whether the Vegas software was able to overcome these errors is not clear, however, and both parties are correct that it is the product's function and not the designer's motivation that determines liability. 17 U.S.C. § 1201(b)(2)(A); see also Reimerdes, 111 F. Supp.2d at 319 (questions of what "motivated those who wrote [alleged circumvention technology] is immaterial to the question whether the defendants . . . violated the anti-trafficking provision of the DMCA.").

111. On balance, the court finds the Studios are likely to prevail on their claim that RealDVD circumvents ARccOS or RipGuard in violation of the copy-control section of the DMCA. This ruling is based on the court's findings that (1) the intentional, calculated sector and file-structure errors created by ARccOS and RipGuard as part of their copy protection systems would be distinguishable by a software program that copies DVD content; (2) the parties refer to both Facet and Vegas interchangeably as RealDVD; and (3) the result of a correctly executed "play and save" process in RealDVD is a complete copy of all playable content on a DVD that is made by avoiding ARccOS and RipGuard errors.

D.    "Fair Use" Defense

112. Real puts forth numerous arguments as to why neither the Studios nor the DVD CCA have a legal right to prevent consumers from making personal or "backup" copies of DVDs using the RealDVD products. The court considers the various iterations of these arguments together and places them under the rubric of a "fair use" defense.

113. Real contends the Studios are attempting to secure an exclusive right not expressly granted by copyright law. Real cites to the DMCA section 1201(c), which provides that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). Real argues that the Studios' rights under sections 1201(a) and (b) are therefore limited in that they exclude the rights preserved to

others under the doctrine of fair use, as an affirmative defense to copyright infringement. <u>See</u> 17 U.S.C. § 106 (granting copyright holder exclusive right to make copies of its work) & § 107 ("the fair use of a copyrighted work . . . is not an infringement of copyright."). In terms of case law, Real relies on <u>Sony Corp. of Am. v. Universal City Studios</u>, 464 U.S. 417 (1984), for the proposition that creating a personal backup copy of a purchased DVD is a fair use.

The court begins its analysis by noting that <u>Sony</u> came down before the DMCA was enacted and, thus, is superceded to the extent that the DMCA broadened copyright owners' rights beyond the <u>Sony</u> holding. <u>See</u> <u>Reimerdes</u>, 111 F. Supp.2d at 323 ("<u>Sony</u> involved a construction of the Copyright Act that has been overruled by the later enactment of the DMCA to the extent of any inconsistency between <u>Sony</u> and the new statute."). Indeed, the DMCA did expand the existing rights of copyright owners, as the court previously noted, by creating new grounds for liability due to circumvention of access controls *in ways that facilitate copyright infringement* and for trafficking in circumvention devices that facilitate copyright infringement. <u>See</u> <u>Chamberlain Group</u>, 381 F.3d at 1195 (emphasis added). "Like all property owners taking legitimate steps to protect their property, however, copyright owners relying on the anticircumvention provisions remain bound by all other relevant bodies of law." <u>Id.</u> at 1194. The DMCA itself is, of course, rooted in the Copyright Act. The DMCA's section 1201(c) merely preserves the general fair use defense to copyright infringement. It does not create new exemptions, nor does it exempt from liability circumvention tools otherwise deemed unlawful under sections 1201(a)(2) or (b)(1). <u>See</u> 17 U.S.C. § 1201(c)(3).

114. To the extent that Real seeks to rely on <u>Sony</u> here, to establish some new form of time- or space-shifting fair use under the DMCA, this effort fails. <u>Sony</u> involved video cassette recorders and copyrighted television broadcasts in a pre-digital era and its "substantial noninfringing use" reasoning has no application to DMCA claims. Real should be well aware of this, given that it was the argument it made and the basis upon which it prevailed in its prior DMCA litigation against Streambox. <u>See</u> <u>RealNetworks, Inc. v. Streambox, Inc.</u>, 2000 WL 127311, *8 (W.D. Wash. Jan. 18, 2000) ("For this reason, Streambox's VCR is not entitled to the same 'fair use' protections the Supreme Court afforded to video cassette recorders used for "time-shifting" in [<u>Sony</u>].");  <u>see also,</u>

Reimerdes, 111 F. Supp.2d at 324 (indicating that Congress, in enacting the DMCA, explicitly noted that section 1201 does not incorporate Sony). Real's persistence in arguing this point is both bumptious and futile. There is no grounding in law for Real to assert a "fair use" defense based on RealDVD being capable of substantial noninfringing use.

115. The Studios contend that fair use is never a defense to DMCA liability. This is the truth, but not the whole truth. Fair use is not a defense to trafficking in products used to circumvent effective technological measures that prevent unauthorized access to, or unauthorized copying of, a copyrighted work under sections 1201(a) or (b), respectively. But, fair use enters into the picture in the context of the act of circumvention itself. Fair use is prohibited in the access-control provision of section (a) but not in the copy-control provision of section (b). The copy-control provision "prohibits trafficking in devices that circumvent technological measures tailored narrowly to protect an individual right of the copyright owner while nevertheless allowing access to the protected work. Though [section] 1201(b) parallels the anti-trafficking ban of [section] 1201(a)(2), there is no narrowly tailored ban on direct circumvention to parallel [section] 1201(a)(1). This omission was intentional." Chamberlain Group, 381 F.3d at 1195. It was intentional because copying of a work may be a fair use under appropriate circumstances. The U.S. Copyright Office has formally acknowledged this legal truth. See The Digital Millenium Copyright Act of 1998, U.S. Copyright Office Summary (Dec. 1998) at 4 (explaining that the distinction between section 1201(a) and (b) as to the act of circumvention in itself was "to assure that the public will have the continued ability to make fair use of copyrighted works. Since copying may be a fair use under appropriate circumstances, section 1201 does not prohibit the act of circumventing a technological measure that prevents copying.")

