1   JAMES A. DiBOISE, State Bar No. 83296         SUSAN CREIGHTON, State Bar No. 135528
    Email: jdiboise@wsgr.com                      Email: screighton@wsgr.com
2   LEO CUNNINGHAM, State Bar No. 121605          RENATA B. HESSE, State Bar No. 148425
    Email: lcunningham@wsgr.com                   Email: rhesse@wsgr.com
3   COLLEEN BAL, State Bar No. 167637             WILSON SONSINI GOODRICH & ROSATI
    Email: cbal@wsgr.com                          Professional Corporation
4   MICHAEL A. BERTA, State Bar No. 194650        1700 K Street, NW, Fifth Floor
    Email: mberta@wsgr.com                        Washington, D.C. 20006-3817
5   TRACY TOSH LANE, State Bar No. 184666         Telephone: (202) 973-8800
    Email: ttosh@wsgr.com                         Facsimile: (202) 973-8899
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation                      JONATHAN M. JACOBSON, NY 1350495
7   One Market Street                             Email: jjacobson@wsgr.com
    Spear Tower, Suite 3300                        WILSON SONSINI GOODRICH & ROSATI
8   San Francisco, CA 94105                       Professional Corporation
                                                  1301 Avenue of the Americas, 40th Floor
9                                                 New York, NY 10019-6022
                                                  Telephone: (212) 999-5800
10                                                Facsimile: (212) 999-5899

11  Attorneys for Plaintiffs and
    Counterclaim Defendants
12  REALNETWORKS, INC. and
    REALNETWORKS HOME
13  ENTERTAINMENT, INC.

14

15                      UNITED STATES DISTRICT COURT

16                    NORTHERN DISTRICT OF CALIFORNIA

17  REALNETWORKS, INC., a Washington          Case Nos. C08 04548 MHP;
    Corporation; and REALNETWORKS HOME                  C08 04719 MHP
18  ENTERTAINMENT, INC., a Delaware corporation,

19                    Plaintiffs,             **REALNETWORKS, INC. AND
                                              REALNETWORKS HOME
20          v.                                ENTERTAINMENT, INC.'S
                                              OPPOSITION TO MOTION
21  DVD COPY CONTROL ASSOCIATION, INC., a     TO DISMISS COUNTERCLAIMS**
    Delaware nonprofit corporation, DISNEY
22  ENTERPRISES, INC., a Delaware corporation;
    PARAMOUNT PICTURES CORP., a Delaware
23  corporation; SONY PICTURES ENTER., INC., a
    Delaware corporation; TWENTIETH CENTURY
24  FOX FILM CORP., a Delaware corporation; NBC
    UNIVERSAL, INC., a Delaware corporation;
25  WARNER BROS. ENTER. INC., a Delaware
    corporation; and VIACOM, Inc., a Delaware
26  Corporation,

27                    Defendants.

28  AND RELATED CASES

    REALNETWORKS' OPPOSITION TO MOTION TO
    DISMISS COUNTERCLAIMS
    CASE NO.: C-08-CV-04548-MHP

1

**TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION..................................................................................................................1

4 ARGUMENT .......................................................................................................................2

5 I. REALNETWORKS HAS ADEQUATELY ALLEGED DVD CCA'S ACTS IN
FURTHERANCE OF A GROUP BOYCOTT LED BY THE STUDIOS .......................2

6
   A. The Conspiracy Alleged Is Illegal Per Se .............................................................2

7
   B. The Allegations of Conspiracy Are More Than Sufficient ....................................4

8

9 II. DVD CCA'S PARTICIPATION IN THE CONSPIRACY MAY NOT BE
EXCUSED OR IMMUNIZED UNDER ANY OF DVD CCA'S THEORIES ................8

10
   A. DVD CCA's License Grant to Real Confirms Rather Than Negates DVD
CCA's Participation in the Studios' Conspiracy....................................................8
11
   B. DVD CCA Acted Outside Its Legitimate Purposes in Conspiring With Its
12 Member Studios .....................................................................................................9

13
      1. DVD CCA's Conduct Does Not Deserve Protection From Per Se
Liability Under the NCRPA.......................................................................9
14

15
      2. DVD CCA's Conduct Does Not Deserve Protection From Per Se
Liability as the Conduct of a Joint Venture..............................................11

16
   C. DVD CCA's Conduct Is Subject to Section One Because DVD CCA Acted
as a Co-Conspirator, Not a Single Entity .............................................................12
17

18
   D. DVD CCA's Conduct Is Not Immunized Under the *Noerr-Pennington*
Doctrine ................................................................................................................14

19 III. REALNETWORKS HAS STATED A PLAUSIBLE CARTWRIGHT ACT
CLAIM FOR THE SAME REASONS ...........................................................................17
20

21 IV. REALNETWORKS HAS STATED A PLAUSIBLE UNFAIR COMPETITION
CLAIM FOR THE SAME REASONS ...........................................................................18

22 V. CONCLUSION ...............................................................................................................18

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4   *Albrecht v. Herald Co.,* 390 U.S. 145 (1968).................................................................. 6

5   *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ..................................... 16

6   *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001)................................. 15

7   *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................................ 5, 8

8   *Associated Press v. United States*, 326 U.S. 1 (1945)........................................................ 7, 8, 11

9   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 5, 7, 8

10  *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995)............................................................ 15

11  *Blank v. Kirwan*, 39 Cal. 3d 311 (1985).......................................................................... 17, 18

12  *Cal. Dental Ass'n v. FTC,* 526 U.S. 756 (1999) ................................................................. 11

13  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240
        (9th Cir. 1982).......................................................................................................... 14

14

    *Columbia Pictures Indus. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525 (9th
15       Cir. 1991), *aff'd on other grounds,* 508 U.S. 49 (1993)........................................... 16

16  *Duplan Corp. v. Deering Milliken, Inc.*, 594 F.2d 979 (4th Cir. 1979) ..................................... 16

17  *Fashion Originator's Guild of America v. FTC*, 312 U.S. 457 (1941).................................... 1, 2, 3

