GLENN D. POMERANTZ (SBN 112503)
Glenn.Pomerantz@mto.com
BART H. WILLIAMS (SBN 134009)
Bart.Williams@mto.com
KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
ROHIT K. SINGLA (SBN 213057)
Rohit.Singla@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
Tel: (213) 683-9100; Fax: (213) 687-3702

GREGORY P. GOECKNER (SBN 103693)
Gregory_Goeckner@mpaa.org
DANIEL E. ROBBINS (SBN 156934)
Dan_Robbins@mpaa.org
15301 Ventura Boulevard, Building E
Sherman Oaks, California  91403-3102
Tel: (818) 995-6600; Fax: (818) 285-4403

ROBERT H. ROTSTEIN (SBN 72452)
rxr@msk.com
ERIC J. GERMAN (SBN 224557)
ejg@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California  90064-1683
Tel: (310) 312-2000; Fax: (310) 312-3100

Attorneys for Motion Picture Studio Parties

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALNETWORKS, INC., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> DVD COPY CONTROL ASSOCIATION, et al., <br><br> Defendants. | CASE NO.  C 08-4548 MHP <br><br> **MOTION PICTURE STUDIO PARTIES' NOTICE OF MOTION AND MOTION TO DISMISS REAL'S ANTITRUST CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Judge:    Hon. Marilyn Hall Patel <br> Date:     October 26, 2009 <br> Time:     2:00 p.m. <br> Crtrm:    15 |
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> REALNETWORKS, INC, et al., <br><br> Defendants. | CASE NO.  C-08-4719 MHP |

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 3

    A. Real's Alleged Antitrust Conspiracies ..................................................... 4

        1. The Alleged Conspiracy Based on the CSS License ..................... 4

        2. The Alleged "Group Boycott" of Real ......................................... 6

    B. The Alleged Harm to Competition—and the Alleged Injury to Real ..................... 8

    C. This Court's Preliminary Injunction Decision ........................................... 9

III. ARGUMENT .................................................................................................... 10

    A. The Studios' Alleged Anti-Competitive Actions Are Not the Cause-in-Fact of Any Injury to Real ................................................................................... 10

        1. Real's Claimed Injuries Result from Real's Violation of Federal Law ........................................................................................... 10

        2. Real Fails to Allege Any Causal Connection Between the Studios' Actions and Real's Claimed Inability to Compete in a Market for Creating, Storing and Managing Copies of Movies and TV Shows ......... 13

    B. Real's Allegations Fail to Plead Plausible Conspiracies, As Required by *Twombly* and *Iqbal* ............................................................................... 14

        1. Real Fails to Plead a Plausible Theory That the CSS License Is an Illegal Restraint ......................................................................... 15

        2. Real's Alleged "Group Boycott" Conspiracy Is Implausible ................. 18

    C. *Noerr-Pennington* Bars Real's Claims ................................................... 20

        1. Real's Third Cause of Action, Based on the Studios' Enforcement of the CSS License, Aims to Penalize Protected Petitioning Conduct ........................................................................................... 21

        2. Real's Fourth Cause of Action Is Barred Because the Studios' Alleged "Collective Refusal to Deal" Was Settlement-Related Conduct ........................................................................................... 23

    D. Real's State Law Claims Fail ................................................................... 25

IV. REAL'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ............................. 25

1

# TABLE OF AUTHORITIES

2

Page

3

## FEDERAL CASES

4   *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................................ 15

5   *Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ............................................................................................... *passim*
6

*Associated General Contractors of California, Inc. v. California State Council of*
7     *Carpenters*,
    459 U.S. 519 (1983) ............................................................................................................ 2, 10
8
*Bell Atlantic Corp. v. Twombly*,
9       550 U.S. 544 (2007) ................................................................................................... *passim*

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
10      485 U.S. 717 (1988) .............................................................................................................. 17

11  *Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) .............................................................................................................. 22

12  *CBS, Inc. v. ASCAP*,
    620 F.2d 930 (2d Cir. 1980) ................................................................................................ 16
13
*Chrysler Corp. v. Fedders Corp.*,
14      643 F.2d 1229 (6th Cir. 1981) ............................................................................................ 10

15  *City of Columbia v. Omni Outdoor Adver., Inc.*,
    499 U.S. 365 (1991) .............................................................................................................. 21

16  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ....................................................................................... 22, 23
17
*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*,
    944 F.2d 1525 (9th Cir. 1991), aff'd, 508 U.S. 49 (1993) ......................................... 20, 23, 24
18
*Courie v. Alcoa Wheel & Forged Prods.*,
19      No. 07-4440, 2009 WL 2497928 (6th Cir. Aug. 18, 2009) .................................................... 16

*Fashion Originators' Guild v. FTC*,
20      312 U.S. 457 (1941) ....................................................................................................... 17, 18

21  *Formula One Licensing, B.V v. Purple Interactive Ltd.*,
    No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ................................... 25

22  *Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ................................................................................... 20, 22, 24
23
*FTC v. Morton Salt Co.*,
24      334 U.S. 37 (1948) .............................................................................................................. 18

*Gadda v. State Bar of Cal.*,
25      511 F.3d 933 (9th Cir. 2007) ............................................................................................... 25

26  *Hotel Employees and Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*,
    393 F. Supp. 2d 972 (N.D. Cal. 2005) .................................................................................. 4

27  *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    102 F.3d 1524 (9th Cir. 1996) .............................................................................................. 4

28

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Burlington Northern, Inc.,*
822 F.2d 518 (5th Cir. 1987).................................................................................... 23

*In re Canadian Import Antitrust Litigation,*
470 F.3d 785 (8th Cir. 2006)................................................................................... 12

*In re Verifone Holdings, Inc. Sec. Litig.,*
No. C 07-06140 MHP, 2009 WL 1458211 (N.D. Cal. May 26, 2009)..................... 4

*Ingram v. City and County of S.F.,*
No. C 06-06896 MHP, 2007 WL 902555 (N.D. Cal. Mar. 22, 2007) ...................... 25

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008)........................................................................... passim

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.,*
146 F.3d 691 (9th Cir. 1998).................................................................................... 25

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
232 F.3d 979 (9th Cir. 2000).................................................................................... 10

*Krasnyi Oktyabr, Inc. v. Trilini Imports,*
578 F. Supp. 2d 455 (E.D.N.Y. 2008)....................................................................... 21

*Lamar County Elec. Co-op. Ass'n v. Rayburn Country Elec. Co-op., Inc.,*
330 F. Supp. 2d 763 (E.D. La. 2002) ....................................................................... 22

*McDonald v. Johnson & Johnson,*
722 F.2d 1370 (8th Cir. 1983).................................................................................. 10

*McGuire Oil Co. v. Mapco, Inc.,*
958 F.2d 1552 (11th Cir. 1992)................................................................................ 21

*Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.,*
309 F. Supp. 2d 1156 (N.D. Cal. 2004) ................................................................ 2, 11

*Nova Designs, Inc. v. Scuba Retailers Ass'n,*
202 F.3d 1088 (9th Cir. 2000)................................................................................... 15

*Pearl Music Co., Inc. v. Recording Industry Association of America,*
460 F. Supp. 1060 (C.D. Cal. 1978) .................................................................... 11, 12

*Pool Water Prods. v. Olin Corp.,*
258 F.3d 1024 (9th Cir. 2001)................................................................................... 18

*Prof'l Rea Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
508 U.S. 49 (1993) ................................................................................................... 21

*RSA Media, Inc. v. AK Media Group, Inc.,*
260 F.3d 10 (1st Cir. 2001)....................................................................................... 12

*Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,*
17 F.3d 295 (9th Cir. 1994)....................................................................................... 21

*Sosa v. DIRECTV, Inc.,*
437 F.3d 923 (9th Cir. 2006)................................................................................ 20, 24

*State Oil Co. v. Khan,*
522 U.S. 3 (1997)...................................................................................................... 17

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
546 F.3d 991 (9th Cir. 2008)................................................................ 20

4

*Theofel v. Farey-Jones,*
359 F.3d 1066 (9th Cir. 2004)................................................................ 24

5

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001)................................................................ 15

6

*Universal City Studios, Inc. v. Reimerdes,*
111 F. Supp. 2d 294 (S.D.N.Y. 2000)............................................... 6, 15

7

*Untracht v. Fikri,*
454 F. Supp. 2d 289 (W.D. Pa. 2006)............................................... 11

8

9

10

**STATE CASES**

11

*Blank v. Kirwan,*
39 Cal. 3d 311 (1985) ................................................................ 25

12

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.,*
176 Cal. App. 4th 697 (2009)................................................................ 9

13

*Freeman v. San Diego Ass'n of Realtors,*
77 Cal. App. 4th 171 (1999)................................................................ 25

14

*Morrison v. Viacom, Inc.,*
66 Cal. App. 4th 534 (1998)................................................................ 25

15

16

**STATUTES AND RULES**

17

17 U.S.C. § 202 ................................................................ 8

18

Cal. Bus. & Prof. Code § 17200 ("UCL") ................................................................ 25

19

Cal. Gov. Code § 56133 ................................................................ 11

20

Fed. R. Civ. P. 12(b)(6)................................................................ 1

21

22

23

24

25

26

27

28

- iv -

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2          TO ALL PARTIES:  On October 26, 2009, at 2:00 p.m., the Motion Picture Studio Parties

3  ("Studios")[1] will and hereby do move the Court for an Order dismissing Real's antitrust claims

4  with prejudice, Fed. R. Civ. P. 12(b)(6), based on this Motion and the record in these actions.

