Pages  1 - 82

United States District Court

Northern District of California

Before The Honorable Marilyn Hall Patel

RealNetworks, Incorporated,  )
et al.,                       )
                              )
          Plaintiff,          )
                              )
  vs.                         )            No. C08-4548 MHP
                              )
DVD Copy Control              )              and related
Association, Incorporated,    )
et al.,                       )            No. C08-4719 MHP
                              )
          Defendant.          )
_____)
                                       San Francisco, California
                                       Monday, December 22, 2008

### Reporter's Transcript Of Proceedings

**Appearances**:

For Plaintiff:        Wilson, Sonsini, Goodrich & Rosati
                      650 Page Mill Road
                      Palo Alto, California  94304-1050
                 By:  **Michael A. Berta, Esquire**
                      **James DiBoise, Esquire**
                      **Leo Cunningham, Esquire**
                      **Tracy Tosh Lane, Esquire**

For Defendants:       White & Case
                      3000 El Camino Real
                      Five Palo Alto Square, 9th Floor
                      Palo Alto, California  94306
                 By:  **Mark Frederick Lambert, Esquire**

(Appearances continued on next page.)

*Reported By:*        *Sahar McVickar, RPR, CSR No. 12963*
                      *Official Reporter, U.S. District Court*
                      *For the Northern District of California*

(Computerized Transcription By Eclipse)

*Sahar McVickar, C.S.R. No. 12963, RPR*
*Official Court Reporter, U.S. District Court*
*(415) 626-6060*

1   <u>Appearances, continued:</u>

2   For Defendant:           Munger Tolles & Olson
                             355 South Grand Avenue, 35th Floor
3                            Los Angeles, California  90071
                        By: **Bart Harper Williams, Esquire**
4                            **Rohit Singla, Esquire**
                             **Lawrence Barth, Esquire**
5
                             Akin Gump Strauss Hauer & Feld, LLP
6                            580 California Street, 15th Floor
                             San Francisco, California  94104
7                       By: **Reginald David Steer, Esquire**

8                            Motion Picture Association of America
                             15503 Ventura Boulevard
9                            Encino, California  91436
                        By: **Daniel Ernest Robbins, Esquire**
10
                             Law Offices of Gary Paul Goeckner
11                           15301 Ventura Boulevard, Building E
                             Sherman Oaks, California  91403
12                      By: **Gary Paul Goeckner, Esquire**

13

14

15                           ---oOo---

16

17

18

19

20

21

22

23

24

25

1   **Monday**, **December** **22**, **2008**                              **2:48 p.m.**

2                          P R O C E E D I N G S

3            **THE CLERK:**  Calling civil 08-4548, civil 08-4719,

4   RealNetworks, Inc. versus DVD Copy Control Associates, et al.

5            **THE COURT:**  By the way, the two of you who are

6   leaving --

7                **(Attorneys appearing for previous case.)**

8            **THE COURT:**  Did you ever see the movie,

9   *Fortune Cookie*?  Oh, you've got to see it.  Walter Matthau --

10           And Mr. Cunningham, you know about that.

11           **MR. CUNNINGHAM:**  Yes.

12           **THE COURT:**  Walter Matthau and Jack Lemmon and

13  insurance surveillance, and all the rest.  Oh, it's really a

14  kick.  It's in black and white.  It's old, but it's still

15  funny.

16                          **(Laughter.)**

17           **THE COURT:**  You're laughing.

18           **THE REPORTER:**  It's good.  It was funny.

19           **THE COURT:**  So he has cards -- we can go on the

20  record now.

21           Mr. Bowser, the courtroom deputy, has cards from

22  everyone.  So we'll just leave it at this, that if you are

23  going to say something on the record, then state your name so

24  the reporter can get down the correct attributes; otherwise,

25  you are all accounted for, for your billable hours, or whatever

1    you need that record for.

2            Don't mean to sound jaded, but I am.

3                    **(Laughter.)**

4            **THE COURT:**  Okay, first of all, I don't understand

5    why there is so much hoopla about an effort to amend the

6    complaint, particularly when, as I understand it, they are

7    willing to remain under the preliminary injunction for that

8    period of time.  And I assume that if they don't amend they

9    could, in fact, file another dec relief action.

10           So, you are going to respond to that?

11           **MR. WILLIAMS:**  Sure, Your Honor.

12           **THE COURT:**  Yes.

13           **MR. WILLIAMS:**   Bart Williams on behalf of the

14   studio defendants and counter-claimants.

15           **THE COURT:**  Yes, good afternoon.

16           **MR. WILLIAMS:**  Thank you, Your Honor.  Good

17   afternoon.

18           The problem, from our perspective, is not so much

19   that they wish to amend their complaint; of course, they are

20   entitled to amend a complaint, pretty much, if they want to.

21   The problem is that they are trying to amend our motion.  Our

22   motion is part of the counter-claim, and our motion is that --

23   to try to get a TRO and preliminary injunction for a particular

24   product.  That product has come to be known as the Vegas

25   product.  We have been calling it RealDVD up until this time,

1   but, in discovery, we have learned that there are two different

2   products.  One product Real calls Facet, which is a product

3   that was developed first, before they appeared in front of Your

4   Honor on August 3rd -- on October 3rd and October 7th for those

5   -- the hearings that we had before you.  Real did not advise

6   the Court; they did not advise us of the existence of the Facet

7   product; they only were talking at that time about a product

8   that they internally called the Vegas product, which is the one

9   that we have been litigating.

10          Over the course of time, for whatever reason,

11   RealNetworks decided that they wanted to have a determination

12   regarding the Facet product.  And what they are doing,

13   effectively, by their motion to amend is requiring that we, the

14   moving party, moving for the TRO on a particular piece of

15   technology, amend our motion.  And that is what we don't want

16   to do, and here is the reason why we don't want to do it:  The

17   information that we have been given on that product is

18   extraordinarily limited.

19          **THE COURT:**  "That product" being Facet?

20          **MR. WILLIAMS:**  Being Facet, yes, Your Honor.

21          We have received precious little information

22   regarding the product.  And, most importantly, the decision

23   makers at our clients, the operations people at the studios,

24   are prohibited from learning information about how the product

25   works.

1          **THE COURT:**  Well, but maybe -- maybe are you not

2   getting the cart before the horse?  Because usually you would

3   get discovery after the complaint is amended.  I mean, it's

4   like you don't get, you know, preemptive discovery, so to

5   speak, before somebody files a complaint.  And here they want

6   to move to amend the complaint, and you are arguing that, well,

7   we don't know enough about it to let them amend or, I guess,

8   get a modified TRO and to have take some action with respect to

9   the TRO or preliminary injunction.  But that would not

10  ordinarily happen until the complaint is amended and you have

11  some further right of discovery.

12          **MR. WILLIAMS:**  Well, actually, Your Honor,

13  respectfully, it is not we who are putting the cart before the

14  horse because you have to have a controversy, you have to have

15  a party that is seeking to get a temporary restraining order,

16  that has a dispute with the party that is releasing the

17  technology.

18          **THE COURT:**  Well, they are seeking to get -- they

19  want dec relief action, is what they want.

20          **MR. WILLIAMS:**  Indeed, they do.  And we have

21  counter-claimed seeking the TRO.

22          **THE COURT:**  Right.

23          **MR. WILLIAMS:**  But the point is that in order to

24  have a case in controversy, for us to have a controversy with

25  them, we have to argue that that product should not be released

1    to the public.

2              It's probable that we will argue that that product

3    should not be released to the public, but we should not have to

4    take their word for it, we should be able to see the product --

5              **THE COURT:**  If they are allowed to amend the

6    complaint, and whatever we are calling it, the TRO -- I guess

7    it's not a preliminary injunction yet -- the TRO remains in

8    effect, and, after the complaint is amended, you either file

9    your answer or whatever other action you are going to take, you

10   do some discovery.

11             And perhaps the discovery will be -- it would have

12   to be more forthcoming; otherwise, they might end up finding

13   that their newly amended complaint, insofar as it relates to

14   Facet, is going to be dismissed, or that claim would be

15   dismissed.  But they would have to allow some discovery.

16             And we'll hold tight on the temporary restraining

17   order and leave that in place as to the Vegas product and allow

18   you to get whatever discovery you need as to the Facet product.

19   And then, if you need to move for a temporary restraining order

20   on that, fine.  If not, then we'll deal with it as a dec relief

21   action unless you move to dismiss that component of the claim

22   because you say there really is no controversy.

23             **MR. WILLIAMS:**  Your Honor, really, all we are asking

24   for is the opportunity to know the product as to which we are

25   seeking a temporary restraining order.

1          **THE COURT:**  Well, then, you would get that after

2     they amend the complaint.

3          **MR. WILLIAMS:**  Well, true, but what they are asking

4     -- what they are saying and what the relief that they are

5     seeking here is not just relief to permit them to amend the

6     complaint. They are seeking relief that has the Court ordering

7     as of today, the time of their motion, that the Facet product

8     will be heard for temporary restraining order in these same

9     proceedings, as to which the Vegas product has been heard.

10          And that's what we object to because our clients

11     should be entitled to make a decision, one way or the other,

12     about whether they want to even move on the Facet product.  And

13     that is the -- that's the putting the cart before the horse.

14          Typically, we would have seen the product out on the

15     market, we would have then moved, and that hasn't happened

16     here.  They have been very careful and cagey about allowing us

17     to have information regarding the Facet product.

18          **THE COURT:**  Cagey a lot over here; is that it?

19               **(Laughter.)**

20          **MR. WILLIAMS:**  In fact --

21          **THE COURT:**  I think we can take care of caginess.

22     It wouldn't be the first time we've had to deal with that.

23          But, we can either keep -- try to keep the TRO on

24     the track and then plug the other product into it while you are

25     doing discovery.  With the battery of lawyers you have, you

1  ought to the be able to, you know, do discovery on more than

2  one product, it would seem to me.

3          **MR. WILLIAMS:**  That's really -- I'm sorry to cut you

4  off.

5          **THE COURT:**  And so, I'm inclined to allow the motion

6  to amend and then keep the TRO in place.  And you tell me when

7  you are going to be ready to deal with the Facet product and

8  whether it's a good idea to keep it on the same track as

9  Vista --

10         **MR. WILLIAMS:**  Vegas.

11         **THE COURT:**  Vegas, excuse me.  That's --

12                  **(Laughter.)**

13         **THE COURT:**  -- someone else's product.  That's

14  Microsoft, isn't it?

15         No, the Vegas product.  And we can figure out a

16  schedule for that.  But they are going to have to provide

17  enough disclosure for you to determine whether or not there is

18  any potential basis for a preliminary injunction or a TRO.

19         **MR. WILLIAMS:**  I see, Your Honor.  So you are

20  suggesting two steps:  One, they amend.  We get a chance to

21  look at some information to determine whether or not our

22  clients will object or not.

23         **THE COURT:**  Yes.

24         **MR. WILLIAMS:**  One thing that we would request,

25  though, as it currently exists, all of the documents have been

1    designated "highly confidential" by Real.

2              THE COURT:  We'll get to that question.

3              MR. WILLIAMS:  Okay.

4              THE COURT:  Okay.

5              I'm going to grant, then, the motion to amend.

6              Now, we have a proposed amended complaint; is that

7    the one that should be lodged, then, and defendants should

8    respond to?

9              MR. CUNNINGHAM:  Yes, Your Honor.

10             THE COURT:  And does it -- I mean, I didn't do a

11   side-by-side, but does it really differ in any respect with

12   regard to the Vegas aspect of the complaint?

13             MR. CUNNINGHAM:  I'm Leo Cunningham.

14             And no, it doesn't, Your Honor.  I did do a

15   side-by-side last night, and it really only adds this language

16   about the new platform, which is what is also called Facet.

17             THE COURT:  Um-hmm, okay.

18             And so do we deem that filed as of today because

19   everybody has a copy of it, right?

20             MR. CUNNINGHAM:  Yes.

21             MR. WILLIAMS:  Yes, we do, Your Honor.

22             THE COURT:  Is that correct?

23             And then how long do you need to file an answer, or

24   whatever else -- I think the best thing is to file an answer,

25   and that is without prejudice to any kind of a motion, either

1    to dismiss or for summary judgment, if you believe that, in

2    fact, there isn't a basis for any kind of declaratory relief or

3    injunctive relief on your part, okay?  Can we do that?

