1   JAMES A. DiBOISE, State Bar No. 83296        SUSAN CREIGHTON, State Bar No. 135528
    Email: jdiboise@wsgr.com                     Email: screighton@wsgr.com
2   LEO CUNNINGHAM, State Bar No. 121605         RENATA B. HESSE, State Bar No. 148425
    Email: lcunningham@wsgr.com                  Email: rhesse@wsgr.com
3   COLLEEN BAL, State Bar No. 167637            WILSON SONSINI GOODRICH & ROSATI
    Email: cbal@wsgr.com                         Professional Corporation
4   MICHAEL A. BERTA, State Bar No. 194650       1700 K Street, NW, Fifth Floor
    Email: mberta@wsgr.com                       Washington, D.C. 20006-3817
5   TRACY TOSH LANE, State Bar No. 184666        Telephone: (202) 973-8800
    Email: ttosh@wsgr.com                        Facsimile: (202) 973-8899
6   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation                     JONATHAN M. JACOBSON, NY 1350495
7   One Market Street                            Email: jjacobson@wsgr.com
    Spear Tower, Suite 3300                      WILSON SONSINI GOODRICH & ROSATI
8   San Francisco, CA 94105                      Professional Corporation
                                                 1301 Avenue of the Americas, 40th Floor
9                                                New York, NY 10019-6022
                                                 Telephone: (212) 999-5800
10                                               Facsimile: (212) 999-5899

11  Attorneys for Plaintiffs and
    Counterclaim Defendants
12  REALNETWORKS, INC. and
    REALNETWORKS HOME
13  ENTERTAINMENT, INC.

14                     UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16  REALNETWORKS, INC., a Washington          Case Nos. C08 04548 MHP;
    Corporation; and REALNETWORKS HOME                  C08 04719 MHP
17  ENTERTAINMENT, INC., a Delaware corporation,
                                              **REALNETWORKS, INC. AND**
18              Plaintiffs,                   **REALNETWORKS HOME**
                                              **ENTERTAINMENT, INC.'S**
19        v.                                  **OPPOSITION TO STUDIOS' MOTION**
                                              **TO DISMISS ANTITRUST CLAIMS**
20  DVD COPY CONTROL ASSOCIATION, INC., a
    Delaware nonprofit corporation, DISNEY
21  ENTERPRISES, INC., a Delaware corporation;   **Before: Hon. Marilyn Hall Patel**
    PARAMOUNT PICTURES CORP., a Delaware        **Dept: Courtroom 15**
22  corporation; SONY PICTURES ENTER., INC., a  **Date: October 26, 2009**
    Delaware corporation; TWENTIETH CENTURY     **Time: 2:00 p.m.**
23  FOX FILM CORP., a Delaware corporation; NBC
    UNIVERSAL, INC., a Delaware corporation;
24  WARNER BROS. ENTER. INC., a Delaware
    corporation; and VIACOM, Inc., a Delaware
25  Corporation,

26              Defendants.

27  AND RELATED CASES

28

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.      HISTORY OF DISPUTE ...................................................................................... 2

II.     REALNETWORKS' CONSPIRACY ALLEGATIONS ..................................... 4

      A.     RealNetworks Is Confronted With the Continuing Existence of the Studios'
            Agreement .................................................................................................... 4

      B.     The Studios Compete With RealNetworks to Provide Technology for
            Saving a Secure Digital Copy of DVDs .................................................. 5

      C.     The Studios' Agreement to Exclude RealNetworks Harms Competition and
            RealNetworks .............................................................................................. 6

      D.     The Studios Hide Their Conspiracy Under the DVD CCA's Umbrella ................. 6

      E.     RealNetworks' Third and Fourth Causes of Action ................................. 7

ARGUMENT ................................................................................................................... 8

III.    THE STUDIOS' MOTION REQUIRES THE COURT TO CONSIDER
      MATERIALS OUTSIDE THE PROPER SCOPE OF ITS INQUIRY ............................. 8

IV.    THE STUDIOS' COLLECTIVE REFUSAL TO DEAL IS THE CAUSE OF
      REALNETWORKS' INJURIES ............................................................................ 10

      A.     RealNetworks' Injuries Do Not Result From RealNetworks' Purported
            Violation of the DMCA ............................................................................ 10

      B.     The Studios Cannot Replace the Market Alleged by RealNetworks with
            One of Their Own Choosing In Order to Dismiss RealNetworks' Claims ........... 13

V.     REALNETWORKS' ALLEGATIONS OF CONSPIRACY SATISFY THE
      APPLICABLE PLEADING STANDARD(S) .................................................... 15

      A.     RealNetworks' Fourth Cause of Action Alleges An Agreement Either on
            Direct or Indirect Evidence ...................................................................... 15

      B.     RealNetworks' Third Cause of Action Also Alleges a Plausible Conspiracy ...... 17

      C.     The Conspiracy RealNetworks Has Alleged Is Per Se Illegal ............................. 18

VI.    REALNETWORKS' CLAIMS ARE NOT BARRED BY *NOERR-PENNINGTON* ....... 19

      A.     RealNetworks' Claims Are Based On Conduct by the Studios Independent
            of Any Protected Litigation Conduct ....................................................... 20

      B.     *Noerr-Pennington* Immunity Does Not Extend to the Studios' Concerted
            Refusal to Deal with RealNetworks .......................................................... 21

VII.   REALNETWORKS' STATE LAW CLAIMS MUST SURVIVE DISMISSAL
       FOR THE SAME REASONS ........................................................................24

VIII.  CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001)..............................4, 22

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1990) ................................25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................1, 15, 16

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995)...............................................22

*Bly-Magee v. California*, 236 F.3d 1014 (9th Cir. 2001).........................................25

*Breier v. N. Cal. Bowling Proprietors' Ass'n*, 316 F.2d 787 (9th Cir. 1983) ............................25

*Brown v. Cabell County Bd. of Educ.*, No. 3:09-0279, 2009 WL 1470471
    (S.D.W.Va. May 22, 2009) ....................................................... 8

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ........................................21

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th
    Cir. 1982) ....................................................................21

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525
    (9th Cir. 1991), *aff'd on other grounds*, 508 U.S. 49 (1993) ............................23

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985) .................10

*Fashion Originators' Guild of America v. FTC*, 312 U.S. 457 (1941)......................12, 13, 18, 19

*In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) ........................................9

*In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 1458025 (N.D. Cal.
    May 21, 2009) ................................................................16

*In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785 (8th Cir. 2006).............................13

*In re Coordinated Pretrial Proceeding in Petroleum Prods. Antitrust Litig.*, 906
    F.2d 432 (9th Cir. 1990)......................................................16

*In re Flash Memory Antitrust Litig.*, -- F. Supp. 2d --, No. C 07-0086, 2009 WL
    1096602 (N.D. Cal. Mar. 31, 2009) .........................................18

*In re N.M. Natural Gas Antitrust Litig.*, MDL Dkt. No. 403, 1982 WL 1827
    (D.N.M. Jan. 26, 1982)....................................................21, 22

*Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048 (9th Cir. 2007) ...................................8

*Krasnov v. United States*, 355 U.S. 5 (1957), *aff'g* 143 F. Supp. 184 (E.D. Pa. 1956).................7

*Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455 (E.D.N.Y. 2008) ......................21

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008) ........................................ 8

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ...................................... 3, 8

*Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356
(9th Cir. 1986) ........................................................................................................ 10

*Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................ 15

*McLaughlin v. Liu*, 849 F.2d 1205 (9th Cir. 1988) ...................................................... 15

*Memorex Corp. v. International Business Machines Corp.*, 555 F.2d 1379 (9th Cir.
1977) ...................................................................................................................... 12

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156 (N.D. Cal.
2004) ...................................................................................................................... 13

*Nanda v. The Bd. of Tr. of the Univ. of Ill.*, No. 00-C-4757, 2002 WL 1553330
(N.D. Ill. July 12, 2002) ...................................................................................... 8, 9

*Pearl Music Co., Inc. v. Recording Indus. Ass'n of America*, 460 F. Supp. 1060
(C.D. Cal. 1978) .................................................................................................... 13

*PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.*, 219 F.3d 92 (2d
Cir. 2000) ...................................................................................................... *passim*

*Richards v. Neilsen Freight Lines*, 810 F.2d 898 (9th Cir. 1987) ............................... 15

*Rivera v. Hamlet*, No. C 03-962, 2003 U.S. Dist. LEXIS 21387 (N.D. Cal. Nov. 24,
2003) ........................................................................................................................ 9

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998) .............................. 15, 16

*Session Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 2006) ................. 20

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984) ........ 3, 8

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008) ............... 15

*U.S. Audio & Copy Corp. v. Philips Bus. Sys. Inc.*, No. C-81-4236, 1983 WL 1818
(N.D. Cal. Apr. 25, 1983) ...................................................................................... 19

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284 (6th Cir. 1997) ............. 24

*United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963) ............................................ 23

*Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977 (9th Cir. 2002) ..................... 9

*Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976) ................ 19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ................... 12, 18

1

**STATUTES**

2    Cal. Bus. & Prof. Code § 16700 ................................................................................................ 24

3    Cal. Bus. & Prof. Code § 17200 ................................................................................................ 24

4    Cal. Penal Code § 455 ............................................................................................................... 24

5

6

**RULES**

7    Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 8

8    Fed. R. Civ. P. 32(a)(6) ............................................................................................................. 14

9    Fed. R. Evid. 106 ....................................................................................................................... 14

10    Fed. R. Evid. 408 ....................................................................................................................... 24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REALNETWORKS' OPPOSITION TO MOTION TO      –v–
DISMISS SECOND AMENDED COMPLAINT
CASE NO.: C-08-CV-04548-MHP

1

## INTRODUCTION

2      Each of the Studios could, acting independently, license RealNetworks to make and sell a

3 device that copies their DVD content onto a hard drive.  Nothing in the nature of the CSS

4 encryption technology precludes any individual Studio from granting such a license if it chooses.

5 What *does* preclude each Studio from granting such a license, instead, is their collective

6 agreement to refuse to do so.  That agreement is the focus of RealNetworks' claims.

7      The Studios' Motion to Dismiss ignores this reality.  Rather than accepting the

8 allegations of the Complaint as true, and rather than opposing RealNetworks' claims as they are

9 alleged, the Studios create their own facts, recast RealNetworks' claims in a light they believe is

10 most favorable to themselves, and then pronounce themselves innocent.  That is not a basis to

11 grant, or even consider, a motion to dismiss.  The factual allegations in the Complaint are set

12 forth in considerable detail, and must be accepted as true.  There is no basis to accept the

13 Studios' hotly contested version of the facts on a motion to dismiss.  Nor is there any basis to

14 consider the contested findings of fact included in this Court's preliminary injunction opinion

15 when deciding whether, as a matter of law, RealNetworks may pursue its claims.

16      None of the four arguments advanced by the Studios provides a basis for dismissing

17 RealNetworks' claims.  First, the Studios' collective refusal to license is the cause of

18 RealNetworks' injuries, not this Court's preliminary finding that the RealDVD products violated

19 the DMCA or the CSS License, and not RealNetworks' decision to develop one type of product

20 rather than another.  Second, because RealNetworks alleged concerted action on the basis of

21 direct evidence—the admission of concerted activity by Paramount—there is no need for this

22 Court to examine whether the allegations are consistent with individual action by the Studios.

23 Even if the Court did so, the detailed factual allegations would easily survive scrutiny under

24 *Twombly* and *Iqbal*.  Third, *Noerr-Pennington* immunity cannot bar RealNetworks' claims, since

25 the Studios' collective agreement to refuse to license is not properly characterized as petitioning

26 activity.  Fourth, for the same reasons, there is no basis to dismiss RealNetworks' state law

27 claims.

28      RealNetworks respectfully requests that the Court deny the Studios' motion to dismiss.

**BACKGROUND**

**I.       HISTORY OF DISPUTE**

In September 2008, RealNetworks informed the DVD CCA and the Studio Defendants that its RealDVD technology would be released to the public on September 30, 2008.  Second Amended Complaint ("Complaint") ¶ 97.  RealNetworks also offered to answer any questions the Studios had about the product's piracy safeguards, and indicated it was interested in exploring mutual marketing opportunities.  *Id.* ¶¶ 45, 69.  Negotiations for a business deal ensued separately with two of the Studios, Fox and Paramount.  *Id.* ¶¶ 45, 74.  These individual talks ended abruptly, however, when the Studios decided they would not break ranks to permit RealNetworks to introduce a managed copy product that would compete with their own offerings.  *Id.* ¶¶ 47, 75, 76.  As Paramount explained, it was not prepared to break with the Studio cartel without substantial compensation—unrelated to the value of the commercial agreement that was being discussed—for doing so.  *Id.* ¶ 74.  RealNetworks then filed a declaratory judgment action against both the DVD CCA and the Studios in this Court on September 30, 2008, seeking a declaration that RealNetworks had neither breached the terms of its CSS License nor engaged in conduct in violation of the DMCA. *Id.* ¶ 97.  At the same time, in the Central District of California, the Studio Defendants filed their own Complaint, together with an *ex parte* application for a temporary restraining order and an order to show cause why a preliminary injunction should not issue to prevent RealNetworks from marketing or selling its RealDVD product.  *Id.*

Following transfer of the Studio Defendants' Complaint and pending TRO motion, this Court granted the Studio Defendants' renewed request for a temporary restraining order barring the sale of RealDVD.  *Id.* ¶ 98.  The DVD CCA subsequently filed Counterclaims against RealNetworks, including a claim that RealNetworks breached the CSS License Agreement by developing and distributing RealDVD, accompanied by DVD CCA's own motion for a preliminary injunction.  *Id.*  RealNetworks responded with an Answer and Counterclaims under the Sherman Act and state law against the DVD CCA [Dkt. 323]; on the same day,

1   RealNetworks filed a Proposed Second Amended Complaint against the Studios [Dkt. 325-2]

2   ("Complaint"), which was subsequently allowed by the Court.[1]  [Dkt. 447]

3        After a hearing on DVD CCA's and the Studios' motions for preliminary injunction, this

4   Court issued an order granting those motions.  [Dkt. 448]  RealNetworks has appealed the

5   Court's issuance of the preliminary injunction to the Ninth Circuit.  [Dkt. 464-2]

6        In the course of the preliminary injunction proceedings, each of the parties produced its

7   own evidence, and vigorously disputed the validity of the evidence produced by the opposing

8   parties.  Although the Court made findings regarding some of that evidence when granting the

9   injunction, those findings are necessarily preliminary, and must be proved at trial before they can

10  be considered final.  *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423

11  (9th Cir. 1984).  It is therefore wholly inappropriate for the Studios to attempt to import still-

12  disputed "facts" from the preliminary injunction proceedings or this Court's preliminary

13  injunction order to rewrite RealNetworks' complaint.  RealNetworks' allegations must be

14  evaluated solely in light of matters appropriately considered on a motion to dismiss.  *See Lee v.*

15  *City of Los Angeles*, 250 F.3d 668, 687-89 (9th Cir. 2001) (reversing grant of motion to dismiss

16  as erroneously based on extrinsic evidence).

17       RealNetworks' claims against the Studios are related to the litigation between the parties

18  about the RealDVD product, but they are not *about* that litigation.  In contrast to cases where, for

19  example, a plaintiff challenges sham litigation as an antitrust violation, nothing in RealNetworks'

20  claims depends at all on whether the Studios' conduct in bringing their claims or prosecuting this

21  litigation is unlawful.  Instead, RealNetworks' allegations recount a garden-variety (and per se

22  illegal) concerted refusal to deal among horizontal competitors (the Studios) whose intended and

23  actual effect was to harm another competitor (RealNetworks) as well as competition.  Complaint

24  ¶¶ 95, 112, 117, 122.  The Studios' insistence that their exclusionary agreement was required by

25

26       [1] The Studios suggest that RealNetworks timed the filing of its antitrust claims in anticipation
    of the Court's decision on the Defendants' preliminary injunction motion.  *See* Motion at 3.  That
27  is false.  As the Studios know, RealNetworks filed when it did because the DVD CCA refused to
    grant RealNetworks a requested extension of time to plead or otherwise respond to the DVD
28  CCA's Counterclaims.

an industry-wide license to technology designed to prevent the illegal duplication of movies from DVDs (Complaint ¶¶ 76, 78, 82) is no defense. *See, e.g., Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 803, 818-19 (D.C. Cir. 2001) ("anticompetitive action in advance" of petitioning activity is subject to challenge under antitrust laws).

