1   GLENN D. POMERANTZ (SBN 112503)
    Glenn.Pomerantz@mto.com
2   BART H. WILLIAMS (SBN 134009)
    Bart.Williams@mto.com
3   KELLY M. KLAUS (SBN 161091)
    Kelly.Klaus@mto.com
4   ROHIT K. SINGLA (SBN 213057)
    Rohit.Singla@mto.com
5   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue, 35th Floor
6   Los Angeles, California  90071-1560
    Tel: (213) 683-9100; Fax: (213) 687-3702
7
8   GREGORY P. GOECKNER (SBN 103693)
    Gregory_Goeckner@mpaa.org
    DANIEL E. ROBBINS (SBN 156934)
9   Dan_Robbins@mpaa.org
    15301 Ventura Boulevard, Building E
10  Sherman Oaks, California  91403-3102
    Tel: (818) 995-6600; Fax: (818) 285-4403
11
12  Attorneys for Motion Picture Studio Parties
    [Additional counsel listed on signature page.]

    ROBERT H. ROTSTEIN (SBN 72452)
    rxr@msk.com
    ERIC J. GERMAN (SBN 224557)
    ejg@msk.com
    MITCHELL SILBERBERG & KNUPP LLP
    11377 West Olympic Boulevard
    Los Angeles, California  90064-1683
    Tel: (310) 312-2000; Fax: (310) 312-3100

13

14                   UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16

17  REALNETWORKS, INC., et al.,                 CASE NO.  C 08-4548 MHP

18            Plaintiffs,                        **REPLY IN SUPPORT OF MOTION
                                                 PICTURE STUDIO PARTIES' MOTION
19       vs.                                     TO DISMISS REAL'S ANTITRUST
                                                 CLAIMS**
20  DVD COPY CONTROL ASSOCIATION,
    INC., et al.,                                Judge:     Hon. Marilyn Hall Patel
21                                               Date:      October 26, 2009
            Defendants.                          Time:      2:00 p.m.
22                                               Ctrm:      15

23  UNIVERSAL CITY STUDIOS                       CASE NO. C 08-4719-MHP
    PRODUCTIONS LLLP, et al.,
24
            Plaintiffs,
25
         vs.
26
    REALNETWORKS, INC., et al.,
27
            Defendants.
28

1

# TABLE OF CONTENTS

2

Page

3

I. INTRODUCTION...................................................................................................... 1

4

II. ARGUMENT ............................................................................................................ 3

5

  A.  The Studios Have Not Asked The Court To Consider Any Materials Outside The
      Scope Of A 12(b)(6) Motion; In Fact, It Is Real - Not The Studios - That Ignores

6

      The Complaint's Allegations .............................................................................. 3

7

  B.  Real Fails To Allege A Causal Connection Between The Alleged Anti-
      Competitive Conduct And A Cognizable Injury-In-Fact.................................... 5

8

      1.  Real's Alleged Injuries - The "Delay" And "Taint" Of Launching
           RealDVD - Result From Real's Unlawful Conduct.................................... 5

9

      2.  The Purported Conspiracy Did Not Exclude Real From Competing In The

10

           Market That Real Alleges ........................................................................ 8

  C.  Real Fails To Plead Plausible Antitrust Conspiracies.......................................... 9

11

      1.  Real's Third Cause Of Action - Even As Revised By Real - Fails To Allege
           A Plausible Antitrust Claim ...................................................................... 9

12

      2.  Real's Fourth Cause of Action Is Not Based On "Direct Evidence" Of A

13

           Conspiracy; It Is Based On Indirect Allegations That Fail The Most Basic
           Pleading Standards .................................................................................. 10

14

  D.  *Noerr-Pennington* Bars Real's Claims ........................................................... 12

15

      1.  Real's Claimed Injuries Flow From The Court's Injunction And
           Constitutionally Protected Petitioning Conduct, Which Are *Noerr*-

16

           Protected.................................................................................................. 12

      2.  Real's Fourth Cause Of Action Is Based On Failed Settlement Discussions,

17

           Which Are *Noerr*-Protected ................................................................... 14

18

  E.  Real's State Law Claims Fail .......................................................................... 15

III. CONCLUSION ...................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
    256 F.3d 799 (D.C. Cir. 2001) ................................................................................. 13

*Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.,*
    185 F.3d 154 (3d Cir. 1999) .................................................................................... 13

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ................................................................................................... 4

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................... *passim*

*Boulware v. State of Nevada, Department of Human Resources,*
    960 F.2d 793 (9th Cir. 1992) ................................................................................. 13

*CBS, Inc. v. ASCAP,*
    620 F.2d 930 (2d Cir. 1980) ............................................................................... 2, 10

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
    690 F.2d 1240 (9th Cir. 1982) ............................................................................... 14

*Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.,*
    944 F.2d 1525 (9th Cir. 1991) ......................................................................... 14, 15

*County of Tuolomne v. Sonora Cmty. Hosp.,*
    236 F.3d 1148 (9th Cir. 2001) ...................................................................... 2, 10, 11

*Fashion Originators' Guild of America v. FTC,*
    312 U.S. 457 (1941) ............................................................................................. 7, 8

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    186 F.3d 781 (7th Cir. 1999) ................................................................................. 12

*In re Canadian Import Antitrust Litigation,*
    470 F.3d 785 (8th Cir. 2006) .............................................................................. 6, 7

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
    906 F.2d 432 (9th Cir. 1990) ................................................................................ 3, 4

