**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15

REALNETWORKS, INC., et al.,

        Plaintiffs and Counter-
        Defendants,

    v.

DVD COPY CONTROL ASSOCIATION,
INC., et al.,

        Defendants and Counter-
        Complainants.

No. C 08-4548 MHP

**OPINION**

**Re: Motions to Dismiss Plaintiffs'/Counter-
Defendants' Antitrust Claims**

_____/

16
17
18
19
20
21
22

UNIVERSAL CITY STUDIOS
PRODUCTIONS L.L.L.P., et al.,

        Plaintiffs,

    v.

REALNETWORKS, INC., et al.,

        Defendants.

No. C 08-4719 MHP

_____/

23
24
25
26
27
28

    RealNetworks, Inc., and RealNetworks Home Entertainment, Inc., (collectively "Real")

have amended their declaratory judgment complaint to allege that the DVD Copy Control

Association, Inc., ("DVD CCA") and several major motion picture studios (collectively "the

Studios") have violated the antitrust laws. The DVD CCA and the Studios now move the court to

dismiss Real's antitrust claims. Having considered the parties' arguments and submissions, and for

the reasons discussed below, the court enters the following order.

1   BACKGROUND[1]

2   I.      Parties

3        RealNetworks, Inc., is a corporation engaged in the business of developing, manufacturing

4   and selling platforms for the delivery of digital media.  Its subsidiary, RealNetworks Home

5   Entertainment, Inc., developed and distributed products called "Vegas" and "Facet," collectively

6   referred to as "RealDVD."

7        The DVD CCA is a joint venture trade association responsible for developing, evaluating and

8   licensing copy control and related technologies to participants at various levels in the DVD[2]

9   industry.  The DVD CCA licenses Content Scramble System ("CSS") technologies to: companies

10  that manufacture hardware and software products that play CSS-protected DVDs; motion picture

11  studios that use CSS to encrypt their copyrighted audio-visual works distributed on DVDs; and

12  others.  The stated purpose of the DVD CCA is to prevent illegal duplication of movies, thus

13  protecting the intellectual property of the manufacturers, producers and writers from theft.

14       The Studio parties to this action comprise Disney Enterprises, Inc., Paramount Pictures

15  Corp., Sony Pictures Entertainment, Inc., Twentieth Century Fox Film Corp., NBC Universal, Inc.,

16  Warner Bros. Entertainment, Inc., and Viacom, Inc.  Each is engaged in the business of making

17  motion pictures.  The Studios are members of the DVD CCA, as are many consumer electronics

18  companies and computer manufacturers.  There are twelve seats on the DVD CCA's board of

19  directors; six of them are held by representatives of various motion picture studios.

20  II.     RealDVD, the DVD CCA and the Studios

21       Beginning in 2007, Real sought to develop technology that would enable consumers to save

22  a secure copy of their DVDs to a hard drive for safekeeping, portability, easy retrieval and playback.

23  Real entered into a CSS license agreement with the DVD CCA on or about August 13, 2007, for the

24  purpose of obtaining the technology needed to enable its RealDVD product to play back encrypted

25  DVD content on personal computers.  RealDVD could save, play and manage backup copies of

26  DVDs owned by consumers.  Before Real released the first RealDVD product, Vegas, Real

27  approached various motion picture studios to notify them of the product and to explore mutual

28

United States District Court

For the Northern District of California

1   marketing opportunities.  Negotiations ensued with two studios, Fox and Paramount.  Ultimately,

2   Real was unable to come to an agreement with any motion picture studio.  According to a studio

3   representative, the Studios have never licensed any third party to offer a lawful product that would

4   allow the copying of DVDs onto hard drives.  The DVD CCA and the Studios assert that the CSS

5   license agreement, to which the Studios are signatories, prevents the Studios from entering into

6   individual licenses granting the right to make digital copies of DVDs.

7          The decision to develop RealDVD was based in part on a California trial court's ruling that

8   another provider of DVD management technology, Kaleidescape, Inc., did not violate the CSS

9   license agreement by marketing a product that stored DVD content on its servers.[3]  Unlike the high-

10  end Kaleidescape system, which could cost a consumer $10,000, Real intended to sell its Vegas

11  software for $50 (with an introductory price of $29.99).  The Studios had themselves been working

12  to develop a product that would allow consumers to manage digital copies of DVDs they purchased.