In other words, fair use applies to section 1201(b) under the DMCA because it does not speak to, and thus does not prohibit, appropriate individual uses of circumvention devices. The prohibition on individual circumvention conduct only applies with respect to access protection technologies (because fair use can never be an affirmative defense to the act of gaining unauthorized access), not to technologies that prevent copying. Real is correct that Congress did not intend to regulate the conduct of individual users with authorized access to copyrighted works, since their

38

liability was controlled by the existing law of copyright infringement and fair use.  In this sense, there is a "user exemption" implicitly recognized in the DMCA for the fair use of copyrighted works.

116.  Against this backdrop, the court appreciates Real's argument that a consumer has a right to make a backup copy of a DVD for their own personal use.  Whether this is a "fair use" copy is not at issue, because while the DMCA provides for a limited "fair use" exception for certain end users of copyrighted works, the exception does not apply to manufacturers or traffickers of the devices prohibited by 17 U.S.C. § 1201(a)(2).  See Macrovision v. Sima Products Corp.,  2006 WL 1063284, *2 (S.D.N.Y. 2006), citing Corley, 273 F.3d at 440-41.  As noted above, the DMCA's "user exemption" is only for the individual who has gained authorized access and who may circumvent the protection measures pursuant to lawful conduct, such as to make fair use of the subject work.  See U.S. v. Elcom Ltd., 203 F. Supp.2d 1111, 1120 (N.D. Cal. 2002) (Whyte, J.) ("Congress did not prohibit the act of circumvention because it sought to preserve the fair use rights of persons who had lawfully acquired a work."), citing H.R. Rep. 105-551 (I), at 18 (1998).

So while it may well be fair use for an individual consumer to store a backup copy of a personally-owned DVD on that individual's computer, a federal law has nonetheless made it illegal to manufacture or traffic in a device or tool that permits a consumer to make such copies.  See id. at 1125 ("while it is not unlawful to circumvent for the purpose of engaging in fair use, it is unlawful to traffic in tools that allow fair use circumvention.").  Importantly, such tools are unable to distinguish between personal use copies of personally-owned DVDs and other sorts of copies for other purposes—commercial, personal, or otherwise.  In enacting the DMCA, Congress chose to strike a balance to combat piracy and maintain economic incentives to create.  The balance embodied in a federal law is not something this court can disturb, absent a Constitutional violation not at issue here.  See Reimerdes, 111 F.Supp.2d at 324 ("The fact that Congress elected to leave technologically unsophisticated persons who wish to make fair use of encrypted copyrighted works without the technical means of doing so is a matter for Congress. . . .").

United States District Court

For the Northern District of California

117.   The court finds the DVD CCA's argument that its business model relies on CSS licensing and any purported "fair use" copies of CSS-protected DVD content would destroy the veritable *raison d'etre* of the DVD CCA unpersuasive.   The purpose of copyright law, and the fair use that copyright law embodies as an exception to protection, is not to protect the business model of any particular company.   The court will not hold that consumers do not have the "fair use" right to make copies of CSS-protected DVD content simply because the DVD CCA would be harmed by such use of its licensed works.

118.   The court is nonetheless mindful that it "must consider the public interest as a factor in balancing the hardships when the public interest may be affected."   Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).   Whether the public interest would best be served by continuing to enjoin Real from making its products available to consumers, and protect the Studios' rights at the expense of the consumers' rights, to engage in legal downstream use of the Studios' copyrighted material is an excellent question.   It is also one the court does not and will not reach, because the statutory structure of the DMCA leaves no room for ambiguity.   By making it a DMCA violation to distribute products that enable consumers to override copyright owner preferences against unauthorized copying, Congress determined that the public interest is best served by outlawing such products.   "Policy considerations cannot override our interpretation of the text and structure of [a statute], except to the extent that they may help to show that adherence to the text and structure would lead to a result so bizarre that Congress could not have intended it."   Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 188 (1994).

The DMCA did not create a new property right, as Real points out, but it did clearly rebalance the competing interests of copyright owners against copyright users.   See Chamberlain Group, 381 F.3d at 1195.   In so doing, the DMCA tipped the balance towards the copyright owners.   The DMCA makes illegal the act of trafficking in circumvention tools.   17 U.S.C. §§ 1201(a), (b).   The DMCA prohibits the circumvention of technological measures that guard copyrighted material, but does not prohibit the downstream or end use of those materials after circumvention has occurred.   See Corley, 273 F.3d at 443.   "It is the technology itself at issue, not the uses to which the copyrighted material may be put."   321 Studios, 307 F. Supp.2d at 1097.   "[W]hile it is not unlawful

40

to circumvent for the purpose of engaging in fair use, it is unlawful to traffic in tools that allow fair use circumvention.  That is part of the sacrifice Congress was willing to make . . . ." Elcom, 203 F. Supp.2d at 1125.  In accord with 321 Studios, Elcom and Corley, this court finds that the fair use of the copyrighted material by end users is not a defense to, and plays no role in determining, liability under the DMCA.  To find otherwise would ignore Congress' clear directive, as embodied in the statutory text of the DMCA.