18  *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180 (9th Cir. 2005)............................................ 16

19  *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir. 2003) .............................. 13, 17

20  *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171 (1999) .................................... 17

21  *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411 (1990) .................................................... 11

22  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256 (1983)............................................................... 17

23  *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195 (10th Cir. 2006) .............................. 13

24  *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482 (N.D. Ill. 1986) ........................ 14

25  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003 (N.D. Cal. 2008) .................................... 11

26  *In re New Mexico Natural Gas Antitrust Litig.*, MDL Dkt. No. 403,
        1982 WL 1827 (D.N.M. Jan. 26, 1982) ..................................................................... 15

27

28  *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.,*
        407 F.3d 1027 (9th Cir. 2005)........................................................................................ 12

1   *Nat'l Society of Prof.l Eng'rs v. United States*, 435 U.S. 679 (1978) ........................................... 13

2   *Princo Corp. v. ITC,* 563 F.3d 1301 (Fed. Cir. 2009) ............................................................... 4

3   *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
     508 U.S. 49 (1993) ............................................................................... 16

4

5   *State Oil Co. v. Khan,* 522 U.S. 3 (1997) ...................................................................... 6

  *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006) ....................................................... 11, 12
6

7   *United States v. Sealy, Inc.,* 388 U.S. 350 (1967) .............................................. 6, 17

8   *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963) ...................................... 14

  *VISA U.S.A., Inc. v. First Data Corp.*, 2006 WL 516662,
9      No. C 02-01786 JSW (N.D. Cal. Mar. 2, 2006) ........................................ 13

10   *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ............................ 3

11                 **STATUTES**

12   15 U.S.C. § 4301(b) ....................................................................................... 10

13   15 U.S.C. § 4303(a) ....................................................................................... 10

14             **MISCELLANEOUS**

15   H.R. Rep. No. 103-94 (1993) ................................................................... 9, 10

**INTRODUCTION**

RealNetworks' counterclaim against DVD CCA alleges a *per se* unlawful horizontal group boycott between and amongst the DVD CCA and its co-conspiring Studio members.  The claim derives from the agreement between the DVD CCA and its Studio members to preclude any individual Studio from negotiating individually for the use of its content in a product that enables the making of any copy – even a fair use copy – of a DVD.[1]  The legality of RealNetworks' RealDVD product is of no moment.  Under the Supreme Court's decision in *Fashion Originator's Guild of America v. FTC*, 312 U.S. 457, 467-68 (1941), this boycott is per se unlawful *irrespective of* Real's compliance with the DVD CCA license or this Court's recent ruling granting a preliminary injunction.  Indeed, this Court's decision confirms that the CSS License Agreement is a mechanism that assists in enabling the unlawful boycott, with precisely the anti-competitive effect described in Real's counterclaim.  It is the agreement of the DVD CCA, together with its Studio members, that no individual Studio may individually authorize the use of its copyrighted content on DVDs outside of the club created by the DVD CCA that gives rise to antitrust liability here.  Put simply, when, for example, Paramount requires the consent of Fox – and the authorization of the DVD CCA – in order to license RealNetworks to reproduce Paramount's own content, Section One of the Sherman Act controls.

The DVD CCA seeks to avoid the application of the Sherman Act to its unlawful conduct by invoking claims that RealNetworks does not make and defenses that cannot be supported.  Thus, although the DVD CCA devotes a large portion of its motion trying to undermine a purported "refusal to deal" claim against the DVD CCA, one need only read RealNetworks' counterclaim to recognize that RealNetworks asserts no such claim against the DVD CCA.  RealNetworks does not claim that the DVD CCA has refused to provide it with anything, or that the DVD CCA has engaged in any other unlawful unilateral conduct.  Nor does the viability of RealNetworks' claims against the DVD CCA depend upon any such allegation.

---

[1] Indeed, the DVD CCA's agreement has the effect of illegally extending the Studios' copyright such that a consumer no longer has a fair use right when it comes to content stored on a DVD.

1    The DVD CCA's "single entity" argument is also a red herring.  RealNetworks does not

2    allege that the DVD CCA has conspired with itself; rather, it alleges that the DVD CCA has

3    conspired with its Studio members to effectuate a per se unlawful group boycott.

4    The conduct that RealNetworks alleges is unlawful is not immunized by the *Noerr-*

5    *Pennington* doctrine.  DVD CCA's efforts to persuade this Court as to how the CSS License

6    Agreement should be interpreted are irrelevant to the viability of RealNetworks' claim.  This

7    Court's recent preliminary decision that RealNetworks' use of the CSS technology in its

8    RealDVD products is a breach of the CSS License Agreement does not negate the fact that it is

9    unlawful for the DVD CCA and its member Studios to have agreed not to negotiate with

10   RealNetworks on a unilateral basis.

11                                   **ARGUMENT**

12   **I.    REALNETWORKS HAS ADEQUATELY ALLEGED DVD CCA'S ACTS IN
            FURTHERANCE OF A GROUP BOYCOTT LED BY THE STUDIOS**

13

14   RealNetworks' Sherman Act Section 1 counterclaim alleges that the DVD CCA and its

15   Studio members have agreed that the only way for anyone – including RealNetworks – to obtain

16   authorization from the Studios to provide technology that enables consumers to make secure

17   back-up copies of DVDs that they own is if all of the Studios – through the DVD CCA – agree

18   jointly to grant that authorization.  As a consequence, no single Studio is permitted by the

19   agreement to negotiate individually with RealNetworks to permit the use of its content in

20   RealNetworks' technology and, perhaps more importantly, all of the Studios are insulated from

21   competition for the provision of this type of technology from companies like RealNetworks.  *See*

22   Dkt. No. 323 ("Counterclaims") ¶¶ 25-29.  RealNetworks alleges that the DVD CCA is the

23   instrumentality that gives life to the unlawful agreement.  This is a per se unlawful horizontal

24   group boycott under *Fashion Originator's Guild*, 312 U.S. at 467-68.