5

**MEMORANDUM OF POINTS AND AUTHORITIES**

6  **I.     INTRODUCTION**

7          Real sued the Studios for declaratory relief on the theory that the CSS License does not

8  proscribe copying the content from CSS-protected DVDs.  Correctly anticipating that the Court's

9  Preliminary Injunction Order would prove it wrong, Real unveiled a lengthy and repetitive

10  antitrust complaint at the eleventh hour of the preliminary injunction proceedings.  Real's theory

11  now is that it is an antitrust conspiracy for one of the most successful and widely available home

12  entertainment products ever created to prohibit the copying of copyrighted content protected by

13  CSS.  These claims are just Real's latest transparent attempt to deflect attention away from its

14  unlawful conduct and violation of federal law.  The claims fail for several fundamental reasons:

15          1.     ***Real's own illegal conduct—not the alleged antitrust conspiracies—is the cause***

16  ***of Real's claimed injuries***.  Real says that the Studios' purported conspiracy with the DVD CCA

17  to construe the CSS License to preclude licensees from using CSS to build DVD copiers harms

18  Real by "delaying" its efforts to launch RealDVD.  ¶¶ 110-112.[2]  That implausibly pleaded

19  conspiracy did not cause Real's injuries.  Real cannot distribute RealDVD because the Digital

20  Millennium Copyright Act ("DMCA") forbids Real from trafficking in a device to circumvent

21  access- and copy-control technologies.  Based on the command of the federal statute, the Court

22  enjoined Real—last October and again after an extensive preliminary injunction hearing—from

23  its unlawful trafficking in RealDVD.  What is more, RealDVD has been adjudged likely to be a

24  device for circumventing not just CSS (which is the exclusive focus of Real's antitrust claims),

25

---

26  [1] The Motion Picture Studio Parties named as Defendants in Real's Second Amended Complaint
are Disney Enterprises, Inc., Paramount Pictures Corporation, Sony Pictures Entertainment Inc.,
27  Twentieth Century Fox Film Corporation, NBC Universal, Inc., Warner Bros. Entertainment Inc.
and Viacom Inc.  *See* Real's Second Amended Complaint, ordered filed on August 11, 2009, ¶ 1.

28  [2] Except as otherwise indicated, all "¶" cites are to Real's Second Amended Complaint.

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

but also ARccOS and RipGuard, which are completely independent of CSS and not in any way implicated by the conspiracies that Real alleges. As this Court and others have "long recognized … 'an action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful.'" *Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.,* 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004).

   2. ***The Studios' purported anticompetitive conduct does not bar Real from participating in the alleged product market***: Real alleges—and claimed throughout the preliminary injunction proceedings—that its real aim is not necessarily to build a DVD copier, but rather a device for storing and managing digital content. Real's CEO, Rob Glaser, testified that copying from a DVD is just a "side effect of what we have to do, in order to add value." Hr'g Tr. at 537:5-10, Apr. 28, 2009. *See also* ¶¶ 57-59, 79-80. Taking that contention as true, Real does not allege any concerted conduct that precluded Real from reaching that goal. Numerous companies—including Apple and Amazon—have entered into bilateral deals with individual content owners, pursuant to which consumers may obtain, store and manage digital copies of copyrighted content. Real does not and cannot allege that anything barred it from likewise obtaining lawful consent from individual owners to create manageable copies of their content. An antitrust plaintiff must plead and prove that the alleged antitrust violations were the cause-in-fact of its injuries, *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 (1983), which Real does not and cannot do.

   3. ***Real fails to plead plausible claims of antitrust violations, as required under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)***: *Twombly, Iqbal* and the Ninth Circuit cases following them make it clear that Real cannot allege an antitrust claim on the basis of conduct that, as alleged here, is consistent with rational, lawful business behavior by each Studio. Yet, in this case, Real alleges nothing more. There is nothing remotely unlawful about a Studio's utilization of a content-distribution system (CSS) that does not allow one to copy the content off of the disks on which that content is distributed. Significantly, the CSS License is *non-exclusive.* That means that a content owner can—and each of the Studios does—utilize other (non-CSS) mechanisms for distributing the same content in

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1    digital format.  Real, like anyone else, is free to strike bilateral deals with individual Studios and

2    other content owners using non-CSS technology to provide consumers with the storable,

3    manageable copies of digital content that Real claims it wants to provide.  The conduct that Real

4    alleges does not plausibly allege an antitrust violation.

5          4.    ***The Noerr-Pennington doctrine bars Real's claims***:  Real's third cause of action

6    alleges that the CSS License is an unlawful conspiracy between the DVD CCA and the Studios.

7    Real's claim, however, is premised on the Studios' (and the DVD CCA's) filing litigation and

8    arguing that the License does not allow copying.  Not only have these arguments prevailed (in

9    this Court and, in the DVD CCA's case, in the California Court of Appeal's recent reversal of the

10   *Kaleidescape* trial court ruling), but such arguments are immune from antitrust liability under

11   *Noerr*.  *Noerr* also bars Real's fourth claim, which alleges that the Studios conspired to boycott

12   Real in the days immediately preceding this case.  The discussions Real cites were incidental to

13   imminent litigation, as evidenced by numerous undisputed facts, including the parties' tolling

14   agreement.  *Noerr* bars Real from basing antitrust conspiracies on settlement negotiations.

15   **II.    BACKGROUND**

16         This is not the typical procedural posture for a motion to dismiss.  Real did not plead its

17   antitrust claims at the beginning of a case, when facts had yet to be discovered.  Real waited until

18   May 13, just a week before the preliminary injunction closing arguments, to file its antitrust

19   claims.  Meanwhile, the case progressed through eight months of intense discovery, including

20   many depositions and the production of thousands of documents, and the Court conducted a

21   multi-day hearing with numerous live witnesses and scores of uncontested exhibits.  And since

22   Real filed its antitrust claims, the Court on August 11 entered a 58-page Memorandum and Order

23   ("Order"), concluding (based on detailed factual findings) that Real's creation of RealDVD and

24   trafficking in that product likely violate the DMCA, the CSS License and California's Covenant

25   of Good Faith and Fair Dealing.  Try as it might, Real can neither run away from nor force the

26   Court to ignore the extensive record simply because this is a 12(b)(6) motion.[3]

27        [3] The Court may take judicial notice of matters from the record in this case in at least two

28   important respects.  *First*, as this Court has explained, where (as here) a plaintiff incorporates

     documents, prior testimony or evidence into a complaint, and the authenticity of such materials is

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                CLAIMS, NO. C 08-4548 MHP

**A.      Real's Alleged Antitrust Conspiracies**

1.      **The Alleged Conspiracy Based on the CSS License**

In its complaint, Real has attempted to allege two conspiracies concerning the CSS License, which are stated as alternative bases for Real's third claim (against the Studios and the DVD CCA).  (Real alleges a different conspiracy, this one just among the Studios, in its fourth claim, which is discussed in the next section.)  The complaint first alleges that the Studios and the DVD CCA conspired to "interpret" the CSS License falsely, *inter alia*, to forbid copying content from CSS-protected DVDs.  ¶¶ 82-83, 119.  Real had to allege that this is a false reading of the CSS License, because Real took the position throughout the preliminary injunction proceedings that the CSS License does *not* prohibit the copying of CSS-protected DVDs.  ¶ 46.

Since Real filed its complaint, the Court has issued its Preliminary Injunction Order and Real has filed its Opposition to the DVD CCA's Motion to Dismiss the antitrust claims Real pleaded against it (Doc. No. 449) ("Real's Opp. to DVD CCA Mot.").  Having taken stock of the Court's Order, Real apparently has jettisoned its "false interpretation" theory in favor of the second purported conspiracy alleged in its complaint.  According to this allegation, the CSS License—which is between the DVD CCA and its licensee (in this case, Real), and to which the Studios are third-party beneficiaries (as "Eligible Content Providers," *see* Order ¶ 9) but not parties—is the purportedly illegal "agreement."  ¶¶ 83, 128.  *See* Real's Opp. to DVD CCA Mot. at 1:10-11 ("[T]his Court's decision confirms that the CSS License Agreement is a mechanism that assists in enabling the unlawful boycott[.]").