4              **MR. WILLIAMS:**  I hate to be persistent, Your Honor.

5              **THE COURT:**  Um-hmm.

6              **MR. WILLIAMS:**  We'd be happy to do that so long as

7    the operations people that are clients, the ones who have to

8    decide whether or not to oppose, can be permitted access to

9    these descriptions of the product, the source code for the

10   product --

11             **THE COURT:**  And we're going to get to that.

12             **MR. WILLIAMS:**  Okay.  As long as that happens --

13             **THE COURT:**  Fine.

14             How long to answer?

15             **MR. WILLIAMS:**  Twenty days.

16             **THE COURT:**  Twenty days?  Twenty days to answer.

17             And then what should we do with respect to the

18   motion for preliminary injunction?

19             **MR. CUNNINGHAM:**  Your Honor, we have a view on that.

20             So we are clear, there has been discovery about the

21   new product, the Facet product.  There were two days of

22   depositions on it just this past -- now last week.  We provided

23   the source code in mid-November.  We provided technical

24   documents beginning in mid-November.  So there has been,

25   actually, a substantial amount of discovery on the product.

1          Our concern is that the current preliminary

2    injunction motion seeks relief that would cover the new

3    product, so we want to make sure that we get to have a fair

4    fight about the new product at the preliminary injunction

5    hearing.  And we appreciate that if time -- more time really is

6    needed to do that, we'll grudgingly accede to that.

7          We are under a TRO, and that is not a comfortable

8    place to be, but we would like to hold the schedule -- in light

9    of the fact that we gave discovery on Facet, we "would like to

10   try to hold the end of January schedule to have Facet and

11   RealDVD or Vegas heard at the same time.

12        **THE COURT:**  And does that depend upon how quickly

13   you get access to whatever it is you believe you have not had

14   access to already?

15        **MR. WILLIAMS:**  Well, indeed, Your Honor.

16        And, if I may, on the topic of the fair fight I have

17   a couple of comments.  The first is that it is true that they

18   gave us a bunch of source code, but it's also true that they

19   gave us five million lines of source code relating to the Facet

20   product.

21        **THE COURT:**  Be careful what you wish for.

22        **MR. WILLIAMS:**  Exactly.  That was contained in

23   33,000 independent files.

24        Point number two is that, yes, it is true that we

25   took depositions of the two people principally responsible for

1   developing the Facet product, Mr. Brennan and Mr. Barrett, but

2   it is also true that the documents that Counsel is referring to

3   that purportedly describe the product, when we placed these

4   documents in front of those witnesses they said, no, no, those

5   aren't the documents that are the current versions of the

6   descriptions of the Facet product.

7           The very documents that are referenced in Ms. Lane's

8   declaration before Your Honor, for today's purposes, or the

9   opposition to -- the reply brief on the motion to amend, it

10  details these documents that we were supposedly given, and when

11  we asked those witnesses, who are supposed to know about them,

12  we were told that these are not the current versions of the

13  documents.  So, as it stands right now, we don't have the

14  document that purportedly describe the document -- or let me

15  rephrase.  We were not given until last --

16          **MR. SINGLA:**  Friday morning.

17          **MR. WILLIAMS:**  -- Friday morning what's called a

18  WIKI, which is the internal working document, living document

19  inside Real that describes their work on the product.  We've

20  been asking for that for some time; we got it on Friday.  So

21  the documents that supposedly demonstrate that we have had

22  these materials for a long time aren't the ones that actually

23  describe the product.

24          It is our view that it is, in fact, Real's

25  intention, and has been for quite some time, to protract the

1    proceedings, to stretch them out.  We don't know why, frankly,

2    but we were prepared to --

3              THE COURT:  Well, it would seem to me that they are

4    the ones who have a product they want to get to market --

5              MR. WILLIAMS:  Right.

6              THE COURT:  So it's to their disadvantage.

7              I mean, you don't want them out there with this

8    product, right?

9              MR. WILLIAMS:  Oh, that's absolutely right.

10             THE COURT:  So, it seems to me as long as they are

11   willing to leave the TRO in place, it's to their disadvantage

12   if they think they have a legitimate basis for getting that

13   product out to market.

14             MR. CUNNINGHAM:  I wish I were as clever or cagey as

15   is being ascribed.  We don't want delay for any reason.  We do

16   want to get our RealDVD product out and out from under the TRO.

17   And our new product is a product under development; it is not

18   ready to go yet.

19             THE COURT:  Well, you anticipated my question, was

20   that is this a work in progress?

21             MR. CUNNINGHAM:  Absolutely.  And that's why --

22             THE COURT:  Is this why, you know, these various

23   plans are changing the source code is changing, and so forth?

24             MR. CUNNINGHAM:  The answer is yes.  And that is

25   what a WIKI is, it's a constantly update -- like Wikipedia,

1  like it's a constantly updatable living document.  So, at any

2  given moment, the document we gave yesterday is likely to then

3  become out of date.  So that is why our witnesses would

4  truthfully answer there could be more current versions of the

5  document.

6          So there is no dispute, the core functionality of

7  this device is that it is going to do what the RealDVD product

8  did.  So, I mean, there is no question that it's teed up, and

9  it's teed up for resolution at the preliminary injunction

10  hearing.

11          And, because the studios are seeking relief that

12  would extend to the RealDVD product or anything with similar

13  functionality, it would plainly cover this new product, and

14  they well know that.

15          **MR. WILLIAMS:**  Your Honor --

16          **THE COURT:**  Hold on just one moment.

17          Is there anything that is likely to happen in the

18  evolution of this product that would take it out of the realm

19  of what the studios are trying to get a TRO for or preliminary

20  injunction for?

21          **MR. CUNNINGHAM:**  Yes.  The answer is no.  I mean,

22  the core of this product is what it is, a hardware device that

23  allows the consumer to save the DVD onto a hard drive, this

24  time in a stand-alone box, not on a PC, and then retrieve it

25  from the hard drive and watch it without having to use the DVD

1  again.   That is immutable.   That is the fundamental

2  characteristic of the product.

3            **THE COURT:**  Yes.

4            **MR. WILLIAMS:**  I just want to be clear:  We would

5  not take the position that the Facet product falls under the

6  ambit of the Court's order that you've already issued unless

7  it's fully litigated properly where we know what the product

8  is.  So we would not take that position, we do recognize that

9  that would be unreasonable.

10           **THE COURT:**  But what I understand Mr. Cunningham is

11 saying is that at least now the way that the TRO is crafted,

12 and perhaps what you are seeking, you know, for the preliminary

13 injunction, is broad enough that it would, in fact, cover this,

14 albeit not naming the product itself.

15           **MR. WILLIAMS:**  I think that's right.  But then

16 issue, would -- if it played out the way we think would be

17 appropriate, if and when the product is released, then our

18 client would have the opportunity to move on that and say that

19 it either does or does not fall under the order.

20           **THE COURT:**  Well, how long would it take, given

21 whatever else you think you need, and given the fact that this

22 iteration is going to be reiterated and reiterated and

23 reiterated, perhaps, but I don't know how long they anticipate

24 for this to be a work in progress, but, I think Mr. Cunningham

25 is suggesting that the way that it operates is known now and is

1  not going to change. To change that in any respect, I guess,

2  it's just maybe some fine-tuning that's going on, so,

3  therefore, maybe you ought to be able, with some reasonable

4  period of time, to address that in your, you know, preliminary

5  injunction as well.

6           **MR. WILLIAMS:** It's obviously very hard to say, Your

7  Honor. That may be true, and it may not be true. We are not

8  in a position now to know. And moreover, again, the decision

9  makers aren't in a position to make a decision on behalf of our

10  clients about whether they would want to fight Facet or not.

11           But I would agree with you, that, yes, if we get

12  enough information to make that decision, we ought to be able

13  to do that.

14           **THE COURT:** Well, if what Mr. Cunningham is saying

15  is correct, that this new product is essentially like Vegas,

16  and for the record, I think when you are referring to the

17  RealDVD, is that correct, you are talking about Vegas, right?

18           **MR. CUNNINGHAM:** Yes.

19           **THE COURT:** So that it's clear. So when we are

20  talking about Vegas, that it operates like Vegas, it's just a

21  stand-alone. If that is, in fact, correct, you certainly would

22  want to do something about that as well, right?

23           **MR. CUNNINGHAM:** Yes, Your Honor.

24           **MR. SINGLA:** Your Honor, if I could make one

25  comment --

1    **THE COURT:**  -- with your name on the record.

2    **MR. SINGLA:**  I'm sorry.

3    This is Rohit Singla for the studios.  My apologies,

4    Your Honor.

5    The witnesses that we deposed this past week made

6    very clear that the source code and the development of this

7    Facet project are completely separate from the Vegas project.

8    So, I think part of what Mr. Williams is saying, part of our

9    concern is that to sit down now and start analyzing the Facet

10   project -- product would take some time.

11   It's not like Mr. Cunningham is suggesting that it's

12   the same functionality.  That might be, we don't know, perhaps

13   that's true.  But for us to analyze it, we're starting, really,

14   from ground zero, essentially, because it's an entirely

15   different set of source code developed by different people with

16   no communications, essentially, with the people who developed

17   Vegas.

18   So, when we are talking about having a preliminary

19   injunction hearing to cover both products, it may take us, very

20   frankly, some significant amount of time, a matter of months,

21   to get up to speed on the Facet project, learn about it.  We

22   don't even have a prototype of it; they apparently do have 20

23   prototypes sitting there in Seattle.  We don't have one.  We

24   didn't get any technical specifications of it until this past

25   Friday.

1        So, I think what we have been thinking is that we

2   could go forward with the hearing on Real DVD at the end of

3   January, and then we would agree that it would not cover the

4   Facet product, we would agree to that.  And we could then

5   proceed to deal with the Facet product.

6        It may be that the Court's rules on the Vegas

7   product would inform the parties enough that we could come to

8   some resolution on the Facet product.  If not, then after

9   dealing with the Vegas product at the end of January we could

10   deal with Facet, at some point down the road.  But, if we're

11   going to deal with them on a consolidated basis, there is going

12   to be some significant delay.

13        **THE COURT:**  How long did it take to get up to speed

14   on the Vegas product?

15        **MR. SINGLA:**  We got the source code in the middle of

16   November.  We got technical documents about the same time,

17   November 13th, and I would say we would be up to speed by the

18   hearing at the end of January.

19        **THE COURT:**  But your papers are due before that.

20        **MR. SINGLA:**  The papers are due before that, that's

21   correct, by mid-January.  So let's saying say something like

22   six weeks to two months.

23        **MR. WILLIAMS:**  Two -- yeah.

24        **MR. SINGLA:**  Something like that, Your Honor.

25        **MR. CUNNINGHAM:**  Your Honor, we gave the source code

1   and technical documents regarding the new product at about the

2   same time.  So, while I appreciate that they need some time

3   with Facet, they have already had some, and that should be

4   considered.  Because we are under a TRO, admittedly only on the

5   first product, but we would have to be Captain Courageous to

6   take a product with such similar functionality out, even if it

7   isn't technically within the scope of the TRO.

8           So, really, it puts us in an impractical and

9   incredibly difficult position.  And, since there's yet another

10  issue lurking in this hearing, where we are now talking about

11  bifurcating the hearing, Vegas versus Facet.  And there is this

12  issue relating to ArccOS and some other stuff we will get to

13  later.  I think that we are going to drive the Court somewhat

14  insane by forcing --

15          *THE COURT:*  No more so than --

16              **(Laughter.)**

17      *MR. CUNNINGHAM:*  We are going to be causing the

18  Court do an interpretation of the license, first in one

19  context, then in a very similar but slightly different context.

20  And then -- that's not the right way to do it.  I mean, it

21  really makes sense for us to get Facet into this hearing and

22  let's look at the license and compare it to these technologies

23  once and for all.

24      *THE COURT:*  Well, would the application of the

25  license look any different in connection with Facet?

1          **MR. CUNNINGHAM:**  I believe that there are some --

2     some differences in the application of the license, given the

3     arguments that the studios have made, about how if you are in a

4     PC environment, a personal computer environment, the contract

5     applies in a particular way.  This, the new product, is a

6     stand-alone, non-PC product.  So there may be some differences.