## II.     REALNETWORKS' CONSPIRACY ALLEGATIONS

The Complaint recounts in detail what the Studios agreed to do; why they agreed to do it; and how they were able to use the DVD CCA (which administers the CSS License) to further their conspiracy. RealNetworks' allegations describe a conspiracy that has harmed not only RealNetworks, but competition, depriving consumers of more innovative products at lower prices. Complaint ¶¶ 54, 114-17. While it is not feasible to include all of the details alleged in the Complaint here, RealNetworks' Complaint alleges as follows:

### A.     RealNetworks Is Confronted With the Continuing Existence of the Studios' Agreement

The RealDVD products give consumers the ability to save DVDs they own to their computers (using the Vegas product) or a separate hardware box (using Facet). *Id.* ¶ 55. Once the DVDs are stored in RealDVD, users can retrieve them for playback without having to search for the physical copy of the DVD. *Id.* ¶ 56. RealDVD also provides additional features that add value to its users' DVD collections. *Id.* ¶¶ 43, 57. Because RealDVD is used to play back DVD content encrypted with CSS on personal computers, RealNetworks entered into a CSS License with DVD CCA to obtain rights to the technology it needed for its product. *Id.* ¶ 96.

Before releasing RealDVD, RealNetworks approached the Studio Defendants to notify them of the product, to answer any questions they had regarding the product's piracy safeguards, and to explore mutual marketing opportunities. *Id.* ¶¶ 45, 69. These talks went furthest with Paramount, with which RealNetworks exchanged numerous term sheets and agreed upon preliminary dollar amounts for a marketing arrangement under which Paramount would include Vegas on its DVDs and receive payment in return. *Id.* ¶ 74. But, at the last minute, Paramount demanded an exorbitant sum, not at all tethered to the business value of the deal under negotiation, without which it refused to break with the Studio cartel. *Id.* The members of that

1  cartel—the Studio Defendants—had agreed that no one of them would enter into an individual

2  business deal that would permit a potential competitor to offer DVD owners technology that

3  would enable them to create and store a secure digital copy of their DVDs.  *Id.* ¶¶ 74, 87.

4      RealNetworks' exchanges with the Studios were business negotiations, not settlement

5  talks.  *Id.* ¶¶ 45, 74.  During these discussions, for example, RealNetworks indicated in response

6  to purported concerns expressed by Fox and Paramount about the potential for "rent, rip &

7  return" that if the Studios wished to mark rental DVDs to make it possible for RealDVD to

8  distinguish them from purchased DVDs, RealNetworks would ensure that RealDVD could not be

9  used to save DVDs with such markings.  *Id.* ¶¶ 70, 71.  RealNetworks also agreed that it would

10 support any industry standard way to prevent its product from being used to save DVDs that had

11 been copied too many times.  *Id.* ¶ 72.  Of course, when the Studios terminated their individual

12 discussions with RealNetworks out of deference to the cartel agreement Paramount described,

13 these issues were never resolved.  *Id.* ¶ 47.

14     **B.     The Studios Compete With RealNetworks to Provide Technology for Saving
               a Secure Digital Copy of DVDs**

15

16     The Studios compete with RealNetworks and with each other to provide technology that

17 enables consumers to (a) create or otherwise obtain digital copies of movies and TV shows on

18 DVDs that the consumers own and (b) store and manage those copies electronically (e.g., on a

19 hard drive) for subsequent playback.  *Id.* ¶ 99.  Other principal competitors in the provision of

20 this technology are AMX, Telestream, and Kaleidescape.  *Id.* ¶ 101.  The Studios have released

21 some competing products and are working on others.  *Id.* ¶ 102.  Some of the Studios presently

22 offer consumers the option to purchase a second disc containing a "digital copy" version of a

23 DVD's content that can be copied onto the consumer's hard drive (without CSS encryption).  *Id.*

24 ¶ 103.  The Studios are also working to provide consumers with the ability to make a copy of the

25 content on a standard definition DVD on the consumer's hard drive in the context of a multi-

26 industry agreement ("managed copy").  *Id.* ¶ 104.

27     The Studios recognized that once one of them broke ranks and entered an individual deal

28 with RealNetworks, not only would RealDVD would be legitimized, but the rest of the Studios

1   would have a more difficult time charging supra-competitive prices for their own competing

2   products.  *Id.* ¶¶ 48, 75.  But for the concerted refusal to license, therefore, many of them would

3   likely have entered their own agreements with RealNetworks.  *Id.*  Hence the importance of

4   ensuring that none of them broke ranks to do an individual deal when RealNetworks came

5   calling.  *Id.* ¶ 87.

6         **C.**     **The Studios' Agreement to Exclude RealNetworks Harms Competition and RealNetworks**

7

8         The Studios charge an additional sum to provide a "digital copy" disc for each DVD title,

9   and they intend to charge DVD purchasers an additional sum for the "managed copy" of each

10   and every DVD they have purchased.  *Id.* ¶¶ 64, 103, 104.  RealNetworks priced its product at

11   $50, with an introductory price of $29.99.  *Id.* ¶ 62.  By agreeing to exclude RealNetworks, the

12   Studios have ensured they will face no competition in the market for technology that enables a

13   consumer to make a secure backup copy of a DVD that she already owns.  *Id.* ¶ 95.  The result is

14   no different than a price-fixing scheme—consumers will pay higher prices.  *Id.* ¶ 94.  And with

15   no competitors to challenge them, the Studios will face less pressure to develop their

16   technologies more quickly, or to offer consumer-friendly features.  *Id.* ¶ 95.  When Paramount

17   made clear to RealNetworks that the Studios had agreed to do what they could to eliminate such

18   competition, the harm to RealNetworks—which had of course invested resources to develop the

19   product in the expectation of selling it at a profit—was obvious.  *Id.* ¶ 75.

20         **D.**     **The Studios Hide Their Conspiracy Under the DVD CCA's Umbrella**

21         Having determined that breaking ranks was not a possibility they would entertain, the

22   Studios sought to justify their agreement to exclude RealNetworks by claiming that CSS License

23   was the reason none of them could reach an individual arrangement to allow purchasers of its

24   DVDs to use RealDVD to make secure backup copies.  *Id.* ¶¶ 39, 49, 75, 76.  The CSS License

25   was a convenient alibi:  it was an agreement which they had helped to frame (and amend), and to

26   which they themselves had been parties for some time.  *Id.* ¶ 51.  As they knew from their

27   experience with "Burn-to-DVD," which allows a consumer to create a DVD after purchasing a

28   download of a move or television show, the CSS License could be amended to permit them to

1   decide independently whether to authorize certain means (and not others) for consumers to

2   duplicate their content.  *Id.* ¶¶ 81, 104, 105, 140.  In the wake of that experience, they decided to

3   take the position with RealNetworks that, unless the CSS License were amended—which

4   requires their collective approval through DVD CCA, where they hold six of twelve Board

5   seats—they were prevented from individually granting RealNetworks a license to use RealDVD

6   to make secure copies of their content from DVDs.  *Id.* ¶¶ 8, 50, 76.  But there is nothing about

7   the CSS technology that requires the Studios to act collectively with respect to the terms on

8   which they will grant to RealNetworks the additional rights they claim are required for

9   RealNetworks to enable consumers to make a digital backup copy of a DVD purchased from a

10   particular studio.  *Id.* ¶ 89.