*In re Travel Agent Comm'n Antitrust Litig.,*
    ___ F.3d ___, 2009 WL 3151315 (6th Cir. Oct. 2, 2009) ...................................... 12

*Jung v. Ass'n of Am. Med. Colleges,*
    300 F. Supp. 2d 119 (D.D.C. 2004) ....................................................................... 12

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) ............................................................................... 11

*Krasnyi Oktyabr, Inc. v. Trilini Imports,*
    578 F. Supp. 2d 455 (E.D.N.Y. 2008) ................................................................... 13

*Memorex Corp. v. International Business Machines Corp.,*
    555 F.2d 1379 (9th Cir. 1977) ................................................................................. 6

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC,*
    404 F. Supp. 2d 1214 (E.D. Cal. 2005) ................................................................. 15

ii

*Michigan Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
   458 F. Supp. 2d 474 (E.D. Mich. 2006)................................................................................ 12

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
   309 F. Supp. 2d 1156 (N.D. Cal. 2004) ............................................................................ 5, 6

*PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.*,
   219 F.3d 92 (2d Cir. 2000)................................................................................................ 7, 15

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006)............................................................................................ 14, 15

*Ventre v. Datronic Rental Corp.*,
   1996 WL 66115 (N.D. Ill. Feb. 13, 1996)............................................................................. 4

**STATE CASES**

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
   176 Cal. App. 4th 697 (2009)................................................................................................. 2

9017302.1

1

## I.     INTRODUCTION

2        Real's Opposition walks away from the contention Real made in its complaint (¶¶ 83,

3  128) and in opposing the DVD CCA's dismissal motion that the CSS License is anticompetitive.

4  Real now insists it does "*not* allege that the CSS License itself, without more, constitutes a *per se*

5  illegal group boycott." Opp. at 17:22-23.[1]  Instead, Real says its antitrust claim is based on the

6  purported "fact" that any Studio "could, acting independently, license RealNetworks to make and

7  sell a device that copies their DVD content [,]" but rather than doing so, all conspired to cite the

8  License's ban on DVD copying as an "alibi" for not licensing Real to make prohibited copies. *Id.*

9  at 1:2-6.

10        Real's latest contention, like those it has made before, fails to state a plausible antitrust

11  claim.  The cornerstone of this new argument is Real's conclusory assertion that any Studio can

12  license Real to do something (copy from CSS-protected disks) that the CSS License prohibits.

13  That assertion is not entitled to any weight on a motion to dismiss.  What is more, everyone, Real

14  included, knows it is false, and Real cannot hide from this fact now.  The complaint explicitly

15  incorporates the License, and the Court must consider its clear prohibition of "digital-to-digital

16  copying" of CSS-protected DVD content in ruling on the Motion.  Order (Doc. No. 448)

17  ¶ 39.  The License forbids any licensee (whether a Studio or a technology company) from settling

18  a claim of breach against any other licensee in a way "that (i) amends any material term of [the

19  License]; (ii) has a material adverse effect on the integrity and/or security of CSS; or (iii) impacts

20  any of the rights in and to CSS held by [the DVD CCA], [Matsushita], or Toshiba or to any

21  intellectual property rights embodied therein. . ." Ex. 1 at 24 § 9.5(d).  Granting a unilateral

22  exemption from the License's no-copying restrictions—which Real claims any Studio is fully

23  authorized to do—strikes at the heart of CSS's security system.  The fact that the License does

24  not allow licensees to grant one-off exemptions from the no-copying prohibition is not an "alibi."

25  It is a critical part of the CSS License, which Real says it is not challenging.

26        Even if Real were to reverse course once again and assert that the CSS License constitutes

27

28

---

[1] *Compare* Real's Opp. to DVD CCA's Mot. to Dismiss (Doc. No. 449) at 1:10-11 ("the CSS License Agreement is a mechanism that assists in enabling the unlawful boycott").

1   an antitrust conspiracy for not allowing such individual exemptions, Real's claims still would fail.

2   The CSS License is non-exclusive—licensees remain free to offer their content in formats using

3   other encryption systems or none at all.  Thus, there is nothing anti-competitive about the fact that

4   CSS licensees are unable to grant exemptions that the License does not authorize.  CSS is a no-

5   copying system.  But CSS does not impede any of the numerous alternative means for content

6   owners to authorize the distribution *of the same content* digitally (*e.g.*, downloads through

7   services like iTunes and Amazon).  *CBS, Inc. v. ASCAP*, 620 F.2d 930, 935-36 (2d Cir. 1980),

8   makes it clear that the existence of such alternative channels for individually authorizing the

9   distribution of the same content means there is no restraint of trade, and hence no antitrust

10  violation.  Real has no answer to this argument, and so ignores it.

11          Beyond its conclusory (and incorrect) assertion that any Studio can grant exemptions from

12  CSS's no-copying system, Real's Opposition rests on the claim that the alleged breakdown of

13  Real's settlement discussions with one Studio (Paramount) over an unspecified "business deal"

14  plausibly alleges "direct evidence" of a "Studio cartel."  *E.g.*, Opp. at 2:11-13 (citing ¶ 74).  This

15  allegation amounts to nothing more than a simple disagreement over price and does not rise to the

16  level of "direct evidence"—evidence so "explicit" as to require "no inferences to establish" the

17  conspiracy.  *County of Tuolomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001).