13  The "digital copy" that would be offered by a studio would take the form either of a separate, non-

14  CSS encrypted disk that could be copied or of delivery of a digital copy over the internet.

15         Real initially planned to launch Vegas upon the announcement of the product at a September

16  8, 2008, technology conference.  It made an ambitious and expensive public relations and

17  advertising effort to prepare for the launch.  Real subsequently delayed launch of Vegas to

18  September 30, 2008, while it attempted to address the Studios' concerns about the product.  It was

19  not as successful re-creating an atmosphere of public interest for the delayed launch.  On September

20  30, having failed to come to any agreement with any motion picture studio, Real launched Vegas.

21   III.   Procedural History

22         On September 30, 2008, Real brought an action in this court against the DVD CCA and the

23  Studios seeking a declaratory judgment that Real neither violated the Digital Millennium Copyright

24  Act, 17 U.S.C. §§ 1201 *et seq.*, ("DMCA") nor breached its CSS license agreement with the DVD

25  CCA by manufacturing and distributing its RealDVD product.  On the same day, the Studios brought

26  an action in the United States District Court for the Central District of California to enjoin Real from

27  manufacturing, distributing or otherwise trafficking in RealDVD.  The Studios alleged violation of

28

3

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  the DMCA and breach of contract.  The Central District case was transferred to this court where the

2  cases were related and consolidated.

3      Following an October 3, 2008, hearing, the court granted the Studios' requested Temporary

4  Restraining Order ("TRO") to restrain and enjoin Real from manufacturing, distributing or otherwise

5  trafficking in RealDVD or any substantially similar product.  Following stipulated extensions of the

6  TRO, the court held preliminary injunction hearings over five days in April and May 2009.

7  Numerous witnesses, including Real's CEO, Rob Glaser, testified.  On August 11, 2009, the court

8  entered a preliminarily injunction against RealDVD.  Docket No. 448 ("P.I. Order").[4]  The court

9  found, *inter alia*, that the Studios and the DVD CCA had demonstrated a strong likelihood of

10  success on their claims.  In the meantime, on May 14, 2009, Real filed a proposed Second Amended

11  Complaint ("SAC") that includes four new claims (collectively "the antitrust claims"): two claims of

12  a group boycott in violation of Section 1 of the Sherman Act; violation of California's Cartwright

13  Act; and violation of California's Unfair Competition Law based on antitrust violations.[5]  The

14  Studios and the DVD CCA now move the court to dismiss the antitrust claims.

15

16  LEGAL STANDARD

17      A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

18  sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Since Rule 12(b)(6) is

19  concerned with a claim's sufficiency rather than its substantive merits, when faced with a motion to

20  dismiss, courts typically courts "look only at the face of the complaint."  *Van Buskirk v. Cable News*

21  *Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  Allegations of material fact are taken as true and

22  construed in the light most favorable to the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80

23  F.3d 336, 337-38 (9th Cir. 1996).  The court need not, however, accept as true allegations that are

24  conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences.  *See*

25  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Clegg v. Cult Awareness*

26  *Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).  Nor must the court accept as true allegations that

27  contradict matters properly subject to judicial notice.  *Sprewell*, 266 F.3d at 988.

28

4

1      A court will grant a motion to dismiss if the plaintiff fails to plead "enough facts to state a

2   claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

3   A plaintiff's complaint may be dismissed either for failing to articulate a cognizable legal theory or

4   for not alleging sufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*,

5   901 F.2d 696, 699 (9th Cir. 1990).  In *Ashcroft v. Iqbal*, ___U.S. ___, ___, 129 S.Ct. 1937, 1950

6   (2009), the U.S. Supreme Court held that a court can "begin by identifying pleadings that, because

7   they are no more than conclusions, are not entitled to the assumption of truth.  While legal

8   conclusions can provide the framework of a complaint, they must be supported by factual

9   allegations.  When there are well-pleaded factual allegations, a court should assume their veracity

10  and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

11

12  DISCUSSION

13      The Studios and the DVD CCA argue that Real's antitrust claims must be dismissed because

14  (1) Real fails to allege any anticompetitive conduct that is the cause-in-fact of an injury to Real, and

15  (2) Real's allegations of an antitrust conspiracy fail to meet the pleading requirements of Federal

16  Rule of Civil Procedure 8 as articulated in *Twombly* and *Iqbal*.[6]  Real contends that its complaint

17  more than adequately alleges an actionable antitrust conspiracy.