119.  There is always a struggle between pleasing copyright holders and copyright users. The DMCA represents Congress' attempt at a balance to preserve ownership rights protection for companies and artists in the face of the modern reality of a digital world with an increasingly technologically-savvy population.  In some circumstances, the law can choose to value the right of public access to unavailable copyrighted works more heavily than the property rights of the owners of those works.  However, the reach of the DMCA is vast and it does not allow courts the discretion to make this assessment and render a value judgment untethered from the language of the statute.  In the words of Justice Cardozo, "[l]aws are not to be sacrificed by courts on the assumption that legislation is the play of whim and fancy."  People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 62 (1920).  The court is bound by the DMCA provisions at issue, even if it determines the extent to which innovative technologies realize their future potential.

120.  Because RealDVD makes a permanent copy of copyrighted DVD content, there is no exemption from DMCA liability, statutory or otherwise, that applies here.  Whatever application the fair use doctrine may have for individual consumers making backup copies of their own DVDs, it does not portend to save Real from liability under the DMCA in this action.

United States District Court

For the Northern District of California

III.     Breach of Contract

A.     Choice of Law

121.  The parties positions on the CSS License Agreement raises threshold choice of law issues.  Real argues that contract interpretation is a matter controlled by state law.  On the other hand, the Studios' and DVD CCA's positions focus on federal copyright law.  The Studios point to the general principle that federal copyright law provides that "copyright licenses are assumed to prohibit any use not authorized."  <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081, 1088 (9th Cir. 1989).

122.  In the CSS License Agreement, the parties explicitly agreed its construction would be governed by California state laws.  <u>See</u> CSS License Agreement, § 10.4(a).  Because this action involves deciding whether Real breached the license, the court agrees with Real that California law governs.  However, as this court has held previously, federalism principles dictate that state rules of contractual construction cannot interfere with federal law or policy.  <u>SQL Solutions, Inc. v. Oracle Corp.</u>, 1991 WL 626458, *3 (N.D. Cal. 1991) (Patel, J.).  Thus, the Studios and DVD CCA are correct to the extent that the license must be construed in accordance with the purposes underlying federal copyright law.  <u>S.O.S., Inc.</u>, 886 F.2d at 1088 (relying on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy), <u>citing</u> <u>Cohen v. Paramount Pictures Corp.</u>, 845 F.2d 851, 854 (9th Cir.1988).  The court proceeds to apply state law in a manner that does not conflict with federal copyright law and policy.

B.     Other Preliminary Issues

123.  Next, Real argues that when the scope of the license is the issue, the copyright owner bears the burden of proving that the copying was unauthorized.  <u>Bourne v. Walt Disney Co.</u>, 68 F.3d 621, 631 (2nd Cir. 1995); <u>SOS, Inc.</u>, 886 F.2d at 1085.  DVD CCA argues that because the assertion of a license is an affirmative defense, Real necessarily has the burden of establishing that the terms of the license authorized its conduct.  The court finds DVD CCA's position here unconvincing.  Where the existence of a license is not in dispute, and only the scope of the license is at issue, the licensor bears the burden of proving that the defendant's copying was unauthorized.  <u>See</u> <u>Bourne</u>, 68 F.3d 621, 631 (2nd Cir. 1995) ("[c]opyright disputes involving only the scope of the alleged

42

infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities."). DVD CCA moved for declaratory relief on its breach of contract counterclaim in this action and DVD CCA bears the burden to show that Real has breached its contractual agreement with DVD CCA.

124. The contractual agreement between Real and DVD CCA is embodied in an interrelated set of documents. The court has found that the CSS License Agreement, along with the CSS Procedural Specifications and the technical specifications (i.e., the CSS General Specifications, Authenticator Module for CSS Decryption Module, DVD-Video Descrambler, and Authenticator Module for DVD Drive), form the contractual agreement between Real and the DVD CCA. The CSS License Agreement made clear that Real must comply with the CSS Procedural Specifications and the technical specifications appropriate to its membership category. Real agrees that the CSS License requires licensees to comply with the CSS Specifications, which include the procedural and technical specifications. However, Real disputes that it is required to comply with the CSS General Specifications, a confidential technical specification that is said to provide general technical guidance for all manufacturers of DVD playback systems.

The CSS License Agreement and the CSS Procedural Specifications were made available to Real at the outset, i.e., on the DVD CCA website and prior to execution. These documents provided all of the non-confidential details about the terms and conditions of use of the CSS technology. That the confidential technical specifications were not delivered until after selection of the appropriate membership category by Real and execution of the agreement does not mean they were not part of the contractual agreement between Real and DVD CCA.

125. The process whereby Real became a CSS licensee was by following the DVD CCA's standard licensing procedure, as clearly set forth on the DVD CCA website. DVD CCA licensing administrators assisted with the process and provided documentation and feedback in accordance with DVD CCA's standard operating practice. Real had to select the type of technology for which it sought a license, e.g., to build a DVD Player, DVD Drive, Descrambler, Authenticator, etc., before it could execute the license and receive the appropriate technical specifications. DVD CCA testified,

43

1    and Real understood, the "appropriate" technical specifications were those that would provide the

2    confidential information necessary to ensure that Real's device would be in technical compliance

3    with the agreement between Real and DVD CCA. This seems entirely reasonable, given the highly

4    confidential nature of the specifications and the diversity of technologies for which a license could

5    be sought.