25   **A.    The Conspiracy Alleged Is Illegal Per Se**

26   As set forth below, the counterclaim allegations more than adequately allege an

27   agreement that is unlawful per se.  The group boycott that the DVD CCA umbrella purports to

28   protect is just as surely illegal as the group boycott the Supreme Court condemned in *Fashion*

1    *Originators' Guild*.  In that case, the co-conspiring textile and garment manufacturers adopted a

2    scheme under which textiles were to be sold to garment manufacturers only upon the condition

3    that buyers would not use or deal in textiles which had been copied from designs of textile

4    manufacturing members of the combination, and garment manufacturers would sell to retailers

5    only upon the condition that retailers would not use or deal in copied garment designs.  *Fashion*

6    *Originators' Guild*, 312 U.S. at 464.  In support of this scheme, Guild members and affiliated

7    textile manufacturers created and participated in a number of enforcement mechanisms based on

8    the mandatory registration of members' designs.  *Id.* at 461-62.  The Court summarily rejected

9    the Guild's attempt to defend its members' conduct as necessary protections against the

10   "devastating evils growing from the pirating of original designs," noting that "[a]s we have

11   pointed out, however, the aim of petitioners' combination was the intentional destruction of one

12   type of manufacture and sale which competed with Guild members."  *Id.* at 467.  There, as here,

13   the members of the conspiracy—and the organization that purports to protect their illegal

14   collective conduct—cannot escape antitrust liability by pointing to their efforts to stamp out the

15   evils of copying.  The boycott was held to be illegal *whether or not the copying itself was*

16   *unlawful as the Guild alleged*.  The Court said: "As we have pointed out, however, the aim of

17   petitioners' combination was the intentional destruction of one type of manufacture and sale

18   which competed with Guild members. . . .  [E]ven if copying were an acknowledged tort under

19   the law of every state, that situation would not justify petitioners in combining together to

20   regulate and restrain interstate commerce in violation of federal law." *Id.* at 467-68.

21            The agreement alleged here is an agreement among direct competitors (the Studios),

22   organized and implemented through the DVD CCA, to refuse to license RealNetworks except on

23   the competitors' collectively imposed terms.  Whether or not the license granted by DVD CCA is

24   reasonable or lawful, and whatever restrictions that license does or does not impose, is not the

25   issue.  The issue, rather, is the agreement that the only way any individual studio can or will

26   license its own, individually-owned content on DVDs is through the DVD CCA-sanctioned

27   license, *and that license alone*.  That type of agreement has long been considered illegal per se,

28   and nothing in the motion to dismiss suggests otherwise.  *See, e.g., Zenith Radio Corp. v.*

*Hazeltine Research, Inc.*, 395 U.S. 100, 118-19 (1969) (agreement among U.S. licensor and foreign competitors to license their patents to U.S. manufacturer only as a package and only for non-imported goods had clear purpose of excluding competitors who wanted to manufacture their goods elsewhere and was found illegal per se); *Princo Corp. v. ITC,* 563 F.3d 1301, 1315-16 (Fed. Cir. 2009) (agreement to license competitor in a way that precluded it from becoming a commercially viable technology found illegal per se).

### B.  The Allegations of Conspiracy Are More Than Sufficient

The DVD CCA goes to great lengths to obfuscate the nature of RealNetworks' claim so that it can argue that RealNetworks has failed to "plausibly allege" that the DVD CCA participated in a conspiracy.  The claim, however, is a straight-forward application of controlling law, as set forth above.  RealNetworks alleges that the DVD CCA and its Studio members have conspired to deprive RealNetworks of an input (copyrighted content) essential to competition in the relevant market, that the Studios participating in the boycott have a dominant position in the "input" market (again, copyrighted content), that the boycott is not justified by any efficiencies and, finally, that the boycott has an anticompetitive effect on the relevant market for technology used to enable consumers to make secure backup copies of DVDs that they own.  In its opposition, the DVD CCA only takes issue with RealNetworks' allegations regarding the DVD CCA's participation in the conspiracy, and so we address only those allegations below.

Importantly, here, the core facts that underlie RealNetworks' claims against the DVD CCA are essentially undisputed, and are alleged in detail in RealNetworks' counterclaims.  For example, in paragraph 1 of the counterclaims, RealNetworks alleges that "[t]he position of the DVD CCA and Studios about the CSS License Agreement was confirmed during the hearing on the preliminary injunction motion.  They acknowledge that the CSS License Agreement results from collective action by the Studios through the DVD CCA to prohibit all copying to a hard drive unless the Studios jointly authorize the making of such a copy. Pursuant to their interpretation of the CSS License Agreement, each Studio has ceded its individual authority to authorize the use of its movie content through *individual* copyright licenses in favor of a *joint agreement* to grant or withhold the use of such content – the CSS License Agreement."

1    Counterclaims ¶ 1.  Further detailed allegations illuminating the summary contained in paragraph

2    1 are contained in paragraphs 10-14 of the counterclaims.  These paragraphs allege facts as to the

3    DVD CCA and its participation in the unlawful scheme.  As set forth below, these allegations are

4    sufficient to state a claim against the DVD CCA and satisfy the pleading standards set forth in

5    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937

6    (2009).

7         RealNetworks' counterclaim against the DVD CCA pleads facts sufficient to give rise to

8    a reasonable inference that the DVD CCA and its Studio Members have engaged in conduct that

9    violates the antitrust laws, hence satisfying the plausibility requirements set forth in *Twombly*

10   (and reiterated in *Iqbal,* which was not an antitrust case).  The principal – and dispositive –

11   difference between this case and *Twombly* is that, here, there is no dispute that there is an

12   agreement.  The agreement not to license *except* pursuant to agreed-upon terms is part and parcel

13   of the CSS License Agreement, which the Studios and the DVD CCA claim mandates their

14   illegal boycott.  The existence of this agreement, RealNetworks' contractual relationship with the

15   DVD CCA, the relationship of the DVD CCA to the agreement and how the agreement operates

16   to harm competition are all alleged in the counterclaim.