Real asserts that the object of this alleged conspiracy is to forbid a CSS licensee from using CSS technology to copy copyrighted content from CSS-protected DVDs.  Real claims that,

---

not disputed, the Court can consider the entirety of the material in evaluating the complaint's sufficiency.  *In re Verifone Holdings, Inc. Sec. Litig.*, No. C 07-06140 MHP, 2009 WL 1458211 (N.D. Cal. May 26, 2009).  *Second*, as this Court also has observed, the Court may judicially notice matters of public record.  *Hotel Employees and Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 979 (N.D. Cal. 2005).  This includes admissions made by Real in the public record of the preliminary injunction proceeding.  *See, e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996) ("[A]mple authority exists" which "recognizes that matters of public record, including court records in related or underlying cases which have a direct relation to the matters at issue, may be looked to when ruling on a 12(b)(6) motion to dismiss.").

1   if a licensee like Real cannot use CSS technology to copy movies and TV shows from DVDs to

2   computer hard drives, then such licensees are excluded from a market alleged to exist for "the

3   provision of technology that enables consumers to (a) create or otherwise obtain digital copies of

4   movies and TV shows that they own on DVDs and (b) store and manage those copies

5   electronically (e.g., on a hard drive) for subsequent playback." ¶ 99.  This contention ignores the

6   proliferation of services and products (including Apple's iTunes, Amazon Video on Demand, and

7   the Studios' "digital copy" products) that compete to provide consumers digital copies of movies

8   and TV shows—and that do so without copying that content from the copies distributed on CSS-

9   protected DVDs.  *See* ¶ 103 (admitting that "digital copy" is "without CSS encryption");

10  Declaration of Michael Dunn ("Dunn Decl.") ¶¶ 9-26 (describing non-CSS distribution

11  mechanisms for digital copies of movies and TV shows) (incorporated into Real's complaint,

12  ¶¶ 102-105); Order ¶ 17 (Studios received aggregate revenues in 2007 of around $200 million

13  from Internet downloads and $600 million from video-on-demand and pay-per-view services).

14        Real paints with a broad brush in stating its allegations about the claimed conspiracy.  For

15  example, Real refers to the DVD CCA as a puppet entity that the Studios "effectively control."

16  ¶ 50.  The supposed evidence of this "control" consists solely of the fact that Studio employees

17  currently occupy six of twelve Board seats (not even a majority under standard voting rules).

18  Indeed, Real admits that the other six seats are "held by representatives of the [consumer]

19  electronics industries and the computer companies."  ¶ 8.  As Real knows (but ignores in its

20  complaint), the DVD CCA is a multi-industry organization, whose more than 300 members

21  (including Real, a voting member) come from a wide variety of content, consumer electronics,

22  and information technology and software companies.  *See* Order ¶¶ 6-7, 22 (findings regarding

23  multi-industry composition of the DVD CCA's Board and licensee-members).

24        Real's allegations also conclusorily presume that the CSS technology was the DVD

25  CCA's (and, implicitly under Real's theory, the Studios') to do with what the DVD CCA wanted

26  at the time it was organized.  Again, the actual facts are different and therefore ignored by Real in

27  its complaint.  CSS was developed, patented, and continues to be owned by Matsushita Electric

28  Industrial Co. (now called Panasonic Corporation) ("MEI") and Toshiba Corporation—not the

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1    Studios or the DVD CCA.  *See Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294,

2    309 (S.D.N.Y. 2000); Order ¶ 19.  Although representatives of multiple industries (including the

3    Studios) were asked to provide input into some of its terms, the initial CSS License was drafted

4    by MEI, Order ¶ 19, and the CSS License makes clear in its recitals that the DVD CCA is

5    licensing only those rights licensed to it by MEI and Toshiba.  Ex. 7 (CSS License) at 1.[4]

6          Real also conclusorily alleges that any amendment to the CSS License requires the

7    Studios' "collective approval."  ¶ 50.  Actually, as Real has previously admitted (but omits from

8    its complaint), the process of amending the CSS License requires reasonable consensus across the

9    industry groups represented at the DVD CCA, and the Studios do not "control" that process.[5]

10   Real never sought an amendment to the License and does not allege that it did.  Real has been a

11   member of the DVD CCA since August 2007.  ¶ 30.  It had ample opportunity to propose an

12   amendment to the CSS License that would enable it to make the RealDVD product.  Yet, Real

13   never did anything to try to request such an amendment.  Rather, as Real admits, it "determined"

14   for itself that, in light of the *Kaleidescape* trial court ruling, it "could make products that provided

15   this capability while complying with the CSS agreement and the law."  ¶ 61.  Real's

16   circumvention of the amendment process mirrors Real's refusal to share its erroneous

17   interpretation of the CSS License with the DVD CCA when Real entered into the License.  Just as

18   Real never did anything, as a prospective licensee, to communicate to the DVD CCA Real's

19   "understanding of the Agreement as being contrary to the recitals," Order ¶ 131, Real also did

20   nothing to try to obtain the exemption it now insists the DVD CCA should be required to grant.

21                    2.    **The Alleged "Group Boycott" of Real**

22         Real's fourth cause of action alleges a different conspiracy, namely, a purported "group

23   boycott" by just the Studios of Real.  Real alleges that each of the Studios conspired not to deal

24

25   [4] "Ex." references are to Exhibits introduced at the preliminary injunction hearing.

26   [5] *See* Real's Proposed Findings of Fact (Doc. No. 413) ¶¶ 14, 86 (Real's proposed findings
     regarding CSS License amendment process and role of DVD CCA "CPAC" (Content Protection
27   Advisory Council) Committee, a multi-industry committee.  *See also* Real's Deposition
     Designations of Deposition of Pioneer Electronics Senior Vice President, and DVD CCA Board
28   Member, Andrew Parsons (Doc. No. 303) at 3 (designating Parsons testimony regarding CPAC).

- 6 -                STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                     CLAIMS, NO. C 08-4548 MHP

1    with Real in September 2008, literally days before these lawsuits were filed and while the parties

2    were conducting individual settlement discussions under a tolling agreement.  Real alleges that its

3    inability to conclude a successful *settlement* with any one Studio in September 2008 must have

4    been the result of a collusive agreement among all the Studios not to do business with Real.

5         Although Real studiously avoids calling its discussions with individual Studios

6    "settlement" discussions (for fear of triggering *Noerr*), the facts alleged on the face of the

7    complaint make it clear that the September discussions were incidental to planned, probable

8    litigation.  Real alleges that "[u]nderlying the negotiations" last September was a legal dispute:

9    "whether a consumer . . . had a fair-use right to" copy a DVD.  ¶ 46.  Real alleges that it

10   "attempted to negotiate in good faith . . . to resolve the Studio Defendants' stated concerns[,]"

11   ¶ 132, and Real alleges that its goal was to "avoid the legal controversy over infringement."  ¶ 75.

12        The facts that Real omits from its complaint (but that were unearthed in the preliminary

13   injunction proceedings) confirm that Real was having bilateral settlement discussions with

14   individual Studios.  Real started developing RealDVD at least as early as 2007.  Order ¶ 50.

15   When Real was interested in having business partners with whom to discuss "mutual . . .

16   opportunities" in regards to RealDVD, ¶ 69, Real reached out to them early in the development

17   process.  Real spent much of its time during its more than 18 months of product development

18   meeting with potential business partners in numerous industries—but not a single Studio.  Hr'g

19   Tr. at 563-70, Apr. 29, 2009.  Numerous potential partners told Real that a device for copying

20   copyrighted content from DVDs would pose fundamental problems for the Studios.[6]  But Real did

21   not actually try to contact any Studio until, at the earliest, mid-August 2008—less than three

22   weeks before Real's planned launch.  Hr'g Tr. at 571:5-15, Apr. 29, 2009; Doc. No. 408 at 1:8.

23   These circumstances (as well as the tolling agreement temporarily postponing litigation to allow

24   for settlement talks) further confirm that Real's Studio discussions were settlement discussions.

25

26

---

27   [6] *See, e.g.,* Ex. 602 (TiVo trip report:  "Many, if not most, of their questions centered around legal
     issues."); Ex. 557 (Sharp trip report:  "[H]e [Sharp representative] specifically countered with if

28   we had talked with Hollywood Studios yet and have they accepted the product.").