7          **THE COURT:**  And is there any reason why, other than

8     what you've said about essentially visiting some of the issues

9     twice, which, of course, no judge wants to do, if we can avoid

10    it, is there any reason why an injunction could not be framed

11    and limited to Vegas, and, you know, if one has to put an "and"

12    there and whatever would be related to Vegas, but confining it

13    to that so that it doesn't spill over into Facet until such

14    time as Facet -- we can address Facet?

15                    **(Counsel confer.)**

16          **THE COURT:**  Is this where the caginess comes in?

17                    **(Laughter.)**

18          **MR. CUNNINGHAM:**  It's back to what Mr. Berta was

19    whispering in my ear, was reminding me of the realities that

20    this is a hardware product that has a manufacturing

21    requirement, and therefore there is a lead time.  You have to

22    release the product to manufacturing, and then it has to be

23    manufactured and debugged, and that kind of stuff, and away we

24    go.  And I'm quickly in over my head with respect to the

25    manufacturing process, which is as a practical problem, I mean,

1  we could be some of the best scribners around, if we are

2  enjoined on RealDVD, it's inconceivable how we could risk

3  making the investment in Facet.  And we should be able to

4  defend Facet at the same time we are defending Real DVD.

5           **MR. WILLIAMS:**  If I may, Your Honor?

6           **THE COURT:**  Yes.

7           **MR. CUNNINGHAM:**  I'm sorry.  I didn't mean to cut

8  off Counsel.

9           **MR. WILLIAMS:**  That is of RealNetworks' own

10 choosing.  They were working on the Facet project well before

11 the Vegas project.  They chose not to advise either the studios

12 or the Court of the existence of the Facet product in October

13 when we appeared before Your Honor.  So, to the extent that the

14 what Mr. Cunningham is describing about lead times and

15 manufacturing is the case, it is RealNetworks that made that

16 decision at the time that they chose only to raise the issue of

17 the Vegas product in front of the Court.

18           That is a critical point, that it's only after the

19 TRO was entered against them that they suddenly have decided to

20 try to insert the Facet product, which they knew all along was

21 being worked upon by them and in the mix.

22           **MR. SINGLA:**  Can I --

23           **THE COURT:**  Now, Mr. Cunningham has also said, if I

24 understand correctly, that you've had the source code for Facet

25 about as long as you've had the source code for Vegas; is that

1    correct?

2            **MR. SINGLA:**  It is in a manner of speaking, Your

3    Honor.

4            **THE COURT:**  Except that it changes.

5            **MR. SINGLA:**  I don't think the issue is so much

6    changing.  That may be, I don't know about that.  And I have

7    experts of the testimony, if the Court would like to see actual

8    testimony about these issues from RealDVD's -- I mean,

9    RealNetworks' witnesses, is that the source code we were given,

10   for example, for the RealDVD, the Vegas product, in November

11   was 9 million lines of source code; that is a monumental amount

12   of source code.  And we asked RealNetworks repeatedly to please

13   tell us what in there is actually for Vegas, and they refused

14   for weeks.

15           Finally, after our people spent a week or more

16   trying to find the actual code for Vegas, we finally found the

17   less than a million lines of source code, which is a reasonable

18   amount, that has to do with Vegas.

19           So, when they say they have provided source code, in

20   a manner of speaking, but they provided it in a way that made

21   it impossible for us to actually find and analyze the relevant

22   code.

23           With Facet, however --

24           **THE COURT:**  So some of that source code that you got

25   in that nine million is Facet?

1          **MR. SINGLA:**  No, Your Honor.  The nine million is

2    one set we were given.  Out of the nine million, about a

3    million of it, the witnesses from RealNetworks testified, was

4    actually about Real DVD, a very small portion that was easily

5    identified by RealNetworks, but very hard for our people to

6    analyze and identify.

7          Separately, we were also given five million lines of

8    source code for Facet.  And the lead developer for Facet, who I

9    deposed Wednesday of the last week -- Tuesday, excuse me, of

10   last week, testified that less than a million lines out of the

11   five million are actually for the Facet product.  And we don't

12   know what those less than a million lines are.  To this day I

13   don't know.  So if my people start, our experts start our

14   consultants analyzing the Facet code, until we find out what is

15   the actual part that relates to the Facet product, it's very

16   difficult to get started.  They could tell us, or we could have

17   our people spend another week or ten days trying to dig it,

18   figure it out and dig through it.

19         So, I guess when they say the source code was

20   provided, it was, in a manner of speaking, but not in a way

21   that could be quickly or efficiently analyzed by our

22   consultants.

23         **MR. CUNNINGHAM:**  If I may, this may be taking us

24   away from where we need to be, but when -- I think he is

25   referring to when an engineer named Brennan was deposed,

1  Mr. Singla could well have asked him where in the code they

2  should be looking, and he didn't.

3         We didn't volunteer to make people available for

4  chats about the source code because we are in a structured

5  litigation context where we knew there would be depositions on

6  the subject and fully expected that if there were those kinds

7  of questions, they would be obtained from our witnesses with

8  the formality of a deposition.

9         **THE COURT:**  God forbid you should be the least bit

10 helpful at all to move the process along.

11        **MR. CUNNINGHAM:**  Well, there is not a ton of

12 Christmas cheer going around in this case at the moment, but we

13 were not trying to be obstructionist or obstreperous.  And, in

14 fact, we have, on an earlier occasion, when there had been this

15 complaint that it was hard to find things in the code, we had

16 suggested a 30(b)(6) on that, and that offer apparently wasn't

17 accepted.

18        **MR. SINGLA:**  Well, Your Honor, on the 30 (b (6)

19 notice, I'm a little -- I mean, I don't want to go back and

20 forth of tit-for-tat issues --

21        **THE COURT:**  And I don't want to spend any time with

22 that.

23        **MR. SINGLA:**  But I will say that we did request a

24 30(b)(6), and we were told that a 30(b)(6) witness would not be

25 made available until last week.  So we were in this position of

1     having --

2              **THE COURT:**  Well, are there more depositions that

3     need to be taken with respect to Facet?

4              **MR. SINGLA:**  With respect to Facet, we have not sat

5     down and really thought about that.  But, my initial

6     inclination would be, for example, the deposition I took this

7     past week of their witnesses they would like to bring at the

8     end of January.  Those were Facet people, two people.

9              Now, the problem is that I brought documents that

10    they had told us were the relevant documents, technical

11    specifications.  The witness said, and again, I have the

12    testimony here, as Mr. Williams explained, the witness said oh,

13    no, those are six months out of date; those are totally not

14    accurate.  I didn't get the supposedly accurate information

15    until Friday morning, so I think we may need to go back and

16    depose one or two of those people again now that we have the

17    actual correct information.  But we didn't have that until

18    Friday morning.

19             **THE COURT:**  What are the issues that the Court would

20    have to -- should hear, really, only once?  I mean, even though

21    we have two different kinds of systems, I suppose, if I can

22    call them that, there are, certainly, some common issues.  What

23    are the common issues?  Do they have to do with the license?

24    Do they -- or licenses, perhaps, is the word?  Do they have to

25    do with, I guess the expert testimony would be testimony that

1   is more specific to -- to each product, but what is there that

2   would be common?

3           **MR. CUNNINGHAM:**  Your Honor, there is a license that

4   applies to this technology in both its forms.

5           **THE COURT:**  Um-hmm.

6           **MR. CUNNINGHAM:**  And Your Honor is going to have to

7   wrestle the license to the ground applying it to the

8   technologies.

9           **THE COURT:**  That bad a license, huh?

10          **MR. CUNNINGHAM:**  Yeah.  So, the whole contract

11  interpretation thing is going to be common to both and much of

12  the Court's effort.

13          **THE COURT:**  And then what else?  Anything else?

14          **MR. WILLIAMS:**  Well, Your Honor, I would argue that,

15  of course, we don't know whether the Facet product has some of

16  the same features, but one of the issues that is before the

17  Court today has to do with other features contained on the

18  Vegas product that we argue defeat copy control measures.  And

19  the terms that are applied to those are the ArccOS measures, I

20  believe it's A-R-c-c-O-S, and RipGuard features.  Those are

21  features that were developed by Sony for ArccOS and Macrovision

22  for RipGuard.  They are features that apparently are contained

23  on the Vegas product.  They don't have anything to do,

24  actually, with the license, but they are copy control measures

25  which our evidence that we have developed over the course of

 1  the discovery has indicated are defeated by the Vegas product.

 2  So that's one issue.  I don't know whether or not that issue

 3  relates to the --

 4          **THE COURT:**  Is that issue implicated with Facet as

 5  well?

 6          One of your co-counsel is shaking his head in the

 7  affirmative.

 8          **MR. CUNNINGHAM:**  Okay, so I agree with whoever it

 9  is.  The answer is yes, Your Honor.

10          So now we are changing topics here to discuss how we

11  are going to deal with what is something that is very new and

12  very surprising and has us at quite a disadvantage now, which

13  is we thought the preliminary injunction hearing was going to

14  be about the CSS technology, which is what the TRO hearing was

15  about and whether we have circumvented the CSS technology --

16          **THE COURT:**  Well, you see where I'm going with this:

17  What I would like to do is, to the extent that we have to take

18  testimony at this preliminary injunction hearing, I'd like to

19  stage it in such a way that we can take testimony that would

20  be -- or evidence that would be common to both of these

21  products and then take the evidence with respect to the Vegas.

22          And meanwhile, some of your, you know, since you

23  have -- I mean, how many lawyers do you have at your respective

24  disposal?  Some of the other lawyers can be working on getting

25  up to speed on Facet so that shortly thereafter -- this is

```
 1   going to be a bench hearing, it's not like we to have bring in
 2   a jury and bring them back a few weeks later -- and, as soon as
 3   possible thereafter, then move to the Facet.  By that time, you
 4   will have got what you need on the Facet product.
 5            Can we do something like that?  I mean, you know, we
 6   are not going to forget who happened at stage one.  We can then
 7   move to stage two when everybody is ready.
 8            And, I can assure you that if we don't get to stage
 9   two in Facet that any injunction is going to be, if granted, is
10   going to be limited, and you can help me frame the language, to
11   the Vegas product and hold off on anything related to or that
12   would be suggested as including Facet until we've got the
13   evidence with respect to that.
14            MR. CUNNINGHAM:  Let me speak to the ArccOS/RipGuard
15   issue because it really is important to us. And we're now --
16            THE COURT:  It is important.
17            MR. CUNNINGHAM:  It is very important to us because
18   we are talking now about, really, there are three ways to cut
19   this.
20            We had suggested that we do Vegas and RealDVD and
21   the new product in one hearing relating to CSS, and then the
22   bifurcation be of this new technology we have just heard is an
23   issue in the case, which is ArccOS and RipGuard.  That is, of
24   course, not our product, that is copy protection technology.
25   We are given to understand that they are now containing -- our
```

1  product, both of them, would circumvent.

2        We know nearly nothing about those two copy

3  protection systems.  We didn't know they were an issue in this

4  case until an interrogatory answer on December 8th.  We don't

5  know how they work.  We don't know how, if, they relate to the

6  CSS.

7        **THE COURT:**  While their lawyers are getting up to

8  speed on Facet, you know, you are not hurting for lawyers at

9  Wilson Sonsini, either, right?  So, you can get up to speed on

10  ArccOS and -- what is it called, RipGuard?

11        **MR. CUNNINGHAM:**  RipGuard.

12        **THE COURT:**  Right?

13        **MR. CUNNINGHAM:**  And there may be others that we

14  haven't heard about.

15        **THE COURT:**  Well, we need to do something about

16  making sure we hear about everything that needs to be heard

17  about --

18        **MR. CUNNINGHAM:**  I agree.

19        **THE COURT:**  -- as soon as possible. So, is there

20  some way of doing that?  Do you know how to fashion -- I mean,

21  why don't we have an interchange now?  Are there any other, I

22  don't know what you call them, products, devices or methods,

23  whatever, that -- of the ArccOS/RipGuard nature that are going

24  to be implicated here, or have we heard about all of them?

25        **MR. WILLIAMS:**  Your Honor, those are the ones that

1    we know about at this time.

2              And I do want to make clear, it's not as though the

3    defendant companies are the ones who developed --

4              **THE COURT:**  I'm not here to assign blame, okay?

5              **MR. WILLIAMS:**  Understood.

6              **THE COURT:**  I want to get things resolved.