11        **E.        RealNetworks' Third and Fourth Causes of Action**

12        Based on these and other facts, RealNetworks' Complaint alleges an ongoing agreement

13   among the Studios not to license their DVD content individually, manifested in two ways.  First,

14   the Studios entered an illegal agreement to impose on the DVD CCA membership the collective

15   position that the CSS License agreement precludes individual licenses—an agreement made

16   possible because they effectively control that body as to this issue.  *Id.* ¶¶ 118-29 (Third Cause of

17   Action).  Second, the Studios specifically targeted RealNetworks, implementing their agreement

18   to refuse to license on an individual basis by ceasing even to negotiate separately with

19   RealNetworks.  *Id.* ¶¶ 130-41 (Fourth Cause of Action).  In either manifestation, the agreement is

20   illegal per se.  *See, e.g., PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.,* 219

21   F.3d 92, 102-03 (2d Cir. 2000) ("[a]lthough coordinated efforts to enforce copyrights against a

22   common infringer may be permissible, copyright holders may not agree to limit their individual

23   freedom of action in licensing future rights to such an infringer before, during, or after the

24   lawsuit"); *Krasnov v. United States,* 355 U.S. 5 (1957), *aff'g* 143 F. Supp. 184 (E.D. Pa. 1956)

25   (agreement to relinquish individual right to license others and act jointly in prosecuting patent

26   infringement suits held per se illegal).

27

28

1

**ARGUMENT**

2   **III.    THE STUDIOS' MOTION REQUIRES THE COURT TO CONSIDER
         MATERIALS OUTSIDE THE PROPER SCOPE OF ITS INQUIRY**

3

4         The Studios have moved under Fed. R. Civ. P 12(b)(6) to dismiss RealNetworks'

5   antitrust claims on the grounds that RealNetworks has failed to state claims upon which relief

6   can be granted.  [Dkt. 454] ("Motion") at 1.  On a motion to dismiss, the Court's inquiry "is

7   limited to the allegations in the complaint, which are accepted as true and construed in the light

8   most favorable to the plaintiff."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir.

9   2008).  Under certain limited circumstances, not present here, the Court may consider material

10  beyond the complaint.  A court may, for example, take judicial notice of matters of public record,

11  but only as long as the facts noticed are not "subject to reasonable dispute."  *Intri-Plex Tech.*,

12  *Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (quoting *Lee*, 250 F.3d at 689).

13  What a court may *not* do is take judicial notice of *disputed* facts stated in public records,

14  including court opinions.  *Id.* at 690.

15         But that is precisely what the Studios are asking the Court to do.  *See* Motion at 3 n.3.  In

16  their Motion, the Studios repeatedly invoke facts that remain in dispute as part of their efforts to

17  rewrite the Complaint.  *See, e.g.*, Motion at 5-7, 11, 16.  Their recasting of RealNetwork's

18  allegations improperly relies on selective fragments of testimony and bits of documentary

19  evidence adduced in the course of the preliminary injunction proceedings, as well as certain of

20  the Court's findings made in conjunction with its issuance of the preliminary injunction.

21  Reliance on this incomplete and disputed evidence is improper, since a preliminary injunction

22  order "is not a preliminary adjudication on the ultimate merits: it is an equitable device for

23  preserving rights pending final resolution of the dispute."  *Sierra On-Line*, 739 F.2d at 1423; *see,*

24  *e.g., Brown v. Cabell County Bd. of Educ.*, No. 3:09-0279, 2009 WL 1470471, at *2 (S.D.W.Va.

25  May 22, 2009) (court could not properly take judicial notice of evidence in preliminary

26  injunction order on motion to dismiss even though order was part of the public record; evidence

27  remained subject to reasonable dispute); *Nanda v. The Bd. of Tr. of the Univ. of Ill.*, No. 00-C-

28  4757, 2002 WL 1553330, at *4 (N.D. Ill. July 12, 2002) (testimony from preliminary injunction

1    hearing not admissible for purposes of motion to dismiss).  Not surprisingly, although the

2    Studios cite to the Court's preliminary injunction order throughout their Motion, they point to no

3    authority that would permit this Court to take those findings into account in deciding this

4    Motion.

5            Nor do RealNetworks' references to testimony by witnesses for the Studios and the DVD

6    CCA in its Complaint provide an excuse for the Studios to point very selectively to "facts" of

7    their choosing from the thousands of pages of testimony and exhibits introduced in the

8    preliminary injunction proceedings.  *See* Motion at 3 n.3 (citing purported authority for

9    consideration of preliminary injunction record).  The Studios rely on the general incorporation-

10   by-reference doctrine that permits the Court to consider on a motion to dismiss "documents that

11   were referenced extensively in the complaint and were accepted by all parties."  *Van Buskirk v.*

12   *Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  But none of the authorities the

13   Studios cite provides any authority for reliance on any and all of thousands of pages of testimony

14   and exhibits submitted on a preliminary motion merely because the complaint cites a few

15   passages of such testimony.  *See* Motion at 3 n.3; *compare Rivera v. Hamlet*, No. C 03-962, 2003

16   U.S. Dist. LEXIS 21387, at *11-15 (N.D. Cal. Nov. 24, 2003) ("The rule that allows the court to

17   look beyond the complaint does not require the court to attribute to a plaintiff everything in a

18   document written by a third party or a defendant"; rejecting defendants' attempt to attribute to

19   plaintiff defendants' statements in official reports that were appended to complaint) *with In re*

20   *Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1042 & n.2 (N.D. Cal. 2009) (considering full

21   text of license from which complaint quoted in part on motion to dismiss).

22           Regardless, even if the Court were to consider the matters the Studios improperly seek to

23   introduce, there would still be no basis for dismissing RealNetworks' claims.  None of the

24   Studio's arguments for dismissal of RealNetworks' claims has merit.  The Studios' reliance on

25   matters not properly considered here merely highlights the futility of their motion.

26

27

28

**IV. THE STUDIOS' COLLECTIVE REFUSAL TO DEAL IS THE CAUSE OF REALNETWORKS' INJURIES**

**A. RealNetworks' Injuries Do Not Result From RealNetworks' Purported Violation of the DMCA**

According to the Studios, because this Court has made a preliminary finding that RealDVD violates the DMCA, RealNetworks' injuries must have resulted from that finding and the accompanying injunction, rather than from anything the Studios did. *See* Motion at 10-11. From these litigation events—which postdated the filing of RealNetworks' claims—the Studio Defendants conclude that "Real's complaint fails to allege that the Studios' claimed anti-competitive conduct is the cause of any actual injury to Real." *Id*. at 10. That is patently untrue.

What RealNetworks actually alleged is that "The collective conduct of the Studio Defendants and the DVD CCA will foreclose RealNetworks from competing in the market . . . . As a result of the conduct, RealNetworks' entry into the relevant market has been delayed while the Studios have remained free to distribute and sell their own 'Digital Copy' products and capture the market for themselves."[2]  Complaint ¶ 112; *see also id.* ¶¶ 129, 141.  Thus, RealNetworks alleged that it was the Studios' agreement to exclude it (and other competitors) that caused it harm.  RealNetworks' allegations include no mention of the TRO (nor the then yet-to-exist preliminary injunction) as causing the harm it describes, and for good reason:  The Studios' collective refusal to license is the cause of RealNetworks' injuries, not the Court's injunction orders.  *Compare* Motion at 10 *with* Complaint ¶ 112; *see PrimeTime 24 Joint Venture*, 219 F.3d at 103 (plaintiff "clearly alleged" antitrust injury where harm alleged was the inability to obtain a license resulting from defendants' concerted refusal).

---

[2] That RealNetworks should have been harmed by its inability to launch its product as planned is hardly surprising—that is the expected (and intended) effect of successful agreements to exclude, which either raise rivals' costs to levels that discourage entry (or encourage exit), or, at their most effective, render entry impossible.  *See, e.g. Los Angeles Mem'l  Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1372 (9th Cir. 1986) (awarding damages for two-year delay in moving team to Los Angeles caused by NFL rule); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) (antitrust plaintiff excluded from market by alleged conspiracy is entitled to recover lost profits).