18          It is obvious what is going on here.  Rather than compete in the legal market for digital

19  content, Real wanted to make and sell a DVD copier.  Real knew that a DVD copying device was

20  contrary to the License's core purpose.  Real also knew that the Studios (whom Real apprised of

21  its plans just days before RealDVD's launch) viewed DVD copying as unlawful under the DMCA

22  and prohibited by the License.  Real nevertheless rushed RealDVD to market.  The Studios

23  promptly sued Real, and this Court enjoined Real from engaging in its unlawful conduct.  Even

24  Real's purported legal justification for "green-lighting" RealDVD, the *Kaleidescape* trial court

25  decision, now has evaporated, with the California Court of Appeal's reversal of that decision.  *See*

26  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697 (2009).  There is no

27  antitrust violation here.  Real was properly enjoined from engaging in illegal conduct and now is

28  looking for litigation leverage.  Real does not and cannot plead any antitrust claim.

1

## II.     ARGUMENT

The Studios' Motion demonstrated that the Court can and should dismiss Real's antitrust claims with prejudice because (1) Real fails to allege a causal connection between the alleged antitrust violations and any injury-in-fact; (2) Real fails to plead plausible antitrust claims under *Twombly* and *Iqbal*; (3) Real's claims are barred under *Noerr-Pennington*; and (4) Real's state law claims fall with its federal claims. Real's responses to all of these arguments fail. We address each in turn, after responding to Real's overarching (and incorrect) contention that the Studios have ignored Real's allegations in favor of evidence not properly before the Court.

### A.     The Studios Have Not Asked The Court To Consider Any Materials Outside The Scope Of A 12(b)(6) Motion; In Fact, It Is Real - Not The Studios - That Ignores The Complaint's Allegations

Real accuses the Studios of basing their motion on "thousands of pages of testimony and exhibits," "facts that remain in dispute," and mere "preliminary" findings. Opp. at 8-9. The only matters that the Court has to consider to grant this Motion are the allegations in Real's complaint; the words contained on the face of the CSS License (which the complaint expressly incorporates, ¶ 22 & Ex. 1); and the facts that Real would have to allege in order to state viable antitrust claims but has *not* alleged. The matters from the preliminary injunction proceeding that the Studios discussed in their Motion relate to the latter category. They demonstrate that Real has omitted critical allegations because Real already has admitted facts that it cannot now contradict. Real's admissions are binding regardless of the fact that the Court's injunction Order is preliminary. Whatever the Ninth Circuit does with Real's appeal will not alter the facts that Real has admitted.

One example of this type of admission is the sworn testimony of Real's own CEO Rob Glaser, that copying from CSS-protected DVDs is a "side effect of what we have to do, in order to add value." Hr'g Tr. at 537:5-10 (Apr. 28, 2009). That admission is relevant because (along with other allegations) it shows why Real cannot allege that its RealDVD device must make copies *from CSS-protected disks*. Real *itself* elicited this admission from its own CEO (the self-described visionary of RealDVD) on direct examination. It is binding on Real. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 458-59 (9th

- 3 -

1   Cir. 1990) (statements of director constitute admissions against company); *Ventre v. Datronic*

2   *Rental Corp.*, 1996 WL 66115, at *1 (N.D. Ill. Feb. 13, 1996) (considering "judicial admissions"

3   by party "within the extensive record of this case . . . on a motion to dismiss"). And, contrary to

4   Real's Opposition, what Mr. Glaser admitted is not disputed. None of the additional lines of Mr.

5   Glaser's testimony that Real cites, *see* Opp. at 14 n.3, says that Real must make a digital copy

6   *from a CSS-protected disk* for a consumer to "get a whole bunch of extra features and

7   functions[.]" Hr'g Tr. at 536:11-17. This admission, and others cited in the Studios' Motion, are

8   fully and properly noticeable under firmly established authority. *See* Mot. at 3-4 n.3.

9        It is ironic, to say the least, for Real to charge the Studios with ignoring the complaint's

10   allegations, because Real itself repeatedly ignores what it has alleged. For example, Real strains

11   to avoid discussing how, exactly, it alleges it has been injured. Real must allege a causal

12   connection between the claimed wrongdoing and some injury-in-fact to Real. *Associated Gen.*

13   *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983). As the

14   Studios demonstrated, the injuries that Real alleges—namely, the "delay[]" in launching

15   RealDVD and the "taint[]" of an illegal product—flow entirely from the Court's Orders enjoining

16   Real's violations of law. And that is fatal to Real's claims under multiple doctrines (including

17   *Modesto Irrigation District* and *Noerr*). *See* Mot. at 10-12; 21-22.

18        Real's Opposition repeatedly asserts that the lawsuit and the Court's Orders are not the

19   cause of Real's injuries. But Real never comes out and says what those injuries are. *See, e.g.*,

20   Opp. at 21:2-4 ("The Studios' agreement to refuse to grant individual licenses would have harmed

21   RealNetworks even if the Studios had not prevailed on their preliminary injunction motion.").

22   *See also id.* at 20:7-9. The *only* injuries that Real attempts to allege are those that flow from this

23   lawsuit and the Court's adjudication of the likely illegality of Real's conduct. The complaint

24   groups these allegations under the heading, "***The Group Boycott Has Harmed RealNetworks***"

25   (¶¶ 110-112). There Real says that "[a]s a result of the [alleged] conduct, *RealNetworks entry*

26   *into the relevant market has been delayed* while the Studios have remained free to distribute and

27   sell their own 'Digital Copy' products and capture the market for themselves." ¶ 112 (emphasis

28   added). The *only* facts that Real cites as the cause of that "delay," however, are (1) Real's

1    unilateral decision to "delay[] the launch of Vegas" from September 8 to September 30, so that

2    Real could engage in settlement discussions with the Studios, ¶ 110; and (2) the delay and

3    "taint[]" from the "DVD CCA's and the Studio Defendants' *efforts* to keep its products from the

4    market[,]" ¶ 111 (emphasis added).  The only "efforts" that Real possibly can refer to are this

5    lawsuit and the Studios' motions for injunctive relief.[2]  *These* are Real's allegations about its

6    "injury."  As explained in the Studios' Motion (and below), they cannot be the basis for a valid

7    antitrust claim.