18  I.      Materials Upon Which the Court May Rely in Deciding This Rule 12(b)(6) Motion

19      Real asserts that the court should restrict the present inquiry to the face of Real's complaint,

20  contending that the Studios' motion relies upon materials outside the proper scope of inquiry on a

21  Rule 12 motion.  A motion to dismiss is typically filed before discovery has taken place.  In the case

22  at bar, however, the parties have taken scores of depositions and filed myriad declarations.  The

23  court conducted a bench trial involving numerous exhibits and fact and expert witnesses for the

24  purpose of determining whether a preliminary injunction should issue.  The court's preliminary

25  injunction order included over nineteen pages of factual findings.

26      A court deciding a Rule 12(b)(6) motion can take judicial notice of matters of public record.

27  *See Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995); *see generally* Fed. R. Evid. 201.  Such

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  public records include admissions made by a party in the record of a related proceeding such as a

2  preliminary injunction proceeding.  *See In re Am. Continental Corp./Lincoln Sav. & Loan Sec.*

3  *Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996), *rev'd on other grounds by*, *Lexecon Inc. v. Milberg*

4  *Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  To the extent Real objects to the Studios'

5  references to admissions made at trial and duly recorded in the public record, or uncontested

6  declarations, Real's objection is spurious.[7]  On the other hand, a party might in some cases object to

7  a court's reliance upon its own findings of fact, as such, made in connection with a preliminary

8  injunction order where those findings have determined only probabilities that the necessary facts can

9  be proved.  *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984)

10  ("[T]he injunction is not a preliminary adjudication on the ultimate merits: it is an equitable device

11  for preserving rights pending final resolution of the dispute.  The district court is not required to

12  make any binding findings of fact; it need only find probabilities that the necessary facts can be

13  proved.").  On the instant Rule 12(b)(6) motion, the court does not rely upon its findings of fact from

14  the preliminary injunction hearing, as such, as it is unnecessary to do so.  The court will take judicial

15  notice of admissions and concessions already made in this action; no rule of procedure requires a

16  court to pretend these do not exist.

17  II.        Failure to Allege an Injury Caused by Anticompetitive Behavior

18         The Studios argue that any injury to Real has been caused by Real's own illegal behavior and

19  the court's resulting injunction, rather than any anticompetitive behavior.  Section 4 of the Clayton

20  Act authorizes suits by a private individual to enforce the Sherman Act where such individual has

21  been "injured in his business or property by reason of anything forbidden in the antitrust laws."

22  15 U.S.C. § 15(a).  A private plaintiff must have "antitrust standing," which requires, among other

23  things, "a showing of antitrust injury, i.e., injury of the type the antitrust laws were intended to

24  prevent and that flows from that which makes defendants' acts unlawful."  *Knevelbaard Dairies v.*

25  *Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (quoting *Atl. Richfield Co. v. USA Petroleum*

26  *Co.*, 495 U.S. 328, 334 (1990)) (internal quotation marks omitted).  The only harm alleged by Real is

27  the delay of its product launch.  *See* Docket No. 325-1 ("SAC") ¶¶ 110-12.  Real initially planned to

28

6

United States District Court
For the Northern District of California

1  launch its Vegas product on September 8, 2008. *Id.* ¶ 110.  Real decided to delay the launch of the

2  product until September 30, 2008, "while it attempted to address the Studio Defendants' concerns

3  regarding the product[.]" *Id.*  The product was launched on September 30, but the sale and

4  distribution of RealDVD was enjoined days later by the court's TRO.