6        Indeed, Real did not elect to return (or destroy, with appropriate certification) the CSS

7    General Specifications after it received them, as Real had a right to do under the agreement. See

8    CSS License Agreement, § 4.1 (providing the steps by which a licensee can reject CSS

9    specifications delivered after execution that are not relevant to the membership category it has

10   deleted or not selected). This behavior indicates that Real understood it to be bound by the CSS

11   General Specifications as well as the other technical specifications received after execution of the

12   CSS License Agreement. See Kennecott Corp. v. Union Oil Co., 196 Cal. App. 3d 1179, 1190 (Cal.

13   App. 1987) (a court "is required to give 'great weight' to the conduct of the parties in interpreting

14   the instrument before any controversy arose") (citation omitted).

15       Moreover, the record is clear that Real had knowledge that it would receive the technical

16   specifications in the order that it did—after membership selection and execution of the CSS License

17   Agreement. The CSS License Agreement does not specify the number or particular titles of the

18   technical specifications relevant to each membership category, but instead states that it will receive

19   "proprietary information and/or CSS Specifications" upon selection of one or more membership

20   categories and appropriate payment. See CSS License Agreement, § 4.1. There is a dearth of

21   evidence in the record to compel the court to either ignore that language or to read it to hold the CSS

22   General Specification outside the bounds of the "proprietary information and/or CSS Specifications"

23   terms, so as to exclude it from the contractual agreement between Real and DVD CCA (hereinafter,

24   the "Agreement" or the "CSS License Agreement" will be used to characterize the contract).

25   Despite Real's arguments to the contrary, the court does not deem this finding in conflict with the

26   Kaleidescape holding, which involved different facts and a different party.

27

28

United States District Court

For the Northern District of California

C.      Breach of Contract

126.  Under California Law, contracts are interpreted to reflect the mutual intent of the parties at the time of contracting.  Cal. Civ. Code § 1636; Cedars-Sinai Medical Ctr. v. Shewry, 137 Cal. App. 4th 964, 979 (Cal. App. 2006). The starting point for ascertaining the parties' intent is the language of the agreement.  Cal. Civ. Code § 1638; Crawford v. Weather Shield Mfg. Inc., 44 Cal. 4th 541, 552 (Cal. App. 2008).  The language of the contract must be interpreted as a whole to give effect to each provision.  Cal. Civ. Code § 1641.

127.  Real asserts that it fully complies with the CSS License Agreement and any and all other documents that form its contractual agreement with DVD CCA.  Real contends that it complies with the Agreement not only by preserving all of the associated protections but also by adding additional layers of protection.  According to Real, the Agreement does not ban all copying of DVDs, but rather, only requires copy protection to the extent that the technical specifications mandate certain functions be preserved in compliant DVD products.

Real contends the CSS-licensed universe for copy protection is contained in the definition of "Copy Protection Functions" in the CSS Procedural Specifications.  See CSS Procedural Specifications § 1.8.  The court agrees.  However, this does not compel the conclusion that Real's RealDVD player does not breach this provision of the Agreement because Real places its own "internal data and signal restrictions and protections" on the data.  Id.  Namely, Real's argument that its own layer of AES protection satisfies the provision referenced therein, which requires the "unscrambled compressed data representing video content or keys initially encrypted using CSS not be carried on a user accessible bus," see § 6.2.4.2, is fallacious.  Real's own layer of protection is inconsequential, from a contract interpretation standpoint, when considering the language of the Agreement between Real and DVD CCA, which concerns CSS technology.  To read the various provisions of the Agreement that grant the licensee some leeway in using unspecified methods of achieving the intended result to mean that the licensee could dispose of the CSS technology, once it had initially been used to unlock and unscramble the CSS-protected data, would be a tortured reading indeed.

United States District Court

For the Northern District of California

128.  The law does not favor Real's complete disavowal of the contract recitals and the intent of the DVD CCA as licensor, based on the Agreement allegedly being a contract of adhesion.  In fact, the law does not permit such a reading.  To break down the allegations, the court first considers whether the Agreement is a contract of adhesion.  A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."  Ting v. AT & T, 319 F.3d 1126, 1148 (9th Cir. 2003); Oestreicher v. Alienware Corp., 502 F. Supp. 2d 1061, 1069-70 (N.D. Cal. 2007) (Patel, J.).

Here, it is uncontested that the Agreement was a standard form agreement.  Real had no opportunity to negotiate any of the provisions, including the confidential technical specifications only given to Real after execution of the Agreement. Though Real may be a large company, its interaction with DVD CCA was in the capacity of an entity seeking to build a product that implements CSS technology and Real had no choice but to accept the CSS License Agreement in order to make a DVD product that interacts with CSS-protected DVDs.  That requirement, and the absence of any alternatives, eliminated Real's bargaining power.  Madden v. Kaiser Found. Hosps., 17 Cal. 3d 699, 711 (1979) ("In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any realistic opportunity to look elsewhere for a more favorable contract."); Graham v. Scissor-Tail, Inc., 28 Cal. 3d 807, 818 (1981).  Thus, the court finds that the Agreement was a contract of adhesion.

129.  Contrary to Real's contentions, however, this does not end the inquiry.  Contracts of adhesion must still be interpreted in the light of the reasonable expectations of the adhering parties. State Farm Fire & Cas. Co. v. Keenan, 171 Cal. App. 3d 1, 14 (1985).  Real cannot ignore DVD CCA's expectations or intent at the time of contracting solely because the contract is adhesive.  The court takes due account of DVD CCA's explanation that uniform intellectual property licenses are rarely subject to separate negotiation with each prospective licensee, particularly when involving the setting of standards.  This is not to say that intellectual property licenses are subject to less negotiation than real property licenses, just because the former grants permission to use the property within certain limits and the latter may grant permission to buy the property.  The limits on

United States District Court

For the Northern District of California

1   intellectual property licenses can vary, e.g., as to the field of use, commercialization requirements,

2   sublicense rights, etc.  In this case, given the structure of the DVD CCA and the desired uniformity

3   of the access to be granted—the ability of devices to play DVDs—there is an understandable benefit

4   to leaving the terms non-negotiable and granting all subscribing parties, across all industries, a level

5   playing field for this basic ability.