17        Thus, RealNetworks alleges, among other things, that:

18        • The DVD CCA's expert, Dr. Kelly, testified "that the Studios and the DVD CCA

19             intend the CSS agreement to prohibit any copies of DVD content to a hard drive

20             without the authority of the Studios."  (Counterclaims ¶ 14)

21        • "Consumers are directly harmed by the Studios' and the DVD CCA's conduct.

22             The risk the Studios faced – that some one of them would do a deal with

23             RealNetworks or any other of their potential competitors – is the risk created by a

24             competitive marketplace. Consumers would have obtained a new technology to

25             gain more value from their DVDs, without having to pay again for a backup copy

26             of the DVDs they had already purchased. The Studios decided to short-circuit this

27             outcome so that they could appropriate all of the extra value themselves, through

28

1  the means of a group boycott. The DVD CCA was the instrumentality that they

2  used to effectuate the boycott." (Counterclaims ¶ 16)

3  • "Nonetheless, the DVD CCA and the Studios claim that the CSS Agreement

4  prevents the Studios from entering into individual licenses granting the right to

5  make digital copies of DVDs previously purchased by customers. To try to

6  enforce the illegal and unjustified terms in the CSS License Agreement, they

7  demand that in order to license the CSS technology, RealNetworks and other

8  potential competitors to the Studios must agree not to compete in the provision of

9  technology that would enable DVD owners to create and store a secure digital

10  copy of DVDs that they own." (Counterclaims ¶ 36)

11  • DVD CCA is the licensor of the Content Scramble System and RealNetworks is a

12  licensee of the DVD CCA. (Counterclaims ¶¶ 47, 59)

13  • The Studios are members of the DVD CCA and hold six of the twelve DVD CCA

14  board seats. (Counterclaims ¶ 47)

15  • "The DVD CCA recently approved an amendment to the CSS Specifications that

16  permits each Studio to decide independently whether and whom it will authorize

17  to enable the creation of such DVDs." (Counterclaims ¶ 68)

18  • "The technology that makes up the relevant market permits consumers to engage

19  in non-infringing conduct relating to the Studios' copyrighted audio-visual works.

20  As such, the DVD CCA and the Studios have no basis in copyright law to exclude

21  competition in this market. Moreover, even if licenses for digital copying were

22  necessary, the relevant copyrights relating to the underlying content are held by

23  the individual Studios, and there is no lawful basis for the Studios to negotiate for

24  such licenses only on collective terms." (Counterclaims ¶ 81)

25  The facts relating to the DVD CCA's role as the instrumentality that not only made

26  possible but helped effectuate the Studios' unlawful conduct are thus fully alleged in the

27  counterclaim. These allegations are more than sufficient to establish a conspiracy under Section

28  One. *See, e.g., Albrecht v. Herald Co.,* 390 U.S. 145, 149-50 (1968) (defendant's retention of

1   firm to solicit distributors' customers so that distributor would choose to comply with unlawful

2   terms was actionable conspiracy) (overruled on other grounds by *State Oil Co. v. Khan,* 522 U.S.

3   3 (1997)); *United States v. Sealy, Inc.,* 388 U.S. 350, 356 (1967) (association was liable where it

4   was used "as an instrumentality of the individual" competitor members).

5          RealNetworks has also alleged facts sufficient to support an inference that the

6   effectiveness of the CSS regime administered by the DVD CCA will not be impaired should an

7   individual Studio authorize the making of secure back-up copies of its content.  Thus,

8   RealNetworks has alleged facts that suggest that there is nothing about either the DVD CCA or

9   its legitimate mission of licensing CSS technology that necessitates this secondary unlawful

10  agreement.  Indeed, the DVD CCA itself has already once amended the CSS License Agreement

11  to permit the making of a form of secure copy (what is called "Secure Managed Recording")

12  provided that the copy is authorized by the applicable Studio copyright holder.  And the Studios

13  themselves have indicated their willingness to permit the creation of digital copies of their

14  content, through the release of their Digital Copy (or "Second Session") products.  *See*

15  Counterclaims ¶¶ 25, 32-35, 65-66.  *See, e.g., Associated Press v. United States*, 326 U.S. 1, 14-

16  15 (1945) (AP bylaws which prevented non-AP member newspapers from buying news from the

17  AP or its members and granting each AP member the power to block non-member competitors

18  from access constituted conspiracy in restraint of trade).

19          In short, the facts alleged in RealNetworks' counterclaims regarding the DVD CCA's

20  participation in the conspiracy go well beyond, for example, an allegation of simple parallel

21  conduct like that in *Twombly*.  The agreements at issue in RealNetworks' claims against the

22  DVD CCA are the CSS License Agreement and the admitted agreement not to license except

23  pursuant to the collectively agreed-upon License Agreement's terms.  The DVD CCA

24  administers the CSS License (indeed it is the licensor) and is the organization through which the

25  competing Studios make collective decisions regarding how and under what circumstances

26  "managed copy" technology will be released to the marketplace.  DVD CCA's participation was

27  essential to the Studios' agreement not to license.  Without the DVD CCA, each Studio would be

28  left to its own individual business decision concerning whether to negotiate a license with an

1   entity like RealNetworks; each would have to decide for itself whether it was in its own

2   economic interest to do so. *See* Counterclaims ¶ 16. Each would need to evaluate the

3   competitive landscape, the likely behavior of its Studio competitors and decide on an individual

4   basis whether such an agreement made sense. Instead, the DVD CCA provided the mechanism

5   by which the Studios collectively dictated the terms upon which other market players could

6   compete and thus served as nothing more than the umbrella organization for a naked cartel. *See*

7   *Associated Press*, 326 U.S. at 14-15.

8                                        *   *   *   *   *

9        RealNetworks has alleged facts sufficient to create a reasonable inference that the DVD

10   CCA, along with its Studio members, has engaged in conduct inconsistent with the antitrust laws

11   and that undermines the competitive process relating to the market for technology that allows a

12   consumer to make a secure back-up copy of a DVD that she owns. Neither *Twombly* nor *Iqbal*

13   require more.