- 7 -                        STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                            CLAIMS, NO. C 08-4548 MHP

### B.   The Alleged Harm to Competition—and the Alleged Injury to Real

Real does not challenge the CSS system, the CSS License, or the DVD CCA as anticompetitive or objectionable *in toto*. Real does not question the pro-competitive and output-enhancing effect of CSS, or the pro-competitive role of the DVD CCA as the non-profit administrator of CSS. CSS has been hugely successful at increasing the output of copyrighted content and playback devices. In fact, the DVD is one of the most successful consumer electronics products ever created. As this Court noted, "CSS has been implemented in millions of DVD players and computers worldwide and is used to protect the content on hundreds of millions of DVDs." Order ¶ 22. Nor does Real allege that the DVD CCA has discriminated among competitors. Real alleges the opposite, that the CSS License is objectionable because it is *non-discriminatory* and treats all licensees the same: none are allowed to copy content from DVDs.

The only "injury to competition" that Real alleges is that consumers are not able to use RealDVD to make additional copies—what Real calls "fair use copies"—of the copyrighted content that consumers purchased on CSS-protected DVDs.[7] Real claims that any additional money that consumers would have to pay the Studios—conspicuously ignoring the money they would have to pay to Real—to obtain additional copies of movies or TV shows reduces the value of the consumers' DVDs. ¶¶ 64-65, 92, 114.[8]

The injury that Real says *it* has suffered consists solely of the "delay" in its product launch and attendant marketing buzz. The fact that RealDVD is not in the market, however, is not the result of any unlawful collusion. Rather, it is the result of Real's violation of federal law.

---

[7] The complaint repeatedly refers to consumers making "digital copies of movies and TV shows that they own on DVDs." *E.g.,* ¶ 119. Of course, consumers do not "own" the movies and TV shows that are "on DVDs." When a consumer buys a DVD, they acquire ownership of the DVD as the physical object on which the copy of the copyrighted movie or TV show is embodied. The consumer does not acquire ownership of the underlying copyrighted work. 17 U.S.C. § 202.

[8] Real's allegations concerning what does (and does not) "reduce" value for consumers reflects an inconsistency—and a double standard. In order to obtain the claimed benefits of what Real calls "fair use copies" using RealDVD, the consumer has to pay additional money—he or she just pays it *to Real*. Moreover, if the consumer wants a "backup" or "convenience" copy of the RealDVD "Vegas" software that he or she owns, Real charges that consumer for every one of those additional copies. Real never explains how this system of multiple payments to Real is not "reducing the value" of the copy of RealDVD owned by the consumer.

**C.    This Court's Preliminary Injunction Decision**

In its Order, the Court found that Real violated the DMCA and the CSS License by making and trafficking in RealDVD.  More specifically, the Court found that the Studios likely would succeed on their claim that Real's trafficking in RealDVD violates the anti-circumvention prohibitions of the DMCA.  Among other things, the Court held that Real removed multiple layers of CSS protection, and that Real's argument that those protections could be dispensed with after Real made an initial copy "amounts to legal legerdemain." Order ¶ 100.  Significantly, although Real's antitrust claims all relate to CSS, the Court's findings regarding Real's DMCA violations were not limited to CSS.  The Court found that Real likely circumvented additional and independent technological measures that Studios employ to prevent copying from DVDs, namely, ARccOS and RipGuard. *Id*. ¶¶ 103-111.

The Court also held that Real's argument for construing the License to allow copying from DVDs was fundamentally inconsistent with the License's stated purpose, "'to prevent digital-to-digital copying in a personal computer environment.'" *Id*. ¶ 133 (quoting Pak Decl. Ex. L § 1.2).  The Court found that Real's interpretation of the CSS License (including its confidential specifications) was "unreasonable," "would lead to absurd results," and was never "communicate[d] to DVD CCA at the time of contract formation[.]" *Id*. ¶¶ 131, 133-134.  "Such an interpretation would render null both the overall essence of the Agreement as well as a variety of specific technical steps therein.  Real's justification is nothing more than a failed coverup, both literally (of the keys) and figuratively (of Real's illegal behavior)." *Id*. ¶ 134.  The day after this Court entered its Order, the California Court of Appeal reversed the trial court decision in *Kaleidescape*, holding (as this Court had) that the CSS General Specifications *are* part of the CSS License; that Section 2.1.2 of the General Specifications requires that playback of DVD content by means of a drive plus a decryption device requires that the physical DVD be in the tray of the drive; and that the CSS License's stipulation of irreparable harm resulting from a breach (discussed in this Court's Order ¶ 145) is enforceable. *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697 (2009).

## III.   ARGUMENT

The Court should dismiss Real's antitrust claims for four reasons:  (1) the alleged antitrust conspiracies are not the cause-in-fact of Real's claimed injuries; (2) Real fails to allege any plausible antitrust violations; (3) *Noerr-Pennington* bars Real's claims; and (4) Real does not allege any additional facts supporting its state law claims, which fall with the federal claims.

### A.   The Studios' Alleged Anti-Competitive Actions Are Not the Cause-in-Fact of Any Injury to Real

To state a valid antitrust claim, a private plaintiff such as Real must plausibly allege a causal connection between the claimed wrongdoing and some injury-in-fact.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 (1983) (private plaintiff must show, *inter alia*, injury caused by defendants' conduct); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) ("The plaintiffs must prove injury in fact, and the claimed injury must be sufficiently direct.").  In two critical respects, Real's complaint fails to allege that the Studios' claimed anti-competitive conduct is the cause of any actual injury to Real: (1) Real's claimed injuries flow from the illegality of Real's product and the Court's enforcement of federal law; and (2) nothing in the CSS License (or any action based on the CSS License) precludes Real from making or distributing products that allow for storage and management of digital copies of movies, as numerous other companies have done.

### 1.   Real's Claimed Injuries Result from Real's Violation of Federal Law

The harm that Real alleges it has suffered is the delay to its product launch caused by the Court's TRO and preliminary injunction orders.  ¶ 112.  Real asserts that it has been injured by the delay since the TRO, because Real "ha[s] been tainted with the mislabel of an illegal product following two aborted launches."  ¶ 111.  The injunctions, however, issued to stop Real's illegal conduct from trafficking in a circumvention device in violation of a federal statute, the DMCA.[9]

---

[9] Real also claims that it suffered injury as a result of its voluntary decision to delay its initial product launch (planned for September 8) until September 30 so it could pursue individual settlement negotiations with each of the Studios.  ¶ 110.  Any purported harm Real suffered from the three-week delay of this product launch was the result of Real's own voluntary action.  It is not subject to a claim under the antitrust laws.  *See, e.g., McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1377-78 (8th Cir. 1983) (finding "fact that [plaintiffs] voluntarily withdrew as competitors [meant they] lack 'antitrust injury'"); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1235 (6th Cir. 1981) ("alleged injuries do not constitute 'anti-trust injury'" where "Chrysler

1    What is more, trafficking in RealDVD is unlawful not simply because it is an unlawful device for

2    circumventing CSS, which is the exclusive focus of Real's antitrust claims. Real's conduct also

3    is illegal under federal law because RealDVD is a device for circumventing the ARccOS and

4    RipGuard copy-protection technologies. *See* Order ¶¶ 103-111. ARccOS and RipGuard are

5    independent of, and Real's circumvention of those technologies has nothing to do with, the CSS

6    License. As to both CSS and ARccOS/RipGuard, the fact that Real's claimed injuries flow from

7    its violations of federal law is fatal to its antitrust claims. As this Court and others have "long

8    recognized . . . 'an action under the antitrust laws will not lie where the business conducted by the

9    plaintiff, and alleged to have been restrained by the defendant, was itself unlawful.'" *Modesto*

10   *Irrigation Dist. v. Pac. Gas & Elec. Co.,* 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004)

11   (collecting numerous cases).

12       In *Modesto Irrigation District*, the plaintiff alleged that the defendant, a utility company,

13   violated the Sherman Act and related provisions of California state law by attempting to prevent

14   the plaintiff from offering electricity services in Pittsburg, California. *Id.* at 1158, 1162, 1170

15   n.27. The plaintiff, however, had violated California Government Code § 56133 by attempting to

16   offer electricity services in Pittsburg without the prior approval of a local agency formation

17   commission. *Id*. at 1166-69. This Court held that "[b]ecause [plaintiff's] conduct was unlawful

18   by its own terms [defendants'] response – however anti-competitive or seemingly monopolistic"

19   —was not the cause of the plaintiff's claimed injury. *Id.* at 1170. The Court rejected plaintiff's

20   claims as "untenable at their core," because the claimed injury was simply not "of the type the

21   antitrust laws were intended to prevent." *See id.*

22       *Modesto Irrigation District* is hardly alone in recognizing that a plaintiff cannot establish

23   causation where its injuries flow from its own violation of the law. In *Pearl Music Co., Inc. v.*

24   *Recording Industry Association of America*, 460 F. Supp. 1060 (C.D. Cal. 1978), the antitrust

_____

25   voluntarily withdrew from competition in the non-automotive air-conditioning market");
26   *Untracht v. Fikri*, 454 F. Supp. 2d 289, 310 (W.D. Pa. 2006) ("voluntary foreclosure of one's
     own opportunities for competition is not the type of antitrust injury for which the antitrust laws
27   were designed to provide redress"). Real likewise cannot complain of injury from its own
     voluntary decision to agree to extend the TRO so that Real could add the Facet product to the
28   preliminary injunction proceedings. *See* Doc. No. 78 at 2; Hr'g Tr. at 15-16, Dec. 22, 2008.