7              **MR. WILLIAMS:**  Right.

8              **THE COURT:**  So, don't worry about that business.  If

9    somebody is pointing a finger, you don't have to point it back

10   or deflect it, you know, let's just get a way to solve it.

11             **MR. WILLIAMS:**  Very well, Your Honor.

12             The only ones that we know of at this point in

13   addition to CSS, the copy control protections that I am aware

14   of are ArccOS and RipGuard.

15             **THE COURT:**  Um-hmm. Well --

16             **MR. STEER:**  Your Honor, may I interject?

17             **THE COURT:**  Yes, yes.

18             **MR. STEER:**  I'm Reginald Steer on behalf of the DVD

19   Copy Control Association.

20             The way this conversation has gone, it raises a

21   number of issues in my mind.  First and foremost is that,

22   initially, we thought that expert disclosures would have been

23   completed by now. They haven't been; they are yet to be done.

24   And, of course, there have been no depositions of experts.

25   And, in any event, I don't see how experts could have been

1    prepared on the new platform -- I'll use that, rather than the

2    catch word for it -- in the time that's been available.

3            And I also believe that it doesn't serve either the

4    parties or the Court very well to push this schedule so that we

5    are going forward, in my view, somewhat half-baked on how this

6    new product works.

7            We don't know --

8            **THE COURT:**  You know, whose side are you on here?

9            **MR. STEER:**  Whose side I'm on?

10           **THE COURT:**  Yeah.  I thought you were with the

11   studios on this.

12           **MR. STEER:**  Certainly, we are on the same side as

13   the studios, but the issue as it's developing, Your Honor, is

14   one, in my mind, that raises concerns about whether the parties

15   can present the kind of helpful evidentiary basis that the

16   Court will need.

17           So, as long as the restraining order that is in

18   effect, remains in effect, I personally, on behalf of DVD CCA,

19   believe that we need a little bit more time to figure out how

20   this new product works, and how it works in light -- in

21   relation to the requirements of the CSS license agreement.

22           **THE COURT:**  By the "new product," you are referring

23   to Facet?

24           **MR. STEER:**  That's correct, what they call the new

25   platform and I call Facet.

1    **THE COURT:**  But that would give -- if we proceed,

2    essentially, on the Vegas, but, taking common issues, you know,

3    at the same time, to the extent that there are common issue,

4    then allowing discovery to go on with respect to Facet and then

5    plugging that in a little bit later down road, I mean, that

6    might be a gap in time, but --

7    **MR. CUNNINGHAM:**  May I --

8    **THE COURT:**  -- certainly, we can organize it in such

9    a fashion or stage it in such a fashion to accomplish that.

10   Yes?

11   **MR. CUNNINGHAM:**  We are under the TRO, and we would

12   like to move expeditiously, but we are not arguing that -- if

13   people need time so we have a fair litigation, so be it.  We

14   understand that.

15   **THE COURT:**  Um-hmm.

16   **MR. CUNNINGHAM:**  I would recommend that we keep

17   Vegas and Facet together, and if we have to bump that some

18   reasonably short period of time --

19   **THE COURT:**  That takes us right back where we were

20   and the arguments on the other side.

21   **MR. CUNNINGHAM:**  And then we do ArccOS and RipGuard,

22   which are much farther behind on the discovery.  Because,

23   truly, we have nothing on those topics, and we have to go to

24   third parties to get them.

25   **THE COURT:**  Does that mean that third parties are

1  going to end up in this lawsuit?

2         MR. CUNNINGHAM:  I don't expect, but I obviously

3  don't know.  Conceivably.  I mean, I don't know.

4         THE COURT:  We'll find that out fairly soon, as

5  well, if third parties are going to have to be added.

6         MR. CUNNINGHAM:  We would not be adding them.  I

7  can't foresee that.

8         THE COURT:  What do you think?

9         MR. WILLIAMS:  We believe, actually, Your Honor, I

10  think that -- and I haven't had a chance, and I would

11  appreciate a moment to speak with the lawyers representing the

12  MPAA, but I -- I, if I'm hearing the Court correctly, would

13  agree, that your suggestion would be the best, which is to go

14  forward, consolidating as many issues as possible on the Vegas

15  product.  To the extent there is additional discovery that has

16  to take place concerning Facet, that would go on at the same

17  time.

18         Where I would differ from Mr. Cunningham is on the

19  notion of ArccOS and RipGuard.  Those aren't different products

20  put out by Real, it's the same product put out by Real, it just

21  has other features that defeat other copy control protections.

22  It should be dealt with in this hearing.

23         THE COURT:  Are each of those involved with both

24  products or --

25         MR. CUNNINGHAM:  Yes.

1          **THE COURT:**  They are?

2          **MR. CUNNINGHAM:**  Yes.

3          **THE COURT:**  So, they are common to both.

4          **MR. CUNNINGHAM:**  Yes.

5          **THE COURT:**  Um-hmm.

6          **MR. WILLIAMS:**  So --

7          **THE COURT:**  But is there third-party discovery that

8   is going to be needed as to those?

9          **MR. SINGLA:**  We don't believe so, Your Honor.

10          You know, the way the situation arose is that,

11   actually, RealNetworks has been aware of the documents that we

12   received in the last few weeks and the witnesses we have

13   deposed.  They have been aware of ArccOS and RipGuard for the

14   better part of a year, maybe more than a year.  It's we who are

15   only recently learning that their products, Vegas and Facet,

16   both, are designed to circumvent these other kinds of copy

17   protections.

18          You know, they have documents about ArccOS and

19   RipGuard.  That is all over their e-mails and their

20   specifications.  Their technical witnesses testified about it.

21   Mr. Buzzard, who is the lead developer for Vegas, testified he

22   knows about ArccOS and RipGuard.  So, it's not as if we have

23   been withholding any information on this subject.  These are

24   not our technologies.

25          **THE COURT:**  Well, and your affiliate over here,

1  whatever you want to call him, he wants to see a little longer

2  time frame.  He doesn't think you are all going to be ready, I

3  gather, by the end of whatever the date is when your papers

4  need to be filed, the middle of January and the hearing date

5  that is scheduled.

6          *MR. SINGLA:*  I believe -- I may be wrong, but I

7  believe Mr. Steer was talking about not being ready on Facet.

8  I don't believe --

9          *THE COURT:*  Is that correct?

10          *MR. STEER:*  That's correct.

11          *MR. SINGLA:*  I don't believe there is any question

12  about being ready on Vegas.

13          *THE COURT:*  Oh, is that correct?  I misunderstood

14  you then; I apologize.

15          Well, listen, it's 3:30:  There are other attorneys

16  here who are going to be far briefer than you are going to be,

17  at least I hope they are going to be brief.  I think you

18  understand what I want, and, you know, understand your

19  concerns, and so forth.  But, I think if we can do something on

20  along the lines of what I suggested, we can get where we need

21  to go, relatively soon, without pushing everybody out of shape

22  about it, as well, and -- but getting it done.

23          So -- and then I guess we had a couple of other

24  issues that need to be sorted out.  So, what I think would be a

25  good idea is if you can all repair to the lawyer's lounge and

```
 1   come up with a schedule for all of this that will work for
 2   everybody, okay?  And that means make some concessions.  And
 3   that means to be cooperative, sometimes.  Let's fight this case
 4   on the merits and not, you know -- and that goes for all of
 5   you:  Let's fight it on the merits and not play around with,
 6   you know, guess which source code this belongs to.  I mean, you
 7   know, this is not Real Games, now, okay?  This is not even fake
 8   games.  Let's just get that done and come back here in a little
 9   while with a schedule.
10            MR. CUNNINGHAM:  Would it be possible to get some
11   sense of the Court's availability in February?
12            THE COURT:  I'm going to generally be here.
13                      (Laughter.)
14            MR. CUNNINGHAM:  Okay.
15            THE COURT:  I don't know, maybe I'll get an
16   invitation I can't refuse, but --
17                      (Laughter.)
18            THE COURT:  Until then, I'm going to generally be
19   here, okay?
20            MR. CUNNINGHAM:  Okay.  Thank you.
21            THE COURT:  So, figure out some dates.
22            I mean, I don't know what you mean by that question.
23            MR. CUNNINGHAM:  I just wondered if you were going
24   on vacation.  That's all I was asking, Your Honor.
25            MR. WILLIAMS:  Your Honor, may I just try to find
```

```
 1   out:  Are you suggesting that we go get dates based upon the

 2   framework that you've described --

 3              THE COURT:  Yes. Yes. Yes, I am.

 4              MR. CUNNINGHAM:  One --

 5              THE COURT:  Having come to that idea, I'm wed to it.

 6              MR. CUNNINGHAM:  And, because I think I would like

 7   to discuss with our colleagues whether or not, just taking the

 8   whole hearing, forgetting any bifurcation or trifurcation and

 9   just doing it all at once.

10              THE COURT:  Well, you can talk with them about it.

11   But, I don't want to see a stalemate back here.  You come back

12   here with dates.

13              MR. CUNNINGHAM:  Okay.

14              THE COURT:  Okay, that you can all live with.

15              And you can leave your things on the tables because

16   nobody is going to need the tables.  We just have the case

17   management conferences.  So, you can leave behind whatever you

18   want to.

19              Don't worry about the source code, I can't read it,

20   anyway.

21              MR. SINGLA:  Your Honor, what time should we plan to

22   come back?  4:30?

23              THE COURT:  4:00, 4:15 at the latest.

24              MR. SINGLA:  Thank you, Your Honor.

25              THE COURT:  You know the lawyer's lounge, right on
```

```
 1   this floor.

 2             MR. WILLIAMS:  Yes.

 3             THE COURT:  Thank you.

 4                   (Proceedings recess for meet and confer;

 5                   proceedings resumed at 4:35 p.m.:)

 6             THE CLERK:  Recalling civil 08-4548, civil 08-4719,

 7   RealNetworks, Inc., versus DVD Copy Control.

 8             THE COURT:  Okay, we don't need to have them restate

 9   their appearances if they were already speaking?  You know who

10   they are?

11             Did we work out a schedule, a work plan?

12             MR. WILLIAMS:  Well, we worked out what -- there is

13   agreement as to what each party wants from the other, but there

14   not an agreement with respect to the schedule.  We made a

15   proposal for the schedule.  The proposal was that the first

16   hearing, one relating to Vegas, which would include ArccOS and

17   RipGuard and the CSS issues, would be February 17th through

18   19th, which is a Tuesday through Thursday, giving Real another

19   three weeks, essentially, to do this discovery than they would

20   normally have to do the discovery they want to do on the

21   ArccOS/RipGuard issue.

22             And then, we proposed the second hearing related to

23   Facet issues not covered by the first hearing would be

24   mid-March, March 16 through 18.  That was our proposal.  I'll

25   let Mr. Cunningham speak for himself, but I think their view
```

1   was that it should all be one hearing.

2           **THE COURT:**  They are still on that.

3           **MR. CUNNINGHAM:**  We're still on that.  We would be

4   delighted to do the whole thing on March 16th, 17th, and 18th.

5   That would work fine for us.

6           We have a problem with trying to do RipGuard and

7   ArccOS as soon as mid-February because, and indulge me a little

8   bit while I explain this, because we are at the bottom of the

9   mountain.  We truly don't understand anything about it.

10          And, I know that Mr. Singla took testimony from some

11  of our engineers who used the term, ArccOS, but I'm telling you

12  that the lawyers and our experts, we don't even know, really,

13  where to begin or where the discovery is going to take us.

14          We had a surreal conversation where we said we may

15  need to see source code from ArccOS; Mr. Singla laughed at us,

16  but we know so little about the technology, we don't know what

17  we don't know.

18          And I would contrast to that --

19          **THE COURT:**  You and Rumsfeld, apparently, right?

20          **MR. CUNNINGHAM:**  Cagey and Rumsfeld: it's a great

21  day.

22                  **(Laughter.)**

23          **MR. CUNNINGHAM:**  I would contrast to that what the

24  studios know about Facet code.  The reason they can tell you

25  how many lines of code it is and how long it will take is

1   because we gave it to them over a month ago, and they have had

2   a chance to work on it.  We might be in the very same position

3   if we had ArccOS or RipGuard and had started to go through it,

4   but we can't do that.  So, we don't think we can be ready by

5   February.

6           **THE COURT:**  You are playing the poor lawyer a little

7   too much, Mr. Cunningham.