As RealNetworks alleges, each Studio could have acted independently to license its content for use on RealDVD.  Complaint ¶ 80.  Instead, the Studios entered into a collective agreement to refuse to enter into individual licenses with RealNetworks, in the absence of which many of them would likely have entered their own agreements with RealNetworks.  *Id.* ¶¶ 47-48, 75-76.  Had they (or any one of them) done so, RealNetworks' *licensed* product could not possibly violate the DMCA as to the licensing Studios' content.  The Studios, however, recognized that once one of them broke ranks and entered such an individual deal with RealNetworks, not only would RealDVD be legitimized, but the rest of the Studios would have had a more difficult time charging supra-competitive prices for their own competing products.  *Id.* ¶¶ 48, 75.  Hence, it is the Studios' *collective* refusal to negotiate individual licenses that is the cause of RealNetworks' harm, not the purported illegality of RealNetworks' products.

The Second Circuit's decision in *PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.*, presents nearly identical facts and demonstrates the error in the Studios' arguments.  In *PrimeTime*¸ a preliminary injunction had been entered against the antitrust plaintiff (PrimeTime, a provider of TV programming) in a prior action, enjoining it from violating the networks' copyrights.  *PrimeTime 24 Joint Venture*, 219 F.3d at 102.  In the later action, PrimeTime alleged that the broadcast television networks and their affiliates, acting through their trade association, the National Association of Broadcasters ("NAB"), had agreed among themselves not to license content to PrimeTime, although it would have been in their interests, acting individually, to do so.  The NAB, bargaining on behalf of the networks and their affiliates, offered PrimeTime a collective license at a prohibitive price.  When PrimeTime sought to negotiate that price, the offer was withdrawn.  NAB then instructed its members not to deal with PrimeTime.  *Id.* at 97.

The court held that the networks' concerted refusal to license copyrighted programming to PrimeTime, if proven, would constitute a per se violation of the Sherman Act:  "Although coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit."  *Id.* at 103.  The same reasoning

1   applies here.  There is simply no merit to the Studios' claim that an unlicensed firm lacks

2   standing to challenge its competitors' collective refusal to license it.  *Accord Zenith Radio Corp.*

3   *v. Hazeltine Research, Inc.*, 395 U.S. 100, 115-19 (1969) (affirming treble damages award under

4   Sherman and Clayton acts to plaintiff manufacturer for defendants' collective refusal to license).

5       The Ninth Circuit has also rejected the very argument the Studios advance here, that the

6   purported illegality of conduct by an antitrust plaintiff may properly serve as a defense to an

7   antitrust action.  *Memorex Corp. v. International Business Machines Corp.*, 555 F.2d 1379, 1382

8   (9th Cir. 1977).  In *Memorex*, IBM contended that Memorex had no standing to sue IBM, since

9   Memorex's presence in the market was a result of its theft of IBM's trade secrets.  *Id*. at 1381.

10  Noting that "[w]e continue to side with goal of vigorous enforcement of our antitrust laws," the

11  Ninth Circuit rejected this contention.  *Id*. at 1383.  The Court explained that "[a] defendant who

12  violates the antitrust laws has committed a public wrong.  A private wrong done by a potential

13  plaintiff should not prevent that party, who may be the only party with standing to sue, from

14  taking action under that antitrust laws," and held that "[a] wrongful act committed against one

15  who violates the antitrust laws must not become a shield in the violator's hands against operation

16  of the antitrust laws."  *Id*. at 1382.

17      The Supreme Court has also rejected the notion that a concerted refusal to deal can be

18  justified on the grounds that its victims may have engaged in illegal conduct.  *See Fashion*

19  *Originators' Guild of America v. FTC*, 312 U.S. 457, 468 (1941).  In that case, the co-conspiring

20  textile and garment manufacturers adopted a scheme under which textiles were to be sold to

21  garment manufacturers only upon the condition that buyers would not use or deal in textiles

22  which had been copied from designs of textile manufacturing members of the combination, and

23  garment manufacturers would sell to retailers only upon the condition that retailers would not use

24  or deal in copied garment designs.  *Id.* at 464.  In support of this scheme, Guild members and

25  affiliated textile manufacturers created and participated in a number of enforcement mechanisms

26  based on the mandatory registration of members' designs.  *Id.* at 461-62.

27      The Court summarily rejected the Guild's attempt to defend its members' conduct as

28  necessary protections against the "devastating evils growing from the pirating of original

-12-

1   designs," noting that, "[a]s we have pointed out, however, the aim of petitioners' combination

2   was the intentional destruction of one type of manufacture and sale which competed with Guild

3   members. . . . [E]ven if copying were an acknowledged tort under the law of every state, that

4   situation would not justify petitioners in combining together to regulate and restrain interstate

5   commerce in violation of federal law." *Id.* at 467-68. There, as here, the members of the

6   conspiracy—and the organization that purports to protect their illegal collective conduct—cannot

7   escape antitrust liability by pointing to their efforts to stamp out purported copying. The boycott

8   was held to be illegal *whether or not the copying itself was unlawful as the Guild alleged*.

9          This controlling authority dooms the Studios' arguments. The cases upon which they

10  purport to rely do not aid their cause. *See* Motion at 11-12. In neither *Modesto Irrigation Dist.*

11  *v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004), nor *Pearl Music Co.,*

12  *Inc. v. Recording Indus. Ass'n of America*, 460 F. Supp. 1060 (C.D. Cal. 1978), did the antitrust

13  plaintiffs allege a collective refusal to deal, as RealNetworks does here. In *In re Canadian Imp.*

14  *Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006), the consumer plaintiffs suffered no harm

15  because—in contrast to the facts here—their inability to obtain Canadian prescription drugs in

16  the United States was beyond the defendants' power to authorize.

17         In this case, each Studio had the ability to license RealDVD in respect to the Studio's

18  own content. To argue, as the Studios do, that their collective refusal to license caused

19  RealNetworks no cognizable harm borders on the frivolous.

20         **B.     The Studios Cannot Replace the Market Alleged by RealNetworks with One**
               **of Their Own Choosing In Order to Dismiss RealNetworks' Claims**
21

22         The Studios also assert that because RealNetworks has (purportedly) failed to allege that

23  the type of product it seeks to offer has to copy content directly from CSS-protected DVDs, it

24  has failed to allege a causal connection between the Studios' concerted refusal to license and the

25  harm it has suffered therefrom. *See* Motion at 13. This assertion is contrary to the express

26  allegations of the Complaint.

27         The Complaint undeniably alleges that RealNetworks developed RealDVD "to meet

28  strong consumer demand among DVD owners for technology that would enable them to save a

1   secure copy of their DVDs to a hard drive for safekeeping, portability, easy retrieval, and later

2   playback." Complaint ¶ 43.  Indeed, throughout the Complaint, RealNetworks makes it clear

3   that the products the Studios agreed to exclude from the market in favor of their own offerings

4   were products to be used by DVD owners to save their DVDs for later playback from a hard

5   drive.  *See, e.g., id.* ¶¶ 44, 47.  RealNetworks' claims are about products that permit users to

6   make archival copies of the DVDs that they own.  *Id.* ¶ 44.  They do not extend to products that

7   download digital files upon demand, "as happens on Amazon and iTunes."  Motion at 13.

8   RealNetworks' claims, as the Studios well know, are about the Studios' efforts to thwart

9   RealDVD— a product that makes fair use of *copies of DVDs*.  There is no mention of digital

10  downloads available from Amazon and iTunes in the Complaint because they are not relevant to

11  RealNetworks' claims.

12      The Studios' assertion that "Real does not allege that the type of product it wants to build

13  has to copy content directly from CSS-protected DVDs" is at best disingenuous.  Motion at 13.

14  The product RealNetworks seeks to offer helps users add value to their DVD collections because

15  the video content to which that value is being added comes from those DVDs —not a digital

16  download users have yet to purchase from the Studios or anyone else.[3]  Complaint ¶¶ 43-44, 55-

17  57.  The Studios may have preferred that RealNetworks had alleged that it has developed a

18  product that adds value to digital downloads so they could argue that their illegal agreement not

19  to permit individual licensing of their content *on DVDs* could not have harmed RealNetworks.