8            **B.    Real Fails To Allege A Causal Connection Between The Alleged Anti-**
                    **Competitive Conduct And A Cognizable Injury-In-Fact**
9

10                  1.    **Real's Alleged Injuries - The "Delay" And "Taint" Of Launching**
                          **RealDVD - Result From Real's Unlawful Conduct**

11           Real is right that its "allegations include no mention of the TRO (nor the then-yet-to-exist

12   preliminary injunction) as causing the harm [Real] describes."  Opp. at 10:17-20.  The "good

13   reason" for this, *id.*, is not that Real has any other claimed source of injury (as discussed above).

14   The reason for the omission is that Real recognized that explicitly referring to the injunctive

15   orders issued to restrain Real's illegal conduct would walk its claims right into the *Modesto*

16   *Irrigation District* line of cases.  *See Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.,* 309 F.

17   Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) ("an action under the antitrust laws will not lie where

18   the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was

19   itself unlawful") (quotations omitted).  That principle, applied in numerous cases*, see* Mot. at 10-

20   12, dooms Real's antitrust claims.  Real's claimed injuries are the result of its illegal trafficking in

21   a device that violates the DMCA through circumvention not only of CSS (the exclusive focus of

22   Real's claims) but also ARccOS and RipGuard, which are independent of CSS (and which Real

23   does not even *mention* in its Opposition), as well as Real's breach of the CSS License and the

24   implied covenant of good faith and fair dealing.

25   _____
     [2]  The Studios' "efforts" certainly have nothing to do with the Studios' licensing or not of Real.
26   Real has been emphatic that it did not (and does not) believe that it needed any license from the
     Studios.  ¶ 46 (Real "believed then [in September 2008], *as it does now*" that no permission is
27   needed for copying with RealDVD (emphasis added)).  *See also* ¶¶ 28, 45; Hr'g Tr. at 472:3-9
     (Real's Counsel:  "Did you think you needed Viacom or any other studios' permission to launch
28   the product?"  Rob Glaser:  "Not the product, the Vegas RealDVD product, version 1.").

- 5 -              REPLY IN SUPP. OF MOT. TO DISMISS
                                                            CASE NO. C 08-4548 MHP

1    Real's arguments for disregarding the *Modesto Irrigation District* cases are baseless:

2    First, Real asserts that this Court's finding of likely illegality is preliminary and must be

3    disregarded. Opp. at 10. There is nothing preliminary about what the License actually says, *i.e.*,

4    that its purpose is to "prevent digital-to-digital" copying. And Real does not even attempt to

5    assert that the Court's finding of likely illegality is wrong, much less why it is wrong. Real may

6    be appealing the Court's Order, but Real cannot pretend that the Order does not exist. On the

7    contrary, Real, as the plaintiff, has the burden of "nudg[ing its] claims across the line from

8    conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Real

9    cannot come close to crossing this line when the cause of its inability to traffic in RealDVD is the

10   fact that such conduct has been adjudged illegal.

11   Second, relying on *Memorex Corp. v. International Business Machines Corp.*, 555 F.2d

12   1379 (9th Cir. 1977), Real argues that the illegality of its conduct is irrelevant to the causation

13   requirement. Opp. at 12. That, however, is not what *Memorex* holds. *Memorex* simply reaffirms

14   that the doctrine of *in pari delicto*—the antitrust "plaintiff's participation in the same wrongdoing

15   as the defendant"—does not deprive the plaintiff of standing to assert an antitrust claim. 555 F.2d

16   at 1382. *Memorex* does not address the question here, which is whether an antitrust plaintiff can

17   plead and prove the required element of causation where the cause of the plaintiff's injuries is the

18   fact that its conduct is illegal. That question is answered by the *Modesto Irrigation District* cases,

19   which make it clear that Real cannot establish causation.

20   Third, Real argues that the *Modesto Irrigation District* cases are inapposite because they

21   did not involve an allegation of "a collective refusal to deal." Opp. at 13:13. That is a *non*

22   *sequitur*. Nothing about the nature of the alleged antitrust violation eliminates the causation

23   requirement, or the rule that a plaintiff cannot meet that element when its own illegal conduct

24   caused its injuries. What is more, Real's attempted distinction of those cases is wrong as a factual

25   matter. *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006), which reaches

26   the same conclusion as *Modesto Irrigation District*, was in fact a case involving an alleged

27   collective refusal to deal. *Id.* at 787. The court in that case nevertheless held that the

28   unlawfulness of importing drugs from Canada, rather than defendants' alleged refusal to deal, was

1    the cause of the plaintiffs' claimed injuries, and therefore the plaintiffs had no claim. *Id*. at 791.

2    Tacitly conceding that *Canadian Import Antitrust Litigation* is a refusal to deal case, Real argues

3    that this Court should distinguish the case on the ground that what the plaintiffs wanted (the

4    importation of drugs from Canada) "was beyond the defendants' power to authorize[,]" whereas

5    here, Real says, the Studios can individually license Real to copy from CSS-protected disks.