5         The ongoing delay in marketing RealDVD results from the TRO and preliminary injunction

6  entered by this court.  Any assertion by Real that the Studios' refusal to license the copying of

7  DVDs caused an antitrust injury apart from the delay resulting from the injunctive relief is

8  contradicted by Real's assertions that it believed no license was necessary. *See* SAC ¶ 46

9  ("RealNetworks believed then, as it does now, that a consumer who had purchased, for example, an

10  *Iron Man* DVD, does not need further permission from Paramount to copy that DVD onto her hard

11  drive so as to get the benefit of additional features that can only be provided by the saving to a hard

12  drive.");[8] Hearing Tr. (Glaser) at 472:3-9 ("Q: Did you think you needed Viacom or any other

13  studios' permission to launch the product?  A: Not the product, the Vegas RealDVD product,

14  version 1. . . . [T]here would be things that would be useful to work with them collaboratively on,

15  but not for the basic product, no."); *see also* SAC ¶ 81.  Indeed, having failed to come to any

16  arrangement with the Studios, on September 30, 2008, Real simply began selling RealDVD. *See id.*

17  ¶ 110.  Real did not believe a license was required and indeed launched its product without having

18  obtained any license.  The distribution of its product has been disrupted only by the entry of a TRO,

19  and later a preliminary injunction, by this court.  Real's injury resulted from that relief, which was

20  necessitated by Real's own possibly unlawful conduct.  To the extent the Studios cooperated with

21  one another and the DVD CCA to petition this court for relief, such cooperation unambiguously falls

22  within the *Noerr-Pennington* exception to liability under the antitrust statutes. *See generally Theme*

23  *Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008).

24         Real does not seriously dispute that the harm it has experienced flows, in the first instance,

25  from the injunction; however, Real argues that the harm was in some sense caused by the Studios'

26  collective agreement not to license a technology that would allow the copying of CSS-encrypted

27  technology.  The court understands Real's argument, stated in its most coherent form, to run as

28

7

1  follows: (1) there is a "cartel" agreement that is illegal under the antitrust laws and should be held

2  unenforceable; (2) in the absence of the agreement, RealDVD's copying of CSS-encrypted DVDs

3  would not violate the DMCA; (3) if RealDVD did not appear to violate the DMCA, it would not be

4  subject to a preliminary injunction; (4) the illegal agreement therefore caused injury to Real by

5  making Real's activities subject to a preliminary injunction under the DMCA; and (5) accordingly,

6  Real has antitrust standing to challenge the "cartel" agreement under the antitrust laws.  Apart from

7  the circularity of the argument, there are at least two fatal problems with Real's position.

8         Firstly, Real's argument makes sense only if the relevant market for purposes of the antitrust

9  analysis is restricted specifically to technologies that copy content from CSS-encrypted disks,

10  because the alleged anticompetitive agreement does not compel any studio to distribute its content

11  exclusively on CSS-protected DVDs.  Real's product saves and manages digital copies of movies,

12  and Real has made no allegation that individual Studios have refused to negotiate individual licenses

13  for digital copies of their movies.  Nor does Real dispute that companies such as Apple and Amazon

14  have negotiated arrangements with various motion picture studios to distribute copyrighted content

15  through their services.  The "cartel" alleged by Real has purportedly denied Real and consumers

16  access to an encryption system, CSS, that protects DVDs from copying, but this has nothing to do

17  with Real's opportunity to license the Studios' content.   Real attempts to overcome this flaw in its

18  theory by asserting that its target market is specifically the market for copying CSS-encrypted DVDs

19  already owned by consumers. Yet this is not what Real's complaint alleges.  According to the

20  complaint, "The relevant product market is the provision of technology that enables consumers to (a)

21  create *or otherwise obtain* digital copies of movies and TV shows that they own on DVDs and (b)

22  store and manage those copies electronically (e.g., on a hard drive) for subsequent playback."  SAC

23  ¶ 99 (emphasis added).  This market definition is not restricted to the market for copying CSS-

24  encrypted DVDs.  Indeed, Real's allegations pertaining to the Studios' anticompetitive conduct

25  would make no sense were the market definition so limited.  Real alleges that the Studios are

26  capturing the market themselves through distribution of their own "Digital Copy" products.  *Id.*

27  ¶ 112.  Yet these are described as products in which a DVD is sold with an additional disk

28

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1  containing the content but no CSS encryption. *Id.* ¶ 103.  By the complaint's own terms, Real's

2  target market is not one requiring the copying of CSS-encrypted disks but one allowing consumers

3  to obtain and manage digital copies. *See also* Hearing Tr. (Glaser) at 537:5-10 ("So the primary

4  point isn't to make an extra copy.  The primary point is to get extra value out of that material. . . .