6        Even though the Agreement between Real and DVD CCA is standardized or adhesive does

7   not in and of itself mean it is unenforceable.  Absent clear evidence of other factors, such as undue

8   oppression or unconscionability, which has not been put forth here, the Agreement must be enforced

9   according to its terms.  See Graham, 28 Cal.3d at 819 ("a contract of adhesion is fully enforceable

10  according to its terms unless certain other factors are present which, under established legal

11  rules—legislative or judicial—operate to render it otherwise.").  The only contention Real makes

12  relevant to this inquiry is that the Agreement does not fall within Real's reasonable expectations and

13  thus should not be enforced against it as the adhering party.  The record is lacking in findings on this

14  issue, in part because Real never communicated its "reasonable expectations" to DVD CCA at the

15  time of formation or anytime thereafter and prior to initiating suit.  Under established principles of

16  contract interpretation, as noted above, the Agreement must be interpreted to reflect the mutual

17  intent and reasonable expectations of the parties *at the time of contracting*.  See Cal. Civ. Code §

18  1636; Cedars-Sinai Medical Ctr, 137 Cal. App. 4th at 979.

19       130.  In general, because Real assented to the Agreement at the time of formation, it is bound

20  by its provisions.  Madden v. Kaiser Found. Hospitals, 17 Cal.3d 699, 710 (1976).  Even with

21  standardized or adhesion contracts, the provisions therein will not operate to limit the duties or

22  liability of the stronger party unless such provisions are "conspicuous, plain and clear," see Steven

23  v. Fidelity & Casualty Co., 58 Cal.2d 862, 878 (1962), and "will not operate to defeat the reasonable

24  expectations of the parties."  See Atlantic Nat. Ins. Co. v. Armstrong, 65 Cal.2d 100, 112 (1966);

25  Madden, 17 Cal.3d at 710.  Real did not communicate its reasonable expectations at the time of

26  contracting, which is the proper time to evaluate the parties' expectations.  By contrast, DVD CCA's

27  reasonable expectations were embodied in the contract recitals it drafted.  See 17A C.J.S. (1999)

28  Contracts, § 317, p. 340 ("Since recitals indicate only the background of a contract, that is, *the*

47

*purposes and motives of the parties*, they do not ordinarily form any part of the real agreement.") (emphasis added).

DVD CCA contends that Real had additional, extraneous "notice" of DVD CCA's reasonable expectations as to the copy prevention objectives of the Agreement before it executed the CSS License Agreement, based on DVD CCA's position in the <u>Kaleidescape</u> litigation. DVD CCA argues that Real was aware that DVD CCA interpreted the Agreement to require compliant products to play back DVD content with the DVD Disc contemporaneously present in the DVD Drive, and that DVD CCA considered the Kaleidescape system noncompliant because it played back from a copy of the CSS-protected content without the DVD Disc in the DVD Drive of the playback device. The court rejects this argument, based on DVD CCA's own position that the <u>Kaleidescape</u> holding has no bearing on the application of CSS specifications to Real. DVD CCA cannot have it both ways—either the <u>Kaleidescape</u> holding has application to Real's interpretation of the Agreement or it does not. For the purposes of the instant motion, the court finds it does not.

131. Nevertheless, the court finds that Real is bound to the DVD CCA's reasonable expectations and understanding of the unambiguous terms of the CSS License Agreement. Real failed to communicate to DVD CCA at the time of contract formation its understanding of the Agreement as being contrary to the recitals, which properly indicate the purposes and motives of the drafting party in an adhesion contract. Real cannot vindicate itself from its own failure to communicate a contrary interpretation based on the interpretive contract rule Real cites, often referred to as the rule "of last resort," to argue that ambiguities in the Agreement should be construed against the drafter. Cal. Civ. Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."); <u>Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan</u>, 329 F. Supp. 2d 1198, 1216 (C.D. Cal. 2004). DVD CCA is correct that this rule, aptly named, only comes into play when the meaning of an adhesive contract cannot be ascertained through the agreement's text and the extrinsic evidence of the parties' understanding. <u>Chow v. Levi Strauss & Co.</u>, 49 Cal. App. 3d 315, 325 (Cal. App. 1975); <u>Rainier Credit Co. v. W. Alliance Corp.</u>, 171 Cal. App. 3d 255, 263 (Cal. App. 1985). That is not the case here.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

132.  The court should only admit and consider extrinsic evidence to assist in contract interpretation when the text of the Agreement can reasonably be understood in more than one way. See Rainer Credit Co., 171 Cal. App. 3d at 261.  The court finds that Real's interpretation of the text of both the non-technical and the technical CSS specifications is unreasonable.  The CSS License Agreement and the CSS Procedural Specifications (the non-technical specifications) make clear that the CSS system combines multiple layers of encryption with an authentication process to protect DVD content from unauthorized access or unauthorized consumer copying.  The CSS License Agreement states on its first page that CSS was developed to "provide reasonable security to the contents of DVD discs" and to "provide protection for copyrighted content against unauthorized consumer copying." Pak Dec., Exh. J (Recital A).  The CSS License Agreement and the CSS Procedural Specifications both clearly bar circumvention of CSS technology.  See id. § 5 & Pak Dec., Exh. P (§ 6.2.12) (section entitled "No Circumvention.").