14   **II.    DVD CCA'S PARTICIPATION IN THE CONSPIRACY MAY NOT BE
             EXCUSED OR IMMUNIZED UNDER ANY OF DVD CCA'S THEORIES**
15

16        **A.    DVD CCA's License Grant to Real Confirms Rather Than Negates DVD
                  CCA's Participation in the Studios' Conspiracy**
17

18        RealNetworks has alleged no separate "refusal to deal" claim that concerns what DVD

19   CCA alone did or did not offer to RealNetworks. *See* Motion at 7. What RealNetworks has

20   alleged is that DVD CCA participated in a conspiracy, *i.e.*, an agreement between the Studios

21   and DVD CCA, the effect of which is to make it impossible for RealNetworks to compete in the

22   market for providing technology that enables consumers to make secure back-up copies of DVDs

23   that they own. Counterclaims ¶ 81. By supporting the Studios in their agreement that no

24   individual Studio may individually authorize the use of its copyrighted content on DVDs acting

25   outside the confines of the DVD CCA, DVD CCA joined and furthered the Studios' group

26   boycott of RealNetworks. It would make no sense in the context of RealNetworks' claim to

27   allege that DVD CCA had unilaterally refused to deal with RealNetworks by refusing to grant it

28   a CSS License or anything else of competitive importance, since the claim is not about what

1  DVD CCA refused to do, but rather what it agreed to do in furtherance of the Studios' group

2  boycott.

3  **B.     DVD CCA Acted Outside Its Legitimate Purposes in Conspiring With Its
          Member Studios**

4

5  RealNetworks has alleged that the DVD CCA was able to conspire with its own

6  constituents—the Studios—because it was acting outside its legitimate purposes when doing so.

7  Its conduct does not deserve protection either under the National Cooperative Research and

8  Production Act ("NCRPA"), or as the conduct of a single entity, and its claims may not be

9  dismissed on that basis.

10  **1.     DVD CCA's Conduct Does Not Deserve Protection From Per Se
           Liability Under the NCRPA**

11

12  According to DVD CCA, this Court cannot impose per se liability for its role as the

13  umbrella covering the Studios' naked cartel because the existence of the DVD CCA was

14  properly notified under the National Cooperative Research and Production Act ("NCRPA").

15  Motion at 11.  On this basis, DVD CCA asserts, incorrectly, that RealNetworks has admitted that

16  DVD CCA "falls under the aegis of the NCRPA" and that "consequently" per se liability cannot

17  be imposed upon it.  *Id.*

18  NCRPA offers notified cooperatives no such absolute protection from per se liability.

19  The Act was not intended to provide an exemption from per se liability to all arrangements

20  calling themselves joint ventures.  H.R. Rep. No. 103-94, at 12 (1993).  The purpose of NCRPA

21  was not to change the antitrust laws substantially, but instead to provide clarification regarding

22  rules "mistakenly perceived to inhibit procompetitive . . . arrangements."  *Id.* at 16.  Specifically,

23  NCRPA was intended to reassure the business community that existing antitrust law encouraged

24  collaborative innovation and was not a "dampening force" on the American economy.  *Id.* at 13.

25  Following this reasoning, NCRPA offered reduced penalties for companies that notified the

26  regulatory agencies of their arrangement, and codified the existing antitrust law regarding joint

27  ventures – a bona fide joint venture should be judged by the rule of reason, but if the joint

28  venture "serves as a guise for . . . competitors to attempt to restrict competition" it should be

1   judged under the per se rule. 15 U.S.C. § 4301(b); 15 U.S.C. § 4303(a); H.R Rep. No. 103-94, at

2   13 (1993).  RealNetworks has specifically alleged that in participating in an agreement with the

3   Studios that no individual Studio may individually authorize the use of its copyrighted content

4   outside of the club created by the DVD CCA, DVD CCA acted outside its legitimate purposes:

5   "Achieving any limited legitimate purpose of the DVD CCA does not require a licensing

6   agreement that prohibits individual Studios from granting licenses to copy their content from

7   DVDs."  Counterclaims ¶ 34.  RealNetworks has adequately alleged that DVD CCA's

8   challenged conduct is beyond the scope of NCRPA protection.

9        The text of NCRPA makes clear that the conduct challenged here is outside the scope of

10   the definition of "joint venture" under the statute and, therefore, is not immunized from per se

11   liability.

12        (b) The term "joint venture" *excludes* the following activities involving two or more
13        persons:
         . . . .
14        (3) entering into any agreement or engaging in any other conduct—

15             (A) *to restrict or require the sale, licensing, or sharing of inventions,*
               *developments, products, processes, or services not developed through, or*
16             *produced by, such venture . . .*

17             that is not reasonably required to prevent misappropriation of proprietary
               information contributed by any person who is a party to such venture or of
18             the results of such venture,

19   15 U.S.C. § 4301(b) (emphasis added).  The challenged conduct alleged by RealNetworks

20   consists of an agreement between DVD CCA and its Studio members to exclude RealDVD as a

21   competitive threat to a product offered by the Studios—digital copies of movies and television

22   programs on DVD—that are not developed or produced by the DVD CCA.   Because that

23   agreement restricts the sale or licensing of movies and other content not developed through DVD

24   CCA, it is clearly not protected by the NCRPA.

25        Moreover, even if NCRPA applied here, the outcome simply would be to have

26   RealNetworks' claim treated under the rule of reason rather than the per se rule.  Since the

27   differences between rule of reason and per se treatment are often trivial, the distinction should

28

1   make no difference at this stage of the case.  *See, e.g., Cal. Dental Ass'n v. FTC,* 526 U.S. 756,

2   779 (1999).