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                                                                     CLAIMS, NO. C 08-4548 MHP

1  plaintiffs had been engaged in the business of creating and selling cassette tapes of recorded

2  music duplicated from phonograph records. *Id.* at 1063. After several rights holders filed suit for

3  infringement, the plaintiffs, for the first time, requested licenses, which the record companies

4  declined to grant. *Id.* at 1062. The court rejected the plaintiffs' antitrust claims that the record

5  labels conspired to refuse to license. The court held that "[t]he plaintiffs in this action are

6  engaged in wholly illegal enterprises which are directed against the public in violation of clear

7  federal and state statutory criminal prohibitions, and as such, should not be able to assert or claim

8  that they have rights protected by the anti-trust laws." *Id.* at 1068.

9  Also on point is *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006).

10  The plaintiffs there alleged that defendant drug companies conspired to prevent brand name

11  prescription drugs purchased from Canadian pharmacies from entering the United States, thereby

12  driving up the prices of the drugs in this country. The Court of Appeals, however, found that the

13  importation of the drugs at issue violated federal law, and that this violation (and not defendants'

14  conduct) was the cause of plaintiffs' claimed injuries:

15        The absence of competition from Canadian sources in the domestic prescription
      drug market, therefore, is caused by the federal statutory and regulatory scheme

16        adopted by the United States government, not by the conduct of the defendants.
      Consequently, the alleged conduct of the defendants did not cause an injury of the

17        type that the antitrust laws were designed to remedy.

18  *Id.* at 791. *Accord RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) ("In

19  sum, the district court's causation analysis was correct. [Plaintiff billboard company] was not

20  excluded from the market . . . because of [defendant's] threats; it was excluded because of the

21  Massachusetts regulatory scheme that prevents new billboards from being built.").

22  The absence of causation forecloses all of Real's antitrust claims. Real's claimed injuries

23  have not been caused by the antitrust conspiracies that Real alleges. Real cannot "launch"

24  RealDVD because a federal statute, the DMCA, bars Real's trafficking in RealDVD. Because

25  Real's own illegal conduct is the cause of its claimed injuries, Real's antitrust claims must fail.

26

27

28

- 12 -

2.   **Real Fails to Allege Any Causal Connection Between the Studios' Actions and Real's Claimed Inability to Compete in a Market for Creating, Storing and Managing Copies of Movies and TV Shows**

Real's complaint fails to allege a causal connection to an injury-in-fact in another respect. Nothing in the License bars Real from building a product to "enable consumers to (a) create or otherwise obtain digital copies of movies and TV shows that they own on DVDs and (b) store and manage those copies electronically (e.g., on a hard drive) for subsequent playback." ¶ 119.

Real does not allege that the type of product it wants to build has to copy content directly from CSS-protected DVDs. Real cannot make such an allegation, because it spent much of the preliminary injunction proceedings *denying* that its interest was in having a product that copied directly from DVDs. Real's CEO, Rob Glaser, testified that the purpose of RealDVD "isn't to make an extra copy. The primary point is to get extra value out of that material . . . . make a copy of it onto a hard drive." Hr'g Tr. at 537:5-15, Apr. 28, 2009. Real insists that the purpose of RealDVD is to put video content on a hard drive so that DVD collections can be organized and easily browsed, so the system can keep track of where a consumer left off watching a video, so parental controls can be implemented, and so that consumers do no have to risk losing or "scratching" their DVDs. ¶¶ 16, 25, 56-57. Real says it is not interested in copying DVDs *per se*, because (again according to Mr. Glaser), copying off of a CSS-protected DVD is simply a "side effect of what we have to do, in order to add value." Hr'g Tr. at 537:5-10, Apr. 28, 2009.

Taking all that as true—that RealDVD's goal is *not* to copy DVDs—then RealDVD could be implemented, for example, through digital downloads rather than copying CSS-protected DVDs, as happens on Amazon and iTunes. Rather than copying the content off the physical disk and thereby circumventing CSS, ARccOS and RipGuard, RealDVD could simply afford consumers a means to download the same movie or television show from the Internet—as Apple, Amazon and others do. ¶ 63 (acknowledging that "copy [of DVD] . . . could be delivered over the Internet as a download"). Certainly, Real does not and cannot allege any conspiracy among the Studios not to license the downloading of movies to consumer hard drives.

Of course, if Real were to implement a system of delivery, storage and management for *authorized* copies of copyrighted content, Real would have to come to an agreement (including

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST CLAIMS, NO. C 08-4548 MHP

mutually acceptable economic terms) with individual owners of the content that Real wants to copy and distribute through its service. In that respect, Real would be no differently situated than any other entity that uses copyrighted content as an input to its business model. Indeed, by trying to evade such terms through its RealDVD copying device, Real seeks to put itself in a *better* position than law-abiding companies who pay for the content they use. Nothing that Real has alleged (or can allege) shows there is any type of "agreement," "conspiracy" or "group boycott" that is the cause of Real's claimed inability to compete against those other entities.

**B.      Real's Allegations Fail to Plead Plausible Conspiracies, As Required by *Twombly* and *Iqbal***

Real's claims also fail to allege any plausible conspiracy to violate the antitrust laws under the standards set forth in *Twombly, Iqbal* and the Ninth Circuit cases following them. Real must allege *facts* that "cross[]" the line "between the factually neutral and the factually suggestive" in order "to enter the realm of plausible liability." *Twombly,* 550 U.S. at 557 n.5. Allegations that are merely consistent with, or that are "more likely explained by, lawful, unchoreographed free-market behavior[,]" fail to state a claim under § 1 of the Sherman Act. *Iqbal*, 129 S. Ct. at 1950. "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. *Twombly* and *Iqbal* also require Real to plead facts, not conclusory assertions, about the "specific time, place, or person involved in the alleged conspirac[y]." *Twombly*, 550 U.S. at 565 n.10. "A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." *Kendall*, 518 F.3d at 1047. To survive dismissal, Real must "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id*. at 1048.

Neither of the "conspiracies" Real alleges meets these demanding standards.

### 1. Real Fails to Plead a Plausible Theory That the CSS License Is an Illegal Restraint

Real's third cause of action alleges that the CSS License is an unlawful agreement between the DVD CCA and the Studios to preclude copying from CSS-protected DVDs. Real never explains why the License—which is between the DVD CCA and Real—is an agreement between the DVD CCA and the Studios. The fact that the Studios are members of the DVD CCA certainly does not plead participation in a conspiracy. *See Twombly*, 550 U.S. at 567 n.12 (allegations of association membership insufficient to plead conspiracy); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("membership alone is not proof of an agreement"); *Kendall*, 518 F.3d at 1048 ("membership in an association does not render an association's members automatically liable for antitrust violations committed by the association"). Nor is a conspiracy pled by Real's allegation of the Studios' "effective[] control" of the DVD CCA (¶ 50); that unsupported legal conclusion must be disregarded under *Twombly*.

More fundamentally, Real does not allege (nor could it) that the Studios' individual decisions to participate in a *non-exclusive* system for protecting copyrighted content against copying are anything other than rational, lawful business behavior. "[W]hile the plaintiff may believe the defendants conspired . . ., the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 550 U.S. at 566-67 (quotation omitted). The facts, as are well known and widely reported in the cases, are that each owner of audiovisual content like the Studios has compelling *individual* motives to opt into the CSS system—to protect *its own* content from being copied. *See, e.g., Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 436-37 (2d Cir. 2001); *Reimerdes*, 111 F. Supp. 2d at 309-11; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1089 (N.D. Cal. 2004).[10] Nothing in Real's complaint suggests that resistance to copying

---

[10] Real does not allege otherwise with its conclusory and inaccurate characterizations of witness testimony at the preliminary injunction hearing. ¶¶ 51-52. Contrary to Real's contention, Marsha King (the Warner Bros. representative to the multi-industry Content Protection Working Group) did not say that the Studios said there could be no copying of one another's content. Ms. King actually testified to each Studio's insistence that its *own* product not be copied from DVDs. Hr'g Tr. at 74:9-12, Apr. 24, 2009. And the DVD CCA's technical expert, Dr. John Kelly (whose testimony Real mischaracterizes in ¶ 52) said *nothing* about what the CSS License does (or does not) do to restrict companies from making their own decisions about the copying of their own

1   "was anything more than the natural, unilateral reaction of each [defendant]."  *Twombly*, 550 U.S.