8           **MR. CUNNINGHAM:**  Well, okay, so then let me come

9   back to what our witnesses said.

10          Our witnesses really did not purport to have any

11  kind of mastery of ArccOS or RipGuard.  And, it was actually

12  much less than that.  I was at one of the depositions: this

13  guy, Brennan, really didn't know about it.  They actually used

14  the phrase ArccOS as a summary headline for a whole bunch of

15  different problems with making DVDs work, and they didn't know

16  what was causing them.  They called them all ArccOS.  They

17  didn't know whether it was copy protection or dust or

18  scratches, or what.  They really didn't.  So that was the

19  testimony I heard on that.  The point is, if March is

20  available, let's do it all in March, and everyone should be

21  completely ready by then.

22          Remember, we are the ones under the TRO.  And it's

23  bizarre for me to be under a TRO and screaming from more time.

24  And, I will say the only reason we heard for why they insist on

25  going sooner is that's what their client wants to do.  And, I

```
 1   get the impression that they sense an opportunity here and they

 2   want to sort of exploit it.  And that is not fair because the

 3   opportunity is that we haven't had a chance to do discovery

 4   that we need to do.

 5              THE COURT:  Well, if there is just that short a

 6   period of time between the two and the TRO stays in effect,

 7   doesn't it make some sense just to do it all at once rather

 8   than run the risk that we may have some duplication?

 9              MR. WILLIAMS:  Well, Your Honor, first of all, Your

10   Honor asked us to be reasonable, and we feel as though we were

11   reasonable and they were unreasonable.  And, if we go halfway

12   in between that, we end up in a place where it's not been

13   reasonable.

14              The way that we thought --

15              THE COURT:  I can make all of you miserable.

16              MR. WILLIAMS:  I understand that.

17              THE COURT:  You know, that's one thing; we can never

18   make you all happy --

19              MR. WILLIAMS:  I know.

20              THE COURT:  So, that is the ultimate objective, is

21   to make you all equally miserable.

22                      (Laughter.)

23              MR. WILLIAMS:  Let me describe the way in which we

24   think we are being reasonable.  The second hearing date that I

25   mentioned, the March 16 through 18th date, that's a date where,
```

1    at least on the current trial schedule I have, I have a trial

2    that starts on the 17th that is supposed to last for two months

3    up here in San Francisco.  Our client was willing to say,

4    Williams, you may not be here for that second date, we are not

5    sure whether the second date would even happen, but the first

6    date they do require that I be here on the date on which the

7    Vegas matter is litigated, which would include, according to

8    what the Court has indicated, the ArccOS and RipGuard matters.

9    We were willing to move those dates considerably from the

10   January hearing.

11          I would like to make a comment, and I don't want to

12   be drawn into a he said/she said, but I think Your Honor is

13   exactly right about the poor lawyer arguments being made

14   because the fact of the matter is that RealNetworks is the

15   party that designed its technology to circumvent, to avoid

16   ArccOS and RipGuard.  There cannot be any reasonable doubt

17   about that based upon e-mails that have been produced in

18   discovery.  It really -- we have them here, we can give them to

19   the Court, but I represent to the Court that the suggestion

20   that they will have a good response to their efforts to bypass

21   those protection devices will be a -- I'm dying to hear what it

22   may be.

23          So, the point is, they know and have known that

24   we've had ArccOS and RipGuard allegations that we've been

25   making since the time we first exchanged search terms back in

1    October, October 28th.  We included both those terms then.  We

2    then answered interrogatories talking about ArccOS and

3    RipGuard.

4            So, to the extent that RealNetworks wanted to do

5    discovery, and they have told us exactly the discovery they

6    want to do, they want to serve subpoenas on Macrovision and on

7    Sony, the Sony division that makes ArccOS.  They want to take

8    30(b)(6) depositions of a couple of the studios who implement

9    those protection devices, and that's fine.  But the notion that

10   the whole thing has to be put off until mid-March, Your Honor,

11   owing to their efforts to learn about ArccOS and RipGuard, when

12   it is the very same gentlemen who designed the Vegas product to

13   bypass those items is asking a lot.  And, we think we've been

14   reasonable to move that time.

15           We respectfully request that the first hearing go

16   forward in the manner that the Court described in mid-February.

17   That gives them an additional three weeks.  The issue that we

18   have with respect to the source code for Facet is that it takes

19   nearly two months to review that code.  Our people will get on

20   it right away.  We need the authorization to tell our clients

21   what this product is; we don't have that at this moment.

22           And so, we think we are being realistic when we say

23   that we need mid-March in order to get into the Facet issue.

24           *THE COURT:*  What is the earliest time you think you

25   could be ready on Facet?

1           **MR. SINGLA:**  Your Honor, there's a few different

2       issues with that.  We sat down and talked about it for quite

3       some length; I think mid-March is pushing it, from our

4       perspective, because the way that we have access to the source

5       code, and this is in some letters that were sent to the Court a

6       few weeks ago, it's in Wilson Sonsini's office in San

7       Francisco.  There's one computer, two computers.

8           That's the only place we have access to the source

9       code, so our consultants have to fly up, work in those offices

10      for a limited number of hours per week.  And so, even if we got

11      identification from them tomorrow of the relevant portions, and

12      our people started working next week, after Christmas, they

13      need at least six weeks to just go through the code and analyze

14      it.  That is the best estimate I have, and it's based on the

15      amount of time they took with the Real DVD code.

16          And obviously, these people are also going to be

17      preparing for the first hearing, doing other things related to

18      Vegas.  And so that puts us into mid-February, at which time

19      they'll produce expert reports, be deposed, there will be

20      briefing; we can't see it on Facet until mid-March.

21          And, given Mr. Williams' trial schedule, that is why

22      we are suggesting sticking with the Court's original plan of

23      some kind of bifurcation, talking about Vegas and everything

24      about Vegas and any duplicative issues in the first hearing,

25      late January or mid-February, even maybe late February, I

1   suppose would be theoretically possible, and pushing Facet off

2   until we had time to look at the source code.

3                    **(Court and clerk confer.)**

4           ***THE COURT:***  Can you print out my February and March

5   for me so I can look at it?  You can do that faster than I can

6   access my computer.  You do one of those calendar lists.

7           ***THE CLERK:***  You want February --

8           ***THE COURT:***  And March.

9           While he's checking on that, now, have you worked

10  out the situation with the protective order and access to the

11  source code and whatever else there is an issue with respect to

12  access?

13          ***MR. CUNNINGHAM:***  On that, each side submitted a

14  letter brief for the Court on November 20th.  We have different

15  positions, and --

16          ***THE COURT:***  And you are still there.

17          ***MR. CUNNINGHAM:***  There hasn't been any further

18  dialogue on that.

19          ***MR. SINGLA:***  We've been operating under whatever

20  restrictions RealNetworks has imposed, which are actually

21  beyond even what they have proposed in their protective order.

22  So, what they have done is made the source code available only

23  in Wilson Sonsini's offices in San Francisco.  We have had no

24  choice, that is what we have been living with.

25          ***THE COURT:***  What about the experts?  Now, you each

1    have your own experts?

2             **MR. SINGLA:** Yes, Your Honor, we each have our own

3    experts.

4             **THE COURT:** And your experts have had access to the

5    code, right?

6             **MR. SINGLA:** Yes, Your Honor.

7             **THE COURT:** What concerned me was the number of

8    lawyers and spreading this stuff around. I would like to have

9    it as confined as possible. And so, if it could be confined in

10   two places, perhaps and accessible -- I don't know why it needs

11   to be accessible to every lawyer just because somebody decides,

12   you know, some client decides to have two sets of lawyers and

13   both sets of lawyers have to have it -- that one set of lawyers

14   would have some responsibility for that along with the expert.

15           And -- I mean because what your clients need to know

16   is not, quote, "how it works," because most of them wouldn't

17   even know, maybe, except for their expert, but what it does,

18   right? I mean, they really need to know what does it do? What

19   is it capable of doing, et cetera? In lay terms. But, how it

20   works, that's what your experts need to know. That is sort of

21   a simplification, I know, but you understand what I'm saying,

22   right?

23           **MR. SINGLA:** I do, Your Honor. But one thing maybe

24   I could propose from our side is we could reduce the number of

25   copies we need, perhaps, to -- I'm going to speak for the DVD

1   CCA -- maybe if we produced three for both sets of defendants:

2   One with one of our experts, one with one of their experts, and

3   then one copy at Munger Tolles' offices, that maybe the White &

4   Case lawyers could come to our office, if they need to.

5           Would that work?

6           **MR. LAMBERT:**  That might work.

7           One other, to cut through --

8           **THE COURT REPORTER:**  Your appearance for me?

9           **MR. LAMBERT:**  I'm sorry.  Mark Lambert, White &

10  Case, for DVD CCA.

11          One alternative that might work is that we could

12  limit access to particular lawyers on the teams by naming names

13  who are working on that aspect of the case; that would

14  substantially constrain access.

15          **THE COURT:**  Because it would make me nervous to have

16  proprietary source code floating around so many places and so

17  many different people having their hands on it.  So, you know,

18  if we could put some reasonable limitation on it.

19          And you are talking about having it available in

20  three places instead of two?

21          **MR. SINGLA:**  That would be for both defendants,

22  Your Honor.  So it would be one for Munger Tolles, or for a

23  lawyer set that both White & Case lawyers and Munger Tolles

24  lawyers could access, and then one for one of our experts and

25  one for one of the DVD CCA experts.

1      **MR. STEERE:**  The only thing I would add to that is

2  that one of the Akin lawyers would need access as well, one

3  individual.

4      **MR. SINGLA:**  That is not an extra copy of the code.

5      **MR. DIBOISE:**  Your Honor?

6      **THE COURT:**  Yes?

7      **MR. DIBOISE:**  Mr. DiBoise for RealNetworks.

8      When you say, "a copy," are you talking the

9  electronic copy or a printed copy?  Because those things are

10  different to my client.

11      **THE COURT:**  Um-hmm.

12      **MR. DIBOISE:**  So, with respect to electronic copies,

13  the position that we would take is that we are -- we offered in

14  the compromise that we offered to the protective order to

15  permit the lawyers to have a copy in their offices.  And it

16  shouldn't be unreasonable to require their experts to come to

17  the lawyers' office, because as officers of the Court, we are

18  obviously required to comply with the terms of the protective

19  order.

20      I know my client would feel better under that

21  circumstance than to have our code sitting in some third-party

22  expert's office, where we don't know what is going to happen.

23  I do know what reasonably happens in my office, and I can

24  expect what reasonably happens in these gentlemen's offices.

25  And I can tell my client with some degree of assurance that

1   their code is going to be protected.

2           **THE COURT:**  That's fine, if they are in offices that

3   are accessible to the expert.  The experts, as I recall, one of

4   the experts is from California, and another one is from

5   Virginia?

6           **MR. SINGLA:**  Yes, one is in Virginia and one in

7   Santa Barbara.  And so making them available in our offices, it

8   is a little burdensome.  It is going to slow things down in

9   terms of our view.  It has so far slowed things down.

10          I would point out, for what it's worth, that in the

11  litigation against RealNetworks that I was involved in with

12  Microsoft, the issue of source code came up, and RealNetworks

13  insisted on and got from Microsoft source code, electronic

14  copies for its consultants and experts.

15          This is done, pretty regularly, in litigation.  And

16  I understand the Court's concern with the number of copies, but

17  an expert who signs an agreement to abide by all the

18  restrictions in the protective order, and we all agree to

19  whatever set of restrictions is reasonable, I don't see why

20  they can't be trusted.