20  But RealNetworks alleged no such thing, so their argument must fail as a matter of law.

---

23  [3] The Studios' selective citations to snippets of hearing testimony by RealNetworks' CEO
    does not support their argument.  The Studios elected not to reproduce any of Mr. Glaser's other
24  testimony in response to the same line of questioning.  Mr. Glaser explained that the main reason
    people want to save their movies on RealDVD "isn't to get an extra copy, in my opinion, it's to
25  get a whole bunch of extra features and functions that simply aren't possible.  All that stuff that
    we demonstrated are not things that you can do with a standard DVD with a standard DVD
26  player.  So we – we add value to the DVD, in a way that simply isn't possible without making a
    physical copy of it."  Hearing Tr. at 536:11-17.  Even if the Studios were entitled to rely on Mr.
27  Glaser's testimony from the preliminary injunction hearing on a motion to dismiss, they are not
    entitled to rely solely on the phrases that suit them, while ignoring those that do not.  *See* Fed. R.
28  Evid. 106; *see also* Fed. R. Civ. P. 32(a)(6).

## V. REALNETWORKS' ALLEGATIONS OF CONSPIRACY SATISFY THE APPLICABLE PLEADING STANDARD(S)

### A. RealNetworks' Fourth Cause of Action Alleges An Agreement Either on Direct or Indirect Evidence

The Studios' repeated insistence that RealNetworks has failed to allege a "plausible conspiracy" as required by *Twombly* and *Iqbal* completely ignores the fact that the challenged conspiracy is alleged on the basis of *direct evidence* consisting of the admission of concerted activity among the Studios by one of the conspirators (Paramount).  Motion at 14-15; Complaint ¶ 74.  The Studios' arguments as to RealNetworks' alleged failure to satisfy the applicable pleading standards should be dismissed on that basis alone, since none of the Supreme Court's recent pronouncements concerning the pleading standards for antitrust conspiracies has done anything to change longstanding precedent dictating that, where there is *direct* evidence of a conspiracy, the plausibility and the existence of a rationale for individual action are irrelevant. *See Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594-95 (1986) (describing inferences that may be drawn where plaintiff seeks to allege a conspiracy based on circumstantial evidence); *see also McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir. 1988) (*Matsushita* authorizes inquiry into plausibility of conspiracy only where there is no direct evidence thereof); *Richards v. Neilsen Freight Lines*, 810 F.2d 898 (9th Cir. 1987) (affirming summary judgment in reliance on *Matsushita* because plaintiff presented no direct evidence of antitrust conspiracy).

As the Third Circuit recently explained, "Thus, in direct evidence cases, the plaintiff need not adduce circumstantial evidence that tends to exclude the possibility that the alleged conspirators acted independently, and there need not be an inquiry into the plausibility of the [plaintiff's] claim or the rationality of defendants' economic motives.  This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220 n.10 (3d Cir. 2008) (citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452,

1   466 (3d Cir. 1998)).  This basic precept applies with equal if not greater force on a motion to

2   dismiss.  *See In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 1458025, at *4

3   (N.D. Cal. May 21, 2009) (applying plausibility analysis only after determining lack of direct

4   evidence of agreement).  It would be truly extraordinary to deny the rare antitrust plaintiff in

5   possession of direct evidence of conspiracy the opportunity to pursue its claims on the grounds

6   that the conspiracy alleged is implausible.  *See In re Coordinated Pretrial Proceeding in*

7   *Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990) ("direct evidence will rarely

8   be available").

9        Even if RealNetworks' allegations were subject to a plausibility analysis under *Twombly*

10  and *Iqbal*, they would more than suffice.  This is not a case, as *Twombly* was, in which the

11  plaintiff alleges no more than parallel conduct by a group of defendants and fails to include any

12  "independent allegation of actual agreement," as the Studios would have it.  *Bell Atlantic Corp.*

13  *v. Twombly*, 550 U.S. 544, 564 (2007).  RealNetworks alleges specifically that a major motion

14  picture studio (Paramount) said that it would break with a "cartel" that included the other Studio

15  Defendants only if RealNetworks paid it an exorbitant sum to do so.  Complaint ¶ 74.  The

16  Studios' assertion that RealNetworks says nothing about who the members of the cartel were

17  willfully ignores the other allegations of the Complaint consistently identifying all of the Studio

18  Defendants as the members.  *See, e.g., id.* ¶¶ 49, 66, 69, 76, 86, 107, 116.  The allegation of

19  Paramount's statement to RealNetworks necessarily informs the inferences appropriately drawn

20  from other facts alleged by RealNetworks.  Given the express allegations of the complaint, there

21  is no reasonable inference that Paramount demanded an exorbitant sum based on its independent

22  business interest in pricing the license at that level.  Nor is there a reasonable inference that

23  RealNetworks' negotiations with Paramount went further than its negotiations with the other

24  Studios based on independent business decisions by each negotiating Studio, as the Studios seem

25  to contend.  *See* Motion at 19.

26       RealNetworks has alleged a plausible conspiracy, and its Complaint may not be

27  dismissed on the grounds it has failed to do so.

28

**B.     RealNetworks' Third Cause of Action Also Alleges a Plausible Conspiracy**

The Studios have also entirely recast RealNetworks' allegations concerning the Studios' successful use of the DVD CCA to shelter their ongoing agreement as somehow entirely unconnected to the direct evidence of conspiracy among the Studios that RealNetworks has alleged (discussed above). *See* Motion at 15-18. That is not what RealNetworks pleaded, as even the most cursory review of the Complaint reveals. Whether or not the Studios' decision to participate in the CSS system is based on "rational, lawful business behavior," as the Studios claim, is irrelevant. *Id.* RealNetworks does not allege otherwise. What is relevant is whether the Studios *also* agreed not to license individually the right to make encrypted copies of their content from their own DVDs except as a group, and to shelter that illegal agreement under the umbrella of legitimacy provided by the CSS License. Complaint ¶ 76. That agreement—which is the agreement challenged here—is not a "natural" outgrowth of the Studios' desire to protect their content from illegal copying. *See* Motion at 16. It is a horizontal group boycott that is illegal per se, regardless of whether it is cloaked in an agreement that purports to protect the Studios from illegal copying. Complaint ¶¶ 49-50.

Rather than addressing the conspiracy that RealNetworks has actually pleaded, the Studios instead complain that RealNetworks has failed to allege that there is anything about the Studios' agreement about CSS technology that violates the antitrust laws. *See* Motion at 15-18. The Studios then proceed to mischaracterize the agreement RealNetworks is challenging as the CSS License's proscription of copying from DVDs. *See id.* & 16 n.11 (asserting that RealNetworks failed to plead which rights MEI and Toshiba granted the DVD CCA). That is *not* what RealNetworks alleged in its Complaint. RealNetworks did *not* allege that the CSS License itself, without more, constitutes a *per se* illegal group boycott. The paragraph of the Complaint the Studios cite for this proposition (Complaint ¶ 123) does not even mention the CSS License. *See* Motion at 17. What RealNetworks *does* allege is that, because the Studios elected to use the CSS License as an alibi for their agreement not to enter individual agreements to permit copying of their content from DVDs, *i.e.*, by claiming that the CSS License mandated their illegal boycott, the Studios made their illegal agreement part and parcel of the CSS License.

1    RealNetworks has alleged that the Studios used the CSS License as "the means to maintain and

2    achieve the end result of the conspiracy," and need not allege that the CSS License itself is

3    illegal in order to make out a colorable claim.  *In re Flash Memory Antitrust Litig.*, -- F. Supp. 2d

4    --, No. C 07-0086, 2009 WL 1096602, at *10 (N.D. Cal. Mar. 31, 2009) (allegations that

5    defendants used joint venture and cross-licensing agreements as the means to achieve and

6    maintain price-fixing conspiracy may be considered with pleadings as a whole in determining

7    existence of plausible conspiracy on motion to dismiss).  The Studios' assertions about what the

8    CSS License fails to require, prevent, or restrain are simply not relevant to the Court's evaluation

9    of RealNetworks' allegations.