6    Opp. at 13:13-19. That attempted distinction fails, however, because the Studios do not have the

7    power to grant the exemption from "no copying" that Real asserts they have.

8         Fourth, Real argues that this case is analogous to *PrimeTime 24 Joint Venture v. National

9    Broadcasting Co., Inc*., 219 F.3d 92 (2d Cir. 2000), which involved allegations of a collective

10   offer to license, followed by a collective refusal to deal. The causation obstacle to Real's claims

11   here, however, was not remotely present there. Although Real misleadingly suggests that the case

12   is similar because in a "prior action" the defendants had enjoined PrimeTime "from violating"

13   their "copyrights," Opp. at 11, there was no allegation in the case that PrimeTime's injuries

14   flowed entirely, or even partly, from that injunction.[3] Moreover, *PrimeTime 24* bears no

15   resemblance to Real's claim. Real's allegations fail to show that any Studio refused to deal with

16   Real on its stated goal of putting copies of movies and TV shows on hard drives. In fact, Real

17   concedes that the Studios regularly enter into bilateral content agreements authorizing third

18   parties to make digital copies of their copyrighted content. *See* Section B.2, *infra*. Further,

19   whereas the Second Circuit rejected the defendants' argument that the Satellite Home Viewers

20   Act "prevent[ed]" them "from individually licensing" content to PrimeTime, 219 F.3d at 103, the

21   CSS License, which is not a restraint and which Real says it does not challenge (Opp. at 17-18),

22   does not authorize licensees to authorize others to copy from CSS-protected disks.

23        Fifth, and finally, Real argues that this case is just like *Fashion Originators' Guild of

24   America v. FTC*, 312 U.S. 457 (1941). Opp. at 12-13. The Studios explained in their Motion

25   why that case is inapposite. *See* Mot. at 17-18. Real tries to distill the Studios' arguments down

26   _____

27   [3] PrimeTime alleged that it was injured from "signal-strength" challenges the defendants filed under the Satellite Home Viewers Act ("SHVA"). 219 F.3d at 97. The court found SHVA actions generally to be *Noerr*-protected but held PrimeTime adequately alleged these challenges

28   were sham litigation. *Id*. at 100-02. Real does not (and cannot) allege the Studios' suit is sham.

1    to the proposition that the case is relevant only in actions brought by the FTC.  Opp. at 18-19.

2    What the Studios actually argued—and what Real ignores—is that the FTC, unlike Real, did not

3    face causation and other hurdles that are fatal to Real's claim.  Mot. at 17-18.  This argument is

4    unaffected by the cases that Real cites applying *Fashion Originators' Guild* in private litigation.

5    The causation requirements come from cases like *Associated General Contractors* that

6    significantly post-date *Fashion Originators' Guild* and that are controlling here.  The Studios also

7    demonstrated that *Fashion Originators' Guild* is inapplicable because, in that case, Guild

8    membership imposed an exclusive dealing requirement.  312 U.S. at 461-62.  Here, in contrast,

9    the CSS License is non-exclusive and imposes no restraint on Real's ability to enter into bilateral

10    licenses for digital copies not protected by CSS.  Tellingly, Real ignores this argument.

11        Because Real's illegal conduct caused its alleged injuries, Real has no antitrust claim.

   2.    **The Purported Conspiracy Did Not Exclude Real From Competing In**
12            **The Market That Real Alleges**
13

14        Real also fails to allege a causal connection to an injury-in-fact because Real cannot (and

15    so does not) allege that the product it says it wants to build has to copy from CSS-protected

16    DVDs.  The binding admission of Real's CEO, Rob Glaser, makes it clear that Real's stated

17    objective is not copying from DVDs *per se*, but providing consumers with the extra features that

18    Real says come from having a digital copy of a movie on a hard drive, rather than on a disk.  *See*

19    *supra* at 3-4.  Real, however, could provide all of this "extra value" by obtaining content-owner

20    authorization (as iTunes, Amazon and others have done) to use methods other than copying from

21    CSS-protected disks to put *exactly the same content* in digital format on a hard drive.  Mot. at 13-

22    14.  Each Studio was free to negotiate such licenses with Real, had Real sought them, which Real

23    never alleges that it did.  That undeniable fact is another break in the alleged causal chain.

24        Real's only response to this argument is to assert that its allegations involve only copying

25    directly from DVDs and do not mention iTunes and Amazon.  Opp. at 14.  It is true that Real's

26    complaint does not mention iTunes and Amazon *by name*, but the complaint expressly

27    incorporates into the relevant market those means (and others) that put digital copies onto hard

28    drives without copying from CSS-protected DVDs.  Although Real refrains from citing to it in

- 8 -

this part of its Opposition, the complaint, under the heading, "***The Relevant Market***," alleges that the market is for "the provision of technology that enables consumers to (a) create ***or otherwise obtain*** digital copies of movies and TV shows that they own on DVDs and (b) store and manage those copies electronically (e.g., on a hard drive) for subsequent playback." ¶ 99 (emphasis added). Real alleges that the market includes means of "otherwise obtain[ing] digital copies" because Real alleges that the market includes the Studios' "digital copy" products.[4] As Real expressly alleges, however, "digital copy" products come on "a second disc," and they are protected "*without CSS encryption*." ¶ 103 (emphasis added). *See also* Opp. at 5:22-23. What Real is alleging (and admitting) is that "digital copy" products do *not* involve making copies of content from copies that are protected by CSS.