5  The copying is a side effect of what we have to do in order to add value.");[9] Docket No. 449 (Opp. to

6  DVD CCA's Mot.) at 4:11-13 ("RealNetworks alleges that the DVD CCA and its Studio members

7  have conspired to deprive RealNetworks of an input (copyrighted content) essential to competition

8  in the relevant market[.]").  There is no allegation that Real is not at full liberty to negotiate

9  individual agreements with motion picture studios to license their content in the form of non-CSS

10  encrypted digital copies.

11      Secondly, the court has found the Studios likely to prevail on their claim that RealDVD

12  circumvents ARccOS or RipGuard, non-CSS copy control measures used on DVDs, in violation of

13  the DMCA's copy control section. *See* P.I. Order ¶ 111.  Even if Real had an unlimited right to

14  circumvent CSS encryption, the sale of its product would nevertheless be enjoined because of the

15  circumvention of ARccOS and/or RipGuard.  Real's purported injury stems from its own decision to

16  manufacture and traffic in a device that is almost certainly illegal under the DMCA.

17      Real relies upon *Memorex Corp. v. International Business Machines*, 555 F.2d 1379 (9th Cir.

18  1977), for the proposition that illegality is not a defense to an antitrust claim.  In that case, the court

19  held that a party who stole trade secrets could nevertheless maintain an antitrust cause of action. *Id.*

20  at 1382-83.  This court need not here reconcile *Memorex* and the authorities cited by the Studios for

21  the proposition that illegality is a defense to antitrust claims. *See, e.g.*, *Modesto Irrigation Dist. v.*

22  *Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156 (N.D. Cal. 2004) (Patel, J.), *aff'd*, 158 Fed. Appx. 807;

23  *Pearl Music Co., Inc. v. Recording Indus. Ass'n of Am.*, 460 F. Supp. 1060 (C.D. Cal. 1978).  The

24  court does not here hold that Real is barred from maintaining an antitrust claim because it has

25  engaged in illegal activity; rather, the court holds that Real has failed to allege a plausible antitrust

26  injury.  Even if Real were free to circumvent CSS technology, RealDVD would have been enjoined

27

28

9

United States District Court

For the Northern District of California

1   due to its circumvention of non-CSS encryption devices.[10]  Real alleges no viable antitrust injury and

2   therefore does not have standing to bring a private claim under the Sherman Act.[11]

3

4   III.       Failure to Plead a Plausible Antitrust Conspiracy

5          Even if Real had antitrust standing, its complaint would be dismissed because Real has failed

6   to meet the Rule 8 notice pleading standard.  It is important first to note what Real does not allege or

7   contest.  Real declines to directly challenge the creation and operation of the DVD CCA or the

8   existence of the CSS license as such.  Nor does Real dispute the Studios' contention that the CSS

9   system was developed for the legitimate purpose of protecting each content-provider's copyrighted

10  content. *See 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D.

11  Cal. 2004) (Illston, J.) ("It is evident to this Court, as it has been to previous courts, that CSS is a

12  technological measure that both effectively controls access to DVDs and effectively protects the

13  right of a copyright holder."); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 436-37 (2d Cir.