133.  As to the technical specifications, the court will not flyspeck the proprietary and confidential technical specifications, but instead points to general objectives and requirements and addresses a few of Real's specific arguments, to deconstruct the nature of its unreasonable interpretation and attendant breach of contract.

First, the CSS General Specifications set forth, as one of the objectives of CSS, "to prevent digital-to-digital copying in a personal computer environment."  Pak Dec., Exh. L (§ 1.2).  Those specifications also indicate that CSS is meant "to prevent casual users from the unauthorized copying of copyrighted materials recorded on DVD-Video/Audio Discs." Id. § 1.5.  The CSS General specifications require the confidential algorithm configured by the security keys and the DVD's content be obtained directly from the DVD, at which time the keys are decrypted and the content is descrambled and sent to the display device, without any opportunity for interception of the data and creation of a digital copy of the content.  Id. § 2.1.2.

Real argues it satisfies the requirement that a DVD drive "lock" so as to prevent pre-authorized access to, or interception of, its contents when reading DVD content from a hard drive by using its own encryption algorithms and keys.  This is an unreasonable interpretation of the

**United States District Court**
For the Northern District of California

Agreement's requirements.  The fact that RealDVD "locks" the DVD content to a computer's hard drive is irrelevant for the purposes of license compliance, because the "locking" has little to do with CSS.  Likewise with the encryption steps,  Real disregards the rest of the Agreement's requirements concerning authentication and bus encryption and in so doing Real violates specific provisions of the technical specifications that form the Agreement.  Real's application of a different or additional layer of encryption fails to excuse noncompliance with the CSS Specifications that both require particular forms of CSS encryption and that bar the output of CSS-encrypted keys at particular steps of the process.  To hold otherwise would effectively read out the "encrypted using CSS" requirement that is present throughout the Agreement.

134.  The crux of Real's technical argument is that "once is enough," meaning the layers of CSS protection (drive-locking, authentication, bus encryption, secure storage of content keys) need only be present and complied with upon the initial insertion of a DVD in RealDVD.  The court found this argument nugatory in the context of the DMCA and finds the same here.  Were the court to accept Real's interpretation of the Agreement, it would lead to absurd results.  Such an interpretation would sanction virtually any behavior by a CSS Licensee who engaged in transmitting or outputting DVD content to a hard drive or other storage location, in whatever form it wished and for whatever purpose it desired, so long as the Licensee began with content that was initially CSS encrypted and supplied its own content protection to the content throughout whatever transmutation process the Licensee chose to implement.  Such an interpretation would render null both the overall essence of the Agreement as well as a variety of specific technical steps therein.  Real's justification is nothing more than a failed coverup, both literally (of the keys) and figuratively (of Real's illegal behavior).  This is exemplified by Real's expert, Dr. Bishop's description of one encryption step using keys that could only be described as "blobs" because they were layered with CSS and AES encryption but still failed to comport with any definition provided in the Agreement.

135.  As explained by the DVD CCA's expert Dr. Kelly, and as admitted by Real's expert Dr. Bishop, by the time RealDVD applies its own content protection—AES encryption—RealDVD has already breached the Agreement and made a playable hard drive copy of CSS-protected DVD content.  The purpose of the mandated process in the Agreement is to require a direct path whereby

United States District Court

For the Northern District of California

the DVD content is transmitted only to certain digital outputs so as to permit a DVD player to playback a DVD. Dr. Kelly explained that the Agreement requires the transmission to occur in a manner that prevents interception and the creation of a copy of the keys and DVD content on an intermediate storage device, such as a computer hard drive. The court agrees that the provisions of the CSS License Agreement and associated technical specifications unambiguously rule out a system that diverts and copies the data to be stored on a hard drive for future playback without the DVD. The Agreement itself explicitly provides for a direct path by which the scrambled DVD content and keys travel from the DVD through the CSS decryption module for display upon playback. As noted earlier, the language of the Agreement must be construed in accordance with the purposes underlying federal copyright law, and copyright license agreements are assumed to prohibit any use not authorized. See S.O.S., Inc., 886 F.2d at 1088. Moreover, the Agreement contains an express provision disclaiming the grant of implied licenses in any form. See Pak Dec., Exh. J (§ 2.5). It would be contrary to the tenets of contract law to read the Agreement to except systems using AES or any other form of alternative or additional encryption from complying with these CSS specifications.

136. The court is mindful that it should not limit its determination of the meaning of the Agreement to its four-corners "merely because it seems to the court to be clear and unambiguous" when the language is reasonably subject to multiple interpretations. Rainier Credit Co., 171 Cal. App. 3d at 261. So if there was some uncertainty within the provisions that grant some leeway to the licensees to accomplish certain tasks by using "any method to achieve this result," see, e.g., CSS Procedural Specifications, § 6.2.4.2, such that the Agreement could "reasonably" be subject to multiple interpretations, the court should consider extrinsic evidence to determine what the parties actually intended the words of the contract to mean at the time.