3            **2.      DVD CCA's Conduct Does Not Deserve Protection From Per Se
                       Liability as the Conduct of a Joint Venture**

4

5            Nor does DVD CCA's formal organization as a joint venture offer it any protection from

6   *per se* liability for the conduct RealNetworks alleges.  Boycotts by formal joint ventures have

7   long been condemned as illegal per se.  *See, e.g., FTC v. Super. Ct. Trial Lawyers Ass'n,* 493

8   U.S. 411, 429-36 (1990);  *Associated Press*, 326 U.S. at 11-12.

9            Both of the cases DVD CCA cites in support of its argument that its conduct must be

10  assessed only under the rule of reason are inapposite.  *See* Motion at 9 (citing *Texaco, Inc. v.*

11  *Dagher*, 547 U.S. 1, 7 (2006) and *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1013

12  (N.D. Cal. 2008)).  Those cases concerned allegations of illegal price-fixing by the members of a

13  joint venture for the good produced by the venture.  In both of those cases, it was clear that the

14  business practice being challenged involved "the core activity of the joint venture itself."

15  Motion at 9 (citing *Dagher*, 547 U.S. at 7).  In the *ATM Fee* case*,* the question was whether the

16  setting of the interchange fee was a "core activity" of the joint venture; in *Dagher*, the "core

17  activity" question concerned setting a unified price for gasoline produced by the joint venture.  *In*

18  *re ATM Fee*, 554 F. Supp. 2d at 1013; *Dagher*, 547 U.S. at 7.  As Judge Breyer explained in *In re*

19  *ATM Fee*:

20           Nonetheless, the holding in *Dagher* applies because like the price of gasoline, the
             interchange fee represents the price that one party to the transaction pays the other
21           party for the joint venture's product.  That is to say, like the pricing at issue in
             *Dagher*, plaintiffs in this case challenge a joint venture's right to put a price on the
22           good that the venture produces.  *Dagher* teaches that such challenges must be
             analyzed under the rule of reason.
23

24  *In re ATM Fee*, 554 F. Supp. 2d at 1013.  That is not the case here.  Even assuming that DVD

25  CCA's activities are appropriately considered as those of a legitimate joint venture, the

26  agreement challenged here is not one setting the price for the "good" the venture produces and

27  distributes via the CSS License.  *Dagher* and *In re ATM Fee* simply do not apply to the question

28  of whether an agreement between DVD CCA and its Studio members to exclude RealNetworks

1   as a competitive threat to a product offered by the Studios can be per se illegal.  This is

2   particularly true where that product does not even utilize CSS protection, the creation and

3   licensing of which is the admitted "core activity" of the DVD CCA.

4          In any event, as mentioned above, even if RealNetworks' claim were more appropriately

5   considered under the rule of reason rather than the per se rule, the differences between rule of

6   reason and per se treatment here should play no role in evaluating whether RealNetworks' claims

7   should survive a motion to dismiss.  *See, e.g., Cal. Dental,* 526 U.S. at 779.

8

9          **C.     DVD CCA's Conduct Is Subject to Section One Because DVD CCA Acted as
               a Co-Conspirator, Not a Single Entity**

10

11         DVD CCA argues, still relying on *Dagher*, that it must have acted as a single entity

12  because it was a joint venture executing its purpose.  Motion at 8.  That is simply not true, as

13  RealNetworks explicitly alleged:

14         Achieving any limited legitimate purpose of the DVD CCA does not require a
           licensing agreement that prohibits individual Studios from granting licenses to copy
15         their content from DVDs.  Yet this is exactly what the DVD CCA and the Studios
           claim that the CSS License prohibits.  As such, the legitimate purpose of the DVD
16         CCA has been subverted to serve as a means through which the Studios act as, and
           enforce, a cartel with respect to the licensing of their content by different, lawful
17         copying technologies.

18  Counterclaims ¶ 34.

19         DVD CCA also mentions in passing that RealNetworks fails to allege a factual basis for

20  how DVD CCA could conspire with its Studio members in light of the single-entity rule.  Motion

21  at 8.  Although DVD CCA does not explain what kind of facts RealNetworks would need to

22  allege in that connection, in fact, RealNetworks alleges all the necessary facts, including: (1) that

23  the Studio members of the DVD CCA compete with RealNetworks by providing products that do

24  not utilize CSS encryption ("digital copy"); (2) are nonetheless using the CSS License offered by

25  DVD CCA to impair competition in the market that includes those products; and (3) in so doing,

26  are motivated by their own financial gain.  *See* Counterclaims ¶¶ 65-66, 81, 40-42.  The Studios

27  acted as independent, self-sufficient agents capable of conspiring with the DVD CCA.  The

28  authority DVD CCA cites does not compel a different conclusion.  *See* Motion at 8 (citing *Jack*

REALNETWORKS' OPPOSITION TO MOTION TO
DISMISS COUNTERCLAIMS
CASE NO.: C-08-CV-04548-MHP                          -12-

1    *Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1036 (9th Cir. 2005)

2    (holding that regional affiliates that did not act as independent, self-sufficient agents could not

3    have conspired with the national club with which they were affiliated)).

4        The Ninth Circuit's decision in *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133

5    (9th Cir. 2003), plainly bars single-entity treatment here.  *Freeman* holds that where, as here, the

6    members of a joint venture are independently owned, do not share profit and loss, and compete

7    outside the joint venture, single-entity treatment is inappropriate.  *Id.* at 1148-49.  The DVD

8    CCA has made no effort to explain how it satisfies *any* of the conditions for treatment as a single

9    entity identified by the court in *Freeman.*  Nor could it.  The Studios are obviously not owned, in

10   whole or in part, by the DVD CCA.  RealNetworks has alleged that the Studios compete with

11   each other and with RealNetworks not only by providing copies of their content that do not

12   utilize CSS, but by providing motion picture content.  Counterclaims ¶¶ 65-66, 69.  DVD CCA's

13   participation in a collective decision to permit the organization to be used in an attempt to shroud

14   clearly illegal conduct with legitimacy should not be rewarded by being spared from scrutiny

15   under Section One.  *See, e.g. VISA U.S.A., Inc. v. First Data Corp.*, 2006 WL 516662, No. C 02-

16   01786 JSW (N.D. Cal. Mar. 2, 2006) (denying Visa system single-entity treatment where

17   member banks did not commonly own the network processing services function at issue,

18   competed with one another, including on the terms and conditions of their purchases of network

19   processing, and where largest bank members voted to pass the ban on individual pricing at

20   issue).