2   at 566.  There is simply "no reason to infer that the companies had agreed among themselves to

3   do what was only natural anyway."  *Id.*

4   Even if Real's conclusory allegations were sufficient to plead an "agreement" among the

5   Studios about the use of CSS technology, those allegations still fail to allege there is anything

6   about that agreement that violates the antitrust laws.  *Cf. Courie v. Alcoa Wheel & Forged Prods.*,

7   No. 07-4440, 2009 WL 2497928, at *2 (6th Cir. Aug. 18, 2009) ("even assuming the agreement

8   exists, [plaintiff's] complaint does not state claims upon which relief may be granted").  First,

9   nothing in the CSS License operates as a restraint of trade, since nothing requires a Studio to

10  distribute its content on CSS-protected DVDs.  And nothing in the License does (or is alleged to)

11  prevent a Studio from using other means for distributing its content digitally—as every Studio

12  does, including through (among other means) digital downloads, video-on-demand, and other

13  products and services that allow storage and management of digital copies.  *See* Order ¶ 17; Dunn

14  Decl. ¶¶ 9-26.  The fact that opportunities to license content for digital dissemination are freely

15  and fully available means that the License's proscription on copying from CSS-protected DVDs

16  is not a restraint.  *See CBS, Inc. v. ASCAP*, 620 F.2d 930, 935-36 (2d Cir. 1980) ("[T]he

17  opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to

18  acquire individual rights is fully available.").

19  Moreover, for the License's proscription of copying from DVDs to constitute an unlawful

20  conspiracy as Real contends, Real logically would need to show the rejection of a realistic

21  alternative system that safely permits such copying.[11]  Real would need to allege facts showing

22

23  content.  His testimony (which the Court discussed at length in its Order) instead was directed to
    the technical requirements of the CSS License.  *See, e.g.*, Order ¶¶ 41-42.

24  [11] And for the License to be "illegal since its inception," ¶ 83, Real would need to plead that the
    owners of the CSS technology gave the DVD CCA the right to license on the basis Real says it

25  wants.  Under the CSS License as originally drafted, the DVD CCA only had the right to convey
    those rights granted to it by MEI and Toshiba.  *See* Order ¶¶ 19-20 (finding that MEI and Toshiba

26  "owned the underlying intellectual property for CSS," that "Counsel for Matsushita served as the
    primary drafter of the agreement," and that when DVD CCA was formed, MEI and Toshiba

27  "granted the DVD CCA a royalty-free license in CSS technology").  Real, however, fails to allege
    that the rights licensed to DVD CCA included the right to allow licensees to use the technology to

28  create copies of content from CSS-protected DVDs.

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1    that if one content owner decided to authorize the copying of its content from its own CSS-

2    protected DVDs, that could be effectuated in such a way that would not expose content released

3    by other content owners—including billions of CSS-protected DVDs distributed worldwide over

4    the last decade—to the risk of unauthorized copying. Real has made no such showing and fails

5    even to allege any facts showing the feasibility of such a system. Absent such allegations, even if

6    Real alleged a "restraint" (which it has not), the "restraint" is fully consistent with rational, lawful

7    business behavior, and Real's claim fails. *Iqbal*, 129 S. Ct. at 1950; *Kendall*, 518 F.3d at 1049.

8        Real's contrary arguments—previewed in its complaint and its opposition to the DVD

9    CCA's motion—do not withstand scrutiny. Without grappling with its failure to plead a

10    conspiracy, Real purports to allege (ineffectively) the legal conclusion that the License's

11    prohibition of copying is a *per se* antitrust violation. ¶ 123. *Per se* treatment, however, is

12    reserved for limited types of restraints where experience gives the Court "confidence that the rule

13    of reason will condemn it." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (quotations omitted).

14    Conversely, the Court has repeatedly "expressed reluctance to adopt *per se* rules with regard to

15    restraints imposed in the context of business relationships where the economic impact of certain

16    practices is not immediately obvious." *Id*. (quotations omitted).[12]

17        The CSS License—which has been enormously output-enhancing and pro-competitive—

18    clearly does not fall into the *per se* category (even aside from Real's failure to plead conspiracy).

19    Real cannot change that conclusion with its repeated invocation of *Fashion Originators' Guild v.*

20    *FTC*, 312 U.S. 457 (1941). *See* Real's Opp. to DVD CCA Mot. at 2-4. In that case, the Court

21    upheld the FTC's unfair competition suit against the Guild, which had adopted an elaborate set of

22    rules to require fashion retailers to deal *exclusively* with Guild members for the undisputed

23    purpose of putting those engaged in "style piracy" (copying conceded *not* to violate the copyright

24    laws) out of business. 312 U.S. at 461-62. By contrast, this is not a suit instituted by the

25    government for the benefit of society as a whole, but a self-interested claim brought by a private

26

---

27    [12] *Accord, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive,'. . . that is, conduct 'that

28    would always or almost always tend to restrict competition and decrease output'").

litigant facing threshold obstacles that Real cannot overcome, starting with the fact (as discussed above) that Real's injury resulted from its illegal conduct, not any antitrust conspiracy.[13] Real's failure to allege antitrust standing aside, *Fashion Originators'* is factually inapposite. In that case, Guild membership imposed an exclusive dealing requirement. Any retailer who dealt with a "style pirate" lost its ability to buy from Guild manufacturers. *Id.* Here, the CSS License is *non-exclusive*. Nothing in the License prevents Real from entering into bilateral deals with individual Studios to distribute their content digitally, just as Apple, Amazon and others have done.

Real also claims that the License's proscription of copying harms consumers' ability to make "fair use copies" of content from DVDs. ¶¶ 64-65. Fair use was irrelevant as a defense to Real's DMCA violations, Order ¶ 120, and it is irrelevant to Real's antitrust claims. Real cannot cure its own lack of standing by speculating about whether an individual consumer in particular factual circumstances has a valid fair use defense to a claim of infringement for copying from a DVD. Moreover, Real's claim actually has nothing to do with fair use. Real claims that the vice of the purported CSS License conspiracy is that companies like Real cannot negotiate bilateral content licenses with individual Studios. ¶¶ 66, 80, 82. Copyright owners, however, are not obligated to grant licenses without compensation. Real of course would pass such costs on to RealDVD customers, just as Real charges those customers for the other costs of RealDVD, including the extra copies of the "Vegas" software.

### 2. Real's Alleged "Group Boycott" Conspiracy Is Implausible

Real's fourth claim fails under *Twombly* and *Iqbal* in failing to allege any basic facts about "who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048. Real instead packs its allegations with general and conclusory labels about the existence of a "Studio cartel," and the Studios "agree[ing] collectively to refuse to enter into individual licenses with Real." ¶¶ 74, 76, 132. Real nowhere describes how the Studios' failure spontaneously to

---

[13] Unlike a private party, the FTC is charged with enforcing statutes in the public interest, and faces fewer standing requirements as a result. *See, e.g., FTC v. Morton Salt Co*., 334 U.S. 37, 46 (1948) (Section 2 of Clayton Act enforced by FTC "does not require the Commission to find that injury has actually resulted"); *Pool Water Prods. v. Olin Corp*., 258 F.3d 1024, 1032 (9th Cir. 2001) ("Unlike in the FTC's action, plaintiffs here must show they were actually injured by a lessening of competition.").

1    offer undefined "individual licenses" when approached for a discussion of "mutual marketing

2    opportunities" (¶ 69) is a proper basis for inferring a group boycott.  Real does not allege the

3    terms of the "individual licenses" it supposedly sought, nor whether these were even consistent

4    with the provisions of the CSS License.

5         The handful of statements that Real makes concerning one Studio it says it negotiated

6    with—Paramount—are bereft of any of the essential details suggesting a conspiracy.  Real claims

7    that it "exchanged numerous term sheets" with Paramount, "and had even agreed upon

8    preliminary dollar amounts to enter into a marketing arrangement[,]" but supposedly "at the last

9    minute, Paramount indicated that it was not prepared to break with the Studio cartel without

10   substantial compensation for doing so."  ¶ 74.  This allegation (which fails to plead the terms of

11   any proposed license much less the details of the "marketing arrangement") does not even skim

12   the surface of alleging a collective agreement to refuse to deal with Real.  Real says nothing about

13   who said what to Real, or about what was said in particular.  Real's allegations say nothing about

14   who the members of the alleged "cartel" were, or any other facts making a group boycott claim

15   plausible.  Real's allegation that Paramount "demanded" that Real pay an "exorbitant sum" for

16   the supposed deal, ¶ 132, suggests at most a disagreement over price between two parties,

17   Paramount and Real.  It does not plausibly suggest, as Real claims it does, "the existence of an

18   agreement among the Studio Defendants to refuse to negotiate individually with Real." *Id.*

19   Real's further contention that its discussions with different Studios went in different directions—

20   that some (Fox and Paramount) allegedly discussed "concern over" the rent-rip-return problem,

21   while other "negotiations" did not go as far, ¶¶ 70, 74—are entirely consistent with independent

22   negotiations and individual Studios making their own independent business decisions.  Claims of

23   parallel conduct fail to plead a plausible § 1 violation, *see Twombly*, 550 U.S. at 566, and here,

24   even if Real made more elaborate self-serving allegations, the fact that negotiations took place

25   and reached varying degrees of ripeness are inconsistent with a plausible group boycott and are

26   fully consistent with independent business decisions.