21          **THE COURT:**  I don't think that's unreasonable, I

22  think the problem is when the numbers of copies floating around

23  gets to be -- and, I know, I am using the word "floating," and

24  I shouldn't use it that loosely, right?  But, it just happens

25  that things are more likely to float around when there are too

```
 1   many copies around.

 2            If we could keep the number of copies down -- and

 3   it's unfortunate that the experts live where they live, but, I

 4   guess, you get the experts where you find them.  But, I think

 5   that if they can have access in their offices but then keep the

 6   number, because there are just two of them, and keep the

 7   numbers for the lawyers down to a number.  And if you have two

 8   law firms representing one side or one party or a group of

 9   parties, then just pick one lawyer, and that would be it.  And

10   then how many lawyers would you have?

11            MR. SINGLA:  I think --

12            THE COURT:  How many lawyers would that implicate,

13   now?

14            MR. SINGLA:  How many individual lawyers or copies

15   of the source code, Your Honor?

16            THE COURT:  How many individual lawyers would be

17   implicated.

18            MR. SINGLA:  I think from the studio's perspective

19   maybe three or four.

20            THE COURT:  But Munger Tolles is representing all of

21   the studios, right?

22            MR. SINGLA:  Yes, Your Honor.

23            THE COURT:  Why do you need more than one copy?

24            MR. SINGLA:  No, no, not more than one copy, Your

25   Honor, one copy at the Munger Tolles offices.
```

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SINGLA:  One copy.

 3              THE COURT:  Okay.

 4              And then, what with respect to -- with White & Case

 5    that is representing DVD?

 6              MR. STEERE:  White & Case and Akin Gump.

 7              And we can share a copy.

 8              THE COURT:  Share a copy.

 9              MR. STEERE:  Right.

10              THE COURT:  You got two firms share a copy.

11              MR. SINGLA:  That's right, Your Honor.

12              THE COURT:  That would be two copies for the

13    lawyers, right?

14              MR. SINGLA:  Yes, Your Honor.

15              THE COURT:  And then one each for the two experts?

16              MR. SINGLA:  Yes, Your Honor.

17                      (Plaintiff's counsel confer.)

18              MR. DIBOISE:  No, hold on.

19              That's all right, Your Honor. We'll make -- as long

20    as we abide by all the restrictions.

21              THE COURT:  Well, yes.  And they are going to have

22    to sign before they receive copies -- before the experts

23    receive copies, they are going to have to sign something that

24    holds them responsible.  And they should understand that once

25    they have signed that -- you submit it to me so that I can sign
```

 1   off and make it an order.  And they will understand that any

 2   violation of that is contempt of court.  And there is no

 3   question about it, then.

 4            Okay, does that take care of that issue, then?

 5            **MR. DIBOISE:**  With respect to the expert's access,

 6   yes.

 7            **THE COURT:**  Yes.

 8            **MR. DIBOISE:**  Now, Your Honor, there is a subsidiary

 9   issue, and I just want to be clear about this.

10            The form in which the code is provided should only

11   be read only so that they can read it.  If they need to

12   manipulate the data that is fine, but we don't want them

13   printing copies and having copies proliferating.

14            **THE COURT:**  Oh yes, oh, it's read only, sure.  I

15   mean, you are not going to -- well, you are not to make copies.

16   I don't what the meaning of that might be to an expert, so

17   maybe I'm using language I shouldn't use, but certainly not

18   making copies of it.

19            **MR. SINGLA:**  I agree with that, Your Honor.  I think

20   that makes sense.  And I'm not exactly sure what Counsel has in

21   mind.  But, certainly, we would agree, and we can draft

22   language they can't make additional copies --

23            **THE COURT:**  Um-hmm.

24            **MR. SINGLA:**  That makes sense.

25            **THE COURT:**  Nor can the lawyers.

1          **MR. SINGLA:**  Nor can the lawyers.

2          But they would need the ability to, for example, try

3  changing something, right, and seeing what happens in the copy

4  that they have.  So I don't know, when they say "read only,"

5  I'm not exactly sure what Counsel has in mind.

6          And on the printout --

7          **MR. DIBOISE:**  I can be very clear, Your Honor.

8          What I mean is, it's on one machine; that machine

9  stays in Counsel's office or the expert's office.  No printed

10  copies are made other than in that office and taken out of that

11  office.  No copies of the code are put on a laptop or any other

12  storage device --

13          **THE COURT:**  Fine.

14          **MR. DIBOISE:**  Taken out of the office.  That is what

15  I mean.  They can do whatever they want to do with the code in

16  the office on that machine.

17          **THE COURT:**  In the office on that one computer.

18          **MR. SINGLA:**  That's fine, Your Honor, as long as

19  they can use printouts in that office.

20          **MR. DIBOISE:**  That's fine as well, Your Honor.

21          **THE COURT:**  Okay.  So why don't you draft it up so

22  it's clear and I don't end up having to hold a contempt

23  hearing, which I hope I won't have do, and it not being clear

24  what the expert was supposed to do, okay?  So draft something

25  up.

1              *MR. BARTH:*  Your Honor, if I may?

2              *THE COURT:*  Yes.

3              *MR. BARTH:*  Lawrence Barth, Munger Tolles for the

4    studio defendants.

5              *THE COURT:*  Yes.

6              *MR. BARTH:*  We are very close, actually, to being

7    resolved on the protective order.  We have submitted two

8    versions of it, with two issues.  One of them was source code;

9    I'm confident after that discussion we can now work together to

10   submit one version of that.

11             *THE COURT:*  Okay, fine.

12             *MR. BARTH:*  And there was one other competing issue

13   that we couldn't agree on, so let's decide it, and that will be

14   part of what we submit to the Court.

15             There was a disagreement with respect to counsel for

16   the Motion Picture Association of America, Messrs. Robbins and

17   Goeckner, who are sitting at table with us today.

18             *THE COURT:*  Um-hmm.

19             *MR. BARTH:*  They are of record in this case.  They

20   are, obviously, officers of the Court, and the version of the

21   protective order that we submitted included them as outside

22   counsel, as they are in this case.

23             We got an objection from Wilson Sonsini to their

24   being characterized as outside counsel, despite the fact that

25   lawyers for the MPA have represented the studios for decades;

1    despite the fact that it's not unusual, lawyers for the RIAA

2    have represented the plaintiffs in a case that you are well

3    familiar with; despite the fact that Mr. Robbins has

4    represented the studio parties in at least ten CSS cases.

5              THE COURT:  But the studios are already represented,

6    right?

7              MR. BARTH:  That is house counsel.

8              THE COURT:  And Munger Tolles is house counsel?

9              MR. BARTH:  No, no.  We have defined outside counsel

10   as Munger Tolles --

11             THE COURT:  Um-hmm.

12             MR. BARTH:  Mitchell Silberberg and Knupp and

13   Messrs. Robbins and Goeckner.  That is how we define it.

14             This is the role they have played, as I say, for

15   decades, with the studios.  And, for some reason, it drew an

16   objection.

17             THE COURT:  Well, but it's an association that is an

18   association with respect to the, you know, the studio parties,

19   right?

20             MR. BARTH:  Yes.  The studios have chosen to hire

21   them and us as their outside counsel, that's exactly right.

22             THE COURT:  Well, that is an additional set of

23   counsel that are not going to be -- have that access.  You

24   know, we've got to have some limits.  And we have enough

25   already.

1            **MR. BARTH:**  There was --

2            **THE COURT:**  The studios have their lawyers.  You are

3     their lawyers.

4            **MR. BARTH:**  We are their lawyers with respect, Your

5     Honor.

6            **THE COURT:**  Well, but I said only one set of lawyers

7     for a party.  And, by coming in as an association, that's sort

8     of adding to it, the burden.  And, no, it's not necessary.

9            **MR. BARTH:**  Let me suggest something, if the Court

10    is concerned about numbers.  There was a discussion we had

11    about a compromise, the compromise --

12            **THE COURT:**  See, when you come to me you don't get a

13    compromise anymore.  I've made a ruling.

14            **MR. BARTH:**  Let me just tell you what the compromise

15    was, and if it doesn't seem sensible, I know you'll let me

16    know.

17            The compromise was each of the studios has three

18    seats among the highly confidential information universe, that

19    is, that information can be shared with up to 18 lawyers.  The

20    compromise was that one of the studios give up one of their

21    seats in favor of Mr. Robbins or Mr. Goeckner, and we can live

22    with that.  But not being able to talk to MPAA counsel about

23    issues of common interest to all the studios --

24            **THE COURT:**  But you can talk with them without their

25    having access to the source code.

1          **MR. BARTH:**   No, no, it's not about source code.

2    They will not get access to source code.   This is about --

3          **THE COURT:**   Okay, what is this about having access

4    to?

5          **MR. BARTH:**   Highly confidential information other

6    than source code.   For example, the new platform information,

7    the sorts of things that we need to consult with them about day

8    to day.   My mistake, I should have started by making clear,

9    this is not about source code.

10          **THE COURT:**   What about that with respect to --

11          **MR. DIBOISE:**   With respect to the --

12          **THE COURT:**   -- this is not about source code?

13          **MR. DIBOISE:**   With respect to MPAA, they are

14    employees of a trade association that represents more studios

15    than are parties in this litigation.   They have, arguably,

16    responsibilities to non-parties to this litigation that we

17    don't think should be -- and we don't think they should be

18    sharing this information.   I don't know how they don't, in a

19    sense, collectively represent somebody outside of this

20    litigation.   And that is a concern that we have.

21          Now, we made an offer of compromise, but --

22          **THE COURT:**   What was your offer of compromise?

23          **MR. DIBOISE:**   Just as Mr. Barth said, if they want

24    to give up one of their inside counsel seats to Mr. -- I don't

25    know who they are, Mr. Robbins and whoever, Mr. Goeckner, that

1  was acceptable.  But, the number of lawyers has to be contained

2  to what we offered them.

3           **THE COURT:**  How many seats are we talking about

4  here?

5           **MR. DIBOISE:**  We said 18.  There are six studios.

6  We allowed them to have three inside counsel to have -- privy

7  to this information.  They wanted all 18 plus Mr. Goeckner and

8  Mr. Robbins.

9           **MR. BARTH:**  We're fine --

10          **MR. DIBOISE:**  And if they want to take --

11          Sorry, you want to concede --

12          **THE COURT:**  You want me to tell you what I would do,

13  then?

14          **MR. BARTH:**  We're fine --

15          **THE COURT:**  I would say you lose the third seat for

16  everybody and for those two.

17          **MR. BARTH:**  We are fine with 18, Your Honor.

18          I need to fix something for the record, Your Honor.

19  I don't believe the MPAA represents anybody but our clients in

20  this action.

21          **MR. DIBOISE:**  No, no, the MPAA is a trade

22  association that represents more studios than are clients in

23  this party.

24          **MR. BARTH:**  Pardon me, but Mr. Goeckner is standing

25  next to me, and that is incorrect, Your Honor.  They represent

```
 1   the six major motion picture studios.

 2            THE COURT:  Do they have any other members besides

 3   the six major motion picture studios here?

 4            MR. GOEKNER:  Your Honor, this is Greg Goeckner.

 5   I'm the general counsel of the Motion Picture Association.  We

 6   have six members; they are all parties in this case.

 7            THE COURT:  You have only six members?

 8            MR. GOEKNER:  Six members.

 9            MR. DIBOISE:  I misunderstood.

10            THE COURT:  I guess their membership is strong.

11            MR. GOEKNER:  We did in the past --

12            THE COURT:  They don't represent indies, I guess.

13                        (Laughter.)

14            MR. BARTH:  I think we're resolved, Your Honor, if

15   we have 18 seats.  And, we'll submit a protective order that I

16   think we can now both agree on.

17            MR. DIBOISE:  No, I heard the Court say that you

18   lose every third --

19            THE COURT:  Well, that was something else -- if you

20   had agreed to something else earlier, then that's fine.  But I

21   said, you know, first of all, I don't know why you need three

22   seats -- I mean three counsel, rather, for each seat.  So drop

23   that third seat, and you can have the other two gentleman

24   there.  Everybody drops their third seat.