10            **C.       The Conspiracy RealNetworks Has Alleged Is Per Se Illegal**

11           The ongoing agreement among the Studios not to license their DVD content individually

12   that RealNetworks has alleged is per se illegal in both of its manifestations under Supreme Court

13   precedent concerning concerted refusals to license, including *Zenith Radio Corp.*, 395 U.S. at

14   115-19 (agreement among U.S. licensor and foreign competitors to license their patents to U.S.

15   manufacturer only as a package and only for non-imported goods had clear purpose of excluding

16   competitors who wanted to manufacture their goods elsewhere and was found illegal per se) and

17   *Fashion Originator's Guild*, 312 U.S. at 457, as well as under *PrimeTime 24 Joint Venture*, 219

18   F.3d at 102-03.  Under these precedents, RealNetworks' allegations concerning the Studios'

19   agreement to impose on the DVD CCA membership the collective position that the CSS License

20   agreement precludes individual licenses (Third Cause of Action) and the Studios'

21   implementation of their agreement by ceasing to negotiate separately with RealNetworks (Fourth

22   Cause of Action) both describe a conspiracy that is illegal per se, without need for further inquiry

23   by the Court into its effects on competition.

24           To avoid this conclusion, the Studios attempt to portray the holding in *Fashion

25   Originators'* as inapplicable to this case because that suit was brought by the FTC rather than a

26   private plaintiff.  *See* Motion at 17-18.  Their efforts are to no avail.  The Supreme Court's

27   opinion nowhere limits its holdings under the Sherman Act to cases instituted by the

28   government.  Moreover, courts, including this one, have not hesitated to apply *Fashion*

1   *Originators'* Sherman Act holding to private lawsuits.  *See, e.g., U.S. Audio & Copy Corp. v.*

2   *Philips Bus. Sys. Inc.*, No. C-81-4236, 1983 WL 1818, at *5 (N.D. Cal. Apr. 25, 1983) (denying

3   motion for summary judgment against Section One claim because under *Fashion Originators',*

4   proof that distributors exerted group pressure on their trade association to withdraw that

5   organization's service of approval of the antitrust plaintiff's contract may establish a boycott in

6   violation of Section One); *Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1365 (5th

7   Cir. 1976) (affirming finding of per se liability based on resemblance of challenged agreements

8   to those in *Fashion Originators'*).

9        When applied to the agreement actually alleged and challenged in RealNetworks'

10   complaint, *Fashion Originators'* directly supports a finding that RealNetworks has adequately

11   pleaded a per se illegal group boycott among the Studios that has been effectively imposed on

12   the DVD CCA and targeted directly at RealNetworks.  The fact that RealNetworks could have

13   entered deals with individual Studios to distribute their content, just not where that content is

14   contained on a DVD, is of no moment when the product RealNetworks seeks to release—and the

15   Studios agreed to exclude—is a product that permits its users to make additional uses of the

16   content on their DVDs.

17        The Studios have provided this Court with no reason to dismiss either of RealNetworks'

18   claims as alleged.

19   **VI.   REALNETWORKS' CLAIMS ARE NOT BARRED BY *NOERR-PENNINGTON***

20        According to the Studios, both of RealNetworks' claims must be dismissed because they

21   are based either on protected litigation activity by the Studios, or on similarly protected conduct

22   incidental to that litigation.  *See* Motion at 20.  The Studios are wrong on both counts.  Their

23   agreement not to deal individually with RealNetworks has nothing to do with obtaining relief

24   from the government, and, as RealNetworks has alleged, the business negotiations they did

25   engage in with RealNetworks cannot be transformed into settlement talks on the Studios' say so.

26

27

28

**A.    RealNetworks' Claims Are Based On Conduct by the Studios Independent of Any Protected Litigation Conduct**

According to the Studios, RealNetworks' Third Cause of Action is based entirely on the parties' advocacy before the Court, and cannot therefore be the basis for antitrust liability under *Noerr*.  *See* Motion at 21.  As with its other challenges to RealNetworks' claims, the Studios' argument depends upon a radical rewriting of RealNetworks' allegations.  As RealNetworks specifically alleged, the harm the Studios' illegal group boycott has caused is the result of their agreement to refuse to grant licenses to reproduce their individually-owned content on DVDs outside the terms of the CSS License Agreement on which they have all jointly agreed.  Complaint ¶ 85.  As RealNetworks also alleged, "Litigation is merely a manifestation of their illegal agreement."  *Id.*  This is exactly what the Second Circuit held to be outside *Noerr* in *PrimeTime 24 Joint Venture*, 219 F.3d at 103.

To escape this distinction—which leads ineluctably to the conclusion that the challenged conduct deserves no protection from *Noerr*—the Studios mischaracterize both the conduct RealNetworks has alleged and the damage RealNetworks has alleged that conduct caused.  It is simply not true that RealNetworks has anywhere alleged that its claims are based on the Studios' "enforcement" of the CSS License.  Motion at 21.  Indeed, what RealNetworks actually alleges in the paragraph cited by the Studios only emphasizes that the challenged conduct is not the enforcement of the license against RealNetworks in litigation, but the Studios' illegal agreement to preclude RealNetworks from competing in the relevant market: "To try to enforce the illegal and unjustified terms in the CSS License Agreement, they demand that in order to license the CSS technology, RealNetworks and other potential competitors to the Studio Defendants must agree not to compete in the provision of technology that would enable DVD owners to create and store a secure digital copy of DVDs that they own."  Complaint ¶ 82.

Nor is it the case that the injury RealNetworks alleges results from the Studios' suit and request that the Court enjoin RealDVD.  *See* Motion at 21.  In contrast to the cases cited by the Studios, here the challenged restraint was not imposed by governmental decision-makers, as in *Session Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 2006), nor was it wholly a

1   result of the outcome of defendants' petitioning efforts, as in *Krasnyi Oktyabr, Inc. v. Trilini*

2   *Imports*, 578 F. Supp. 2d 455 (E.D.N.Y. 2008). *See* Motion at 21.  The Studios' agreement to

3   refuse to grant individual licenses would have harmed RealNetworks even if the Studios had not

4   prevailed on their preliminary injunction motion.  RealNetworks' allegations cannot logically be

5   read to the contrary.

6        Despite these express allegations, the Studios insist that RealNetworks relies exclusively

7   on the Studios' petitioning conduct to make out its claims. *See id.* at 23.  As established above,

8   this is just not true.  What RealNetworks *did* allege is that the Studios elected to use the CSS

9   License as an alibi for their agreement not to enter individual agreements to permit copying of

10  their content from DVDs.  Complaint ¶¶ 52, 94.  When RealNetworks refused to accede to the

11  exclusion the Studios had planned for it, litigation ensued.  But the fact that litigation turned out

12  to be one of the means to enforce the Studios' illegal agreement cannot immunize the agreement

13  itself.  A conspiracy remains subject to the antitrust laws despite the use of litigation to further it.

14  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263-64 (9th Cir.

15  1982).  If the Studios' Motion is evaluated, as it must be, based on the allegations in the

16  Complaint, and not on the counter-story the Studios have constructed from their own

17  interpretations and arguments, *Clipper Exxpress* is exactly on point here.  In both cases, the

18  plaintiff relied on conduct other than petitioning conduct to allege its claims.  In this case, as in

19  *Clipper Exxpress*, the plaintiff is not challenging the petitioning activity, but the defendants'

20  exclusionary course of conduct.  *Clipper Exxpress* dictates that *Noerr* immunity may not extend

21  beyond the Studios' pursuit of the lawsuit to their illegal agreement to exclude RealNetworks.