Contrary to Real's Opposition, therefore, its complaint *does* allege that the relevant means of putting content onto a hard drive to add "value" to that content include means other than copying from copies protected by CSS.[5] That means that alternative methods of putting such content onto hard drives *are* relevant, even if Real refrains from mentioning them by name. And the undisputed presence of such alternatives is yet another reason why Real cannot allege a causal link between the CSS License's proscription on copying and any asserted injury-in-fact.

## C.   Real Fails To Plead Plausible Antitrust Conspiracies

### 1.   Real's Third Cause Of Action - Even As Revised - Fails To Allege A Plausible Antitrust Claim

Real's *Twombly-Iqbal* defense of its third claim consists exclusively of an argument that the Studios attack the wrong "conspiracy." Real is emphatic, for the first time since filing its antitrust claims, that it does "*not* allege that the CSS License itself, without more, constitutes a *per se* illegal group boycott." Opp. at 17:22-23. Rather, Real now claims that the prohibited

---

[4] In particular, Real alleges that its own "entry into the relevant market has been delayed while the Studios have remained free to distribute and sell their own 'Digital Copy' products and capture the market for themselves." ¶ 112.

[5] Real briefly refers to RealDVD as being "a product that makes fair use of *copies of DVDs*." Opp. at 14:9. As the Studios explained, fair use is irrelevant to Real's antitrust claim, which is premised on Real's claimed inability to offer copies authorized by the content owner, not copies claimed to be excused from a finding of infringement under the fair use defense. Mot. at 18:13-18. Real says nothing in response to the Studios' argument on this point.

1    "agreement" is one not to enter into individual licenses authorizing the copying of content from

2    CSS-protected DVDs.  *Id.* at 17-18.

3          This reformulated conspiracy claim, like Real's original arguments, fails to allege

4    plausible antitrust violations.  Real does not allege any facts showing that any Studio, even if it so

5    desires, can license Real (or anyone else) to copy content from CSS-protected DVDs.  The CSS

6    License on its face shows that no such authority is granted to any licensee.  Real also fails to

7    allege any facts showing that the lack of such authority implicates the antitrust laws.  Real does

8    not allege (nor could it) that any Studio's individual decision to participate in the *non-exclusive*

9    CSS system for protecting copyrighted content against copying is the result of anything other than

10   rational, lawful behavior.  The fact that the License is non-exclusive, and that there exist abundant

11   alternative means for individual, bilateral licensing of the same content for digital dissemination,

12   means that the License's proscription on copying from CSS-protected DVDs is not a restraint of

13   trade.  *See CBS v. ASCAP*, 620 F.2d at 935-36.  Real's third claim fails under *Twombly* and *Iqbal*.

14                    2.      **Real's Fourth Cause of Action Is Not Based On "Direct Evidence" Of**
                              **A Conspiracy; It Is Based On Indirect Allegations That Fail The Most**
15                            **Basic Pleading Standards**

16         Real asserts that its fourth cause of action (the purported "group boycott" in September

17   2008) is not subject to *Twombly* and *Iqbal* at all because Real claims it has "direct evidence" of a

18   "cartel" among the Studios.  Opp. at 15-16.  Simply alleging a "cartel" is not sufficient.

19         In the Ninth Circuit, "direct evidence in a Section 1 conspiracy must be evidence that is

20   explicit and requires no inferences to establish the proposition or conclusion being asserted."

21   *County of Tuolomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001) (quotations

22   omitted).  In *County of Tuolomne*, the Ninth Circuit held that statements in a signed letter

23   authored by one party to the alleged conspiracy, and addressed to the others, failed to provide

24   direct proof of a conspiracy, because it failed to "evidence a 'meeting of [the] minds'" among the

25   alleged co-conspirators.  *Id.* at 1156.

26         Real's threadbare allegations do not remotely satisfy the demanding standards for direct

27   proof of a conspiracy.  The sum total of Real's purported "direct evidence" is found in the

28

- 10 -

1    following paragraph in the complaint:

2           The negotiations for a potential solution and a business deal went the furthest with
     Paramount.  RealNetworks and Paramount exchanged numerous term sheets, and had
3    even agreed upon preliminary dollar amounts to enter into a marketing arrangement
     whereby Paramount would include Vegas on its DVDs and receive some payment in
4    return.  *At the last minute, however, Paramount indicated that it was not prepared to
     break with the Studio cartel without substantial compensation for doing so.  The
5    compensation demanded by Paramount was an exorbitant sum, not at all tethered to the
     business value of the deal under negotiation*.  ¶ 74 (emphasis added).

6

7           This is not direct evidence of a conspiracy.  One would have to pile unsubstantiated

8    inference upon unsubstantiated inference to get from Real's highly general description of a

9    disagreement over price to proof of any conspiracy.  The allegations do not evidence any

10   agreement among the alleged conspirators; indeed, neither these allegations (nor any others in the

11   complaint) provide direct evidence of any type of agreement among the Studios not to do

12   business with Real.  As in *County of Tuolomne*, nothing in these allegations shows any "meeting

13   of the minds."  Real does not overcome this deficiency by putting the word *cartel* in quotation

14   marks in its Opposition, at 16:14.  Real uses quotation marks because Real is merely quoting *its*

15   *own allegation* back to itself.  These are not words that Real alleges came from the mouth of

16   anyone representing Paramount.  As in *Twombly*, Real's shorthand description of "the Studio

17   cartel" is nothing more than "mere[] legal conclusions resting on the prior allegations."  *Twombly*,

18   550 U.S. at 564.  If the allegations set forth in Paragraph 74 were enough to get past a motion to

19   dismiss, *Twombly*'s plausibility standard would be a dead letter.  That cannot be the case.