14  2001) (discussing development of CSS in context of initial marketing of DVDs).  Nor does Real

15  make any allegation that the Studios rejected any realistic and more competition-enhancing

16  alternative system to pursue the legitimate goal of preventing unauthorized copying.  Nor does Real

17  allege that any of the Studios actually possessed the right to license to anyone a right to copy CSS-

18  encrypted DVDs.[12]  Nor, critically, does Real allege that the CSS license agreement, or any other

19  agreement, compels a studio to distribute its content on CSS-protected DVDs, as noted above.[13]

20         Some of the missing allegations listed above simply cannot be made without contradicting

21  admissions already on the record in this case.  Whatever the reason for failing to connect the dots,

22  Real's complaint does not meet the pleading standard articulated in *Twombly* and subsequent cases.

23  A necessary element of a "restraint of trade" claim under Section 1 of the Sherman Act is the

24  existence of a contract, combination or conspiracy. *William O. Gilley Enter., Inc. v. Atl. Richfield

25  Co.*, 561 F.3d 1004, 1010 (9th Cir. 2009).  The Studios trade in movies, not encryption software.

26  *See* SAC ¶¶ 9-15.  Where there is no allegation that the Studios have entered into an exclusive

27  agreement to distribute their movies only on CSS-encrypted DVDs, the CSS license cannot plausibly

28
                                                    10

be an illegal restraint of trade.[14] *See Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 620 F.2d 930, 935-36 (2d Cir. 1980) (holding opportunity to pool rights to musical pieces not an illegal restraint of trade where alternative opportunities to acquire individual rights is fully available).

Nor does the complaint allege enough specific facts to state a claim for a Section 1 violation under a group boycott theory. The complaint's antitrust allegations consist largely of conclusory assertions and legal conclusions. Offering a conclusory assertion that a conspiracy existed is insufficient; a party must allege enough facts to nudge its claim across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 570; *accord Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("There are no facts alleged to support [the conclusion that a conspiracy existed]. Even after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?") (internal citation omitted). Real hangs its hat on exactly one allegation:

> The negotiations for a potential solution and a business deal went the furthest with Paramount. RealNetworks and Paramount exchanged numerous term sheets, and had even agreed upon preliminary dollar amounts to enter into a marketing arrangement whereby Paramount would include Vegas on its DVDs and receive some payment in return. At the last minute, however, Paramount indicated that it was not prepared to break with the Studio cartel without substantial compensation for doing so. The compensation demanded by Paramount was an exorbitant sum, not at all tethered to the business value of the deal under negotiation.

SAC ¶ 74. According to Real, the "specifics" contained in this allegation nudge the complaint over the line from conceivable to plausible.[15] Real errs. As to the "exorbitant sum" allegedly demanded by Paramount, this allegation suggests a dispute over (some unspecified) price but does not plausibly give rise to an inference of an antitrust conspiracy. As to the reference to "the Studio cartel," Real fails to allege any facts that would turn this legal conclusion into a plausible factual allegation. Notably, the word "cartel" is not in quotation marks in the complaint and is not alleged to have actually been uttered by any person alleged to have been an agent of Paramount.[16] Construing the complaint's allegation in the light most favorable to Real, the court cannot find that Real's vague statements and legal conclusions amount to a plausible antitrust claim.

IV.   Leave to Amend

11

1    The complaint will be dismissed.[17]  Real has requested leave to amend in the event that the

2  motions to dismiss are granted.  The court should freely give leave to amend pleadings when justice

3  so requires.  Fed. R. Civ. P. 15(a)(2).  In assessing the propriety of a motion for leave to amend, the

4  court considers five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party;

5  (4) futility of amendment; and (5) whether the plaintiffs have previously amended their pleading.

6  *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (citing *Bonin v. Calderon*, 59 F.3d 815, 845

7  (9th Cir. 1995)).  Although the policy of freely granting leave to amend is to be applied with extreme

8  liberality, *Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation

9  omitted), futility alone can justify the denial of a motion for leave to amend, *Nunes*, 375 F.3d at 808.