137. In this case, upon consideration of the extrinsic evidence in the record, the court finds that Real's lack of communication at the time of contracting forecloses the possibility of according any weight to Real's "reasonable" interpretation. See Cal. Civ. Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, *at the time of making it*, that the promisee understood it.") (emphasis added). If

51

United States District Court

For the Northern District of California

extrinsic evidence exists to show that one party understood that the other party interpreted the contract in a particular way, and that party did not communicate a contrary interpretation to the other party, then the other party's interpretation shall control.  See United Teachers of Oakland, Local 771 v. Oakland Unified School Dist., 75 Cal. App. 3d 322, 330 (Cal. App. 1977); Winet v. Price, 4 Cal. App. 4th 1159, 1166 n.3 (Cal. App. 1992); see also Restatement (Second) of Contracts § 201(2)(a) (1981) ("Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party."); Merced County Sheriff's Employee's Assn. v. County of Merced, 188 Cal. App. 3d 662, 673 (Cal. App. 1987) (binding the parties to plaintiff's contractual understanding when defendant had reason to know of plaintiff's understanding and never communicated its understanding to plaintiff); Johnston v. Comm'r, 461 F.3d 1162, 1165 (9th Cir. 2006) (same).  Accordingly, the lack of Real's communication of a contrary interpretation to DVD CCA at the time the Agreement was executed means that DVD CCA's interpretation, embodied in the general text of the Agreement, controls.

138.  The fact that Real's construction would lead to a very unreasonable result makes it all the more unlikely that DVD CCA could have assented to it.  Certainly not all prospective licensees who elected the CSS technical specifications that Real did were electing to build DVD copiers.  The court finds that DVD CCA has met its burden to show that copying of CSS-protected DVD content was unauthorized under the terms of the Agreement.  Real has failed to show that its unreasonable result is one that either the parties could have intended or that DVD CCA was aware that Real intended at the time of formation.  At no time during the process whereby Real became a CSS licensee, which included working with DVD CCA licensing administrators who provided documentation and feedback in accordance with DVD CCA's standard licensing practice, did Real provide its own feedback to memorialize its own expectations regarding the licensing requirements.  Real's lack of communication to DVD CCA on this issue was paramount, given the disparity between this interpretation and DVD CCA's communicated reasonable expectations.  Real had the burden to make its contrary interpretation abundantly clear, which Real did not.  Instead, Real

withheld its own subjective construction of the Agreement, along with its subjective belief that the CSS General Specifications did not form part of the Agreement, from the DVD CCA.  These unspoken beliefs cannot provide after-the-fact evidence of Real's reasonable expectations upon entering into the contract.  This is particularly so because the anti-copying and anti-circumvention provisions of the Agreement were unambiguous on their face.

139.  Based on the foregoing analysis and the court's findings concerning Real's circumvention of CSS technology in the DMCA section of this order, the court finds that Real has breached the contractual Agreement with the DVD CCA.  Real's use of the CSS keys to copy DVD content to the hard drive of a Facet machine, or a computer by using the Vegas software, is a breach of the CSS License Agreement.  None of the steps Real takes, to circumvent CSS in order to copy the CSS-protected DVD content, is authorized by the CSS License Agreement.  The court has found that Real has failed to comply with the terms of the agreement at several levels, including not abiding by the requirements the court has found in the CSS License Agreement to preserve CSS protections of DVD drive-locking, authentication, bus encryption and storage of the CSS keys in secure areas on the RealDVD copies.

140.  As a licensee to the Agreement, Real had no authority to make RealDVD products that copy DVD content.  Other courts have come to this same conclusion.  See, e.g., 321 Studios, 307 F. Supp.2d at 1096 ("Licensed DVD players have been issued a key to decrypt CSS, and in exchange must adhere to strict prohibitions on copying the decrypted DVD."); Reimerdes, 111 F.Supp.2d at 310 ("In order to ensure that . . . compliant devices could not be used to copy as well as merely to play CSS-protected movies, the technology is licensed subject to strict security requirements.").  That Real preserves CSS encryption on DVD content copied to a hard drive does not forgive Real's other violations and breaches of the CSS License Agreement.  The RealDVD products, by their very nature, open a veritable Pandora's box of liability for Real.

United States District Court

For the Northern District of California

D.      Breach of The Covenant of Good Faith and Fair Dealing

141.  "[E]very contract [includes] an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Locke v. Warner Bros., 57 Cal. App. 4th 354, 363 (Cal. App. 1997).  "The covenant creates a duty of good faith and fair dealing in a contract's performance and enforcement."  In re Marriage of Corona, 172 Cal. App.4th 1205, 1220 (Cal. App. 2009) (citation omitted).

142.  The court finds that Real has breached the covenant of good faith and fair dealing. Real argues there is nothing in the Agreement that prohibits Real from performing the steps required by the CSS system (drive locking, authentication, decryption, etc.) only when a DVD is inserted the first time, and never again.  However, this interpretation clearly violates the Agreement's intent and Real's knowledge of the licensor DVD CCA's intent.  That the Agreement does not explicitly ban the order in which Real copies DVD content onto a hard drive has no force from a legal standpoint, given that the step of playing back DVD content from a RealDVD hard drive itself violates the Agreement, both expressly and impliedly.  By eliminating the role of the DVD drive and the physical DVD from the entire playback process in RealDVD products, the court finds that Real has failed to act in good faith and with fair dealing with DVD CCA.

143.  The copies of DVD content made by RealDVD, using Vegas or Facet, do not include most of the protections provided by CSS and mandated by the Agreement, namely, DVD drive-locking, secure storage of keys on a DVD, CSS authentication or CSS bus encryption.  Once a DVD has been saved to a hard drive, RealDVD plays the movie from the hard drive and thus does not authenticate the DVD drive or receive encrypted keys at that time.  RealDVD's actions which divorce the authentication step from the descrambling and playback steps cannot be squared with the language of the Agreement and fail to represent a good faith attempt to comply with its provisions.