21       Courts have not hesitated to charge organizations with antitrust liability on the basis of

22   their participation in illegal agreements among their members.  *See, e.g., Nat'l Society of Prof'l

23   Eng's., v. United States*, 435 U.S. 679, 692-93 (1978) (association of engineers liable under

24   Section One for promulgating rule prohibiting competitive bidding by its members); *Gregory v.

25   Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006) (board of association's

26   decision to exclude traders from selling replica goods at social gathering involved plurality of

27   actors necessary to establish concerted action requirement where members horizontally compete

28   to sell those goods); *see also Freeman*, 322 F.3d at 1148 (noting that Supreme Court "routinely

1  scrutinizes joint ventures that involve aspects of common interest" and listing cases).  There is no

2  basis for this Court to dismiss RealNetworks' counterclaim on the grounds it alleges conduct by

3  a single entity.

4         **D.      DVD CCA's Conduct Is Not Immunized Under the *Noerr-Pennington***
                    **Doctrine**

5

6         RealNetwork's allegations concerning the DVD CCA's and its Studio members' group

7  boycott cannot be reduced to a thinly disguised "litigation position," or to nothing more than

8  conduct incidental to litigation.  *See* Motion at 8-9.  *Noerr-Pennington* immunity is not an all-or-

9  nothing doctrine that covers all of DVD CCA's conduct or none of it.  The Court need only

10 apply the "unremarkable proposition that petitioning activity that is part of an overall illegal

11 scheme cannot confer immunity on the defendant's other, unprotected activities" to determine

12 that the challenged conduct here is not immunized by the *Noerr-Pennington* doctrine.  *See Grip-*

13 *Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482, 1498 (N.D. Ill. 1986).  As

14 RealNetworks explained in the Counterclaims themselves, the harm the illegal group boycott

15 causes happens as a result of their agreement to refuse to grant licenses to reproduce their

16 individually-owned content on DVDs outside the terms of the CSS License Agreement on which

17 they have all jointly agreed.  The instant litigation, in contrast, is simply the means by which the

18 Studios and DVD CCA have sought to convince the Court to adopt their interpretation of the

19 agreement they are attempting to use to legitimate their illegal boycott.  Counterclaims ¶ 39.

20        In short, DVD CCA's violation of the antitrust laws by means of its illegal agreement

21 with the Studios does not become immune simply because DVD CCA employed a lawsuit as the

22 means to enforce the violation.  *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,*

23 *Inc.*, 690 F.2d 1240, 1263-64 (9th Cir. 1982), ("[w]e hold that when there is a conspiracy

24 prohibited by the antitrust laws, and the otherwise legal litigation is nothing but an act in

25 furtherance of that conspiracy, general antitrust principles apply, notwithstanding the existence

26 of *Noerr-Pennington* immunity.")  In so holding, the Ninth Circuit cited *United States v. Singer*

27 *Mfg. Co.*, 374 U.S. 174 (1963), for the proposition that a conspiracy remains subject to the

28 antitrust laws despite the use of litigation to further it.  *Clipper Exxpress*, 690 F.2d at 1264.

1   Whether or not DVD CCA's prosecution of its claims or defenses in the instant lawsuit are

2   subject to *Noerr-Pennington* immunity, it remains clear that RealNetworks has pled that DVD

3   CCA engaged in other, non-immunized conduct in violation of Section One.  The precedents

4   summarized above clearly prohibit precisely what DVD CCA is asking the Court to do:  extend

5   the immunity presumptively granted to DVD CCA's pursuit of its lawsuit to its illegal agreement

6   with the Studios to exclude RealNetworks.

7        The fact that some of RealNetworks' allegations were based on evidence presented

8   during the course of litigation has no bearing on whether DVD CCA's conduct is immunized

9   from liability under *Noerr-Pennington*.  *See* Motion at 9.  DVD CCA cites no case in support of

10  this argument; nor could it do so.  As it happened, litigation by DVD CCA against RealNetworks

11  turned out to be one of many means to enforce the group boycott of RealNetworks, at least

12  during the pendency of the preliminary injunction.  That happenstance cannot serve to immunize

13  the illegal boycott itself.  The boycott is the collective refusal to license except on the CSS

14  license terms.  That collective agreement is not petitioning activity and is not protected by *Noerr-*

15  *Pennington*.

16       DVD CCA also argues that RealNetworks' only direct accusations against DVD CCA

17  concern DVD CCA's interpretation of the CSS License Agreement.  Motion at 9.  Even if that

18  were true (and it is not, as explained above), the precedents cited above illustrate why it is

19  inappropriate to collapse the act of agreeing upon an interpretation of the CSS License that

20  furthers a separate group boycott into generic "conduct incidental to litigation"—an argument

21  that DVD CCA again fails to support with relevant case law.  *Noerr-Pennington* protects the act

22  of requesting a court to grant (or deny) relief; it affords no protection for private agreements that

23  are not, themselves, petitioning activities.  Indeed, private agreements in settlement of litigation,

24  unlike agreements to undertake litigation, are not protected by *Noerr-Pennington* immunity.  *See*

25  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 803, 818-819 (D.C. Cir. 2001)

26  (likening agreement purporting to maintain status quo pending outcome of litigation to

27  settlement agreement and denying immunity to same); *In re New Mexico Natural Gas Antitrust*

28  *Litig.*, MDL Dkt. No. 403, 1982 WL 1827, at * 7 (D.N.M. Jan. 26, 1982) (private settlement

1   accomplished without Court participation should not be afforded *Noerr-Pennington* protection;

2   denying summary judgment to both plaintiffs and defendants where settlement approved by

3   Court); *see also Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (holding that dissolution

4   agreement between former law partners settling a state court lawsuit was a per se violation of the

5   Sherman Act); *Duplan Corp. v. Deering Milliken, Inc.*, 594 F.2d 979, 981 (4th Cir. 1979)

6   (imposing per se liability for settlement agreement that was at the core of a scheme to stabilize

7   production royalties and monopolize the relevant market).  And as two Justices noted in their

8   concurrence in *PRI*, a successful legal action to enforce agreements illegal under the antitrust

9   laws may itself be evidence of the violation.  *Prof'l Real Estate Investors, Inc. v. Columbia*

10  *Pictures Indus.*, *Inc.*, 508 U.S. 49, 75 (1993) (Stevens, J., concurring).  Unlike *Columbia*

11  *Pictures Indus. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991), *aff'd*

12  *on other grounds,* 508 U.S. 49 (1993), the challenged agreement here to refuse to grant licenses

13  to the Studios' DVD content other than on collectively-determined terms was not a response to

14  an offer to settle the lawsuit, and cannot be characterized as conduct incidental to litigation.  That

15  agreement existed wholly independently of any lawsuit.