27        The only other "fact" that Real points to in support of its conspiracy theory is the

28   allegation "that none of the Studios would individually enter into a tolling agreement with

1   Real[,]" instead "insist[ing] on a group agreement." ¶ 88.  The Studios' actions in negotiating a

2   tolling agreement with Real are directly incidental to imminent litigation, and thus are immune

3   from antitrust liability under the *Noerr-Pennington* doctrine, as discussed below.  *Noerr* aside, the

4   allegation that each Studio insisted on one tolling agreement is wholly consistent with lawful,

5   independent behavior.  It is obvious that parties with common claims against a single defendant—

6   each of whom faces the prospect of a declaratory judgment claim in reverse (which claim Real

7   actually did file, in this District)—would want there to be one deadline, not several, when

8   litigation might commence.  Neither the tolling agreement, nor any other facts alleged by Real,

9   provides plausible grounds for a § 1 group boycott theory.

10      **C.   *Noerr-Pennington* Bars Real's Claims**

11      The *Noerr-Pennington* doctrine provides that "those who petition any department of the

12   government for redress are immune from statutory liability for their petitioning conduct."[14]

13   *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008).  In the

14   "litigation context, not only petitions sent directly to the court in the course of litigation, but also

15   'conduct incidental to the prosecution of the suit,'" such as deciding whether to settle a claim, are

16   "protected" by the doctrine.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (quoting

17   *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528-29 (9th

18   Cir. 1991), *aff'd*, 508 U.S. 49 (1993)).  *Noerr* bars Real's antitrust claims against the Studios for

19   two reasons:  (1) Real's "group boycott" claim is based entirely on the Studios' protected

20   petitioning of this Court for relief from Real's unlawful conduct; and (2) Real's claim of a

21   "collective refusal" by the Studios to settle with Real in the weeks preceding this lawsuit is

22   conduct that is incidental to litigation and thus *Noerr*-protected.

23

24

---

25   [14] Petitioning conduct may only "be restricted by law where [it] include[s] representations so
26   baseless that the threatened litigation would fall into the 'sham litigation' exception."  *Theme Promotions*, 546 F.3d at 1007.  Real makes no allegation of a sham, nor could it, given the
27   Court's issuance of a TRO and a preliminary injunction.  *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005) (successful litigation by definition is not "objectively
28   baseless," as it must be for the sham exception to apply).

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1. **Real's Third Cause of Action, Based on the Studios' Enforcement of the CSS License, Aims to Penalize Protected Petitioning Conduct**

Real's "group boycott" claim is based on what Real calls the Studios' and the DVD CCA's "collective interpretation" and "enforce[ment]" of the CSS License.  ¶¶ 82-83, 119. Real's allegations are all based on the parties' advocacy before the Court, ¶¶ 51-52, which cannot be the basis for antitrust liability under *Noerr*.  This follows for two reasons.

First, Real's sole claim of injury—the "delay" in the release of RealDVD—is the result of the Studios' suit and their request that the Court enjoin Real from its unlawful conduct, core petitioning activity protected by the First Amendment.[15]  Under *Noerr*, the "antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government."  *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991).  As the Ninth Circuit has explained, to "hold [the defendant] liable for injuries flowing from governmental decision-makers' imposition of an anticompetitive restraint, [the Court] would have to find that the restraint was imposed because of [the defendant's] petitioning efforts."  *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 300 (9th Cir. 1994).  *See also, e.g.*, *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y. 2008) ("Here, defendants' claim *rests wholly on the outcome of process, namely interference with prospective relations resulting from the court's issuance of a temporary injunction*.  Absent the injunction, however, no evidence has been presented that plaintiff's choice to involve defendants in a suit has interfered with its prospective business relations." (emphasis added)).  *Noerr* does not allow Real to base antitrust liability on the Studios' availing themselves of access to the judicial process.

Second, the elements of Real's alleged claim are based on the parties' litigation positions, which are every bit as immune as the underlying petition to the Court.  In particular, the only alleged manifestation of the supposed DVD CCA-Studios conspiracy is the parties' interpretation and enforcement of the CSS License in this litigation.  ¶¶ 51-52, 83.  Other than the parties'

---

[15] *See, e.g.*, *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 n.11 (11th Cir. 1992) (defendant "cannot allege that plaintiffs did anything but 'use the adjudicatory process to obtain a favorable outcome.'  Such use is protected under the *Noerr-Pennington* doctrine, given that the plaintiffs 'were within their rights to use every available legal means' to succeed in the litigation.").

1  positions regarding the CSS License's proscription on copying, Real does not allege any specific

2  facts in support of its conspiracy allegation.  Indeed, Real expressly alleges that the Studios' and

3  the DVD CCA's unlawful conspiracy revealed itself through the prosecution of this case.  ¶ 39.

4  Such conduct, however, cannot be the basis for antitrust liability.  "[C]ommunication[s] to the

5  court," *e.g.*, "[a] complaint, an answer, a counterclaim and other assorted documents and

6  pleadings, in which plaintiffs or defendants *make representations and present arguments* to

7  support their request that the court do or not do something," constitute *Noerr*-protected

8  "petitions."  *Freeman*, 410 F.3d at 1184 (emphasis added).  *Cal. Motor Transp. Co. v. Trucking*

9  *Unlimited*, 404 U.S. 508, 511 (1972) (*Noerr* provides immunity for the use of "the channels and

10  procedures of state and federal agencies and courts to advocate" causes).[16]

11        The case that Real relies on, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,*

12  *Inc.,* 690 F.2d 1240 (9th Cir. 1982), is inapposite.  *See* Real's Opp. to DVD CCA Mot. at 14-17.

13  There, the plaintiff alleged that the "defendants engaged in a rate fixing conspiracy, *part of which*

14  *involved defendants' protests to the ICC*, and that this conspiracy constitute[d] a separate

15  violation of the antitrust laws independent of any petitioning activity that might enjoy *Noerr*

16  immunity."  *Id.* at 1263 (emphasis added).  The defendants argued that under *Noerr*, the

17  petitioning conduct to the ICC immunized the "overall scheme."  *Id.*  The court disagreed, and

18  held that an "antitrust violation does not enjoy immunity simply because an element of that

19  violation involves an action which itself is not illegal."  *Id.*  The court found the plaintiff was "not

20  challenging merely the petitioning activity" but rather "the defendants' *entire course of conduct,*

21  which allegedly resulted in the price fixing and trade restraints."  *Id.* at 1265 (emphasis added).

22

---

23  [16] *Lamar County Elec. Co-op. Ass'n v. Rayburn Country Elec. Co-op., Inc.*, 330 F. Supp. 2d 763
(E.D. La. 2002), illustrates that the interpretation of an agreement advanced in litigation cannot be

24  the basis for an antitrust claim.  The plaintiff (Rayburn) successfully challenged and enjoined a
merger as violating the terms of a prior settlement agreement between the plaintiff and one of the

25  merging parties.  One of the merging parties (Lamar) then brought an antitrust suit against
Rayburn, alleging that "Rayburn's efforts to interpret and enforce the [underlying] settlement

26  agreement violate both federal and state antitrust laws." *Id.* at 765.  The court held Lamar's
antitrust claims barred by *Noerr*, and it dismissed them on the pleadings.  The complaint failed

27  under *Noerr* because it alleged liability based on "Rayburn's efforts to 'interpret and enforce the
settlement agreement' and . . . the position it took in the state court litigation"; thus it was clear

28  that "the conduct it complains of is Rayburn's effort to obtain the state court judgment." *Id.*

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
CLAIMS, NO. C 08-4548 MHP

1    *Clipper* thus holds only that a defendant's *overall* illegal scheme is not protected by *Noerr*

2    where *part* of the scheme involved legal petitioning.  Unlike in *Clipper*, Real cannot allege the

3    necessary elements of an antitrust claim—including injury and causation—without relying

4    exclusively on the Studios' petitioning conduct.  That conduct remains protected under *Noerr*.  As

5    the Fifth Circuit stated in *In re Burlington Northern, Inc.*, 822 F.2d 518, 526 (5th Cir. 1987),

6    *Clipper*'s "holding was that *Noerr-Pennington* 'provides immunity only for the narrow

7    petitioning activity,' . . . and that this immunity does not provide 'overall immunity' to other

8    violations . . . . The court did not hold, and could not hold consistently with *Pennington*, that the

9    overall scheme makes the otherwise protected petitioning a sham."  *Id.*

10             2.    **Real's Fourth Cause of Action Is Barred Because the Studios' Alleged**
                     **"Collective Refusal to Deal" Was Settlement-Related Conduct**

11

12           Real's fourth claim is barred because the Studios' alleged "collective refusal to deal" with

13   Real prior to the parties' filing suit was in the context of settlement discussions, as evidenced by,

14   *inter alia*, the admitted fact that the discussions took place pursuant to a tolling agreement.  ¶ 88.