25            MR. DIBOISE:  Sounds good to us, Your Honor.
```

1      **MR. BARTH:**  I was fine with the original compromise

2  that was offered by Wilson Sonsini, which was one studio drops

3  one, and Mr. Robbins --

4      **THE COURT:**  That is the problem when you bring it to

5  me.  And I take what looks reasonable to me, and that is why do

6  you need three for each studio?

7      So, drop the third seat for each studio, and you can

8  add the two gentleman.

9      **MR. BARTH:**  I could answer it, if the Court wanted

10  me to, but the fact is, there are lawyers inside each studio

11  responsible for copy protection.  And the general counsel --

12      **THE COURT:**  Well, that may be.  And four would look

13  even better, right?  And five would be the best.  But that's

14  it.  So that's what you got.  Now, that will teach you to work

15  things out on your own instead of bringing them to me.

16      Is that clear now?

17      **MR. BARTH:**  We now have a protective order.  Thank

18  you.

19      **THE COURT:**  Yes, you do.  Okay.

20      **MR. SINGLA:**  Your Honor, there's one other issue

21  that we wanted to raise.  And, I don't know if the Court wants

22  to talk about scheduling first or --

23      **THE COURT:**  Well, I haven't had a chance to look at

24  the calendar, I've been talking to you all.

25      But, at any rate, there was also an issue -- I don't

1   know if I can put my hands on the papers -- that there was a

2   letter having to do with Ms. Hamilton's deposition; has that

3   been resolved?

4           **MR. SINGLA:**  No, Your Honor, it has not.

5           **THE COURT:**  Does that need to be resolved?

6           **MR. SINGLA:**  We think it does, Your Honor.  We did

7   speak to Ms. Hamilton, and she was available for deposition.

8   And we are not sure what the latest mission -- exactly what the

9   status is.

10          It's our understanding, and we could be wrong, and

11  Counsel could clarify, that RealNetworks is paying this lawyer

12  who claims to represent or represents Ms. Hamilton.  If that is

13  the case, we would ask that she be made available at some

14  point.

15          **MR. CUNNINGHAM:**  So --

16          **MR. DIBOISE:**  Hold on.

17          **THE COURT:**  Is there any reason why she shouldn't be

18  made available?

19          **MR. DIBOISE:**  Your Honor, we don't represent her.

20  There is a signed declaration from a lawyer from the State of

21  Washington on this very issue that we submitted this morning.

22          **THE COURT:**  I haven't seen that.  This is what I saw

23  that came in, I guess on Friday.

24          **MR. DIBOISE:**  Right.  We made a filing in response

25  to that this morning sometime.

```
 1              The issue is that Mr. Singla and counsel at Munger
 2     Tolles, I assume, have been in direct contact with
 3     Ms. Hamilton's counsel for at least two weeks, probably.  And
 4     he has told them that he represents her.  So, I don't know what
 5     can be done here with respect to Ms. Hamilton.  She is a third
 6     party, former employee of the Real --
 7              THE COURT:  Was that the person in the courtroom?
 8              MR. DIBOISE:  No.  That's -- she was -- she is an
 9     in-house lawyer at RealNetworks but only here in their San
10     Francisco office because nobody can get out of Seattle because
11     of the weather.
12              THE COURT:  As soon as we started to discuss this,
13     she got up and walked out.  And I thought, oh, she is getting
14     out of here, she sees a subpoena coming.
15                        (Laughter.)
16              MR. DIBOISE:  No.  But the subpoena's issued out of
17     the District Court in the Western District of Washington.  So
18     Mr. Chu, who is the lawyer representing Ms. Hamilton, has
19     raised objections to their subpoena and has filed, you know, we
20     filed on his behalf his declaration and Ms. Hamilton's
21     declaration on this very issue.  Your Court can look and see
22     the very words of the third-party witness and her counsel on
23     this issue.  They are persons that need to be dealt with on
24     this third-party deposition.
25              THE COURT:  If, in fact, what, has he made a motion
```

```
 1   to quash in the Western District of Washington, or something
 2   like that?
 3            MR. SINGLA:  No, he's filed objections, Your Honor;
 4   he has not made a motion to quash.
 5            And I guess our question is whether RealNetworks is
 6   paying that counsel.  And that's what we have not been able to
 7   get an answer to.  Because if RealNetworks -- our view is if
 8   RealNetworks is paying for counsel, then they should have some
 9   ability -- then we are concerned about what is going on, quite
10   frankly.
11            MR. DIBOISE:  There are a lot of things I would be
12   concerned about.
13            THE COURT:  What firm is Mr. Chu with?
14            MR. CUNNINGHAM:  Mr. Chu is with a firm in
15   Washington.  He wasn't picked by us.  He wasn't picked by Real.
16            THE COURT:  Is he paid by you?
17            MR. CUNNINGHAM:  I don't know the answer.  And I
18   think it will probably turn on Washington indemnification law.
19   If it were California, they would probably have to pay him, but
20   I don't know about Washington, and I don't know the
21   arrangement.
22            But Mr. Chu has his own ethical obligation to his
23   client.  He is not our guy; he is going his own way on this.
24   And he has explained why he has been unwilling to make her
25   available for the depo dates that have been requested.  His
```

1    declaration explains and her declaration explains she has been

2    unemployed, she's been trying to do job interviews.  And it's

3    for those reasons that she has been unavailable.

4              So, I don't know what the issue here is.  I think

5    that they are going to work something out in January.

6              **THE COURT:**  Have you talked with Mr. Chu directly?

7              **MR. SINGLA:**  Yes, Your Honor.

8              **THE COURT:**  Have you worked out -- have you at least

9    discussed the possibility that there is a date sometime in the

10   not too far distant future when you can take her deposition?

11             **MR. SINGLA:**  He refuses to provide any date, Your

12   Honor.  He says he will discuss it in January.

13             **THE COURT:**  Where?

14             **MR. SINGLA:**  Sorry?

15             **THE COURT:**  Where?

16             **MR. SINGLA:**  Where would the deposition be?

17             **THE COURT:**  No, where are you going to discuss it,

18   in Court or on the phone?

19             **MR. SINGLA:**  On the phone, I suppose.  But he has

20   been unwilling to discuss any date for the deposition in

21   December.  And, given the upcoming hearing date that we have,

22   and the schedule for fact depositions --

23             **THE COURT:**  Well, now the hearing dates are a little

24   bit down the road.  So why don't you talk to him in early

25   January and try to get it resolved.

```
 1                    MR. SINGLA:  Okay.

 2                    THE COURT:  By that time, I will have seen the

 3      declaration.  And you can get what ever information you need

 4      from him.

 5                    Seems to me that, you know, what is -- he either has

 6      to produce her, or -- or, rather, she has to show up for the

 7      deposition or, you know, if you subpoenaed her, you know, get

 8      an order quashing the subpoena.  I mean, you can't just sort of

 9      all call up and object and object and then put you on hold.  So

10      I think that, you know, either you then have to compel

11      attendance or -- by way of motion -- or you'll have to make a

12      motion to quash.

13                    MR. SINGLA:  Thank you, Your Honor.

14                    THE COURT:  Okay?  So does that take care of it?

15      Anything else, then?  Is that it?

16                    MR. WILLIAMS:  Just the schedule.

17                    THE COURT:  Just the schedule.

18                    MR. CUNNINGHAM:  There actually are a couple of

19      other things that we put in our letter, Your Honor, one of

20      which was a dispute about --

21                    THE COURT:  You mean the one you submitted today?

22                    MR. CUNNINGHAM:  No -- yes, yeah, last night,

23      30(b)(6) depositions.

24                    THE COURT:  Um-hmm.

25                    MR. CUNNINGHAM:  We have produced our testifying
```

1   witnesses and depositions have been taken, but we had asked to

2   do 30(b)(6)'s of the DVD CCA and two of the six studios.  And

3   the studios won't make witnesses available as 30(b)(6)

4   witnesses.  They said they didn't have sufficient time to

5   prepare them as 30(b)(6) witnesses, and, therefore, they

6   couldn't go forward.  Maybe that discussion will be affected by

7   the change in timing so that --

8           **THE COURT:**  Is it just a question of you don't have

9   time or the dates?

10          **MR. BARTH:**  I wish it were, Your Honor.

11          Just some background:  In October we submitted

12  competing letters to the Court.  We agreed that we should be

13  allowed to depose one another's testifying witnesses, that is,

14  the witnesses who will testify at the hearing.  And we made a

15  proposal that we could depose up to five others.  They asked

16  for up to seven others, I think.  We couldn't reach agreement.

17  We submitted it, and the Court said six witnesses each.

18          **THE COURT:**  That is just what I was thinking.

19          **MR. BARTH:**  And on the appointed day --

20          **THE COURT:**  Why not six?

21          **MR. BARTH:**  On the appointed day, we sent over a

22  list of six names, six human beings, and in return we got

23  30(b)(6)notices with 28 categories, each asking that we

24  designate people to testify on behalf of entire studios on each

25  of 28 categories.

1          We felt that was unreasonable and communicated that.

2    We didn't stop there; we found people who can testify on some

3    of those categories and shot their names back over and said

4    they won't be in a position to testify on behalf of an

5    organization, but they can certainly testify about what they

6    know on these subjects.  And that was met with a "no."

7          Since that time, we have gotten none of the other

8    six back.  That's the story of the 30 (b)(6).

9          *THE COURT:*  Have you exchanged witness lists for

10   that preliminary injunction hearing?

11          *MR. BARTH:*  We have.  And with respect to the

12   testifying witnesses, we don't seem to have an issue.  We have

13   made those available for deposition.  These are the wild card

14   depositions.

15          *THE COURT:*  Yeah, but there are only six wild cards.

16          *MR. BARTH:*  That's what the Court ordered, and we're

17   fine with that.  We sent over six names and got back these

18   litanies of 30(b)(6) --

19          *THE COURT:*  Well, you sent over six names of people

20   of RealNetworks under their control that you want to depose,

21   right?

22          *MR. BARTH:*  Correct, including Ms. Hamilton.

23          *THE COURT:*  And you sent a list of six names to

24   them, right?

25          *MR. CUNNINGHAM:*  No.  We sent 30(b)(6)s for three

1   entities:  The DVD CCA, Sony, and Warner.  We didn't send

2   names; we don't know the names.  We have been somewhat

3   transparent.  You can see who the folks are who have been doing

4   our products and our projects, we don't know who is responsible

5   for what at the studios.  So, if we could have named names we

6   would have named names.  We couldn't do that.

7              **THE COURT:**  If you have six, then you can designate,

8   you know, six 30(b(6) -- why didn't you just list, you know,

9   essentially six 30(b)(6) witnesses?

10             **MR. CUNNINGHAM:**  That's what we did, but we only did

11  three, actually.  And they wouldn't give us any 30(b)(6)

12  witnesses.

13             **THE COURT:**  I'm not going to sit here and hash that

14  out.

15             You sit down, and you tell them what it is you want

16  to cover.

17             And you give them the six best witnesses that you

18  got on those and -- on those the issues, and that's it.  And

19  you depose them.

20             **MR. BARTH:**  Your Honor, if we are talking about six

21  people, we've never had a problem with that.  The problem is

22  that the notices served would have called for, I don't know, 56

23  people to talk about 26 --

24             **THE COURT:**  Sit down and negotiate what it is you

25  want you really need to have covered because you are not going

1    to get more than six, okay?

2            *MR. BARTH:*  People, Your Honor?

3            *THE COURT:*  Yes, six people.

4            *MR. CUNNINGHAM:*  I think we are there.  But we would

5    be happy to take one person.

6            *THE COURT:*  Just say give us the best six people

7    that can cover the most of these areas.  Or, if there are

8    certain areas that are more important to you than others and

9    you can forego the other areas, then focus on those, okay?

10           *MR. BARTH:*  That's fine.

11           *THE COURT:*  How hard is that?  So just meet and

12   confer and do it.

13           *MR. CUNNINGHAM:*  Okay.

14           *THE COURT:*  Does that take care of everything except

15   for the schedule, right?  Actually, I did get a better offer,

16   so I'm not sure about that February date.

17           Did you say you have another trial at some point?

18           *MR. BARTH:*  I do, Your Honor, starting March 16th.

19   It's a six- to eight-week trial.

20           *THE COURT:*  Is it possible that you could be ready

21   in early March, like the first week of March, on the Facet as

22   well as --

23           *MR. SINGLA:*  The first week of March?

24           *THE COURT:*  As well as -- I'm drawing a blank right

25   now.

1          **MR. CUNNINGHAM:**  Vegas.

2          **THE COURT:**  I keep wanting to say Vista.  I just

3   have a mental block against Vegas.

4          The first week of March on both of them?

5          **MR. SINGLA:**  In all honesty, Your Honor, it's

6   possible.  I'm very hesitant to say yes, just because I'm not

7   sure when we are going to get the information we need from the

8   other side.  I don't know what issues our people will have.

9          I'm thinking early March means briefing in

10  mid-February and expert reports, then, by something like the

11  end of January, really pushing it.  That gives us a very

12  limited window to get the source code analysis done.  And I'm

13  not sure when our people are going to be able to even start

14  with that.

15         **MR. DIBOISE:**  Your Honor?

16         **THE COURT:**  Yes?

17         **MR. DIBOISE:**  We can stagger the expert reports, if

18  that makes it easier to make those dates.

19         **MR. WILLIAMS:**  I'm not sure I understand what

20  Counsel means, Your Honor.

21         **MR. DIBOISE:**  Well, we could get expert reports on

22  everything except Facet source code at a date -- I don't know

23  what the exact date would be, and then have --

24         **THE COURT:**  Late January, early February.

25         **MR. DIBOISE:**  And then have the Facet stuff, you

1  know, maybe five days before the briefs are due or six days

2  before the briefs are due.  And arguably, we are all going to

3  work very hard, but with that much time we could have a

4  staggered date when information is going to be coming to us so

5  we don't all get it at once and have to deal with the whole

6  mass of information all at the same time so we could be a bit

7  more efficient.

8            **THE COURT:**  What about that?

9            **MR. SINGLA:**  Well, Your Honor, I would like to try

10 to see if we can work this out.  The thing -- the situation for

11 us is that they are very familiar with the Facet source code.

12           **THE COURT:**  Oh, sure, yeah.

13           **MR. SINGLA:**  Right?  And, we are at a great

14 disadvantage.  And when Counsel suggests, well, we could just

15 get that work done in the five days before briefing, I think

16 that would be a great disadvantage to us because we are the

17 ones who need to have somebody spend six weeks with the code,

18 have someone explain it to the lawyers, do expert reports, then

19 put that in the briefs.

20           For example, the Vegas source code that our

21 consultants have analyzed have proven to be very, very helpful

22 in analyzing some of the issues that are going to be heard at

23 the preliminary injunction.  So, I'm reluctant, I'm personally

24 a little reluctant to sign up for a schedule in which we don't

25 get adequate time to look at the source code for this product.