22  RealNetworks' claims may not be dismissed on *Noerr* grounds.

23         **B.**   ***Noerr-Pennington* Immunity Does Not Extend to the Studios' Concerted**
                  **Refusal to Deal with RealNetworks**

24

25        *Noerr-Pennington* immunity is limited as to the scope of conduct it encompasses.  The

26  doctrine immunizes activity designed to obtain government action, including action by the

27  courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972).  *Noerr* does

28  not extend to *private agreements* by which litigation, once initiated, is resolved. *See In re N.M.*

1  *Natural Gas Antitrust Litig.*, MDL Dkt. No. 403, 1982 WL 1827, at *7 (D.N.M. Jan. 26, 1982)

2  (private settlement accomplished without Court participation should not be afforded *Noerr-*

3  *Pennington* protection; denying summary judgment to both plaintiffs and defendants where

4  settlement approved by Court); *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (holding

5  that dissolution agreement between former law partners settling a state court lawsuit was a per se

6  violation of the Sherman Act). Nor can the *Noerr-Pennington* doctrine be used to protect an

7  agreement reached during litigation to maintain the competitive status quo pending the outcome

8  of that litigation. *Andrx Pharms., Inc.,* 256 F.3d at 803, 818-819 (distinguishing challenged

9  agreement to maintain status quo from an offer of settlement). And, for the same reasons, *Noerr*

10  certainly is inapplicable to the facts here – involving a private agreement to refuse to grant

11  individual licenses entered into before litigation even began. As the courts have consistently

12  held, an agreement among competitors to limit their individual freedom in licensing future rights

13  that would be deemed per se illegal in the absence of litigation cannot be immunized by the

14  existence of a common lawsuit, whether that agreement is reached before, during, or after the

15  lawsuit. *PrimeTime 24 Joint Venture*, 219 F.3d at 103.

16         The Studios' claim that their conduct is immune because it consisted of settlement

17  negotiations incidental to litigation is simply wrong. First, the discussions between

18  RealNetworks and the Studios were business discussions and went far beyond prelitigation

19  settlement discussions. The Studios make much of the timing of Real's approach to the

20  individual Studios, asking the Court to draw the conclusion that a business discussion that occurs

21  late in a product's development cycle must have been part of a settlement discussion. Motion at

22  7.[4] The Studios also point to RealNetworks' mention of the parties' tolling agreement in the

23  Complaint as conclusive evidence that the Studios' collective refusal to deal occurred in the

24  context of settlement discussions. *See* Motion at 23, citing Complaint ¶ 88. Here again, the

25  Studios are telling only part of the story and drawing inferences favorable to themselves, rather

26

27         [4] That timing is hardly a secret—RealNetworks included mention of it in the Complaint.
28  Complaint ¶ 97.

1    than addressing the allegations of the Complaint.  As alleged in the Complaint, when Paramount

2    broke off its individual negotiations with RealNetworks, it was not because it had decided to join

3    the other Studios in a collective response to a request from RealNetworks to settle the case

4    before it was filed.  What RealNetworks alleges is that Paramount abruptly broke off

5    negotiations for a business deal because the Studios had agreed none of them would permit

6    RealNetworks to introduce a competing product.  Complaint ¶¶ 74-76.  In contrast to *Columbia*

7    *Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991),

8    *aff'd on other grounds,* 508 U.S. 49 (1993), on which the Studios rely, the challenged agreement

9    here to refuse to grant licenses to the Studios' DVD content other than on collectively-

10   determined terms was not a response to an offer to settle the lawsuit.  *Columbia Pictures* thus

11   simply does not apply here—just as the Second Circuit held on nearly identical facts in

12   *PrimeTime 24 Joint Venture*, 219 F.3d at 103.

13          The Studios' attempt to characterize RealNetworks' Fourth Cause of Action as based on

14   "settlement discussions" is therefore beside the point.  *See* Motion at 23.  RealNetworks alleges,

15   based on direct evidence provided by Paramount, that the Studios collectively agreed to refuse to

16   license their content on an individual basis.  Complaint ¶¶ 130-41 (Fourth Cause of Action).

17   Their conspiracy did not become any less illegal once the Studios engaged in litigation to enforce

18   their rights under the CSS License.  *See United States v. Singer Mfg. Co.*, 374 U.S. 174, 194

19   (1963) (finding illegal conspiracy to suppress competition from Japanese sewing machines

20   despite use of patent litigation as a means to enforce the conspiracy).  Had a Studio said to

21   RealNetworks that it would license if, and only if, RealNetworks agreed to set fire to a

22   competing Studio's building, there would obviously be no immunity available for that statement.

23   The Studio would be subject to prosecution for attempting to procure arson despite the context in

24

25

26

27

28

1   which its remarks occurred.[5]  The facts here are no different in principle, and the challenged

2   agreement is no more entitled to immunity than the attempted procurement would have been.[6]

3         Finally, there is an additional, and fatal, flaw in the Studios' assertion that their illegal

4   agreement was immunized under *Noerr* as conduct incidental to settlement.  The substantive

5   defense that the Studios have proffered for their agreement to exclude RealNetworks is that they

6   had to act collectively because the CSS License precluded them from acting individually.  But if

7   that is so, the discussions with RealNetworks—in which several Studios acknowledged the

8   possibility of individual arrangements—had to have been undertaken in bad faith.  The Studios

9   want to have it both ways: they want to be excused from engaging in an unlawful horizontal

10  group boycott, even though their own actions in negotiating individually with RealNetworks

11  indicate that they did not actually believe that anything in the CSS License truly prevented them

12  from doing so.  Their bad faith should not be rewarded by immunizing their illegal agreement.

13  **VII.   REALNETWORKS' STATE LAW CLAIMS MUST SURVIVE DISMISSAL FOR THE SAME REASONS**

14

15        As the Studios acknowledge, California law imposes no significantly different

16  requirements for valid antitrust claims than does federal law.  *See* Motion at 25.  For the reasons

17  explained above, therefore, RealNetworks has adequately alleged its claims under the Cartwright

18  Act, Cal. Bus. & Prof. Code § 16700, and Cal. Bus. & Prof. Code § 17200.

19

20

---

21        [5] Under Cal. Penal Code § 455: "Any person who willfully and maliciously attempts to set
22  fire to or attempts to burn or to aid, counsel or procure the burning of any structure, forest land,
    or property, or who commits any act preliminary thereto, or in furtherance thereof, is punishable
23  by imprisonment in state prison for 16 months, two or three years."

24        [6] This principle is echoed by the limitations courts have placed on the use of Federal Rule of
    Evidence 408 to exclude the admission of evidence of settlement conduct.  Rule 408 is
25  inapplicable to "suits seeking to vindicate wrongs committed during settlement discussions,"
    since such suits involve a claim different than the the claim that was the subject of the
26  compromise.  *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293-94 (6th Cir.
    1997).  Rule 408 would not preclude RealNetworks from introducing evidence that the Studio
27  Defendants had committed a wrong when they reached their agreement not to negotiate
    individually with RealNetworks for a license to each Studio's copyrighted works, even if they
28  had done so in the course of pre-litigation settlement discussions concerning the Studios' claims.

1

**VIII.   CONCLUSION**

2          For all of the above reasons, the Motion Picture Studio Parties' Notice of Motion and

3   Motion to Dismiss RealNetworks' Antitrust Claims should be denied.[7]

4

5

6   Dated:  October 2, 2009                    WILSON, SONSINI, GOODRICH & ROSATI

7

8                                              By: /s/ Renata B. Hesse
                                                        Renata B. Hesse
9
                                               Attorneys for Plaintiffs
10                                             REALNETWORKS, INC. and REALNETWORKS
                                               HOME ENTERTAINMENT, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24          [7] Should this Court decide to grant the Studios' motion in any respect, RealNetworks should
    be granted leave to amend its claims, since this Court will be unable to determine that its
25   pleading could not possibly be cured by the allegation of other facts in light of evidence already
    presented in connection with the preliminary injunction proceedings.  *See, e.g. Bly-Magee v.*
26   *California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (reversing denial of leave to amend); *Balistreri*
    *v. Pacifica Police Dept.,* 901 F.2d 696, 701 (9th Cir. 1990) ("leave to amend should be granted if
27   'it appears at all possible that the plaintiff can correct the defect,'" *quoting Breier v. N. Cal.*
    *Bowling Proprietors' Ass'n*, 316 F.2d 787, 789-90 (9th Cir. 1963)).

28