20          Real's allegations also fail to assert "indirect" proof of a conspiracy.  Real fails to provide

21   any of the basic facts about "who, did what, to whom (or with whom), where, and when[,]" as the

22   cases require.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).  Such facts are

23   missing even as to Paramount.  Paragraph 74 says nothing about who made statements on behalf

24   of Paramount, what they actually said, or to whom they said it.  Paragraph 74 is cryptic even as to

25   the nature of the "business deal" or "marketing arrangement" that Real claims it was discussing

26   with Paramount.  Real's allegation that the "deal" contemplated Paramount "includ[ing] Vegas on

27   its DVDs and receiv[ing] some payment in return," is indicative of a proposal to have Paramount

28   act as a distributor of RealDVD, not of Paramount licensing Real to copy content from CSS-

1   protected DVDs.  And Real's conclusory allegation that Paramount purportedly demanded

2   "substantial compensation" "not at all tethered to the business value of the deal under

3   negotiation," suggests, at most, a price dispute.  It does not show the existence of a conspiracy.

4          Beyond Real's conclusory allegations concerning Paramount, the complaint is completely

5   devoid of information about the other Studios' participation in the alleged group boycott.  That

6   deficiency, too, is fatal to Real's claim.  *See In re Travel Agent Comm'n Antitrust Litig.*, ___ F.3d

7   ___, 2009 WL 3151315, at *7 (6th Cir. Oct. 2, 2009) (allegations regarding claimed conspiracy

8   among airlines fails to satisfy *Twombly* where complaint fails to specify how multiple airline

9   members of alleged conspiracy were involved).[6]  Real does not fill this void with its string cite to

10  other paragraphs, which Real says "consistently identify[] all of the Studio Defendants as the

11  members."  *See* Opp. at 16:17-18.  The paragraphs that Real cites contain nothing more than

12  conclusory allegations that all of the Studios were members of a "cartel."  In fact, the only

13  allegations that Real makes concerning its discussions with other Studios aver that Real's

14  discussions with those Studios went in different directions.  ¶¶ 70, 74.  These allegations are more

15  consistent with independent, self-interested behavior in each Studio's discussions with Real than

16  they are with the existence of a group boycott.  *See In re Brand Name Prescription Drugs*

17  *Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999) (Posner, C.J.) (plaintiff must show "that the

18  hypothesis of collusive action [i]s more plausible than that of individual action").

19      **D.**     ***Noerr-Pennington* Bars Real's Claims**

20          **1.     Real's Claimed Injuries Flow From The Court's Injunction And
                      Constitutionally Protected Petitioning Conduct, Which Are *Noerr*-
21                   Protected**

22          Even if Real were correct (and it is not) that the *Modesto Irrigation District* line of cases

23  does not apply, Real's claims still would be barred under *Noerr-Pennington*.  RealDVD is not on

24

_____

25  [6] *See also Michigan Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp.
    2d 474, 485 (E.D. Mich. 2006) ("Plaintiffs cannot escape their burden of alleging that each
26  defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply
    to numerous parties without any specific allegations as to any individual cemetery defendant.");
27  *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004) ("[P]laintiffs are not
    relieved from alleging that each individual defendant joined the conspiracy and played some role
28  in it.").

9017302.1

- 12 -

1   the market *solely* because the Studios sued Real and the Court granted orders of injunctive relief

2   keeping RealDVD off the market.  As Real's own allegations make clear, *see supra* n.2, Real

3   does not believe that RealDVD requires studio authorization, and Real did (and would have

4   continued to) sell the product absent the Court's orders.

5        "[W]here, as here, all of the plaintiff's alleged injuries result from state action, antitrust

6   liability cannot be imposed on a private party who induced the state action by means of concerted

7   anticompetitive activity."  *Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185

8   F.3d 154, 160 (3d Cir. 1999).  The case law that Real cites holds the same thing.  *See Andrx*

9   *Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001) (cited by Real, Opp. at

10   4:2-4, 22:8-9) ("If anticompetitive harm is caused by the decision of a court, even though granted

11   at the request of a private party, no private restraint of trade occurs because the intervening

12   government action breaks the causal chain.").

13        The fact that the Court's injunction Order is preliminary does not, as Real contends, Opp.

14   at 10, change this analysis.  In *Boulware v. State of Nevada, Department of Human Resources*,

15   960 F.2d 793 (9th Cir. 1992), the plaintiff asserted antitrust claims against a competitor based on

16   its intervention in a state court action.  The state trial court issued a temporary injunction followed

17   by a permanent injunction prohibiting construction of a facility for plaintiff's business.  The state

18   supreme court later reversed that decision.  In the federal antitrust suit, the plaintiff alleged that

19   his injury stemmed from being "[d]riven into bankruptcy *by the injunction* that stalled his"

20   business.  *Id*. at 795-96 (emphasis added).  The Ninth Circuit affirmed dismissal of the plaintiff's

21   claims under *Noerr*, notwithstanding the vacatur of the state trial court's injunction.  *Id*. at 800

22   (defendant's "intervention in the state suit may be characterized as a monopolist's attempt to

23   prevent competition by aiding a state agency to push the boundaries of its jurisdiction by taking

24   an aggressive legal position in enforcement proceedings.  [This] does not place it beyond *Noerr-*

25   *Pennington's* protection.  [The plaintiff's] success on appeal does not alter this conclusion.").