10  In this case, granting leave to amend would sanction an exercise in futility.  Even if Real could,

11  consistent with Federal Rule of Civil Procedure 11, allege additional facts to support its conspiracy

12  allegations, the lack of an actionable antitrust injury dooms Real's antitrust claims.  The only injury

13  Real has suffered in connection with its RealDVD product is the delay in the product's release and

14  accompanying lost profits.  This delay is a result of this court's decision to enjoin the distribution of

15  a product which the court has found likely to violate federal law and to breach the terms of Real's

16  license agreement with the DVD CCA.  Moreover, even if Real had the unimpeded right to copy

17  CSS-protected DVDs, its product would nevertheless be subject to an injunction because it

18  circumvents non-CSS copyright protection technologies.  In the circumstances of this case, there is

19  no allegation Real could make that would give it antitrust standing even if it could otherwise plead a

20  plausible claim under Rule 8.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

12

*United States District Court*
For the Northern District of California

1   ///

2   ///

United States District Court

For the Northern District of California

13

CONCLUSION

For the foregoing reasons, defendants'/counter-complainants' motions to dismiss are GRANTED.  Declaratory judgment plaintiff's claims for violations of the federal Sherman Act, the California Cartwright Act and the California Unfair Competition Law are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated: January 6, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court
For the Northern District of California

14

**United States District Court**
For the Northern District of California

**ENDNOTES**

1.      Unless otherwise indicated, the background facts derive from the allegations of Real's Second Amended Complaint.  *See* Docket No. 325-1 ("SAC").

2.      "DVD" stands for "Digital Versatile Disk."  These five-inch disks store data in digital form and are commonly used to record full-length movies.  *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 245 (2004).

3.      In the meantime, the California Court of Appeal has reversed the trial court's decision.  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697 (2009).

4.      Unless otherwise indicated, citations to docket entries in this order refer to the docket in the declaratory judgment action brought by Real, Case No. C 08-4548.

5.      Real asserted its antitrust claims both in its Second Amended Complaint and as "counterclaims to the counterclaims" of the DVD CCA, a defendant in the declaratory judgment action.  *See* Docket No. 323 (Answer and Counterclaims to Counterclaims).  For the purposes of this motion, the court considers the later-filed Second Amended Complaint, which contains the same antitrust claims, to be the operative pleading of Real's antitrust claims against the Studios and the DVD CCA.

6.      Defendants also invoke the *Noerr-Pennington* doctrine, arguing that all of the alleged cooperation among the Studios, including the alleged "collective refusal to deal" prior to the filing of litigation, comprised protected petitioning activity.  Because the court rules on other grounds, it is unnecessary to reach the issue of the precise extent to which the specific pre-litigation conduct alleged in the complaint constituted protected petitioning activity.

7.      Notably, Real's complaint itself references testimony from the preliminary injunction trial.  *See* SAC ¶¶ 51-53.  Pursuant to the doctrine of incorporation, a district court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)). Even if the trial transcript were not judicially noticeable under Federal Rule of Evidence 201, Real's citations to it arguably incorporate it by reference.

8.      Although Real couches the issue as an abstract question of a consumer's right to make a fair use copy, the allegations of the complaint pertain specifically to the use of RealDVD.  To be clear, the question of whether a consumer has a right to make a fair use copy of a DVD she has purchased—whatever the legality of trafficking in a device that would help her to do so—is not presented on this motion and is not addressed by the court.

9.      The court notes that this response was elicited in cross examination, not direct examination as the Studios' papers assert.  *See* Docket No. 477 (Studios' Reply) at 3.

10.      The case of *PrimeTime 24 Joint Venture v. National Broadcasting Co., Inc.*, 219 F.3d 92 (2d Cir. 2000), to which Real cites, is inapposite.  In *PrimeTime*, a provider of satellite television services alleged that broadcasters engaged in a concerted refusal to license copyrighted content.  *Id.* at 103.  In this case, there is no allegation that the individual motion picture studios have refused to license their content to Real.  There is also no allegation that CSS encryption technology is copyrighted content of the Studios.

11.      The court rejects any suggestion that Real's voluntary delay in launching its product from September 8, 2008, to September 30, 2008, constitutes an antitrust injury separate from the delay caused by this court's injunctive relief.  First, Real voluntarily made the decision to delay the product for three

**United States District Court**

For the Northern District of California

weeks.  Second, Real maintains it believed no license from the Studios was necessary to launch RealDVD and, indeed, simply launched the product on September 30 without any license.  Third, RealDVD would just as surely have been subject to an injunction if launched on September 8 as it was when launched on September 30.