Again, here Real's lack of candor in informing the DVD CCA of its alternative interpretations of the Agreement do not help Real.  In business, the predictability of law is necessary and parties in a contractual relationship must be able to proceed in their dealings based on a mutual understanding of the contract at the time.  This understanding is based on an up-front agreement as

54

to the terms of the contract upon execution of the agreement.  The obligations imposed by the covenant of good faith and fair dealing "preclude one party from taking action that frustrates the other party's contractual expectations."  Guz v. Bechtel Nat'l Inc., 24 Cal. 4th 317, 349 (2000).  Here, Real remained silent and later acted in a manner that frustrated DVD CCA's clear and reasonable expectation of the Agreement.  In so doing, Real violated the covenant of good faith and fair dealing.

IV.    Irreparable Harm

144.  In a case involving copyright claims, where a copyright holder has shown likelihood of success on the merits of a copyright infringement claim, the Ninth Circuit has held that irreparable harm is presumed.  LGS Architects, Inc. v. Concordia Homes of Nev., 434 F.3d 1150, 1155-56 (9th Cir. 2006).  In a case involving the circumvention of copyright protection systems, demonstration of a reasonable likelihood of success on the merits likewise creates a presumption of irreparable harm.  Universal City Studios, Inc. v. Reimerdes, 82 F. Supp.2d 211, 215 (S.D.N.Y. 2000) (technology that circumvents copy protection systems and thus facilitates infringement gives rise to "the same immediate and irreparable injury" as would occur with direct copyright infringement); see also Lexmark Intern., Inc. v. Static Control Components, Inc., 387 F.3d 522, 532 (6th Cir. 2004) (affirming presumption of irreparable harm in case involving circumvention of copy protection, stating "[w]e see no reason why a similar presumption of irreparable harm should not apply to claims under the DMCA.").  Further, the DMCA expressly provides for injunctive relief to "prevent or restrain a violation."  17 U.S.C. § 1203(b)(1).  Accordingly, the court presumes irreparable harm to the Studios, based upon their showing of likely success under the DMCA.

145.  Section 9.2 of the CSS License Agreement expressly entitles DVD CCA to preliminary or permanent injunctive relief for a breach of the agreement for the sale of non-compliant products or for otherwise "making available the means for widespread unauthorized copying of copyrighted content intended to be protected using CSS," to force licensees to remove non-compliant products from the market.  Pak Dec., Exh. J (§ 9.2).  The Agreement further provides that injury arising from a breach "will be irreparable."  Id.  Based on this stipulated irreparable injury provision, the court

United States District Court

For the Northern District of California

55

United States District Court
For the Northern District of California

1    finds that DVD CCA is entitled to injunctive relief, based upon its showing of likely success on its

2    breach of contract claim.

3        Real's arguments that an injunction is improper if it goes beyond the parties' agreement or if

4    the terms of the obligation sought cannot be ascertained with certainty are misplaced, given the

5    certain specified injunctive relief and irreparable injury provisions in the Agreement. This ruling is

6    not inconsistent with California Civil Code section 3423(e) (providing instances in which an

7    injunction may not be granted). Accordingly, the court finds the contractual stipulations in the

8    Agreement sufficient to establish the element of irreparable harm for the purpose of issuing

9    preliminary injunctive relief.

10   CONCLUSION

11

12       For the foregoing reasons, the court GRANTS the Studio plaintiffs' and DVD CCA's motion

13   for a preliminary injunction against Real. RealNetworks is hereby preliminarily enjoined from

14   engaging in, or facilitating others in, manufacturing, importing, offering to the public, providing or

15   otherwise trafficking in the product known as RealDVD, whether termed Vegas, Facet or another

16   internal name, or any substantially similar software application or other product, service, device,

17   component or part thereof that circumvents or otherwise fails to protect against access to,

18   duplication of, and/or redistribution of CSS-protected and copyrighted DVD content. The Studios

19   and DVD CCA may submit a proposed order for injunctive relief if anything further is sought, or if

20   the parties can reach a stipulated proposed order for injunctive relief, they may submit it, without

21   waiving any rights to appeal the injunction.

22       RealDVD makes a permanent copy of copyrighted DVD content and by doing so breaches its

23   CSS License Agreement with DVD CCA and circumvents a technological measure that effectively

24   controls access to or copying of the Studios' copyrighted content on DVDs. Had Real's products

25   been manufactured differently, i.e., if what happened in Vegas really did stay in Vegas, this might

26   have been a different case. But, it is what it is. Once the distributive nature of the copying process

27   takes hold, like the spread of gossip after a weekend in Vegas, what's done cannot be undone.[2]

28

The court hereby converts the Studios' temporary restraining order bond, posted in the sum of $1,000,000.00 on October 6, 2008, to a preliminary injunction bond, to compensate Real for its losses in the event that this injunction is reversed or vacated.

Real will be ordered to file a report in writing and under oath setting forth in detail the manner and form in which Real has complied with the injunction, within thirty (30) days after the entry of the order that confirms the bounds of this injunction. Until such time the injunction remains in full force and effect as described above.

IT IS SO ORDERED.

Dated: August 11, 2009

_____

MARILYN HALL PATEL
United States District Court Judge

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

## <u>ENDNOTES</u>

1.  All Docket numbers refer to the Electronic Court File for the declaratory judgment suit filed by Real, under the assigned case number C 08-04548 MHP.

2.  Or, in the words of a Shakespeare contemporary, "What is done is done: Spend not the time in tears, but *seek for justice*." John Ford, '<u>Tis Pity She's a Whore</u> (1633) (emphasis added).