16          In real-life terms, DVD CCA now finds itself in litigation against RealNetworks because,

17  as it has repeatedly asserted, it structured its licensing program so as to make a CSS License

18  available to any firm that requested it.  That decision left DVD CCA to seek recourse from the

19  courts when it disagreed with a licensee's opinion as to whether its licensed products or services

20  complied with the terms of the CSS License.  RealNetworks, for its part, could either accede to

21  an interpretation of the license with which it disagreed – or not.  But none of this has anything to

22  do with the antitrust violation alleged here – the Studios' agreement, implemented through and

23  with the active participation of the DVD CCA, to refuse to grant licenses for the reproduction of

24  their own, individually-owned, content *except* under the restrictive terms of the CSS License

25  Agreement to which the Studios and the DD CCA had agreed.  A horizontal boycott is not

26  protected by *Noerr-Pennington* even if it is part of a genuine effort to influence government.

27  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988).

28

1    The allegations in this case are clearly governed by the line of precedent embodied by

2  *Clipper Express*.  That authority renders irrelevant the precedent on which DVD CCA relies,

3  *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005), which considered

4  (without ultimately deciding) only whether conduct that is part and parcel of litigation—

5  discovery misconduct, subornation of perjury and witness intimidation—should be immunized as

6  "conduct incidental to" litigation.  *See* Motion at 8.  It is telling that DVD CCA did not describe

7  the facts of *Freeman*.  It is even more telling that DVD CCA did not cite a single case dismissing

8  allegations of an agreement implemented in part by means of litigation on *Noerr-Pennington*

9  grounds.  There is simply no precedent that permits dismissal of RealNetworks' claims as

10  immunized under the *Noerr-Pennington* doctrine.

11  **III.    REALNETWORKS HAS STATED A PLAUSIBLE CARTWRIGHT ACT CLAIM**
         **FOR THE SAME REASONS**

12

13    As DVD CCA admits, the California cases it cites provide no different or additional

14  grounds from those discussed above for dismissing RealNetworks' counterclaim under the

15  Cartwright Act.  Unlike the plaintiff in *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th

16  171 (1999), who was attempting to plead her claims for a fourth time in a third amended

17  complaint, RealNetworks has alleged specific acts by DVD CCA in furtherance of the Studios'

18  group boycott.  *See* Section I, *supra*.  RealNetworks' counterclaim is therefore sufficiently

19  detailed to state a group boycott claim under the Cartwright Act.  *See Freeman*, 77 Cal. App. 4th

20  at 196 (citing precedents requiring factual allegations of overt acts in furtherance of conspiracy).

21  Nor does *Freeman* provide a basis to dismiss RealNetworks' Cartwright Act claim on the

22  grounds that RealNetworks failed to allege "with factual particularity that separate entities

23  maintaining separate and independent interests combined for the purpose to restrain trade."

24  *Freeman*, 77 Cal. App. 4th at 189 (citing *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265-66

25  (1983)).  As discussed in section II above, RealNetworks has alleged that the Studios combined

26  to agree to exclude RealNetworks from competing to provide a product as to which the Studios

27  not only had previously been actual competitors, but remained so.  There is no question under

28  California law that RealNetworks has adequately pleaded, not only that the Studios acted as co-

1    conspirators rather than as a single enterprise, but that DVD CCA served as the instrumentality

2    effecting their agreement.  *See Freeman*, 77 Cal. App. 4th at 192 (citing *U.S. v. Sealy*, 388 U.S.

3    350, 355-58 (1967)).

4         *Blank v. Kirwan*, 39 Cal. 3d 311 (1985) adds nothing to DVD CCA's motion beyond its

5    holding that the *Noerr-Pennington* doctrine may be applied to claims under the Cartwright Act.

6    *See* Motion at 11; *Blank*, 39 Cal. 3d at 322.  As such, RealNetworks' counterclaim must survive

7    dismissal on *Noerr-Pennington* grounds for the same reasons elucidated in section II.D above.

8    Finally, DVD CCA provides no different basis under state law for precluding the imposition of

9    *per se* liability for the alleged group boycott despite DVD CCA's notification under the NCRPA.

10   *See* Section II.B.1, *supra*.

11   **IV.    REALNETWORKS HAS STATED A PLAUSIBLE UNFAIR COMPETITION
            CLAIM FOR THE SAME REASONS**

12

13        RealNetworks has alleged conduct by DVD CCA that is neither reasonable, condoned or

14   immunized as a violation of federal antitrust law.  *See* Sections I & II, *supra*.  DVD CCA

15   provides no basis for finding that conduct that violates Section 1 of the Sherman Act would not

16   also violate California's Unfair Competition Law.  *See* Motion at 12.  DVD CCA has therefore

17   provided no reason for this Court to dismiss RealNetworks' counterclaim under the UCL.

18   **V.     CONCLUSION**

19        For the foregoing reasons, RealNetworks respectfully requests that the Court deny DVD

20   CCA's motion to dismiss RealNetworks' counterclaims, either in their entirety, or to the extent

21   they allege claims for *per se* antitrust liability.

22

23   Dated:  August 24, 2009                    WILSON, SONSINI, GOODRICH & ROSATI

24

25                                              By: /s/ Renata B. Hesse
                                                    Renata B. Hesse
26

27                                              Attorneys for Plaintiffs
                                                REALNETWORKS, INC. and REALNETWORKS
28                                              HOME ENTERTAINMENT, INC.