15   This Court, in its Order on the Studios' motion for spoliation sanctions against Real, held that the

16   tolling agreement showed that "Real was on notice that litigation was probable and a potential

17   claim was identifiable[.]"  Doc. No. 316 at 14:9-15.

18           "A decision to accept or reject an offer of settlement is conduct incidental to the

19   prosecution of the suit and not a separate and distinct activity which might form the basis for

20   antitrust liability."  *Columbia Pictures*, 944 F.2d at 1528.  In *Columbia Pictures*, the Studios

21   brought a copyright infringement action against a hotel ("PRE") based on its rental of video discs

22   to hotel guests.  PRE filed antitrust counterclaims based in part on the allegation that the Studios

23   "concertedly refused to grant licenses to PRE to rent videodiscs to its guests."  *Id.*  Real makes an

24   analogous claim here, *viz.*, that the Studios "in concert" refused to license Real to permit

25   consumers to copy DVDs.  In rejecting PRE's claim, the Ninth Circuit explained:

26           PRE's first allegation - the concerted refusal to deal - relates to PRE's attempts,
             after Columbia Pictures instituted the copyright infringement action, to obtain
27           licenses from the Movie Studios to use and install in-room videodisc systems in
             the guest rooms. . . . *A decision to accept or reject an offer of settlement is conduct*
28           *incidental to the prosecution of the suit and not a separate and distinct activity*
             *which might form the basis for antitrust liability.*

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                                                        CLAIMS, NO. C 08-4548 MHP

1    *Id.* (emphasis added).  The Court held that liability could be found for the alleged collective

2    refusal to license only if the litigation itself was shown to be sham.  (As noted, Real does not and

3    cannot allege sham litigation here.)

4        The rule of *Columbia Pictures*—that settlement activity incidental to litigation is *Noerr*-

5    protected—does not turn on whether settlement discussions take place before or after suit is filed.

6    In *Sosa*, for example, defendant DirectTV sent thousands of letters to consumers demanding that

7    they settle claims of accessing satellite television signals illegally.  The Ninth Circuit noted that,

8    unlike in *Columbia Pictures*, "there was no suit ongoing, and thus, no existing 'petition' to which

9    the settlement demands were incidental."  437 F.3d at 935.  Nonetheless, the Court was "not

10   persuaded that this distinction changes the analysis" because "preceding the formal filing of

11   litigation with an invitation to engage in negotiations to settle legal claims is a common, if not

12   universal, feature of modern litigation."  *Id.*  Thus, the "connection" between "presuit" settlement

13   communications and "access to the courts is sufficiently close that the Petition Clause issues" by

14   such communications "are indeed substantial" and protected by *Noerr*.  *Id.  See also Theofel v.*

15   *Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004) (*Noerr* "has been extended to certain conduct

16   'incidental to the prosecution of the suit,' for example, deciding whether to settle a claim");

17   *Freeman*, 410 F.3d at 1185 (settlement talks are conduct incidental to litigation).

18       Real's allegations, including its express reference to the fact that the discussions took

19   place pursuant to the tolling agreement, ¶ 88, demonstrate that Real's group boycott claim is

20   based on failed settlement discussions.  Real alleges that the Studios expressed concerns to Real

21   about, *inter alia*, the "potential problem of people renting DVDs, copying them, and then

22   returning them," ¶ 70, and that Real "delayed its long-planned and scheduled product release to

23   try to reach an accommodation with the Studios to address their concerns."  ¶ 73.  *Accord* ¶ 110.

24   Real describes these discussions as an effort to "*resolve* the Studios Defendants' *stated concerns*

25   with the product" and "attempts *to resolve the ensuing dispute* between" Real and the Studios.

26   ¶¶ 97, 132 (emphases added).[17]  *Noerr* bars Real's attempt to plead antitrust liability based on this

27   conduct incidental to imminent litigation.

28   _____

[17] As noted in the Background section, *supra*, Real's business discussions with the parties it

1      **D.**    **Real's State Law Claims Fail**

2      Real's state law claims under the Cartwright Act and Cal. Bus. & Prof. Code § 17200

3  ("UCL") are based on the same allegations as its federal claims and likewise fail.  While the

4  Cartwright and Sherman Acts are not coterminous, the California courts have adopted many of

5  the same requirements for valid antitrust claims as have the federal courts.  These include that the

6  alleged conspiracies be pleaded with "a high degree of particularity," *Freeman v. San Diego*

7  *Ass'n of Realtors*, 77 Cal. App. 4th 171, 196 (1999); the *Noerr-Pennington* doctrine, *Blank v.*

8  *Kirwan*, 39 Cal. 3d 311 (1985); and that plaintiffs plead "facts to show they suffered an injury

9  which was caused by restraints on competition," *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534,

10  548 (1998).  The failure of Real's complaint to meet each of these standards under federal law

11  means that the state antitrust claim fails as well.  Real's UCL claim also falls with its failed

12  federal claims.  "Where a Plaintiff fails to state an antitrust claim, and where an unfair

13  competition claim is based upon the same allegations, such [unfair competition] claims are

14  properly dismissed." *Formula One Licensing, B.V v. Purple Interactive Ltd.*, No. C 00-2222

15  MMC, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001) (citing *Kentmaster Mfg. Co. v. Jarvis*

16  *Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998)).

17  **IV.**    **REAL'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE**

18      Real's claims are facially deficient.  Real cannot make the allegations necessary to state

19  plausible antitrust claims because doing so would contradict the extensive record, including

20  Real's binding admissions.  Real has had extensive discovery and a multi-day hearing.  Leave to

21  amend will not cure the deficiencies in Real's complaint, which should be dismissed with

22  prejudice. *See Gadda v. State Bar of Cal.*, 511 F.3d 933, 939 (9th Cir. 2007) (affirming dismissal

23  with prejudice where plaintiff "has not suggested any possible way that he could cure his

24  complaint to survive dismissal upon amendment, nor is one apparent"); *Ingram v. City and*

25  *County of S.F.*, No. C 06-06896 MHP, 2007 WL 902555, at *3 (N.D. Cal. Mar. 22, 2007).

26

27  actually wanted to have as partners stand in marked contrast to its eve-of-litigation approach to
the Studios.  The judicially noticeable facts concerning those discussions confirm (as the

28  complaint does) that Real's discussions with the Studios concerned settling imminent litigation.

1    DATED: September 8, 2009                    Respectfully submitted,

2                                               MUNGER, TOLLES & OLSON LLP
                                                  GLENN D. POMERANTZ
3                                                 BART H. WILLIAMS
                                                  KELLY M. KLAUS
4                                                 ROHIT K. SINGLA
                                                  JONATHAN H. BLAVIN
5

6
                                                By:    /s/ Glenn D. Pomerantz
7                                                         GLENN D. POMERANTZ

8                                               Attorneys for Motion Picture Studio Parties

9    DATED: September 8, 2009                    GIBSON, DUNN & CRUTCHER LLP
                                                  DANIEL G. SWANSON
10                                                DANIEL M. FLORES
                                                  KAIPONANEA T. MATSUMURA
11

12
                                                By:    /s/ Daniel G. Swanson
13                                                        DANIEL G. SWANSON

14                                              Attorneys for Sony Pictures Entertainment Inc.

15   DATED: September 8, 2009                    SIMPSON THACHER & BARTLETT LLP
                                                  KENNETH R. LOGAN
16                                                KEVIN ARQUIT
                                                  HARRISON J. FRAHN IV
17                                                MICHAEL LIZANO

18
                                                By:    /s/ Harrison J. Frahn IV
19                                                        HARRISON J. FRAHN IV

20                                              Attorneys for Viacom Inc. and Paramount
                                                Pictures Corporation
21

22   .

23

24

25

26

27

28

STUDIOS' MOT. TO DISMISS REAL'S ANTITRUST
                                                CLAIMS, NO. C 08-4548 MHP