```
 1              I mean, one of the things -- I don't want to rehash

 2     issues that Mr. Williams raised earlier, but in September,

 3     their people testified that in September they were 60 days from

 4     launch on Facet.  So, if they were so interested in making sure

 5     that Facet was heard and determined by the Court in terms of

 6     its legality, there is no reason -- back then in September they

 7     thought they were about to launch, and yet they never raised

 8     it --

 9              THE COURT:  But we are where we are now.

10              MR. SINGLA:  I understand.  I apologize.  I

11     understand.

12               THE COURT:  When is your trial finished?  And is it

13     going to go?

14              MR. WILLIAMS:  We think it is going to go, Your

15     Honor.  It's in Superior Court here in San Francisco in front

16     of the Judge Kramer.  And, we believe it's a hard date.

17              That's my best information at the moment.

18              THE COURT:  Is that on a single assignment?

19              MR. WILLIAMS:  Yes.

20              Your Honor, what I was going to suggest is, if the

21     Court is inclined to put the Facet hearing in early March,

22     then, at a minimum, we request very specific orders of the

23     Court regarding things that we have discussed with counsel for

24     Real that we would need in order to expedite the process.  And

25     I can list them, if I may:  To -- that we have authority to
```

1   tell our clients today what Facet does, at least as far as what

2   we understand, that is, the highly confidential designation.

3   We can bypass that in order to describe to our clients and the

4   operations people what it does, as a general matter; number

5   two, that the they point us to the source code sections that

6   are the actual source code for the product; number three, that

7   we be permitted to get all of the technical specifications, the

8   current ones for the Facet product, not ones that are outdated.

9           **THE COURT:**  All of this by when?

10          **MR. WILLIAMS:**  Immediately.

11          Number 4; that we be permitted to redepose the two

12   witnesses who are the supposed experts on Facet who told us

13   that the technical specifications that we were looking at were

14   not the current versions; number 5, that they give us access to

15   prototypes for the product, or at least one or two so that we

16   can actually test the product --

17          **THE COURT:**  To your experts.

18          **MR. WILLIAMS:**  To our experts.

19          **THE COURT:**  And not to the --

20          **MR. WILLIAMS:**  Correct.  Not to our operations

21   people, correct, so that we can test it in the same way that

22   our experts test --

23          **MR. DIBOISE:**  Your Honor, with respect to the

24   specifications issue that has been raised by the studios here,

25   Mr. Barrett, who is the most senior executive at Real DVD

1  testified in his deposition that the best place to find the

2  technical specifications for Facet were in the source code.

3  And to the extent that there is a, quote, "technical

4  specification" for Facet, it is embodied in the source code,

5  which we have given them.  So, we believe we have complied

6  substantially with what they are asking for on that particular

7  issue.

8         We don't mind, and we are happy to try and work out

9  a means to get both sides the information they need.  We could

10  go through a wish list of what we need on ArccOS and RipGuard

11  and some other things, but I think that you shouldn't have to

12  be sitting here making this decision.  If you tell us a hearing

13  date, I'm sure we'll work out a schedule that gets each side

14  what they want.

15         *THE COURT:*  Well, let's get each side what it wants

16  by the end of the first week of January, which would be

17  January 9th.  I'm keeping in mind that I don't think much is

18  going to happen for the rest of this week or next week,

19  probably, but at least you can gear up for that.  By

20  January 9th.

21         *MR. CUNNINGHAM:*  What are we being directed to give

22  by January 9th?

23         *THE COURT:*  Well, whatever it is that we are talking

24  about here.  He had a whole list.

25         *MR. CUNNINGHAM:*  Um-hmm.

1              **THE COURT:**  And, I didn't commit the whole list all

2      to memory.

3              **MR. CUNNINGHAM:**  Right.  So the devil is in the

4      details.  This is a new product.  The studios may have

5      competitive products.  So it's hard for us to say, hey, yeah

6      sure, we'll give it to anyone in your organization who wants to

7      see it.

8              **THE COURT:**  They are not saying that.

9              **MR. CUNNINGHAM:**  Right, no, I said --

10             **THE COURT:**  The first one was the one about

11     discussing it with --

12             **MR. WILLIAMS:**  With the operations people.

13             **THE COURT:**  But the rest of it was, as I understand,

14     it --

15             **MR. WILLIAMS:**  Subject to --

16             **THE COURT:**  The attorneys and their experts.

17             **MR. WILLIAMS:**  That's exactly right.

18             **MR. CUNNINGHAM:**  Yeah but, are there no limits?  We

19     would like for there to be some sort of reasonable limits on

20     who can hear about the new product within the organization.

21             **THE COURT:**  That's as to his number one item, right?

22             **MR. CUNNINGHAM:**  Yes.

23             **THE COURT:**  Everything else is subject to the

24     protective order, attorney eyes only for the attorneys that are

25     designated, et cetera.  And, you are going to get all of that

1   in and the experts.  That is it, the two experts.

2          And then, with respect to the first item, you know,

3   who would be the chosen few who would get this information?

4          **MR. WILLIAMS:**  May I talk to MPAA counsel?

5          **THE COURT:**  Very briefly, because it's getting late.

6   It's getting late for the court reporter and my courtroom

7   deputy.

8                    **(Counsel conferring.)**

9          **MR. WILLIAMS:**  Your Honor, we would commit to

10  providing Counsel with the names of two individuals, two

11  operations people, within each of the studios.  I don't know

12  the names of those people right now, but we would supply those

13  names to Counsel.

14         And again, this is just for a description of what

15  the product does, it's not getting them any of the source code

16  or the -- that type of information.

17         **THE COURT:**  Okay.  And then work out a protective

18  order, that applies to them as well, that they will have to

19  sign, okay?

20         **MR. WILLIAMS:**  Very well, Your Honor.

21         **THE COURT:**  And identify those people.  And, there

22  is not to be any change without prior notification.  For

23  example, if one of them comes down with some serious illness,

24  or something, and they have to substitute someone else, that

25  person has to sign the protective order, and that person is

```
1    substituted in, okay?

2              MR. WILLIAMS:  Yes, Your Honor.

3              THE COURT:  Now, the only other thing, I think, is

4    DVD CCA coming in on the preliminary hearing, injunction

5    hearing.

6              MR. STEERE:  That's right.

7              THE COURT:  And, but the nature of your claim is

8    mostly in the nature of a contract claim, right?

9              MR. STEERE:  That's correct.

10             THE COURT:  So, are you entitled to preliminary

11   injunction?

12             MR. STEERE:  We believe so.  We believe, first of

13   all, there is a stipulation in the agreement, in the parties'

14   agreement, that this -- that breach creates irreparable injury.

15   And we can cite authorities that we are entitled to injunctive

16   relief.

17             THE COURT:  Well, then, you are on the same track in

18   terms of the briefing, then.

19             MR. STEERE:  That's right.  And from the

20   beginning --

21             THE COURT:  And you have to have your separate

22   briefing because there are certain issues that pertain only to

23   you.

24             MR. STEERE:  Correct.

25             THE COURT:  Okay.
```

1          **MR. CUNNINGHAM:**  So, what our problem was, and,

2     again, the timing may have shifted this, was we didn't

3     understand -- we were asking the same questions you were

4     asking, what is going to be their basis for an injunction.  If

5     it's different -- if it's not different from the studios, just

6     pile on with the studios.  If it is different, what is it?  And

7     what's different?

8          **THE COURT:**  I guess we'll find out from their

9     briefing.

10         **MR. CUNNINGHAM:**  Right.  And our concern was we

11    weren't going to find out in time.

12         **MR. STEERE:**  They'll find out.  They've already got

13    our interrogatory answers.  We have provided detailed responses

14    to their interrogatories.

15         **THE COURT:**  You know, you can get on the phone and

16    talk, too.  I mean, the adversary system does not prevent you

17    from talking to each other, right?

18         **MR. STEERE:**  Well, we've tried that.

19         **THE COURT:**  Well, do it, then.  That's an order.

20    Christmas cheer be damned.  Just do it.  The rest of the year,

21    too.

22         And then, I think what we are looking at is starting

23    something like this probably around on March 3rd, when the rest

24    of my calendar be damned.

25         **MR. DIBOISE:**  Your Honor?

1          **THE COURT:**  Yes?

2          **MR. DIBOISE:**  One point.  On the list of materials

3     that we are to provide to them by the end of January 9th --

4          **THE COURT:**  Um-hmm.

5          **MR. DIBOISE:**  There is the question of our discovery

6     of them with respect to RipGuard and ArccOS.

7          I can read a list the same way that they read a

8     list. We would like some information --

9          **THE COURT:**  No, don't read a list.

10         **MR. DIBOISE:**  I wasn't going to.

11         **THE COURT:**  Just sit down and work it out, okay?

12         **MR. DIBOISE:**  We will, Your Honor.

13         **THE COURT:**  You can exchange documents without all

14    this formal requests, you know.

15         **MR. DIBOISE:**  I understand.  But, I just wanted to

16    be clear, because we should be able to get the same --

17         **THE COURT:**  It's a two-way street.  Whatever you are

18    entitled to, you ask for it.  Whatever you need at this stage

19    that you are discussing, then let's -- and I'm not sure what it

20    is, so --

21         **MR. DIBOISE:**  We'll try to be reasonable.

22         **THE COURT:**  January the 9th.

23         **MR. SINGLA:**  Your Honor, on March 3rd, how many days

24    was the Court thinking?

25         **THE COURT:**  I don't know.  Until we are finished.

1          **MR. SINGLA:**  Okay.

2          **THE COURT:**  I haven't thought about that.  I'll

3     think about that down the road, okay?

4          **MR. SINGLA:**  Is the Court suggesting all day?

5          **THE COURT:**  Probably so, yeah, because I have some

6     other cases set for trial, but we'll have to bump those back a

7     little bit.

8          **MR. SINGLA:**  Should the parties work out the

9     briefing schedule, or does the Court have a date by which it

10    would like all the briefs?

11         **THE COURT:**  Why don't you try to work out a briefing

12    schedule.  If I don't like it, I will change it, okay?  Because

13    it is late.

14         **MR. STEERE:**  Thank you.

15         **MR. WILLIAMS:**  Thank you, Your Honor.

16              Sorry to go late.

17         **MR. SINGLA:**  Thank you very much.

18         **MR. CUNNINGHAM:**  Thank you, Your Honor.

19              **(Proceedings adjourned at 5:40 p.m.)**

20

21                        **---oOo---**

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


**/s/ Sahar McVickar**

**Sahar McVickar, RPR, CSR No. 12963**

**December 29, 2008**