26   *Accord Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y. 2008)

27   (claim dismissed where alleged injuries stemmed from TRO that was vacated upon dismissal of

28

1   claims on summary judgment).  Real's injuries likewise flow from the Studios' protected

2   petitioning conduct and the Court's injunction Orders.

3        As expected, Real also argues that its claims are not *Noerr*-barred based on *Clipper*

4   *Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240 (9th Cir. 1982).  *See* Opp.

5   at 21.  *Clipper Express* holds only that if petitioning activity is one element of a larger scheme

6   with other anti-competitive acts, the court will not disregard the other non-petitioning acts based

7   on *Noerr*.  690 F.2d at 1265.  *Clipper Express* is irrelevant because all of the anti-competitive acts

8   that Real alleges (settlement discussions, lawsuit, requests for (and granting of) injunctions) are

9   core petitioning activities under *Noerr*.

### 2.   Real's Fourth Cause Of Action Is Based On Failed Settlement Discussions, Which Are *Noerr*-Protected

12        *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.,* 944 F.2d

13   1525 (9th Cir. 1991), holds that where conduct "*amount[s]* to an offer to settle the lawsuit,"

14   *Noerr* applies.  *Id*. at 1528 (emphasis added).  *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 933-34 (9th

15   Cir. 2006), holds that *Noerr* also applies to pre-litigation settlement communications.  Real's

16   fourth cause of action is based exclusively on Real-Studio settlement discussions in the days

17   before this litigation.  These cannot be the basis for liability under *Noerr*.

18        Real's claim that the September 2008 discussions were "business" discussions ignores

19   (again) Real's allegations, which make the settlement nature of the discussions clear.  *See, e.g.,*

20   ¶¶ 97, 132 (purpose of talks was to "*resolve* the Studios Defendants' *stated concerns* with the

21   product" and "*to resolve the ensuing dispute* between" Real and the Studios (emphases added)).

22   Real also ignores the Court's Order on the Studios' motion for sanctions.  That Order holds that

23   the parties' tolling agreement showed that "Real was on notice that litigation was probable and a

24   potential claim was identifiable[.]"  Order (Doc. No. 316) at 14:9-15.

25        Real's argument that the September discussions had business as well as settlement

26   components, Opp. at 22:18-19, does not change this analysis.  As the Ninth Circuit held in *Sosa*,

27   even though pre-litigation discussions between private parties may raise issues concerning the

28   parties' "commercial interests," in "nearly every instance in which *Noerr-Pennington* has been

applied, including *Noerr* itself, the petitioning conduct at issue was carried out to further the petitioning party's commercial interests." 437 F.3d at 935 n.8. *See Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1222 (E.D. Cal. 2005) ("most courts" have concluded that prelitigation communications are incidental to suit and thus *Noerr*-protected).

Real, in its *Noerr* argument, again returns to the Second Circuit's decision in *PrimeTime 24*, this time as a purported basis for disregarding the Ninth Circuit's controlling decision in *Columbia Pictures*. Opp. at 23:10-12. *PrimeTime 24* is as irrelevant here as it is to the causation issue. In connection with allegations about the networks' refusal to deal with PrimeTime, the Second Circuit distinguished *Columbia Pictures* on grounds that do not apply here. That court noted that PrimeTime's "initial offer" to deal "predated the copyright infringement lawsuits." 219 F.3d at 102. *Sosa*, decided by the Ninth Circuit four years later, makes clear that, in this Circuit, pre-litigation conduct may be *Noerr*-protected. 437 F.3d at 933-34. The Second Circuit also suggested that PrimeTime's proposal to "offer each station a fee for each local subscriber" may have "allow[ed] ongoing legal actions to survive." 219 F.3d at 102. Here, Real admits it was aware of the possibility of litigation with the Studios and that its September discussions were "attempts *to resolve the ensuing dispute* between" Real and the Studios. ¶ 97 (emphasis added).

Finally, Real asserts that if the CSS License in fact prohibits licensees from granting exemptions to its no-copying rule, then any settlement discussions were undertaken in "bad faith." Opp. at 24:8. That is baseless. Real never describes what the content of its discussions was, what business "arrangements" were proposed, or what the proposals said about Real's compliance with the License. Real's cry of "bad faith" must be disregarded.

### E. Real's State Law Claims Fail

Real concedes that if its federal law claims fail, then so do its state law claims. *See* Opp. at 24:13-18. Hence, Real's state law claims also should be dismissed.

## III. CONCLUSION

The Court should dismiss Real's antitrust claims with prejudice.

9017302.1

REPLY IN SUPP. OF MOT. TO DISMISS
CASE NO. C 08-4548 MHP

1

2    DATED:   October 12, 2009

3

4

5    DATED:   October 12, 2009

6

7

8

9    DATED:   October 12, 2009

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: _____ /s/ Glenn D. Pomerantz _____
                    GLENN D. POMERANTZ

Attorneys for Motion Picture Studio Parties

GIBSON, DUNN & CRUTCHER LLP

By: _____ /s/ Daniel G. Swanson _____
                    DANIEL G. SWANSON

Attorneys for Sony Pictures Entertainment Inc.

SIMPSON THACHER & BARTLETT LLP

By: _____ /s/ Harrison J. Frahn IV _____
                    HARRISON J. FRAHN IV

Attorneys for Viacom Inc. and Paramount Pictures
Corporation

9017302.1

REPLY IN SUPP. OF MOT. TO DISMISS
CASE NO. C 08-4548 MHP