12.     The Studios are themselves CSS licensees.  Undisputed evidence in the record shows that Matsushita Electrical Industrial Company Ltd. and Toshiba Corporation owned the underlying intellectual property for CSS and granted a royalty-free license to the DVD CCA to be the sole licensor and administrator of CSS technology.  *See* Hearing Tr. (King) at 86:12-87:7; 89:9-90:1; 98:10-99:17; Docket No. 199-5 (Pak Dec.), Exh J.  Like Real, the owners of content distributed on CSS-encrypted DVDs are CSS licensees.  Pak Dec. ¶ 2.

13.     Indeed, the Studios receive revenues of hundreds of millions of dollars each year through dissemination of their content via internet downloads and video-on-demand and pay-per-view services.  *See* Case No. C 08-4719, Docket No. 6 (Dunn Dec.) ¶¶ 14-16.

14.     Real's first "group boycott" cause of action is subtitled "Construction of the CSS License Agreement" and suggests that the Studios' and DVD CCA's purportedly incorrect interpretation of the licensing agreement amounted to a group boycott.  *See* SAC ¶ 128.  Real appears to have abandoned this theory, presumably in light of court's intervening preliminary injunction order.

15.     Real audaciously asserts in the alternative that it need not meet the Rule 8 pleading requirement as articulated in *Twombly* and *Iqbal* because its allegation of Paramount's reference to "the Studio cartel," if true, provides direct evidence of a conspiracy.  Real relies on the pre-*Twombly* case of *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594-95 (1988), and subsequent pre-*Twombly* Ninth Circuit cases for the proposition that the plausibility of its allegations is irrelevant if it alleges direct, as opposed to circumstantial, evidence of a conspiracy.  Real is incorrect.  First, a perusal of the cases reveals that this is not their holding.  Second, there is no authority for the proposition that Rule 8, as interpreted in *Twombly* and *Iqbal*, applies to every other litigant in the federal courts, but not Real.

16.     Real misleadingly writes in its opposition brief: "RealNetworks alleges specifically that a major motion picture studio (Paramount) said that it would break with a 'cartel' that included the other Studio defendants only if RealNetworks paid it an exorbitant sum to do so.  SAC ¶ 74."  Opp. to Studios' Mot. at 16:13-15.  By placing the word "cartel" in quotation marks, Real suggests that it alleged someone specifically used that term.  In fact, Real was only quoting itself.  It chose to use the world "cartel" (without quotation marks) in its complaint.  Without any reference to actual words spoken by an actual speaker, the use of the word can only be construed as a legal conclusion, not a factual allegation.
       When pressed on this point at oral argument, Jonathan M. Jacobson, counsel for Real, stated: "I'm telling you right now in open court that the phrase used by the Paramount representative was quote 'I'll require blood money to break the cartel.'  All right.  If we have to file amended pleading we can put that quotation in, but I'm telling you right now it's not a paraphrase, it's not an inference, it's direct evidence . . . ."  Docket No. 482 (MTD Hearing Tr.) at 36:6-11.  Even if an amendment of Real's pleading to include specifics concerning such a quotation could enable Real to plead a plausible antitrust conspiracy, which the court doubts, the amendment would not cure Real's lack of an antitrust injury.

17.     The parties are in agreement that Real's state law claims survive or fall with the federal Sherman Act claims.  *See* Opp. to Studios' Mot. at 24:15-18.  The four antitrust claims are dismissed as to both the Studios and the DVD CCA, because the court's discussion applies with equal force to the DVD CCA as to the Studios.  Nothing in the complaint alleges actions by the DVD CCA inconsistent with its role as the licensor of CSS encryption technology.  The complaint alleges that the Studios "us[e] the DVD CCA to impede or thwart the efforts of firms like RealNetworks to develop and distribute products that would permit them to compete in the relevant market," SAC ¶ 117, but the complaint does not allege

1    any specific action taken by the DVD CCA other than administering the CSS licensing agreement,
     which Real does not directly challenge. Notably, when Real applied to the DVD CCA for a CSS
2    license, a license was granted. *Id.* ¶ 24.

**United States District Court**

For the Northern District of California

17